# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

HARMONY BIOSCIENCES, LLC, et al.,

        Plaintiffs,

    v.

LUPIN LIMITED, et al.,

        Defendants.

C.A. No. 23-1286-JLH

(Consolidated)

REDACTED - PUBLIC VERSION
Original filing date: January 14, 2026
Redacted filing date: March 4, 2026

## EXHIBIT 1
## JOINT STATEMENT OF UNCONTESTED FACTS

CONFIDENTIAL

## TABLE OF CONTENTS

I.      THE PARTIES ....................................................................................................... 1

     A.      **Plaintiffs Harmony Biosciences, LLC, Harmony Biosciences Management, Inc., Bioprojet Société Civile de Recherche, and Bioprojet Pharma SAS** ............................................................ 1

     B.      **Defendants AET Pharma US, Inc.; Hikma Pharmaceuticals USA Inc.; MSN Pharmaceuticals Inc. and MSN Laboratories Private Limited; and Novitium Pharma LLC** ........................................... 1

II.     BACKGROUND ................................................................................................... 2

     A.      **Polymorphism** ....................................................................................... 2

     B.      **Analytical Techniques for Identifying Solid State Forms** ................. 3

III.    WAKIX® ............................................................................................................... 3

IV.     U.S. PATENT NOS. 8,486,947 AND 8,207,197 AND ASSERTED CLAIMS ............... 4

     A.      **U.S. Patent No. 8,486,947** ................................................................... 4

     B.      **U.S. Patent No. 8,207,197** ................................................................... 7

V.      AET'S ANDA AND ANDA PRODUCTS ............................................................ 9

VI.     HIKMA'S ANDA AND ANDA PRODUCTS ...................................................... 10

VII.    MSN'S ANDA AND ANDA PRODUCTS ........................................................... 14

VIII.   NOVITIUM'S ANDA AND ANDA PRODUCTS ............................................... 15

IX.     LITIGATION ...................................................................................................... 17

X.      DOCUMENTS .................................................................................................... 20

XI.     ADDITIONAL FACTS ....................................................................................... 36

CONFIDENTIAL

## I. THE PARTIES

### A. Plaintiffs Harmony Biosciences, LLC, Harmony Biosciences Management, Inc., Bioprojet Société Civile de Recherche, and Bioprojet Pharma SAS

1. Plaintiff Harmony Biosciences Management, Inc. ("HBMI") is a corporation organized and existing under the laws of the State of Delaware, having a place of business at 630 W Germantown Pike, Suite 215, Plymouth Meeting, PA 19462, USA.

2. Plaintiff Harmony Biosciences, LLC (collectively with Harmony Biosciences Management, Inc., "Harmony") is a limited liability company that is a wholly owned subsidiary of HBMI, organized and existing under the laws of the State of Delaware, and having a place of business at 630 W Germantown Pike, Suite 215, Plymouth Meeting, PA 19462, USA.

3. Plaintiff Bioprojet Société Civile de Recherche ("Bioprojet SCR") is an independent, privately owned company organized and existing under the laws of France, having a place of business at 7, rue Rameau, 75002, Paris, France.

4. Plaintiff Bioprojet Pharma (collectively with Bioprojet SCR, "Bioprojet") is a wholly owned subsidiary of Bioprojet SCR, existing under the laws of France, having a place of business at 9, rue Rameau, 75002, Paris, France.

5. Plaintiffs Harmony and Bioprojet are collectively referred to herein as "Plaintiffs."

### B. Defendants AET Pharma US, Inc.; Hikma Pharmaceuticals USA Inc.; MSN Pharmaceuticals Inc. and MSN Laboratories Private Limited; and Novitium Pharma LLC

6. Defendant AET Pharma US, Inc. ("AET") is a corporation organized and existing under the laws of the State of Delaware, having a principal place of business at 9841 Washingtonian Boulevard, Suite 200, Gaithersburg, Maryland 20878.

CONFIDENTIAL

7.      Defendant Hikma Pharmaceuticals USA Inc. ("Hikma") is a corporation organized and existing under the laws of the State of Delaware, having a principal place of business at 200 Connell Drive, Suite 4100, Berkeley Heights, New Jersey 07922.

8.      Defendant Hikma was substituted for previous defendants Zenara Pharma Private Limited and Biophore India Pharmaceuticals Private Limited (collectively "Zenara") on March 31, 2025. C.A. 23-1286, D.I. 261.

9.      Defendant MSN Pharmaceuticals Inc. is a corporation organized and existing under the laws of the State of Delaware, having its principal place of business at 20 Duke Road, Piscataway, New Jersey 08854.

10.     Defendant MSN Laboratories Private Limited (collectively with MSN Pharmaceuticals Inc., "MSN") is a Private Limited company organized and existing under the laws of India, having its principal place of business at MSN House, Plot No.: C-24, Industrial Estate, Sanathnagar, Hyderabad – 18 Telangana, India. MSN Pharmaceuticals Inc. is a wholly owned subsidiary of MSN Laboratories Private Limited.

11.     Defendant Novitium Pharma LLC ("Novitium") is a limited liability company organized and existing under the laws of the State of Delaware, having a principal place of business at 70 Lake Drive, East Windsor, New Jersey 08520.

12.     Defendants AET, Hikma, MSN, and Novitium are collectively referred to herein as "Defendants."

## II.    BACKGROUND

### A.    Polymorphism

13.     Many compounds are known to exist in more than one distinct crystalline form. When such crystal forms have the same chemical composition, the compounds are said to exhibit "polymorphism," with the different forms called "polymorphs," each having a distinct structure.

2

CONFIDENTIAL

### B.    Analytical Techniques for Identifying Solid State Forms

14.    XRPD is a common analytical technique that relies on the scattering patterns of X-rays caused by the regularly repeating structure of crystals. When an X-ray beam hits an atom, the electrons around the atom start to oscillate with the same frequency as the incoming beam. As a result of this process, the X-rays are scattered in a characteristic pattern that reflects the interatomic spacing between atoms in the crystal.

15.    Conducting an XRPD analysis results in a "diffraction pattern" that is directly related to the crystal structure of the substance of interest. The X-ray diffraction pattern may be considered a "fingerprint" of the particular polymorphic form of the crystal being examined.

16.    The XRPD pattern generated provides a unique signature that is inherent to the crystalline form being investigated, and can be used to distinguish the given polymorphic form from other polymorphic forms of the substance.

## III.    WAKIX®

17.    HBMI is the holder of New Drug Application ("NDA") No. 211150 for WAKIX® ("WAKIX"), which has been approved by the U.S. Food and Drug Administration ("FDA").

18.    The FDA first approved WAKIX on August 14, 2019 for the treatment of excessive daytime sleepiness in adult patients with narcolepsy.

19.    The FDA approved WAKIX on October 13, 2020 for the treatment of cataplexy in adult patients with narcolepsy.

20.    WAKIX is indicated for the treatment of excessive daytime sleepiness (EDS) or cataplexy in adult patients with narcolepsy, and for the treatment of excessive daytime sleepiness (EDS) in pediatric patients 6 years of age and older with narcolepsy.

21.    According to the Orange Book entries for WAKIX®, pitolisant hydrochloride is listed as the active ingredient in WAKIX® in crystalline form.

CONFIDENTIAL

22.    The chemical formula of pitolisant hydrochloride is included in Section 11 of the WAKIX Prescribing Information.

23.    Harmony's NDA alleges that pitolisant hydrochloride is an antagonist/inverse agonist of the histamine-3 ($H_3$) receptor.

24.    WAKIX is available in film-coated tablets containing 5 mg or 20 mg of pitolisant hydrochloride (equivalent to 4.45 mg or 17.8 mg of pitolisant free base, respectively).

25.    WAKIX was granted orphan drug exclusivity for the treatment of EDS in adult patients with narcolepsy and for the treatment of cataplexy in adult patients with narcolepsy.

26.    WAKIX's orphan drug exclusivity for the treatment of EDS in adult patients with narcolepsy expires on August 14, 2026.

27.    WAKIX's orphan drug exclusivity for the treatment of cataplexy in adult patients with narcolepsy expires on October 13, 2027.

## IV.    U.S. PATENT NOS. 8,486,947 AND 8,207,197 AND ASSERTED CLAIMS

28.    The Asserted Patents are U.S. Patent Nos. 8,486,947 (the "'947 Patent) and 8,207,197 (the "'197 Patent").

29.    Bioprojet SCR is the assignee and owner of the Asserted Patents.

30.    Harmony is the exclusive licensee of the Asserted Patents.

31.    The Asserted Patents are listed in connection with WAKIX in the Orange Book.

32.    The Orange Book lists the expiration date of the '947 Patent as September 26, 2029.

33.    The Orange Book lists the expiration date of the '197 Patent as March 7, 2030.

### A.    U.S. Patent No. 8,486,947

34.    The '947 Patent is entitled "Treatment of Parkinson's Disease, Obstructive Sleep Apnea, Dementia with Lewy Bodies, Vascular Dementia with Non-Imidazole Alkylamines Histamine $H_3$-Receptor Ligands."

**CONFIDENTIAL**

35.    The '947 Patent issued on July 16, 2013 from U.S. Patent Application No. 11/909,778 ("the '778 application"), which was filed on September 26, 2007 as the U.S. national phase of International Patent Application No. PCT/IB2006/000739, filed March 30, 2006.

36.    The '778 application also claims priority to U.S. Provisional Patent Application No. 60/668,618, filed on April 6, 2005, and to European Patent Application EP 05290727, filed on April 1, 2005.

37.    The '947 Patent lists Jean-Charles Schwartz and Jeanne-Marie Lecomte as inventors and is assigned on its face to Bioprojet.

38.    The '947 Patent has been awarded 1276 days of Patent Term Adjustment (PTA) under 35 U.S.C. § 154(b). According to the FDA's "Approved Drug Products with Therapeutic Equivalence Evaluations" (the "Orange Book"), the '947 Patent will expire on September 26, 2029.

39.    Plaintiffs are asserting claim 13 of the '947 Patent.

40.    Claim 1 of the '947 Patent recites the following:

> 1. A method for treating excessive daytime sleepiness comprising administering to a patient in need thereof a compound of formula (IIa):
>
> $$R^1 \diagdown \\ N - (\text{chain } A^{II}) - X^{III} - (\text{chain } B^{II}) - Y^{II} \qquad (IIa) \\ R^2 \diagup$$
>
> wherein:
>     $R^1$ and $R^2$ form together with the nitrogen atom to which they are attached a saturated nitrogen-containing ring

**CONFIDENTIAL**

i)

$$N \quad (CR^aR^b)_m$$

with m ranging from 2 to 8, or

    $R^{a-b}$ being independently a hydrogen atom or a linear or branched alkyl group containing 1 to 6 carbon atoms, and

the chain $A^{II}$ selected from an unbranched alkyl group —$(CH_2)_{nII}$— where $n_{II}$ is 3 ;

the group X" is —O—;

the chain $B^{II}$ is an unbranched alkyl comprising 3 carbon atoms; and

the group $Y^{II}$ represents a phenyl group, unsubstituted or mono- or polysubstituted with one or more identical or different substituents selected from halogen atoms, $OCF_3$, CHO, $CF_3$, $SO_2N(alkyl)_2$, $NO_2$, S(aryl), $SCH_2$ (phenyl), an unbranched or branched alkene, an unbranched or branched alkyne optionally substituted with a trialkylsilyl radical, —O (alkyl), —O(aryl), —$CH_2CN$, a ketone, an aldehyde, a sulphone, an acetal, an alcohol, a linear or branched alkyl group containing 1 to 6 carbon atoms, —CH=CH—CHO, —C(alkyl) =N—OH, —C(alkyl)=N—O(alkyl), —CH=NOH, —CH=NO(alkyl), —C(alkyl)=NH—NH—$CONH_2$, an O-phenyl or —$OCH_2$(phenyl) group, —C(cycloalkyl)=NOH, —C(cycloalkyl)=N—O(alkyl);

or its pharmaceutically acceptable salts, hydrates, or hydrated salts, or the polymorphic crystalline structures of these compounds or their optical isomers, racemates, diastereoisomers or enantiomers, wherein said patient is suffering from Parkinson's disease, narcolepsy, or sleep apnea.

41.    Claim 13 of the '947 Patent recites the following:

    The method according to claim 1, wherein the compound is selected from 3-(4-chlorophenyl)propyl-3-piperidinopropyl ether, or its pharmaceutically acceptable salts, hydrates, or hydrated salts, or the polymorphic crystalline structures of this compound or its optical isomers, racemates, diastereoisomers or enantiomers.

42.    A certificate of correction issued by the U.S. Patent and Trademark Office dated July 16, 2013, corrects the spelling of the compound in claim 13 of the '947 Patent to "3-(4-chlorophenyl)propyl 3-piperidinopropyl ether."

43.    The compound "3-(4-chlorophenyl)propyl 3-piperidinopropyl ether" is pitolisant.

**CONFIDENTIAL**

44.    Pitolisant is a compound of formula IIa (as defined by claim 1 of the '947 Patent, on which claim 13 depends).

**B.    U.S. Patent No. 8,207,197**

45.    The '197 Patent is entitled "Monohydrochloride Salt of 1-[3-[3-(4-Chlorophenyl) Propoxy]Propyl] -Piperidine."

46.    The inventors listed for the '197 Patent are: Manuel Raga, Juan Sallares, Marta Guerrero, Antonio Guglietta, Jean-Michel Arrang, Jean-Charles Schwartz, Holger Stark, Walter Schunack, Xavier Ligneau, Jeanne-Marie Lecomte, and Charon Ganellin.

47.    The '197 Patent issued on June 26, 2012 from U.S. Patent Application No. 11/815,736, which was filed on March 27, 2008 as the U.S. national phase of International Patent Application No. PCT/EP2006/050703, filed February 6, 2006.

48.    The '197 Patent states on the cover that one of its priority documents is European Patent Application No. 05100942, filed on February 10, 2005.

49.    The '197 Patent lists Manuel Raga, Juan Sallares, Marta Guerrero, Antonio Guglietta, Jean-Michal Arrang, Jean-Charles Schwartz, Holger Stark, Walter Schunack, Xavier Ligneau, Jeanne-Marie Lecomte, and Charon Ganellin as inventors.

50.    Plaintiffs are asserting claims 1 and 2 of the '197 Patent (the "Asserted Claims").

51.    Claim 1 of the '197 Patent recites the following:

CONFIDENTIAL

1. Crystalline 1-[3-[3-(4-chlorophenyl)propoxy]propyl]-piperidine monohydrochloride of formula (I)



(I)

optionally comprising water up to 6%, and having an X-ray diffractogram that comprises characteristic peaks (2θ) at 11.2° , 19.9° ,20.7° and 34.1° ±0.2°

52.    Claim 2 of the '197 Patent recites the following:

2. The crystalline 1-[3-[3-(4-chlorophenyl)propoxy]pro-pyl]-piperidine monohydrochloride according to claim 1, having an X-ray diffractogram that comprises characteristic peaks (2θ) at 11.2° , 15.4° , 16.3° , 16.9° , 17.8° , 19.9° , 20.7° , 21.0° , 21.8° , 22.6° , 24.5° , 24.6° , 25.0° , 25.5° , 26.3° , 28.3° , 30.3° , 34.1° , 35.8° ,40.0° , 46.0° ±0.2° .

53.    The parties have agreed to the following constructions of certain terms from the

Asserted Claims of the '197 Patent:

| Claim Term(s) | Patent(s), Claim(s) | Agreed-Upon Construction |
|---|---|---|
| "an X-ray diffractogram that comprises characteristic peaks (2θ) at 11.2°, 19.9°, 20.7° and 34.1° ±0.2" | '197 Patent, Claim 1 | an X-ray diffractogram that includes peaks at 11.2°, 19.9°, 20.7° and 34.1° ±0.2° (2θ) wherein the peaks together uniquely identify the crystalline form of pitolisant hydrochloride |
| "crystalline" | '197 Patent, Claim 1 | a solid form having a regularly repeating pattern of molecules or atoms with long range order extending in three dimensions |
| "optionally comprising water up to 6%" | '197 Patent, Claim 1 | which may have up to 6% water |
| "an X-ray diffractogram that comprises characteristic peaks(2θ) at 11.2°, 15.4°, 16.3°, 16.9°, 17.8°, 19.9°, 20.7°, 21.0°, 21.8°, 22.6°, 24.5°, 24.6°, 25.0°, 25.5°, 26.3°, 28.3°, 30.3°, 34.1°, 35.8°, 40.0°, 46.0° ±0.2°" | '197 Patent, Claim 2 | an X-ray diffractogram that includes peaks at 11.2°, 15.4°, 16.3°, 16.9°, 17.8°, 19.9°, 20.7°, 21.0°, 21.8°, 22.6°, 24.5°, 24.6°, 25.0°, 25.5°, 26.3°, 28.3°, 30.3°, 34.1°, 35.8°, 40.0°, 46.0° ±0.2° (2θ) wherein the peaks together uniquely identify the crystalline form of pitolisant hydrochloride |

**CONFIDENTIAL**

V.    **AET'S ANDA AND ANDA PRODUCTS**

54.    AET submitted Abbreviated New Drug Application ("ANDA") No. 218892 ("AET's ANDA") to FDA under 21 U.S.C. § 355(j) seeking FDA approval to engage in the commercial manufacture, use, or sale of a generic version of WAKIX for the treatment of adult patients with narcolepsy.

55.    By letter dated October 14, 2023, AET notified Plaintiffs that AET submitted ANDA No. 218892 to FDA under 21 U.S.C. § 355(j).

56.    AET's October 14, 2023 Notice Letter ███████████████████████████

███████████████████

57.    On August 7, 2024, ████████████████████████.

58.    By letter dated August 7, 2024, AET notified Plaintiffs that AET had submitted its amended ANDA No. 218892 to FDA under 21 U.S.C. § 355(j).

59.    AET's August 7, 2024 Notice Letter states that ██████████████████████

█████████████████████████████, which includes the Asserted claims of the '197 Patent.

60.    AET's ANDA contains a certification pursuant to 21 U.S.C. § 355(j)(2)(A)(vii)(IV) for the '197 and '947 Patents.

61.    The formulation used to make AET's ANDA Products is as follows:

**CONFIDENTIAL**



62.     To conserve the parties' and the Court's resources, and avoid disrupting the trial schedule in this case, AET has stipulated that ███████████████████████████ ███████████████████████████████████████████████ ████████████████████ .

63.     On August 28, 2025, the Plaintiffs and Defendant AET filed a stipulation and proposed order that the sale, offer for sale, use, and/or manufacture within the United States and/or importation into the United States of any product covered by ANDA No. 218892, in accordance with AET's Proposed Labeling (and any proposed or approved labeling in AET's ANDA that does not remove the indication of treatment of excessive daytime sleepiness (EDS) in patients with narcolepsy), prior to the expiration of the '947 Patent would constitute an act of infringement of claims 12 and 13 of the '947 Patent under 35 U.S.C. § 271(e)(2)(A). and 35 U.S.C. § 271(b). D.I. 332. The Court ordered the stipulation on September 8, 2025. D.I. 339.

## VI.     HIKMA'S ANDA AND ANDA PRODUCTS

64.     On ████████████ , Zenara Pharma Private Limited ("Zenara") submitted ANDA No. 218796 ("Hikma's ANDA") to FDA under 21 U.S.C. § 355(j) seeking FDA approval to

CONFIDENTIAL

engage in the commercial manufacture, use, or sale of a generic version of WAKIX for the treatment of adult patients with narcolepsy.

65.     Hikma's ANDA contains a certification pursuant to 21 U.S.C. § 355(j)(2)(A)(vii)(IV) ("Paragraph IV") for the '947 and '197 Patents.

66.     On ███████████, Zenara received a Paragraph IV Acknowledgement and ANDA Receipt letter from the FDA.

67.     By letter dated ███████████, within the 20-day period in accordance with FDA regulations 21 C.F.R. §§ 314.95(a), (b), and (d), Zenara notified Plaintiffs that Zenara submitted ANDA No. 218796 to FDA under 21 U.S.C. § 355(j).

68.     Zenara received ███████████ for ANDA No. 218796 by letter dated ███████ ███████

69.     Zenara transferred ownership of ANDA No. 218796 to Hikma effective March 11, 2025.

70.     The thirty-month stay of FDA's approval of Hikma's ANDA expires on ███████ ███████

71.     Hikma's ANDA Products are 5 mg or 20 mg pitolisant hydrochloride tablets (equivalent to 4.45 mg or 17.8 mg of pitolisant free base, respectively) formulated for oral administration.

72.     The composition of Hikma's ANDA Products is as follows:

CONFIDENTIAL



73.    Hikma's ANDA relies on Drug Master File ("DMF") No. 037753. The material made according to DMF No. 037753 is pitolisant hydrochloride ███████████ containing pitolisant hydrochloride (active ingredient) and ████████████████████

74.    Biophore India Pharmaceuticals Private Limited ("Biophore") is the holder of DMF No. 037753. Biophore is an affiliate of Zenara.

75.    Biophore manufactures the ███████████ of pitolisant hydrochloride used by Hikma in its ANDA Products under DMF No. 037753.

**CONFIDENTIAL**

76.    Hikma's ANDA Products ████████████████████████████

████████████████████

77.    The chart below shows the three exhibit batches of each dosage strengths of Hikma's ANDA Products. *See* Pitoli_0000724.

| Product Name and Strength | Batch No. | Manufacturing Date | Manufacturer |
|---|---|---|---|
| Pitolisant Tablets 4.45 mg | ██████ | █████ | Zenara |
| | ██████ | █████ | Zenara |
| | ██████ | █████ | Zenara |
| Pitolisant Tablets 17.8 mg | ██████ | █████ | Zenara |
| | ██████ | █████ | Zenara |
| | ██████ | █████ | Zenara |

78.    The chart below shows the two batches of pitolisant hydrochloride ████████ used to prepare Hikma's ANDA Products. *See* Pitoli_0005618.

| Product Name | Batch No. | Manufacturing Date | Manufacturer |
|---|---|---|---|
| Pitolisant HCl Solid Dispersion | ████████ | █████ | Biophore |
| | ████████ | █████ | Biophore |

79.    The current prescribing information for Hikma's ANDA Products was produced by Hikma bearing the following Bates numbers: Pitoli_028214-232.

**CONFIDENTIAL**

## VII.    MSN'S ANDA AND ANDA PRODUCTS

80.    On August 14, 2023, MSN submitted ANDA No. 218873 ("MSN's ANDA") to FDA seeking FDA approval for a generic pitolisant tablet ("MSN's ANDA Products") in the United States.

81.    ████████████████████████████████████████████

████

82.    ████████████████████████████████████████████

████

83.    MSN's ANDA Products are 5 mg or 20 mg pitolisant hydrochloride tablets (equivalent to 4.45 mg or 17.8 mg of pitolisant free base, respectively) formulated for oral administration.

84.    The composition of MSN's ANDA Products is as follows:

14

**CONFIDENTIAL**



## VIII. NOVITIUM'S ANDA AND ANDA PRODUCTS

85.     Novitium submitted ANDA No. 218495 ("Novitium's ANDA") to FDA under 21 U.S.C. § 355(j) seeking FDA approval to engage in the commercial manufacture, use, or sale of a generic version of WAKIX for the treatment of excessive daytime sleepiness or cataplexy adult in patients with narcolepsy.

**CONFIDENTIAL**

86.    Novitium subsequently amended its ANDA on November 14, 2024, such that it now seeks FDA approval to engage in the commercial manufacture, use, or sale of a generic version of WAKIX for █████████████████████████████████████

87.    By letter dated October 12, 2023, Novitium notified Plaintiffs that Novitium submitted ANDA No. 218495 to FDA under 21 U.S.C. § 355(j).

88.    Novitium's ANDA contains a certification pursuant to 21 U.S.C. § 355(j)(2)(A)(vii)(IV) for the '947 and '197 Patents.

89.    Novitium also revised its ANDA on ███████████████, to include a ████████ ████████████████████████████████████████████████████████ ██████████████████████ Novitium maintains its certifications pursuant to 21 U.S.C. § 355(j)(2)(A)(vii)(IV) with respect to use code U-1102, directed to the treatment of cataplexy in patients with narcolepsy.

90.    Novitium maintains a counterclaim against Plaintiffs with respect to the '947 patent, maintaining that use code U-1102 is improperly listed in the Orange Book for the '947 patent because it does not claim a method of treating cataplexy in patients with narcolepsy.

91.    Novitium's ANDA Products are 5 mg or 20 mg pitolisant hydrochloride tablets (equivalent to 4.45 mg or 17.8 mg of pitolisant free base, respectively) formulated for oral administration.

92.    The composition of Novitium's ANDA Products is as follows:

CONFIDENTIAL



93.     ████████████████████ are batch numbers of the exhibit batches of Novitium's 4.45mg ANDA Product.

94.     ████████████████████ are batch numbers of the exhibit batches of Novitium's 17.8mg ANDA Product.

## IX.     LITIGATION

95.     On November 21, 2023, in an action captioned *Harmony Biosciences, LLC et al. v. AET Pharma US, Inc. et al.*, 1:23-cv-1340-JLH (D. Del.), Plaintiffs filed suit against AET Pharma US, Inc.; Annora Pharma Private Limited, Hetero USA, Inc., and Hetero Labs Limited

(collectively, "Annora"); Novitium Pharma LLC; and Zenara Pharma Private Limited and Biophore India Pharmaceuticals Private Limited, alleging infringement of the '197 Patent, the '947 Patent, and U.S. Patent No. 8,354,430 ("the'430 Patent) by submitting AET's ANDA, Annora's ANDA No. 218832 ("Annora ANDA"), and Hikma's ANDA, respectively, with Paragraph IV certifications and seeking FDA approval of their ANDA prior to the expiration of the '197 Patent, the '947 Patent, and the '430 Patent. *Harmony Biosciences, LLC et al. v. AET Pharma US, Inc. et al.*, 1:23-cv-1340-JLH (D. Del.), D.I. 1 (Nov. 21, 2023).

96.    Novitium filed counterclaims seeking declaratory judgment of noninfringement and invalidity of the '197 Patent, the '947 Patent, and the '430 Patent on January 29, 2024. C.A. 23-1340, D.I. 24. Novitium filed an additional counterclaim on August 30, 2024, seeking an order that Plaintiffs delete or delist use code U-1102 from the Orange Book's listing for WAKIX with respect to the '947 patent. C.A. 23-1286, D.I. 108. AET filed counterclaims seeking declaratory judgment of noninfringement and invalidity of the '197 Patent and the '947 Patent on February 2, 2024. D.I. 28. Zenara and Biophore filed counterclaims seeking declaratory judgment of noninfringement and invalidity of the '197 Patent, the '947 Patent, and the '430 Patent on February 15, 2024. C.A. 23-1340, D.I. 33. Annora has been dismissed from this litigation. C.A. 1286, D.I. 260.

97.    On December 11, 2023, in an action captioned *Harmony Biosciences, LLC et al. v. MSN Pharmaceuticals Inc. et al.*, 1:23-cv-1420-JLH (D. Del.), Plaintiffs filed suit against MSN Pharmaceuticals Inc. and MSN Laboratories Private Limited, alleging infringement of the '197 Patent, the '947 Patent, and the'430 Patent by submitting MSN's ANDA with a Paragraph IV certification and seeking FDA approval of MSN's ANDA prior to the expiration of the '197 Patent, the '947 Patent, and the '430 Patent. *Harmony Biosciences, LLC et al. v. MSN Pharmaceuticals*

CONFIDENTIAL

*Inc. et al.*, 1:23-cv-1420-JLH (D. Del.), D.I. 1 (Dec. 11, 2023). MSN filed counterclaims seeking declaratory judgment of noninfringement and invalidity of the '947 Patent, and declaratory judgment of noninfringement of the '197 Patent and the '430 Patent on February 29, 2024. *Harmony Biosciences, LLC et al. v. MSN Pharmaceuticals Inc. et al.*, 1:23-cv-1420-JLH, D.I. 21.

98.     On April 15, 2024, the Court ordered the consolidation of *Harmony Biosciences, LLC et al. v. MSN Pharmaceuticals Inc. et al.*, 1:23-cv-1420-JLH (D. Del.) and *Harmony Biosciences, LLC et al. v. AET Pharma US, Inc. et al.*, 1:23-cv-01340-JLH (D. Del.) with *Harmony Biosciences, LLC et al. v. Lupin Limited, and Lupin Pharmaceuticals, Inc. et al.*, 1:23-cv-1286-JLH (D. Del). D.I. 34. *Harmony Biosciences, LLC et al. v. Lupin Limited, and Lupin Pharmaceuticals, Inc. et al.*, 1:23-cv-1286-JLH (D. Del) was a case filed on November 9, 2023 against defendants who have been dismissed from this litigation and is the case reflecting the consolidate case number. *See* 23-1286, D.I. 147, 260 and 322.

99.     On August 13, 2024, Plaintiffs brought suit against AET Pharma US, Inc., AET Laboratories Private Limited, and Alfred E. Tiefenbacher (GmbH & Co. KG) in an action captioned *Harmony Biosciences, LLC et al. v. AET Pharma US, Inc. et al.*, 1:24-cv-941-JLH (D. Del.) ("the August 2024 AET Action"), alleging infringement of the '197 and '947 Patents based on AET's submission of AET's ANDA, which seeks approval to engage in the sale, offer for sale, use, and/or manufacture within the United States and/or importation into the United States of the AET ANDA Products prior to expiration of the '947 Patent.

100.     On October 4, 2024, the Court dismissed AET Laboratories Private Limited and Alfred E. Tiefenbacher (GmbH & Co. KG) from the August 2024 AET Action and otherwise consolidated the August 2024 AET Action pending against AET with *Harmony Biosciences, LLC*

**CONFIDENTIAL**

*et al. v. Lupin Limited, and Lupin Pharmaceuticals, Inc. et al.*, 1:23-cv-1286-JLH (D. Del). *See* the August 2024 AET Action, D.I. 11.

101.    On October 4, 2024, AET filed counterclaims seeking declaratory judgment of noninfringement and invalidity of the '197 Patent and the '947 Patent in *Harmony Biosciences, LLC et al. v. Lupin Limited, and Lupin Pharmaceuticals, Inc. et al.*, 1:23-cv-1286-JLH (D. Del), D.I. 137.

102.    On June 13, 2025, Plaintiffs informed Defendants that they were no longer asserting the '430 Patent in this litigation.

## X.    DOCUMENTS

103.    Plaintiffs' NDA No. 218892 and related FDA correspondence, as produced in this litigation, are authentic pursuant to Fed. R. Evid. 901 and are not excluded as hearsay pursuant to Fed. R. Evid. 803(6).

104.    Plaintiffs' IND No. 111,842 and related FDA correspondence, as produced in this litigation, are authentic pursuant to Fed. R. Evid. 901 and are not excluded as hearsay pursuant to Fed. R. Evid. 803(6).

105.    AET's ANDA No. 218892 and related FDA correspondence, as produced in this litigation, are authentic pursuant to Fed. R. Evid. 901 and are not excluded as hearsay pursuant to Fed. R. Evid. 803(6).

106.    Hikma's ANDA No. 218796 and related FDA correspondence, as produced in this litigation, are authentic pursuant to Fed. R. Evid. 901 and are not excluded as hearsay pursuant to Fed. R. Evid. 803(6).

107.    MSN's ANDA No. 218873 and related FDA correspondence, as produced in this litigation, are authentic pursuant to Fed. R. Evid. 901 and are not excluded as hearsay pursuant to Fed. R. Evid. 803(6).

**CONFIDENTIAL**

108.    Novitium's ANDA No. 218495 and related FDA correspondence, as produced in this litigation, are authentic pursuant to Fed. R. Evid. 901 and are not excluded as hearsay pursuant to Fed. R. Evid. 803(6).

109.    MSN Laboratories Private Ltd.'s DMF No. 38131 and related FDA correspondence, as produced in this litigation by MSN, are authentic pursuant to Fed. R. Evid. 901 and are not excluded as hearsay pursuant to Fed. R. Evid. 803(6).

110.    Biophore India Pharmaceuticals Private Ltd.'s DMF No. 37753 and related FDA correspondence, as produced in this litigation by Hikma, are authentic pursuant to Fed. R. Evid. 901 and are not excluded as hearsay pursuant to Fed. R. Evid. 803(6).

111.    The following exhibits, reflecting documents from ███████████████ as produced in this litigation by Novitium, are authentic pursuant to Fed. R. Evid. 901:

- PTX-16

- PTX-26

- PTX-115

- PTX-316

- PTX-338

- PTX-368

- PTX-657

- PTX-658

112.    The following documents from ████████████████ as produced in this litigation by Novitium, are authentic pursuant to Fed. R. Evid. 901 and are not excluded as hearsay pursuant to Fed. R. Evid. 803(6):

- PTX-25

21

**CONFIDENTIAL**

113.    The following references are authentic pursuant to Fed. R. Evid. 901:

- International Patent Publication WO 2000/06254 ("WO '254"), published on February 10, 2000 (PTX-497) (DTX-0090)

- European Patent No. 1100503 B1 ("EP '503"), published on September 22, 2004 (DTX-0002)

- European Patent Application EP 0982300 A2 ("EP '300"), published on March 1, 2000 (DTX-0082)

- Ancoli-Israel, S., et al., *Are Breathing Disturbances in Elderly Equivalent to Sleep Apnoea Syndrome?*, SLEEP 17, 77–83 (1994) ("Ancoli-Israel") (DTX-0111)

- Arnulf, I., et al., *Parkinson's disease and sleepiness*, NEUROLOGY 58, 1019–1024 (2002) ("Arnulf") (DTX-0128)

- Berge, S. M. et al., *Pharmaceutical Salts*, 66 J. PHARM. SCIS., 1, 1-19 (1977) ("Berge") (PTX-427) (DTX-0079)

- Byrn, S., et al., *Pharmaceutical Solids: A Strategic Approach to Regulatory Considerations*, 12 PHARMACEUTICAL RESEARCH, 945, 945-954 (1995) ("Byrn-1995") (PTX-428) (DTX-0081)

- Garbarg, M., et al., *Histaminergic pathway in rat brain evidenced by lesions of the medial forebrain bundle*, 186 SCIENCE 833–835 (1974) ("Garbarg") (PTX-559) (DTX-0102)

- Arrang et al., *Autoinhibition of brain histamine release mediated by a novel class (H₃) of histamine receptor*, 302 NATURE 832 (1983) ("Arrang 1983") (PTX-471) (DTX-0078)

- Arrang, J.-M., et al., *Highly potent and selective ligand for histamine H₃-receptors*, NATURE 327, 117–123 (1987) ("Arrang 1987") (DTX-0108)

- Aslanian, R., et al., *Recent Progress in Histamine H₃ Receptor Chemistry*, ANN. REP. MED. CHEM. 39, 57–66 (2004) ("Aslanian") (PTX-470) (DTX-0044)

- Pollard, H. and Schwartz, J.-C. *Histamine neuronal pathways and their functions*, 10 TRENDS IN NEUROSCIENCE 86 (1987) ("Pollard") (PTX-591) (DTX-0105)

- Monti, et al., *Effects of selective activation or blockade of the histamine H₃ receptor on sleep and wakefulness*, 205 EUR. J. OF PHARMACOLOGY 283 (1991) ("Monti") (PTX-486) (DTX-0098)

CONFIDENTIAL

- Ganellin, C.R., et al., *Design of potent non-thiourea H₃-receptor histamine antagonists*, 38 J. MED. CHEM. 3342 (1995) ("Ganellin 1995") (PTX-475) (DTX-0091)

- Ganellin, C.R., et al., *A novel series of (phenoxyalkyl)imidazoles as potent H₃-receptor histamine antagonists*, 39 J. MED. CHEM. 3806 (1996) ("Ganellin 1996") (PTX-558) (DTX-0110)

- Grammatopoulos, D.K., and Chrousos, G.P., *Functional characteristics of CRH receptors and potential clinical applications of CRH-receptor antagonists*, TRENDS ENDOCRINOL. METAB. 13, 436–444 (2002) ("Grammatopoulos") (PTX-477) (DTX-0047)

- Onodera et al., *Neuropharmacology of the Histaminergic Neuron System in the Brain and its Relationship with Behavioral Disorders*, 42 PROGRESS IN NEUROBIOLOGY 685 (1994) ("Onodera 1994") (PTX-587) (DTX-0114)

- Stark H., et al., *Developments of histamine H₃-receptor antagonists*, 21 DRUGS OF THE FUTURE 507 (1996) ("Stark 1996") (PTX-491) (DTX-0132)

- Stark, H., et al., *Development of FUB 181, a selective histamine H₃-receptor antagonist of high oral in vivo potency with 4-(omega-(arylalkyloxy)alkyl)-1H-imidazole structure*, ARCH. PHARM. PHARM. MED. CHEM. 331, 211–218 (1998) ("Stark 1998") (PTX-492) (DTX-0101)

- Stark, H., *Recent advances in histamine H₃/H₄ receptor ligands*, EXPERT OPIN. THER. PATENTS 13, 851–865 (2003) ("Stark 2003") (PTX-495) (DTX-0053)

- Stepnowsky, C., et al., *Sleep Apnea and Health-Related Quality of Life in African-American elderly*, ANN. BEHAV. MED. 22, 116–120 (2000) ("Stepnowsky 2000") (DTX-0116)

- Leurs, R., et al., *Therapeutic potential of histamine H₃ receptor agonists and antagonists*, 19 TiPS 177 (1998) ("Leurs") (PTX-481) (DTX-0099)

- Ligneau, X., et al., 116 *Neurochemical and behavioral effects of ciproxifan, a potent histamine H₃-receptor antagonist*, 287 J. PHARMACOL. EXP. THER. 658 (1998) ("Ligneau") (PTX-573) (DTX-0092)

- McLeod, R.L et al., Sch 50971, *An Orally Active Histamine H₃ Receptor Antagonist, Inhibits Central Neurogenic Vascular Inflammation and Produces Sedation in the Guinea Pig*, 287 J. PHARMACOL. EXP. THER. 43 (1998) ("McLeod") (PTX-580) (DTX-0089)

- Parmentier, et al., *Anatomical, Physiological, and Pharmacological Characteristics of Histidine Decarboxylate Knock-Out Mice: Evidence for*

23

CONFIDENTIAL

the Role of Brain Histamine in Behavioral and Sleep-Wake Control, 22 J. NEUROSCIENCE 7695 (2002) ("Parmentier") (PTX-589) (DTX-0087)

- Toyota, H. et al., Behavioral characterization of mice lacking histamine H₃ receptors, 62 MOL. PHARMACOL. 389 (2002) ("Toyota") (PTX-599) (DTX-0125)

- Brooks et al., Novel Therapies for Narcolepsy, 11 EXPERT OPIN. INVESTIG. DRUGS 1821 (2002) ("Brooks 2002") (PTX-472) (DTX-0080)

- Cowart, M., et al., Medicinal Chemistry and Biological Properties of Non-Imidazole Histamine H₃ Antagonists, MINI-REV. MED. CHEM. 4, 979–992 (2004) ("Cowart") (PTX-474) (DTX-0046)

- Fletcher, L., Guilford Halts Gliatech Deal, NAT. BIOTECHNOL. 18, 1023 (2000) ("Fletcher") (DTX-0194)

- Ganellin, C.R., Synthesis of potent non-imidazole histamine H₃-receptor antagonists, 331 ARCH. PHARM. PHARM. MED. CHEM. 395 (1998) ("Ganellin 1998") (PTX-476) (DTX-0093)

- Hobson, D., et al., Excessive Daytime Sleepiness and Sudden-Onset Sleep in Parkinson Disease, JAMA 287, 455–463 (2002) ("Hobson") (DTX-0129)

- Kumar, S., and Bhatia, M., Excessive daytime sleepiness in Parkinson's disease as assessed by the Epworth Sleepiness Scale, SLEEP MED. 4, 339–342 (2003) ("Kumar") (DTX-0180)

- Kushida, C.A., et al., Electroencephalographic correlates of cataplectic attacks in narcoleptic canines, ELECTROENCEPHALOGR. CLIN. NEUROPHYSIOL. 61, 61–70 (1985) ("Kushida") (PTX-627)

- Lin J.S. et al., Involvement of histaminergic neurons in arousal mechanisms demonstrated with H₃ receptor ligands in the cat, 523 BRAIN RES. 325–330 (1990) ("Lin") (PTX-482) (DTX-0107)

- Onodera, K., et al., Improvement by FUB181, a novel histamine H₃-receptor antagonist, of learning and memory in the elevated plus-maze test in mice, 357 NAUNYN-SCHMIEDEBERG'S ARCH. PHARMACOL. 508 (1998) ("Onodera 1998") (PTX-588) (DTX-0094)

- Meier et al., Influence of imidazole replacement in different structural classes of histamine H-3-receptor antagonists, 13 EUR. J. OF PHARM. SCI. 249 (2001) ("Meier II") (PTX-430) (DTX-0086)

- Meier, G., FUB 649: A Novel Non-Imidazole Histamine H₃-Receptor Antagonist with High In Vitro and Oral In Vivo Potency, ARCH. PHARM.

**CONFIDENTIAL**

PHARM. MED. CHEM. Suppl. 2, 1–89 (2001) ("Meier I") (PTX-429) (DTX-0085)

- Apelt et al., *Development of a New Class of Nonimidazole Histamine H₃ Receptor Ligands with Combined Inhibitory Histamine N-Methyltransferase Activity*, 45 J. MED. CHEM. 1128 (2002) ("Apelt 2002") (PTX-468) (DTX-0077)

- Liedtke et al., *Replacement of Imidazole by a Piperidone Moiety Differentially Affects the Potency of Histamine H₃-Receptor Antagonists*, 367 NAUNYN-SCHMIEDEBERG'S ARCH. PHARMACOL. 43 (2003) ("Liedtke") (PTX-431) (DTX-0084)

- Morisset S., et al., *High Constitutive Activity of Native H₃ Receptors Regulates Histamine Neurons in Brain*, 408 NATURE 860 (2000) ("Morisset") (PTX-487) (DTX-0097)

- Stark, H. et al., *The Histamine H₃ Receptor and its Ligands*, PROGRESS IN MED. CHEM. 279 (2001) ("Stark 2001") (PTX-493) (DTX-0104)

- Mikó, T., et al., *Novel Nonimidazole Histamine H₃ Receptor Antagonists: 1-(4-(Phenoxymethyl)benzyl)piperidines and Related Compounds*, 46 J. MED. CHEM. 1523 (2003) ("Mikó 2003") (DTX-0096)

- Mitler, M.M., et al., "*Narcolepsy and Its Treatment with Stimulants*," SLEEP 17, 352–354 (1994) ("Mitler") (PTX-584) (DTX-0052)

- Alguacil et al., *Histamine H₃ Receptor: A Potential Drug Target for the Treatment of Central Nervous System Disorders*, 2 CURRENT DRUG TARGETS – CNS & NEUROLOGICAL DISORDERS 303 (2003) ("Alguacil") (PTX-544) (DTX-0076)

- Passani et al., *The histamine H₃ receptor as a novel therapeutic target for cognitive and sleep disorders*, 25 TRENDS IN PHARM. SCI. 618 (2004), (PTX-489) (DTX-0088)

- Sauter, C., et al., "*Excessive daytime sleepiness in patients suffering from different levels of obstructive sleep apnoea syndrome*," J. SLEEP RES. 9, 293–301 (2000) ("Sauter") (DTX-0112)

- Lovenberg, T.W. et al., *Cloning of Rat Histamine H₃ Receptor Reveals Distinct Species Pharmacological Profiles*, 293(3) THE J OF PHARMACOL. AND EXPERIMENTAL THERAPEUTICS 771 (2000) ("Lovenberg) (PTX-576) (DTX-0344)

- A. N. Vgontzas et al., *Marked Decrease in Sleepiness in Patients with Sleep Apnea by Etanercept, a Tumor Necrosis Factor-(a) Antagonist*, 89(9) J.

**CONFIDENTIAL**

CLIN. ENDOCRIN. & METAB. 4409 (2004) ("Vgontzas") (PTX-496) (DTX-0055)

- Witkin, J.M., and Nelson, D.L., *Selective histamine H₃ receptor antagonists for treatment of cognitive deficiencies and other disorders of the central nervous system*, PHARMACOL. & THERAPEUTICS 103, 1–20 (2004) ("Witkin") (DTX-0197)

- Zeman, A. et al., *Clinical review Narcolepsy and excessive daytime sleepiness*, 329 BMJ 724 (2004) ("Zeman") (PTX-603) (DTX-0127)

- Johns, M.W., *A New Method for Measuring Daytime Sleepiness: The Epworth Sleepiness Scale*, 14(6) SLEEP 540 (1991) ("Johns 1991") (DTX-0176)

- Johns, M.W., *Reliability and Factor Analysis of the Epworth Sleepiness Scale*, 15(4) SLEEP 376 (1992) ("Johns 1992") (DTX-0178)

- Johns, M.W., *Daytime Sleepiness, Snoring, and Obstructive Sleep Apnea. The Epworth Sleepiness Scale*, 103(1) CHEST 30 (1993) ("Johns 1993") (DTX-0177)

- Johns, M.W., *Sleepiness in Different Situations Measured by the Epworth Sleepiness Scale*, 17(8) SLEEP 703 (1994) ("Johns 1994") (DTX-0179)

- Johns, M. & Hocking, B., *Daytime sleepiness and sleep habits of Australian workers*, 20(10) SLEEP 844 (1997) ("Johns 1997") (PTX-817) (DTX-0175)

- Guilleminault, C. et al*., Determinants of daytime sleepiness in obstructive sleep apnea*, 94(1) CHEST 32 (1988) ("Guilleminault 1998") (DTX-0124)

- Guilleminault, C., et al., *Excessive daytime sleepiness, A Challenge for the practicing neurologist*, BRAIN 124, 1482–1491 (2001) ("Guilleminault 2001") (DTX-0118)

- Heinzer, R. et al., *Slow-wave activity in sleep apnea patients before and after continuous positive airway pressure treatment. Contribution to daytime sleepiness*, 119(6) CHEST 1807 (2001) ("Heinzer") (DTX-0126)

- American Academy of Sleep Medicine, International Classification of Sleep Disorders, (ICSD-1 rev.) (2001) ("ICSD-1") (DTX-0121)

- Seneviratne, U. & Puvanendran, K., *Excessive daytime sleepiness in obstructive sleep apnea: prevalence, severity, and predictors*, 5 SLEEP MED. 339 (2004) ("Seneviratne") (DTX-0131)

CONFIDENTIAL

- R.D Chervin, *Sleepiness, fatigue, tiredness, and lack of energy in obstructive sleep apnea*, 118(2) CHEST 372 (2000) ("Chervin") (DTX-0123)

- Levin B.E. et al., *Cognitive Impairment in Parkinson's Disease*, 10(2) NEUROLOGIC CLINICS 471 (1992) ("Levin") (DTX-0227)

- Dubois, B. & Pillon, B., *Cognitive deficits in Parkinson's disease*, 244 J. NEUROL. 2 (1997) ("Dubois") (DTX-0119)

- Young, T.B., *Epidemiology of Daytime Sleepiness: Definitions, Symptomatology, and Prevalence*, 65 J. CLIN. PSYCHIATRY 12 (2004) ("Young") (DTX-0117)

- Bosboom, J.L.W. et al., *Cognitive dysfunction and dementia in Parkinson's disease,* 111 J. NEURAL TRANSM. 1303 (2004) ("Bosboom") (DTX-0120)

- Garcia-Borreguero, D. et al., *Parkinson's Disease and sleep*, 7(2) SLEEP MED. REVIEWS 115 (2003) ("Garcia-Borreguero") (DTX-0122)

- Tandberg, E., et al., *Excessive Daytime Sleepiness and Sleep Benefit in Parkinson's Disease: A Community-Based Study*, 14 MOV'T. DISORDERS 922 (1999) ("Tandberg") (DTX-0130)

- Amidon, G.L. et al, *A Theoretical Basis for a Biopharmaceutic Drug Classification: The Correlation of in Vitro Drug Product Dissolution and in Vivo Bioavailability*, 12(3) PHARM. RSCH. 413 (1995) ("Amidon") (DTX-0151)

- Tong, W.-Q. & Whitesell, G., *In Situ Salt Screening—A Useful Technique for Discovery Support and Preformulation Studies*, 3(2) PHARM. DEV. & TECH. 215 (1998) ("Tong") (DTX-0166)

- Gould, P. L., *Salt selection for basic drugs*, 33 INT'L J. PHARMS. 201 (1986) ("Gould") (PTX-440) (DTX-0083)

- CENTER FOR DRUG EVALUATION AND RESEARCH, GUIDELINE FOR SUBMITTING SUPPORTING DOCUMENTATION IN DRUG APPLICATIONS FOR THE MANUFACTURE OF DRUG SUBSTANCES U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, FOOD AND DRUG ADMINISTRATION, February 1987 ("1987 FDA Guideline") (PTX-445) (DTX-0012)

- *ICH Harmonised Tripartite Guideline*, SPECIFICATIONS: TEST PROCEDURES AND ACCEPTANCE CRITERIA FOR NEW DRUG SUBSTANCES AND NEW DRUG PRODUCTS: CHEMICAL SUBSTANCES Q6A, 1 (1999) ("1999 ICH Q6A Guideline") (PTX-444) (DTX-0164)

**CONFIDENTIAL**

- Vippagunta, S.R. et al., *Crystalline Solids*, 48 ADVANCED DRUG DELIVERY REVIEWS 3 (2001) ("Vippagunta") (PTX-413) (DTX-0013)

- *ICH Harmonised Tripartite Guideline* STABILITY TESTING OF NEW DRUG SUBSTANCES AND PRODUCTS Q1A(R2), INT'L CONF. ON HARMONISATION OF TECHNICAL REQUIREMENTS FOR REGISTRATION OF PHARMACEUTICALS FOR HUMAN USE (Feb. 2003) ("2003 ICH Q1A(R2) Guideline") (DTX-0163)

- Stephenson, G.A. et al., *Formation of Isomorphic Desolvates: Creating a Molecular Vacuum*, 87 J. PHARM. SCIS. 536 (1998) ("Stephenson") (PTX-455) (DTX-0170)

- Rose, H.A., *Erythromycin and Some of Its Derivatives*, 26 ANALYTICAL CHEMISTRY 938 (1954) ("Rose") (DTX-0144)

- U.S. Patent No. 8,354,430 (DTX-0375)

- U.S. Patent No. 7,910,605 (DTX-0158) (PTX-64)

- U.S. Patent No. 7,169,928 (DTX-0134)

- U.S. Patent No. 7,138,413 (DTX-0133) (PTX-63)

- M. Littner et al., *Practice Parameters for the Treatment of Narcolepsy: An Update for 2000*, 24 SLEEP 451 (2001) ("Littner 2001") (PTX-575)

- Morgenthaler, T.I. et al., *Practice Parameters for the Treatment of Narcolepsy and other Hypersomnias of Central Origin: An American Academy of Sleep Medicine Report*, 30(12) SLEEP 1705 (2007) (DTX-0186)

- V. C. Abad & C. Guilleminault, *Emerging Drugs For Narcolepsy*, EXPERT OPIN. EMERG. DRUGS 281 (2004) (PTX-541)

- J. R. Lampe, CONG. RSCH. SERV., R45948, THE CONTROLLED SUBSTANCES ACT (CSA): A LEGAL OVERVIEW FOR THE 119TH CONGRESS (2025) (PTX-571)

- W. Elliot & J. Chan, *Pitolisant Tablets (Wakix)*, 41 INTERNAL MED. ALERT 19 (2019) (PTX-555)

- DRUG ENFORCEMENT ADMINISTRATION, EO- DEA226, PRACTITIONERS' MANUAL: AN INFORMATIONAL OUTLINE OF THE CONTROLLED SUBSTANCES ACT (2023) (PTX-537)

CONFIDENTIAL

- CENTER FOR DISEASE CONTROL AND PREVENTION, PRESCRIPTION DRUG TIME AND DOSAGE LIMIT LAWS, Public Health Law Program (Mar. 2015) (PTX-535)

- D. Banerjee et al., *Pharmacotherapy for Excessive Daytime Sleepiness*, 8 SLEEP MED. REV. 339 (2004) (PTX-547)

- G. J. Meskill et al., *Clinical Impact of Pitolisant on Excessive Daytime Sleepiness and Cataplexy in Adults With Narcolepsy: An Analysis of Randomized Placebo-Controlled Trials*, 36 CNS DRUGS 61 (2022) (PTX-148)

- G. J. Meskill et al., *Pitolisant for the Treatment of Cataplexy in Adults with Narcolepsy*, 9 EXPERT OPINION ON ORPHAN DRUGS 237 (2021) (PTX-155)

- B. Boutrel & G. F. Koob, *What Keeps Us Awake: the Neuropharmacology of Stimulants and Wakefulness-Promoting Medications*, 27 SLEEP 1181 (2004) (PTX-551)

- E. Mignot & S. Nishino, *Emerging Therapies in Narcolepsy-Cataplexy*, 28 SLEEP 754 (2005) (PTX-582)

- M. J Tozer & S Barret Kalindjian, *Histamine $H_3$ receptor antagonists*, 10(7) EXP. OP. THER. PATENTS 1045 (2000) (PTX-600)

- M. Berlin, *Histamine $H_3$ Receptor as a Drug Discovery Target*, 5 J. MED. CHEM. 26 (2010) (PTX-548)

- M. Parsons, *Histamine and its receptors*, 147 BRIT. J. PHARM. S127 (2006) (PTX-590)

- ClinicalTrials.gov – NCT00424931, "A Safety and Effectiveness Study of a Single Dose of JNJ-17216498 in Patients with Narcolepsy," (PTX-506)

- J. Sun, *Selective Inverse Agonists of the $H_3$ Histamine Receptor as Treatment for Narcolepsy*, 3 NEUROLOGYLIVE (Aug. 29, 2020) (PTX-598)

- V. Abad & C. Guilleminault, *New developments in the management of narcolepsy*, 9 NATURE AND SCI. OF SLEEP 39 (2017) (PTX-542)

- P. Bonaventure et al., *Histamine $H_3$ receptor antagonists: From target identification to drug leads*, 73 BIOCHEM. PHARM. 1084 (2007) (PTX-550)

- K. Nikolic et al., *Precognitive Properties of Drugs with Single and Multitargeting $H_3$ Receptor Antagonist Activities*, 20 CNS NEUROSCI. & TECHS. 613 (2014) (PTX-586)

**CONFIDENTIAL**

- TA Esbenshade et al., *The Histamine H₃ Receptor: an attractive target for the treatment of cognitive disorders*, 154 BRIT. J. PHARM. 1166 (2008) (PTX-556)

- Victoria Harwell & Pius S. Fasinu, *Pitolisant and Other Histamine-3 Receptor Antagonists— An Update on Therapeutic Potentials and Clinical Prospects*, 7 MEDICINES 55 (2020) (PTX-564)

- ClinicalTrials.gov, NCT03194217, "BEN-2001 in Parkinson Disease Patients with Excessive Daytime Sleepiness" (PTX-508)

- R. Weisler et al., *Randomized Clinical Study of a histamine H₃ Receptor Antagonist for the Treatment of Adults with Attention-Deficit Hyperactivity Disorder*, 26 CNS DRUGS 421 (2012) (PTX-602)

- ClinicalTrials.gov, NCT00366080, "Effectiveness of the Drug GSK189254 in Treating Patients with Narcolepsy" (PTX-520)

- ClinicalTrials.gov, NCT00387413, "A Study of GSK 189254 and Duloxetine in the Electrical Hyperalgesia Model of Healthy Volunteers" (PTX-519)

- M. Egan et al., *Pilot Randomized Controlled Study of a Histamine Receptor Inverse Agonist in the Symptomatic Treatment of AD*, 9 CURR. ALZHEIMER RES. 481 (2012) (PTX-554)

- W. Herring et al., *Randomized Controlled Study of the Histamine H₃ Inverse Agonist MK- 0249 in Adult Attention-Deficit/Hyperactivity Disorder*, 73 J. CLINICAL PSYCHIATRY e891 (2012) (PTX-565)

- W. Herring et al., *Alertness and Psychomotor Performance Effects of the Histamine-3 Inverse Agonist MK-0249 in Obstructive Sleep Apnea Patients on Continuous Positive Airway Pressure Therapy with Excessive Daytime Sleepiness: A Randomized Adaptive Crossover Study*, 14 SLEEP MED. 955 (2013) (PTX-566)

- Y. Chang et al., *Futility Stopping in Clinical Trials, Optimality and Practical Considerations*, 30 J. BIOPHARM. STAT. 1050 (2020) (PTX-552)

- ClinicalTrials.gov – NCT01124851, "Safety, Tolerability, Pharmacokinetic and Pharmacodynamic Study of ABT-652 in Subjects with Excessive Daytime Sleepiness" (PTX-521)

- Arena Pharmaceuticals Announces Phase 1 Results for APD916 for Narcolepsy with Cataplexy, PR NEWSWIRE (Oct. 20, 2010) (PTX-534)

**CONFIDENTIAL**

- P. Nathan et al., *The Safety, Tolerability, Pharmacokinetics and Cognitive Effects of GSK 239512, a Selective histamine H3 Receptor Antagonist in Patients with Mild to Moderate Alzheimer's Disease: A Preliminary Investigation*, 10 CURR. ALZHEIMER RES. 240 (2013) (PTX-585)

- R. Grove et al., *A Randomized, Double-Blind, Placebo-Controlled, 16-week Study of the H3 Receptor Antagonist, GSK239512 as a Monotherapy in Subjects with Mild-to- Moderate Alzheimer Disease*, 11 CURR. ALZHEIMER RES. 47 (2014) (PTX-561)

- L. Jarskog et al., *A Phase II Study of a Histamine H3 Receptor Antagonist GSK239512 for Cognitive Impairment in Stable Schizophrenia Subjects on Antipsychotic Therapy*, 164 SCHIZOPHRENIA RES. 136 (2015) (PTX-569)

- C. J. Schwartzbach et al., *Lesion Remyelinating Activity of GSK239512 Versus Placebo in Patients with Relapsing-Remitting Multiple Sclerosis: A Randomised, Single- Blind, Phase II Study*, 264 J. NEUROLOGY 304 (2017) (PTX-595)

- K. Kyriakidis et al., *Histamine H3 and H4 Receptor Ligands Modify Vascular Histamine Levels in Normal and Arthritic Large Blood Vessels In Vivo*, 38 INFLAMMATION 949 (2015) (PTX-570)

- S. Hung & W. Fu, *Drug Candidates in Clinical Trials for Alzheimer's Disease*, 24 J. BIOMEDICAL SCI. 47 (2017) (PTX-568)

- S. Bertoni et al., *In Vitro Pharmacology at Human Histamine H3 Receptors and Brain Access of Non-Imidazole Alkylpiperidine Derivatives*, 55 PHARM. RES. 111 (2007) (PTX-549)

- Mikó et al., *Structural Variations of 1-(4-(phenoxymethyl)benzyl)piperidines as nonimidazole histamine H3 receptor antagonists*, 12 BIOORG. & MED. CHEM. 2727– 2736 (2004) ("Mikó 2004) (PTX-485)

- R. Alexander et al., *A 3-Way Cross-over Study of Pregabalin, Placebo, and the Histamine 3 Receptor Inverse Agonist AZD5213 in Combination with Pregabalin in Patients with Painful Diabetic Neuropathy and Good Pain-reporting Ability*, 37 CLIN. J. PAIN 38 (2021) (PTX-543)

- R. Raddatz et al., *CEP-26401 (Irdabisant), a Potent and Selective Histamine H3 Receptor Antagonist/Inverse Agonist with Cognition-Enhancing and Wake-Promoting Activities*, 340 J. PHARM. AND EXPER. THER. 124 (2012) (PTX-592)

- O. Spiegelstein et al., *Pharmacokinetics, Pharmacodynamics, and Safety of CEP-26401, a High-Affinity Histamine-3 Receptor Antagonist, Following*

**CONFIDENTIAL**

*Single and Multiple Dosing in Healthy Subjects*, 30 J. PSYCHOPHARM. 983 (2016) (PTX-596)

- A. Baakman et al., *Central Nervous System Effects of the Histamine-3 Receptor Antagonist CEP-26401, in Comparison with Modafinil and Donepezil, After a Single Dose in a Cross- over Study in Healthy Volunteers*, 85 BRIT. J. CLIN. PHARM. 861 (2019) (PTX-546)

- G. Griebel et al., *SAR110894, a Potent Histamine H₃-Receptor Antagonist, Displays Procognitive Effects in Rodents*, 102 PHARMACOLOGY BIOCHEMISTRY AND BEHAVIOR 203 (2012) (PTX-560)

- D. Leger et al., *Alzheimer's Disease Severity is Not Significantly Associated with Short Sleep: Survey by Actigraphy on 208 Mild and Moderate Alzheimer's Disease Patients*, 55 J. ALZHEIMER'S DISEASE 321 (2017) (PTX-572)

- J. Stemmelin et al., *A phase 2 study to investigate the Effects of SAR110894 on cognition, daily function, apathy and sleep in mild to moderate Alzheimer's disease patients*, 17 J. NUTRITION, HEALTH AND AGING 774 (2013) (PTX-597)

- P. Daley-Yates et al., *The Efficacy and Tolerability of Two Novel H(1)/H(3) Receptor Antagonists In Seasonal Allergic Rhinitis*, 158 INT'L ARCH. ALLERGY IMMUNOLOGY 84 (2012) (PTX-553)

- R. L. McLeod et al., *Sch 50971, an Orally Active Histamine H₃ Receptor Agonist, Inhibits Central Neurogenic Vascular Inflammation and Produces Sedation in the Guinea Pig*, 287 J. PHARMACOL. AND EXPERIMENTAL THERAPEUTICS 43 (1998) (PTX-580)

- K. Malmlof et al., *Influence of a Selective Histamine H₃ Receptor Antagonist on Hypothalamic Neural Activity, Food Intake and Body Weight*, 29 INT'L J. OBESITY 1402 (2005) (PTX-577)

- K. Malmlof et al., *Increase of Neuronal Histamine in Obese Rats is Associated with Decreases in Body Weight and Plasma Triglycerides*, 14 OBESITY 2154 (2006) (PTX-578)

- K. Malmlof et al., *Antagonistic Targeting of the H₃ Receptor Decreases Caloric Intake in Higher Mammalian Species*, 73 BIOCHEM. PHARM., 1237 (2007) (PTX-579)

- I. Linney et al., *Design, Synthesis, and Structure-Activity Relationships of Novel Non- Imidazole Histamine H₃ Receptor Antagonist*s, 43 J. MED. CHEM. 2362 (2000) (PTX-574)

**CONFIDENTIAL**

- U.S. Patent No. 7.803,825 (PTX-529)

- N. Sarfraz et al., *Pitolisant, a novel histamine- 3 receptor competitive antagonist, and inverse agonist, in the treatment of excessive daytime sleepiness in adult patients with narcolepsy*, 10 HEALTH PSYCHOL. RES. (2022) (PTX-594)

- S. Fabara et al., *Efficacy of Pitolisant on the Treatment of Narcolepsy: A Systematic Review*., 13 CUREUS (2021) (PTX-557)

- J. Guevarra et al., Pitolisant to Treat Excessive Daytime Sleepiness and Cataplexy in Adults with Narcolepsy: Rationale and Clinical Utility, 12 NAT. & SCI. SLEEP 709 (2020) (PTX-562)

- Acuna-Goyocela, et al., *Glucagon-Like Peptide 1 Excites Hypocretin/Orexin Neurons by Direct and Indirect Mechanisms: Implications for Viscera-Mediated Arousal*, 24 J. NEUROSCI. 8141 (2004) ("Acuna-Goyocela 2004") (PTX-465)

- Cephalon, *2002 Annual Report* (2002) (PTX-473)

- Stark et al., *Different Antagonist Binding Properties of Human and Rat Histamine $H_3$ Receptors*, 11 BIOORG. & MED. CHEM. 951-954 ("Stark 2001a") (PTX-494).

- Grassman et al. *Progress in the proxifan class: heterocyclic congeners as novel potent and selective histamine H -receptor antagonists*, 15 EUR. J. PHARM. SCI. 367-378 (2002) ("Grassman 2002") (PTX-478)

- Grassman et al., *Imidazole Derivatives as a Novel Class of Hybrid Compounds with Inhibitory Histamine N-Methyltransferase Potencies and Histamine $hH_3$ Receptor Affinities*, 11 BIOORG. & MED. CHEM. 2163-2174 (2003) ("Grassman 2003") (PTX-479)

- Meier et al., *4-(a)(Alkyloxy)alkyl]-1H-imidazole Derivatives as Histamine $H_3$ Receptor Antagonists/Agonists*, 47 J. MED. CHEM. 2678-2687 (2004) ("Meier 2004") (PTX-484)

- Wulff et al., *Characteristics of recombinantly expressed rat and human histamine $H_3$ receptors*, 453 EUR. J. PHARM. 33-41 (2002) ("Wulff 2002") (PTX-500)

- WO2004/089373 (PTX-498)

- Meier et al., *Piperidino-Hydrocarbon Compounds as Novel Non-Imidazole Histamine $H_3$-Receptor Antagonists*, 10 BIOORG. & MED. CHEM. 2535-2542 (2002) ("Meier 2002") (PTX-483)

**CONFIDENTIAL**

- Grassman et al., *Search for Histamine H₃ Receptor Ligands with Combined Inhibitory Potency at Histamine N-Methyltransferase: (t)-Piperidinoalkanamine Derivatives*, Arch. Pharm. Pharm. Med. Chem. 337 (abs) (2004) ("Grassman 2004") (PTX-480)

- Apelt et al., *Search for Histamine H₃ Receptor Antagonists with Combined Inhibitory Potency at Nt-methyltransferase: ether derivatives*, 60 Pharmazie 97 (2005) ("Apelt 2005") (PTX-469)

- Apelt et al., *Development of a New Class of Non-Imidazole Histamine H₃ Receptor Ligands with Combined Inhibitory Histamine N-Methyltransferase Activity*, 45 J. Med. Chem. 1128 (2002) ("Apelt 2002") (PTX-468)

- WO99/424458 (PTX-499)

- J. W. Lubach & E. J. Munson, *Solid-state NMR Spectroscopy*, in Polymorphism in the Pharmaceutical Industry 83 (Rolf Hilfiker ed., 2006) (PTX-462)

- Van Campen et al., *An Approach to the Evaluation of Hygroscopicity for Pharmaceutical Solids*, 5 Int'l J. Pharmaceutics 1 (1980) (PTX-457)

- Danchen Gao, *Crystallinity and Physical Stability of Warfarin Sodium and Sucrose* (1995) (Ph.D. dissertation, University of Kansas) (PTX-458)

- Susan H. Kopleman & Larry L. Augsburger, *Selected Physical and Chemical Properties of Commercial Hypericum perforatum Extracts Relevant for Formulated Product Quality and Performance*, 3 AAPS PharmSci 1 (2001) (PTX-459)

- N. A. Visalakshi et al., *Behavior of Moisture Gain and Equilibrium Moisture Contents (EMC) of Various Drug Substances and Correlation with Compendial Information on Hygroscopicity and Loss on Drying*, 10 Pharm. Dev. & Tech. 489 (2005) (PTX-460)

- Reutzel-Edens et al., *Anhydrates and Hydrates of Olanzapine: Crystallization, Solid-State Characterization, and Structural Relationships*, 3 Crystal Growth & Design 897 (2003) (PTX-407)

- Kenneth R. Morris, *Structural Aspects of Hydrates and Solvates*, in Polymorphism in Pharmaceutical Solids (H.G. Brittain ed., 1st ed. 1999) (PTX-461)

- Vippagunta et al., *Crystalline Solids*, 48 Advanced Drug Delivery Revs. 3 (2001) (PTX-413)

**CONFIDENTIAL**

- Chew & Chan, *The Role of Particle Properties in Pharmaceutical Powder Inhalation Formulations*, 15 J. AEROSOL MED. 325 (2002) (PTX-453)

- J. C. Callahan et al., *Equilibrium Moisture Content of Pharmaceutical Excipients*, 8 DRUG DEV. & INDUS. PHARMACY 355 (1982) (PTX-454)

- Bighley, *Salt Forms of Drugs and Absorption*, *in* ENCYCLOPEDIA OF PHARM. TECH. 453 (1996) (PTX-435)

- Fuji et al., *Solid-State Hydration/Dehydration of Erythromycin A Investigated by ab Initio Powder X-ray Diffraction Analysis: Stoichiometric and Nonstoichiometric Drhydrated Hydrate*, 13 CRYST. GROWTH DES. 2060 (2013) (PTX-456)

- Moulton & Zaworotko, *From Molecules to Crystal Engineering: Supramolecular Isomerism and Polymorphism in Network Solids*, 101 CHEM. REV. 1629 (2001) (PTX-410)

- Lee et al., *Crystal Polymorphism in Chemical Process Development*, ANN. REV. CHEM. BIOMOL. ENG'G. 259 (2011) (PTX-423)

- Paulekuhn, *Trends in Active Pharmaceutical Ingredient Salt Selection Based on Analysis of the Orange Book Database*, 50 J. MED. CHEM. 6665 (2007) (PTX-432)

- Pitolisant to Assess Weekly Frequency of Cataplexy Attacks and EDS in Narcoleptic Patients (HARMONY CTP) – Study Details Tab, clinicaltrials.gov, available at https://clinicaltrials.gov/study/NCT01800045 ("NCT01800045 – Study 3") (PTX-153)

- Efficacy and Safety Study of BF2.649 in the Treatment of Excessive Daytime Sleepiness in Narcolepsy (Harmony1) – Study Details Tab, clinicaltrials.gov, available at https://clinicaltrials.gov/study/NCT01067222 (PTX-158)

- Citrine Medicine Limited - NCT05223166, A Clinical Study to Evaluate the Efficacy and Safety of Pitolisant in the Treatment of EDS in Patients With OSA – No Results Posted Tab (DTX-0003)

- Harmony Biosciences - NCT05156047, Phase 3 Study to Assess the Safety and Efficacy of Pitolisant in Adult Patients with Idiopathic Hypersomnia – Research View Tab (DTX-0004)

- Bioprojet - NCT01036139, Efficacy and Safety of BF2.649 in Excessive Daytime Sleepiness (EDS) in Parkinson's Disease (HARPS1) – No Results Posted Tab (DTX-0005)

CONFIDENTIAL

- Bioprojet - NCT01067222, Efficacy and Safety Study of BF2.649 in the Treatment of Excessive Daytime Sleepiness in Narcolepsy (Harmony1) – No Results Posted Tab (DTX-0006)

- Harmony Biosciences - NCT04886518, Safety and Efficacy of Pitolisant on Excessive Daytime Sleepiness and Other Nonmuscular Symptoms in Patients with Myotonic Dystrophy Type 1 - Researcher View Tab (DTX-0007)

- Harmony Biosciences - NCT04886518, Safety and Efficacy of Pitolisant on Excessive Daytime Sleepiness and Other Non-Muscular Symptoms in Patients with Myotonic Dystrophy Type 1 - Study Details Tab (DTX-0008)

- Bioprojet - NCT01399606, Long Term Open Label Study in Narcolepsy With BF2.649 (Pitolisant) (HARMONYIII) - Study Details Tab (DTX-0216)

- Bioprojet - NCT00642928, Dose Range Finding Study of BF2.649 Versus Placebo to Treat Excessive Daytime Sleepiness in Parkinson's Disease Patients - Study Details Tab, Researcher View Tab, No Results Posted Tab, and Record History Tab (DTX-0221)

- Bioprojet - NCT01066442, Efficacy and Safety of BF2.649 in Excessive Daytime Sleepiness (EDS) in Parkinson's Disease (HARPS2) ) - Study Details Tab, Researcher View Tab, No Results Posted Tab, and Record History Tab (DTX-0222)

- Bioprojet - NCT01638403, Effects of BF2.649 in the Treatment of Excessive Daytime Sleepiness in Narcolepsy - Study Details Tab (DTX-0243)

## XI.    ADDITIONAL FACTS

114.    U.S. Patent No. 8,354,430 (the "'430 patent") was filed on June 7, 2012, issued on January 15, 2013, and expires February 6, 2026.

115.    The named inventors of the '430 patent are Manuel Raga, Juan Sallares, Marta Guerrero, Antonio Guglietta, Jean-Michel Arrang, Jean-Charles Schwartz, Holger Stark, Walter Schunack, Xavier Ligneau, Jeanne-Marie Lecomte, and Charon Ganellin.

116.    The assignee of the '430 patent is Bioprojet.

117.    The '430 Patent and '947 Patent are commonly owned by Bioprojet.

CONFIDENTIAL

118.    On its face, the '430 Patent states that it is a "Division of application No. 11/815,736, filed as application No. PCT/EP2006/050703 on Feb. 6, 2006, now Pat. No. 8,207,197."

119.    Claim 1 of the '430 Patent states:

> **Claim 1.** A method for the treatment of sleep apnea, comprising administering crystalline 1-[3-[3-(4-chlorophenyl)propoxy]propyl]-piperidine monohydrochloride of formula (I):
>
> 
>
> optionally comprising water up to 6%, and having an X-ray diffractogram that comprises characteristic peaks (2θ) at 11.2°, 19.9°, 20.7° and 34.1°±0.2°.

120.    Claim 3 of the '430 Patent states:

> **Claim 3.** A method for the treatment of diurnal somnolence, comprising administering crystalline 1-[3-[3-(4-chlorophenyl)propoxy]propyl]-piperidine monohydrochloride of formula (I):
>
> 
>
> optionally comprising water up to 6%, and having an X-ray diffractogram that comprises characteristic peaks (2θ) at 11.2°, 19.9°, 20.7° and 34.1°±0.2°.

121.    The '430 Patent is listed in connection with WAKIX in the Orange Book.

122.    U.S. Patent No. 7,910,605 (the "'605 patent") was filed on July 3, 2006, issued on March 22, 2011, and is expired.

123.    The named inventors of the '605 patent are Jean-Charles Schwartz, Jean-Michel Arrang, Monique Garbarg, Jeanne-Marie Lecomte, Xavier Ligneau, Walter G. Schunack, Holger Stark, Charon Robin Ganellin, Fabien Leurquin, and Sigurd Elz.

124.    The assignee of the '605 patent is Societe Civile Bioprojet.

125.    Claim 1 of the '605 Patent recites:

**CONFIDENTIAL**

**Claim 1.** A method for treating symptoms associated with cognitive disorders selected from the group consisting of attention, wakefulness and memory disorders, said method comprising administering, in an amount effective to inhibit H3 receptor activity, a compound of formula (IIa) as defined below:

(IIa)

$$R^1 \diagdown N — (\text{chain } A^{II}) — X^{II} — (\text{chain } B^{II}) — Y^{II}$$
$$R^2 \diagup$$

wherein:

$R^1$ and $R^2$ form together with the nitrogen to which they are attached

a saturated nitrogen-containing ring

$$N \diagup (CR^aR^b)_m$$ i)

with m ranging from 4 to 5 and

$R^{a-b}$ being independently a hydrogen atom or a lower alkyl, and

(i') the chain $A^{II}$ selected from an unbranched alkyl group $—(CH_2)_{nII}—$ where $n_{II}$ is 3;

(ii') the group $X''$ is $—O—$;

(iii') the chain $B^{II}$ is an unbranched alkyl comprising 3 carbon atoms; and

(iv') the group $Y^{II}$ represents a phenyl group, unsubstituted or mono- or polysubstituted with one or more identical or different substituents selected from halogen atoms, $OCF_3$, CHO, $CF_3$, $SO_2N(alkyl)_2$, $NO_2$, S(aryl), $SCH_2(phenyl)$, an unbranched or branched alkene, an unbranched or branched alkyne optionally substituted with a trialkylsilyl radical, $—O$ (alkyl), $—O(aryl)$, $—CH_2CN$, a ketone, an aldehyde, a sulphone, an acetal, an alcohol, a lower alkyl, $—CH=CH—CHO$, $—C(alkyl)=N—OH$, $—C(alkyl)=N—O(alkyl)$, $—CH=NOH$, $—CH=NO(alkyl)$, $—C(alkyl)=NH—NH—CONH_2$, an O-phenyl or $—OCH_2(phenyl)$ group, $—C(cycloalkyl)=NOH$, $—C(cycloalkyl)=N—O(alkyl)$;

or its pharmaceutically acceptable salts, or their optical isomers, racemates, diastereoisomers or enantiomers;

to a patient in need thereof.

126.    Claim 2 of the '605 Patent recites:

**Claim 2.** The method according to claim 1 using 3-(4-chlorophenyl)propyl-3-piperidinopropylether, or its pharmaceutically acceptable salts, or its optical isomers, racemates, diastereoisomers or enantiomers.

127.    Claim 6 of the '605 Patent recites:

**Claim 6.** The method according to claim 2 wherein the compound is in the form of a pharmaceutical salt selected from the group consisting of hydrochloride, hydrobromide, hydrogen maleate and hydrogen oxalate.

128.    U.S. Patent No. 7,169,928 (the "'928 patent") was filed June 1, 2004, issued on January 30, 2007, and is expired.

129.    The named inventors of the '928 patent are Jean-Charles Schwartz, Jean-Michel Arrang, Monique Garbarg, Jeanne-Marie Lecomte, Xavier Ligneau, Walter G. Schunack, Holger Stark, Charon Robin Ganellin, Fabien Leurquin, and Sigurd Elz.

130.    The assignee of the '928 patent is Societe Civile Bioprojet.

131.    The '928 Patent and '947 Patent are commonly owned by Bioprojet.

132.    Claim 1 of the '928 Patent recites:

Claim 1. A compound of formula (IIa)

$$R^1$$
$$\underset{R^2}{\overset{R^1}{\diagdown}} N \text{—(chain } A^{II}\text{)—} X^{II} \text{—(chain } B^{II}\text{)—} Y^{II}$$
(IIa)

wherein:
R1 and R2 form together with the nitrogen to which they are attached a saturated nitrogen-containing ring



with m ranging from 2 to 8 and $R^{a-b}$ being independently a hydrogen atom or a lower alkyl, and
(i′) the chain $A^{II}$ selected from an unbranched alkyl group $—(CH_2)_{nII}—$ where $n_{II}$ is 3;
(ii′) the group $X''$ is $—O—$;
(iii′) the chain $B^{II}$ is an unbranched alkyl comprising 3 carbon atoms; and
(iv′) the group $Y^{II}$ represents a phenyl group, unsubstituted or mono- or polysubstituted with one or more identical or different substituents selected from halogen atoms, $OCF_3$, CHO, $CF_3$, $SO_2N(alkyl)_2$ $NO_2$, S(aryl),

SCH$_2$(phenyl), an unbranched or branched alkene, an unbranched or branched alkyne optionally substituted with a trialkylsilyl radical, —O(alkyl), —O(aryl), —CH$_2$CN, a ketone, an aldehyde, a sulphone, an acetal, an alcohol, a lower alkyl, —CH=CH—CHO, —C(alkyl)=N—OH, —C(alkyl)=N—O(alkyl) and derivatives, —CH=NOH, —CH=NO(alkyl), —C(alkyl)=NH—NH—CONH$_2$, an O-phenyl or —OCH$_2$ (phenyl) group, —C(cycloalkyl)=NOH, —C(cycloalkyl)=N—O(alkyl);

or its pharmaceutically acceptable salts, hydrates, or hydrated salts, or their optical isomers, racemates, diastereoisomers or enantiomers.

133.    Claim 13 of the '928 Patent recites:

**Claim 13**. The compound according to claim 1, wherein the compound is 3-(4-chlorophenyl)propyl 3-piperidinopropyl ether, or its pharmaceutically acceptable salts, hydrates, or hydrated salts, or its optical isomers, racemates, diastereoisomers or enantiomers.

134.    Claim 14 of the '928 Patent recites:

**Claim 14**. The compound according to claim 1, in the form of a pharmaceutical salt chosen from the group consisting in hydrochloride, hydrobromide, hydrogen maleate or hydrogen oxalate.

135.    Claim 15 of the '928 Patent recites:

**Claim 15.** A pharmaceutical composition comprising a compound of formula (IIa) as defined in claim 1 with a pharmaceutically acceptable vehicle or excipient.

136.    Claim 16 of the '928 Patent recites:

**Claim 16**. A pharmaceutical composition according to claim 15 comprising 3-(4-chlorophenyl)propyl-3-piperidinopropylether or its pharmaceutically acceptable salts, hydrates, or hydrated salts, racemates, diastereoisomers or enantiomers with a pharmaceutically acceptable vehicle or excipient.

137.    U.S. Patent No. 7,138,413 (the "'413 patent") was filed July 29, 1999, issued on November 21, 2006, and is expired.

138.    The named inventors of the '413 patent are Jean-Charles Schwartz, Monique Garbarg, Jeanne-Marie Lecomte, Xavier Ligneau, Walter G. Schunack, Holger Stark, Charon Robin Ganellin, Fabien Leurquin, Sigurd Elz, and Jean-Michel Arrang.

139.    The assignee of the '413 patent is Societe Civile Bioprojet.

140.    The '413 Patent and '947 Patent are commonly owned by Bioprojet.

141.    The '413 Patent has expired.

142.    Claim 1 of the '413 Patent recites:

Claim 1. A method for treating symptoms associated with cognitive disorders selected from the group consisting of attention, wakefulness and memory disorders, said method comprising administering in an amount effective to inhibit H3 receptor activity to a patient in need thereof a compound having the general formula (IIa)

(IIa)

$$R^1 \diagdown N —(chain\ A^{II})— X^{II} —(chain\ B^{II})— Y^{II}$$
$$R^2 \diagup$$

wherein:

$R^1$ and $R^2$ may be identical or different and represent each independently a lower alkyl

or taken together with the nitrogen atom to which they are attached,

a saturated nitrogen-containing ring



with m ranging from 3 to 6, or

a non-aromatic unsaturated nitrogen-containing ring

with p and q being 1 or 2 and r being 1,

$R^{a-d}$ being independently a hydrogen atom or a lower alkyl or carboalkoxy group, or

a morpholino group, or

a N-substituted piperazino group:

**CONFIDENTIAL**



with R being a lower alkyl, cycloalkyl, carboalkoxy, aryl, arylalkyl, an alkanoyl or aroyl group; and

(i) the chain $A^{II}$ selected from a saturated, straight or branched hydrocarbon chain containing 1 to 6 carbon atoms, the saturated hydrocarbon chain optionally may be interrupted by a hetero atom which may be a sulphur atom;

(ii) XII selected from an oxygen atom, —NHCO—, —O—CO—, —OCONH—, —CONH—, and —S—C(=NY$^{II}$)—NH—Y$^{II}$— with the Y$^{II}$ identical or different;

(iii) the chain $B^{II}$ selected from an aryl; a straight alkylene chain —$(CH_2)_{nII}$—, $n_{II}$ being an integer which can vary between 1 and 5 or a branched alkylene chain containing from 2 to 8 carbon atoms; and

(iv) $Y^{II}$ selected from a straight or branched alkyl group containing 1 to 8 carbon atoms; a cycloalkyl containing 3 to 6 carbon atoms; an aryl group such as an optionally substituted phenyl group; a 5- or 6-membered heterocyclic radical containing one or two heteroatoms chosen from nitrogen and sulphur atoms, the heterocyclic radical optionally being substituted; and a bicyclic radical resulting from the fusion of a benzene ring to a heterocycle as defined above;

or

(i′) the chain $A^{II}$ selected from an unbranched or branched alkyl group —$(CH_2)_{nIV}$— where $n_{IV}$ is an integer which can vary between 1 and 8;

(ii′) the group $X^{II}$ selected from —OCONH—, —OCO—, —OCSNH—, —CH$_2$—, —O—, —OCH$_2$CO—, and saturated alkyl;

(iii′) the chain $B^{II}$ selected from an unbranched, branched or unsaturated lower alkyl comprising from 1 to 8 carbon atoms; —$(CH_2)nII$ (hetero atom)— where the hetero atom is preferably a sulphur or oxygen atom; nil being an integer which can vary between 1 and 5; and

(iv′) the group $Y^{II}$ represents a phenyl group, unsubstituted or mono- or polysubstituted with one or more identical or different substituents selected from halogen atoms, CHO, SO$_2$N(alkyl)$_2$ such as SO$_2$N(CH$_3$)$_2$, NO$_2$, an unbranched or branched alkene, —O(alkyl), —O(aryl), a ketone, an aldehyde, an alcohol, a lower alkyl, —CH=CH—CHO, —C(alkyl)=N—OH, —C(alkyl)=N—O(alkyl) and other keto derivatives, —CH=NOH, —CH=NO(alkyl), and other aldehyde derivatives, an O-phenyl or —OCH$_2$(phenyl) group, —C(cycloalkyl)=NOH, —C(cycloalkyl)=N—O(alkyl); an optionally substituted heterocycle; a cycloalkyl; a phenyl ring fused to a heterocycle comprising a nitrogen hetero atom or to a carbocycle or a

42

heterocycle bearing a keto function; an unbranched or branched lower alkyl comprising from 1 to 8 carbon atoms; a linear or branched alkyl mono- or polysubstituted with phenyl groups which are either unsubstituted or mono- or polysubstituted; a phenyl alkyl ketone in which the alkyl group is branched or unbranched or cyclic; a substituted or unsubstituted benzophenone; a substituted or unsubstituted, unbranched or branched or cyclic phenyl alcohol; an unbranched or branched alkene; a piperidyl group; a polycyclic group, in particular a fluorenyl group, a naphthyl or polyhydronaphthyl group or an indanyl group; a ketone or keto derivative; a diphenyl group; a phenoxyphenyl group; or its pharmaceutically acceptable salts, hydrates, or hydrated salts, or their optical isomers, racemates, diastereoisomers or enantiomers.

143.    Claim 36 recites:

**Claim 36**. The method according to claim 1 wherein said compound is 3-(4-chlorophenyl)propyl-3-piperidinopropylether    or    its    pharmaceutically acceptable salts, hydrates, or hydrated salts, or the polymorphic crystalline structures of these compounds or their optical isomers, racemates, diastereoisomers or enantiomers.

144.    Claim 37 recites:

**Claim 37**. The method according to claim 1 wherein said compound is in the form of a pharmaceutically acceptable salt chosen from the group consisting in hydrochloride, hydrobromide, hydrogen maleate, hydrogen oxalate.

145.    A POSA would understand that the compound referred to as "3-(4-chlorphenyl)propyl-3-piperidinopropylether" is pitolisant.

146.    The '430, '413, '928, and '605 Patents all issued before the issuance of the '947 Patent.

147.    The '430, '413, '928, and '605 Patents all have or had expiration dates earlier than the expiration date of the '947 Patent.

148.    The '413, '928, and '605 Patents may be considered as reference patents in an obviousness-type double patenting analysis of the '947 Patent.

149.    The following references are prior art to the '197 Patent:

| '197 Patent | | | |
|---|---|---|---|
| **Abbrev.** | **Citation** | **Issue Date / Pub. Year** | **Exhibit Number** |
| EP '503 | European Patent No. 1 100 503 B1 | Sept. 22, 2004 | DTX-0002 |
| Berge | Berge et al., *Pharmaceutical Salts*, 66 J. PHARM. SCI. 1–19 | 1977 | PTX-427 DTX-0079 |
| Byrn 1995 | Byrn et al., *Pharmaceutical Solids: A Strategic Approach to Regulatory Considerations*, 12 PHARM. RES. 945–954 | 1995 | PTX-428 DTX-0081 |

150.    The following references are prior art to the '947 Patent:

| '947 Patent | | | |
|---|---|---|---|
| **Abbrev.** | **Citation** | **Issue Date / Pub. Year** | **Exhibit Number** |
| WO '254 | International Patent Publication WO 2000/06254 | Feb. 10, 2000 | PTX-497 DTX-0090 |
| Brooks | Brooks, S. et al., *Novel therapies for narcolepsy*, 11 EXPERT OPIN. INVESTIG. DRUGS, 1821 | 2002 | PTX-472 DTX-0080 |
| Meier I | Meier, G. et al., *FUB 649: A Novel Non-imidazole histamine H3-Receptor Antagonist with High In Vitro and Oral In Vivo Potency*, 334(2) ARCH. PHARM. PHARM. MED. CHEM. C40 | 2001 | PTX-429 DTX-0085 |

# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| HARMONY BIOSCIENCES, LLC, et al., | |
| Plaintiffs, | |
| v. | C.A. No. 23-1286-JLH |
| LUPIN LIMITED, et al., | (Consolidated) |
| Defendants. | **CONTAINS CONFIDENTIAL INFORMATION SUBJECT TO PARAGRAPH 9 OF THE PROTECTIVE ORDER** |

**EXHIBIT 2
PLAINTIFFS' STATEMENT OF CONTESTED ISSUES OF FACT**

# Contents

I.    BACKGROUND ............................................................................................... 1

    A.    Narcolepsy ....................................................................................... 1

    B.    WAKIX® ......................................................................................... 3

    C.    The Histaminergic System ............................................................. 5

    D.    The $H_3$ Receptor ............................................................................. 5

    E.    Diurnal Somnolence vs. Excessive Daytime Sleepiness ................ 6

    F.    Diagnosing Narcolepsy Based on the ICSD .................................. 7

    G.    Treatment of Narcolepsy Prior to April 2005 .............................. 10

    H.    The Mechanisms/Receptors Considered for Treatment of EDS in Narcolepsy as of April 2005 ....................................................... 11

        1.    Existing treatments as of Early 2005 had drawbacks. ............. 11

        2.    Different novel treatment strategies were pursued as of early 2005 ........ 12

    I.    By Early 2005, There Were Numerous $H_3$ Receptor Antagonists ........................ 14

        1.    Imidazole $H_3$ Antagonists ............................................... 15

        2.    Non-Imidazole $H_3$ Receptor Antagonists ................................. 15

        3.    $H_3$ Receptor Antagonists/Inverse Agonists ............................. 17

        4.    Dual Action $H_3$ Receptor Antagonists...................................... 18

    J.    Stereochemistry............................................................................ 19

    K.    Salts of Pharmaceutically Active Compounds ........................... 21

    L.    Crystals and Crystallization ......................................................... 23

II.    U.S. PATENT NO. 8,207,197 ........................................................................ 27

    A.    The Person of Ordinary Skill in the Art ('197 Patent) ................ 27

    B.    Background Relating to Infringement of the '197 Patent.............. 27

        1.    Analytical and Testing Procedures........................................... 27

**2.** Sample handling and chain of custody were managed carefully and properly. ........................................................................................ 31

**3.** Alleged expiry of the samples tested by Plaintiffs' experts did not impact testing. ..................................................................................... 32

**C.** AET's ANDA Products ███████████████████████
███████████████ ........................................................................ 33

**1.** ███████████████████████████████ ............... 34

**2.** ██████████████████████████ ............................. 34

**3.** Dr. Wenslow's testing of AET's ANDA Products ███████
██████████████████. ...................................................... 35

**4.** ████████████████████████████████████
████ ....................................................................................... 36

**D.** MSN's ANDA Products Contain the Claimed Crystalline Form of Pitolisant Hydrochloride .......................................................................... 38

**1.** Manufacturing of MSN's ANDA Product. ................................. 39

**2.** XRPD Testing ............................................................................ 39

**3.** ████████████████████████████████████
████████er. .......................................................................... 41

**E.** Novitium's ANDA Products Contain the Claimed Crystalline Form of Pitolisant Hydrochloride .......................................................................... 42

**1.** Manufacturing of ███████ and Novitium's ANDA Products ........... 43

**2.** XRPD Testing ............................................................................ 44

**3.** Dr. Wenslow's Testing of Novitium ANDA Products .............................. 45

**4.** The crystalline pitolisant in Novitium's ANDA Products contains 6% or less water. ...................................................................... 47

**F.** Hikma's ANDA Products Contain the Claimed Crystalline Form of Pitolisant Hydrochloride .......................................................................... 48

**1.** Manufacturing of Biophore's ████████ and Hikma's ANDA Products. ................................................................................ 49

**2.** XRPD Testing ............................................................................ 50

3.    Dr. Wenslow's Testing of Hikma's ANDA Products ................................ 52

4.    Crystalline Form of Pitolisant Hydrochloride ............................................. 53

G.    Claims 1 and 2 of the '197 Patent Are Not Obvious over EP 503 Alone or
in View of Berge and/or Bryn-1995 ....................................................................... 54

1.    EP '503 does not disclose the claimed crystalline pitolisant
monohydrate salt. ................................................................................... 54

2.    A POSA would not have been motivated to pursue pitolisant for
development or investigate its salts and crystalline forms ...................... 57

3.    A POSA would not have been motivated to make the claimed
crystalline form of pitolisant hydrochloride. ........................................ 59

4.    A POSA would not have had a reasonable expectation of success in
making the claimed crystalline form of pitolisant hydrochloride. ........... 66

H.    Objective Indicia Support Non-Obviousness .......................................................... 71

1.    Nexus with Claims 1 and 2 exists. ........................................................ 72

2.    The claimed pitolisant hydrochloride exhibits unexpectedly
advantageous properties for pharmaceutical use. .................................. 72

3.    Copying of the claimed crystalline form demonstrate its non-
obviousness. ........................................................................................... 77

I.    Claim 1 of the '197 Patent Is Enabled and Supported by Adequate Written
Description ............................................................................................................ 78

J.    Claim 2 of the '197 Patent Is Not Indefinite ......................................................... 83

K.    The '197 Patent Is Not Invalid for Improper Inventorship ................................... 84

III.    U.S. PATENT NO. 8,486,947 ........................................................................................ 86

A.    The Person of Ordinary Skill in the Art ('947 Patent) .......................................... 86

B.    Background Relating to Infringement of the '947 Patent ...................................... 86

1.    The WAKIX® label addresses treatment of EDS and cataplexy. .............. 86

2.    Treating cataplexy with pitolisant hydrochloride inevitably results
in treating a narcolepsy patient's EDS. .................................................... 87

3.    The description of treating EDS in the specification of the '947
Patent encompasses the treatment of cataplexy. ..................................... 88

iv

C.      Novitium's ANDA Products Proposed Prescribing Information Encourages
        Physicians to Practice the Claimed Method of Treatment ................................... 89

D.      Hikma's ANDA Products Proposed Prescribing Information Encourages
        Physicians and Patients to Practice the Claimed Method of Treatment ............... 95

E.      MSN's ANDA Products Proposed Prescribing Information Encourages
        Physicians and Patients to Practice the Claimed Method of Treatment ............. 103

F.      Claim 13 Is Not Obvious ..................................................................... 106

        1.      References Identified in Defendants' Combinations ............................. 106

        2.      Additional Facts about the State of the Art in April 2005 ...................... 110

        3.      Claim 13 is not obvious over the combination of WO '254 and
                Brooks 2002. .................................................................................. 116

        4.      Claim 13 is not obvious over the combination of Meier I and
                Brooks. ........................................................................................... 122

G.      Claim 13 Is Not Invalid for Obviousness-type Double Patenting ..................... 122

        1.      Claim 13 is not invalid for OTDP over claims 1 or 3 of the '430
                Patent.............................................................................................. 123

        2.      Claim 13 is not invalid for OTDP over claims 1, 2 or 6 of the '605
                Patent.............................................................................................. 128

        3.      Claim 13 is not invalid for OTDP over claims 1, 36 and/or 37 of
                the '413 Patent. ............................................................................... 130

        4.      Claim 13 is not invalid for OTDP over claims 1 and 13-16 of the
                '928 Patent. ..................................................................................... 131

H.      Objective Indicia Confirm the Non-obviousness of Claim 13 of the '947
        Patent.................................................................................................... 133

        1.      Nexus with Claim 13 exists. ............................................................. 133

        2.      There was a long-felt but unmet need for a non-controlled drug
                that was efficacious in treating EDS and cataplexy. ........................... 134

        3.      There was a long-felt but unmet need for a once-daily tablet was
                efficacious in treating EDS and cataplexy. ....................................... 136

        4.      Many others failed to develop an H$_3$ antagonist that achieved
                regulatory approval. ........................................................................ 137

v

**5.** Pitolisant hydrochloride demonstrated unexpected therapeutic benefits as a method of treating EDS in patients with Parkinson's, narcolepsy or sleep apnea. ........................................................ 144

**6.** WAKIX has been the subject of industry praise and acceptance since its release onto the market. ........................................................ 146

I. Claim 13 Is Not Invalid for Indefiniteness ........................................................ 146

J. Claim 13 Is Not Invalid for Lack of Enablement ........................................................ 150

K. Claim 13 Is Not Invalid for Lack of Written Description ........................................... 153

L. The '947 Patent Is Appropriately Listed in the Orange Book with Use Code U-1102 ........................................................ 156

**1.** The '947 Patent is appropriately listed in the Orange Book with Use Code U-1102. ........................................................ 156

**2.** As the term "treating excessive daytime sleepiness" is used in the context of the '947 Patent, the '947 Patent is appropriately listed in the Orange Book with Use Code U-1102. ........................................................ 157

1.      Pursuant to D. Del. LR 16.3(c)(4), Plaintiffs submit the following issues of fact that remain to be litigated.

## I.     BACKGROUND

### A.     Narcolepsy

2.      Narcolepsy is a chronic sleep disorder.

3.      Narcolepsy is a lifelong, often disabling condition. Narcolepsy can cause sleep attacks that lead to serious accidents and an inability to maintain employment.  This increased risk of accidents makes EDS in patients with narcolepsy a public health issue.

4.      Narcolepsy is a disorder characterized by excessive daytime sleepiness ("EDS"). In addition to EDS, narcolepsy is characterized by displaced manifestations of REM sleep during wakefulness, which clinicians understand to include cataplexy, sleep-related hallucinations, sleep paralysis and nocturnal sleep disruption (also called fragmented sleep).

5.      Excessive daytime sleepiness is discussed in the scientific literature as pathological sleepiness that interferes with daytime functioning, including lapses into sleep during the daytime, sleep attacks (onset of involuntary sleep), and excessive daytime napping. EDS is often the most disabling symptom of narcolepsy.

6.      Clinicians use the Epworth Sleepiness Scale ("ESS") to diagnose EDS, which is a self-assessment used to determine how likely a patient is to fall asleep during the daytime.

- 0 to 5: Low daytime sleepiness (normal).

- 6 to 10: High daytime sleepiness (normal).

- 11 to 12: Mild excessive daytime sleepiness.

- 13 to 15: Moderate excessive daytime sleepiness.

- 16 to 24: Severe excessive daytime sleepiness.

An ESS score of 11 or above typically indicates the presence of EDS.

7.     According to the American Academy of Sleep Medicine, *International Classification of Sleep Disorders* 83 (2nd ed. 2005) ("ICSD-2"), "[n]arcolepsy with cataplexy can be diagnosed on purely clinical grounds."

8.     EDS is the hallmark of all types of narcolepsy; all narcolepsy patients have EDS.

9.     According to the ICSD-2, in order to be diagnosed with narcolepsy, a patient must suffer from EDS for at least 3 months.

10.     The narcolepsy diagnosis is split into two main types of narcolepsy: narcolepsy with cataplexy (Narcolepsy type 1), and narcolepsy without cataplexy (narcolepsy type 2).

11.     Patients with narcolepsy type 1 (also known as narcolepsy with cataplexy) have both EDS and cataplexy.

12.     Patients with narcolepsy type 2 (also known as narcolepsy without cataplexy) have EDS, but do not have cataplexy.

13.     Narcolepsy type 2 is characterized by EDS and the absence of definite cataplexy, though patients with narcolepsy type 2 may still have other REM abnormalities, such as hypnagogic hallucinations or sleep paralysis.

14.     Every narcoleptic patient—including those with cataplexy—has EDS.

15.     Cataplexy is characterized by a sudden loss or weakening of muscle tone frequently provoked by strong emotions, such as laughter, elation, or surprise.

16.     Cataplexy varies in severity and may be widespread throughout the musculature or limited to certain muscles.

17.     Cataplexy and EDS are linked and clinicians treat cataplexy and EDS as "a homogenous clinical entity."

2

18.     Clinicians have observed narcolepsy patients who experience long cataplectic episodes that transition into paradoxical sleep.

19.     Clinicians have hypothesized that narcolepsy "results from vigilance and state boundary problems" – i.e., the boundaries between sleep and wake are "leaky."

20.     The core cause of narcolepsy with cataplexy is orexin deficiency, although the precise contours of this mechanism have not been fully elucidated.

21.     Prior to the approval of WAKIX most drugs used to treat narcolepsy were controlled substances. Further, prior to the approval of WAKIX, almost all pharmacological treatments for narcolepsy, with the exception of sodium oxybate, treated either EDS or cataplexy, but not both.

22.     Sodium oxybate was approved for the treatment of EDS in narcolepsy patients in November 2005.

23.     Sodium oxybate is a controlled scheduled substance.

24.     Antidepressants such as serotonin-selective reuptake inhibitors and tricyclic antidepressants are also prescribed for the treatment of cataplexy, though they are not FDA-approved for such use.

**B.     WAKIX®**

25.     WAKIX is an FDA-approved drug for the treatment of excessive daytime sleepiness or cataplexy in adult patients with narcolepsy, as well as for the treatment of excessive daytime sleepiness in pediatric patients 6 years of age or older with narcolepsy.

26.     WAKIX is the first FDA-approved $H_3$ receptor antagonist/inverse agonist.

27.     WAKIX is the first and only FDA-approved once-daily tablet for treatment of EDS and cataplexy in narcolepsy.

28.     Pitolisant hydrochloride is an $H_3$ antagonist/inverse agonist. It is the first $H_3$ antagonist and the first $H_3$ inverse agonist approved by FDA for any indication.

3

29.    WAKIX is available in two strengths, 4.45 mg and 17.8 mg.

30.    WAKIX was first approved for EDS in narcolepsy patients in 2019 and for cataplexy in narcolepsy patients in 2020.

31.    Pitolisant remains the only treatment approved for both EDS and cataplexy in adult patients with narcolepsy that is not a controlled substance.

32.    Pitolisant's mechanism of action in treating patients with narcolepsy is not fully understood, but it is thought to act through the histaminergic system, as a selective $H_3$ antagonist/inverse agonist and indirectly through other neurotransmitter systems, like norepinephrine, dopamine, and acetylcholine.

33.    It is hypothesized that pitolisant reduces EDS through the histaminergic system, which functions to both increase alertness and reduce the desire to sleep and reduces cataplexy by suppressing REM sleep intrusions through an unknown mechanism. Through these potential mechanisms, pitolisant is thought to treat EDS and cataplexy by resetting a patient's sleep/wake system (which is sometimes referred to as a patient's sleep architecture).

34.    The WAKIX Prescribing Information states that the recommended dosage range for WAKIX for the treatment of EDS or cataplexy in adult patients is 17.8 mg to 35.6 mg administered orally once daily in the morning upon wakening.

35.    The WAKIX Prescribing Information states that the dosage of WAKIX should be titrated upwards over three weeks, and that the dose may be adjusted based on tolerability.

36.    WAKIX was granted fast track designation for the treatment of EDS and cataplexy in patients with narcolepsy; and breakthrough therapy designation for the treatment of cataplexy in people with narcolepsy.

### C.    The Histaminergic System

37.    The histaminergic system facilitates several physiological functions, including regulating immune response, itch, arousal, sleep-wake cycles, learning and memory, seizure activity, neuroendocrine responses, food and water intake, thermoregulation, regulation of glucose and lipid metabolism, control of blood pressure, and analgesic responses.

38.    There are 4 receptors within the histaminergic system ($H_1$ – $H_4$). $H_1$, $H_2$, and $H_3$ receptors are expressed primarily in the brain and regulate behavior, cognition, and blood-brain barrier control, respectively. The $H_4$ receptor is expressed in peripheral tissues and plays a role in chemotaxis.

### D.    The $H_3$ Receptor

39.    The $H_3$ receptor was discovered in 1983.[1] The $H_3$ receptor is an inhibitory autoreceptor that, when activated, inhibits pre-synaptically the release of neurotransmitters such as dopamine, GABA, norepinephrine, and serotonin. When histamine binds to the $H_3$ receptor, histamine reduces the activity of the receptor, which is known as a negative feedback mechanism.

40.    As of April 2005, it was known that the $H_3$ receptor had constitutive activity, such that it produces a cellular response even in the absence of a ligand.

41.    As of April 2005, the $H_3$ receptor was speculated to have involvement in numerous downstream activities including obesity, schizophrenia, ADHD, Alzheimer's, epilepsy, sleep disorders, improving cognition, attention, allergic rhinitis, myocardial dysfunction and pain.

42.    By April 2005, although a handful of $H_3$ compounds had entered Phase II studies, none had successfully exited such studies, suggesting that the compounds were not found to be clinically efficacious for any disorder regulated by $H_3$ receptors.

---

[1] Some of the discoverers are named inventors on the asserted patents.

43.    Neuronal histamine can affect sleep-wake cycles by (1) activating $H_1$ receptors which in turn impact arousal; and (2) by inhibiting histaminergic or other neurons by binding pre-synaptically to the $H_3$ receptor, and for histaminergic neurons, reducing the release of histamine, thereby reducing activation of postsynaptic $H_1$ receptors.

44.    $H_3$ antagonists and inverse agonists bind to $H_3$ receptors. $H_3$ antagonists block the effect of histamine on the receptor.  $H_3$ inverse agonists reduce the basal activity of the receptor. Both have the potential to increase the concentration of histamine in the synaptic cleft, the former by reducing the effect of histamine on the receptor and the latter by altering the activity of the receptor itself.

**E.    Diurnal Somnolence vs. Excessive Daytime Sleepiness**

45.    Excessive daytime sleepiness ("EDS") is understood scientifically to be pathological sleepiness that interferes with daytime functioning, characterized by repeated inappropriate lapses into sleep or irresistible sleep attacks during the waking state. EDS may be measured by the Epworth Sleepiness Scale (ESS), or by MSLT, a hypocretin level evaluation, or polysomnography.

46.    Diurnal somnolence is distinguishable from EDS, as it represents a broad category of tiredness or drowsiness during the day, which is not pathological, and is experienced by all humans, for example, after a bad night's sleep.

47.    Wake- and sleep-promoting neurons inhibit one another, and as a result, oscillations of activity between these two neuronal systems regulates the sleep-wake cycle. The hypocretin/orexin system orchestrates arousal; the accumulation of adenosine regulates sleepiness after wakefulness; and the release of dopamine appears to also play a role in arousal.

48.    EDS in patients with narcolepsy is partly a result of disrupted sleep architecture. EDS in Parkinson's patients is a result of structural damage that has caused disrupted sleep

architecture. EDS in patients with sleep apnea is a result of chronically poor nocturnal sleep that has resulted in disrupted sleep architecture.

49.     The fact that EDS may be associated with clinical conditions—such as narcolepsy, Parkinson's disease, or sleep apnea—does not mean that EDS itself is not distinct from those associated disorders.

50.     EDS is a pathological disorder—in other words, a clinical condition. Clinicians understand a patient with an Epworth Sleepiness Scale (ESS) score greater than 11—the pathological cut-off of the continuum spanning EDS and daytime sleepiness—to have EDS, a pathology distinct from the ordinary sleepiness experienced daily by healthy individuals.

51.     Because EDS is a pathology characterized by disorganized sleep architecture, it is managed differently from ordinary diurnal somnolence. For example, caffeine is effective against diurnal somnolence—but not EDS.

**F.     Diagnosing Narcolepsy Based on the ICSD**

52.     When diagnosing narcolepsy, with or without cataplexy, a clinician or POSA would follow the diagnostic criteria set forth in American Academy of Sleep Medicine, *International Classification of Sleep Disorders* (ICSD). Several editions of the ICSD have been published, including the 2nd edition published in 2005 (ICSD-2) and the 3rd edition text revision published in 2023 (ICSD-3-TR).

53.     For purposes of this litigation, any differences in the discussion of narcolepsy across the various editions of the ICSD are immaterial and would not affect the understanding of a clinician or POSA as to infringement, validity, or listing of the '947 Patent.

54.     The ICSD-2 teaches that EDS is the hallmark of all types of narcolepsy.

55.     The ICSD-2 requires that a patient have EDS for at least 3 months to be diagnosed with narcolepsy (with or without cataplexy).

7

56.    Although the ICSD-2 distinguishes between the types of narcolepsy based on whether or not cataplexy is present, all narcoleptic patients have EDS.

57.    Like the ICSD-2, the ICSD-3-TR teaches that EDS is an "[e]ssential [f]eature" and the "cardinal symptom" of narcolepsy type 1. ICSD-3-TR at 180 (ANI-Pitolisant00028262) ("Narcolepsy type 1 (NTl) is a disorder primarily characterized by excessive daytime sleepiness . . . . Excessive daytime sleepiness is the cardinal symptom . . . ."); *id.* at 193 (ANI-Pitolisant00028275) ("Narcolepsy type 2 (NT2) is characterized by excessive daytime sleepiness").

58.    One of the means of diagnosing NT1 is a Multiple Sleep Latency Test score of 8 minutes or under, which is indicative of pathological sleepiness, i.e., EDS.

59.    The ICSD-3-TR also requires that to be diagnosed with narcolepsy type 2, a patient must suffer from "daily periods of irrepressible need to sleep or daytime lapses into drowsiness or sleep occurring for at least 3 months". ICSD-3-TR at 192 (ANI-Pitolisant00028274). A POSA or clinician would understand the foregoing phrasing to be equivalent to the diagnostic criterion in the ICSD-2, which specifies that the patient must suffer from EDS for at least 3 months to be diagnosed with narcolepsy. In other words, a POSA or clinician would understand the verbiage "daily periods of irrepressible need to sleep or daytime lapses into drowsiness or sleep occurring for at least 3 months" to mean that the patient must suffer from EDS for at least 3 months to be diagnosed with narcolepsy.

60.    Similarly, the ICSD-3-TR requirement that to be diagnosed with narcolepsy type 1, a patient must suffer from "daily periods of irrepressible need to sleep or daytime lapses into drowsiness or sleep" and further, "[t]he symptoms and signs are not better explained by chronic insufficient sleep, a circadian rhythm sleep-wake disorder or other current sleep disorder, mental

8

disorder or medication/substance use or withdrawal." ICSD-3-TR at 179 (ANI-Pitolisant00028262). These diagnostic criteria A and C (which are required for a narcolepsy type 1 diagnosis) would be understood by a POSA or clinician to mean that the patient must exhibit EDS. Indeed, the ICSD-3-TR description of narcolepsy type 1 states as follows:

> **Excessive daytime sleepiness** Excessive daytime sleepiness is the cardinal symptom, and often the most disabling. Patients with narcolepsy type 1 experience repeated *daily episodes, of an irresistible need to sleep or lapses into drowsiness or sleep*.

ICSD-3-TR at 180 (ANI-Pitolisant00028262) (emphasis added).

61.     Like the ICSD-2, the ICSD-3-TR differentiates between narcolepsy with cataplexy and narcolepsy without cataplexy. The ICSD-3-TR terms the former "narcolepsy type 1" and the latter "narcolepsy type 2." And like the ICSD-2, the ICSD-3-TR requires that both narcolepsy type 1 and narcolepsy type 2 patients exhibit EDS. *Supra* ¶¶ 57-4859.

62.     Defendants' labeling continues to define narcolepsy based on the ███████ indicating the continuing relevance of the █████, notwithstanding the publication of other editions of the ICSD. For example, Hikma's labeling states as follows:



Pitoli_028230

63.     Similarly, Novitium's labeling states as follows:



64.    Cataplexy is a manifestation of REM sleep that occurs during the day. In some cases, cataplexy episodes can transition into sleep attacks.

65.    That articles from 1988 and 1991 discuss "isolated cataplexy" do not reflect present-day thinking that "isolated cataplexy represents a form of narcolepsy."

**G.    Treatment of Narcolepsy Prior to April 2005**

66.    Clinicians prefer to treat any symptoms of a condition using only one drug, if possible. Prior to pitolisant, there was only one other drug, sodium oxybate, that was known to be effective for both EDS and cataplexy in narcolepsy patients.

67.    Just because cataplexy and EDS are "typically" treated using different drugs does not mean that 1) one drug cannot treat both; or that 2) administering a single drug (like pitolisant) is not the preferable treatment regimen.

68.    As of 2005, all "wake-promoting" drugs used to safely and effectively treat EDS acted through the dopamine-reuptake transporter. These drugs included amphetamines, methylphenidate, and modafinil.

69.    Sodium oxybate (also known as Xyrem, GHB or $\gamma$-hydroxybutyric acid) received FDA approval for the treatment of cataplexy in narcolepsy patients in 2002 and treatment of EDS in narcolepsy patients in November 2005. Sodium oxybate is hypothesized to treat both cataplexy and EDS through the GABAergic neurotransmitter system by reducing dopamine release.

70.    As of April 2005, treatment of narcolepsy with sodium oxybate was especially difficult because sodium oxybate is a scheduled drug, which must be taken twice nightly in liquid form, posing patient compliance difficulties. Because sodium oxybate is a scheduled drug, patients and prescribers had to enroll in a specialized database. And bi-nightly dosing required patients to take a dose before going to bed, and then awaken in the middle of the night for the second dose.

10

71.     Treatments for EDS should prevent the patient from falling asleep during the day, while simultaneously not disturbing (or improving) normal nocturnal sleep patterns. Thus, a pharmacological agent should have an ideal half-life, such that the agent lasts long enough in the patient's body during the day to prevent sleep attacks, but leaves the body at night to avoid interference with nocturnal sleep.

72.     A compound used to treat EDS should reach the site of action in the body. Thus, a sufficient quantity of the compound must be able to diffuse through bodily tissues to reach the site of action. The site of action for CNS disorders—like EDS co-morbid with narcolepsy, sleep apnea and Parkinson's disease—is the central nervous system, so the compound should be able to cross the blood-brain barrier.

73.     As of April 2005, the study of $H_3$ receptor ligands as potential treatments for EDS in narcolepsy, Parkinson's disease, and sleep apnea was still nascent and unproven. However, research had been conducted on the role of $H_3$ receptors in cognition, attention, pain, allergic rhinitis, congestion, obesity, sleep disorders, ADHD, epilepsy, schizophrenia, Alzheimer's and myocardial dysfunction.

74.     There are multiple isoforms and splice variants of the $H_3$ receptor, which are associated with differing pharmacological properties and biological impacts.

75.     As of April 2005, the research group that discovered pitolisant had not published on pitolisant in nearly 2 years and there was no data to suggest that pitolisant had optimal properties for treatment of EDS in narcolepsy, Parkinson's or sleep apnea patients.

**H.      The Mechanisms/Receptors Considered for Treatment of EDS in Narcolepsy as of April 2005**

**1.      Existing treatments as of Early 2005 had drawbacks.**

76.    Brooks 2002 reports on amphetamine, methamphetamine, methylphenidate, pemoline, mazindol, selegiline, and modafinil as medications used to treat EDS in narcoleptic patients. Brooks 2002 notes that most of these drugs have drawbacks in terms of safety and efficacy.

77.    The amphetamine class of compounds are known as stimulants that exhibit their effect through the dopamine receptors.

78.    Brooks 2002 identifies modafinil as a "first-line" treatment for EDS in narcolepsy. By April 2005, it was speculated that modafinil exhibited its effect through dopamine receptors.

79.    Brooks 2002 teaches that several wake-promoting agents are either tolerated poorly by the patient or are ineffective at treating EDS in narcolepsy patients (an example of which is caffeine), indicating that merely having a wake-promoting effect does not render an agent effective at treating EDS in narcolepsy.

### 2.    Different novel treatment strategies were pursued as of early 2005.

#### a)    Hypocretin/orexin agonists

80.    Brooks 2002 reports that hypocretin/orexin played a role in the sleep-wake cycle and that patients with narcolepsy with cataplexy had very low, if any, quantities of hypocretin in their cerebrospinal fluid.

81.    Brooks 2002 promotes hypocretin/orexin agonists as clearly promising candidates for the treatment of narcolepsy. A POSA reading Brooks 2002 would pursue hypocretin/orexin agonists for treatment of EDS, which is the hallmark condition associated with narcolepsy.

#### b)    Slow wave sleep (SWS) enhancing agents

82.    Because sodium oxybate is known to enhance SWS and sodium-oxybate is an effective treatment for narcolepsy, Brooks 2002 suggests research into SWS-enhancing

compounds as promising for the treatment of narcolepsy. As of April 2005, there were several SWS-enhancing compounds approved by the FDA (for other indications), including tigabine, gaboxadol, olanzapine, and risperidone.

### c)    Dopaminergic re-uptake blockers

83.    Numerous compounds used to treat EDS as of 2005 acted through the dopaminergic system and Brooks 2002 suggests that dopamine reuptake inhibitors have fewer side effects than stimulants.

84.    Compounds thought to be acting through the dopaminergic system as of April 2005 included amphetamines and modafinil.

### d)    Compounds without dopaminergic activity

85.    Brooks 2002 reports on compounds without dopaminergic activity, as well. For example, Cephalon was developing CEP-11124 as an agent to promote wakefulness, which did not exhibit dopaminergic activity in animal studies.

### e)    $H_3$ receptor antagonists

86.    Although Brooks 2002 speculates that $H_3$ receptor antagonists may be useful for treating EDS in narcolepsy, Brooks 2002 (and the prior art as a whole) emphasizes the complexity of narcolepsy as a neurological disorder and suggests that given this complexity research into other classes of compounds—e.g., hypocretin/orexin agonists, dopamine transport blockers, and SWS-enhancing agents—was warranted for the treatment of narcolepsy.

87.    The pharmacology of the $H_3$ receptor was considered complex and challenging as of 2005, and much about the receptor, including the effects of agonists or antagonists on pathological conditions, and associated side effects, was unknown. In addition, a number of $H_3$ antagonists were known to present toxicity issues, and it was not known whether and how any particular $H_3$ antagonist could be used to treat EDS in a safe and effective manner; many $H_3$

antagonists failed in clinical studies. This undeveloped state of the $H_3$ receptor field made selecting a particular $H_3$ receptor ligand for clinical development a highly unpredictable challenge.

### f)    CRH receptor antagonists

88.    As of April 2005, researchers had identified corticotropin-releasing hormone (CRH) as potentially beneficial for treatment of EDS.

### g)    TNF-α inhibitors

89.    In Vgontzas 2004, the authors taught that TNF-α inhibitors were effective at improving sleepiness in OSA patients and that more generally TNF-α plays a role in sleepiness in humans.

### I.    By Early 2005, There Were Numerous $H_3$ Receptor Antagonists

90.    As of early 2005, not only did researchers recognize that using $H_3$ ligands as wake promoting treatments was highly speculative, but also Passani 2004 and other researchers recognized that selecting the right ligand for clinical development for the myriad indications proposed for $H_3$ receptor ligands would be more difficult than researchers had previously predicted.

91.    In exploring the many $H_3$ receptor antagonists evaluated by numerous pharmaceutical researchers and ventures, the most common data available in April 2005 was binding affinity in different species, most commonly mice, rats, guinea pigs and humans. Testing in mice also yielded $ED_{50}$ values, reporting the dose at which a compound could elicit at the mouse $H_3$ receptor the same concentration of a histamine metabolite as a 3mg/kg treatment of the compound ciproxifan.

92.    There is significant variability across species in the binding activity of $H_3$ ligands to a species' $H_3$ receptor. It is impossible to predict the binding affinity of an $H_3$ ligand at the human receptor based on binding affinity of the ligand at a different species' $H_3$ receptor.

14

93.     After the discovery and cloning of the human $H_3$ receptor in 2000, pharmaceutical researchers and ventures tested their compounds by assessing binding affinity data at the human receptor; by April 2005, new binding affinity data of compounds at the $H_3$ receptor in mice, rats and guinea pigs was less commonly tested or published.

94.     A POSA would not take all potent, selective $H_3$ antagonists into clinical studies.

### 1.     Imidazole $H_3$ Antagonists

95.     Because the naturally-occurring ligand of the $H_3$ receptor is histamine, which is an imidazole, the starting place for research into $H_3$ ligands was imidazole-containing compounds, such as thioperamide, clobenpropit, proxifan, and ciproxifan, all of which yielded binding data of interest to researchers.

96.     Because imidazoles tend to interact with cytochrome P450 enzymes, which serve as major routes of clearance for many drugs, imidazole-containing compounds pose a risk for drug-drug interactions. However, not all imidazoles inhibit P450 enzymes, and hence, not all imidazoles pose such a risk.

97.     Numerous papers published in the early 2000s evaluated imidazole-containing $H_3$ antagonists, including Grassman 2002, Grassman 2003, Aslanian 2004, and Meier 2004.

98.     GT2331, an imidazole compound, had entered Phase II studies as of 2003, from which a POSA would understand that GT2331 had been shown as safe in healthy humans.

99.     By April 2005, several companies were continuing to study imidazole containing $H_3$ antagonists, including Schering and others.

### 2.     Non-Imidazole $H_3$ Receptor Antagonists

100.    Numerous pharmaceutical researchers and ventures had created and evaluated hundreds of different possible non-imidazole $H_3$ antagonists. A POSA would have to consider all of these compounds when determining which compounds to take into clinical development.

101.    All non-imidazole $H_3$ antagonists would, in theory, avoid the concerns regarding CYP450 interaction, because each compound lacked an imidazole group.

102.    All non-imidazole $H_3$ antagonists that lacked a thiourea group (of which there were many) would, in theory, avoid the toxicity concerns that thioperamide was speculated to have.

103.    Many of these non-imidazole $H_3$ antagonist compounds were selective for the $H_3$ receptor over other histamine receptors.

104.    The numerous pharmaceutical researchers and ventures exploring $H_3$ antagonists were exploring different chemical structures for pre-clinical optimization. Thus, the scientific literature available as of April 2005 would have taught a POSA to *modify* the structure of existing compounds (including pitolisant), none of which had yet proven safe and effective, rather than selecting an existing compound for clinical development. Thus, the prior art taught away from using pitolisant in a method of treatment for EDS.

105.    Apart from the Schwartz/Stark/Ganellin group, numerous other pharmaceutical researchers and ventures published in the early 2000s on a wide range of $H_3$ antagonists.

106.    Stark 2003 provides an overview of the companies exploring $H_3$ ligands, reporting on several companies that had filed patents on potential compounds.

107.    Cowart 2004 discusses 166 compounds, including 150 non-imidazole compounds, synthesized by a range of companies and provides biological data, including mainly data of compounds assessing binding at human receptors.

108.    Aslanian 2004 discusses 26 compounds, including 15 non-imidazole compounds, and suggests that imidazole-containing compounds remain promising candidates.

109.    As of April 2005, the available biological data showed that many compounds were superior to pitolisant across multiple parameters, including binding data and $ED_{50}$ data.

110.    No company licensed pitolisant prior to April 2005; instead reflecting the common wisdom that the POSA would have developed *new* compounds, rather than using a compound like pitolisant, reported on in the literature several years prior, without more recent data.

### 3.    H₃ Receptor Antagonists/Inverse Agonists

111.    In the early 2000s, researchers discovered that some $H_3$ antagonists display "inverse agonist" activity.

112.    As of April 2005, there was no prior art teaching or suggesting that pitolisant is an inverse agonist.

113.    Morisset 2000 teaches that thioperamide, ciproxifan and FUB 465, which were previously considered antagonists, are better classified as inverse agonists. Morisset 2000 teaches that inverse agonists are more likely to be effective than neutral antagonists at improving arousal and learning. Cowart 2004 likewise suggests that $H_3$ antagonists/inverse agonists would be especially promising compounds.

114.    Morisset 2000 teaches that inverse agonists disrupt the constitutive activity of the $H_3$ receptor, thereby resulting in increased activity of cerebral histamine neurons, an effect not seen with neutral antagonists.

115.    Thus, the POSA, as of April 2005 would have been motivated to select a compound exhibiting inverse agonism for the development of a method of treating EDS.

116.    Morisset 2000, which first identified the importance of inverse agonism, is a paper originating in the Schwartz/Stark/Ganellin group that discovered pitolisant. Yet this group did not

17

report on pitolisant's inverse agonism prior to April 2005, suggesting to a POSA that pitolisant was not an inverse agonist.

117.    A POSA would not understand the statement in Brooks 2002 that $H_3$ antagonists increase wakefulness as indicating that any $H_3$ antagonist would alleviate EDS effectively in narcolepsy, Parkinson's, or sleep apnea patients, nor would a POSA read that statement negating the value of inverse agonism. In fact, in the early 2000s, a few imidazole containing $H_3$ antagonists were reported as having wake promoting activity in cats and rats (in models that were not reflective of the human disease states of Parkinson's, narcolepsy or sleep apnea); but it was later shown, in hindsight, that this beneficial activity was reported in compounds displaying *inverse agonism*.

118.    Many $H_3$ antagonists do not promote wakefulness, and a POSA would not be motivated to modify Brooks's teaching that $H_3$ antagonists promote wakefulness by choosing pitolisant in particular as the wake-promoting agent.

### 4.    Dual Action $H_3$ Receptor Antagonists

119.    The POSA would have been interested in compounds exhibiting activity in addition to $H_3$ receptor antagonism.

120.    For example, the POSA would have been interested in developing compounds exhibiting both $H_3$ antagonism and HMT inhibition, because doing so would increase histamine levels, which would not be metabolized given HMT inhibition, resulting in sustained release of cerebral histamine. Indeed, this was an avenue pursued by the Schwartz/Stark/Ganellin group.

121.    Additionally, the POSA would have pursued dual $H_1/H_3$ antagonists to treat allergic and inflammatory diseases, as well as compounds with effects on nitric-oxide, given that nitric oxide is an important neuronal signaling molecule impacting cognition.

122.    An additional approach the POSA would have pursued would have been $H_3$ antagonists with m2-antimuscarinic properties, which the prior art taught exhibited a synergy with the histaminergic system, with an impact on learning and memory.

123.    Thus, the POSA would have had to explore numerous research pathways when studying a treatment for wakefulness as of April 2005, and would not have found pitolisant a desirable option for use in a method of treating EDS nor would the POSA have been motivated to combine the teaching in Brooks about the role of $H_3$ receptor antagonists generally in promoting wakefulness, with the use of pitolisant for treating EDS in narcolepsy patients in particular.

**J.    Stereochemistry**

124.    Compounds utilized in pharmaceutical methods are typically organic compounds, which are made of carbon ("C") atoms, and typically also made of some of the following atoms: hydrogen ("H"),  nitrogen ("N"), oxygen ("O"), sulfur ("S"), chlorine ("Cl"), or fluorine ("F").

125.    Carbon atoms form four bonds. When drawing chemical structures, organic and medicinal chemists represent carbon through the terminus or apex of the straight-line drawing, with hydrogen atoms omitted. The carbon ring below, containing 6 carbons (referred to as a 6-membered ring) demonstrates these principles.

126.    Chemists depict single, double, and triple bonds by single, double, and triple lines, respectively. Compounds containing double or triple bonds are referred to as "unsaturated," while compounds containing only single bonds are referred to as saturated.

127.    The below chemical formula represents the genus of compounds encompassed by the method of claim 1 of the '947 Patent. Pitolisant belongs to this genus and is the compound required to be used in the method of claim 13.

$$R^1 \diagdown N \text{---} (\text{chain } A^{II}) \text{---} X^{II} \text{---} (\text{chain } B^{II}) \text{---} Y^{II}$$
$$R^2 \diagup$$

128.    In this formula, A, B, X, and Y represent different portions of the formula, N represents a nitrogen atom, and $R^1$ and $R^2$ are groups bonded to said nitrogen atom.

129.    Stereoisomers are compounds that are composed of the same number and types of atoms but differ in the spatial arrangement of the atoms.

130.    A chiral compound is a type of stereoisomer that contains an asymmetric carbon, such that the compound is distinguishable from and cannot be superimposed on its mirror image. This is analogous to the impossibility of superimposing one's right hand and left hands as shown below:



131.    The asymmetric carbon of a chiral compound is called a "chiral center" or "stereogenic center." An asymmetric carbon exists if it is bonded to 4 distinct substituents, as shown below.



*An example of enantiomers*

132.    The non-superimposable mirror images of a chiral compound are distinct molecules with distinct properties. These compounds are called "enantiomers" and they differ only by their chiral configuration, labeled "S" or "R."

133.    When a compound contains only one chiral center, the stereoisomers are known as enantiomers. When a compound contains more than one chiral center, the stereoisomers are known as diastereomers. An equal parts mixture of stereoisomers is known as a racemic mixture, or a racemate.

134.    Optical isomers are compounds with the same number and kinds of atoms, but that which rotate light in different directions. Enantiomers are always optimal isomers of one another, but a diastereomer may be an optical isomer of only some other diastereomers.

**K.    Salts of Pharmaceutically Active Compounds**

135.    Creating crystalline salts is challenging and unpredictable.

136.    One cannot predict prior to actually attempting to form a salt whether the reaction of a given active drug compound with a particular acid or base will successfully produce a crystalline salt. Even when a salt is formed in solution, a POSA cannot predict whether a pharmaceutical salt will crystallize out of the solution.

137.    Even if a crystalline salt is formed, the properties of that particular salt form are not predictable in advance.

138.    In pharmaceutical development, the counterion of any particular salt formed from the "free" form of the active compound can have a significant influence on the properties of the overall compound, including its stability, solubility, bioavailability and the way the molecules can be arranged in space (i.e., its crystal form or forms). For example, a pitolisant oxalate salt and a pitolisant hydrochloride salt will have different properties due to the influence of the different counterions—each is a different compound, and each compound will have its set of unique properties.

139.    As of February 2005, crystalline salt formation required trial and error experimentation, and testing was needed to determine whether it can be made as a solid and if so, to determine the properties of that solid. For example, Abu T. M. Serajuddin & Madhu Pudipeddi, *Salt-Selection Strategies*, *in* HANDBOOK OF PHARMACEUTICAL SALTS 135–60, 137 (P. Heinrich Stahl & Camille G. Wermuth eds., 2002) at 136 explains that "[o]ne needs to determine whether the compound exists in crystalline or amorphous form, and, if crystalline, whether it exhibits polymorphism." Some salts in solutions will not form solids at all, and may result in an oil or the salt may dissociate.

140.    Optimal salt development and selection is a multi-faceted and empirical endeavor. While certain characteristics of a compound, for example, dissolution or solubility, may be improved if a particular salt is formed, other characteristics, for example stability or hygroscopicity may become unfavorable. Optimal salt selection for pharmaceutical development requires balancing numerous properties. Selecting an optimal salt form that exhibits the desired combination of properties is a difficult process.

22

141.    Different salts of the same active ingredient are different compounds. Each crystalline salt (assuming one can be prepared) will have a different solid-state structure because it consists of active ingredient molecules and the specific counter-ions for that salt form.

142.    Each salt of the same active ingredient is a different compound, with its own set of physiochemical properties. Those physiochemical properties, such as stability, solubility, and flowability, etc., impact the potential use of the drug molecule in a finished drug product that can be produced at commercial scale and used to dose patients to achieve a desired effect.

143.    A salt formed with a particular anion and free base, may have different solid-forms, including polymorphs. Each solid form will have a unique set of physiochemical properties.

### L.    Crystals and Crystallization

144.    As of February 2005, many aspects of crystallization were unpredictable, including: whether a compound will crystallize; what form or forms (e.g., anhydrous, hydrate, other solvate, etc.) will if any crystallize; and what properties the crystalline form or forms will have.

145.    As of February 2005, there was no way of predicting whether a compound would crystallize at all. For any particular compound one cannot predict in advance whether that compound will come out of solution as a crystal, or will come out of solution as an amorphous solid or an oil.

146.    Even if a compound *can* crystallize into a particular form, a POSA in February 2005 could not predict in advance *how* that form can be crystallized.

147.    Even if a compound crystallized, there was no way for a POSA in February 2005 to predict in advance what crystal structure it would assume.

148.    Nor could a POSA in February 2005 predict whether additional solid forms of the compound would appear.

23

149.    As of February 2005, the hydration state of any crystalline form also could not be predicted.

150.    Predicting whether or not a compound could form a hydrate was not possible in February 2005.

151.    A POSA in February 2005 would know that different crystal forms could exhibit different physicochemical properties.

152.    It was not possible at the priority date to predict the properties of any particular crystalline form in advance.

153.    As of February 2005, there were a wide variety of known techniques that could potentially induce crystallization. There was no way to predict in advance which technique, if any, would be successful in yielding crystalline material, much less which technique would produce a particular crystalline form.

154.    A POSA in February 2005 would know that the choice of crystallization procedure, and the precise conditions used in that procedure, could affect—in unpredictable ways—whether crystals precipitated from solution and, if they did, what crystal form would emerge. The range of known parameters that could have been varied to induce crystallization or to potentially create different crystal forms of a compound was vast.

155.    At the priority date, there were various solution-based techniques for potentially inducing crystallization including slow solvent evaporation, cooling, use of "anti-solvents," and rapidly changing solution pH.

156.    These techniques are not interchangeable. To the contrary, the POSA would have understood that a particular crystalline form might be obtainable via one method—for example, evaporative crystallization—but not by a different method—for example, cooling crystallization.

24

157.    For each crystallization technique, the POSA would have known that there were multiple parameters that could have been varied, including (but not limited to) the particular solvents, temperatures, and agitation rates. The choice of these parameters could have profound and unpredictable effects on the outcome of the crystallization experiment.

158.    The POSA would have known that the choice of solvent mixtures could affect whether crystalline material would precipitate and, if so, what form it would take.

159.    The POSA would have further understood that the rate of supersaturation generation (i.e., evaporation rate, cooling rate, rate of anti-solvent addition, rate of pH change, etc.) could affect whether crystallization would occur and what crystalline form might emerge.

160.    Another factor that could impact crystallization is the concentration or degree of supersaturation of the solute in the solvent.

161.    The POSA also would have known that temperature could affect crystallization behavior.

162.    The POSA would have further understood that additives and impurities could affect crystallization.

163.    Crystal form and crystal size distributions can also be influenced by "seed" crystals, which can induce the growth of a crystalline form.

164.    Agitation can also affect crystallization.

165.    Any of the above-listed parameters could affect whether crystallization occurs and, if so, what crystalline form is produced. Understanding the relationship between the experimental parameters and the outcome of a crystallization experiment is a trial-and-error process that is not predictable in advance.

166.    The above parameters are not exhaustive—every crystallization procedure involves numerous additional choices, which themselves could affect the outcome of the crystallization experiment. Indeed, it can be difficult to control every possible parameter of a crystallization experiment, such that labs have been unable to re-create crystalline forms that they previously obtained, particularly when new crystalline forms emerge.

167.    Failure of a particular crystallization experiment does not mean that the same experiment would not result in crystallization on a later attempt.

168.    Perhaps because of the vast range of experimental approaches and parameters available, new crystalline forms are often discovered serendipitously. The literature is replete with examples of new crystalline forms being discovered unexpectedly, even for very old and well-studied compounds. Examples include sucrose, aspirin, and maleic acid.

169.    The prior art did not contain any information or guidance regarding crystalline forms of pitolisant salts other than pitolisant oxalate, any teaching about how to make other crystalline forms of pitolisant or its salts, any teaching about the potential physiochemical properties of any salt or any crystalline form other than pitolisant oxalate.

170.    The prior art did not contain any information or guidance regarding crystalline forms of pitolisant hydrochloride, any teaching about how to make crystalline forms of pitolisant hydrochloride, any teaching about the potential physiochemical properties of any crystalline form of pitolisant hydrochloride.

171.    The inventors of the '197 Patent were the first to make pitolisant hydrochloride.

172.    The inventors of the '197 Patent were the first to make the crystalline form of pitolisant hydrochloride described and claimed in the patent.

26

## II.    U.S. PATENT NO. 8,207,197

### A.    The Person of Ordinary Skill in the Art ('197 Patent)

173.    The '197 Patent claims priority to European Patent Application No. 05100942, filed on February 10, 2005.

174.    The POSA is person with a bachelor's degree in chemistry, chemical engineering, pharmaceutical science or a related discipline, with some knowledge of crystalline solid forms and several years of experience in the pharmaceutical industry; or an advanced degree in the above-listed disciplines or a related discipline, with knowledge of crystalline solid forms and less experience.

175.    The POSA may interface or consult individuals having specialized expertise such as, for example, persons working in the field of the relevant disorders with a Ph.D. or M.D. and at least one year of research or clinical experience. Such a person may also be working as part of a team.

### B.    Background Relating to Infringement of the '197 Patent

#### 1.    Analytical and Testing Procedures

##### a)    Solid State Nuclear Magnetic Resonance Testing

176.    Solid State Nuclear Magnetic Resonance (ssNMR) is an experimental technique often used to characterize and identify crystalline forms.

177.    Nuclear Magnetic Resonance (NMR) spectroscopy is an analytical technique that provides information concerning molecular structure, including information relating to the bonding arrangement of atoms in a molecule. NMR spectroscopy detects the chemical environment of atomic nuclei in a sample based on the absorption of radio-frequency electromagnetic radiation when a sample is placed in a high magnetic field. The integration of NMR "peaks," which are also described as "resonances," provides information concerning

27

the relative number of atomic nuclei in a sample or types of molecules in a sample containing two or more molecules.

178.    An ssNMR spectrum is composed of peaks, with an x-axis that corresponds to chemical shifts, which are in units of parts per million (ppm), and a y-axis corresponding to peak intensity. Peaks in a ssNMR spectrum are located at chemical shifts that are a function of the local electronic environment surrounding the nucleus of an atom. In ssNMR, the electronic environment is affected by the functional groups of the compound, and by how the molecules are packed together (i.e., crystalline forms, or amorphous).

179.    ssNMR testing can be conducted with different atomic nuclei. Carbon-13 is the most commonly used nuclei for pharmaceutical compounds.

180.    ssNMR can be used to analyze crystalline forms and distinguish crystalline and amorphous forms because, *inter alia*, changes in the crystal structure will cause differences in chemical shift. Therefore, different forms of the same chemical compound will exhibit carbon-13 chemical shifts at different ppm values.

181.    Each crystalline form of a compound is expected to have its own unique carbon-13 ssNMR spectrum.

182.    Spectral editing is a widely practiced and accepted ssNMR technique that can be used to minimize or eliminate the signal from some components in a mixed component sample.

183.    To design his spectral editing filtering experiments, Dr. Wenslow conducted T1rho relaxation experiments investigating signal intensity as a function of delay time $\tau$ (a "T1rho relaxation" experiment).

184.    By identifying a $\tau$ value where the component of interest (here, the crystalline component) has substantial signal while the other component (here, the amorphous component)

has low signal, one can then filter subsequent ssNMR spectra so as to focus on the component of interest while minimizing signal from the other component.

185.    Spectral editing can be used to minimize or eliminate the amorphous signal in a sample containing both amorphous and crystalline material.

186.    The solid-state characterization of a compound via ssNMR testing with spectral editing does not need to be confirmed by XRPD, or any other testing method.

187.    The ssNMR testing Dr. Wenslow oversaw was conducted according to the best practices and scientific standards of his field.

188.    Dr. Wenslow conducted C-ssNMR testing on a sample of the pitolisant hydrochloride API that Harmony uses in Wakix to obtain the ssNMR spectrum. The sample Dr. Wenslow tested came from Batch No. 142868.

### b)    X-Ray Powder Diffraction Testing

189.    X-ray diffraction ("XRD") is an experimental technique often used to characterize and identify crystalline forms. It can be performed on a single crystal or on a powder sample of a crystalline substance.

190.    In X-ray powder diffraction ("XRPD") or powder X-ray diffraction ("PXRD"), the sample is a powder. XRPD relies on the fact that the array of crystals in the powder sample, randomly arranged, will present all possible lattice planes for reflection of an incident X-ray beam. When X-rays of particular wavelengths (0.5–2.5 Angstroms) are directed at a sample, they are diffracted. These diffraction angles are measured. Because the distances between the atoms in a crystal are of a length similar to the X-ray wavelength, the presence of a crystal structure in the sample will produce an observable pattern.

191.    The relationship between the wavelength of the X-rays and the spacing between atoms in a crystal is known as Bragg's law: $n\lambda = 2d \sin\theta$, where "n" is an integer (normally 1), "λ"

29

is the wavelength of the incident X-rays, "d" is the interplanar spacing in the crystal (referred to as "d-spacings"), and "θ" is the angle of incident X-rays on the crystal.

192.    A device called a diffractometer measures the intensity of the diffracted X-rays at each of the angles of the incident X-rays, commonly referred to as Bragg angles, 2-Theta, "2-Theta," or "two-theta" values.

193.    The XRPD diffractogram is an x-y plot. The horizontal (x)-axis plots the 2-Theta value, which is measured in units of degrees. The vertical (y)-axis plots the intensity (number of X-rays detected at a particular 2-Theta value). The 2-Theta values measured in XRPD can also be reported in the form of a peak position.

194.    When XRPD analysis is performed, the number of detected peaks and their intensities depend on experimental factors such as the composition of the sample, the scanning speed used in the diffractometer, the degree to which the sample was ground, and the crystallinity of the sample.

195.    The smallest amount of a material that can be qualitatively identified in a sample by a particular analytical method, including XRPD, is known as the limit of detection ("LOD"). XRPD testing cannot be used to show the absence of crystalline material below the test's limit of detection.

196.    Synchrotron XRPD ("S-XRPD") is XRPD testing in which a synchrotron is used as the source of X-rays. A synchrotron uses high intensity magnetic fields to change the direction paths of high-energy electrons to produce X-rays with an ultra-high beam intensity.

197.    The LOD for S-XRPD testing of complex mixtures, such as finished drug products ███████████████████████████, is typically below that of conventional laboratory XRPD.

198.    LOD of any analytical method is specific to the instrument and sample and must be determined empirically.

199.    The position of crystalline peaks in an XRD diffractogram is the result of measuring various characteristics of the crystal(s) in the sample. As a result, XRD peaks are intrinsic to a particular crystalline form.

200.    The characteristic XRPD peaks of the crystalline form claimed in the '197 Patent are intrinsic to that crystalline form.

201.    Crystalline pitolisant hydrochloride that generates the characteristic XRPD peaks of the '197 Patent will optionally comprise up to 6% water.

202.    The characteristic XRPD peaks of the claimed crystalline form are unique and intrinsic to that form, as they are generated by the distinct crystal structure of the form. If the crystalline pitolisant hydrochloride contained more than 6% water, it would not generate the characteristic XRPD peaks. A POSA would understand that detection of the claimed crystalline form of pitolisant hydrochloride demonstrates that the "optionally comprising water up to 6%" is met.

203.    Dr. Gozzo conducted synchrotron XRPD testing on Batch No. 142868 of the Harmony pitolisant hydrochloride. Batch No. 142868 of the Harmony pitolisant hydrochloride generated all of the X-ray diffraction peaks identified in claims 1 and 2 of the '197 Patent.

204.    Dr. Gozzo conducted her S-XRPD testing consistent with the scientific standards and best practices of her field.

> **2.    Sample handling and chain of custody were managed carefully and properly.**

205.    All samples tested by Plaintiff's experts were stored, handled, and shipped properly, and the chain of custody was properly maintained, consistent with Defendants' proposed prescribing information.

206.    The storage, handling, and shipping of each Defendant's drug product intermediate and ANDA Products had no effect on the form or forms of pitolisant hydrochloride detected in those intermediate and tablet samples.

207.    The containers in which each Defendant's ANDA Products were shipped had no effect on the form or forms of pitolisant hydrochloride detected in those tablets.

208.    Defendants' ███████████, excipients, and tablet samples were not contaminated during handling or shipping.

209.    Each sample tested by Plaintiffs' experts were representative of the respective ANDA Products that Defendant will sell if approved and, where applicable, the ███████████, active pharmaceutical ingredient, drug substance, or excipient that will be used to make the respective ANDA Products.

210.    All of the Defendant samples tested by Plaintiffs' experts complied with the release specifications in Defendants' ANDAs.

211.    All samples were stored and shipped by Dr. Engers to Plaintiffs' experts in a manner that maintained the integrity of the samples and complied with the storage conditions set forth in Defendants' proposed prescribing information.

212.    All samples were stored by Dr. Engers and Plaintiffs' experts in a manner that maintained the integrity of the samples and complied with the storage conditions set forth in each Defendants' proposed prescribing information.

### 3.    Alleged expiry of the samples tested by Plaintiffs' experts did not impact testing.

213.    Any alleged expiry of any sample from any Defendant did not impact any of Plaintiffs' experts' testing.

214.    The samples of each respective Defendant's ANDA Products tested by Plaintiffs' experts are representative of that Defendant's ANDA Products. The ▮▮▮▮▮▮▮▮, active pharmaceutical ingredient, drug substance, and excipients that will be used to make that ANDA Products tested by Plaintiffs' experts are also representative of those used to make each Defendant's ANDA Products.

**C.    AET's ANDA Products** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

215.    The manufacturing process for AET's ANDA Products begins by using the claimed crystalline form of pitolisant hydrochloride.

216.    AET's ANDA Products ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

217.    The ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

218.    The ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

219.    The ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

220.    AET's ANDA Products, if approved, will literally infringe claims 1 and 2 of the '197 Patent, as the products meet every element of the claims.

33

221.    AET's ANDA Products infringe claims 1 and 2 of the '197 patent.

**1.**  

222.

223.

224.

225.

**2.**

226.

227.

228.    AET's internal XRPD testing procedure to identify the claimed form of crystalline pitolisant hydrochloride is present in a sample relies on the presence of a peak at 11.2° ± 0.2° 2θ.

229.    The release specification for AET's ANDA Products does not include an XRPD test or any other test to confirm or identify the solid-state form of pitolisant hydrochloride.

230.

███████████████████████████████████████████████████

███████████████████████

231.    ████████████████████████████████████████████

███████████████████████████████████████████████████

████████████

232.    AET's accelerated and long-term stability testing of its ANDA Products do not include an XRPD test or any other test to confirm or identify the solid-state form of pitolisant hydrochloride.

### 3.    Dr. Wenslow's testing of AET's ANDA Products detected ████████████ ████████████

233.    Dr. Wenslow conducted independent ssNMR testing on representative samples of AET's ANDA Products and certain components of AET's ANDA Products.

234.    Dr. Wenslow's ssNMR testing ██████████████████████████████ ████████████████████

235.    Dr. Wenslow designed and conducted C13-ssNMR 32 msec T1rho filter experiments on AET's ANDA Products. Dr. Wenslow also performed unfiltered C13-ssNMR experiments on AET's ANDA Products.

236.    Dr. Wenslow conducted C13-ssNMR testing on the crystalline API used in WAKIX.

237.    AET's excipients had no interfering signal at the locations Dr. Wenslow used to determine the presence of the crystalline form.

238.    ssNMR signal remained in the filtered ssNMR spectrum for AET's ANDA Products, including peaks at approximately 132 ppm and 142 ppm. Relative to the corresponding peaks in the unfiltered ssNMR spectrum, the peaks in the filtered ssNMR spectrum were sharper and shifted downfield.

239.    The presence of the 132 ppm and 142 ppm peaks in the filtered ssNMR spectrum shows that crystalline pitolisant hydrochloride is present in AET's ANDA Products.

240.    The downfield shift of the 132 ppm and 142 ppm peaks in the filtered ssNMR spectrum shows that crystalline pitolisant hydrochloride is present in AET's ANDA Products.

241.    The sharpening of the 132 ppm and 142 ppm peaks in the filtered ssNMR spectrum shows that crystalline pitolisant hydrochloride is present in AET's ANDA Products.

242.    The filtered ssNMR spectrum for AET's ANDA Products created by Dr. Wenslow has peaks that are clearly aligned with the peaks of the crystalline API contained within WAKIX,



243.

244.

245.    Dr. Wenslow conducted C-ssNMR testing using the same batch of Harmony crystalline pitolisant hydrochloride API that Dr. Gozzo tested, Batch No. 142868, as a reference standard. Thus, the unique C-ssNMR peaks that Dr. Wenslow used for his analysis correspond to the claimed crystalline form of pitolisant hydrochloride.

and thus has "an X-ray diffractogram that includes peaks at 11.2°, 19.9°, 20.7° and 34.1° ±0.2° (2θ) wherein the peaks together uniquely identify the crystalline form of pitolisant hydrochloride."

4.

246. █████████████████████████████████████████████████████

████████████████████████

247.    As the patent explains, the water content of the claimed crystalline form "can reach up to 6±0.5%" without fundamentally altering the crystal structure of the form.

248. █████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

██████████

249.    If the crystalline pitolisant contained more than 6% water, it would not generate characteristic XRPD peaks at 11.2, 19.9, 20.7 and 34.1° ±0.2° 2θ nor have an ssNMR spectrum aligning with that of Harmony API Batch No. 142686. █████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

██████████████████████████████████████████████

250. █████████████████████████████████████████████████████

████████████████████████████████████████████

251.    Internal███████████████████████████████████████████████

█████████████████████████████████████████████████████████████

██████████

252. █████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████



253. ██████████████████████████████████████████████████

██████

254. ██████████████████████████████████████████████████

███████████████████████████████████████.

255.    AET's ANDA Products infringe claims 1 and 2 of the '197 patent.

**D.    MSN's ANDA Products Contain the Claimed Crystalline Form of Pitolisant Hydrochloride**

256.    MSN's ANDA Products contain crystalline pitolisant monohydrochloride as recited in claim 1 of the '197 patent.

257.    The claimed crystalline form in MSN's ANDA Products optionally comprises water up to 6%.

258.    The crystalline pitolisant hydrochloride in MSN's ANDA Products has an X-ray diffractogram that includes ████████████████████████████████████████

████████████████████████████████

259.    The crystalline pitolisant hydrochloride in MSN's ANDA Products has an X-ray diffractogram that includes ████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████████████

260.    MSN's ANDA Products, if approved, will literally infringe claims 1 and 2 of the '197 Patent, as the products meet every element of the claims.

38

261.    MSN's ANDA Products infringe claims 1 and 2 of the '197 patent.

### 1.    Manufacturing of MSN's ANDA Product

262.    ███████████████████████████████████

████████████████████████

███    ███████████████████████████████████

████████████████████████

███    ███████████████████████████████████

██████████████████████████████

███    ███████████████████████████████████

█████████████████████

███    ███████████████████████████████████

███████████████████████████████████████

### 2.    XRPD Testing

#### a)    MSN's Testing and Analytical Methods

267.    ███████████████████████████████████

██████████████

███    ███████████████████████████████████

█████████████████████████

███    ███████████████████████████████████

███████████████████████████████████████

███

███    ███████████████████████████████████

███    ███████████████████████████████████

███

272.   ███████████████████████████████████████████████████████

███████████

### b)    Dr. Gozzo's Testing of MSN's ANDA Products

273.   Dr. Gozzo conducted S-XRPD testing on batches of MSN's ANDA Products, and generated peak lists using the TOPAS software.

274.   ███████████████████████████████████████████████████████

███████████████████████████████████████████████

███   ███████████████████████████████████████████████████

█████████

276.   At least ███████████████████████████ were detected in ████████████

████████████████████

277.   At least peaks at ███████████████████ were detected in ████████████

278.   Additional peaks recited in claim 2 of the patent, which are similarly characteristic of the claimed form, ██████████████████████████████████████████

█████████████ shown in Dr. Gozzo's diffractograms, █████████████████████

█████████████ these include the █████████████████████████████████████

279.   ███████████████████████████████████████████████████████

█████████████, were detected in █████████████████████

280.   The claim 1 peaks ██████████████████████████████████████

█████████████████████████.

281.   Dr. Gozzo's peak lists confirm that ████████████████████████████

█████████████ were detected in MSN's ANDA Products.

███████████████████████████████████████ were detected in MSN's ANDA Products.

███████████████████████████████████████████████████

████ were also identified in MSN's ANDA Products.

282.    Dr. Gozzo's testing shows ████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████

283.    No crystalline form of pitolisant hydrochloride other than the form claimed in the

'197 Patent is responsible for the ████████████████████████████

    **3.    The crystalline pitolisant in MSN's ANDA Products** █████████████

██████████

284.    The claimed crystalline form in MSN's ANDA Products optionally comprises water

up to 6%.

285.    As the patent explains, the water content of the claimed crystalline form "can reach

up to 6±0.5%" without fundamentally altering the crystal structure of the form.

286.    If the crystalline pitolisant contained more than 6% water, it would not generate

characteristic XRPD peaks at 11.2, 19.9, 20.7 and 34.1 ±0.2° 2θ. ████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████

287.    ████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████

288.    ████████████████████████████████████████████

███████████████████████████████████████████████████



289. MSN's ███████████████████████████████████████
████████████████████████████

290. MSN's ███████████████████████████████████████
████████████████████

291. The specifications and water content limits in MSN's ANDA ████████████
████████████████████████████████

292. MSN's ANDA Products infringe claims 1 and 2 of the '197 patent.

**E.    Novitium's ANDA Products Contain the Claimed Crystalline Form of Pitolisant Hydrochloride**

293. Novitium's ANDA Products contain crystalline pitolisant monohydrochloride as recited in claim 1 of the '197 Patent.

294. The claimed crystalline form in Novitium's ANDA Products optionally comprises water up to 6%.

295. The crystalline pitolisant hydrochloride in Novitium's ANDA Products has an X-ray diffractogram that includes peaks at 11.2°, 19.9°, 20.7° and 34.1° ±0.2° (2θ), wherein the peaks together uniquely identify the crystalline form of pitolisant hydrochloride.

296. The crystalline pitolisant hydrochloride in Novitium's ANDA Products has an X-ray diffractogram that includes peaks at 11.2°, 15.4°, 16.3°, 16.9°, 17.8°, 19.9°, 20.7°, 21.0°, 21.8°,

22.6°, 24.5°, 24.6°, 25.0°, 25.5°, 26.3°, 28.3°, 30.3°, 34.1°, 35.8°, 40.0°, 46.0° ±0.2° (2θ) wherein the peaks together uniquely identify the crystalline form of pitolisant hydrochloride.

297.    Novitium's ANDA Products, if approved, will literally infringe claims 1 and 2 of the '197 Patent, as the products meet every element of the claims.

298.    Novitium's ANDA Products infringe claims 1 and 2 of the '197 patent.

**1.    Manufacturing of ▮▮▮▮▮ and Novitium's ANDA Products**

299.    The ▮▮▮▮▮▮▮▮▮▮ is unstable in the presence of moisture and has shown a tendency to undergo phase transformation to the claimed crystalline pitolisant hydrochloride.

300.    The process used to prepare the ▮▮▮▮▮▮ and Novitium's ANDA Products contribute to the presence of the claimed crystalline form in Novitium's ANDA Products.

301.    During manufacture of the ▮▮▮▮▮ and Novitium's ANDA Products, pitolisant hydrochloride is exposed to ▮▮▮▮▮▮▮▮▮, including in the ▮▮▮▮▮▮▮ steps.

302.    ▮▮▮▮▮▮▮▮▮ can result in conversion of amorphous pitolisant hydrochloride to the claimed crystalline form.

303.    The presence of a drug in a ▮▮▮▮▮ reduces, but does not eliminate, molecular mobility, and therefore does not eliminate the potential for crystallization.

304.    Some portion of the pitolisant hydrochloride within Novitium's ANDA Products is not ▮▮▮▮▮▮▮▮▮▮▮ and is therefore not ▮▮▮▮ ▮▮▮▮▮▮▮ .

305.    Novitium's ANDA Products contain ▮▮▮▮▮ , which facilitates conversion of amorphous pitolisant hydrochloride to the claimed crystalline form within the ANDA Product.

306.    The packaging of Novitium's ███████████ in ███████████████

███████████████████████████████████████████ reflects an

effort to protect the drug substance from factors such as atmospheric moisture and is indicative of

its instability and susceptibility to conversion to the claimed crystalline form.

307.    In-process precautions taken by ██████ further point to an awareness of the potential

instability of the ████████████ and likelihood of conversion to the claimed crystalline form.

308.    Novitium does not take in-process similar precautions to ██████ to prevent

conversion to the claimed crystalline form during manufacture of its ANDA Products, and instead

exposes the pitolisant hydrochloride to ████████████████.

### 2.    XRPD Testing

#### a)    ████████████████████████



### b)    Novitium's Testing and Analytical Methods

311.    Novitium's routine testing and analytical methods do not ensure that Novitium's

ANDA Products do not contain the claimed crystalline form.

312.    Novitium's specification of analysis for in-process monitoring of the solid state of

its ANDA Products does not ███████████████████████████████████████

44

███████████████████████████████████████████████████

██████████████████████████

313.    The release specification, analytical procedures, and manufacturing and process controls for Novitium's ANDA Products do not ███████████████████████████ ████████████████████████████

314.    Novitium's accelerated and long-term stability testing of its ANDA Products submitted to FDA do not ███████████████████████████████ ████████████████████████████.

    c)    ██████

315.    Novitium hired a third-party laboratory, ██████ to conduct XRPD testing on samples of its ANDA Products under controlled room temperature and accelerated stability conditions.

316.    ██████ testing showed the presence of crystalline peaks, and therefore crystalline material, present in each batch of Novitium's ANDA Products tested (under both controlled room temperature and accelerated stability conditions). These crystalline peaks were not present in the placebo or █████████████████████████ tested by ██████

### 3.    Dr. Wenslow's Testing of Novitium ANDA Products

317.    Dr. Wenslow conducted independent ssNMR testing on representative samples of Novitium's ANDA Products and other components of those ANDA Products.

318.    Dr. Wenslow's ssNMR testing confirms the presence of the claimed crystalline form in Novitium's ANDA Products.

319.    Dr. Wenslow conducted performed 32 msec T1rho filter C13-ssNMR testing on Novitium's ANDA Products, as well as unfiltered C13-ssNMR testing. Dr. Wenslow also conducted C13-ssNMR testing on the crystalline API used in WAKIX.

320.    Novitium's excipients had no interfering signal at the locations Dr. Wenslow used to determine the presence of the crystalline form.

321.    ssNMR signal remained in the filtered ssNMR spectrum for Novitium's ANDA Product, including peaks at approximately ███████████. Relative to the corresponding peaks in the unfiltered ssNMR spectrum, the peaks in the filtered ssNMR spectrum were sharper and shifted downfield.

322.    The presence of the ███████████ peaks in the filtered ssNMR spectrum shows that crystalline pitolisant hydrochloride is present in Novitium's ANDA Products.

323.    The downfield shift of the ███████████ peaks in the filtered ssNMR spectrum shows that crystalline pitolisant hydrochloride is present in Novitium's ANDA Products.

324.    The sharpening of the ███████████ peaks in the filtered ssNMR spectrum shows that crystalline pitolisant hydrochloride is present in Novitium's ANDA Products.

325.    The filtered ssNMR spectrum for Novitium's ANDA Products created by Dr. Wenslow has peaks that are clearly aligned with the peaks of the crystalline API contained within WAKIX, which confirms that two contain the same crystalline form of pitolisant hydrochloride.

326.    Dr. Wenslow conducted C-ssNMR testing using the same batch of Harmony crystalline pitolisant hydrochloride API that Dr. Gozzo tested, Batch No. 142868, as a reference standard. Thus, the unique C-ssNMR peaks that Dr. Wenslow used for his analysis correspond to the claimed crystalline form of pitolisant hydrochloride. This confirms that the crystalline pitolisant hydrochloride detected in the Novitium's ANDA Products is the crystalline form described in claim 1 of the '197 Patent, and thus has "an X-ray diffractogram that includes peaks at 11.2°, 19.9°, 20.7° and 34.1° ±0.2° (2θ) wherein the peaks together uniquely identify the crystalline form of pitolisant hydrochloride."

327. Dr. Wenslow's and Dr. Gozzo's data show that there is crystalline pitolisant hydrochloride present in Novitium's ANDA Products and that the crystalline pitolisant hydrochloride present is the crystalline form with the peaks claimed in claims 1 and 2 of the '197 Patent.

328. Nothing in Novitium's release specification for its ANDA Products precludes the presence of the claimed crystal form of pitolisant hydrochloride. Novitium's release specification contains no ▮▮▮▮▮▮▮▮ pitolisant hydrochloride in the ANDA Products. Thus, even conforming to its own release specification, Novitium can sell infringing drug products.

329. No crystalline form of pitolisant hydrochloride other than the form claimed in the '197 Patent is responsible for the observed crystallinity within Novitium's ANDA Products

### 4. The crystalline pitolisant in Novitium's ANDA Products contains 6% or less water.

330. The crystalline pitolisant hydrochloride in Novitium's ANDA Products "optionally comprises water up to 6%."

331. As the patent explains, the water content of the claimed crystalline form "can reach up to 6±0.5%" without fundamentally altering the crystal structure of the form.

332. If the crystalline pitolisant contained more than 6% water, it would not generate characteristic XRPD peaks at 11.2, 19.9, 20.7 and 34.1±0.2° 2θ nor have an ssNMR spectrum aligning with that of Harmony API Batch No. 142686. That the crystalline pitolisant hydrochloride in Novitium's ANDA Products has the characteristic XRPD peaks of the '197 patent shows the presence of crystalline pitolisant hydrochloride with a repeating unit cell that contains 6% or less water. That the crystalline pitolisant hydrochloride in Novitium's ANDA Products aligns with the ssNMR spectrum of the form claimed in the '197 patent likewise shows the presence of crystalline pitolisant hydrochloride with a repeating unit cell that contains 6% or less water.

333.    A POSA would understand that detection of the claimed crystalline form of pitolisant hydrochloride demonstrates that the "optionally comprising water up to 6%" limitation is met.

334.    The specifications and water content limits in Novitium's ANDA permit the presence of water consistent with the limitation of claim 1 of the '197 Patent.

335.    ███████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████

336.    The water in Novitium's ANDA Products would not be concentrated in the crystalline pitolisant hydrochloride present in Novitium's ANDA Products. There is no reason to think that the water in Novitium's ANDA Products would be inhomogenously distributed such that the water content of the crystalline pitolisant hydrochloride would be above 6%. A POSA would understand that much of the water in the ANDA Products would be attributable to excipients. It is virtually certain that excipients will continue to retain some amount of water as part of the final formulation of Novitium's ANDA Products. Thus, water would be drawn to these excipients rather than the API.

337.    ███████████████████████████████████████████████████
████████████████████████████████████████████████

338.    Novitium's ANDA Products infringe claims 1 and 2 of the '197 patent.

**F.    Hikma's ANDA Products Contain the Claimed Crystalline Form of Pitolisant Hydrochloride**

339.    Hikma's ANDA contains a certification pursuant to 21 U.S.C. § 355(j)(2)(A)(vii)(IV) for the '947 and '197 Patents.

340.    Hikma's ANDA Products contain crystalline pitolisant monohydrochloride as recited in claim 1 of the '197 Patent.

341.    The crystalline pitolisant hydrochloride in Hikma's ANDA Products has an X-ray diffractogram that includes peaks at 11.2°, 19.9°, 20.7° and 34.1° ±0.2° (2θ), wherein the peaks together uniquely identify the crystalline form of pitolisant hydrochloride.

342.    The crystalline pitolisant hydrochloride in Hikma's ANDA Products has an X-ray diffractogram that includes peaks at 11.2°, 15.4°, 16.3°, 16.9°, 17.8°, 19.9°, 20.7°, 21.0°, 21.8°, 22.6°, 24.5°, 24.6°, 25.0°, 25.5°, 26.3°, 28.3°, 30.3°, 34.1°, 35.8°, 40.0°, 46.0° ±0.2° (2θ) wherein the peaks together uniquely identify the crystalline form of pitolisant hydrochloride.

343.    Hikma's ANDA Products, if approved, will literally infringe claims 1 and 2 of the '197 Patent, as the products meet every element of the claims.

344.    Hikma's ANDA Products infringe claims 1 and 2 of the '197 patent.

**1.    Manufacturing of Biophore's ███████████ and Hikma's ANDA Products**

345.    The ███████████ manufactured by Biophore India Pharmaceuticals Private Limited ("Biophore") is hygroscopic, unstable in the presence of moisture, and has shown a tendency to undergo phase transformation to the claimed crystalline pitolisant hydrochloride.

346.    The process used to prepare the Biophore ███████ and Hikma's ANDA Products contribute to the presence of the claimed crystalline form in Hikma's ANDA Products.

347.    During manufacture of the Biophore ███████ and Hikma's ANDA Products, pitolisant hydrochloride is exposed to ███████████████████████ ███████████████████

348.    ███████████████████████████s can result in conversion of amorphous pitolisant hydrochloride to the claimed crystalline form.

349.     The presence of a drug in a ███████████ reduces, but does not eliminate, molecular mobility, and therefore does not eliminate the potential for crystallization.

350.     Some portion of the pitolisant hydrochloride within Hikma's ANDA Products is not contained within a ████████████████████████ and is therefore not stabilized by the ██████████████████████

351.     Hikma's ANDA Products contain residual water, which facilitates conversion of amorphous pitolisant hydrochloride to the claimed crystalline form within the ANDA Product.

352.     Biophore made multiple, failed attempts to achieve a stable amorphous ██████ which demonstrates the instability of its amorphous form of pitolisant hydrochloride.

353.     The packaging of Biophore's ████████████ in a ████████████████ ████████████████████████████████ ████████████████████████████████ ████████████████████████████████ reflects an effort to protect the drug substance from factors such as ████████████ ██████ and is indicative of its instability and susceptibility to conversion to the claimed crystalline form.

354.     Hikma does not take in-process similar precautions to Biophore to prevent conversion to the claimed crystalline form during manufacture of its ANDA Products, and instead exposes the material to atmospheric conditions as well as directly introducing water and heat.

### 2.     XRPD Testing

#### a)     Biophore

355.     Biophore's method of analysis for its ██████████ does not ████████ ████████████████████████████████ and does not provide ███████████████████████████

356.    XRPD testing reported by Biophore in its DMF does not establish an absence of crystalline pitolisant hydrochloride, but only that crystalline pitolisant hydrochloride is present in an amount no higher than the 

### b)    Hikma's Product Specifications

357.    Hikma's manufacturing process for its ██████████ does not include ██████


358.    The release specifications for Hikma's Finished ANDA Products do not ██████


359.    Hikma's manufacturing and process controls as submitted to FDA do ██████
.

360.    Hikma does not conduct ████████████████████


361.    Hikma did not establish ██████████████

362.    Diffractograms from XRPD testing conducted on Hikma's development batches have ████████████████████ which demonstrate the unreliability of Hikma's testing and preclude one from drawing any meaningful conclusions from Hikma's diffractograms.

363.    Hikma's experts reported the following expiry dates for batches of Hikma's solid dispersion and ANDA Products:

| Sample No. | Sample Name | Batch No. | Manufacturing Date | Expiration Date |
|---|---|---|---|---|
| 1 | Pitolisant HCl ████████ | ████████ | ████████ | ████████ |
| 2 | Pitolisant HCl ████████ | | | |
| 3 | Pitolisant Tablets 4.45 mg | | | |
| 4 | Pitolisant Tablets 17.8 mg | | | |
| 5 | Pitolisant Tablets 4.45 mg | | | |
| 6 | Pitolisant Tablets 17.8 mg | | | |
| 7 | Pitolisant Tablets 4.45 mg | | | |
| 8 | Pitolisant Tablets 17.8 mg | | | |

### 3.    Dr. Wenslow's Testing of Hikma's ANDA Products

364.    Dr. Wenslow conducted independent ssNMR testing representative samples of Hikma's ANDA Products and components of those products.

365.    Dr. Wenslow's ssNMR testing confirms the presence of the claimed crystalline form in Hikma's ANDA Products.

366.    Dr. Wenslow conducted 32 msec T1rho filter C13-ssNMR testing on Hikma's ANDA Products, as well as unfiltered C13-ssNMR testing. Dr. Wenslow also conducted C13-ssNMR testing on the crystalline API used in WAKIX.

367.    Hikma's excipients had no interfering signal at the locations Dr. Wenslow used to determine the presence of the crystalline form.

368.    ssNMR signal remained in the filtered ssNMR spectrum for Hikma's ANDA Product, including peaks at approximately 132 ppm and 142 ppm. Relative to the corresponding

52

peaks in the unfiltered ssNMR spectrum, the peaks in the filtered ssNMR spectrum were sharper and shifted downfield.

369.    The presence of the 132 ppm and 142 ppm peaks in the filtered ssNMR spectrum shows that crystalline pitolisant hydrochloride is present in Hikma's ANDA Products.

370.    The downfield shift of the 132 ppm and 142 ppm peaks in the filtered ssNMR spectrum shows that crystalline pitolisant hydrochloride is present in Hikma's ANDA Products.

371.    The sharpening of the 132 ppm and 142 ppm peaks in the filtered ssNMR spectrum shows that crystalline pitolisant hydrochloride is present in Hikma's ANDA Products.

372.    The filtered ssNMR spectrum for Hikma's ANDA Products created by Dr. Wenslow has peaks that are clearly aligned with the peaks of the crystalline API contained within WAKIX, which confirms that two contain the same crystalline form of pitolisant hydrochloride.

373.    Dr. Wenslow conducted C-ssNMR testing using the same batch of Harmony crystalline pitolisant hydrochloride API that Dr. Gozzo tested, Batch No. 142868, as a reference standard. Thus, the unique C-ssNMR peaks that Dr. Wenslow used for his analysis correspond to the claimed crystalline form of pitolisant hydrochloride. This confirms that the crystalline pitolisant hydrochloride detected in the Hikma's ANDA Products is the crystalline form described in claim 1 of the '197 patents, and thus has "an X-ray diffractogram that includes peaks at 11.2°, 19.9°, 20.7° and 34.1° ±0.2° (2θ) wherein the peaks together uniquely identify the crystalline form of pitolisant hydrochloride."

374.    Dr. Wenslow's and Dr. Gozzo's data show that there is crystalline pitolisant hydrochloride present in Hikma's ANDA Products and that the crystalline pitolisant hydrochloride present is the crystalline form with the peaks claimed in claims 1 and 2 of the '197 Patent.

### 4.    Crystalline Form of Pitolisant Hydrochloride

375.    No crystalline form of pitolisant hydrochloride other than the form claimed in the '197 Patent is responsible for the observed crystallinity within Hikma's ANDA Products.

376.    Hikma's release specification for its ANDA Products █████████████████ ███████████████████████████████████████████████████ Hikma does not employ a ████████████████ of the claimed crystalline form of pitolisant hydrochloride as part of its release specification. Thus, ███████████████████████████, Hikma can sell infringing drug products.

**G.    Claims 1 and 2 of the '197 Patent Are Not Obvious over EP 503 Alone or in View of Berge and/or Bryn-1995**

**1.    EP '503 does not disclose the claimed crystalline pitolisant monohydrate salt.**

377.    EP '503 does not disclose pitolisant hydrochloride, the pitolisant hydrochloride form claimed in the '197 Patent, or any crystalline form of pitolisant hydrochloride. EP '503 does not disclose any method for synthesizing the claimed crystalline form of pitolisant hydrochloride described in the '197 Patent.

378.    Claim 48 of EP '503 does not disclose pitolisant hydrochloride or the crystalline form of pitolisant hydrochloride claimed in the '197 Patent.

379.    Claim 48 of EP '503 is not limited to hydrochloride salts. It refers to hydrochloride, hydrobromide, maleate, and oxalate salts.

380.    Claim 48 of EP '503 refers to "anyone of the preceding claims." The "preceding claims," encompass at least millions of compounds from two genera.

381.    A POSA would not view claim 48 as a disclosure of a particular salt form not exemplified in EP '503, let alone a particular crystalline salt form that is not exemplified.

54

382.    In any event, pairing a compound from claims 1-47 of EP '503 with a particular acid would tell a POSA nothing about the solid form or forms (i.e. amorphous, crystalline, solvated, non-solvated) of the resulting salt or their physiochemical properties.

383.    A POSA would not be able to "immediately envisage" the salts of claim 48 of EP '503, let alone the claimed crystalline monohydrochloride with the particular characteristics described in the '197 Patent.

384.    A POSA would not be able to immediately envisage all possible crystalline salts within the scope of claim 48—not only because of the large number but also because fundamentally there is no way of predicting whether a salt will crystallize and whether that salt will have more than one solid form. As of the priority date, whether a salt would form in a crystallized state was unpredictable and required experimentation. The parameters for making crystalline salts were vast and a POSA could not predict without trial-and-error which combination of techniques and parameters would yield a crystalline salt.

385.    EP '503 does not disclose, teach, or enable the claimed crystalline hydrochloride salt of pitolisant. Nor does EP '503 describe a process for making the claimed pitolisant hydrochloride salt.

386.    The list of "hydrochloride, hydrobromide, hydrogen maleate, [and] hydrogen oxalate" mentioned in claim 48 is a general list of possible pharmaceutically acceptable salts applicable to the millions of compounds claimed in EP '503. The specification of EP '503 identifies this list of salts as exemplary, and does not mention the hydrochloride salt of pitolisant anywhere.

387.    Example 117 of EP '503 discloses the chemical structure of the free base of pitolisant and a schematic figure of its synthesis. The free base of pitolisant described in EP '503 is not crystalline and is of unknown purity. EP '503 also discloses a process for synthesizing a

55

crystalline oxalate salt of pitolisant. This crystalline oxalate salt is the only salt of pitolisant disclosed in EP '503.

388.    This one crystal form for pitolisant oxalate disclosed in Example 117 does not predict whether a POSA could make more crystal forms of the pitolisant oxalate salt, much less the pitolisant hydrochloride salt. Each salt is a different compound. Whether a particular crystalline oxalate salt of pitolisant was formed in Example 117, would have no predictive value for whether any other crystalline salt of pitolisant would form because each salt is a different compound.

389.    As of the priority date, there was no predictive procedure for whether crystallization would be successful, and if so, how many forms there would be or what properties a given crystal form would have.

390.    Not every salt form of a pharmaceutical product can be crystallized. There are salts that do not crystallize, meaning the salt may be isolated as an amorphous solid or exist as an oil. At a high level, salt formation is a chemical process in which an acid and base react (via proton transfer) to form an ionic compound—the salt. By contrast, crystallization is a physical process in which a substance (salt or non-salt) arranges its constituent molecules/ions into an ordered, repeating lattice; the process is about structure and solid form, not about creating new ions. Crystallization and salt formation are not one in the same.

391.    A POSA could not know or predict that a given compound will crystallize without experimentation—much less based on the disclosure of EP '503.

392.    A POSA could not know or predict the properties or characteristics of any given crystalline form, how to make any given crystalline form, or how many forms might exist.

393.    There is no disclosure in EP '503 that discloses the particular crystalline form claimed in the '197 Patent.

## 2. A POSA would not have been motivated to pursue pitolisant for development or investigate its salts and crystalline forms.

394.    A POSA would not have been motivated to pursue pitolisant for development or investigate its salts and crystalline forms. *See also* Section I.I; Section III.B.

395.    A POSA would not have been motivated to make the claimed crystalline form of pitolisant hydrochloride.

### a) EP '503 would not have motivated a POSA to pursue pitolisant

396.    EP '503 contains *no* human data for any of the disclosed compounds. There is very limited biological data for 23 compounds in the form of binding affinity data and mouse model data assessing a compound's ability to increase the level of tele-methylhistamine (a histamine metabolite) in the brains of mice. Pitolisant is not among these 23 compounds.

397.    EP '503 provides no biological data for pitolisant. Because there is no biological data at all for pitolisant in EP '503, a POSA would have no reason to select it for further development.

398.    To the extent a POSA would be motivated to select a compound for development from EP '503, a POSA would have looked to the formula I compounds for which EP '503 provided animal data. A POSA would recognize that overall EP '503 places a greater emphasis on formula (I) compounds than formula (IIa) compounds. The specification identifies a list of "particularly preferred compounds" and "more preferred compounds" all of which are formula I compounds.

399.    If a POSA were to look to the EP '503 formula (IIa) compounds, the POSA would consider the formula (IIa) compounds for which there is biological animal data. There was no such data for pitolisant or pitolisant oxalate in EP '503.

> b) **No other reference would motivate a POSA to pursue pitolisant or make the claimed crystalline hydrochloride salt**

400.    Meier G. et al., FUB 649: A Novel Non-imidazole histamine $H_3$-Receptor Antagonist with High In Vitro and Oral In Vivo Potency, 334(2) ARCH. PHARM. MED. CHEM. C40 (2001) ("Meier I"), Susanna Liedtke et al., Replacement of Imidazole by a Piperidine Moiety Differentially Affects the Potency of Histamine $H_3$-Receptor Antagonists, 367 NAUNYN-SCHMIEDEBERG'S ARCH. PHARMACOL. 43–50 (2003) ("Liedtke"), and Galina Meier et al., Influence of imidazole replacement in different structural classes of histamine $H_3$-receptor antagonists, 13 EUR. J. OF PHARM. SCI. 249–59 (2001) ("Meier II") would not motivate a POSA to pursue pitolisant for development.

401.    The data contained in these publications are limited to animal potency data; there is no human data. A POSA would not be motivated to select a compound, such as pitolisant, which had no promising human data as of the priority date.

402.    Moreover, other compounds disclosed in EP '503 demonstrate higher potency (ED50) values than the pitolisant oxalate in the Meier I and Meier II publications. For example, Meier II at 256 (listing pitolisant oxalate ED50 value in mouse model as "1.6±0.9" mg/kg); Meier I, C40, citing to Meier II (listing pitolisant oxalate ED50 value as "1.6±0.9 mg/kg p.o."); EP '503 ¶¶ 217, 219 (listing compounds with ED50 values between 0.2 mg/kg to 1.1 mg/kg). A POSA would not be motivated to pursue pitolisant based on the data in Meier I or Meier II.

403.    Neither Meier I nor Liedtke nor Meier II would provide a POSA with any motivation to deviate from the pitolisant oxalate salt. The publications do not identify any drawbacks or issues with that salt. None of these references would provide a POSA with motivation

to make additional salts, including the hydrochloride salt, much less the particular claimed crystalline pitolisant hydrochloride salt, which did not exist at the time.

### 3. A POSA would not have been motivated to make the claimed crystalline form of pitolisant hydrochloride.

404.    Even if a POSA had selected pitolisant for further development, the POSA would lack the motivation to make pitolisant hydrochloride, much less the claimed crystalline form of pitolisant hydrochloride.

405.    The existence of the claimed crystalline pitolisant hydrochloride salt and its physicochemical properties were not known, could not have been known, and were not predictable. As a result, a POSA would have had no reason to attempt to make the claimed crystalline pitolisant hydrochloride salt.

406.    Nor could a POSA have been motivated to make a hydrochloride salt that is crystalline with XRPD peaks as set forth in the claims and optionally comprises water up to 6%.

### a) EP '503 would not have motivated a POSA to make the claimed crystalline form of pitolisant hydrochloride.

407.    Claim 48 of EP '503 is not specific to pitolisant, nor does it claim any particular salt of pitolisant.

408.    Claim 48 does not "specifically" claim any compound but rather is directed to "anyone of the preceding claims," which include independent claims to two separate genera, each encompassing at least millions of compounds. This is not a "finite number."

409.    Crystalline pitolisant oxalate is the only pitolisant salt exemplified in EP '503. And nothing in EP '503 or the prior art generally suggested to a POSA that he or she should deviate from pitolisant oxalate.

59

410.    If a POSA were attempting to develop a salt of pitolisant other than pitolisant oxalate, the number of salts would not have been "finite." A POSA would have had dozens of anions from which to select.

411.    The possible options are not "finite," for the added reason that salts can form with varying stoichiometries and solid-state forms. For example, maleic acid and oxalic acid are diprotic acids, meaning they can donate more than one proton per molecule in an aqueous solution, resulting in salts of varying stoichiometries of the free base compound and the acid.

412.    The salt options are also not "finite" because solid formation is unpredictable. It is impossible to predict whether a particular salt will crystallize, and if so what its properties will be. The possible solid forms include crystalline forms, amorphous materials, solvates, and non-solvates.

413.    Even if a POSA was motivated by EP '503 to attempt to make a hydrochloride salt of pitolisant, he or she would not have been motivated by EP '503 to make the claimed crystalline pitolisant hydrochloride salt.

414.    EP '503 does not contain any information or guidance regarding crystalline forms of pitolisant salts other than the pitolisant oxalate exemplified in Example 117, any teaching about how to make other crystalline forms of pitolisant or its salts, any teaching about the potential physiochemical properties of any salt or any crystalline form other than the pitolisant oxalate exemplified in Example 117.

415.    A POSA would not have been able to predict which if any crystalline form of pitolisant hydrochloride could be made because crystallization is unpredictable for a new compound. A POSA would have had no reason to believe that the claimed crystalline form of

pitolisant hydrochloride would exist or could be made and thus would have had no motivation to make it based on EP '503 or any other reference or publication available at the time of invention.

416. A POSA would not have been able to predict the physicochemical properties (including whether it would exhibit physicochemical properties that make it useful for pharmaceutical development) of the claimed crystalline pitolisant hydrochloride or any other crystalline form of pitolisant or its salts before it has been made, and a POSA would not have had any motivation to make something whose properties are completely unpredictable.

        **b)**        **The POSA would not have been motivated to modify the pitolisant or the crystalline pitolisant oxalate salt disclosed in EP '503**

417. The prior art did not identify problems or drawbacks with pitolisant or the crystalline pitolisant oxalate salt disclosed in EP '503 that would have motivated a POSA to pursue other salts or solid forms.

418. As of the priority date, the prior art did not describe or discuss pitolisant freebase as oily. Nor did it identify any physiochemical drawbacks of pitolisant freebase.

419. The prior art did not describe or discuss the solubility of pitolisant oxalate. Nor did the prior art disclose any problems with the oxalate salt of pitolisant. On the contrary, pitolisant oxalate was used to generate the animal potency data reported in Liedtke and Meier II.

        **c)**        **EP '503 in view of Berge did not provide a POSA motivation to make the claimed crystalline form of pitolisant hydrochloride**

420. EP '503 in view of Berge would not have motivated a POSA to make the claimed crystalline form of pitolisant hydrochloride or to select it for further development.

421. Berge does not mention pitolisant, much less describe processes to make its pharmaceutical salts.

422. Berge is a general reference that describes the complicated set of factors to consider when choosing a pharmaceutically acceptable salt for therapeutic use. The opening paragraph of Berge states that "[c]hoosing the appropriate salt, however, can be a very difficult task, since each salt imparts unique properties to the parent compound." Berge at 1. Based on a literature review, Berge concludes, "[a]t present, selecting a salt form that exhibits the desired combination of properties is a difficult semiempirical choice." Berge at 16.

423. Berge would not motivate a POSA to make a pitolisant hydrochloric acid salt.

424. Table 1 in Berge would not motivate a POSA to make a pitolisant hydrochloric acid salt.

425. Berge demonstrates that most FDA approved commercial salts were *not* hydrochloride salts.

426. Berge states, "[t]he number of salt forms available to a chemist is large; surveys of patent literature show numerous new salts being synthesized annually."

427. Berge illuminates that challenges in finding the most suitable form for drug development given the numerous physiochemical properties that salts may influence, and the fact that these properties cannot be predetermined in advance.

428. There are numerous examples where hydrochloride salts of active pharmaceutical ingredients were made but ultimately not chosen for commercial development and therapeutic use because they have undesirable characteristics.

429. Beginning in the mid-1990s there was a strong trend toward increased diversity of anions applied for the formation of salts.

430. Since 2006, the diversification of pharmaceutical salts has continued.

431.    Berge does not contain any information or guidance regarding crystalline forms of pitolisant or its salts, any teaching about how to make crystalline forms of pitolisant or its salts, any teaching about the potential physiochemical properties of any salt of pitolisant or any crystalline form of pitolisant or its salts.

> **d)    EP '503 in view of Byrn-1995 did not provide a POSA motivation to make the claimed crystalline form of pitolisant hydrochloride**

432.    EP '503 in view of Byrn-1995 would not have motivated a POSA to make the claimed crystalline form of pitolisant hydrochloride or to select it for further development.

433.    Byrn 1995 does not mention pitolisant nor the pitolisant oxalate salt disclosed in EP '503, or any other salt of pitolisant, much less describe their physicochemical properties.

434.    Byrn 1995 does not provide guidance on how to make solid forms of pitolisant or its salts.

435.    Byrn 1995 teaches that solid state screening is not necessary in all circumstances, particularly "if a company can establish a specification/test to ensure production of a well defined solid form of the drug substance, then it is not necessary to do all of the physical/chemical testing outlined in the decision trees."

436.    Byrn 1995 is not prescriptive in urging the POSA to adopt any specific approach. Instead, Byrn 1995 acknowledges that "each individual compound has its own peculiarities which require flexibility in approach." Byrn 1995 at 945.

437.    Here, those "peculiarities" included the fact that the prior art disclosed a crystalline pitolisant oxalate salt and there were no known drawbacks to that salt in the prior art.

438.    Byrn 1995 notes that flexibility is needed given that "[s]olid drug substances display a wide and largely unpredictable variety of solid state properties." Byrn 1995 at 945.

439.    There was very little in the prior art about the physiochemical properties about pitolisant and the crystalline oxalate salt exemplified in the EP '503.

440.    A POSA would not be motivated to conduct salt or solid-state screening to find alternatives to the pitolisant or the crystalline oxalate salt exemplified in the EP '503.

441.    A POSA would understand that there is no standard method to screen for salts or solid forms and the number of potential experiments is exceptionally large. There is no reasonable expectation of success in obtaining any particular crystal form from a screen. Moreover, some screens do not produce any additional solid forms and in some cases do not result in any crystalline form.

> **e)    Neither the 1987 FDA Guidelines nor the 1999 ICH Guidelines would provide a POSA with motivation to make the claimed crystalline form of pitolisant hydrochloride.**

442.    Neither the 1987 FDA "Guideline for Submitting Supporting Documentation in Drug Applications for the Manufacture of Drug Substances" ("1987 FDA Guidelines") nor the 1999 ICH "Procedure and Acceptance Criteria for New Drug Substances and New Drug Products: Chemical Substances Q6A" ("1999 ICH Guidelines") would have motivated a POSA to make the claimed crystalline form of pitolisant hydrochloride.

443.    These references discuss the use of analytical procedures that may be capable of identifying the presence of polymorphs but do not instruct innovators to search for new crystalline forms. Thus, a POSA would not have been motivated to screen for crystalline forms based upon the guidelines.

444.    ICH Guidelines 1999 did not govern drugs or drug substances in the research and development stage.

445.    ICH Guidelines 1999 did not mention pitolisant or any of its solid forms.

446.    ICH Guidelines 1999 states that the NDA applicant should provide information describing whether there is a change in solid-state form under the conditions submitted for regulatory approval, that is, under the manufacturing and storage conditions indicated in the NDA. This provides no motivation to a POSA to screen for crystalline forms before the manufacturing and storage conditions are determined, as the crystallization protocols used in the screen may be irrelevant for the regulatory submission.

447.    ICH Guidelines 1999 did not direct an applicant to create or attempt to create additional solid-state forms, including any crystalline forms.

448.    FDA Guidelines 1987 do not state that an applicant should search for new crystalline forms, how to search for new crystalline forms, or provide any teaching of how to create new crystalline forms of a known compound.

449.    From these two references, a POSA would understand that there is no standard method to screen for salts or solid forms and the number of potential experiments is exceptionally large.

450.    A POSA would not have been motivated to conduct a salt and solid-state screen to make the claimed crystalline pitolisant hydrochloride salt.

> **f)    A POSA would have understood that using hydrochloric acid for salt formation presented a number of potential drawbacks.**

451.    A POSA would have understood that there are drawbacks with using hydrochloric acid for salt formulation of pharmaceutical compounds.

452.    One potential problem with hydrochloride salts is hygroscopicity, which refers to a compound's ability to adsorb and/or absorb moisture from the surrounding environment. Due to its hygroscopicity, a compound may become damp or even deliquescent, meaning it dissolves in the water it absorbed.

453.    Hygroscopicity can be a significant problem in the development of pharmaceutical drugs. For example, a hygroscopic drug may result in stability issues since the moisture uptake can lead to chemical degradation (e.g. hydrolysis) or solid-state changes, reducing the drug potency and shelf life.

454.    The prior art discussed other potential disadvantages to hydrochloride salts. For example, the prior art reported that hydrochloride salts are volatile, susceptible to heat, and can have stability problems.

455.    The prior art disclosed numerous examples where the hydrochloride salt was not chosen for pharmaceutical development.

456.    The prior art notes that hydrochloride salts could have limited solubility due to the presence of hydrochloric acid in the stomach.

457.    Moreover, as reflected in the '197 Patent, pitolisant succinate also has good solubility and is a pharmaceutically acceptable salt.

458.    Pharmaceutical compounds also need not be in crystalline form. Crystalline and amorphous forms each present potential advantages and disadvantages for pharmaceutical dosage forms. For example, for some drugs, the improved dissolution rate provided by an amorphous form can yield beneficial improvements in bioavailability.

### 4.    A POSA would not have had a reasonable expectation of success in making the claimed crystalline form of pitolisant hydrochloride.

459.    A POSA would not have had a reasonable expectation of success of making the claimed crystalline pitolisant hydrochloride salt.

460.    The existence of the claimed crystalline pitolisant hydrochloride salt and its physicochemical properties were not known, could not have been known, and were not predictable. A POSA would have had no reasonable expectation of success of making the claimed crystalline

pitolisant hydrochloride salt. Nor could a POSA have reasonably expected success at making a hydrochloride salt that is crystalline with XRPD peaks as set forth in the claims and optionally comprises water up to 6%.

461.    Making new crystalline salts was and is challenging and unpredictable.

462.    A POSA would not necessarily conduct a solid-state screen as part of the materials stage or preformulation process, and such a screen would not invariably lead to the discovery of the claimed crystalline pitolisant hydrochloride sale.

463.    A POSA would understand that there is no standard method to screen for solid forms and the number of potential experiments is exceptionally large.

464.    If a POSA had performed a solid-state screen relating to pitolisant or one or more of its salts, he or she would have recognized that it is impossible to predetermine the set of crystallization parameters that can lead to a particular crystalline form.

465.    Making salts in solution and making crystalline salts that would be suitable for pharmaceutical use are not one and the same.

466.    Making salt in solution does not guarantee that a crystalline salt will form.

467.    Whether a crystalline salt will form with one compound will not predict whether a crystalline salt with form with another compound, and if so, what the crystal structure will be.

468.    The prior art described numerous instances where a hydrochloride salt could not be crystallized.

> **a)    EP '503 would not have provided a POSA with a reasonable expectation of success to make the claimed crystalline form of pitolisant hydrochloride**

469.    Example 117 of EP '503 would not have given a POSA a reasonable expectation that using hydrochloric acid instead of oxalic acid would have achieved a crystalline salt of pitolisant let alone the claimed form of the '197 Patent.

470.    The crystallization parameters in Example 2 of the '197 Patent bear no resemblance to those described in Example 117 of EP '503.

471.    The formation of a crystalline oxalate pitolisant salt in Example 117 of EP '503 has no predictive value with respect to whether a crystalline hydrochloride salt of pitolisant will form, what the structure of a crystalline form or forms would be, or what the properties of a crystalline form or forms will be.

472.    Oxalic acid and hydrochlorid acid are not interchangeable, and these acid have unique properties. For example, oxalic acid is a weak acid and hydrochloride a strong acid. A POSA would not assume that "same end result" by merely swapping out the acids.

473.    Example 117 could not predict whether another crystalline form of a pitolisant oxalate salt would form, much less any other types of salts. Each salt is a different compound with its own set of unique physicochemical properties.

474.    With respect to salt and solid form formation, every compound is essentially a new situation.

475.    A POSA would not have had a reasonable expectation of success in making the claimed crystalline pitolisant hydrochloride salt based on the crystalline oxalate and hydrochloride salt examples in EP '503.

476.    EP '503 also does not provide a "standard solvent-mediated crystallization process" with a reasonable expectation of success in making the claimed crystalline pitolisant hydrochloride salt.

477.    A POSA as of the priority date would have known that there is no "standard solvent-mediated crystallization process."

478.    Nothing in EP '503 (or elsewhere in the prior art) provided guidance to establish what particular solvents, temperatures, agitation rates, etc., were likely to result in the claimed crystalline pitolisant hydrochloride salt.

479.    The list of suitable solvents in EP '503 does not meaningfully narrow the set of parameters that would likely result in the claimed crystalline pitolisant hydrochloride salt

480.    There are a vast number of additional parameters that could impact crystallization, including temperature, concentration, agitation, pH, cooling rate, evaporation rate, to name a few.

481.    The prior art taught the significant impact that even a single variable, including temperature or concentration, can have on the outcome of polymorph screens even when only a single solvent is used.

> **b)    EP '503 in view of Berge and/or Bryn 1995 would not provide a POSA with a reasonable expectation of success to make the claimed crystalline form of pitolisant hydrochloride**

482.    EP '503 in view of Berge and Byrn 1995 did not provide a POSA with a reasonable expectation of successfully making the claimed crystalline pitolisant hydrochloride salt.

483.    Berge would not have provided a POSA with a reasonable expectation of success in making the claimed crystalline pitolisant hydrochloride salt. Each compound is a new situation, and it was impossible to predict without experimentation whether the claimed crystalline pitolisant hydrochloride salt would form.

484.    A POSA would not infer that because hydrochloride salts were formed with other compounds, there was a reasonable expectation that the claimed crystalline pitolisant hydrochloride salt would form.

*485*.    There are numerous examples in the prior art of hydrochloride salts that did not crystallize.

486.    11. Crystallization is not expected for any given compound, much less pitolisant hydrochloride.

487.    A POSA would not have a reasonable expectation of success of making the claimed crystalline form of pitolisant hydrochloride by conducting a solid-state screen.

488.    A POSA would not have a reasonable expectation of success of making the claimed crystalline form of pitolisant hydrochloride based on Byrn 1995.

489.    Solid-state screening is an unpredictable science and it is impossible to predetermine the set of crystallization parameters that can lead to a particular crystalline form.

490.    As of the priority date there was no standard or routine approach to attempting to make a crystal form of a compound. To the contrary, the prior art taught that "[t]he range and combinations of crystal growth conditions are virtually infinite, and there is no way to guarantee the preparation of additional polymorphs of a substance, much less the generation of 'all' of them." Bernstein 1993 at B67. The range of known experimental parameters that could have been varied to potentially induce crystallization or to potentially create different crystal forms of a compound was vast.

491.    A POSA would not understand Byrn 1995 to provide instructions on how to make a crystalline form that has never been made before.

492.    It does not teach how to make crystalline forms of pitolisant or its salts or any other specific drug compound.

493.    Byrn 1995 does not disclose or suggest pitolisant hydrochloride or any crystalline forms of pitolisant hydrochloride.

494.    There is no standard method to screen for solid forms and the number of potential experiments is exceptionally large.

70

495.    It is impossible to predict how, if at all, a chemical compound can be made into a crystalline material and what physical characteristics it might have.

### c)    A POSA would not have been able to predict the properties of the claimed crystalline form of pitolisant hydrochloride

496.    A POSA would not have had any expectation of making a particular crystalline form with any particular properties and characteristics.

497.    A POSA would have no way of predicting the XRPD peaks of the crystalline form. Nor would a POSA be able to predict what water content range the crystalline form could have.

498.    Prior art at the time of the invention taught that the properties of a crystal form are unpredictable.

499.    APOSA would not have been able to predict with reasonable certainty that the claimed crystalline form of pitolisant hydrochloride would exhibit the physicochemical properties that make it useful for pharmaceutical development.

500.    A POSA would not have had a reasonable expectation of success in obtaining the claimed crystalline pitolisant hydrochloride salt with its unique and unexpected properties based on the prior art.

501.    Solid-state screening is an unpredictable science and it is impossible to predetermine the set of crystallization parameters that can lead to a particular crystalline form.

502.    Nothing in the prior art taught a POSA how to conduct a salt screen or solid-state screen for pitolisant. Nor did it teach any specific variables or conditions to use in conducting a solid-state screen of pitolisant or pitolisant salts.

### H.    Objective Indicia Support Non-Obviousness

503.    The objective indicia of unexpected results and copying further demonstrate the non-obviousness of claims 1 and 2 of the '197 Patent.

1.    **Nexus with Claims 1 and 2 exists.**

504.    WAKIX embodies every limitation of claims 1 and 2 of the '197 Patent.

505.    WAKIX is an embodiment of claim 1 of the '197 Patent.

506.    WAKIX is an embodiment of claim 2 of the '197 Patent.

507.    Harmony's pitolisant hydrochloride Batch No. 142868 has an X-ray diffractogram that includes all peaks recited in claims 1 and 2 of the '197 Patent.

508.    Harmony's pitolisant hydrochloride Batch No. 142868 is an embodiment of claim 1 of the '197 Patent.

509.    Harmony's, pitolisant hydrochloride Batch No. 142868 is an embodiment of claim 2 of the '197 Patent.

510.    The drug substance in WAKIX is the crystalline pitolisant hydrochloride salt described and claimed in the '197 Patent.

511.    The WAKIX drug substance produces an XRPD diffractogram with peaks identified in the '197 Patent, which is shown by the XRPD of Batch GRP01, which is a reference standard batch used in the Wakix NDA.

2.    **The claimed pitolisant hydrochloride exhibits unexpectedly advantageous properties for pharmaceutical use.**

512.    The claimed crystalline hydrochloride salt exhibits a number of properties that are advantageous for pharmaceutical use, including that it was unexpectedly physically stable, despite being hygroscopic; that it demonstrated flowability despite its hygroscopicity; that it was physically stable at high temperatures; and that it had beneficial solubility.

a)    **It is unexpected that the claimed crystalline pitolisant hydrochloride is a physically stable salt with good flowability despite being hygroscopic**

513.    Whether a crystal form will exist for a compound is unpredictable. It is also unpredictable what form that crystalline structure will have, including whether it will be a hydrate

72

or will be hygroscopic. It is also unpredictable how physically stable a crystalline form will be under various conditions (e.g. water vapor).

514.    The claimed crystalline pitolisant hydrochloride salt is hygroscopic.

515.    Despite its hygroscopicity, the claimed crystalline hydrochloride salt was unexpectedly physical stable, and showed good flowability.

516.    Hygroscopic compounds readily take up moisture from the atmosphere, becoming a hydrate, damp, or deliquescent.[2] Hygroscopicity can range from "[n]on-hygroscopic" to "[s]lightly hygroscopic" to "[m]oderately hygroscopic" to "[v]ery hygroscopic."[3]

517.    Hygroscopicity is a first-order concern in drug development because it can impact the physical and chemical stability of the compound. Hygroscopicity can trigger solid-state changes which can reduce the drug potency and shelf life of the drug product. Hygroscopicity can also present manufacturability problems due to caking, sticking, and poor flowability.

518.    The physical stability of a crystalline form generally refers to its ability to retain its physical form. This characteristic is important in pharmaceutical products because different crystalline forms, including hydrates, can exhibit different properties. Physical instability is among the most significant potential disadvantages when working with pharmaceutical hydrates.

519.    Given the potential impact of hygroscopicity to the physical and chemical stability of salts described in the prior art, a POSA would have considered a non-hygroscopic or low-hygroscopic salt desirable, which is borne out by the literature.

---

[2] A deliquescent substance is one that absorbs so much moisture from the air that it dissolves in the water it collects, forming a solution.

[3] Under this rubric, the claimed crystalline pitolisant hydrochloride salt was classified as "[v]ery hygroscopic."

73

520.    At the priority date, there was no method of predicting whether a compound would be hygroscopic, and if so, what would be the behavior of the water molecules, and their impact on the physical stability of the crystal form or its chemical properties.

521.    The POSA would not have had any reason to suspect that any solid-state form of pitolisant hydrochloride would have been stable. To the extent the POSA would have been able to make any prediction at all, the POSA would have expected that the crystalline pitolisant hydrochloride salt to be unstable given its hygroscopicity.

522.    Surprisingly, the claimed crystalline pitolisant hydrochloride salt is physically stable up to 6.0% water, as demonstrated by Example 3 and Table 2 of the '197 Patent, as well as internal testing reports.

523.    Above 6.0% water content, the claimed crystalline pitolisant hydrochloride salt becomes deliquescent.

524.    There is no reliable way of predicting the influence of a particular salt species on the behavior of the parent compound. It is not possible to predict the properties of a new crystalline salt form based on the behavior of other compounds.

525.    A POSA would have no way of predicting that the claimed crystalline form could maintain its physical stability up to 6% water and thereafter become deliquescent. There are examples in the prior art of other crystalline forms retaining or losing physical stability at numerous other water ranges.

526.    Even if the property (e.g., that the claimed crystalline pitolisant hydrochloride can have a water content up to 6%) is inherent does not make it predictable.

527.    During prosecution, the evidence of the claimed crystalline form's stability with up to 6% water1 were presented to the Examiner, who agreed that the factual evidence that the claimed

material remained stable even with a water content up to 6%, was contrary to the expectations of the ordinary properties of the material.

528.    At the priority date, the POSA could not predict that the claimed crystalline salt form could remain stable up to 1.1 mole of water because there was no way of predicting the crystal structure.

529.    Crystalline hydrates are not necessarily hygroscopic.

530.    It is unclear, as of 2011, how many approved pharmaceutical drugs were hydrated crystal forms.

531.    That acetaminophen, aspirin, and ibuprofen have hydrated crystalline forms does not demonstrate that such forms are common in approved pharmaceuticals, that such forms do not have drawbacks, or that such forms are predictable.

532.    Choosing between an anhydrate and a hydrated phase for use in a pharmaceutical is complex, as various factors are considered including the solubility, dissolution profile, processability, dehydration-hydration behavior, and solid-state stability, all of which must be assessed empirically.

533.    At the priority date, it was not known how many hydrochloride salts were hydrates, let alone how many hydrochloride salt hydrates were hygroscopic. Regardless, the properties and behavior of other compounds' crystalline forms is irrelevant in predicting how the particular claimed crystalline form of pitolisant hydrochloride would behave at various conditions.

534.    That nine hydrochloride salts were known as being hygroscopic, of the 279 hydrochloride salts approved by FDA as of 2006, demonstrates how strikingly few hygroscopic hydrochloride salts there were prior to the invention. This data shows that it was unusual for hygroscopic hydrochloride salts to be used as pharmaceutical drugs.

535.    In addition, surprisingly, in spite of its high hygroscopic properties, it is possible to work with the claimed crystalline pitolisant hydrochloride under stressful relative humidity conditions.

536.    The claimed form remains stable when formulated, manufactured, and stored as tablets. Stability such as that exhibited by the claimed form is beneficial when formulating and manufacturing a tablet product because tableting involves processes, such as wet granulation, blending, and compression, which place mechanical stress on the crystalline form, and can potentially result in phase transformation.

537.    The POSA would have expected that the cell volume of the claimed crystalline pitolisant hydrochloride would have varied directly with the water content, in that the cell volume expands with increasing water content.

538.    Surprisingly, the variation of the cell volume of the claimed crystalline pitolisant hydrochloride is inversely proportional to water content, in that the cell volume contracts with increasing water content.

**b)      It is unexpected that the claimed crystalline pitolisant hydrochloride is physically stable at high temperatures**

539.    The melting point of a crystalline form is an important property because it is an indicator of the thermal stability and structural integrity of that solid form. In pharmaceutical development, a melting point too close to processing temperatures risks partial melting or degradation.

540.    The melting point of the crystalline pitolisant hydrochloride is around 117ºC, which is higher than both the pitolisant succinate and pitolisant maleate. The temperatures of both the pitolisant succinate and pitolisant maleate were considered to be too low for pill preparation.

541.    The POSA would not have expected that the crystalline pitolisant hydrochloride salt would be more thermodynamically stable than the hydrogen succinate and hydrogen maleate.

542.    The POSA would have viewed the melting point of the claimed crystalline pitolisant hydrochloride salt as entirely unexpected and highly desirable for the development of a pharmaceutical product, and is one of the characteristics that allows it to be formulated into WAKIX tablets at commercial scale for distribution to patients.

### c)    It is unexpected that the claimed crystalline pitolisant hydrochloride demonstrates superior solubility to the pitolisant hydrogen oxalate and hydrogen maleate salts

543.    The claimed crystalline pitolisant hydrochloride salt unexpectedly demonstrates superior solubility compared to the pitolisant hydrogen oxalate and hydrogen maleate salts.

544.    Higher solubility is a desired property in drug development because it can yield beneficial improvements in bioavailability.

545.    Crystalline pitolisant hydrochloride salt is more soluble than pitolisant hydrogen oxalate and hydrogen maleate, which the POSA would not have expected. The POSA would have viewed the high solubility of the claimed crystalline pitolisant hydrochloride salt as entirely unexpected and highly desirable for the development of a pharmaceutical product.

546.    The beneficial and unexpected features of the claimed crystalline pitolisant hydrochloride, including its solubility, facilitated the clinical use and results of WAKIX in patients, including WAKIX's unique pharmacokinetic profile.

### 3.    Copying of the claimed crystalline form demonstrate its non-obviousness.

547.    Companies in the industry have recognized the benefits of the claimed crystalline pitolisant hydrochloride salt at least by submitting Drug Master Files (DMFs) to FDA that allow

the DMF holder to make the claimed crystalline pitolisant hydrochloride salt for its own pitolisant product or to sell to others.

548.    Nuray Chemicals Private Limited ("Nuray") (DMF No. 36859), Emnar Pharma Private Limited ("Emnar") (DMF No. 39126), and Dasami Lab Private Limited ("Dasami") (DMF No. 38307) have filed DMFs for pitolisant hydrochloride, each of which describes the claims crystalline form.

549.    Nuray, which is an API supplier for AET, conducted testing on samples of the crystalline pitolisant hydrochloride salt described in DMF No. 36859, ███████████████ ████████████████████████████████████████████████

550.    Emnar, which is another API supplier for AET, conducted testing on samples of the crystalline pitolisant hydrochloride salt described in DMF No. 39126, ███████████████ ████████████████████████████████████████

551.    Dasami, which is an API supplier for Annora, an ANDA filer that has since been dismissed, conducted testing on samples of the crystalline pitolisant hydrochloride salt described in DMF No. 38307, and concluded that the samples exhibited the crystalline form described in the '197 Patent.

552.    ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████.

553.    ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████

I.    **Claim 1 of the '197 Patent Is Enabled and Supported by Adequate Written Description**

554. The specification of the '197 Patent provides detailed disclosures that would allow the POSA to make and use the full scope of Claim 1 without undue experimentation.

555. The '197 Patent also contains ample written description supporting the claimed invention in claim 1, and in particular the full water content range of 0% up to 6%.

556. A POSA reading the '197 Patent would understand that the inventors were in possession of a crystalline form of pitolisant hydrochloride optionally comprising water up to 6%, and having an X-ray diffractogram that comprises characteristic peaks (2θ) at 11.2°, 19.9°, 20.7° and 34.1° ±0.2.

557. Dr. Zaworotko provided no analysis of undue experimentation in his opening or reply reports.

558. The '197 Patent contains specific working examples teaching how to make, characterize, and recognize the claimed crystalline form. The patent contains examples of embodiments of the invention with water content throughout the claimed range of 0% to 6%: 2.7%, 2.8%, 3.7%, and 6.0%.

559. The patent provides single crystal data for each example, along with a detailed analysis of how the claimed crystal structure interacts with water.

560. The '197 Patent describes experimental XRPD testing on samples with water content of 2.7%, 2.8%, 3.7% and 6.0%, and explains that "the X-ray diffraction pattern obtained from different samples indicates that all samples correspond to the same crystal structure, except for small variations related to different water contents." A POSA would view the data as exemplifying several points within the range of water content that can be present in the claimed crystalline form while retaining its crystal structure.

561.    The '197 Patent contains other statements describing and supporting the claimed water content range, including the following: "Crystalline 1-[3-[3-(4-chlorophenyl)proxy]propyl]-piperidine monohydrochloride may show a variable content of water. However, the X-ray diffraction pattern obtained from different samples indicates that all samples correspond to the same crystal structure, except for small variations related to different water contents, as shown in Example 3, Table 2. [¶] According to the experimental studies, water content in the 1-[3-[3-(4-chlorophenyl)proxy]propyl]-piperidine monohydrochloride crystals ranges from traces to 6 ± 0.5%."

562.    Example 2 explains how to make the claimed form. Example 2 describes drying the product of its preparation method in a vacuum oven at 50ºC. for a minimum of 12 hours.

563.    The patent explains that the crystalline form "may show a variable content of water." '197 Patent, 2:1–3. The patent also explains that experimental studies showed that the "water content in the [pitolisant] mono-hydrochloride crystals ranges from traces to 6±0.5%." *Id.* at 2:7–9.

564.    The '197 Patent also provides ample data about the claimed form, including single crystal data and water content. A POSA would have the necessary degree of skill to understand this information in the '197 Patent and practice the invention.

565.    The fact that others in the industry, including Emnar and Nuray were able to make the claimed crystalline form, including in embodiments with water content below 2.7%, further supports enablement of the claims.

566.    A POSA would be able to make and use a crystalline form of pitolisant hydrochloride optionally comprising water up to 6%, and having an X-ray diffractogram that

comprises characteristic peaks (2θ) at 11.2°, 19.9°, 20.7° and 34.1° ±0.2 without undue experimentation.

567.     A POSA would look to the totality of the specification, and would understand that the claimed crystalline form would retain its crystal structure with water content below 2.7%.

568.     A POSA would have no reason to believe that the claimed crystalline form would not retain its crystal structure (and therefore X-ray diffraction pattern) with a water content below 2.7%.

569.     A POSA would understand, for example, that he/she could dry the product further (beyond the disclosed minimum of 12 hours) to remove additional water, or could apply conditions to minimize the water content of a sample of the claimed form (e.g. vacuum drying).

570.     Pitolisant hydrochloride in anhydrous form with XRPD peaks (2θ) at 11.2°, 19.9°, 20.7° and 34.1° ±0.2 is not impossible to make. It can be made without undue experimentation.

571.     ██████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
███████████████████████████████████

572.     The crystalline form of pitolisant hydrochloride described in the '197 Patent is not an isolated-site hydrate.

573.     ██████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
█████████████████████████████████████████

574. 

575.

576.

577.    Crystalline pitolisant hydrochloride manufactured by Nuray Chemicals Pvt. Ltd. and Emnar Pharma Pvt. Ltd. have been tested and show less than 2.7% water content while possessing the characteristic peaks of the claimed crystalline form.

578.    Given the information provided in the patent, the type of experimentation necessary to confirm a water up to 6% would be manageable for a POSA without undue experimentation. Water content testing, for example by Karl Fisher or solvent loss using TGA, would be well within the knowledge of a POSA. Such testing would allow a POSA to know whether a crystalline form of pitolisant hydrochloride met the water content limitation of the claim. Techniques like XRPD

and Infrared (IR) spectroscopy, which are both used in the patent, would also be within the knowledge of a POSA and could be used for additional characterization.

579.    A collapsed form of pitolisant hydrochloride that does not have the characteristic XRPD peaks of the claims of the '197 Patent is not an embodiment within the scope of the claims.

580.    2-Theta peaks provide structural information about a crystalline form.

581.    Single crystal data provides structural information about a crystalline form.

582.    Whether or not a crystalline form has the characteristic XRPD peaks and water content of Claims 1 and 2 of the '197 Patent would be readily identifiable and recognizable using standard analytical techniques.

583.    In light of the specificity of the claims and the extensive disclosures in the patent, a POSA would have understood that the inventors both possessed and enabled the inventions of Claims 1 and 2 of the '197 Patent.

**J.    Claim 2 of the '197 Patent Is Not Indefinite**

584.    Claim 2 of the '197 Patent is not indefinite.

585.    A POSA would be able to determine the scope of Claim 2 of the '197 Patent with reasonable certainty.

586.    A POSA would understand that claim 2 claims distinct peaks. The margin of error does not change that.

587.    A POSA would understand that experimental error $\pm 0.2°$ can be present in X-ray diffraction. The experimental error depends on various factors, including sample preparation, such as the size of the sample, crystallinity of the sample, instrument variability, and experimental parameters. A POSA would understand how to account for $\pm 0.2°$ of experimental error in peak positions when analyzing X-ray diffraction data, in light of the patent claims, in order to identify the claimed form.

588.    The XRPD figure in the '197 Patent (Figure 1) shows the full X-ray diffractogram for a sample of the claimed form, which would further inform a POSA how all of the peaks listed in the claims relate to one another and can be used to identify the form.

589.    Claim 2 of the '197 Patent has a different scope than claim 1. Claim 2 of specifies a further limitation of the subject matter claimed beyond that in claim 1.

590.    Claim 2 identifies additional peaks beyond the four characteristic X-ray diffraction peaks identified in claim 1. Claim 2 identifies additional peaks (2θ) at 15.4°, 16.3°, 16.9°, 17.8°, 21.0°, 21.8°, 22.6°, 24.5°, 24.6°, 25.0°, 25.5°, 26.3°, 28.3°, 30.3°, 35.8°, 40.0°, 46.0° ±0.2.

591.    Each listed peak corresponds to an interplanar spacing in the crystal (referred to as a d spacing) and therefore identifies a particular dimension in the crystalline pattern of the crystalline form.

### K.    The '197 Patent Is Not Invalid for Improper Inventorship

592.    The inventorship of the '197 Patent is correct. Each of the named inventors contributed to the conception of the invention(s) claimed in one or more of the issued claims.

593.    Both Mr. Ligneau and Dr. Schwartz are properly listed as inventors of the '197 Patent.

594.    Mr. Ligneau contributed to the subject matter of at least claim 10 of the '197 Patent.

595.    Mr. Ligneau provided pharmacological data in Examples 6 through 10 of the '197 Patent. Ligneau Dep. He testified that this type of data is necessary in developing a pharmaceutical composition.

596.    Claim 10 of the '197 Patent claims a "pharmaceutical composition comprising a therapeutically effective amount" of crystalline pitolisant monohydrochloride.

597.    Dr. Schwartz contributed to the subject matter of at least claims 1, 2 and 10 of the '197 Patent.

84

598.     In addition to contributing to the discovery of the pitolisant molecule, Dr. Schwartz was involved in the effort to create pitolisant and to select it for further development, including collaborating closely with researchers in Walter Schunack and Holger Stark's laboratory on their part of the development work leading to pitolisant hydrochloride and engaging Ferrer to conduct further analysis on the solid-state form of pitolisant hydrochloride. Dr. Schwartz also led the team of scientists that conducted preclinical and clinical studies to develop pitolisant monohydrochloride into a therapeutically effective pharmaceutical composition. He was one of the lead scientists who oversaw the development of crystalline pitolisant monohydrochloride and its use as a pharmaceutical drug.

599.     If Dr. Schwartz or Mr. Ligneau are found by the Court not to be proper inventors on the '197 Patent, Bioprojet would take action to correct inventorship.

III.    **U.S. PATENT NO. 8,486,947**

A.    **The Person of Ordinary Skill in the Art ('947 Patent)**

600.    The POSA is a person working as part of a team comprised of a person with a Ph.D. and at least 1–2 years of experience, or a person with a master's degree and at least 3–4 years of experience, in the fields of synthetic or medicinal chemistry, pharmaceutical sciences, or a related discipline; and a person working in the field of central nervous system disorders including sleep disorders arising in patients with Parkinson's, narcolepsy, or sleep apnea, with a Ph.D. or M.D. and at least one year of research or clinical experience.

B.    **Background Relating to Infringement of the '947 Patent**

601.    Pitolisant (3-(4-chlorophenyl)propyl 3-piperidinopropyl ether) is a compound of Formula (IIa) of claim 1 of the '947 Patent.

1.    **The WAKIX® label addresses treatment of EDS and cataplexy.**

602.    WAKIX is approved for the following indications: (1) treatment of excessive daytime sleepiness (EDS) or cataplexy in adult patients with narcolepsy; and (2) treatment of excessive daytime sleepiness (EDS) in pediatric patients 6 years of age or older with narcolepsy.

603.    The "Clinical Studies" section of the WAKIX labeling describes three clinical trials that supported the approval of pitolisant hydrochloride for the treatment of EDS and cataplexy in adult patients with narcolepsy.

604.    Study 1 (NCT01067222) and Study 2 (NCT01638403) are described in Section 14.1, "Excessive Daytime Sleepiness (EDS) in Patients with Narcolepsy." Among other characteristics, patients were required to have an ESS score of 14 or greater to enroll in both Study 1 and Study 2.

605.    In Study 1, approximately 80% of the patients also had cataplexy, and in Study 2, about 75% of patients had cataplexy.

606.    Patients taking WAKIX demonstrated significantly greater improvement on the primary endpoint, the final ESS score, a measure of EDS, compared to patients taking a placebo, in both Study 1 and Study 2, as demonstrated by Table 3 in the WAKIX Label.

607.    Section 14.2 of the WAKIX Label describes clinical studies of pitolisant hydrochloride used to treat "Cataplexy in Adult Patients with Narcolepsy." It includes Study 3 (NCT01800045) and results for the subset of patients in Study 1 (NCT01067222) (the approximately 80% of patients) who had cataplexy in addition to EDS.

608.    In Study 3, patients were required to have an ESS score of 12 or greater and a history of cataplexy in order to enroll.

609.    Study 1 demonstrated that the 80% subset of patients with a history of cataplexy taking WAKIX showed statistically significantly greater improvement in the secondary endpoint, the rate of cataplexy, compared to patients taking placebo.

610.    Patients taking WAKIX in Study 3 also demonstrated statistically significantly greater improvement on the primary endpoint, the change in rate of cataplexy, as compared to patients who took placebo.

611.    Study 3 also assessed EDS as a secondary endpoint and concluded that patients taking WAKIX showed a clinically meaningful improvement in EDS compared to placebo.

### 2.    Treating cataplexy with pitolisant hydrochloride inevitably results in treating a narcolepsy patient's EDS.

612.    All narcolepsy patients with cataplexy necessarily have EDS.

613.    Pitolisant is well-known for treating both cataplexy and EDS in patients with narcolepsy.

614.    Clinicians do not prescribe pitolisant to treat cataplexy without the expectation that it would also treat a narcoleptic patient's EDS.

87

615.    A clinician cannot separate out EDS and REM dissociation when treating the disease of narcolepsy, as they are part of the same continuum.

616.    Current treatment guidelines from the American Academy of Sleep Medicine recommend that clinicians use pitolisant hydrochloride for the treatment of narcolepsy in adults, concluding that clinical trials of pitolisant hydrochloride in patients with narcolepsy, both with and without cataplexy, demonstrated clinically significant improvements in excessive daytime sleepiness, cataplexy, and disease severity.

### 3.    The method of treating EDS described in the '947 Patent encompasses the treatment of cataplexy in narcolepsy patients.

617.    "Excessive daytime sleepiness" or "EDS" is a pathological inability to stay awake and alert during the day.  EDS is the hallmark of narcolepsy; all patients with narcolepsy have EDS.

618.    The specification instructs that pitolisant treats the sleep and vigilance disorders associated with narcolepsy, Parkinson's disease, and sleep apnea, '947 Patent, at e.g., 37:62-65, 38:14-18, and it describes EDS broadly to be a sleep and vigilance disorder that "include[es] narcolepsy or 'sleep attacks,' i.e., inappropriate and unintended falls into sleep while in daytime activity," '947 Patent, 2:36–46.

619.    "Treating" a disorder in the context of the '947 Patent means "reversing, alleviating, inhibiting the progress of, or preventing the disorder or condition to which the term applies, or one or more symptoms of such disorder or condition." '947 Patent, 42:15–19.

620.    Cataplexy, the displaced manifestations of REM sleep that emerge during wakefulness or semiwakefulness, is a symptom associated with narcolepsy.  Treating EDS in a narcolepsy patient, according to claim 13 the '947 Patent, read in light of the specification, includes

alleviating the pathological sleepiness that interferes with daytime functioning or other manifestations of the sleep and vigilance disorder, including alleviating cataplexy.

621.    Said differently, "treating EDS" in the context of claim 13 read in light of the specification includes the treatment of symptoms of narcolepsy, such as treatment of cataplexy and treatment of a narcoleptic patients' pathological inability to stay awake and alert during the day, i.e., EDS.

622.    The use of "treating EDS" in accordance with the specification of the '947 Patent is consistent with the prosecution history of the '947 Patent including the declaration of Jean-Charles Schwartz.

623.    U.S. Application No. 2009/0312367 ("the '367 application"), a later filed application than the application that resulted in the '947 Patent, is directed to the co-administration of modafinil and pitolisant, and has no bearing on how the '947 Patent uses the term "treating EDS" in claim 13. The term "treating" in the '367 application is defined differently from how the term is used in the '947 Patent.

**C.    Novitium's ANDA Products Proposed Prescribing Information Encourages Physicians to Practice the Claimed Method of Treatment**

624.    ANDA No. 218495 (Novitium's ANDA) was submitted to FDA on August 14, 2023.

625.    Novitium's ANDA lists "WAKIX (Pitolisant Hydrochloride) Tablets 4.45 mg and 17.8 mg approved under NDA 211150 held by HARMONY BIOSCIENCES LLC" as the "Reference Listed Drug" (RLD) and requests approval for Novitium's Pitolisant Tablets, 4.45 mg and 17.8 mg.

626.    The strengths of Novitium's ANDA Products, 4.45 mg and 17.8mg, mirror the available strengths of WAKIX.

627.    Novitium's ANDA Products will be accompanied by Prescribing Information, the most recent proposed version of which is dated June 2025.

628.    Novitium's Proposed Prescribing Information states at Section 1 that its pitolisant tablets █████████████████████████████████████████████████████

629.    EDS is the hallmark symptom of narcolepsy. Thus, clinicians treating narcolepsy patients monitor and treat their EDS. Clinicians administering Novitium's Proposed ANDA Products would be monitoring and treating EDS in narcolepsy patients.

630.    Clinicians would therefore understand Section 1 of Novitium's Proposed Prescribing Information to instruct, encourage and/or recommend administration of Novitium's ANDA Products to treat narcolepsy patients, who necessarily have EDS.

631.    Section 2 of Novitium's Proposed Prescribing Information provides dosing instructions and recommendations for Novitium's ANDA Products.

632.    Section 2 of Novitium's Proposed Prescribing Information recommends for the treatment of adult patients a dosage range of ████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ████████████████████. Novitium's Proposed Prescribing Information also explains that ███ ████████████████████████████████████████████████████████████ ████████████████

633.    ██████████████████████████████ of Novitium's Proposed Prescribing Information are the same as those set forth in the WAKIX Prescribing Information for treatment of EDS and/or cataplexy in adult patients with narcolepsy.

634.    Novitium's Proposed Prescribing Information states ██████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████    These statements would be

understood by a clinician to be a reference to the approved WAKIX product, which is administered

according to the WAKIX Prescribing Information.

635.    The WAKIX Prescribing Information indicates that 4.45 mg and 17.8 mg pitolisant

tablets are safe and effective for the treatment of excessive daytime sleepiness in adults and

pediatric patients six or older, using doses of up to 35.6 mg/day.

636.    ████████████, Novitium's Proposed Prescribing Information references ████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████    Novitium's Proposed Prescribing Information states that ████

████████████████████████████████████████████████████████████████████████████

████████████

637.    ██████████████████ of Novitium's Proposed Prescribing Information reports data

from ████████████████████████████████

638.    ██████████████████ of Novitium's Proposed Prescribing Information reports ████

██████████████████████████████████████████████████. Since ████████████

of Novitium's Proposed Prescribing Information reports ████████████████████████████

████████████████████████████████████████, a clinician reading Novitium's

Proposed Prescribing Information would understand that ████████████████████████

███████████████████████████████████████████████████████████████████████, in

placebo-controlled clinical studies.

639.    Novitium's Proposed Prescribing Information at ███████████████████

██████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████.

640.    ███████████    Novitium's Proposed Prescribing information would inform the

clinician that the active ingredient of Novitium's ANDA Products is pitolisant hydrochloride, as

required by Claim 13.

641.    Novitium's Proposed Prescribing Information ███████████    provides  ████████

██████████████████████████████████████████y. In the ████████████████████████

███████████████████████████████████████████████. Per the ICSD-2,

to be diagnosed with any type of narcolepsy, the presence of EDS is required.

642.    Because all patients in ████████████████████████████████████████████

████████████████████████    were narcolepsy patients, each patient had EDS when administered

pitolisant.

643.    ██████████████████████████████████████████    provides results from

the ███████████████████████    confirming that Novitium's Proposed Prescribing Information

provides sufficient information to inform a clinician that its proposed ANDA Products are safe and

effective for the treatment of patients with narcolepsy, who all have EDS.

644.    ████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████

1 ██████████████████████████████████████████████████████████████

██████████████████████████████

645.    Clinicians reading ████████ of Novitium's Proposed Prescribing Information would understand that ███████████████████████████████████████████████ ██████████████.

646.    A clinician reading ████████ of Novitium's Proposed Prescribing Information would understand, or would readily be able to ascertain, that ███████████████████ ████████████████████████████████ and that the primary outcome measure was ██████████████████████████████.

647.    A clinician, reading Novitium's Proposed Prescribing Information which includes ██████████████████████████████ conducted in narcolepsy patients, would know that there was a primary endpoint for ████████████████████ which was also met, because ████████████████████████████████████████████████████████ Because Novitium's Proposed Prescribing Information includes ██████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████ in order to ensure that the clinician is safely administering Novitium's ANDA Products.

648.    A clinician reading Novitium's Proposed Prescribing Information would note that ████████████████████████████████████████████████████████████████ ██████████████████████ and would understand from this phrasing that there were additional patients who were evaluated ██████████████████████████.

649.    A clinician reading ████████ of Novitium's Proposed Prescribing Information would understand that ████████████████████████████████████████████████████ ████████████████

650.    At least sections ████████ of Novitium's Proposed Prescribing Information instruct, recommend, and/or promote administration of pitolisant for ████████████ ████████████ Furthermore, a treating clinician reading Novitium's Proposed Prescribing Information would further understand from at least sections ████████ that Novitium's ANDA Products are safe and effective for ████████████████████████.

651.    Because Novitium's Proposed Prescribing Information specifically states that ████████████████████████████████████████████████████ ████████ the clinician would either know, or consult the WAKIX label prior to prescribing pitolisant in order to ensure that the clinician is safely administering Novitium's ANDA Products to narcolepsy patients, and therefore be informed that ████████████████████ ████████████████████.

652.    Clinicians and/or patients will follow Novitium's Proposed Prescribing Information and administer pitolisant to narcolepsy patients ████████. Clinicians and/or patients will follow Novitium's Proposed Prescribing Information and administer pitolisant to narcolepsy patients ████ ████████████. It is well known that pitolisant has been shown in multiple clinical trials to ████████████████████ to a statistically significant degree. At least some narcolepsy patients who are administered Novitium's ANDA Products will ████████████████ ████.

653.    Clinicians and/or patients following the Novitium Proposed Prescribing Information will inevitably ████████ in at least some narcolepsy patients.

94

654.    There is no substantial noninfringing use for Novitium's ANDA Product.

655.    Novitium's Proposed Prescribing Information instructs, recommends and/or promotes infringement of Claim 13 of the '947 patent, demonstrating that Novitium specifically intends to induce infringement of Claim 13 of the '947 patent.

656.    In addition, the '947 Patent describes "treating EDS" in narcolepsy patients to include the treatment of symptoms of the sleep disorder EDS, which the specification describes as includes narcolepsy. Treating EDS in narcolepsy patients is thus described in the '947 Patent as encompassing the treatment of the other associated manifestations of narcolepsy, which would include cataplexy.

657.    Clinicians and/or patients will follow Novitium's Proposed Prescribing Information to ███████████████████████ by administering pitolisant. Because cataplexy is a manifestation of narcolepsy, treatment of cataplexy is treatment of EDS in narcolepsy patients, as it is described in the '947 Patent.

658.    Therefore, Novitium will encourage, recommend, or promote methods of administering Novitium's ANDA Products in a manner that induces clinicians and/or patients to infringe claim 13 of the '947 Patent.

659.    Novitium's Proposed ANDA Products, together with the Novitium Proposed Prescribing Information will induce clinicians and/or patients to infringe claim 13 of the '947 Patent.

**D.    Hikma's ANDA Products Proposed Prescribing Information Encourages Physicians and Patients to Practice the Claimed Method of Treatment**

660.    ANDA No. 218796 (Hikma's ANDA) was submitted to FDA on ████████████, by Zenara Pharma Private Limited.

95

661.    Zenara Pharma Private Limited transferred ownership of ANDA No. 218796 to Hikma effective March 11, 2025.

662.    Hikma's ANDA lists "WAKIX® (Pitolisant) tablets 4.45 mg and 17.8 mg (NDA# N211150" as the "Reference Listed Drug" (RLD), notes that "HARMONY BIOSCIENCES LLC" as the "holder of the approved application" and requests approval for Hikma's Pitolisant Tablets 4.45 mg and 17.8 mg.

663.    The strengths of Hikma's ANDA Products, 4.45 mg and 17.8mg, mirror the available strengths of WAKIX.

664.    Hikma's ANDA Products will be accompanied by Prescribing Information, the most recent proposed version of which is dated ███████████

665.    Hikma's Proposed Prescribing Information states at Section 1 that its pitolisant tablets are indicated ████████████████████████████████████████

666.    EDS is the hallmark symptom of narcolepsy. Thus, clinicians treating narcolepsy patients monitor and treat their EDS. Clinicians administering Hikma's Proposed ANDA Products would be monitoring and treating EDS in narcolepsy patients.

667.    Clinicians would therefore understand ███████ of Hikma's Proposed Prescribing Information to instruct, encourage and/or recommend administration of Hikma's ANDA Products to ████████████████████████████

668.    Section 2 of Hikma's Proposed Prescribing Information provides dosing instructions and recommendations for Hikma's ANDA products.

669.    Section 2 of Hikma's Proposed Prescribing Information recommends ███████ ████████████████████████████████████████████████ ████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████

670.    The dosing recommendations in Section 2 of Hikma's Proposed Prescribing

Information ████████████████████████████████████████████████

██████████████████████████████████

671.    In Section 6.1, Hikma's Proposed Prescribing Information references "adverse

reactions" ████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████

672.    Table 1 in Section 6.1 of Hikma's Proposed Prescribing Information ██████████

██████████████████████████████████

673.    Table 4 in Section 14 of Hikma's Proposed Prescribing Information ███████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████    a clinician reading Hikma's

Proposed  Prescribing  Information  would  understand  that  pitolisant  ██████████████

███████████████████████████████████████████████████

████████████████████████

674.    Section 8 of Hikma's Proposed Prescribing Information, entitled "Use In Specific Populations," contains section 8.4, describing "Pediatric Use," which states that ███████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████

675.    Because Section 8 of Hikma's Proposed Prescribing Information specifically notes

███████████████████████████████████████████████

███████████████████████ Section 8 of Hikma's Proposed Prescribing Information would inform a clinician ██████████████████████████████████████

███████████████████████████████████████

676.    In addition, Sections 1 and 14.2 of Hikma's Proposed Prescribing Information states that ██████████████████████████████████████████

███████████ The inclusion of these statements confirms that Hikma's Proposed Prescribing Information ████████████████████████████████

███████████████████████████████████████████████

███████████████████

677.    Sections 1, 2, 6, and 8, among others, of Hikma's Proposed Prescribing Information states that ████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████

678.    The WAKIX Prescribing Information indicates that 4.45 mg and 17.8 mg pitolisant tablets are safe and effective for the treatment of excessive daytime sleepiness in adults and

pediatric patients six or older, using doses of up to 35.6 mg/day. The only pediatric use information described in the WAKIX Prescribing Information concerns the treatment of excessive daytime sleepiness in pediatric patients six or older.

679.    Hikma's Proposed Prescribing Information at Section 11 states 

680.    Section 11 of Hikma's Proposed Prescribing information would , as required by Claim 13.

681.    Hikma's Proposed Prescribing Information at Section 14 . In the studies included in

682.    An ESS score of greater or equal to 12 means that a narcolepsy patient has EDS.

683.    Further, per the ICSD-2, to be diagnosed with any type of narcolepsy, the presence of EDS is required.

684.    

685.    Section 14 of Hikma's Proposed Prescribing Information provides confirming that Hikma's Proposed Prescribing Information provides

██████████████████████████████████████████████████████████████████

████████████████████████████████████

686.     ██████████████████ of Hikma's Proposed Prescribing Information shows that,

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████

687.     Clinicians reading ████████ of Hikma's Proposed Prescribing Information would

understand that ██████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████

688.     A clinician reading ██████████ Hikma's Proposed Prescribing Information would

understand, or would readily be able to ascertain, that ████████████████████

██████████████████████████████████████████████████████████████████

█████████████████████████████████████

689.     A clinician, reading Hikma's Proposed Prescribing Information which ████████

██████████████████████████████████████████████████████████████████

████████, would know that there was ██████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

know of or consult the WAKIX Prescribing Information or information on ███████ prior to prescribing in order to ensure that the clinician is safely administering Hikma's ANDA Products.

690.    In comparison to the WAKIX Prescribing Information, Hikma's Proposed Prescribing Information ████████████████████████████████████████████████████ ██████████████████████████████████████

691.    Section 14 of Hikma's Proposed Prescribing Information indicates that █████████ █████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████ ████████████████████████████████████████████

692.    A clinician reading Hikma's Proposed Prescribing Information would note that ███████████ of Hikma's Proposed Prescribing Information reports on the ███████████████ █████████████████████████████████████████████████████████ ██████████████████████████████████████

693.    A clinician reading ██████████ of Hikma's Proposed Prescribing Information would understand that ████████████████████████████████████████████████████ ████████

694.    At least sections ███████████████ of Hikma's Proposed Prescribing Information instruct, recommend, and/or promote administration of pitolisant for ███████████████████ ███████████████ Furthermore, a treating clinician reading Hikma's Proposed Prescribing Information would further understand from at least sections █████████████ that Hikma's Proposed ANDA Products are safe and effective ████████████████████████████

695.    Because Hikma's Proposed Prescribing Information specifically states that pitolisant ████████████████████████, which are presented in the WAKIX Prescribing

Information, the clinician would either know, or consult the WAKIX label prior to prescribing pitolisant in order to ensure that the clinician is safely administering Hikma's ANDA Products to narcolepsy patients, and therefore be informed ███████████████████████████████ █████████████████████████████.

696.    Clinicians and/or patients will follow Hikma's Proposed Prescribing Information and ███████████████████████████. Clinicians and/or patients will follow Hikma's Proposed Prescribing Information and administer pitolisant ████████████████ ███████████████. It is well known that pitolisant has been shown in multiple clinical trials to improve EDS in patients with narcolepsy to a statistically significant degree. At least some narcolepsy patients who are administered Hikma's ANDA Products will see an improvement in EDS.

697.    Clinicians and/or patients following the Hikma Proposed Prescribing Information will ██████████████████████████████.

698.    There is no substantial noninfringing use for Hikma's ANDA Product.

699.    Hikma's Proposed Prescribing Information instructs, recommends and/or promotes infringement of Claim 13 of the '947 patent, demonstrating that Hikma specifically intends to induce infringement of Claim 13 of the '947 patent.

700.    In addition, the '947 Patent describes "treating EDS" in narcolepsy patients to include the treatment of symptoms of the sleep disorder EDS, which the specification describes as includes narcolepsy. Treating EDS in narcolepsy patients is thus described in the '947 Patent as encompassing the treatment of the other associated manifestations of narcolepsy, which would include cataplexy.

701.     Clinicians and/or patients will follow Hikma's Proposed Prescribing Information to ██████████████████████████████████████████████. Because cataplexy is a manifestation of narcolepsy, treatment of cataplexy is treatment of EDS in narcolepsy patients, as it is described in the '947 Patent.

702.     Therefore, Hikma will encourage, recommend, or promote methods of administering Hikma's ANDA Products in a manner that induces clinicians and/or patients to infringe claim 13 of the '947 Patent.

703.     Hikma's Proposed ANDA Products, together with the Hikma Proposed Prescribing Information, will induce clinicians and/or patients to infringe claim 13 of the '947 Patent.

**E.     MSN's ANDA Products Proposed Prescribing Information Encourages Physicians and Patients to Practice the Claimed Method of Treatment.**

704.     ████████████████████████████████

██   ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████

██   ████████████████████████████████████

█████████████████

██   ████████████████████████████████████

██████████████████████████████

██   ████████████████████████████████████

████████████████████████████████████████████

███████

709. 

716.    An ESS score of greater or equal to 12 means that a narcolepsy patient has EDS.

717.    Further, per the ICSD-2, to be diagnosed with any type of narcolepsy, the presence of EDS is required.

718.    ██████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████

██    ████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████

██    ████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████

721.    Clinicians and/or patients will follow MSN's Proposed Prescribing Information and administer pitolisant to treat EDS in narcolepsy patients.

722.    There is no substantial noninfringing use for MSN's ANDA Product.

723.    In addition, the '947 Patent describes "treating EDS" in narcolepsy patients to include the treatment of symptoms of the sleep disorder EDS, which the specification describes as

includes narcolepsy. Treating EDS in narcolepsy patients is thus described in the '947 Patent as encompassing the treatment of the other associated manifestations of narcolepsy, which would include cataplexy.

724.    Clinicians and/or patients will follow MSN's Proposed Prescribing Information to treat EDS (as used in the literature) in adult narcolepsy patients by administering pitolisant. Because EDS (as used in the literature) is a manifestation of narcolepsy, treatment of EDS (as used in the literature) is treatment of EDS in narcolepsy patients, as it is described in the '947 Patent.

725.    MSN's Proposed Prescribing Information instructs, recommends and/or promotes infringement of Claim 13 of the '947 patent, demonstrating that MSN specifically intends to induce infringement of Claim 13 of the '947 patent.

726.    MSN will encourage, recommend, or promote methods of administering MSN's ANDA Products in a manner that induces clinicians and/or patients to infringe claim 13 of the '947 Patent.

727.    MSN's Proposed ANDA Products, together with the MSN Proposed Prescribing Information will induce clinicians and/or patients to infringe claim 13 of the '947 Patent.

**F.    Claim 13 Is Not Obvious**

    **1.    References Identified in Defendants' Combinations**

        **a)    Brooks 2002**

728.    Brooks 2002 explores existing and new approaches to the treatment of narcolepsy, looking at drugs that treat EDS and cataplexy.

729.    Brooks 2002 concerns then-existing treatments and proposed novel treatments for EDS and cataplexy, which include hypocretin and hypocretin agonists, slow-wave sleep enhancers, stimulants and wakefulness-promoting agents, and adrenergic drugs.

730.    Brooks 2002 observes that then-existing treatments for EDS in narcolepsy, as of 2002 include stimulants, including the amphetamines, pemoline, and modafinil. Other "alerting agents" such as mazindol, selegiline, caffeine and ephedrine were also used, although they were deemed to be "of limited usefulness due to poor tolerance and/or lack of efficacy." Brooks 2002 at 1822-23. This shows that alerting agents may not be adequate to treat EDS.

731.    Much of Brooks 2002 focuses on "novel treatment strategies for narcolepsy," outlining several classes of compounds that were speculated might have an effect on EDS. Brooks 2002 concludes by focusing on "hypocretin or hypocretin agonists, selective dopamine transport blockers and agents that enhance SWS." Brooks 2002 at 1825. No express mention is made in the conclusion about $H_3$ antagonists.

732.    The full disclosure in Brooks 2002 about $H_3$ antagonists is produced below:

> Recognition of the importance of the neurotransmitter histamine has increased in recent years. Histaminergic cells found in the tuberomammillary nucleus, located in the posterior hypothalamus, interact with the hypocretin system and appear to function in the regulation of sleep and wakefulness. Histamine receptor agonists have been shown to increase SWS in animals (see above) and other studies have also demonstrated that $H_3$ antagonists, such as thioperamide (BioProjet, Societe Civile de Recherche) increase wakefulness. The $H_3$ antagonist, Perceptin ™, is currently being developed by Gliatech Inc. Such agents may prove useful in treating EDS due to narcolepsy or other causes.

Brooks 2002 at 1824-25.

733.    Brooks 2002 is silent as to the role of inverse agonists, safety, tolerability, or other properties that make a compound suitable for administration, such as bioavailability or pK or pD parameters, including brain to plasma ratio, half-life or properties that allow for acceptable dosing.

734.    Brooks 2002 does not discuss pitolisant, even though pitolisant had been disclosed for several years by the time of Brooks 2002's publication.

735.   $H_3$ antagonists were not likely therapeutic targets for treating EDS in narcolepsy patients in 2002. That $H_3$ antagonist compounds would be efficacious was speculation at best. There were no clinical studies demonstrating a link between $H_3$ antagonism and efficacy in treating EDS in any patient population. There were no pre-clinical studies of $H_3$ antagonists in animal models reflecting EDS in any human patient population in 2002 or even prior to April 2005.

**b)    WO '254**

736.   International Patent Publication WO 2000/06254 ("WO '254") is an international patent application published in 2000, five years before April 2005, listing Jean-Charles Schwartz as one of several inventors.

737.   WO '254 presents the preparation and therapeutic applications of nonimidazole alkylamines as histamine $H_3$-receptor ligands. These compounds are of the formula (A), depicted below, where W is a nonimidazole moiety, and encompass 18 different sub-classes.

$$[W]-N\begin{smallmatrix} R^1 \\ R^2 \end{smallmatrix} \qquad (A)$$

738.   WO '254 lists a wide range of different applications for the "antagonists" including "having psychotropic effects, promoting wakefullness [sic], attention, memory and improving mood, in treatment of pathologies such as Alzheimer disease and other cognitive disorders in aged persons, depressive or simply asthenic states" in addition to "stimulat[ing] attention and memorization capacity in healthy humans" and treating "obesity, vertigo and motion sickness," "peripheral organs mainly a simulant of secretions or gastro-intestinal motricity," "CNS disorders of aged persons," and potentially "certain form[s] of epilepsy." WO '254 at 71:16-33.

739.   WO '254 further provides that the "said compounds may also be used as an agonist or partial agonists action on the said histamine receptors." Indeed, "compounds which are

108

histamine $H_3$ receptor agonists or partial agonists are advantageously used as active principle of medicinal products, in particular having mild sedative, antisecretory, anti-inflammatory, steep[sleep]-regulating and anticonvulsant effects," among other effects. WO '254 at 72:1-24.

740.    WO '254 makes no mention of EDS or any of the specific sleep conditions claimed in the '947 Patent. WO '254's cursory mention of "promoting wakefulness" would not motivate a POSA to select narcolepsy out of the wide range of neurological and psychiatric diseases that the formula (A) antagonists (as distinct from the formula (A) agonists/partial agonists) were hypothesized to be effective in treating EDS.

741.    Given that the compounds of formula (A) in WO '254 are stated to be antagonists, agonists, or partial agonists, there is no way to determine simply based on binding data what function each of these compounds serves.

742.    WO '254 lists 180 formula (A) compounds, including pitolisant, which is compound 117. WO '254 provides no biological data on pitolisant, or information from which to determine whether it is an antagonist, agonist or partial agonist.

743.    Out of the billions of compounds disclosed, WO '254 presents biological data for just 18 compounds, several of which were subsequently confirmed to have similar data to pitolisant.

744.    WO '254 selects several other nonimidazole $H_3$-receptor compounds to use as examples, reporting their Ki and ED50 values in Table II, III and IV (including compound 116, for which it only provides binding data).

       **c)**      **Meier I**

745.    Meier I is a collection of abstracts published in a medicinal chemistry journal published in 2001, of which one, C40, is an abstract discussing FUB 649 as a nonimidazole $H_3$-

receptor antagonist of interest, calling it a "a new promising lead for further development," as compared to an even earlier compound, FUB 181, and relying on data provided in Meier II.

746.    Calling a compound a "lead for further development" can mean that it is a compound intended for further structural modification, not as a compound intended to be taken into clinical studies. Meier I thus teaches a POSA that pitolisant should be further modified before it enters clinical trials.

747.    Similarity to FUB 181 would not motivate a POSA to pursue pitolisant even in 2001, let alone in April 2005, when significantly more information about numerous additional $H_3$ antagonists was known.

748.    Meier I C42 is another abstract published directly below C40 from the same group, which discusses imidazole and non-imidazole compounds related to ciproxifan, as "one of the most promising class" of $H_3$ receptor antagonists. Certain of these compounds are reported as being tested against a human $H_3$ receptor, and the compounds all displayed "nanomolar concentration range[s] exceeding that of [c]iproxifan," and "good capabilities of penetrating the blood brain barrier in mice with oral administration."

## 2.    Prior Art to the '947 Patent

749.    The following references relied on by Dr. Reider in his Rebuttal Report are prior art to the '947 Patent:

| '947 Patent | | | |
|---|---|---|---|
| **Abbrev.** | **Citation** | **Issue Date / Pub. Year** | **Exhibit Number** |
| Acuna-Goyocela 2004 | Acuna-Goycolea et al., *Glucagon-Like Peptide 1 Excites Hypocretin/Orexin Neurons by Direct and Indirect Mechanisms: Implications for Viscera-Mediated Arousal*, 24 J. NEUROSCI. 8141-8152 (2004) | 2004 | PTX-562 |
| Apelt 2002 | Apelt et al., *Development of a New Class of Nonimidazole Histamine H3 Receptor Ligands with Combined Inhibitory Histamine N-Methyltransferase Activity*, 45 J. MED. CHEM. 1128 | 2002 | PTX-468 DTX-0077 |
| Apelt 2005 | *Search for Histamine $H_3$ Receptor Antagonists with Combined Inhibitory Potency at Nt-methyltransferase: ether derivatives*, 60 PHARMAZIE 97 (2005) | 2005 | PTX-469 |
| Aslanian | Aslanian, R., et al., *Recent Progress in Histamine H3 Receptor Chemistry*, ANN. REP. MED. CHEM. 39, 57–66 | 2004 | PTX-470 DTX-0044 |
| Cephalon | Cephalon, *2002 Annual Report* (2002) | 2002 | PTX-473 |
| Cowart | Cowart, M., et al., *Medicinal Chemistry and Biological Properties of Non-Imidazole Histamine H3 Antagonists*, MINI-REV. MED. CHEM. 4, 979–992 | 2004 | PTX-474 DTX-0046 |
| Grammatopoulos | Grammatopoulos, D.K., and Chrousos, G.P., "Functional characteristics of CRH receptors and potential clinical applications of CRH-receptor antagonists," TRENDS ENDOCRINOL. METAB. 13, 436–444 | 2002 | PTX-477 DTX-0047 |
| Grassman 2002 | Grassman et al. *Progress in the proxifan class: heterocyclic congeners as novel potent and selective histamine H -receptor antagonists*, 15 EUR. J. PHARM. SCI. 367-378 (2002) | 2002 | PTX-478 |

111

| Grassman 2003 | Grassman et al., *Imidazole Derivatives as a Novel Class of Hybrid Compounds with Inhibitory Histamine N-Methyltransferase Potencies and Histamine hH₃ Receptor Affinities*, 11 BIOORG. & MED. CHEM. 2163-2174 (2003) | 2003 | PTX-479 |
|---|---|---|---|
| Grassman 2004 | Grassman et al., *Search for Histamine H₃ Receptor Ligands with Combined Inhibitory Potency at Histamine N-Methyltransferase: (t)-Piperidinoalkanamine Derivatives*, ARCH. PHARM. PHARM. MED. CHEM. 337 (abs) (2004) | 2004 | PTX-480 |
| Meier 2002 | Meier et al., *Piperidino-Hydrocarbon Compounds as Novel Non-Imidazole Histamine H₃-Receptor Antagonists*, 10 BIOORG. & MED. CHEM. 2535-2542 (2002) | 2002 | PTX-483 |
| Meier 2004 | Meier et al., *4-(a)(Alkyloxy)alkyl)-1H-imidazole Derivatives as Histamine H₃ Receptor Antagonists/Agonists*, 47 J. MED. CHEM. 2678-2687 | 2004 | PTX-484 |
| Mikó 2004 | Mikó et al., *Structural Variations of 1-(4-(phenoxymethyl)benzyl)piperidines as nonimidazole histamine H₃ receptor antagonists*, 12 BIOORG. & MED. CHEM. 2727– 2736 (2004) | 2004 | PTX-485 |
| Primacor Package Insert | Primacor Injection labeling (2003) | 2003 | PTX-490 |

### 3.    Additional Facts about the State of the Art in April 2005

750.    As of April 2005, the animal data provided on pitolisant is not reflective of pitolisant's effect on treating EDS in patients. The available biological data on pitolisant reports the binding efficiency of pitolisant to different $H_3$ receptors in different animal species, and the dose in a mouse at which resulted in a maximal release of N-methylhistamine, the main metabolite of histamine.

751.    Meier II is another 2001 paper, published four years prior to April 2005, which investigates whether the imidazole moiety of different structural classes of $H_3$-receptor antagonists could be substituted with a nonimidazole substituent while still maintaining the initial compounds' in vitro and in vivo potency.

752.    Of the four compounds (5, 6, 7 and 14) highlighted in Meier II for their potency, the authors especially emphasized the potency of compound 7—a compound 10x more potent *in vivo* than pitolisant, concluding that "in the light of a potential therapeutic use, the unparalleled in vivo potency of the ciproxifan analogue 7 (which is also the compound discussed in Meier I C42) in combination with possible pharmacokinetic advantages of this compound make it a promising subject for future investigations." Unlike compound 7, Meier II reports that pitolisant (compound 6) was not more potent *in vivo* than most of the other imidazole $H_3$-receptor antagonists (including the compounds thioperamide and ciproxifan) and the authors did not highlight pitolisant as a "promising subject for future investigations," as they did for compound 7.

753.    Leidtke, a paper from the same group as published Meier I and II, was published online in November of 2002, and in paper form in early 2003, over two years before the April 2005 priority date.

754.    Leidtke 2003 states that pitolisant had a less-promising ED50 value in mice relative to thioperamide, the reference standard $H_3$ antagonist. Based on this data, Leidtke 2003 suggests to a POSA that pitolisant would need to undergo further structural modifications before an ensuing derivative might enter clinical trials, consistent with the teaching in Meier I that pitolisant is a lead, which a POSA would understand as a lead for additional structural modifications.

755.    Liedtke observes that each of FUB 661, FUB 637, FUB 772 and FUB 649 have "relatively high pA2 values (~7.5)." While Liedtke states FUB 649 (pitolisant), among others,

113

"may represent a lead for the development of non-imidazole $H_3$-receptor antagonists," Liedtke at 43, the use of "lead" is better understood to be a "starting point," as evidenced when Liedtke says that FUB 649 "might therefore represent starting points for the development of imidazole-free $H_3$-receptor antagonists."

756.    Liedtke is the last paper prior to the April 2005 priority date that publishes new data on pitolisant, and it still only provides minimal data in non-human animal species.

757.    None of Brooks 2002, Meier I, Meier II, Liedtke or WO '254 – or any publicly available reference – provide data as to pitolisant's potency against the human $H_3$ receptor and are silent as to whether pitolisant is an inverse agonist, let alone pitolisant's safety, tolerability, or other properties that make a compound suitable for administration, such as bioavailability or pK or pD parameters, including brain to plasma ratio, half-life or properties that allow for once-daily dosing.

758.    As of April 2005, only the following data on pitolisant would have been available to the POSA: pitolisant's structure as the oxalate salt (WO '254), rat binding data (Meier I and Meier II), mouse ED50 data (Meier I and Meier II), guinea pig pA2 (Meier I and Meier II), mouse pA2 (Leidtke 2003), purported "high selectivity for the $H_3$ receptor" (Meier I and Meier II).

759.    By April 2005, there was no human data on pitolisant, no identification of pitolisant as an inverse agonist, no data on bioavailability or brain plasma ratios, no data on CYP inhibition or substance abuse risks, no pharmacokinetic data (in any species), no data on half life, and no data on dosing.

760.    As of April 2005, the POSA would not have had sufficient information to gauge whether pitolisant had the right balance of properties for use in a treatment of EDS in Parkinson's disease, narcolepsy, or sleep apnea.

761.    By April 2005, no new information about pitolisant had been published in over two years.

762.    Through April 2005 and beyond, the group that had developed pitolisant continued to publish extensively on $H_3$ antagonists – but did not publish on pitolisant. In fact, dating back to the Schwartz/Stark/Ganellin group's 2002 publications, numerous other papers on $H_3$ antagonists published by the same group did not mention pitolisant, including Meier 2002, Miko 2004, Grassman 2004, and Apelt 2005. This body of publications, which do not mention pitolisant for several years would suggest to a POSA that pitolisant weas no longer promising in any sense as of the priority date of April 2005.

763.    By April 2005, there was extensive data on how other $H_3$ antagonists, developed both by the group that had developed pitolisant and many other groups, bound to human $H_3$ receptors.

764.    By April 2005, the POSA would understand that $H_3$ receptors showed significant differences across species and existed as isoforms, meaning that activity at an animal $H_3$ receptor would not be predictive of activity at the human $H_3$ receptor. In particular, the heterogeneity of the $H_3$ receptor "raise the possibility that splice isoforms couple preferentially to different G proteins and exhibit pharmacological differences based on downstream transduction amplifications." *See* Passani 2004.

765.    By April 2005, the POSA would understand that many groups were spending "much effort is focused on understanding $H_3$ receptor physiology and synthesizing increasingly selective and potent $H_3$ receptor ligands with therapeutic potential." *See* Passani 2004.

115

766.    By April 2005, the POSA would understand that the challenge in developing $H_3$ antagonists was "greater than initially expected because some of these compounds affect cognition in opposite ways, depending on the behavioral task." *See* Passani.

767.    By April 2005, there was speculation that just because something was an "$H_3$ antagonist" was no prediction as to which of the numerous pathways modulated by $H_3$ the compound might affect.

768.    By April 2005, it was understood that the $H_3$ receptor was constitutively active, and thus, when combined with the known differences in species and isoforms, the downstream pharmacological results were diverse and unpredictable.

769.    By April 2005, it was understood that thioperamide and ciproxifan were both $H_3$ inverse agonists; no such information was available about pitolisant. Further, not all $H_3$ antagonists were inverse agonists, and there was no way to predict, a priori, which $H_3$ antagonists would be inverse agonists.

770.    Ciproxifan and thioperamide are both imidazole-containing $H_3$ antagonists, which are structurally different from pitolisant.

771.    By April 2005, only a few imidazole $H_3$ antagonists had been tested in sleep/wake models of rats and cats. No reported study was illustrative of efficacy of a compound in humans to treat EDS in any specific patient population, let alone Parkinson's, narcolepsy or sleep apnea patients, as opposed to a human who simply experienced tiredness.

772.    In contrast, Example 1 of the '947 Patent was conducted in a cat model which is generally believed to be reflective of Parkinson's disease in humans. Pitolisant was found to improve sleep architecture in these cats who had induced Parkinson's.

**4.    Claim 13 is not obvious over the combination of WO '254 and Brooks 2002.**

116

773.    Claim 13 would not be obvious over WO '254 in view of Brooks 2002.

774.    The POSA as of April 2005 would not have been motivated to combine WO '254 with Brooks 2002 with a reasonable expectation of success.

775.    The patent examiner considered and cited at least EP '300 during the prosecution of the '947 Patent. WO '254 claims priority to EP '300 and contains many identical disclosures as EP '300. The examiner determined that Claim 13 is valid in view of EP '300.

776.    The POSA would not have been motivated to pursue pitolisant from among the many compounds disclosed in WO '254 (let alone the many classes of compounds being investigated at the time, April 2005) to treat EDS in patients suffering from Parkinson's, narcolepsy, or sleep apnea.

777.    Defendants have articulated no motivation for a POSA in April 2005 to pursue pitolisant for further development or why the POSA would be motivated to combine Brooks 2002 with WO '254.

778.    Brooks 2002 discusses several proposed classes of treatments for EDS in narcolepsy, of which $H_3$ antagonists merit two lines. Brooks 2002 concludes by focusing on hypocretin or hypocretin agonists, selective dopamine transport blockers and agents that enhance SWS.

779.    If the goal of a POSA were to develop a treatment for EDS in patients with narcolepsy, sleep apnea, or Parkinson's, a POSA would have selected a therapeutic agent from among the multiple other classes of compounds that were better understood and researched for use in treating EDS at the time, such as the dopaminergics.

780.    If the metric for selection is compounds with mechanisms that were known to have an effect on wakefulness, there were a number of mechanisms that were speculated to also have

117

such an effect, including hypocretin/orexin agonists, slow wave sleep enhancing agents (including serotonin (5-HT) receptor antagonists, GABA uptake inhibitors, dopamine re-uptake blockers, GABA receptor agonists, $H_3$ agonists, and atypical antipsychotics), compounds without dopaminergic activities, CRH-receptor antagonists, and TNF-α inhibitors.

781.    There were a number of reasons not to select an $H_3$ antagonist as the class of compounds from which to select a potential therapeutic agent, including that there was no clinical verification that $H_3$ antagonists would be useful to treat EDS in patients with Parkinson's, narcolepsy and sleep apnea, let alone would have the requisite properties needed for dosing, such as once-daily dosing, and appropriate half-life to reduce interference with nighttime sleep.

782.    There was also no information regarding whether $H_3$ antagonists would cause dependence, or would have some other issue that would make them a scheduled drug, like many of the then-known treatments for EDS in, for example, narcolepsy patients.

783.    The POSA would not be motivated to target the histaminergic system in order to develop a treatment for EDS in patients with narcolepsy, sleep apnea, or Parkinson's given its widespread targets, which raise the risk of potential polypharmacology or unwanted off-target effects, which a POSA would wish to avoid.

784.    Even if the POSA in April 2005, decided to pursue $H_3$ antagonists as a means of treating EDS, there were multiple compounds that had been disclosed in the literature, including many with promising pre-clinical data, including for compounds that displayed dual-purposes (such as $H_3$ antagonist/inverse agonist or $H_3$ antagonist/HMT inhibitor). Based on the data available in 2005, the POSA would not have selected pitolisant for further development as a clinical candidate.

785.    Even if the POSA were to limit herself to the compounds disclosed in WO '254 (where no biological data is provided for pitolisant), there was no reason to pursue pitolisant. There is no biological data on pitolisant. In contrast, WO '254 reports that there were a number of other compounds shown to have biological activity data equivalent to or better than pitolisant.

786.    None of Meier I, Meier II or Leidtke would motivate the POSA to pursue pitolisant from WO '254, given the overall lack of information needed to ascertain whether a compound would be promising for further development, including data in humans, like efficacy, tolerability, safety, pK or pD data. Each of these papers was over 2 years old in April 2005, and by 2005, the inventors had stopped discussing pitolisant, while continuing to discuss other non-imidazole antagonists.

787.    Focusing on Meier I, Meier II or Leidkte, while ignoring the wealth of other data available does not reflect how a POSA would have selected a clinical candidate to treat EDS in patients with Parkinson's, narcolepsy, and sleep apnea.

788.    Even if the POSA were for some reason motivated to pursue pitolisant (which the POSA would not do for the reasons above), the POSA would have no reasonable expectation of success that pitolisant would be useful to treat EDS in patients with Parkinson's, narcolepsy and sleep apnea, based on WO '254 in view of Brooks 2002.

789.    The existence of animal studies to test for in vitro and in vivo activity of $H_3$ antagonists is not indicative of whether a particular compound will be useful to treat EDS in patients with Parkinson's, narcolepsy, and sleep apnea, especially in light of the known differences in $H_3$ receptor structure across and within species, as well as the lack of understanding as to how that heterogeneity would impact particular physiological function.

790.    That EDS was known to be treated by "stimulants and wake promoting therapeutics" is not evidence that compounds that are $H_3$ antagonists will be "stimulants and wake promoting therapeutics." The compounds identified in Brooks 2002 as being "stimulants and wake promoting therapeutics" functioned via entirely different mechanisms, such as dopaminergic reuptake inhibition.

791.    By April 2005, there were no $H_3$ antagonist (let alone $H_3$ antagonist/inverse agonist) compounds that were known to be therapeutics, i.e., had been shown to be effective and tolerable in patients for any indication.

792.    By April 2005, although a relationship between $H_3$ antagonists and "promoting wakefulness" had been speculated, there was no clinical data demonstrating that such a relationship in fact existed between $H_3$ antagonists (let alone pitolisant) and treating EDS in patients with Parkinson's, narcolepsy, and sleep apnea. Consequently, the literature reports that although researchers were hopeful the mechanism would prove successful, any potential success using a specific $H_3$ antagonist was speculative at best.

793.    At best, the literature suggested that thioperamide, which by April 2005 was known to be a $H_3$ antagonist/inverse agonist, showed some effect in cats and rats. There was no indication in the art by April 2005 that pitolisant had that property.

794.    The difficulty in developing the right compound for treatment of a specific target of the $H_3$ receptor is underscored by the fact that, despite multiple sophisticated pharmaceutical companies trying to develop $H_3$ antagonists or $H_3$ antagonists/inverse agonists and even undertaking clinical trials of compounds, Wakix is, to date, the only approved $H_3$ antagonists/inverse agonist FDA approved for any indication.

120

795.    The POSA would not have reasonably expected that a compound that "promotes wakefulness" to treat EDS in patients with Parkinson's, narcolepsy and sleep apnea. Such patients have pathological sleepiness, which cannot be ameliorated by just any treatment. For example, caffeine promotes wakefulness, but in Brooks 2002, was acknowledged as not being effective against EDS.

796.    The POSA would understand that patients with EDS are not simply "people [who] are sleepy during the daytime" who may be treated simply by "promoting wakefulness" or "induc[ing] an extended period of wakefulness"; rather, the POSA would understand that EDS is pathological sleepiness that requires restoring sleep architecture and/or inhibition of sleepiness/sleep attacks. General statements about usefulness in promoting wakefulness do not get at this heart of treating EDS.

797.    The POSA also would not have a reasonable expectation of success in treating EDS in narcolepsy patients with pitolisant in April 2005. General statements about potential usefulness of an entire class of compounds cannot provide a reasonable expectation of success for a specific compound for which there is, at best, minimal in vitro and in vivo animal data—most compounds fail, and indeed, all other $H_3$ antagonist compounds in development failed.

798.    The POSA would have no understanding as to whether pitolisant would be, in fact, therapeutic. A therapeutic compound for a chronic disease is one that is tolerable, safe, and has a suitable pK/pD profile (including a proper half life to allow the compound exert its effect, but leave the body before it interfered with needed sleep) to allow it to be administered to a patient on a chronic basis. As of April 2005, there was no data to suggest that pitolisant would have those properties.

121

799.    Brooks 2002 provides no additional information that would clarify any of these points (selection of pitolisant or a reasonable expectation of success in treating EDS in Parkinson's, narcolepsy and sleep apnea patients) for the POSA.

### 5.    Claim 13 is not obvious over the combination of Meier I and Brooks.

800.    Claim 13 would not be obvious over Meier I in view of Brooks 2002.

801.    The POSA as of April 2005 would not have been motivated to combine Meier I with Brooks 2002 with a reasonable expectation of success.

802.    Defendants have articulated no motivation for a POSA in April 2005 to pursue pitolisant for further development or why the POSA would be motivated to combine Brooks 2002 with Meier I for much of the same reasoning discussed above with respect to the WO'254 Patent, which is incorporated by reference.

803.    The POSA would not narrowly focus on just FUB 649 (pitolisant) disclosed in the short abstract that is Meier 1, especially in light of the wealth of other information that was available.

804.    Because the POSA (1) would have no reason to pursue pitolisant from among the other compounds discussed next to Meier I, let alone the many classes of compounds suggested to treat EDS at the time of invention, particularly given the limited amount of data regarding pitolisant that had been disclosed compared to other compounds; (2) would not have been motivated to use pitolisant to treat EDS specifically, nor EDS in patients with narcolepsy, Parkinson's, and sleep apnea simply through the suggestion that such antagonists could "promote wakefulness"; and (3) would not have had a reasonable expectation of success in doing so, the treatment of EDS in narcolepsy, Parkinson's, or sleep apnea using pitolisant would not have been obvious to a POSA as of the claimed priority date of the '947 Patent.

### G.    Claim 13 Is Not Invalid for Obviousness-type Double Patenting

    **1.**      **Claim 13 is not invalid for OTDP over claims 1 or 3 of the '430 Patent.**

        **a)**      **The '430 Patent is not a proper OTDP reference**

805.    The '430 Patent is not a proper OTDP reference as against the '947 Patent.

806.    The application leading to the '947 Patent was filed on March 30, 2006, issued on July 16, 2013, and expires on September 26, 2029.

807.    The '430 Patent resulted from a divisional application of the '197 Patent filed as a result of a restriction requirement during the prosecution of the '197 Patent.

808.    The application leading to the '197 Patent was filed on February 6, 2006, with claims directed to compound, composition and method of treatment inventions, among other types of claims.

809.    During the prosecution of the application leading to the '197 Patent, the Patent Office issued a restriction requirement, requiring the applicants to elect which invention to pursue. The applicants chose to pursue compound and composition claims in the application that became the '197 Patent.

810.    On June 7, 2012, the applicants filed the non-elected method of treatment claims from the '197 Patent in the application that became the '430 Patent.

811.    The claims filed in what became the '430 Patent are consonant with the restriction requirement.

812.    The '430 Patent was filed after the '947 Patent was filed.

813.    The '197 Patent issued on June 26, 2012, and expires on March 7, 2030.

814.    The '197 Patent is not a proper OTDP reference as against the '947 Patent, because the '197 Patent expires after the '947 Patent.

815.    But for the Patent Office's restriction requirement during the prosecution of the '197 Patent, the claims of the '430 Patent would have been included in the '197 Patent, and the claims would not expire before the '947 patent claims expire.

### b)    Claim 13 of the '947 Patent is not invalid for OTDP over Claim 1 of the '430 Patent

816.    Claim 13 of the '947 Patent is patentably distinct from claim 1 of the '430 Patent.

817.    Claim 1 of the '430 Patent is directed to the treatment of *sleep apnea*—not treatment of EDS in patients with sleep apnea.

818.    Sleep apnea is an anatomical or neuromuscular disease involving collapse of the airways which can be treated, *inter alia*, through mechanical means like CPAP.

819.    EDS is a sleep and vigilance disorder with distinct symptomology relative to sleep apnea, including sleep attacks. '947 Patent at 2:36-55.

820.    Although sleep apnea is treated at night, EDS is treated during the day.

821.    Not all patients with sleep apnea have EDS, and not all patients with EDS have sleep apnea.

822.    Although sleep apnea patients may experience sleepiness, such that a wake-promoting agent is beneficial, a wake-promoting agent will not necessarily treat EDS in sleep apnea. *Infra* ¶ 835.

823.    Because treating sleep apnea is distinct from treating EDS, the POSA would not have understood claim 1 of the '430 Patent as suggesting that pitolisant could treat EDS in sleep apnea patients. In fact, it is quite possible that a POSA, for example, would have understood that pitolisant treats sleep apnea by reducing associated obesity, thereby preventing airway collapse underlying sleep apnea. $H_3$ receptor antagonists were thought to be beneficial in the treatment of obesity as of 2005.

824.    Claim 1 of the '430 Patent refers to treatment of sleep apnea, whereas claim 13 refers to treatment of EDS in each of Parkinson's disease, narcolepsy and sleep apnea. At a minimum, the POSA would not have understood from claim 1 of the '430 Patent that pitolisant can be used to treat EDS in narcolepsy or Parkinson's disease—neither condition is mentioned claim 1. In fact, each of narcolepsy, Parkinson's disease, and sleep apnea has a different hallmark symptom and the mechanism of $H_3$ receptors was not well-understood as of April 2005, such that the POSA would not have been able to predict with reasonable certainty the effects of pitolisant treatment of pathologies other than sleep apnea based on claim 1. Indeed, pitolisant does not treat EDS in every patient population; for example, pitolisant has not been found to offer statistically significant benefits for the identified clinical endpoints of EDS in patients with idiopathic hypersomnia.

825.    It cannot be said that merely because a drug treats EDS in certain conditions, it will treat EDS in patients with any condition.

826.    The FDA considers treatment of EDS in a patient with one condition distinct from treatment of EDS in a patient with a different condition.

827.    The '947 Patent includes data on treatment of EDS in each of Parkinson's disease, narcolepsy, and sleep apnea patients, indicating that the inventors viewed treatment of EDS in each patient population as a distinct problem. The FDA also evaluates EDS indications based on the underlying pathology and patient population, and has declined to approve a general EDS indication.

828.    It would not be obvious to a POSA that a method of treatment for sleep apnea using pitolisant monohydrochloride would also successfully treat EDS in a patient with narcolepsy,

Parkinson's disease, or sleep apnea. For example, use of a CPAP machine would not be expected to successfully treat EDS in a patient with narcolepsy.

829. A POSA would not have had access to use of the specification of the patent-in-suit outside of specific embodiments.

830. Thus, a POSA would understand a method of treating sleep apnea (claim 1 of the '430 Patent) to be patentably distinct from a method of treating EDS in patients with narcolepsy, Parkinson's, or sleep apnea.

**c)**      **Claim 13 of the '947 Patent is not invalid for OTDP over Claim 3 of the '430 Patent.**

831. Claim 13 of the '947 Patent is patentably distinct from claim 3 of the '430 Patent.

832. Claim 3 of the '430 Patent is directed to the treatment of *diurnal somnolence* in any disease state. By contrast, claim 13 of the '947 Patent is directed to EDS—a pathological condition distinct from diurnal somnolence—and claim 13 of the '947 Patent is far narrower than claim 3 of the '430 Patent, because claim 13 is directed to the treatment of EDS in specific patient populations, specifically, narcoleptic patients, Parkinson's patients, and sleep apnea patients.

833. EDS is patentably distinct from diurnal somnolence.

834. EDS is pathological sleepiness that interferes with daily functioning. Diurnal somnolence is daytime sleepiness that any healthy human can experience. That is, EDS is far more of an extreme condition than diurnal somnolence; EDS reflects underlying central nervous system pathologies. By contrast, diurnal somnolence is day-to-day fatigue or a feeling that one should sleep.

835. Diurnal somnolence is a general condition, so treating EDS in sleep apnea, narcolepsy and Parkinson's patients *includes* reducing diurnal somnolence episodes, but mere reduction of diurnal somnolence episodes does not treat EDS. In other words, a treatment of EDS

treats diurnal somnolence, but a treatment of diurnal somnolence does not necessarily treat EDS. Caffeine is an illustrative example: it treats diurnal somnolence, but not EDS.

836.    Listing both the '430 and '947 Patents for Wakix is not evidence that the claims are patentably indistinct.

837.    Treating diurnal somnolence and treating excessive daytime sleepiness in patients with narcolepsy are not the same. Treating EDS in a narcolepsy patient will treat diurnal somnolence; in contrast, treating diurnal somnolence will not necessarily treat EDS in a narcolepsy patient.

838.    The '947 Patent describes EDS as including "'sleep attacks,' i.e. inappropriate and unintended falls into sleep while in daytime activity." '947 Patent at 2:44-46. Such sleep attacks reflect pathologically disordered sleep well beyond drowsiness following a bad night's sleep.

839.    That EDS and diurnal somnolence are both measured by ESS does not mean the two conditions are the same. When a patient consistently exhibits an ESS score greater than 11 the patient exhibits sleepiness beyond a pathological cut off, reflecting a condition that requires clinical treatment, not just a cup of coffee.

840.    The Wakix® clinical trials used ESS scores as an endpoint to measure improvements in EDS.

841.    Example 2 does not use the language "excessive daytime sleepiness," instead referring to "a diagnostic [*sic*] of OSA, confirmed by polysomnography performed during a night in a hospital setting, an Epswoth [*sic*] score above 12 and a body mass index of less than 35." '947 Patent at 43:54‑57. A POSA would understand that because the patients have an ESS score above 12, the patients have EDS.

842.    Example 2 of the '947 Patent makes clear that diurnal somnolence and EDS are not equivalent. Indeed, Example 2 indicates that treatment in patients with EDS reduced "the number of diurnal somnolence episodes and . . . prevent[ed] the occurrence of diurnal sleep episodes." '947 Patent at 43:47-67. This indicates that EDS includes diurnal somnolence episodes, but not that EDS and diurnal somnolence are co-extensive.

843.    The POSA has different treatment goals for diurnal somnolence on the one hand and EDS on the other.

844.    Diurnal somnolence can, for most people, be cured with a good night's sleep.

845.    Treatment of diurnal somnolence aims to provide alertness that alleviates daytime sleepiness on a short term, transitory basis – e.g. administering caffeine.

846.    By contrast, EDS cannot be cured; a good night's sleep does not alleviate the EDS of a narcolepsy, sleep apnea, or Parkinson's patient. Thus, EDS is treated on a chronic basis, aiming to prevent the patient from falling asleep during the day while maintaining normal sleep architecture long-term. In sum, treating EDS involves a complex set of treatment goals not present when treating diurnal somnolence.

847.    Because different treatment strategies are utilized to treat EDS and diurnal somnolence, the POSA would not have a reasonable expectation of success that a treatment for diurnal somnolence would also effectively treat EDS.

848.    Thus, the POSA would understand that a method of treating diurnal somnolence with pitolisant is patentably distinct from a method of treating EDS with pitolisant in patients with Parkinson's disease, narcolepsy, or sleep apnea.

**2.    Claim 13 is not invalid for OTDP over claims 1, 2 or 6 of the '605 Patent.**

849.    Claim 13 of the '947 Patent is patentably distinct from claims 1, 2, and 6 of the '605 Patent, which are directed to methods of treating symptoms associated with cognitive disorders, selected from the group consisting of attention, wakefulness and memory disorders by inhibiting $H_3$ receptor activity.

850.    Although the '605 Patent is directed to treatment of symptoms of cognitive disorders, claim 13 of the '947 Patent is directed to treatment of EDS in narcolepsy, Parkinson's disease, or sleep apnea.

851.    A POSA would find treatment of symptoms associated with cognitive disorders selected from the group consisting of attention, wakefulness and memory disorders to be patentably distinct from treating EDS in patients with Parkinson's, narcolepsy, or sleep apnea.

852.    The POSA would not be motivated to modify treatment of cognitive disorders selected from the group of attention, wakefulness and memory disorders, into a treatment of EDS in patients with Parkinson's disease, narcolepsy or sleep apnea.

853.    None of sleep apnea, Parkinson's disease, or narcolepsy are cognitive disorders.

854.    Parkinson's disease is a movement disorder. Although Parkinson's patients may experience issues with cognition, such defects are not hallmark symptoms of Parkinson's but rather part of a suite of non-motor symptoms experienced by Parkinson's patients.

855.    Narcolepsy patients exhibit EDS, cataplexy, sleep paralysis, hallucinations, and disturbed sleep—none of which characterize narcolepsy as a cognitive disorder.

856.    Sleep apnea is a disorder caused by collapsed airways, which does not characterize sleep apnea as a cognitive disorder.

857.    EDS itself is not a cognitive disorder. Although cognitive impairment may affect certain patients with EDS, this occurs because of the underlying pathological sleepiness. Indeed,

EDS is pathological sleepiness that interferes with daytime functioning, which is not a cognitive defect.

858.    Indeed, the '605 Patent identifies Alzheimer's disease as a cognitive disorder, which is how a POSA would understand Alzheimer's disease. By contrast, the POSA would not understand EDS, Parkinson's disease, narcolepsy or sleep apnea as cognitive disorders.

859.    A POSA would not have a reasonable expectation that a treatment for the symptoms of cognitive disorders would also be a successful treatment for EDS, a pathological sleepiness that requires restoring sleep architecture and inhibition of sleepiness, in patients with Parkinson's, narcolepsy and sleep apnea.

860.    That the '605 Patent is directed, in part, to wakefulness symptoms does not indicate that the POSA would have a reasonable expectation of success at using pitolisant to treat EDS. As discussed, treating wakefulness or sleepiness is distinct from treating EDS. *Supra* ¶ 812835.

861.    Prior to this litigation, and prior to the '605 Patent's expiration date, Harmony removed the listing of the '605 Patent in the Orange Book for a method of treating excessive daytime sleepiness in narcolepsy patients, indicating Harmony's belief that the '605 Patent does *not* cover a method of treating EDS in patients with narcolepsy.

862.    The POSA would understand that a method of treating symptoms of cognitive disorders is patentably distinct from a method of treating EDS in patients with narcolepsy, Parkinson's disease, or sleep apnea.

### 3.    Claim 13 is not invalid for OTDP over claims 1, 36 and/or 37 of the '413 Patent.

863.    Claim 13 of the '947 Patent is patentably distinct from claims 1, 36, and/or 37 of the '413 Patent.

864.    Claim 13 of the '947 Patent is directed to a method of treating EDS in patients with narcolepsy, sleep apnea, or Parkinson's disease. By contrast, claims 1, 36, and/or 37 of the '413 Patent are directed to methods for treating symptoms of cognitive disorders, selected from the group consisting of attention, wakefulness, and memory disorders.

865.    The POSA would find the '413 Patent's reference claims which are directed to treatment of symptoms associated with cognitive disorders, selected from the group of attention, wakefulness, and memory disorders to be patentably distinct from claim 13 of the '947 Patent which is directed to treatment of EDS in patients with narcolepsy, sleep apnea, and Parkinson's disease for the reasons discussed above with respect to the '605 Patent. *Supra* Sec. 22.

### 4.    Claim 13 is not invalid for OTDP over claims 1 and 13-16 of the '928 Patent.

866.    Claim 13 of the '947 Patent is patentably distinct from claims 1 and 13-16 of the '928 Patent. Claim 1 of the '928 Patent is directed to a genus of compounds that includes pitolisant, and claims 13-16 of the '928 Patent narrow claim 1 to pitolisant and salts and pharmaceutical compositions thereof. By contrast, claim 13 of the '947 Patent is directed to a method of using pitolisant to treat EDS in narcolepsy, sleep apnea, and Parkinson's patients.

867.    Unlike the composition and compound claims of the '928 Patent, claim 13 of the '947 Patent is directed to a method of treatment.

868.    A POSA would find claims directed to the class of compounds encompassed by the '928 Patent to be patentably distinct from a method of treatment of a specific disorder, EDS, in specific patient populations, with some compounds that are within the class. The claims of the '928 Patent teach a POSA nothing more about pitolisant than its existence as a compound. Thus, a POSA would not have a reasonable expectation of success of taking the compound pitolisant, claimed in

the '928 Patent, and using pitolisant in a method of treating EDS in Parkinson's, narcolepsy, and sleep apnea patients.

869.    The specification for the '928 Patent lists a wide range of different applications for the genus of "antagonists" and agonists disclosed, including "having psychotropic effects, promoting wakefullness [sic], attention, memory and improving mood, in treatment of pathologies such as Alzheimer disease and other cognitive disorders in aged persons, depressive or simply asthenic states" in addition to "stimulat[ing] attention and memorization capacity in healthy humans" and treating "obesity, vertigo and motion sickness," "peripheral organs mainly a simulant of secretions or gastro-intestinal motricity," "CNS disorders of aged persons," and potentially "certain form[s] of epilepsy."

870.    The '928 Patent further provides that the "said compounds may also be used as an agonist or partial agonists action on the said histamine receptors." Indeed, "compounds which are histamine $H_3$ receptor agonists or partial agonists are advantageously used as active principle of medicinal products, in particular having mild sedative, antisecretory, anti-inflammatory, steep[sleep]-regulating and anticonvulsant effects," among other effects.

871.    The '928 Patent makes no mention of EDS or any of the specific sleep conditions claimed in the '947 Patent. The '928 Patent's cursory mention of "promoting wakefulness" would not motivate a POSA to select treatment of EDS in narcolepsy, Parkinson's or sleep apnea out of the wide range of neurological and psychiatric diseases that the formula (A) antagonists (as distinct from the formula (A) agonists/partial agonists) were hypothesized to be effective in, or motivated to select, in particular, pitolisant. Nor would the POSA reasonably expect that pitolisant would be effective in treating EDS in those patient populations.

132

872.    Claim 13 of the '947 Patent is patentably distinct from claims 1 and 13-16 of the '928 Patent.

**H.    Objective Indicia Confirm the Non-obviousness of Claim 13 of the '947 Patent**

873.    The objective indicia of long-felt but unmet need, failure of others, unexpected results, and praise and industry acceptance further demonstrate the non-obviousness of claim 13 of the '947 Patent.

**1.    Nexus with Claim 13 exists.**

874.    Use of WAKIX in accordance with its Prescribing Information embodies Claim 13 of the '947 Patent.

875.    Pitolisant hydrochloride is approved by the European Medicines Agency ("EMA") for use in Europe under the drug product name OZAWADE.

876.    Use of OZAWADE in accordance with its Prescribing Information embodies Claim 13 of the '947 Patent.

877.    OZAWADE is approved for the following indications: "to improve wakefulness and reduce excessive daytime sleepiness (EDS) in adult patients with obstructive sleep apnoea (OSA) whose EDS has not been satisfactorily treated by, or who have not tolerated, OSA primary therapy, such as continuous positive airway pressure (CPAP)."

878.    Pitolisant hydrochloride is the active ingredient in OZAWADE.

879.    The fact that OZAWADE is not a U.S. commercial embodiment of Claim 13 does not undermine its nexus to the claims.

880.    Until WAKIX was approved as a treatment for EDS and cataplexy in patients with narcolepsy, the long-felt need for a non-controlled drug that was in tablet form, with once daily dosing and that was efficacious in treating EDS and cataplexy, existed in significant part because

133

of the challenges in identifying a non-scheduled treatment for EDS in patients suffering from narcolepsy,.

881.    Until WAKIX was approved as a treatment for EDS and cataplexy in patients with narcolepsy, the long-felt need for a tablet drug with once daily dosing that was efficacious in treating EDS and cataplexy existed in significant part because of the challenges in identifying such a drug with an appropriate pK profile suitable for treating EDS in patients suffering from narcolepsy.

882.    WAKIX was the first product to meet this unmet need. WAKIX achieved FDA approval and is safe and effective for the treatment of EDS and cataplexy in patients with narcolepsy. The use of WAKIX to treat patients with narcolepsy, which is embodied by Claim 13 of the '947 Patent, has resulted in industry recognition and praise.

883.    It was unexpected that pitolisant (formulated as pitolisant hydrochloride, the active ingredient in WAKIX and OZAWADE) would have the characteristics required—i.e., safety, sustained efficacy, half-life, tolerability, or other properties that make a compound suitable for administration—that would allow it to be used in a method of treating EDS in patients suffering from Parkinson's, narcolepsy, or sleep apnea, as required by Claim 13.

884.    Prior efforts to develop an $H_3$ antagonist for any purpose failed. All attempts to develop an appropriate $H_3$ antagonist candidate for the treatment of any patient, let alone for the treatment of EDS and cataplexy in narcolepsy patients, failed, until the use of WAKIX embodied by Claim 13 was developed.

**2.    There was a long-felt but unmet need for a non-controlled drug that was efficacious in treating EDS and cataplexy.**

885.    Narcolepsy is a lifelong, often disabling condition. Narcolepsy can cause sleep attacks that lead to serious accidents and an inability to maintain employment. The increased risk of accidents makes EDS in patients with narcolepsy a public health issue.

886.    Prior to the approval of WAKIX by FDA in August 2019, all narcolepsy medications, including the sole EDS treatment that also demonstrated efficacy in treating cataplexy, sodium oxybate, were scheduled substances.

887.    The Controlled Substances Act ("CSA") of 1970 regulates drugs or chemicals that have a potential for abuse. Controlled substances subject to the CSA are divided into categories known as Schedules I through V based on their medical utility and their potential for abuse and dependence. Schedule I drugs are subject to the highest level of restrictions and are considered to have no accepted medical use, while Schedule V drugs have accepted medical uses, but have fewer, but nonetheless, some restrictions.

888.    As of August 2019, FDA-approved drugs to treat EDS were classified under the following Schedules: modafinil (C-IV), armodafinil (C-IV), solriamfetol (C-IV), methylphenidate (C-II), sodium oxybate (C-III), and amphetamine (C-II).

889.    The CSA classifications present numerous restrictions on physicians and patients seeking to access EDS medications, including requiring physicians to seek special licenses, imposing state restrictions on the quantity of medication patients may be prescribed by their doctors, and imposing federal restrictions on how patients can refill their prescriptions.

890.    State and federal restrictions on controlled substances limit the pool of doctors qualified or willing to treat narcoleptic patients and impede a patient's ability to maintain a continuous treatment schedule.

891.    The literature before and after 2005 recognized that this extensive multijurisdictional regulatory scheme presented a significant challenge to narcolepsy patients because of the absence of any noncontrolled narcolepsy medications.

892.    Given the drawbacks of the existing EDS medications as 2005, which were all controlled substances, the industry acknowledged the need for a non-scheduled treatment to address both EDS and cataplexy.

893.    That controlled substances continued to be developed, and that clinicians continue to prescribe controlled substances to narcolepsy patients, does not change the fact that clinicians and patients would prefer to prescribe and take drugs that are not burdened with the restrictions of being a controlled substance.

894.    Pitolisant hydrochloride (WAKIX) fulfilled and continues to fulfill this long-felt unmet need as the only non-scheduled drug approved for the treatment of EDS in narcolepsy patients, and the only non-scheduled drug efficacious for treating both EDS and cataplexy in narcolepsy patients.

**3.    There was a long-felt but unmet need for a once-daily tablet was efficacious in treating EDS and cataplexy.**

895.    By late 2005, there was only a single drug on the market that treated both EDS and cataplexy in narcolepsy patients: sodium oxybate.

896.    Although sodium oxybate was also a controlled substance, patients faced additional challenges in using sodium oxybate for the treatment of narcolepsy because it was formulated in a liquid dosage form that patients had to mix themselves and required bi-nightly dosing. These challenges existed in 2005 and up to and including when WAKIX was approved in 2019 (EDS) and 2020 (cataplexy).

136

897.     Pitolisant is administered in a tablet form and only requires once-daily dosing during the day, which is significantly easier for patients to use as compared to, for example, sodium oxybate's twice-nightly self-mixed liquid dosage form.

898.     That pitolisant is a successful, approved drug for the treatment of EDS and cataplexy in patients with narcolepsy that meets this long-felt need demonstrates the non-obviousness of the claims of the '947 Patent.

### 4. Many others failed to develop an H₃ antagonist that achieved regulatory approval.

899.     Since the discovery of the $H_3$ receptor in the early 1980s, many pharmaceutical companies and research groups have pursued the development of numerous $H_3$ receptor antagonists for potential therapeutic use. These companies include GSK, Merck, Pfizer, Johnson & Johnson, Schering-Plough, Wyeth, Abbott, Gliatech, Banyu, Conessine, Novo Nordisk, Obecure, Arena, AstraZeneca, Athersys, Cephalon, Eli Lilly, Hoffman-LaRoche, Neurogen, Sanofi-Aventis, and Laboratoires Servier.

900.     These companies explored the use of $H_3$ receptor ligands for cognitive disorders (Alzheimer's, schizophrenia, ADHD), sleep disorders, pain/analgesia, epilepsy, obesity and diabetes, allergic rhinitis, Meniere's Disease, cancer, GI disorders, cerebral ischemia, and tremor.

901.     At present, only a few compounds known to exhibit $H_3$ antagonist behavior have ever entered clinical trials for any purpose.

902.     At present, only one compound known to exhibit $H_3$ antagonist behavior has been approved for treatment in humans, and it is the only compound with $H_3$ antagonist behavior approved to treat EDS or cataplexy in patients with narcolepsy—pitolisant, an $H_3$ antagonist/inverse agonist.

903.    If a compound showed promise for a clinical purpose, a company could choose to further develop the compound or license it out to other companies for development. That a company chose to no longer develop or license a compound suggests that it was deficient in some way that made it unfit for therapeutic use.

904.    That so many companies tried and failed to develop $H_3$ antagonists not only for indications relating to narcolepsy, but also for other CNS- and non-CNS indications, further demonstrates the nonobviousness of the claims of the '947 Patent.

### a)    $H_3$ antagonists explored as a treatment for narcolepsy

905.    The literature reports that the following compounds showing $H_3$ antagonist activity were investigated for treatment of narcolepsy: GT-2331, JNJ-17216498, JNJ-10181457, JNJ-5207852, Bavisant, GSK-189254, MK-0249, ABT-652, and APD916. None of these compounds has been approved by any regulatory agency.

906.    That none of GT-2331, JNJ-17216498, JNJ-10181457, JNJ-5207852, Bavisant, GSK-189254, MK-0249, ABT-652, and APD916 were shown to be clinically effective is evidence of the failure of others to develop a method of using an $H_3$ antagonist for the treatment of any disease, let alone narcolepsy.

907.    GT-2331, also known as cipralisant or Perceptin, an imidazole-containing compound, was developed by Gliatech. It completed Phase I trials, with the goal of treating central nervous systems diseases involving attention/learning or sleep disorders. GT-2331 entered Phase II trials in ADHD in 2001, but no results were ever reported. Given that 24 years has elapsed since the last clinical trial involving GT-2331, it is reasonable to conclude that the Phase II study did not yield a positive result.

908.    Johnson & Johnson attempted to bring four different compounds with $H_3$ antagonist activity into clinical trials (JNJ-17216498, JNJ-10181457, JNJ-5207852, and Bavisant),

138

demonstrating a strong desire to bring an $H_3$ receptor to market. As explained below, each compound stopped short of Phase III trials (or earlier), and Johnson & Johnson neither continued to develop the compounds nor tried to sell the compounds to a different company for further development. This lack of activity suggests that the compounds failed to deliver a positive result.

909.   JNJ-17216498 completed a Phase II clinical trial for patients with narcolepsy in 2007, with no reported results, and was not reported as entering Phase III trials for any indication.

910.   JNJ-10181457 was investigated preclinically for use in cognitive disorders and narcolepsy. Although it showed high and selective human $H_3$ receptor binding, *in vitro* and *in vivo* efficacy and wake-promoting effects in rodent models, and good oral bioavailability, it was never taken into clinical studies, which suggests there was an issue with JNJ-10181457 that made it unsuitable for the treatment of patients such as its rather long half-life.

911.   Bavisant was a highly selective orally active $H_3$ receptor antagonist that was evaluated in Phase II studies for EDS in Parkinson's patients (among other studies). The study in EDS in Parkinson's patients was completed in 2019 and showed no efficacy in improving ESS scores in patients. Bavisant has not been reported as entering Phase III for any indication.

912.   GSK-189254, developed by GlaxoSmithKline, showed potent and selective $hH_3R$ antagonistic activity, a good pharmacokinetic profile, CNS penetration, and favorable procognitive activity in preclinical models of cognitive impairment, neuropathic pain, and narcolepsy. GSK-189254 was evaluated in Phase II trials in 2007 in patients with narcolepsy, but the study was terminated early based on interim results of a futility test.

913.   MK-0249, a Merck compound, was evaluated in a Phase II trial for EDS in sleep apnea patients, where it did not significantly improve alertness. The trial was stopped for futility after an interim analysis. Moreover, another Phase II trial in Alzheimer patients showed an increase

139

in adverse events compared to those patients taking placebo. A Phase II study in ADHD patients showed that the compound causes insomnia in a greater percentage of patients than placebo, potentially due to its 14-hour half-life. No Phase III studies on MK-0249 have been reported.

914.     ABT-652, an Abbot compound, was evaluated in 2011 in a pK/pD trial in subjects with EDS. No results have been posted, and ABT-652 has not been reported as entering Phase II for any indication.

915.     APD916, developed by Arena Pharmaceuticals, was tested in Phase I studies, where it showed dose-limiting CNS adverse events, including insomnia, abnormal dreams, and nightmare, potentially due to its 50-hour half-life. Although Arena reported in 2010 that it was evaluating next steps, no further studies on APD916 have been reported.

### b)    H$_3$ antagonists explored as treatment for other CNS indications

916.     Under the premise that mere H$_3$ antagonist binding activity is predictive of whether a compound can be used to treat EDS in patients with Parkinson's, narcolepsy, or sleep apnea, the literature reports that the following compounds have demonstrated some type of H$_3$ antagonist binding activity and have been evaluated clinically or preclinically for potential treatment of CNS-related disorders, but have not been approved for any indication: GSK-239512, GSK-334429, ABT-239, ABT-288, ABT-834, AZD-5213, Irdabisant, and SAR110894.

917.     That none of GSK-239512, GSK-334429, ABT-239, ABT-288, ABT-834, AZD-5213, Irdabisant, and SAR110894 were shown to be clinically effective is evidence of the failure of others to develop a method of using an H$_3$ antagonist for the treatment of any disease, let alone narcolepsy.

918.     GSK-239512, a GlaxoSmithKline compound, was explored for a variety of CNS indications, and advanced as far as Phase II in Alzheimer's patients, where it failed to show any benefit and was reported to have a slightly higher rate of adverse events. A similar lack of benefits

was reported for a Phase II study in schizophrenia patients. A study in multiple sclerosis patients with GSK-239512 showed a higher rate of insomnia. No Phase III studies were reported for GSK-239512.

919.    GSK-334429, another GlaxoSmithKline compound, was investigated preclinically in animal models for cognitive disorders, neuropathic pain, and memory impairment. No clinical studies were ever reported for GSK-334429.

920.    ABT-239, an Abbott compound, was considered for treatment of cognitive disorders and schizophrenia, but it did not advance to clinical evaluation because of cardiotoxicity concerns.

921.    ABT-288, another Abbott compound with good pK, CNS penetration, a safe preclinical profile, and efficacy in several animal cognition models, progressed to Phase II studies in Alzheimer's patients, but the studies ended due to a lack of clinical efficacy. No further studies on ABT-288 were reported.

922.    ABT-834, another Abbott compound with promising preclinical results, entered clinical trials by 2007 for cognitive disorders, ADHD, and obesity, but no results were ever reported.

923.    AZD-5213, an AstraZeneca compound, showed efficacy in rodent cognition models, had a short half-life, and was shown to be safe in humans upon repeat dosing. Phase II trials in neuropathic pain did not provide any evidence of clinical efficacy. Although results were posted in 2016, no evaluation of Phase II trials in Alzheimer's and Tourette's patients has been reported, and no further studies of AZD-5213 have been undertaken.

924.    Irdabisant, a Cephalon compound, demonstrated good affinity and activity in preclinical evaluation, and was well-tolerated at low doses in pK/pD studies in humans. However,

141

in 2016 it was reported to cause dose-limiting adverse events, and that further studies would be needed to establish clinical efficacy. No such further studies on Irdabisant have been reported.

925.    SAR110894, a Sanofi compound, showed promising results in animal models of Alzheimer's. It entered Phase II studies in Alzheimer's patients in 2013 but did not meet its primary endpoint. No further studies on SAR110894 have been reported.

### c)    $H_3$ antagonists explored for other indications

926.    Under the premise that mere $H_3$ antagonist binding activity is predictive of whether a compound can be used to treat EDS in patients with Parkinson's, narcolepsy, or sleep apnea, the literature reports that the following compounds have demonstrated some type of $H_3$ antagonist binding activity and have been evaluated clinically or preclinically for potential treatment of a non-CNS-related disorder, but have not been approved for any indication: GSK-1004723, GSK-835726, SCH-79687, NNC 38-1049, and NNC 38-1202.

927.    That none of GSK-1004723, GSK-835726, SCH-79687, NNC 38-1049, and NNC 38-1202 were shown to be clinically effective is evidence of the failure of others to develop a method of using an $H_3$ antagonist for the treatment of any disease, let alone narcolepsy.

928.    GSK-1004723 and GSK-835726, both GlaxoSmithKline compounds, are $H_1/H_3$ dual receptor antagonists developed under the theory that dual blockade of $H_1$ and $H_3$ receptors may provide symptom relief, particularly for nasal blockage.

929.    GSK-1004723 was designed for intranasal administration as a suspension or solution and GSK-835726 was designed for oral administration. Both were evaluated in Phase II trials but failed to show clinically differentiated improvement in reducing total nasal symptom score or nasal blockage when compared to pure $H_1$ antagonism. No further studies of GSK-1004723 and GSK-835726 have been reported.

142

930.    SCH-79687, a Schering compound that is a selective, orally active $H_3$ antagonist, showed *in vivo* efficacy as a decongestant in a feline model of allergic rhinitis. No clinical studies of SCH-79687 have been reported.

931.    NNC 38-1049 and NNC 38-1202, both Novo Nordisk compounds, have been evaluated as anti-obesity agents. Preclinical testing of NNC 38-1049 showed reduced food intake in animal models, but the literature reported that a compound with a longer plasma half-life would be needed. NNC 38-1202 had an improved pK profile compared to NNC 38-1049 and also showed a decrease in food intake. No clinical studies of either compound have been reported.

### d)    $H_3$ antagonists disclosed as having binding activity/$ED_{50}$ values sufficiently equivalent to thioperamide/FUB 181

932.    Under the premise that only pre-clinical *in vitro* and *in vivo* animal receptor binding data is needed to determine whether a compound could be used to treat EDS in patients with Parkinson's, narcolepsy, or sleep apnea, the literature reports hundreds of compounds as demonstrating $H_3$ antagonist binding activity /$ED_{50}$ values sufficiently equivalent or superior to thioperamide/FUB 181, including compounds tested against the human $H_3$ receptor.

933.    The literature as of 2005 contained numerous examples of such compounds, including those referenced in such papers as I. Linney et al., *Design, Synthesis, and Structure-Activity Relationships of Novel Non-Imidazole Histamine $H_3$ Receptor Antagonists,* 43 J. MED. CHEM. 2362-2370 (2000) (highlighting compound JB 98064); H. Stark, *Recent Advances in Histamine $H_3$/$H_4$ Receptor Ligands*, 13 EXPERT OPS. ON. THERAPEUTIC PATENTS 851 (2003); R. Aslanian & N.Y. Shih, *Recent Progress in Histamine $H_3$ Receptor Chemistry*, 39 ANN. REPS. MED. CHEM. 57 (2004); M. Cowart et al., *Medicinal Chemistry and Biological Properties of Non-Imidazole Histamine $H_3$ Antagonists*, 4 MINI REVS. MED. CHEM. 979 (2004); and U.S. Patent No. 7,803,825.

934.    That none of the myriad compounds with $H_3$ antagonist binding activity /$ED_{50}$ values sufficiently equivalent to thioperamide/FUB 181 were shown to be clinically effective is evidence of failure of others.

### 5.    Pitolisant hydrochloride demonstrated unexpected therapeutic benefits as a method of treating EDS in patients with Parkinson's, narcolepsy or sleep apnea.

935.    Pitolisant, an $H_3$-receptor antagonist/inverse agonist, has had unexpected therapeutic benefits as a method of treating EDS in patients with Parkinson's, narcolepsy, or sleep apnea, as evidenced by its FDA and EMA approvals and its clinically significant improvement in ESS scores in patients with Parkinson's.

936.    In 2005, the POSA had no expectation that pitolisant would be effective in treating EDS in narcolepsy, sleep apnea or Parkinson's patients.

937.    The existing treatments in 2005 for EDS acted on the dopaminergic system (amphetamines), were slow-wave sleep enhancer (sodium oxybate), or had uncertain mechanisms but were thought to involve dopamine (modafinil).

938.    Prior to April 2005, researchers speculated that several classes of compounds proposed could be used for the treatment of EDS in patients with narcolepsy, including hypocretin and hypocretin agonists, slow-wave sleep enhancers, adrenergic drugs, and novel stimulants and wakefulness promoting agents, such as those that selectively block dopamine reuptake.

939.    As of 2005, much was still unknown about $H_3$ receptor ligand. Research into such compounds was an accelerating but nascent field, with widespread proposed therapeutic targets. Literature at the time suggested that $H_3$ antagonists *may* be useful for sleep disorders, but more research was needed.

940.    As of 2005, no $H_3$ antagonist had been approved for use in humans for any indication, and indeed, no $H_3$ antagonist had successfully made it through a Phase II trial.

941.    The literature suggested that a compound would need to be an $H_3$ antagonist/inverse agonist to be therapeutically successful.

942.    As of April 2005, the POSA would not have been optimistic about any new $H_3$ antagonist in particular, let alone pitolisant specifically, for any of the unproven indications, and especially not specifically for the treatment of EDS in patients with narcolepsy, Parkinson's, or sleep apnea.

943.    As of April 2005, very little was known about pitolisant. Although there was published in vitro $H_3$ binding data in rats, mice and guinea pigs, there was no data on human $H_3$ binding, and it was known by April 2005 that there was great variability in affinity for the $H_3$ receptor in animal studies as compared to humans.

944.    As of April 2005, there was nothing known about pitolisant's potential for inverse agonism or its bioavailability, pK or pD parameters, stability, half-life, or brain-to-plasma ratio. As of April 2005, there was no data reported from behavioral studies in animals using pitolisant.

945.    Treatment of patients requires a balance of a number of different properties, including safety, tolerability, efficacy, appropriate pharmacokinetics and pharmacodynamics, and suitability for manufacturing, among other considerations. Finding any drug that meets this unique combination of properties is very difficult.

946.    Treatment of EDS in patients with Parkinson's, narcolepsy or sleep apnea also requires a compound to have an appropriate pharmacokinetic profile that permits chronic administration to prevent falling asleep during the day, while simultaneously leaving normal nocturnal sleep patterns unaffected (or if possible, improved). To achieve this "sweet spot" generally requires a compound with a particular half-life such that it lasts long enough during the

day to prevent sleep attacks, but leaves the system sufficiently quickly so as to avoid interfering with nocturnal sleep—which would exacerbate the EDS.

947.    Given all of these limitations in identifying a promising drug candidate, the POSA would not expect that pitolisant, specifically, would be effective in treating EDS in patients with narcolepsy, Parkinson's, or sleep apnea.

948.    That pitolisant is a successful, approved drug for the treatment of EDS and cataplexy in patients with narcolepsy, and EDS in patients with sleep apnea, is an unexpected result that demonstrates the nonobviousness of the claims of the '947 Patent.

### 6.    WAKIX has been the subject of industry praise and acceptance since its release onto the market.

949.    WAKIX has received praise and industry recognition, including from physicians, patients, and industry leaders.

950.    WAKIX has been recommended as a front-line treatment for narcolepsy because of its rare ability to treat both EDS and cataplexy.

951.    WAKIX has received praise for being the only non-controlled drug indicated for treatment of EDS in narcolepsy patients. That WAKIX has received praise as a successful, approved non-scheduled drug for the treatment of EDS and cataplexy in patients with narcolepsy further demonstrates the nonobviousness of the claims of the '947 Patent.

### I.    Claim 13 Is Not Invalid for Indefiniteness

952.    A POSA would understand the scope of claim 13 with reasonable certainty.

953.    Claim 13 is directed to specific compounds, including pitolisant and its pharmaceutically acceptable salts and its optical isomers, racemates, diastereomers or enantiomers.

954.    The structure of pitolisant is set out below:

146

955.    Pitolisant is also known as (3-(4-chlorophenyl)propyl-3-piperidinopropyl ether) and has no chiral carbon.

956.    The POSA would read claim 13 as reciting, in the alternative (A) pitolisant, (B) pharmaceutically acceptable salts of pitolisant, (C) hydrates of pitolisant, and (D) hydrated salts of pitolisant; as well as the (E) polymorphic crystalline structures of these compounds (for each of A-D) or their (F) optical isomers (for each of A-E), (G) racemates (for each of A-E), (H) diastereomers (for each of A-E) or (I) enantiomers (for each of A-E).

957.    Although claim 13 refers to "its" optical isomers, racemates, diastereomers or enantiomers, it is well-accepted that in claims, absent compelling evidence to the contrary, the singular encompasses the plural. There is no evidence that Claim 13 is intended to be limited to referring solely to optical isomers, racemates, diastereomers or enantiomers of pitolisant alone; indeed, the fact that claim 13 refers to "optical isomers, racemates, diastereomers or enantiomers" when pitolisant by itself, lacks such structural components confirm that the "its" in claim 13 is meant to include more than just pitolisant itself.

958.    A POSA understands that items B and D in ¶ 956 above encompass compounds that are chiral, as the incorporation of a chiral salt with a molecule like pitolisant will make the resulting salt compound a chiral compound. In turn, chiral compounds will have racemates and optical isomers, and depending on the number of chiral centers, enantiomers and diastereomers.

959.    As of April 2005, the POSA would understand that several acids can form pharmaceutically acceptable chiral salts with a basic compound like pitolisant, and that these salts would have optical isomers, racemates, diastereomers and enantiomers. For example, malate salts

and lactate salts have been approved by the FDA and these salts have chiral carbons, circled in red in the corresponding acids below:



malic acid        lactic acid

960.    There are also FDA-approved pharmaceutically acceptable salts with two stereogenic centers, including salts of camphorsulfonate or camsylate (the salt form of casmphorsulfonic acid) (left, below) and salts of tartaraic acid (right, below). These salts have diastereomers, in addition to optical isomers and racemates.



961.    Other pharmaceutically acceptable, FDA-approved salts have more than two chiral centers—for example, gluceptate (the salt form of glucoheptonic acid), gluconate (the salt form of gluconic acid), glucuronate (the salt form of glucuronic acid), and polygalacturonate (the salt form of polygalacturonic acid).

148



Glucoheptonic acid

gluconic acid

glucuronic acid

**Polygalacturonic acid**

962.    The POSA is well equipped to determine which salts of pitolisant have a chiral center and, in turn, which pitolisant salts are optical isomers, racemates, diastereomers or enantiomers of pharmaceutically acceptable salts of pitolisant or of hydrated pharmaceutically acceptable salts of pitolisant.

963.    The POSA is well equipped to ascertain with reasonable certainty what the inventors intended to cover in claim 13.

964.    Claim 13 is not indefinite.

**J.      Claim 13 Is Not Invalid for Lack of Enablement**

965.    Claim 13 is enabled because the POSA would be able to practice the full scope of claim 13 without undue experimentation.

966.    Claim 13 is directed, *inter alia*, to the usage of pharmaceutically acceptable salts of pitolisant in the treatment of EDS in patients with Parkinson's disease, narcolepsy, or sleep apnea. Because claim 13 is not directed to compounds other than pitolisant and pharmaceutically acceptable salts thereof, claim 13 is a narrow claim.

967.    The POSA can make and use, without undue experimentation, the optical isomers of pharmaceutically acceptable salts of pitolisant, racemates of pharmaceutically acceptable salts of pitolisant, diastereomers of pharmaceutically acceptable salts of pitolisant or enantiomers of pharmaceutically acceptable salts of pitolisant.

968.    To the extent there are compounds within the scope of claim 13 that lack a chiral center, the POSA is well equipped to immediately identify such compounds through a cursory examination of the compounds' chemical structure, including the salt, where appropriate.

969.    The treatment of EDS within the meaning of claim 13 does not require remission of EDS; rather, treatment within the meaning of the '947 Patent includes "reversing, alleviating, inhibiting the progress of, or preventing" EDS or symptomatically treating EDS in these specific patient populations. '947 Patent at 42:15-19.

970.    The specification of the '947 Patent informs a POSA of working examples wherein pitolisant improved EDS in patient populations suffering from narcolepsy, obstructive sleep apnea, and Parkinson's disease. These examples are sufficient to enable a POSA to practice the full scope of claim 13.

971.    Because the POSA as pertains to the '947 Patent would have a high level of skill, a POSA would be able to practice the claimed invention based on the specification of the '947 Patent. It follows that the highly-skilled POSA, as informed by the '947 Patent, would not need to engage in undue experimentation to practice the full scope of claim 13.

972.    Example 2 demonstrates to a POSA that pitolisant hydrochloride is effective in treatment of EDS in patients with obstructive sleep apnea. '947 Patent at Example 2, 43:55-6 (when administered to sleep apnea patients, pitolisant causes "a clear decrease . . . in the number

of diurnal somnolence episodes and a total prevention of diurnal somnolence episode during the day.").

973.    Pitolisant is approved to treat EDS in sleep apnea patients in Europe under the trade name Ozawade.

974.    Example 5 discusses the treatment of EDS in narcolepsy patients. Although parts of Example 5 mention sleep apnea, the '947 Patent had already exemplified treatment of sleep apnea patients with EDS in Example 2, so the POSA would understand that Example 5 concerns a different underlying disorder – narcolepsy, as stated in the title of Example 5.

975.    The '947 Patent specification provides both *in vivo* and clinical data on the use of pitolisant to treat EDS co-morbid with obstructive sleep apnea, Parkinson's, and narcolepsy. '947 Patent at Examples 1, 2, 4, and 5. The specification states that EDS was improved, as measured by ESS or a reduction in daytime sleepiness episodes.

976.    The '947 Patent specification exemplifies successful treatment of EDS in a cat model of Parkinson's disease. '947 Patent at Example 1, 43:41-45 (pitolisant effectively "treat[s] the excessive daytime sleepiness which is so detrimental in the everyday life of PD patients, but also to reestablish a normal sleep architecture.). Example 1 of the '947 Patent demonstrates that pitolisant effectively normalizes the sleep-wake patterns of cats with induced Parkinson's. This example is in contrast to the data available before the '947 Patent, which reflected data from cats and rats *without* induced Parkinson's or reflective of patients with narcolepsy or sleep apnea, using compounds other than pitolisant.

977.    The '947 Patent specification also demonstrates that the safety, tolerability, and other pharmaceutical properties of pitolisant enable the drug to be suitable for clinical administration, including to Parkinson's patients. '947 Patent at Examples 2, 4, and 5.

978. The POSA would understand from the '947 Patent specification that pitolisant effectively treats Parkinson's disease based collectively on efficacy data in Example 1 on usage of pitolisant to treat EDS in a cat model of Parkinson's disease and efficacy data exemplified on the use of pitolisant in human narcolepsy and sleep apnea patients with EDS, and data in Parkinson's patients. '947 Patent at Examples 1, 2, 3, 4, and 5.

979. Dr. Schwartz submitted a declaration to the U.S. Patent and Trademark Office during prosecution of the '947 Patent, demonstrating that pitolisant was efficacious in treating the EDS of Parkinson's, narcolepsy, and sleep apnea patients, as measured by a reduction in ESS score of about 5 points.

980. The conclusion from the HARPS1 and HARPS 2 clinical trials does not change the conclusion that claim 13 is enabled.

981. Data from the HARPS1 and HARPS2 clinical trials on treatment of EDS in Parkinson's disease was not available to the POSA as of the priority date of April 2005.

982. The HARPS1 and HARPS2 data showed a clinically meaningful reduction in EDS (greater than 3 point decrease in ESS score) in Parkinson's patients. Relative to placebo, the statistical significance of the effect of pitolisant was dose-dependent, and at least within the standard of deviation. .

983. The HARPS1 and HARPS2 data is distinct from that presented in the '947 Patent specification and Dr. Schwartz's declaration.

984. The data on pitolisant's efficacy in treating EDS in patients with narcolepsy and obstructive sleep apnea was confirmed by FDA and EMA approvals of pitolisant for these indications.

**K.    Claim 13 Is Not Invalid for Lack of Written Description**

153

985.    The inventors of the '947 Patent were in possession of a method of using pitolisant to treat EDS in patients suffering from narcolepsy, Parkinson's disease and obstructive sleep apnea.

986.    Because the POSA as pertains to the '947 Patent would have a relatively high level of skill, the POSA requires less guidance to understand that the inventors possessed the claimed method of treatment.

987.    The '947 Patent specification discusses EDS as a sleep disorder. '947 Patent at 2:35-46, 41:22-35. The specification further describes the invention as a method of using pitolisant to treat EDS in Parkinson's disease, obstructive sleep apnea and narcolepsy. *Id.* at 41:16‑21; *see also id.* at 37:62‑65 ("The inventors have now demonstrated that the $H_3$-receptor antagonists/inverse agonists as described herein are able to treat the wakefulness/sleep disorders of PD, OSA, narcolepsy, DLB, VD."); 38:16‑18 ("As used herein, the treatment of Parkinson's disease, obstructive sleep apnea, narcolepsy, dementia with Lewy bodies and/or vascular dementia encompasses the treatment of associated disorders, especially the treatment of sleep and vigilance disorders associated therewith."); 37:66‑38:5.

988.    Examples 1, 2, 4, and 5 of the '947 Patent describe the study type, dosage, and measures of efficacy the inventors used in demonstrating that the claimed method of treatment effectively treats EDS in patients with narcolepsy, Parkinson's disease and obstructive sleep apnea. The Examples also provide results showing pitolisant's efficacy in improving sleep patterns and reduction in ESS score and frequency of naps or daytime sleepiness episodes. *Id.* at 43:34-35; 44:48-51.

989.    To the extent that the Court construes EDS as encompassing cataplexy in the context of the '947 Patent, the '947 Patent likewise provides adequate written description for the treatment of cataplexy.

154

990.    The '947 Patent specification discloses that EDS as used in the patent "include[es] narcolepsy." '947 Patent at 2:44. The POSA understands that cataplexy is pathognomonic to narcolepsy, meaning that cataplexy differentiates narcolepsy from other diseases. The '947 Patent specification further discloses that "the treatment of Parkinson's disease, obstructive sleep apnea, [and *inter alia*] narcolepsy . . . encompasses the treatment of associated disorders, especially the treatment of sleep and vigilance disorders associated therewith." *Id.* at 38:14-18. The POSA would understand that cataplexy, as the intrusion of REM sleep during wakefulness, is a "sleep and vigilance disorder[] associated" with narcolepsy, and therefore within the scope of the invention of claim 13 of the '947 Patent. The '947 Patent specification also states that pitolisant "is able not only to treat the excessive daytime sleepiness which is so detrimental in the everyday life of PD patients, but also to reestablish normal sleep architecture." '947 Patent at Example 1. The POSA would understand that this statement describes cataplexy because cataplexy is an intrusion of aspects of REM sleep when the patient should be awake and because cataplectic episodes have been known in the art to transition into sleep episodes.

991.    The '947 Patent states that "treating" means "reversing, alleviating, inhibiting the progress of, or preventing the disorder or condition to which [the] term applies, or one or more symptoms of such disorder or condition." '947 Patent at 42:15-19. It follows that when treating narcolepsy patients according to the '947 Patent, the treatment alleviates the pathological sleepiness that interferes with daytime functioning (which a POSA and clinician understand to be EDS) and alleviating the displaced manifestation of REM sleep during wakefulness (which a POSA and clinician understand to be cataplexy).

992.    U.S. Application No. 2009/0312367 ("the '367 application"), a later filed application than the application that resulted in the '947 Patent, is directed to the co-administration

155

of modafinil and pitolisant, and contains no claims or disclosure directed to the treatment of cataplexy solely with pitolisant.

993.   The '367 Application defines treatment only of narcolepsy-cataplexy, which is different from how the '947 Patent defines "treating."

994.   The '367 Application would not be within the knowledge base of a POSA evaluating the '947 Patent for adequate written description as of April 2005.

995.   The POSA reading the specification would understand with reasonable certainty that the inventors possessed the full scope of claim 13 as of April 2005.

**L.    The '947 Patent Is Appropriately Listed in the Orange Book with Use Code U-1102**

996.   Two use codes are properly listed in the Orange Book for the '947 Patent: (a) use code U-1101, which is directed to a "method of treating excessive daytime sleepiness in patients with narcolepsy" and (b) use code U-1102, which is directed to a "method of treating cataplexy in patients with narcolepsy."

997.   A claim of patent infringement predicated on usage of pitolisant hydrochloride to treat cataplexy in narcoleptic patients could reasonably be asserted and has reasonably been asserted in this litigation.

998.   The claims of the '947 Patent claim the approved use of Wakix®, that is, treatment of cataplexy in adult patients with narcolepsy.

999.   Pitolisant hydrochloride is the active ingredient in Wakix®.

1000.  Pitolisant hydrochloride is a pharmaceutically acceptable salt of pitolisant and is thus within the scope of the method of the claims of the '947 Patent.

**1.    The '947 Patent is appropriately listed in the Orange Book with Use Code U-1102.**

1001.   Under the scientific meaning of EDS—pathological sleepiness that interferes with daytime functioning—the treatment of cataplexy is within the scope of claim 13 of the '947 Patent and a claim of infringement can be reasonably brought.

1002.   Under the scientific meaning of EDS, claim 13 is directed to the use of pitolisant to treat pathological sleepiness that interferes with daytime functioning in a narcolepsy patient (as well as in sleep apnea and Parkinson's patients).

1003.   All narcolepsy patients, by definition, have EDS

1004.   The POSA understands that when pitolisant is administered to a narcolepsy patient with cataplexy—the method to which use code U-1102 is directed—pitolisant treats the narcolepsy patient's EDS—i.e., the patient's pathological sleepiness that interferes with daytime functioning.

1005.   Thus, the claims of the '947 Patent, including claim 13, encompass—and can reasonably be asserted in a claim of patent infringement predicated on—the method to which use code U-1102 is directed, i.e., treatment of cataplexy in a narcolepsy patient.

> **2.     As the term "treating excessive daytime sleepiness" is used in the context of the '947 Patent, the '947 Patent is appropriately listed in the Orange Book with Use Code U-1102.**

1006.   As the term "treating excessive daytime sleepiness" is used in the '947 Patent—reversing, alleviating, inhibiting the progress of, or preventing one or more symptoms of the sleep and vigilance disorder EDS, which include narcolepsy and sleep attacks—the treatment of cataplexy is within the scope of claim 13 of the '947 Patent and a claim of infringement can be reasonably brought.

1007.   Claim 13, through its incorporation by reference of claim 1, is directed to "treating excessive daytime sleepiness." As discussed above, *supra* ¶¶ 990-968991, EDS as used in the '947 Patent is a "sleep and vigilance disorder" that "includ[es] narcolepsy" clearly indicating that EDS as used in the patent differs from its meaning in the scientific literature. The '947 Patent defines

157

"treating" as "reversing, alleviating, inhibiting the progress of, or preventing the disorder or condition to which such term applies, or one or more symptoms of such disorder or condition." '947 Patent at 42:15-19.

1008.   The POSA understands that cataplexy is a characteristic of the "sleep and vigilance disorders associated" with narcolepsy, being one of the pentad of sleep-related symptoms experienced by narcoleptic patients ((1) EDS, (2) cataplexy, (3) hallucinations, (4) sleep paralysis and (5) fragmented sleep).

1009.   The later-filed '367 Application, discussed above at ¶¶ 969992–971994 has no bearing on whether Use Code 1102 is appropriately listed for the '947 Patent.

# EXHIBIT 3

CONFIDENTIAL

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| HARMONY BIOSCIENCES, LLC, HARMONY BIOSCIENCES MANAGEMENT, INC., BIOPROJET SOCIÉTÉ CIVILE DE RECHERCHE and BIOPROJET PHARMA SAS, <br><br> Plaintiffs, <br><br> v. <br><br> LUPIN LIMITED, et al., <br><br> Defendants. | C.A. No. 23-1286 (JLH) (SRF) <br><br> **CONSOLIDATED** |

## DEFENDANTS' STATEMENT OF DISPUTED FACTS

**CONFIDENTIAL**

## <u>TABLE OF CONTENTS</u>

**Page**

I.   INTRODUCTORY STATEMENT ................................................................................ 1

II.  THE '197 PATENT .................................................................................................... 3

   A. Background on the Field and Technology of the '197 Patent ............................. 3

      1.  Crystalline and Amorphous Compounds ................................................. 3

      2.  XRPD as an Analytical Techniqe for Identifying Solid State Forms .......... 4

   B. Overview of the '197 Patent ............................................................................ 5

   C. The Date of the Alleged Invention of the '197 Patent ...................................... 6

   D. The Level of Ordinary Skill in the Art of the '197 Patent ............................... 6

   E. The Asserted Claims of the '197 Patent Are Invalid ...................................... 13

      1.  Claims 1 and 2 of the '197 Patent Are Obvious ..................................... 13

      2.  Claim 1 of the '197 Patent Is Not Enabled ........................................... 36

      3.  Claim 1 of the '197 Patent Lacks Written Description ............................ 39

      4.  Claim 2 of the '197 Patent Is Indefinite ................................................ 39

      5.  The '197 Patent Is Invalid for Improper Inventorship ........................... 41

III. THE '947 PATENT .................................................................................................. 42

   A. Background on the Field and Technology of the '947 Patent ........................... 42

      1.  The Histamine Receptors ...................................................................... 42

      2.  H$_3$ Receptor Antagonists ...................................................................... 44

      3.  Narcolepsy, EDS, and Cataplexy ........................................................... 45

      4.  ICSD Classifications .............................................................................. 66

      5.  Treating Daytime Sleepiness .................................................................. 71

      6.  Pitolisant Stereochemistry .................................................................... 73

   B. Overview of the '947 Patent ............................................................................ 74

   C. The Level of Ordinary Skill in the Art for the '947 Patent .............................. 85

   D. The Asserted Claim of the '947 Patent Is Obvious in View of the Prior Art .................. 85

      1.  Treating Excessive Daytime Sleepiness with Pitolisant in Narcolepsy Patients
         Would Have Been Obvious Over WO '254 in View of Brooks .................................. 85

      2.  Treating Excessive Daytime Sleepiness with Pitolisant in Parkinson's Disease
         Patients and Sleep Apnea Patients Would Have Been Obvious Over WO '254
         in View of Brooks ................................................................................ 88

      3.  Claim 13 of the '947 Patent Is Obvious Over Meier I in View of Brooks ................ 89

   E. The Asserted Claim of the '947 Patent Is Invalid for Obviousness Type Double
     Patenting ................................................................................................... 91

i

CONFIDENTIAL

    1.  The Asserted Claim of the '947 Patent Is Not Patentably Distinct from Claims 1 and/or 3 of the '430 Patent.................................................................. 92

    2.  The Asserted Claim of the '947 Patent Is Not Patentably Distinct from Claims 1, 2 and/or Claim 6 of the '605 Patent. ................................................. 101

    3.  The Asserted Claim of the '947 Patent Is Not Patentably Distinct from Claims 1, 36 and/or 37 of the '413 Patent............................................................... 103

    4.  The Asserted Claim of the '947 Patent Is Not Patentably Distinct from Claims 1 and 13-16 of the '928 Patent ................................................................ 105

F.  Lack of Secondary Considerations ................................................................. 107

    1.  No Secondary Considerations for the '197 Patent ...................................... 107

    2.  No Secondary Considerations for the '947 Patent ...................................... 128

G.  The Asserted Claim of the '947 Patent Is Not Enabled ................................. 134

H.  The Asserted Claim of the '947 Patent Lacks Written Description............................... 137

I.  The Asserted Claim of the '947 Patent Is Indefinite....................................... 137

J.  The Asserted Claim of the '947 Patent Lacks Written Description for the Treatment of Cataplexy........................................................................... 138

K.  Plaintiffs Have No Basis for Listing Use Code U-1102 in the Orange Book for the '947 Patent. ............................................................................................ 146

**IV. AET'S ANDA PRODUCTS DO NOT INFRINGE THE ASSERTED CLAIMS ........ 148**

A.  AET's ANDA Products Contain Amorphous Pitolisant Hydrochloride. ...................... 149

    1.  AET's Manufacturing Process Assures That There Is No Crystalline Pitolisant Hydrochloride in AET's ANDA Products. ............................................... 149

    2.  The Formulation of AET's ANDA Products Prevents Potential Recrystallization .................................................................................... 154

    3.  Independent Testing Confirms that AET's ANDA Products Do Not Contain the Claimed Crystalline Form of Pitolisant Hydrochloride. ...................................... 155

    4.  AET's Internal Testing Confirms that AET's ANDA Products Do Not Contain the Claimed Crystalline Form of Pitolisant Hydrochloride ...................................... 157

B.  Plaintiffs Have Failed to Show that AET's ANDA Products Infringe the Asserted Claims ................................................................................................. 160

    1.  Plaintiffs Have Not Shown that Pitolisant Hydrochloride in AET's ANDA Products is in a Crystalline Form Having the Claimed "Characteristic Peaks" ....... 160

    2.  $^{13}$C ssNMR Testing Is Not A Reliable and Valid Scientific Method That Can Identify Specific Solid-State Forms of Pitolisant Hydrochloride ............................ 162

    3.  Dr. Wenslow's $^{13}$C ssNMR Testing is Deeply Flawed and Does not Show that AET's ANDA Products Contain the Claimed Crystalline Form of Pitolisant Hydrochloride. .................................................................................... 166

**CONFIDENTIAL**

4.  Dr. Wenslow Fails to Establish that Any Alleged Crystalline Pitolisant Hydrochloride He Purports to Identify Is the Same Crystalline Form in Wakix ...... 185

5.  Dr. Wenslow's Testing May Have Caused Conversion. ........................................... 186

6.  Plaintiffs Have Not Provided Any Testing of the 4.45 mg Strength of AET's ANDA Products. ................................................................................................. 187

7.  Plaintiffs' Reliance on Testing from Accelerated Stability Studies Does Not Show Infringement........................................................................................ 188

8.  Plaintiffs' Reliance on Testing of Development Batches Does Not Show Infringement........................................................................................................ 204

9.  Plaintiffs Did Not Store or Maintain AET's ANDA Products Under the Appropriate Confitions ....................................................................................... 207

C.  Conclusion ............................................................................................................... 207

V.  **HIKMA'S NONINFRINGEMENT** ................................................................................ **208**

A.  The '197 Patent ....................................................................................................... 209

1.  Hikma's ANDA Product ......................................................................................... 209

2.  Crystal Forms, Polymorphism, and Amorphous Solids............................................ 213

3.  Techniques Used to Identify Polymorphs: X-Ray Diffraction Techniques.............. 215

4.  Techniques Used to Identify Polymorphs: Solid State Nuclear Magnetic Resonance Spectroscopy (SSNMR) ....................................................................... 218

5.  The pitolisant hydrochloride ▉▉▉▉▉▉▉▉ used to create Hikma's ANDA Products is amorphous, not crystalline. .................................................................. 219

6.  XRPD and S-XRPD testing of Hikma's pitolisant hydrochloride ▉▉▉▉ ▉▉▉▉confirms the absence of crystalline pitolisant hydrochloride with the claimed characteristic peaks........................................................................ 221

7.  The pitolisant hydrochloride ▉▉▉▉▉▉▉ remains amorphous through the shelf life of Hikma's ANDA Products.................................................................... 245

8.  Dr. Wenslow's SSNMR testing shows that Hikma's ANDA Products do not contain the claimed crystalline pitolisant hydrochloride with the claimed characteristic peaks. ......................................................................................... 247

9.  Hikma's manufacturing process does not contribute to the presence of the claimed crystalline form. ..................................................................................... 253

10. Biophore's internal documents do not contain evidence of conversion to the claimed crystalline form. ..................................................................................... 254

B.  The '947 Patent ....................................................................................................... 256

1.  Technical Background ............................................................................................. 257

2.  EDS in the '947 Patent............................................................................................ 263

3.  The Role of a Package Insert In Practice ................................................................. 273

4.  Hikma's Proposed Label ......................................................................................... 274

**CONFIDENTIAL**

VI. MSN'S NONINFRINGEMENT ........................................................................ **281**

  A. The '197 Patent ................................................................................................ 281

    1. Background Regarding the '197 Patent ......................................................... 282

    2. Scientific Background ..................................................................................... 284

    3. Diffractograms for MSN's ANDA Products Lack Claimed Peaks ............... 295

    4. Background Regarding MSN'S ANDA Products ........................................... 297

    5. Manufacturing of MSN's ANDA Products .................................................. 298

    6. MSN's Internal Testing .................................................................................. 302

    7. Plaintiffs Have Failed to Prove That ██████████████████
       ██████████████████████████
       █████ ........................................................................................ 306

    8. Plaintiffs Have Failed to Prove That MSN's Manufacturing Process
       "Contributes to the Presence of the Claimed Crystalline Form" ................. 308

    9. Dr. Gozzo Performed Synchrotron Testing Rather Than the XRD Test
       Required by the Claims .................................................................................. 308

    10. Plaintiffs Have Failed to Prove That They Tested Samples of MSN's ANDA
       Products That Are Representative of What Will Be Sold .............................. 309

    11. Dr. Gozzo's TOPAS Peak List Analysis Is Unreliable ................................ 310

    12. Plaintiffs Have Failed to Prove That MSN's ANDA Products Meet the
       Required Water Content Limitation ............................................................... 314

  B. The '947 Patent ................................................................................................ 315

VII. NOVITIUM'S NONINFRINGEMENT ......................................................... **315**

  A. Background ....................................................................................................... 315

    1. U.S. Patent No. 8,207,197 .............................................................................. 315

    2. U.S. Patent No. 8,486,947 .............................................................................. 320

    3. Novitium's ANDA Products ........................................................................... 322

    4. Person of Ordinary Skill in the Art ("POSA") .............................................. 322

  B. Noninfringement of the '197 Patent ................................................................ 323

    1. The ████████████ in Novitium's ANDA Products Does Not Display the
       XRPD Peaks Required by the Asserted Claims ............................................ 326

    2. Novitium's ANDA Products Do Not Display the XRPD Peaks Required by
       the Asserted Claims ........................................................................................ 332

    3. Plaintiffs' Experts' Opinions Cannot Establish Infringement of the Asserted
       Claims of the '197 Patent ............................................................................... 337

  C. Noninfringement of the '947 Patent ................................................................ 361

    1. The Orange Books Listing of the '947 Patent .............................................. 361

    2. Narcolepsy, EDS, and Cataplexy .................................................................. 361

3.   The Plain and Ordinary Meaning of EDS Does Not Include Cataplexy .................. 372

4.   Plaintiffs Used the Plain and Ordinary Meaning of EDS During Prosecution of the '947 Patent ............................................................................................ 372

5.   Plaintiffs' Experts' Interpretation of "Treating" Is Inconsistent with the Specification and Claims of the '947 Patent............................................................ 392

6.   The '947 Patent Does Not Disclose Administering Pitolisant to Patients with Cataplexy ....................................................................................................... 399

7.   Novitium Will Not Directly Infringe the Asserted Claims of the '947 Patent ......... 400

8.   Plaintiffs Have Failed to Prove Direct Infringement by a Third Party .................... 400

**VIII.    CERTAIN REFERENCES AND PRIOR ART .................................................. 418**

## I.    INTRODUCTORY STATEMENT

1.    Defendants submit the following Statement of Disputed Facts that may be proven at trial. By setting forth specific information herein, Defendants do not intend to waive the right to prove information not set forth herein. This statement is not intended to be exhaustive, and in addition to what is set out herein, Defendants may prove any matters identified in their pleadings and discovery taken in this action to date. Defendants hereby incorporate by reference facts (and to the extent appropriate, issues of law) referenced in their pleadings, discovery responses, reports of their experts, the deposition testimony of all expert witnesses in this case, and the stipulated facts in this Pretrial Order.

2.    Defendants' identification of the contested facts is based, in part, on their understanding of the arguments that Plaintiffs are likely to make, based upon the pleadings and discovery in the action to date. Other than the facts listed in the Joint Statement of Undisputed Facts (Ex. 1), Defendants dispute all facts in Plaintiffs' Contested Issues of Fact (Ex. 2). To the extent that Plaintiffs intend or attempt to introduce different or additional factual arguments, Defendants reserve the right to contest those factual arguments, and to present any and all rebuttal evidence in response to those arguments, and will not be bound by this summary of issues of fact to be litigated. Moreover, nothing in this statement should be construed as Defendants' agreement or acquiescence to Plaintiffs' Statement of Disputed Facts. Defendants further reserve the right to amend or revise these issues in view of any amendments or revisions of Plaintiffs' Statement of Disputed Facts and/or Plaintiffs' Statement of Issues of Law.

3.    To the extent that Defendants' Statement of Contested Issues of Law attached hereto as Exhibit 5 contains issues of fact, those issues are incorporated herein by reference. Should the Court determine that any issue identified in this Exhibit is more appropriately considered an

**CONFIDENTIAL**

issue of law, it should be treated as an issue of law and incorporated into Defendants' Statement of Contested Issues of Law.

4.      WAKIX is a wake-promoting drug, and the most commonly reported side effect of WAKIX is insomnia. After a single dose of 35.6 mg of WAKIX, the median half-life of pitolisant is approximately 20 hours.

5.      This case involves Defendants' submission of their respective ANDAs for generic versions of tablets containing pitolisant hydrochloride for use in treating patients with one or more symptoms of narcolepsy. Years before the Patents-in-suit, the inventors or those associated with them, had already disclosed pitolisant hydrochloride and its therapeutic potential, even going so far as to label it a "lead" compound. Indeed, Plaintiffs previously listed one of these earlier publications, U.S. Patent No. 8,354,430 ("'430 Patent"), in the Orange Book as encompassing a method of treating the very conditions claimed by the later patent asserted in this case. Plaintiffs are attempting to block Defendants from entering the market with second-generation patents that Defendants' ANDA Products do not infringe and/or are invalid.

6.      The two patents asserted here claim a specific polymorphic form of pitolisant hydrochloride (U.S. Patent No. 8,207,197 ("'197 Patent")) and a method of treating excessive daytime sleepiness in patients suffering from narcolepsy, sleep apnea, or Parkinson's Disease with pitolisant (U.S. Patent No. 8,486,947 ("'947 Patent")). As explained below, the Asserted Patents are invalid: (1) as obvious in view of one or more prior art references, (2) under 35 U.S.C. § 112, and (3) under the doctrine of obviousness-type double patenting.[1]

---

[1]  Defendants' ANDA Products ███████████████████████████████
███████████████████████. For at least this reason, Defendants' ANDA Products do not infringe any of the asserted claims of the '197 Patent.

CONFIDENTIAL

7.      Nothing in this Statement of Disputed Facts should be construed as asserting that claim terms not expressly construed by the Court have any meaning other than their plain and ordinary meaning as understood by a person of ordinary skill ("POSA") in the art at the time of the invention.

## II.      THE '197 PATENT

### A.      Background on the Field and Technology of the '197 Patent

#### 1.      Crystalline and Amorphous Compounds

8.      Solid forms of drug compounds in general are divided into two categories: (a) amorphous, where there is no regularity in the structure, and (b) crystalline, where the atoms are arranged in regular arrays. J.K. Haleblian, *Characterization of Habits and Crystalline Modification of Solids and Their Pharmaceutical Applications*, 64, no. 8, J. PHARM. SCIS. 1269, 1272 (1975).

9.      The unit cell, as well as the arrangement of atoms or molecules within the unit cell, is the defining characteristic of a given crystal. *See* Brittain at 318.

10.      Unlike crystalline solids, amorphous solids are comprised of molecules, ions or atoms with no long-range order. *See* Hancock & Zografi, *Characteristics and Significance of the Amorphous State in Pharmaceutical Systems*, 86(1) J. PHARM. SCIS., 1, 1 (1997).

11.      Crystalline forms of a given compound may also include solvent molecules within their three-dimensional crystal structures as part of the crystal repeat unit. In that situation, these crystalline forms are generally called "solvates." *See* Vippagunta at 4. If the incorporated solvent is water, the crystalline form is called a "hydrate." Vippagunta at 4. A crystalline solid that contains no solvent molecules within the crystal structure is called an "unsolvated" crystal or, in the case of water, an "anhydrate." *See* J. Bernstein, *Polymorphism in Molecular Crystals* at 5 (Clarendon Press, 2002) ("Bernstein").

**CONFIDENTIAL**

## 2.     XRPD as an Analytical Techniqe for Identifying Solid State Forms

12.     The XRPD pattern of a mixture of polymorphs includes all of the peaks from each polymorph that is a component of that mixture, although some peaks may be obscured by overlap. *See* Bernstein at 117-19.

13.     Unlike crystalline solids, amorphous solids do not give rise to an XRPD pattern comprising distinct, sharp peaks. Instead, an amorphous material gives rise to a broad, nearly featureless 'halo' without distinct, sharp peaks.

14.     XRPD is generally regarded as the "gold standard" for identification of a crystalline form of an active pharmaceutical ingredient ("API") since XRPD can produce a pattern of peaks that acts as a signature, or fingerprint, for a particular crystalline solid. The theory and operation of XRPD has been well-known in the art for decades, and APIs have been studied by XRPD since at least 1954. *See* Rose, H.A., *Erythromycin and Some of Its Derivatives*, 26 ANALYTICAL CHEMISTRY 938, 938-939 (1954) ("Rose").

15.     The absence of sharp peaks in an XRPD diffractogram of a pharmaceutical product is indicative of the absence of crystalline material.

16.     The only positive way to differentiate amorphous from crystalline solids is by means of X-ray powder diffraction. The X-ray powder diffraction of amorphous solids gives very diffuse reflections where the d distances, the distance between parallel planes in which the atoms of the crystal lie, cannot be determined as is done with crystalline solids. Haleblian 1975 at 1272–73; *see also* S. Byrn et al., Solid-State Chemistry of Drugs at 22 (2nd ed. 1999) ("Amorphous solids have no long-range order, are not crystalline, and therefore do not give a definitive X-ray diffraction pattern .... Amorphous forms have no (or a very broad) X-ray powder diffraction pattern." (emphasis omitted)); Desrosiers, P.J., *The Potential of Preform*, MODERN DRUG

**CONFIDENTIAL**

DISCOVERY 40, 42-43 (2004) ("Powder XRD is considered one of the most reliable methods for detecting different crystalline forms.").

### B. Overview of the '197 Patent

17.     Plaintiffs are currently asserting claims 1 and 2 of the '197 Patent. Each of these claims is generally directed to a polymorphic form of pitolisant hydrochloride "having an X-ray diffractogram that comprises characteristic peaks (2θ)." Claim 1 recites 4 "characteristic peaks" and claim 2 recites 21 "characteristic peaks."

18.     Pitolisant hydrochloride has an aqueous solubility of 4 g/ml at 23 °C. '197 Patent, 1:58-60.

19.     The molecular weight of pitolisant hydrochloride is 332.31 grams per mole.

20.     Pitolisant hydrochloride is non-hygroscopic below a relative humidity of 75%.

21.     Table 2 of the '197 Patent shows cell volume at various percentages of water.

## 7

### TABLE 2

| Comparative crystal parameters for 1-[3-[3-(4-chlorophenyl)propoxy]propyl]-piperidine monohydrochloride depending on the water content | | | |
|---|---|---|---|
| Parameter | 2.7% $H_2O$ | 2.8% $H_2O$ | 3.7% $H_2O$ | 6.0% $H_2O$ |
| a(Å) | 14.1588(8) | 14.279(7) | 14.24(3) | 14.202(3) |
| b(Å) | 8.2798(6) | 8.450(4) | 8.40(1) | 8.368(14) |
| c(Å) | 15.9262(13) | 15.872(5) | 15.98(3) | 15.69(6) |
| β(°) | 97.996(4) | 97.11(7) | 96.9(3) | 97.1(4) |
| Volume (Å³) | 1848.9(2) | 1900(1) | 1897(5) | 1850(6) |
| Density (g/cm³) | 1226 | 1195 | 1208 | 1269 |

22.     Table 7 of the '197 Patent purports to disclose melting points for the crystalline forms of pitolisant hydrochloride, pitolisant hydrogen oxalate, pitolisant hydrogen succinate, and pitolisant hydrogen maleate.

5

**CONFIDENTIAL**

## TABLE 7

| Conditions | Monohydrochloride | Hydrogen oxalate | Hydrogen succinate | Hydrogen maleate |
|---|---|---|---|---|
| $N_2$ atmosphere | 117.68° C. | 149.16° C. | 63.21° C. | 90.85° C. |
| $O_2$ atmosphere | 117.54° C. | 149.28° C. | 63.46° C. | 90.74° C. |

Melting points.

WAKIX-PLFS_00000008. The '197 Patent characterizes the data in Table 7 as showing that "the four salts kept substantially unchanged their melting points independently of the oxidation conditions, therefore, all of them are equally stable." '197 Patent, 10:48-50.

23.     The melting point is an inherent property of a crystalline solid.

24.     The data in Tables 1-5 of the '197 Patent comes from the September 17, 2003 Report of Dr. Elies Molins.

### C.     The Date of the Alleged Invention of the '197 Patent

25.     The '197 Patent issued on June 26, 2012, from U.S. Patent Application No. 11/815,736, which was filed as the U.S. national phase of International Patent Application No. PCT/EP2006/050703, filed on February 6, 2006. WAKIX-PLFS_00000001 at 002. Therefore, the earliest effective filing date of the '197 Patent is February 6, 2006.

### D.     The Level of Ordinary Skill in the Art of the '197 Patent

26.     Whether the priority date of the '197 Patent is February 10, 2005 (Plaintiffs' contention) or February 6, 2006 (Defendants' contention), and whether any prior art references or other validity issues turn on this distinction.

27.     As of the priority date of the '197 Patent, a POSA concerning the subject matter of the '197 Patent would have had an advanced degree (e.g., a Master's or Ph.D. degree) in the field

6

CONFIDENTIAL

of chemistry, chemical engineering, or a related discipline and at least two (2) years of experience in solid state forms of pharmaceutical actives including various salt forms and polymorphic forms.

28.      During prosecution of the '197 Patent, Applicants argued that a POSA would not have found it obvious to prepare the crystalline form of pitolisant hydrochloride, alleging, *inter alia*, that "there is a general prejudice against using hydrochloride salts" and further that hydrochloride salts are unstable hygroscopic compounds, yet the claimed crystalline form of pitolisant hydrochloride has unexpected stability with a water content up to 6%.  Response to August 18, 2011 Office Action, Nov. 14, 2011 Remarks, WAKIX-PLFS_00000059 at WAKIX-PLFS_00000648-WAKIX-PLFS_00000652; Capet Declaration, WAKIX-PLFS_00000059 at WAKIX-PLFS_00000657-WAKIX-PLFS_00000659. The Examiner allowed the '197 Patent claims in view of these Remarks.  Jan. 30, 2012 Notice of Allowance, WAKIX-PLFS_00000059 at WAKIX-PLFS_00000665-0666.

29.      The '197 Patent was filed as U.S. Patent Application No. 11/815,736 ("the '736 application") with 28 claims, of which claim 1 was the only independent claim. Original claims 1-2 recited:

> 1. Crystalline 1-[3-[3-(4-chlorophenyl)propoxy]propyl]-piperidine monohydrochloride of formula (I)

(I)



> and its pharmaceutically acceptable solvates, including hydrates.
>
> 2. The Crystalline 1-[3-[3-(4-chlorophenyl)propoxy]propyl]-piperidine monohydrochloride according to claim 1, having an X-ray diffractogram that comprises characteristic peaks (2θ) at 11.2°, 19.9°, 20.7° and 34.1° ±0.2.

WAKIX-PLFS_00000059- WAKIX-PLFS_00000859 at 0061.

CONFIDENTIAL

30.    The Examiner rejected, *inter alia*, claim 1 as obvious in view of U.S. Patent Nos. 7,138,413, 7,910,605, or 7,169,928, each to Schwartz et al., in view of Berge, S.M., *et al. Pharmaceutical Salts*, 66(1) J. PHARM. SCI. 1,1-19 (1977), and in further view of Borchardt, R.T., *et al. Pharmaceutical Profiling in Drug Discovery for Lead Selection*, 93-125 (2004)). WAKIX-PLFS_00000059-WAKIX-PLFS_00000859 at WAKIX-PLFS_00000446. The named inventor "Schwartz" identified on U.S. Patent Nos. 7,138,413, 7,910,605, or 7,169,928 is the same Jean-Charles Schwartz named as an inventor on the '197 Patent. WAKIX-PLFS_00000059-WAKIX-PLFS_00000859 at WAKIX-PLFS_00000446.

31.    The Examiner stated that the Schwartz prior art patents disclose an oxalate crystalline salt of pitolisant, and "generically taught that alternative acid addition salt[s] such as hydrochloride can be prepared from converting the free base to the hydrochloric acid addition salt by using the hydrochloric acid as an alternative acid" (Office Action dated August 12, 2011, page 7); WAKIX-PLFS_00000059-WAKIX-PLFS_00000859 at WAKIX-PLFS_00000446. The Examiner further explained that "[o]ne would particularly be motivated in choosing the hydrochloric acid addition salt since it is an FDA approved salt as well as most acceptable salt (42.98%)." '197 Patent File History, Office Action dated August 12, 2011, WAKIX-PLFS_00000059-WAKIX-PLFS_00000859 at WAKIX-PLFS_00000446-0447. Regarding the X-ray diffraction pattern limitations of original claim 2, the Examiner stated: "The better solubility or other physical properties such as X-ray diffraction pattern, is the inherently property [sic] of such a prima facie obvious crystalline form and cannot be separated from the compound or be unexpected." Office Action dated August 12, 2011, WAKIX-PLFS_00000059-WAKIX-PLFS_00000859 at WAKIX-PLFS_00000446-0447.

CONFIDENTIAL

32.    In response to the August 12, 2011 Office Action, Applicants filed an Amendment,

removing from claim 1 the limitation reciting "pharmaceutically acceptable solvates, including

hydrates," and adding to claim 1 the limitation of original claim 2, i.e., "having an X-ray

diffractogram that comprises characteristic peaks (2θ) at 11.2°, 19.9°, 20.7° and 34.1° ± 0.2°."

WAKIX-PLFS_00000059-WAKIX-PLFS_00000859    at    WAKIX-PLFS_00000641.    The

Amendment    also    added    the    limitation    that    the    crystalline    1-[3-[3-(4-

chlorophenyl)propoxy]propyl]-piperidine monohydrochloride "optionally compris[es] water up to

6%." WAKIX-PLFS_00000059-WAKIX-PLFS_00000859 at WAKIX-PLFS_00000641.

33.    In Remarks submitted with the Amendment, Applicants argued "there is a general

prejudice **against** using hydrochloride salts," citing an excerpt from Wermuth et al. on *Book of*

*Pharmaceutical Salts Properties, Selection and Use* (Gould Int. J. Pharm. 1986, 33, 201). Nov. 14,

2011 Remarks at 11. Applicants specifically quoted the following passage from Wermuth at page

163:

> However, the potential disadvantages of hydrochloride salts include unacceptably
> high acidity in formulations, the risk of corrosion of manufacturing plant and
> equipment, less than optimal solubility due to the risk of salting out and the
> potential for poor stability, if the drug is acid labile and hygroscopic.

WAKIX-PLFS_00000059-WAKIX-PLFS_00000859    at    WAKIX-PLFS_00000651    (quoting

Wermuth at 163).

34.    The portion of Wermuth quoted above by Applicants during prosecution explains

that hydrochloride salts have "the potential for poor stability, if the drug is acid labile and

hygroscopic."[2] Wermuth at 163 (emphasis added); WAKIX-PLFS_00000059-WAKIX-

PLFS_00000859 at WAKIX-PLFS_00000651.

---

[2] Pitolisant is *not* acid labile.

9

35.     Thereafter, Applicants argued that "experimental data show that the [claimed] crystalline form is hygroscopic," attracting "a varied content of water up to 6%," and this property of claimed compound having stable crystalline form with a water content up to 6%, "would not have been expected and is not an inherent property." WAKIX-PLFS_00000059-WAKIX-PLFS_00000859 at WAKIX-PLFS_00000651; *see also* '197 Patent, 7:1-13 (Table 2), WAKIX-PLFS_00000001 at WAKIX-PLFS_00000007. Regarding "stability," Applicants argued that "hygroscopic compounds generally tend to be deliquescent and then, hence, show a poor stability and as a result are difficult to handle for future uses," yet, "the monohydrochloride crystalline form of the invention is, although hygroscopic, still stable and non deliquescent." WAKIX-PLFS_00000059-WAKIX-PLFS_00000859 at WAKIX-PLFS_00000651.

36.     In support of this argument, Applicants submitted a Declaration of Marc Capet, Ph.D., an organic chemist and assistant director at Bioprojet Biotech, which stated as follows:

> The crystalline monohydrochloride salt of the invention comprising up to 6% water was unexpectedly obtained and showed unexpected properties. This salt is hygroscopic according to the European Pharmacopea Standards (see attachment 1) and attracts water.
>
> It is generally expected that the hydrochloride salt of a hygroscopic compound to be unstable in that it turns out to be deliquescent, as supported by Wermuth et al. (see attachment 2).
>
> In the case of the monohydrochloride of 1-[3-[3-[(4-chlorophenyl)-propoxy]propyl]piperidine of the invention, the salt remained stable, even with a content in water up to 6%. Surprisingly, the crystalline parameters remained substantially unchanged as apparent from table 2 of the specification.
>
> This stable crystalline form could not have been expected, as it was contrary to the general expectations. The presently amended claims thus involve an inventive step.

WAKIX-PLFS_00000059-WAKIX-PLFS_00000859 at WAKIX-PLFS_00000658.

37.     Thereafter, the USPTO issued a Notice of Allowance on January 20, 2012, which included the Examiner's Statement of Reasons for Allowance. In this Statement, reproduced

CONFIDENTIAL

below, the Examiner states that the '197 Patent was allowed in view of Dr. Capet's declaration as

to the alleged "unexpected property" that the claimed crystalline from of pitolisant hydrochloride

is stable with a water content up to 6%.

> Applicants have provided a 132 declaration in the record confirming that the up to
> 6% water in the crystalline form of claim 1 is drawn to hygroscopic water which
> only minorily [sic] affects the crystalline structure. Therefore, the rejections under
> 35 USC 112 first and second paragraph are drooped [sic]. Applicants further
> confirms that the mono-hydrochloride salt of 1-[3-[3-[(4-chlorophenyl)-
> propoxy]propyl]piperidine, although hydroscopic, remain stable, contrary to the
> expectation of ordinary property for such material (see Wermuth submitted by
> applicants). Such unexpected property obviated the rejections under 35 USC 103(a)
> or obviousness type double patenting and the rejections are dropped. By cancelling
> the non-elected claims 11-23, 25-28, claims 1, 3-10, 24 are allowed.

Jan. 20, 2012 Statement of Reasons for Allowance, WAKIX-PLFS_00000059-WAKIX-
PLFS_00000859 at WAKIX-PLFS_00000670.

38.     Xavier Ligneau has admitted that he did not contribute to any of the elements in

any claim of the '197 patent. Ligneau Dep. Tr. at 42:4-50:25.

39.     Jean-Charles Schwartz has admitted that his contribution to the claims of the '197

patent was to the pitolisant molecule itself. Schwartz II Dep. Tr. at 231:8-16

40.     Pitolisant is a prior art compound. Pitolisant was disclosed in the prior art at least

as early as March 3, 2000. *See* EP' 300; *see also* International Patent Application Publication WO

2000/06254 ("WO '254") (February 10, 2000 prior art disclosing pitolisant).

41.     The specification of the '197 Patent explains that while pitolisant oxalate "is a

crystalline substance," "its low aqueous solubility (0.025 g/ml at 23º C) also limits its use as a

pharmaceutical ingredient." '197 Patent 1:19-23.

42.     The '197 patent generally relates to the mono-hydrochloride salt of pitolisant and

provides a chemical name for pitolisant as 1-[3-3-(4-chlorophenyl)propoxy]propyl]-piperidine.

43.     The '197 patent states that an aspect of the invention is "crystalline" pitolisant

hydrochloride which has a has a "maximum water content of 6±0.5%" and "as claimed herein has

an X-ray powder diffraction pattern with characteristic peaks (2θ): 11.2°, 19.9°, 20.7°, and 34.1 (±0.2°)." '197 patent, 2:10-27, 1:53-57.

44.     According to the specification of the '197 patent, prior to the '197 patent, the compound 1-[3-[3-(4-chlorophenyl)propoxy]propyl]-piperidine was known in its free base form and as an oxalate salt as early as March 1, 2000. '197 patent, 1:10-27, referring to EP '300.

45.     The specification of the '197 patent discloses that the crystalline 1-[3-[3-(4-chlorophenyl)propoxy]propyl]-piperidine monohydrochloride is characterized by a particular X-ray powder diffraction pattern with "characteristic peaks (2θ)" at 11.2°, 19.9°, 20.7° and 34.1° ±0.2°. '197 patent, 1:53-57, Example 3.

46.     The specification of the '197 patent also discloses that "water content in the 1-[3-[3-(4-chlorophenyl)propoxy]propyl]-piperidine monohydrochloride crystals ranges from traces to 6 +/- 0.5%." '197 patent, 2:7-9.

47.     According to the specification of the '197 patent, the aqueous solubility of the crystalline pitolisant monohydrochloride "is unexpectedly much higher than the aqueous solubility of the oxalate salt," and "the monohydrochloride salt shows [a] better profile of stability to oxidation conditions than other salts." '197 patent, 1:58-63. The specification of the '197 patent includes "[t]he aqueous solubility of crystalline l-[3-[3-(4-chlorophenyl) propoxy ]propyl]-piperidine monohydrochloride (4g/ml at 23 ° C)." As a result, the '197 patent concludes that the monohydrochloride "has proved to be a more suitable salt for its use as a pharmaceutical ingredient." '197 patent, 1:64-67.

48.     The '197 patent only provides examples of the claimed crystalline form with a water content at 2.7%, 2.8%, 3.7%, and 6%. ('197 patent at Table 2.)

**CONFIDENTIAL**

49. According to the parties' agreed construction, the "characteristic peaks" recited in claim 2 "together uniquely identify the crystalline form of pitolisant hydrochloride."

50. The ± 0.2° error range of claim 2 creates overlapping peaks. Claim 2 identifies characteristic peaks at 24.5°, 24.6° but with an error range of +/- 0.2°, the "characteristic peaks" overlap.

51. Claims 1 and 2 of the '197 Patent each claim the same compound – crystalline pitolisant hydrochloride.

52. Plaintiff Bioprojet and the Ferrer Group ("Ferrer"), Ferrer, in collaboration with Professor Elies Molins of the Institute of Material Science, Barcelona ("Prof. Molins") ███████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████

**E.    The Asserted Claims of the '197 Patent Are Invalid**

**1.    Claims 1 and 2 of the '197 Patent Are Obvious**

53. The subject matter of the Claims 1 and 2 of the '197 Patent would have been obvious over Bioprojet's own earlier patent, European Patent No. 1100503 ("EP '503") alone or in view of Berge and/or Byrn-1995.

> a)    *Claim 1: 1(a) crystalline 1-[3-[3-(4-chlorophenyl)propoxy]propyl]-piperidine monohydrochloride of formula (I)*

54. EP '503 discloses limitation 1(a) of the '197 Patent or at least renders limitation 1(a) obvious to a POSA. *See e.g.,* EP '503, [0015], Example 117 (p. 63).

CONFIDENTIAL

        i.     Pitolisant was known prior to the priority date of the '197
Patent

55.    The '197 Patent admits that pitolisant, as both the free base and oxalate salt is disclosed in EP '503. '197 Patent 1:24-25.

56.    EP '503 discloses in Example 117 the preparation of pitolisant as the oxalate salt. EP '503, p. 63, lines 15-25. AET_000038864 at AET_000038908, AET_000038926.

57.    Claim 47 of EP '503 is directed to the use of pitolisant or its "pharmaceutically acceptable salts." EP '503, [0021], claim 47. AET_000038864 at AET_000038951, AET_000038868.

58.    A POSA would have recognized that pitolisant was an important compound relative to the other disclosed compounds in EP '503 because it is the only one expressly claimed on its own. EP '503, claim 47; AET_000038864-AET_000038951; *see also e.g.*, '197 Patent, 1:12-14; WAKIX-PLFS_00000001 at WAKIX-PLFS_00000004. A POSA would also have been aware that Bioprojet (and Dr. Schwartz) had identified pitolisant as a "lead" compound and published preclinical data showing it is a potent and selective H3 antagonist. *See* Meier, G. et al., *FUB 649: A Novel Non-imidazole histamine H3-Receptor Antagonist with High In Vitro and Oral In Vivo Potency*, 334(2) ARCH. PHARM. PHARM. MED. CHEM. C40 ("Meier I") at C40, PRIORART_000000357 (discloses pitolisant as a "lead"); Liedtke at 45, 49 (disclosing that pitolisant is a "lead" $H_3$ receptor antagonist, has a "relatively high pA$_2$ value[] (~7.5)" and "shows high antagonist activity in an *in vivo* model of the mouse ED$_{50}$ of 1.6 mg/kg, compared to an ED$_{50}$ of 1.0 mg/kg for the standard H$_3$-receptor antagonist thioperamide") PRIORART_000000349-PRIORART_000000356; Meier, G. et al., *Influence of imidazole replacement in different structural classes of histamine H- 3-receptor antagonists*, 13 EUR. J. PHARM. SCI. 249, 255, 257-58 (2001) ("Meier II") (disclosing results of comparative in vitro testing with pitolisant, having

CONFIDENTIAL

nearly equipotent in vitro affinity compared to its imidazole-containing parent compound FUB 181, and having "high potency in vivo after p.o administration" and highlighting pitolisant as one of the new "potent non-imidazole histamine $H_3$-receptor antagonists" that was "successfully designed from known antagonists."), (PRIORART_000000358).

59.     Based on the admissions in the '197 Patent, the disclosure in EP '503 (e.g., claim 47), and further evidenced by the other prior art publications, including Meier I, identifying pitolisant as highly potent and selective $H_3$ antagonist, even a "***lead***," a POSA would have been motivated to select pitolisant (i.e., compound 117) in EP '503 as a compound for further investigation as an $H_3$-receptor antagonist in drug development. *See e.g.*, '197 Patent (WAKIX-PLFS_00000001); EP '503 (AET_000038864); Meier I (PRIORART_000000357); Meier II (PRIORART_000000358); and Liedtke (PRIORART_000000349).

<blockquote>ii.     The hydrochloride salt form of pitolisant was disclosed in EP '503 and was a well-known, obvious alternative to the free base and oxalate salt forms of pitolisant</blockquote>

60.     Based on Claims 47 and 48 of EP '503, a POSA would have understood that EP '503 discloses pitolisant hydrochloride or at the very least would have found the hydrochloride salt form of pitolisant obvious. *See* EP '503, claims 47 and 48 (AET_000038864 at 951).

61.     A POSA would have understood that the monohydrochloride salt is a pharmaceutically acceptable salt because EP '503 Claim 48, which depends from Claim 47, explicitly claims pitolisant monohydrochloride, i.e., limitation 1(a) of the '197 Patent. *Id.* A POSA would have understood that Claim 48 limits Claim 47 to require that the pitolisant compound of Claim 47 is in the form of hydrochloride, hydrobromide, hydrogen maleate, of hydrogen oxalate salt. *Id.*

62.     Given that Claim 48 of EP '503 is directed to only four specifically identified salts, a POSA would have immediately envisaged each of the following four compounds: (1) pitolisant

hydrochloride, (2) pitolisant hydrobromide, (3) pitolisant hydrogen maleate, and (4) pitolisant

hydrogen oxalate. *Id.* Accordingly, EP '503 discloses pitolisant hydrochloride.

63.    A POSA would have further recognized that the disclosed hydrochloride salt of

pitolisant was the "monohydrochloride" salt because the molecule, pitolisant, has only one basic

group that could form an acid addition salt with hydrogen chloride (HCl). Specifically, pitolisant

contains a tertiary amine comprised of the piperidine ring bonded through the nitrogen atom to a

propyl group. *See e.g., id.* A POSA would recognize that this basic tertiary amine will form a

monoprotonated salt in the presence of hydrochloric acid (HCl) and that there are no other basic

groups or atoms in pitolisant that will form an acid addition salt with hydrogen chloride.

Consequently, a POSA would understand that together Claim 47 and 48 of the '503 Patent disclose

pitolisant monohydrochloride. *Id.*

64.    Furthermore, a POSA, presented with the limited, finite number of

pharmaceutically acceptable salts for pitolisant in EP '503 Claim 48, would have been motivated

and found it obvious to select and make the hydrochloride salt. *Id.*

65.    It would have been obvious to a POSA to prepare the pitolisant in a salt form

because a POSA was aware that use of the free base form of pitolisant "is limited because of its

oily nature." '197 Patent at 1:17-19 (WAKIX-PLFS_00000001 at 004). EP '503, [0021]

(AET_000038864 at 868). POSAs understood that free base forms of drugs are often difficult to

formulate and have other drawbacks.

66.    The '197 Patent discloses the oxalate salt of pitolisant in Example 117, however a

POSA would have understood that oxalate salts are extremely uncommon in pharmaceuticals. A

POSA also would have readily and inevitably determined that the oxalate salt of pitolisant lacked

suitable solubility for pharmaceutical purposes. Therefore a POSA would have explored additional

salt forms of pitolisant. Prior to the '197 Patent it was well known to a POSA that the process for selecting the correct or optimal salt form in pharmaceutical drug development did not typically end with the first salt made. Rather, it was well known to a POSA that "[t]ypically, the first step in a traditional salt selection is the preparation of numerous salts (1-4)." Tong, W. & Whitesell, G., *In Situ Salt Screening – A Useful Technique for Discovery Support and Preformulation Studies*, 3(2) PHARM DEV. & TECH. 215, 216 (1988) (emphasis added) (PRIORART_000004458). A POSA would have been motivated to identify all suitable salt forms, not stopping at pitolisant oxalate.

67.     In addition it was well-known as of the priority date of the '197 that salt selection for pharmaceuticals should begin by preparation and testing of the hydrochloride salt. Berge, S. M. et al., *Pharmaceutical Salts*, 66 J. PHARM. SCI., 1, 2 (1977) ("Berge") (PRIORART_000000162-180) ("Because of simple availability and physiological reasons, the monoprotic hydrochlorides have been by far the most frequent choice of the available anionic salt-forming radicals…"); Gould, P. L., *Salt selection for basic drugs*, 33 INT'L J. PHARMS. 201, 203-204 (1986) ("Gould") (PRIORART_000000309 at 311-312) ("there is clear precedent, and an overwhelming argument on many grounds to immediately progress to the hydrochloride sale and evaluate other forms only if problems with the hydrochloride emerge"); Bighley, L. D. et al., Salt Forms of Drugs and Absorption, 13 ENCYC. PHARM. TECH., 453, 453 (Swarbrick, J. & Boylan, J. C., eds., 1996) ("Bighley") (PRIORART_000004278) at 453 ("The monoprotic hydrochlorides are by far the most frequent choice of an anionic salt-forming radical, probably for physiological reasons and simple availability."); Paulekuhn, G. et al., *Trends in Active Pharmaceutical Ingredient Salt Selection based on Analysis of the Orange Book Database*, 50 J. MED. CHEM. 6665-72 (2007) ("Paulekuhn") (PRIORART_000003877) at 6666 ("The anion encountered most frequently in FDA-approved pharmaceutical salts is the chloride ion."); Bastin, R.J. et al., *Salt*

*Selection and Optimisation Procedures for Pharmaceutical New Chemical Entities*, 4 ORG. PROCESS RSCH. & DEV. 427, 428 (2000) ("Bastin") (HBS-EXPERT_0007014 at 7015) ("Hydrochloride salts have often been the first choice for weakly basic drugs, since as a consequence of the low counterion pKa, salts can nearly always be formed, and recyrstallisation from organic solvents is normally straightforward."); Byrn, S. R. et al., SOLID STATE PROPERTIES OF PHARMACEUTICAL MATERIALS (1st ed. 2017) 1, 51 ("Byrn 2017") (HBS-EXPERT_0009918) ("Hydrochloride acid salts are typically the most popular for weakly basic drugs due to the ease in forming the salt and recrystallization from organic solvents."); Tong, W.Q. & Whitesell, G., *In Situ Salt Screening—A Useful Technique for Discovery Support and Preformulation Studies*, 3(2) PHARM DEV & TECH, 215, 216 (1998) ("The most common salt made is the hydrochloride salt…") (PRIORART_000004458 at 459).

68.     A POSA would have been motivated and found it obvious to make the hydrochloride salt of pitolisant, particularly when presented with the four pharmaceutically acceptable salts in Claims 47-48 of EP '503. Indeed, the first thing Plaintiffs did after they determined that pitolisant was a promising compound for further development, was prepare it as a hydrochloride salt. *See* Marc Capet memo titled *Short history of the Chemistry of Pitolisant*, dated December 9, 2016  (Even though pitolisant was first synthesized as an oxalate salt, once "it was decided that this compound may be suitable for development, the hydrochloride [salt] was prepared.") (WAKIX-BP_00222113); *see also e.g.*, Berge at 2 (PRIORART_000000162 at 163) ("Because of simple availability and physiological reasons, the monoprotic hydrochlorides have been by far the most frequent choice of the available anionic salt-forming radicals…"); Gould at 203-204 (PRIORART_000000309 at 311-312) ("there is clear precedent, and an overwhelming argument on many grounds to immediately progress to the hydrochloride sale and evaluate other

18

CONFIDENTIAL

forms only if problems with the hydrochloride emerge"); Bighley at 453 (PRIORART_000004278) ("The monoprotic hydrochlorides are by far the most frequent choice of an anionic salt-forming radical, probably for physiological reasons and simple availability."); Paulekuhn, at 666  (PRIORART_000003877 at 878) ("The anion encountered most frequently in FDA-approved pharmaceutical salts is the chloride ion."); Bastin at 428 (HBS-EXPERT_0007014) ("Hydrochloride salts have often been the first choice for weakly basic drugs, since as a consequence of the low counterion pKa, salts can nearly always be formed, and recyrstallisation from organic solvents is normally straightforward."); Byrn 2017 at 51 (HBS-EXPERT_0009918) ("Hydrochloride acid salts arc typically the most popular for weakly basic drugs due to the ease in forming the salt and recrystallization from organic solvents."); Tong, W.Q. & Whitesell, G., *In Situ Salt Screening—A Useful Technique for Discovery Support and Preformulation Studies*, 3(2) PHARM. DEV & TECH., 215 at 216  (1998) (PRIORART_000004458) ("The most common salt made is the hydrochloride salt…").

69.    A POSA also would have had a reasonable expectation of success in forming the hydrochloride salt form of pitolisant. Initially, as discussed above, pitolisant is a monobasic drug molecule because it only has one basic functional group (a tertiary amine), and it was widely known as of the priority date of the '197 Patent that hydrochloride salts were the most common salt form of basic drugs. *See, e.g.*, Gould at 204 ("progression of a hydrochloride salt should be a first move") (PRIORART_000000309 at 312); Berge at 2 (disclosing that as early as 1974, 42.98% of all FDA-approved commercially marketed salts were hydrochloride salts) (PRIORART_000000162 at 163); *see also e.g.,* Capet Dep. Tr. 110-113; Paulekuhn at 6666-69 (PRIORART_000003877 at 878-881) (discloses that in or around 2006, approximately 50% of

CONFIDENTIAL

APIs approved for use in solid dosage forms of drug products were salts and nearly 40% of these APIs were hydrochloride salts).

70.     Moreover, EP '503 further discloses to a POSA that the hydrochloride salt of pitolisant was an obvious alternative to its known oxalate salt form and teaches procedures for preparing the hydrochloride salt of compounds structurally similar to pitolisant. *See e.g.*, EP '503, [0021], [0131], [0139], [0142], [0147], Examples 14, 78, 79, 81, 82, 84, 87, 98, 105, 120, 122, 131, 132, 140, 167, Claims 47-48 (AET_000038864 at 868, 888, 900, 901, 903, 905, 908-910, 912, 917, 921-924, and 951).

71.     A POSA also would have had a reasonable expectation of success in forming the hydrochloride salt form due to the pKa difference between the drug and the salt form. Based on the tertiary amine structure of pitolisant, a POSA would have understood that it was a strong base with an estimated pKa comparable to other tertiary amines of around 10 to 11. Clayden et al., *Organic Chemistry*, 187, 199 (Oxford University Press 1st ed. 2001) ("Clayden") (PRIORART_000005601). Salt formation is expected when there is a sufficient $pK_a$ difference ($pK_a$ is a measure of the "strength" or ionizability of an acid or base in an aqueous solution) between the drug and salt form (i.e., greater than 2 to 3 $pK_a$ units). The pKa value of HCl is approximately -6 to -7 (Clayden at 189 (PRIORART_000005603); Levanov, A.V. et al., *Dissociation Constants of Hydrohalic Acids HCl, HBr, and HI in Aqueous Solutions*, 93 Rus. J. Phys. Chem. 93, 93 (2019) (PRIORART_000005583)), ███████████

███████████████████████

███████████████████████

███████████████████████

███████████████████████

20

**CONFIDENTIAL**

████████████████████████████████████████

██████████████████████████████

72.    The hydrochloride salt would have been the first salt form of pitolisant that a POSA would consider for development and formulation as a drug product for human use and, consistent with the well-documented safety and solubility of hydrochloride salts, he or she would have had a reasonable expectation of success in doing so as the pKa difference for pitolisant (pK$_a$ over 9) and hydrochloric acid (pK$_a$ is -6 to -7) is well beyond the required pKa difference for salt formation.

73.    A POSA would not have been concerned about chemical degradation of the pitolisant molecule by reaction with HCl.

74.    Thus, in view of EP '503, alone, or in combination with Berge, a POSA would have found it obvious to make the hydrochloride salt form of pitolisant.

iii.    The crystalline form of pitolisant hydrochloride was obvious

75.    Claim 47 of EP 503 further indicates that the composition exists in a "polymorphic crystalline forms." *See also* EP '503, p. 63, lines 15-26, Example 117 (AET_000038864 at 826, 851).

76.    A POSA would therefore recognize that the pitolisant monohydrochloride salt disclosed by EP '503 in Claims 47 and 48 would exist in crystalline form. *Id*. Therefore, EP '503 discloses limitation 1(a).

77.    A POSA would have been motivated and would have expected to obtain a crystalline form of pitolisant hydrochloride because obtaining a crystalline form of an API is a routine part of drug development. Byrn-1995 at 946 (PRIORART_000000188 at 188). Different solid forms of a drug compound, for example, different crystalline forms or an amorphous form, can vary in their physicochemical properties, including water solubility, thermodynamic stability, physical stability, chemical stability, hygroscopicity, and compressibility. *See e.g.,* Byrn, S.R. et

CONFIDENTIAL

al., Solid-State Chemistry of Drugs (2d ed. 1999) ("Byrn 1999) (HBS-EXPERT_0002787 at 789).

Each of these properties, especially solubility and stability, can affect various aspects of a drug

substance's behavior, and therefore, whether or not it is ultimately selected for development for

use in a drug product. *See e.g.,* Byrn 1999 (HBS-EXPERT_0002787 at 790). Solid form screening

and selection had become a routine part of pharmaceutical development well before 2006 as a

result of the ability of the solid forms of a drug compound to impact its development. Fiese, E.F.

& Hagen, T.A., Theory and Practice of Industrial Pharmacy 171, 181 (3rd ed. 1986) (Lachman,

L., Lieberman, H.A., Kanig, J.L., eds.) ("Fiese") (PRIORART_000003893 at 916); Center for

Drug Evaluation and Research, *Guideline for Submitting Supporting Documentation in Drug*

*Applications for the Manufacture of Drug Substances* U.S. Department of Health and Human

Services, Food and Drug Administration, February 1987 at 44-49 ("1987 FDA Guidelines")

(PRIORART_000004327 at 361-365); *ICH Procedure and Acceptance Criteria for New Drug*

*Substances and new Drug Products: Chemical Substances Q6A,* 1, 8-9 (1999) ("1999 ICH Q6A

Guideline") PRIORART_000004399 at 410-411.

78.    A POSA would have used standard solvent-mediated recrystallization techniques

using well-known solvents in the pharmaceutical field including without limitation, methanol,

ethanol, propanol, diethyl-ether, ethyl acetate, etc., as well as mixtures of these, and would have

employed well-known recrystallization techniques such as slow solvent evaporation. Fiese at 181

(PRIORART_000003893 at 916); 1987 FDA Guidelines at 44-49 (PRIORART_000004327 at

361-365); "1999 ICH Q6A Guideline at 8-9 (PRIORART_000004399 at 410-411).

79.    Further, a POSA, having been motivated to prepare crystalline pitolisant

hydrochloride, would have expected with certainty that such a crystalline form would form. Byrn-

1995 at 947 (PRIORART_000000188 at 189). Initially, Byrn-1995 states "the first step in the

polymorph decision tree is to crystallize the substance…" *Id.* at 947  (PRIORART_000000189). Byrn-1995's use of the affirmative term "is" without qualification tells a POSA that crystallization is entirely expected. *Id.* at 946 (PRIORART_000000188).

80.    Moreover, a POSA considering EP '503, alone, would have expected to obtain crystalline pitolisant hydrochloride. First, as discussed above, Claim 47 discloses pitolisant "as well as its pharmaceutically acceptable salts, its hydrates, its hydrated salts, [and] the polymorphic crystalline structures of this compound." *See* EP '503, Claim 47 (AET_000038864 at 951). Claim 48, which depends from claim 47, discloses hydrochloride salts as one of the finite group of four pharmaceutically acceptable salts of pitolisant. *Id.*; *see also e.g.*, Bastin at 428 ("Hydrochloride salts have often been the first choice for weakly basic drugs, since as **a** consequence of the low counterios pK$_a$ salts can nearly always **be** formed, and recrystallisation from organic solvents is normally straightforward.") (HBS-EXPERT_0007014 at 015) (emphasis added).

81.    Thus, based on this disclosure alone, a POSA would have expected crystalline pitolisant hydrochloride to be obtainable. (AET_000038864 at 951).

82.    Second, a POSA would have had a reasonable expectation of success in obtaining crystalline pitolisant hydrochloride in view of the examples disclosed in EP '503. EP '503 (*id.* at 908, 926 and 951). In one example—Example 117—EP '503 discloses a protocol for preparing an oxalate salt crystalline form of pitolisant. EP '503 (*id.* at 908, and 926). While Example 117 does not disclose the hydrochloride salt of pitolisant, a POSA would have expected that using hydrochloric acid instead of oxalic acid would have achieved the same end result, a crystalline salt of pitolisant. EP '503 (*id.* at 908, and 926). This is because EP '503 discloses obtaining the crystalline forms using the well-known solvent-mediated crystallization process for each compound. EP '503 (*id.*). Moreover, in these examples, EP '503 discloses numerous compounds

23

CONFIDENTIAL

that are structurally analogous to pitolisant in the form of crystalline hydrochloride salts and further discloses using common solvents, such as acetone, ethanol, and dimethyl ether, in the solvent-mediated crystallization processes. *See generally, e.g., id.*

83.    Moreover, a POSA would have predicted, based on a component analysis, that pitolisant hydrochloride was extremely likely to crystallize. The molecule pitolisant can be structurally examined by looking at its structural components (functional groups). A POSA would have known that the hydrochloride salt of 1-propyl-piperidine (*N*-propyl piperidine) is a crystalline solid. *See* Gaudet, M.V. et al., *X-ray Crystallographic Characterization of Hydrogen-Bonding Interactions in Piperidinium Chloride and Piperidinium Tetrachloroaluminate: Relevance to the Structure of Room-Temperature Melts*, 28 INORG. CHEM., 1191-93 (1989) (PRIORART_000005487-489); Dattagupta, J. K. & Saha N. N., *Crystal and Molecular Structure of Hexahydropyridine (Piperidine) Hydrochloride*, 5 J. CRYST. MOL. STRUCT., 177-89 (1975) (PRIORART_000005465 at 477); Ivanova, B. B. & Spiteller, M., *Factors stabilizing the gas-phase ionic species of crystals of organic salts – Experimental and theoretical study*, 1036 J. OF MOLECULAR STRUCTURE, 226-34 (2013) (PRIORART_000005447 at 455); Stark, H. et al., *1-(3-{4-[(2,4-Dinitroanilino)methyl] – phenoxy}propyl)piperidinium chloride*, E63 Acta Cryst. (2007) (PRIORART_000005456 at 564). Given this, it would have been expected that the higher molecular weight compound pitolisant would also be crystalline under ambient conditions, particularly given (1) the presence of the para-chlorophenyl group which would be understood to facilitate crystal packing through aromatic stacking interactions, and (2) the prior art knowledge that pitolisant oxalate can be prepared in crystalline form.

84.    Thus, based on the disclosure in EP '503 that hydrochloride salts were successfully recrystallized sharing many of the same structural components as pitolisant, a POSA would have

reasonably expected the hydrochloride salt of pitolisant to be crystalline when prepared using the standard solvent-mediated crystallization process of, e.g., Example 117, by replacing oxalic acid with hydrochloric acid. *See* EP '503 at e.g., Example 117, [0157] (AET_000038864 at e.g., 926).

        b)    *Claim 1: 1(b) optionally comprising water up to 6%, and*

85.    EP '503 discloses or renders obvious limitation 1(b). *See* EP '503 (AET_000038864-967).

86.    Initially, during prosecution of the '197 Patent, Applicants told the Examiner, relying on the Declaration of Marc Capet submitted with the Nov. 14, 2011 Remarks, in Response to the August 12, 2011 Office Action ("Capet Declaration"), that the claimed composition retains its crystalline form with water content up to 6% before deliquescence, where condensation occurs between solid particles of pitolisant hydrochloride at high relative humidity, which in some cases will in turn lead to dissolution of pitolisant hydrochloride particles. Capet declaration (WAKIX-PLFS_00000059 at 657-0659 at 0658). There is nothing unique or unexpected about this property. Stable crystalline hydrates, like pitolisant, were well known, and all of them are, by definition, hygroscopic. Stable crystalline hydrates, would be ***expected*** to be stable at some range of relative humidities ("RH"), just like any crystalline hydrate would be. The Examiner was misled by the Capet Declaration.

87.    Crystalline hydrates can be classified as variable stochiometric hydrates or isolated site hydrates. A variable stoichoiometric hydrate can incorporate water into pores or channels and reversibly take up or release water from the atmosphere depending on the relative humidity. An isolated site hydrate on the other hand, has a more limited capacity to incorporate or lose water from its crystalline structure. Either type of crystalline hydrate can comprise surface water. There is nothing unexpected about a variable stoichiometry crystalline hydrate. Such crystals are well-known in the art. Unlike a stoichiometric hydrate which has a fixed ratio of water to drug molecule

**CONFIDENTIAL**

in the crystalline lattice, a variable stoichiometric hydrate has no fixed stoichiometry. These structures typically have channels or pores that adsorb/absorb water from the atmosphere. This can be analogized to a sponge. At some point, a crystalline form will reach a level of saturation where it cannot accommodate any more water molecules. This is an expected property of a hydrate and the exact threshold of relative humidity ("RH") is an inherent property of the crystalline form. Isolated site hydrates comprise water at fixed locations within the crystal. However, it is not possible to remove all of the water from the isolated site hydrate molecule because the crystal structure will collapse. However, isolated site hydrates like variable stoichiometric hydrates can comprise surface water. █████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████ That is, the crystals can be superficially wetted without significantly altering the unit cell parameters. *See e.g.*, Braga, D. et al*., The Relevance of Crystal Forms in the Pharmaceutical Field: Sword of Damocles or Innovation Tools?*, 23 INT'L. J. MOL. SCIS. 9013 (2022) ("In the non-stoichiometric case, the difference in the physico-chemical properties will be small and the solid phases will show a highly variable composition in terms of water content, but a very small variation in cell parameters and overall structure organization.").

88.   █████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████ The image below shows two protonated pitolisant cations (depicted as ball-and-stick diagrams), two chloride anions (depicted as green balls) and two water

CONFIDENTIAL

molecules (depicted as red balls). ████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████, *Exploring Polymorphism: Hydrochloride Salts of Pitolisant and*

*Analogues*, 24 CRYSTAL GROWTH & DESIGN, 1286-83 (2024) ("Patel").

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████

89.     A POSA would not expect the crystal cell parameters to change significantly with

variable water content, especially surface wetness, in the case of an isolated site hydrate. In any

event it would have been obvious to a POSA that crystalline hydrates can comprise a range of

water content, particularly surface water. ████████████████████████████

████████████████████

90.     Moreover, as discussed above with respect to Byrn-1995, it was well-understood to a POSA prior to the '197 Patent that determining the amount of water in a crystalline form was routine in pharmaceutical development. (PRIORART_000000188 at 189); *see also* ICH Q1A(R2) (PRIORART_000004399). A POSA developing pitolisant hydrochloride as a drug substance would have conducted testing of samples of such substance in its crystalline form, prepared using different solvents and standard solvent-mediated crystallization processes, to determine that the solid form achieves the desirable stability for pharmaceutical use—the water content range of limitation 1(b) simply represents data obtained as a result of this stability testing that pharmaceutical developers were instructed to undertake prior to the '197 Patent.

91.     Further, that crystalline pitolisant hydrochloride may have variable water content is an inherent property of the obvious crystalline pitolisant hydrochloride over a range of relative humidities. A POSA would have understood that hydrochloride salts of organic bases, like all molecular compounds, can be inherently hygroscopic when exposed to humidity and undergo transformation from an anhydrate (to the extent they can exist) to a stoichiometric or a non-stoichiometric hydrate. Thus, a POSA would have understood that the fact that crystalline pitolisant hydrochloride would absorb or adsorb some amount of water, and further that the amount of water absorption would vary with respect to the relative humidity of the environment in which it is stored, is an inherent characteristic of crystalline pitolisant hydrochloride as it is for other crystalline drug compounds.

92.     Finally, based on admissions by Plaintiffs, the claimed water content of limitation 1(b) is an obvious property of the claimed crystalline form of pitolisant hydrochloride. *See* Byrn-1995    (PRIORART_000000189-PRIORART_000000192);    EP    '503    AET_000038864    at AET_000038908; 1987 FDA Guidelines (PRIORART_000004327 at 364); 1999 ICH Q6A

Guidelines (PRIORART_000004399 at 410-411); ████████████████████████

████████████████████

93.    ██████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████ :



94.    Therefore, to the extent that Plaintiffs argue that the water content is inherent in the crystalline polymorph of pitolisant hydrochloride, it would have been an inherent property of the obvious pitolisant hydrochloride crystals suggested by EP '503. ████████████████████

████████████████████████

95.    To the extent that Plaintiffs do not argue that the water content is an inherent property of the crystalline polymorph of pitolisant hydrochloride, the water content nevertheless would have been abundantly obvious. First, if the water content of the crystalline polymorph can be higher than 6%, then the 6% maximum would simply be an arbitrary numerical endpoint without any criticality or unexpected property. Given that a POSA would understand that a hydrate would necessarily have *some* upper limit on water content (just as a sponge would have some maximum absorption of water), it would have been obvious to determine that upper limit through routine experiments such as dynamic vapor sorption (DVS). Accordingly, limitation 1(b) is either simply an inherent property of the obvious crystalline form of pitolisant hydrochloride or, if not,

CONFIDENTIAL

it would be obvious and routine to determine the maximum water content over a range of RH and

the maximum RH at which the crystals remain stable.

96.     Furthermore, a POSA would have known that there is nothing unexpected in

identifying a variable range of water content over which the crystalline form of pitolisant HCl is

stable. A maximum water content of 6% is typical and expected for a crystalline hydrate.

97.     Also, there is no evidence that you do not get the claimed XRD peaks with a water

content above 6%. The patent admits that you get the peaks at 6.5%, for example.

98.     Moreover, Applicants' "unexpected result" contention from the Capet Declaration

is based on an incorrect premise. Specifically, during prosecution of the '197 Patent, Applicants

cited the following passage from Wermuth in support of their unexpected result argument:

> However, the potential disadvantages of hydrochloride salts include
> unacceptably high acidity in formulations, the risk of corrosion of
> manufacturing plant and equipment, less than optimal solubility due
> to the risk of salting out and the potential for poor stability, if the
> drug is acid labile and hygroscopic.

Nov. 14, 2011 Remarks at 11 (emphasis in original) (WAKIX-PLFS_00000648-0652 at 0651).

99.     A POSA would have understood that Wermuth does not support the alleged

unexpected result of limitation 1(b). Pitolisant is not acid labile. ██████████████

██████████████████████████████████████████████████████

████████████████████████████

100.     Moreover, contrary to Applicants' contention during prosecution of the '197 Patent,

a POSA would not have expected the claimed crystalline form to be unstable due to the

hygroscopic nature of hydrochloride salts because it was widely known as of the priority date of

the '197 Patent that hydrochloride salts were the most commonly developed salt form of basic

drugs. *See, e.g.*, (WAKIX-PLFS_00000657-659); Berge at 2 (disclosing that, as early as 1974,

42.98% of all FDA-approved commercially marketed salts were hydrochloride salts)
(PRIORART_000000162 at 163).

101.     Furthermore, a POSA would have understood that hygroscopicity does not preclude
the development of a drug substance since there are many examples of drug substances that exist
as stable hydrates under ambient conditions of temperature and humidity going back to morphine
sulfate, which is a hydrate, as well as the solid drug substances disclosed in Stephenson, G.A. et
al., *Formation of Isomorphic Desolvates: Creating a Molecular Vacuum*, 87 J. PHARM. SCIS. 536,
536 (1998) (PRIORART_000004513 at 513, 516) ("Stephenson") (PRIORART_000004513 at
514); *see also* Vippagunta, S.R. et al., *Crystalline Solids*, 48 ADVANCED DRUG DELIVERY REVIEWS
3, 15 (2001) (WAKIX-PLFS_00000457 at 469); Lee, A.Y. et al., *Crystals and Crystal Growth*,
HANDBOOK OF INDUSTRIAL CRYSTALLIZATION 1, 260, 263 (3d ed. 2019) (PRIORART_000004434
at 435, 438).

102.     Many drug substances approved prior to the earliest priority date of the '197 Patent
are listed in the US Pharmacopeia as being hygroscopic.

103.     A POSA would have recognized that each of these hydrochloride salts had been
approved by FDA, and thus would have known that monohydrochloride salts are often stable, even
if they are hygroscopic.

104.     There is nothing unexpected about the claimed crystalline pitolisant hydrochloride
being physically stable despite being hygroscopic, including having a variable water content "up
to 6%." Stephenson at 536, 539 (PRIORART_000004513 at 513, 516. ████████

████████████████████████████████████████████████

████████████████████████████████████████████████

**CONFIDENTIAL**

██████████████████████████████████████████████████

████████████████████████

105.     Thus, EP '503 discloses or renders obvious limitation 1(b).

      c)     *Claim 1: 1(c) having an x-ray diffractogram that comprises characteristic peaks (2θ) at 11.2°, 19.9°, 20.7° and 34.1° ±0.2°.*

106.     EP '503 discloses or renders obvious the claimed crystalline pitolisant hydrochloride having an x-ray diffractogram that comprises the claimed characteristic peaks. *See e.g.,* EP '503 at 58- 60 (AET_000038864 at 921-924).

107.     It was known to a POSA well-before the '197 Patent that a crystalline solid can be identified by its inherent characteristics including its characteristic peaks. *See* Byrn-1995 at 946; (PRIORART_000000188 at 189); Rose, H.A., *Erythromycin and Some of Its Derivatives*, 26 ANALYTICAL CHEMISTRY 938, 938 (1954), (PRIORART_000003815-816). Thus, a POSA would have understood that "an x-ray diffractogram that comprises characteristic peaks" of a crystalline solid form of a pharmaceutical compound was well-known prior to the '197 Patent. *Id.*

108.     Regarding the specific characteristic peaks identified in limitation 1(c), a POSA would have understood that they are the inherent property of the obvious form of the claimed crystalline pitolisant hydrochloride. Plaintiffs admit that once the hydrochloride salt of pitolisant is made, all known recrystallization techniques will produce the claimed crystalline form. Capet Dep. Tr. at 61-62, 66-77, 90-91, 194:5-18; ███████████████████

██████████████████████████████████████████████████

██████████████████████████████████

109.     ███████████████████████████████████████

██████████████████████████████████████████████████

**CONFIDENTIAL**

███████████████████████████████████████████████████████

████████████████████████

110.    ███████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████

111.    ███████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████

112.    ███████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████

113.    Consistent with Byrn-1995 and the examples in EP '503, ███████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████

114.    ██████████████████████████████████████████████ were the same as

many of those listed in Bryn-1995 and in the EP '503 examples, e.g., water, methanol, acetone,

**CONFIDENTIAL**

propanol. *Cf.* *Id.* █████████████████ █ █████████ Bryn-1995 at 947

(PRIORART_000000188 at 189), and EP '503 p. 58-61 (AET 000038864 at 920-924)**.**

115.    As disclosed in the EP '503 examples and in Byrn-1995,████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

Thereafter, just as instructed by Bryn-1995, X-ray diffraction was used to obtain X-ray

diffractograms identifying the Bragg peaks in each of the samples. ████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████ ████████████████████████████████████

████████████████

116.    ██████████████████████████████████████████████

████████████████████████████████████████████

          ████████████████████████████████████████

          ████████████████████████████████████████

          ████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████

117.    ████████████████████████████████████████ that the

characteristic peaks of limitation 1(c) are an inherent property of the obvious crystalline pitolisant

hydrochloride suggested by EP '503. ██████████████████████████████

████████████████████████████████████████████████████████

████████████

34

CONFIDENTIAL

118.    EP '503 alone or in combination with Berge and/or Byrn-1995 discloses the crystalline form of pitolisant hydrochloride, including examples for how such a crystalline form can be obtained using standard solvent-mediated crystalline processes. Moreover, Byrn-1995 instructs pharmaceutical developers (1) to obtain several samples of the crystalline form of pitolisant hydrochloride via these standard solvent-mediated crystallization processes using various solvents and at various temperatures, and (2) then analyze these samples using X-ray diffraction to study their physical properties. Byrn-1995 at 947 (PRIORART_000000188 at 189).

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████    Independently, another group of researchers reported that over 1000 different recrystallization experiments all led to the same polymorphic form. *See* Patel. Therefore, limitation 1(c) is the natural and inevitable consequence of the formation of the obvious crystalline hydrochloride salt of pitolisant.

119.    Accordingly, EP '503 discloses or renders obvious each and every limitation recited in Claim 1 of the '197 Patent.

CONFIDENTIAL

d)    *Claim 2*

2. The crystalline 1-[3-[3-(4-chlorophenyl)propoxy]propyl]-piperidine monohydrochloride according to claim 1, having an X-ray diffractogram that comprises characteristic peaks (2θ) at 11.2°, 15.4°, 16.3°, 16.9°, 17.8°, 19.9°, 20.7°, 21.0°, 21.8°, 22.6°, 24.5°, 24.6°, 25.0°, 25.5°, 26.3°, 28.3°, 30.3°, 34.1°, 35.8°, 40.0°, 46.0° ±0.2°.

120.    EP '503 discloses or renders obvious Claim 2 of the '197 Patent because Claim 2 recites the same crystalline form of pitolisant hydrochloride as Claim 1 and simply identifies additional characteristic peaks.

121.    EP '503 anticipates or renders obvious claims 1 and 2 of the '197 Patent, because a POSA following the teachings of EP '503 in combination and their knowledge prior to the '197 Patent would have invariably prepared the claimed crystalline form.

**2.    Claim 1 of the '197 Patent Is Not Enabled**

122.    Defendants have proven, by clear and convincing evidence, the factual elements underlying 35 U.S.C. § 112(a) (non-enablement) for Claim 1 of the '197 Patent.

123.    The specification of the '197 Patent fails to teach those skilled in the art how to make and use the full scope of Claim 1 without undue experimentation.

124.    The '197 Patent fails to provide sufficient direction or guidance to enable a POSA to make the claimed crystalline pitolisant hydrochloride across the entire claimed water content range of 0% to 6%.

125.    The '197 Patent does not enable a POSA to make the claimed crystalline form over the water content range of 0% to 6%.

126.    The '197 Patent provides examples of the claimed crystalline form with a water content at 2.7%, 2.8%, 3.7%, and 6%, but does not provide an example below 2.7% water content with the claimed characteristic peaks.

**CONFIDENTIAL**

127.    There is no indication in the specification of the '197 Patent that the claimed crystalline form with a water content of less than 2.7% had the claimed characteristic peaks. The '197 Patent does not teach a person of ordinary skill in the art how to make and use the full scope of the claim, e.g., a crystalline form with a water content of less than 2.7% with the claimed characteristic peaks.

128.    The '197 Patent fails to provide any enabling examples of the claimed crystalline pitolisant hydrochloride having water content below 2.7% with the claimed characteristic peaks. █████████████████████████████████████████████ ███████████████████████████████████████████████ ██████ █ ████████ ████ ██ ██ ████ ███ ██ ████ ████ █████████████████████████████████████████ *see also e.g.*, Patel. Isolated site hydrates comprise water at fixed locations within the crystal. It is not possible to remove all of the water from the isolated site hydrate molecule because the crystal structure will collapse.

129.    ████████████████████████████████████ █████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ████████████████████████████████████ Crystalline pitolisant hydrochloride having each of the claimed characteristic X-ray diffractogram peaks cannot exist in

a purely anhydrous form (i.e., having zero percent (0%) water). Nor does the patent enable one of skill in the art to make such a composition.

130. 

131.    Patel further shows that heating the composition of Claim 1 results in a conversion to form II then III and regeneration of form I on cooling. This suggests that it is not possible to drive off water to reach an anhydrous state retain the claimed crystal structure. Rather, the crystal structure will convert to other forms as water is removed.

132.    A person of ordinary skill in the art would not be able to make and use a crystalline form of pitolisant hydrochloride with the claimed XRPD peaks and a water content from 0% to 2.7% (and in particular, 0%) without undue experimentation. The patent fails to provide any example or explanation to make and use such a form.

133.    A person of ordinary skill in the art would not have been able to make a crystalline form of pitolisant hydrochloride with the claimed XRPD peaks and a water content below 2.7% (and particularly with a water content of 0% - i.e., an anhydrate). If a person of ordinary skill attempted to make such a crystalline form, they would discovery it was impossible. A POSA would have understood that pitolisant HCl is a stable isolated sitehydrate and such hydrates can have

CONFIDENTIAL

enhanced thermal stability (e.g., they do not dehydrate until melting occurs). WAKIX-HBS_00001752-1764 at 1760; WAKIX-HBS_00514451-4462 at 4458.

134.    A POSA would be unable to make the claimed crystalline pitolisant hydrochloride with water content from 0% to 2.7% without undue experimentation.

### 3.    Claim 1 of the '197 Patent Lacks Written Description

135.    Defendants have proven, by clear and convincing evidence, the factual elements underlying pre-AIA 35 U.S.C. § 112, ¶ 1 (lack of written description) for Claim 1 of the '197 Patent.

136.    The specification of the '197 Patent fails to reasonably convey to a POSA that the inventors possessed the claimed crystalline pitolisant hydrochloride over the entire claimed water content range of 0% to 6%.

137.    The specification of the '197 Patent fails to describe the claimed crystalline pitolisant hydrochloride having each of the claimed characteristic X-ray diffractogram peaks across the entire claimed water content range of 0% to 6%.

138.    The specification of the '197 Patent does not contain sufficient disclosure to demonstrate that the inventors possessed the claimed crystalline pitolisant hydrochloride having each of the claimed characteristic X-ray diffractogram peaks with water content below 2.7%.

139.    The specification of the '197 Patent does not contain sufficient disclosure to demonstrate that the inventors possessed the claimed crystalline pitolisant hydrochloride having each of the claimed characteristic X-ray diffractogram peaks with water content at 0%.

140.    Nor could the '197 Patent describe such embodiments because crystalline pitolisant hydrochloride having each of the claimed characteristic X-ray diffractogram peaks is incapable of existing in a purely anhydrous form (i.e., having zero percent (0%) water).

### 4.    Claim 2 of the '197 Patent Is Indefinite

## CONFIDENTIAL

141.    Defendants have proven, by clear and convincing evidence, the factual elements underlying 35 U.S.C. § 112(b) (indefiniteness) for Claim 2 of the '197 Patent.

142.    A POSA would not be able to determine the scope of Claim 2 of the '197 Patent with reasonable certainty.

143.    Claim 2 recites that the crystalline form of Claim 1 has "characteristic peaks (2θ) at 11.2°, 15.4°, 16.3°, 16.9°, 17.8°, 19.9°, 20.7°, 21.0°, 21.8°, 22.6°, 24.5°, 24.6°, 25.0°, 25.5°, 26.3°, 28.3°, 30.3°, 34.1°, 35.8°, 40.0° and 46.0° ± 0.2°."

144.    A POSA would not understand Claim 2 with reasonable certainty because the recited ±0.2° error range results in overlapping "characteristic peaks."

145.    Applying the recited ±0.2° error range, the recited "characteristic peaks" at 24.5° and 24.6° overlap.

146.    A POSA would not be able to reasonably ascertain the scope of Claim 2 because Claim 2 identifies 21 "characteristic peaks" that "together uniquely identify the crystalline form of pitolisant hydrochloride," yet the recited ±0.2° margin for error for each peak position allows for ambiguity as to one or more of those peaks exists.

147.    A POSA could not determine with reasonable certainty individual characteristic peaks exist at 24.5° and 24.6° given their overlapping ±0.2° ranges.

148.    Certain pairs or groups of characteristic peaks recited in Claim 2 overlap when the ±0.2° tolerance is applied.

149.    Overlapping peaks at 24.5° and 24.6° (and any other overlapping peaks) render Claim 2 indefinite because a POSA cannot determine with reasonable certainty which peak positions correspond to which claimed "characteristic peaks."

CONFIDENTIAL

### 5.    The '197 Patent Is Invalid for Improper Inventorship

150.    The '197 Patent is invalid for improper inventorship because at least one of the listed inventors, ███████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████

151.    The priority application EP 05100942 relied upon by the '197 Patent was originally filed by Ferrer Internacional, S.A. without Bioprojet's knowledge.

152.    The priority application EP 05100942 relied upon by the '197 Patent only listed Manuel Raga, Juan Salares, Marta Guerrero, and Antonio Guglietta as inventors. The remaining alleged inventors were not added to this priority application until after that application published, allegedly as part of resolving a contract dispute between Bioprojet and Ferrer Internacional, S.A., the original applicant of the priority application relied upon by the '197 Patent.

153.    Given that Bioprojet was "a company without a laboratory" whose contribution to the alleged discovery of pitolisant "was to provide some salaries and financial contribution, to take patents in the name of inventors, to perform the various steps of pharmaceutical development through CROs, for example, toxicity and clinical trials and, importantly, to provide expertise on clinical and pharmaceutical aspects of the research," the remaining inventors from Bioprojet and other institutions such as INSERM did not contribute to the identification of the polymorphic form of pitolisant hydrochloride claimed in the '197 Patent. *See* Schwartz, J.-C., *The third histamine receptor: from discovery to clinics, long-lasting love story at INSERM and Bioprojet, in The Third Histamine Receptor*, CRC Press, pp. 13–29 (2009) (ed. D. Vohora).

154.    One or more named inventors and/or their employers (e.g., Bioprojet) derive pecuniary benefits from the improper listing of inventors.

CONFIDENTIAL

155.    Contributing biological data is not relevant to the conception and reduction to practice of a crystalline polymorph. Particularly, a POSA would have understood that there is no overlap or link between biological data collected during (a) the molecules stage (i.e. activity against a particular target) and the medicines stage (e.g. determination of doses and therapeutic efficacy) of drug development, and (b) the crystal form screening conducted at the materials stage of drug development. In this case, while biological data that identified pitolisant (and pitolisant salts including the HCl salt) as a candidate drug compound may have motivated a POSA to conduct solid form screening, that biological data was part of the prior art.

156.    ███████████████████████████████████████

███████████████████████████████████████

██████████. A person does not become an inventor merely by providing information that is in the prior art. An inventor contributes to the allegedly novel aspects of an invention, not what is in the prior art.

157.    Nothing in Mr. Ligneau's and Dr. Schwartz's deposition testimony demonstrates that either of them contributed to any of the elements in any claim of the '197 Patent.

158.    One or more named inventors and/or their employers (e.g., Bioprojet) derive pecuniary benefits from the improper listing of inventors.

159.    Thus, the '197 Patent is invalid for improper inventorship.

## III.    THE '947 PATENT

### A.    Background on the Field and Technology of the '947 Patent

#### 1.    The Histamine Receptors

160.    Histamine receptors include the $H_3$ receptor.

161.    By April 1, 2005, histamine was known to act as a neurotransmitter in the central nervous system ("CNS"), regulating physiological processes including arousal, wakefulness, cognition, and attention.

162.    Histamine is a biogenic amine involved in multiple physiological functions, including immune responses, gastric acid secretion, and neurotransmission.

163.    Histamine is often referred to as the "waking amine" because it plays a crucial role in promoting wakefulness and arousal in the brain.

164.    Histamine neurons in the hypothalamus are most active during wakefulness and largely inactive during sleep.

165.    Histamine helps regulate the sleep–wake cycle by activating cortical neurons that promote arousal and inhibiting neurons that promote sleep.

166.    By April 1, 2005, the histamine $H_3$ receptor was known to function as a presynaptic autoreceptor that regulates the synthesis and release of histamine in the brain, including by inhibiting histamine release upon activation.

167.    $H_3$ receptor antagonists block receptor activation, while $H_3$ inverse agonists decrease constitutive activity, and both types of compounds inhibit $H_3$ activation by histamine.

168.    Antagonist and inverse agonist activity at the $H_3$ receptor both produce similar functional effects in the presence of endogenous histamine—namely, inhibition of $H_3$ receptor activation and increased histamine release.

169.    A POSA would understand that there are biological similarities of the $H_3$ receptor pathway among various animal models and humans.

170.     Based on the state of the art, the H₃ receptor pathway was recognized as a promising target for therapeutic development related to physiological processes including arousal, wakefulness, cognition, and attention.

### 2.     H₃ Receptor Antagonists

171.     Histamine H3 receptor antagonists are known to promote extended wakefulness.

172.     By April 1, 2005, the prior art taught that H₃ antagonists increase cerebral histamine levels and induce extended wakefulness.

173.     By April 1, 2005, the prior art taught that H₃ antagonists were advantageously used to promote wakefulness. Indeed, the '947 Patent itself admits that H₃ antagonists were known to induce "extended wakefulness" and improve daytime alertness.

174.     Prior art (including Lin 1990, Monti 1991, and Ligneau 1998) established that H₃ receptor ligands directly modulate sleep-wake behavior in animal models, showing that antagonists induce a waking state in multiple species. *See e.g.,* Monti et al., *Effects of selective activation or blockade of the histamine H3 receptor on sleep and wakefulness*, EUR. J. OF PHARMACOL. 283-287 (1991), Lin J.S. et al., *Involvement of histaminergic neurons in arousal mechanisms demonstrated with H₃ receptor ligands in the cat*, 523 BRAIN RES. 325, 329 (1990) ("Lin"), Ligneau, X., et al., 116 *Neurochemical and behavioral effects of ciproxifan, a potent histamine H3-receptor antagonist*, 287 J. PHARMACOL. EXP. THER. 658, 658 (1998) ("Ligneau").

175.     Animal studies and review literature (including Lin 1990, Monti 1991, Brooks 2002, and Witkin 2004) taught that H₃ antagonists increase wakefulness and could be advantageously used for sleep/wake disorders, including excessive daytime sleepiness in narcolepsy and act as stimulants. See e.g., Lin; Monti; Brooks; J.M. Witkin & D.L. Nelson, *Selective histamine H3 receptor antagonists for treatment of cognitive deficiencies and other disorders of the central nervous system*, 103 PHARMACOL. & THERAPEUTICS 1 (2004).

176.    As of April 1, 2005, the field recognized therapeutic applications for $H_3$ receptor antagonists, including treatment of disorders involving excessive daytime sleepiness, as reported in at least Passani et al., *The histamine H3 receptor as a novel therapeutic target for cognitive and sleep disorders*, 25 TRENDS IN PHARM. SCI. 618, 620 (2004) ("Passani") (PRIORART_000000390-0397) ("Passani"), Ganellin 1998, Stark 2001, and Brooks 2002. Indeed, prior art (including Passani, Lin, Monti 1991, Meier II, Morisset 2000) described $H_3$ antagonists as targets for arousal control, most promising for wakefulness disorders and expected them to be useful for treating excessive daytime sleepiness.

177.    The prior art taught that many $H_3$ antagonists display inverse agonism activity.

178.    A person of ordinary skill in the art would have routinely characterized inverse agonism activity in $H_3$ antagonists.

179.    The prior art taught that $H_3$ antagonists containing an imidazole moiety (such as thioperamide, ciproxifan, and FUB 181) had drawbacks including P450 interactions and toxicity

180.    Medicinal chemistry efforts to replace the thiourea and imidazole chemical groups in earlier $H_3$ antagonists such as FUB 181 with a piperidine moiety led to the development of non-imidazole $H_3$ antagonists, including pitolisant.

181.    Pitolisant (FUB 649) was identified in the prior art as a potent and selective non-imidazole $H_3$ antagonist and "promising lead" compound.

### 3.    Narcolepsy, EDS, and Cataplexy

182.    Narcolepsy is a neurological disorder characterized by manifestations of sleep at times when a person would normally be awake. Standards of Practice Committee, Michael Littner MD et al., *Practice Parameters for the Treatment of Narcolepsy: An Update for 2000*, 24 Sleep 451, 451 (2001) ("Littner 2001") (ANI-Pitolisant00028286-303). Narcolepsy can have two major abnormalities, excessive daytime sleepiness and the intrusion of REM-associated phenomena into

CONFIDENTIAL

wakefulness, each of which manifest as distinct symptoms. Dorothée Chabas et al., *The genetics of narcolepsy*, 4 Ann. Rev. of Genomics & Hum. Genetics 459, 460 (2003) ("Chabas 2003") (ANI-Pitolisant00028183-210); Timothy I. Morganthaler et al., *Practice Parameters for the Treatment of Narcolepsy and other Hypersomnias of Central Origin: An American Academy of Sleep Medicine Report*, 30 Sleep 1705, 1705 (2007) ("Morganthaler 2007") (HBS-EXPERT_0003531-37).

183.    As of the priority date, a POSA would understand cataplexy to be "the abrupt loss of muscle tone triggered by strong emotional reactions or exercise." *Principles and Practice of Sleep Medicine* (Meir H. Kryger, Thomas Roth, & William C. Dement eds., 4th ed., 2005) ("Kryger 2005") at 597 (ANI-Pitolisant00030568-88); *see also* Chabas 2003 at 460 (ANI-Pitolisant00028184) ("Cataplexy, a highly specific symptom, is sudden muscle atonia in response to emotional arousal, in particular laughter."). Cataplexy represents an intrusion of one isolated feature of the REM state. Other intrusions of REM-associated phenomena into the wake state that are also associated with narcolepsy include sleep paralysis and hypnagogic hallucination. Chabas 2003 at 460 (ANI-Pitolisant00028184). In the REM state, an individual's muscles become largely paralyzed. Cataplexy is when some degree of this REM-related muscle paralysis occurs when an individual is awake. (*See, e.g.*, *id.*; Joshi John et al., *Cataplexy-Active Neurons in the Hypothalamus: Implications for the Role of Histamine in Sleep and Waking Behavior*, 42 Neuron 619, 619 (2004) ("John 2004") (WAKIX-HBS_00210191-206); Michihiro Mieda et al., *Orexin peptides prevent cataplexy and improve wakefulness in an orexin neuron-ablated model of narcolepsy in mice*, 101 Proc. of the Nat'l Acad. of Scis. 4649, 4649 (2004) ("Mieda 2004") (ANIPitolisant00028314-19).

CONFIDENTIAL

184.    EDS is a symptom of many conditions and can be caused by a variety of factors,

including sleep deficiency caused by lifestyle or disease (e.g., insomnia) or a complication of sleep

disorders (e.g., sleep apnea, narcolepsy) or a feature or a disorder damaging nervous system

structures (e.g., Alzheimer's Disease, Parkinson's Disease). (*See, e.g.*, Am. Acad. of Sleep Med.,

*The International Classification of Sleep Disorders: Diagnostic & Coding Manual* 79, 177 (2d ed.

2005) ("ICSD-2") (ANIPitolisant00028226-36, ANI-Pitolisant00032069-72); Thomas M. Heffron

et al., *Clinical significance of sleepiness: an American Academy of Sleep Medicine position

statement*, 21 J. Clinical Sleep Med. 1103, 1104 (2025) ("Heffron 2025") (ANI-

Pitolisant00032064-68).

185.    EDS is commonly evaluated using subjective and/or objective criteria. The

Epworth Sleepiness Scale ("ESS") is a commonly used questionnaire to evaluate subjective

indicators of sleepiness. Murray W. Johns, *A New Method for Measuring Daytime Sleepiness: The

Epworth Sleepiness Scale*, 14 Sleep 540, 541 (1991) ("Johns 1991") (ANI-Pitolisant00030562-

67). The questionnaire yields a total score ranging from 0 to 24, with a score of 11 and above

considered to represent EDS. (*Id.* at 541; Gerard J. Meskill et al., *Clinical Impact of Pitolisant on

Excessive Daytime Sleepiness and Cataplexy in Adults with Narcolepsy: An Analysis of

Randomized Placebo-Controlled Trials*, 36 CNS DRUGS 61, 63 (2021) ("Meskill 2021") (HBS-

EXPERT_0003522-30). To determine a patient's ESS score, doctors practicing sleep medicine

will ask the patient eight questions to rate the patient's likelihood of dozing off or falling asleep in

various situations – for example, sitting and reading or being in a car while stopped in traffic for a

few minutes. Johns 1991 at 541 (ANI-Pitolisant00030563). For each question, the patient is asked

to rate their likelihood of dozing off or falling asleep (in contrast to just feeling tired) on a scale of

0 to 3, with 0 meaning they would never doze, 1 meaning they have a slight chance of dozing, 2

meaning they have a moderate chance of dozing, and 3 meaning they have high chance of dozing. The scores for each prompt are then added to give the final total. A patient's responses are used to guide diagnosis of emergent challenges to individual and public safety and quality of life. ESS measures only sleepiness and does not measure other symptoms of narcolepsy (e.g., cataplexy).

186.    One of the most widely used and reliable objective measurements of sleepiness is the multiple sleep latency test ("MSLT"). *See, e.g.,* Johns 1991 at 540 (ANI-Pitolisant00030562). Administration of an MSLT is recited in the current version of the diagnostic criteria for Narcolepsy Type 1 ("NT1"). AM. ACAD. OF SLEEP MED., *International Classification of Sleep Disorders* 179 (3d ed. Text Revision 2023) ("ICSD-3-TR") (ANI-Pitolisant00028237-81); *see also* ICSD-2 at 84 (ANI-Pitolisant00028233).

187.    Prior to 2005, amphetamines, methylphenidate, and modafinil were used to treat excessive daytime sleepiness (EDS) in narcolepsy patients.

188.    Narcolepsy is just one of many different sleep disorders in which EDS sometimes manifests. *See, e.g.*, Kryger 2005 at 596 (ANI-Pitolisant00030572).

189.    As of April 2005, EDS was a diagnostic criteria for narcolepsy with cataplexy and narcolepsy without cataplexy. ICSD-2 at 84 (ANI-Pitolisant00028233).

190.    Narcolepsy is treated symptomatically. Brooks, S. et al., *Novel therapies for narcolepsy*, 11 EXPERT OPIN. INVESTIG. DRUGS, 1821, 1821 (2002) ("Brooks").

a)    *Excessive Daytime Sleepiness*

191.    Excessive daytime sleepiness is a clinical symptom characterized by an inability to stay awake and alert during the major waking episodes of the day. Plaintiffs' experts agree that this is the plain and meaning of EDS. It is undisputed that sleepiness is measured on a continuum, where excessive daytime sleepiness is further down that continuum than, for example, drowsiness due to a bad night's sleep.

**CONFIDENTIAL**

192.     Despite agreeing on the "clinical" or "scientific" definition of excessive daytime sleepiness, Plaintiffs argue that the '947 Patent uses the term excessive daytime sleepiness differently from its plain meaning. In other words, Plaintiffs argue that the patentee was its own lexicographer and ascribed a meaning to "excessive daytime sleepiness" that differs from its plain and ordinary meaning. However, Plaintiffs' experts do not point to a consistent purported special definition of excessive daytime sleepiness in the '947 Patent.[3] Instead, in some places Plaintiffs' experts claim that excessive daytime sleepiness is "a pathology involving the disorganization of sleep/wake architecture." In other places, they argue that "EDS, as it is discussed in the '947 Patent is not simply a symptom of narcolepsy, sleep apnea, and Parkinson's, it may encompass symptoms of those associated disorders."[4] Whatever alleged definition Plaintiffs choose to proceed with, there is no support in the '947 Patent or its file history that shows that excessive daytime sleepiness means anything other than its plain meaning—namely, sleepiness during the daytime to a degree that interferes with daily functioning. Excessive sleepiness is defined by the American Academy of Sleep Medicine in the International Classification of Sleep Disorders (ICSD), as "a complaint of difficulty maintaining desired wakefulness or a complaint of excessive amount of sleep." Young T., Epidemiology of Daytime Sleepiness: Definitions, Symptomatology, and Prevalence, 65 J. CLIN. PSYCHIATRY 12-16 (2004) ("Young"); ICSD-1 (rev.) (2001) at 331. The ICSD further describes excessive sleepiness (also referred to as somnolence, hypersomnia) as a subjective report of difficulty maintaining the alert awake state, usually accompanied by a rapid entrance into sleep when the person is sedentary. *See, e.g.*, Young; ICSD-1 (rev.) (2001) at 341.

---

[3] Defendants' do not concede that claim construction arguments are facts.
[4] Given that Plaintiffs' cannot even articulate the supposed special definition of excessive daytime sleepiness allegedly set forth in the '947 Patent, their analysis cannot meet that exacting standard for lexicography.

i.      The '947 Patent Uses "Excessive Daytime Sleepiness"
According to Its Plain and Ordinary Meaning.

193.    The parties did not ask the Court during the Markman phase of the case to construe

the term "excessive daytime sleepiness" recited in claim 1 of the '947 patent.

194.    The term "excessive daytime sleepiness" appears in the specification six times

(other than the claims). Plaintiffs primarily rely on a single portion of the specification dealing

with Parkinson's disease to support their alleged re-definition of excessive daytime sleepiness:

> In addition to the major signs of PD in the movement initiation and
> control which constitute the core of the disease, it has become
> apparent during the last decades that a large proportion ( as large as
> 7 4-81 % ) of PD patients display sleep and vigilance disorders
> (Garcia-Borreguero et al., Sleep Med. Rev., 2003, 7, 115). ***These
> include disorders of sleep initiation and maintenance, sleep
> fragmentation,    parasomnias    (including    nocturnal
> hallucinations), sleep disordered breathing and excessive daytime
> sleepiness (including narcolepsy or "sleep attacks", i.e.
> inappropriate and unintended falls into sleep while in daytime
> activity).*** It is not entirely clear whether this group of disorders is
> purely related to the PD itself or whether there is also some
> participation of the treatment by direct or indirect dopaminergic
> agonists. The treatment of this class of disorders, which may all
> result from a loss of circadian rythmicity, is poorly efficient: for
> instance modafinil treatment of excessive daytime sleepiness was
> tried with limited success and the indication for this stimulant drug
> of essentially unknown mechanism of action has not been
> recognized by health authorities.

'947 Patent at 2:36-55 (emphasis added).

195.    From this text, Plaintiffs experts claim that excessive daytime sleepiness, among

others, is referred to as a "sleep and vigilance disorder" and that these disorders "may all result

from a loss of circadian rhythmicity." Plaintiffs' experts also claim that the passage refers to

"excessive daytime sleepiness (including narcolepsy or 'sleep attacks', i.e. inappropriate and

unintended falls into sleep while in daytime activity)." Thus, Plaintiffs argue, the '947 Patent

defines excessive daytime sleepiness as including narcolepsy.

196.     To a POSA, the inclusion of the word "narcolepsy" in this parenthetical is medically incorrect. Narcolepsy is a neurological disorder that affects the brain's ability to regulate sleep/wake cycles. A POSA would understand that narcolepsy itself is not excessive daytime sleepiness, nor does excessive daytime sleepiness "include" narcolepsy. To a POSA, this disclosure in column 2 of the '947 Patent is nonsensical. While narcolepsy can be co-morbid with Parkinson's disease, it is not itself the same as excessive daytime sleepiness. Indeed, later in the '947 Patent, similar language appears describing "sleep and vigilance disorders associated with PD" that does not include narcolepsy within a similar parenthetical. *See* '947 Patent 41:36-53 ("excessive daytime sleepiness (including 'sleep attacks')"). Indeed, if excessive daytime sleepiness is defined as including "narcolepsy" the claims of the '947 Patent would illogically recite a method of treating narcolepsy in patients having narcolepsy.

197.     Plaintiffs' experts do not explain how this paragraph supports a claim construction that excessive daytime sleepiness is somehow re-defined to involve a disruption of "sleep architecture." To the extent that Plaintiffs imply that the reference to "loss of circadian rhythmicity" informs the understanding of excessive daytime sleepiness, that disregards the fact that the '947 Patent indicates that these disorders "may" result from a loss of circadian rhythmicity. A POSA would not understand that such equivocal language is intended to redefine excessive daytime sleepiness to mean something other than its plain and ordinary clinical meaning. Indeed, Plaintiffs' experts have opined that the language in this paragraph "could be clearer."

198.     Plaintiffs also fail to address the significance of the other disclosures in this paragraph. For example, the paragraph explains that "it is not entirely clear whether this group of disorders is purely related to the PD itself or whether there is also some participation of the treatment by direct or indirect dopaminergic agonists." '947 Patent, 2:46-49. A POSA understands

CONFIDENTIAL

this to mean that, as of the filing of the '947 Patent, it was unknown whether excessive daytime sleepiness in Parkinson's patients was caused by the disease itself or if it was a side effect of the medications used to treat Parkinson's disease. As discussed in more detail below, this disclosure reinforces that excessive daytime sleepiness is a symptom (whether of Parkinson's disease or the dopaminergic agonists used to treat it), not itself a disease state involving disrupted "sleep architecture." This is confirmed by the statement in the same paragraph that explains that "excessive daytime sleepiness" can be treated with a "stimulant drug," like modafinil." '947 Patent, 2:49-55. This would indicate to a POSA that excessive daytime sleepiness is a symptom characterized by excessive sleepiness inasmuch as it is treatable with a stimulant drug. A POSA understands that a stimulant drug treats EDS by promoting arousal/wakefulness. A stimulant drug does not restore or otherwise affect "sleep architecture" or "loss of circadian rhythmicity," it merely promotes arousal/wakefulness. An example of a stimulant is amphetamine. Moreover, the disclosure in the '947 Patent that it is unknown whether the various vigilance and sleep disorders associated with Parkinson's disease result from the underlying disease or the treatments used to treat Parkinson's disease is fatal to Plaintiffs' contention that, in the context of the '947 Patent, excessive daytime sleepiness "is not simply a symptom of … Parkinson's" but may also "encompass symptoms of [Parkinson's disease]." The disclosure in the patent makes no mention that excessive daytime sleepiness encompasses any symptoms of Parkinson's disease other than daytime sleepiness itself (which may or may not be attributable to the Parkinson's disease as opposed to the medications used to treat it).

199.    This same passage of the '947 Patent provides further support that "excessive daytime sleepiness" is used according to its plain meaning. For example, it explains that a "sleep attack" is an inappropriate and unintended fall into sleep during the daytime. '947 Patent, 2:36-46.

## CONFIDENTIAL

This passage states that excessive daytime sleepiness "includes" sleep attacks, which a POSA would understand to be an extreme manifestation of the symptom. This language does not limit excessive daytime sleepiness to any degree of severity, however. Further, this passage shows that excessive daytime sleepiness does not encompass disorders such as "sleep fragmentation" and "sleep initiation and maintenance," as those are separately listed and therefore distinguished from excessive daytime sleepiness. This further supports that the '947 Patent does not use "excessive daytime sleepiness" in a non-standard way, as Plaintiffs argue, to require the disruption of "sleep architecture."

200.    The flaw in Plaintiffs' argument is especially apparent in the case of obstructive sleep apnea (OSA). A POSA understands that OSA involves obstructions to the airway during sleep which interfere with the ability of a patient to get a good night's sleep. The '947 Patent explains that excessive daytime sleepiness is a "consequence" (i.e., a symptom) of the underlying breathing disorder:

> ***As used herein, "obstructive sleep apnea" (also referred to herein as "OSA") denotes a breathing disorder that occurs primarily during sleep with consequences that may persist throughout the waking hours in the form of sleepiness.*** This increasingly well-recognized disease is characterized by periodic collapse of the upper airway during sleep with apneas (periodic cessation of breathing), hypopneas (repetitive reduction in breathing) or a continuous or sustained reduction in ventilation and excessive daytime sleepiness, neurocognitive defects and depression . . . .

*Id.* at 41:22-31 (emphasis added). Pharmacological treatment of EDS in OSA patients have little impact on "sleep architecture," rather they promote arousal of a sleepy individual during waking hours. In other words, a POSA would understand that the primary function of pharmacological treatments is to alleviate a person's sleepiness that results from the disrupted sleep caused by the apneas, not to address the underlying condition itself causing the sleep disruption. *See, e.g.*, '947 Patent at 1:8-13; 41:22-31. A POSA would understand that the use of "excessive daytime

sleepiness" as a characteristic symptom of OSA is consistent with its plain and ordinary meaning, referring to a degree of daytime sleepiness, not a nocturnal sleep disorder or involving disrupted "sleep architecture." Further, there is nothing in this disclosure that even remotely suggests that EDS embraces symptoms of OSA other than diurnal somnolence.

201.    Plaintiffs also rely on Example 1 of the '947 Patent for their alleged specialized definition of excessive daytime sleepiness. This example does not evidence an intent to depart from the ordinary meaning of excessive daytime sleepiness. To the contrary, it confirms that excessive daytime sleepiness has its plain and ordinary meaning. Example 1 relates to the use of pitolisant to treat wakefulness/sleep disorders in a feline model of Parkinson's disease, although no actual data is presented in this example. *See* '947 Patent at 43:31-40. According to Example 1, the cats experienced "long periods of sleep" before administration of pitolisant and a "succession of periods of sleep and wakefulness" after administration of pitolisant. *Id.* Example 1 then hypothesizes that this change from "long periods of sleep" to periods of wakefulness would translate to the suppression of "excessive daytime sleepiness experienced by a large proportion of human patients . . . of this drug." *Id.* Example 1 concludes, "[t]hese data, obtained in a very reliable model of PD, show that treatment with histamine H3 antagonists/inverse agonists is able ***not only*** to treat the excessive daytime sleepiness which is so detrimental in the every day life of PD patients, ***but also*** to reestablish a normal sleep architecture." *Id.* (emphasis added). This example demonstrates that "excessive daytime sleepiness" is distinct from reestablishing "normal sleep architecture." Reading this example, a POSA understands that the inventors intended to distinguish between "treat[ing] excessive daytime sleepiness" and "reestablish[ing] a normal sleep architecture." Example 1 thus uses "excessive daytime sleepiness" according to its plain meaning and does not equate it with reestablishing "normal sleep architecture" as Plaintiffs contend.

**CONFIDENTIAL**

Moreover, that pitolisant is said to have an effect on sleep architecture does not mean that sleep architecture is part of excessive daytime sleepiness. While impaired sleep architecture may be a symptom of OSA, that in no way suggests that it is the same as or included within the definition of excessive daytime sleepiness. The same disease or disorder can of course have many different symptoms, some of which may be treated by the same therapeutic. For example, ibuprofen can be used to reduce fever and treat pain, two symptoms of influenza. This does not imply that fever encompasses pain or vice versa. And it certainly does not mean that pain or fever (a symptom of influenza) *is* influenza.

202.    Plaintiffs also rely on Example 2 of the '947 Patent for their alleged specialized definition of excessive daytime sleepiness. This example does not support Plaintiffs' argument. While the example states that the OSA patients treated with pitolisant had improved sleep quality (although this example does not show the underlying data), Plaintiffs attempt to conflate that with excessive daytime sleepiness misses the mark. When read in context, a POSA understands that, like Example 1, Example 2 distinguishes treatment of excessive daytime sleepiness from improvement in the quality of sleep. Specifically, Example 2 states:

> In a group of 10 male patients with a diagnostic of OSA, confirmed by polysonmography performed during a night in an hospital setting, an Epswoth score above 12 and a body mass index of less than 35, the effect of a 3-day treatment with BF 2.649 (3-( 4-Chlorophenyl)propyl 3-piperidinopropyl ether) was assessed in a single-blind trial against placebo, at a fixed oral dose of 40 mg once a day.

> This treatment resulted in all subjects in a clear decrease (by more than 60%) in the number of diurnal somnolence episodes and a total prevention of the occurrence of diurnal sleep episodes. In addition the nocturnal sleep duration was not decreased and its quality was improved. This clinical trial establishes for the first time the utility of H3 antagonists/inverse agonists in OSA.

'947 Patent at 43:53-67.

203.    First, the treatment of subjects having excessive daytime sleepiness with pitolisant, resulted in a "clear decrease" in the number of "diurnal somnolence episodes." '947 Patent at 43:61-63. In other words, the treatment of excessive daytime sleepiness was evaluated simply by the amount of daytime sleepiness (diurnal somnolence) that resulted. *Id.* This further demonstrates that excessive daytime sleepiness is simply daytime sleepiness of a degree that impairs daytime functioning. The fact that the example describes the patient's sleep quality in no way supports a specialized definition of excessive daytime sleepiness. As with Example 1, reference to the sleep attributes are made "[i]n addition" to the decrease in daytime sleepiness. '947 Patent at 43:64. Example 2 makes no reference to "sleep architecture." '947 Patent at 43:53-67. In any event, there is nothing in Example 2 that a POSA would understand to be a redefinition of the term excessive daytime sleepiness. Further, as mentioned above, the fact that excessive daytime sleepiness and poor sleep quality are both symptoms of OSA does not imply the symptom of excessive daytime sleepiness includes poor sleep quality or vice versa.

204.    Finally, Plaintiffs rely on Example 5, which states:

> Two clinical studies were conducted on patients suffering from obstructive sleep apnea (OSA), in a single-blinded or double-blinded trial against placebo with a polysonmographical test on patients. In both studies, patients were administered with 3-( 4-Chlorophenyl) propyl 3-piperidinopropyl ether at 40 mg p.o. once a day during 3 and 7 days.

> In both studies, daytime sleepiness was improved in accordance with the Epworth test or according to the frequency of naps or daytime sleepiness occurrences. The average daytime sleepiness could be reduced by up to 50%.

'947 Patent at 44:40-51.

205.    Plaintiffs do not explain how Example 5 supports a re-definition of excessive daytime sleepiness. Like Example 2, Example 5 relates to clinical studies to evaluate daytime sleepiness in patients with OSA, however no actual data is presented. In Example 5, the '947 Patent

states that OSA patients treated with pitolisant showed a reduction in "daytime sleepiness." '947

Patent at 44:48. Example 5 makes no mention of any symptom other than daytime sleepiness. This

example further demonstrates that excessive daytime sleepiness refers simply to daytime

sleepiness ("diurnal somnolence") that impacts a person's daily functioning. Further, the reference

to the "Epworth test" confirms that excessive daytime sleepiness is just a degree of sleepiness. It

is undisputed that the Epworth test does not measure anything other than sleepiness – not sleep

architecture, cataplexy, halucinations, or any of the other symptoms of narcolepsy.

206.    For these reasons, the specification, when viewed in its entirety, confirms that

excessive daytime sleepiness should be given its plain meaning.

207.    The file history does not support Plaintiffs' re-definition theory either. Instead, the

file history of the '947 Patent confirms that "excessive daytime sleepiness" should be given its

plain meaning.

208.    For example, one of the inventors, Dr. Schwartz submitted a Declaration during

prosecution of the '947 Patent, in which he claimed that pitolisant showed utility for treating

excessive daytime sleepiness. WAKIX-PLFS_00002100-2105. In that declaration, Dr. Schwartz

stated "Excessive daytime sleepiness is measured with the Epworth Sleepiness Scale (ESS). The

Epworth Sleepiness Scale is used to determine the level of daytime sleepiness, that is measured by

use of a short questionnaire." *Id.* at WAKIX-PLFS_00002101 (emphasis added). In other words,

Dr. Schwartz states that excessive daytime sleepiness is measured by the level of daytime

sleepiness (i.e., diurnal somnolence) and confirm that excessive daytime sleepiness is used

according to its plain and ordinary meaning. *Id.*

209.    Moreover, the term "excessive daytime sleepiness" appears in original Claims 94

or 95. WAKIX-PLFS_00001880:

> 93.    Use of a ligand of the H3 receptor for the preparation of a medicament for the treatment of Parkinson's disease, obstructive sleep apnea, narcolepsy, dementia with Lewy bodies and/or vascular dementia, to be administered in combination with a medicament for treating of Parkinson's disease, obstructive sleep apnea, narcolepsy, dementia with Lewy bodies and/or vascular dementia, respectively.
>
> 94.    Use according to anyone of the preceding claims in which said treatment of Parkinson's disease, obstructive sleep apnea, dementia with Lewy bodies and/or vascular dementia is intended for treating symptoms of Parkinson's disease, obstructive sleep apnea, dementia with Lewy bodies and/or vascular dementia.
>
> 95.    Use acording to claim 94, in which said symptoms are chosen from sleep and vigilance disorders.
>
> 96.    Use according to claim 94 or 95 in which said symptoms are chosen from insomnia, disorders of sleep initiation and maitenance, sleep fragmentation, parasomnias, sleep disordered breathing, excessive daytime sleepiness (including "sleep attacks") and circadian dysrhythmia.

210.    As shown in the above excerpt, the claims as originally filed expressly characterized excessive daytime sleepiness as a symptom. Moreover, like the specification, the claims shows that excessive daytime sleepiness does not encompass disorders such as "sleep fragmentation" and "sleep initiation and maintenance," as those are separately listed and therefore distinguished from excessive daytime sleepiness. This further demonstrates that the '947 Patent does not use "excessive daytime sleepiness" in a non-standard way, as Plaintiffs argue, to require the disruption of "sleep architecture."

211.    The subsequent preliminary amendment which added claims 99 and 100 is also consistent with the plain meaning of excessive daytime sleepiness:

> 100.  (New)  The method for the treatment of excessive daytime sleepiness according to claim 99 wherein said sleepiness is associated with Parkinson's disease, narcolepsy or sleep apnea.

212.    This amendment provides further evidence that the '947 Patent does not use "excessive daytime sleepiness" to mean something other than excessive sleepiness during the day, which is a symptom of the underlying diseases claimed in the preceding independent claim.

213.    The Examiner's April 2011 rejection also supports the notion that pitolisant treats excessive daytime sleepiness regardless of underlying pathology. As Plaintiffs' experts admit, in this rejection:

> The Examiner asserted that the prior art disclosed that pitolisant (which I understand to be a representative compound) was part of a group of previously disclosed compounds that were "known to be useful in treating obesity," that "obesity is associated with daytime sleepiness," and that "weight loss clearly will improve daytimes sleepiness that is associated with obesity." WAKIX-PLFS_00002006. Based on these observations, the Examiner concluded that "it would have been obvious to one of ordinary skill in the art at the time the invention was made to employ the herein claimed compounds in a method to treat excessive daytime sleepiness," given the Examiner's asserted link between the claimed compounds, treatment of obesity, and improved daytime sleepiness associated with weight loss. WAKIX-PLFS_00002006.

214.    Clearly, the Examiner took the position that the claimed method was directed to treating excessive daytime sleepiness as a symptom, regardless of the underlying pathology. The inventors did not correct the Examiner and indeed, confirmed the Examiner's understanding during prosecution.

215.    For example, Dr. Schwartz, an inventor listed on the '947 Patent, used the plain and ordinary meaning of excessive daytime sleepiness in a sworn declaration submitted with Applicant's Office Action Response. *See* WAKIX-PLFS_00002090-2105. The Schwartz

Declaration explicitly discloses that the pending claims are narrowly directed to the specific symptom of EDS, and not some vague and ambiguous pathological condition "involving the disorganization of sleep/wake architecture" or other aspects of narcolepsy. The Schwartz Declaration states that pitolisant "exhibit[s] a purely symptomatical activity on excessive daytime sleepiness." WAKIX-PLFS_00002090 at 2101. The Applicants used Dr. Schwartz's declaration in an effort to overcome the Examiner's prior art rejection, distinguishing the claims of the '947 Patent over the prior art by pointing to "the fact that the effect of [pitolisant] is purely targeting the symptom of excessive daytime sleepiness." WAKIX-PLFS_0000 2104. Furthermore, in the Applicant Arguments and Remarks that accompanied the Schwartz Declaration, the Applicants clearly represented that the pending claims are directed to the use of pitolisant for "the specific treatment of excessive daytime sleepiness as a symptom of [the claimed] conditions." WAKIX-PLFS_00002090 at 2099.

216.    Accordingly, nothing in the claims, specification, or prosecution history of the '947 Patent, including the inventor, Dr. Schwartz's explicit statements, show that the term excessive daytime sleepiness means anything other than its plain meaning.

217.    Plaintiffs' construction is also contradicted by their expert's own prior publications, which confirm the plain meaning of "excessive daytime sleepiness." For example, in *Recognition and Management of Excessive Sleepiness in the Primary Care Setting*, a paper which one of Plaintiffs' experts defines excessive sleepiness as "characterized by difficulty maintaining wakefulness and/or an increased propensity to fall asleep when sleep is inappropriate or dangerous." Schwartz et al., *Recognition and Management of Excessive Sleepiness in the Primary Care Setting*, 11(5) PRIM CARE COMPANION J CLIN PSYCHIATRY 197, 197 (2009). The authors cite ICSD-2 (2005) to support their definition. In another article, Plaintiffs' experts define

CONFIDENTIAL

excessive daytime sleepiness as "inappropriate and undesirable sleepiness during waking hours."

Roth T. and Winkelman J., *Recognizing and Treating Excessive Daytime Sleepiness in Patients with Narcolepsy*, 81(6) J. CLIN PSYCHIATRY 1, 1 (2020); *see also* Kryger et al., "Principles and Practice of Sleep Medicine," 4th Ed. (2005) ("Kryger 2005") at 595; Kryger et al., "Principles and Practice of Sleep Medicine," 6th Ed. (2017) ("Kryger 2017") at 579.

ii.    Excessive Daytime Sleepiness Is a Symptom of an Underlying Condition

218.    Excessive daytime sleepiness is simply a major symptom of narcolepsy, Parkinson's disease, and sleep apnea within the context of the '947 Patent.

219.    To start, the claims of the '947 Patent confirm that "excessive daytime sleepiness" is simply a symptom of the underlying disease states recited in claim 1 (emphasis added):

> Claim 1. ***A method for treating excessive daytime sleepiness*** comprising administering to a patient in need thereof a compound of formula (IIa) . . . ***wherein said patient is suffering from Parkinson's disease, narcolepsy, or sleep apnea***.

220.    A POSA would have understood that the claim language suggests that excessive daytime sleepiness is a symptom of Parkinson's disease, narcolepsy, and sleep apnea. In particular, the claim identifies the underlying disease or disorder of which the patient is "suffering from" as Parkinson's disease, narcolepsy, and sleep apnea. However, the claim does not purport to treat those conditions per se but rather to treat excessive daytime sleepiness in those patients. Given that excessive daytime sleepiness is a well-known symptom of those conditions a POSA would understand the language of claim 1 to describe a method of treating excessive daytime sleepiness as a symptom of those conditions.

221.    Moreover, the specification begins by explaining that the claimed invention "relates to the therapeutical application of alkylamines of formula (A) . . . for the treatment of Parkinson's disease (PD), obstructive sleep apnea (OSA) . . . and ***particularly for the treatment of their***

61

## CONFIDENTIAL

*symptoms*." *Id.* at 1:8-13. The specification also explains that "the inventors have now unexpectedly demonstrated that antagonists/inverse agonists of the H3R can markedly improve some major **symptoms of these diseases**." *Id.* at 3:1-4; 41:16-21 ("The invention further relates to the use of [pitolisant] for the manufacture of a medicament intended for the treatment of Parkinson's disease, obstructive sleep apnea, narcolepsy, dementia with Lewy bodies and/or vascular dementia, **and in particular the treatment of the symptoms thereof**."). Moreover, in its description of OSA, the '947 Patent explains that excessive daytime sleepiness is a "consequence" of the underlying breathing disorder:

> As used herein, **"obstructive sleep apnea" (also referred to herein as "OSA") denotes a breathing disorder that occurs primarily during sleep with consequences that may persist throughout the waking hours in the form of sleepiness**. This increasingly well-recognized disease is characterized by periodic collapse of the upper airway during sleep with apneas (periodic cessation of breathing), hypopneas (repetitive reduction in breathing) or a continuous or sustained reduction in ventilation and excessive daytime sleepiness, neurocognitive defects and depression . . . .

*Id.* at 41:22-31 (emphasis added). This would suggest to a POSA that EDS is associated with OSA as a symptom, not an independent co-morbidity. In addition, the '947 Patent defines "treating" as "reversing, alleviating, inhibiting the progress of, or preventing the disorder or condition to which such term applies, **or one or more symptoms of such disorder or condition**." '947 Patent at 42:15-19. This, too, suggests to a POSA that EDS is associated as a symptom.

222.    The prosecution history confirms that excessive daytime sleepiness is a symptom of an underlying disease. For example, the Schwartz Declaration explicitly discloses that the claims are directed to the specific symptom of excessive daytime sleepiness. The Schwartz Declaration states that "**[c]ompounds of the invention exhibit a purely symptomatical activity on excessive daytime sleepiness**." WAKIX-PLFS_00002090 at 2101. The Applicants used Dr. Schwartz's declaration in an effort to overcome the Examiner's prior art rejection, distinguishing

the claims of the '947 Patent over the prior art by pointing to "the fact that the effect of the compounds of the invention *is purely targeting the symptom of excessive daytime sleepiness*." WAKIX-PLFS_00002090 at 2104. Furthermore, in the Applicant Arguments and Remarks that accompanied the Schwartz Declaration, the Applicants clearly represented that the pending claims are directed to the use of pitolisant for "the specific treatment of excessive daytime sleepiness as a symptom of [other] conditions." WAKIX-PLFS_00002090 at 2098-99 (emphasis in original):

> sleepiness in the process of the claimed invention. The results evidenced in the Declaration also unexpectedly show that the compounds specifically target excessive daytime sleepiness as a <u>symptom</u>, such as in the case of obesity and other conditions, and this high specificity for the treatment of excessive daytime sleepiness as a <u>symptom</u> could not have been expected. This specificity will allow treatment on a broad scale with a

> In light of the fact that the results obtained as reflected in the attached Declaration are <u>contrary</u> to the expectations and predictions based on the prior art, the present claims thus provide the unexpected benefit of giving improvement in cases of excessive daytime sleepiness that is <u>independent</u> of obesity and allow for the specific treatment of excessive daytime sleepiness as a <u>symptom</u> of other conditions. Accordingly, the prior art <u>teaches</u>

223. Plaintiffs' experts own publications also expressly refer to excessive daytime sleepiness as a symptom. For example, Plaintiffs' experts have authored papers that state "excessive sleepiness is also the hallmark symptom of some primary sleep disorders, including narcolepsy and idiopathic hypersomnia" and that "regardless of the etiology, excessive sleepiness can be a debilitating symptom." Schwartz et al., *Recognition and Management of Excessive Sleepiness in the Primary Care Setting*, 11(5) PRIM CARE COMPANION J CLIN PSYCHIATRY 197, 198 (2009).

224.    Accordingly, excessive daytime sleepiness is just a symptom of an underlying condition recited in claim 1 of the '947 Patent.

b)    *EDS and Cataplexy Are Two Distinct Symptoms of Narcolepsy*

225.    Cataplexy is a pathognomonic symptom of narcolepsy. Unlike EDS, cataplexy is not a symptom associated with a wide variety of sleep disorders, but is unique to Narcolepsy Type 1 ("NT1"). *See e.g.*, ICSD-3-TR at 179 (ANIPitolisant00028261. The ICSD-3-TR also permits a diagnosis of NT1 in the absence of cataplexy with a test showing low levels of hypocretin-1 ($\leq$ 110 pg/mL) in the cerebrospinal fluid. Cataplexy represents one of several manifestations in which REM-associated phenomena intrude into waking states. As noted above, the other REM-related manifestations can include sleep paralysis and hypnagogic hallucinations. Cataplexy symptoms vary in onset, frequency, and severity. For instance, some patients may experience cataplexy less than once per year, whereas others may have several cataplexy attacks per day. Each individual episode of cataplexy can last anywhere from a single second to nearly two minutes. *See, e.g.*, M.M. Ohayon et al., *Prevalence of narcolepsy symptomatology and diagnosis in the European general population*, 58 Neurology 1826, 1830 (2002) ("Ohayon 2002") (WAKIX-HBS_00210614-21); M.M. Ohayon et al., *Frequency of narcolepsy symptoms and other sleep disorders in narcoleptic patients and their first-degree relatives*, 14 J. Sleep Res. 437, 441 (2005) ("Ohayon 2005") (ANI-Pitolisant00028353-61).

226.    Excessive Daytime Sleepiness (EDS) is a clinical condition characterized by an inability to stay awake and alert during the major waking episodes of the day. (Kushida Opening Report, ¶ 110). Patients with excessive daytime sleepiness may fall asleep at inappropriate times. A patient in the throes of cataplexy is experiencing REM-related muscle paralysis while awake. Put differently, the person remains conscious throughout a cataplexy episode. *See, e.g.*, Chabas

2003 at 460 (ANI-Pitolisant00028184); John 2004 at 619 (WAKIX-HBS_00210191); Mieda 2004

at 4649 (ANIPitolisant00028314).

227.    Excessive daytime sleepiness and cataplexy occur in response to different stimuli.

Cataplexy is triggered by strong emotional reactions, especially laughter or surprise. John 2004 at

619 (WAKIX-HBS_00210191); Kryger 2005 at 597 (ANI-Pitolisant00030573). In contrast, EDS

most often occurs while doing monotonous activities that require no active participation, such as

being a passenger in an automobile, and can be temporarily suppressed by physical activity.

228.    Excessive daytime sleepiness and cataplexy also frequently develop at different

ages and are not both present in all patients with narcolepsy. *See, e.g.*, J.G. van Dijk et al*., Isolated

Cataplexy of more than 40 Years' Duration*, 159 British J. Psych. 719, 719-21 (1991) ("van Dijk

1991") (ANI-Pitolisant00032089-93); *Principles and Practice of Sleep Medicine* (Meir H. Kryger,

Thomas Roth, & William C. Dement eds., 4th ed., 2017) at 875. Indeed, the current version of the

ICSD-3-TR diagnostic manual does not recite EDS under the diagnostic criteria for NT1. ICSD-

3-TR at 179-191 (ANI-Pitolisant00028261-73).

229.    The pathophysiologic mechanism underlying cataplexy is not the same as that

which causes EDS. As of the earliest priority date of the '947 Patent, it was understood that at least

EDS, as a symptom of narcolepsy in humans, is caused by deficient hypocretin neurotransmission

in the lateral hypothalamus. Emmanuel Mignot, Shahrad Taheri & Seji Nishino, *Sleeping with the

Hypothalamus: Emerging Therapeutic Targets for Sleep Disorders*, 5 Nature Neuroscience 1071,

1073 (2002) ("Mignot 2002") (ANIPitolisant00028320-24). At the time, $H_3$ histamine receptors

had long been a target for developing treatments for EDS. *See, e.g.*, Seji Nishino et al., *Decreased

Brain Histamine Content in Hypocretin/Orexin Receptor-2 Mutated Narcoleptic Dogs*, 313

Neuroscience Letters 125, 125-28 (2001) (ANI-Pitolisant00031269-72). In contrast, the way in

which pitolisant acts to alleviate cataplexy was and remains poorly understood. *See* Yves Dauvilliers, Isabella Arnulf & Emmanuel Mignot, *Narcolepsy with Cataplexy,* 369 The Lancet 499, 499, 502-05, 507 (2007) (WAKIX-HBS_00031632-44); Yves Dauvilliers et al., *Cateplexy— Clinical Aspects, Pathophysiology and Management Strategy*, 10 Nat. Rev. Neurol. 386, 391 (2014) (WAKIX-HBS_00568601-10); WAKIX-BP 00140153-65; ANI-Pitolisant00032094-106; ICSD-3-TR at 171-91 (ANI-Pitolisant00028261-81); ICSD-2 at 81-86, 87-90 (ANIPitolisant00028232-36). It is generally understood that serotonergic or noradrenergic cells are primarily implicated in muscle tone, but that histamine cells are not. John 2004 at 628-31 (WAKIX-HBS_00210200-03). Indeed, Plaintiffs' experts have suggested that pitolisant treats cataplexy via a receptor system other than $H_3$ histamine receptors. Thus, although the mechanism underlying cataplexy remains unresolved, it is known to be different from that which causes excessive daytime sleepiness.

### 4.    ICSD Classifications

230.    The American Academy of Sleep Medicine recognizes narcolepsy as a clinical condition in its International Classification of Sleep Disorders, Second Edition and Third Edition-Text Revision. ICSD-2 at 50-55; 80-91 (ANIPitolisant00028226-36); ICSD3-TR at 66-86, 179-199 (ANI-Pitolisant00028240-81).

231.    The ICSD-2, which is contemporary with the earliest priority date of the '947 Patent, referred to two main types of narcolepsy, distinguished by the presence or absence of cataplexy. *Cf.,* ICSD-2 at 81-86 (ANIPitolisant00028231-34) ("Narcolepsy with Cataplexy"), 87-90 (ANIPitolisant00028234-36) ("Narcolepsy without Cataplexy").

232.    Therefore, as of the priority date of the '947 Patent, it was common knowledge in the art that narcolepsy was generally classified into two main categories: narcolepsy with cataplexy

and narcolepsy without cataplexy. *See, e.g.*, ICSD-2 at 81-86, 87-90 (ANIPitolisant00028231-36); Kryger 2005 at 619 (ANI-Pitolisant00030582).

233.    The ICSD-3-TR was published after the priority date of the '947 Patent and categorizes Narcolepsy into two distinct types: Narcolepsy Type 1 ("NT1") and Narcolepsy Type 2 ("NT2"). *See* ICSD-3-TR at 179-199 (ANI-Pitolisant00028261-81). Patients with NT1 display cataplexy, whereas those with NT2 do not. *Id.* Though the diagnostic criteria for narcolepsy with cataplexy in the ICSD-2 specifically required a complaint of EDS lasting more than 3 months, the diagnostic criteria in the ICS-3-TR for NT1 removed the reference to EDS and, for NT1, no longer requires that any episodes of somnolence persist for three months or more. *C.f.*, ICSD-3-TR at 179-199 (ANI-Pitolisant00028261-81); *see also* ICSD-2 at 81-90 (ANIPitolisant00028231-36).

234.    Today, clinicians diagnose and treat narcolepsy according to the ICSD-3-TR, which does not recite EDS within its diagnostic criteria. *See* ICSD-3-TR at 179, 192 (ANI-Pitolisant00028261, ANI-Pitolisant00028274).

235.    The presence of cataplexy is all but diagnostic for narcolepsy with cataplexy. *See, e.g.*, Kryger 2005 at 595 (ANI-Pitolisant00030571). Cases of isolated cataplexy without EDS have been documented since at least the 1980's. *See generally* van Dijk 1991 (ANI-Pitolisant00032089-93); Kristyna M. Hartse et al., *Isolated Cataplexy: a familial study*, 36 Henry Ford Hosp. Med. J. 24 (1988) ("Hartse 1988") (ANI-Pitolisant00028221-25). It is now thought that "isolated cataplexy represents a form of narcolepsy." van Dijk 1991 at 720 (ANI-Pitolisant00032090). This is reflected in the current-day diagnostic criteria of ICSD-3-TR which removes the reference to EDS for a diagnosis of NT1. ICSD-3-TR at 179 (ANI-Pitolisant00028261). To be clear, as of the priority date of the '947 Patent excessive daytime sleepiness was a diagnostic requirement for any type of narcolepsy.

### CONFIDENTIAL

a)    *EDS and Cataplexy Are Treated Separately*

236.    EDS and cataplexy generally manifest separately, and EDS is usually the first to appear. Still, a substantial portion of subjects – approximately 10% – experience cataplexy first. Thomas Roth, *New Advances in the Diagnosis and Treatment of Narcolepsy,* 267 J. Managed Care Med. 59, 59 (2020).

237.    Thus, as of the earliest priority date of the '947 Patent – and still to this day – the symptoms of EDS and cataplexy, when they occur in the same patient, manifest at different times (often years apart) and are typically treated separately. *See, e.g.*, Meskill Rpt. 42; Roth Opening Rpt. 42.; Yves Dauvilliers et al., *Age at onset of narcolepsy in two large populations of patients in France and Quebec*, 57 NEUROLOGY 2029, 2031 (2001) ("Dauvilliers 2001") (ANI-Pitolisant00029635-39); Lois E. Krahn et al., *Narcolepsy with Cataplexy*, 161 AM J PSYCHIATRY 2181, 2184 ("Krahn 2004") (ANIPitolisant00028282-85). Sleepiness frequently presents emergent quality of life and safety issues for the patient and is therefore typically the first symptom of narcolepsy to be treated. See ICSD-2 at 81 (ANIPitolisant00028231). As such, many patients experiencing narcolepsy with cataplexy will present with and be treated for sleepiness and, potentially, excessive daytime sleepiness before they manifest and receive treatment for cataplexy.

238.    Excessive daytime sleepiness and cataplexy are also assessed differently. The ESS questionnaire does not contain prompts directed to cataplexy and does not capture information about cataplexy attacks; that evaluation must be performed separately. Johns 1991 at 541 (ANI-Pitolisant00030563).

239.    Around the earliest priority date of the '947 Patent, excessive daytime sleepiness and cataplexy were treated using different medications. At that time, there were no drugs approved for the treatment of both cataplexy and excessive daytime sleepiness in patients with narcolepsy. There were several treatments for symptoms of excessive daytime sleepiness associated with

narcolepsy, including modafinil, various amphetamines, methylphenidate, and pemoline. Littner

2001 at 453-54 (ANI-Pitolisant00028288-89).

240.    In contrast, REM-related symptoms, including cataplexy, sleep paralysis, and

hypnagogic hallucinations, were for a time treated with tricyclic antidepressants and fluoxetine.

*Id*. at 454 (ANI-Pitolisant00028289). Clinicians later moved away from using tricyclic

antidepressants to treat cataplexy, instead using serotonergic or adrenergic reuptake inhibitors such

as venlafaxine ER and atomoxetine. Isabelle Arnulf et al., *Sodium Oxybate for Excessive Daytime

Sleepiness in Narcolepsy-Cataplexy: Comment on Mamelak M et al. A pilot study on the effects of

sodium oxybate on sleep architecture and daytime alertness in narcolepsy*, 27 SLEEP 1242, 1242

(2004) ("Arnulf 2004") (ANI-Pitolisant00028158-61).

241.    As of the earliest priority date of the '947 Patent, the "available treatments for

narcolepsy" were still "only palliative, symptom-oriented pharmacotherapies." Mieda 2004 at

4649 (ANIPitolisant00028314). Indeed, most patients still required multiple therapies to treat more

than one symptom of narcolepsy. Arnulf 2004 at 1327 (ANI-Pitolisant00028158).

242.    In current practice, clinicians have a toolbox of no fewer than six separate drugs

(aside from pitolisant) for the treatment of excessive daytime sleepiness in patients with

narcolepsy. *See generally* Kiran Maski et al., *Treatment of Central Disorders of Hypersomnolence:

An American Academy of Sleep Medicine Clinical Practice Guideline*, 17 J. Clinical Sleep Med.

1881, 1883 (2021) ("Maski 2021") (HBS-EXPERT_0003509-21). In contrast, there is just one

drug other than pitolisant that is approved to treat cataplexy in narcolepsy.

243.    Defendants' experts recognize that EDS and cataplexy, where they occur together,

are generally treated separately with treatments varying based on the patient's symptom severity

and individual needs. Meskill Rpt. ¶ 42; Roth Opening Rpt. ¶ 42. For instance, Dr. Roth states that

**CONFIDENTIAL**

"EDS and cataplexy were typically treated using separate medications, as most drugs used to treat EDS have little effect on cataplexy or other REM-associated symptoms, while most anticataplectic drugs have little effect on EDS." Roth Opening Rpt. ¶ 42. Meanwhile, Dr. Meskill asserts that, at present, "[m]ost available narcolepsy treatments do not treat the underlying condition, and are effective in treating only one of EDS or cataplexy. As a result, EDS and cataplexy are typically treated with different medications." Meskill Rpt. ¶ 42. A clinician would thus not expect a drug that treats cataplexy to be effective in treating EDS, or vice versa.

   b) *FDA Separately Reviews Indications for Treating Cataplexy and Indications for Treating EDS*

244. Plaintiffs have twice submitted data seeking approval for both excessive daytime sleepiness and cataplexy indications. Both times, FDA initially approved only the indication for excessive daytime sleepiness but not for cataplexy.

245. In its initial review of Plaintiff Harmony's regulatory submissions, FDA approved Wakix to treat excessive daytime sleepiness in adult patients with narcolepsy, but found that Harmony had failed to show that Wakix was effective at treating cataplexy. ███████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████

246. ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

**CONFIDENTIAL**

███████████████████████████████████████

███████████████████████████████████

247.    As early as 2021, Harmony discussed its planned "pursuit of indications for both

EDS and cataplexy" in pediatric patients. Harmony Biosciences Holdings, Inc. Form 10-K (Mar.

25, 2021) ("Harmony 2020 10-K") at 7 (ANI-Pitolisant00028439 at ANI-Pitolisant00028445).

248.    In December 2023, Harmony submitted an sNDA to expand the  label for the

treatment of excessive daytime sleepiness ("EDS") and cataplexy in pediatric patients with

narcolepsy.  Harmony Biosciences Holdings, Inc. Form 10-K (Feb. 25, 2025) ("Harmony 2025

10-K") at 8.  FDA granted approval for the use of pitolisant to treat pediatric EDS, including in

patients under six, but expressly declined to approve treatment of cataplexy in pediatric pateitns

six years of age and older. *See id.* In denying approval for cataplexy but not EDS, FDA again

recognized that efficacy in treating the former is different from efficacy in treating the latter.

### 5.        Treating Daytime Sleepiness

249.    Excessive daytime sleepiness is a clinical symptom characterized by an inability to

stay awake and alert during the major waking episodes of the day. A person with excessive daytime

sleepiness may fall asleep at an inappropriate time or setting. Excessive daytime sleepiness is a

symptom, not a diagnosis in itself, and it can result from a variety of underlying causes or disorders.

*See e.g.*, Moller, H., et al., 12. *Quality of Life in Excessive Daytime Sleepiness and Hypersomnia*

in J. C. Verster et al., SLEEP AND QUALITY OF LIFE IN CLINICAL MEDICINE (2008) WAKIX-

HBS_00577616 at 620; Brooks, S. et al., *Novel therapies for narcolepsy*, 11 EXPERT OPIN.

INVESTIG. DRUGS, 1821 (2002) PRIORART_000000181 ("Brooks"); Guilleminault, C. et al.,

*Excessive daytime sleepiness, A Challenge for the practicing neurologist*, 124 BRAIN 1482 (2001)

PRIORART_000002326 ("Guilleminault"); *see also* Guilleminault, C., et al., *Determinants of*

*Daytime Sleepiness in Obstructive Sleep Apnea*, 94 CHEST 32 (1988) PRIORART_000002589-PRIORART_000002594 (Guilleminault 1998).

250. A POSA would understand as of April 2005 that daytime sleepiness is generally characterized along a spectrum with excessive daytime sleepiness being a more severe manifestation of daytime sleepiness. *See* About the ESS at 5 PRIORART_000006646 at 6651; *see also* Tandberg, E., et al., *Excessive Daytime Sleepiness and Sleep Benefit in Parkinson's Disease: A Community-Based Study*, 14 MOV'T DISORDERS 922-927 (1999) (evaluating "[d]aytime somnolence" according to "grade[s] in groups of no somnolence, mild daytime somnolence, and EDS."); PRIORART_000002656 at 2658.

251. Excessive daytime sleepiness is a major symptom of narcolepsy, Parkinson's disease, and sleep apnea.

252. Treatment of excessive daytime sleepiness focuses on wake-promotion, not the underlying disease.

253. The plain meaning of excessive daytime sleepiness is pathological daytime sleepiness interfering with daily functioning.

254. The specification and file history of the '947 Patent use the term excessive daytime sleepiness to refer to a symptom.

255. The Examples in the '947 Patent distinguish excessive daytime sleepiness improvement from sleep architecture and sleep quality.

256. The Epworth Sleepiness Scale ("ESS") is used to assess severity of excessive daytime sleepiness, with excessive daytime sleepiness generally defined as ESS >10 or 11.

257. Prior art, including Brooks 2002, taught that excessive daytime sleepiness is the primary symptom of narcolepsy.

CONFIDENTIAL

258.    Stimulants or wakefulness-promoting medications are used to treat the EDS associated with narcolepsy. Brooks, at 1822.

259.    Brooks 2002 taught that $H_3$ antagonists increase wakefulness and "may prove useful" for excessive daytime sleepiness due to narcolepsy or other causes.

260.    Sleep doctors continue to prescribe scheduled substances as first-line treatments of excessive daytime sleepiness in patients with narcolepsy.

261.    Caffeine has been used to treat EDS in patients with narcolepsy, though it is not FDA-approved for such use.

262.    Modafinil, a treatment of EDS in patients with narcolepsy available before April 2005, was not associated with a significant potential for abuse. Roth T. and Winkelman J., *Recognizing and Treating Excessive Daytime Sleepiness in Patients with Narcolepsy*, 81(6) J. CLIN. PSYCHIATRY 1, 1 (2020).

263.    Passani 2004 described $H_3$ antagonists as targets for arousal control, and most promising for major wake disorders including hypersomnia and narcolepsy.

264.    It was expected that $H_3$ antagonists could treat excessive daytime sleepiness in narcoleptic patients. Brooks 2002 would have motivated a POSA to treat excessive daytime sleepiness due to narcolepsy with an $H_3$ antagonist.

265.    There would have been a reasonable expectation of success in treating excessive daytime sleepiness in narcoleptics for the simple reason that pitolisant was known to be a potent $H_3$ receptor antagonist and $H_3$ receptor antagonists were known to promote wakefulness.

### 6.    Pitolisant Stereochemistry

266.    Certain molecules can exist in mirror-image forms, known as "chiral" or "left-handed/right-handed" forms, depending on their three-dimensional arrangement of atoms.

267.    A molecule must contain at least one chiral center—typically a carbon atom bonded to four different groups—to have such mirror-image forms.

268.    Pitolisant's chemical structure contains no carbon atom bonded to four different groups and therefore has no chiral center.

269.    Because pitolisant has no chiral center, it is an "achiral" molecule that cannot exist in multiple stereochemical forms such as optical isomers, enantiomers, diastereomers, or racemic mixtures.

**B.     Overview of the '947 Patent**

270.    Plaintiffs are currently asserting Claim 13 of the '947 Patent. This claim is generally directed to a method of treating excessive daytime sleepiness in patients suffering from narcolepsy, sleep apnea, or Parkinson's Disease with pitolisant.

271.    The term "treating," as used in the '947 Patent, was understood to include alleviating or reducing symptoms such as excessive daytime sleepiness, and did not require curing any underlying condition.

272.    The Examples of the '947 Patent rely on wakefulness changes in cats to support human use, consistent with how POSAs used animal models to form expectations about human efficacy.

273.    The '947 Patent specification lacks any meaningful human data.

274.    The '778 application was filed with 98 claims, which were amended prior to examination by way of a Preliminary Amendment dated June 16, 2008. *See* WAKIX-PLFS_00001038 at WAKIX-PLFS_00001894-WAKIX-PLFS_00001906. Among other things, the amendment canceled Claims 40-92, and modified Claim 1 from a "use" claim to a claim directed to "a method for the treatment of Parkinson's disease obstructive sleep apnea, narcolepsy,

CONFIDENTIAL

dementia with Lewy bodies and/or vascular dementia" comprising the administration of the compound. WAKIX-PLFS_00001038 at WAKIX-PLFS_00001894-WAKIX-PLFS_00001906.

275.    Applicants filed a second Preliminary Amendment on July 16, 2008, adding Claims 99-100, directed to a method for treating excessive daytime sleepiness by the administration of a compound of formula (A). WAKIX-PLFS_00001038 at WAKIX-PLFS_00001955-WAKIX-PLFS_00001956.

276.    The Examiner issued a restriction requirement on October 12, 2010, setting forth six different groups of inventions, namely: Group I, drawn to a method of treating Parkinson's disease, Group II, drawn to a method of treating obstructive sleep apnea, Group III, drawn to a method of treating narcolepsy, Group IV, drawn to a method of treating dementia with Lewy bodies, Group V, drawn to a method of treating vascular dementia, and Group VI, drawn to a composition combination. WAKIX-PLFS_00001038 at WAKIX-PLFS_00001969. The Office stated that European Patent Application Publication EP 0 962 300 A2 "teaches the herein claimed compounds as H3 receptor modulators," such that "there is no special technical feature present in the claims." WAKIX-PLFS_00001038 at WAKIX-PLFS_00001970.

277.    On December 8, 2010, Applicants filed a Response to Restriction Requirement and Preliminary Amendment, declining to elect any of Groups I-VI, but instead canceling claim 1, and amending dependent claims to depend from claim 99, directed to a method for the treatment of excessive daytime sleepiness. WAKIX-PLFS_00001038 at WAKIX-PLFS_00001982-WAKIX-PLFS_00001996. Applicants elected the subject matter of claim 99 without traverse, and further elected the compound of claim 28, pitolisant. Response to Restriction Requirement dated December 8, 2010, page 15. WAKIX-PLFS_00001038 at WAKIX-PLFS_00001996.

CONFIDENTIAL

278.    The Patent Office rejected the pending claims in an Office Action dated April 29, 2011. WAKIX-PLFS_00001038 at WAKIX-PLFS_00002002-WAKIX-PLFS_00002008. Among other reasons, the Examiner rejected claims 2-39 and 99-100 as obvious in view of European Patent Application Publication EP 0 982 300 A2 ("EP '300 publication"), in view of Vgontzas (ARCH. INTERN. MED. 158:1333-1337 (1998)), Chervin (CHEST 118:372-379 (2000)), and Dixon (CHEST 123:1134-1141 (2003)). WAKIX-PLFS_00001038 at WAKIX-PLFS_00002002-WAKIX-PLFS_00002008. According to the Examiner, the EP '300 publication discloses the claimed compounds, including pitolisant, which are known to treat obesity, although it "does not expressly teach the method of employing the herein claimed compounds to treat excessive daytime sleepiness." WAKIX-PLFS_00001038 at WAKIX-PLFS_00002006. Reasoning that Vgontzas and Dixon teach that obesity is associated with daytime sleepiness, and that Chervin teaches that excessive daytime sleepiness is often associated with obstructive sleep apnea, the Office concluded that it would have been obvious to a person of ordinary skill in the art to use the claimed compounds in a method to treat excessive daytime sleepiness. WAKIX-PLFS_00001038 at WAKIX-PLFS_00002006.

279.    The Examiner reasoned that because it was known that weight loss can improve daytime sleepiness, and the claimed compounds were known to treat obesity, "administering the herein claimed compounds to obese patients who are suffering from excessive daytime sleepiness would reasonably [be] expected to be effective in treating the obesity and thereby improving excessive daytime sleepiness." WAKIX-PLFS_00001038 at WAKIX-PLFS_00002007.

280.    On October 31, 2011, Applicants filed a Response to the April 29, 2011 Office Action, amending Claim 16 to be independent, and to recite that the patient is not suffering from obesity. WAKIX-PLFS_00001038 at WAKIX-PLFS_00002044-WAKIX-PLFS_00002051. In

particular, amended Claim 16 was directed to, *inter alia*, a method for treating excessive daytime

sleepiness comprising administering to a patient in need thereof a compound of formula (IIa), as

follows:

$$R^1 \diagdown N \text{---(chain A}^{II}) \text{---} X^{II} \text{---(chain B}^{II}) \text{---} Y^{II}$$
$$R^2 \diagup$$

$$(IIa)$$

wherein some of the variables in the formula are as defined in the claim, and wherein said patient

is not suffering from obesity. WAKIX-PLFS_00001038 at WAKIX-PLFS_00002044-WAKIX-

PLFS_00002051. The amendment also canceled Claims 2-15, 30-39 and 99, and amended

dependent claims to depend from Claim 16. WAKIX-PLFS_00001038 at WAKIX-

PLFS_00002044-WAKIX-PLFS_00002051.

281.    To try to overcome this obviousness rejection, Applicants amended the claims and

argued that there is no disclosure in the prior art of the use of the claimed method to treat patients

not suffering from obesity. WAKIX-PLFS_00001038 at WAKIX-PLFS_00002051.

282.    The Examiner then rejected the pending claims in a Final Office Action dated

January 17, 2012. WAKIX-PLFS_00001038 at WAKIX-PLFS_00002058-WAKIX-

PLFS_00002062. In the Final Office Action, the Examiner, rejected the claim under 35 U.S.C.

§ 112, first paragraph, for failing to comply with the written description requirement, on the basis

that the limitation "wherein the patient is not suffering from obesity" is not supported by the

specification of the application. WAKIX-PLFS_00001038 at WAKIX-PLFS_00002059.

283.    On April 16, 2012, Applicants filed a Response to Final Rejection, amending independent Claim 16 to remove the limitation requiring that the patient is not suffering from obesity, replacing it with a limitation requiring that the patient is suffering from Parkinson's disease, narcolepsy, or sleep apnea. WAKIX-PLFS_00001038 at WAKIX-PLFS_00002070-WAKIX-PLFS_00002077. Applicants argued that the amendment rendered moot all outstanding claim rejections. WAKIX-PLFS_00001038 at WAKIX-PLFS_00002070-WAKIX-PLFS_00002077.

284.    The Patent Office mailed an Advisory Action dated May 10, 2012, stating that the Applicants' amendments would change the scope of the claims and, as a result, would not be entered. WAKIX-PLFS_00001038 at WAKIX-PLFS_00002081WAKIX-PLFS_00002082. The Advisory Action further stated, "[h]owever, the examiner notes that if the amendments are to be entered, they overcome the outstanding rejection under 35 U.S.C. § 112, first paragraph." WAKIX-PLFS_00001038 at WAKIX-PLFS_00002081-WAKIX-PLFS_00002082.

285.    On July 17, 2012, Applicants filed a Notice of Appeal, followed by a Request for Continued Examination and Response to Final Rejection, dated December 17, 2012. WAKIX-PLFS_00001038 at WAKIX-PLFS_00002084, WAKIX-PLFS_00002089-WAKIX-PLFS_00002099. Applicants resubmitted the prior amendment to claim 16, and thanked the Examiner for an Examiner Interview. WAKIX-PLFS_00001038 at WAKIX-PLFS_00002084, WAKIX-PLFS_00002089-WAKIX-PLFS_0000209. Applicants argued that the claim amendments overcame the written description rejections, and also the prior obviousness rejection. In particular, Applicants argued:

> As discussed in the Interview, if the Examiner's [obviousness] position with regard to the connection between obesity and excessive daytime sleepiness was correct, one would predict that patients with obesity would be [sic] receive substantially

greater benefits from the treatment of excessive daytime sleepiness than would non-obese patients.

Response to Final Rejection dated December 17, 2012, page 8 (WAKIX-PLFS_00001038 at

WAKIX-PLFS_00002097).

286.    However, according to Applicants, a series of tests, the results of which were

discussed in a Declaration of Dr. Jean-Charles Schwartz submitted with the Response, illustrated

the non-obviousness of the invention, as follows:

> [T]he results of the test showed that across the broad range of body mass types, the results were the <u>same</u> and were <u>independent</u> of body mass. In other words, in light of the prior art and the position of the Examiner based on those references, it was unexpected and unpredictable that the effect of the claimed compound on excessive daytime sleepiness would be <u>independent</u> of obesity, and indeed there is no added effect on the basis of obesity in terms of improvement of excessive daytime sleepiness in the process of the claimed invention. The results evidenced in the Declaration also unexpectedly show that the compounds specifically target excessive daytime sleepiness as a <u>symptom</u>, such as in the case of obesity and other conditions, and this high specificity for the treatment of excessive daytime sleepiness as a <u>symptom</u> could not have been expected. This specificity will allow treatment on a broad scale with a wide variety of patients but with fewer side effects.

Response to Final Rejection dated December 17, 2012, page 9 (emphasis in original) (WAKIX-

PLFS_00001038 at WAKIX-PLFS_00002098).

287.    The Declaration of Dr. Jean-Charles Schwartz stated, among other things, that the

"[c]ompounds of the invention exhibit a purely symptomatical activity on excessive daytime

sleepiness," as illustrated by patient data "showing that the effect of the compounds of the

invention is obtained on non-obese patients suffering from Parkinson's disease, narcolepsy or

obstructive sleep apnea." Declaration of Dr. Jean-Charles Schwartz dated September 17, 2012, ¶

5 (WAKIX-PLFS_00001038 at WAKIX-PLFS_00002101-WAKIX-PLFS_00002103). More

specifically:

> It therefore follows that the improvement of the excessive daytime sleepiness is independent from the body mass index of the patients. Therefore, there is no

additive effect associated with the activity of obesity. On the assumption that the treatment of obesity would necessarily improve excessive daytime sleepiness, the score obtained for overweight or obese patients would be significantly higher than for normal patients, due to the resulting added effect. On the contrary, the results are similar for obese and normal patients, thus supporting the fact that the effect of the compounds of the invention is purely targeting the symptom of excessive daytime sleepiness, and the treatment of obesity by the compounds does not have an associated effect on excessive daytime sleepiness.

Declaration of Dr. Jean-Charles Schwartz dated September 17, 2012, ¶ 6 (WAKIX-PLFS_00001038 at WAKIX-PLFS_00002103-WAKIX-PLFS_00002104.

288.    To that end, Dr. Schwartz's Declaration submitted clinical data for Bioprojet's use of pitolisant[5] to treat EDS in patients suffering from Parkinson's disease[6], obstructive sleep apnea, and narcolepsy:

I - Patients suffering from Parkinson's disease

| BMI (Body Mass Index) | Patients | ESS before treatment | ESS at 3 months of treatment | ESS at 6 months of treatment | ESS at 9 months of treatment |
|---|---|---|---|---|---|
| Normal (body mass index > 18.5 – 24.9) | N | 156 | 83 | 74 | 69 |
| | mean ± SD | 15.4 ± 2.8 | 10.4 ± 4.8 | 10.3 ± 4.3 | 10.4 ± 4.2 |
| | min | 7 | 2 | 1 | 2 |
| | max | 24 | 21 | 19 | 21 |
| Overweight (body mass index 25 – 29.9) | N | 224 | 134 | 121 | 111 |
| | mean ± SD | 15.4 ± 2.5 | 9.52 ± 4.5 | 9.96 ± 4.5 | 9.76 ± 4.4 |
| | min | 9 | 1 | 2 | 2 |
| | max | 24 | 22 | 23 | 21 |
| Obese (body mass index 30 - 40) | N | 129 | 77 | 69 | 63 |
| | mean ± SD | 15.5 ± 2.9 | 9.85 ± 5.4 | 10.0 ± 5.3 | 10.1 ± 5.0 |
| | min | 6 | 1 | 1 | 1 |
| | max | 24 | 23 | 22 | 22 |
| Super obese (body mass index > 40) | N | 8 | 5 | 5 | 4 |
| | mean ± SD | 15.5 ± 2.6 | 10.6 ± 7.7 | 9.6 ± 6.5 | 9.5 ± 4.6 |
| | min | 12 | 4 | 3 | 5 |
| | max | 19 | 23 | 18 | 14 |

---

[5] BF-2649 is pitolisant hydrochloride. Capet Dep. Tr. at 66:20-68:21.

[6] At the time that Dr. Schwartz included this Parkinson's clinical data, he knew that pitolisant did not show statistically significant improvement in excessive daytime sleepiness in Parkinson's patients as compared to placebo. Schwartz Dep. Tr. Vol. I at, e.g., 131:14-135:17. Pitolisant was not, and has not been, approved for treating Parkinson's patients. Schwartz Dep. Tr. Vol. I at, e.g., 133:10-133:15.

**CONFIDENTIAL**

II - Patients suffering from obstructive sleep apnea

| ESS | N | ESS before treatment | | | ESS after treatment | | | ΔESS | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Mean±SD | Min | Max | Mean±SD | Min | Max | Mean±SD | Min | Max |
| Normal (18.5-24.9) | 5 | 13 ± 0 | 13 | 13 | 6.8 ± 4.6 | 1 | 12 | -7.2 ± 5.6 | -12 | -1 |
| Overweight (25-29.9) | 16 | 14.3 ± 2.3 | 12 | 21 | 7.54 ± 3.0 | 3 | 14 | -6.5 ± 2.1 | -9 | -2 |
| Obese (30-40) | 12 | 16 ± 3.1 | 12 | 20 | 10.8 ± 5.6 | 1 | 21 | -5 ± 5.8 | -15 | 8.5 |
| Total | 33 | 14.9 ± 2.8 | 12 | 21 | 9.06 ± 4.9 | 1 | 21 | -6.0 ± 4.9 | 1 | 8.5 |

III - Patients suffering from narcolepsy

| BMI (Body Mass Index) | Patients | ESS before treatment | ESS after treatment |
|---|---|---|---|
| Normal (body mass index > 18.5 – 24.9) | N | 30 | 6 |
| | mean ± SD | 16.5±4.3 | 8.33±5.7 |
| | min | 5 | 1 |
| | max | 24 | 16 |
| Overweight (body mass index 25 – 29.9) | N | 44 | 8 |
| | mean ± SD | 17.1±3.3 | 9.75±8.2 |
| | min | 8 | 1 |
| | max | 23 | 20 |
| Obese (body mass index 30 - 40) | N | 27 | 6 |
| | mean ± SD | 17.7±3.5 | 14.3±6.4 |
| | min | 10 | 8 |
| | max | 23 | 23 |
| Super obese (body mass index > 40) | N | 7 | 5 |
| | mean ± SD | 15.8±3.4 | 9.2±3.1 |
| | min | 10 | 6 |
| | max | 21 | 14 |

WAKIX-PLFS_00001038 at WAKIX-PLFS_00002102-WAKIX-PLFS_00002103.

289.    As shown in the tables in Dr. Schwartz's declaration "[e]xcessive daytime sleepiness is measured with the Epworth Sleepiness Scale (ESS)." WAKIX-PLFS_00001038 at WAKIX-PLFS_00002101. "The Epworth Sleepiness Scale is used to determine the level of daytime sleepiness, that is measured by use of a short questionnaire." WAKIX-PLFS_00001038 at WAKIX-PLFS_00002101. In other words, Dr. Schwartz states that excessive daytime sleepiness is measured by the level of daytime sleepiness (*i.e.*, diurnal somnolence). WAKIX-PLFS_00001038 at WAKIX-PLFS_00002101.

CONFIDENTIAL

290.    The Patent Office mailed a Notice of Allowance on April 3, 2013, including the following Examiner's statement of reasons for allowance: "The amendments filed 12/17/2012 obviate the rejection under 35 U.S.C. § 112, first paragraph. The herein claimed invention of treating obstructive apnea is not taught or fairly suggested by the prior art." WAKIX-PLFS_00001038 at WAKIX-PLFS_00002171-WAKIX-PLFS_00002178.

291.    The specification of the '947 Patent states that previously known H3 receptor antagonist or agonist compounds resembled histamine in possessing an imidazole ring, generally mono-substituted in the 4(5)-position. '947 Patent, 1:27-39.

292.    The specification of the '947 Patent states that previously known, non-imidazole, neuro-active compounds such as betahistine, phencyclidine, dimaprit, clozapine, and sesquiterpenes had only very low potency at the time. '947 Patent, 1:47-55.

293.    The specification of the '947 Patent states that the participation of histamine, particularly when acting through its H3 Receptor (H3R), in the etiology or symptomatology of PD [Parkinson's disease], OSA [obstructive sleep apnea], DLB [dementia with Lewy bodies] or VD [vascular dementia] has never been reported before. '947 Patent, 2:4-7.

294.    The specification of the '947 Patent identifies Parkinson's Disease as a therapeutic target because the histaminergic neurons are completely spared by the degeneration process of the disease; where PD is mainly associated with a degeneration of dopaminergic neurons in the nigrostriatal tract from which derive the motor impairments and neuropsychiatric disorders characteristic of the disease. Whereas some other aminergic neuron classes might be affected in the parkinsonian brain, post-mortem neurochemical and immunohistochemical studies have shown that histaminergic neurons are completely spared from the degeneration process. '947 Patent, 2:8-34.

CONFIDENTIAL

295.    The '947 Patent includes five (5) examples directed to the use of histamine H3 antagonists/inverse agonists in the treatment of wakefulness/sleep disorders of Parkinson's disease (Example 1), treatment of obstructive sleep apnea (Example 2), treatment of dementia with Lew[y] Bodies (Example 3), treatment of Parkinson's disease in combination with an anti-Parkinson's drug (Example 4), and treatment of obstructive sleep apnea (Example 5). '947 Patent, 43:19-44:51.

296.    The specification of the '947 Patent only provides limited data for only one of the claimed H3 receptor ligands (Examples 1-5).

297.    Example 1 of the '947 Patent relates to the use of pitolisant to treat wakefulness/sleep disorders in a feline model of Parkinson's disease. According to Example 1, the cats experienced "long periods of sleep" before administration of pitolisant and a "succession of periods of sleep and wakefulness" after administration of pitolisant. See '947 Patent at 43:31-40.

298.    Pitolisant is an achiral molecule with no chiral centers.

299.    Achiral molecules do not have enantiomers. A molecule with no enantiomer cannot exist as a racemate.

300.    A molecule with no chiral centers cannot exist as an enantiomer, or a diastereomer, or a racemic mixture.

301.    Clinical trials of pitolisant to treat excessive daytime sleepiness in Parkinson's patients (including HARPS1 and HARPS2 phase 3 trials) did not show statistically significant improvement in excessive daytime sleepiness in Parkinson's patients as compared to placebo. Indeed, in both phase 3 clinical trials the placebo achieved clinically meaningful reductions in EDS. Both phase 3 clinical trials found that pitolisant was "less effective at reducing EDS tha[n] placebo," even at the highest administered dose of pitolisant. "Therefore the placebo seemed more

effective at reducing EDS than the 5 mg and 20 mg strength of [pitolisant]" and "the study drug did not induce a reduction of EDS when compared to the placebo."

302.    Clinical trials for approval of the excessive daytime sleepiness indication in WAKIX used ESS scores to measure changes in sleepiness and/or excessive daytime sleepiness.

303.    Harmony has also listed use code U-1101 in association with other patents, including U.S. Patent Nos. 7,910,605 and 8,354,430.

304.    Harmony has also listed use code U-1102 in association with other patents, including U.S. Patent Nos. 7,138,413; 7,910,605; and 8,354,430. WAKIX-HBS_00034877; WAKIX-HBS_00047046; WAKIX-HBS_00047056.

305.    The sole independent claim of the '947 Patent recites, in relevant part, "[a] method for treating excessive daytime sleepiness . . . [in a] patient [] suffering from Parkinson's disease, narcolepsy, or sleep apnea."

306.    The word "cataplexy" does not appear in the claims of the '947 Patent.

307.    The specification of the '947 Patent does not use the word "cataplexy."

308.    A POSA would understand that the crystalline compound referred to as "1-[3-[3-(4-chlorophenyl)propoxy]propyl]-piperidine monohydrochloride" as depicted in Claims 1 and 3 of the '430 Patent is pitolisant hydrochloride.

309.    The listing of use code U-1102 for the '947 Patent was challenged in July 2022 through a dispute under 21 C.F.R. 314.53(f). The dispute asserted that "[t]he U-1102 use code exceeds the scope of the patent" because the "claims do not include cataplexy or the symptoms of narcolepsy." WAKIX-HBS_00569133 at WAKIX-HBS_00569135-56.

CONFIDENTIAL

310. ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████

### C.    The Level of Ordinary Skill in the Art for the '947 Patent

311.    A POSA, with respect to the therapeutic aspects of the '947 Patent, would generally be a person with a medical degree and several years of clinical and research experience in the treatment of excessive daytime sleepiness. Furthermore, because drug discovery and development are a multidisciplinary effort, a POSA would have access to and interface with a synthetic, medicinal, analytical, or pharmaceutical scientist. Such a person may also be working as part of a team with a synthetic, medicinal, analytical, or pharmaceutical scientist. *See also* Defendants' Amended Joint Final Invalidity Contentions at 36-37, dated May 9, 2025.

### D.    The Asserted Claim of the '947 Patent Is Obvious in View of the Prior Art

312.    Claim 13 of the '947 Patent claims the treatment of excessive daytime sleepiness in patients with Parkinson's disease, narcolepsy, or sleep apnea with pitolisant. There is nothing inventive about this method.

#### 1.    Treating Excessive Daytime Sleepiness with Pitolisant in Narcolepsy Patients Would Have Been Obvious Over WO '254 in View of Brooks

313.    Bioprojet had already disclosed pitolisant, its potent and selective $H_3$-receptor antagonist properties, and the therapeutic utility of $H_3$-receptor antagonists for "promoting wakefulness," several years before the earliest priority date of the '947 Patent. Specifically, Bioprojet's International Patent Publication WO 00/06254 ("WO '254"), which published more than five years before the claimed priority date of the '947 Patent, discloses that "[a]ntagonists of histamine $H_3$-receptor are known especially to increase synthesis and release of cerebral histamine" and "[t]hrough this mechanism, they induce extended wakefulness…" WO '254 at p.

**CONFIDENTIAL**

1, lns. 6-10 (emphasis added). Consistent with this known property of histamine $H_3$-receptor antagonists, WO '254 further discloses that "[t]he antagonists are advantageously used" as medicaments for "promoting wakefulness." WO '254 at p. 1, lns. 17-21. WO '254 specifically discloses the compound pitolisant. A POSA would have been motivated to select pitolisant from amongst the other $H_3$-receptor ligands disclosed in WO '254 for development of a therapeutic $H_3$-receptor antagonist because Bioprojet had subsequently identified pitolisant as a "lead" compound in the prior art Meier I reference, which published in 2001. Specifically, Meier I identified pitolisant (referred to therein as "FUB 649") "as one of the most potent antagonists both *in vitro* (pA2=8.25±0.04) and *in vivo* ($ED_{50}$=1.6±0.9 mg/kg p.o.) with high selectivity for the $H_3$ receptor" and disclosed that it is "a potent and selective non-imidazole $H_3$-receptor antagonist, [which] is a new promising lead for further development." Armed with the knowledge that pitolisant is a potent and selective $H_3$-receptor antagonist and a "promising lead" candidate, a POSA would have been amply motivated to select pitolisant from the various $H_3$-receptor ligands disclosed in WO '254 for any "therapeutical applications . . . known for $H_3$-antagonist[s]" (p. 66, lines 8-10), including "promoting wakefulness." *Id.* at p. 71, lines 17-18. As an agent for promoting wakefulness, a POSA would have recognized the suitability of pitolisant for the treatment of symptoms associated with narcolepsy.

314.    As explained in Brooks, an article published in 2002, "[t]he primary symptom of narcolepsy is excessive daytime somnolence" which "may be perceived as a continuous feeling of sleepiness or it may present as irresistible episodes of drowsiness." Brooks, at p. 1821. Brooks explains that "[a]t present, the treatment of narcolepsy is symptomatic" and "[i]n general, excessive daytime sleepiness is treated with stimulants or wakefulness-promoting agents." *Id.*; *see also id.* at 1822 ("Stimulants or wakefulness-promoting medications are used to treat the EDS

associated with narcolepsy.")  In reviewing "new treatment strategies" for narcolepsy, Brooks

notes that "studies have also demonstrated that $H_3$ antagonists, such as thioperamide (BioProjet,

Societe Civile de Recherche) increase wakefulness" and observes that "[s]uch agents may prove

useful in treating EDS due to narcolepsy or other causes." *Id.* at 1825. Given Brooks' teaching

that excessive daytime sleepiness is treated with "wakefulness-promoting agents," together with

the specific suggestion that $H_3$ antagonists may be useful for treating EDS, a POSA would have

been motivated to treat excessive daytime sleepiness in patients suffering from narcolepsy using

the known $H_3$ antagonist pitolisant.

315.    A POSA would have had a reasonable expectation of success in treating excessive

daytime sleepiness in narcolepsy patients using pitolisant because, amongst other reasons, (1)

Brooks teaches that excessive daytime sleepiness in narcolepsy is treated with "stimulants and

wake-promoting therapeutics," (2) WO '254 discloses that $H_3$-receptor antagonists "promote

wakefulness," (3) Brooks teaches that "studies have also demonstrated" that $H_3$-receptor

antagonist, such as thioperamide, "increase wakefulness" and thus "may prove useful in treating

due to narcolepsy or other causes," (4) Liedtke discloses that pitolisant "shows high antagonist

activity in an *in vivo* model of the mouse" comparable to that of thioperamide ("$ED_{50}$ of 1.6 mg/kg,

compared to an $ED_{50}$ of 1.0 mg/kg for the standard $H_3$-receptor antagonist thioperamide"); and (5)

the '947 Patent admits that $H_3$ antagonists were known to induce "extended wakefulness" and

improve daytime alertness.

316.    The treatment of excessive daytime sleepiness in narcoleptic patients using

pitolisant would therefore have been obvious to a POSA as of the earliest claimed priority date of

the '947 Patent.

     **2.**     **Treating Excessive Daytime Sleepiness with Pitolisant in Parkinson's Disease Patients and Sleep Apnea Patients Would Have Been Obvious Over WO '254 in View of Brooks**

317.    As discussed above, it would have been obvious to treat excessive daytime sleepiness in narcolepsy patients using pitolisant in light of WO '254 and Brooks. A POSA would have appreciated the generality of the method for treating excessive daytime sleepiness using $H_3$-receptor antagonists discussed above and reasonably expected it to be applicable to treat excessive daytime sleepiness regardless of the patients' underlying condition. That is true, in part, because excessive daytime sleepiness is simply sleepiness during the daytime and drugs that "promote wakefulness" would be expected to alleviate that sleepiness. The prior art likewise recognized the generality of treating excessive daytime sleepiness, regardless of underlying condition. *See, e.g.*, Brooks, at p. 1825 (explaining that $H_3$-receptor antagonists "may prove useful in treating excessive daytime sleepiness due to narcolepsy or other causes."). For example, it was known in the prior art that people may feel sleepy during the daytime for many reasons, not just narcolepsy. For example, the prior art article Arnulf (2002) explains that excessive daytime sleepiness "may affect 15% of patients with [Parkinson's Disease]." Arnulf (2002), at p. 1019. Similarly, excessive daytime sleepiness is a hallmark symptom of sleep apnea. *See* Sauter C, et al., *Excessive daytime sleepiness in patients suffering from different levels of obstructive sleep apnea syndrome*, 9 J. SLEEP RES. 293 (2000), *e.g.*, at "Summary" ("Excessive daytime sleepiness (EDS) is a frequent symptom of patients with obstructive sleep apnoea (OSA)"); Stepnowsky C, et al., *Sleep Apnea and Health-Related Quality of Life in African-American Elderly*, 22(2) ANN. BEHAVIORAL MED. 116 (2000), *e.g.*, at p. 116 ("Consequences of obstructive sleep apnea include excessive daytime sleepiness") (PRIORART_000002316 at 320); Ancoli-Israel S. and Coy T, *Are Breathing Disturbances in Elderly Equivalent to Sleep Apnea Syndrome?* 17(1) SLEEP 77-83 (1994) at e.g., at p. 78 ("Excessive daytime sleepiness is the most common consequence of [sleep apnea

syndrome]") (PRIORART_000001039 at 045). Based on the same rationale for treating excessive daytime sleepiness in narcoleptic patients discussed above, it would have been equally obvious to a POSA to treat excessive daytime sleepiness in Parkinson's disease or sleep apnea patients using pitolisant, since these patients were also known to suffer from excessive daytime sleepiness and the wake-promoting benefits of $H_3$-receptor antagonist are directed to the excessive daytime sleepiness symptom rather than the underlying disease or condition.

### 3.    Claim 13 of the '947 Patent Is Obvious Over Meier I in View of Brooks

318.    Meier I is a 2001 publication from Jean Charles Schwartz and his colleagues, disclosing pitolisant (identified as "FUB 649"). Meier I states that the majority of potent histamine $H_3$ receptor ligands that were known contained an imidazole moiety, which was known to cause interactions with metabolic enzymes such as cytochrome P450. The authors state that "in order to facilitate a potential therapeutic use of $H_3$ receptor antagonists for applications proposed, e.g., attention deficit hyperactivity disorder and Alzheimer's disease, we developed a novel type of $H_3$ antagonist without an imidazole moiety." The authors state that "FUB 649" was detected "as one of the most potent antagonists both *in vitro* ($pA_2$=8.25±0.04) and *in vivo* ($ED_{50}$=1.6±0.9 mg/kg p.o.) with high selectivity for the $H_3$ receptor." Meier I shows the structure of FUB 649 as follows:



Meier I concludes that "FUB 649, a potent and selective non-imidazole $H_3$-receptor antagonist, is a new ***promising lead*** for further development." (emphasis added).

319.    From Meier I, a POSA would have understood that FUB 649 (pitolisant) is an $H_3$ receptor antagonist that lacks the imidazole functionality of prior antagonists, such as

thioperamide, and which would avoid deleterious interactions with metabolic enzymes such as cytochrome p450. A POSA would further understand that FUB 649 was extremely potent both *in vivo* and *in vitro* and, importantly, had high selectivity for the $H_3$ receptor. These properties would have suggested to a POSA that FUB 649 would be a useful therapeutic candidate. Indeed, the authors themselves state in Meier I that pitolisant is a "new and promising lead for further development." Based on this, a POSA would have been motivated to engage in further development of pitolisant for known applications of $H_3$ receptor antagonists.

320.    Brooks, an article published in 2002, relates to treating excessive daytime sleepiness associated with narcolepsy, Brooks explains that "studies have also demonstrated that $H_3$ antagonists, such as thioperamide (BioProjet, Societe Civile de Recherche) increase wakefulness" and observes that "[s]uch agents may prove useful in treating EDS due to narcolepsy or other causes." *Id.* at 1825.

321.    It would have been obvious to a POSA to use pitolisant (FUB 649) to treat excessive daytime sleepiness in narcolepsy patients. Meier I teaches that FUB 649 is a potent $H_3$ receptor antagonist without any of the disadvantages of prior imidazole-containing antagonists. Meier I also suggests using FUB 649 to treat conditions that have been proposed for $H_3$ receptor antagonists. As noted in Brooks, the known $H_3$ receptor antagonist, thioperamide, had been shown to increase wakefulness. Based on that property, Brooks suggests that thioperamide and other $H_3$ antagonists may be useful for treating excessive daytime sleepiness in narcolepsy and other causes. A POSA would recognize that pitolisant possesses comparable *in vitro* and *in vivo* potency and selectivity for $H_3$ as thioperamide (*see* Liedetke and Meier II) but is better suited for clinical development due to the superior pharmacokinetics (e.g., lack of interaction with metabolic enzymes). Given that thioperamide had been shown to promote wakefulness a POSA would have expected pitolisant to

90

CONFIDENTIAL

do the same since they are of comparable potency *in vitro* and *in vivo*. Given Brooks' teaching that excessive daytime sleepiness is treated with "wakefulness-promoting agents," together with the specific suggestion that $H_3$ antagonists may be useful for treating excessive daytime sleepiness, a POSA would have been motivated to treat excessive daytime sleepiness in patients suffering from narcolepsy using the known highly potent and selective, non-imidazole $H_3$ antagonist, pitolisant.

322.    A POSA would have had a reasonable expectation of success in treating excessive daytime sleepiness in narcolepsy patients using pitolisant because, amongst other reasons, (1) Brooks teaches that excessive daytime sleepiness in narcolepsy is treated with "stimulants and wake-promoting therapeutics," (2) the '947 Patent admits that $H_3$-receptor antagonists were known promote wakefulness, (3) Brooks teaches that "studies have also demonstrated" that $H_3$-receptor antagonist, such as thioperamide, "increase wakefulness" and thus "may prove useful in treating EDS due to narcolepsy or other causes," and (4) Liedtke discloses that pitolisant "shows high antagonist activity in an *in vivo* model of the mouse" comparable to that of thioperamide ("$ED_{50}$ of 1.6 mg/kg, compared to an $ED_{50}$ of 1.0 mg/kg for the standard $H_3$-receptor antagonist thioperamide"). The treatment of excessive daytime sleepiness in narcoleptic patients using pitolisant would therefore have been obvious to a POSA as of the earliest claimed priority date of the '947 Patent.

### E.    The Asserted Claim of the '947 Patent Is Invalid for Obviousness Type Double Patenting

323.    The '430 Patent, the '605 Patent, the '928 Patent, and the '413 Patent, which are all co-owned by Plaintiff Bioprojet, share one or more common inventors and to the extent not already expired, expire before the '947 Patent. Each of these patents qualify as references for purposes of obviousness-type double patenting.

## CONFIDENTIAL

324.    The earliest filing date in the chain leading to the '430,'605,'928, and '413 Patents is July 29, 1998, based on European Patent Application No. 98401944. None of the '430,'605,'928, and'413 Patents list a terminal disclaimer referencing the '947 Patent.

325.    The following individuals are named inventors on each one of the '947, '430, '413, '928, and '605 Patents: Jean-Charles Schwartz and Jeanne-Marie Lecomte.

326.    The '947, '430, '413, '928, and '605 Patents are all assigned to Bioprojet, Paris (FR) or Societe Civile Bioprojet, Paris (FR).

327.    Bioprojet, Paris (FR) and Societe Civile Bioprojet, Paris (FR) are affiliated entities.

328.    The '430 Patent, the '605 patent, the '928 patent, and the '413 patent are all commonly owned by Bioprojet, Paris (FR) or Societe Civile Bioprojet, Paris (FR), share common inventors, and expire before the '947 Patent.

### 1.    The Asserted Claim of the '947 Patent Is Not Patentably Distinct from Claims 1 and/or 3 of the '430 Patent

329.    The '430 patent and the '947 patent have two inventors in common: Jean-Charles Schwartz and Jeanne-Marie Lecomte. The '430 Patent is listed in the Orange Book for WAKIX®. According to the Orange Book, the expiration date of the '430 Patent is February 6, 2026, which is earlier than the listed expiration date of the '947 Patent—March 30, 2029.

330.    The PCT application for the '430 patent was filed on February 6, 2006, which is earlier than the filing of the PTC application for the '947 patent–March 30, 2006.

331.    The '430 Patent claims priority to a foreign application, European Patent Application No. 05100942, filed on February 10, 2005, which is earlier than the priority date for the '947 Patent.

332.    The '430 Patent is directed to a method of treatment of sleep apnea (claim 1), diurnal somnolence (claim 3), and other conditions by administering an effective amount of

crystalline 1-[3-[3-(4-chlorophenyl)propoxy]propyl]-piperidine monohydrochloride, optionally comprising water up to 6%, and having certain x-ray diffractogram characteristic peaks. See '430 Patent, Abstract. The identified drug in the '430 Patent is pitolisant hydrochloride.

333.    Harmony's Orange Book listing states that Claims 3 and 4 of the '430 Patent cover a method of treating excessive daytime sleepiness in patients with narcolepsy. WAKIX-HBS_00576261-65.

334.    The only difference between Claim 3 of the '430 Patent and Claim 13 of the '947 Patent is that Claim 3 the '430 Patent is directed to treating "diurnal somnolence" whereas Claim 13 of the '947 Patent is directed to treating "excessive daytime sleepiness" in three patient sub-populations, namely narcolepsy, sleep apnea, and Parkinson's Disease. A POSA would not consider this difference patentably distinct.

335.    A POSA would understand that "diurnal somnolence" as recited in Claim 3 of the '430 Patent is synonymous with daytime sleepiness. As explained above, the difference between daytime sleepiness (a/k/a diurnal somnolence) and excessive daytime sleepiness is simply a matter of degree with excessive daytime sleepiness being a comparatively more severe form daytime sleepiness.

336.    The '947 Patent itself equates diurnal somnolence with excessive daytime sleepiness. For example, Example 2 is directed to the treatment of obstructive sleep apnea ("OSA"). *See* '947 Patent 43:47-67. The patients in the study had ESS scores above 12 indicating that they suffered from excessive daytime sleepiness. *Id.* Treatment with pitolisant was evaluated based on a reduction in a reduction in diurnal somnolence. *Id.* In other words, the '947 Patent equates treatment of excessive daytime sleepiness with reduction in diurnal somnolence. The '947

Patent itself thus confirms that Claim 3 of the '430 Patent and Claim 13 of the '947 Patent are directed to the treatment of the same symptom, namely daytime sleepiness.

337.    A listed inventor of the '947 Patent, Dr. Schwartz, submitted a declaration during prosecution of the '947 Patent which likewise confirms that "excessive daytime sleepiness" and "diurnal somnolence" are one and the same. In that declaration, Dr. Schwartz referred to interim data from human clinical trials in which "excessive daytime sleepiness is measured with the Epworth Sleepiness Scale (ESS). The Epworth Sleepiness Scale is used to determine the level of daytime sleepiness . . . ." WAKIX-PLFS_00002100-2105; *see also* Schwartz Dep. Tr. Vol. I at 105-106. Thus, the file history of the '947 Patent also equates excessive daytime sleepiness with diurnal somnolence.

338.    The Schwartz Declaration further explains that the ESS scale is based on answers to a short questionnaire and provides a score ranging from 1 to 24, with scores above 10 being considered excessive daytime sleepiness, whereas scores below 10 are characterized as normal "daytime sleepiness." In other words, the difference between diurnal somnolence and excessive daytime sleepiness is simply the difference between a subjectively reported ESS score of 10 (which is normal daytime sleepiness) versus an ESS score of 11 (which is excessive daytime sleepiness). The stimulant action of the drug is the same regardless of whether the ESS score is 10 or 11. Pitolisant, like other stimulants, simply wakes sleepy people up.

339.    This is consistent with the clinical trials Bioprojet and Harmony conducted to assess the efficacy of pitolisant to treat excessive daytime sleepiness. Improvement in ESS score was used as the primary endpoint in numerous trials to measure the extent of daytime sleepiness and improvements in excessive daytime sleepiness. Schwartz Dep. Tr. Vol. II at 189-192; 204-207; Schwartz Dep. Tr. Ex. 15, 16, 17, 18.; Roy Dep. Tr. at 169-173; Roy Dep. Ex. 12. Indeed, in

Harmony's own public description of its clinical trials for the WAKIX® Product on clincaltrials.gov, Harmony stated that the "results obtained . . . showed that [pitolisant] reduced significantly the diurnal somnolence compared to placebo confirming its wakening effect against EDS." In other words, Harmony admitted that pitolisant's ability to treat diurnal somnolence confirms its ability to treat excessive daytime sleepiness.

340.     A POSA would also not consider the language of Claim 13 of the '947 Patent, reciting: "wherein said patient is suffering from Parkinson's disease, narcolepsy, or sleep apnea" to meaningfully limit or patentably distinguish from Claim 1 of the '430 Patent. WAKIX-PLFS_00000016 at 029-030; WAKIX-PLFS_00000031 at 55. As explained in the prosecution history of the '947 Patent, including the Schwartz Declaration, treatment of excessive daytime sleepiness according to the invention is purely symptomatic and thus is independent of the underlying disease or condition. That is why stimulants such as amphetamines and modafinil treat excessive daytime sleepiness in both narcoleptic and sleep apnea patients. A POSA understood that such agents simply promote wakefulness regardless of the underlying cause of sleepiness. Pitolisant is no different. Therefore the identification of the three patient subpopulations in Claim 13 of the '947 Patent does not meaningfully distinguish from Claim 3 of the '430 Patent.

341.     Given that these disease states are generally treated symptomatically, a POSA would understand that treating excessive daytime sleepiness generally would also treat excessive daytime sleepiness in patients Parkinson's disease, narcolepsy, or sleep apnea. The '947 Patent does not identify anything unexpected or critical about treatment of excessive daytime sleepiness in the patient sub-populations recited in Claim 1.

342.     In any event, a POSA would have known that excessive daytime sleepiness is a hallmark symptom for Parkinson's disease, narcolepsy, or sleep apnea. '947 Patent, 2:36-46;

**CONFIDENTIAL**

(WAKIX-PLFS_00000031 at 033); *see also*, Brooks at 1821 (PRIORART_000000181 at 181);

Seneviratne, et al., *Excessive daytime sleepiness in obstructive sleep apnea: prevalence, severity, and predictors*, 5(4) SLEEP MED. 339-343 (July 2004) ("Seneviratne") (PRIORART_000002662 at 666); R.D Chervin, *Sleepiness, fatigue, tiredness, and lack of energy in obstructive sleep apnea*, CHEST (2000) ("Chervin") (PRIORART_000002579-588); Guilleminault 1988 (PRIORART_000002589-594); R. Heinzer et al., *Slow-wave activity in sleep apnea patients before and after continuous positive airway pressure treatment. Contribution to daytime sleepiness*, CHEST (2001) ("Heinzer") (PRIORART_000002604-610); American Academy of Sleep Medicine, International Classification of Sleep Disorders, second edition (ICSD-2) (2005) ("ICSD-2") WAKIX-HBS_00209335; American Academy of Sleep Medicine, *International Classification of Sleep Disorders*, (ICSD-1 rev.) (2001) ("ICSD-1") PRIORART_000002356 at 2533; Schwartz Dep. Tr. Vol. I at 99-100. In fact, in the case of narcolepsy, excessive daytime sleepiness is a diagnostic criterion as of 2005, meaning that all patients diagnosed with narcolepsy would have experienced excessive daytime sleepiness. In the case of sleep apnea, reported prevalence of excessive daytime sleepiness is as high as 87%. *See* Seneviratne (PRIORART_000002662); Sauter (2000), *e.g.*, at "Summary" ("Excessive daytime sleepiness (EDS) is a frequent symptom of patients with obstructive sleep apnoea (OSA)"); Stepnowsky (2000), *e.g.*, at p. 116 ("Consequences of obstructive sleep apnea include excessive daytime sleepiness") (PRIORART_000002316 at 320); Ancoli-Israel (1994), e.g., p. 78 ("Excessive daytime sleepiness is the most common consequence of [sleep apnea syndrome]") (PRIORART_000001039 at 045). Thus, a POSA would have understood that Claim 3 of the '430 Patent would find particular use in these patient populations.

**CONFIDENTIAL**

343.    Thus, it would have been obvious to a POSA that the method of Claim 3 of the '430 Patent could be practiced to treat excessive daytime sleepiness in individuals affected by Parkinson's disease, narcolepsy, or sleep apnea, given that it is a necessary or common symptom of each of these conditions.

344.    Harmony's Orange Book listing of both the '430 Patent and the '947 Patent as covering the same approved use further demonstrates that Claim 13 of the '947 Patent is not patentably distinct from Claim 3 of the '430 Patent. ███████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████ In both cases, Harmony identified the '430 Patent and the '947 Patent as covering use code U-1101, a method of treating excessive daytime sleepiness in patients with narcolepsy. Thus, Plaintiffs have admitted that the '430 Patent covers treatment of excessive daytime sleepiness in patients with narcolepsy.

345.    Plaintiffs' infringement contentions further confirm that Claim 13 of the '947 Patent is not patentably distinct from Claim 3 of the '430 Patent. *See* Plaintiffs' Final Infringement Contentions to Defendant Hikma Pharmaceuticals USA Inc., served on April 4, 2025. Plaintiffs cite the indication of treating excessive daytime sleepiness in patients with narcolepsy to support their contention that that Hikma's ANDA Products would infringe the Claim 3 of the '430 Patent and Claim 13 of the '947 Patent. *See* Plaintiffs' Final Infringement Contentions to Defendant

CONFIDENTIAL

Hikma Pharmaceuticals USA Inc., served on April 4, 2025. Moreover, Plaintiffs admit that "Narcoleptic patients experience diurnal somnolence in the form of excessive daytime sleepiness." Thus, Plaintiffs appear to agree that treating diurnal somnolence and treating excessive daytime sleepiness in patients with narcolepsy are essentially the same.

346.    A POSA would also not consider the Asserted Claim of the '947 Patent patentably distinct from Claim 1 of the '430 Patent.

347.    The only difference between Claim 1 of the '430 Patent and Claim 13 of the '947 Patent is that the '430 Patent is directed to treating sleep whereas Claim 13 of the '947 Patent is directed to treating excessive daytime sleepiness in patients suffering from narcolepsy, sleep apnea, and Parkinson's Disease.

348.    Both methods recite giving pitolisant to the same patient population, namely sleep apnea patients. A POSA would understand that excessive daytime sleepiness is a hallmark symptom of sleep apnea. A POSA would also understand that there were no pharmacological treatments for sleep apnea as of April 2005. Therefore, a POSA would have understood the treatment of sleep apnea to encompass treatments of the symptoms, not the apnea (i.e., airway obstruction) itself.

349.    The primary symptom of sleep apnea is excessive daytime sleepiness with pitolisant. *See, e.g.*, Seneviratne; Chervin; Guilleminault 1988; Heinzer; ICSD-2 (WAKIX-HBS_00209335); ICSD-1 PRIORART_000002356; Sauter (2000), *e.g.*, at "Summary" ("Excessive daytime sleepiness (EDS) is a frequent symptom of patients with obstructive sleep apnoea (OSA)"); Stepnowsky (2000), *e.g.*, at p. 116 ("Consequences of obstructive sleep apnea include excessive daytime sleepiness") (PRIORART_000002316 at 320); Ancoli-Israel (1994), e.g., at p. 78 ("Excessive daytime sleepiness is the most common consequence of [sleep apnea

syndrome]") (PRIORART_000001039 at 045). Bioprojet's website quotes Dr. Schwartz in acknowledging that "excessive daytime sleepiness is the most frequently reported symptom by patients [with sleep apnea] . . . ." *See* Bioprojet website, Sleep apnea and excessive daytime sleepiness (last visited Nov. 18, 2025) (PRIORART_000006654-659).

350.    Dr. Schwartz confirmed at his deposition that patients suffering from sleep apnea tend to experience daytime sleepiness and would benefit from a wake promoting agent. *See* Schwartz Dep. Tr. Vol. I at 99-100; *see also* European Patent Application EP 0 982300 at [0245], [0255 ] ("the compounds "promote wakefulness" and may "be useful in the treatment of sleep disorders.") (PRIORART_000000198-297); International Patent Publication WO 2000/06254, page 1, line 6-10 (2"[a]ntagonists of histamine H3-receptor are known especially to increase synthesis and release of cerebral histamine" and "[t]hrough this mechanism, they induce an extended wakefulness.") (PRIORART_000000519-713); Brooks at 1825 (". . . studies have also demonstrated that H$_3$ antagonists, such as thioperamide (BioProjet, Societe Civile de Recherche) increase wakefulness.") (PRIORART_000000181 at 185); Lin at 329 ("H$_3$-antagonists like thioperamide, the first histaminergic drug capable of inducing arousal by systemic application, may provide a novel means to promote [wakefulness] in vigilance deficits and sleep disorders such as hypersomnia or narcolepsy.") PRIORART_000000982; Ligneau at 658 (1998) ("ciproxifan appears to be an orally bioavailable, extremely potent and selective H$_3$-receptor antagonist whose vigilance- and attention-promoting effects are promising for therapeutic applications in aging disorders.") PRIORART_000000744 at 744; Onodera et al., *Neuropharmacology of the Histaminergic Neuron System in the Brain and its Relationship with Behavioral Disorders*, 42 PROGRESS IN NEUROBIOLOGY 685, 688 (1994) ("Onodera") ("histamine seems to maintain wakefulness as a 'wake amine.'") (PRIORART_000002291-2308); Leurs, R., et al., *Therapeutic*

CONFIDENTIAL

*potential of histamine H₃ receptor agonists and antagonists*, 19 TiPS 177, 180 (1998) ("Leurs") ("increased wakefulness, decreases in rapid eye movement (REM) and slow-wave sleep and increased locomotion are observed after systemic application of H₃ receptor antagonists.") (PRIORART_000000806 at 809); Parmentier, et al., *Anatomical, Physiological, and Pharmacological Characteristics of Histidine Decarboxylate Knock-Out Mice: Evidence for the Role of Brain Histamine in Behavioral and Sleep-Wake Control*, 22 J. Neuroscience 7695, 7695-96 (2002) ("Parmentier") ("[a]dministration of various substances impairing histaminergic transmission increases slow wave sleep (SWS), whereas enhancement of transmission promotes [wakefulness].") (PRIORART_000000373-374); Passani at 620 ("Passani") ("while "enhancement of histamine-mediated neurotransmission . . . promotes waking.") (PRIORART_000000390 at 392). A POSA would have understood that pitolisant was an H₃ antagonist and that H₃ antagonists promote wakefulness.

351.    A POSA would understand that a method of treating sleep apnea using the known H₃ antagonist, pitolisant, would be directed to treating the associated sleepiness rather than the sleep apnea itself. Indeed, Example 2 of the '947 Patent is directed to the "Treatment of Obstructive Sleep Apnea" but does not treat the underlying airway obstruction. It simply evaluates treating the diurnal somnolence symptom associated with the sleep apnea. *See* '947 Patent at 43:47-67. At the very minimum, it would have been obvious to a POSA to practice Claim 1 of the '430 Patent with the subset of sleep apnea patients suffering from excessive daytime sleepiness because pitolisant was known as an H₃ antagonist and H₃ antagonists were known to promote wakefulness and/or act as stimulants. In other words, a POSA would have understood that pitolisant treats sleep apnea patients by ameliorating the associated excessive daytime sleepiness symptoms. Merely

identifying the major symptom of sleep apnea (excessive daytime sleepiness) does not patentably distinguish Claim 1 of the '430 Patent and Claim 13 of the '947 Patent.

352.    A POSA thus would not consider the method of Claim 13 of the '947 Patent, directed to treating excessive daytime sleepiness in patients with, among others, sleep apnea, to be patentably distinct from the method of Claim 1 of the '430 Patent, directed to treating sleep apnea.

### 2. The Asserted Claim of the '947 Patent Is Not Patentably Distinct from Claims 1, 2 and/or Claim 6 of the '605 Patent.

353.    The '605 patent and the '947 patent have two inventors in common: Jean-Charles Schwartz and Jeanne-Marie Lecomte. The '605 patent claims priority to European Patent Application No. 98401944, filed July 29, 1998, and European Patent Application No. 98403351, filed December 31, 1998. The '605 patent has expired.

354.    The '605 Patent is directed to a method of treating symptoms associated with cognitive disorders selected from the group consisting of attention, wakefulness and memory disorders by inhibiting H3 receptor activity with the same class of compounds recited in Claim 1 of the '947 Patent.

355.    Claim 13 of the ' 947 Patent is not patentably distinct from Claims 1, 2, and/or 6 of the '605 Patent. (PRIORART_000004186 at 252; WAKIX-PLFS_00000031 at 055).

356.    Claim 13 of the '947 Patent and Claims 1, 2, and 6 of the '605 Patent do not contain the exact same language. (PRIORART_000004186 at 252 and WAKIX-PLFS_00000031 at 055). Claim 13 of the '947 Patent is directed to a method of treating (1) "excessive daytime sleepiness" in (2) patients suffering from Parkinson's disease, narcolepsy, or sleep apnea, whereas Claims 1, 2 and 6 of the '605 Patent are directed to a method of treating "symptoms associated with cognitive disorders selected from the group consisting of attention, wakefulness and memory disorders." (PRIORART_000004186 at 252 and WAKIX-PLFS_00000031 at 055). A POSA would not

CONFIDENTIAL

consider these differences in claim language significant. Nor do these differences render Claim 13 of the '947 Patent patentably distinct from Claims 1, 2 or 6 of the '605 Patent.

357.    A POSA would not consider a method of treating "excessive daytime sleepiness" in patients with Parkinson's disease, narcolepsy, or sleep apnea with pitolisant as recited in Claim 13 of the '947 Patent patentably distinct from the method of treating "symptoms associated with cognitive disorders selected from the group consisting of attention, wakefulness and memory disorders" recited in Claims 1, 2 or 6 of the '605 Patent because the recited "cognitive disorders" in Claim 1 of the '605 Patent, include attention, **wakefulness** and memory disorders. *See e.g.*, Passani at 621 (2004) (characterizing narcolepsy as a "wake disorder.") (PRIORART_000000390 at 393); ICSD-2 (WAKIX-HBS_00209335 at 340).

358.    A POSA would have known that wakefulness disorders include conditions such as narcolepsy and sleep apnea. *Id.* As explained above, a POSA would have also known that excessive daytime sleepiness is a hallmark symptom of narcolepsy and sleep apnea. '947 Patent at 2:36-46 (WAKIX-PLFS_00000031 at 033); Brooks at 1821 (PRIORART_000000181 at 181); Zeman, A., et al., *Clinical Review Narcolepsy and excessive daytime sleepiness* BMJ 2004 (PRIORART_000002619): ICSD-2 at 81-87 (WAKIX-HBS_00209335 at 340-346).

359.    A POSA would have also understood that Parkinson's disease is a cognitive disorder whose symptoms include excessive daytime sleepiness. B. E. Levin et al., *Cognitive Impairment in Parkinson's Disease*, 10(2) Neurologic Clinics 471 (1992) ("Levin") (PRIORART_000006778- 792); B. Dubois & B. Pillon*, Cognitive deficits in Parkinson's disease*, J Neurol 244:2-8 (1997) ("Dubois") (PRIORART_000002336-342); J. L. W. Bosboom et al., *Cognitive dysfunction and dementia in Parkinson's disease*, 111 J. Neural Transm. 1303 (2004) ("Bosboom") (PRIORART_000002343-355).

360.    Given that excessive daytime sleepiness was a common symptom of narcolepsy, sleep apnea, and Parkinson's disease, a POSA would understand that the method of Claims 1, 2, and 6 of the '605 Patent to treat "symptoms associated with cognitive disorders selected from the group consisting of attention, wakefulness and memory disorders" using a genus of $H_3$ antagonists of Claim 1 of the '605 Patent including pitolisant as specified in Claim 2 and pitolisant hydrochloride as further specified in Claim 6 were directed to methods of treating excessive daytime sleepiness in at least patients with narcolepsy and sleep apnea.

361.    ███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████ For example, Plaintiffs previously listed, among others, claims 1, 2, and 6 of the '605 Patent in the Orange Book for the same use code as the '947 Patent, encompassing a method of treating excessive daytime sleepiness in patients suffering from narcolepsy. ███████████████████████████████████

███████████████████████████████████████████

████.

### 3.    The Asserted Claim of the '947 Patent Is Not Patentably Distinct from Claims 1, 36 and/or 37 of the '413 Patent

362.    The '413 patent and the '947 patent have two inventors in common: Jean-Charles Schwartz and Jeanne-Marie Lecomte. The '413 patent claims priority to European Patent

Application No. 98401944, filed July 29, 1998, and European Patent Application No. 98403351, filed December 31, 1998. The '413 patent has expired.

363.    The '413 Patent is directed to a method of treating symptoms associated with cognitive disorders selected from the group consisting of attention, wakefulness and memory disorders by inhibiting H3 receptor activity with the same broad class of compounds recited in Claim 1 of the '947 Patent.

364.    While Claim 13 of the '947 Patent and Claims 1, 36, and 37 of the '413 Patent do not contain the exact same language, a POSA would not consider these differences in claim language significant. *Cf.* PRIORART_000002779 at 852-853; WAKIX-PLFS_00000031 at 055. Nor do these differences render Claim 13 of the '947 Patent patentably distinct from Claims 1, 36 or 37 of the '413 Patent. (PRIORART_000002779 at 852-853; WAKIX-PLFS_00000031 at 055).

365.    A POSA would understand that the compound referred to as "3-(4-chlorphenyl)propyl-3-piperidinopropylether" is pitolisant and is essentially identical to the recited "-3-(4-Chlorophenyl)propyl 3-piperidinopropyl ether" recited in Claim 13 of the '947 Patent.

366.    For the same reasons described in Section III.C.3., a POSA would not consider a method of treating excessive daytime sleepiness in patients with Parkinson's disease, narcolepsy, or sleep apnea with pitolisant as recited in Claim 13 of the '947 Patent patentably distinct from the method of treating symptoms associated with cognitive disorders selected from the group consisting of attention, wakefulness and memory disorders because the recited "cognitive disorders" in Claim 1 of the '413 Patent, include attention, ***wakefulness*** and memory disorders. *See, e.g.*, Passani at 621 (PRIORART_000000390 at 393); ICSD-2 (WAKIX-HBS_00209335 at 340); B. E. Levin 471-481 (PRIORART_000006778-792); Dubois 244:2-8 (PRIORART_00000233 at 342); Bosboom at 1303-1315 (PRIORART_000002343-355).

CONFIDENTIAL

### 4. The Asserted Claim of the '947 Patent Is Not Patentably Distinct from Claims 1 and 13-16 of the '928 Patent

367.     The '928 patent and the '947 patent have two inventors in common: Jean-Charles Schwartz and Jeanne-Marie Lecomte. The '928 patent claims priority to European Patent Application No. 98401944, filed July 29, 1998, and European Patent Application No. 98403351, filed December 31, 1998. The '928 patent has expired.

368.     The 928' Patent is directed to the same broad class of compounds recited in Claim 1 of the '947 Patent. PRIORART_000002856 at PRIORART_000002936 and WAKIX-PLFS_00000031 at WAKIX-PLFS_00000055.

369.     The '928 Patent also discloses that "Antagonists of histamine H3-receptor are known especially to increase synthesis and release of cerebral histamine, through this mechanism, they induce an extended wakefullness, an improvement in cognitive processes, a reduction in food intake and a normalization of vestibular reflexes (Schwartz et al., Physiol. Rev., 1991, 71: 1–51)." '928 Patent. at 1:12-16.

370.     Claim 13 of the '947 Patent is also not patentably distinct from Claims 1 and/or 13-16 of the '928 Patent. *Cf.* PRIORART_000002856 at PRIORART_000002936-937 and WAKIX-PLFS_00000031 at 055.

371.     Even though Claims 1 and 13-16 of the '928 Patent do not claim a method of treatment, obviousness type double patenting prevents a later patent from claiming the use of an earlier patented composition when the use is disclosed in the specification of the earlier patent.

372.     A POSA would understand that the compound referred to as "3-(4-chlorphenyl)propyl-3-piperidinopropylether" is pitolisant and is essentially identical to the recited "-3-(4-Chlorophenyl)propyl 3-piperidinopropyl ether" recited in Claim 13 of the '947 Patent.

373.    Based on the specification of the '928 Patent, a POSA would understand that the method of treating excessive daytime sleepiness in patients with Parkinson's disease, narcolepsy, and sleep apnea as claimed in Claim 13 of the '947 Patent. PRIORART_000002856 at 936-937; WAKIX-PLFS_00000031 at 055.

374.    A POSA would understand that the treatment of the symptom of excessive daytime sleepiness is disclosed in the '928 Patent in view of its disclosures of promoting wakefulness and treating asthenic states. *See, e.g.*, '928 Patent at 48:4-9 (PRIORART_000002856 at 880); Garcia-Borreguero et al., *Parkinson's Disease and Sleep*, SLEEP MED. REV., 2003, 7, 115 (PRIORART_000002564-578); Levin (PRIORART_000006778-792); Dubois (PRIORART_000002336-342); Bosboom (PRIORART_000002343-355); *see also* European Patent Application EP '300 at [0245], [0255 ] ("the compounds "promote wakefulness" and may "be useful in the treatment of sleep disorders.") (PRIORART_000000198-297); International Patent Publication WO '254, page 1, line 15-17 ("[h]istamine $H_3$-receptor agonists are known to inhibit the release of several neurotransmitters including histamine, monoamines and neuropeptides and thereby exert sedative and sleep-promoting effects in brain.") (PRIORART_000000519-713); Brooks at 1825 ("[h]istamine receptor agonists have been shown to increase [slow-wave sleep] in animals and other studies have also demonstrated that $H_3$ antagonists, such as thioperamide (BioProjet, Societe Civile de Recherche) increase wakefulness.") (PRIORART_000000181 at 185); Lin at 329 ("$H_3$-antagonists like thioperamide, the first histaminergic drug capable of inducing arousal by systemic application, may provide a novel means to promote [wakefulness] in vigilance deficits and sleep disorders such as hypersomnia or narcolepsy.") PRIORART_000000982; Ligneau at 658 ("ciproxifan appears to be an orally bioavailable, extremely potent and selective $H_3$-receptor antagonist whose vigilance- and

attention-promoting effects are promising for therapeutic applications in aging disorders.")
(PRIORART_000000744 at 744); Onodera at 688 ("histamine seems to maintain wakefulness as
a 'wake amine.'") (PRIORART_000002291-308); Leurs at 180 ("increased wakefulness,
decreases in rapid eye movement (REM) and slow-wave sleep and increased locomotion are
observed after systemic application of $H_3$ receptor antagonists.") (PRIORART_000000806 at
809); Parmentier at 7695-696 ("[a]dministration of various substances impairing histaminergic
transmission increases slow wave sleep (SWS), whereas enhancement of transmission promotes
[wakefulness].") (PRIORART_000000373-374); Passani at 620 (PRIORART_000000390-0397).

375.    There is nothing unique or unexpected in the treatment of excessive daytime
sleepiness in the subpopulation of patients, having Parkinson's disease, sleep apnea, or narcolepsy
that would patentably distinguish the use claimed in the '947 Patent from the uses contemplated
in the '928 Patent.

376.    Given that excessive daytime sleepiness was a common symptom of Parkinson's
disease, sleep apnea, and narcolepsy, a POSA would understand that the method of Claims 1 and
13-16 of the '928 Patent in view of its disclosure of its disclosure that the claimed compounds,
including pitolisant, would be useful to promoting wakefulness was not patentably distinct from
methods of treating excessive daytime sleepiness in these patient populations.

## F.    Lack of Secondary Considerations

### 1.    No Secondary Considerations for the '197 Patent

377.    Plaintiffs' alleged evidence of objective indicia of unexpected results and copying
does not demonstrate the non-obviousness of claims 1 and 2 of the '197 patent.

a)    *Evidence Related To WAKIX Not Commensurate with Scope of
Claims*

CONFIDENTIAL

378.     Claims 1 and 2 of the '197 Patent do not require that the polymorph be the pharmaceutically effective component nor do they require the presence of any particular quantity of the polymorph. Unlike unasserted claim 10 of the '197 Patent, asserted claims 1 and 2 are not limited or directed to pharmaceutical uses or compositions. Plaintiffs view the Asserted Claims of the '197 Patent so broadly as to embrace ANDA products in which crystalline pitolisant hydrochloride cannot even be detected by XRPD; given this reading of the claims, that such alleged trace quantities of crystalline pitolisant hydrochloride are within the scope of the Asserted Claims, Plaintiffs' alleged evidence of unexpected results and copying related to Wakix could not have a nexus with or be commensurate with this broad scope. (*See* Zaworotko Reply Rpt. ¶ 87). If Plaintiffs' reading of the claims is correct, Plaintiffs' product, WAKIX, would not be reflective of the full scope of the Asserted Claims, as required for the nexus element of a secondary considerations analysis. (*See* Zaworotko Reply Rpt. ¶ 87).

379.     Claim 2 of the '197 Patent requires as one of the twenty-one characteristic peaks, an XRPD peak at 30.3° 2θ. Harmony's API lacks such a peak. Dr. Gozzo's data indicates that Harmony's API has a peak at 30.5374°, which is outside the claimed range for peak 30.3° recited in claim 2. Moreover, Dr. Gozzo's data does not show that Harmony's API exhibits a peak at 34.1° 2θ as required by claim 1.[7]

  b)     *No Unexpectedly Advantageous Properties For Pharmaceutical Use*

380.     Contrary to Plaintiffs' positions, predictability is different from whether the result is unexpected, as is required for weighing any alleged evidence of unexpected results as a secondary consideration of non-obviousness. (*See* Zaworotko Reply Rpt., ¶ 83).

---

[7] As to AET and Novitium, Plaintiffs have not submitted any expert testimony, opinions, or evidence concerning whether the Harmony API, including Batch No. 142868, meets claim 2 of the '197 Patent.

381.    It is expected (not unexpected), that a hydrochloride salt would yield a crystalline material having favorable properties for pharmaceutical use. That is why the hydrochloride salt is the first choice in salt screening for basic drug molecules. In or around 2006, approximately 50% of APIs used in solid dosage forms of drug products were salts and nearly 40% of these APIs were hydrochloride salts. *See, e.g.*, Paulekuhn, G., et al., Trends in Active Pharmaceutical Ingredient Salt Selection based on Analysis of the Orange Book Database, 50 J. Med. Chem. 6665-72 (2007) ("Paulekuhn"). Plaintiffs' alleged unexpected results are merely inherent properties of this obvious composition.

382.    Pitolisant is a monobasic drug molecule because it only has one basic functional group (a tertiary amine). Given that hydrochloric acid is a strong acid, a POSA would have had a complete expectation of successfully being able to prepare the hydrochloride salt of pitolisant and crystallize the salt using routine methods for crystallization.

383.    Further, Plaintiffs allege that claims 1 and 2 of the '197 Patent cover both pharmaceutically or therapeutically effective and non-pharmaceutically or non-therapeutically effective amounts of the claimed polymorph. Accordingly, alleged advantageous properties *for pharmaceutical use* are not commensurate with the scope of the claims, as is required for relevance to a secondary considerations analysis. (*See* Zaworotko Reply Rpt. ¶ 87).

                    i.    Physically Stable Despite Being Hygroscopic Is Inaccurate
                          And Not Unexpected

384.    The range of water content identified in the Asserted Claims having a maximum value at 6% is squarely within the range that a POSA would have expected for a crystalline drug compound prior to the '197 Patent. (Zaworotko Op. Rpt., ¶ 305; *see also* Stephenson et al., *Formation of Isomorphic Desolvates: Creating a Molecular Vacuum*, 87 J. PHARM. SCIS., 536-42 (1998) ("Stephenson") (describing automated methods for collecting data on the mass of water

vapor in four solid drug substances: cephalexin, cefaclor, erythromycin A and Spirapril hydrochloride, across a range of RH values)).

385.    The figure below (Stephenson at 539) quantifies the amount of water adsorbed by four crystalline drug substances (cephalexin, cefaclor, erythromycin A and Spirapril hydrochloride) as RH was changed in 5% steps from 0% RH (anhydrate) to 80% RH (hydrate). (Zaworotko Reply Rpt., ¶ 81).



386.    As shown in the Figure above, the maximum amount of water uptake (saturated uptake) for each solid drug substance studied is represented by the plateau/flattened line of data points. These saturated uptakes were found to be consistent with 1 or 2 moles of water per mole of drug compound (i.e., classified as monohydrate or a dihydrate, respectively). (Zaworotko Reply Rpt., ¶ 81).

387.    The Spirapril drug product adsorbed water as relative humidity rises from 0 to 5% RH. (Zaworotko Reply Rpt., ¶ 82).

388.    Using the molecular weight of pitolisant hydrochloride, 332.31 grams per mole, the claimed maximum water content of 6% equates to 19.9 grams of water per mole of pitolisant

CONFIDENTIAL

hydrochloride, i.e., approximately 1.1 moles of water per mole of pitolisant hydrochloride. (Zaworotko Reply Rpt., ¶ 81). 1.1 mol of water is squarely within the range for water content in hydrates shown in Stephenson several years prior to the '197 Patent. (Zaworotko Reply Rpt., ¶ 81; *see also* Zaworotko Op. Rpt., ¶ 306). The same is true for the three other drugs shown in the Figure of Stephenson above. (Stephenson at 539).

389.    That the crystalline form of pitolisant hydrochloride is stable with a water content up to 6% would not have been an unexpected result to a POSA. (Zaworotko Op. Rpt. ¶ 316.) There is nothing unexpected about a hydrochloride salt—which is known as the most commonly used pharmaceutical salt—remaining stable with a water content up to 6%. (Zaworotko Op. Rpt. ¶ 316.)

390.    No matter the nature of the pitolisant hydrochloride crystalline form embodied in the Asserted Claims of the '197 Patent, whether an isolated site hydrate or a variable non-stoichiometric hydrate, the range of water content recited in the claims is squarely within the amount that would have been expected by a POSA at the time of the '197 Patent. If pitolisant hydrochloride is an isolated site hydrate (*see*, WAKIX-BP_00180201-222; Patel, J. et al., *Exploring Polymorphism: Hydrochloride Salts of Pitolisant and Analogues*, 24 CRYSTAL GROWTH & DESIGN, 1286-83 (2024); *See* WAKIX-HBS_00001752-1764 at 1760; WAKIX-HBS_00514451-4462 at 4458) a POSA would understand that the water content in the crystals is approximately 2.7-2.9% and the Asserted Claims are simply covering a range of surface water content – i.e., the crystals are wetted – up to 6%. If the water content must be contained within the crystalline form, as opposed to surface wetness, then, to the extent that the subject matter of the Asserted Claims of the '197 Patent is enabled (which it is not), the claimed water content is simply a function of the ambient humidity.

391.    Applicants' arguments during prosecution regarding the water content limitation of
the Asserted Claims of the '197 Patent are █████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
██████████████████(Zaworotko Op. Rpt. n.83.)

392.    Plaintiffs have not identified any evidence of the expected maximum water contents
for drug substances (whether hygroscopic or non-hygroscopic) and how the water content of "up
to 6%" in the claimed crystalline material provides any meaningful improvement when it comes
to the claimed crystalline form's use as a pharmaceutical substance. (Zaworotko Reply Rpt. ¶ 84).

393.    The 6% limit on water content is entirely without any practical significance.
(Zaworotko Reply Rpt. ¶ 84). Plaintiffs have not alleged that pitolisant hydrochloride is rendered
a better drug substance because it can accommodate 6% water as opposed to, say 3% of 4% water.
(Zaworotko Reply Rpt. ¶ 84). The 6% threshold—to the extent that it is even real—is simply an
empirical observation of an inherent property of the obvious crystalline form. It is neither high nor
low, it simply is what it is. (Zaworotko Reply Rpt. ¶ 84).

394.    Plaintiffs have identified no evidence that the 6% limitation is backed by actual
data showing that it is a critical threshold. For example, Plaintiffs have identified no data that the
crystalline form of pitolisant hydrochloride having the recited characteristic XRPD peaks does not
exist at water contents above 6%. Further, the '197 Patent discloses that the allegedly inventive
crystals can have a water content of 6.5%. (Zaworotko Reply Rpt. n.16; *see also* Zaworotko Op.
Rpt. ¶ 220). There is no evidence that a crystalline form of pitolisant hydrochloride meeting the

claimed XRPD peaks but having a water content of 6.5% would not possess the same physical properties (such as stability and flowability) as the claimed crystalline form, or the same utility as the claimed crystalline form.

395.    There is nothing unexpected about a drug substance (whether or not hygroscopic) that is stable under ambient conditions of temperature and humidity. (Zaworotko Reply Rpt. ¶ 85). Many crystalline hydrates are by definition hygroscopic. Despite this, they are commonly and successfully formulated as hydrochloride salts because the hydrate is the most stable crystalline form at ambient temperature and humidity. (Zaworotko Reply Rpt. ¶ 85).

396.    It is not unexpected and indeed it is expected that the hydrochloride salt form would produce a stable crystalline form. As an initial matter, pitolisant free base was reported to be an oil and therefore is undesirable in that form for pharmaceutical formulations, particularly for oral administration in a solid dosage form (tablet). POSAs routinely convert free base molecules into salt forms using predictable acid/base chemistry. A primary reason that salt screening is conducted is to produce crystalline materials that are suitable for use in drug products, i.e., soluble enough to be absorbed by the body and stable enough to be easily handled, processed, and formulated for pharmaceutical use.

397.    The claimed pitolisant hydrochloride is an isolated site hydrate, based on the image below, showing the crystal structure of the claimed drug substance. (Zaworotko Reply Rpt. ¶ 103).

(Zaworotko Reply Rpt. ¶ 103).

113

CONFIDENTIAL

█████████████████████████████████████████████████████████████████

████ and is consistent with the crystal structure of pitolisant hydrochloride published in a 2024 peer-reviewed article, which confirms water molecules lie in isolated sites. Patel, J. et al., *Exploring Polymorphism: Hydrochloride Salts of Pitolisant and Analogues*, 24 CRYSTAL GROWTH & DESIGN, 1286-83 (2024); Zaworotko Reply Rpt. ¶ 103.



WAKIX-HBS_00001752-1764 at 1760; WAKIX-HBS_00514451-4462 at 4458. The single crystal structure of pitolisant hydrochloride demonstrates that the water molecules stabilize the crystalline structure. ████████████████████████████████████████████

███████████████████████████████ The named inventors did not inform the Examiner during prosecution of the '197 patent that the single crystal structure determined that the nature of the crystal was a hemihydrate. It is not possible to remove all of the water from the pitolisant hydrochloride crystals since the water stabilizes the crystalline form. In other words, the anhydrate of pitolisant hydrochloride would not have the claimed XRPD peaks.

**CONFIDENTIAL**

398.

399.



400.     A POSA would have been familiar with DVS testing as of the priority date of the

Asserted Patents. The stability also would have been expected because pitolisant hydrochloride

crystals, by their nature, are non-hygroscopic at normal relative humidity values (e.g., up to 75%

relative humidity), as would be apparent to a POSA based on routine pharmaceutical testing

commonly performed during drug development, such as DVS. ██████████████████

██████████



401. ███████████████████████████████████████████████

██████████████████████████████████████████████ It is a routine matter in pharmaceutical development to test drug candidates under different relative humidity and temperature conditions to evaluate the stability of the crystalline form (*e.g.*, DVS testing). ████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████ This is to be expected in view of the proportion of approved pharmaceuticals with a hydrochloride salt, where pharmaceuticals are routinely tested for stability in this manner. *See* Berge et al., "Pharmaceutical Salts," J. Pharm. Sci. 66(1):1-19 (Jan. 1977) ("Berge"); Paulekuhn; Gould, P. L., *Salt selection for basic drugs*, International Journal of Pharmaceutics, 33, 201-217, 1986; Morris,

K. R.; Fakes, M. G.; Thakur, A. B.; Newmann, A. W.; Signh, A. K.; Venit, J. J.; Spagnulo, C. J.;

Serajuddin, A. T. M., *An integrated approach to the selection of optimal salt form for a new drug candidate*, International Journal of Pharmaceutics 105, 209-217, 1994; Bighley, L. D.; Berge, S. M.; Monkhouse, D. C., *Salt Forms of Drugs and Absorption* in Encyclopedia of Pharmaceutical Technology, Vol. 13; Swarbrick, J., Boylan, J. C., Eds.; Marcel Dekker Inc.: New York, 1996; pp. 453-497; Tong, W.-Q., Whitesell, G., *In Situ Salt Screening—A Useful Technique for Discovery Support and Preformulation Studies*, Pharmaceutical Development and Technology, 3(2), 215-223, 1998, etc. Moreover, it also would have been expected because pitolisant hydrochloride crystals, by their nature, are non-hygroscopic at normal relative humidity values (e.g., up to 75% relative humidity), as would have been apparent to a POSA based on routine pharmaceutical testing commonly performed during drug development, such as DVS. *See, e.g.*, WAKIX-HBS_00001752-1764 at -1763.

402.    Paulekuhn, a 2007 publication titled "Trends in Active Pharmaceutical Ingredient Salt Selection based on Analysis of the Orange Book Database," sets forth that "Chloride ions continue to be the most frequently used anionic counterions for the formation of salts as active pharmaceutical ingredients (APIs)." Paulekuhn at 6665. Paulekuhn reports that between 2002 and 2006, i.e., the time period immediately prior to the filing of the '197 Patent, "the fraction of chlorides" in FDA approved pharmaceutical salts was 38.9%, which is just a few percentage points away from the data reported in Berge 30 years earlier. (*See* Zaworotko Reply Rpt. ¶ 54). Even so, the data in Paulekuhn, which disclosed a "trend toward increased diversity of anions" (Paulekuhn at 6666) does not render hydrochloride salts non-obvious. (*See* Zaworotko Reply Rpt. ¶ 54). Rather, Paulekuhn confirmed that 30 years after Berge published, chloride anions remained the

most frequently encountered FDA-approved pharmaceutical salt. (*See* Zaworotko Reply Rpt. ¶ 54).

403.    Prior to 2006 many approved drug substances were in the form of crystalline hydrates which, by definition, means that their anhydrate solid form(s) are hygroscopic, many of which were hydrochloride salts. (Zaworotko Reply Rpt. ¶ 13f). It is neither inventive nor unexpected to target and make a stable crystalline hydrochloride salt of a basic drug molecule that is hygroscopic as their hydrated forms can be stable under everyday temperatures and humidities. (Zaworotko Reply Rpt. ¶ 13f). Therefore, even if pitolisant hydrochloride were hygroscopic, ███ ████████████████████████████████████████████████████ the hydrochloride salt would have been an obvious and predictable form for stabilizing pitolisant.

404.    Regardless of how many approved pharmaceutical drugs were hydrated crystal forms at the time, as of 2007 for 30 years, the hydrochloride salt was by far the most frequently encountered FDA-approved pharmaceutical salt. (Zaworotko Reply Rpt. ¶ 55). Therefore, the potential for a hydrochloride salt to be hygroscopic or to be a salt that did not enhance solubility did not render crystalline hydrochloride salts unexpected. (Zaworotko Reply Rpt. ¶ 55). Indeed, as explained in Gould "***progression of a hydrochloride salt should be a first move***." P. Gould, *Salt selection for basic drugs*, 33 INT'L J. PHARM. 201, 204 (1986) (emphasis added); Bighley, L. D. et al., Salt Forms of Drugs and Absorption, 13 ENCYC. PHARM. TECH., 453-499, (Swarbrick, J. & Boylan, J. C., eds., 1996); Bastin, R., et al., Salt Selection and Optimisation Procedures for Pharmaceutical New Chemical Entities, 4 ORGANIC PROCESS RESEARCH & DEVELOPMENT 427 (2000); Tong, W.-Q., Whitesell, G., *In Situ Salt Screening—A Useful Technique for Discovery Support and Preformulation Studies*, Pharmaceutical Development and Technology, 3(2), 215-223, 1998; Zaworotko Reply Rpt. ¶ 55. A POSA understood that the

**CONFIDENTIAL**

hydrochloride salt is overwhelmingly the first choice of the chemist, whether during the initial synthesis (molecules) stage or during the pre-formulation (materials) stage of drug development. (Zaworotko Reply Rpt. ¶ 55). It has a singular importance in pharmaceutical science and is unquestionably the preferred acid addition salt in the pharmaceutical industry (whether at the time of Berge, just prior to the priority date of the '197 Patent, and even today). (Zaworotko Reply Rpt. ¶ 55). As Gould confirms, the hydrochloride salt would have been the obvious salt screening starting point for a POSA. (Zaworotko Reply Rpt. ¶ 55). In other words, it is expected that a hydrochloride salt will form with inherent characteristics that are suitable for pharmaceutical development.

   ii.    Contracting Cell Volume With Increasing Water Content Is Inaccurate

405.    Table 2 of the '197 Patent shows cell volume at various percentages of water. The cell volume of the claimed crystalline actually increased, rather than decreased or contracted when the water content increased from 2.7% to 2.8% and from 2.7% to 3.7%. (Zaworotko Reply Rpt. ¶ 86).

## TABLE 2

| Comparative crystal parameters for 1-[3-[3-(4-chlorophenyl)propoxy]propyl]-piperidine monohydrochloride depending on the water content | | | | |
|---|---|---|---|---|
| Parameter | 2.7% $H_2O$ | 2.8% $H_2O$ | 3.7% $H_2O$ | 6.0% $H_2O$ |
| a(Å) | 14.1588(8) | 14.279(7) | 14.24(3) | 14.202(3) |
| b(Å) | 8.2798(6) | 8.450(4) | 8.40(1) | 8.368(14) |
| c(Å) | 15.9262(13) | 15.872(5) | 15.98(3) | 15.69(6) |
| β(°) | 97.996(4) | 97.11(7) | 96.9(3) | 97.1(4) |
| Volume (Å³) | 1848.9(2) | 1900(1) | 1897(5) | 1850(6) |
| Density (g/cm³) | 1226 | 1195 | 1208 | 1269 |

(WAKIX-PLFS_00000007; Zaworotko Reply Rpt. ¶ 86).

CONFIDENTIAL

406.     The cell volume of the claimed crystalline form was nearly identical at 2.7% water and 6% water. Therefore, based on the data in the '197 Patent, a POSA would have understood that the cell volume does **not** "contract with increasing water content." (Zaworotko Reply Rpt. ¶ 86). The fact that there were slight variations in cell volume at 2.8% and 3.7%, which are within just a few percentage points of one another, does not tell a POSA that the cell volume data was unexpected. (Zaworotko Reply Rpt. ¶ 86). Moreover, there is no data provided for any water content below 2.7%. (Zaworotko Reply Rpt. ¶ 86). Therefore, a POSA cannot conclude that in the claimed crystalline product, the cell volume always decreases with increasing water content. (Zaworotko Reply Rpt. ¶ 86). The data in Table 2 do not establish a relationship between water content and cell parameters, including cell volume.

### iii.     "Good Flowability"

407.     Plaintiffs have identified no data or scientific evidence for the contention that the flowability of the claimed crystalline pitolisant hydrochloride is an unexpected property. (Zaworotko Reply Rpt. ¶ 87). The claimed form of crystalline pitolisant hydrochloride is non-hygroscopic under RH conditions encountered during manufacturing of the drug substance and drug product. As such, a POSA would not have expected any problems with the flowability of the crystalline drug substance. Moreover, Plaintiffs have pointed to no evidence that pitolisant hydrochloride unexpectedly exhibits desirable flowability properties.

### iv.     Physically Stable at High Temperatures Is Not Unexpected

408.     There is nothing unexpected as to physical stability with respect to the melting point of the claimed crystalline pitolisant hydrochloride. (Zaworotko Reply Rpt. ¶ 89). Table 7 of the '197 Patent purports to disclose melting points for the crystalline forms of pitolisant hydrochloride, pitolisant hydrogen oxalate, pitolisant hydrogen succinate, and pitolisant hydrogen maleate. (Zaworotko Reply Rpt. ¶ 89).

409. However, the data in Table 7, alone, demonstrates that there is nothing unexpected about the melting point for pitolisant hydrochloride, as the melting point for pitolisant hydrogen oxalate is more than 30 degrees higher. (Zaworotko Reply Rpt. ¶ 90).

## TABLE 7

| | | Melting points. | | |
|---|---|---|---|---|
| Conditions | Monohydrochloride | Hydrogen oxalate | Hydrogen succinate | Hydrogen maleate |
| N$_2$ atmosphere | 117.68° C. | 149.16° C. | 63.21° C. | 90.85° C. |
| O$_2$ atmosphere | 117.54° C. | 149.28° C. | 63.46° C. | 90.74° C. |

WAKIX-PLFS_00000008.

410. The melting point is an inherent property of a crystalline solid. (Zaworotko Reply Rpt. ¶ 90). There is not an "expected" melting point from which the actual melting point unexpectedly deviates. (Zaworotko Reply Rpt. ¶ 90). That a POSA cannot guess or even predict the melting point in advance is of no moment—that is true of many chemical compounds. (Zaworotko Reply Rpt. ¶ 90). The melting point is simply an inherent property of a solid form and it is always empirically determined. (Zaworotko Reply Rpt. ¶ 90). There is nothing special about the melting point of pitolisant hydrochloride, it is neither surprisingly high nor surprisingly low. (Zaworotko Reply Rpt. ¶ 90). That it is in a suitable range for pharmaceutical use puts it squarely in line with many other hydrochloride salt drug compounds that have been previously developed. (Zaworotko Reply Rpt. ¶ 90). In fact, the suitability of hydrochloride salts for pharmaceutical use is precisely one of the reasons that the hydrochloride salt is by far the most common salt form in drug products.

CONFIDENTIAL

411.    The '197 Patent characterizes the data in Table 7 as showing that "the four salts kept substantially unchanged their melting points independently of the oxidation conditions, ***therefore, all of them are equally stable***." '197 Patent, 10:48-50 (emphasis added). While the '197 Patent hypothesizes that "the low melting point of hydrogen succinate and hydrogen maleate salts made them less suitable for industrial application than monohydrochloride salt . . .," ('197 Patent at 10:51-55), Plaintiffs have identified no evidence to support this conclusion. (Zaworotko Reply Rpt. ¶ 90). Indeed, there is no evidence that drug products having a melting point at around 90 degrees Celsius or lower are unsuitable for industrial application. (Zaworotko Reply Rpt. ¶ 91). Moreover, the '197 Patent only identifies the other salts as "less suitable", rather than being unsuitable. A POSA would have expected various salts to provide a range of suitability for pharmaceutical use. The fact that the hydrochloride salt was suitable is consistent with hydrochloride salts generally being the first choice salt form for drug products. *See* Berge et al., "Pharmaceutical Salts," J. Pharm. Sci. 66(1):1-19 (Jan. 1977) ("Berge"); Paulekuhn; Gould, P. L., *Salt selection for basic drugs*, International Journal of Pharmaceutics, 33, 201-217, 1986; Morris, K. R.; Fakes, M. G.; Thakur, A. B.; Newmann, A. W.; Signh, A. K.; Venit, J. J.; Spagnulo, C. J.; Serajuddin, A. T. M., *An integrated approach to the selection of optimal salt form for a new drug candidate*, International Journal of Pharmaceutics 105, 209-217, 1994; Bighley, L. D.; Berge, S. M.; Monkhouse, D. C., *Salt Forms of Drugs and Absorption* in Encyclopedia of Pharmaceutical Technology, Vol. 13; Swarbrick, J., Boylan, J. C., Eds.; Marcel Dekker Inc.: New York, 1996; pp. 453-497; Tong, W.-Q., Whitesell, G., *In Situ Salt Screening—A Useful Technique for Discovery Support and Preformulation Studies*, Pharmaceutical Development and Technology, 3(2), 215-223, 1998, etc.

CONFIDENTIAL

412.    ███████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████    In the case of crystalline pitolisant hydrochloride, the melting point was found to be suitable for pharmaceutical use because it was above 80°C and therefore was amenable to tableting. *Id*. But a property that is useful or even superior does not mean that it is an unexpected result, especially when, as here, the property is routinely tested during drug development and optimization.

413.    Hydrochloride salts are known to produce pharmaceutically acceptable crystal forms as evidenced by their widespread use and status as the first choice of salt form for pharmaceutical formulators. *See* Berge; Paulekuhn; Gould, P. L., *Salt selection for basic drugs*, International Journal of Pharmaceutics, 33, 201-217, 1986; Morris, K. R.; Fakes, M. G.; Thakur, A. B.; Newmann, A. W.; Signh, A. K.; Venit, J. J.; Spagnulo, C. J.; Serajuddin, A. T. M., *An integrated approach to the selection of optimal salt form for a new drug candidate*, International Journal of Pharmaceutics 105, 209-217, 1994; Bighley, L. D.; Berge, S. M.; Monkhouse, D. C., *Salt Forms of Drugs and Absorption* in Encyclopedia of Pharmaceutical Technology, Vol. 13; Swarbrick, J., Boylan, J. C., Eds.; Marcel Dekker Inc.: New York, 1996; pp. 453-497; Tong, W.-Q., Whitesell, G., *In Situ Salt Screening—A Useful Technique for Discovery Support and Preformulation Studies*, Pharmaceutical Development and Technology, 3(2), 215-223, 1998, etc.

v.    Beneficial Solubility Is Not Unexpected

414.    There is nothing unexpected as to the solubility of the claimed crystalline pitolisant hydrochloride. (Zaworotko Reply Rpt. ¶ 92). Table 6 of the '197 Patent purports to disclose solubility data for the crystalline forms of pitolisant hydrochloride, pitolisant hydrogen oxalate, pitolisant hydrogen succinate, and pitolisant hydrogen maleate.

**CONFIDENTIAL**

415.    Table 6 does not include enough information to determine if there is anything unexpected about the solubility of pitolisant hydrochloride, as the solubility is just listed as greater than 100, which is the same as pitolisant succinate. (Zaworotko Reply Rpt. ¶ 93).

## TABLE 6

### Solubility data.

| Salt | Solubility (% w/v) | | |
|------|--------------------|--------------------|--------------------|
| | Water room T | pH 4.5 | pH 7.4 |
| Monohydrochloride | >100 | >100 | >100 |
| Hydrogen oxalate | 1-3 | 1-3 | 3-10 |
| Hydrogen succinate | >100 | >100 | >100 |
| Hydrogen maleate | >50 | >50 | 10-50 |

WAKIX-PLFS_00000008.

416.    Plaintiffs have not identified why the solubility value of >100 for pitolisant hydrochloride, shown in Table 6 above, matters. (Zaworotko Reply Rpt. ¶ 94). Generally contending that higher solubility is a desired property in drug development because it can yield beneficial improvements in bioavailability does not provide a POSA with enough information to determine whether the actual solubility value for pitolisant hydrochloride does, in fact, yield beneficial improvements in bioavailability as compared to any other pitolisant salt in Table 6. (Zaworotko Reply Rpt. ¶ 94). Further, one known advantage of hydrochloride salts is that they can be used to significantly enhance water solubility. (Zaworotko Reply Rpt. ¶ 94). This is one of the reasons that for decades they have been the "go to" salts for pharmaceutical formulation. (Zaworotko Reply Rpt. ¶ 94).

417.    ███████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

**CONFIDENTIAL**

██████████████████████████████████████████████████ At best,

the evidence shows that the solubility of the hydrochloride salt is merely different than the

solubility of the oxalate salt, but POSAs would expect that there would be differences in solubility

between different salt forms. Moreover, the hydrochloride salt, which is the most common salt

form of basic drug molecules (see, Berge et al.; Paulekuhn; Gould, P. L., Salt selection for basic

drugs, International Journal of Pharmaceutics, 33, 201-217, 1986; Morris, K. R.; Fakes, M. G.;

Thakur, A. B.; Newmann, A. W.; Signh, A. K.; Venit, J. J.; Spagnulo, C. J.; Serajuddin, A. T. M.,

An integrated approach to the selection of optimal salt form for a new drug candidate, International

Journal of Pharmaceutics 105, 209-217, 1994; Bighley, L. D.; Berge, S. M.; Monkhouse, D. C.,

Salt Forms of Drugs and Absorption in Encyclopedia of Pharmaceutical Technology, Vol. 13;

Swarbrick, J., Boylan, J. C., Eds.; Marcel Dekker Inc.: New York, 1996; pp. 453-497; Tong, W.-

Q., Whitesell, G., In Situ Salt Screening—A Useful Technique for Discovery Support and

Preformulation Studies, Pharmaceutical Development and Technology, 3(2), 215-223, 1998, etc.),

is specifically known to generally exhibit high aqueous solubility relative to other salt forms or the

free base drug molecule. In fact, during routine formulation, POSAs often screen different salt

forms and expect them to have different solubilities. *Id.* Hydrochloride salts, which are the first

choice for a salt form due to the strong acidity of hydrochloric acid and its high safety profile

(hydrochloric acid is present in gastric fluid in the stomach), in drug development, are known to

provide high solubility, as evidenced by the fact that so many approved drug products are based

upon APIs that are hydrochloride salts. *Id.* It is therefore unsurprising that the hydrochloride salt

of pitolisant was selected for study and that it exhibits high aqueous solubility. Regardless, with

respect to physicochemical properties, these are inherent properties of a solid form that are

determined through routine testing that is performed as part of drug development and there is nothing unexpected about the observed properties.

418.    Finally, the aqueous solubility of pitolisant hydrochloride is an inherent property. Plaintiffs have no evidence that the solubility of pitolisant hydrochloride is unique to the claimed crystalline form. Pitolisant hydrochloride was disclosed in the prior art. *See*, EP503 claims 47-48. Pointing to a property of the prior art is not an "unexpected" result or property, and does not render the asserted claims patentable.

419.    Plaintiffs have not identified any evidence that the pharmacokinetic profile of WAKIX is unique or unexpected. To the contrary, pitolisant hydrochloride has an undesirably long half-life, leading to significant side effects such as insomnia. *See* WAKIX Label (rev. 2024), pp. 5, 12 (WAKIX-HBS_00489339 at 343, 350).

c)    *No Evidence Of Copying*

420.    Plaintiffs rely on the DMFs of Defendants' API suppliers and reports prepared by the API suppliers regarding the APIs identified in the DMFs as compared to the '197 Patent as evidence of alleged copying to be considered as a secondary consideration of non-obviousness.

421.    All organic solvent mediated recrystallizations of pitolisant hydrochloride inherently produce a crystalline form having the claimed XRPD peaks. *See* WAKIX-BP_00181083-138; WAKIX-BP_00222231 - WAKIX-BP_00222326; Patel, J. et al., *Exploring Polymorphism: Hydrochloride Salts of Pitolisant and Analogues*, 24 CRYSTAL GROWTH & DESIGN, 1286-83 (2024). There is no evidence that any of the API suppliers sought to "copy" that form. In fact, the evidence shows that the Defendants in this case deliberately sought to avoid producing pitolisant hydrochloride having the claimed XRPD peaks.

422.    There is no particular advantage of the claimed crystalline pitolisant hydrochloride; and there is no indication that any party desired or attempted to use that form. Plaintiffs have

CONFIDENTIAL

produced no evidence that crystalline pitolisant hydrochloride has any benefits relative to amorphous pitolisant hydrochloride. In fact, amorphous hydrochloride is bioequivalent to crystalline pitolisant hydrochloride in Defendants' ANDA Products. In other words, there is no therapeutic benefit to the claimed form.

### 2.    No Secondary Considerations for the '947 Patent

423.    There is no evidence of secondary considerations of non-obviousness that overcome the prima facie case of obviousness discussed above.

424.    Plaintiffs' alleged evidence of objective indicia of long-felt need, unexpected results, failure of others, and industry praise does not demonstrate the non-obviousness of claim 13 of the '947 patent.

425.    As a threshold matter, Plaintiffs have not shown the required nexus between any of the alleged secondary considerations and a feature of the claim that is both claimed and novel. And even if there was a nexus, Plaintiffs have not provided sufficient evidence of long-felt need, unexpected results, failure of others, or industry praise.

426.    Moreover, the alleged secondary considerations for the '947 Patent do not apply to the obviousness type double patenting references because they are not unique to the '947 Patent.

427.    The alleged secondary considerations apply equally to the '430 Patent obviousness type double patenting reference. Excessive daytime sleepiness is just a degree of diurnal somnolence.

428.    The alleged secondary considerations apply equally to the '605 Patent obviousness type double patenting reference.

429.    The alleged secondary considerations apply equally to the '928 Patent obviousness type double patenting reference.

CONFIDENTIAL

430.    The alleged secondary considerations apply equally to the '413 Patent obviousness type double patenting reference.

a)    *No Nexus*

431.    Plaintiffs have failed to show nexus that is commensurate or co-extensive with the scope of claim 13 of the '947 Patent.

432.    Claim 13 generally relates to a method of treating excessive daytime sleepiness in patients suffering from Parkinson's disease, narcolepsy, or sleep apnea (to the extent those disease states limit the claims) using pitolisant. Plaintiffs only rely on Wakix®, which uses pitolisant and is indicated for the treatment of excessive daytime sleepiness and cataplexy in patients with narcolepsy. However, treatment of excessive daytime sleepiness in patients with narcolepsy is just one embodiment of claim 13 which also recites treatment of excessive daytime sleepiness in patients with sleep apnea and Parkinson's disease. Plaintiffs have not shown that any of the alleged secondary considerations relate to treatment of EDS in Parkinson's disease. Nor can they because, as demonstrated by the multiple failed clinical trials, there is no evidence that pitolisant is effective in treating excessive daytime sleepiness in patients with Parkinson's disease. Moreover, pitolisant is not approved to treat excessive daytime sleepiness in patients with obstructive sleep apnea. It is only approved in Europe for that indication.

433.    Harmony holds multiple additional patents relating to pitolisant, undermining any claim of a nexus between the alleged secondary considerations and the '947 Patent.

434.    Moreover, the '947 Patent does not encompass cataplexy, so there is no nexus to any secondary considerations related to cataplexy.

435.    Accordingly, Plaintiffs have not shown the requisite nexus.

b)    *No Long-Felt But Unmet Need*

436.    There was no long-felt need for a non-scheduled narcolepsy medication that could treat excessive daytime sleepiness. No one in the art expressed any need, much less any long-felt need, for a non-scheduled narcolepsy medication that could treat excessive daytime sleepiness.

437.    As an initial matter, the '947 Patent does not mention, let alone claim the non-scheduled nature of pitolisant or even identify any concern in the relevant field about scheduled drugs. Because there is none. Non-scheduled treatments were already available to treat excessive daytime sleepiness. For example, caffeine, exercise, and naps were used to treat excessive daytime sleepiness as of the effective filing date of the '947 Patent (April 2005). That pitolisant hydrochloride was determined by regulatory authorities many years after the priority date of the '947 Patent to not be prone to abuse or psychological and/or physical dependence is not probative of the non-obviousness of claim 13. This simply reflects a regulatory determination that is subject to change and which does not reflect knowledge in the art as of the priority date.

438.    Regardless, as of April 2005 and to this day, doctors regularly prescribe scheduled substances for the treatment of excessive daytime sleepiness without any concerns over substance abuse. Indeed, Plaintiffs' own experts have published that modafinil, a treatment of excessive daytime sleepiness available well-before April 2005, was not associated with a significant potential for abuse. And scheduled drugs continue to be developed for the treatment of excessive daytime sleepiness even after the '947 Patent issued. For example, LUMRYZ® is a controlled drug that was approved in 2023 for treatment of excessive daytime sleepiness.

439.    Moreover, sleep doctors continue to prescribe controlled substances as first-line treatments of excessive daytime sleepiness even after the availability of Wakix®. For example, modafinil is still the front line treatment and most widely prescribed treatment for excessive

daytime sleepiness. Doctors prescribe treatments for excessive daytime sleepiness based on safety and efficacy, not on whether the drug is scheduled or not.

440.    Even if it were claimed, whether a substance is addictive or not is an inherent property of a drug. There is no dispute that pitolisant was known in the art. Thus, any of its inherent properties do not provide evidence of secondary considerations. Furthermore, the non-scheduled nature of Wakix® applies equally to the '430, '605, '928, and/or '413 Patent references.

c)    *No Unexpected Results*

441.    Plaintiffs have also failed to demonstrate that the alleged therapeutic benefits of pitolisant as a method of treating excessive daytime sleepiness in patients with Parkinson's disease, narcolepsy and sleep apnea were unexpected.

442.    A POSA would have reasonably expected an H3 antagonist having a potency and selectivity comparable to thioperamide such as pitolisant to beneficially promote wakefulness and thereby ameliorate excessive daytime sleepiness in patients with Parkinson's disease, narcolepsy, or sleep apnea. Indeed, the '947 Patent admits that H3 antagonists were known to promote an extended wakefulness. '947 Patent at 1:14-19; *see also* WO '254 at 1:6-10.

443.    The prior art explicitly disclosed that it was "expected" that H3 antagonists could treat excessive daytime sleepiness in narcoleptic and other patients. *See, e.g.*, Brooks at 1825 ("studies have also demonstrated that H$_3$ antagonists, such as thioperamide (BioProjet, Societe Civile de Recherche) increase wakefulness" and observes that "[s]uch agents may prove useful in treating EDS due to narcolepsy or other causes."), Onodera 1994 at 695 ("[c]linical introduction of these drugs is still very preliminary but, for example, thioperamide is expected to be useful for the therapy of narcolepsy and dementia."), Alguacil at 307 ("Ligands of the H3 receptors could be expected to affect sleep and wakefulness by changing central histaminergic tone."). Indeed, it was well known that pitolisant was a potent H$_3$ receptor antagonist and H$_3$ receptor antagonists were

known to promote wakefulness and alertness and even act as a stimulant. *See, e.g.*, Lin 1990; Monti 1991; Ganellin 1995; Ganellin 1996; Leurs 1998; Ligneau 1998; Toyota 2002; WO '254.

444.    A POSA would have had a reasonable expectation of success that an agent that promotes wakefulness would ameliorate excessive daytime sleepiness regardless of the underlying disease state. Narcoleptic and other patients that are sleepy during the daytime would benefit from drugs that reduce sleepiness, like stimulants. That is because the stimulants are directly treating the symptom of sleepiness. A POSA would have understood that pitolisant was a potent and selective H3 antagonist, which was known to promote wakefulness. As such, a POSA would have had a reasonable expectation of success of using pitolisant as a stimulant or wake-promoting agent for treating excessive daytime sleepiness.

445.    Accordingly, there was nothing unexpected about pitolisant's ability to treat excessive daytime sleepiness in patients with narcolepsy and sleep apnea.

446.    Plaintiffs have also failed to show that pitolisant's pharmacokinetic profile provided any unexpected benefit. Pitolisant's pharmacokinetic profile is an inherent property of the drug, which was in the prior art as of the priority date of the '947 Patent. Thus, any of its inherent properties do not provide evidence of secondary considerations.

447.    Moreover, pitolisant's pharmacokinetic profile does not provide a clinical benefit. As stated on its label, pitolisant has a long half-life of 20 hours. Stimulants, like pitolisant, should have a shorter half-life so that the arousing effects only occur during daytime hours or so that patients can take additional doses before starting activities that require increased alertness (e.g., before driving a car). As a result, the primary side effect of pitolisant is insomnia, which could exacerbate rather than ameliorate excessive daytime sleepiness.

d)    *No Failure of Others*

CONFIDENTIAL

448.    Plaintiffs have also not shown that other companies failed to develop pitolisant to treat excessive daytime sleepiness in patients with narcolepsy, Parkinson's disease,[9] or sleep apnea.

449.    Instead, Plaintiffs largely point to the alleged failed development of other compounds and/or the alleged failure to use these compounds to treat symptoms/diseases other than excessive daytime sleepiness in patients with narcolepsy, Parkinson's disease, or sleep apnea. For example, Plaintiffs identify alleged failures to develop treatments for Alzheimer's, ADHD, etc., which have no bearing on the obviousness of treating excessive daytime sleepiness. Indeed, most of the alleged failures Plaintiffs identify occurred *after* the filing date of the '947 Patent, which provide little, if any, probative evidence of failure of others.

450.    Also for many of the alleged "failures," Plaintiffs do not point to actual evidence of failures. Instead, Plaintiffs speculate that a company's decision not to advance certain compounds (either pre-clinically or clinically) must mean that the compound failed. Plaintiffs ignore the many various reasons that a company might choose to advance a particular compound, including economic or market-related considerations and internal priorities.

e)    *Industry Praise*

451.    Plaintiffs have also failed to show that Wakix® has received any industry praise. Plaintiffs largely rely on articles they sponsored for their alleged "industry praise," including from a Wakix® spokesperson. Plaintiffs also rely on articles identifying pitolisant's approval to treat *both* excessive daytime sleepiness and cataplexy to show alleged industry praise. But cataplexy is

---

[9] Plaintiffs themselves have failed to develop pitolisant to treat excessive daytime sleepiness in patients with Parkinson's disease. As noted, Plaintiffs' two Phase 3 trials for treating excessive daytime sleepiness in patients with Parkinson's disease failed to demonstrate any efficacy for that indication.

not claimed in the '947 Patent. Moreover, simply being FDA approved to treat more than one indication is not evidence of praise.

452.    Finally, Plaintiffs claim that Wakix has received praise for being the only non-controlled drug with an excessive daytime sleepiness indication. As explained above with respect to long-felt need, pitolisant's status as a non-scheduled drug is not claimed or mentioned in the '947 Patent and is not an important differentiator for physicians in the sleep medicine field.

### G.    The Asserted Claim of the '947 Patent Is Not Enabled

453.    The Asserted Claim of the '947 Patent fails to meet the enablement requirement because a POSA would not have been able to practice a method of treating excessive daytime sleepiness in patients suffering from Parkinson's disease with pitolisant.

454.    First, the specification does not provide data sufficient to demonstrate to a POSA that pitolisant would be effective in treating excessive daytime sleepiness in patients with Parkinson's disease. The '947 Patent only contains data from a cat model of Parkinson's disease. *See* '947 Patent, Example 1. It does not contain any human clinical data showing that pitolisant treats excessive daytime sleepiness in patients with Parkinson's disease. Plaintiffs' expert, Dr. Roth, opines that without data on pitolisant's effects on humans, a POSA would not understand that pitolisant was effective in treating any condition in humans. Dr. Roth also testified that as of the filing date of the '947 Patent is would not have been expected that an $H_3$ antagonist or inverse agonist could treat excessive daytime sleepiness. Roth Dep. Tr. Vol. I, 62:7-65:11. The '947 Patent thus does not describe or provide a POSA with sufficient information to practice the full scope of Claim 13.

455.    Second, Bioprojet tried to seek regulatory approval for treating excessive daytime sleepiness in patients suffering from Parkinson's disease with pitolisant, but failed because pitolisant did not show statistically significant improvement in excessive daytime sleepiness in

Parkinson's patients as compared to placebo. *See* Bioprojet Clinical Study Report - *Randomized, Multicenter, 12-Week, Double-blind, Placebo-Controlled, Study to Assess the Efficacy and Safety of BF2.649 in Excessive Daytime Sleepiness (EDS) in Parkinson disease, followed by a 9-month Open-Label Extension Phase* - Reference P06-10_Harps 1, dated February 7, 2014 ("HARPS1 Report") (WAKIX-HBS_00132184-200); Bioprojet Clinical Study Report - *Randomized, Multicenter, 12-Week, Double-blind, Placebo-Controlled, Study to Assess the Efficacy and Safety of BF2.649 in Excessive Daytime Sleepiness (EDS) in Parkinson disease*, *followed by a 9-month Open-Label Extension Phase* - Reference P06-10_Harps 2, dated February 12, 2014 ("HAPRS2 Report")(WAKIX-HBS_00139059 at 068); *see also, e.g.*, AET_000164060-061; Bioprojet - NCT01036139, *Efficacy and Safety of BF2.649 in Excessive Daytime Sleepiness (EDS) in Parkinson's Disease* (HARPS1) (AET_000164381-382); Bioprojet - NCT01067222, Efficacy and Safety Study of BF2.649 in the Treatment of Excessive Daytime Sleepiness in Narcolepsy (Harmony1) (AET_000164475-477). Indeed, Harmony concluded based on those studies that pitolisant "was not more effective at reducing EDS than the placebo" and that the highest dose of pitolisant given to patients "was less effective at reducing EDS tha[n] the placebo." *See* HARPS1 Report (WAKIX-HBS_00132184 at 193); HARPS2 Report (WAKIX-HBS_00139059 at 068).

456. ████████████████████████████████████████

████████████████████████████████████████ Bioprojet was aware of this during prosecution of the '947 Patent, despite its submission of interim clinical trial data in a 1.132 declaration from Dr. Schwartz in which he declared that pitolisant successfully treated excessive daytime sleepiness in Parkinson's patients. *See* Schwartz Dep. Tr. Vol. II at 193-199; Schwartz Dep. Ex. 18 (WAKIX-PLFS_00002090-105). Because pitolisant did not work in the treatment of excessive daytime sleepiness in Parkinson's Disease, the full scope of Claim 13 is not enabled.

CONFIDENTIAL

457.    Given the failure of pitolisant to treat excessive daytime sleepiness in Parkinson's Disease, a POSA could not practice the full scope of Claims 13 of the '947 Patent without undue experimentation.

458.    Moreover, the specification only provides limited data for treatment with pitolisant. (WAKIX-PLFS_00000031 at 054). This sparse data would not enable a person of skill in the art to practice the full scope of the Asserted Claim, to the extent Claim 13 is found to be nonobvious. *Id.* The five examples discuss the treatment of (1) Wakefulness/Sleep Disorders of Parkinson's Disease in a cat model; (2) Obstructive Sleep Apnea; (3) Dementia with Lewy Bodies; (4) Parkinson's Disease with Histamine $H_3$ Antagonists/Inverse Agonists in Combination with an Anti-Parkinson Drug; and (5) Treatment of Narcolepsy with Histamine $H_3$ Antagonists/Inverse Agonists. *Id.* The fifth example, which includes "narcolepsy" in the title, actually relates to sleep apnea. The example states "[t]wo clinical studies were conducted on patients suffering from obstructive sleep apnea (OSA)." *Id.* Outside of this statement, there is no discussion on the treatment of excessive daytime sleepiness. Moreover, there is no evidence of the results of this study. *See id.* Thus, there are no working examples of treating excessive daytime sleepiness in patients with narcolepsy. Thus, to the extent Claim 13 is found to be nonobvious, a POSA would need to engage in extensive and undue experimentation to practice the full scope of the Asserted Claim.

459.    In view of all of the foregoing considerations, the '947 Patent does not enable a POSA to practice the full scope of the Asserted Claim because the patent provides no guidance on how to determine whether pitolisant would be effective in treating excessive daytime sleepiness in Parkinson's disease and/or narcolepsy patients without undue experimentation, so the Asserted Claim fails to meet the enablement requirement.

**CONFIDENTIAL**

460.    Accordingly, the Asserted Claim of the '947 Patent is invalid for lack of enablement.

### H.    The Asserted Claim of the '947 Patent Lacks Written Description

461.    The Asserted Claims of the '947 Patent fail to meet the written description requirement because the patent does not demonstrate that the inventors were in possession of the claimed invention.

462.    The '947 Patent specification discloses five examples discussing the treatment of (1) Wakefulness/Sleep Disorders of Parkinson's Disease in a Cat model; (2) Obstructive Sleep Apnea; (3) Dementia with Lewy Bodies; (4) Parkinson's Disease with Histamine $H_3$ Antagonists/Inverse Agonists in Combination with an Anti-Parkinson Drug; and (5) Treatment of Narcolepsy with Histamine $H_3$ Antagonists/Inverse Agonists. (WAKIX-PLFS_00000031 at 054). On the fifth example, which ostensibly discusses narcolepsy, the specification states, "[t]wo clinical studies were conducted on patients suffering from obstructive sleep apnea (OSA)." *Id.* Outside of this statement, there is no discussion on the treatment of excessive daytime sleepiness. *Id.* Moreover, there is no evidence of the results of this test. *Id.* The lack of further information concerning the conditions for treating this sleepiness in the group of patients affected by narcolepsy renders the claims of the '947 Patent invalid for lack of written description. For a POSA, there is nothing suggesting that the inventors had possession of the invention. *Id.*

### I.    The Asserted Claim of the '947 Patent Is Indefinite

463.    Claim 13 recites pitolisant "or its . . . optical isomers, racemates, diastereoisomers or enantiomers."

464.    Pitolisant is achiral, and therefore optical isomers, racemates, diastereoisomers, and enantiomers of pitolisant do not exist.

465.    A POSA cannot ascertain the scope of Claim 13 with reasonable certainty because it claims non-existent forms of pitolisant.

466.    Attempts to read the language as referring to the stereochemistry of pitolisant salts are unsupported by the claim grammar and the '947 Patent specification.

### J.    The Asserted Claim of the '947 Patent Lacks Written Description for the Treatment of Cataplexy

467.    Asserted Claim 13 of the '947 Patent depends from independent Claim 1, which recites in part "[a] method for treating excessive daytime sleepiness comprising administering to a patient in need thereof a compound of formula (IIa) . . . wherein said patient is suffering from Parkinson's disease, narcolepsy, or sleep apnea." '947 Patent, col. 44, l. 54 – col. 45, l. 35, col. 46, ll. 34-39.

468.    If the construction of "excessive daytime sleepiness" (i.e., "EDS") advanced by Plaintiffs were to be adopted (*see supra* III.A.3), the asserted claim of the '947 Patent would be invalid for lack of written description to the extent it is construed as covering cataplexy. Plaintiffs assert that "EDS" should be construed to include other symptoms of narcolepsy, particularly cataplexy. But nothing in the '947 Patent would demonstrate to a POSA that the named inventors possessed a method of treating cataplexy. Nor is there anything in the '947 Patent that would demonstrate to a POSA that the named inventors possessed a method of treating other symptoms of narcolepsy such as hypnagogic hallucinations, nocturnal sleep disruptions, or sleep paralysis.

469.    The '947 Patent lacks adequate written description for treatment of cataplexy. The claims and specification of the '947 Patent make no mention of cataplexy.

470.    At the time of invention, a POSA would not have understood disclosures in the '947 Patent related to the treatment for excessive daytime sleepiness as also teaching a method of treating cataplexy.

CONFIDENTIAL

471.    As discussed above and below, it was understood as of the priority date of the '947 Patent that the excessive daytime sleepiness symptom of narcolepsy in humans is caused by deficient hypocretin neurotransmission in the lateral hypothalamus (Mignot 2002 at 1073 (ANIPitolisant00028322)), but the origin and pathophysiology of the cataplexy was still unresolved.

472.    In addition, as of the priority date of the '947 Patent, cataplexy and excessive daytime sleepiness were treated with different medications. *See supra* at III.A.3.  A POSA would not have expected that a drug directed to treating one symptom of narcolepsy, such as excessive daytime sleepiness, would be effective at treating another symptom, such as cataplexy. Indeed, as noted above, FDA had not approved a single drug for the treatment of both excessive daytime sleepiness and cataplexy as of the priority date of the '947 Patent. *See supra* at III.A.3.

473.    Despite the availability of data showing efficacy of pitolisant in an animal model of cataplexy as of the patent's earliest priority date, that data is absent from the '947 Patent. WAKIX-BP 00212124-35; Chemelli 1999. That data, however, was included in U.S. Patent Application No. US 2009/0312367 (the "'367 application), which was later filed by the same two inventors listed on the '947 Patent and which specifically claims a method for treating narcolepsy-cataplexy. *See supra* at III.A.3; s*ee also* WAKIX-BP 00212124-35.

474.    The typical symptoms associated with narcolepsy include excessive daytime sleepiness, cataplexy, sleep paralysis, nocturnal sleep disruption, and hallucinations. *See, e.g.*, Kryger 2005 at 780-82 (ANIPitolisant00032086-88). Under Dr. Roth and Dr. Meskill's constructions of excessive daytime sleepiness, all of these symptoms of narcolepsy would fall within the scope of the '947 Patent claims. In essence, Dr. Roth and Dr. Meskill assert that the scope of the claims encompass treating many symptoms of narcolepsy beyond excessive daytime

sleepiness to the point of treating narcolepsy as a whole. But the language of the claims only specify treating excessive daytime sleepiness in patients with, *inter alia*, narcolepsy.

475.    Plaintiffs' experts Dr. Roth and Dr. Meskill suggest that a POSA would "understand" cataplexy to be a displaced manifestation of the REM state in narcoleptics. But other symptoms of narcolepsy, namely, sleep paralysis and hallucinations, have also been theorized to be related to the REM state. *See, e.g.*, Kryger 2005 at 780 (ANI-Pitolisant00032086); Chabas 2003 at 460 (ANIPitolisant00028184). According to Dr. Roth and Dr. Meskill, the term "EDS" as used in the '947 Patent would cover all the typical symptoms associated with narcolepsy, including sleep paralysis, nocturnal sleep disruption, and hypnagogic hallucinations.

476.    The assertion by Dr. Roth and Dr. Meskill that "EDS" as used in the '947 Patent includes hallucinations conflicts with the disclosures of the patent, which associate hallucinations with parasomnias, and not with excessive daytime sleepiness. *See* '947 Patent col. 2, ll. 36-46 ("PD patients display sleep and vigilance disorders . . . [which] include disorders of sleep initiation and maintenance, sleep fragmentation, parasomnias (including nocturnal hallucinations), sleep disordered breathing and excessive daytime sleepiness . . . ."). Indeed, the only mention of hallucinations in the '947 Patent is in association with parasomnias in patients with Parkinson's, and there is nothing in the '947 Patent to indicate that pitolisant would be effective at treating hallucinations.

477.    In addition, as with cataplexy, the '947 Patent is completely silent as to the symptom of sleep paralysis. This is yet further evidence that Dr. Roth and Dr. Meskill's constructions are overbroad.

478.    Indeed, any assertion by Dr. Roth or Dr. Meskill that the '947 Patent describes, discloses, and claims treating the other symptoms of narcolepsy related to the REM state in patients

with narcolepsy (sleep paralysis, nocturnal sleep disruptions, and hypnagogic hallucinations) encounters the same issues with written description that exist for cataplexy. Roth Rebuttal Rpt. 344, 508. Nothing in the '947 Patent would allow a POSA to conclude that the inventors possessed a method of treating hypnagogic hallucinations, nocturnal sleep disruptions, or sleep paralysis in patients with narcolepsy.

479.    As such, if Dr. Roth or Dr. Meskill's construction of excessive daytime sleepiness is adopted, a POSA would not understand that the named inventors possessed the full scope of the claims, because they lack written description at least with respect to other symptoms of narcolepsy, including cataplexy, sleep paralysis, nocturnal sleep disruption, and hypnagogic hallucinations.

480.    Use Code U-1102 is Improperly Listed in the Orange Book for the '947 Patent

481.    The '947 Patent has two listed use codes in FDA's Orange Book: U-1101 for a "method of treating daytime sleepiness in patients with narcolepsy", and U-1102 for a "method of treating cataplexy in patients with narcolepsy." Orange Book at ADA 356 (ANIPitolisant00028362); *id*. at ADB 108 (ANIPitolisant00028363).

482.    As of the priority date, a POSA would understand cataplexy to be "the abrupt loss of muscle tone triggered by strong emotional reactions or exercise." Principles and Practice of Sleep Medicine (Meir H. Kryger, Thomas Roth, & William C. Dement eds., 4th ed., 2005) ("Kryger 2005") at 597 (ANI-Pitolisant00030568-88); *see also* Chabas 2003 at 460 (ANI-Pitolisant00028184) ("Cataplexy, a highly specific symptom, is sudden muscle atonia in response to emotional arousal, in particular laughter."). Cataplexy represents an intrusion of one isolated feature of the REM state. Other intrusions of REM-associated phenomena into the wake state that are also associated with narcolepsy include sleep paralysis and hypnagogic hallucination. Chabas 2003 at 460 (ANI-Pitolisant00028184). In the REM state, an individual's muscles become largely

CONFIDENTIAL

paralyzed. Cataplexy is the abrupt loss of muscle tone triggered by strong emotional stimuli . . . ." Kryger 2005 at 597 (ANI-Pitolisant00030573). "Cataplexy is incapacitating because it leaves the individual awake but temporarily either fully or partially paralyzed." Yves Dauvilliers et al., *Cateplexy—Clinical Aspects, Pathophysiology and Management Strategy*, 10 NAT. REV. NEUROL. 386, 386 (2014) ("Dauvilliers 2014") (WAKIX-HBS_00568601-10); *See also* Joshi John et al., *Cataplexy-Active Neurons in the Hypothalamus: Implications for the Role of Histamine in Sleep and Waking Behavior*, 42 Neuron 619, 619 (2004) ("John 2004") (WAKIX-HBS_00210191-206); Michihiro Mieda et al., *Orexin peptides prevent cataplexy and improve wakefulness in an orexin neuron-ablated model of narcolepsy in mice*, 101 PROC. OF THE NAT'L ACAD. OF SCIS. 4649, 4649 (2004) ("Mieda 2004") (ANIPitolisant00028314-19).

483.    Excessive daytime sleepiness is commonly evaluated using subjective and/or objective criteria. The Epworth Sleepiness Scale ("ESS") is a commonly used questionnaire to evaluate subjective indicators of sleepiness. Murray W. Johns, *A New Method for Measuring Daytime Sleepiness: The Epworth Sleepiness Scale*, 14 Sleep 540, 541 (1991) ("Johns 1991") (ANI-Pitolisant00030562-67). The questionnaire yields a total score ranging from 0 to 24, with a score of 11 and above considered to represent excessive daytime sleepiness. *Id.* at 541; Gerard J. Meskill et al., *Clinical Impact of Pitolisant on Excessive Daytime Sleepiness and Cataplexy in Adults with Narcolepsy: An Analysis of Randomized Placebo-Controlled Trials*, 36 CNS Drugs 61, 63 (2021) ("Meskill 2021") (HBS-EXPERT_0003522-30). To determine a patient's ESS score, doctors practicing sleep medicine will ask the patient eight questions to rate the patient's likelihood of dozing off or falling asleep in various situations – for example, sitting and reading or being in a car while stopped in traffic for a few minutes. Johns 1991 at 541 (ANI-Pitolisant00030563). For each question, the patient is asked to rate their likelihood of dozing off or falling asleep (in contrast

to just feeling tired) on a scale of 0 to 3, with 0 meaning they would never doze, 1 meaning they have a slight chance of dozing, 2 meaning they have a moderate chance of dozing, and 3 meaning they have high chance of dozing. The scores for each prompt are then added to give the final total. A patient's responses are used to guide diagnosis of emergent challenges to individual and public safety and quality of life.

484.    One of the most widely used and reliable objective measurements of sleepiness is the multiple sleep latency test ("MSLT"). *See, e.g.,* Johns 1991 at 540 (ANI-Pitolisant00030562). Administration of an MSLT is recited in the current version of the diagnostic criteria for Narcolepsy Type 1 ("NT1"). Am. Acad. of Sleep Med., *International Classification of Sleep Disorders* 179 (3d ed. Text Revision 2023) ("ICSD-3-TR") (ANI-Pitolisant00028237-81); *see also* ICSD-2 at 84 (ANI-Pitolisant00028233). The ESS is a subjective measure whereas the MSLT is a more objective measure of sleepiness. *See, e.g.*, Murray W. Johns, *Sleepiness in Different Situations Measured by the Epworth Sleepiness Scale,* 17 Sleep 703, 705-10 (1994) (WAKIX-HBS_00556423-WAKIX-HBS_00556430).

485.    Narcolepsy is just one of many different sleep disorders in which excessive daytime sleepiness sometimes manifests. *See, e.g.*, Kryger 2005 at 596 (ANI-Pitolisant00030572).

a)    *Excessive Daytime Sleepiness and Cataplexy Are Two Distinct Symptoms of Narcolepsy*

486.    Cataplexy is a pathognomonic symptom of narcolepsy. Unlike EDS, cataplexy is not a symptom associated with a wide variety of sleep disorders, but is unique to Narcolepsy Type 1 ("NT1"). *See e.g.*, ICSD-3-TR at 179 (ANIPitolisant00028261). Cataplexy represents one of several manifestations in which REM-associated phenomena intrude into waking states. As noted above, other REM-related manifestations can include sleep paralysis and hypnagogic hallucinations. Cataplexy symptoms vary in onset, frequency, and severity. Each individual

CONFIDENTIAL

episode of cataplexy can last anywhere from a single second to nearly two minutes. *See, e.g.*, M.M. Ohayon et al., *Prevalence of narcolepsy symptomatology and diagnosis in the European general population*, 58 Neurology 1826, 1830 (2002) ("Ohayon 2002") (WAKIX-HBS_00210614-21); M.M. Ohayon et al., *Frequency of narcolepsy symptoms and other sleep disorders in narcoleptic patients and their first-degree relatives*, 14 J. Sleep Res. 437, 441 (2005) ("Ohayon 2005") (ANI-Pitolisant00028353-61).

487.    Excessive Daytime Sleepiness (EDS) is a clinical condition characterized by an inability to stay awake and alert during the major waking episodes of the day. (Kushida Opening Report, ¶ 110). Patients with excessive daytime sleepiness may fall asleep at inappropriate times. A patient in the throes of cataplexy is experiencing REM-related muscle paralysis while awake. Put differently, the person remains conscious throughout a cataplexy episode. *See, e.g.*, Chabas 2003 at 460 (ANI-Pitolisant00028184); John 2004 at 619 (WAKIX-HBS_00210191); Mieda 2004 at 4649 (ANIPitolisant00028314).

488.    Excessive daytime sleepiness and cataplexy occur in response to different stimuli. Cataplexy is triggered by strong emotional reactions, especially laughter or surprise. John 2004 at 619 (WAKIX-HBS_00210191); Kryger 2005 at 597 (ANI-Pitolisant00030573). In contrast, excessive daytime sleepiness most often occurs while doing monotonous activities that require no active participation, such as being a passenger in an automobile, and can be temporarily suppressed by physical activity.

489.    Excessive daytime sleepiness and cataplexy also frequently develop at different ages and are not both present in all patients with narcolepsy. *See, e.g.*, J.G. van Dijk et al.*, Isolated Cataplexy of more than 40 Years' Duration*, 159 British J. Psych. 719, 719-21 (1991) ("van Dijk 1991") (ANI-Pitolisant00032089-93); *Principles and Practice of Sleep Medicine* (Meir H. Kryger,

## CONFIDENTIAL

Thomas Roth, & William C. Dement eds., 4th ed., 2017) at 875. Indeed, the current version of the ICSD-3-TR diagnostic manual does not recite EDS under the diagnostic criteria for NT1. ICSD-3-TR at 179-191 (ANI-Pitolisant00028261-73).

490.    The pathophysiologic mechanism underlying cataplexy is not the same as that which causes excessive daytime sleepiness. As of the earliest priority date of the '947 Patent, it was understood that at least excessive daytime sleepiness, as a symptom of narcolepsy in humans, is caused by deficient hypocretin neurotransmission in the lateral hypothalamus. Emmanuel Mignot, Shahrad Taheri & Seji Nishino, *Sleeping with the Hypothalamus: Emerging Therapeutic Targets for Sleep Disorders*, 5 Nature Neuroscience 1071, 1073 (2002) ("Mignot 2002") (ANIPitolisant00028320-24). At the time, $H_3$ histamine receptors had long been a target for developing treatments for EDS. *See, e.g.*, Seji Nishino et al., *Decreased Brain Histamine Content in Hypocretin/Orexin Receptor-2 Mutated Narcoleptic Dogs*, 313 Neuroscience Letters 125, 125-28 (2001) (ANI-Pitolisant00031269-72). In contrast, the way in which pitolisant acts to alleviate cataplexy was and remains poorly understood. *See* Yves Dauvilliers, Isabella Arnulf & Emmanuel Mignot, *Narcolepsy with Cataplexy,* 369 The Lancet 499, 499, 502-05, 507 (2007) (WAKIX-HBS_00031632-44); Dauvilliers 2014 at 56 (WAKIX-HBS_00568606); WAKIX-BP 00140153-65; ANI-Pitolisant00032094-106; ICSD-3-TR at 171-91 (ANI-Pitolisant00028261-81); ICSD-2 at 81-90 (ANIPitolisant00028232-36). It is generally understood that serotonergic or noradrenergic cells are primarily implicated in muscle tone, but that histamine cells are not. John 2004 at 628-31 (WAKIX-HBS_00210200-03). Indeed, Plaintiffs' experts have suggested that pitolisant treats cataplexy via a receptor system other than $H_3$ histamine receptors. Thus, although the mechanism underlying cataplexy remains unresolved, it is known to be different from that which causes excessive daytime sleepiness.

**K.    Plaintiffs Have No Basis for Listing Use Code U-1102 in the Orange Book for the '947 Patent.**

491.    As further discussed above, the '947 Patent does not mention cataplexy even once, let alone recite a method of treating cataplexy in patients with narcolepsy. Nor does the '947 Patent provide data that would demonstrate efficacy for the treatment of cataplexy, despite having such pre-clinical data available to the named inventors before the priority date of the '947 Patent. *Supra* at III.A.3.

492.    As discussed above, excessive daytime sleepiness and cataplexy are distinct symptoms of narcolepsy. *Supra* at III.A.3.  Whereas excessive daytime sleepiness is "the inability to stay awake and alert during major waking episodes of the day", cataplexy is "the abrupt loss of muscle tone triggered by strong emotional stimuli or physical exercise. Patients are aware of their surroundings and have a clear memory of the events.]" Kryger 2005 at 597-98 (ANI-Pitolisant00030573-4), 619 (ANI-Pitolisant00030582).

493.    Plaintiffs' experts agree that the '947 Patent claim language is written in plain English and is not ambiguous in its form. Moreover, Plaintiffs' experts admit that a POSA would not understand EDS, under its plain and ordinary meaning, to include cataplexy, which is a separate symptom. Plaintiffs' own experts also agree that, under the plain and ordinary meaning of EDS, the claims of the '947 Patent exclude anything other than excessive daytime sleepiness.

494.    The '947 Patent does not provide an alternate definition of EDS. Indeed, Dr. Roth testified that nobody in the art has used the definition of EDS advanced here by Plaintiffs.

495.    Moreover, a POSA would understand that the '947 Patent applicants disclaimed during prosecution any claim scope relating to the treatment of symptoms other than EDS. During prosecution, the named inventors also disavowed claims covering symptoms of narcolepsy other than EDS. The original application recited a method of treating a number of disorders, including

CONFIDENTIAL

Parkinson's disease, obstructive sleep apnea, and narcolepsy. The Examiner countered with a "Requirement for Restriction/Election" requesting that, pursuant to PTO procedure, the applicants select a single group of claims for further prosecution. Requirement for Restriction/Election, Application No. 11/909,778 at 1-2 (U.S. Patent & Trademark Office Oct. 12, 2010) (WAKIX-PLFS_00001969- WAKIX-PLFS_00001976). One such group was of claims "drawn to a method of treating narcolepsy." *Id*. But the applicants did not accept any of the Examiner's suggest groups and instead elected (without traverse) claims directed to a "method for the treatment of excessive daytime sleepiness." Response to Restriction/Election Requirement, Application No. 11/909,778 (U.S. Patent & Trademark Office Dec. 8, 2010) (WAKIX-PLFS_00001996). Here, the applicants disavowed claims covering (1) narcolepsy in full, and (2) symptoms of narcolepsy other than excessive daytime sleepiness (*e.g.,* cataplexy, sleep paralysis, and hypnagogic hallucinations).

496. Also as discussed above, a POSA would recognize that the named inventors of the '947 Patent knew how to properly disclose and claim methods of treating cataplexy at least because later issued '367 Application claims methods for the treatment of narcolepsy-cataplexy. *See supra* at I.A.3.

497. Plaintiffs' fact witness, Michelle Roy, also failed to articulate any reasonable basis for listing the cataplexy use code in the Orange Book. At her deposition, Ms. Roy refused to answer questions regarding Plaintiffs' interpretation of the '947 Patent claims as it relates to use code U-1102, asserting attorney-client privilege.

498. A third party previously submitted a dispute to FDA regarding Plaintiffs' listing of use code U-1102 (for a "method of treating cataplexy in patients with narcolepsy") in the Orange Book for the '947 Patent. WAKIX-HBS_00569135 (citing 81 Fed. Reg. 69,580 at 69,598). The listing dispute asserted that, because "the relevant claims do not include cataplexy or the symptoms

CONFIDENTIAL

of narcolepsy[,]" the use code U-1102 "is broader than the claims set forth in the patent, which do not apply to cataplexy in patients with narcolepsy." (*Id.*)

499.    Plaintiffs were required to respond to the listing dispute by withdrawing, amending, or confirming the correctness of the listing of use code U-1102 for the '947 Patent. *See* WAKIX-HBS_00569133. Because Plaintiffs did not withdraw use code U-1102, federal regulations required them to provide a short narrative description of their "interpretation of the scope of the patent that explains why the existing or amended 'Use Code' describes only the specific approved method of use claimed by the patent for which a claim of patent infringement could reasonably be asserted . . . ." *Id.; see also* 21 C.F.R. § 314.53(f)(1)(i)(B).

500.    ███████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████

## IV.    AET'S ANDA PRODUCTS DO NOT INFRINGE THE ASSERTED CLAIMS

501.    AET's ANDA Products do not infringe the Asserted Claims for at least the reasons discussed below.

502.    AET's ANDA expressly states that its ANDA Products contain amorphous pitolisant hydrochloride. AET ensures that its ANDA Products contain amorphous pitolisant hydrochloride by using a well-established, validated manufacturing process known to produce amorphous formulations – spray granulation. AET formulates its ANDA Products to prevent conversion of amorphous pitolisant hydrochloride to crystalline pitolisant hydrochloride. The result of AET's efforts are ANDA Products that contain only amorphous pitolisant hydrochloride

CONFIDENTIAL

and which have never experienced any conversion to a crystalline form, much less the claimed crystalline form of pitolisant hydrochloride, as evidenced by extensive XRD testing by AET and independent laboratories.

### A. AET's ANDA Products Contain Amorphous Pitolisant Hydrochloride.

503.    AET's ANDA Products do not contain the crystalline pitolisant hydrochloride required by claims 1 and 2 of the '197 Patent. They contain amorphous pitolisant hydrochloride.

504.    AET's ANDA directly addresses the issue of infringement because it states that AET's ANDA Products contain amorphous, not crystalline, pitolisant hydrochloride. *See, e.g.*, AET_000007695-7855 at e.g., 7731.

505.    AET's ANDA Products are 5 mg or 20 mg amorphous pitolisant hydrochloride tablets (equivalent to 4.45 mg or 17.8 mg of pitolisant free base, respectively) formulated for oral administration.

### 1. AET's Manufacturing Process Assures That There Is No Crystalline Pitolisant Hydrochloride in AET's ANDA Products.

506.    The manufacturing process for AET's ANDA Products uses crystalline pitolisant hydrochloride (purchased from third parties Nuray Chemicals Private Limited ("Nuray") (DMF No. 035859) or Emnar Private Limited ("Emnar") (DMF No. 039126)), dissolves the crystalline pitolisant hydrochloride together with maltodextrin in water to form an aqueous solution, and subsequently generates amorphous pitolisant hydrochloride via a spray granulation technique. *See* AET_000007695-7855 at e.g., 7782-7784. This entire process occurs in India. Dissolution of the crystalline pitolisant hydrochloride destroys the crystalline structure.

507.    Spray granulation is an established manufacturing technique for preparing amorphous solids or formulating amorphous solid dispersions. *See* Neuwirth et al., *Amorphous*

*Solid Dispersions Layered onto Pellets—An Alternative to Spray Drying?*, Pharmaceutics 15,

764 (2023).

508.    In AET's spray granulation method, the API is dissolved in a solvent and sprayed

onto a substrate, then dried and collected.



509.    The amorphous pitolisant hydrochloride in AET's ANDA Products is generated by

first completely dissolving pitolisant hydrochloride (purchased from third parties Nuray Chemicals

Private Limited ("Nuray") or Emnar Private Limited ("Emnar")) and maltodextrin in purified

water to produce a clear solution. *See* AET_000007695-7855 at *e.g.*, 7782-7784;

CONFIDENTIAL

AET_000007949-8288; AET_000007397-7511 at e.g., 7423; Dr. Florian Herb Deposition Transcript, Dated April 29, 2025 ("Herb Dep. Tr.") at e.g., 78:12-86:21; 98:25-106:21; 128:4-129:8; 195:15-197:4; 199:20-203:1; Dr. Abhay Joshi Deposition Transcript, Dated May 1, 2025 ("Joshi Dep. Tr.") at e.g., 41:8-54:4; 112:6-20. The complete dissolution of the purchased third party pitolisant hydrochloride is confirmed by two different operators. *See* AET_000007695-7855 at *e.g.*, 7782-7784; AET_000007949-8288; AET_000007397-7511 at e.g., 7423. The clear solution is then spray granulated onto microcrystalline cellulose to generate a solid dispersion, containing amorphous pitolisant hydrochloride. *See* AET_000007695-7855 at *e.g.*, 7782-7784; AET_000007949-8288; AET_000007397-7511 at e.g., 7423. The remaining excipients are then added and once blended, the ANDA Products are tableted, coated, and packaged. *See* AET_000007695-7855 at *e.g.*, 7782-7784.

510.    AET uses a common blend of pitolisant hydrochloride and excipients to make both dosage strengths of its ANDA Products. Specifically, a common blend of amorphous pitolisant hydrochloride and excipients is prepared and then the resultant powder is divided to manufacture the two different strengths of tablets. 33.50 mg of the common blend is used to manufacture the 4.45 mg strength and 134.00 mg of the common blend is used to manufacture the 17.8 mg strength. *See, e.g.*, AET_000007949-8288 at 7959.

511.    The process used to make the pitolisant hydrochloride in AET's ANDA Products precludes the presence of crystalline pitolisant hydrochloride in AET's ANDA Products. AET generates amorphous pitolisant hydrochloride for use in its ANDA Products via spray granulation. *See* AET_000007695-7855 at e.g., 7782-7784; AET_000007949-8288 at 7950-7953; AET_000007397-7511 at e.g., 7423; Herb Dep. Tr. at e.g., 78:12-86:21; 98:25-106:21; 128:4-129:8; 195:15-197:4; 199:20-203:1; Joshi Dep. Tr. at e.g., 41:8-54:4; 111:17-112:20. Plaintiffs'

expert, Dr. Myerson, recognizes that spray drying is a suitable technique for producing amorphous solid state forms. Myerson Rpt. ¶ 55.

512.    The amorphous pitolisant hydrochloride in AET's ANDA Products is generated by first completely dissolving pitolisant hydrochloride API purchased from third parties (Nuray and Emnar) and maltodextrin in purified water to produce a clear solution. *See* AET_000007695-7855 at e.g., 7782-7784; AET_000007949-8288 at e.g., 7951-7953; AET_000007397-7511 at e.g., 7423; Herb Dep. Tr. at e.g., 78:12-86:21; 98:25-106:21; 128:4-129:8; 195:15-197:4; 199:20-203:1; Joshi Dep. Tr. at e.g., 41:8-54:4; 111:17-112:20. The complete dissolution is confirmed by two different operators. *See* AET_000007695-7855 at e.g., 7782-7784; AET_000007949-8288 at e.g., 7951-7953; AET_000007397-7511 at e.g., 7423; Herb Dep. Tr. at e.g., 78:12-86:21; 98:25-106:21; 128:4-129:8; 195:15-197:4; 199:20-203:1; Joshi Dep. Tr. at e.g., 41:8-54:4; 111:17-112:20.

513.    Complete dissolution is also confirmed as a matter of scientific certainty. Pitolisant hydrochloride is a highly water soluble substance. The '197 Patent discloses that pitolisant hydrochloride has an aqueous solubility of 4 g/ml at 23 °C. '197 Patent, 1:58-60. This means that four parts by weight pitolisant hydrochloride will fully dissolve in one part by weight water.

514.    In the manufacture of the ANDA Products, AET dissolves 3.250 kg of pitolisant hydrochloride in 15.234 kg of water to make a clear solution. *See e.g.*, AET_000007949 at 7963. This ratio of pitolisant hydrochloride to water (0.213:1) is over an order of magnitude ***below*** the 4:1 solubility limit at 23°C reported in the '197 Patent. The ratio of pitolisant hydrochloride to water in AET's manufacturing of its ANDA Products will guarantee complete dissolution of the pitolisant hydrochloride.

515.    Dissolving the pitolisant hydrochloride API in water completely destroys any crystalline form of pitolisant hydrochloride. The dissolution in water and subsequent spray granulation alters the solid state form of the pitolisant hydrochloride to an amorphous form.

516.    It is scientifically impossible for any amount of crystalline pitolisant hydrochloride to survive dissolution under such conditions as a matter of fundamental thermodynamics because the energy of the solvated state is more stable than the lattice energies of the crystalline form. The generation of a "clear solution" in the manufacture of AET's ANDA Products thus indicates that the pitolisant hydrochloride is completely dissolved.

517.    The clear solution is then spray granulated onto microcrystalline cellulose to generate an amorphous solid dispersion, containing amorphous pitolisant hydrochloride. AET_000007695-7855 at e.g., 7782-7784; AET_000007949-8288 at e.g., 7951-7953; AET_000007397-7511 at e.g., 7423; Herb Dep. Tr. at e.g., 78:12-86:21; 98:25-106:21; 128:4-129:8; 195:15-197:4; 199:20-203:1; Joshi Dep. Tr. at e.g., 41:8-54:4; 111:17-112:20. The remaining excipients are then added and once blended, the ANDA Products are tableted, coated, and packaged. AET_000007695-7855 at e.g., 7782-7784.

518.    Accordingly, AET's ANDA confirms that AET's ANDA Products contain pitolisant hydrochloride in an amorphous form and do not infringe the Asserted Claims.

519.    Moreover, AET confirmed that its process generates purely amorphous pitolisant hydrochloride based on its own internal XRD testing of its ANDA Products, which have never shown any conversion from amorphous pitolisant hydrochloride to crystalline pitolisant hydrochloride. *See, e.g.*, *See* Herb Dep. Tr. at 117:12-16 ("Q. Who would know whether recrystallization occurred during the research and development of AET's ANDA product? A. So maybe to be clear here. For the ANDA product, no crystallization occurred."); Joshi Dep. Tr. at

CONFIDENTIAL

238:15-239:1 ("Q. Has AET ever detected even a trace of crystalline pitolisant hydrochloride in its ANDA products? A. No.").

520.    None of AET's internal XRD testing has shown that AET's ANDA Products contain all four of the $2\theta$ peaks required by claim 1 of the '197 Patent, whether under standard or accelerated storage conditions.

521.    None of AET's internal XRD testing has shown that AET's ANDA Products contain all twenty-one of the $2\theta$ peaks required by claim 2 of the '197 Patent, whether under standard or accelerated storage conditions.

522.    Accordingly, AET's manufacturing process completely dissolves the pitolisant hydrochloride API that AET received from third parties in water before spray granulation. Therefore, the solid state form of the pitolisant hydrochloride API is irrelevant to and uninformative of the solid state form of pitolisant hydrochloride in AET's ANDA Products.

### 2.    The Formulation of AET's ANDA Products Prevents Potential Recrystallization

523.    As AET's ANDA explains, the formulation of AET's ANDA Products also precludes the formation of crystalline pitolisant hydrochloride. Specifically, AET included maltodextrin in its formulation as insurance to prevent conversion of amorphous pitolisant hydrochloride in a crystalline form. *See* AET_000007397-7511 at e.g., 7423-7424.

524.    AET's corproate desginee, Dr. Florian Herb, stated during deposition that AET has never encountered any crystallization of pitolisant hydrochloride in its ANDA Products. *See* Herb Dep. Tr. 117:12-16 ("Q. Who would know whether recrystallization occurred during the research and development of AET's ANDA product? A. So maybe to be clear here. For the ANDA product, no crystallization occurred."). Dr. Herb also stated that AET included maltodextrin in its formulation to further ensure that only the amorphous form of pitolisant hydrochloride is in AET's

CONFIDENTIAL

ANDA Products and remains that way for the shelf-life of its Products. *See, e.g.*, Herb Dep. Tr. at 114:23-117:19.

525.    Dr. Herb further confirmed at deposition that, despite never encountering any crystallization of pitolisant hydrochloride in its ANDA Products, AET included maltodextrin to further ensure that only the amorphous form of pitolisant hydrochloride is contained in AET's ANDA Products and remains that way for the shelf-life of its Products. *See, e.g.*, Herb Dep. Tr. at 114:23-117:19.

526.    Maltodextrin is an excipient known to stabilize amorphous solid state forms. *See* Garnero et al., *Ibuprofen-Maltodextrin Interaction: Study of Enantiomeric Recognition and Complex Characterization*, PHARMACOLOGY & PHARMACY 4, 18-30 (2013). Plaintiffs' expert even admits that this is a known benefit of maltodextrin.

### 3.    Independent Testing Confirms that AET's ANDA Products Do Not Contain the Claimed Crystalline Form of Pitolisant Hydrochloride.

527.    Analytical testing of AET's ANDA Product that were maintained under normal/standard storage conditions for over eighteen months also confirms that AET's ANDA Products contain only amorphous pitolisant hydrochloride. Specifically, X-ray diffraction (XRD), which is the gold standard for polymorphic determination and is required by the Asserted Claims, shows that AET's ANDA Products contain only amorphous pitolisant hydrochloride.

528.    Samples of each exhibit batch manufactured by AET Laboratories Private Limited in November 2023 and maintained under standard storage conditions were provided to Bhogala Biosciences Pvt. Ltd., an independent testing lab affiliated with the University of Hyderabad in India.

529.    At Bhogala Biosciences Pvt. Ltd., XRD diffractograms of tablets from each of the eight exhibit batches of AET's ANDA Products were obtained according to general industry

standards using a Bruker D8 Focus instrument and PANalytical software. Continuous XRPD scans were run from 3–40° 2θ for 30 minutes at 25 °C.

530.    None of the eight exhibit batches of AET's ANDA Products showed any of the claimed characteristic XRPD peaks.[10] Figure 1 below provides overlays of the XRPD testing performed in July 2025 for each of the four exhibit batches of AET's 4.45 mg ANDA Products. Figure 2 below provides overlays of the XRPD testing performed in July 2025 for each of the four exhibit batches of AET's 17.8 mg ANDA Products. There are no identifiable peaks attributable to the claimed crystalline form of pitolisant hydrochloride.



Fig. 1 – Overlay of XRPD Testing on AET's 4.45 mg ANDA Products

AET_EXPERTS_00000058.

---

[10] The only observable peaks are attributable to the excipients.



Fig. 2 – Overlay of XRPD Testing on AET's 17.8 mg ANDA Products

AET_EXPERTS_00000056.

531.    Accordingly, based on this testing, there is no evidence that AET's ANDA Products contain crystalline pitolisant hydrochloride having any of the "characteristic peaks" required by the Asserted Claims.

532.    For this reason, AET's ANDA Products do not infringe any of the Asserted Claims and will not infringe any of the Asserted Claims during their shelf life.

### 4.    AET's Internal Testing Confirms that AET's ANDA Products Do Not Contain the Claimed Crystalline Form of Pitolisant Hydrochloride

533.    AET conducted internal testing of the exhibit batches of its ANDA Products and confirmed that they did not contain the crystalline form of pitolisant hydrochloride of the Asserted Claims.

**CONFIDENTIAL**

534.    On or around January 2024, AET performed its initial XRPD testing of "Pitolisant 4.45 mg and 17.8 mg Film-Coated Tablets exhibit batches," which were manufactured in November 2023. *See* AET_000102537-2552. There were no identifiable peaks attributable to crystalline pitolisant hydrochloride and AET concluded that each of these batches contained pitolisant hydrochloride "in amorphous form[]" with "[n]o pitolisant hydrochloride crystalline form characteristic reflexes (11.2° 2θ) observed in drug product exhibit batches by XRD analysis." AET_000102529-2536 at 2529.

535.    These XRPD diffractograms are consistent with the diffractograms of the same exhibit batches stored for approximately 20 months under standard storage conditions (*see* Figs. 1 and 2 above), and indicate that there is no crystalline pitolisant hydrochloride in AET's ANDA Products.[11] The XRPD diffractograms of the exhibit batches that AET tested in January 2024 are provided below:



---

[11] The only observable peaks are attributable to the excipients.

AET_000102537 (4.45 mg tablets).



AET_000102537 at 2539 (4.45 mg tablets).



AET_000102537 at 2545 (17.8 mg tablets).



AET_000102537 at 2551 (17.8 mg tablets).

536.     Neither the initial January 2024 XRPD testing, nor the July 2025 testing by Bhogala Biosciences Pvt. Ltd. show any of the claimed characteristic 2θ peaks.

### B.     Plaintiffs Have Failed to Show that AET's ANDA Products Infringe the Asserted Claims

#### 1.     Plaintiffs Have Not Shown that Pitolisant Hydrochloride in AET's ANDA Products is in a Crystalline Form Having the Claimed "Characteristic Peaks"

537.     The Asserted Claims require that the crystalline pitolisant hydrochloride have, among other attributes, "an X-ray diffractogram that comprises characteristic peaks (2θ) at" particular enumerated 2θ values. Plaintiffs specifically amended the pending claims during prosecution to only claim crystalline forms of pitolisant hydrochloride with these "characteristic peaks" after the Patent Office rejected claims to a crystalline form of pitolisant hydrochloride, which did not specific any XRPD peaks. *See, e.g.*, WAKIX-PLFS_00000059 at 0641-0652. Therefore, the Asserted Claims do not cover any pitolisant hydrochloride, but rather only pitolisant

hydrochloride crystals having an XRPD diffractogram that meets the recited 2θ characteristic peaks.

538.    Plaintiffs have agreed that the construction of "an X-ray diffractogram that comprises characteristic peaks (2θ) at" these specific 2θ values means "an X-ray diffractogram that includes peaks at [11.2°, 19.9°, 20.7° and 34.1° ±0.2° for claim 1 and 11.2°, 15.4°, 16.3°, 16.9°, 17.8°, 19.9°, 20.7°, 21.0°, 21.8°, 22.6°, 24.5°, 24.6°, 25.0°, 25.5°, 26.3°, 28.3°, 30.3°, 34.1°, 35.8°, 40.0°, 46.0° ±0.2° for claim 2] wherein the peaks together uniquely identify the crystalline form of pitolisant hydrochloride." *See* D.I. 251 at A-1.

539.    Plaintiffs have not shown that AET's ANDA Products contain crystalline pitolisant hydrochloride having the claimed characteristic peaks that together uniquely identify the claimed crystalline form of pitolisant hydrochloride. Indeed, Plaintiffs' experts will not offer any XRPD analysis of AET's ANDA Products. Plaintiffs did not provide any XRPD testing by their experts of any of AET's ANDA Products in their opening expert reports July 1, 2025. Plaintiffs provided sXRPD testing of defendant MSN's ANDA Products by their expert Dr. Gozzo in their opening expert reports. At the time Dr. Gozzo conducted sXRPD testing of Defendant MSN's ANDA Products, she was in possession of Defendant AET's ANDA Products. Despite having AET's samples, Dr. Gozzo did not conduct sXRPD testing of AET's ANDA Products.

540.    Plaintiffs' experts will not point to any XRPD diffractogram of AET's ANDA Products which show 2θ peaks at 11.2°, 19.9°, 20.7° and 34.1° ±0.2°.

541.    Plaintiffs' experts will not point to any XRPD diffractogram of AET's ANDA Products which show 2θ peaks at 11.2°, 15.4°, 16.3°, 16.9°, 17.8°, 19.9°, 20.7°, 21.0°, 21.8°, 22.6°, 24.5°, 24.6°, 25.0°, 25.5°, 26.3°, 28.3°, 30.3°, 34.1°, 35.8°, 40.0°, and 46.0° ±0.2°.

CONFIDENTIAL

542.    Plaintiffs will not provide any XRPD testing that demonstrates that AET's ANDA Products contain pitolisant hydrochloride having the specific characteristic peaks in the Asserted Claims.[12]

543.    Plaintiffs instead offer ssNMR testing of AET's ANDA Products. Plaintiffs did not offer any ssNMR testing of the 4.45 mg strength of AET's ANDA Products. ssNMR testing is not a surrogate for the XRD testing specified in the Asserted Claims. ssNMR testing does not provide an XRD diffractogram or otherwise identify any characteristic XRD peaks. Indeed, it is impossible to use ssNMR to determine whether pitolisant hydrochloride contained within AET's ANDA Products exhibits any 2θ XRPD peaks.

## 2.    $^{13}$C ssNMR Testing Is Not A Reliable and Valid Scientific Method That Can Identify Specific Solid-State Forms of Pitolisant Hydrochloride

544.    While $^{13}$C ssNMR can provide, under appropriate circumstances, a distinctive fingerprint of a given solid-state form of a compound, Plaintiffs' use of $^{13}$C ssNMR cannot distinguish between the solid-state forms of pitolisant hydrochloride and thus cannot show that AET's ANDA Products infringe the Asserted Claims.

545.    Specifically, the 13C ssNMR testing and spectral editing (i.e., filtering) performed by Plaintiffs' expert, Dr. Robert Wenslow, to allegedly identify crystalline material amongst amorphous pitolisant hydrochloride in AET's ANDA Products is not a scientifically valid method.

546.    Spectral editing cannot be used to "discover" signals that are not present in a conventional $^{13}$C ssNMR spectrum. There are no signals corresponding to crystalline pitolisant hydrochloride in the conventions $^{13}$C ssNMR spectrum of AET's ANDA.

---

[12] As to AET, Plaintiffs have also not submitted any expert testimony, opinions, or evidence concerning whether the Batch No. 142868 of the Harmony API meets claim 2 of the '197 Patent.

CONFIDENTIAL

547.    [13]C ssNMR is only appropriate to distinguish solid-state forms of compounds when there is robust [13]C ssNMR data available for pure reference samples of particular solid-state forms of a compound. Different solid forms of a compound will have the same peaks in about the same positions (chemical shifts) because of the common chemical environment surrounding the carbon atoms (e.g., a benzene ring, a carbonyl group etc.).[13] The solid-state identity of a compound generally cannot be shown based simply on a small subset (e.g., one or two) of similar peaks since the overlap may be coincidental. Since there is no well-defined criterion for the number of peaks that need to match up to demonstrate polymorphic identity, ssNMR is most generally applied for tracking the presence of forms with known spectra.

548.    No robust ssNMR data is available for any specific solid-state form of pitolisant hydrochloride. At best, [13]C ssNMR can be used to determine whether the pitolisant hydrochloride is amorphous, based on the differences in linewidth between crystalline and amorphous pitolisant hydrochloride. This is because the most scientifically sound approach to detecting crystalline content in a sample that also contains amorphous content is the simple [13]C ssNMR spectrum—the sharp crystalline peaks can be readily distinguished from the broad amorphous peaks, allowing crystalline content down to about 0.5% to be observed. Harris et al., *Quantification of bambuterol hydrochloride in a formulated product using solid-state NMR*, 38 J. PHARM. AND BIOMEDICAL ANALYSIS 858, 858 (2005). Here, Dr. Wenslow's [13]C ssNMR confirms that the pitolisant hydrochloride in AET's ANDA Products is amorphous because the broad line widths are consistent with amorphous, not crystalline material. Dr. Wenslow's Figure 8 shows the broad peaks obtained from one of AET's ANDA Products.

---

[13] This contrasts to XRPD where a set of reflections is characteristic of a crystal structure and so different crystalline arrangements of the same molecule have very different sets of diffraction peaks.

**CONFIDENTIAL**



**Figure 8: CPMASTOSS spectrum of AET tablet.**

549. In contrast, crystalline pitolisant hydrochloride produces characteristically sharp and narrow peaks.

**Figure 1: CPMASTOSS spectrum of Harmony's crystalline pitolisant hydrochloride API.**

550. Plaintiffs do not attempt to identify the solid-state forms of pitolisant hydrochloride by simply reviewing the $^{13}$C ssNMR spectra of AET's ANDA Products. That is because the $^{13}$C ssNMR spectra of AET's ANDA Products confirm that only amorphous pitolisant hydrochloride is present. Were crystalline pitolisant hydrochloride present, the peaks corresponding to pitolisant

hydrochloride would be sharp. And because ssNMR is additive, crystalline peaks, if present, would appear as sharp peaks on top of broader amorphous peaks in a $^{13}$C ssNMR spectrum. Plaintiffs expert has not identified any such peaks in the $^{13}$C ssNMR spectra—because they are not there.

551.    Plaintiffs' expert instead purports to use "spectral editing" to allegedly "filter out" signal from amorphous pitolisant hydrochloride and identify supposed crystalline pitolisant hydrochloride in AET's 17.8 mg ANDA Product[14] based on perceived differences in relaxation time between these solid-state forms.

552.    But spectral editing cannot be used to find what is not present in a conventional $^{13}$C ssNMR spectrum. If a crystalline component cannot be observed in an ordinary $^{13}$C ssNMR spectrum, it is not possible to detect such material using spectral editing. $^{13}$C ssNMR is an additive technique. The presence of strong amorphous signal does not diminish or obscure a weaker crystalline spectrum. The crystalline peaks, if present, will always be visible due to their sharpness. In other words, there is no "drowning out" effect in ssNMR – if there is crystalline material, it will be shown in the conventional $^{13}$C ssNMR spectrum.

553.    Spectral editing cannot, as Dr. Wenslow claims to do, find a needle in a haystack. This is because the spectral editing performed by Dr. Wenslow does not increase the sensitivity of the $^{13}$C ssNMR testing. It does the opposite. Relaxation-based spectral editing degrades the ssNMR spectrum by reducing the signal-to-noise ratio and makes it more difficult to identify particular solid state forms. Accordingly, $^{13}$C spectral editing is not, and should not be, a recognized or reliable method to "discover" otherwise unobserved crystalline content.

---

[14] Dr. Wenslow does not conduct any testing on AET's 4.45 mg ANDA Products.

CONFIDENTIAL

554.    Accordingly, the $^{13}$C ssNMR spectral editing performed by Plaintiffs' expert is not a viable method to uncover small crystalline fractions of solid-state forms of pitolisant hydrochloride.

### 3. Dr. Wenslow's $^{13}$C ssNMR Testing is Deeply Flawed and Does not Show that AET's ANDA Products Contain the Claimed Crystalline Form of Pitolisant Hydrochloride.

555.    Even if spectral editing can be used to distinguish solid-state forms of pitolisant hydrochloride (it cannot), Dr. Wenslow's $^{13}$C ssNMR testing is fatally flawed and unreliable for several reasons. First, Dr. Wenslow did not use an appropriate standard to determine the relaxation time for the amorphous pitolisant hydrochloride in AET's ANDA Product.

Second, Dr. Wenslow improperly manipulated his data by arbitrarily omitting data points in performing his filtering analysis, which render it unreliable and inconsistent with the scientific principles he purports to rely on. Third, even if Dr. Wenslow's calculation of the filter was adequate to eliminate signal from amorphous pitolisant hydrochloride (which it is not), Dr. Wenslow has failed to demonstrate that the "filtered" peaks are uniquely attributable to the crystalline form of pitolisant hydrochloride claimed in the Asserted Claims. Finally, Dr. Wenslow fails to recognize that "filtered peaks" are identical to the "unfiltered peaks" in AET's ANDA Products, and thus confirms that AET's ANDA Products contain only amorphous pitolisant hydrochloride. Dr. Wenslow also fails to account for the possibility that his ssNMR testing or

Plaintiffs uncontrolled storage of AET's ANDA Products could cause conversion of AET's ANDA Products.

a)    <em>Dr. Wenslow's Flawed Spectral Editing</em>

556.    Dr. Wenslow conducted his $^{13}$C ssNMR testing in essentially two parts. First, he purports to determine relaxation curves ($T1_\rho$ relaxation rates) by comparing the rate of signal decay for two selected peaks (~131 ppm and ~141 ppm) for his two "standards," namely, ████████

████████████████████████████████████████████████████████

████████████████████ and the crystalline pitolisant hydrochloride allegedly in Plaintiffs' Wakix® products. For each peak position (~131 ppm and ~141 ppm), Dr. Wenslow purports to determine a time (tau ($\tau$) value) at which the signal from the amorphous "standard" is no longer detectable but where the signal from the crystalline pitolisant hydrochloride is detectable. Then, using the determined tau ($\tau$) value for signal acquisition delay, Dr. Wenslow obtained $^{13}$C ssNMR spectra of one of AET's ANDA Products to allegedly identify crystalline material in AET's ANDA Products. Based on his premise that the signal from the amorphous standard is no longer detectable at the tau value, Dr. Wenslow erroneously concludes that visible signal at ~131 and ~141 ppm must indicate that the same crystalline pitolisant hydrochloride contained in Wakix® is also present in AET's ANDA Products. Dr. Wenslow's methodology and conclusions are deeply flawed and entirely unreliable.

557.    First, $^{13}$C ssNMR spectral editing cannot "discover" crystalline material that is not present in the initial ssNMR spectrum. Dr. Wenslow ignores the fact that the initial $^{13}$C ssNMR spectrum of AET's ANDA Products do not show any sharp peaks at ~131 and ~141 ppm. If crystalline pitolisant hydrochloride were present, one would observe sharp peaks on top of the broader amorphous peaks at these positions.

167

558.    Second, Dr. Wenslow fails to establish that ███████████████ ████████████ is an appropriate standard to determine the relaxation time for the amorphous pitolisant hydrochloride contained in AET's ANDA Products. Dr. Wenslow assumes that the relaxation behavior of the amorphous pitolisant hydrochloride in ████████████████████ is the same as the relaxation behavior of amorphous pitolisant hydrochloride in AET's ANDA Products. There is no basis for that assumption. In applying the same tau filter determined using ██████████████████, Dr. Wenslow assumes that the amorphous pitolisant hydrochloride will have the same relaxation behavior in AET's ANDA Products as in ████████ █████████████████ It will not.

559.    The relaxation rate of a particular carbon is not simply a function of a compound's chemical structure. Schanda at 3 ("Dynamic processes in molecules lead to a modulation of NMR parameters as a function of time since they depend on the local environment."). It is much more complex and is highly dependent on the local environment, molecular motion, and the experimental conditions employed. Schanda at 3. The extent of these local dynamics depends strongly on the overall composition of the surrounding environment that the compound is present and is not a property of individual molecules. For example, excipients in a formulation can stabilize the amorphous form and prevent crystallization by slowing down structural relaxation. PVP-based polymers, such as crosprovidone in AET's ANDA Products, are widely used for this purpose. Bookwala at 2966. Accordingly, different amorphous formulations can be expected to have different relaxation behaviors.

560.    Dr. Wenslow did not perform any testing to show that the relaxation behavior for the amorphous pitolisant hydrochloride in █████████████████████████ would be the same as the relaxation behavior for the amorphous pitolisant hydrochloride in AET's ANDA

**CONFIDENTIAL**

Products.[15] Given the significant differences between ████████████████████

and AET's ANDA Products, the relaxation behavior for the amorphous pitolisant hydrochloride

in AET's ANDA Products would be different. For example, the amorphous pitolisant

hydrochloride in AET's ANDA Products is generated by spray granulation onto microcrystalline

cellulose. It is not ████████████████████████████████████████

████████████████████████████_000007949-8288 at e.g., 7953.

    561.   ████████████ is a very different stabilizer than the maltodextrin,

microcrystalline cellulose, and other excipients in AET's ANDA Products.████████████████

████████████████████████████████████████████████

████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████   ████████████████████████████████

████████████████████████████████████

████████████████████████

---

[15] Dr. Wenslow also failed to determine whether the T1ρ relaxation behavior was consistent across
████████████████████████████████████████ he was provided, including
MSN's and Hikma's.

**CONFIDENTIAL**



563.    Unlike the ███████████████ that Dr. Wenslow used as an alleged "standard" for the amorphous form of pitolisant hydrochloride, AET's ANDA Products do not include ███████████████. In this regard, one would expect the local environment of pitolisant hydrochloride in ███████████████ to differ significantly from the local environment of amorphous pitolisant hydrochloride in AET's ANDA Products. Therefore, the molecular dynamics and associated relaxation behaviors would be expected to differ. Dr. Wenslow fails to account for these differences and fails to show that the relaxation behavior of pitolisant hydrochloride in ███████████████ is representative of the relaxation behavior of amorphous pitolisant hydrochloride in AET's ANDA Products.

564.    Thus, Dr. Wenslow's unsupported assumption that the relaxation behavior of ███████████████ would be the same for the amorphous pitolisant hydrochloride in AET's ANDA Products is incorrect and Dr. Wenslow has failed to show that the 32 ms tau value, established for ███████████████, is an appropriate filter for the amorphous pitolisant chloride in AET's ANDA Products. Dr. Wenslow's T1ρ filtering experiment, as applied to AET's ANDA Products, was entirely uncontrolled and unvalidated.

565.    Dr. Wenslow's calculation of the tau value for his "filter" is also flawed and unreliable due to his erroneous methodology.

**CONFIDENTIAL**

566.    According to Dr. Wenslow, he determined the 32 ms tau value based on differences

in the relaxation behavior between ████████████████████████ and Plaintiffs'

Crystalline Pitolisant Hydrochloride API at two peaks those forms shared in common, namely,

~141 ppm and ~131 ppm. For each peak, Dr. Wenslow purports to plot the signal intensity as a

function of time for the amorphous and crystalline "standards." However, Dr. Wenslow arbitrarily

and inexplicably omits data points, which dramatically change the decay curves. These decay

curves are depicted in Figures 4 and 5 of his report and are reproduced below:



**CONFIDENTIAL**



567.    Using his incomplete data sets, Dr. Wenslow obtained regression lines to model the decay behavior at each peak. He then selected a tau value at which the intensity of ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ goes to "virtually" zero but there is still intensity for Plaintiffs' Crystalline Pitolisant Hydrochloride API. His analysis is based on erroneous extrapolation and is replete with errors.

568.    As an initial matter, Dr. Wenslow obtained intensity data at eleven different time points (0.1 ms, 0.5 ms, 1 ms, 1.5 ms, 2 ms, 3 ms, 4 ms, 8 ms, 16 ms, 32 ms, and 64 ms). But Dr. Wenslow does not plot all of these data points when he derives his decay curves. He instead only plots and fits a subset of the data for each plot. For Figure 4, Dr. Wenslow selected only seven of the eleven measured values for the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, inexplicably omitting several others, including 8 and 32 ms:

CONFIDENTIAL



HBS-EXPERT_0005147 (annotated to reveal the equation for the trend line). Dr. Wenslow only includes six of the 11 time points for Plaintiffs' Crystalline Pitolisant Hydrochloride sample (red) and notably omits the data points at 16 ms and 32 ms. The omission of these data points is not justified and distorts the extrapolated decay curves.

569.    The omission of the data at 32 ms is particularly egregious because Dr. Wenslow is ignoring data at the very time point (tau) at which he is setting his "filter." In fact, the raw data demonstrates that the signal intensity for the amorphous "standard" is measurable and comparable to that of the crystalline standard. Had Dr. Wenslow included all of the data points for the decay curves in Figure 4, he would have seen that his tau filter of 32 ms cannot distinguish between crystalline and amorphous pitolisant hydrochloride.

570.    Dr. Wenslow also selected only a subset of measured values in arriving at Figure 5 of his report:

**CONFIDENTIAL**



HBS-EXPERT_0005147 (annotated to reveal the equations for the trend lines). Here too, Dr. Wenslow notably omits the data points at 16 ms and 32 ms for Plaintiffs' Crystalline Pitolisant Hydrochloride sample (red). Likewise, for the ███████████████████████████, Dr. Wenslow inexplicably omits the ██████ datapoint. The omission of these data points is not justified and distorts the extrapolated decay curves. In fact, the raw data Dr. Wenslow generated shows that there was detectable signal at 32 ms for the amorphous "standard" of a magnitude comparable to the crystalline "standard." Had Dr. Wenslow included all of the data points for the decay curves in Figure 5, he would have seen that his tau filter of 32 ms cannot distinguish between crystalline and amorphous pitolisant hydrochloride.

571.     The poor fits of Dr. Wenslow's decay curves are best illustrated by his decay curves in Figure 5. As can be seen, there is a systematic deviation of the dotted blue decay curve above several continuous data points. In a proper fit, the deviation above and below the data points should be random. Notably, Dr. Wenslow does not even fit the decay curve of the crystalline pitolisant hydrochloride using an exponential function, even though he admits that the decay behavior should be modeled by that function. After inexplicably omitting data points, Dr. Wenslow uses a *logarithmic* decay model to fit the behavior of the crystalline material at ~131 ppm. Not only is

CONFIDENTIAL

this inconsistent with the physics of the decay, which Dr. Wenslow admits should be exponential, it appears to be artificially selected to make the crystalline "standard" curve appear to decay more slowly than the ███████ amorphous "standard." This is clearly erroneous.

572.    Dr. Wenslow provides no rationale for omitting any of the calculated relaxation behavior. Indeed, the scientifically correct way to handle this data is to fit through all the data points. Omitting data points will introduce bias and distort the results. Critically, Dr. Wenslow does not plot any data past 16 ms, including at 32 ms. In particular, it is striking and indefensible there are no data points plotted at the 32 ms, as this is precisely the time delay that he chooses as his filter to allegedly discriminate between signal from crystalline and amorphous forms. Given that Dr. Wenslow's filter value is purportedly determined based on the time where there is measurable signal for Plaintiffs' Crystalline Pitolisant Hydrochloride API but virtually no signal for ██████████████████████████ the reliability of the 32 ms tau value is critical to Dr. Wenslow's theory. However, based on Dr. Wenslow's actual data (i.e., the measured T1ρ data with the arbitrary omission of data points), it is readily seen that at 32 ms there is, in fact, measurable signal for both the amorphous "standard" and the crystalline "standard." Dr. Wenslow should have appreciated that the data at 32 ms undermined the validity of his supposed filter.

573.    Indeed, if Dr. Wenslow had plotted the complete data for the crystalline "standard" he would have realized that it behaved nearly identically at both ███████████

**CONFIDENTIAL**



574.    Indeed, even the decay curve that Dr. Wenslow provides for explanatory background on T1ρ filtering includes data points before, at, and after the determined tau value:



**Figure F: In a T1rho experiment, the amorphous (red) and crystalline (black) forms of a compound have different decay curves. At the dotted grey line around 0.3 τ, the amorphous signal is effectively zero while crystalline signal remains detectable.**

575.    Unlike his explanatory background $T_1\rho$ decay curves shown above, in this case, Dr. Wenslow purports to extrapolate the decay curves to the tau value (in this case 32 ms), while

ignoring and omitting the actual data at that tau value. The omitted data confirms that his filtering approach is ineffective in discriminating between crystalline and amorphous forms of pitolisant hydrochloride at 32 ms.

576.    Even the data Dr. Wenslow chose to plot poorly fits into his single exponential assumption. A proper fitting of the data is important because, if relaxation behavior is being used for filtering, it is necessary to accurately fit the relaxation behavior of the particular sample. Generally, if a chosen model fits the underlying data well, that can indicate that the model assumptions are satisfied, and analyses of the data can provide reliable inferences. By contrast, if the model fits the data poorly, that often indicates that the underlying assumptions of the model are not satisfied, and that inferences based on the analyses using the model cannot be relied on. Here, a simple review of the fitted line shows that the data poorly fits the data:



Wenslow Report at Figure 4.

**CONFIDENTIAL**



Wenslow Report at Figure 5.

577.    This poor fitting confirms that the relaxation behavior of these solid-states are more complex than single-exponential decay. Relaxation is instead likely to be heterogeneous, with some sites relaxing more quickly than others. As a result of this heterogeneity, amorphous signal will remain at 32 ms (e.g., the function will have "long tail"). Accordingly, as reflected in the $T_{1\rho}$ values Dr. Wenslow obtained, an accurate fitting of Dr. Wenslow's data would provide a curve with significant non-zero intensity at ▮▮▮ for ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ at both peaks, contradicting the assertion that signal from amorphous components will have decayed to zero.

578.    Dr. Wenslow's assumption that the relaxation of the signal intensity can be described as a simple exponential function is also an oversimplification. This assumption is only valid under very limited circumstances that do not apply here. Relaxation behavior is only a single exponential if motion driving the relaxation is "isotropic," meaning the same in all three spatial axes: $x$, $y$, and $z$. This condition is met in solution-state NMR, as the molecules tumble randomly and freely in space. Hence relaxation decays are generally single exponential in solution-state

NMR. This condition is ***not*** met in the solid-state, where motions are generally restricted. As a result, the relaxation behavior in ssNMR is intrinsically multi-exponential and not a simple exponential as Dr. Wenslow assumes. This is especially true for Dr. Wenslow's chosen peak at ~130-131 ppm, which clearly includes more than one signal (each having its own relaxation behavior). For example, four of the aromatic sites in the benzene ring of pitolisant are protonated (CH) and 2 are not (quaternary). This will affect the relaxation behavior. By definition, at least one of the peaks (most obviously ~130-131 ppm) must involve a mix of protonated and non-protonated sites. Dr. Wenslow fails to discuss this and assumes that each peak has its own relaxation behavior, omitting to mention that the peaks may involve multiple carbon sites.

579.    As a result, Dr. Wenslow's chosen region evaluates the relaxation of multiple components which will relax at different rates and will not follow a simple exponential decay curve. Dr. Wenslow's faulty assumption is also demonstrated by his strained attempts to "fit" the data he used to artificially obtain the 32 ms tau filter.

580.    When plotted correctly (including the data points that Dr. Wenslow arbitrarily and inexplicably omitted), the appropriate fit confirms that the relaxation behavior is heterogenous (shown in the solid lines below).





**CONFIDENTIAL**



581.    The dotted lines are fits to simple exponential functions, which is the function that Dr. Wenslow argues is the correct function to fit the data. As shown above, by including all of the data and not selectively omitting at certain timepoints (as Dr. Wenslow has done), the entire shape of the decay curve for the ███████████████████ at 140 ppm has an entirely different profile (compared to Figure 5 of the Wenslow Report) and clearly does **not** go to zero at 32 ms. This demonstrates how inappropriate it is to omit data when performing this type of analysis and how easy it is to distort the true relaxation behavior in these models.

582.    The better fit is also demonstrated by the $X^2$ values generated for each of these fits, which are, generally, considerably lower for the stretched exponential fits (corresponding to smaller deviations between fitted and experimental data).

583.     Using the appropriate fitting also confirms that Dr. Wenslow's "filtering" does not remove all amorphous signal and does not "discriminate" between crystalline and amorphous material at 32 ms. The existence of amorphous signal at 32 ms thus invalidates his entire analysis. It is scientifically impossible to conclude from the presence of a signal after 32 ms that it is crystalline as opposed to amorphous pitolisant hydrochloride.

584.     Accordingly, the complete data and the proper fitting show that there is significant intensity at ██████ for ████████████████████████ at both peaks and that Dr. Wenslow's "filtering" cannot discriminate between amorphous and crystalline pitolisant material.

585.     Dr. Wenslow claims to show that his 32 ms "filter" works to discriminate between the amorphous and crystalline forms of pitolisant hydrochloride in Figure 6 of his report:



586.     Using this Figure, Dr. Wenslow claims that he can obtain crystalline pitolisant hydrochloride signal in the crystalline "standard" but not the amorphous "standard." Dr. Wenslow's Figure 6 is misleading. The reason Dr. Wenslow does not obtain signal for the amorphous sample shown Figure 6 is not because of the filter but because of the inappropriately

## CONFIDENTIAL

short scan time he used to perform this experiment. Figure 6 was generated using only 152 data acquisitions (~11 mins) as compared to 19,896 acquisitions (~24 hours) for his other NMR experiments. *See, e.g.*, Figs. 10, 11; Wenslow Report, Ex. K. In other words, the data in Dr. Wenslow's Figure 6 reflects a shorter experiment time by a factor of almost 132 than Dr. Wenslow's analysis of AET's 17.8 mg ANDA Product. This limited number of scans (corresponding to about 11 minutes of experiment time) greatly reduces the signal-to-noise ratio and is insufficient to obtain a clear spectrum of an amorphous material.

587.    This major difference in experimental conditions explains why no amorphous signal is apparent in Dr. Wenslow's Figure 6, while the correctly fitted experimental data using a stretched exponential (as shown below) confirms that there is amorphous signal from the ███████ ████████████████████ sample using a 32 ms delay. Because the signal-to-noise increases as the square root of the scan time, the shorter scan time greatly reduces the signal-to-noise ratio by a factor of SQRT(132) = 11.5 and is insufficient to obtain a clear spectrum of an amorphous material. In other words, the amorphous signal would be too weak to observe under the conditions of Dr. Wenslow's Figure 6, but would be observed if 19,896 acquisitions (~24 hours) had been used. This principle is depicted in the figure below. *See* AET_EXPERTS00000768.



588.    Moreover, Figure 6 has no relevance to AET's ANDA Products because AET's ANDA Products do not use ███████████████████████████. Figure 6 is uninformative as to the intensity of the solid state NMR signals at approximately 131 and 141 ppm for AET's amorphouse ptiolisant hydrochloride at a tau of 32 ms.

589.    The "filtering" Dr. Wenslow performed on AET's ANDA Products thus cannot and does not identify crystalline pitolisant hydrochloride. Instead, Dr. Wenslow's data continues to identify only amorphous pitolisant hydrochloride in AET's ANDA Products.

> b)    *Dr. Wenslow's ssNMR Testing Confirms that AET's ANDA Products Contain Only Amorphous Pitolisant Hydrochloride.*

590.    As explained above, it is my opinion that Dr. Wenslow's $^{13}C$ ssNMR filtering analysis is not appropriate to identify specific solid-state forms of pitolisant hydrochloride. However, $^{13}C$ ssNMR can be used to determine whether the pitolisant hydrochloride is amorphous based on the differences in linewidth between crystalline and amorphous pitolisant hydrochloride. The linewidths of $^{13}C$ NMR spectra of amorphous materials are generally "4-20 times broader than those of crystalline forms." *See* USP Chapter 1762. This broader line shape is the defining feature of an amorphous phase and arises because a distribution of local chemical environments (and hence chemical shifts) as a result of the local disorder.

591.    Here, the spectra of AET's ANDA Products generated by Dr. Wenslow clearly show that the pitolisant hydrochloride in AET's ANDA Products is amorphous:

**CONFIDENTIAL**



Figure 11: Comparison of unfiltered CPMASTOSS AET tablet spectrum (olive), AET tablet T1rho
FILTERED spectrum (red), and Harmony crystalline pitolisant hydrochloride CPMASTOSS
spectrum (blue).

Wenslow Report at Figure 11.

592.    Figure 11 of Dr. Wenslow's Report does not show the presence of any crystalline material in AET's ANDA Product, whether the unfiltered (olive) or filtered (red), let alone the presence of the crystalline form of pitolisant hydrochloride claimed in the '197 Patent. It is clear in Figure 11 that peaks in the filtered spectrum (red) are broad, which means they must arise from an amorphous compound.

593.    The pitolisant hydrochloride peaks in the filtered spectrum (red) are simply scaled down versions of the peaks in the original, unfiltered spectrum (olive) that Dr. Wenslow concedes are amorphous pitolisant hydrochloride. It is important to note that the fact that a signal is narrower in the filtered spectrum has no interpretable significance. An NMR signal cannot "become more like another one" – either it is attributable to an amorphous phase or it is not. The observed signals in the filtered spectrum are not the same as the crystalline pitolisant hydrochloride peaks, so the material is not crystalline pitolisant hydrochloride.

594.    Indeed, as shown in the overlay below, Dr. Wenslow's own ssNMR spectra show that there is no change in the "filtered" (red) and "unfiltered" (olive) peak at ~141 ppm when placed on the same scale:



595.    As can be seen above, the peak at ~141 ppm is essentially ***identical*** between the unfiltered (olive) and filtered (red) spectra of AET's ANDA Product. Both peaks are far broader than the peak for the crystalline pitolisant hydrochloride (blue). Dr. Wenslow should have observed that his 32 ms filter had no effect on ~141 ppm peak. Based on that, he should have realized that he applied an inappropriate and unreliable methodology. The fact that the peaks at ~141 ppm do not change, confirms that AET's ANDA Products is amorphous and does not contain pitolisant hydrochloride.

596.    Accordingly, the ssNMR spectra that Dr. Wenslow generated for AET's 17.8 mg ANDA Product shows that it contains amorphous pitolisant hydrochloride.

> **4.   Dr. Wenslow Fails to Establish that Any Alleged Crystalline Pitolisant Hydrochloride He Purports to Identify Is the Same Crystalline Form in Wakix.**

597.    Even if there is some crystalline pitolisant hydrochloride detected in AET's ANDA Products by ssNMR (which there is not, for all of the reasons discussed above), Dr. Wenslow has made no attempt to show that it is the form claimed in the '197 Patent, rather than another crystalline form. This is particularly fatal to Dr. Wenslow's analysis given that pitolisant

CONFIDENTIAL

hydrochloride can exist in at least two metastable forms when generated using methods other than solvent mediated crystallization. *See* Patel, J. et al., *Exploring Polymorphism: Hydrochloride Salts of Pitolisant and Analogues*, 24 CRYST. GROWTH DES. 1268, 1274 (2024). There is also another reported form of crystalline form of pitolisant hydrochloride identified as the sesquihydrate form. *See* U.S. Patent No. 11,623,920.

598.    In addition, Dr. Gozzo has failed to demonstrate that the Harmony API that Dr. Wenslow used as his crystalline "standard" meet the elements of claims 1 and 2 of the '197 Patent. Dr. Gozzo's testing fails to show a peak at $34.1° \pm 2\theta$. Dr. Gozzo also offers no opinion or evidence regarding the 21 recited $2\theta$ peaks of claim 2 as to AET.

599.    Dr. Wenslow has made no attempt to validate his methodology. He offers no explanation as to why peaks at ~131 ppm and ~141 ppm must be uniquely attributable to the crystalline pitolisant hydrochloride in Wakix and not another crystalline form of pitolisant hydrochloride.

### 5.    Dr. Wenslow's Testing May Have Caused Conversion.

600.    Dr. Wenslow's ssNMR testing omits a key control experiment: verification that the tested sample did not change over the course of the experiment. Specifically, Dr. Wenslow's testing omits verifying by PXRD that there are no new crystalline peaks in the tested sample.

601.    It is well-known that prolonged sample spinning during ssNMR testing like that performed by Dr. Wenslow can, itself, cause an amorphous compound to convert into a crystalline compound. The development of crystallinity can be triggered by the high pressures present under magic angle spinning conditions. The pressure at the rotor walls for 7 mm rotors at 5 kHz spinning rate, similar to the conditions in, for example, Experiment 64 performed by Dr. Wenslow, is

approximately 75 bar. These pressures far exceed the pressure exerted on AET's ANDA Products during standard storage conditions.[16]

602.    The filtered experiment performed by Dr. Wenslow were indeed long, corresponding to ~24 hours of total run time. This is easily sufficient time to potentially degrade samples and induce crystallization.

603.    Accordingly, to the extent Dr. Wenslow has even identified crystalline material in AET's ANDA Products (which he has not done), he has not performed sufficient experimentation to determine whether his own ssNMR testing induced the formation of such crystalline material.

604.    Moreover, Plaintiffs experts have not provided to AET any XRPD analysis of the crystalline material contained in Wakix which shows the presence of each of the claimed characteristic peaks recited in claims 1 or 2 of the '197 Patent. With respect to claim 1, Dr. Gozzo's s-XRD testing does not identify a peak at $34.1° \pm 0.2°$ $2\theta$. With respect to claim 2, Dr. Gozzo's data shows only the presence of three of the twenty-one claimed characteristic peaks.

**6.    Plaintiffs Have Not Provided Any Testing of the 4.45 mg Strength of AET's ANDA Products.**

605.    As mentioned previously, despite having samples from each exhibit batch, Plaintiffs have not provided any XRD testing of any of AET's ANDA Products with their opening expert reports. For that reason alone, Plaintiffs have failed to prove infringement of any of AET's

---

[16] Crystallization under high-pressure conditions will not necessarily produce the solvent-mediated crystallization of Form 1 of the '197 Patent. Since the amorphous state is relatively high energy, crystallization could well produce a different metastable form, particularly given that pitolisant hydrochloride can exist in at least two metastable forms when generated using methods other than solvent mediated crystallization. *See* Patel, J. et al., *Exploring Polymorphism: Hydrochloride Salts of Pitolisant and Analogues*, 24 CRYST. GROWTH DES. 1268, 1274 (2024). Even if there is some crystalline pitolisant hydrochloride detected in AET's ANDA Products by ssNMR (which there is not, for all of the reasons discussed above), Dr. Wenslow has made no attempt to show that it is the form claimed in the '197 Patent, rather than another crystalline form.

CONFIDENTIAL

ANDA Products because the claims of the '197 Patent require that the product have the identified characteristic XRD peaks.

606.     Further, the only ssNMR testing that Plaintiffs offer is of the 17.8 mg strength of AET's ANDA Products. Plaintiffs do not offer any ssNMR testing of the 4.45 mg strength of AET's ANDA Products. Plaintiffs have not asserted that the 17.8 mg strength is representative of the 4.45 mg strength or otherwise provided any opinions showing correspondence between the 17.8 mg strength and the 4.45 mg strength.

607.     Accordingly, Plaintiffs have failed to show that the 4.45 mg strength of AET's ANDA Products infringes the Asserted Claims.

### 7.     Plaintiffs' Reliance on Testing from Accelerated Stability Studies Does Not Show Infringement

608.     Accelerated stability studies can be important in the pharmaceutical industry, but they are not necessarily an accurate predictor for how a solid-state form would behave under standard storage conditions. Accelerated stability studies are mainly used to predict long-term *chemical* stability because the rates of chemical degradation reactions are generally accelerated by increased temperatures and humidity levels according to a humidity-modified Arrhenius relationship. *See generally*, Waterman, *The Application of the Accelerated Stability Assessment Program (ASAP) to Quality by Design (QbD) for Drug Product Stability*, 12 AAPS PHARM. SCI. TECH. 3, 932-937 (2011). However, the applicability of humidity-modified Arrhenius models to various physical stability processes are much less certain. Physical transformations often exhibit threshold behavior in which no transformation occurs until a particular temperature or humidity threshold is reached. For example, glycine does not undergo a polymorph transformation from the b to g form until a threshold humidity is reached. *See* Isakov et al., *In Situ Observation of the Humidity Controlled Polymorphic Phase Transformation in Glycine Microcrystals*, 14 CRYSTAL

CONFIDENTIAL

GROWTH & DESIGN, 4138, 4139 (2014). That is because the physical stability of the solid-state

forms of a given drug substance may be sensitive to very high humidity and temperature (i.e.,

40 °C and 75% RH) over prolonged periods of time. But these accelerated stability conditions do

not reflect the physical reality of how drug products are stored. If approved, AET's ANDA

Products will not be stored at 40 °C and/or 75% RH for 6 months.[17] Indeed, AET did not include

XRD testing during its own accelerated stability testing submitted to the FDA and was not required

to do so by the FDA. *See, e.g.*, AET_000009731-9765. This is because the solid-state form of

pitolisant hydrochloride in AET's ANDA Products is not a specification, nor is the solid-state form

of pitolisant hydrochloride in AET's ANDA Products a critical quality attribute, and was only

tested for internal informational purposes, not for FDA purposes. *See, e.g.*, AET_000007695-7855;

Joshi Dep. Tr. at 41:8-42:8; 159:6-9.

609.    As a result, the more accurate reflection of how the amorphous solid state form of

pitolisant hydrochloride in AET's ANDA Products will behave over the shelf life of the ANDA

Products is to study samples that are maintained under standard storage conditions, as these are

the conditions a product would encounter throughout its normal shelf life.

610.    As shown above, the pitolisant hydrochloride in AET's ANDA Products remains

in the amorphous form, with no detectable crystalline pitolisant hydrochloride, for at least 20

months when maintained under the standard storage conditions specified in AET's ANDA.

611.    Even so, there is no sign of crystalline material appearing in any of the exhibit

batches in those accelerated conditions. Indeed, testimony from AET's corporate designees, Dr.

Florian Herb and Dr. Abhay Joshi confirm that AET has never experienced any conversion of its

---

[17]The ANDA specifications do not require *any* solid state form of pitolisant hydrochloride, let alone that the solid state form of pitolisant hydrochloride be physically stable at 40 °C and/or 75% RH for 6 months.

**CONFIDENTIAL**

ANDA Products. *See* Herb Dep. Tr. at 117:12-16 ("Q. Who would know whether recrystallization occurred during the research and development of AET's ANDA product? A. So maybe to be clear here. For the ANDA product, no crystallization occurred."); Joshi Dep. Tr. at 238:15-239:1 ("Q. Has AET ever detected even a trace of crystalline pitolisant hydrochloride in its ANDA products? A. No.").

612.    Plaintiffs' expert, Dr. Myerson, mischaracterizes the XRPD testing that AET internally performed on its amended ANDA Products, leading to incorrect conclusions.

613.    For example, Dr. Myerson states that "AET performed internal stability testing on Exhibit Batches EK316 and EK319 of its amended ANDA Products and detected crystalline pitolisant hydrochloride with peaks corresponding to the '197 patent claims." This is incorrect for several reasons.

614.    ██████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████.



**CONFIDENTIAL**

**CONFIDENTIAL**

615. ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████

616. ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████ ██████ █████████ █████ ████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████

**CONFIDENTIAL**





CONFIDENTIAL

CONFIDENTIAL

617.    In support of his incorrect conclusion that "AET observed the presence of the

claimed crystalline form in Exhibit Batch No. EK316 (17.8 mg tablets) after 6 months under

accelerated stability conditions of 40°C/ 75% RH by detection of the 11.2° ± 0.2° 2θ peak under

Method 1 and Method 2 of AET's XRPD Test Procedure," Dr. Myerson relies on a document that

actually states the opposite conclusion. AET_000164953 at 4956-4960. This XRD report states

the following result on the front page:

**RESULT**

The diffractogram doesn't exhibit Pitolisant
hydrochloride crystalline form characteristic
reflexes (at 11.2° ± 0.2° 2θ) by XRD
analysis.

API polymorphic form in drug product is in
amorphous form.

AET_000164953-4968 at 4953; Joshi Dep. Tr. at 174:6-182:6.

618.    In an attempt to manufacture a basis for an incorrect opinion, Dr. Myerson cites to

diffractograms which exhibited "noise/artifact at 11.2° 2θ" as stated in the XRD Report relating to

the scans performed on July 23, 2024. AET_000164953-4968 at 4955. Per AET's internal XRPD

Test Procedure, due to the "ambiguity observed in the XRD data at 11.2° 2θ," the scans of 6-month

accelerated stability samples of EK316 per Method 1 and Method 2 were repeated on July 25,

2024. AET_000164953-4968 at 4955; Joshi Dep. Tr. at 174:6-182:6, 213:19-217:9.

619.    Because of this anomaly at or near 11.2° 2θ, AET investigated the EK 316 samples

further to determine whether they could possibly contain crystalline pitolisant hydrochloride.

AET's further investigation included repeating the analysis of the same EK 316 batch two days

later (see diffractograms above). The July 25, 2024 scans of 6-month accelerated stability samples

of EK316 led to diffractograms that "exhibits no pitolisant hydrochloride crystalline form characteristic reflex (at 11.2° 2θ) by XRD analysis. API polymorphic form in drug product is in amorphous form." AET_000164953-4968 at 4955; Joshi Dep. Tr. at 174:6-182:6. A POSA would agree with AET that the July 25, 2024 diffractograms of EK 316 show no sign of crystalline pitolisant hydrochloride by either Method 1 or Method 2. Based on these repeat analyses, a POSA would agree with AET that the July 23, 2024 diffractograms of EK 316 6-month stability samples most likely contained an artifact in the region of 11.2° 2θ, rather than a real peak, or resulted from contamination or mishandling of the initial sample.

620.    Furthermore, Dr. Myerson does not contend that any other 2θ peaks required by the Asserted Claims of the '197 patent appeared in any XRPD analysis of EK316. Indeed, a review of the July 23, 2024 diffractograms of EK 316 6-month stability samples shows none of the other "characteristic peaks" required by the Asserted Claims. AET and Dr. Myerson did not detect peaks at any of the other recited peaks of claim 1, namely, 19.9°, 20.7° and 34.1° ±0.2°. AET and Dr. Myerson also did not detect any of the other recited peaks of claim 2, namely, 15.4°, 16.3°, 16.9°, 17.8°, 19.9°, 20.7°, 21.0°, 21.8°, 22.6°, 24.5°, 24.6°, 25.0°, 25.5°, 26.3°, 28.3°, 30.3°, 34.1°, 35.8°, 40.0°, 46.0° ±0.2°.

621.    Accordingly, there is no evidence that exhibit batch EK316, even after unrealistic and extreme 6-month accelerated storage conditions, contains the form of crystalline pitolisant hydrochloride claimed in the Asserted Claims of the '197 patent.

622.    Dr. Myerson provides similarly faulty conclusions with respect to exhibit batch EK319, stating that stability testing of that batch "at 6 months accelerated conditions (40°C/75% RH detected the presence of a peak at "11.2674." Again, Dr. Myerson cites an XRD Report, which provides the following on the front page:

**CONFIDENTIAL**

## RESULT

The diffractogram doesn't exhibit Pitolisant hydrochloride crystalline form characteristic reflexes (at 11.2° ± 0.2° 2θ) by XRD analysis.

API polymorphic form in drug product is in amorphous form.

AET_000164969-4983 at 4969.

623.    Similar to EK316, Dr. Myerson points to diffractograms generated on July 23, 2024 by scans of EK319 samples under accelerated stability conditions for 6 months which "exhibits noise/artifact at 11.3° 2θ." AET_000164969-4983 at 4970; Joshi Dep. Tr. at 170:14-171:2. Again, per AET's internal XRPD Test Procedure, due to the "ambiguity observed in the XRD data at 11.2° 2θ," the scans of 6-month accelerated stability samples of EK319 per Method 1 and Method 2 were repeated on July 25, 2024. AET_000164969-4983 at 4970, 4979-4983.

624.    The July 23, 2024 scans of EK 319 (17.8 mg) showed an anomaly at or near 11.2° 2θ, AET investigated these samples further to determine whether they could possibly contain crystalline pitolisant hydrochloride. This investigation included repeating the analysis of the same EK319 batch two days later (see diffractograms above). The July 25, 2024 scans of the 6-month accelerated stability samples of EK319 led to diffractograms that, per AET's Stability Analytical Report, "exhibits no pitolisant hydrochloride crystalline form characteristic reflex (at 11.2° 2θ) by XRD analysis. API polymorphic form in drug product is in amorphous form." AET_000164969-4983 at 4970; Joshi Dep. Tr. at 165:24-166:22. A POSA would agree with AET that the July 25, 2024 diffractograms of EK319 show no sign of crystalline pitolisant hydrochloride by either Method 1 or Method 2. Based on these repeat analyses, a POSA would agree with AET that the July 23, 2024 diffractograms of the EK319 6-month stability samples most likely contained an

artifact in the region of 11.2° 2θ, rather than a real peak, or resulted from contamination or mishandling of the initial sample.

625.    Furthermore, Dr. Myerson does not contend that any other 2θ peaks required by the Asserted Claims of the '197 patent appeared in any XRPD analysis of EK319 samples. Indeed, a review of the July 23, 2024 diffractograms of EK319 6-month stability samples shows none of the other "characteristic peaks" required by the Asserted Claims. AET and Dr. Myerson did not detect peaks at any of the other recited peaks of claim 1, namely, 19.9°, 20.7° and 34.1° ±0.2°. AET and Dr. Myerson also did not detect any of the other recited peak of claim 2, namely, 15.4°, 16.3°, 16.9°, 17.8°, 19.9°, 20.7°, 21.0°, 21.8°, 22.6°, 24.5°, 24.6°, 25.0°, 25.5°, 26.3°, 28.3°, 30.3°, 34.1°, 35.8°, 40.0°, 46.0° ±0.2°.

626.    Accordingly, neither EK316 nor EK319 contains the claimed form of pitolisant hydrochloride claimed in the Asserted Claims of the '197 patent, even when subjected to extreme accelerated stability testing for three or six months.

627.    Dr. Myerson also contends that "AET's in-house Test Procedure relies on the presence or absence of a single peak at '11.2° ± 0.2° 2θ,' to determine whether the claimed crystalline pitolisant hydrochloride is present in its ANDA Products." This is also incorrect.

628.    AET's internal XRPD test procedure for pitolisant film-coated tablets includes two methods, referred to as Method-1 and Method-2. *See* AET_000164927-4933; Joshi Dep. Tr. at 105:23-107:18.

629.    Per AET's internal XRPD test procedure for pitolisant film-coated tablets, the scan parameters for Method-1 start at 2° 2θ and go to 40° 2θ with a scan time of 15 minutes. *See* AET_000164927-4933 at 4929; Joshi Dep. Tr. at 105:1-106:15.

### CONFIDENTIAL

630.    Per AET's internal XRPD test procedure for pitolisant film-coated tablets, the scan parameters for Method-2 start at 10° 2θ and go to 12° 2θ with a scan time of 30 minutes. *See* AET_000164927-4933 at 4929-4930; Joshi Dep. Tr. 106:16-107:12.

631.    AET's internal XRPD test procedure for pitolisant film-coated tablets instructs individuals performing the testing to "[r]epeat the XRD analysis with fresh sample of any ambiguity observed in the XRD results." AET_000164927-4933 at 4931.

632.    AET's internal XRPD test procedure for pitolisant film-coated tablets states that "[i]f the sample diffractogram does not exhibit Pitolisant Hydrochloride crystalline form characteristic reflex at 11.2° ± 0.2° 2θ by Method-1 and Method-2, then report the result as 'The diffractogram does not exhibit Pitolisant Hydrochloride crystalline form characteristic reflex by XRD analysis'. Then the API polymorphic form in drug product might be in amorphous form (for information only)." AET_000164927-4933 at 4931. A POSA would understand that if neither Method-1 nor Method-2 exhibits a peak at 11.2° ± 0.2° 2θ, then the crystalline form of pitolisant hydrochloride having the claimed characteristic peaks would not be present in the tablet. A POSA would understand that if a peak of 11.2° ± 0.2° 2θ is altogether absent under XRPD testing (as with the AET ANDA Products), then it can be concluded that, for the purposes of claims 1 and 2 of the '197 Patent, the claimed crystalline polymorph is not present. Plaintiffs elected to claim their alleged invention by reference to specifically claimed XRPD peaks (four peaks for claim 1 and twenty-one peaks for claim 2). To a POSA, the absence of such peaks in the XRPD diffractogram would be dispositive of non-infringement.

633.    AET's internal XRPD test procedure for pitolisant film-coated tablets also states that "[i]f the sample diffractogram exhibits Pitolisant Hydrochloride crystalline form characteristic reflex at 11.2° ± 0.2° 2θ by Method-1 and/or Method-2, then report the results as 'The

diffractogram exhibits 'Pitolisant Hydrochloride' crystalline form characteristic reflex by XRD analysis'." AET_000164927–4933 at 4931. That is because the peak at $11.2° \pm 0.2°$ 2θ is necessary but not sufficient to identify the presence of the claimed crystalline form.

634.    AET used the 11.2° peak to screen for the presence of crystalline pitolisant hydrochloride because the 11.2° peak is one of the strongest reflections in the powder diffractogram of the claimed polymorphic form shown in the '197 Patent. AET has never considered the presence of a peak at $11.2° \pm 0.2°$ 2θ to be determinative of the presence of the claimed crystalline form of pitolisant hydrochloride. Rather, AET considered the presence of a peak at $11.2° \pm 0.2°$ 2θ to be merely an indication that further investigation should be carried out to confirm or refute the presence of the claimed crystalline polymorph. In other words, a real peak at $11.2° \pm 0.2°$ 2θ could indicate the *possibility* that the claimed crystalline pitolisant hydrochloride is present but confirmation of the existence of such crystalline pitolisant hydrochloride would require identification of all of the claimed XRPD peaks. A POSA would understand that an XRPD peak at $11.2° \pm 0.2°$ 2θ could be consistent with the presence of the claimed crystalline pitolisant hydrochloride but the XRPD peak at $11.2° \pm 0.2°$ 2θ could have other explanations, including that it could be noise, an instrumental artifact, contamination, an unknown impurity, a crystalline form of an excipient, or even an unclaimed crystalline form of pitolisant hydrochloride,[18] to name a few. That is, a peak at $11.2° \pm 0.2°$ 2θ could provide a hint to further investigate whether crystalline pitolisant hydrochloride is present, but it does not, itself, suggest, let alone establish, that any crystalline pitolisant hydrochloride is present.

---

[18]There is at least one other polymorphic form of pitolisant hydrochloride that exhibits an XRD peak at $11.2° \pm 0.2°$ 2θ

635.     A single peak is generally never sufficient to identify crystalline material. Here, it is insufficient to meet the "characteristic peaks" limitation of the Asserted Claims which require that *all* the enumerated peaks together uniquely identify the crystalline pitolisant hydrochloride. Accordingly, every "characteristic peak" is required to meet the "characteristic peak" limitation of the Asserted Claims.

**8.     Plaintiffs' Reliance on Testing of Development Batches Does Not Show Infringement**

636.     Plaintiffs also identify two development batches that he claims showed conversion. But neither of these development batches are representative of AET's ANDA Products. Nor do they provide any evidence of infringement.

637.     The first batch Plaintiffs identify is PIO/B-009. There is no dispute that PIO/B-009 has a different formulation than AET's ANDA Products. Indeed, Dr. Myerson opines that this development batch is only "similar" to AET's amended ANDA Products.

638.     This formulation (copied below) significantly differs from AET's ANDA Products in that this formulation contains at least one excipient that is not in AET's ANDA Products—Syloid AL1 FP:

| Ingredients | mg/unit | mg/unit |
|---|---|---|
| Stage-A: Granulation | | |
| Microcrystalline Cellulose (Comprecel 101) | 37.50 | 9.375 |
| Stage-B: Binder solution | | |
| Pitolisant HCl | 20.00 | 5.000 |
| Maltodextrin (Glucidex 12D) | 50.00 | 12.500 |
| Purified water | qs | qs |
| Stage-C: Lubrication | | |
| Crospovidone type A (Polyplasdone XL) | 10.00 | 2.500 |
| Croscarmellose-Na | 10.00 | 2.500 |
| Syloid AL1 FP | 4.00 | 1.000 |
| Talc (Luzenac Pharma) | 1.25 | 0.312 |
| Magnesium stearate | 1.25 | 0.313 |
| Core tablet weight | 134.00 | 33.500 |
| Stage-D: Film Coating | | |
| Opadry II white 85F580019 | 6.00 | 1.500 |
| Purified Water | q.s | q.s |
| Coated tablet weight | 140.00 | 35.000 |

639.     Syloid AL1 FP is a silicified microcrystalline cellulose that was added to this development batch to help control moisture in the tablet. Controlling moisture is a completely different function than the colloidal silicon dioxide used in AET's ANDA Products—which AET's ANDA identifies functions as a glidant. *See, e.g.*, AET_000007682-7694 at 7864.

640.     Moreover, while this development batch was prepared using spray granulation, it was not prepared using the same, validated spray granulation process as AET's ANDA Products. AET_000007695-7855 at e.g., 7752- 7753, 7782-7801; AET_000007949-8288 at e.g., 7849, 7950-7953; AET_000007397-7511 at e.g., 7439; AET_000027184-292 at e.g., 27224, 27252-253. This development batch was granulated using lab-scale equipment and tableted using a different, manual press. AET_000007695-7855 at e.g. 7823-7833; AET_000027184-292 at e.g., 27224, 27252-253. It was also granulated with granules that had an excessively high loss on drying that was not within the specification of AET's ANDA Products. AET_000007695-7855 at e.g., 7752- 7753, 7782-7801; AET_000007949-8288 at e.g., 7849, 7950-7953; AET_000007397-7511 at e.g.,

7439; AET_000027184-292 at e.g., 27224, 27252-253. PIO/B-009 thus is not "similar" to AET's

ANDA Products, much less representative of them.

641. ██████████████████████████████████████████

███████████████████████████████



642. ██████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████.

643. ██████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████

644. ██████████████████████████████████████████

███████████████████████████████████████████████

645. ████████████████████████████████████████████

646.    None of the identified development batches are representative of AET's ANDA Products and are thus irrelevant to the infringement inquiry.

### 9.    Plaintiffs Did Not Store or Maintain AET's ANDA Products Under the Appropriate Confitions

647.    Plaintiffs' experts have also failed to provide sufficient information about the storage of AET's ANDA Products. AET stores its ANDA Products at 22.5±2.5°C; 55%±10%RH. While Plaintiffs have provided information about the temperature samples of AET's ANDA Products were stored in, they have not provided any information about the relative humidity these samples were stored in.

648.    Plaintiffs' omission of this information for AET's ANDA Products casts serious doubt on the validity of the data upon which Plaintiffs' experts rely on in their reports, as the samples may not have been stored in the appropriate conditions and thus would not be representative of the products AET will sell after approval.

### C.    Conclusion

649.    Plaintiffs have failed to prove that AET's ANDA Products contain or will contain crystalline pitolisant hydrochloride.

650.    Plaintiffs have failed to prove that AET's ANDA Products contain or will contain the same crystalline pitolisant hydrochloride as in the Wakix product.

651.    Plaintiffs have failed to prove that AET's ANDA Products contain or will contain crystalline pitolisant hydrochloride comprising characteristics peaks (2θ) at 11.2°, 19.9°, 20.7°, and 34.1° ±0.2°.

652.    Plaintiffs have failed to prove that AET's ANDA Products contain or will contain crystalline pitolisant hydrochloride comprising characteristics peaks (2θ) at 11.2°, 15.4°, 16.3°,

## CONFIDENTIAL

16.9°, 17.8°, 19.9°, 20.7°, 21.0°, 21.8°, 22.6°, 24.5°, 24.6°, 25.0°, 25.5°, 26.3°, 28.3°, 30.3°, 34.1°, 35.8°, 40.0°, 46.0° ±0.2°.

653.    AET's ANDA Products do not infringe and, if approved, will not infringe the Asserted Claims of the '197 Patent.

## V.    HIKMA'S NONINFRINGEMENT

654.    Hikma incorporates by reference any issues of fact set forth in its responsive papers to any comparable material filed or submitted by Plaintiffs. Hikma reserves all rights with respect to these disclosures, including the right to amend, supplement, or otherwise modify these disclosures without prejudice according to the schedule set forth by the Parties for pre-trial exchanges, the local rules, the Federal Rules of Civil Procedure, and any other basis in fact or law. Hikma reserves the right to affirmatively use, elaborate upon, or dispute any fact cited by Plaintiffs, including the scientific bases for such fact or Plaintiffs' application of such fact in this case. By including a fact herein, Hikma does not assume the burden of proof or production with regard to that fact. As such, Hikma reserves the right to object to and/or contest those alleged facts and present any and all rebuttal evidence in response to those alleged facts when identified by Plaintiffs. Any fact not specifically admitted in the parties' Statement of Uncontested Facts should be considered contested, even if not specifically enumerated herein. Hikma's following statement is based, in relevant part, on its current understanding of Plaintiffs' positions and the prior proceeding in this litigation. To the extent Defendants' Statement of Contested Issues of Law contains issues of fact, those issues are incorporated herein by reference. If the Court determines that any issue identified in this list as an issue of fact is more properly considered an issue of law, Hikma incorporates such issue by reference into its Statement of Issues of Law. Hikma incorporates by reference their expert reports, invalidity contentions, and noninfringement contentions (by interrogatory response) in support of any proof to be presented by expert

CONFIDENTIAL

testimony. To the extent that a fact or an issue of fact in one section applies to another section, claim or theory, it is incorporated therein as well without separate repetition. Hikma incorporates by reference the Statement of Uncontested Facts. To the extent Hikma sets forth a statement of contested fact in one section of this document, its use is not limited to that section or to the issue addressed in that section. Hikma reserves the right to use any assertion of fact in this document in connection with any defense they advance. By way of example, Hikma's failure to repeat, in connection with a theory or defense, statements of contested fact that are already asserted elsewhere in this document with respect to other theories or defenses, is not a waiver of using such contested facts with all applicable theories and defenses.

655.    Hikma here by incorporates the expert reports of Dr. Aeri Park and Dr. Jonathan Emens and the declaration of Dr. Victor G. Young, Jr. as if set fully herein.

A.    The '197 Patent

1.    Hikma's ANDA Product

656.    Zenara Pharma Private Limited ("Zenara") filed ANDA No. 218796 seeking FDA approval to manufacture, market, and sell generic 4.45 mg and 17.8 mg pitolisant tablets. Hikma has since acquired ANDA No. 218796 from Zenara.

657.    Hikma's ANDA Products are manufactured using pitolisant hydrochloride ████ ██████████ Biophore India Pharmaceuticals Private Limited ("Biophore") is the manufacturer of pitolisant hydrochloride ██████████████ and the holder of DMF No. 037753 (the "DMF"). This ████ ██████████ consists of pitolisant hydrochloride ████ ███████████ ████████████ ██████████

658.    Pitolisant hydrochloride is the active pharmaceutical ingredient ("API") in Hikma's ANDA Products. The API in Hikma's ANDA Products is formed in situ in the manufacturing process for pitolisant hydrochloride ██████████████

CONFIDENTIAL

659.    Hikma's submission of ANDA No. 218796 to obtain approval to engage in the commercial manufacture, use, offer to sell, or sale of Hikma's proposed ANDA products prior to the expiration of the '197 Patent does not constitute an act of infringement of the asserted claims of the '197 Patent under 35 U.S.C. § 271(e)(2)(A).

660.    The use, offer to sell, and sale of Hikma's ANDA Products within the United States, and the importation of Hikma's ANDA Products into the United States, prior to the expiration of the '197 Patent will not directly infringe the asserted claims of the '197 Patent.

661.    The use, offer to sell, or sale of Hikma's ANDA Products within the United States, and the importation of Hikma's ANDA Products into the United States for distribution will not induce infringement of the asserted claims of the '197 Patent.

662.    Hikma's proposed ANDA Products do not contain crystalline pitolisant hydrochloride. Hikma does not intend that its ANDA Products comprise crystalline pitolisant hydrochloride.

663.    Hikma's ANDA Products only contain an amorphous form of pitolisant hydrochloride.

664.    XRPD testing, including synchrotron XRDP testing, establishes that Hikma's ANDA Products only contain an amorphous form of pitolisant hydrochloride.

665.    XRPD testing, including synchrotron XRDP testing, establishes that Hikma's ANDA Products do not contain the crystalline form of pitolisant hydrochloride claimed in claims 1 and 2 of the '197 Patent.

666.    Hikma's ANDA Products would not induce direct infringement of the asserted claims of the '197 Patent by healthcare professionals and/or patients in the United States.

667.    Hikma's proposed label for its ANDA Products would not encourage healthcare professionals or patients in the United States to directly infringe the asserted claims of the '197 Patent.

668.    Hikma has no knowledge that healthcare professionals' and/or patients' use of the Hikma ANDA Product will result in infringement of the asserted claims of the '197 Patent.

669.    Hikma does not intend that healthcare professionals' and/or patients' use of the Hikma ANDA Product will result in infringement of the asserted claims of the '197 Patent.

670.    Hikma has no knowledge or intent that its activities will lead to infringement of the asserted claims of the '197 Patent.

671.    Plaintiffs cannot show that Hikma's ANDA products contain crystalline pitolisant hydrochloride. As such, Plaintiffs have failed to establish that Hikma will directly or indirectly infringe the asserted claims of the '197 Patent.

672.    Claim 1 of the '197 Patent requires crystalline pitolisant hydrochloride that comprises characteristic peaks (2θ) at 11.2°, 19.9°, 20.7° and 34.1°±0.2°. As such, to infringe claim 1, Hikma's ANDA product must include crystalline pitolisant hydrochloride that comprises the claimed characteristic peaks. Hikma's ANDA product does not contain crystalline pitolisant hydrochloride let alone that comprises the claimed characteristic peaks.

673.    Claim 2 of the '197 Patent requires crystalline pitolisant hydrochloride that comprises characteristic peaks (2θ) at 11.2°, 15.4°, 16.3°, 16.9°, 17.8°, 19.9°, 20.7°, 21.0°, 21.8°, 22.6°, 24,5°, 24.6°, 25.0°, 25.5°, 26.3°, 28.3°, 30.3°, 34.1°, 35.8°, 40.0°, and 46.0°±0.2°. Hikma's ANDA Products do not contain crystalline pitolisant hydrochloride that comprises any of the characteristic peaks (2θ) at 11.2°, 15.4°, 16.3°, 16.9°, 17.8°, 19.9°, 20.7°, 21.0°, 21.8°, 22.6°, 24,5°, 24.6°, 25.0°, 25.5°, 26.3°, 28.3°, 30.3°, 34.1°, 35.8°, 40.0°, and 46.0°±0.2°. As such, to infringe

211

CONFIDENTIAL

claim 2, Hikma's ANDA product must comprise crystalline pitolisant hydrochloride that comprises the claimed characteristic peaks. Hikma's ANDA product does not contain crystalline pitolisant hydrochloride let alone that comprises the claimed characteristic peaks.

674.    Hikma will not make, use, offer to sell, or sell within the United States or import into the United States a product containing crystalline pitolisant hydrochloride, let alone with the claimed characteristic peaks. Therefore, Hikma will not directly infringe claim 1 or 2 of the '197 Patent.

675.    No testing of Hikma's ANDA product under the indicated storage conditions shows the presence of any crystalline pitolisant hydrochloride with the claimed characteristic peaks. Therefore, Plaintiffs have not shown that Hikma will directly infringe claim 1 or claim 2. Additionally, because claim 2 depends from claim 1, which is not infringed, Hikma will not infringe claim 2 either.

676.    Plaintiffs do not allege infringement under § 271(g) of the '197 Patent against Defendant Hikma.

677.    Plaintiffs do not allege infringement of the '197 Patent against Defendant Hikma under the Doctrine of Equivalents.

678.    Plaintiffs do not allege contributory or induced infringement of the '197 Patent against Defendant Hikma. Hikma will not induce, or contribute to the infringement of the asserted claims. To find indirect infringement, there must be direct infringement. Hikma's ANDA products will not directly infringe the asserted claims either at the time of manufacturing or after storage, and therefore there can be no indirect infringement either.

679.    Hikma will not indirectly infringe when it manufactures and supplies the Hikma ANDA Product for distribution in the United States. Hikma's ANDA Products do not contain

crystalline pitolisant hydrochloride, and the amorphous pitolisant hydrochloride used to manufacture Hikma's ANDA Products do not convert to crystalline pitolisant hydrochloride during manufacture or storage. All of Hikma's testing, including synchrotron XRDP testing, has confirmed that its Pitolisant HCl ██████████ and Hikma's ANDA Products do not contain crystalline pitolisant hydrochloride, let alone with the claimed characteristics peaks.

680.    Hikma will not induce, or contribute to the infringement by healthcare professionals and patients in the United States according to the proposed labeling for Hikma's ANDA Products. Hikma's ANDA Products sold according to the conditions in the proposed labeling will not include any crystalline pitolisant hydrochloride with the claimed characteristic peaks. Crystalline pitolisant hydrochloride with the claimed characteristic peaks does not form in Hikma's ANDA Products when they are stored consistent with the storage instructions described in Hikma's ANDA and prescribing information.

681.    For at least these reasons, Hikma will not induce, or contribute to the infringement of claim 1 and/or claim 2 of the '197 Patent by selling its ANDA products. Additionally, because claim 2 depends from claim 1, which is not infringed, Hikma will not infringe claim 2 either.

## 2.    Crystal Forms, Polymorphism, and Amorphous Solids

682.    Chemical compounds generally can exist in one of three basic phases: solid, liquid, and gas. Solids can be further classified as crystalline and amorphous.

683.    In some solids, the molecules arrange in a periodic, repeating pattern that extends in three dimensions. Such solids are called "crystalline," and the individual particles are called "crystals."

684.    Some substances can exist in more than one crystalline form, meaning that their constituent molecules can be arranged in more than one repeating, three-dimensional pattern.

CONFIDENTIAL

These different crystal forms, called polymorphs, can have very different properties, even though they are made of the same molecule.

685.    Crystal structure refers to the identity, number and position of the constituent atoms or molecules relative to each other extending in three dimensions, along with the packing arrangement and symmetry elements of the structure. Knowledge of the crystal structure allows one to construct a three-dimensional model of the crystal with all atoms in the correct location.

686.    In a crystal, the repeating arrangements of atoms or molecules are described by a three-dimensional array called the crystal lattice. The lattice is a set of points arranged so that each point has identical surroundings.

687.    The "unit cell" of a crystal structure is the smallest repeating unit of atoms and molecules that when packed in three-dimensional space provides the crystal structure. A unit cell therefore represents the simple "building block" that may be extended in three dimensions to provide a crystalline compound. For every crystalline compound, the unit cell parameters describe the lengths, angles, and volumes of the repeating unit. Different crystalline forms of the same compound will have different unit cell parameters due to the differences in packing of the component molecules. The space group of a crystal structure describes the symmetry of the composition of the unit cell. The parameters $a$, $b$, and $c$ describe the lengths of the edges of the unit cell along the three different axes. The angles alpha, beta, and gamma describe the angles at the corners of the faces of the unit cell. The dimensions of the unit cells of crystals of different molecules, or of a particular crystal form of a given substance, are unique. Thus, each crystal form of a substance will have a characteristic "fingerprint" based on its unit cell dimensions.

688.     An amorphous solid is characterized by the lack of long-range order in the arrangement of the molecules that make up the compound. Amorphous solids do have short-range molecular order.

689.     Amorphous solids can have higher solubility and higher dissolution rates than the corresponding crystal form but are generally less stable.

### 3.     Techniques Used to Identify Polymorphs: X-Ray Diffraction Techniques

690.     X-ray diffraction ("XRD") is the primary technique used to characterize different solid forms of a drug substance. While other techniques can provide supporting information about the solid form, XRD is required to definitively establish the existence of polymorphism.

691.     When XRD experiments are carried out on powdered samples, it is referred to as X-ray powder diffraction ("XRPD"). XRPD is considered the "gold standard" for the identification and characterization of pharmaceutical solid materials. This is because each crystal form is uniquely identified by its powder pattern, and XRPD directly detects and uniquely identifies multiple solid crystal forms of the same pharmaceutical compound.

692.     XRPD involves directing a beam of X-ray radiation at the substance to be tested and measuring the intensity of the diffracted X-rays on an electronic detector. The diffracted intensity is measured over a wide range of the angle through which the X-rays are diffracted. The internal architecture of a crystal is defined by a repeating unit cell, which may be thought of as comprising a series of equally spaced planes or layers intersecting the positions of constituent atoms or molecules. These planes can be used as a "diffraction grating" (i.e., a set of parallel slits that disperse light) for X-rays if the wavelength is comparable to the spacing of the planes in the crystal. The diffraction pattern is a result of the interaction of the X-rays with the series of planes and their interplanar spacings.

CONFIDENTIAL

693.    A beam of X-rays directed at a crystalline solid is diffracted by every possible plane of atoms or molecules in the crystal. Mathematically, this diffraction process is treated as being a process of reflection of the beam of X-rays from the crystal plane and hence diffracted X-ray beams are termed "reflections." The emergent beam appears at certain specific angles and produces a diffraction pattern for a given lattice or family of planes. This happens because, in a crystal, an enormous number of similar parallel planes are present. An X-ray reflection is only observed where the effect of diffraction from these planes is additive ("constructive interference").

694.    When X-rays of a certain wavelength interact with a crystalline material, they will diffract according to Bragg's Law, $n\lambda = 2d\sin\theta$. Bragg's law states that an integer multiple (n) of the wavelength ($\lambda$) of the X-ray radiation must equal twice the distance (d) between the individual parallel planes of the crystal structure (i.e., d-spacing or interplanar spacing) multiplied by the sine of the angle of incidence ($\theta$). An observable X-ray diffraction peak only occurs when Bragg's law is obeyed (i.e., when there is constructive interference between X-ray beams) and results in a distinct "Bragg" peak in the X-ray diffraction pattern.

695.    Bragg's law allows the interplanar spacings in a crystal and hence its unit cell to be determined. This is the foundation for crystal form determination and identification. For any substance, each crystal form will have a unique set of unit cell dimensions and families of planes. These dimensions therefore define a crystalline form of a given material. The overall XRPD pattern in terms of peak positions and intensities represents a characteristic "fingerprint" of a particular crystal form of a specific substance. Each crystalline form of a pure compound has a characteristic and unique X-ray diffractogram "fingerprint." This "fingerprint" of a crystalline compound is commonly used to (1) identify the particular crystal form of a sample, (2) to

CONFIDENTIAL

determine whether a sample is a crystal form or amorphous, and (3) to distinguish one polymorph from another.

696.     As in all instrumental methods of analysis, XRPD is subject to a variety of random and systematic errors, however, these errors and issues are well known and there are various means by which they can be addressed, including by calibrating the instrument with National Institute of Standards and Technology ("NIST") standard, by preparing the samples properly, and by spinning the samples in transmission mode.

697.     Synchrotron XRPD ("S-XRPD") is another diffraction testing method in which the X-ray radiation is generated by a synchrotron, which accelerates electrons in a circular path to nearly the speed of light. This testing method yields a diffraction pattern that, once adjusted to the equivalent wavelength, can be compared to standard XRPD diffraction patterns.

698.     S-XRPD testing is significantly more sensitive than lab XRPD testing and has extremely low detection limits. Using optimized conditions, S-XRPD has been found to have a limit of detection of 0.02% and a limit of quantification of 0.05%, which is approximately 100 times as sensitive as that obtained using conventional XRPD. Another source was able to achieve a 100 ppm detection limit (0.01%) of crystalline ritonavir in an amorphous matrix using S-XRPD.

699.     The peaks in the S-XRPD pattern are significantly sharper and have improved signal-to-noise ratio (SNR) in the baseline. The significantly improved SNR demonstrates that S-XRPD is a much more sensitive technique than regular laboratory XRPD.

700.     Synchrotron sources for S-XRPD testing are found at large national or international facilities that produce radiation, many orders of magnitude brighter than conventional laboratory equipment. One well-known synchrotron facilities is the European Synchrotron Radiation Facility ("ESRF") located in France.

CONFIDENTIAL

### 4.     Techniques Used to Identify Polymorphs: Solid State Nuclear Magnetic Resonance Spectroscopy (SSNMR)

701.     Another technique that can provide information about the solid state is carbon-13 solid-state nuclear magnetic resonance spectroscopy ("SSNMR"), which is based on the characteristic resonance frequency of the nuclei of carbon atoms in the presence of a magnetic field. The precise frequency at which these characteristic signals occur is influenced by the chemical environment in which the atom finds itself, including the packing arrangement in the solid state. SSNMR signals can be very broad, and a technique called "magic angle spinning" is used to eliminate some of the worst broadening that arises from the dipolar couplings and chemical shift anisotropy.

702.     SSNMR spectroscopy probes the structure of the molecule and its local environment. In an SSNMR spectrum, each different carbon atom will give rise to its own peak. If a particular carbon atom gives rise to more than one peak, this is an indication that there is more than one environment for that type of atom in the crystal. SSNMR spectra can also include small peaks situated symmetrically on either side of a main peak termed "spinning side bands," which are easily recognized by the operator. Typically, they are marked with an asterisk to indicate that they are not part of the main pattern. In general, in carbon (13C) SSNMR spectrum of amorphous materials, the peaks are often broader than crystalline peaks. The crystalline solids have a long-range order, and each carbon atom in the molecule is in a similar local electronic environment which gives rise to sharper signals in the SSNMR spectra. On the other hand, in amorphous solids, each carbon atom exists in a slightly different local environment because of the (1) lack of long-range order and (2) having a higher molecular mobility. This means that the SSNMR spectra of amorphous solids show a distribution of chemical shifts for each carbon in the molecule, and this broadens the corresponding peak in the SSNMR spectrum.

703.    SSNMR testing must be considered as supporting and ancillary information and cannot alone be taken as definitive proof of the existence of polymorphism.

704.    Unlike XRPD, SSNMR does not provide the characteristic X-ray diffraction peaks ($2\theta$), which are what is claimed in claims 1 and 2 of the '197 patent.

705.    It can be difficult to distinguish between crystalline and amorphous forms solely using SSNMR.

706.    Overlapping SSNMR peaks cannot be taken as proof that two samples contain the same crystalline form or that they would have the same XRPD diffraction peaks.

707.    SSNMR peaks corresponding to amorphous materials are broader than those corresponding to crystalline materials.

708.    SSNMR has a higher limit of detection ("LOD") than S-XRPD.

**5.    The pitolisant hydrochloride ████████ used to create Hikma's ANDA Products is amorphous, not crystalline.**

709.    Hikma's ANDA Products are manufactured using pitolisant hydrochloride ██ ████████.

710.    Hikma's ANDA and the corresponding DMF both confirm that the pitolisant hydrochloride ████████ used to prepare Hikma's ANDA Products is amorphous.

711.    The drug substance specifications for Hikma's ANDA Products expressly provide that the XRD "should match with amorphous form."

712.    The method of stabilizing amorphous solids by formulating them as amorphous ████████ is well known and frequently used. An amorphous ████████ is a solid ████ consisting of a drug ████████████████████████████████████ This allows the amorphous solid to ████████████████████ which is used as a ████████████████████."

713.     ████████amorphous████████████ can be used to stabilize amorphous APIs.

████████████████████████████████████████████████████████████

of an amorphous ████████████████████████████████████████████████.

714.     Stabilization of an amorphous solid generally means attempting to **minimize molecular mobility** (since molecular mobility is needed for nucleation and crystal growth).

715.     ████████████████ therefore act as crystallization inhibitors.

716.     When the drug loading is lower than the ████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████

717.     There were forty-eight drug products containing amorphous ████████████ approved by the U.S. Food and Drug Administration ("FDA") between 2012 and 2023.

718.     Physically and chemically stable amorphous ████████████ drug products were FDA approved as early as the 1990s.

719.     In Hikma ANDA Products, ██████████████████████████████████████

████████████████████████████████████" Pitoli_033036–119 at 033052. Thus, ████████

████████████████████████████████████████████████

720.     ████████████████████, are widely used in amorphous drug formulations because they are known to stabilize the amorphous state of the drug. This improved stability is due to the fact that ████████████████████████████████████████████

████████████████████████████████████████████████████████████

drug molecules in their ████████████████████████████████████

API has a protective effect, ██████████████████████████████████

████████████

721.    Pitolisant hydrochloride contains a lipophilic portion and will have ██████████ ████████████████████████████████████████████████████████████████ keeps the amorphous form of pitolisant hydrochloride stable in the formulation.

722.    The manufacturing process for the pitolisant hydrochloride ████████████ used to prepare Hikma's ANDA Products is detailed in Hikma's ANDA and the corresponding DMF. This preparation involves ██████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████

723.    The manufacturing process of Hikma's ANDA Products creates the stable amorphous form of pitolisant hydrochloride.

724.    It is well known that ██████████████ is commonly used to produce an amorphous product.

725.    After ████████████, the next step in the manufacturing process for preparing the pitolisant hydrochloride ██████████████ in Hikma ANDA Products ████████████████ ████████████████████████████████████████████████████████████ ██████████████ is a common means of producing amorphous solids. For example, milling cyclodextrin and a drug to prepare an amorphous ████████ is described in the literature.

726.    The pitolisant hydrochloride ██████████████ resulting from the manufacturing process described in the ANDA to prepare Hikma's ANDA Products is amorphous.

**6.    XRPD and S-XRPD testing of Hikma's pitolisant hydrochloride ████ ████████ confirms the absence of crystalline pitolisant hydrochloride with the claimed characteristic peaks.**

727.    XRD testing reported in the DMF corresponding to Hikma's ANDA Products confirms that the pitolisant hydrochloride ████████████████ used in preparing Hikma ANDA

**CONFIDENTIAL**

Products is amorphous and "confirmed that the manufacturing process consistently produces same pattern of XRD" As shown below:



728.    Hikma's ANDA also includes XRPD diffractograms of the pitolisant hydrochloride ███████████ which confirms the pitolisant hydrochloride ███████████ used in preparing

Hikma ANDA Products is amorphous:

**CONFIDENTIAL**



729.    This XRPD testing in Hikma's ANDA and the corresponding DMF was conducted

by ███████████████████████████████ certifies that the facilities, instruments,

procedures, records and methods used are in compliance with the current Good Manufacturing

Practice codified in 21 C.F.R. §§ 210–11 and with ICH Q7.

730.    Dr. Myerson did not present any evidence that the XRPD tests from the ANDA and

DMF show crystallization of pitolisant hydrochloride.

731.    Dr. Victor Young, Jr. conducted S-XRPD testing in July 2025 on six samples of

Hikma ANDA Products manufactured in ███████████ and two samples of the pitolisant

hydrochloride ██████████ manufactured in ████████

732.    Dr. Young's synchrotron XRPD testing was conducted at the European

Synchrotron Radiation Facility (the "ESRF") ID22.

733.    ESRF is a joint research facility supported by the international cooperation of 19

countries in Grenoble, France.

734.    Experiments at the ESRF are performed by scientists who have a formal connection to the facility or one of its beamlines, and by general users, who obtain access to the facility by writing proposals in which they describe the motivation for their work, justify the need for synchrotron radiation, and demonstrate that the work can be carried out safely.

735.    ID22 is one of the beamlines at ESRF. Specifically, it is a high-resolution powder diffraction beamline that can be used for a wide range of powder diffraction measurements, including crystallographic studies.

736.    S-XRPD testing was conducted on six batches of Hikma's ANDA Products and two batches of the pitolisant hydrochloride ███████████ used to manufacture Hikma's ANDA Products. Dr. Young received these samples from Hikma. The samples were shipped consistent with the suppliers' conditions for storage and shipment.

737.    Hikma provided Dr. Young with samples that were manufactured by either Zenara Pharma Private Limited ("Zenara") in ████████████; Biophore India Pharmaceuticals Private Limited ("Biophore") in ██████████████; or ████████ ████████ ████████ ████████ ██████████████████

| Sample No. | Sample Name | Batch No. | Manufacturing Date |
|---|---|---|---|
| 1 | Pitolisant HCl ███████ | ██████████ | █████████ |
| 2 | Pitolisant HCl ███████ | ██████████ | █████████ |
| 3 | Pitolisant Tablets 4.45 mg | ██████████ | █████████ |
| 4 | Pitolisant Tablets 17.8 mg | ██████████ | █████████ |
| 5 | Pitolisant Tablets 4.45 mg | ██████████ | █████████ |
| 6 | Pitolisant Tablets 17.8 mg | ██████████ | █████████ |
| 7 | Pitolisant Tablets 4.45 mg | ██████████ | █████████ |

**CONFIDENTIAL**

| Sample No. | Sample Name | Batch No. | Manufacturing Date |
|---|---|---|---|
| 8 | Pitolisant Tablets 17.8 mg | ████ | ████ |

███    Dr. Young received the Hikma samples on December 30, 2024 via Cencora World Courier. A temperature sensor was included in the shipment, but this was immediately removed and retained by the shipper upon arrival at my home.

739.    While in Dr. Young's possession, the Hikma samples were continuously stored and maintained at a temperature of 15-25°C.

740.    Powders were prepared from each of the samples. Each sample was crushed and gently ground with a mortar and pestle followed by scraping with a stainless-steel spatula three successive times to produce fine powders suitable for study.

741.    The prepared powders from each of the sample preparations were packed by Dr. Young into sealed 40.0 x 1.0 mm polyimide capillaries.

742.    Dr. Young shipped the Hikma samples via DHL to ESRF in Grenoble, FR on July 22, 2025. The samples arrived at ESRF on July 28, 2025.

743.    Dr. Young did not use temperature-controlled packaging to ship the samples via DHL to ESRF. Any deviation from the recommended storage temperature did not result in forming any claimed crystalline form of pitolisant hydrochloride.

744.    The S-XRPD testing was performed in July 2025.

745.    At ESRF, per Dr. Young's instruction, the samples were collected on ESRF ID22 with $\lambda = 0.354314(7)$ Å using standard protocol to produce diffractograms.

746.    At Dr. Young's instruction, an ESRF scientist collected the diffraction patterns via ESRF's normal high-resolution continuous-scanning mode at a wavelength of 0.354314(7) Å (calibrated via NIST 640c Si) while spinning (at 919 rpm). For each capillary the ESRF scientist

made 21 scans covering 23 mm of the capillary (so scan, translate by 1.1 mm to expose fresh sample; repeat) to minimize possible radiation damage and average over the capillary; beam size 1 x 1 mm2. For each sample the ESRF scientist checked all the scans for consistency before combining them, along with the data from the 13 channels. Corrections for axial divergence and channel efficiencies were applied as standard practice. Samples 1 and 2 were measured twice and all scans combined. The continuous-scan data were rebinned into various step sizes.

747.    The S-XRPD testing procedures used by Dr. Young were proper and in line with industry standards.

748.    The claimed diffraction peaks recited in claims 1 and 2 of the '197 patent are not present in the S-XRPD diffraction patterns for Hikma's pitolisant hydrochloride ████████

749.    Dr. Young tested two batches of the pitolisant hydrochloride solid dispersion used to create Hikma's ANDA Products, which he referred to as Samples 1 and 2. Dr. Young replotted the diffractograms for Sample 1 and Sample 2 by converting each to Cu Kα λ = 1.54184 Å. The resulting plots are below:

**CONFIDENTIAL**



750.    Dr. Young further provided figures zooming in on the 10–15º 2-theta region for Samples 1 and 2, wherein the diffraction peak of claim 1 of the '197 Patent at 11.2º is annotated with a red arrow:

**CONFIDENTIAL**



751.   The results of Dr. Young's S-XRPD testing confirm that the pitolisant hydrochloride ▮▮▮▮▮▮▮▮ used to prepare Hikma's ANDA Products does not contain crystalline pitolisant hydrochloride with the claimed characteristic diffraction peaks.

752.    The results of Dr. Young's S-XRPD testing confirm that the pitolisant hydrochloride ████████████ used to prepare Hikma's ANDA Products contains only the amorphous form of pitolisant hydrochloride without any crystalline material.

753.    The two batches of batches of pitolisant hydrochloride ████████████ tested by Dr. Young were manufactured in ████████, thus, the pitolisant hydrochloride remained amorphous in Hikma's ████████ for over two years.

754.    Plaintiffs' expert, Dr. Gozzo, conducted S-XRPD testing of Plaintiffs' pitolisant hydrochloride API reference. Dr. Gozzo's S-XRPD diffraction pattern of Harmony's API samples is shown below. Based on this testing, Dr. Myerson concluded that Plaintiffs' pitolisant hydrochloride API reference contained the claimed diffraction peaks of claims 1 and 2 of the '197 patent.



***Figure 2 – S-XRPD pattern of** HARMONY pitolisant HCl Reference API with ESS code FGCB159 **on the CuKα** scale over the extended 4°–50° 2-theta range overlaid with the digitized Figure 1 from the '197 US Patent, which provides a representative XRPD pattern of HARMONY crystalline 1-3-3-(4 chlorophenyl)propoxypropyl-piperidine monohydrochloride on a CuKα scale pattern. The landscape format of this figure is available in Appendix H-C.*

**CONFIDENTIAL**

755.    Dr. Park overlayed the S-XRPD pattern of Plaintiffs' pitolisant hydrochloride API

reference from Dr. Gozzo and the S-XRPD patterns of Hikma's pitolisant hydrochloride █████

████████ from Dr. Young:



**Dr. Park Rebuttal Report, Figure 2. S-XRPD pattern of Hikma pitolisant hydrochloride ████████████████████████ black); S-XRPD pattern of Hikma pitolisant hydrochloride ████████████████████████ (red); and S-XRPD pattern of pitolisant hydrochloride API reference (HBS-EXPERT_0004860) (blue).**

756.    Dr. Park created the below figures zooming in on the 10–15º, 15–25º, 25–30º, 30–

40º, and 40–50º 2-theta regions; The '197 peaks in claims 1 and 2 are highlighted in yellow shade:

**CONFIDENTIAL**



**CONFIDENTIAL**




CONFIDENTIAL



757.    As seen in the above zoomed-in plots, none of the claimed diffraction peaks at 11.2°, 15.4°, 16.3°, 16.9°, 17.8°, 19.9°, 20.7°, 21.0°, 21.8°, 22.6°, 24.5°, 24.6°, 25.0°, 25.5°, 26.3°, 28.3°, 30.3°, 34.1°, 35.8°, 40.0°, and 46.0° are present in the diffraction patterns for Hikma's pitolisant hydrochloride ████████████.

758.    Hikma produced samples from the same batches of pitolisant hydrochloride ████ ████████ as were tested by Dr. Young upon Plaintiffs' request, but Plaintiffs or their experts did not disclose or rely on any XRPD or S-XRPD testing results on these samples.

759.    Dr. Young tested six batches of Hikma's ANDA Products, which he referred to as Samples 3–8. Dr. Young replotted the diffractograms for these samples by converting each to Cu Kα λ = 1.54184 Å. The resulting plots are below:

**CONFIDENTIAL**





**CONFIDENTIAL**



760.    Dr. Young further provided figures zooming in on the 10–15º 2-theta region for Samples 3–8, wherein the diffraction peak of claim 1 of the '197 Patent at 11.2º is annotated with a red arrow:

**CONFIDENTIAL**





**CONFIDENTIAL**



761.    These figures show that Samples 3–8 of Hikma's ANDA Products contain only the amorphous form of pitolisant hydrochloride. These diffractograms display the raised baseline, or "halo," diffraction pattern consistent with amorphous solids, here, amorphous pitolisant hydrochloride ███████████ and amorphous excipients in the formulation.

**CONFIDENTIAL**

762.   Hikma   ANDA   Products   contain   amorphous   pitolisant   hydrochloride   ███

███████ and additional excipients ███████████████████████████████████████████

██████████

763.   ████████████████████████████████████████████████████████████████████

███████████████████████████

764.   While all of the above diffractograms for Samples 3-8 show the same sharp signals,
these do not match the peaks of crystalline pitolisant hydrochloride. These sharp peaks in the
diffractograms arise from ██████████████████████████████ present in Hikma's ANDA
Products. The diffractogram for Sample 3 is annotated below with red shadowing to show peaks
from ██████████████████████████████



765.   The results of Dr. Young's S-XRPD testing confirm that Hikma's ANDA Products
do not contain the claimed crystalline pitolisant hydrochloride with the required diffraction peaks
recited in claims 1 and 2 of the '197 Patent. Dr. Park overlayed the S-XRPD pattern of Plaintiffs'

pitolisant hydrochloride API reference from Dr. Gozzo, which Plaintiffs' experts contend

"contains the peaks of claims 1 and 2 of the '197 Patent" and the S-XRPD patterns of Hikma's

ANDA Products from Dr. Young:



766.    Dr. Park created the below figures zooming in on the 10–15º, 15–25º, 25–30º, 30–

40º, and 40–50º 2-theta regions. The peaks in claims 1 and 2 of the '197 patent are highlighted in

yellow:

**CONFIDENTIAL**



**CONFIDENTIAL**



**CONFIDENTIAL**



767.    As seen in the above zoomed-in plots, none of the claimed diffraction peaks at 11.2°, 15.4°, 16.3°, 16.9°, 17.8°, 19.9°, 20.7°, 21.0°, 21.8°, 22.6°, 24.5°, 24.6°, 25.0°, 25.5°, 26.3°, 28.3°, 30.3°, 34.1°, 35.8°, 40.0°, and 46.0° are present in the diffraction patterns for Hikma's pitolisant hydrochloride solid dispersion.

768.    The claimed diffraction peaks recited in claims 1 and 2 of the '197 patent are not present in the S-XRPD diffraction patterns for Hikma's ANDA Products.

769.    Hikma produced samples from the same batches of Hikma's ANDA Products as were tested by Dr. Young upon Plaintiffs' request, but Plaintiffs or their experts did not disclose or rely on any XRPD or S-XRPD testing results of these samples.

CONFIDENTIAL

770.    Plaintiffs' experts do not disclose or rely on any XRPD or S-XRPD testing of Hikma's ANDA Products or Pitolisant HCl ███████ produced by Hikma in this case.

771.    The absence on the part of Plaintiffs' experts to disclose, consider, and/or rely on XRPD or S-XRPD testing to prove that Hikma's ANDA products contain the claimed crystalline pitolisant hydrochloride means that Plaintiffs have failed to meet their burden of proving that Hikma's ANDA Products contain the claimed crystalline pitolisant hydrochloride with the claimed characteristic peaks.

772.    Dr. Gozzo conducted S-XRPD testing on Harmony's API samples, and therefore had access to a synchrotron facility.

773.    Dr. Gozzo performed the S-XRPD testing on Harmony's API samples in April 2025, after she had received samples of Hikma's ANDA Products and Hikma's pitolisant hydrochloride solid dispersion.

774.    Dr. Gozzo also performed S-XRPD testing on samples from MSN Pharmaceuticals Inc., another defendant in this case. Plaintiffs provided synchrotron XRD testing of Defendant MSN's ANDA Products by their expert Dr. Gozzo in their opening expert reports. At the time Dr. Gozzo conducted synchrotron XRD testing of Defendant MSN's ANDA Products, she was in possession of Defendant Hikma's ANDA Products. Despite having Hikma's samples, Dr. Gozzo did not conduct synchrotron XRD testing of Hikma's ANDA Products.

**7.    The pitolisant hydrochloride ███████ remains amorphous through the shelf life of Hikma's ANDA Products.**

775.    The amorphous structure of the pitolisant hydrochloride contained in Hikma's ANDA Products does not change during or after the manufacturing of Hikma's ANDA Products. The ANDA includes XRD diffractograms demonstrating that Hikma's ANDA Products contain

**CONFIDENTIAL**

amorphous pitolisant hydrochloride ▮▮▮▮▮▮. An example is below. Pitoli_0000456–711

at 0000482 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *see also id.* at 0000481–491 (Figs. 3–25).



776.    The two peaks are from excipients, as shown for example by the following Figure.

*Id.* at Pitoli_0000481 (Fig. 4).

246

CONFIDENTIAL

777.    The pitolisant hydrochloride in Hikma's ANDA Products is stable and remains amorphous.

778.    Stability data in Hikma's ANDA and the corresponding DMF states that the pitolisant hydrochloride ███████████ is stable and remains amorphous through the shelf life of Hikma's ANDA Products and do not show any crystallization of the pitolisant hydrochloride ███ ███████ In particular, the DMF provides accelerated and long-term stability data of validation batches of the pitolisant hydrochloride ███████████. This testing indicates that the pitolisant hydrochloride ███████████ was stable at accelerated and long-term storage conditions.

779.    Dr. Myerson has not come forth with any data to dispute or contradict the statements and XRPD testing in Hikma's ANDA and the corresponding DMF showing that the amorphous form of pitolisant hydrochloride is maintained throughout the shelf life of Hikma's ANDA Products.

8.    **Dr. Wenslow's SSNMR testing shows that Hikma's ANDA Products do not contain the claimed crystalline pitolisant hydrochloride with the claimed characteristic peaks.**

780.    Plaintiffs' experts did not disclose XRPD or S-XRPD testing of Hikma's ANDA Products or pitolisant hydrochloride ███████████ produced by Hikma in this case to support their infringement positions. Instead, they relied solely on SSNMR testing of Hikma's samples to support their infringement opinions. However, Plaintiffs did not offer any ssNMR testing of the 4.45 mg strength of Hikma's ANDA Products.

781.    The SSNMR testing that Dr. Wenslow conducted is insufficient to show the presence of crystalline pitolisant hydrochloride with the claimed characteristic peaks.

782.    The SSNMR testing that Dr. Wenslow conducted supports the conclusion that the pitolisant hydrochloride in Hikma's ANDA Products and pitolisant hydrochloride ███████████ are only amorphous.

783.    Dr. Wenslow conducted 13C CPMASTOSS (Cross Polarization Magic Angle Spinning with Total Sideband Suppression) SSNMR testing on Plaintiffs' crystalline pitolisant hydrochloride API, the pitolisant hydrochloride ████████, and Hikma's excipients and ████.

784.    As a control, Dr. Wenslow also conducted CPMASTOSS SSNMR testing of





████████████ which allows one to distinguish the crystalline from amorphous forms."

785.    Dr. Wenslow admits that the resulting CPMASTOSS spectrum "indicates that the pitolisant hydrochloride peaks sample of Hikma's tablet is primarily amorphous because the peaks are broad, shifted up field, and the relative intensity is similar to the relativity intensity of the amorphous pitolisant hydrochloride ████████ peaks in that region."

786.    Dr. Wenslow further performed $T_1\rho$ filtered SSNMR experiments on Hikma's ANDA Products and pitolisant hydrochloride ████████ to determine whether there was any crystalline pitolisant hydrochloride present in Hikma's "primarily amorphous" pitolisant hydrochloride ████████. He chose to conduct this $T_1\rho$ filter experiment because crystalline pitolisant hydrochloride has longer $T_1\rho$ than the ████████████████ ████████ meaning that "at a particular point in time, here around tau = 0.3 sec, the amorphous material will produce a statistically negligible signal while crystalline signal will still be detectable." Specifically, he selected tau = 32 ms to exclude amorphous signals. Dr. Wenslow's SSNMR testing fails to meet Plaintiffs' burden of proving that Hikma's ANDA Products contain crystalline pitolisant hydrochloride with the claimed characteristic peaks.

787.    SSNMR testing cannot alone be taken as proof of the existence of polymorphism.

788.    SSNMR does not measure 2-theta peaks that are required in the asserted claims.

789.    None of Plaintiffs' experts provide any explanation or support for their opinion that the mere overlap of two SSNMR peaks can somehow establish the presence of the claimed crystalline form and the claimed characteristic XRPD diffraction peaks.

790.    Overlapping SSNMR peaks do not prove that two APIs have the same crystalline form or the same XRPD diffraction peaks.

791.    Dr. Wenslow did not conduct SSNMR testing or confirm the specificity of the two peaks he selected from the claimed crystalline form as compared to other forms of crystalline pitolisant hydrochloride. This failure casts further doubt on his conclusions, because different crystalline forms can have overlapping SSNMR peaks, and one set of signals cannot be used to uniquely identify a specific crystalline form.

792.    Given that Dr. Young's S-XRPD testing did not detect any crystalline pitolisant hydrochloride, SSNMR testing would not be able to detect any crystalline pitolisant hydrochloride because SSNMR has a higher limit of detection than S-XRPD.

793.    Dr. Wenslow's method development is also flawed because he does not include a proper control, which is required for all analytical techniques. Dr. Wenslow uses ███████ ███████████████████████████████ as a reference, but there is no information as to how this █████████ is manufactured or to what extent that manufacturing process differs from Biophore's DMF manufacturing process.

794.    ████████████████████████████████████████ is different from the carrier in Hikma's ███████████.

795.   Dr. Wenslow's method, developed using █████████ █████████ █████████ ████████████████████ as a reference is improper to analyze Hikma's pitolisant hydrochloride ████████████ and Hikma's ANDA Products.

796.   The $T_1\rho$ filtered SSNMR peaks of Hikma's ANDA Products and pitolisant hydrochloride ████████████ are broad, which further suggests that they are amorphous.

797.   Assuming that Dr. Wenslow's $T_1\rho$ calculations were properly optimized his testing supports the conclusion that Hikma's ANDA Products and pitolisant hydrochloride ████ ████████████ are amorphous. The SSNMR peaks corresponding to pitolisant hydrochloride in Hikma's ANDA Products and pitolisant hydrochloride ████████████ are broad, rather than narrow. As Dr. Winslow admits, "amorphous SSNMR peaks are typically broad, while crystalline SSNMR peaks are typically sharp." Dr. Wenslow compares the narrower peaks of Harmony's crystalline pitolisant hydrochloride with the broader peaks of ████████████████████ ████████████████████████████ Thus, the SSNMR testing suggests that the Hikma ANDA Products and pitolisant hydrochloride ████████████ are amorphous, not crystalline.

798.   The $T_1\rho$ filtered spectra of Hikma's ANDA Products and pitolisant hydrochloride ████████████ include excipient peaks, further indicating that they are amorphous and stable.

799.   The decay curve experiments presented by Dr. Wenslow suffer from methodological and interpretive shortcomings. The decay curve centered at 141.9 ppm corresponding to the crystalline API is notably missing data points at $\tau = 16$ ms and 32 ms, while the curve for the ████████████████████████████████████. The absence of these intermediate $\tau$ values is problematic, as it may lead to an inaccurate representation of the decay kinetics, potentially distorting the inferred relaxation behavior. Similarly, the crystalline API decay curve for the 131.7 ppm signal lacks data at $\tau = 16$ ms and 32 ms, and the ████████████

**CONFIDENTIAL**

████████████████████████. Such omissions may significantly impact the apparent curvature and trajectory of the decay, especially given that longer τ values are critical for assessing whether signals from amorphous components have fully decayed. It is plausible that a τ value of 32 ms is insufficient to fully remove the signal contributions from amorphous pitolisant hydrochloride.

800.     Dr. Wenslow concluded that at τ = 32 ms, only signals corresponding to crystalline pitolisant hydrochloride remain visible, asserting the absence of residual amorphous signal. However, this conclusion is based on data acquired with only 152 scans. In contrast, the $T_{1\rho}$-filtered SSNMR spectrum of Hikma's ANDA product was obtained using 19,896 scans—approximately 130 times more scans than in the decay curve experiment. Given that signal-to-noise ratio (SNR) improves with the square root of the number of scans, this increase in scan number corresponds to an approximate 11.5-fold improvement in SNR. An estimation of the SNR for the peak near 131.7 ppm, based on peak height relative to the average noise level, yields an SNR of approximately 7. This observation is consistent with the enhanced sensitivity resulting from the substantial increase in scans. It follows that low-intensity signals, potentially from residual amorphous content, may not have been detectable in the lower-sensitivity decay experiment (τ = 32 ms, 152 scans), yet become observable under extended acquisition (τ = 32 ms, 19,896 scans). A similar analysis of the $T_{1\rho}$-filtered SSNMR spectrum of Hikma's ████████ ████████ acquired with 6,632 scans—43 times more than in the decay experiment—yields an estimated SNR of approximately 4 for the peak near 131.7 ppm. This scan count corresponds to an expected 6.6-fold improvement in SNR relative to the 152-scan dataset. These findings collectively suggest that Dr. Wenslow did not adequately optimize τ values or acquisition parameters to ensure complete relaxation of amorphous components. Consequently, residual

CONFIDENTIAL

amorphous signals, while potentially obscured in the lower-sensitivity data, become evident with longer acquisition times. Therefore, the signals observed in Hikma's amorphous ███████ and Hikma's ANDA product spectra are not attributable to crystalline pitolisant hydrochloride. The presence of residual amorphous signals—detectable with improved SNR—strongly suggests that the spectral data cannot be interpreted as evidence of crystallinity.

801.    Assuming that Dr. Wenslow's $T_1\rho$ calculations were properly optimized the SSNMR testing by Dr. Wenslow further demonstrates that Hikma's ANDA Products and the pitolisant hydrochloride ████████ used to prepare Hikma's ANDA Products are amorphous because the $^{13}C$ $T_1\rho$ filtered spectra show (1) two broad peaks from amorphous pitolisant hydrochloride and (2) excipient peaks.

802.    When the pitolisant hydrochloride - █████ amorphous █████ is formed, the local environment of the pitolisant hydrochloride changes because of ████████████ ██████ As a result, the $T_1\rho$ of pitolisant hydrochloride changes because pitolisant hydrochloride is ██████████████████████ which changes the molecular mobility of pitolisant hydrochloride. Due to this change in mobility, the $T_1\rho$ of both pitolisant hydrochloride and █████ changes in the ████████, and in fact, the $T_1\rho$ becomes longer for the ██████████ due to the reduced molecular mobility.

803.    Therefore, the fact that the $T_1\rho$ filtered spectra in Dr. Wenslow's report, which was designed to detect crystalline pitolisant hydrochloride with longer $T_1\rho$, exhibit signals █████ indicates that an ████████ is present in Hikma's amorphous █████ and ANDA product.

804.    If Hikma's ANDA Products and pitolisant hydrochloride █████████ contained crystalline pitolisant hydrochloride, the $T_1\rho$ filtered spectrum of Hikma ANDA Products should

CONFIDENTIAL

*only* show the peaks corresponding to crystalline pitolisant hydrochloride. However, the $T_1\rho$ filtered spectrum of Hikma ANDA Products still shows (1) two broad signals from amorphous pitolisant hydrochloride and (2) three signals from ███████ This suggests that a ███████ ███████ has been formed.

805.    Dr. Wenslow's data files provide additional support that pitolisant hydrochloride is amorphous in Hikma's ANDA Products and pitolisant hydrochloride ███████. Thus, the $T_1\rho$ relaxation times for both ███████ and pitolisant hydrochloride have been changed, exhibiting longer $T_1\rho$ values than those for the individual component. These changes in $T_1\rho$ values strongly imply a reduction in local molecular dynamics, evidence of amorphous inclusion complex formation within Hikma's pitolisant hydrochloride ███████. In addition, the pitolisant hydrochloride peaks are much broader in the spectrum of Hikma's pitolisant hydrochloride ███ ███████ than the peaks in the spectrum of Plaintiffs' crystalline pitolisant hydrochloride API. This further proves that pitolisant hydrochloride detected is amorphous.

**9.    Hikma's manufacturing process does not contribute to the presence of the claimed crystalline form.**

806.    The production process of the pitolisant hydrochloride ███████ ensures that the drug substance is amorphous.

807.    ███████████████████████████████████ ███████

808.    Hikma's pitolisant hydrochloride ███████ is amorphous and remained amorphous after more than 2 years had passed.

809.    Hikma's ANDA Products only contain amorphous pitolisant HCl, which remained amorphous after more than 2 years had passed.

CONFIDENTIAL

810.    Crystallization does not occur during the manufacturing process of Hikma's ANDA Products.

811.    When the pitolisant hydrochloride ██████████ is ███████ with several ingredients, any ████████████████████. Such ████████████ is typical of drug product manufacturing. There are many amorphous drugs which have been successfully manufactured and marketed.

812.    The final step of Hikma's manufacturing process, ████████████████████ but there is no evidence that this step causes conversion. ██████████ are routinely performed in drug product manufacturing. ████████████████████████████ ████████████████████████ stabilizes the amorphous form under these conditions.

813.    Even if the manufacturing process *could* theoretically result in crystallization, Plaintiffs have presented no evidence that crystallization does in fact occur. And even if crystallization could occur, Plaintiffs have presented no evidence that such crystallization would necessarily result in the claimed crystalline form, as opposed to a different crystalline form of pitolisant hydrochloride.

        **10.    Biophore's internal documents do not contain evidence of conversion to the claimed crystalline form.**

814.    Biophore's process for preparing the pitolisant hydrochloride ██████████ used in manufacturing Hikma's ANDA Products was a typical formulation development process, including an ordinary amount of experimentation to identify an appropriate ratio of ████████ to pitolisant hydrochloride to prepare a stable amorphous ██████████

        ████    It is typical in drug formulation development for ████████████████████████ ████████████████

254

816.    Biophore took deliberate action to ensure that the pitolisant hydrochloride █████ ███████ was amorphous, including conducting many experiments and undertaking significant research and development efforts.

817.    Biophore ██████████████████████████████████████████████████ ██████████████████████████████████████████. That result conflicted with Biophore's express "aim" of "obtain[ing] the amorphous form of pitolisant hydrochloride."

818.    Biophore ████████████████████████████████████████████████ ██████████████████

819.    The final production process used to create the pitolisant hydrochloride █████ ███████ used to prepare Hikma's ANDA Products does not result in the crystalline form., and the final drug substance in Hikma's ANDA Products is amorphous and stable.

820.    The packaging and handling of the amorphous pitolisant ███████████ does not demonstrate the presence of the claimed crystalline form.

821.    Hikma's ANDA Products and the pitolisant hydrochloride ██████████ used to make them only contain amorphous pitolisant hydrochloride, as confirmed by S-XRPD testing performed by Dr. Young.

822.    Hikma's testing and analytical methods do not demonstrate the presence of the claimed crystalline form.

823.    For regulatory purposes, Biophore was required to manufacture and test ████████ pitolisant hydrochloride. This ██████ pitolisant hydrochloride was "fully characterized and compared with Pitolisant HCl reference standard and found to be equivalent."

CONFIDENTIAL

824.    A POSA would have understood that there is no need to conduct XRPD testing on the pitolisant hydrochloride formed ██ ██ during the process for preparing pitolisant hydrochloride ████████.

825.    The pitolisant hydrochloride formed ████ is in *solution*.

826.    The solid state of the ██████ pitolisant hydrochloride prepared in response to the FDA inquiry does not provide any information about the solid state of the pitolisant hydrochloride ████████ used in preparing Hikma's ANDA Products.

**B.    The '947 Patent**

827.    Plaintiffs do not allege contributory infringement of the '947 Patent against Defendant Hikma.

828.    Plaintiffs do not allege infringement of the '947 Patent under § 271(g) against Defendant Hikma.

829.    Plaintiffs do not allege infringement of the '947 Patent against Defendant Hikma under the Doctrine of Equivalents.

830.    A person of ordinary skill in the art would have understood the term "excessive daytime sleepiness" as used in the '947 Patent has its plain and ordinary meaning, e.g., a symptom in which a patient falls asleep at an inappropriate time or setting during the day.

831.    Hikma's submission of ANDA No. 218796 to obtain approval to engage in the commercial manufacture, use, offer to sell, or sale of Hikma's proposed ANDA products prior to the expiration of the '947 Patent does not constitute an act of infringement of the asserted claim of the '947 Patent under 35 U.S.C. § 271(e)(2)(A).

832.    Hikma's proposed label for its ANDA Products would not induce direct infringement of the asserted claim of the '947 Patent by healthcare professionals and/or patients in the United States.

833.    Hikma's proposed label for its ANDA Products would not encourage healthcare professionals or patients in the United States to directly infringe the asserted claim of the '947 Patent.

834.    Hikma does not intend that healthcare professionals' and/or patients' use of the Hikma ANDA Product will result in infringement of the asserted claim of the '947 Patent.

835.    Hikma has no knowledge or intent that its activities will lead to infringement of the asserted claim of the '947 Patent.

836.    Hikma is not seeking approval for treating excessive daytime sleepiness in patients with Parkinson's disease, narcolepsy, or sleep apnea. Nor will Hikma's proposed products be approved by the FDA for such use.

837.    Hikma's proposed label does not encourage, promote, or recommend the use of Hikma's ANDA products for treating excessive daytime sleepiness in patients with Parkinson's disease, narcolepsy, or sleep apnea.

838.    Hikma's label will not encourage, recommend, or promote using Hikma's ANDA products for treating excessive daytime sleepiness in patients as claimed in the '947 Patent.

839.    The asserted claim of the '947 Patent require treating excessive daytime sleepiness in a patient suffering from Parkinson's disease, narcolepsy, or sleep apnea. Hikma's proposed label does not encourage, promote, or recommend any such use.

### 1.    Technical Background

840.    Excessive daytime sleepiness ("EDS") is a symptom in which one enters sleep at an inappropriate time or setting during the day. Sleepiness can occur in varying degrees of severity. For example, in cases of mild sleepiness, a person might fall asleep while reading a book or sitting quietly, while greater degrees of sleepiness may involve bouts of irresistible sleep or sleep attacks

CONFIDENTIAL

that intrude on such activities as driving having a conversation, or eating meals. EDS is daytime sleepiness of a degree that impairs daytime functioning.

841.    Excessive daytime sleepiness may be diagnosed by obtaining a thorough sleep, medical, and psychiatric history; targeted clinical examination; measuring sleep duration and sleep-wake patterns; polysomnography to test for associated conditions such as sleep-related breathing disorders or other factors that might disrupt nighttime sleep; multiple sleep latency testing. Another test that is part of the clinical assessment of excessive daytime sleepiness is overnight polysomnography, which "evaluates electroencephalographic, electro-oculographic, electromyographic, cardiovascular, respiratory, gastrointestinal, and other measures over an entire night's sleep. Sleep stages are readily identified and evaluated via the record. Polysomnography is also used to detect specific abnormalities, such as sleep apnea and periodic limb movements, either of which might cause EDS.

842.    The multiple sleep latency test is one of the key tests used for quantifying the objective level of sleepiness.

843.    Excessive daytime sleepiness can also be quantified subjectively by questionnaires, such as the Epworth Sleepiness Scale ("ESS"). While ESS is not currently used as a diagnostic test for sleep disorders such as narcolepsy or sleep apnea, it may be used, for example, to measure sleepiness and how sleepiness changes before and after taking a medication or starting treatment.

844.    The ESS results range from 0 to 24, as shown below.

- 0 to 5: Low daytime sleepiness (normal).

- 6 to 10: High daytime sleepiness (normal).

- 11 to 12: Mild excessive daytime sleepiness.

- 13 to 15: Moderate excessive daytime sleepiness.

- 16 to 24: Severe excessive daytime sleepiness.

CONFIDENTIAL

845.    Persistent excessive daytime sleepiness may be symptomatic of pathological abnormalities, such as apnea or narcolepsy. There were four known major causes of excessive daytime sleepiness, including (1) central nervous system (CNS) pathologic abnormalities, such as narcolepsy and idiopathic CNS hypersomnia; (2) qualitative or quantitative sleep deficiencies, such as sleep apnea and insufficient nocturnal sleep; (3) misalignments of the body's circadian pacemaker with the environment (for example, jet lag or shift work); and (4) drugs, which can increase sleepiness either therapeutically or as a side effect.

846.    Apnea is the absence of ventilation. Sleep apnea can be categorized into three major types: (1) obstructive apneas, in which the effort to breathe is maintained against an occluded airway; (2) central apneas, caused by a transient failure of the central nervous system (CNS) to activate the respiratory effort systems; and (3) mixed apneas, which include an initial pause followed by breathing efforts against an obstructed airway.

847.    The fundamental problem underlying obstructive sleep apnea is the collapse of the upper airway during sleep. The airway collapse leads to increased respiratory efforts, which in turn lead to arousals. Although these arousals may or may not be recalled during the day, their effect sleep fragmentation-produces excessive daytime sleepiness.

848.    Narcolepsy is a sleep disorder. There are four main symptoms of narcolepsy: EDS, cataplexy, Sleep related hallucinations, and sleep paralysis. A narcoleptic patient's symptoms may evolve or change over time.

849.    There are two main types of narcolepsy: narcolepsy type 1, in which patients frequently show two different symptoms of cataplexy and excessive daytime sleepiness; and narcolepsy type 2, in which patients do not have cataplexy.

CONFIDENTIAL

850.    By 2005, the evidence suggested that most cases of narcolepsy with cataplexy are associated with the loss of approximately 50,000 to 100,000 hypothalamic neurons containing the neuropeptide hypocretin. The lack of hypocretin can be best assessed by measuring [cerebrospinal fluid, "CSF"] levels of hypocretin-1.

851.    The cause of narcolepsy type 2 is uncertain.

852.    In patients who develop narcolepsy at age 60 years or older, cataplexy is the most common initial symptom.

853.    In about 5-10% of narcoleptic patients, cataplexy is the first symptom.

854.    The diagnostic criteria for narcolepsy types 1 and 2 in ICSD-3TR do not include the phrase "excessive daytime sleepiness," and instead require that the patient has daily periods of irresistible need to sleep or daytime lapses into drowsiness or sleep.

855.    A narcoleptic patient may not have EDS.

856.    Cataplexy is an abrupt and temporary decrease or loss of muscle tone triggered by emotional responses such as surprise, laughter, or anger.

857.    Cataplexy most often occurs as a symptom of narcolepsy.

858.    Cataplexy and excessive daytime sleepiness are different symptoms of narcolepsy and there are several known differences between the two symptoms. For example, a patient experiencing a cataplexy attack maintains consciousness and memory during the cataplexy attack. On the other hand, a patient falling asleep due to excessive daytime sleepiness does not maintain consciousness and memory while asleep.

859.    In narcolepsy, the goal of all therapeutic approaches is to control the narcoleptic symptoms. Treatment objectives include control of sleepiness and other symptoms, such as

cataplexy, hypnagogic hallucinations, and sleep paralysis, when present and troublesome in patients with narcolepsy.

860.    When selecting a medication for treatment of narcolepsy, a healthcare provider should consider the benefit to risk ratio of medication for an individual patient, the cost of medication, convenience of administration, and the cost of ongoing care including possible laboratory tests.

861.    The 2021 Clinical Practice Guideline by the American Academy of Sleep Medicine (the "Maski 2021 Guideline") explains that a clinician should "use clinical knowledge and experience, and strongly consider the individual patient's values and preferences to determine the best course of action."

862.    The Maski 2021 Guideline recommends certain therapeutic interventions for treating narcolepsy vs. no treatment. The Maski 2021 Guideline also provides information on the balance of risks and benefits, cost, and availability of the recommended therapeutic intervention.

863.    Based on the available information, including Maski 2021 Review, a POSA would expect pitolisant's effectiveness in treating excessive daytime sleepiness to be comparable to other available medications strongly recommended in the Maski 2021 Guideline.

864.    A POSA would expect pitolisant to be more effective in treating cataplexy than other available medications strongly recommended in the Maski 2021 Guideline.

865.    A therapeutic intervention should be selected depending on the diagnosis and the targeted symptoms.

866.    Co-administration of two or more classes of compounds may be needed in some patients to adequately address their symptoms.

**CONFIDENTIAL**

867.    A POSA could select pitolisant for treating the cataplexy symptoms in a patient with narcolepsy whose excessive daytime sleepiness is managed by other available medications, e.g., those strongly recommended in the Maski 2021 Guideline.

868.    Selection of treatment depends on symptoms and hence, a medication regimen that improves several symptoms at once is preferable, in cases where different symptoms are present. Further, comorbid conditions might have an impact on the determination of which treatment to apply. Combinations of medications can be useful. Most narcolepsy treatments can be combined, e.g. stimulants with sodium oxybate or with antidepressants. Even a combination of modafinil and pitolisant seems to be feasible. In some studies, coadministration of sodium oxybate and modafinil has shown additional effects on improvement of excessive daytime sleepiness.

869.    Kallweit 2017 provides treatment suggestions for patients with "clear focus on [excessive daytime sleepiness]," with both "[excessive daytime sleepiness] and cataplexy," and "patients mainly bothered by cataplexy."  For treating "patients mainly bothered by cataplexy," Kallweit 2017 suggests using sodium oxybate, pitolisant, or venlafaxine.

870.    A POSA would have understood that pitolisant may be administered to treat a patient's cataplexy and not excessive daytime sleepiness.

871.    Using pitolisant to treat cataplexy in adult patients with narcolepsy is distinct from using pitolisant to treat excessive daytime sleepiness in adult patients with narcolepsy.

872.    Data from the HARMONY CTP clinical trial show patient No. 83006 experienced a large decrease in the cataplexy episodes per week (from 13.5 episodes per week down to 1-2 episodes per week), however, the same patient's ESS score only decreased by one point. Similar patterns in response to pitolisant can be seen in at least patient numbers 31006, 31017, 41003, and 83002.

873.    More than 30% of patients who took pitolisant for treatment of EDS in HARMONY 1 and HARMONCY CTP clinical trials did not respond to the treatment when treatment response was defined as ESS score reduction ≥ 3.  More than 50% of patients who took pitolisant for treatment of EDS in HARMONY 1 clinical trial and more than 60% of patients who took pitolisant for treatment of EDS in HARMONCY CTP clinical trial did not respond to the treatment when treatment response was defined as final ESS score of ≤ 10.

874.    Use of pitolisant to treat cataplexy in adult patients with narcolepsy would not necessarily treat excessive daytime sleepiness in those patients.

**2.    EDS in the '947 Patent**

875.    A POSA as of April 1, 2005, would have understood the term "excessive daytime sleepiness" to have its plain and ordinary meaning in the '947 Patent, which is a symptom in which one falls asleep at an inappropriate time or setting during the day.

876.    A POSA would have understood that the asserted claim of the '947 Patent is directed to treating one specific symptom (excessive daytime sleepiness) in patients with Parkinson's disease, sleep apnea or narcolepsy, and that the asserted claims are not directed to treating cataplexy, a different symptom, which is observed in certain patients with narcolepsy, but is not observed in patients with sleep apnea or Parkinson's disease.

877.    Excessive daytime sleepiness is a symptom associated with several different disorders, such as Parkinson's disease, narcolepsy, or sleep apnea.

878.    As of April 2005, a POSA would have understood that each of Parkinson's disease, narcolepsy, and sleep apnea are associated with various symptoms other than excessive daytime sleepiness.

879.    Claim 1 of the '947 Patent does not mention treating any symptoms other than excessive daytime sleepiness. Claim 1 does not mention treating cataplexy (another symptom of

narcolepsy), any other symptom of sleep apnea (e.g., loud snoring, nocturnal reflux, headache in the morning, excessive dry mouth), or any other symptom of Parkinson's disease (e.g., tremor, bradykinesia, akinesia, insomnia, sleep fragmentation, parasomnias).

880.    As of April 2005, a POSA would have known that cataplexy was not a known symptom associated with Parkinson's disease or sleep apnea.

881.    The language of claim 1 shows that the term "excessive daytime sleepiness" cannot be expanded to encompass symptoms such as cataplexy that were not reported in patients with Parkinson's disease or sleep apnea that are recited in the claim.

882.    A POSA would have understood the asserted claim of the '947 Patent to encompass what the claim says it encompasses—namely a method of treating excessive daytime sleepiness in patients with Parkinson's disease, narcolepsy, or sleep apnea.

883.    A POSA would have understood that the claimed invention is treating certain symptoms or disorders associated with Parkinson's disease (PD), narcolepsy, and other disclosed diseases.

884.    The specification of the '947 Patent describes various symptoms and/or sleep and vigilance disorders associated with Parkinson's disease, narcolepsy or sleep apnea. Thus, a POSA would have understood that the inventors were aware of various symptoms or disorders associated with Parkinson's disease, narcolepsy or sleep apnea. From these symptoms and disorders, claim 1 only recites a method of treating excessive daytime sleepiness. The fact that claim 1 does not recite other symptoms or disorders is a strong indicator to a POSA that claim 1 does not encompass any of the other symptoms of (or disorders associated with) Parkinson's disease, narcolepsy or sleep apnea.

885.    The term cataplexy does not appear anywhere in the '947 Patent or its file history.

CONFIDENTIAL

886.    The '947 Patent specification does not clearly and unambiguously redefine EDS to include narcolepsy.

887.    The statements at col. 2, ll. 36-55 of the '947 Patent specification do not provide an express intent to redefine the term EDS. Instead, these statements include a list of different symptoms, disorders, or classes of disorders that may be associated with Parkinson's disease.

888.    A POSA would not have understood the above cited statements to suggest the term "excessive daytime sleepiness," as used in the context of the PD in the '947 Patent, means cataplexy, or either "disorders characterized by excessive daytime sleepiness," or "the sleep disorder characterized by pathological daytime disordered sleep/wake cycles." Instead, a POSA would have understood from this passage that the inventors viewed excessive daytime sleepiness as a symptom associated with PD, which "may [] result from a loss of circadian rhythmicity."

889.    The '947 Patent specification defines "Parkinson's disease" or "PD" as "idiopathic PD or idiopathic parkinsonism described by James Parkinson in 1817. The clinical tetrad of PD includes tremor at repose, bradykinesia (slowness of voluntary movement) or akinesia (reduced or absent movement), cogwheel or leadpipe rigidity, and postural impairment causing difficulty in turning and a stooped posture. The pathologic hallmark is the presence of intracytoplasmic eosinophillic inclusions (Lewy bodies) in addition to loss of neurons in the substantia nigra pars compacta." *See id.* at 41:36-45. Thus, a POSA would have understood that the specification describes various symptoms associated with Parkinson's disease, including tremor at repose, slowness of voluntary movement, and reduced or absent movement. Further, the symptoms provided for Parkinson's disease does not include cataplexy. This is consistent with a POSA's understanding that cataplexy is not a symptom known to be associated with Parkinson's disease. Indeed, the term cataplexy does not appear anywhere in the '947 Patent.

CONFIDENTIAL

890.    From various Parkinson's disease symptoms listed in the '947 Patent, excessive daytime sleepiness is the only one that the inventors recited in claim 1.

891.    The '947 Patent defines "obstructive sleep apnea" or "OSA" as "a breathing disorder that occurs primarily during sleep with consequences that may persist throughout the waking hours in the form of sleepiness," and that OSA "is characterized by periodic collapse of the upper airway during sleep with apneas (periodic cessation of breathing), hypopneas (repetitive reduction in breathing) or a continuous or sustained reduction in ventilation and excessive daytime sleepiness, neurocognitive defects and depression." *Id.* at 41:22-25.

892.    Excessive daytime sleepiness was a known symptom of certain disorders, such as obstructive sleep apnea. Thus, a POSA would have understood the '947 Patent statement's that excessive daytime sleepiness is one of the characteristic symptoms of obstructive sleep apnea to be consistent with the plain and ordinary meaning of excessive daytime sleepiness.

893.    1223.  A POSA would have understood that the '947 Patent describes different signs and symptoms associated with obstructive sleep apnea such as periodic collapse of the upper airway during sleep, excessive daytime sleepiness, and depression. From the various signs and symptoms described as characterizing obstructive sleep apnea, claim 1 only recites excessive daytime sleepiness.

894.    A POSA would have understood that the '947 Patent describes different signs and symptoms associated with obstructive sleep apnea such as periodic collapse of the upper airway during sleep, excessive daytime sleepiness, and depression. From the various signs and symptoms described as characterizing obstructive sleep apnea, claim 1 only recites excessive daytime sleepiness.

895.    The '947 Patent does not mention cataplexy among the list of symptoms that characterize obstructive sleep apnea. This is consistent with a POSA's understanding that cataplexy is not a symptom associated with obstructive sleep apnea.

896.    Nothing in the '947 Patent specification sets forth a definition of the term "excessive daytime sleepiness" other than its plain and ordinary meaning. The '947 Patent does not define this term to mean cataplexy, or either disorders characterized by excessive daytime sleepiness" or "the sleep disorder characterized by pathological daytime disordered sleep/wake cycles.

897.    In a preliminary amendment filed on June 16, 2008, the applicant amended claims 1-98 by, among other things, canceling claims 40-92, and replacing in claim 1 "[u]se of" certain compounds "for the preparation of a medicament intended for the treatment of Parkinson's disease, obstructive sleep apnea, narcolepsy, dementia with Lewy bodies, and/or vascular dementia" with "[a] method for the treatment of Parkinson's disease, obstructive sleep apnea, narcolepsy, dementia with Lewy bodies, and/or vascular dementia comprising administering." *See* WAKIX-PLFS_00001894-1906.

898.    The applicant stated that by the above-mentioned amendments, "the claims have been rewritten to reduce the multiple dependencies and to place the claims in better conformance with US practice." *See* WAKIX-PLFS_00001907.

899.    On July 16, 2010, the applicant filed another preliminary amendment adding new claims 99-100. *See* WAKIX-PLFS_00001942-1958. Claims 99-100 recite as follows:

> 99. A method for treating excessive daytime sleepiness comprising administering a compound having the general formula (A) [additional chemical description].

> 100. The method for the treatment of excessive daytime sleepiness according to claim 99 wherein said sleepiness is associated with Parkinson's disease, narcolepsy or sleep apnea.

CONFIDENTIAL

900.    The applicant cited pages 3 and 63-64 of the original application as support for claims 99-100. WAKIX-PLFS_00001958.  Here, "the original application" refers to WO '546. Page 3 of WO '546 describes "excessive daytime sleepiness" in the context of "sleep and vigilance disorders" displayed by a large portion of Parkinson's disease patients. *See* WAKIX-PLFS_00001534.   A similar disclosure is found on page 64 of WO '546. *See* WAKIX-PLFS_00001595. These correspond to col. 2, ll. 36-55 and col. 41, ll. 36-53 of the '947 Patent specification, respectively. Page 63 of WO '546 describes "excessive daytime sleepiness" in the context of symptoms of obstructive sleep apnea. WAKIX-PLFS_00001594.  This corresponds to col. 41, ll. 22-35 of the '947 Patent specification.

901.    Claim 99 recites a method of treating excessive daytime sleepiness irrespective of the underlying disease or disorder causing the excessive daytime sleepiness. Claim 100 depends from claim 99 and narrows the method to treating excessive daytime sleepiness that is associated with Parkinson's disease, narcolepsy or sleep apnea.

902.    Based on the language of claims 99-100, and consistent with the '947 Patent specification, a POSA would have understood that "excessive daytime sleepiness" is a symptom associated with certain diseases, such as Parkinson's disease, narcolepsy, or sleep apnea.

903.    Nothing in the language of claims 99-10 suggests that "excessive daytime sleepiness" means cataplexy, or either "sleep disorders characterized by excessive daytime sleepiness" or "the sleep disorder characterized by pathological daytime disordered sleep/wake cycles."

904.    On December 8, 2010, the applicant further amended the pending claims, by, among other things, cancelling claim 1 and amending other pending claims to depend from claim 99. *See* WAKIX-PLFS_00001981-1996.

**CONFIDENTIAL**

905.    In the Remarks submitted with this amendment, the applicant stated that "Claim 99 is directed to a method of treatment of excessive daytime sleepiness."  WAKIX-PLFS_00001996. The applicant further described "the subject matter of Claim 99" as "a method for the treatment of excessive daytime sleepiness." *Id.*

906.    Based on these statements, a POSA would have understood that the term "a method of treatment of excessive daytime sleepiness" has its plain and ordinary meaning in the art, i.e., "a method of treatment of excessive daytime sleepiness."

907.    On April 29, 2011, the examiner issued a Non-final Rejection, rejecting pending claims 2-39, 99 and 100, and withdrawing claims 93-95 and 98 from consideration. *See* WAKIX-PLFS_00002002-2013.

908.    In rejecting pending claims 2-39, 99 and 100 as obvious in view of the cited prior art, the examiner explained that excessive daytime sleepiness was "often associated with obstructive sleep apnea," but in some cases, "daytime sleepiness may not be associated with sleep apnea," that "obesity is associated with daytime sleepiness," and that "weigh loss can improve daytime sleepiness." *See* WAKIX-PLFS_00002006-07.

909.    These statements are consistent with POSA's understanding of the plain and ordinary meaning of excessive daytime sleepiness.

910.    On October 31, 2011, the applicant responded by amending the pending claims and submitting Remarks. *See* WAKIX-PLFS_00002044-051.

911.    The applicant cancelled claims 2-15, 30-39 and 99, made claim 16 into an independent claim, and edited the remaining dependent claims to depend from claim 16.  *See* WAKIX-PLFS_00002050 (Remarks); WAKIX-PLFS_00002045-49 (claim amendments).

912.     In particular, the applicant amended claim 16 to recite "[a] method for treating excessive daytime sleepiness comprising administering to a patient in need thereof a compound of formula (IIa) [ ], wherein said patient is not suffering from obesity." WAKIX-PLFS_00002045-46.

913.     In the submitted Remarks, the applicant stated, "Claim 16 now refers to the treatment of excessive daytime sleepiness in a patient population that is not suffering from obesity." WAKIX-PLFS_00002050.

914.     Nothing in the above amendments or statements suggest to a POSA that the term "excessive daytime sleepiness" has any meaning other than its plain and ordinary meaning in the art.

915.     On January 17, 2012, the examiner issued a Final Rejection, rejecting pending claims 16-29 and 100. *See* WAKIX-PLFS_00002058-062. The examiner explained that the "newly added limitation 'wherein said patient is not suffering from obesity' is not supported by the originally filed claims and specification."  *See* WAKIX-PLFS_00002060.

916.     On April 16, 2012, the applicant responded by amending the pending claims and submitting Remarks. WAKIX-PLFS_00002069-077.

917.     In particular, the applicant amended claim 16 by replacing "said patient is not suffering from obesity," with "said patient is suffering from Parkinson's disease, narcolepsy, or sleep apnea." *See* WAKIX-PLFS_00002072.

918.     The applicant explained that, "[b]y this amendment, Claim 16 has been amended to refer to the patient population treated by the method." *See* WAKIX-PLFS_00002076. The applicant further explained "the claims are directed to the treatment of a specific group of patients,

namely those suffering from the conditions of Parkinson's disease, narcolepsy and sleep apnea."
*Id.*

919. A POSA would have known that excessive daytime sleepiness is a symptom observed in patients suffering from the conditions of Parkinson's disease, narcolepsy and sleep apnea.

920. Nothing in the above amendments or statements suggest to a POSA that the term "excessive daytime sleepiness" has any meaning other than its plain and ordinary meaning in the art.

921. On December 17, 2012, the applicant filed a request for continued examination, and submitted claim amendments, Remarks, and a declaration by Dr. Jean-Charles Schwartz ("Schwartz declaration"). WAKIX-PLFS_00002089-2105.

922. The applicant submitted the same amendments it had submitted on April 16, 2012 as they "had not previously been entered." WAKIX-PLFS_00002096.

923. The applicant explained that after the claim amendment replacing "said patient is not suffering from obesity," with "said patient is suffering from Parkinson's disease, narcolepsy, or sleep apnea," the examiner reinstated the April 29, 2011 obviousness rejection. *Id.*

924. To overcome this rejection, the applicant relied on the Schwartz declaration, which included data for "treatment of daytime sleepiness in patients separated into four body mass classifications," arguing "the results were the <u>same</u> and were <u>independent</u> of body mass." WAKIX-PLFS_00002098 (emphasis in the original).

925. The applicant further stated, "[t]he results evidenced in the [Schwartz] Declaration also unexpectedly show that the compounds specifically target excessive daytime sleepiness as a <u>symptom,</u> such as in the case of obesity and other conditions, and this high specificity for the

treatment of excessive daytime sleepiness as a <u>symptom</u> could not have been expected." *Id.* (emphasis in the original); *see also* WAKIX-PLFS_00002098 ("the present claims thus . . . allow for the specific treatment of excessive daytime sleepiness as a <u>symptom</u> of other conditions") (emphasis in the original).

926.   Similarly, Dr. Schwartz declared that "[c]ompounds of the invention exhibit a ***purely symptomatical activity*** on excessive daytime sleepiness." *See* WAKIX-PLFS_00002101, ¶ 5 (emphasis added); *see also* WAKIX-PLFS_00002104, ¶ 6 ("the effect of the compounds of the invention is ***purely targeting the symptom*** of excessive daytime sleepiness") (emphasis added).

927.   Dr. Schwartz also stated "[e]xcessive daytime sleepiness is measured with the Epworth Sleepiness Scale (ESS). The Epworth Sleepiness Scale is used to determine the level of daytime sleepiness, that is measured by use of a short questionnaire. The scale may be comprised between 1 to 24, patients with a score of 10 or less being considered as normalized." *See* WAKIX-PLFS_00002101, ¶ 5. This statement is consistent with a POSA's understanding of the plain and ordinary meaning of excessive daytime sleepiness and how it can be quantified subjectively by the Epworth Sleepiness Scale.

928.   Further, the term "cataplexy" does not appear in the Schwartz declaration or in the applicant's December 17, 2012 Remarks.

929.   On April 3, 2013, the examiner issued a notice of allowance, allowing claims 16-29, 93-95, and 98.  WAKIX-PLFS_00002171-78.

930.   Based on the applicant's statements and Dr. Schwartz's declaration, a POSA would have understood that the pending claims (which later issued in the '947 Patent) cover methods of treating excessive daytime sleepiness as ***a symptom of other conditions***, i.e., Parkinson's disease,

narcolepsy, or sleep apnea. This is consistent with how a POSA would have understood the claims based on the plain and ordinary meaning of the term "excessive daytime sleepiness."

931.    The applicant statements and Dr. Schwartz's declaration also suggest to a POSA that, the term "excessive daytime sleepiness" does not mean "sleep disorders characterized by excessive daytime sleepiness" or "the sleep disorder characterized by pathological daytime disordered sleep/wake cycles." In other words, the applicant's December 17, 2012 statements and the Schwarz's declaration convinced the examiner to allow the issuance of the claims by characterizing the claimed method of treatment as focused on treating a symptom of the listed disorder.

932.    Further, the applicant's statements and Dr. Schwartz's declaration suggest to a POSA that the applicant and a named inventor of the '947 Patent believed the compounds claimed in the asserted claims only target the symptom of excessive daytime sleepiness and no other symptoms of Parkinson's disease, narcolepsy, or sleep apnea. Because cataplexy and excessive daytime sleepiness were known to be different symptoms of narcolepsy and based on the applicant's statements and Dr. Schwartz's declaration, a POSA would have understood that the claimed compound does not target cataplexy, or any symptom other than excessive daytime sleepiness.

### 3.    The Role of a Package Insert In Practice

933.    A POSA may use the prescribing information available in the package insert or label as one piece of information in their toolkit to treat patients. The package insert is a piece of information that may be considered by a POSA, but the package insert is not a substitute for the POSA's judgment, training, and experience that are all critical to the process of selecting an appropriate drug for a patient.

CONFIDENTIAL

934.    The package insert does not constrain a prescriber's ability to exercise their medical judgment for individual patients nor is it intended to do so.

935.    The FDA does not require prescribers to consult the package insert for a drug before they prescribe it. FDA allows prescribers the discretion to seek information from whatever sources they find most informative.

936.    The decision to prescribe a particular drug to a patient and select the appropriate dose is based first and foremost on the prescriber's knowledge of the patient's medical history, the prescriber's knowledge, training, and experience in the field, available data regarding efficacy and safety, and discussions with the patient about his or her treatment goals, tolerance for side effects, and lifestyle.

937.    There are many classes of medication that are well known and prescribed without consultation with a package insert.

938.    Notwithstanding the role of a package insert in practice, in cases like the one here, where Hikma has requested approval of its proposed ANDA products from the FDA, but the FDA has not yet approved its products, the question of induced infringement is focused on whether Hikma has the specific intent, based on the content of Hikma's proposed label, to encourage physicians to use Hikma's ANDA Products to treat excessive daytime sleepiness.

### 4.    Hikma's Proposed Label

939.    Hikma's proposed label begins with a "Highlights of Prescribing Information" page that provides a summary of information in the full product labeling. This page includes the following information for the products' "Indications and Usage": ███████████████

███████████████████████████████████████

███████████████

CONFIDENTIAL

940.    Similar information is provided in the corresponding section of the full prescribing information, which reads as follows: "████████████████████████████████████████

████████████████████████████

941.    The Indication and Usage section in the Full Prescribing Information further explains that ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████ Thus, Hikma's proposed label explicitly tells the readers that ████████████████████████████████████████

942.    FDA regulations regarding the "Indications and Usage" section of a drug label state that a drug's "[i]ndications or uses must not be implied or suggested in other sections of the labeling if not included in this section." *See* 21 C.F.R. § 201.57(c)(2)(iv).

943.    The FDA has ████████████████ Hikma's ANDA and has ████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████

944.    The "Indications and Usage" section makes clear that Hikma's ANDA products are

████████████████████████████████████████

945.    A treating physician looks to the "Indications and Usage" section of a pharmaceutical product label to determine what method of treatment has been approved by the FDA for the labeled drug. Thus, Hikma's proposed label does not promote, encourage, or suggest any indication or use, ████████████████████████████████

946.    Hikma's proposed label does not promote, encourage, or suggest treating ████████

████████████████████████████████████████. This clinical effect may

## CONFIDENTIAL

occur in patients taking Hikma's ANDA products, but it is not an effect for which Hikma's ANDA products are indicated.

947.    To the extent that physicians prescribe the Hikma's ANDA Products to achieve the effect of treating ███████████████████████████████████ such treatment would represent an off-label use with respect to Hikma's ANDA products.

948.    Both the "Highlights of Prescribing Information" and the "Full Prescribing Information" portions of Hikma's proposed label include sections with instructions on the "Dosage and Administration" of the products for their indicated use.

949.    The Dosage Recommendation for Hikma's ANDA Product is specifically provided for ████████████████████████████

950.    The "Dosage and Administration" section from the "Highlights of Prescribing Information" for Hikma's ANDA Product does not provide dosage recommendations for any other indications, ██████████████████████████. Indeed, █████████████████████ ███████████████████████████████████

951.    The "Dosage and Administration" section in the "Full Prescribing Information" portion of Hikma's proposed label starts with Section 2.1, i.e., ████████████████████ ████████ This section begins with stating ██████████████████████████ ██████████████████████████████████████████ ████████████████ Thus, consistent with the "Indications and Usage" sections, the "Recommended Dosage in Adult Patients" section is limited to █████████████████ ████████████████████████████████████████ ████████████████████

952.    The remaining sub-sections under the "Dosage and Administration" section in the "Full Prescribing Information" portions of Hikma's proposed label (sections 2.3 to 2.6) relate to dosage recommendations in patients ████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████. In addition to providing recommended dosage information, these sections also provide █████████████████████████████████

█████████████ *Id.* Nothing in sections 2.3 to 2.6 encourages, recommends, or promotes using Hikma's ANDA products for ████████████████████████████████████

953.    Wakix®'s prescribing information is ██████ █████ Hikma's prescribing information, and Wakix's prescribing information is not relevant to the question of whether Hikma's proposed label induces infringement of the asserted claims. Thus, even if a clinician were to compare Hikma's proposed labeling does not encourage any comparison of Hikma's proposed label with Wakix®'s prescribing information, such a comparison is not encouraged by Hikma's labeling.

954.    The purpose of the "Adverse Reactions" section in the "Highlights of Prescribing Information" of Hikma's proposed label is █████████████████████████████████

██████████████████████████ Nothing in this section encourages, recommends, or promotes using Hikma's ANDA products for ████████████████████████████████

█████████████████

955.    The "Pediatric Use" section in Hikma's proposed label does not promote, encourage or suggest using Hikma's ANDA products ███████████████████. In fact, it ████

████████████████████████████████████████████. This statement clearly provides that Hikma ANDA Products ██████████████████████████████

**CONFIDENTIAL**

956.    Hikma's proposed label includes Section 14 titled "Clinical Studies," with ████ ██████████████████████████████████████████████ The "Clinical Studies" section reflects the fact that Hikma's ANDA products are indicated for ████████ ████████████████████████████████████████████████████ ████████████

957.    Section ████ does not describe or provide any results from ██████████ ████████████████████████████████████████████████████ ██████████████████████████████████████

958.    Disclosures from records related to ████████████████ available at ClinicalTrials.gov and publications, as well as Wakix® Prescribing Information or other documents outside Hikma's proposed label is not relevant to the question of whether Hikma's proposed label induces infringement of the asserted claims. Hikma's labeling does not encourage doctors or patients to consult these documents and information.

959.    FDA guidance states that "[t]he CLINICAL STUDIES section must not suggest or imply indications, uses or dosing regimens not stated in the INDICATIONS AND USAGE or DOSAGE AND ADMINISTRATION section." Thus, the fact that the "Clinical Studies" section of Hikma's proposed label mentions ████████████████ a clinical study that ████████ ████████████████████████████████████████████████████ ██████████ does not mean that Hikma's ANDA products are indicated to achieve that result. Indeed, the "Clinical Studies" section of Hikma's proposed label ████████████████████ ████████████████████████████████████████████████████, nor does it otherwise reach any conclusion. ████████████████████████████████ ██████████████████████ The "Indications and Usage" and "Dosage and Administration"

CONFIDENTIAL

sections of the label make clear that Hikma's ANDA product is indicated ████████████
████████████

960.    Plaintiffs have failed to show that Hikma induces infringement of Claim 13 of the '947 Patent.

961.    In order to induce infringement, the proposed label must encourage, recommend, or promote infringement. In my opinion, Hikma's proposed label does not encourage, recommend, or promote the use of Hikma's ANDA products ████████████████████

████ As a result, Hikma will not induce infringement of the asserted claim of the '947 Patent.

962.    Nothing in Hikma's proposed label instructs physicians to administer Hikma's ANDA products ██████████████████. Hikma's proposed label simply states that Hikma's ANDA products are indicated for ██████████████████

████████

963.    Nothing in the "Indications and Usage" of Hikma's proposed label instructs or even mentions ██████████████████

964.    Other sections of Hikma's proposed label similarly do not instruct using Hikma's ANDA products for ██████████████████.

965.    Hikma's proposed label is simply ██████████████████

██████████████████ iness, and thus does not encourage, recommend, or promote using Hikma's ANDA products for ██████████████████.

966.    Hikma's proposed label will not induce physicians, patients, or both to use Hikma's ANDA products for ██████████████████

967.    Hikma's proposed label does not encourage, recommend, or promote the use of Hikma's ANDA Products for ██████████████████.

**CONFIDENTIAL**

968.    Hikma's proposed label will not encourage, recommend, or promote using Hikma's ANDA products for ████████████████████████████████████

969.    The labeled indication for Hikma's ANDA products simply states that Hikma's ANDA products are indicated ███████████████████████████████ This indication ████████████████████████████, and nothing else in the proposed label instructs using Hikma's ANDA products ████████████████████ including in patients with narcolepsy. This is in contrast with Wakix's label that does instruct using Wakix for treating excessive daytime sleepiness in patients with narcolepsy.

970.    To the extent that physicians may prescribe Hikma's ANDA products to treat ███████████████████████████████████, such use would be an off-label and non-encouraged use of Hikma's ANDA products. Physicians are entitled to use a drug for off-label uses. Hikma would not have encouraged, recommended, or promoted use of its product for that off-label method of treatment.

971.    Hikma's proposed label here does not specifically encourage using Hikma's ANDA products for ██████████████████████, in fact, it is indifferent to ████████████████ ████████████████████████████

972.    Hikma has taken no active steps to encourage using Hikma's ANDA products for ██████████████████████████████████████████

973.    The only active steps by Hikma in its proposed label are limited to encouraging using its ANDA Products to treat ███████████████████████████████

974.    There is nothing in Hikma's proposed label that instructs doctors or patients to use Hikma's ANDA products ██████████████████████████

CONFIDENTIAL

975.    There is nothing in Hikma's proposed label that suggests, promotes or encourages using Hikma's ANDA products for ███████████████████████

976.    A POSA would not have understood the term "treatment of excessive daytime sleepiness" in the '947 Patent to encompass treating cataplexy.

977.    The only indication provided in Hikma's proposed label for Hikma's ANDA products is ██████████████████████████.

## VI.    MSN'S NONINFRINGEMENT

978.    On October 13, 2023—within the 20-day period—MSN sent its notice letter to Harmony Biosciences LLC (the NDA Holder) and Bioprojet (the Patent Owner) via Federal Express in accordance with FDA regulations. See 21 C.F.R. §§ 314.95(a), (b), and (d).

### A.    The '197 Patent

979.    MSN incorporates by reference the expert reports of Dr. Jennifer Swift, Ph.D., dated August 28, 2025, and Dr. Robert Dinnebier, Ph.D., dated November 24, 2025.

980.    Plaintiffs have failed to prove by a preponderance of the evidence that MSN's submission of ANDA No. 218873 constitutes infringement of claims 1 or 2 of the '197 Patent pursuant to 35 U.S.C. § 271(e)(2)(B).

981.    Plaintiffs have failed to prove by a preponderance of the evidence that the sale, offer for sale, use, and/or manufacture within the United States and/or importation into the United States of any product covered by ANDA No. 218873, would literally infringe claims 1 or 2 of the '197 Patent.[19]

---

[19] Plaintiffs have not alleged infringement of claims 1 and 2 of the '197 Patent under the doctrine of equivalents.

**CONFIDENTIAL**

982.     ███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

### 1.     Background Regarding the '197 Patent[20]

983.     The '197 Patent specification states:  "[Single] Crystal data were obtained using a Nonius Kappa Charge Coupled Device system at −158° C.  The used wavelength was 0.71073 Å. The crystal structure was solved by direct methods and refined by means of SHELX97 in the WinGX package environment." '197 Patent at 2:3–6; *see also id.* at 6:17–23.

984.     The '197 Patent does not include any discussion of using synchrotron beamlines for testing or characterizing the described pitolisant hydrochloride.

985.     Table 1 of the '197 Patent provides a "summary of the crystal data and data refinement parameters for a sample containing a water content of 2.7%"  and is reproduced below:

---

[20] MSN provides these headers solely for organizational convenience and does not intend them to limit the disputed facts to only particular issues.

**CONFIDENTIAL**

TABLE 1

| Crystal data parameters for 1-[3-[3-(4-chlorophenyl)propoxy]propyl]-piperidine monohydrochloride | | |
|---|---|---|
| Crystal system | Monoclinic | |
| Space group | P2$_1$ | |
| Unit cell dimensions | a = 14.1588(8)Å | $\alpha = 90°$ |
| | b = 8.2798(6)Å | $\beta = 97.996(4)°$ |
| | c = 15.9262(13)Å | $\gamma = 90°$ |
| Volume | 1848.9(2)Å3 | |
| Z | 4 | |
| Density (calculated) | 1.226 g/cm3 | |
| Absorption coefficient | 0.354 mm$^{-1}$ | |
| F(000) | 732 | |
| Crystal size | 0.25 × 0.10 × 0.05 mm$^3$ | |
| Theta range for data collection | 1.80 to 25.95° | |
| Index ranges | −17 <= h <= 17, −9 <= k <= 10, −19 <= l <= 19 | |
| Reflections collected | 6442 | |
| Independent reflections | 6442 | |
| Completeness to θ = 25.95° | 98.2% | |
| Max. and min. transmission | 0.9825 and 0.9167 | |

986.    The authors of the '197 Patent expect water molecules to be present in the crystal structure of the described pitolisant hydrochloride.

987.    Table 3 of the '197 Patent lists the fractional coordinates for all heavy atoms, including the water oxygens OW1A and OW1B.

988.    The '197 Patent provides one "X-ray diffraction pattern of 1-[3-[3-(4 chlorophenyl)propoxy]propyl]-piperidine monohydrochloride." *See* Figure 1 of the '197 Patent.

989.    The '197 Patent specification explains that "Crystalline 1-[3-[3-(4-chlorophenyl)propoxy]propyl]-piperidine monohydrochloride may show a variable content of water."   The specification states, "However, the X-ray diffraction pattern obtained from different samples indicates that all samples correspond to the same crystal structure, except for small variations related to different water contents, as shown in Example 3, Table 2." *See* Table 2 of the '197 Patent.

283

CONFIDENTIAL

990.    The '197 Patent's statement that "all samples correspond to the same crystal structure, except for small variations related to different water contents" may indicate that (1) either the material is not a single, unique, well-defined crystalline phase, or (2) it is a non-stoichiometric hydrate. (Swift Rebuttal Report ¶ 142).

## 2.    Scientific Background

### a)    Solid Forms

991.    Chemical compounds generally can exist in one of three basic phases: solid, liquid, and gas. Solids can be further classified as crystalline or amorphous.

992.    A crystalline solid is one in which the molecules or atoms are arranged into a regularly repeating (periodic) three-dimensional pattern.[21]

993.    Not all solids are crystalline.

994.    If a solid has no regular, repeating internal structure, it is said to be amorphous.[22]

995.    An amorphous solid (also sometimes referred to as a glass) lacks a uniform, periodic arrangement of molecules in three dimensions.[23]

996.    Active pharmaceutical ingredients ("APIs") may be crystalline or amorphous.

997.    Some API molecules can exist in amorphous or crystalline forms, depending on the processing conditions to which the molecules are exposed.

998.    Amorphous and crystalline forms of the same API typically have different physical properties.[24]

---

[21] See J. Keith Guillory, *Generation of Polymorphs, Hydrates, Solvates, and Amorphous Solids*, in POLYMORPHISM IN PHARMACEUTICAL SOLIDS 183, 208 (Harry G. Brittain ed., 1999) ("Guillory 1999").
[22] Guillory 1999 at 208.
[23] See Guillory 1999 at 208.
[24] Lynne S. Taylor & Sheri L. Shamblin, *Amorphous Solids*, in POLYMORPHISM IN PHARMACEUTICAL SOLIDS 587, 587 (Harry G. Brittain ed. 2d ed. 2009) ("Taylor 2009") ("Amorphous solids have very different properties from their crystalline counterparts . . . .").

CONFIDENTIAL

999.   "Crystal structure" refers to the identity, number, and position of the constituent atoms or molecules relative to each other extending in three dimensions.

1000.   The unit cell of a crystal refers to the dimensions (*a*, *b*, and *c*), angles (alpha, beta, and gamma), and internal symmetry elements that define the smallest volume that is repeated in three-dimensional space to create the crystal lattice.[25]

1001.   Knowledge of a solid's crystal structure allows one to construct a three-dimensional model of the crystal with atoms in their correct relative positions.

1002.   The dimensions of the unit cell and the internal symmetry and contents within the cell are an intrinsic characteristic of each crystalline material.

1003.   Many chemical compounds, including APIs, can exist in more than one crystalline form. Forms that have the same chemical composition but different 3-dimensional packing arrangements due to the differences in their unit cells are referred to as "polymorphs."[26]

1004.   Some molecules can co-crystallize with solvent molecules to yield a solid form commonly referred to as a "solvate." If the solvent is water, it is referred to as a "hydrate."

1005.   The terms "solvate" and "hydrate" are properly applied only to crystals; they are not used to describe amorphous material.

1006.   In a pharmaceutical hydrate, both the API and the water molecules are part of the repeating periodic pattern that extends in three dimensions.[27]

1007.   Hydrates can be "stoichiometric," meaning that they contain a fixed molar ratio of API to water molecules, or "non-stoichiometric." In a stoichiometric hydrate, the ratio of API to

---

[25] Harry G. Brittain and Stephen R. Byrn, *Structural Aspects of Polymorphism*, in POLYMORPHISM IN PHARMACEUTICAL SOLIDS 73, 76 (Harry G. Brittain ed., 1999) ("Brittain 1999").
[26] David J.W. Grant, *Theory and Origin of Polymorphism*, in POLYMORPHISM IN PHARMACEUTICAL SOLIDS 1, 1–2 (Harry G. Brittain ed., 1999) ("Grant 1999").
[27] Guillory 1999 at 205.

CONFIDENTIAL

water is often referenced in the hydrate name (e.g., "hemihydrate," "monohydrate," "sesquihydrate" and "dihydrate," forms of an API refer to a solid form containing a 2:1, 1:1, 1:1.5 and 1:2 molar ratios of API: water, respectively).

1008.  Some solvates can have a variable API to solvent stoichiometry.[28] For example, in some "channel hydrates," water molecules occupy and can diffuse along 1-dimensional channels within the lattice.[29] In such systems, the waters are mobile but the relative positions of the API molecules in the lattice do not significantly change. Because the overall crystal packing of the drug is largely unchanged by the presence of the solvent, these are considered isostructural, and they often produce XRPD patterns that are very similar or even indistinguishable from one another.

1009.  Changes in the relative humidity or temperature to which the hydrate is exposed can affect the water content due to diffusion into or out of the lattice.[30]

1010.  In addition to having different chemical compositions (e.g., monohydrate and dihydrate), hydrates can be polymorphic.

1011.  If a crystal form does not contain water, it is said to be "anhydrous," or an "anhydrate."

1012.  Single component API crystals and their crystal hydrates do not have the same chemical composition, so they are not technically "polymorphs" of one another, however, they are frequently referred to as "pseudopolymorphs."

---

[28] Guillory 1999 at 206 ("The most commonly encountered solvates among pharmaceuticals are those of 1:1 stoichiometry, but occasionally mixed solvates species are encountered.").
[29] Kenneth R. Morris, *Structural Aspects of Hydrates and Solvates*, in POLYMORPHISM IN PHARMACEUTICAL SOLIDS 125, 145 (Harry G. Brittain ed. 1999) ("Morris 1999").
[30] Morris 1999 at 145, 149; S.R. Vippagunta et al., *Crystalline Solids*, 48 ADVANCED DRUG DELIVERY REVIEWS 3, 15 (2001) ("Vippagunta 2001").

## CONFIDENTIAL

1013.   Different API forms differ in their crystal packing, which can result in differences in their physical properties, e.g., density, hardness, tabletability, refractive index, melting point, enthalpy of fusion, vapor pressure, solubility, dissolution rate, other thermodynamic and kinetic properties, and even color.[31]

1014.   Hydrate and anhydrous forms differ in their chemical composition as well as their physical properties.

1015.   Water in a crystalline API can be present as part of the crystal lattice (crystalline water), or adsorbed on the surface (surface water). Several complementary analytical methods can be employed to quantify and characterize this water. Because no single method is universally definitive, a combination of techniques is typically used to measure and characterize the water content of a hydrate. Such methods include Karl Fischer titration, thermogravimetric analysis, and dynamic vapor sorption.

1016.   For a finished tablet of an API, the total water content of the tablet is not a reliable indicator of the water content of its constituent API form.

1017.   Amorphous solids can be prepared in a variety of ways.[32] "Amorphous solids can be produced by common pharmaceutical processes, including melt quenching, freeze- and spray-drying, milling, wet granulation, and drying of solvated crystals."[33] "Amorphous compounds can be precipitated from solution or obtained from melts of compounds by carrying out the

---

[31] Grant 1999 at 7–8; Vippagunta 2001 at 4.
[32] Guillory 1999 at 209–19; Taylor 2009 at 597–98.
[33] Lian Yu, *Amorphous Pharmaceutical Solids: Preparation, Characterization and Stabilization*, 48 ADVANCED DRUG DELIVERY REVIEWS 27, Abstract (2001) ("Yu 2001").

solidification in such a way as to avoid the thermodynamically preferred crystallization process."[34]
Amorphous solids can also be "prepared by disrupting an existing crystal structure."[35]

1018.  Crystallization is the process by which molecules and/or ions assemble into a crystal. The nucleation step "is decisive in that it can be regarded as being associated with a free energy of activation and is therefore rate limiting."[36] The addition of secondary components can be used to either promote or inhibit nucleation. "Seeding" is a common technique used to reduce the barrier to crystallization.

1019.  A number of nucleation inhibitors are also known, such as the addition of antifreeze to prevent ice crystallization. As another example, the excipient Neusilin® (a porous excipient widely used in tableting) has been shown to inhibit transition of amorphous solids to crystalline states.[37]

1020.  Crystallization is a balance of both kinetic and thermodynamic factors. For a hypothetical compound that has two crystal polymorphs, a given crystallization experiment may give rise to Form A, Form B, or both. The relative stability of the forms can be quantified in terms of their Gibbs free energy.[38] The form with lower Gibbs free energy will be more stable.[39] Gibbs free energy is a function of the temperature and pressure. Under any given set of pressure and temperature (P/T) conditions, only one polymorph can have the lowest free energy. This lowest

---

[34] Guillory 1999 at 209.

[35] Guillory 1999 at 209.

[36] Jack D. Dunitz & Joel Bernstein, *Disappearing Polymorphs*, 28 ACCT. CHEM. RES. 193, 193 (1995) ("Dunitz 1995").

[37] Manish K. Gupta et al., *Formation of Physically Stable Amorphous Drugs by Milling with Neusilin*, 92 J. PHARM. SCI. 536, 547–48 (2003) ("Gupta 2003"); *see also* Fuji Chemical Industries Co., Ltd., *Neusilin® - The Specialty Excipient* (2022), available at 20P_Neusilin-Brochure_FCI-USA.pdf at 12 ("Key advantage of Neusilin . . . Restriction on reversion of amorphous form to crystalline state."), 18 ("Neusilin® Brochure").

[38] Grant 1999 at 13–16.

[39] Grant 1999 at 17–18.

CONFIDENTIAL

energy form is referred to as the thermodynamic polymorph, which for argument sake is Form B. At the same P/T, Form A is considered "metastable" because it is higher in energy than Form B. Whether or not metastable Form A transforms to Form B over some time period—seconds, minutes, weeks or years—is determined by the kinetics of the polymorph transformation. Some metastable polymorphs may convert very quickly to more a stable form while others "metastable" polymorphs are stable indefinitely. The kinetic barrier a metastable polymorph must overcome to transform to a lower energy polymorph is unique to each compound.

1021.   Diamond, which is metastable relative to graphite, does not convert to graphite on any observable human timescale because the energy barrier is too high.

1022.   If a crystalline material is dissolved in a solution, the molecules cease to exist in a crystalline form. In other words, a crystalline form is no longer present when it is dissolved in solution.

b)     *X-ray Diffraction and Bragg's Law*

1023.   The spacing between repeating atoms or molecules in each crystal form (or polymorph) is unique. This allows for different crystal forms to be identified using an experimental method known as X-ray diffraction ("XRD"). XRD is an analytical method used in pharmaceutical sciences to help identify and possibly distinguish solid forms of pharmaceutical compounds.[40]

1024.   When X-rays of a certain wavelength interact with a crystalline material, they will diffract according to Bragg's Law, $n\lambda = 2d\sin\theta$.  In this equation n is usually 1, $\lambda$ is the wavelength of the incident X-rays, d is the periodic spacing between planes of atoms or molecules and is also known as "d-spacing", and $\theta$ is the angle of the incident X-ray beam with respect to the sample.

---

[40] *See, e.g.*, Caira et al., *Crystalline Polymorphism of Organic Compounds*, 198 TOPICS IN CURR. CHEM. 163, 188–90 (1998) ("Caira 1998"); Stephen R. Byrn et al., *Pharmaceutical Solids: A Strategic Approach to Regulatory Considerations*, 12 PHARM. RES. 945, 946 (1995) ("Byrn 1995").

**CONFIDENTIAL**

1025.   When X-rays interact with a crystalline material, the X-rays are diffracted at a unique set of "scattering angles" which differ in their relative "intensities" based on the type and arrangement of atoms and molecules in the solid. X-ray diffraction can be performed on single crystals or on powdered samples.

1026.   When XRD experiments are carried out on single crystals, it is referred to as "single crystal X-ray diffraction."  Single crystal XRD on a conventional diffractometer typically requires an individual crystal ~ 0.1mm or greater in all dimensions. If a higher energy X-ray source is used (e.g. synchrotron), smaller crystal sizes may be used. In this method, a single crystal is mounted on a goniometer, and then rotated with respect to the incident X-rays so that diffraction intensity from all possible planes can be collected. The raw diffraction data, which includes the angle and intensity of diffracted X-rays from the different planes in the crystal, is then used to determine the lattice type, unit cell dimensions, and the location of each atom within the unit cell.[41]

1027.   When XRD experiments are carried out on powdered samples, it is referred to as powder X-ray diffraction or X-ray powder diffraction ("XRPD"). The method assumes that the crystalline particles within the powdered sample are randomly oriented such that all possible lattice planes will be represented so that diffraction from all possible planes will occur simultaneously. With most conventional powder X-ray diffractometers, the sample does not rotate during the data collection, though sample rotation is possible with some instrument configurations.

1028.   The output of a XRPD experiment is typically reported as a diffractogram where the X-axis is the scattering angle given in units of degrees 2θ ("two theta"), and the Y-axis is intensity given in either absolute units or relative units compared to the strongest peak in the

---

[41] Caira 1998 at 187–89.

diffraction pattern. The peaks present in a diffractogram are also sometimes reported in tabular rather than graphical form.

1029.   A sample containing a single crystalline form of an API of moderate size will typically have dozens of peaks in its XRPD pattern. A powder X-ray diffraction pattern therefore provides essentially a "fingerprint" for a given crystalline form.[42]

1030.   A XRPD pattern can also be simulated from a single crystal structure (if available).

1031.   XRPD can be performed using different X-ray sources. Conventional diffractometers generate X-rays from copper tubes, which emit radiation with a wavelength of 1.54056 Å.  Given the broad use of such instruments, most powder diffraction patterns are typically presented on a Copper scale ("Cu scale"), where the 2-theta ranges from 5 – 40 or 50°. The 2-theta positions of peaks generated by a conventional diffractometer have an angular resolution of typically ± 0.1 to 0.2°.

1032.   XRPD data can also be generated from synchrotron sources ("s-XRPD"). Synchrotron light sources are large-scale facilities, typically government funded, and used by researchers from across academic, industrial, and government laboratories. At a synchrotron facility, high intensity and high energy (short wavelength) X-ray radiation is generated by the acceleration of electrons which are injected into a storage ring where they circulate without gaining or losing further energy. The radiation in the storage ring is then projected out at a tangent to different beamlines, each configured to enable experiments probing the structure and properties of various types of materials, including single crystals, powders, thin films, etc.

---

[42] Vippagunta 2001 at 5.

**CONFIDENTIAL**

1033.   Since the wavelength of synchrotron radiation is shorter than that emitted by copper, the 2-theta range of the diffraction pattern generated will differ from that of the diffraction pattern of the same material generated on a conventional diffractometer.

1034.   Synchrotron diffraction, with its high intensity and shorter wavelength, conveys unique properties over conventional XRPD in terms of both resolution and detection limits. Peak positions are more precise with synchrotron diffraction since the angular resolution is orders of magnitude higher. For example, the powder diffraction station at the ALBA synchrotron cites an angular resolution of ± 0.005°.[43] The powder beamline at the Swiss Light Source also cites an angular resolution of ± 0.005°.[44] This enhanced resolution afforded by synchrotron diffraction therefore enables the assignment of exact peak positions of crystalline components in samples containing multiple solid forms. The increased intensity and resolution also enables a lower limit of detection compared to conventional XRPD.

c)      *Diffractograms*

1035.   An XRPD diffractogram is a graphical representation of the intensity of X-rays diffracted by a sample as a function of the diffraction angle (2θ).

1036.   The first-level interpretation of an XRPD diffractogram begins with a holistic analysis of the peak shapes, positions, and intensities.

1037.   Under certain conditions, scientists may compare the XRPD pattern of an unknown sample to the diffraction pattern of a known "reference standard."[45] A number of factors can affect

---

[43]   ALBA Synchrotron, Powder Diffraction Endstation (Beamline BL04-MSPD), ALBA Synchrotron (CELLS), available at https://www.cells.es/en/instruments/beamlines/bl04-mspd/powder-diffraction-endstation.

[44] Fabia Gozzo et al., *Instrumental Profile of MYTHEN Detector in Debye–Scherrer Geometry*, 225 Z. KRISTALLOGR. 616, 623 (2010) ("Gozzo 2010").

[45] Cameron F. Holder & Raymond E. Schaak, *Tutorial on Powder X-ray Diffraction for Characterizing Nanoscale Materials*, 13 ACS NANO 7359, 7363 (2019) ("Holder 2019") ("One application of XRD is phase identification, which is often accomplished by comparing an

CONFIDENTIAL

peak position and intensity on a conventional sealed-tube diffractometer, such that peak positions have an accuracy of about ±0.2° 2θ.

1038.   In high-resolution synchrotron XRPD, diffraction peak positions of an unknown sample can generally be matched to those of a reference material with a precision on the order of ±0.005° 2θ, reflecting the high sensitivity of the technique.[46] Accordingly, use of a ±0.2° 2θ window for synchrotron data would be inappropriate, as it would mask meaningful differences in peak positions that are resolvable with high-resolution instrumentation.

1039.   For samples of the same material prepared in the same way and measured on the same type of instrument, both the peak positions and intensities should match one another closely. "In such cases, an unambiguous and complete match between the experimental and reference patterns is needed."[47]  "Arbitrary peaks predicted by a reference pattern cannot be missing in the experimental XRD data without justification."[48] For samples of the same material measured on different instruments, the peak positions should match one another and the relative intensities of the peaks should be close.

1040. The United States Pharmacopeia–National Formulary recommends scanning beyond the ten strongest diffraction peaks to confirm identity of crystalline solids.[49]

1041.   When comparing a sample to a reference standard, the presence of one, or even two or three, characteristic peaks alone is not indicative of a particular crystalline form.[50]

---

experimental XRD pattern with a reference pattern that is either simulated or obtained from a database.").

[46] Gozzo 2010 at 623.

[47] Holder 2019 at 7363.

[48] Holder 2019 at 7363.

[49] USP-NF, Chapter 941 (2022) at 9.

[50] See, e.g., Holder 2019 at 7363; USP-NF; Chapter 941 (2022) at 9;.

**CONFIDENTIAL**

1042.   The absence of even one peak in an experimental sample compared to a reference standard can evidence that the sample is not the reference standard.[51]

1043.   There are many examples of distinct crystalline forms having similar, but not identical, X-ray diffractograms.

1044.   In an XRPD diffractogram, the shape of the peaks can provide information about the crystallinity of the material. Highly crystalline materials with large coherent scattering domains over long distances have many sharp, well-defined peaks.

1045.   The International Union for Crystallography describes a "crystal" as a material with "a sharp diffraction pattern."[52]

1046.   In a multi-component mixture, diffraction peaks from different phases may overlap and be unresolvable, preventing unambiguous identification of the peak's source.

1047.   Amorphous or poorly ordered materials typically exhibit broad humps instead of discrete peaks.

1048.   Peak intensity is determined by the chemical identity (and hence number of electrons) and distribution of the atoms or molecules themselves in the structure, with heavier atoms contributing more to the intensity. While the positions ($2\theta$) of diffraction peaks are determined by the unit cell dimensions and crystal symmetry, the intensities of these peaks provide critical information about the arrangement of atoms within the structure. (Kaduk 2021 at 4, Figure 2.)

---

[51] J. Bernstein, *Analytical techniques for studying and characterizing polymorphs*, in POLYMORPHISM IN MOLECULAR CRYSTALS 96, 112–114, 115 (2nd ed. 2002) ("Bernstein 2002") (describing "some reported cases of two genuinely polymorphic structures exhibiting very similar power diffraction patterns.").

[52] "Crystal," Online Dictionary of Crystallography, Int'l Union of Crystallography, https://dictionary.iucr.org/Crystal (last visited July 30, 2025).

**CONFIDENTIAL**

1049. Variations in intensity may stem from "preferred orientation."[53] Preferred orientation is most noticeable in materials that have either large particle sizes or very anisotropic morphologies (e.g. plates or needles). Skilled practitioners take steps to minimize the effects of preferred orientation.

1050. "The fundamental relationships between diffracted peak intensity in a powder diffraction pattern and the quantity of phase in a mixture producing that peak are well established." (Madsen 2008 at 299.)

1051. In an ideal sample, the "contribution of each phase to the observed diffraction pattern is derived directly from its crystal structure, with an intensity proportional to its concentration in the specimen[.]" (Kaduk 2021 at 9.) Factors that may affect relative intensities include "counting errors, particle statistics, preferred orientation, microabsorption and, the most hazardous of all, operator error." (Madsen 2008 at 284.) "One of the more common sources of error is preferred orientation[.]" (Kaduk 2021 at 4.) If prepared correctly, testing ground samples in capillary tubes can reduce preferred orientation effects. (Kaduk 2021 at 4–5.)

1052. When grinding or crushing a sample for XRPD testing, a "gentle hand should be used to avoid loss of crystallinity or structural changes resulting from friction and heat." (Kaduk 2021 at 4.) Examples of "structural changes resulting from friction and heat" include polymorphic transitions (Form X→Form Y), hydrate/solvate changes, rearrangement of molecular packing, etc. (Kaduk 2021 at 4.)

### 3.    Diffractograms for MSN's ANDA Products Lack Claimed Peaks

1053. Claim 1 of the '197 Patent requires, among other limitations, "an X-ray diffractogram that comprises characteristics peaks (2θ) at 11.2°, 19.9°, 20.7°, and 34.1° ±0.2°."

---

[53] R.J. Hill, *Expanded Use of the Rietveld Method in Studies of Phase Abundance in Multiphase Mixtures*, 6 POWDER DIFFRACTION, 74, 77 (1991) ("Hill 1991").

CONFIDENTIAL

1054.  Claim 2 of the '197 Patent requires, among other limitations, "an X-ray diffractogram that comprises characteristics peaks (2θ) at 11.2°, 15.4°, 16.3°, 16.9°, 17.8°, 19.9°, 20.7°, 21.0°, 21.8°, 22.6°, 24.5°, 24.6°, 25.0°, 25.5°, 26.3°, 28.3°, 30.3°, 34.1°, 35.8°, 40.0°, 46.0° ±0.2°."

1055.  Plaintiffs have failed to prove that MSN's ANDA Products produce "an X-ray diffractogram that comprises characteristics peaks (2θ) at 11.2°, 19.9°, 20.7°, and 34.1° ±0.2°."

1056.  Plaintiffs have failed to prove that MSN's ANDA Products produce "an X-ray diffractogram that comprises characteristics peaks (2θ) at 11.2°, 15.4°, 16.3°, 16.9°, 17.8°, 19.9°, 20.7°, 21.0°, 21.8°, 22.6°, 24.5°, 24.6°, 25.0°, 25.5°, 26.3°, 28.3°, 30.3°, 34.1°, 35.8°, 40.0°, 46.0° ±0.2°."

1057.  The diffractograms of MSN's ANDA Products produced by Plaintiffs' expert, Dr. Gozzo, lack peaks attributable to Harmony's API at 11.2°, 15.4°, 16.3°, 16.9°, 17.8°, 19.9°, 20.7°, 21.0°, 21.8°, 22.6°, 24.5°, 24.6°, 25.0°, 25.5°, 26.3°, 28.3°, 30.3°, 34.1°, 35.8°, 40.0°, 46.0° ±0.2° 2θ.

1058.  Plaintiffs' expert concede that the diffractograms of MSN's ANDA Products lack peaks at 22.6°, 24.5°, 24.6°, 28.3°, 30.3°, 35.8°, 40.0°, and 46.0° ±0.2°.

1059.  For samples of the same material prepared the same way and measured on the same type of instrument, the peak positions and peak intensities in the diffractograms of the reference standard and experimental standard should match one another closely. In such cases, an unambiguous match of all peaks between the experimental and reference patterns is needed for identification.

1060.  It is standard scientific practice to conclude that a crystalline phase is absent when characteristic diffraction peaks are not observed.

296

**CONFIDENTIAL**

1061.  The absence of even one peak can be meaningful to distinguish between polymorphic forms.

1062.  The diffractogram data generated by Plaintiffs' experts for MSN's ANDA Product samples ███████████████████. These missing peaks confirm to a POSA that MSN's ANDA Product does not contain the crystalline pitolisant hydrochloride described in the '197 Patent.

1063.  The diffractograms of MSN's ANDA Product samples do not match the diffractogram of Harmony's API.

1064.  MSN's ANDA Products do not contain the crystalline pitolisant hydrochloride described in the '197 Patent.

### 4.    Background Regarding MSN'S ANDA Products

1065.  MSN filed Abbreviated New Drug Application No. 218873 with the FDA seeking approval to market a generic version of reference listed drug Wakix® (pitolisant) Tablets.[54]

1066.  FDA



---

[54] Cover Letter from MSN Laboratories Private Limited to Office of Generic Drugs, August 14, 2023 (MSNPIT0000067).

[55] ████████████████████████████

[56]  MSN ANDA, Section 3.2.P.1 Description and Composition of the Drug Product (MSNPIT0000478 at -480); MSN ANDA, Section 2.3.P.1 Description and Composition of the Drug Product (MSNPIT0000199 at -200–201).

[57]  MSN ANDA, Section 3.2.P.1 Description and Composition of the Drug Product (MSNPIT0000478 at -480); MSN ANDA, Section 2.3.P.1 Description and Composition of the Drug Product (MSNPIT0000199 at -200–201).

CONFIDENTIAL



### 5.    Manufacturing of MSN's ANDA Products

1068.  MSN's ANDA Product is manufactured in India ████████████████████

████████████████████

1069.  MSN's ANDA Product is manufactured ████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

---

[58] MSN ANDA, Section 2.3.P.3, Manufacture (MSNPIT0000199 at -238) ████████████████
████████████████████████████████████████

[59] MSN ANDA, Section 2.3.P.3, Manufacture (MSNPIT0000199 at -238–242).
[60] MSN ANDA, Section 2.3.P.3, Manufacture (MSNPIT0000199 at -239).

**CONFIDENTIAL**

████████ ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████ █████████████████████████████████████

███████████████████████████████████████ ██████

████████████████████████████████████████████

██████████████████████████ █

1070. ████████████████████████████████████

█████████████████

1071. The manufacturing process disclosed in MSN's ANDA are ████████

████████████████████████████████████████████

██████████████

1072. ████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████

1073. ████████████████████████████████████████

████████████████████ .

---

[61] MSN ANDA, Section 2.3.P.3, Manufacture (MSNPIT0000199 at -240).

[62] MSN ANDA, Section 2.3.P.3, Manufacture (MSNPIT0000199 at -239–41).

[63] MSN ANDA, Section 2.3.P.3, Manufacture (MSNPIT0000199 at -241–242).

[64] MSN ANDA, Section 2.3.P.3, Manufacture (MSNPIT0000199 at -243).

1074. 



1079. ███████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████

████ Notably, the MSN manufacturing process ████████████████

████████████████████████████████████████████████████

███████████

1081. ███████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████

1082. Whether water hinders or aids crystallization depends heavily on the specific context and the type of material undergoing crystallization.

1083. ███████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████ One can heat diamonds to very high temperatures and still not make graphite.

1084. ███████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████

1085. ███████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████

---

[70] Harmony NDA, Section 2.3.S Drug Substance [Manufacture] (WAKIX-HBS_00000112 at -116).

1086. ███████████████████████████████████

████████████████████████████████████████

██████████████████

1087.  The  finished  product  specification  for  MSN's  ANDA  Product ████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████ ███████████████████

████████████████████████████████

**6.    MSN's Internal Testing**

1088. ███████████████████████████████████

████████████████████████████████████████

████████████████

1089.   MSN's diffractograms from its internal testing show that its ████████

████████████████████████████████████████

████████████████████ ████████████████████████

████████ ████████████ ███████████████████████

---

[71] MSN ANDA, Finished Product Specification – fp spec 4.45 mg (MSNPIT0001957 at -959).

[72] MSN ANDA, Finished Product Specification – fp spec 17.8 mg (MSNPIT0001954 at -956).

[73] MSN's ANDA, Finished Product Certificate of Analysis – 4.45 mg (MSNPIT0002554 at -555).

[74] Nithiyanandham Dep. Tr. at 72:5–8.

[75] Nithiyanandham Dep. Tr. at 34:12–35:1.

[76] Nithiyanandham Dep. Tr. at 71:18–20; MSN's ANDA, Section 3.2.P.2. Pharmaceutical Development (MSNPIT0000551 at -581).

**CONFIDENTIAL**

1090.  MSN has also stated that "███████████████████████████

██████████████████████████████████████████████████████████

████████████████████████

1091.  MSN's Method Development Report details MSN's efforts to ███████████

██████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████[79] (MSNPIT0027607 at -610).

1092.  ██████████████████████████████████████████

█████████████████████████████████████████████████████████████

███████████████[81]



[77] Defendants MSN Pharmaceuticals Inc. and MSN Laboratories Private Limited Supplemental Responses to Plaintiffs' Second Set of Interrogatories (Nos. 9–16), May 7, 2025, at pdf page 13.
[78] XRPD Method Development Report (MSNPIT0027607 at -609).
[79] XRPD Method Development Report (MSNPIT0027607 at -609).
[80] XRPD Method Development Report (MSNPIT0027607 at -612–13).
[81] XRPD Method Development Report (MSNPIT0027607 at -613) ██████████████
███████████████████████████████████████

**CONFIDENTIAL**



1093.

1094.

---

[82] Bairy Dep. Tr. at 68:7–25; *see also id.* at 71:14–72:24.

[83] Bairy Dep. Tr. at 72:21–23; *see also* MSNPIT0033643

MSNPIT0033655

MSNPIT0000551 at -636

MSNPIT0024178 at -179

[84] Nithiyanandham Dep. Tr. at 89:17–90:23.

[85] *See* MSNPIT0033643

MSNPIT0033649

MSNPIT0033655

[86] MSN's ANDA, Section 3.2.P.2. Pharmaceutical Development (MSNPIT0000551 at -581).

CONFIDENTIAL

███████████████████████████████████████████████████████

████████████████ ██████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████ ■ The resulting

XRPD diffractograms submitted to the FDA are reproduced below (MSNPIT0000551 at -581).



---

[87]MSN's ANDA, Section 3.2.P.2. Pharmaceutical Development (MSNPIT0000551 at -581).
[88]MSN's ANDA, Section 3.2.P.2. Pharmaceutical Development (MSNPIT0000551 at -581).

305

**CONFIDENTIAL**



1095.  From this data, MSN concluded that ███████████████████

███████████████████████████████████████████

███████████████████████████ █ ████████████████

███████████████████████████████████████████

██████████████████████████ █

1096.  MSN is not required to conduct polymorphic testing on its exhibit batches.

> **7.  Plaintiffs Have Failed to Prove That Any Peaks Present in Diffractograms of MSN's ANDA Products Are Unique to the Polymorph Described in the '197 Patent**

1097.  Plaintiffs have failed to prove that, in any diffractogram of MSN's ANDA Products,

any peaks at 11.2°, 15.4°, 16.3°, 16.9°, 17.8°, 19.9°, 20.7°, 21.0°, 21.8°, 22.6°, 24.5°, 24.6°, 25.0°,

---

[89] MSN's ANDA, Section 3.2.P.2. Pharmaceutical Development (MSNPIT0000551 at -582).

[90]  MSN's ANDA, Section 3.2.P.2. Pharmaceutical Development (MSNPIT0000551 at -582)

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████

CONFIDENTIAL

25.5°, 26.3°, 28.3°, 30.3°, 34.1°, 35.8°, 40.0°, or 46.0° ±0.2° 2θ are attributable to the crystalline

pitolisant hydrochloride described in the '197 Patent.

1098. ████████████████████████████████████████████████

████████████████████████████████

1099. In the ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████ A separate analysis of Dr.

Gozzo's s-XRPD patterns collected on the excipients indicates that ████████████████

████████████████████████████████████████████████████

████████████████████████████

1100. ████████████████████████████████████████████████

████████████████████████████.

1101. ████████████████████████████████████████████████

████████████████████████████

1102. ████████████████████████████████████████████████

████████████████████████████████

1103. More than one polymorphic form of pitolisant hydrochloride exists, and Plaintiffs

have failed to meet their burden to exclude these other polymorphic forms as the source of any

peaks in any diffractogram of MSN's ANDA Products. *See, e.g.*, *Exploring Polymorphism:*

*Hydrochloride Salts of Pitolisant and Analogues*, 24 CRYST. GROWTH DES. 1268 (2024).

1104. U.S. Patent No. 12,145,916, titled "Polymorph Form of Pitolisant Hydrochloride,"

describes a polymorphic form of pitolisant hydrochloride (Form II) with peaks that overlap with

peaks recited in the Asserted Claims of the '197 Patent.

1105.   U.S. Patent No. 11,623,920, titled "Process for Preparing Pitolisant Hydrochloride and Solid-State Forms Thereof," describes several polymorphic forms of pitolisant hydrochloride, including a sesquihydrate with peaks that overlap with peaks recited in the Asserted Claims of the '197 Patent.

1106.   The '920 Patent discloses "crystalline pitolisant hydrochloride sesquihydrate" with "characteristic peaks" at 11.122°, 15.2756°, 16.1671°, 17.6405°, 19.7524°, 20.6094°, 21.6246°, 25.3733°, 26.1062°, 30.1217°, and 33.9292°, among others. Each of these peaks of crystalline pitolisant hydrochloride sesquihydrate is within ± 0.2° 2θ of a peak claimed in claims 1 or 2 of the '197 Patent.

1107.   It is possible that additional polymorphic forms of pitolisant will be discovered in the future and have peaks that overlap with peaks recited in the Asserted Claims of the '197 Patent.

**8.      Plaintiffs Have Failed to Prove That MSN's Manufacturing Process "Contributes to the Presence of the Claimed Crystalline Form"**

1108.   Plaintiffs have failed to prove that MSN's manufacturing "contributes to the presence of the claimed crystalline form."

1109.   Plaintiffs have failed to prove that, in any diffractogram of MSN's ANDA Products, any peaks at 11.2°, 15.4°, 16.3°, 16.9°, 17.8°, 19.9°, 20.7°, 21.0°, 21.8°, 22.6°, 24.5°, 24.6°, 25.0°, 25.5°, 26.3°, 28.3°, 30.3°, 34.1°, 35.8°, 40.0°, or 46.0° ±0.2° 2θ are attributable to any crystalline pitolisant hydrochloride produced during MSN's manufacturing process.

1110.   ███████████████████████████████████████████

**9.      Dr. Gozzo Performed Synchrotron Testing Rather Than the XRD Test Required by the Claims**

1111.   A POSA would understand the Asserted Claims of the '197 Patent to require XRPD testing by conventional laboratory XRPD; however, Plaintiffs' expert, Dr. Gozzo, conducted testing of samples of MSN's ANDA Products using synchrotron XRPD.

CONFIDENTIAL

1112.  Synchrotron testing ("S-XRPD") is generally more sensitive than standard laboratory XRPD and is capable of detecting the presence of crystalline phases that are present in a mixture in small amounts that would otherwise be undetectable using conventional XRD.

1113.  During S-XRPD testing, Dr. Gozzo tested certain samples of MSN's ANDA Products in capillaries that were spun during testing, which reduces preferred orientation.

1114.  Plaintiffs' expert, Dr. Gozzo, did not establish a limit of detection as part of her S-XRPD testing of MSN's ANDA Products.

1115.  The testing by Plaintiffs' expert, Dr. Gozzo, was not designed to determine the ████████████████████████████████████

███  **Plaintiffs Have Failed to Prove That They Tested Samples of MSN's ANDA Products That Are Representative of What Will Be Sold**

1116.  Plaintiffs' expert, Dr. Gozzo, conducted synchrotron testing on expired samples of MSN's ANDA Products.

1117.  Plaintiffs' expert, Dr. Gozzo, altered MSN's ANDA Products ████████████ ████████████████████████

1118.  Grinding can result in polymorphic transformation or conversion to an amorphous substance.

1119.  Grinding also compromises ████████████████████████ ████████████████████████████████████████ ███████

1120.  Plaintiffs have failed to meet their burden to show that the expiration of the samples, Plaintiffs' handling of the samples, and/or Dr. Gozzo's alteration of the samples did not change the tested samples.

### 11.    Dr. Gozzo's TOPAS Peak List Analysis Is Unreliable

1121.   The TOPAS peak list analysis conducted by Plaintiffs' expert, Dr. Gozzo, is unreliable and was not conducted in accordance with scientifically acceptable procedures.

1122.   The statistical analysis performed by Dr. Gozzo is flawed and fails to confirm the presence of any claimed peaks.

1123.   TOPAS (**To**tal **P**attern **A**nalysis **S**olution) is a highly versatile computational tool for the analysis of powder diffraction data. It provides an integrated environment for performing Rietveld refinement (a mathematical technique using a least squares approach to refine a theoretical profile until it matches the measured data)[91] and related modeling tasks, but it does not perform these analyses automatically. (*See* TOPAS Manual[92] at 125.)  Rather, TOPAS functions as a framework through which the user defines a mathematical model or parameters that are iteratively adjusted to fit the observed diffraction data. The quality and reliability of the resulting refinement depend critically on the user's understanding of crystallography, diffraction physics, data quality, and the appropriateness of the chosen model or parameters.

1124.   When TOPAS generates a diffraction peak based on first-principles (fundamental parameters), it convolutes (a mathematical procedure of blending functions) a basic X-ray emission profile (typically a set of convoluted Lorentzian's) with various physical effects originating from the instrument and the sample. Each convolution is meant to represent something "real" (if performed correctly), like the instrument's optics, the specimen's characteristics, or asymmetry in the beam, and each step slightly modifies the shape of the peak. By layering these

---

[91]In other words, it's a method where the computer keeps "tweaking" its predicted pattern until it lines up as closely as possible with the "real" pattern measured by XRPD.
[92]Diffrac. Suite TOPAS 7 Technical Reference, Bruker Corporation, DOC-M88-EXX066 V7 (August 2022) ("TOPAS Manual").

CONFIDENTIAL

effects, TOPAS is intended to create a realistic peak shape that reflects how the instrument and specimen behave in real life.

1125.   TOPAS is fundamentally a user-driven tool. Because TOPAS operates by refining a user-defined model, its results are inherently model-dependent. The outcome of a refinement reflects the assumptions embedded in the model (for example, space group, atomic arrangement, background treatment, and instrumental parameters). Consequently, two users working on the same dataset can reach different refinements depending on, for example, their assumptions, chosen parameters and interpretation of the diffraction pattern.

1126.   TOPAS does not inherently produce the "correct" or "true" structural result.

1127.   Using TOPAS to conduct unconstrained single peak fitting might lead to an excellent fit, but the refined parameters can be completely meaningless. If the model is incomplete, physically implausible, or based on inappropriate assumptions, the refinement may still converge, but the output will not necessarily represent the real structure or phase composition of the material. Consequently, a refinement cannot, by itself, demonstrate that the assumed phase actually exists; it only shows that the data can be fitted by that model under the specified user-defined conditions.

1128.   TOPAS was not created to automatically identify an entirely unknown substance. In practice, scientists employ a combination of independent data (such as chemical composition or thermal behavior) and iterative testing to validate their refinements.

1129.   Dr. Gozzo used TOPAS to refine a *user-supplied* model (that is, Dr. Gozzo's chosen selection of peaks and chosen parameters) against the observed diffraction data.

1130.   If a user starts with only one model, TOPAS will find the best possible agreement between that model and the data, even if the model is incorrect. (*See* Dinnebier 2019 at 89; Kaduk

## CONFIDENTIAL

2021[93] at 18 ("these analyses fit a model to the data, and so the information obtained depends on whether the model is appropriate."))

1131.   The least-squares algorithm used by TOPAS will always converge to *some* numerical minimum, but that does not guarantee that the model is physically valid. (*See* Dinnebier 2019 at 89.)  Thus, if the structural identity of the material is in question, refining only one model risks confirmation bias: the software will faithfully refine whatever hypothesis a user feeds it. (*Compare* Kaduk 2021 at 18 ("If two different techniques converge on the same answer, there is increased confidence in the accuracy of the result."))  In other words, if a user "tells" TOPAS to find a peak at a certain position, TOPAS will refine the experimental data to "show" that peak, whether or not that peak is a "true peak" that reflects the atomic structure of the material.

1132.   The TOPS user decides which parameters to refine and which to fix. Too few parameters leads to a poor fit, but too many parameters can cause overfitting or physically meaningless results.

1133.   In her TOPAS peak list analysis, Dr. Gozzo selected regions of the diffractograms corresponding to each of the claimed peak positions, including the region ███████ and fitted "peaks" at those locations. Dr. Gozzo also added artificial, arbitrary, additional peaks for describing single asymmetric peaks and as "background fillers," with the stated purpose of improving the overall quality of the fit and correcting for local distortions in peak shape. (Gozzo Reply ¶ 42.)  In this way, Dr. Gozzo's TOPAS peak list analysis is circular and unscientific—she "initially assigned graphically" areas on the diffractogram that she determined to be a peak, then told TOPAS to find a peak in those positions, releasing a variety of parameters individually for every peak, and then characterized that output as definitive evidence of a peak.

---

[93]James A. Kaduk et al., *Powder Diffraction*, 77 Nature Reviews 1 (2017) ("Kaduk 2021").

1134.   In Dr. Gozzo's TOPAS peak list analysis, Dr. Gozzo used multiple, entirely different values for the axial divergence (which is determined entirely by the geometry of the diffractometer) within the same powder pattern. Dr. Gozzo's choice to use varying values for the axial divergence does not make any physical sense, except to artificially force a better "fit."

1135.   Dr. Gozzo generated "peak lists" for only certain batches of MSN's ANDA Product ███████████   ████████████   ████████████   ████████████   █████   ████████████   ████████████ .

1136.   In Dr. Gozzo's TOPAS peak list analysis, Dr. Gozzo states that she accepts only peaks with a signal-to-noise ratio (S/N) of at least 3, while features of lower statistical significance are "flagged" as uncertain. (Gozzo Reply ¶¶ 34, 42; Gozzo Reply Ex. 11.)

1137.   The specific parameterization and workflow design adopted by Dr. Gozzo introduce a number of biases that diminish the objectivity and accuracy of her conclusions.

1138.   In TOPAS Rietveld and profile fitting, agreement between observed and calculated diffraction patterns is quantified using several "criteria of fit." (TOPAS Manual at 151.) Indicators relevant to quality assessment include the weighted-pattern R-factor ($R_{wp}$), the goodness-of-fit (GOF), and the Durbin-Watson statistic (for serial correlation in residuals).

1139.   Dr. Gozzo's TOPAS peak list analysis results in poor fits, including as shown by the resulting criteria of fits for the type of data that Dr. Gozzo analyzed.

1140.   Dr. Gozzo's TOPAS peak list analysis split the background into 15 arbitrary lengths and fitted each "peak" separately, an approach that is scientifically unreliable and results in overparameterization.

1141.  Dr. Gozzo's TOPAS peak list approach creates false "detections," particularly for weak signals such as the ███████████████ which fails to meet even Dr. Gozzo's definition of statistical significance.

1142.  Dr. Gozzo applied an inappropriate signal-to-noise formula including several errors taken from a study on X-ray photoelectron spectroscopy rather than synchrotron XRPD (Gozzo Reply ¶ 34), and she tested only a single model on only certain samples without verifying that her results are robust under different assumptions or across all MSN ANDA Product samples provided to her.

1143.  A proper whole-pattern analysis with a single constrained background and validated instrumental parameters confirms that certain reflections which Dr. Gozzo identifies as "peaks" are indistinguishable from the background and cannot be used to establish the presence of the claimed invention in MSN's ANDA products.

1144.  A proper analysis of relative intensities of peaks in Dr. Gozzo's diffractograms, confirms that certain reflections which Dr. Gozzo identifies as "peaks" are indistinguishable from the background and cannot be used to establish the presence of the claimed invention in MSN's ANDA products.

1145.  Dr. Gozzo's TOPAS peak lists do not support Dr. Myerson's conclusions of infringement.

### 12.    Plaintiffs Have Failed to Prove That MSN's ANDA Products Meet the Required Water Content Limitation

1146.  Claims 1 and 2 of the '197 Patent require, among other limitations, that the crystalline pitolisant hydrochloride "optionally compris[e] water up to 6%."

1147.  Plaintiffs' experts did not conduct any test to measure the water content of MSN's drug substance in MSN's drug product.

CONFIDENTIAL

1148.  Total tablet water content is not probative of the water content of individual components of a tablet.

1149.  MSN's specifications ███████████████████████████████████████

████████████████████████████████████████████

## B.    The '947 Patent

1150.  Plaintiffs have failed to prove by a preponderance of the evidence that MSN's submission of ANDA No. 218873 constitutes infringement of claim 13 of the '947 Patent pursuant to 35 U.S.C. § 271(e)(2)(B).

1151.  Plaintiffs have failed to prove by a preponderance of the evidence that the sale, offer for sale, use, and/or manufacture within the United States and/or importation into the United States of any product covered by ANDA No. 218873, would constitute an act of infringement of claim 13 of the '947 Patent under 35 U.S.C. § 271(b).

## VII.    NOVITIUM'S NONINFRINGEMENT

### A.    Background

#### 1.    U.S. Patent No. 8,207,197

1152.  U.S. Patent No. 8,207,197 ("the '197 Patent") issued from U.S. Patent Application No. 11/815,736, which was filed on February 6, 2006.  The priority date of the '197 Patent is February 10, 2005.

1153.  Plaintiffs assert that Novitium infringes claims 1 and 2 of the '197 Patent. Claim 2 depends from claim 1 and incorporates all of its limitations by reference. Asserted claims 1 and 2 of the '197 Patent are reproduced below.

> 1. Crystalline 1-[3-[3-(4-chlorophenyl)propoxy]propyl]-piperidine monohydrochloride of formula (I)

**CONFIDENTIAL**



optionally comprising water up to 6%, and having an X-ray diffractogram that comprises characteristic peaks (2θ) at 11.2°, 19.9°, 20.7° and 34.1° ±0.2°

2. The crystalline 1-[3-[3-(4-chlorophenyl)propoxy]propyl]-piperidine monohydrochloride according to claim 1, having an X-ray diffractogram that comprises characteristic peaks (2θ) at 11.2°, 15.4°, 16.3°, 16.9°, 17.8°, 19.9°, 20.7°, 21.0°, 21.8°, 22.6°, 24.5°, 24.6°, 25.0°, 25.5°, 26.3°, 28.3°, 30.3°, 34.1°, 35.8°, 40.0°, 46.0°±0.2°.

<blockquote>
a)  *Patentees' Statements During Prosecution of the '197 Patent Disclaimed Polymorphs Without All Claimed Peaks*
</blockquote>

1154.   During prosecution of the '197 Patent, the patentees amended then-pending claim 1 to recite that the claimed crystalline form must have specific X-ray diffractogram ("XRD")[94] characteristic peaks:

---

[94] The '197 Patent refers to XRD and X-ray *powder* diffractogram ("XRPD") analyses interchangeably. *Compare* '197 Patent col. 1, ll. 53-57 ("The crystalline 1-[3-[3-(4-chlorophenyl)propoxy ]propyl]piperidine monohydrochloride as claimed herein has an X-ray powder diffraction pattern with characteristic peaks (2θ): 11.2°, 19.9°, 20.7° and 34.1° (±0.2°) as shown in the experimental data included in Example 3") *with id.* col. 22, ll. 12-27 (claiming same crystalline substance "having an X-ray diffractogram that comprises characteristic peaks (2θ) at 11.2°, 19.9°, 20.7° and 34.1° ±0.2°").

**CONFIDENTIAL**

*This listing of claims will replace all prior versions, and listings, of claims in the application.*

1.    (Currently amended)  Crystalline 1-[3-[3-(4-chlorophenyl)propoxy]propyl]-piperidine monohydrochloride of formula (**I**)



**(I)**

~~and its pharmaceutically acceptable solvates, including hydrates~~optionally comprising water up to 6%, and having an X-ray diffractogram that comprises characteristic peaks (2$\theta$) at 11.2°, 19.9°,20.7° and 34.1° ±0.2°

('197 Patent file history, Claims (Nov. 14, 2011) (WAKIX-PLFS_00000059-859 at -0641-52.)

1155.  The patentee made this amendment in response to the patent examiner's earlier rejection of then-pending claim 1 and then-pending dependent claim 2, the latter of which had recited the XRD limitation that now appears in claim 1.  The examiner saw no difference between then-pending claims 1 and 2 because "[a] specific crystal form can be identified by its x-ray diffraction pattern." ('197 Patent file history, Non-Final Rejection (Aug. 12, 2011) at 6) (WAKIX-PLFS_00000439-48 at -0445).) The patentees thus amended claim 1 to recite the specific XRD peaks and cancelled then-pending claim 2.

1156.  In amending claim 1 to specify that the claimed crystalline form of pitolisant hydrochloride has specific XRD peaks, the patentees narrowed the scope of claim 1.  Whereas the previous language of claim 1 did not specify how one would confirm whether a given sample of pitolisant hydrochloride fell within the scope of the claim, the amended language – which appears

in claim 1 of the '197 Patent – specifies that the crystalline form is characterized by the four recited XRD peaks. The patentees thus narrowed both the range of polymorphs covered by claim 1 and the methods by which the claimed crystalline form can be characterized. Put differently, the patentee narrowed the scope of claim 1 to polymorphs that display the claimed peaks *and* required that the peaks be determined using XRD.

1157.   When the patentees amended claim 1 to include specific XRD peaks, then-pending claim 3 had 21 required peaks. (Claims (Nov. 14, 2011) (showing text of claim 3) (WAKIX-PLFS_00000641-52 at -0642).)  Then-pending claim 3 issued as claim 2 of the '197 Patent, which requires the presence of those same 21 peaks. (Index of Claims (Jan. 30, 2012) (WAKIX-PLFS_00000665-679 at -0675) (showing that original claim 3 became claim 2).)  Thus, claim 2 of the '197 Patent requires that an infringing polymorph display the 21 recited peaks as determined by XRD analysis.

> b)   *The Specification and Claims of the '197 Patent Indicate that the Claimed Polymorphs Must Be Characterized Using Conventional XRPD*

1158.   The specification of the '197 Patent discloses conventional XRPD as a method of characterizing the claimed polymorphs. ('197 Patent col. 1, ll. 53-57.)  There is no mention of, for example, other XRPD methods (e.g., synchrotron XRPD), or solid-state nuclear magnetic resonance ("ssNMR")). Example 3 of the '197 Patent, and corresponding Figure 1, involve the use of only conventional XRPD, not synchrotron XRPD. The '197 Patent also contains no data generated from the use of synchrotron XRPD.

1159. The    '197    Patent    discloses    that    "[t]he    crystalline    1-3-3-(4-chlorophenyl)propoxypropyl piperidine monohydrochloride as claimed herein has an X-ray powder diffraction pattern with characteristic peaks (2θ): 11.2°, 19.9°, 20.7° and 34.1° (±0.2) as shown in the experimental data included in Example 3."  (*Id*. at col. 1, ll. 53-57.)  Example 3

318

CONFIDENTIAL

discloses the use of lab-based (i.e., conventional) XRPD, as shown by, for example, its disclosure

that the "used wavelength was 0.71073 Å," (*id.* at col. 6, ll. 12-13), which is the wavelength for

X-rays from a molybdenum anode used in a typical lab-based (i.e., conventional) diffractometer

employing MoKα radiation. A person of ordinary skill in the art ("POSA") would therefore

understand that evaluating whether a sample is a crystalline pitolisant hydrochloride having the

XRPD peaks claimed in the asserted claims of the '197 must be done using conventional, rather

than synchrotron, XRPD testing.

1160. As discussed above, the claim language the patentee amended during prosecution

now appears in claim 1 of the '197 Patent: "having an X-ray diffractogram that comprises

characteristic peaks (2θ) at 11.2°, 19.9°, 20.7° and 34.1° ±0.2°." With respect to this limitation,

the parties have stipulated that "the peaks *together* uniquely identify the crystalline form of

pitolisant hydrochloride." (Amended Joint Claim Construction Chart (D.I. 251) at A-1 (emphasis

added).)

1161. Asserted claim 2 of the '197 Patent requires that the claimed crystalline form has

"an X-ray diffractogram that comprises characteristic peaks (2θ) at 11.2°, 15.4°, 16.3°, 16.9°,

17.8°, 19.9°, 20.7°, 21.0°, 21.8°, 22.6°, 24.5°, 24.6°, 25.0°, 25.5°, 26.3°, 28.3°, 30.3°, 34.1°, 35.8°,

40.0°, 46.0° ±0.2°." Similar to claim 1, the parties have agreed that "the peaks together uniquely

identify the crystalline form of pitolisant hydrochloride" recited in claim 2. (*Id.*)

1162. A POSA would therefore understand from the agreed-upon claim constructions that

finding only one or some of the claimed peaks is insufficient to uniquely identify the claimed

crystalline form.

CONFIDENTIAL

1163.   A POSA would further understand from the specification and claims of the '197

Patent that an infringing form of pitolisant hydrochloride must exhibit all of the claimed peaks as

displayed on a conventional XRPD diffractogram.

### 2.    U.S. Patent No. 8,486,947

1164.   U.S. Patent No. 8,486,947 ("the '947 Patent") issued from U.S. Patent Application

No. 11/909,778, which was filed on March 30, 2006.  The priority date of the '947 Patent is April

1, 2005.

1165.   Plaintiffs assert that Novitium infringes claim 13 of the '947 Patent. Claim 13

depends from claim 1 and incorporates all of its limitations by reference. Asserted claim 13 of

the '947 Patent, and independent claim 1 from which it depends, are reproduced below.

1. A method for treating excessive daytime sleepiness comprising administering
to a patient in need thereof a compound of formula (IIa):

$$ \underset{R^2}{\overset{R^1}{\diagdown}} N \text{---} (\text{chain } A^{II}) \text{---} X^{III} \text{--} (\text{chain } B^{II}) \text{---} Y^{II} \qquad (IIa) $$

wherein:
$R^1$ and $R^2$ form together with the nitrogen atom to which they are attached a
saturated nitrogen-containing ring

$$ N \quad (CR^a R^b)_m $$

with m ranging from 2 to 8, or
    $R^{a-b}$ being independently a hydrogen atom or a linear or
      branched alkyl group containing 1 to 6 carbon atoms,
      and
the chain $A^{II}$ selected from an unbranched alkyl group
    $-(CH_2)_{nII}$-where $n_{II}$ is 3;
the group X" is -O-;
the chain $B^{II}$ is an unbranched alkyl comprising 3 carbon atoms; and
the group $Y^{II}$ represents a phenyl group, unsubstituted or mono- or polysubstituted

320

with one or more identical or different substituents selected from halogen atoms, $OCF_3$, CHO, $CF_3$, $SO_2N(alkyl)_2$, $NO_2$, S(aryl), $SCH_2$(phenyl), an unbranched or branched alkene, an unbranched or branched alkyne optionally substituted with a trialkylsilyl radical, —O (alkyl), —O(aryl), —CH2CN, a ketone, an aldehyde, a sulphone, an acetal, an alcohol, a linear or branched alkyl group containing 1 to 6 carbon atoms, -CH=CH-CHO, —C(alkyl) =N—OH, -C(alkyl)=N—O(alkyl), —CH=NOH, —CH=NO(alkyl), —C(alkyl)=NH-NH—$CONH_2$, an O-phenyl or -$OCH_2$(phenyl) group, -C(cycloalkyl)= NOH, —C(cycloalkyl)=N—O(alkyl); or its pharmaceutically acceptable salts, hydrates, or hydrated salts, or the polymorphic crystalline structures of these compounds or their optical isomers, racemates, diastereoisomers or enantiomers, wherein said patient is suffering from Parkinson's disease, narcolepsy, or sleep apnea.

13. The method according to claim **1**, wherein the compound is selected from 3-(4-chlorophenyl)propyl-3-piperidino- propylether, or its pharmaceutically acceptable salts, hydrates, or hydrated salts, or the polymorphic crystalline structures of this compound or its optical isomers, racemates, diastereoisomers or enantiomers.

a)    *Prosecution History*

1166.   Plaintiffs elected to pursue claims directed to "excessive daytime sleepiness" and not claims directed to "narcolepsy."  (*See, e.g.*, '947 Patent File History Restriction/Election Requirement (Oct. 12, 2010) (WAKIX-PLFS_00001967-76; WAKIXPLFS_00001996).)   The patent examiner noted that "[b]ecause applicant did not distinctly and specifically point out the supposed errors in the restriction requirement, the election has been treated as an election without traverse (MPEP § 818.03(a))."  ('947 Patent File History Non-final Rejection (Apr. 29, 2011) (WAKIX-PLFS_00002002-08 at -2004).)   In response, Plaintiffs argued that excessive daytime sleepiness ("EDS") is an independent symptom of several conditions.

1167.   During prosecution of the '947 Patent, the Applicant further limited claims directed to treating "excessive daytime sleepiness" by amending the claim to recite only specific patient populations including those with "narcolepsy."  (*See, e.g.,* '947 Patent File History Response to Final Rejection (Apr. 16, 2012) (WAKIX-PLFS_00002070-77.) U.S. Patent No. 8,486,947

CONFIDENTIAL

### 3.    Novitium's ANDA Products

1168.    Novitium submitted ANDA No. 218495 ("Novitium's ANDA") seeking approval

to market 4.5 mg and 17.8 mg pitolisant hydrochloride tablets ("Novitium's ANDA Products").

1169.    Novitium's ANDA states that ███████████████████████████████

████████████████████████████████████████████████████  ██████████

████████████████████████████████████

1170.    Novitium's ANDA No. 218495 lists the chemical name of Novitium's ANDA

Products    as    ████████████████████████████    ████████████████

███████████████████████████████

1171.    In addition to their API, which is ██████████████████████████████

██████████████████████████████, Novitium's ANDA Products contain

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████

### 4.    Person of Ordinary Skill in the Art ("POSA")

1172.    During claim construction, Plaintiffs defined a POSA as follows:

> [A] person with a Ph.D. and at least 1–2 years of experience, or a
> person with a master's degree and at least 3–4 years of experience,
> in the fields of synthetic or medicinal chemistry, pharmaceutical
> sciences, or a related discipline. Furthermore, because drug
> discovery and development are multidisciplinary efforts, a synthetic
> or medicinal chemist or pharmaceutical scientist may interface or
> consult with individuals having specialized expertise such as, for
> example, persons working in the field of central nervous system
> disorders, such as Parkinson's, narcolepsy, or sleep apnea, with a
> Ph.D. or M.D. and at least one year of research or clinical
> experience. Such a person may also be working as part of a team.

(Declaration of Dr. Paul J. Reider in Support of Plaintiffs' Opening Claim Construction Brief

(Oct. 14, 2024), ¶ 12.)

1173.   Two of Plaintiffs' experts, Gerard Meskill, M.D. and Thomas Roth, Ph.D.,

subsequently proposed an alternate definition of a POSA. Specifically, a POSA:

> [would work] as part of a team comprised of a person with a Ph.D.
> and at least 1–2 years of experience, or a person with a master's
> degree and at least 3–4 years of experience, in the fields of synthetic
> or medicinal chemistry, pharmaceutical sciences, or a related
> discipline; and a person working in the field of central nervous
> system disorders including sleep disorders arising in patients with
> Parkinson's, narcolepsy, or sleep apnea, with a Ph.D. or M.D. and
> at least one year of research or clinical experience.

(Opening Expert Report of Dr. Gerard J. Meskill Regarding Infringement of U.S. Patent No.

8,486,947 ("Meskill Opening Rpt.") ¶ 33; Opening Expert Report of Thomas E. Roth Regarding

Infringement of U.S. Patent No. 8,486,947 ("Roth Opening Rpt.") ¶¶ 34-36.)

1174.   In their respective opening expert reports, Drs. Meskill and Roth defined a POSA

differently than Plaintiffs did during claim construction. Plaintiffs' experts' post-claim

construction definitions require that a POSA "would be working as part of a team comprised of"

at least two team members. (Meskill Opening Rpt. ¶ 33; *see also* Roth Opening Rpt. ¶ 34.)

**B.    Noninfringement of the '197 Patent**

1175.   Plaintiffs have not provided, and the record does not otherwise include, any XRPD

diffractogram of Novitium's ANDA Products that displays each of the four peaks claimed in claim

1 of the '197 Patent.

1176.   Plaintiffs have not provided, and the record does not otherwise include, any XRPD

diffractogram of the ███████████████████████████████ that displays each of

the four peaks claimed in claim 1 of the '197 Patent.

CONFIDENTIAL

1177.   Plaintiffs have not provided, and the record does not otherwise include, any XRPD diffractogram of Novitium's ANDA Products that displays each of the 21 peaks claimed in claim 2 of the '197 Patent. [95]

1178.   Plaintiffs have not provided, and the record does not otherwise include, any XRPD diffractogram of the ███████████████████████████ that displays each of the 21 peaks claimed in claim 2 of the '197 Patent.

1179.   Neither Plaintiffs nor their experts report having conducted X-ray diffraction testing of any kind on Novitium's ANDA Products ████████████████████

1180.   Plaintiffs did not provide any XRD testing by their experts of any of Novitium's ANDA Products in their opening expert reports served on July 1, 2025. Plaintiffs provided synchrotron XRD testing of Defendant MSN's ANDA Products by their expert Dr. Gozzo in their opening expert reports. As of the time that Dr. Gozzo conducted synchrotron XRD testing of Defendant MSN's ANDA Products, she was also in possession of samples of Novitium's ANDA Products. Despite having Novitium's samples, Dr. Gozzo did not conduct synchrotron XRD testing of Novitium's ANDA Products.

1181.   X-ray crystallographic methods can, in most cases, be definitive in the identification and characterization of polymorphs.

1182.   X-ray crystallographic methods should be included, wherever possible, as among the analytical methods used to define a polymorphic system.

1183.   The absence of sharp peaks in an XRPD diffractogram of a pharmaceutical product is indicative of the absence of crystalline material.

---

[95] As to Novitium, Plaintiffs have also not submitted any expert testimony, opinions, or evidence concerning whether the Batch No. 142868 of the Harmony API meets claim 2 of the '197 Patent.

**CONFIDENTIAL**

1184.  The term "amorphous form" refers to a noncrystalline solid. An amorphous pharmaceutical solid is one in which the constituent molecules are not ordered or organized with respect to one another over long range, but rather are arranged in a more-or-less random fashion.

1185.  An amorphous pharmaceutical lacks translational periodicity, although it may have local correlations among the positions and orientations of molecules.

1186.  A neat amorphous solid is distinct from ████████████████████ ████████████████████. ████████████████████ ████████████████████

1187.  ████████████ are distinct from neat amorphous solids in that they are ████████████████████ and, as such, they are specifically designed to prevent conversion to crystalline solids. By dissolving the API to make ██████████, API molecules are kept separate from each other, preventing the API molecules from aggregating to form crystal nuclei that can then grow into crystals with a long-range repeating pattern.

1188.  When below the glass transition temperature (Tg), the API molecules in an ████████████ do not have molecular mobility and cannot crystallize in the absence of stress exceeding normal handling and storage parameters, such as grinding, excessive heat, or excessive moisture.

1189.  Plaintiffs do not allege contributory or induced infringement of the '197 Patent against Novitium.

1190.  Plaintiffs do not allege infringement under § 271(g) of the '197 Patent against Novitium.

1191.  Plaintiffs do not allege infringement of the '197 Patent against Novitium under the Doctrine of Equivalents.

**CONFIDENTIAL**

1.    **The** ███████████ **in Novitium's ANDA Products Does Not Display the XRPD Peaks Required by the Asserted Claims**

1192.  There are no known XRD diffractograms of the ███████████

███████████ that display each of the four claimed peaks of claim 1 of the '197 Patent.

1193.  There are no known XRD diffractograms of the ███████████

███████████ that display each of the 21 claimed peaks of claim 2 of the '197 Patent.

1194.  As noted above, the language of the '197 Patent, its claims, and the parties' stipulated construction of the same require the presence of all claimed peaks to establish infringement. The evidence at trial will demonstrate that the ███████████

███████████ does not infringe because it does not display the claimed peaks.

1195.  XRPD scans of crystalline material are characterized by sharp diffraction patterns. The absence of well-defined XRPD peaks indicates that a tested sample is amorphous and lacks any defined crystalline structure.

1196.  Drs. Bart Kahr and Alexander Shtukenberg analyzed three batches of Novitium's ███████████ using conventional XRPD analysis.

1197.  XRPD analyses of the three batches displayed no distinct peaks. Instead, they displayed broad the "hump" or "halo" patterns that are characteristic of amorphous material. (ANI_Pitolisant00017632-34.)  This indicates that the ████████████ in Novitium's ANDA Products contains no crystalline material, let alone the claimed crystalline polymorphs. The results for the three batches consistently showed the same form of pitolisant hydrochloride:



(ANI_Pitolisant00031962 (DTX-4155, 4330-31); ANI_Pitolisant00031963 (DTX-4153, 4332-33); ANI_Pitolisant00031969 (DTX-4152, 4344-45)).)

**CONFIDENTIAL**

1198.   None of the diffraction patterns show even one of the "characteristic peaks" at 11.2°, 19.9°, 20.7° and 34.1 ° ± 0.2°, much less all four as recited by independent claim 1 of the '197 Patent.

1199.   Likewise, none of the diffraction patterns show peaks at all 21 positions required by dependent claim 2 of the '197 Patent (at 11.2°, 15.4°, 16.3°, 16.9°, 17.8°, 19.9°, 20.7°, 21.0°, 21.8°, 22.6°, 24.5°, 24.6°, 25.0°, 25.5°, 26.3°, 28.3°, 30.3°, 34.1 °, 35.8°, 40.0°, 46.0° ± 0.2°).

1200.   The lack of crystalline material in Novitium's ███████████ is further confirmed by testing done by █████, a third-party laboratory. As part of Novitium's ANDA submission, Novitium submitted a Method Validation Report prepared by █████ that describes the results of testing that █████ performed on the ███████████████ ██████ (ANI-Pitolisant00003557.) The Method Validation Report discloses XRPD scans from ███████████████████ of the ████████████ noting that ████████████ ████████████████████████████████████████████████████████ ████████████████████████ (*Id*. at -3562-63.) Indeed, the Method Validation Report's



**CONFIDENTIAL**

overlay of diffractograms from each tested sample shows no ███████████████ that would

reflect the presence of crystalline material.

(*Id*. at -3571.)

    1201.  Moreover, a comparison table in the Method Validation Report showing the

locations of the amorphous halo peaks for the tested samples demonstrates the absence of the

claimed peaks recited by claims 1 and 2 of the '197 Patent:



    1202.  The ██████████████ in Novitium's ANDA Products is described under ███

████████████████████ and is manufactured by ██████████████████████████.

The DMF includes results of XRPD testing performed by ██████████ on the ████████████

██████████████████ (ANI-Pitolisant00000129-84 at -0168.)

1203. █████ submission to FDA accompanying the test results states that █████ manufacturing process ████████████████ (*Id.* at -0167.) It also contains a comparison of the diffractograms of the four tested samples:



1204. Similar to the diffractograms discussed above, *supra* XX, these diffractograms each lack the sharp diffraction pattern that characterizes crystalline material. Rather, the absence of well-defined peaks indicates an amorphous material that lacks any defined crystalline structure, let alone the specific claimed crystalline pitolisant hydrochloride.

1205. ██████████, on behalf of █████ also conducted XRPD testing on samples of the ████████████████████████ where the █████████ had varying ████████ (ANI-Pitolisant00026950-7239 at -7197-213.) The below table summarizes the results, which █████ submitted to FDA:

**CONFIDENTIAL**



(*Id*. at -7019.)  These results demonstrate that the ███████████ ████████████████

████████ remains amorphous when it has a moisture content of up to 6% (i.e., the claimed range).

The testing conducted by ██████████ shows that the claimed crystalline form of asserted claims

1 or 2 of the '197 Patent is not present in the ████████████████████████████

████████.

1206.  In a letter to Novitium dated ██████████ regarding Novitium's ANDA, FDA

stated that it ████████████████████████████████████████████

████████████████████████████

1207.  In sum, separate XRPD analyses performed by Drs. Kahr and Shtukenberg, ████

and ██████████ all independently confirm that the ████████████████████████

████████ contains only amorphous material. No test results showed any crystalline peaks, much

less the characteristic peaks required by the asserted claims of the '197 Patent. A statement from

FDA further confirms that there is no crystalline pitolisant in Novitium's API.

1208.  In addition, Dr. Wenslow's ssNMR testing used the ████████████████

████████████████████ as a reference to establish a baseline of the spectrum for amorphous

pitolisant hydrochloride.

1209.  Thus, the evidence at trial will show that the ████████████████████

████████████ does not infringe the asserted claims of the '197 Patent.

### 2.     Novitium's ANDA Products Do Not Display the XRPD Peaks Required by the Asserted Claims

#### a)     *Novitium's Placebo Tablets*

1210.   To establish a reference for comparing Novitium's ███████████ and Novitium's ANDA Products, Drs. Kahr and Shtukenberg tested and analyzed placebo tablets containing only the inactive ingredients used in Novitium's ANDA Products. The inactive ingredients in Novitium's placebo tablets include ████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

1211.   The scans of Novitium's placebo tablets produced the following diffractogram:



(ANI-Pitolisant00031970; DTX-4151, 4346-47.)   The diffraction pattern of Novitium's placebo tablets displays several features that are each attributable to one of the inactive ingredients in Novitium's ANDA Products and placebo tablets. ████████████████████████ drive the most notable features of the XRPD scan of Novitium's placebo tablets, but ███ ████████████, and others may also show some influence on the overall pattern.

1212.   ███████████████████ has a characteristic diffraction pattern which includes the ███████████████, a ███████████████████, and yet another ███████████

**CONFIDENTIAL**

██████████ . ██████████████████████████, shows a well-defined peak at

███████████████, with a broader and less well-defined feature ███████████. The major features

in the diffraction pattern of the placebo tablets combine with ██████████████████████

██████████████ to yield the consistent diffraction patterns produced by Novitium's ANDA

Products. (ANI-Pitolisant00031972 (DTX-4350-51); DTX-4146; DTX-4162; DTX-4155; DTX-



4151; DTX-4150.)  Thus, the only well-defined peaks in the XRPD scans of Novitium's placebo

tablets are attributable to specific inactive ingredients in Novitium's ANDA Products.

    b)  *Novitium's 4.45 mg ANDA Product*

  1213. There are no known XRD diffractograms of Novitium's 4.45mg ANDA Product

that display each of the four claimed peaks of claim 1 of the '197 Patent.

  1214. 734. There are no known XRD diffractograms of Novitium's 4.45mg ANDA

Product that display each of the 21 claimed peaks of claim 2 of the '197 Patent.

1215.    Drs. Kahr and Shtukenberg analyzed three one-tablet samples from each of three different exhibit batches of Novitium's 4.45 mg ANDA product, a total of nine samples. Dr. Myerson agrees that the number of samples tested was not unreasonable. All scans were consistent and displayed a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ centered around ▮▮▮▮▮ The scans also displayed characteristics consistent with the presence of the inactive ingredient ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ which drove a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and also contributed the ▮▮▮▮▮▮▮▮▮▮▮▮▮. An exemplary pattern is provided below.



(ANI-Pitolisant00031973 (DTX-4149); DTX-4352; DTX-4353.)

1216.    The absence of well-defined peaks in the XRPD scans indicates that Novitium's 4.45 mg ANDA product contains only amorphous material that lacks any defined crystalline structure, let alone the specific claimed polymorphs of crystalline pitolisant hydrochloride.

1217.    The only clearly defined features of any kind are attributable to and driven by inactive ingredients present in the formulation of Novitium's ANDA Products, and not by any form of crystalline pitolisant hydrochloride. None of these diffractograms have "peaks" that fall within the claimed ranges of $11.2°$, $19.9°$, $20.7°$ and $34.1° \pm 0.2°$ as required by claim 1 of the '197

CONFIDENTIAL

Patent. Even if any of the peaks in the XRPD scan of Novitium's 4.45 mg ANDA Products were attributable to pitolisant hydrochloride and fell within the claimed ranges of ± 0.2° (2θ) (and none do) there are certainly not all four peaks recited in claim 1.  The presence of all four peaks is required by the Court's construction that the peaks identifying the claimed crystalline structure must be present together. (D.I. 251 at A-1.)

1218.  As noted above, *supra* at XX, dependent claim 2 of the '197 Patent recites peaks at 11.2°, 15.4°, 16.3°, 16.9°, 17.8°, 19.9°, 20.7°, 21.0°, 21.8°, 22.6°, 24.5°, 24.6°, 25.0°, 25.5°, 26.3°, 28.3°, 30.3°, 34.1 °, 35.8°, 40.0°, 46.0° ± 0.2°. To the extent any of the features in the XRPD spectra could have "peaks" falling within the claimed ranges, this would not be a "characteristic peak" of crystalline pitolisant hydrochloride as claimed, because, as noted above, any purported "peaks" in the XRPD scans of Novitium's ANDA Products are attributable to inactive ingredients and therefore cannot uniquely identify any crystalline pitolisant hydrochloride as required by the parties' stipulated claim construction. (*Supra* at XX.)  Even to the extent any particular peak were attributable to pitolisant hydrochloride (and none are), there are certainly not all 21 peaks required by claim 2 of the '197 Patent.

c)    *Novitium's 17.8 mg ANDA Product*

1219.  There are no known XRD diffractograms of Novitium's 17.8mg ANDA Product that display each of the four claimed peaks of claim 1 of the '197 Patent.

1220.  There are no known XRD diffractograms of Novitium's 17.8mg ANDA Product that display each of the 21 claimed peaks of claim 2 of the '197 Patent.

1221.  Drs. Kahr and Shtukenberg analyzed three one-tablet samples from each of three different exhibit batches of Novitium's 17.8 mg ANDA product, a total of nine samples. Dr. Myerson agrees that the number of samples tested was not unreasonable. All scans were consistent and displayed a broad ████████████████████████████

CONFIDENTIAL

The scans also displayed characteristics consistent with the presence of the inactive ingredient ███████████████████████, *see supra* XX, which drove a ██████████████████████████ and also contributed the characteristic features at ████████████████. An exemplary pattern is provided below.



(ANI-Pitolisant00031959 (DTX-4161).)

1222.   The absence of well-defined peaks in the XRPD scans indicates that Novitium's 17.8 mg ANDA product contains only amorphous material that lacks any defined crystalline structure, let alone the specific claimed polymorphs of crystalline pitolisant hydrochloride.

1223.   The only clearly defined features of any kind are attributable to and driven by inactive ingredients present in the formulation of Novitium's ANDA Products, and not by any form of crystalline pitolisant hydrochloride. None of these have "peaks" that fall within the claimed ranges of 11.2°, 19.9°, 20.7° and 34.1 ° ± 0.2° as required by claim 1 of the '197 Patent. Even if any of the peaks in the XRPD scan of Novitium's 17.8 mg ANDA product were attributable to pitolisant hydrochloride and fell within the claimed ranges of ± 0.2° (2θ) (and none do) there are certainly not all four peaks recited in claim 1.  The presence of all four peaks is required by the

CONFIDENTIAL

Court's construction that the peaks identifying the claimed crystalline structure must be present together. (D.I. 251 at A-1.)

1224.   As noted above, dependent claim 2 of the '197 Patent recites peaks at 11.2°, 15.4°, 16.3°, 16.9°, 17.8°, 19.9°, 20.7°, 21.0°, 21.8°, 22.6°, 24.5°, 24.6°, 25.0°, 25.5°, 26.3°, 28.3°, 30.3°, 34.1 °, 35.8°, 40.0°, 46.0° ± 0.2°. To the extent any of the features in the XRPD spectra could have "peaks" falling within the claimed ranges, this would not be a "characteristic peak" of crystalline pitolisant hydrochloride as claimed, because, as noted above, any purported "peaks" in the XRPD scans of Novitium's ANDA Products are attributable to inactive ingredients and therefore cannot uniquely identify any crystalline pitolisant hydrochloride as required by the parties stipulated claim construction. (*Supra* at XX.)  Even to the extent any particular peak were attributable to pitolisant hydrochloride (and none are), there are certainly not all 21 peaks required by claim 2 of the '197 Patent.

### 3.    Plaintiffs' Experts' Opinions Cannot Establish Infringement of the Asserted Claims of the '197 Patent

1225.   Plaintiffs have offered infringement theories regarding the '197 Patent based on the opinions of Dr. Allan S. Myerson, Dr. Fabia Gozzo, and Dr. Robert Wenslow.

1226.   Dr. Myerson has opined that Novitium's ANDA Products infringe claims 1 and 2 of the '197 Patent. His opinions are based in part on the opinions of Drs. Gozzo and Wenslow. Dr. Myerson essentially opines that Novitium's ANDA Products must contain the claimed crystalline form of pitolisant hydrochloride because (1) Dr. Gozzo's synchrotron XRPD ("S-XRPD") testing of Harmony's pitolisant hydrochloride shows that Harmony's pitolisant hydrochloride contains the claimed crystalline form, and (2) Dr. Wenslow's $^{13}$C ssNMR ("ssNMR") testing shows that Harmony's and Novitium's pitolisant hydrochloride contain the same crystalline form as one another. For numerous reasons explained below, the opinions of Drs. Gozzo and Wenslow are

independently flawed. Moreover, Dr. Myerson's synthesis of those opinions cannot support infringement of the '197 Patent.

1227.   Dr. Myerson also bases his opinions on unsupported conclusions regarding, *inter alia*, Novitium's manufacturing processes for its API, the packaging of Novitium's drug substance, the testing of its ANDA products, and testing conducted by ███ on a ███████████ ████████████. For reasons explained below, these conclusions are similarly insufficient to meet the Plaintiffs' burden of proving infringement of the '197 Patent.

> a)   *Dr. Gozzo's S-XRPD Analysis of Harmony's Pitolisant Hydrochloride Cannot Show Infringement of the '197 Patent*

1228.   Dr. Gozzo performed S-XRPD on a sample of Harmony's API. Novitium's ANDA Products do not contain Harmony's API.

1229.   Dr. Gozzo's lab received samples of Novitium's 4.45mg and 17.8mg ANDA Products.

1230.   Despite receiving samples, Dr. Gozzo did not report having performed, or having been asked to perform, S-XRPD (or any other XRD) testing on Novitium's 4.45mg or 17.8mg ANDA Products.

1231.   Dr. Gozzo did not provide an opinion regarding the presence of the claimed crystalline form in Novitium's ANDA Products. She was merely asked "to perform S-XRPD testing on one reference sample of pitolisant API from Harmony" and "generate S-XRPD data on the CuKα scale for this sample." (Opening Expert Report of Fabia Gozzo, Ph.D., Regarding S-XRPD Testing of Samples of Harmony Biosciences, LLC and Harmony Biosciences Management, Inc. ("Gozzo Rpt.") ¶14.)

1232.   As explained *supra*, the asserted claims of the '197 Patent require characteristic peaks as determined by conventional XRPD. Thus, the S-XRPD testing conducted by Dr. Gozzo

CONFIDENTIAL

cannot be used to show that Novitium's ANDA Products or the ███████████ therein (or even Harmony's API) meets the XRPD limitations of the asserted claims. Indeed, Dr. Gozzo does not opine that S-XRPD results from testing the Harmony API sample can show the presence of the claimed polymorphs in Novitium's ANDA Products.

1233.  Thus, even to the extent that Dr. Wenslow's ssNMR testing showed that Novitium's ANDA Products contain the same crystalline form as Harmony's API (which, as discussed below, they do not), it would not mean that Novitium's ANDA Products contain the claimed crystalline forms of the '197 Patent.

> b)    *Dr. Wenslow's Opinions Do Not Support Infringement of the '197 Patent*
>
>> i.    Dr. Wenslow Admitted that He Did Not Employ the Analysis Required by the Patent

1234.  "The use of XRD testing to demonstrate a claimed 'X-ray diffractogram that comprises characteristic peaks' is facially apparent from the language of the '197 Patent."  (D.I. 377 at 6.)

1235.  Dr. Wenslow did not analyze Novitium's ANDA Products using XRD testing despite testifying that, to determine whether the relevant products exhibited the recited XRD peaks, he "would obtain an X-ray diffractogram and determine the presence of peaks and the 2-theta values associated with those peaks."  (D.I. 355, Ex. B at 67:2-18.)

1236.  Plaintiffs did not provide or offer opinions on any ssNMR testing of the 4.45 mg strength of Novitium's ANDA Products.

1237.  XRPD is recognized in the field as the gold standard for the identification of solid forms, such as amorphous and crystalline forms.

CONFIDENTIAL

1238.  ssNMR does not measure the 2-theta peaks of a crystalline material. Similarly, ssNMR cannot be used to obtain an X-ray diffractogram that shows characteristic 2-theta peaks of a crystalline material.

1239.  An ssNMR spectrum cannot be converted to an X-ray diffractogram.

ii.     Dr. Wenslow Tested Only Expired Samples

1240. The samples of Novitium's ANDA Products produced to Plaintiffs were manufactured and packaged no later than ████████. (ANI-Pitolisant00003587-96; ANI-Pitolisant00003597-606.)  Novitium's proposed label specifies that its ANDA products have a ████████████████████. (ANI-Pitolisant00003583-86; ANI-Pitolisant00017007 at -7043.)  The samples of Novitium's ANDA Products produced by Novitium to Plaintiffs therefore expired ████████.

1241.  Dr. Wenslow's opinions were based on ssNMR testing performed by Kansas Analytical Services ("KAS"), which did not receive Novitium's samples until ████████ (Opening Expert Report of Dr. Robert Wenslow Regarding Solid-State NMR Testing ("Wenslow Opening Rpt.") ¶ 66.)  Notably, KAS did not receive – and therefore did not test – any samples of Novitium's 4.45mg ANDA Product. Dr. Wenslow therefore based his opinion on the testing of 17.8 mg samples that had been expired for ████████ at the time KAS tested them, and conducted no review of any ssNMR spectra for any sample of Novitium's 4.45mg ANDA Product. Because the samples that Dr. Wenslow/KAS analyzed were not representative of Novitium's ANDA Products as properly stored and handled, his opinions cannot demonstrate that Novitium's ANDA Products contain the claimed polymorphs.

1242.  Even to the extent that Dr. Wenslow's ssNMR testing detected the presence of crystalline material in Novitium's expired ANDA Products (which it did not), Dr. Wenslow provides no proof that such crystalline material existed in Novitium's ANDA Products prior to

expiration. Dr. Wenslow also provides no date on which crystalline growth supposedly first began in Novitium's expired ANDA Products. Plaintiffs have not provided any data that shows that the amount of supposed crystalline pitolisant hydrochloride in Novitium's ANDA Products increases over time.

1243.  Neither Dr. Wenslow nor KAS conducted or reviewed any stability testing – such as loss on drying testing, dissolution testing, HPLC or photodiode array testing, and residual solvent or impurity testing – to determine whether the expired Novitium samples still met stability specifications as of the time of KAS's testing. Similarly, Dr. Myerson is not aware of any stability testing having been conducted on Novitium's ANDA Products at or after ▮▮▮▮▮ from manufacture (i.e., the timepoint at which KAS conducted ssNMR testing on Novitium's ANDA Products).

1244.  It was not until Dr. Wenslow's deposition – after the KAS testing and the submission of his opening and reply expert reports – that he first learned that the Novitium samples were expired as of the time that KAS conducted ssNMR testing on them.

1245.  Novitium's ANDA, as currently before FDA, includes a proposed ▮▮▮▮▮ ▮▮ for Novitium's ANDA Products. Therefore, Dr. Wenslow's ssNMR testing was conducted on expired samples.

> iii.    Dr. Wenslow Did Not Adequately Control the ssNMR Testing on Which He Based His Opinions

1246.  As noted above, Dr. Wenslow's conclusions were based on ssNMR testing performed by KAS. But his report does not indicate that he was directly involved in, or even witnessed, the performance of those tests. Dr. Wenslow merely states that he sent Novitium's samples to KAS and allegedly had an analyst there work "under [his] direction and supervision"

CONFIDENTIAL

by "follow[ing] the experimental protocols [he] designed[.]" (Wenslow Opening Rpt. ¶ 64.) He does not, however, confirm that the samples were properly stored and handled by KAS.

iv.    Dr. Wenslow's Unsound and Unsupported Spectral Editing Methodology Undermines His Opinions

1247.   Dr. Wenslow selected a 32 msec T1rho filter for his ssNMR testing to filter out the unwanted amorphous signal while maintaining the desired crystalline signal. (Wenslow Opening Rpt. ¶ 60.) But his selection of a 32 msec tau value is unsound and unsupported by his data, which show signals still present for the amorphous material at 32 msec in both the ███████████████ ████████████. Dr. Wenslow's failure to select a tau value for which the amorphous signal is negligible indicates that the filtered spectra still contains signals that come from amorphous material. Therefore, one cannot conclude that the peaks that appear in the filtered spectra are, in fact, derived from crystalline material. Because the filtered spectra cannot discriminate crystalline material in Novitium's ANDA Products, they cannot support Dr. Wenslow's conclusion that two peaks in the ████████████ indicate the presence of crystalline material in Novitium's ANDA product.

1248.   Dr. Wenslow omitted data points that he collected, which undermines his opinion that the selection of a 32 msec filter adequately removed any signal from amorphous material. (*See* Wenslow Opening Rpt. at Figs. 4-5 (showing decay curves with 32 msec filer); HBS-EXPERT_00005147 (showing charts of intensities, some of which were omitted in decay curves); ANI-Pitolisant00031983 (showing decay curves reflecting all data from charts, which display non-negligible intensities at 32 msec).)

1249.   For example, with respect to Dr. Wenslow's decay curve used to determine that 32 msec was an appropriate tau value for the peak in the ████████████, the curve omitted data collected for the Harmony API at least at ████████████. Similarly, that decay curve omitted

data collected for the ███████████████ at least at ██████, where, in fact, a significant signal was still present.

1250.   As another example, with respect to Dr. Wenslow's decay curve used to determine that 32 msec was an appropriate tau value for the peak in the ███████████████, the curve omitted data collected for the Harmony API at least at █████████████. Similarly, that decay curve omitted data collected for the █████████████████ at least at ████████, where, in fact, a significant signal was still present.

1251.   When all the omitted data are included, both the Harmony API and the Novitium API display signals at ████████. This contradicts Dr. Wenslow's conclusion that "there is virtually no signal for the amorphous form[.]"  (Wenslow Opening Rpt. ¶ 104.)

1252.   Had Dr. Wenslow's decay curves included all of the data points he collected, it would have been clear that a 32 msec filter would not sufficiently remove amorphous signal. Dr. Wenslow provided no explanation for the improper and scientifically unsound exclusion of data points from his analysis.

1253.   Dr. Wenslow's inexplicable omission of data in generating his decay curves renders all of his conclusions regarding the presence of crystalline material in Novitium's ANDA Products unsound and unreliable.

> v.   The Peak Shapes in Dr. Wenslow's ssNMR Spectra Do Not Confirm the Presence of the Claimed Crystalline Form in Novitium's ANDA Products

1254.   Dr. Wenslow's failure to establish an adequate baseline for the amorphous form of █████████████████████ undercuts his conclusions regarding his ssNMR spectra. Dr. Wenslow uses ██████████████████ as the baseline for the amorphous form, characterizing it as having "broad peaks present in the area around ████████████."  (*Id*. ¶ 96.)  But he also notes that he "cannot determine the precise location of where the apex of broad amorphous pitolisant

**CONFIDENTIAL**

hydrochloride peaks would be in a pure amorphous sample." (*Id.* . ¶ 98.) This means that he cannot determine whether crystalline pitolisant hydrochloride is present in Novitium's ANDA Products, at least because he cannot differentiate the location of an amorphous peak from the location of a crystalline peak.

1255. Dr. Wenslow admits that "peak shape, peak position, and relative peak area" of ssNMR spectra help differentiate crystalline and amorphous pitolisant hydrochloride. (*Id.* ¶ 100.) The figure below from Dr. Wenslow's report shows significant differences in peak shapes in the ▮▮▮▮▮▮▮▮ of the spectra. The filtered Novitium tablet spectrum's peaks (in red) are much broader in shape than the crystalline pitolisant hydrochloride spectrum (in blue). Dr. Wenslow agrees that a broader shape is indicative of amorphous rather than crystalline material. (*Id.* ¶ 44.) At least one of the alleged "peaks" in the spectrum of Novitium's ANDA Products (in red) more closely resembles the spectrum of the Novitium ▮▮▮▮▮▮▮▮ (in green) than the crystalline pitolisant spectrum (in blue).



(*Id.* Figure 16.)

344

**CONFIDENTIAL**

1256.   Peak width is commonly quantified by calculating the Full Width at Half Maximum ("FWHM"), the measurement of the width of a line shape at half of its maximum amplitude.

1257.   According to Dr. Kahr's measurements of the features in the ██████████████ in the figure above, the peak of the filtered spectrum of Novitium's ANDA Products (in red) has a ██████████████ – more than five times that of the spectrum of the Harmony's pitolisant hydrochloride (in blue), which has a FWHM of 0.18.  The FWHM of ██████████████ ██████████████ Thus, the FWHM of Novitium's ANDA Products is far closer to that of Novitium's ██████████████ than that of Harmony's pitolisant hydrochloride.

1258.   The peak widths in the filtered spectrum of Novitium's ANDA Products, as measured by Dr. Wenslow, are more indicative of amorphous than crystalline material.

1259.   Dr. Wenslow did not conduct a FWHM analysis of any of his generated spectra.

> vi.   Dr. Wenslow's Reliance on Two ssNMR Peaks is Insufficient to Show the Presence of the Claimed Crystalline Form

1260.   Dr. Wenslow mistakenly concludes that just two peaks in the ██████████████ show that Novitium's ANDA Products contain the same crystalline form of pitolisant hydrochloride as the Harmony API. (*Id.* ¶ 120.)

1261.   There is no indication that that the pitolisant hydrochloride in each of the tested samples exists as a crystal with the monoclinic symmetry indicated in the '197 Patent. Even to the

extent it does, all seventeen of the carbon atoms in the pitolisant hydrochloride molecule, as shown in the figure below, may be differentiable in an ssNMR experiment.

1262.  Dr. Wenslow's CPMASTOSS experiment on Harmony's API (KAS0625001 (Batch No. 142868)), however, shows at most eight resolved. (*Id*. ¶ 92 (Figure 1).)

1263.  Dr. Wenslow's CPMASTOSS results likely only display eight of the seventeen expected peaks because of overlap between peaks that are actually distinct from one another.

1264.  There should be seventeen resonance peaks in the CPMASTOSS spectrum in a crystal without any special symmetry positions as for crystalline pitolisant hydrochloride. But Dr. Wenslow identifies, at most, only eight, and made no attempt to discern which of those eight peaks might actually contain signal from two or more carbon atoms. Dr. Wenslow further did not attempt to assign each peak to any particular carbon atom within the pitolisant molecule. Moreover, none of these peaks are used in the '197 Patent, which defines the claim polymorphs solely in terms of their conventional XRPD peaks, not ssNMR peaks.

1265.  Because Dr. Wenslow's testing did not clearly identify and resolve even the majority of the independent carbon atoms, he cannot determine whether the two peaks he identified are in fact only two peaks, or whether additional would-be peaks within the range are overlapping or nearby but could not be discriminated. As a result, the T1rho values that Dr. Wenslow assigned to each of those two peaks cannot definitively be said to be T1rho values for a single carbon atom within the molecule, rather than merely an average of differing T1rho values across multiple carbons. Because he cannot discriminate among carbons even within the same molecule, he cannot go a step further and rely on apparently aligned peaks across two samples to conclude that they contain the same polymorphic form – particularly when relying on just two peaks out of the seventeen that exist in principle.

CONFIDENTIAL

1266.   Dr. Wenslow's reliance on only two peaks in Harmony's pitolisant hydrochloride and filtered Novitium spectra is thus insufficient to prove that the two samples contain the same crystalline form. Dr. Wenslow has failed to establish that the two supposed peaks he identified characterize only the claimed crystalline form.

1267.   Rather than conducting XRPD testing, as required by the asserted claims of the '197 Patent, Dr. Wenslow simply performed ssNMR testing on the Harmony pitolisant hydrochloride that he believes to be the claimed crystalline form, identified two peaks from the resulting spectrum, and concluded that the presence of two "clearly aligned" peaks in the filtered Novitium spectrum must mean that the same crystalline form is present.

1268.   Dr. Wenslow's methodology and conclusion are unsound. Even to the extent that Dr. Wenslow's testing adequately confirms the presence of some kind of crystalline material – which it does not – his testing cannot confirm the presence of the claimed crystalline form.

vii.    Dr. Wenslow's Assertion that Novitium's ████████ Samples Are Not "Pure Amorphous Sample[s]" Renders His Filtering Methodology Flawed and Unreliable

1269.   Despite the absence of evidence that ██████████████████████ ████████ is crystalline, Dr. Wenslow asserts that he "did not have a pure amorphous sample to use as a reference standard" for his filtering experiments. (Wenslow Opening Rpt. ¶ 98.)  If that were true, which it is not, then Dr. Wenslow's filtering technique would be flawed.

1270.   The goal of Dr. Wenslow's $^{13}C$ T1rho and T1rho filter experiments was to "eliminate signal from amorphous material, leaving behind only signal from crystalline material in the sample." (Id. ¶ 48.)  To do so, he states, one must identify a tau value "where the unwanted signal is negligible and the desired signal is still detectable." (Id. ¶ 60.)

1271.   But, without a pure amorphous sample to identify what the amorphous signals actually are, one cannot conclude that the signals remaining after filtering actually indicate the

347

presence of crystalline material. Here, Dr. Wenslow sought to suppress the signal of the amorphous

pitolisant hydrochloride, which would have required him to identify the proper tau value by testing

a pure amorphous sample of pitolisant hydrochloride. Dr. Wenslow, however, characterizes the

████████████    ████████████████████████ as only "primarily amorphous[.]"  (*Id*. ¶

96.)  Asserting that he "did not have a pure amorphous sample to use as a reference standard[,]"

(*Id*. ¶ 98), Dr. Wenslow performed his filter experiments without a proper baseline establishing

which signals were amorphous and therefore needed to be filtered out.

1272.   Either the ████████████ samples Dr. Wenslow tested are purely amorphous

(and therefore do not infringe), or his failure to use a purely amorphous sample makes his filtering

methodology and results flawed (and therefore not reliable proof of the presence of crystalline

material).

> c)  *Chain-of-Custody Issues May Have Compromised the Samples on Which the Conclusions of Plaintiffs' Experts Rely*

1273.   Dr. David Engers received, stored, and shipped samples of Harmony's pitolisant

hydrochloride API and samples of Novitium's ANDA Products and ████████████ that were

used in Plaintiffs' experts' analyses. (Declaration of David Engers, Ph.D., Regarding Chain of

Custody of Samples ("Engers Decl.") at 1-2, 4-6, 9-10; Engers Decl. Ex. 2.)  Dr. Engers' handling

of the samples, however, may have compromised the samples' integrity. In particular, Dr. Engers'

declaration failed to describe or provide documentation of record showing that the temperature

and humidity of the samples were properly controlled between his receipt of the samples and their

eventual testing. Because there is doubt as to whether the tested samples were properly handled

and stored, Plaintiffs' experts' conclusions may be based on samples that are not representative of

Novitium's ANDA Products.

CONFIDENTIAL

1274.  Dr. Engers received a parcel containing a sample of Harmony's pitolisant hydrochloride drug substance on November 26, 2024 and reviewed data from a temperature logger therein. (Engers Decl. ¶ 2; Engers Decl. Ex. 1 at 6.)  The data indicate that the temperature of Harmony's samples exceeded the maximum temperature specified in the shipping instructions, 2° C to 8° C, at least once before arriving at Dr. Engers' office. (Engers Decl. Ex. 1 at 6.)

1275.  The shipping instructions from Harmony Biosciences included the following: "Special Handling / Instructions: . . . DO NOT EXPOSE TO EXCESS HEAT[.]"  (*Id*. at 3 (emphasis in original).)  The periods of excess heat reflected by the temperature logger data may have caused changes in Harmony's samples that compromised their integrity before they reached Dr. Engers.

1276.  Dr. Engers has provided no documentation of the humidity at which any of the Harmony samples were stored. The integrity of the Harmony samples may therefore have been compromised during their storage at Dr. Engers' facility, particularly because the asserted claims of the '197 Patent require a water content of no more than 6%.

1277.  The Novitium samples that Dr. Engers handled may have been similarly compromised. According to Dr. Engers, "a temperature-controlled parcel containing samples from Novitium" was delivered to his office on October 23, 2024.  (Engers Decl. ¶ 20). Dr. Engers was not in the office when the parcel arrived, so it was received by his colleague, Dr. Daniel T. Smith. (*Id*.)  Dr. Engers did not open the parcel until October 25, 2024.  (*Id*. ¶ 21). The only information Dr. Engers has provided regarding the parcel's storage conditions over those two days was that Dr. Smith stored it "in a secure, restricted-access, climate-controlled area."  (*Id*. ¶20.)  The uncertainty regarding the storage conditions of the Novitium samples means that their integrity

CONFIDENTIAL

may have been compromised while at Dr. Engers' office, particularly because the asserted claims of the '197 Patent require a water content of no more than 6%.

1278.   Dr. Engers' division of Novitium's samples into subsamples is similarly fraught. Dr. Engers has noted that:

> On November 12, 2024 and March 31, 2025, I divided certain Novitium samples. I divided one bottle from each 17.8 mg tablet lot into three subsamples, each consisting of ten tablets placed in a sealed clear glass vial. I divided each ███████ ███████████████ lot into ten subsamples of 500 mg. I stored each ██████████ subsample in a sealed amber glass vial with minimal headspace. Additionally, the subsamples of ██████ ██████████████████ were stored in a sealed foil pouch.
>
> *            *            *
>
> On November 20, 2024, I divided Novitium's placebo tablets into six subsamples, each consisting of five tablets. I stored each placebo subsample in a sealed clear glass vial with minimal headspace.

(*Id*. ¶¶ 23-24.)  But Dr. Engers has not provided any information on the storage conditions for those subsamples. It is unclear whether he stored the Novitium subsamples under the same conditions as he did the Novitium samples. Even to the extent he did, Dr. Engers' handling of the Novitium subsamples may have compromised their integrity for the reasons stated above, particularly because the asserted claims of the '197 Patent require a water content of no more than 6%.

1279.   On ████████████, Dr. Engers packed Novitium sample ███████████ ████████████████████████████████████████████ "in a temperature-controlled parcel" and "stored the parcel in a secure, restricted-access, climate-controlled area and maintained at controlled room temperature to await pick up by the shipping service."  (*Id*. ¶ 42; Engers Decl. Ex. 16 at 2.)  On ████████████, Dr. Engers sent the parcel to Dr. Hanrahan of KAS at 510 E. 5th Street,

Loveland, Colorado 80537.  (Engers Decl. ¶ 42). Dr. Engers has provided no chain-of-custody information specific to these samples nor described the conditions under which they were stored between ███████████████████.  His handling of these samples may therefore have compromised their integrity.

1280.  On June ██████, Dr. Engers packed Novitium sample ███████████ in a temperature-controlled parcel and "stored [it] in a secure, restricted-access, climate-controlled area and maintained at controlled room temperature to await pick up by the shipping service[,]" which occurred on June 11, 2025.  (Engers Decl. ¶ 45; Engers Decl. Ex. 19 at 1-2). Dr. Engers has provided no chain-of-custody information specific to this sample nor described the conditions under which it was stored between ██████████████.  His handling of this sample may therefore have compromised its integrity.

1281.  The Engers Declaration and the attached Exhibits make no mention of the humidity at which any of the Novitium samples were stored. The integrity of the Novitium samples may therefore have been compromised, particularly because the asserted claims of the '197 Patent require a water content of no more than 6%.

1282.  The samples of Novitium's ANDA Products that were sent to KAS for ssNMR testing had, prior to shipment, been removed from their original █████████████ packaging, exposed to ambient conditions, and then placed (and shipped) in glass vials. The transfer and storage of Novitium's ANDA Products in glass vials rendered them no longer representative of the product that Novitium seeks to sell at least because, as of the time of the ssNMR testing, they had not been stored in the packaging proposed in Novitium's ANDA. As one example, it is not known whether the glass vials contained the desiccant (silica gel) required by Novitium's ANDA.

d)      *Dr. Myerson's Opinions Cannot Prove Infringement of the '197 Patent*

1283. Dr. Myerson has not performed, or instructed anyone to perform, XRPD testing of Novitium's ANDA Products or ███████████. Instead, he relies on the opinions of Drs. Gozzo and Wenslow. For the numerous reasons stated above and further detailed below, their findings cannot support Dr. Myerson's conclusions regarding infringement of the '197 Patent.

1284. Dr. Myerson also speculates that the amorphous form of pitolisant hydrochloride *could* convert to a crystalline form – without any evidence that such conversion actually occurred, much less that such conversion would result in the claimed crystalline form. Lastly, Dr. Myerson attempts to undermine the results of internal testing, which show that Novitium's ANDA Products and ███████████ contain only amorphous pitolisant material.

1285. Dr. Myerson's piecemeal infringement argument is insufficient to show infringement of the asserted claims of the '197 Patent.

1286. Plaintiffs are not asserting infringement under the doctrine of equivalents with respect to Novitium's ANDA Products and the asserted claims of the '197 Patent.

1287. Dr. Myerson admits that, if he were the person deciding about the testing of Novitium's ANDA Products in this case, he would have tested them by XRD. Instead, he simply requested all available data and was given Dr. Wenslow's ssNMR data. Conversely, in all prior litigations in which he has had the ability to recommend what types of testing should be done when looking for crystalline material in an amorphous drug product, he has always recommended that X-ray powder diffraction experiments be conducted.

> viii.    Dr. Myerson's Opinions Based on Those of Dr. Gozzo and Dr. Wenslow Do Not Show that Novitium's ANDA Products Contain the Claimed Crystalline Form

1288. Dr. Myerson reasons that Novitium's ANDA Products must contain the claimed crystalline form because (1) Dr. Gozzo's S-XRPD testing of Harmony's samples supposedly shows that Harmony's samples contain the claimed crystalline form and (2) Dr. Wenslow's testing

supposedly shows that Harmony's and Novitium's samples demonstrate some similar ssNMR peaks (after the spectral editing performed by Dr. Wenslow), which Dr. Myerson argues demonstrates the presence of the same crystalline form in both sets of samples. The evidence at trial will show that his reasoning is unavailing.

1289.  Dr. Myerson's use of Dr. Gozzo's results, individually and in combination with other evidence, does not show infringement of the '197 Patent. Dr. Gozzo analyzed a batch of *Harmony's* pitolisant hydrochloride, which purportedly "generate[d] all of the X-ray diffraction peaks identified in claims 1 and 2 of the '197 Patent." (Opening Expert Report of Dr. Allan S. Myerson Regarding Infringement of U.S. Patent No. 8,207,197 ("Myerson Opening Rpt."), App'x D ¶ 71.)  Novitium's ANDA Products, however, do not contain Harmony's pitolisant hydrochloride. Dr. Gozzo also conspicuously failed to provide any opinion or report any testing on Novitium's ANDA Products or the ████████████ therein. Therefore, neither Dr. Gozzo's S-XRPD testing, nor Dr. Myerson's assessment of it, is indicative of whether Novitium's ANDA Products demonstrate the claimed XRPD peaks. Moreover, as discussed above, methods other than conventional XRPD cannot be used to assess infringement of the asserted claims. Owing to the greater sensitivity of S-XRPD compared to conventional XRPD, one cannot guarantee that all peaks that appear in an S-XRPD diffractogram of a sample would necessarily appear in a conventional XRPD diffractogram of that same sample. Thus, even to the extent Dr. Gozzo's testing displays any supposed peaks, her results cannot show the presence of the claimed crystalline form because the '197 Patent requires that the peaks be present using conventional XRPD.

1290.  Dr. Myerson also relies on ssNMR testing disclosed in Dr. Wenslow's report. (Myerson Opening Rpt., App'x D ¶¶ 72-81.)  As noted above, Dr. Wenslow's ssNMR testing of

**CONFIDENTIAL**

Novitium's ANDA Products cannot prove that the products contain the claimed crystalline form because the '197 Patent requires characteristic peaks as displayed on a conventional XRPD diffractogram. That ssNMR peaks from Harmony's API and Novitium's ANDA Products (as filtered by Dr. Wenslow) may appear similar does not prove that the two contain identical crystal forms. Without using sophisticated theoretical models, which Dr. Wenslow has not relied on, ssNMR results cannot simply be translated into XRPD results, much less results showing the presence of the claimed peaks.

1291. Without the ssNMR data, Dr. Myerson would have no opinion regarding Novitium's ANDA Products' infringement of the asserted claims of the '197 Patent.

1292. As explained above, even to the extent that Dr. Wenslow's ssNMR testing could theoretically indicate the presence of the claimed crystalline forms, flaws in Dr. Wenslow's testing and analysis minimize their probative value. First, Dr. Wenslow's use of expired samples, which do not represent the products Novitium intends to market, means that his results cannot be used to show infringement. Second, Dr. Wenslow selected a tau (filter) value that did not adequately eliminate the signal from the amorphous material of Novitium's ███████████. Third, Dr. Wenslow's reliance on just two ssNMR peaks was scientifically unsound and does not show infringement by Novitium's ANDA Products or the ███████████ therein.

1293. Dr. Myerson is not an expert in ssNMR or T1rho filtering.

1294. Dr. Myerson's conclusions are based on the inapplicable and flawed analyses of Drs. Gozzo and Wenslow and therefore cannot show infringement of the asserted claims of the '197 Patent.

       ix.    Dr. Myerson's Conclusions Rely on Speculation Regarding Conversion of ███████████ in Novitium's ANDA Products

**CONFIDENTIAL**

1295.   In support of his conclusion that Novitium's ANDA Products contain the claimed crystalline form, Dr. Myerson relies on unsupported theories to argue that Novitium's ANDA Products or the ██████████████ therein converts to a crystalline form.

1296.   ████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████ And, as noted above, Novitium's ANDA Products contain ████████████████████████████████████████████

████████████████████████.

1297.   Dr. Myerson speculates that the ████████████████████████████████████

████████████████████ causes crystal formation. For example, he suggests that the "presence of water" in the ████████████████ in Novitium's ANDA Products creates the "*possibility*" that some amorphous material could convert to crystalline because "water *may* depress the glass transition temperature," increasing molecular mobility and thereby "increasing the *possibility* of conversion." (Myerson Opening Rpt., App'x D ¶ 38 (emphasis added).)  Dr. Myerson presents this series of "possibilit[ies]" without providing any quantitative data, observations, or estimates even approximating the probability of conversion. Dr. Myerson further argues that the potential of conversion to crystalline form is ████████████████████████████████████████

████████████████████████████████████████████████████

But Dr. Myerson offers nothing beyond the "potential" for such conversion. In particular, he does not argue that the ████████████████████████████████ would cause conversion. Dr. Myerson does not know the glass transition temperature of amorphous pitolisant hydrochloride and therefore cannot confirm that any step in the manufacturing process for Novitium's ANDA Products or the ████████████████████████████████████ therein

355

causes exposure to a temperature higher than the glass transition temperature for amorphous pitolisant hydrochloride. His statements regarding ████████████████████ are therefore conjecture.

1298.   Dr. Myerson similarly relies on speculation to argue that Novitium's ██

 causes conversion from amorphous to crystalline pitolisant hydrochloride. (Myerson Opening Rpt., App'x D ¶ 39.)  Dr. Myerson merely notes that various factors, such as "████████████████████████████████████████

████████████████████████████  ████████████████████████

██████  He provides no evidence that those factors actually cause conversion in Novitium's ANDA Products or ████████████████. Without any testing of Novitium's ANDA Products or the ██████████████ therein, or – at minimum – an analysis of the actual conditions of manufacture to empirically assess potential conversion, Dr. Myerson's speculative statements regarding Novitium's ██████████████████████ are insufficient to show infringement.

1299.   Dr. Myerson mistakenly concludes that ██████████ packaging process is "indicative" that the amorphous pitolisant in Novitium's ANDA Products is unstable and susceptible to converting to the claimed crystalline form. (Myerson Opening Rpt., App'x D ¶¶ 40-45.)  The evidence at trial will show that a number of factors unrelated to conversion could have motivated ████████ to use its packaging process. For example, ██████████ may have sought to avoid unnecessarily exposing the drug substance to ambient conditions and inviting the possibility of contamination. Although Dr. Myerson concludes that ██████████ packaging process "indicates an awareness of potential instabilities of the drug substance[,]" ██████████ packaging is consistent with FDA guidance that applies to *all* bulk drug substances. (*Id*. ¶40; *see also* FDA, "Guidance for Industry: Container Closure Systems for Packaging Human Drugs and Biologics" (May 1999) at 39 (ANI-

Pitolisant00030443-98 at -0484) ("The container closure system for storage or shipment of a bulk solid drug substance is typically a drum with double LDPE liners that are usually heat sealed or closed with a twist tie.").)

1300.  Dr. Myerson does not know which of the supposed stressors during the manufacture of Novitium's ANDA Products would be the actual cause of any conversion from amorphous to crystalline pitolisant hydrochloride.

                    x.    Dr. Myerson's Conclusions Regarding Third-Party Testing
                          Have No Probative Value

1301.  Dr. Myerson argues that third-party testing from ████ discussed above, and testing by ████████████████████ show that Novitium's ANDA Products contain the claimed polymorphs. But the evidence at trial will show that his conclusions have no bearing on the question of infringement.

1302.  Dr. Myerson disagrees that the third-party testing from ████, discussed above, shows a lack of crystalline material in Novitium's ANDA Products. He argues that the results "demonstrate[] that there are crystalline peaks present in Novitium's ANDA Products that are not present in the placebo or ████████████████ used to manufacture the drug product[,]" noting 2θ peaks "near the region of ████████████[.]"  (Myerson Opening Rpt., App'x D ¶ 61.)  The phrase "near the region" is not quantifiable in terms of degrees 2θ. Dr. Myerson does not conclude that those peaks are attributable to pitolisant hydrochloride, much less the polymorphs recited by the asserted claims. Moreover, because none of the peaks Dr. Myerson references are recited by the asserted claims, his observation has no bearing on whether Novitium's ANDA Products infringe. In fact, the diffractogram Dr. Myerson cites, shown below and marked with green lines at the claimed peaks, demonstrates that *none* of the claimed peaks are present in ████ results.

**CONFIDENTIAL**



1303.   The evidence at trial will further show that Dr. Myerson's conclusions regarding ███ testing of a ███████████████████████ are irrelevant to whether Novitium's ANDA Products infringe.

1304.   It is unclear whether ████ even tested the ████████████ that is used in Novitium's ANDA Products. Neither the analytical report, the ████████ agreement, nor the certificates of analysis that Dr. Myerson cites indicate that the ██████████████████t

████ that is used in Novitium's ANDA Products, nor do they mention the DMF number of the

████ that is used in Novitium's ANDA Products, nor do they mention that what ████

received or tested is a ████. (Myerson Opening Rpt., App'x D ¶ 64; *see*

AET_000120050.)

1305.  Even to the extent ████ did test the ████

████, there is no information available regarding how the tested samples were handled between

the time ████ received them and the time ████ tested each of them. Different samples, for example,

could have been exposed to temperatures, humidities, or other conditions that would have affected

the results of the testing and/or whether conversion to crystalline material would occur.

1306.  Even to the extent ████ did test the ████

████, Dr. Myerson's analysis of ████ results fails to show the presence of the XRPD peaks

recited by the asserted claims of the '197 Patent. Dr. Myerson states that "the ████

████ under 80% relative humidity for 1 week includes 2θ peaks at 11.2°,

15.4°, 16.3°, 16.9°, 17.8°, 19.9°, 20.7°, 21.0°, 21.8°, 24.5°, 24.6°, 25.0°, 25.5°, 26.3°, 28.3°, and

30.3° ±0.2°." (Myerson Opening Rpt., App'x D ¶ 67.)  The peaks recited by claim 1 of the '197

Patent, however, are 11.2°, 19.9°, 20.7° *and* 34.1° ±0.2°. Thus, Dr. Myerson agrees that ████

results fail to display the required peak at 34.1° ±0.2°. (*See* AET_000031199 at -1207, -1208.)

1307.  Similarly, ████ testing conducted at ████ does not show a peak at least

at ████ (*See id.* at -1212-14.) ████ testing did not reveal peaks at

least at 11.2° ±0.2° and 34.1° ±0.2°. (*See id.* at -1215-17.) Further, ████s diffractogram for testing

conducted at ████ does not even display 2-theta positions above ████, and therefore fails

to show a peak at least at ████ (*See id.* at -1221.)

1308.  Even to the extent that ▮▮▮ did test the ▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮ and/or produced diffractograms showing the claimed peaks, the results are

irrelevant to infringement because the tested samples were subjected to conditions outside those

required by Novitium's proposed label. Novitium's label recites that the product must be stored at

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ The▮▮ testing subjected▮▮▮

▮▮▮▮▮▮ to "various stress conditions."  (Myerson Opening Rpt., App'x D ¶ 68.)  These

include at least two ▮▮▮▮▮▮▮▮ that far exceeded the temperatures permitted

by Novitium's proposed label. Other testing conditions under which ▮▮▮ purportedly found

conversion to a crystalline form were ▮▮▮▮▮▮▮▮▮▮ (a term

that fails to provide sufficient context or information about, e.g., the temperature and RH during

the ▮▮▮ and the extent to which the sample was manipulated before, during, or after the ▮

▮). (*Id.*) Novitium's ANDA Products would not be kept ▮▮▮▮▮▮ because they will be

supplied in ▮▮▮▮.

1309.  Similarly, Novitium's ANDA Products would not be kept exposed to ▮▮▮ for

▮▮▮. Typical relative humidity in ambient indoor conditions generally does not exceed about

60% RH.

1310.  Because Novitium's ANDA Products are coated tablets, rather than ▮▮▮

▮▮▮▮▮▮▮▮▮ like the ▮▮ samples, their contents will not be exposed

to the same stress conditions that purportedly caused conversion in ▮▮▮ testing.

1311.  Dr. Myerson opines that the ▮▮▮▮▮▮▮▮ tested by ▮▮

supposedly converted to a crystalline form. (Myerson Rpt., App'x D ¶¶ 63-68.)  But the claimed

crystalline form may comprise of up to 6% water, and some of the conditions under which the

██████ samples were stored (e.g., "█████████████████████████") could

reasonably be expected to cause the water content of an exposed ████████████

████████ sample to rise above 6%.

1312.  In sum, the evidence at trial will show that Dr. Myerson's conclusions regarding

third-party testing are either irrelevant to infringement or indicate that Novitium's ANDA Products

and the ████████████ therein do not contain the claimed polymorphs.

## C.    Noninfringement of the '947 Patent

### 1.    The Orange Books Listing of the '947 Patent

1313.  Plaintiffs market pitolisant drug products under the brand name Wakix. On August

14, 2019, FDA approved these products for the treatment of EDS in patients with narcolepsy.

(Wakix Approval Letter (Aug. 2019) (ANIPitolisant00028432-38).)[96] On October 13, 2020, FDA

approved Wakix for the "[t]reatment of cataplexy in adult patients with narcolepsy."  (ANI-

Pitolisant00025129.)[97]

1314.  The '947 Patent has two listed use codes in FDA's Orange Book: U-1101 for a

"method of treating daytime sleepiness in patients with narcolepsy", and U-1102 for a "method of

treating  cataplexy  in  patients  with  narcolepsy."    (Orange  Book  at  ADA  356

(ANIPitolisant00028362)[98] id. at ADB 108 (ANIPitolisant00028363).)

### 2.    Narcolepsy, EDS, and Cataplexy

1315.  Narcolepsy is a chronic neurological disorder characterized by manifestations of

sleep at times when a person would normally be awake. (Standards of Practice Committee,

Michael Littner MD et al., *Practice Parameters for the Treatment of Narcolepsy: An Update for*

---

[96] https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2019/211150Orig1s000ltr.pdf.
[97] https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2020/211150Orig2s000ltr.pdf.
[98] https://www.fda.gov/media/71474/download?attachment.

CONFIDENTIAL

*2000*, 24 Sleep 451, 451 (2001) ("Littner 2001") (ANIPitolisant00028286-303).) Narcolepsy can have two major abnormalities, EDS and the intrusion of REM-associated phenomena into wakefulness, each of which manifests as distinct symptoms. (Dorothée Chabas et al., *The Genetics of Narcolepsy*, 4 Ann. Rev. of Genomics & Hum. Genetics 459, 460 (2003) ("Chabas 2003") (ANI-Pitolisant00028183-210); Timothy I. Morganthaler et al., *Practice Parameters for the Treatment of Narcolepsy and other Hypersomnias of Central Origin: An American Academy of Sleep Medicine Report*, 30 Sleep 1705, 1705 (2007) ("Morganthaler 2007") (HBS-EXPERT_0003531-37).)

1316. As of the priority date, a POSA would understand cataplexy to be "the abrupt loss of muscle tone triggered by strong emotional reactions or exercise." (*Principles and Practice of Sleep Medicine* (Meir H. Kryger, Thomas Roth, & William C. Dement eds., 4th ed., 2005) ("Kryger 2005") at 597 (ANI-Pitolisant00030568-88 at -0573); *see also* Chabas 2003 at 460 (ANI-Pitolisant00028184) ("Cataplexy, a highly specific symptom, is sudden muscle atonia in response to emotional arousal, in particular laughter.").) Cataplexy represents an intrusion of one isolated feature of the REM state. Other intrusions of REM-associated phenomena into the wake state that are also associated with narcolepsy include sleep paralysis and hypnagogic hallucination. (Chabas 2003 at 460 (ANI-Pitolisant00028184).) In the REM state, an individual's muscles become largely paralyzed. Cataplexy is when some degree of this REM-related muscle paralysis occurs when an individual is awake. (*See, e.g.*, *id.*; Joshi John et al., *Cataplexy-Active Neurons in the Hypothalamus: Implications for the Role of Histamine in Sleep and Waking Behavior*, 42 Neuron 619, 619 (2004) ("John 2004") (WAKIX-HBS_00210191-206); Michihiro Mieda et al., *Orexin peptides prevent cataplexy and improve wakefulness in an orexin neuron-ablated model of*

*narcolepsy in mice*, 101 Proc. of the Nat'l Acad. of Scis. 4649, 4649 (2004) ("Mieda 2004")
(ANIPitolisant00028314-19).)

1317.   EDS is defined as "a condition in which one enters sleep at an inappropriate time
or setting."   (Kryger 2005 at 595 (ANI-Pitolisant00030571).)   EDS is a symptom of many
conditions and can be caused by a variety of factors, including sleep deficiency caused by lifestyle
or disease (e.g., insomnia) or a complication of sleep disorders (e.g., sleep apnea, narcolepsy) or a
feature or a disorder damaging nervous system structures (e.g., Alzheimer's Disease, Parkinson's
Disease). (*See, e.g.*, Am. Acad. of Sleep Med., *The International Classification of Sleep Disorders:
Diagnostic & Coding Manual* 79, 177 (2d ed. 2005) ("ICSD-2") (ANIPitolisant00028226-36,
ANI-Pitolisant00032069-72); Thomas M. Heffron et al., *Clinical significance of sleepiness: an
American Academy of Sleep Medicine position statement*, 21 J. Clinical Sleep Med. 1103, 1104
(2025) ("Heffron 2025") (ANI-Pitolisant00032064-68).)

1318.  EDS is commonly evaluated using subjective and/or objective criteria. The
Epworth Sleepiness Scale ("ESS") is a commonly used questionnaire to evaluate subjective
indicators of sleepiness. (Murray W. Johns, *A New Method for Measuring Daytime Sleepiness:
The Epworth Sleepiness Scale*, 14 Sleep 540, 541 (1991) ("Johns 1991") (ANI-
Pitolisant00030562-67).)  The questionnaire yields a total score ranging from 0 to 24, with a score
of 11 and above considered to represent EDS. (*Id.* at ANI-Pitolisant00030563; Gerard J. Meskill
et al., *Clinical Impact of Pitolisant on Excessive Daytime Sleepiness and Cataplexy in Adults with
Narcolepsy: An Analysis of Randomized Placebo-Controlled Trials*, 36 CNS Drugs 61, 63 (2021)
("Meskill 2021") (HBS-EXPERT_0003522-30).)  To determine a patient's ESS score, doctors
practicing sleep medicine will ask the patient eight questions to rate the patient's likelihood of
dozing off or falling asleep in various situations – for example, sitting and reading or being in a

CONFIDENTIAL

car while stopped in traffic for a few minutes. (Johns 1991 at 541 (ANI-Pitolisant00030563).)  For

each question, the patient is asked to rate their likelihood of dozing off or falling asleep (in contrast

to just feeling tired) on a scale of 0 to 3, with 0 meaning they would never doze, 1 meaning they

have a slight chance of dozing, 2 meaning they have a moderate chance of dozing, and 3 meaning

they have high chance of dozing. The scores for each prompt are then added to give the final total.

A patient's responses are used to guide diagnosis of emergent challenges to individual and public

safety and quality of life.

1319.    One of the most widely used and reliable objective measurements of sleepiness is

the multiple sleep latency test ("MSLT"). (*See, e.g.,* Johns 1991 at 540 (ANI-Pitolisant00030562).)

Administration of an MSLT is recited in the current version of the diagnostic criteria for

Narcolepsy Type 1 ("NT1"). (Am. Acad. of Sleep Med., *International Classification of Sleep

Disorders* 179 (3d ed. Text Revision 2023) ("ICSD-3-TR") (ANI-Pitolisant00028237-81 at -

8261); *see also* ICSD-2 at 84 (ANIPitolisant00028233).)  It has long been known that subjective

ESS scores are not reliable indicators of objective measures of sleepiness such as the MSLT. (*See,

e.g.*, Murray W. Johns, *Sleepiness in Different Situations Measured by the Epworth Sleepiness

Scale,* 17 Sleep 703, 705-10 (1994) ("Johns 1994") (WAKIX-HBS_00556423-30).)

1320.    Narcolepsy is just one of many different sleep disorders in which EDS sometimes

manifests. (*See, e.g.*, Kryger 2005 at 596 (ANI-Pitolisant00030572).)

a)        *EDS and Cataplexy Are Two Distinct Symptoms of Narcolepsy*

1321.    Cataplexy is a pathognomonic symptom of narcolepsy. Unlike EDS, cataplexy is

not a symptom associated with a wide variety of sleep disorders, but is unique to Narcolepsy Type

1 ("NT1"). (*See e.g.*, ICSD-3-TR at 179 (ANIPitolisant00028261).)  Cataplexy represents one of

several manifestations in which REM-associated phenomena intrude into waking states. As noted

above, the other REM-related manifestations can include sleep paralysis and hypnagogic

hallucinations. Cataplexy symptoms vary in onset, frequency, and severity. For instance, some patients may experience cataplexy less than once per year, whereas others may have several cataplexy attacks per day. Each individual episode of cataplexy can last anywhere from a single second to nearly two minutes. (*See, e.g.*, M.M. Ohayon et al., *Prevalence of narcolepsy symptomatology and diagnosis in the European general population*, 58 Neurology 1826, 1830 (2002) ("Ohayon 2002") (WAKIX-HBS_00210614-21); M.M. Ohayon et al., *Frequency of narcolepsy symptoms and other sleep disorders in narcoleptic patients and their first-degree relatives*, 14 J. Sleep Res. 437, 441 (2005) ("Ohayon 2005") (ANI-Pitolisant00028353-61 at -8357).)

1322.   Whereas EDS occurs when a patient falls asleep, a patient in the throes of cataplexy is experiencing REM-related muscle paralysis while awake. Put differently, the person remains conscious throughout a cataplexy episode. (*See, e.g.*, Chabas 2003 at 460 (ANI-Pitolisant00028184); John 2004 at 619 (WAKIX-HBS_00210191); Mieda 2004 at 4649 (ANIPitolisant00028314); Schwartz Dep. Tr., Vol. II, ("Schwartz Dep. Tr. II") 237:7- 241:3 (Apr. 10, 2025).)

1323.   EDS and cataplexy occur in response to different stimuli. Cataplexy is triggered by strong emotional reactions, especially laughter or surprise. (John 2004 at 619 (WAKIX-HBS_00210191); Kryger 2005 at 597 (ANI-Pitolisant00030573).)  In contrast, EDS most often occurs while doing monotonous activities that require no active participation, such as being a passenger in an automobile, and can be temporarily suppressed by physical activity.

1324.  EDS and cataplexy also frequently develop at different ages and are not both present in all patients with narcolepsy. (*See, e.g.*, J.G. van Dijk et al.*, Isolated Cataplexy of more than 40 Years' Duration*, 159 British J. Psych. 719, 719-21 (1991) ("van Dijk 1991") (ANI-

## CONFIDENTIAL

Pitolisant00032089-93); *Principles and Practice of Sleep Medicine* (Meir H. Kryger, Thomas Roth, & William C. Dement eds., 6th ed., 2017) at 875 (Meskill Dep. Ex. 17).) Indeed, the current version of the ICSD-3-TR diagnostic manual does not recite EDS under the diagnostic criteria for NT1. (ICSD-3-TR at 179-191 (ANI-Pitolisant00028261-73).)

1325. The pathophysiologic mechanism underlying cataplexy is not the same as that which causes EDS. As of the earliest priority date of the '947 Patent, it was understood that at least EDS, as a symptom of narcolepsy in humans, is caused by deficient hypocretin neurotransmission in the lateral hypothalamus. (Emmanuel Mignot, Shahrad Taheri & Seji Nishino, *Sleeping with the Hypothalamus: Emerging Therapeutic Targets for Sleep Disorders*, 5 Nature Neuroscience 1071, 1073 (2002) ("Mignot 2002") (ANIPitolisant00028320-24 at -8322).) At the time, $H_3$ histamine receptors had long been a target for developing treatments for EDS. (*See, e.g.*, Seji Nishino et al., *Decreased Brain Histamine Content in Hypocretin/orexin Receptor-2 Mutated Narcoleptic Dogs*, 313 Neuroscience Letters 125 (2001) (ANI-Pitolisant00031269-72).) In contrast, the way in which pitolisant acts to alleviate cataplexy was and remains poorly understood. (*See* Yves Dauvilliers, Isabella Arnulf & Emmanuel Mignot, *Narcolepsy with Cataplexy,* 369 The Lancet 499, 499, 502-05, 507 (2007) (WAKIX-HBS_00031632-44 at -1632, -1635-38, -1640); Yves Dauvilliers et al., *Cateplexy—Clinical aspects, Pathophysiology and Management Strategy*, 10 Nat. Rev. Neurol. 386, 390-91 (2014) (WAKIX-HBS_00568601-10); WAKIX-BP 00140153-65; ANI-Pitolisant00032094-107; ICSD-3-TR at 179-91 (ANI-Pitolisant00028261-73); ICSD-2 at 81-90 (ANIPitolisant00028231-36).) It is generally understood that serotonergic or noradrenergic cells are primarily implicated in muscle tone, but that histamine cells are not. (John 2004 at 628-31 (WAKIX-HBS_00210200-03).) Indeed, Plaintiffs' experts have suggested that pitolisant treats

CONFIDENTIAL

cataplexy via a receptor system other than $H_3$ histamine receptors. Thus, although the mechanism underlying cataplexy remains unresolved, it is known to be different from that which causes EDS.

      b)    *EDS Is Not Required for a Diagnosis of Narcolepsy*

1326.  The American Academy of Sleep Medicine recognizes narcolepsy as a clinical condition in its International Classification of Sleep Disorders, Second Edition and Third Edition-Text Revision. (ICSD-2 at 50-55; 80-91 (ANIPitolisant00028226-36); ICSD3-TR at 66-86, 179-199 (ANI-Pitolisant00028240-81).)

1327.  The ICSD-2, which is contemporary with the earliest priority date of the '947 Patent, referred to two main types of narcolepsy, distinguished by the presence or absence of cataplexy. (*Cf.,* ICSD-2 at 81-86 (ANIPitolisant00028231-34) ("Narcolepsy with Cataplexy"), 87-90 (ANIPitolisant00028234-36) ("Narcolepsy without Cataplexy").)

1328.  Therefore, as of the priority date of the '947 Patent, it was common knowledge in the art that narcolepsy was generally classified into two main categories: narcolepsy with cataplexy and narcolepsy without cataplexy. (*See, e.g.*, ICSD-2 at 81-86, 87-90 (ANIPitolisant00028231-36); Kryger 2005 at 619 (ANI-Pitolisant00030582).)

1329.  The ICSD-3-TR was published after the priority date of the '947 Patent and categorizes Narcolepsy into two distinct types: Narcolepsy Type 1 ("NT1") and Narcolepsy Type 2 ("NT2"). (*See* ICSD-3-TR at 179-99 (ANI-Pitolisant00028261-81).) Patients with NT1 display cataplexy, whereas those with NT2 do not. (*Id.*) Though the diagnostic criteria for narcolepsy with cataplexy in the ICSD-2 specifically required a complaint of EDS lasting more than 3 months, the diagnostic criteria in the ICS-3-TR for NT1 removed the reference to EDS and, for NT1, no longer requires that any episodes of somnolence persist for three months or more. (*C.f.*, ICSD-3-TR at 179-99 (ANI-Pitolisant00028261-81); *see also* ICSD-2 at 81-90 (ANIPitolisant00028231-36).)

CONFIDENTIAL

1330.   Today, clinicians diagnose and treat narcolepsy according to the ICSD-3-TR, which does not recite EDS within its diagnostic criteria. (*See* ICSD-3-TR at 179, 192 (ANI-Pitolisant00028261, ANI-Pitolisant00028274.).)

1331.   The presence of cataplexy is all but diagnostic for narcolepsy with cataplexy. (*See, e.g.*, Kryger 2005 at 595 (ANI-Pitolisant00030571).)   Cases of isolated cataplexy without EDS have been documented since at least the 1980's.   (*See generally* van Dijk 1991 (ANI-Pitolisant00032089-93); Kristyna M. Hartse et al., *Isolated Cataplexy: A Familial Study*, 36 Henry Ford Hosp. Med. J. 24 (1988) ("Hartse 1988") (ANI-Pitolisant00028221-25).)   It is now thought that "isolated cataplexy represents a form of narcolepsy."   (van Dijk 1991 at 720 (ANI-Pitolisant00032092).)   This is reflected in the current-day diagnostic criteria of ICSD-3-TR which removes the reference to EDS for a diagnosis of NT1.   (ICSD-3-TR at 179 (ANI-Pitolisant00028261).)

c)   *EDS and Cataplexy Are Treated Separately*

1332.   EDS and cataplexy generally manifest separately, and EDS is usually the first to appear. Still, a substantial portion of subjects – approximately 10% – experience cataplexy first. Thomas Roth, *New Advances in the Diagnosis and Treatment of Narcolepsy,* 267 J. Managed Care Med. 59, 59 (2020) (Meskill Dep. Ex. 6) ("Roth 2020").

1333.   Thus, as of the earliest priority date of the '947 Patent – and still to this day – the symptoms of EDS and cataplexy, when they occur in the same patient, manifest at different times (often years apart) and are typically treated separately. (*See, e.g.*, Meskill Opening Rpt. ¶ 42; Roth Opening Rpt. ¶ 42.; Yves Dauvilliers et al., *Age at onset of narcolepsy in two large populations of patients in France and Quebec*, 57 NEUROLOGY 2029, 2031 (2001) ("Dauvilliers 2001") (ANI-Pitolisant00029635-39 at -9637); Lois E. Krahn et al., *Narcolepsy with Cataplexy*, 161 Am J Psychiatry 2181, 2184 ("Krahn 2004") (ANIPitolisant00028282-85 at -8285).)   Sleepiness

CONFIDENTIAL

frequently presents emergent quality of life and safety issues for the patient and is therefore typically the first symptom of narcolepsy to be treated. (*See* ICSD-2 at 81 (ANIPitolisant00028231).) As such, many patients experiencing narcolepsy with cataplexy will present with and be treated for sleepiness and, potentially, EDS before they manifest and receive treatment for cataplexy.

1334.   EDS and cataplexy are also assessed differently. The ESS questionnaire does not contain prompts directed to cataplexy and does not capture information about cataplexy attacks; that evaluation must be performed separately. (Johns 1991 at 541 (ANI-Pitolisant00030563).)

1335.   Around the earliest priority date of the '947 Patent, EDS and cataplexy were treated using different medications. At that time, there were no drugs approved for the treatment of both cataplexy and EDS in patients with narcolepsy. There were several treatments for symptoms of EDS associated with narcolepsy, including modafinil, various amphetamines, methylphenidate, and pemoline. (Littner 2001 at 453-54 (ANIPitolisant00028288-89).)

1336.   In contrast, REM-related symptoms, including cataplexy, sleep paralysis, and hypnagogic hallucinations, were for a time treated with tricyclic antidepressants and fluoxetine. (*Id*. at 454 (ANIPitolisant00028289).) Clinicians later moved away from using tricyclic antidepressants to treat cataplexy, instead using serotonergic or adrenergic reuptake inhibitors such as venlafaxine ER and atomoxetine. (Isabelle Arnulf et al., *Sodium Oxybate for Excessive Daytime Sleepiness in Narcolepsy-Cataplexy: Comment on Mamelak M et al. A pilot study on the effects of sodium oxybate on sleep architecture and daytime alertness in narcolepsy*, 27 SLEEP 1242, 1242 (2004) ("Arnulf 2004") (ANIPitolisant00028158-61).)

1337.   As of the earliest priority date of the '947 Patent, the "available treatments for narcolepsy" were still "only palliative, symptom-oriented pharmacotherapies." (Mieda 2004 at

369

**CONFIDENTIAL**

4649 (ANIPitolisant00028314).)  Indeed, most patients still required multiple therapies to treat

more than one symptom of narcolepsy. (Arnulf 2004 at 1327 (ANI-Pitolisant00028158).)

1338.   In current practice, clinicians have a toolbox of no fewer than six separate drugs

(aside from pitolisant) for the treatment of EDS in patients with narcolepsy. (See generally Kiran

Maski et al., Treatment of Central Disorders of Hypersomnolence: An American Academy of

Sleep Medicine Clinical Practice Guideline, 17 J. Clinical Sleep Med. 1881 (2021) ("Maski 2021")

(HBS-EXPERT_0003509-21).)  In contrast, there is just one drug other than pitolisant that is

approved to treat cataplexy in narcolepsy.

1339.   Plaintiffs' experts recognize that EDS and cataplexy, where they occur together,

are generally treated separately with treatments varying based on the patient's symptom severity

and individual needs. (Meskill Opening Rpt. ¶ 42; Roth Opening Rpt. ¶ 42.)  For instance, Dr.

Roth states that "EDS and cataplexy were typically treated using separate medications, as most

drugs used to treat EDS have little effect on cataplexy or other REM-associated symptoms, while

most anticataplectic drugs have little effect on EDS."  (Roth Opening Rpt. ¶ 42.)  Meanwhile, Dr.

Meskill asserts that, at present, "[m]ost available narcolepsy treatments do not treat the underlying

condition, and are effective in treating only one of EDS or cataplexy. As a result, EDS and

cataplexy are typically treated with different medications."  (Meskill Opening Rpt. ¶ 42.)  A

clinician would thus not expect a drug that treats cataplexy to be effective in treating EDS, or vice

versa.

        d)  *FDA Separately Reviews Indications for Treating Cataplexy and*
             *Indications for Treating EDS*

1340.   Plaintiffs have twice submitted data seeking approval for both EDS and cataplexy

indications. Both times, FDA initially approved only the indication for EDS but not for cataplexy.

1341.  In its initial review of Plaintiff Harmony's regulatory submissions, FDA approved Wakix to treat EDS in adult patients with narcolepsy, but found that Harmony had failed to show that Wakix was effective at treating cataplexy. In an August 14, 2019 Complete Response Letter ("CRL"), FDA "concluded that [Harmony's] NDA submission does not provide substantial evidence of effectiveness to support the approval of pitolisant for treatment of cataplexy in adult patients with narcolepsy."  Complete Response Letter (Aug. 14, 2019) ("CRL Letter") at 2 (ANI-Pitolisant00028796-801 at -8797).)

1342.  FDA's CRL Letter specifically discussed two clinical trials submitted by Plaintiffs in support of the cataplexy indication: HARMONY I and HARMONY CTP. (*Id*. at ANI-Pitolisant00028798.)  FDA found both studies inadequate to support an indication for cataplexy and concluded that "[a] second trial, substantiating the results of HARMONY CTP, [would] be required to obtain the cataplexy indication."  (*Id*. at ANI-Pitolisant00028798.)  FDA thus recognized that the treatment of cataplexy in patients with narcolepsy is clinically different from treating EDS in patients with narcolepsy.

1343.  As early as 2021, Harmony discussed its planned "pursuit of indications for both EDS and cataplexy" in pediatric patients. Harmony Biosciences Holdings, Inc. Form 10-K (Mar. 25, 2021) ("Harmony 2020 10-K") at 7 (ANI-Pitolisant00028439-601 at -8445).

1344.  Harmony later submitted an sNDA for the treatment of EDS and cataplexy in pediatric patients with narcolepsy in December 2023.  Harmony Biosciences Holdings, Inc. Form 10-K (Feb. 25, 2025) ("Harmony 2024 10-K") at 77 (ANI-Pitolisant00028602-757 at -8678).) FDA granted approval for the use of pitolisant to treat EDS in patients under six but "FDA did not approve [Harmony's] sNDA seeking to expand the WAKIX label for the treatment of pediatric

CONFIDENTIAL

patients with cataplexy." (*See id.*) In denying approval for cataplexy but not EDS, FDA again recognized that efficacy in treating the former is different from efficacy in treating the latter.

### 3.    The Plain and Ordinary Meaning of EDS Does Not Include Cataplexy

1345.    In the relevant field of art, EDS is defined as "a condition in which one enters sleep at an inappropriate time or setting." (Kryger 2005 at 595 (ANI-Pitolisant00030571).) EDS has also been defined as "the inability to stay awake and alert during the major waking episodes of the day . . . ." (ICSD-2 at 79 (WAKIX-HBS_00209338).) Plaintiffs' own experts agree that, under the plain and ordinary meaning of EDS, the claims of the '947 Patent do not cover cataplexy, because that definition excludes anything other than excessive daytime sleepiness.

1346.    The evidence at trial will thus demonstrate that the plain and ordinary meaning of EDS does not encompass cataplexy.

### 4.    Plaintiffs Used the Plain and Ordinary Meaning of EDS During Prosecution of the '947 Patent

#### a)    *The '947 Patent Uses the Plain and Ordinary Meaning of EDS*

1347.    The claims of the '947 Patent recite methods of treating EDS – not cataplexy or narcolepsy generally. The sole independent claim of the '947 Patent recites (in relevant part) "a method for treating excessive daytime sleepiness . . . [in a] patient [] suffering from Parkinson's disease, narcolepsy, or sleep apnea." ('947 Patent col. 44, l. 54 – col. 45 l. 35.) The patent does not define "excessive daytime sleepiness."

1348.    A definition of EDS other than its plain and ordinary meaning is not supported by the specification, which does not mention cataplexy even once.

#### b)    *In Prosecuting the '947 Patent, Plaintiffs Limited the Scope of Asserted Claims to Treating EDS Under Its Plain and Ordinary Meaning*

CONFIDENTIAL

1349.   In prosecuting the '947 Patent, the patentee limited the claim scope to the specific symptom of EDS in order to secure the patent's issuance. (*See, e.g.*, '947 Patent File History Response to Restriction/Election Requirement (Dec. 8, 2010) (WAKIX-PLFS_00001981-96); '947 Patent File History at Schwartz Decl. (Sep. 17, 2012) (WAKIX-PLFS_00002100-05) ("Schwartz Decl."); '947 Patent File History Applicant Argument/Remarks (Dec. 17, 2012) (WAKIX-PLFS_00002090-99).)

1350.   The original application that later issued as the '947 Patent contained claims directed to "[a] method for the treatment of Parkinson's disease obstructive sleep apnea, narcolepsy, dementia with Lewy bodies and/or vascular dementia comprising administering a compound."  ('947 Patent File History Claims (Jul. 16, 2010) (WAKIX-PLFS_00001942-58 at -1943).)   In an October 12, 2010 Restriction/Election Requirement, the Examiner asked the applicant to select one of six groups of claims for further prosecution:

> Group I, drawn to a method of treating Parkinson's disease.
> Group II, drawn to a method of treating obstructive sleep apnea.
> Group Ill, drawn to a method of treating narcolepsy.
> Group IV, drawn to a method of treating dementia with Lewy bodies.
> Group V, drawn to a method of treating vascular dementia.
> Group VI, drawn to a composition combination.

('947 Patent File History Restriction/Election Requirement at 2 (Oct. 12, 2010) (WAKIX-PLFS_00001967-76 at -1969).)

1351.   Rather than electing to pursue claims in Group II (i.e., those "drawn to a method of treating narcolepsy"), the applicant proposed their own category of claims to pursue: claims directed to a "method for the treatment of excessive daytime sleepiness."  ('947 Patent File History Response to Restriction/Election Requirement (Dec. 8, 2010) (WAKIX-PLFS_00001981-96).) The applicant elected claims for the treatment of EDS across various conditions, rather than claims for treating all symptoms of a single condition such as narcolepsy, Parkinson's, or one of the other

CONFIDENTIAL

disorders disclosed in the '947 Patent. (*See e.g.*, '947 Patent File History Claims (Dec. 8, 2010) (WAKIX-PLFS_00001982-96); '947 Patent File History Claims (Oct. 31, 2011) (WAKIX-PLFS_00002044-51 at -2045-49).)

1352.    The Examiner determined the election was made "without traverse" and stated that certain claims were "withdrawn from further consideration" as being "drawn to a nonelected invention."  ('947 Patent File History Non-final Rejection, at 1 (Apr. 29, 2011) (WAKIX-PLFS_00002002-08 at -2004).) Thus, the applicant disclaimed any claim scope directed to treating symptoms other than EDS.

1353.    The applicant also cancelled certain claims and modified the remaining ones so that they incorporated the EDS limitation, directly or indirectly, into each pending claim. ('947 Patent File History Claims (Dec. 8, 2010) (WAKIX-PLFS_00001982-96); '947 Patent File History Claims (Oct. 31, 2011) (WAKIX-PLFS_00002045-49).)

1354.    In an attempt to overcome the Examiner's substantive rejections of the pending claims, the applicant produced a sworn declaration from Dr. Schwartz, one of the two inventors listed on the '947 Patent. ('947 Patent File History Response to Final Rejection Dated January 17, 2012 (Dec. 17, 2012) (WAKIX-PLFS_00002090-2105).)   The Schwartz Declaration unambiguously states that pitolisant "exhibits a purely symptomatical activity on excessive daytime sleepiness."  ('947 Patent File History at Schwartz Decl. at 2 (WAKIX-PLFS_00002101).) Dr. Schwartz also stated that the effect of pitolisant "is purely targeting the symptom of excessive daytime sleepiness."  (*Id.* at 5 (WAKIX-PLFS_00002104). *See also id.* ("Specific activity on excessive daytime sleepiness would therefore not have been expected in view of the prior art.").)  Therefore, the Schwartz Declaration discusses the then-pending claims as being narrowly directed to the specific symptom of EDS.

1355.  The applicant's argument accompanying the Schwartz Declaration further demonstrates that the '947 uses the plain and ordinary meaning of EDS. There, the applicant clearly represented that the pending claims are directed to the use of pitolisant for "the specific treatment of excessive daytime sleepiness as a <u>symptom</u> of [the claimed] conditions." ('947 Patent File History Applicant Argument/Remarks (Dec. 17, 2012) at 10 (WAKIX-PLFS_00002099) (emphasis in original); *see also id.* at 9 (WAKIX-PLFS_00002098) ("The results evidenced in the Declaration also unexpectedly show that the compounds specifically target excessive daytime sleepiness as a <u>symptom</u>, such as in the case of obesity and other conditions, and this high specificity for the treatment of excessive daytime sleepiness as a <u>symptom</u> could not have been expected.") (emphasis in original).)

1356.  The applicant's statements during prosecution thus demonstrate that the claims were directed to treating EDS under its plain and ordinary meaning – *i.e.*, as only one *symptom* of narcolepsy. Indeed, Plaintiffs' own experts both agree that the inventor and prosecuting attorneys used EDS under its plain and ordinary meaning in communications with the USPTO.

1357.  Neither the '947 Patent nor its prosecution history offer a clear alternate definition for EDS. Given the lack of a clear alternate definition, there is no need for a POSA to look beyond the claims of the '947 Patent and/or study the specification or file history to further define EDS. The evidence at trial will show that the '947 Patent and its file history use EDS according to its plain and ordinary meaning.

c)  *The '947 Patent Does Not Disclose Treating Cataplexy*

1358.  Claim 1 of the '947 Patent recites a method of treating EDS in patients with narcolepsy using pitolisant hydrochloride. ('947 Patent col. 44, l. 45 – col. 45, l. 35.)  None of the asserted claims mention cataplexy or indicate that they cover the use of any of the chemical compounds recited therein to treat cataplexy.

CONFIDENTIAL

1359.  The specification provides no evidence that the chemical compounds or treatment methods recited in the claims would be effective in treating cataplexy. As Plaintiffs admit, the specification does not mention cataplexy even once. (*See* Plaintiffs' Responses and Objections to Novitium's First Set of RFAs (1-11) (April 14, 2025) at 4-5.)

1360.  The '947 Patent discusses treating EDS not only in narcolepsy but also in other conditions, including Parkinson's, vascular dementia, and dementia with Lewy Bodies. EDS is the only major symptom common among all these disorders. As is clear from the title and from Plaintiffs' internal nickname for the '947 Patent, its primary focus was not narcolepsy but Parkinson's. (*See* Capet Dep. Tr. 36:18-23 (Apr. 11, 2025).)  The patent's focus on EDS as a component of multiple disorders is confirmed by its definition of "treatment," which makes no mention of cataplexy specifically, or even of narcolepsy in general:

> In the context of the invention, the term "treating" or "treatment", as used herein, means reversing, alleviating, inhibiting the progress of, or preventing the disorder or condition to which such term applies, or one or more symptoms of such disorder or condition.

('947 Patent col. 42, ll. 15-19.)

1361.  As one inventor listed on '947 Patent has admitted, data showing efficacy of pitolisant in an animal model of cataplexy were available as of the patent's earliest priority date, but those data are not disclosed in the '947 Patent. (Schwartz Dep. Tr. II 237:7- 241:3 (Apr. 10, 2025); WAKIX-BP_00212124-135.)

      d)    *Plaintiffs' Experts Advance a Definition of EDS that is Inconsistent with the Use of EDS Throughout the Specification and File History*

      e)    *Plaintiffs' Experts' Definitions Are Confusing and Ambiguous*

1362.  Notwithstanding the consistent and relatively unambiguous use throughout the '947 Patent of "excessive daytime sleepiness" according to its plain and ordinary meaning, Plaintiffs' experts assert that a POSA reading the '947 Patent would conclude that it "provides for a different

definition of EDS than the scientific definition."  (Roth Opening Rpt. ¶ 53; *see also* Meskill Opening Rpt. ¶ 55.)

1363.   Plaintiffs' experts, Drs. Meskill and Roth, offer two different definitions based "on [their] reading[s]" of the '947 Patent. Whereas Dr. Meskill "reads" the '947 Patent as claiming "treatment of the sleep disorder characterized by pathological daytime disordered sleep/wake cycles as they appear in patients with Parkinson's disease, narcolepsy, or sleep apnea[,]" (Meskill Opening Rpt. ¶ 74), Dr. Roth "reads" the '947 Patent as claiming "treatment of the sleep disorders characterized by EDS as they manifest in patients with Parkinson's disease, narcolepsy, and sleep apnea"  (Roth Opening Rpt. ¶ 69). Dr. Roth has also stated that "pathological disordered sleep/wake cycles" is an acceptable construction of EDS. Dr. Roth also asserted another, even broader, construction of EDS that includes all disorders where one of the symptoms is daytime sleepiness, excessive daytime sleepiness. Those disorders include narcolepsy, sleep apnea, and Parkinson's disease.

1364.   Plaintiffs' experts' definitions of EDS are confusing, both individually and in combination. For example, Dr. Meskill refers to a single "sleep disorder" that manifests in patients with narcolepsy, Parkinson's disease, and sleep apnea. (Meskill Opening Rpt. ¶ 74.)  That disorder is characterized by "pathological daytime disordered sleep/wake cycles" rather than EDS. (*Id.*) Dr. Meskill does not cite any disclosure or discussion in the '947 Patent of the phrase "pathological daytime disordered sleep/wake cycles."  Indeed, Dr. Meskill admitted that the phrase "the sleep disorder characterized by pathological daytime disordered sleep/wake cycles" does not appear in the '947 Patent.

1365.   Dr. Roth appears to read the '947 Patent to claim the treatment of multiple "sleep disorders" which are characterized by EDS and not by "pathological daytime disordered

sleep/wake cycles" per Dr. Meskill's definition. It is also unclear whether Dr. Roth's reference to multiple "sleep disorders characterized by EDS" refers to the disorders recited in the patent (narcolepsy, Parkinson's disease, and sleep apnea) or to some other group of disorders "characterized by EDS" but which manifest in Parkinson's, narcolepsy, and sleep apnea. To the extent Dr. Roth is referring to the disorders recited in the patent, Parkinson's disease is not "characterized by EDS" but is instead characterized by certain neurological symptoms. To the extent Dr. Roth is suggesting that narcolepsy, Parkinson's disease, and sleep apnea can each have multiple different "sleep disorders characterized by EDS," it is not clear what those sleep disorders would be, and Dr. Roth does not specify.

1366.   Dr. Roth asserts that EDS is not limited to the symptom of excessive sleepiness but instead encompasses all "pathologically disordered sleep."  (Roth Rebuttal Rpt. ¶¶ 333-34.)  But Dr. Roth fails to reconcile his position with the multiple statements by the applicant and inventors during prosecution of the '947 Patent emphasizing that the claims are directed to treatment of EDS as a *symptom* and not to the disorders of Parkinson's disease, narcolepsy, and sleep apnea. (*See supra* ¶¶ 148-50.)

> f)      *Plaintiffs' Experts Base Their Novel Definitions on a Clear Drafting Error*

1367.   Plaintiffs' experts, Drs. Meskill and Roth, suggest that EDS should be construed to include *any* sleep-related symptom associated with *any* of the disorders recited in the claims (i.e., Parkinson's disease, narcolepsy, and sleep apnea). (*See* Meskill Opening Rpt. ¶ 74; Roth Opening Rpt. ¶ 69.)  This definition is far broader than the plain and ordinary meaning of EDS.

1368.   The novel definition of EDS advanced by Plaintiffs' experts is based on a single statement in the '947 Patent. (*See, e.g.*, Meskill Opening Rpt. ¶ 56; Roth Opening Rpt. ¶ 54.) Specifically, the '947 Patent states that included among the "sleep and vigilance disorders"

CONFIDENTIAL

affecting patients with Parkinson's Disease are "excessive daytime sleepiness (including narcolepsy or 'sleep attacks', i.e. inappropriate and unintended falls into sleep while in daytime activity)." ('947 Patent col. 2, ll. – 36-46.)

1369.   Relying on that single statement, Plaintiffs' experts assert that the '947 Patent defines EDS (*one* symptom of narcolepsy) as including nearly *every* symptom related to narcolepsy. This would extend the definition of EDS to include not only cataplexy, but also to hypnagogic hallucinations and sleep paralysis. (Meskill Opening Rpt. ¶ 74; Roth Opening Rpt. ¶ 69.)

1370.   A POSA would recognize that the single statement on which Plaintiffs' experts' base their constructions of EDS is a drafting error. First, a POSA would note that the statement characterizing "narcolepsy" as being "included" within the meaning of EDS makes little sense because narcolepsy, unlike "sleep attacks," is not considered a subtype of EDS. Instead, narcolepsy is one of many disorders for which EDS may be a symptom. (*See, e.g.*, ICSD-2 at 85 (ANIPitolisant00028233) ("Excessive daytime sleepiness may be secondary to *obstructive sleep apnea* (OSA), *periodic limb movement disorder* (PLMD) or *behaviorally induced insufficient sleep syndrome*.") (emphasis added).)   Second, a POSA would recognize that the statement of EDS "including narcolepsy" was made in error because a corrected disclosure – omitting "narcolepsy" – occurs later in the '947 Patent specification. ('947 Patent col. 41, ll. 48-53 ("These 'sleep and vigilance disorders associated with PD' include in particular . . . excessive daytime sleepiness (including 'sleep attacks'). . . .").)   In fact, there are multiple independent disclosures within the '947 specification which directly conflict with the idea that EDS "includes" other symptoms of narcolepsy, as Plaintiffs' experts assert. (*Id.* (listing "sleep and vigilance disorders" affecting

379

Parkinson's patients but omitting "narcolepsy"); *id*. at col. 41, ll. 22-35 (neglecting to define obstructive sleep apnea as "including narcolepsy").)

1371.   Plaintiffs admit that that drafting errors exist in the specification of the '947 Patent. (*See* Meskill Opening Rpt. ¶ 62; Roth Opening Rpt. ¶ 58.)   The single statement cited by Drs. Meskill and Roth in defining EDS is one of those drafting errors.

> g)    *The Disclosure Cited by Plaintiffs' Experts Does Not Relate to Narcolepsy*

1372.   Read in context, the drafting error relied upon by Plaintiffs' experts is part of a background discussion on sleep disorders in *Parkinson's disease*, not narcolepsy. That same paragraph later clarifies that the EDS under discussion (i.e., in patients with Parkinson's) does not include EDS that is attributable to narcolepsy.

1373.   Specifically, the '947 Patent states that "modafinil treatment of excessive daytime sleepiness was tried with limited success and the indication . . . has not been recognized by health authorities." ('947 Patent col. 2, ll. 51-55.)   As of the '947 Patent's priority date, modafinil *was* approved to treat EDS in patients with narcolepsy, but it was *not* approved to treat EDS in patients with Parkinson's. (*See* Provigil Label (Jan. 23, 2004) at 1 (ANI-Pitolisant00028369-403 at -8369).) The paragraph on which Plaintiffs' experts rely thus clarifies that EDS, when discussed as a symptom of Parkinson's, does *not* include EDS attributable to narcolepsy but rather specifically *excludes* it.

1374.   Dr. Roth also cites disclosures related to sleep and vigilance disorders as they manifest in patients with Parkinson's disease, not narcolepsy. (*See, e.g.*, Roth Rebuttal Rpt. ¶¶ 344, 495, 498.)   Dr. Roth also inaccurately cites the '947 Patent in asserting that EDS is a "disorder[] of sleep initiation and maintenance."   Properly read, the patent states that both EDS and "disorders of sleep initiation and maintenance" are two among a list of examples of the "sleep and vigilance

disorders" displayed by patients with Parkinson's disease. (*Cf.* Roth Rebuttal Rpt. ¶ 344; '947 Patent col. 2, ll. 36-46.)

1375.   Dr. Roth suggests that EDS should be construed to include all "disorders of sleep initiation and maintenance."  But the patent language he references for support describes EDS as one symptom out of many symptoms and disorders that can be associated with Parkinson's disease. Indeed, the '947 Patent describes EDS as being discrete from and in addition to other possible symptoms and disorders, including the general category of "disorders of sleep initiation and maintenance." ('947 Patent col. 2, ll. 36-46.)

1376.   Even assuming the specific symptom of EDS somehow implicates the broader category of "disorders of sleep initiation and maintenance," Dr. Roth still fails to show that the specific symptom of cataplexy is a disorder of sleep initiation and maintenance. Nor does he show how either cataplexy or EDS are "displaced manifestation[s] of REM sleep." (Roth Rebuttal Rpt. ¶ 496.)

1377.   Furthermore, to the extent disclosures specific to Parkinson's disease are even relevant to patients with narcolepsy, Dr. Roth admits that the '947 Patent distinguishes between "sleep and vigilance disorders" (which can include EDS) and symptoms related to "movement initiation and control," such as cataplexy. (Roth Rebuttal Rpt. ¶ 64 (citing '947 Patent col. 2, ll. 36–41).)  As such, the '947 Patent itself explicitly excludes symptoms related to movement initiation and control (such as cataplexy) from its discussion of sleep and vigilance disorders (such as EDS). ('947 Patent col. 2, ll. 36-41.)

1378.   A POSA, as of the priority date, would consider cataplexy to be a symptom involving an abnormal pattern of muscle tone, and not a "disorder of sleep initiation and maintenance."  Cataplexy is one of many symptoms related to abnormal muscle tone, some of

which can be found in a range of sleep disorders (e.g., sleep paralysis, restless leg syndrome, sleep

apnea, REM behavior disorder). (Kryger 2005 at 154 (ANI-Pitolisant00032075).)

1379.   A POSA would not understand the muscle atonia of cataplexy to relate at all to a

"loss of circadian rhythmicity."  Circadian rhythm sleep disorders are characterized primarily by

EDS, insomnia, or both. There is no association with cataplexy or other symptoms related to

muscle atonia. (*See, e.g.*, ICSD-2 at 117 (ANI-Pitolisant00032072); *see also* Kryger 2005 at 597-

98  (ANI-Pitolisant00030573-74),  691-99  (ANI-Pitolisant00032077-85)).)    Dr. Roth has not

provided any reasoning to the contrary.

> h)   *The '947 Patent Does Not Disclose Any Data from Patients with Narcolepsy*

1380.   The '947 Patent discloses no data regarding the treatment of patients with

narcolepsy.

1381.   As Plaintiffs' experts admit, only the title of Example 5 references narcolepsy. The

disclosures and substance of Example 5 reference only obstructive sleep apnea. (*See, e.g.*, '947

Patent col. 44, ll. 36-51.)  Drs. Meskill and Roth both "believe" that the title of Example 5 and not

the body is correct, but only Dr. Roth opines that he believes a POSA would understand Example

5 this way. (*See* Meskill Opening Rpt. ¶ 62; Roth Opening Rpt. ¶ 58.)  Their position is untenable.

The body of Example 5, where obstructive sleep apnea is mentioned, is the substantive part of the

disclosure. There is nothing of substance in the title – which is the only place narcolepsy is

mentioned in Example 5.

1382.   Plaintiffs' experts assert that a POSA would assume that Example 5 refers to

narcolepsy because Example 2 also discloses treatment of patients with obstructive sleep apnea.

(*See* Meskill Opening Rpt. ¶ 61-62; Roth Opening Rpt. ¶ 57-58.)  This assertion is similarly

unfounded. For one thing, multiple examples in a patent can disclose data related to treatment of

CONFIDENTIAL

the same disease. Indeed, both Example 1 and Example 4 both disclose treatment of patients with Parkinson's disease. ('947 Patent col. 43, l.19-col. 44, l. 34.)  Furthermore, there are substantive differences between Example 2 and Example 5.  Example 2 was limited to male patients with a body mass index above 35, while Example 5 was not. Their logic is also unavailing because the body of Example 5 itself states that "*[t]wo* clinical studies were conducted on patient suffering from obstructive sleep apnea."  (*Id*. at col. 44, ll.41-42 (emphasis added).)  The substance of the '947 Patent's examples indicate that both Example 2 and Example 5 disclose treating obstructive sleep apnea rather than narcolepsy.

i)    *'947 Patent Does Not Discuss the REM State*

1383.   Dr. Roth argues that EDS encompasses symptoms beyond sleepiness, to include "the intrusion of REM sleep . . . [and] hallucinations." (Roth Rebuttal Rpt. ¶ 344.)  Dr. Roth thus suggests that EDS, as defined in the '947 Patent, is not merely a symptom, but a disorder with its own suite of symptoms. This construction is nonsensical, given that EDS (as used in the patent, including the claims themselves) is a single symptom of many disorders. (*See* ¶¶ XX, *infra*.)

1384.   Moreover, the REM state is not even discussed in the '947 Patent. Dr. Roth does not – and cannot – point to any discussion in the claims, specification, or prosecution history of the '947 Patent related to "the intrusion of REM sleep."  Nor does Dr. Roth establish any direct relationship between EDS and the REM state. In other words, Dr. Roth does not explain why he considers EDS to be a "dissociated REM sleep event."  (*See* Roth Opening Rpt. ¶ 70; Roth Rebuttal Rpt. ¶ 496.)  Dr. Roth's proposed construction of EDS that includes "the intrusion of REM" is thus entirely unsupported. Indeed, to support his position, Dr. Roth points primarily to his own opening report and excerpts from an inventor deposition – neither of which would have been known as of the priority date to a POSA considering the disclosures of the '947 Patent.

CONFIDENTIAL

1385.  As of the priority date, a POSA would understand that EDS is not necessarily attributed to or associated with the REM state.

1386.  A POSA would further recognize that cataplexy represents an intrusion of one isolated feature of the REM state, and that these dissociated aspects of the REM state – including cataplexy, hypnagogic hallucinations, and sleep paralysis – may appear in isolation, without EDS. For instance, cataplexy often appears without EDS. As such, a POSA as of the priority date would not understand cataplexy to be "an intrusion of REM sleep" or a "displaced manifestation of REM sleep" as Dr. Roth suggests. (*See, e.g.,* Roth Rebuttal Report ¶¶ 344, 496, 498, 508.)

1387.  Cataplexy and certain other symptoms of narcolepsy (i.e., sleep paralysis and hypnagogic hallucinations) are isolated intrusions of phenomena that are associated with the REM state. But these symptoms are distinct and differ from the REM state as a whole. For example, the plain and ordinary meaning of cataplexy as of the priority date is "the abrupt loss of muscle tone triggered by strong emotional stimuli. . . ."  (Kryger 2005 at 597 (ANI-Pitolisant00030573).) Cataplexy thus represents the intrusion of one aspect of the REM state – muscle atonia – into waking. But because other conditions of the REM state are absent, cataplexy and the REM state cannot be equated.

1388.  A POSA might understand that cataplexy is thought to be mechanistically related to the REM state but would not consider it "the intrusion of REM sleep. . . ."  (Roth Rebuttal Rpt. ¶¶ 344, 496-97, 508.)

        j)     *Plaintiffs Disclosed Treating Cataplexy in a Subsequent Application*

1389.  Even if one were to ignore the '947 Patent's clear and unambiguous use of EDS according to its plain meaning, extrinsic evidence outside the '947 Patent and its prosecution history confirms that EDS should be defined under its plain and ordinary meaning, which does not encompass cataplexy.

## CONFIDENTIAL

1390.  Indeed, the purported inventors themselves showed how to disclose and claim methods of treating cataplexy in a patent application filed shortly after the '947 Patent. The two inventors listed on the '947 Patent filed a separate patent application that, like the '947 Patent, lists Plaintiff Bioprojet as the assignee. (U.S. Patent Application No. US 2009/0312367 (the "'367 application") (ANIPitolisant00028419-31).)  The earliest priority date for the '367 application is July 21, 2006, just over one year after the earliest priority date of the '947 Patent.

1391.  In contrast to the '947 Patent, the '367 application explicitly disclosed and sought patent protection "for the treatment of narcolepsy-cataplexy."  ('367 application at Abstract (ANIPitolisant00028419).)

1392.  The '367 application demonstrates that the inventors of the '947 Patent knew how to disclose and claim a method of treating cataplexy. The '367 application illustrates how the inventors likely would have defined "treatment" to clearly encompass cataplexy if that was their intent. Specifically, '367 application states that "the term 'treatment' should be understood to . . . include[] improvement in the symptoms of the disease, particularly the prevention, or reduction in the number of *cataplexy attacks*."  (*Id.* at [0228] (ANIPitolisant00028427) (emphasis added).)

1393.  The same inventors, in drafting and prosecuting the '947 Patent, make no indication that the claimed "treatment" should read on treating cataplexy specifically. (*Supra* ¶ X (citing '947 Patent col. 42, ll. 15-19).)  The claims of the '947 Patent recite *treating* EDS – they do not recite *treating* narcolepsy (or Parkinson's disease or sleep apnea). ('947 Patent col. 38, ll. 14-18.)

1394.  The inventors made no mention of cataplexy in the '947 Patent because they did not intend to claim a method of treating cataplexy in the '947 Patent. Plaintiffs' experts now attempt to impose a post-hoc definition of EDS that groups cataplexy along with *any* sleep-related

symptom into the definition of "treatment" of EDS. (*See, e.g.*, Meskill Opening Rpt. ¶ 77; Roth Opening Rpt. ¶ 71.) The evidence at trial will show that this definition is improper.

1395.   Dr. Roth dismisses the '367 application on the basis that it was not available to a POSA as of the priority date. But the '367 application shows that the inventors of the '947 Patent knew perfectly well how to disclose, describe, and claim methods of treating cataplexy. Indeed, the animal model of cataplexy that is disclosed in the '367 application was available as early as 1999. (*See, e.g.*, Richard M. Chemelli et al., *Narcolepsy in Orexin Knockout Mice: Molecular Genetics of Sleep Regulation*, 98 *Cell* 437, 437-51 (1999) ("Chemelli 1999") (WAKIX-HBS_00031564-78); *see also* WAKIX-BP_00212124-35 (reporting data in 2004 later disclosed in the '367 application.) Had the inventors possessed and sought to claim a method of treating cataplexy in the '947 Patent, they would have done so as clearly and unambiguously as they did in the '367 application. Yet, the '947 Patent describes no method of treating cataplexy; it does not even mention the term.

1396.   Dr. Roth's emphasis on the importance of animal data in showing whether and how pitolisant treats EDS across the claimed conditions is further evidence that a POSA would not understand the '947 Patent as disclosing a method of treating cataplexy. For example, Dr. Roth notes that the "fact[] that the patent includes data specifically for treatment of EDS in each condition (data from a cat model of Parkinson's disease in Example 1, and human data for sleep apnea and narcolepsy in Examples 2 and 5) demonstrates that the inventors viewed each of Parkinson's, narcolepsy and sleep apnea as presenting its own challenges in the treatment of EDS." (Roth Rebuttal Rpt. ¶ 352; *see also id.* ¶ 350.) If there were challenges and uncertainties about the effects of pitolisant on EDS in different patient populations, the challenges and uncertainties associated with using pitolisant to treat cataplexy – a different symptom entirely – would likely be

even greater. By Dr. Roth's own logic, the disclosure of animal data would be all the more necessary to establish pitolisant as effective at treating cataplexy.

1397.  Dr. Roth suggests that treating cataplexy and treating EDS are two sides of the same coin, and that one cannot be treated without the other. As explained elsewhere, this is inaccurate. (*Supra/infra* at XX.)  As recently as 2017, an internal presentation from Bioprojet noted that pitolisant is active against cataplexy but that most other $H_3$ antagonists under development are not. (WAKIX-BP 00140153; ANI-Pitolisant00032094.)  The presentation concludes that it is unlikely that $H_3$ inverse agonists are generally anti-cataplectic. (WAKIX-BP 00140155; ANI-Pitolisant00032096.)  This "suggests that the anti-cataplectic effects of pitolisant are a special feature of the product."  (WAKIX-BP 00140156; ANI-Pitolisant00032097; *see also* WAKIX-BP 00140157-58 (noting the affinity of pitolisant to other receptors); ANI-Pitolisant00032098-99 (same); WAKIX-BP 00140159-62 (detailing the possible involvement of other neurotransmitter systems in cataplexy); ANI-Pitolisant00032100-103 (same); WAKIX-BP 00140163 (showing how cataplexy and sleep attacks are caused "via 2 distinct efferent (sic) pathways."); ANI-Pitolisant00032104 (same).)  This shows that by 2017 Plaintiffs had evaluated several compounds and concluded that $H_3$ antagonists/inverse agonists do not generally show a class effect against cataplexy. Dr. Roth has not established that any presumption of such a class effect against cataplexy existed 12 years earlier, when the application giving rise to the '947 Patent was filed.

1398.  As explained above (*supra* at XX), the art explicitly taught that treatments for other symptoms of narcolepsy, such as EDS, would not be expected to treat cataplexy as well. As of the priority date, cataplexy was associated with pathologies related to the hypocretin signaling system. But "it is inaccurate to link a deficiency in hypocretin to narcolepsy."  (Kryger 2005 at 166 (ANI-Pitolisant00032076).)  "Accordingly, to understand the basis for narcolepsy, studies of hypocretin

are irrelevant or misleading; on the other hand, to understand and develop efficacious treatments for cataplexy, they are indispensable." (*Id* (ANI-Pitolisant00032076); *see also* Roth Rebuttal Rpt. ¶ 158 ("It is therefore necessary to clarify the respective role of histaminergic and orexin neurons in sleep-wake control using animal models. . . .") (quoting Parmentier 2002 at 7696).) But the '947 Patent makes no mention of hypocretin or orexin, nor does it disclose the data from orexin animal models that was available to the inventors at the time. Absent such data, Dr. Roth does not explain why an H3 receptor antagonist such as pitolisant would be expected to treat cataplexy, an orexin-mediated symptom of narcolepsy.

1399.  Dr. Roth's emphasis on the importance of animal data in showing whether and how pitolisant treats EDS across the claimed conditions is further evidence that a POSA would not understand the '947 Patent as disclosing a method of treating cataplexy. For example, Dr. Roth notes that the "fact[] that the patent includes data specifically for treatment of EDS in each condition (e.g., data from a cat model of Parkinson's disease in Example 1, and human data for sleep apnea and narcolepsy in Examples 2 and 5) demonstrates that the inventors viewed each of Parkinson's, narcolepsy and sleep apnea as presenting its own challenges in the treatment of EDS." (Roth Rebuttal Rpt. ¶ 352; *see also id*. ¶ 350.)  If there were challenges and uncertainties about the effects of pitolisant on EDS in different patient populations, the challenges and uncertainties associated with using pitolisant to treat cataplexy – a different symptom entirely – would likely be even greater. By Dr. Roth's own logic, the disclosure of animal data would be all the more necessary to establish pitolisant as effective at treating cataplexy.

1400.  Dr. Roth also does not address the fact that the '947 Patent contains no data from animal models of cataplexy, but the '367 application does. Indeed, one of the two inventors listed on the '947 Patent, Dr. Schwartz, has acknowledged that data from animal models for cataplexy

CONFIDENTIAL

were available to him prior to the priority date of the '947 Patent. (Schwartz Dep. Tr. II 238:3-238:8 (Apr. 10, 2025) ("Q. Could you -- did you study the effects of pitolisant in these orexin knock out mice? A. . . . Yes, I studied that model in my lab and I show -- and I could show that pitolisant abolishes the effects of cataplexy in animals.")  The orexin knockout mice used by Schwartz in his lab were disclosed and available to the research community by 1999 – over half a decade before the earliest priority date of the '947 Patent. (*See, e.g.*, Chemelli 1999; '367 application at [0230] (ANIPitolisant00028427).)  By Dr. Roth's logic, if the named inventors had intended to claim a method of treating cataplexy in the '947 Patent, then a POSA would expect the named inventors to have included the animal data they later disclosed in the '367 application.

1401.  Dr. Schwartz, however, testified that the only example of the '947 Patent that even mentions narcolepsy discloses no data from an animal model for cataplexy. (Schwartz Dep. Tr. II 240:18-23 (Apr. 10, 2025); *see* '947 Patent col. 43, l. 19 – col. 44, l. 51.)

1402.  By contrast, the '367 application does contain data from the orexin knockout mouse model of cataplexy. Specifically, Example 1 of the '367 application is titled "Narcolepsy/Cataplexy Model" and relates to data "obtained in groups of 6 orexin knockout mice (Chemilli [sic] et al., Cell, 1999, 98, 437)." ('367 application at [0230] (ANIPitolisant00028427); *c.f.*, WAKIX-BP_00212124-35.)  No such data related to treating cataplexy are disclosed anywhere in the '947 Patent. This omission is further evidence that a POSA would not understand the '947 Patent as disclosing a method of treating cataplexy, much less claiming one.

    i.    The '367 Application Is Directed to Treating Cataplexy and
          Not to Any Purported "Synergy" Between Modafinil and
          Pitolisant

1403.  Dr. Roth asserts that the supposed "invention" of the '367 application is directed not to treating cataplexy, but to the purported "synergy" between modafinil and pitolisant that "potentiate[d] the anticataplectic effect of" pitolisant. (Roth Rebuttal Rpt. ¶¶ 505-06.)  But the

CONFIDENTIAL

'367 application discloses no synergy between modafinil and pitolisant with respect to cataplexy. The only "synergy" between modafinil and pitolisant documented in the '367 application was the predictable additive effect of the two compounds on *EDS*. ('367 application at [0230]-[0233] (ANIPitolisant00028427).) Indeed, the '367 application notes modafinil's "lack of anticataplectic effect in human narcoleptics" and that "this parameter was improved by" pitolisant. (*Id*. at [0232].) But there are no data in the '367 application that indicate that using pitolisant and modafinil in combination improved the "cataplectic transitions" specifically.

1404.   Moreover, to the extent that the 2004 report on orexin knockout mice – an internal, nonpublic report that would not have been available to a POSA – documents any purported synergy with respect to cataplexy, those data are not disclosed in the '367 application . (*C.f. id*. at [supra at 230-233]; WAKIX-BP 00212129-34.)   This undercuts Dr. Roth's contention that "what was unforeseeable was not the fact that pitolisant contributed anticataplectic potential . . . but, instead, the fact that the combination of modafinil and pitolisant had such a 'remarkable synergy' was 'unforeseeable.'" (Roth Rebuttal Rpt. ¶ 505.)   Indeed, the 2004 orexin knockout report suggests that, relative to the anti-cataplectic effect of pitolisant, any purported synergy with modafinil would be less likely to translate to humans because it is "more complex as the modafinil has multiple mechanisms and acts in a species-dependent manner."   (WAKIX-BP 00212134.)   Dr. Roth is thus incorrect in asserting that that any purported "synergy" is "the most obvious distinction" between the '367 application , which discloses and claims treating cataplexy, and the '947 Patent, which does not.

k)   *Dr. Roth's and Dr. Meskill's Constructions of "EDS" Are Not Commensurate with the Scope of the '947 Patent*

1405.   Dr. Roth and Dr. Meskill argue that the definition of "treatment" in the '947 Patent is broader than that of the '367 application because it must be generally applicable to a number of

CONFIDENTIAL

conditions discussed in the '947 Patent. (Roth Rebuttal Rpt. ¶¶ 502-03; Roth Opening Rpt. ¶ 70; Meskill Opening Rpt. ¶ 76.)  By the same token, the meaning of EDS as used in the '947 Patent should be defined in a way that is generally applicable to the various disorders discussed and/or claimed – e.g., Parkinson's disease, sleep apnea, narcolepsy, and Lewy body dementia.

1406.  Both Dr. Roth and Dr. Meskill, however, take the opposite approach for EDS, offering definitions that are not generally applicable across the claimed disorders of Parkinson's disease, narcolepsy, and sleep apnea. Dr. Roth and Dr. Meskill suggest that the '947 Patent claims treatment of any symptoms generally related to a "disordered sleep/wake cycle."  (Roth Opening Rpt. ¶ 70; Meskill Opening Rpt. ¶¶ 74-76; Roth Rebuttal Rpt. ¶ 496; Meskill Reply Rpt. ¶¶ 34, 50, 80, 83, 87-90, 101, 144; Roth Reply Rpt. ¶¶  87, 90, 95-96, 175.)  But the symptoms implicated by this construction of EDS will vary depending upon the disorder at issue. For example, Dr. Roth admits that cataplexy is not associated with other disorders claimed by the '947 Patent. (*See* Roth Rebuttal Rpt. ¶ 502.)  Under this construction, EDS would only include certain conditions, such as cataplexy, when discussed in reference to narcolepsy. When discussed in the context of Parkinson's or sleep apnea, "EDS" would encompass a different suite of symptoms or conditions. Dr. Roth and Dr. Meskill's definitions of EDS are not generally applicable across the claimed disorders of narcolepsy, Parkinson's disease, and sleep apnea.

1407.  The prosecution history of the '947 Patent confirms that "EDS" should be construed to mean the same thing as applied across all of the claimed disorders (i.e., Parkinson's disease, narcolepsy, and sleep apnea). During prosecution, the applicant opted not to pursue claims directed to treating narcolepsy and instead elected claims directed to treating EDS. (*See supra* at XX.)  As a result, the '947 Patent issued with claims directed not only to patients with narcolepsy, but to those suffering from sleep apnea and Parkinson's disease as well. Dr. Roth and Dr. Meskill fail to

explain what distinction, if any, they would make between claims directed to "narcolepsy" versus claims directed to "treatment of EDS in patients with Parkinson's disease, narcolepsy, or sleep apnea." Indeed, their constructions conflate the two, *i.e.*, they construe the phrase as if the claim reads "treating narcolepsy" rather than "treating [EDS] . . . in patient[s] suffering from Parkinson's disease, narcolepsy, or sleep apnea." (*See, e.g.,* Roth Rebuttal Rpt. ¶ 499.) Dr. Roth and Dr. Meskill's proposed constructions of "EDS" seek to extend the claim scope to include what the applicant previously surrendered in prosecuting the '947 Patent. (*See also supra* at XX.)

### 5. Plaintiffs' Experts' Interpretation of "Treating" Is Inconsistent with the Specification and Claims of the '947 Patent

1408. Dr. Roth and Dr. Meskill argue that the term "treating" as used in the '947 Patent justifies expanding the scope of the claims beyond the treatment of EDS under its plain and ordinary meaning. Their reading misinterprets the '947 Patent's definition of "treating." (*See, e.g.,* Roth Rebuttal Rpt. ¶¶ 496, 502; Roth Opening Rpt. ¶ 70; Meskill Opening Rpt. ¶ 76.)

1409. Plaintiffs' experts assert that "treating" EDS means treating "two manifestations of pathological daytime disordered sleep/wake cycles," or treating the "displaced manifestations of REM sleep." (Roth Rebuttal Rpt. ¶¶ 496-98; *see also* Roth Opening Rpt. ¶ 70; Meskill Opening Rpt. ¶ 76.) Thus, Drs. Roth and Meskill seek to shift the scope of the claims from treating a specific symptom, EDS, to treating the disorder of narcolepsy more generally.

1410. But a POSA would understand that "[e]xcessive daytime sleepiness is a primary symptom of multiple sleep–wake disorders." Heffron 2025 at 1104 (ANI-Pitolisant00032065) (emphasis added); *see also* Kryger 2005 at 596 (ANI-Pitolisant00030572) ("Excessive sleepiness may result from a wide range of medical disorders . . . Sleepiness is frequently the cardinal symptom of many sleep disorders.") (emphasis added).) As discussed above, the '947 Patent's references to EDS are consistent with this position, reciting "treating [EDS]" in patients with

## CONFIDENTIAL

Parkinson's disease, narcolepsy, and sleep apnea. Dr. Roth and Dr. Meskill fail to show that the claims of the '947 Patent extend beyond the plain meaning of the terms to encompass treating some – but not all – "disordered sleep/wake cycles" or "displaced manifestations of REM sleep" in patients with Parkinson's disease, narcolepsy, and sleep apnea. (Roth Rebuttal Rpt. ¶ 497; *see also* Roth Opening Rpt. ¶ 70; Meskill Opening Rpt. ¶¶ 74-76.)  Dr. Roth and Dr. Meskill's interpretation of "treating" EDS is thus overly broad.

1411.   Dr. Roth and Dr. Meskill do not show that EDS itself is a displaced manifestation of the REM state. As discussed elsewhere, EDS is a discrete symptom related to sleepiness and is frequently a symptom in many (but not all) sleep disorders, including many that have no particular association with the REM state. (*See, e.g.*, ICSD-2 at 79, 117 (ANI-Pitolisant00032071, ANI-Pitolisant00032072) (listing numerous sleep disorders).)  A POSA would therefore understand that EDS has no general association with the REM state.

1412.   Dr. Roth and Dr. Meskill do not offer a clear definition for their use of the phrase "disordered sleep/wake cycles," but that description could arguably encompass most (if not all) of the sleep disorders disclosed in the ICSD-2.  Defining EDS as including any manifestation of a "disordered sleep/wake cycle" is both overbroad and unsupported by the '947 Patent.

1413.   Dr. Roth and Dr. Meskill's conclusions also rely on a misapplication of the clear definition of "treatment," as provided by the '947 Patent. Specifically, the '947 Patent states that:

> [T]he term "treating" or "treatment", as used herein, means reversing, alleviating, inhibiting the progress of, or preventing the disorder or condition to which such term applies, or one or more symptoms of such disorder or condition.

('947 Patent col. 42, ll. 15-19; *see also* Roth Opening Rpt. ¶ 70; Meskill Opening Rpt. ¶ 76; Roth Rebuttal Rpt. ¶ 502.)  In their analyses, Dr. Roth and Dr. Meskill both appear to apply this definition of "treatment" to the disorder of narcolepsy as a whole. But that is not what is claimed

## CONFIDENTIAL

by the '947 Patent. Instead, the claims of the '947 Patent directly or indirectly recite "a method for treating *excessive daytime sleepiness* . . . wherein [a] patient is suffering from Parkinson's disease, narcolepsy, or sleep apnea." ('947 Patent col. 44, l. 54 - col. 46, l. 57.) The '947 Patent claims are structured such that they specify the treatment of EDS in three different disorders. Applying the definition of the '947 Patent to the claims, "treatment" refers to one specific symptom – EDS – in narcolepsy, sleep apnea, or Parkinson's disease. The claims of the '947 Patent do not recite treating more than one symptom of any of those conditions. Nor do they recite the treatment of the overall disorders of Parkinson's disease, narcolepsy, or sleep apnea. Thus, under the '947 Patent's definition of "treatment," treating EDS simply means treating EDS.

1414.  The claims of the '947 Patent are not directed to treating "narcolepsy" generally, much less the "pathological daytime disordered sleep/wake cycle in a narcolepsy patient" – a phrase that does not appear in the '947 Patent. (Roth Rebuttal Rpt. ¶ 496.) As discussed elsewhere, nothing else in the '947 Patent or its prosecution history defines EDS outside of its plain and ordinary meaning.

1415.  Dr. Roth and Dr. Meskill's misreading of the claims encompasses "treating" all possible symptoms of narcolepsy. He arrives at the conclusion after making two leaps in logic. Dr. Roth first asserts that treating EDS in patients with narcolepsy "means alleviating the symptoms of pathological daytime disordered sleep/wake cycle in a narcolepsy patient." (Roth Rebuttal Rpt. ¶ 496; *see also* Roth Opening Rpt. ¶ 70; Meskill Opening Rpt. ¶¶ 74-76.) This is too broad. As Dr. Roth and Dr. Meskill both acknowledge, "symptoms of pathological daytime disordered sleep/wake cycle" encompasses more than just EDS. (*See, e.g.*, Meskill Opening Rpt. ¶¶ 74-76; Roth Opening Rpt. ¶ 70, Roth Rebuttal Rpt. ¶ 496.) But "treating EDS" as used in the '947 Patent just means "treating EDS."

CONFIDENTIAL

1416.   Dr. Roth makes another logical leap when he states that "alleviating the symptoms of pathological daytime disordered sleep/wake cycle in a narcolepsy patient" includes both treating EDS and "alleviating the displaced manifestation of REM sleep . . . (which clinicians understand to be cataplexy)." (*Id.*)  Clinicians do not understand (and likewise did not in 2005) that cataplexy is "the displaced manifestation of REM sleep," as Dr. Roth suggests. Instead, clinicians in 2005 would have understood cataplexy to be "the abrupt loss of muscle tone triggered by strong emotional reactions. . . ." (Kryger 2005 at 597 (ANI-Pitolisant00030573), *see also* ¶ 185, *supra*.) As of 2005, a POSA would have been aware of the possible mechanic link between the muscle atonia in cataplexy and that experienced during the REM state. But there are other aspects of the REM state that are not present during cataplexy, most notably dreaming, hypnagogic hallucinations, and rapid eye movements. A POSA would therefore not *define* cataplexy as "the displaced manifestation of REM sleep."

a)    *Treating EDS Does Not Imply Reestablishing Normal Sleep Architecture*

1417.   Based on the disclosures in Example 1, Dr. Roth argues that a POSA would know pitolisant could be used to treat cataplexy because the '947 Patent states that administering pitolisant could also "reestablish normal sleep architecture."[99]  (Roth Rebuttal Rpt. ¶ 495.)  This is inaccurate. First, the disclosure cited by Dr. Roth again refers to an animal model of Parkinson's disease and not narcolepsy, *supra* at XX, and appears to relate to bioelectric activity scans in cats with no clear connection to cataplexy. Furthermore, a plain reading of Example 1 shows that any ability to "reestablish a normal sleep architecture" is separate from the disclosed ability to treat EDS.

---

[99]The '947 patent does not provide an explicit definition for "reestablishing normal sleep architecture."

CONFIDENTIAL

1418.    Specifically, Dr. Roth states that "[e]xample 1 notes that pitolisant, is 'able to *not only treat* the excessive daytime sleepiness which is so detrimental in the every day life of PD patients, *but also* to reestablish a normal sleep architecture.'"   (Roth Rebuttal Rpt. ¶ 471 (citing '947 Patent col. 43, ll. 41–45) (emphasis added).)  As is evident from this passage of the specification that Dr. Roth quotes, reestablishing normal sleep architecture is discussed in the '947 Patent as being *separate from and in addition to* the treatment of EDS.

1419.    Furthermore, Example 1 assessed "sleep architecture" with electromyographic and EEG scans in a feline model of Parkinson's disease. Cataplexy is not a symptom of Parkinson's disease, nor does it follow that reestablishing "normal sleep architecture" in a model for Parkinson's mean that pitolisant would be effective at treating cataplexy in patients with narcolepsy. Regardless, Example 1's discussion of using pitolisant to treat EDS in addition to reestablishing normal sleep architecture shows that the term "EDS" as used in the '947 Patent is limited to its plain and ordinary definition rather than encompassing any condition that is distinct from some undefined "normal sleep architecture."  The disclosures of Example 1 of the '947 Patent only support a plain and ordinary definition of EDS, which does not include cataplexy.

        b)     *"Treatment" As Claimed in the '947 Patent Requires That the Patient is Actively Suffering from EDS*

1420.    Dr. Roth suggests that cataplexy as a symptom of narcolepsy is always and invariably accompanied by EDS. This is incorrect. Dr. Roth argues that all patients with NT1 necessarily have "at least two manifestations of pathological daytime disordered sleep/wake cycles." (Roth Rebuttal Rpt. ¶ 496.)  Dr. Roth further suggests that such patients will always have EDS because "EDS is a pathological state for which there is no cure, absent curing the underlying cause." (Roth Rebuttal Rpt. ¶ 340.)  But sleep clinicians focus on *treating* EDS rather than curing the underlying disorder of narcolepsy. Many patients with narcolepsy who have undergone or are

undergoing treatment for their somnolence will not currently have any EDS to treat, as the claims require.

1421.   Drs. Roth and Meskill also suggest that patients with narcolepsy necessarily have EDS because patients with NT1 always suffer "at least two" symptoms, EDS and cataplexy. (*See* Roth Rebuttal Rpt. ¶ 496; Meskill Reply Rpt. ¶ 41.)   They further suggest that patients with narcolepsy will necessarily need treatment for EDS, asserting that "treatments for EDS must be chronically administered as preventatives from falling asleep during the day." (*See, e.g.*, Roth Rebuttal Rpt. ¶ 340.)  Both points are incorrect. Cataplexy can and does occur without EDS. (*See supra* at XX; *see also* ICSD-3-TR at 179-191 (ANIPitolisant00028261-73); Hartse 1988 at 24-25 (ANI-Pitolisant00028222-23); van Dijk 1991 at 720 (ANI-Pitolisant00032092).)  It has long been known "that cataplexy may occur in an isolated form for very long periods" and that it "can occur as the first or sole symptom of narcolepsy."  (van Dijk 1991 at 720 (ANI-Pitolisant00032092).) Thus, "isolated cataplexy represents a form of narcolepsy." (*Id.*)

1422.   Additionally, the presence, prevalence, and severity of EDS vary not just between patients, but within the same individual over time. As such, many patients with a diagnosis of narcolepsy may not actively experience any EDS at a given time. Patients who are not actively experiencing EDS cannot be treated for it.

1423.   Furthermore, the claims of the '947 Patent require treatment of EDS in a patient "in need thereof."  ('947 Patent col. 44, l. 55.)  A previous diagnosis of EDS associated with narcolepsy, Parkinson's disease or sleep apnea would not be sufficient, nor would sleepiness that does not rise to the level of EDS as measured by ESS.

1424.   In addition, the clinical trials relied on for the approval of Wakix to treat EDS used endpoints based mainly upon subjective ESS scores to qualify sleepiness as "EDS" and to monitor

symptom response. (*See, e.g.,* HBS_EXPERT_0003538 at -3543; *see also* Meskill 2021 (HBS-EXPERT_0003522-30 at -3522); Nathaniel F. Watson et al., *Time to Onset of Response to Pitolisant for the Treatment of Excessive Daytime Sleepiness and Cataplexy in Patients with Narcolepsy: An Analysis of Randomized, Placebo-Controlled Trials*, 35 CNS Drugs 1303 (2021) ("Watson 2021") (ANI-Pitolisant00031635-46 at -1637).) Plaintiffs' pivotal clinical trials did not have endpoints based on MSLTs, nor was an MSLT performed on patients as part of the clinical protocol. (*See, e.g.,* HBS_EXPERT_0003538 at -3543-44.) As Plaintiffs' own experts admit, a patient would be diagnosed with NT1 using objective evidence such as an MSLT or low hypocretin level to diagnose a patient with narcolepsy. Objective and subjective measures of sleep and sleepiness may be poorly correlated. (*See, e.g.,* Johns 1994.) Therefore, a patient diagnosed with NT1 based on an MSLT or hypocretin will not necessarily have EDS when measured by the ESS scores promoted in both the '947 Patent and used in the clinical trials for Wakix. There is thus no evidence that NT1 patients treated for cataplexy will be treated for the subjective symptom of EDS as measured by ESS scores.

1425. Given the explicit limitation that patients must be in need of treatment for their EDS, the claims of the '947 Patent would not be infringed by administering pitolisant to patients whose EDS is already being effectively treated, or to patients with ESS scores below 11, the threshold for EDS. Indeed, Dr. Roth appears to agree when he admits that "not everything that reduces diurnal somnolence treats EDS." (Roth Rebuttal Rpt. at ¶ 335.) According to Dr. Roth's logic, simply reducing somnolence to some degree in patients with narcolepsy does not treat EDS. To be treated, a patient must be suffering from EDS to begin with, and the treatment must reduce somnolence until the patient is no longer suffering from EDS and in need of treatment. Therefore,

administering pitolisant to treat cataplexy in patients with narcolepsy would not necessarily or inevitably treat EDS in a patient in need thereof as recited by the claims of the '947 Patent.

### 6. The '947 Patent Does Not Disclose Administering Pitolisant to Patients with Cataplexy

1426. As discussed above, the '947 Patent does not disclose treating cataplexy. Moreover, the '947 Patent does not even disclose *administering* pitolisant to any subjects with cataplexy.

1427. As discussed, Dr. Roth emphasizes the importance of in vivo data as of the priority date to properly describe and disclose a method of treating EDS in patients with narcolepsy. (*See* ¶¶ XX-XX, *supra*.) Yet Dr. Roth points to only Example 5 as disclosing data regarding treating EDS in patients with narcolepsy. But a POSA would not consider Example 5 to disclose data related to narcolepsy. Instead, a POSA would understand that Example 5 relates to treatment of obstructive sleep apnea, in accordance with a plain reading of the text.

1428. Even assuming a POSA did consider Example 5 of the '947 Patent to disclose treating narcoleptic patients (though they would not), there is no indication that any patients with narcolepsy studied in Example 5 actually suffered from cataplexy. Nor does Dr. Roth explain the basis on which a POSA would assume that any of the subjects described in Example 5 suffer from cataplexy. As Dr. Roth admits, not all patients with narcolepsy experience cataplexy. (*See, e.g.*, Roth Rebuttal Rpt. ¶ 39.) There is thus no indication that the subjects in Example 5 – who are described as having obstructive sleep apnea – presented with cataplexy.

1429. The '947 Patent does not disclose or describe administering pitolisant to patients with cataplexy, nor does it indicate that pitolisant would be effective at treating cataplexy. A POSA would thus not understand the '947 Patent to describe a method of administering pitolisant to treat cataplexy.

7. **Novitium Will Not Directly Infringe the Asserted Claims of the '947 Patent**

1430. Novitium does not treat patients.

1431. Novitium will not practice or use the claimed methods of treatment to treat EDS.

8. **Plaintiffs Have Failed to Prove Direct Infringement by a Third Party**

1432. Plaintiffs' experts, including Dr. Roth and Dr. Meskill, have not identified any third party that they allege directly infringes claim 13 of the '947 Patent.

1433. Plaintiffs have failed to prove direct infringement of claim 13 of the '947 Patent by a third party, which is a necessary predicate to any claim of induced infringement.

9. **Novitium Will Not Induce Infringement of the Asserted Claims of the '947 Patent**

a) *Novitium's Proposed Label Does Not Disclose the Claimed Method of Treating EDS*

1434. Novitium's ANDA Products ██████████████████████████████

██████████████████████████████ as required by independent claim 1 of the '947 Patent. As noted above, Novitium's proposed label ██████████████████
████████████████    ████████████    ███████████████████████
███████████████████████████████████████████    ███████████
███████████████████████████████████████████
█████████████████.

1435. Plaintiffs' experts theorize that a prescribing clinician would, of their own volition, undertake an extensive analysis of clinical disclosures and the published articles they reference. Plaintiffs' experts further argue that a clinician would refer to the Wakix label to ascertain that pitolisant is effective in treating EDS. (Meskill Opening Rpt., App'x. D ¶¶ 48-51; Roth Opening Rpt., App'x. D ¶¶ 50-52.) A clinician would not undertake these kinds of analyses in considering

whether to prescribe Novitium's ANDA Products. Even to the extent they did, they would not conclude that Novitium's ANDA Products are necessarily ██████████████████████ ████.

      b)    *References to* ██████████████████████ *Do Not Promote Novitium's ANDA Products as* ████████████

1436.   Plaintiffs' experts assert that a clinician would see the ████████████ ██████████████████ and undertake their own analysis to arrive at the conclusion that Novitium's ANDA Products are █████████████. (*See, e.g.,* Meskill Opening Rpt., App'x. D ¶¶ 27-30; Roth Opening Rpt., App'x. D ¶¶ 29-30.) The evidence at trial will show that this is incorrect.

1437.   Novitium's proposed label ██████████████████████

1438.   Although section 14.1 of the Wakix label is titled "Excessive Daytime Sleepiness (EDS) in Patients with Narcolepsy[,]" section 14.1 is ████████████████████ ████████████████████████████████████ ███████████████████.

1439.   Novitium's proposed label ███████████████████████ ████████.[100] Novitium ███████████████████████ ██████████ from its proposed label. In view of this, Novitium had no way of knowing that its proposed label, ████████████████, could be alleged to encourage, recommend, or promote clinicians to ████████████████.

1440.   A clinician would know that the mere inclusion of an endpoint in a study does not establish efficacy for that endpoint. FDA, Guidance for Industry, "Multiple Endpoints in Clinical

---

[100]  Novitium's proposed label describes ██ ████ ████████ ██ ██ ██████████████████

**CONFIDENTIAL**

Trials" (Jan. 2017) at 2. Because a clinician would know that multiple primary and secondary endpoints are frequently incorporated into clinical trials, and that not all endpoints are met, a clinician would not base a prescribing decision on the existence of clinical endpoints.

1441. Plaintiffs' experts present arguments about what the clinical studies cited in Novitium's proposed label might "imply" or "suggest." They hypothesize that a clinician would then "confirm" such implications by consulting sources outside the proposed label itself. (*See, e.g.*, Meskill Opening Rpt., App'x. D ¶¶ 24, 26; Roth Opening Rpt., App'x. D ¶¶ 14, 25, 27.)

1442. A clinician considering prescribing Novitium's ANDA Products would not look to or evaluate sources outside of Novitium's proposed label, such as clinical trials and their related publications, to determine whether they are ███████████████. A prescribing clinician would understand that the labeling language and approved indications have been reviewed by professional regulators who have much greater access to the original clinical data and specialized training on how to analyze and interpret clinical study design and results. Such a clinician would also lack the time, training, and/or access to independently assess individual clinical trials for each drug prescribed.

1443. Even to the extent a clinician researched one or more of the clinical trials and their related publications based on Novitium's proposed label, a clinician would understand that research articles are not substitutes for the regulatory approval process. Only that regulatory process provides a rigorous, independent review of the underlying data to establish whether pitolisant is safe or effective at treating ████████████████████. Such materials would therefore fail to promote ████████████████.

1444. Moreover, it would be impossible for a clinician to independently review and analyze the clinical trials referenced on Novitium's proposed label (████████████████

██████████████████) because the clinicaltrials.gov entries for both trials note that there

are "No Study Results Posted on ClinicalTrials.gov for this Study."[101]

1445.  Wakix was previously approved only for the treatment of EDS, but its original label

repeatedly mentions the inclusion of patients with cataplexy in clinical trials. (Wakix Label (2019)

at 4 (ANIPitolisant00028121-38 at -8124) (noting "clinical trials [were] conducted in patients with

narcolepsy with or without cataplexy").)  A clinician would not understand that the inclusion of

patients with cataplexy in clinical studies would "imply" that Wakix was effective at and approved

for treating that symptom, as Plaintiffs' experts suggest. (Meskill Opening Rpt., App'x. D ¶¶ 47-

48; Roth Opening Rpt., App'x. D ¶¶ 49-50.)

      i.    References to Patients with Narcolepsy Without Cataplexy
           Do Not Suggest Pitolisant is ████████████████

1446.  The inclusion of some narcoleptic patients without a history of cataplexy in one of

the clinical studies discussed on Novitium's proposed label does not suggest that pitolisant is

█████████████████, as Drs. Meskill and Roth assert. (Meskill Opening Rpt., App'x. D ¶¶ 20-

32, 46-52; Roth Opening Rpt., App'x. D ¶¶ 21-31, 47-53.)

1447.  First, there is no evidence that a clinician would know that the form of pitolisant

used in that study, referred to as "BF2.649," is the same as the pitolisant hydrochloride in

Novitium's ANDA Products. (Meskill Opening Rpt., App'x. D ¶ 27; Roth Opening Rpt., App'x.

D ¶ 28.)

1448.  Second, as noted above, the mere inclusion of a particular endpoint in a clinical

study does not suggest that the study drug is ultimately shown effective for that particular endpoint.

Similarly, the mere inclusion of a particular patient population in a clinical trial (e.g., patients with

---

[101]         https://clinicaltrials.gov/study/NCT01067222?tab=results;
https://clinicaltrials.gov/study/NCT01800045?term=NCT01800045&rank=1&tab=results.

CONFIDENTIAL

█████████████████████) does not mean that effectiveness was ultimately shown across all symptoms or all patients.

1449.   Third, a clinician reviewing Novitium's prescribing information would not compare █████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████ And even were they to do so, clinicians would not make the same untested assumptions made by Plaintiffs' experts in their calculations. For instance, Plaintiffs' experts appear to assume that the adverse event data are limited to those gathered from ████████

████████████████████████ (Meskill Opening Rpt., App'x. D ¶ 24; Roth Opening Rpt., App'x. D ¶¶ 24-25; ANIPitolisant00027871.)  But a clinician would understand that adverse event data may be pooled to include clinical trials that were not pivotal to the approved conditions of use. (*See e.g.,* Adverse Reactions Section of Labeling for Human Prescription Drug and Biological Products — Content and Format at 9 (Jan. 2006)[102] (ANI-Pitolisant00032048-63).)  This would include at least six placebo-controlled studies of pitolisant in patients with narcolepsy registered on clinicaltrials.gov for the relevant time period.[103]

c)   *A Clinician Would Rely on the Label and Not on Academic Publications to Make Prescribing Decisions*

1450.   A clinician making a prescribing decision would rely on Novitium's proposed label and regulatory approval of Novitium's ANDA Products rather than publications or articles summarizing the results of specific studies. A clinician would understand that statements about effectiveness in scientific articles are not equivalent to or a substitute for the rigors of regulatory review and approval. A clinician would also understand that a statement in a journal article about

---

[102] https://www.fda.gov/media/72139/download
[103]   NCT01067222, NCT01800045, NCT01067235, NCT01789398, NCT01638403, NCT02611687.

a specific endpoint or outcome measure does not equate to regulatory approval for a given use, particularly because regulatory reviews involve unconflicted professionals for an extensive evaluation of the underlying clinical data. CDER: Drug Development and Approval Process.[104] For example, approximately six years before FDA first approved Wakix, one study disclosed that "[p]itolisant at doses up to 40 mg was efficacious on EDS." (Yves Dauvilliers & Claudio Bassetti et al., *Pitolisant versus placebo or modafinil in patients with narcolepsy: a double-blind, randomised trial*, 12 Lancet Neurology 1068-75, 1068 (2013) ("Dauvilliers 2013") (ANI-Pitolisant00029627-34 at -9627).) A clinician knows that such statements regarding effectiveness in scientific articles are no substitute for the rigors of regulatory review and approval.

1451.   A clinician would not prescribe Novitium's ANDA Products on the basis of the most recent practice parameters, as Drs. Meskill and Roth assert. (Meskill Opening Rpt., App'x. D ¶¶ 42-43; Roth Opening Rpt., App'x. D ¶¶ 42-43.) As discussed above, a prescribing clinician would rely on Novitium's Label, which does not reference practice parameters. Even to the extent such a clinician was aware of the relevant practice parameters, he or she would still make the decision of which particular drug product to prescribe based on the FDA-approved and labelled uses for that specific drug product.

d)   *References on Novitium's Proposed Label* ███████████
███████████████████

1452.   The proposed Novitium label's reference to ██████████████████
███████████   does not actively encourage a clinician to use Novitium's ANDA Products ███████. (Meskill Opening Rpt., App'x. D ¶¶ 11, 14-15, 26, 31; Roth Opening Rpt., App'x. D ¶¶ 12, 15-16, 27, 31.)

1453.   Novitium's proposed label states that:

---

[104] https://www.fda.gov/drugs/development-approval-process-drugs.

**CONFIDENTIAL**



1454.   Far from actively encouraging a clinician to prescribe Novitium's ANDA Products ████, this language discourages clinicians from using Novitium's ANDA Products to treat anything other than the conditions listed on Novitium's proposed label. As noted above, Novitium's label ████████████████. A clinician reading Novitium's proposed label would not understand statements related to Harmony's marketing exclusivity to promote, recommend, or encourage the use of Novitium's ANDA Products ████████.

1455.   As Plaintiffs admit, a clinician reading the above-referenced language from Novitium's proposed label would still have to reference the Wakix label, evaluate for any differences with Novitium's proposed label, and infer which of those differences might implicate ████████. (*See, e.g.*, Meskill Opening Rpt., App'x. D ¶¶ 14-15; Roth Opening Rpt., App'x. D ¶¶ 15-16.)  Thus, Novitium's proposed label does nothing on its own to even identify, much less promote, ████████████████████.

1456.   "[A] generic drug is generally required to have the same labeling as the RLD." (*See* Revising ANDA Labeling Following Revision of the RLD Labeling (Jan. 2024) at 2)[105] (ANI-Pitolisant00028802-10 at -8806).)  FDA will thus refuse to approve an ANDA unless "the labeling proposed for the generic drug is the same as the labeling approved for the RLD, except for . . . aspects of the RLD's labeling are protected by patent or exclusivity." (*Id.*)  As such, any differences between Novitium's approved label and that of Wakix are limited to the aspects of the RLD that are allegedly protected by exclusivities such as the '947 Patent. Any changes to the

---

[105]https://www.fda.gov/media/175654/download.

ANDA labeling over that of the RLD, as required by FDA, are explicitly permitted by statute and regulation. (*See, e.g.*, 21 U.S.C. § 355a(o).)  These changes therefore do not actively promote, recommend, or encourage ███████████████████████████████.

1457.   As noted above, EDS and cataplexy are frequently treated separately. (*See supra* at XX.)  Because a treating clinician viewing Novitium's proposed label would be concerned with ████████████████████████████████████████████████, a mere reference to some other, undefined use would not motivate a clinician to investigate other uses that may not be needed for that particular patient.

    e)  *Novitium's ANDA Products Will Be Used* ██████████████
████████████████████████████

1458.   Again, EDS and cataplexy are frequently treated separately. Accordingly, clinicians regularly use pitolisant to treat patients for cataplexy who may have no active need for treatment of EDS.

1459.   Indeed, Plaintiffs' expert, Dr. Meskill, has prescribed pitolisant to treat cataplexy in patients having no need for EDS treatment. In a 2020 publication, Dr. Meskill discussed using Wakix to treat cataplexy in patients that were already "taking at least one standard-of-care agent for narcolepsy at enrollment."  (Meskill, G. J., *Pitolisant (Wakix) Is an Effective Anticataplexy Agent In Narcolepsy Type 1*, 43 SLEEP, Abstract Supplement (2020) ("Meskill 2020") (ANI-Pitolisant00030640).)  Of the six narcoleptic patients with cataplexy for which data are provided, at least four were already taking another medication to treat EDS symptoms. (*See id.*)

1460.   Dr. Meskill's experience reflects standard practice. A clinician treating a patient for cataplexy would not expect any given treatment to also be effective in treating EDS. (*Supra* at XX.)  Moreover, whether EDS is present and, if so, its frequency and severity, varies across patients. (*Supra* at XX.)  "Sleepiness is usually the first symptom to manifest" in patients with

NT1.  (*See* ICSD-3-TR at 185 (ANI-Pitolisant00028267)).)  As such, patients will regularly seek and obtain treatment for EDS, when present, before cataplexy symptoms arise. And practicing clinicians routinely deal with patients who are receiving adequate treatment for any EDS, but who are in need of further treatment to alleviate the cataplexy symptoms. Pitolisant is thus regularly used to treat cataplexy without also treating EDS.

1461.   Even to the extent a patient were in need of treatment for both EDS and cataplexy, a clinician would still regularly administer a drug other than Wakix to treat EDS while still using pitolisant to treat cataplexy.

1462.   EDS does not necessarily manifest as generalized sleepiness. For example, some patients predictably experience EDS when they undertake certain activities, for example such as driving a car. In such cases, where a patient has defined triggers and predictable EDS episodes, a clinician would prescribe a fast-acting stimulant over Wakix, the latter of which can take several weeks to show any effect on EDS. Plaintiffs have admitted as much. (Harmony 2020 10-K (ANI-Pitolisant00028439-601 at -8497 (stating that "because the clinical response to WAKIX may take several weeks before addressing EDS and cataplexy symptoms, patients and physicians may choose other fast acting, stimulant and wake promoting agents over WAKIX.").)

1463.   Many prescribing physicians will not prescribe pitolisant in the first instance to treat EDS because it is unlikely to be covered by a patient's insurance, on which a large percentage of patients rely. Insurance companies rarely cover Wakix as a first line of treatment for EDS in narcoleptic patients and generally only consider coverage of Wakix for EDS if other first-line interventions cannot treat it. Because Wakix has a high out-of-pocket cost for patients (a 30-day supply of Wakix at the maximum dose of 35.6 mg would cost a patient around $16,300 if not

covered by insurance),[106] few patients opt to pay out of pocket for Wakix, even in the unlikely event that a clinician would otherwise prescribe it to treat EDS in the first instance.

1464.  Many other drugs are known to be effective in treating EDS in narcoleptic patients. For example, armodafinil costs only between $16.25 and $45.82 for a one-month supply, without insurance. If one of the many proven (and potentially cheaper) drugs provided a patient relief from EDS, subsequent administration of Novitium's ANDA Products to treat cataplexy would not necessarily also treat EDS.

1465. EDS is not required for a diagnosis of NT1.  (ICSD-3-TR at ANI-Pitolisant00028261.)  Indeed, there have been documented cases of cataplexy without any associated EDS dating back decades. (*See generally* Van Dijk 1991 (ANI-Pitolisant00032089-93); Hartse 1988 (ANI-Pitolisant00028221-25).)  And clinicians specializing in sleep medicine continue to regularly encounter narcoleptic patients who require treatment for cataplexy but not EDS.

1466.  Plaintiffs' fact witnesses and licensing agreements also show that they expect clinicians to prescribe pitolisant to treat cataplexy when they would not prescribe it to treat EDS. (*See, e.g.,* Capet Dep. Tr. 186:5-13 (Apr. 11, 2025).)

1467.  Plaintiffs' experts suggest that Dauvilliers 2013 would motivate a clinician to prescribe pitolisant to treat EDS. (*See* Meskill Opening Rpt., App'x. D ¶¶ 29-30; Roth Opening Rpt., App'x. D ¶¶ 29-30.)  But Dauvilliers concluded that pitolisant was likely inferior ("not non-inferior") to modafinil. (*See, e.g.*, Dauvilliers 2013 at 1068, 1072, 1073 (ANI-Pitolisant00029627, -9631, -9632).)  As discussed above, a clinician would not consult sources outside of Novitium's proposed label in making a prescribing decision. And, even in the unlikely event that a clinician

---

[106]https://www.drugs.com/price-guide/wakix.

CONFIDENTIAL

prescribing Novitium's ANDA Products were to review Dauvilliers 2013, the clinician would conclude that other drugs such as modafinil would be better suited to treating EDS.

1468.  As noted above, Plaintiffs' expert, Dr. Meskill, has used pitolisant to treat cataplexy in patients that are already receiving another standard-of-care treatment for EDS. Clinicians will similarly prescribe Novitium's ANDA Products for the treatment of ████████████████████ ████████████████ .

f)    *Treating Cataplexy with Pitolisant Will Not Necessarily Treat EDS*

1469.  Treating cataplexy would not necessarily treat EDS in any given patient having both symptoms because not all individuals respond equally to treatment of EDS with pitolisant. In Study 1, for example, 29% of patients had not even seen a reduction of at least 3 points on their ESS score by week 8.  (Watson 2021 at Fig. 2A (ANI-Pitolisant00031639).)  In that same time, fewer than half of subjects taking pitolisant saw their ESS score drop below 10, the minimum sleepiness threshold to qualify as EDS. Put differently, EDS was still diagnosable in more than half of patients after 8 weeks of treatment with pitolisant. (*Id.* at Fig. 2B (ANI-Pitolisant00031639).)  As discussed above, many patients in need of treatment for cataplexy do not have an active need for treatment of EDS.

1470.  Even to the extent a patient had a need for treatment of both symptoms at the same time, Study 1 shows that roughly half of the patients a clinician would treat for cataplexy would not show diagnosable treatment of EDS (i.e. an ESS score below 10), and nearly a third of patients do not show even a minimal 3-point improvement in ESS scores after 8 weeks of treatment. Thus, a clinician administering pitolisant to treat cataplexy would not necessarily expect the drug to also treat EDS.

1471.  The idea that pitolisant necessarily treats both EDS and cataplexy is further undermined by an analysis co-authored by Plaintiffs' expert, Dr. Meskill, which is also listed on

clinicaltrials.gov under both Study 1 and Study 3. In that analysis, the authors (which also include an inventor on the '947 Patent and the current Harmony CEO) conclude that pitolisant does not, in practice, treat EDS in every patient who takes it. (*See generally* Meskill 2021 (HBS-EXPERT_0003522-30).) The authors calculated the number needed to treat ("NNT") for pitolisant with respect to both EDS and cataplexy endpoints. According to Dr. Meskill, the NNT is the "number of patients that need to be treated to achieve a specific outcome for one person." (*Id.* at 61 (HBS-EXPERT_0003522).) For example, if an NNT for a given outcome is four, a clinician would need to treat four patients to expect just one to have the defined outcome. In terms of probabilities, this means that with an NNT of four, each patient would have a 25% chance of having the defined outcome as a result of taking pitolisant.

1472. For EDS, Dr. Meskill calculated the NNTs for a $\geq 3$ point reduction in ESS score, and for a final ESS score of $\leq 10$ (i.e., the cutoff between somnolence and diagnosable EDS). For cataplexy, he calculated NNTs for reductions of $\geq 25\%$, $\geq 50\%$, and $\geq 75\%$ in the weekly rate of cataplexy ("WRC"). Dr. Meskill's analysis concluded that that a clinician needs to prescribe pitolisant to four or five patients in order to see ESS scores drop below 10 in just one. (*See, e.g.*, Meskill 2021 at 66 (HBS-EXPERT_0003527).) In other words, pitolisant is effective in treating EDS in only about 20-25% of patients. Similarly, Dr. Meskill's analysis of a 75% reduction in WRC yielded an NNT of four. (*Id.* at 67 (HBS-EXPERT_0003528).) Put differently, only 25% of patients to whom pitolisant is administered will see a 75% reduction in the rate of cataplexy attacks over the course of a week. Dr. Meskill's own analysis further demonstrates that a prescribing clinician looking to treat cataplexy would not necessarily expect it to treat a patient's existing EDS (to the extent it exists).

1473.   The NNTs calculated by Dr. Meskill indicate that the probability of pitolisant effectively treating both EDS and cataplexy is low. As noted above, the NNT for both EDS and cataplexy is approximately four, meaning that the probability of treating each in a particular patient is approximately 25%. This means that, based on Dr. Meskill's own analysis, there is at most just a 6.25% chance that a given patient would even respond to pitolisant with a meaningful reduction in both EDS and cataplexy symptoms (because 0.25 x 0.25 = 0.0625). For the remaining 93.75% of patients, one or both symptoms would be refractory to treatment with pitolisant. Dr. Meskill's NNT calculations suggest that a physician needs to prescribe pitolisant to an average of 16 patients with active EDS and cataplexy in order to effectively treat both symptoms in just *one* patient.

1474.   The evidence presented at trial will thus show that Plaintiffs' own clinical data and published analyses indicate that a clinician administering pitolisant to treat cataplexy pursuant to Novitium's proposed label would not ███████████████████████████████, when both symptoms are present in the same patient.

g)      *Novitium's Proposed Label Does Not Actively Promote* ███████
        *████ Because Following Its Titration Instructions Would Not*
        *Necessarily Lead to* ████████████

1475.   Even to the extent a particular patient was actively in need of treatment of both EDS and cataplexy symptoms, and was responsive to pitolisant with respect to both symptoms, the titration instructions on Novitium's proposed label would lead some clinicians to prescribe pitolisant to ████████████████████. Data from Plaintiffs' clinical trials indicate that pitolisant can alleviate the symptom of cataplexy faster and at lower dosages than it does EDS. (*See, e.g.*, Watson 2021 at ANI-Pitolisant00031641; Roth Reply Rpt. ¶ 181. A clinician following the ████████████████████████████████████████████████████████

████████████████████████.

1476.   Plaintiffs' own clinical data show that pitolisant acts to treat cataplexy faster than it does to treat EDS. Plaintiffs' expert Dr. Meskill admits as much. (Meskill Reply Rpt. ¶ 148, ("In Watson 2021, patients' cataplexy improved at a faster rate and lower pitolisant dosages relative to EDS.").)  For example, Study 3 showed a significant effect on cataplexy at just half the dose of pitolisant needed to produce a significant effect on EDS. (Watson 2021 at ANI-Pitolisant00031641 ("initial statistical separation from placebo was observed for EDS when most patients were receiving a pitolisant dose of 17.8 mg/day and for cataplexy when all patients were receiving 8.9 mg/day"); *see also id.* at Figs. 1B, 4 (showing that patients taking pitolisant showed statistically significant separation from placebo after just one week of treatment, when all patients were taking 4.45 mg, whereas no statistical separation was observed for EDS until the third week, when ~89% of the test subjects were taking a 17.8 mg dose).)

1477.   Novitium's proposed label ██████████████████████████████████

██████████████████████████████████████████████████████████

The label permits ████████████████████████████████ As discussed, cataplexy responds to lower doses of pitolisant than does EDS. A clinician titrating a patient's dosage based on the response of cataplexy symptoms is therefore more likely to discontinue upward titration earlier because cataplexy ameliorates more rapidly and at lower doses than does EDS.

1478.   Again, Plaintiffs clinical trial data confirm this dynamic. In Study 3, all patients suffered from frequent cataplexy, whereas in Study 1, just over half of the patients treated with pitolisant had cataplexy. (Watson 2021 at ANI-Pitolisant00031637, Table 2.)  And in Study 3, twice as many patients (13% vs. 6.5%) were maintained on the minimum dose of 8.9 mg throughout the stable dosing period from weeks 4-7. (*Id.* at ANI-Pitolisant00031638, Fig. 1.)

**CONFIDENTIAL**

These data further confirm that clinicians treating cataplexy would discontinue upward titration sooner and at lower doses, indicating that clinicians administering pitolisant to treat cataplexy may stop administering pitolisant before it acts to treat EDS. In other words, EDS would not necessarily be treated by virtue of ███████████████████████████████████████████.

1479.   Employees and shareholders of plaintiff Bioprojet have even commented on this dynamic. In a 2017 paper in *The Lancet*, Bioprojet employees noted that "for each of the subgroups of patients receiving a stable dose of 10 mg, 20 mg, or 40 mg, [weekly rate of cataplexy] was reduced significantly compared with placebo, which underscores the potential advantage of the flexible dosing scheme and reduces unnecessary drug exposure." (Z. Szakacs et al., *Safety and efficacy of pitolisant on cataplexy in patients with narcolepsy: a randomised, double-blind, placebo-controlled trial*, 16 Lancet Neurol 1-8, 7 (2017) (ANI-Pitolisant00031561-70 at -1567).) A clinician treating cataplexy would ██████████████████████████████████ and, in so doing, treat cataplexy without necessarily treating any EDS, which may (or may not) be present.

>    h)    *Novitium Does Not Intend to Induce Infringement of the Asserted Claim of the '947 Patent*

1480.   Novitium's actions show no evidence of any intent to induce others to administer its ANDA Products ████████████████████. Indeed, Novitium has taken steps to avoid any suggestion that its ANDA Products should be used for any indication other than ████████████ ███████████████████████████.

1481.   A substantial number of patients with narcolepsy need treatment only for cataplexy, and using Novitium's ANDA Products to treat cataplexy would be a substantial noninfringing use of the ANDA Products. Cataplexy is present in a substantial portion of patients with narcolepsy. Treatment of cataplexy merits its own use code and is a separate indication from EDS. Furthermore, Plaintiff Harmony agreed to pay Plaintiff Bioprojet a milestone payment of $100

**CONFIDENTIAL**

million upon FDA approval of Wakix to treat cataplexy, compared a separate payment of only $75 million for FDA approval of the EDS indication. (2020 10-K at 39 (ANI-Pitolisant00028439-601 at -477).)[107] It has long been known "that cataplexy may occur in an isolated form for very long periods" (van Dijk 1991 at 720 (ANI-Pitolisant00032092).) For example, about 10% of narcolepsy patients present with cataplexy as their first symptom. (Roth 2020 at 59.) Cataplexy can occur for decades before EDS presents, and that "isolated cataplexy represents a form of narcolepsy." (van Dijk 1991 at 720 (ANI-Pitolisant00032092).) Furthermore, the presence of EDS is not part of the diagnostic criteria for Narcolepsy Type 1 ("NT1"). Indeed, the diagnostic criteria for NT1 does not even require a history of somnolence going back at least 3 months. (ICSD-3-TR at 179 (ANI-Pitolisant00028261).) To Novitium's knowledge and belief, a substantial number of patients diagnosed with NT1 will never develop or need treatment for EDS. (*See supra* at XX; *see also* ICSD-3-TR at 179-191 (ANIPitolisant00028261-73); Hartse 1988 at 24-25 (ANI-Pitolisant00028222-23); van Dijk 1991 at 720 (ANI-Pitolisant00032092).)

1482. When Novitium revised its patent certification to the '947 Patent to include a section viii carveout with respect to EDS, Novitium also made extensive modifications to its proposed prescribing information. (*See* eCTD Seq. 008 (Nov. 14, 2024) (ANI-Pitolisant00017679-80).) As a result, Novitium's proposed prescribing information ███████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

---

[107]  Available at https://ir.harmonybiosciences.com/static-files/a23d6150-81ab-472b-8d01-b9baf78ba1fc.

**CONFIDENTIAL**



1483.   Novitium does not intend for its ANDA Products to be used ███████████ ████████ to otherwise infringe the '947 Patent. Novitium does not intend for its ANDA Products to be used ████████████ in a manner that would otherwise infringe the '947 Patent, and Plaintiffs have not shown otherwise. Novitium lacks any knowledge that its ANDA Products and proposed prescribing information would induce others to infringe the '947 Patent, and Plaintiffs have not shown otherwise. Indeed, given Novitium's revisions to its proposed prescribing information, nothing about Novitium's proposed ANDA products promotes, encourages, or recommends their use to ████████████████████████. (*See* eCTD Seq. 008 (Nov. 14, 2024) (ANI-Pitolisant00017679-80); Novitium Redline Label (Revised 06/2025) (ANIPitolisant00027887-27914).)

1484.   Plaintiffs thus resort to references and statements outside of Novitium's label to support their contention that Novitium's ANDA Products would somehow induce others to infringe the claims of the '947 Patent. But even were that the case (though it is not), Plaintiffs still do not show that Novitium possesses any intent or took active steps to induce others to infringe claim 13 of the '947 Patent. For example, Plaintiffs, through their experts, point to ████████████ ████████████████████████████████████████████ Plaintiffs cannot show that Novitium intended to ████████████████████████████████████ ████████████████████

1485.   Furthermore, any use of Novitium's ANDA Products ████████ would be an off-label use, and not approved by FDA. Novitium has no knowledge of or intent to promote any off-

CONFIDENTIAL

label use of its ANDA Products, and indeed Federal regulations provide that "any clinical study that is discussed in prescription drug labeling . . . must not imply or suggest indications or uses or dosing regimens not stated in the 'Indications and Usage' or 'Dosage and Administration' section." (21 CFR 201.57(c)(15)(i).)  Guidance published by FDA likewise states that "[t]he CLINICAL STUDIES section must not suggest or imply indications, uses or dosing regimens not stated in the INDICATIONS AND USAGE or DOSAGE AND ADMINISTRATION section."  (*See* Clinical Studies Section of Labeling for Human Prescription Drug and Biological Products — Content and Format, at 10 (Jan. 2006) (ANI-Pitolisant00028771-95, at -8783); *see also* Cramer Bornemann Reb. Rpt. at ¶ 93; Kryger Reb. Rpt. at ¶ 137.)

1486.   Indeed, Plaintiffs (again through their experts) suggest a host of references outside of Novitium's label would induce clinicians to ▮▮▮▮▮ using pitolisant. (Roth Op. Rpt. Appx. D at ¶¶ 29-31; Meskill Op. Rpt. Appx. D at ¶¶ 28-31.)  These include articles published by Plaintiffs' employees and even the Wakix label itself. (*See, e.g.,* Meskill 2021 (HBS-EXPERT_0003522-30); Dauvilliers 2013 (ANI-Pitolisant00029627-34); Watson 2021 (ANI-Pitolisant00031639).)  But Plaintiffs have not shown that Novitium has any knowledge or intent to promote infringement via such outside references, particularly when those references are unrelated to the approval of Novitium's ANDA. (*See, e.g.*, Cramer Bornemann Reb. Rpt. at ¶¶ 101-102; Kryger Reb. Rpt. at ¶ 145.)

1487.   Plaintiffs do not allege infringement under § 271(g) of the '947 Patent against Novitium.

1488.   Plaintiffs do not allege contributory infringement of the '947 Patent against Novitium.

1489.   Plaintiffs do not allege infringement of the '947 Patent against Novitium under the

Doctrine of Equivalents.

## VIII.   CERTAIN REFERENCES AND PRIOR ART

1490.   The following references qualify as proper obviousness-type double patenting

references against the '947 Patent:

- U.S. Patent No. 8,354,430 (DTX-0375)

- U.S. Patent No. 7,910,605 (DTX-0158)

- U.S. Patent No. 7,169,928 (DTX-0138)

U.S. Patent No. 7,138,413 (DTX-0133)

1491.   The following references are prior art to the '197 Patent:

| '197 Patent | | | |
|---|---|---|---|
| Abbrev. | Citation | Issue Date / Pub. Year | Exhibit Number |
| EP '300 | European Patent Application EP 0 982 300 A2 | Mar. 1, 2000 | DTX-0082 |
| WO '254 | International Patent Publication WO 2000/06254 | Feb. 10, 2000 | PTX-497 DTX-0090 |
| Amidon | Amidon, G.L. et al, *A Theoretical Basis for a Biopharmaceutic Drug Classification: The Correlation of in Vitro Drug Product Dissolution and in Vivo Bioavailability*, 12(3) PHARM. RSCH. 413 | 1995 | DTX-0151 |
| 1987 FDA Guidelines | FDA Guidelines: *Guideline for Submitting Supporting Documentation in Drug Applications for the Manufacture of Drug Substances*, U.S. Department of Health and Human Services, Food and Drug Administration, February 1987 | 1987 | PTX-445 DTX-0012 |

**CONFIDENTIAL**

| '197 Patent | | | |
|---|---|---|---|
| **Abbrev.** | **Citation** | **Issue Date / Pub. Year** | **Exhibit Number** |
| Fiese | Fiese, E.F. & Hagen, T.A., *Preformulation*, THEORY AND PRACTICE OF INDUSTRIAL PHARM. 171 (Lachman, L., Lieberman, H.A., Kanig, J.L., eds., 3rd ed. 1986) | 1986 | DTX-0152 |
| Gould | Gould, P. L., *Salt selection for basic drugs*, INTERNATIONAL JOURNAL OF PHARMACEUTICS, 33, 201-217 | 1986 | DTX-0083 |
| 1999 ICH Q6A Guideline | ICH Q6A Guideline: *ICH Procedure and Acceptance Criteria for New Drug Substances and new Drug Products: Chemical Substances Q6A* | 1999 | PTX-444 DTX-0164 |
| 2003 ICH Q1A(R2) Guideline | ICH Harmonised Tripartite Guideline Stability Testing of New Drug Substances and Products Q1A(R2), Int'l Conf. on Harmonisation of Technical Requirements for Registration of Pharmaceuticals for Human Use | 2003 | DTX-0163 |
| Meier I | Meier, G. et al., *FUB 649: A Novel Non-imidazole histamine H3-Receptor Antagonist with High In Vitro and Oral In Vivo Potency*, 334(2) ARCH. PHARM. PHARM. MED. CHEM. C40 | 2001 | PTX-429 DTX-0085 |
| Meier II | Meier, G. et al., *Influence of imidazole replacement in different structural classes of histamine H- 3-receptor antagonists*, 13 EUR. J. PHARM. SCI. 249, 255, 257–58 | 2001 | PTX-430 DTX-0086 |
| Stephenson | Stephenson, G.A. et al., *Formation of Isomorphic Desolvates: Creating a Molecular Vacuum*, 87 J. PHARM. SCIS. 536 | 1998 | PTX-455 DTX-0170 |
| Tong | Tong, W. & Whitesell, G., *In Situ Salt Screening – A Useful Technique for Discovery Support and Preformulation Studies*, 3(2) PHARM DEV. & TECH. 215 | 1988 | DTX-0166 |

| '197 Patent | | | |
|---|---|---|---|
| **Abbrev.** | **Citation** | **Issue Date / Pub. Year** | **Exhibit Number** |
| Vippagunta | Vippagunta, S.R. et al., *Crystalline Solids*, 48 ADVANCED DRUG DELIVERY REVIEWS 3–26 | 2011 | PTX-413 DTX-0013 |

1492. The following references are prior art to the '947 Patent:

| '947 Patent Prior Art | | | |
|---|---|---|---|
| **Abbrev.** | **Citation** | **Issue Date / Pub. Year** | **Exhibit Number** |
| EP '300 | European Patent Application EP 0 982 300 A2 | Mar. 1, 2000 | DTX-0082 |
| EP '503 | European Patent No. 1 100 503 B1 | Sept. 22, 2004 | DTX-0002 |
| Alguacil | Alguacil et al., *Histamine H3 Receptor: A Potential Drug Target for the Treatment of Central Nervous System Disorders*, 2 CURRENT DRUG TARGETS – CNS & NEUROLOGICAL DISORDERS 303 | 2003 | PTX-544 DTX-0076 |
| Ancoli-Israel | Ancoli-Israel et al., *Are Breathing Disturbances in Elderly Equivalent to Sleep Apnoea Syndrome?*, NATURE 17:77–83 | 1994 | DTX-0111 |
| Apelt | Apelt et al., *Development of a New Class of Nonimidazole Histamine H3 Receptor Ligands with Combined Inhibitory Histamine N-Methyltransferase Activity*, 45 J. MED. CHEM. 1128 | 2002 | PTX-468 DTX-0077 |
| Arnulf | Arnulf et al., *Parkinson's disease and sleepiness*, NEUROLOGY 58:1019–1024 | 2002 | DTX-0128 |
| Arrang 1983 | Arrang et al., *Autoinhibition of brain histamine release mediated by a novel class (H3) of histamine receptor*, NATURE 302:832 | 1983 | PTX-471 DTX-0200 |
| Arrang 1987 | Arrang et al., *Highly potent and selective ligand for histamine H3-receptors*, NATURE 327:117–123 | 1987 | DTX-0108 |
| Aslanian | Aslanian, R., et al., *Recent Progress in Histamine H3 Receptor Chemistry*, ANN. REP. MED. CHEM. 39, 57–66 | 2004 | PTX-470 DTX-0044 |

CONFIDENTIAL

| '947 Patent Prior Art | | | |
|---|---|---|---|
| Abbrev. | Citation | Issue Date / Pub. Year | Exhibit Number |
| Bosboom | Bosboom, J.L.W. et al., *Cognitive dysfunction and dementia in Parkinson's disease*, 111 J. NEURAL TRANSM. 1303 | 2004 | DTX-0120 |
| Chervin | R.D Chervin, *Sleepiness, fatigue, tiredness, and lack of energy in obstructive sleep apnea*, 118(2) CHEST 372 | 2000 | DTX-0123 |
| Cowart | Cowart, M., et al., *Medicinal Chemistry and Biological Properties of Non-Imidazole Histamine H3 Antagonists*, MINI-REV. MED. CHEM. 4, 979–992 | 2004 | PTX-474 DTX-0046 |
| Dubois | Dubois, B. & Pillon, B., *Cognitive deficits in Parkinson's disease*, 244 J. NEUROL. 2 | 1997 | DTX-0119 |
| Fletcher | Fletcher, L., *Guilford Halts Gliatech Deal*, NAT. BIOTECHNOL. 18, 1023 | 2000 | DTX-0194 |
| Garbarg | Garbarg, M., et al., *Histaminergic pathway in rat brain evidenced by lesions of the medial forebrain bundle*, 186 SCIENCE 833–835 | 1974 | PTX-559 DTX-0102 |
| Garcia-Borreguero | Garcia-Borreguero, D. et al., Parkinson's Disease and sleep, 7(2) SLEEP MED. REVIEWS 115 | 2003 | DTX-0122 |
| Gannellin 1995 | Ganellin, C.R., et al., Design of potent non-thiourea H3-receptor histamine antagonists, 38 . MED. CHEM. 3342 | 1995 | PTX-475 DTX-0091 |
| Gannellin 1996 | Ganellin, C.R., et al., A novel series of (phenoxyalkyl)imidazoles as potent H3-receptor histamine antagonists, 39 J. MED. CHEM. 3806 | 1996 | PTX-558 DTX-0110 |
| Gannellin 1998 | Ganellin, C.R., Synthesis of potent non-imidazole histamine H3-receptor antagonists, 331 ARCH. PHARM. PHARM. MED. CHEM. 395 | 1998 | PTX-476 DTX-0093 |

| '947 Patent Prior Art | | | |
| --- | --- | --- | --- |
| Abbrev. | Citation | Issue Date / Pub. Year | Exhibit Number |
| Grammatopoulos | Grammatopoulos, D.K., and Chrousos, G.P., "Functional characteristics of CRH receptors and potential clinical applications of CRH-receptor antagonists," TRENDS ENDOCRINOL. METAB. 13, 436–444 | 2002 | PTX-477 DTX-0047 |
| Guilleminault 1988 | Guilleminault, C., et al., *Determinants of Daytime Sleepiness in Obstructive Sleep Apnea*, CHEST 94(1):32–37 | 1988 | DTX-0124 |
| Guilleminault 2001 | Guilleminault, C. et al., *Excessive daytime sleepiness, A Challenge for the practicing neurologist*, BRAIN 124(Pt8):1482–91 | 2001 | DTX-0118 |
| Heinzer | R. Heinzer et al., *Slow-wave activity in sleep apnea patients before and after continuous positive airway pressure treatment. Contribution to daytime sleepiness*, CHEST 119(6):1807-13 | 2001 | DTX-0126 |
| Hobson | Hobson, D., et al., *Excessive Daytime Sleepiness and Sudden-Onset Sleep in Parkinson Disease*, JAMA 287, 455–463 | 2002 | DTX-0129 |
| ICSD-1 | American Academy of Sleep Medicine, *International Classification of Sleep Disorders*, (ICSD-1 rev.) | 2001 | DTX-0121 |
| Johns 1991 | Johns, M.W., *A New Method for Measuring Daytime Sleepiness: The Epworth Sleepiness Scale*, 14(6) SLEEP 540 | 1991 | DTX-0176 |
| Johns 1992 | Johns, M.W., *Reliability and Factor Analysis of the Epworth Sleepiness Scale*, 15(4) SLEEP 376 | 1992 | DTX-0178 |
| Johns 1993 | Johns, M.W., *Daytime Sleepiness, Snoring, and Obstructive Sleep Apnea. The Epworth Sleepiness Scale*, 103(1) CHEST 30 | 1993 | DTX-0177 |
| Johns 1994 | Johns, M.W., *Sleepiness in Different Situations Measured by the Epworth Sleepiness Scale*, 17(8) SLEEP 703 | 1994 | DTX-0179 |

**CONFIDENTIAL**

| '947 Patent Prior Art | | | |
|---|---|---|---|
| **Abbrev.** | **Citation** | **Issue Date / Pub. Year** | **Exhibit Number** |
| Johns 1997 | Johns, M. & Hocking, B., *Daytime sleepiness and sleep habits of Australian workers*, 20(10) SLEEP 844 | 1997 | PTX-817 DTX-0175 |
| Kumar | Kumar, S., and Bhatia, M., *Excessive daytime sleepiness in Parkinson's disease as assessed by the Epworth Sleepiness Scale*, SLEEP MED. 4, 339–342 | 2003 | DTX-0180 |
| Kushida | Kushida, C.A., et al., *Electroencephalographic correlates of cataplectic attacks in narcoleptic canines*, ELECTROENCEPHALOGR. CLIN. NEUROPHYSIOL. 61, 61–70 | 1985 | PTX-627 |
| Leurs | Leurs, R., et al., *Therapeutic potential of histamine H3 receptor agonists and antagonists*, 19 TIPS 177 | 1998 | PTX-481 DTX-0099 |
| Levin | Cognitive *Impairment in Parkinson's Disease*, 10(2) NEUROLOGIC CLINICS 471 | 1992 | DTX-0227 |
| Liedtke | Liedtke, S. et al., *Replacement of imidazole by a piperidine moiety differentially affects the potency of histamine H3-receptor antagonists*, NAUNYN-SCHMIEDEBERG'S ARCH PHARMACOL. 367:43–50 | 2003 | PTX-431 DTX-0084 |
| Ligneau | Ligneau, X., et al., *116 Neurochemical and behavioral effects of ciproxifan, a potent histamine H3-receptor antagonist*, 287 J. PHARMACOL. EXP. THER. 658 | 1998 | PTX-573 DTX-0092 |
| Lin | Lin et al., *Involvement of histaminergic neurons in arousal mechanisms demonstrated with H3 receptor ligands in the cat*, BRAIN RES. 523:325–330 | 1990 | PTX-482 DTX-0107 |
| Lovenberg | Lovenberg, *T.W. et al., Cloning of Rat Histamine H3 Receptor Reveals Distinct Species Pharmacological Profiles*, 293(3) J. PHARMACOL. EXP. THER. 771 | 2000 | PTX-576 DTX-0344 |

| '947 Patent Prior Art | | | |
|---|---|---|---|
| Abbrev. | Citation | Issue Date / Pub. Year | Exhibit Number |
| McLeod | McLeod, R.L et al., Sch 50971, *An Orally Active Histamine H3 Receptor Antagonist, Inhibits Central Neurogenic Vascular Inflammation and Produces Sedation in the Guinea Pig*, 287 J. PHARMACOL. EXP. THER. 43 | 1998 | PTX-580 DTX-0089 |
| Meier II | Meier, G. et al., *Influence of imidazole replacement in different structural classes of histamine H- 3-receptor antagonists*, 13 EUR. J. PHARM. SCI. 249, 255, 257–58 | 2001 | PTX-430 DTX-0086 |
| Mikó | Mikó, T., et al., Novel Nonimidazole Histamine H3 Receptor Antagonists: 1-(4-(Phenoxymethyl)benzyl)piperidines and Related Compounds, 46 J. MED. CHEM. 1523 | 2003 | PTX-583 DTX-0096 |
| Mitler | Mitler, M.M., et al., *Narcolepsy and Its Treatment with Stimulants*, SLEEP 17, 352–354 | 1994 | PTX-584 DTX-0052 |
| Monti | Monti, et al., *Effects of selective activation or blockade of the histamine H3 receptor on sleep and wakefulness*, 205 EUR. J. OF PHARMACOLOGY 283 | 1991 | PTX-486 DTX-0098 |
| Morisset | Morisset S., et al., *High Constitutive Activity of Native H3 Receptors Regulates Histamine Neurons in Brain*, 408 NATURE 860 | 2000 | PTX-487 DTX-0097 |
| Onodera | Onodera et al., *Neuropharmacology of the Histaminergic Neuron System in the Brain and its Relationship with Behavioral Disorders*, PROGRESS IN NEUROBIOLOGY, 42(6):685-702 | 1994 | PTX-587 DTX-0114 |

| '947 Patent Prior Art | | | |
|---|---|---|---|
| Abbrev. | Citation | Issue Date / Pub. Year | Exhibit Number |
| Parmentier | Parmentier, et al., *Anatomical, Physiological, and Pharmacological Characteristics of Histidine Decarboxylate Knock-Out Mice: Evidence for the Role of Brain Histamine in Behavioral and Sleep-Wake Control*, 22 J. NEUROSCIENCE 7695 | 2002 | PTX-589 DTX-0087 |
| Passani | Passani et al., The histamine H3 receptor as a novel therapeutic target for cognitive and sleep disorders, 25 TRENDS IN PHARM. SCI. 618 | 2004 | PTX-489 DTX-0088 |
| Pollard | Pollard, H. and Schwartz, J.-C., *Histamine neuronal pathways and their functions*, 10 TRENDS IN NEUROSCIENCEE 86 | 1987 | PTX-591 DTX-0105 |
| Rose | Rose, H.A., *Erythromycin and Some of Its Derivatives*, 26 ANALYTICAL CHEMISTRY 938 | 1954 | DTX-0144 |
| Sauter | Sauter C, et al., *Excessive daytime sleepiness in patients suffering from different levels of obstructive sleep apnea syndrome*, 9 J. SLEEP RES. 293 | 2000 | DTX-0112 |
| Seneviratne | Seneviratne, et al., *Excessive daytime sleepiness in obstructive sleep apnea: prevalence, severity, and predictors*, 5(4) SLEEP MED. 339-343 (July 2004) | 2004 | DTX-0131 |
| Stark 1996 | Stark H., et al., *Developments of histamine H3-receptor antagonists*, 21 DRUGS OF THE FUTURE 50 | 1996 | PTX-491 DTX-0132 |
| Stark 1998 | Stark, H., et al., *Development of FUB 181, a selective histamine H3-receptor antagonist of high oral in vivo potency with 4-(omega-(arylalkyloxy)alkyl)-1H-imidazole structure*, ARCH. PHARM. PHARM. MED. CHEM. 331, 211–218 | 1998 | PTX-492 DTX-0101 |
| Stark 2001 | Stark, H. et al., *The Histamine H3 Receptor and its Ligands*, 38 PROGRESS IN MED. CHEM. 279 | 2001 | PTX-493 DTX-0104 |

| '947 Patent Prior Art | | | |
|---|---|---|---|
| **Abbrev.** | **Citation** | **Issue Date / Pub. Year** | **Exhibit Number** |
| Stark 2003 | Stark, H., *Recent advances in histamine H3/H4 receptor ligands*, EXPERT OPIN. THER. PATENTS 13, 851–865 | 2003 | PTX-495 DTX-0053 |
| Stepnowsky | Stepnowsky C, et al., *Sleep Apnea and Health-Related Quality of Life in African-American Elderly*, 22(2) ANN. BEHAVIORAL MED. 116 | 2000 | DTX-0116 |
| Tandberg | Tandberg, E., et al., *Excessive Daytime Sleepiness and Sleep Benefit in Parkinson's Disease: A Community-Based Study*, 14 MOV'T DISORDERS 922-927 | 1999 | DTX-0130 |
| Toyota | Toyota, H. et al., *Behavioral characterization of mice lacking histamine H3 receptors*, 62 MOL. PHARMACOL. 389 | 2002 | PTX-599 DTX-0125 |
| Vgontzas | Vgontzas et al., *Marked Decrease in Sleepiness in Patients with Sleep Apnea by Etanercept*, J. CLIN. ENDOCRINOL. & METAB. 89:4409– 4413 | 2004 | PTX-496 DTX-0055 |
| Witkin | Witkin, J.M., and Nelson, D.L., *Selective histamine H3 receptor antagonists for treatment of cognitive deficiencies and other disorders of the central nervous system*, PHARMACOL. & THERAPEUTICS 103, 1–20 | 2004 | DTX-0197 |
| Young | Young, T.B., *Epidemiology of Daytime Sleepiness: Definitions, Symptomatology, and Prevalence*, 65 J. CLIN. PSYCHIATRY 12 | 2004 | DTX-0117 |
| Zeman | Zeman, A. et al., *Clinical review Narcolepsy and excessive daytime sleepiness*, 329 BMJ 724 (2004) | 2004 | PTX-603 DTX-0127 |

1493. Meier G, FUB 649: A Novel Non-imidazole histamine H3-Receptor Antagonist

with High In Vitro and Oral In Vivo Potency 334(2) ARCH. PHARM. PHARM. MED. CHEM.

C42 (2001) ("Meier I").

CONFIDENTIAL

a)   Meier I is a 2001 publication from Jean-Charles Schwartz and his colleagues, disclosing pitolisant (identified as "FUB 649").

b)   The authors state that "in order to facilitate a potential therapeutic use of H3 receptor antagonists for applications proposed, e.g., attention deficit hyperactivity disorder and Alzheimer's disease, we developed a novel type of H3 antagonist without an imidazole moiety."

c)   In Meier I, "FUB 649" was identified as "as one of the most potent antagonists both in vitro (pA2=8.25±0.04) and in vivo (ED50=1.6±0.9 mg/kg p.o.) with high selectivity for the H3 receptor."

d)   Meier I concluded that "FUB 649, a potent and selective non-imidazole H3-receptor antagonist, is a new promising lead for further development."

1494.   Brooks et al., *Novel Therapies for Narcolepsy*, 11(12) EXPERT OPIN. INVESTIG. DRUGS 1821-1827 (2002) ("Brooks").

a)   Brooks is an article published in 2002 relating to treating excessive daytime sleepiness associated with narcolepsy. Brooks states that "[t]he primary symptom off narcolepsy is excessive daytime somnolence (EDS), which impairs performance of usual activities." Brooks at 1821. Brooks also states that EDS in narcolepsy is treated with "stimulants and wake-promoting therapeutics." Brooks at 1822. .

b)   Brooks states that "studies have also demonstrated that H3 antagonists, such as thioperamide (Bioprojet, Societe Civile de Recherche) increase wakefulness" and further states that "[s]uch agents may prove useful in treating EDS due to narcolepsy or other causes." Brooks at 1825.

c)   Lin J.S. et al., Involvement of histaminergic neurons in arousal mechanisms demonstrated with H3 receptor ligands in the cat, 523 BRAIN RES. 325–330 (1990) ("Lin").

d)   Lin was a neurophysiological and pharmacological investigation by Jean-Charles Schwartz and colleagues into the role of histamine in regulating wakefulness and sleep. Lin at 325.

e)   Lin discloses that it was known that histaminergic neurons are situated in "a brain area involved in the maintenance of wakefulness." Lin at 325.

f)   Lin specifically studied the effects of histamine H3-receptor in the arousal mechanism by examining their effects on sleep-waking parameters in cats. Lin at 325. The investigators orally administered the "highly potent, selective, and brain penetrating ligands to H3 receptors, (R) αMeHA (an H3 receptor agonist) or thioperamide (an H3 receptor competitive antagonist) to cats and monitored their sleep-waking patterns via polygraph. Id. at 325-326. The "agonist and antagonist were further shown to be able to decrease or increase, respectively, in a marked and long-lasting manner, the synthesis and

CONFIDENTIAL

release of HA in vitro as well as in the brain of living animals." Id. at 325. The study found that when administered orally (R) αMeHA induced an increase in deep, slow wave sleep. Id. at 328. In contrast, thioperamide "elicited a marked, dose-related and long-lasting increase in W at the expense of both PS and SWS, especially S2." Id. at 326. Figure

g)  Lin stated that thioperamide is "the first drug facilitating HA release" and it "exerts a significant arousing effect." Lin at 329. Lin also stated that the "stimulation or blockade" of $H_3$ receptors "may constitute novel approaches to the treatment of sleep or vigilance disorders." Id. Furthermore, Lin states that "$H_3$-antagonists like thioperamide, the first histaminergic drug capable of inducing arousal by systemic application, may provide a novel means to promote [wakefulness] in vigilance deficits and sleep disorders such as hypersomnia or narcolepsy." Id.

h)  Lin also stated that its findings "provide further evidence for a role of antihistamine in the sleep-waking control and indicate that H3 receptors are crucially involved in the histaminergic arousal mechanisms." Lin at 329.

1495.  International Patent Publication WO 2000/06254 ("WO '254").

a)  "WO '254" was published on February 10, 2000, and lists Jean-Charles Schwartz as one of several inventors.

429

CONFIDENTIAL

b)  WO '254 discloses "new compounds, the structure of which does not contain imidazole moiety, which are useful as histamine $H_3$-receptor ligands." WO '254 at page 2, lines 25-27.

c)  WO '254 states that "[a]ntagonists of histamine H3-receptor are known especially to increase synthesis and release of cerebral histamine" and "[t]hrough this mechanism, they induce an extended wakefulness." WO '254 at page 1, lines 6-10. WO '254 further states that "[h]istamine $H_3$-receptor agonists are known to inhibit the release of several neurotransmitters including histamine, monoamines and neuropeptides and thereby exert sedative and sleep-promoting effects in brain." Id. at page 1, line 15-17.

d)  The objective of WO '254 was to provide "new potent $H_3$-receptors ligands" that do not include the imidazole ring, and which aimed to reduce poor blood-brain barrier penetration, interaction with cytochrome P-450 proteins and/or some hepatic and ocular toxicities. WO '254 at page 2, lines 23-24.

e)  WO '254 states that the claimed compounds are antagonists of WO '254 "advantageously used as active ingredient in particular, of medicaments having psychotropic effects, promoting wakefulness, attention, memory and improving mood." WO '254 at page 71, lines 17-19.

f)  An example of the compounds disclosed by WO '254 is 3-(4-Chlorophenyl)propyl 3 piperidinopropyl ether (page 19, line 7), i.e.,

430

pitolisant, the synthesis of which is described in Example 117 (page 121, lines 7-19), and which is the subject of claim 38. The claims of WO '254 are also directed to pharmaceutically acceptable salts and polymorphic crystalline structures of the claimed compounds. (WO '254 Claim 1).

1496.   European Patent Application EP 0 982 300 ("EP '300").

a)    EP '300 is a European Patent Application published on March 1, 2000 and lists Jean-Charles Schwartz, Jean-Michel Arrang, Monique Garbarg, Jeanne-Marie Lecomte, Xavier Ligneau, Walter Schunack, Holger Stark, Charon Ganellin, Fabien Leurquin, and Elz Sigurd as inventors.

b)    EP '300 discloses to the use of a compound of formula (A), the structure of which does not contain an imidazole moiety, in certain therapeutic applications. Abstract, [0016].



c)    EP '300 states that "[t]he compounds of formula (A) according to the invention have antagonistic and/or agonistic properties at the histamine H3-receptors" and also states that the compounds of formula (A) according to EP '300 "affect the synthesis and release of histamine monoamines or neuropeptides in brain and peripheral tissues." EP_'300 at [0240]-[0241].

d)    EP '300 states that "[a]ntagonists of histamine H3-receptor are
known especially to increase synthesis and release of cerebral
histamine and "[t]hrough this mechanism, they induce an extended
wakefulness, an improvement in cognitive processes, a reduction in
food intake and a normalization of vestibular reflexes." EP_'300 at
[0002] (citing Schwartz et al., Physiol. Rev., 1991, 71:1-51).

e)    EP'300 also states that "the compounds of formula (A) according to
the invention are advantageously used as active ingredient of
medicaments which act as an antagonist and/or agonist of H3-
receptors of histamine" and that the compounds "promote
wakefulness" and may "be useful in the treatment of sleep
disorders." Id. at [0245], [0255].

f)    EP '300 discloses "[p]harmaceutical products with histamine H3
receptor ligand properties and subsequent pharmacological
activities," and that an "especially important product among those
disclosed" in EP '300 "is 1-[3-[3[4-chlorophenyl)propoxy]propyl]-
piperidine" (i.e., pitolisant). '197 Patent, 1:12-16.

g)    EP '300 discloses pitolisant as "the free base and as the oxalate
salt". '197 Patent, 1:15-17.

1497.    European Patent No. 1100503 ("EP '503").

a)    EP '503 is a European Patent which issued on September 22, 2004,
which is more than one year before the earliest effective filing date
(i.e., February 6, 2006) of the '197 Patent.

432

b)    EP '503 identifies the patent owner as "Societe Civile Bioprojet" i.e., one of the Plaintiffs in this action. In addition, EP '503 lists several inventors, seven (7) of which are also listed as inventors on the '197 Patent, namely: Jean-Charles Schwartz, Jean-Michel Arrang, Jeanne-Marie Lecomte, Xavier Ligneau, Walter G. Schunack, Holger Stark, and Charon Ganellin.

c)    EP '503 discloses non-imidazole histamine $H_3$-receptor antagonists for use as the active ingredient in a pharmaceutical drug product. The non-imidazole histamine $H_3$-receptor antagonists disclosed in EP '503 include pitolisant.

d)    EP '503 discloses processes for crystallizing each of the disclosed non-imidazole histamine $H_3$-receptor antagonists compounds including pitolisant.

e)    EP '503 contains 48 claims. Claim 47 is reproduced below:

47. Use according to anyone of claims 1 to 46, wherein the compound is 3-(4-chlorophenyl)propyl-3-piperidinopropyl-ether, as well as its pharmaceutically acceptable salts, its hydrates, its hydrated salts, the polymorphic crystalline structures of this compound and its optical isomers, racemates, diastereoisomers and enantiomers.

AET_000038864 at AET_000038951. Claim 48 is reproduced below.

48. Use according to anyone of the preceding claims wherein said compound is in the form of its pharmaceutically acceptable salts, and said salts are chosen from the group consisting in hydrochloride, hydrobromide, hydrogen maleate, hydrogen oxalate.

AET_000038864 at AET_000038951.

a)    EP '503 further discloses "the use of addition salts which the compounds form with pharmaceutically acceptable acids." EP '503,

[0021]; AET_000038864 at AET_000038868. EP '503 discloses four "pharmaceutically acceptable salts," namely, "hydrochloride," "hydrobromide," "hydrogen maleate," and "hydrogen oxalate." EP '503, [0021]; AET_000038864 at AET_000038868.

b)    In several of the examples, the non-imidazole histamine H3-receptor antagonists compounds were crystallized or recrystallized using hydrochloric acid or oxalic acid and suitable solvents, including acetone, absolute ethanol/diethyl ether, diethyl ether/ethanol, and acetone. AET_000038864 at AET_000038920, AET_000038922-AET_000038924, AET_000038926.

c)    Example 117 of EP '503 provides the structure of 3-(4-chlorophenyl)propyl-3-piperidinopropyl ether which is the same molecule shown in the '197 Patent at column 1, lines 36-49 and identified as 1-[3-[3-(4-chlorophenyl)propoxy]propyl]-piperidine. AET_000038864 at AET_000038908, AET_000038926; WAKIX-PLFS_00000001 at WAKIX-PLFS_00000004. A POSA would recognize that 3-(4-chlorophenyl)propyl-3-piperidinopropyl ether, as used in EP '503, is synonymous with 1-[3-[3-(4-chlorophenyl)propoxy]propyl]-piperidine, as used in the '197 patent, and that they both refer to pitolisant.

1498.  U.S. Patent Application Publication No. 2009/0312367 (the "'367 Application").

a)    The '367 Application has an earliest priority date of July 21, 2006. The '367 Application and '947 Patent are both assigned to Bioprojet

and both share the same two named inventors: Jean-Charles Schwartz and Jeanne-Marie Lecomte. See ANIPitolisant00028419.

b)   The '367 Application discloses "a combination of modafinil and a histamine H3 receptor antagonist or inverse agonist, in particular for the treatment of narcolepsy-cataplexy." ANIPitolisant00028419 at ANIPitolisant00028420.

c)   The "Summary of the Invention" of the '367 Application states that "[i]n an unexpected manner, the inventors have shown that histamine H3 receptor antagonists or inverse agonists exhibit an anticataplectic potential" and that "these findings [were] acquired through the use of a reliable orexin knock-out mouse model . . . ." Id.

d)   The '367 application states that "[i]n the spirit of the invention, the term 'treatment' should be understood to mean curative or preventative treatment of narcolepsy-cataplexy, and includes improvement in the symptoms of the disease, particularly the prevention, or reduction in the number of, cataplexy attacks." ANIPitolisant00028419 at ANIPitolisant00028427.

e)   Example 1 of the '367 Application, titled "Narcolepsy/Cataplexy Model", discloses data from a report that issued February 6, 2004. WAKIX-BP 00212124 at WAKIX-BP 00212125. Example 1 of the '367 Application discloses that "[c]ontinuous electroencephalographic (EEG) and electromyographic (EMG)

435

recordings were obtained in groups of 6 orexin knockout mice (Chemilli et al., Cell, 1999, 98, 437)." ANIPitolisant00028419 at ANIPitolisant00028427.

f)      Example 1 of the '367 Application further discloses that an "[a]nalysis of the EEG and EMG data showed that . . . [i]n comparison with non-mutant mice, the null mice receiving vehicle alone showed decreased wakefulness, more episodes of REM sleep and direct transitions from wakefulness to REM sleep, an anomaly considered in this murine model to be the equivalent of narcolepsy-cataplexy attacks in humans (Willie et al., Neurosci. 2005, 130, 583)."  Id.

g)      Example 1 further recites that "[w]hile modafinil had no effect on wake-REM sleep transitions (in agreement with Willie et al., 2005, supra, and its lack of anticataplectic effect in human narcoleptics), this parameter was improved by" pitolisant.  Id.

h)      Independent claim 7 of the '367 Application recites a "method for treating a disorder of sleep, wakefulness or vigilance" and claim 15 depends from claim 7 and further recites that "the disorder of sleep or wakefulness is selected in the group consisting of . . . narcolepsy . . ." ANIPitolisant00028419 at ANIPitolisant00028431.

i)      Claim 16 depends from claim 15 and further recites that "the narcolepsy is narcolepsy-cataplexy", while claim 17 depends from

CONFIDENTIAL

claim 16 and specifies that the method is "for the prevention of cataplexy attacks." Id.

1499. Byrn, S., et al., Pharmaceutical Solids: A Strategic Approach to Regulatory Considerations, 12 PHARM. RSCH. 945 (1995) ("Byrn-1995").

a) Byrn-1995 is an article titled "Pharmaceutical Solids: A Strategic Approach to Regulatory Considerations, which published in July 1995. PRIORART_000000188.

b) Byrn-1995 discloses "a conceptual approach to the characterization of pharmaceutical solids" and "tools to develop information on pharmaceutical solids for both scientific and regulatory purposes." PRIORART_000000188

c) In several of the examples, the non-imidazole histamine H3-receptor antagonists compounds were crystallized or recrystallized using hydrochloric acid or oxalic acid and suitable solvents, including acetone, absolute ethanol/diethyl ether, diethyl ether/ethanol, and acetone. AET_000038864 at AET_000038920, AET_000038922-AET_000038924, AET_000038926.

d) Byrn-1995 also states that "[i]f polymorphs exist then it is necessary to examine the physical properties of the different polymorphs that can affect dosage form performance (bioavailability and stability) or manufacturing reproducibility," including "solubility profile . . . and stability." PRIORART_000000188 – 197 at PRIORART_000000190.

437

e)    In discussing the development of pharmaceutical products, Byrn-
1995 states that "[u]sually, . . . the most physically stable"
polymorph is selected, further noting that "[s]election of the most
stable form would, of course, insure that there would be no
conversion into other forms." PRIORART_000000188 – 197 at
PRIORART_000000191.

f)    Byrn-1995 also discloses that the solid form may be characterized
by X-ray powder diffraction, DSC (melting point), microscopy, IR,
and/or solid-state NMR. PRIORART_000000188 – 197 at
PRIORART_000000195.

g)    Byrn-1995 also states that "[i]nterest in the subject of
pharmaceutical solids stems in part from the Food and Drug
Administration's (FDA's) drug substance guidelines that states
'appropriate' analytical procedures should be used to detect
polymorphic, hydrated, or amorphous forms of the drug substance."
PRIORART_000000188 at PRIORART_000000188. "These
guidelines suggest the importance of controlling the crystal form of
the    drug    substance."    PRIORART_000000188    at
PRIORART_000000188.

1500.  Berge, S. M. et al., *Pharmaceutical Salts*, 66 J. PHARM. SCIS. (1977) ("Berge").

a)    Berge is an article titled "Pharmaceutical Salts," which published in
January 1977.

b)      Berge states that its purpose is "to present an overview of the many different salts from which new drug candidates can be chosen and to assemble data that will provide, for the student and practitioner alike, a rational basis for selecting a suitable salt form." Berge at 1-2.

c)      Specifically, according to Berge:

Salt-forming agents are often chosen empirically. Of the many salts synthesized, the preferred form is selected by pharmaceutical chemists primarily on a practical basis: cost of raw materials, ease of crystallization, and percent yield.

Berge at 1.

d)      In addition, Berge states:

Because of simple availability and physiological reasons, the monoprotic hydrochlorides have been by far the most frequent choice of the available anionic salt-forming radicals, outnumbering the sulfates nearly six to one.

Berge at page 2.

e)      Berge also includes Table 1, which lists commercially marketed salts that have been FDA-approved, along with their percentage in use through 1974:

**CONFIDENTIAL**

| Table I—FDA-Approved Commercially Marketed Salts | | | |
|---|---|---|---|
| Anion | Percent[a] | Anion | Percent[a] |
| Acetate | 1.26 | Iodide | 2.02 |
| Benzenesulfonate | 0.25 | Isethionate[i] | 0.88 |
| Benzoate | 0.51 | Lactate | 0.76 |
| Bicarbonate | 0.13 | Lactobionate | 0.13 |
| Bitartrate | 0.63 | Malate | 0.13 |
| Bromide | 4.68 | Maleate | 0.13 |
| Calcium edetate | 0.25 | Mandelate | 0.38 |
| Camsylate[b] | 0.25 | Mesylate | 2.02 |
| Carbonate | 0.88 | Methylbromide | 0.76 |
| Chloride | 4.17 | Methylnitrate | 0.38 |
| Citrate | 3.03 | Methylsulfate | 0.88 |
| Dihydrochloride | 0.51 | Mucate | 0.13 |
| Edetate | 0.35 | Napsylate | 0.25 |
| Edisylate[c] | 0.38 | Nitrate | 0.64 |
| Estolate[d] | 0.13 | Pamoate (Embonate) | 1.01 |
| Esylate[e] | 0.13 | Pantothenate | 0.25 |
| Fumarate | 0.25 | Phosphate/diphosphate | 3.16 |
| Gluceptate[f] | 0.18 | Polygalacturonate | 0.13 |
| Gluconate | 0.51 | Salicylate | 0.88 |
| Glutamate | 0.25 | Stearate | 0.25 |
| Glycollylarsanilate[g] | 0.13 | Subacetate | 0.38 |
| Hexylresorcinate | 0.13 | Succinate | 0.38 |
| Hydrabamine[h] | 0.25 | Sulfate | 7.46 |
| Hydrobromide | 1.90 | Tannate | 0.88 |
| Hydrochloride | 42.98 | Tartrate | 3.54 |
| Hydroxynaphthoate | 0.25 | Teoclate[j] | 0.13 |
| | | Triethiodide | 0.13 |
| Cation | Percent[a] | Cation | Percent[a] |
| Organic: | | Metallic: | |
| Benzathine[k] | 0.66 | Aluminum | 0.66 |
| Chloroprocaine | 0.33 | Calcium | 10.49 |
| Choline | 0.33 | Lithium | 1.64 |
| Diethanolamine | 0.98 | Magnesium | 1.31 |
| Ethylenediamine | 0.66 | Potassium | 10.83 |
| Meglumine[l] | 2.29 | Sodium | 61.97 |
| Procaine | 0.66 | Zinc | 2.95 |

[a] Percent is based on total number of anionic or cationic salts in use through 1974. [b] Camphorsulfonate. [c] 1,2-Ethanedisulfonate. [d] Lauryl sulfate. [e] Ethanesulfonate. [f] Glucoheptonate. [g] p-Glycollamidophenylarsonate. [h] N,N'-Di(dehydroabietyl)ethylenediamine. [i] 2-Hydroxyethanesulfonate. [j] 8-Chlorotheophyllinate. [k] N,N'-Dibenzylethylenediamine. [l] N-Methylglucamine.

Berge at 2.

1501.  For the purpose of differential diagnosis, excessive daytime sleepiness is defined as symptom "in which one enters sleep at an inappropriate time or setting."  Principles and Practice of Sleep Medicine (Meir H. Kryger, Thomas Roth, and William C. Dement eds, 4th ed. 2005) at 595 HBS-EXPERT 0004309 at HBS-EXPERT 0004317. As of the priority date, excessive daytime sleepiness was defined by the American Academy of Sleep Medicine in *the International Classification of Sleep Disorders* (ICSD), as "a complaint of difficulty maintaining desired wakefulness or a complaint of excessive amount of sleep." American Academy of Sleep Medicine, International Classification of Sleep Disorders, (ICSD-1 rev.) (2001) at 331 PRIORART_000002356 at PRIORART_000002528. The ICSD further describes excessive sleepiness (also referred to as somnolence, hypersomnia) as a subjective report of difficulty maintaining the alert awake state, usually accompanied by a rapid entrance into sleep when the person is sedentary. ICSD-1 (rev.) (2001) at 341 PRIORART_000002356 at PRIORART_000002533. The severity criteria for sleepiness from the ICSD are based on

CONFIDENTIAL

frequency and degree of associated daytime impairment. ICSD-1 (rev.) (2001) at 341
PRIORART_000002356 at PRIORART_000002533.

1502.   The Epworth Sleepiness Scale (ESS) is a common tool used to evaluate subjective
daytime sleepiness. *See* Johns MW, *A new method for measuring daytime sleepiness: the Epworth
sleepiness scale*, 14(6) Sleep. 540–554 (1991); Johns MW, *Reliability and factor analysis of the
Epworth Sleepiness Scale*, 15(4) Sleep 376-381 (1992); Johns MW, *Daytime sleepiness, snoring,
and obstructive sleep apnea. The Epworth Sleepiness Scale*, 103(1) Chest 30-36 (1993); Johns
MW, *Sleepiness in different situations measured by the Epworth Sleepiness Scale*, 17(8) Sleep
703-710 (1994); Johns M and Hocking B, *Daytime sleepiness and sleep habits of Australian
workers*, 20(10) Sleep 844-849 (1997).

1503.   The ESS is a self-administered questionnaire with 8 questions. Respondents are
asked to rate, on a 4-point scale (0-3), their usual chances of dozing off or falling asleep while
engaged in eight different activities. *See* PRIORART_000006646- PRIORART_000006653. The
ESS score (the sum of 8 item scores, 0-3) can range from 0 to 24. The higher the ESS score, the
higher that person's average sleep propensity in daily life (ASP), or their 'daytime sleepiness'.
PRIORART_000006646 at PRIORART_000006647.

1504.   In general, ESS Scores are interpreted clinically as follows:

> **0-5 Lower Normal Daytime Sleepiness**
>
> **6-10 Higher Normal Daytime Sleepiness**
>
> **11-12 Mild Excessive Daytime Sleepiness**
>
> **13-15 Moderate Excessive Daytime Sleepiness**
>
> **16-24 Severe Excessive Daytime Sleepiness**

**CONFIDENTIAL**

*See* PRIORART_000006646 at PRIORART_000006651. Generally, ESS scores above ten are characterized as "excessive daytime sleepiness" whereas scores of ten or below are characterized as normal "daytime sleepiness." PRIORART_000005249-PRIORART_000005254 at PRIORART_000005250 (Johns M and Hocking B, Daytime sleepiness and sleep habits of Australian workers, 20(10) SLEEP 844-849 (1997)).

# EXHIBIT 4

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

HARMONY BIOSCIENCES, LLC, et al.,

               Plaintiffs,

    v.

LUPIN LIMITED, et al.,

               Defendants.

C.A. No. 23-1286-JLH

(Consolidated)

**EXHIBIT 4**
**PLAINTIFFS' STATEMENT OF CONTESTED ISSUES OF LAW THAT REMAIN TO
BE LITIGATED**

# CONTENTS

I.    INFRINGEMENT .................................................................................................... 4

    A.    **Issues to Be Litigated** ................................................................................. 4

    B.    **General Standards for Infringement** .......................................................... 6

        1.    Infringement Is Determined by Comparing the Accused Product
            with the Asserted Claims ................................................................... 6

        2.    A Patentee Need Only Prove Infringement by a Preponderance of
            the Evidence ...................................................................................... 7

        3.    A Patentee May Prove Infringement Using Direct or
            Circumstantial Evidence ................................................................... 8

    C.    **Infringement in Hatch-Waxman Cases Where the Asserted Patent Is
        Directed to the Crystalline Form of a Compound** .......................................... 11

    D.    **A Patentee May Establish Infringement of Method of Treatment
        Claims Under 35 U.S.C. § 271(b) or 35 U.S.C. § 271e(a)(2)** ............................ 15

II.    VALIDITY ......................................................................................................... 24

    A.    **Issues to be Litigated** ................................................................................. 24

    B.    **Presumption of Validity and Burden of Proof** ............................................. 24

    C.    **Nonobviousness** ......................................................................................... 26

    D.    **Obviousness-Type Double Patenting (OTDP)** .............................................. 44

    E.    **Objective Indicia of Nonobviousness** ......................................................... 49

        1.    General .............................................................................................. 49

        2.    Nexus ................................................................................................ 50

        3.    Copying ............................................................................................. 54

        4.    Unexpected Results ........................................................................... 55

        5.    Long-Felt Need ................................................................................. 56

        6.    Failure of Others ............................................................................... 57

        7.    Praise or Industry Acceptance .......................................................... 58

| | F. | Enablement | 58 |
|---|---|---|---|
| | G. | Written Description | 65 |
| | H. | Definiteness | 69 |
| | I. | Inventorship | 70 |
| III. | | LISTING | 73 |
| | A. | Issue to be Litigated | 73 |
| | B. | Requirements for Listing a Patent in the Orange Book | 73 |
| | C. | Procedure for Disputing Listing | 76 |
| IV. | | REMEDIES | 78 |
| | A. | Issues to be Litigated | 78 |
| | | 1. As against AET | 78 |
| | | 2. As against Novitium | 79 |
| | | 3. As against Hikma | 80 |
| | | 4. As against MSN | 81 |
| | | 5. As against All Defendants | 81 |
| | B. | Legal Standards | 82 |

1.      Pursuant to Local Rule 16.3(c)(5), Plaintiffs submit the following issues of law that remain to be litigated. The following statements and authorities are not exhaustive, and Plaintiffs reserve the right to prove any matters identified in their pleadings, interrogatory responses, and/or expert reports. Plaintiffs reserve the right to modify or amend this Statement to the extent necessary to reflect any future rulings by the Court, and to supplement or amend this Statement to fairly respond to any new issues that Defendants may raise. To the extent Plaintiffs' statement of the contested issues of fact, which is submitted as Exhibit 2 hereto, contains issues of law, those issues are incorporated here by reference. Moreover, if any issue of law identified below should properly be considered an issue of fact, then such statement should be considered to be part of Plaintiffs' statement of issues of fact that remain to be litigated.

2.      Further, Plaintiffs' identification of the issues that remain to be litigated on issues where Defendants bear the burden of proof is based on its understanding of the arguments that Defendants have put forth to date. To the extent Defendants intend or attempt to introduce different or additional legal arguments to meet their burden of proof, Plaintiffs reserve their rights to contest those legal arguments, and to present any and all rebuttal evidence in response to those arguments, and will not be bound by this summary of remaining legal issues.

## I.      INFRINGEMENT

### A.      Issues to Be Litigated

3.      Whether AET's ANDA Products infringe Claims 1 and 2 of the '197 Patent under 35 U.S.C. § 271(e)(2)(A).

4.      Whether the manufacture, use, offer for sale, sale, and/or importation of AET's ANDA Products infringes Claims 1 and 2 of the '197 Patent under 35 U.S.C. § 271(a), (b), and/or (c).

5.    Whether Hikma's ANDA Products infringe Claims 1 and 2 of the '197 Patent under 35 U.S.C. § 271(e)(2)(A).

6.    Whether the manufacture, use, offer for sale, sale, and/or importation of Hikma's ANDA Products infringes Claims 1 and 2 of the '197 Patent under 35 U.S.C. §§ 271(a), (b), and/or (c).

7.    Whether MSN's ANDA Products infringe Claims 1 and 2 of the '197 Patent under 35 U.S.C. § 271(e)(2)(A).

8.    Whether the manufacture, use, offer for sale, sale, and/or importation of MSN's ANDA Products infringes Claims 1 and 2 of the '197 Patent under 35 U.S.C. § 271(a), (b), and/or (c).

9.    Whether Novitium's ANDA Products infringe Claims 1 and 2 of the '197 Patent under 35 U.S.C. § 271(e)(2)(A).

10.    Whether the manufacture, use, offer for sale, sale, and/or importation of Novitium's ANDA Products infringes Claims 1 and 2 of the '197 Patent under 35 U.S.C. § 271(a), (b), and/or (c).

11.    Whether Hikma induces infringement of Claim 13 of the '947 Patent under 35 U.S.C. § 271(b).

12.    Whether MSN induces infringement of Claim 13 of the '947 Patent under 35 U.S.C. § 271(b).

13.    Whether Novitium induces infringement of Claim 13 of the '947 Patent under 35 U.S.C. § 271(b).

14.    Whether Hikma infringes Claim 13 of the '947 Patent under 35 U.S.C. § 271(e)(2)(A).

15.     Whether MSN infringes Claim 13 of the '947 Patent under 35 U.S.C. § 271(e)(2)(A).

16.     Whether Novitium infringes of Claim 13 of the '947 Patent under 35 U.S.C. § 271(e)(2)(A).

**B.     General Standards for Infringement**

**1.     Infringement Is Determined by Comparing the Accused Product with the Asserted Claims**

17.     The infringement analysis involves two steps. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996).

18.     The first step is to define disputed terms of the patent consistent with how those terms would be understood by a person of ordinary skill in the art. *Id.*; *Phillips v. AWH Corp.*, 415 F.3d 1303,1313 (Fed. Cir. 2005).

19.     "[A] district court may engage in claim construction during various phases of litigation, not just in a Markman order. We have recognized that district courts may engage in 'rolling claim construction, in which the court revisits and alters its interpretation of the claim terms as its understanding of the technology evolves.'" *Conoco, Inc. v. Energy & Environmental Int'l*, 460 F.3d 1349, 1359 (Fed. Cir. 2006) (quoting *Guttman, Inc. v. Kopykake Enters., Inc.*, 302 F.3d 1352, 1361 (Fed. Cir. 2002)). "*Markman* does not obligate the trial judge to conclusively interpret claims at an early stage in a case. A trial court may exercise its discretion to interpret the claims at a time when the parties have presented a full picture of the claimed invention and prior art." *Sofamore Danek Grp., Inc. v. DePuy-Motech, Inc.*, 74 F.3d 1216, 1221 (Fed. Cir. 1996).

20.     "The court can hold a trial to resolve [claim construction] disputes." *Elf Atochem N. Am., Inc. v. Libbey-Owens-Ford Co.*, 894 F. Supp. 844, 850 (D. Del. 1995). Judge Bryson recently ordered that the court would resolve a claim construction dispute "at a late stage in the

proceedings" where the proffered interpretations were discussed in expert reports and expert depositions. *Heron Therapeutics, Inc. v. Azurity Pharms., Inc.*, C.A. No. 24-830, 24-1363, 2025 WL 3022166, at *2, *4 (D. Del. Oct. 29, 2025) (Bryson, J.). "It is not unusual for a previously unrecognized claim construction issue to arise late in pretrial proceedings or even during trial, and when it does, it is ordinarily the duty of the court to decide the issue." *Id.* at *4;

21.    The second step of the infringement inquiry is to determine whether the accused product infringes the patent, which is done by comparing the accused product with the properly construed claims. *Markman*, 52 F.3d at 976.

## 2.    A Patentee Need Only Prove Infringement by a Preponderance of the Evidence

22.    Under 35 U.S.C. § 271(a), "whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent." 35 U.S.C. § 271(a).

23.    Under 35 U.S.C. § 271(b), "[w]hoever actively induces infringement of a patent shall be liable as an infringer." 35 U.S.C. § 271(b).

24.    Under 35 U.S.C. § 271(c), "[w]hoever offers to sell or sells within the United States or imports into the United States a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer." 35 U.S.C. § 271(c).

25.    35 U.S.C. § 271(e)(2)(A) provides that whoever submits "an application under section 505(j) of the Federal Food, Drug, and Cosmetic Act or described in section 505(b)(2) of

such Act for a drug claimed in a patent or the use of which is claimed in a patent" infringes the patent. 35 U.S.C. § 271(e)(2)(A).

26.    To establish infringement, a patentee need only prove infringement by a preponderance of the evidence, *i.e.*, that it is more likely than not that infringement occurred. *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1317–18 (Fed. Cir. 2009). A patentee need not prove infringement by any heightened standard. *Id.*

27.    A finding of infringement can rest on as little as one instance of the claimed method being performed during the pertinent time period. *Lucent Techs.*, 580 F.3d at 1317. "[A]n accused product that sometimes, but not always, embodies a claimed method nonetheless infringes." *Bell Comm'n Res., Inc. v. Vitalink Comm. Corp.*, 55 F.3d 615, 622-23 (Fed. Cir. 1995) ("it does not necessarily follow that Bellcore's infringement claim against Vitalink must fail, because the record does not make it clear that Vitalink's DLS system *never* uses the claimed method").

### 3.    A Patentee May Prove Infringement Using Direct or Circumstantial Evidence

28.    A patentee may prove infringement by direct or circumstantial evidence. *Lucent Techs., Inc.*, 580 F.3d at 1318. Direct evidence is not required. *Symantec Corp. v. Comput. Assocs. Int'l Inc.*, 522 F.3d 1279, 1293 (Fed. Cir. 2008); *see also Broadcom Corp. v. Qualcomm Inc.*, 543 F.3d 683, 700 (Fed. Cir. 2008).

29.    "A patentee may prove infringement by 'any method of analysis that is probative of the fact of infringement.'" *Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1372 (Fed. Cir. 2009) (quoting *Forest Labs., Inc. v. Abbott Labs.*, 239 F.3d 1305, 1312 (Fed. Cir. 2001)); *Bristol-Myers Squibb Co. v. Aurobindo Pharma USA Inc.*, 477 F. Supp. 3d 306, 346-47 (D. Del. 2020); *Novartis Pharms. Corp. v. Par Pharm., Inc.*, 48 F. Supp. 3d 733, 743-44 (D. Del. 2014); *Novartis Pharms. Corp. v. Mylan Pharms. Inc.*, 681 F. Supp. 3d 516, 559 (N.D. W. Va. 2023)

8

("Novartis also may prove infringement by any method probative of infringement, including by circumstantial evidence. That Dr. Matzger used different testing parameters or techniques for [crystalline] Form II than Novarits used for [crystalline] LCZ696 this is irrelevant.") (internal citations omitted) (citing *Martek*, 579 F.3d at 1372).

30.     Infringement of claims in the chemical arts may be shown via analysis probative of the claimed composition of matter, but not contemplated by the inventors. *Cosden Oil & Chem. Co. v. Am. Hoechst Corp.*, 543 F. Supp. 522, 530 (D. Del. 1982) (finding infringement of composition claim based on NMR testing, notwithstanding that NMR was "not available" as of the priority date.); *Olaplex, Inc. v. L'Oreal USA, Inc.*, 845 F'Appx 943, 950-51 (Fed. Cir. 2021) (reversing summary judgment of noninfringement because NMR testing showed the presence of maleic acid, notwithstanding that NMR testing was not mentioned in the asserted patent); *Syntex (USA) Inc. v. Paragon Optical Inc.*, 1987 WL 124333 (D. Ariz. Nov. 23, 1987), *aff'd sub nom*, *Wilsa, Inc. v. Syntax (U.S.A.) Inc.*, 856 F.2d 202 (Fed. Cir. 1988) (finding "overwhelming evidence of infringement" based on comparison of NMR spectra of claimed composition and accused product which "showed comparable results with no substantial difference," notwithstanding that NMR testing was not mentioned in the asserted patents). This court has "perceive[d] no advantage and considerable mischief in freezing measurement technology and disregarding new learning which can establish, almost beyond peradventure, the precise characteristics of the accused substance." *Cosden Oil*, 543 F. Supp. at 530.

31.     Probative evidence of infringement includes expert testimony on the testing of drug products accused of infringement. *See Vectura Ltd. v. Glaxosmithkline LLC*, 981 F.3d 1030, 1036-37 (Fed. Cir. 2020). Evidence derived from testing of drug product samples may be probative of the fact of infringement even if testing occurs after the samples' purported expiration date. *See,*

*e.g.*, *In re Omeprazole Patent Litig.*, 490 F. Supp. 2d 381, 495 (S.D.N.Y. 2007) *aff'd*, 281 F. App'x 974 (Fed. Cir. 2008) (finding testing performed on expired samples to be relevant to the infringement inquiry); *Supernus Pharmaceuticals, Inc. v. TWi Pharmaceuticals, Inc.*, 265 F. Supp. 3d 490, 509 (D.N.J. 2017), *aff'd*, 747 F. App'x 852 (Fed. Cir. 2018) (finding testing of a sample tablet beyond its proposed expiration date to be relevant to the determination of infringement); *Shire LLC v. Abhai, LLC*, 298 F. Supp. 3d 303, 317-18 (D. Mass. 2018) (finding infringement based on "Dr. Luk's testing" and stating that "[i]t is of no consequence that the samples tested by Dr. Luk were beyond the 2-month [*sic* year] shelf life").

32.    "[D]evelopment batches may be considered where the ANDA specification does not define the compound in a manner that directly addresses the issue of infringement." *Connetics Corp. v. Agis Indus. (1983) Ltd.*, 2008 WL 11512329, at *2 (D.N.J. April 16, 2008) (citing *Bayer AG v. Elan Pharm. Rsch. Corp.*, 212 F.3d 1241, 1250 (Fed. Cir. 2000)) (citing *Glaxo, Inc. v. Novopharm, Ltd.*, 110 F.3d 1562, 1569-70 (Fed. Cir. 1997)); *see also Medicines Co. v. Mylan Inc.*, 2014 WL 127930000, at *1 (N.D. Ill. May 28, 2014) ("The Court denies Mylan's motion in *limine* to exclude evidence regarding Biocon's development batch CMB09001.") "[I]n *Glaxo*, [the Federal Circuit] approved of the district court looking to a biobatch for help in deciding the issue of infringement under 35 U.S.C. § 271(e)(2)(A)." *Bayer*, 212 F.3d at 1250 (citing *Glaxo*, 110 F.3d at 1569-70).

33.    When evaluating infringement under § 271(e)(2)(A), courts evaluate "all the relevant evidence, including the ANDA filing, other materials submitted by the accused infringer to the FDA, and other evidence provided by the parties." *Abbott Laby's. v. TorPharm, Inc.*, 300 F.3d 1367, 1373 (Fed. Cir. 2002); *see also Ferring B.V. v. Watson Labs., Inc.*, 764 F.3d 1401, 1409

(Fed. Cir. 2014) ("biobatch data and actual samples of the proposed generic composition that the ANDA filer had submitted to the FDA" are relevant evidence).

### C.    Infringement in Hatch-Waxman Cases Where the Asserted Patent Is Directed to the Crystalline Form of a Compound

34.    If an ANDA specification permits the marketing of an infringing product, "a judgment of infringement must necessarily ensue." *Sunovion Pharms., Inc. v. Teva Pharms. USA, Inc.*, 731 F.3d 1271, 1278 (Fed. Cir. 2013).

35.    There is no *de minimis* exception to infringement. *Abbott Laby's v. Sandoz, Inc.*, 566 F.3d 1282, 1299 (Fed. Cir. 2009). To establish that the filing of an ANDA infringes a claim on a chemical substance, the patentee needs only prove "that it is 'more likely than not' that some quantity, however miniscule, of the [claimed substance]" is "present in the ANDA product." *Cephalon, Inc. v. Watson Pharm., Inc.*, 769 F. Supp. 2d 761, 778 (D. Del. 2011), *aff'd*, 446 F. App'x 306 (Fed. Cir. 2011) (Rule 36); *see also Kowa Co., Ltd. v. Amneal Pharms., LLC*, Civ. A. No. 14-CV-2758, 2017 WL 10667089, at *8 (S.D.N.Y Sept. 19, 2017), *aff'd*, 745 F. App'x 168 (Fed. Cir. 2018) (Rule 36); *SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331, 1339–40 (Fed. Cir. 2005); *Orexigen Therapeutics, Inc. v. Actavis Labs. FL, Inc.*, 282 F. Supp. 3d 793, 816 (D. Del. 2017), ("Plaintiff has adduced sufficient evidence to prove by a preponderance of the evidence that at least some of Defendant's tablets will meet the claimed dissolution profile. This is all that is required for a finding of infringement.") *rev'd in part on other grounds sub nom. Nalpropion Pharm., Inc. v. Actavis Labs. FL, Inc.*, 934 F.3d 1344 (Fed. Cir. 2019). In *Cephalon*, the Court explained that the defendant's argument that the accused product was primarily a non-infringing substance "somewhat misse[d] the point" because "[t]here [was] no [expert] opinion" that the presence of non-infringing forms "preclude[d] any amount of [the infringing form]." *Cephalon*, 769 F. Supp. 2d at 778. And in *Glaxo Group v. TorPharm*, the Federal Circuit vacated

11

summary judgment of noninfringement and held that infringement could be found based on evidence that 0.5% of the accused product consisted of the infringing polymorph. *Glaxo Grp. Ltd. v. TorPharm, Inc.*, 153 F.3d 1366, 1373 (Fed. Cir. 1998).

36.     This court has found infringement of claims directed to crystalline forms based on ssNMR testing and expert testimony regarding the same. *Bristol-Myers Squibb Co. v. Aurobindo Pharma USA Inc.*, 477 F. Supp. 3d 306, 343 (D. Del. 2020) (Stark, J.) ("The results of the SSNMR testing by BMS expert Dr. Munson provide further support for the conclusion that Sigmapharm's ANDA products contain crystalline apixaban."); *cf. Pfizer Inc. v. Dr. Reddy's Laby's, Ltd.*, 2011 U.S. Dist. LEXIS 19180, at \*10-11 n.4 (D. Del. Feb. 28, 2011) (both patent owner and accused infringer agreeing that ssNMR or XRD could be used to identify the claimed crystalline form).

37.     In *Bristol-Myers Squibb Co. v. Aurobindo Pharma USA Inc.*, Judge Stark found infringement of a crystalline form claim based on expert analysis comparing the ssNMR spectrum of the ANDA Product to the ssNMR spectrum of the reference listed drug; the analysis showed "twelve peaks in [the ANDA] product that corresponded to peaks in the spectra from the reference crystalline API. Six of the peaks were well-resolved while the other six were partially-resolved." 477 F. Supp. 3d 306, 343 (D. Del. 2020) (Stark, J.). This court rejected all of the ANDA applicant's criticisms of the ssNMR testing: Judge Stark reasoned that (a) peaks characteristic of the crystalline form were observed, notwithstanding "normal distortions in SSNMR"; (b) "measuring line widths is unnecessary where, as here, a POSA can simply compare the line widths of the observed peaks to those in the reference API"; and (c) there was no need to determine a limit of detection "because [the expert's] testing confirmed the presence of crystalline apixaban." *Id.* at 344-45.

38.     "It is fundamental that one cannot avoid infringement merely by adding elements if each element recited in the claims is found in the accused device." *SunTiger, Inc. v. Sci. Rsch. Funding Grp.*, 189 F.3d 1327, 1336 (Fed. Cir. 1999) (quoting *Stiftung v. Renishaw PLC*, 945 F.2d 1173, 1178 (Fed. Cir. 1991)); *see also Forest Laby's, LLC v. Accord Healthcare, Inc.*, 2016 U.S. Dist. LEXIS 160823 at *4, *21 n.6 (D. Del. Nov. 21, 2016) ("When a patent recites a compound comprising a specific polymorphic form, that does not foreclose the possibility that other active ingredients are also present."). In the context of chemical compounds, a claim may be directed towards the crystalline form of a compound defined by X-ray Powder Diffraction peaks. *Salix Pharms., Ltd. v. Norwich Pharms., Inc.*, Civ. A. No. 20-430-RGA, 2022 WL 3225381 at *3 (D. Del. Aug. 10, 2022) (Andrews, J.), *aff'd*, 98 F.4th 1056 (Fed. Cir. 2024) ("X-ray powder diffraction (XRPD) peaks are an inherent characteristic of a polymorph. Each peak in an XRPD diffractogram is a structural element of that form."); *Sandvik Intell. Prop. AB v. Kennametal, Inc.*, Civ. A. No. 2:10-CV-00654-TFM, 2012 WL 3027983 at *2 (W.D. Pa. Feb. 16, 2012) ("The α-alumina . . . may be characterized by using the analytical technique X-ray diffraction (XRD). X-rays have particular wavelengths that are roughly equal to the distance between planes of atoms in crystalline solids. As a result, a beam of X-rays that strikes a crystalline solid will be reflected with varying intensity depending on the physical structure of the crystalline solid. . .. When assessed across a variety of incident beam angles, the resulting X-ray emission spectrum will provide a characteristic intensity profile that may be used to determine the underlying crystalline structure of the solid of interest."); *Forest Laby's, LLC v. Accord Healthcare, Inc.*, 2016 U.S. Dist. LEXIS 160823 at *4, *9 n.6 (D. Del. Nov. 21, 2016) ("both Defendants' and Plaintiffs' experts agree on the plain and ordinary meaning of 'crystalline' to a person having ordinary skill in the art—a solid morphological form where atoms or molecules are arranged with a three-dimensional long-range

order.") (internal quotations omitted); *Roche Palo Alto LLC v. Ranbaxy Laby's Ltd.*, Civ. A. No. 06-2003, 2009 WL 3261252 at *4 (D.N.J. Sept. 30, 2009) ("When a crystalline material is subjected to XRD the X-rays are diffracted at specific angles ('degrees 2θ' or '°2θ'), resulting in a pattern similar to a fingerprint, which exhibits one or more sharp, well-defined 'peaks.'"); *Cephalon*, 769 F. Supp. 2d at 773, 779 (discussing and relying on testimony by Dr. Simon Bates that "[t]he monohydrate form has its characteristic diffraction peak . . . indicative of a crystalline structure" and characterizing Dr. Bates (among others) as "highly qualified and articulate"); *ViiV Healthcare Co. v. Lupin Ltd.*, 2019 U.S. Dist. LEXIS 165245, at *12 ("a compound's crystalline structure can be identified using a number of different measurement techniques, including 'X-ray powder diffraction ('XRPD'), infrared absorption spectroscopy ('IR'), and solid-state NMR spectroscopy ('ssNMR'). Thus, the data yielded by using one or more of these techniques provide a unique 'signature' useful for identifying the particular crystal structure being examined."); *Celgene Corp. v. Natco Pharma Ltd.*, 2014 U.S. Dist. LEXIS 71646 at *13 (D.N.J. May 27, 2014) (a crystalline form has "attributes that are distinguishable from" other polymorphs including "specific IR and Raman spectra, specific thermal characteristics, and representative moisture sorption and desorption data" in addition to XRD spectra); *see Bristol-Myers Squibb Co. v. Aurobindo Pharma USA Inc.*, 477 F. Supp. 3d 306 (D. Del. 2020) (Stark, J.), *aff'd*, 858 F. App'x 359 (Fed. Cir. 2021) ("[w]e . . . find no error, and certainly no clear error, in the district court's findings of fact . . . we believe the district court's patent infringement . . . determinations").

39.     It is unnecessary for an accused product to match all characteristic peaks in order to show infringement. *Bristol-Myers Squibb v. Aurobindo*, 477 F. Supp. 3d at 317, 347 (noting an "industry standard" to match all characteristic peaks applies only when one must identify an unknown sample); *Eisai Co. v. Glenmark Pharms., Ltd.*, 2015 U.S. Dist. LEXIS 32462 at *30 (D.

Del. Mar. 17, 2015) (the claimed crystalline form and its characteristic XRD spectra recited in the claim "does not require all of the recited [spectral]-values to be present in every experimental run (i.e., an exact one-to-one match)."). Moreover, where any amount of crystalline structure is sufficient to infringe the claims, a limit of detection testing is unnecessary after XRPD testing successfully identifies the presence of the crystalline form. *Id.* at 344, 346.

40.     Even if "the generic manufacturer's ANDA application describes a generic drug with characteristics that take it outside the patent's claims," a court can find infringement "in spite of the ANDA specification if, for example, the ANDA is based on faulty testing or screening procedures." *Tyco Healthcare Grp. LP v. Mut. Pharm. Co.*, 762 F.3d 1338, 1344 (Fed. Cir. 2014). Indeed, "other evidence may directly contradict the clear representations of the ANDA . . . regarding the identity of the compound" which the generic manufacturer seeks to market. *See id.* (quoting *Abbott Laby's v. TorPharm, Inc.*, 300 F.3d 1367, 1376 (Fed. Cir. 2002)). One example of such contradictory evidence is PXRD testing of a sample of the generic manufacturer's compound showing the presence of an infringing crystalline form – not withstanding representations in the ANDA that the generic formulation contained a non-infringing crystalline form. *Kowa Co.*, 2017 WL 10667089, at *40-41, *43, *47.

**D.    A Patentee May Establish Infringement of Method of Treatment Claims Under 35 U.S.C. § 271(b) or 35 U.S.C. § 271e(a)(2)**

41.     "Whoever actively induces infringement of a patent shall be liable as an infringer." 35 U.S.C. § 271(b). To establish inducement, a patentee must prove specific intent and action to induce infringement. *Sanofi v. Watson Labs. Inc.*, 875 F.3d 636, 644 (Fed. Cir. 2017); *see also Eli Lilly & Co. v. Teva Parenteral Meds., Inc.*, 845 F.3d 1357, 1368 (Fed. Cir. 2017) ("the intent for inducement must be with respect to the actions of the underlying direct infringer, here physicians."). "While proof of intent is necessary, direct evidence is not required; rather,

circumstantial evidence may suffice." *AstraZeneca LP v. Apotex, Inc.*, 633 F.3d 1042, 1060 (Fed. Cir. 2010). Under that standard, a generic applicant is liable for inducement of a method claim if the generic applicant's proposed labeling encourages, recommends, or promotes infringement of that claim. *See id.* (citing *Takeda Pharm. U.S.A., Inc. v. W.-Ward Pharm. Corp.*, 785 F.3d 625, 631 (Fed. Cir. 2015)); *Toshiba Corp. v. Imation Corp.*, 681 F.3d 1358, 1365 (Fed. Cir. 2012); *Metabolite Laby's. v. Lab. Corp. of Am. Holdings*, 370 F.3d 1354, 1365 (Fed. Cir. 2004)). "[D]irect evidence [of inducement] is not required; rather, circumstantial evidence may suffice." *GlaxoSmithKline LLC v. Teva Pharms. USA, Inc.*, 7 F.4th 1320, 1327 (Fed. Cir. 2021) (quoting *DSU Med. Corp. v. JMS Co., Ltd.*, 471 F.3d 1293, 1306 (Fed. Cir. 2006)).

42.    The proposed labeling of the generic drug in an ANDA application can be used to find specific intent to induce infringement. *See Vanda Pharms. Inc. v. West-Ward Pharms. Int'l Ltd.*, 887 F.3d 1117, 1129 (Fed. Cir. 2018) ("The contents of the label itself may permit the inference of specific intent to encourage, recommend, or promote infringement."); *GlaxoSmithKline LLC v. Teva Pharms. USA, Inc.*, 7 F.4th 1320, 1326 (Fed. Cir. 2021) ("agree[ing] that" induced infringement occurs when a generic manufacturer "market[s] a drug with a label describing a patented therapeutic use"); *Sanofi v. Watson Laby's Inc.*, 875 F.3d 636, 646 (Fed. Cir. 2017) (holding that expert testimony "that persons of skill in the art 'look[ ] to drug labels, in part, "for information about the use of the drug in special or specific populations,"'" supported "inducement inferences"); *Amarin Pharma Inc. v. Hikma Pharms. USA Inc.*, 104 F.4th 1370, 1378 (Fed. Cir. 2024) (holding plausible a claim of induced infringement, given assertion that "portions of the label . . . would be understood by physicians as teaching that the [generic] product could be prescribed to treat" a patented indication); *Eli Lilly & Co. v. Actavis Elizabeth LLC*, 435 F. App'x 917, 926 (Fed. Cir. 2011) (citing *AstraZeneca LP v. Apotex, Inc.*, 633 F.3d 1042, 1060 (Fed. Cir.

2010)) ("We have long held that the sale of a product specifically labeled for use in a patented method constitutes inducement to infringe that patent[.]"); *see also Cephalon, Inc. v. Slayback Pharma Ltd. Liab. Co.*, 456 F. Supp. 3d 594, 626 (D. Del. 2020) (quoting *Orexigen Therapeutics, Inc. v. Actavis Labs. FL, Inc.*, 282 F. Supp. 3d 793, 816 (D. Del. 2017), *rev'd in part on other grounds sub nom. Nalpropion Pharm., Inc. v. Actavis Labs. FL, Inc.*, 934 F.3d 1344 (Fed. Cir. 2019)) ("Although Defendants' proposed labeling does not mention the claimed PG ester limitations, Defendants know 'that [their ANDA products] meet all of the claim limitations and, through [their] proposed label[s], encourage[ ] patients to administer [their ANDA products] in a manner that infringes the claimed method.'"); *In re Alfuzosin Hydrochloride Patent Litig.*, No. 08-MD-1941 GMS, 2010 WL 1956286, at *3 (D. Del. May 14, 2010) (finding specific intent to induce infringement where the "proposed label instructs physicians and patients how to use [the Generic Product]").

43.     "[A] patentee does not need to prove an actual past instance of direct infringement by a physician to establish infringement under 35 U.S.C. § 271(e)(2)(A)." *Vanda Pharms. Inc. v. West-Ward Pharms. Int'l Ltd.*, 887 F.3d 1117, 1129 (Fed. Cir. 2018). Rather, "evidence that the product labeling that Defendants seek would inevitably lead *some* physicians to infringe establishes the requisite intent for inducement." *Eli Lilly & Co. v. Teva Parenteral Meds., Inc.*, 845 F.3d 1357, 1369 (Fed. Cir. 2017) (emphasis added); *id.* at 1368 ("we have not required evidence regarding the general prevalence of the induced activity."); *see also Pernix Ireland Pain DAC v. Alvogen Malta Operations Ltd.*, 323 F. Supp. 3d 566, 587 (D. Del. 2018) (alterations in original) (Bryson, J.) ("all that is required is that 'the product labeling . . . would inevitably lead *some* physicians to infringe. Alvogen's argument is unavailing, as it demands that *all* physicians would [directly infringe] to find inducement, a standard that is too restrictive.").

44.     Where a claim covers a method of using a drug to treat one symptom of a condition and a clinician administers an ANDA Product intending to treat different symptoms, but the ANDA Product nevertheless treats the claimed symptom, the clinician directly infringes the claimed method of treatment. *See Dow Chem. Co. v. Mee Indus., Inc.*, 341 F.3d 1370, 1380 (Fed. Cir. 2003) ("The issue is whether by [performing the claimed method]. . . [the claimed result was achieved]." Even if a[] [direct infringer] [performed the claimed method] . . . for an entirely different reason [than achieving the claimed result], that would not avoid infringement."). If any clinician administers the ANDA Product according to the labeling in a manner that results in direct infringement—regardless of the clinician's intent—then the ANDA applicant is liable for induced infringement. *See Dow Chem.*, 341 F.3d at 1380; *Eli Lilly & Co. v. Teva Parental Meds., Inc.*, 845 F.3d 1368 (Fed. Cir. 2017).

45.     Evidence showing how the generic product's labeling as a whole would be understood by physicians is probative of a generic applicant's specific intent to induce infringement. *GlaxoSmithKline LLC v. Teva Pharms. USA, Inc.*, 7 F.4th 1320, 1329, 1335, 1339 (Fed. Cir. 2021) (holding "[t]he jury was entitled to credit expert testimony regarding the label's instructions on who should take what drug, when, why, and how, and to reject the argument that certain portions of the label were disjointed from others" and noting "evidence that Teva intended its label to affect physician's prescribing practices"); *id.* at 1328 (finding inducement where indications portion of label cross-referenced the clinical studies portion of the label and clinical studies portion of label referenced administration of the formulation to a patient population that satisfied a claim limitation); *see also Sanofi.*, 875 F.3d at 646. Reliance on a particular portion of the label is not required for a finding of inducement; relevant portions of the label include, but are not limited to, the "Indications and Usage"; "Clinical Studies"; "Dosage and Administration";

18

pediatric use, side effects and pharmacokinetics sections. *See id.* at 645; *GlaxoSmithKline LLC*, 7 F.4th at 1335*; see Pernix Ireland Pain DAC v. Alvogen Malta Operations Ltd.*, 323 F. Supp. 3d 566, 588 (D. Del. 2018) (Bryson, J.) (specific intent to induce infringement was inferred from clinical data found in pharmacokinetics section that described "how to prescribe a starting dose in patients with mild or moderate hepatic impairment."); *AstraZeneca*, 633 F.3d at 1056–57, 1061; *Forest Lab's Holdings Ltd. v. Mylan Inc.*, 206 F. Supp. 3d 957, 976 n.14 (D. Del. 2016) (inferring specific intent from "warnings of potentially life-threatening side effects"); *Amarin Pharma, Inc. v. Hikma Pharms. USA Inc.*, 104 F.4th 1370, 1372-73, 1378 (Fed. Cir. 2024) (finding relevant to inducement inquiry portion of label "warning of potential side effects for patients with cardiovascular disease" where the asserted patent was directed to a method of treating cardiovascular disease).

46.    A generic applicant's proposed labeling need not recite the exact language of a claimed method to have the specific intent to induce infringement. *See Pernix*, 323 F. Supp. 3d at 585 (finding inducement where the defendant's labeling directed "the use of the [defendant's] product for the treatment of pain," which satisfied "the pharmacokinetic limitations of the claims," even though the defendant's labeling did not recite those limitations). Rather, the question is whether the generic applicant's proposed labeling would "encourage, recommend, or promote" others to perform that method. *Takeda Pharms. U.S.A., Inc. v. West-Ward Pharm. Corp.*, 785 F.3d 625, 631-32 (Fed. Cir. 2015); *Orexigen Therapeutics, Inc. v. Actavis Labs. FL, Inc.*, 282 F. Supp. 3d 793, 816 (D. Del. 2017) (finding inducement where the defendant's product satisfied "all limitations in the claim and the label instructs on administering the product in the amount and with the frequency recited in the claim," regardless of "[w]hether the patient who performs the method by administering the tablets knows that the tablets" infringe because "Defendant knows that the

tablets meet all of the claim limitations and, through its proposed label, encourages patients to administer the tablets in a manner that infringes the claimed method."), *rev'd in part on other grounds sub nom. Nalpropion Pharms., Inc. v. Actavis Laby's FL, Inc.*, 934 F.3d 1344 (Fed. Cir. 2019).

47.     "Courts have found induced infringement even in situations where a label did not track the patent's description of an underlying medical condition, but instead sought to treat a symptom. Infringement was found because the use of the product would entail the patented treatment of the underlying condition." *BTG Int'l Ltd. v. Amneal Pharms. LLC*, 352 F.Supp.3d 352, 399 (D.N.J. 2018).

48.     Relatedly, a generic applicant's proposed labeling need not recite the properties of a claimed composition to induce administering the composition with the properties recited in the claims. *See Pernix Ire. Pain*, 323 F. Supp. 3d at 585; *Orexigen Therapeutics*, 282 F. Supp. 3d at 816.

49.     A generic's proposed labeling need not induce all physicians to infringe; inducement of some physicians is sufficient to find requisite intent. *See Eli Lilly & Co. v. Teva Parental Meds., Inc.*, 845 F.3d 1368 (Fed. Cir. 2017) ("[E]vidence that the product labeling that Defendants seek would inevitably lead some physicians to infringe establishes the requisite intent for inducement."); *see also Sanofi*, 875 F.3d at 646 ("Section 271(b), on inducement, does not contain the "substantial noninfringing use" restriction of section 271(c), on contributory infringement.").

50.     A generic applicant's proposed labeling may evidence inducement even where the generic manufacturer seeks and obtains a section viii carve-out for information related to the patented use. *Amarin*, 104 F.4th at 1381 (without "clarity and consistency in a generic

manufacturer's communications regarding a drug marketed under a skinny label" the generic manufacturer is at risk of "liability for induced infringement"); *AstraZeneca*, 633 F.3d at 1059 (finding inducement even though generic manufacturer obtained a section viii carve-out because label was written in such a way that it evidenced active steps to induce infringement); *see also Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913, 936 (2005) (holding that "active steps" encouraging direct infringement can include "advertising an infringing use or instructing how to engage in an infringing use."); *GlaxoSmithKline*, 7 F.4th at 1327 ("GSK argues that, despite Teva's section viii certification purporting to carve out one heart failure indication . . . . substantial evidence supports the jury's finding that Teva induced doctors to infringe the method of use . . . . We agree.).

51.    Notwithstanding a section viii carve-out, physicians' background knowledge of a generic drug product's infringing use is probative of induced infringement. *See GlaxoSmithKline*, 7 F.4th at 1328, 1334-36, 1338 (affirming verdict of induced infringement, despite generic manufacturer's section viii carve out, because doctors are familiar with "information about generic drug products from a variety of sources" including "the relevant medical literature" and other "basic information" and because doctors "verify" this background knowledge "against the labelling", the generic manufacturer "expected doctors to prescribe" the drug "for . . . patented uses."); *Amarin*, 104 F.4th at 1378 ("a generic manufacturer can be liable for inducing infringement of a patented method even if it has attempted to 'carve out' the patented indications . . . where . . . other evidence is asserted with regard to inducement"); *see also Braintree Laby's, Inc. v. Breckenridge Pharm., Inc.*, 688 F. App'x 905, 909-10 (Fed. Cir. 2017) (because "FDA has approved the [branded product] as safe and effective for the indication of colon cleansing" "a physician would understand [the] ANDA label to recommend or suggest that 'inducing purgation'"

of the colon with the generic version "is safe and effective."); *Sanofi v. Glenmark Pharms. Inc., USA*, 204 F. Supp. 3d 665, 683 (D. Del. 2016), *aff'd sub nom Sanofi v. Watson Laby's Inc.*, 875 F.3d 636 (Fed. Cir. 2017) ("Dr. Kim . . . testified that diuretics . . . are commonly used to treat [cardiovascular] conditions . . .. I credit Dr. Kim's testimony . . .. Likewise, I think the fact that over half of the [patient] population was taking diuretics, and that the diuretics did not decrease positive outcomes from dronedarone, would encourage at least some physicians to administer dronedarone concomitantly with diuretics" thereby inducing infringement of the claimed method of treatment).

52.    For example, in *Amarin Pharma v. Hikma Pharms. USA Inc.*, the FDA had approved Vacepa for 2 indications: first the FDA approved the severe hypertriglyceridemia ("SH") indication, and subsequently, the FDA approved the cardiovascular ("CV") indication. 104 F.4th 1370, 1372-73 (Fed. Cir. 2024). Prior to approval of the CV indication, the branded drug's label contained a "CV Limitation of Use" noting that the drug's impact on "cardiovascular mortality and morbidity in patients with severe hypertriglyceridemia has not been determined." *Id.* at 1372. The generic manufacturer attempted to carve-out the CV indication—but crucially, the generic label "d[id] not include the CV Limitation of Use." *Id.* at 1373. The Federal Circuit held that the patentee had plead a plausible case of induced infringement, reasoning that healthcare providers knew that "the patient population for the SH indication . . . overlaps with that for the CV indication" and healthcare providers also knew that "other drugs approved for only the SH indication . . . *do* contain the CV Limitation of Use." *See id.* at 1378; *see also Amarin Pharma Inc. v. Hikma Pharms. USA Inc.*, 449 F. Supp. 3d 967, 1002 n.19, ("The absence of a warning would be conspicuous to clinicians because the prescribing information for [other parallel drugs] contain such a warning. And physicians who treat patients with severe hypertriglyceridemia would be

22

intimately familiar with the effects of other available drugs.") (citation omitted) *aff'd*, 819 F. App'x 932 (Rule 36). Thus, applying their background knowledge of overlapping patient populations for the two indications and CV Limitation of Use, physicians would understand the generic manufacturer's removal of the CV Limitation of Use as "communicat[ing] . . . that [the] generic product could be used for the" carved-out "CV indication." *See Amarin*, 104 F.4th at 1378. Such understanding by physicians based on their background knowledge would suffice to prove induced infringement—even though "the 'Indications & Usage' section of [the] label does not provide an implied or express instruction to prescribe the drug for the [patented] CV indication." *See id.*

53.    35 U.S.C. 271(e)(2)(A) creates an independent "act of infringement to submit an ANDA seeking approval to make, use, or sell a drug if the drug or the use *for which FDA approval is sought* is claimed in a patent." *See Warner-Lambert Co. v. Apotex Corp.*, 316 F.3d 1348, 1354 (Fed. Cir. 2003); *Bayer Schering Pharma AG v. Lupin, Ltd.*, 676 F.3d 1316, 1322 (Fed. Cir. 2012) ("[D]efendants' conduct would constitute infringement under section 271(e)(2)(A) (or inducement of infringement under section 271(b)) only if the defendants' ANDAs sought approval for the use protected by the [] patent[.]"); *see also Valeant Pharms. N. Am. LLC v. Mylan Pharms.*, 978 F.3d 1374, 1381 (Fed. Cir. 2020) ("A plain language reading of [35 U.S.C. § 271(e)(2)(A)] directs us to the conclusion that it is the submission of the ANDA, and only the submission, that constitutes an act of infringement in this context.") .

54.    "When considering allegations that an ANDA filing infringes a patented method, § 271(e)(2) directs [a court's] analysis to the scope of approval sought in the ANDA." *AstraZeneca Pharms. LP v. Apotex Corp.*, 669 F.3d 1370, 1379 (Fed. Cir. 2012). "The content of the label . . . permits the inference of specific intent to encourage the infringing use. . . . [I]nducement law

permits the required factual inferences about the intended effects to rest on circumstantial evidence in appropriate circumstances." *Sanofi*, 875 F.3d at 646.

## II.    VALIDITY

### A.    Issues to be Litigated

55.    Whether Defendants can prove by clear and convincing evidence that claims 1 and 2 of the '197 Patent and claim 13 of the '947 Patent would have been obvious under 35 U.S.C. § 103.

56.    Whether Defendants can prove by clear and convincing evidence that claim 13 of the '947 Patent would have been invalid for obviousness-type double patenting.

57.    Whether Defendants can prove by clear and convincing evidence that claims 1 and 2 of the '197 Patent and claim 13 of the '947 Patent are invalid for lack written description under 35 U.S.C. § 112.

58.    Whether Defendants can prove by clear and convincing evidence that claims 1 and 2 of the '197 Patent and claim 13 of the '947 Patent are invalid for lack of enablement under 35 U.S.C. § 112.

59.    Whether Defendants can prove by clear and convincing evidence that claims 1 and 2 of the '197 Patent and claim 13 of the '947 Patent are invalid for indefiniteness under 35 U.S.C. § 112.

60.    Whether Defendants can prove by clear and convincing evidence that claims 1 and 2 of the '197 Patent are invalid due to improper inventorship under 35 U.S.C. § 102(f) (pre-AIA).

### B.    Presumption of Validity and Burden of Proof

61.    By statute, issued patents are "presumed valid." 35 U.S.C. § 282. Because a patent is presumed valid, the patent holder bears no burden or obligation to prove that the asserted patent

claims are valid—the burden of persuasion always lies with the patent challenger. *See Commil USA, LLC v. Cisco Sys., Inc.*, 575 U.S. 632, 643 (2015).

62. When invalidity is asserted on the basis of a reference that was considered by the patent office during prosecution of the patent, it is "especially difficult" to overcome the presumption of validity. *Glaxo Grp. Ltd. v. Apotex, Inc.*, 376 F.3d 1339, 1348 (Fed. Cir. 2004).

63. The presumption of validity applies to each patent claim individually and with respect to all challenges to the validity of a patent on any grounds. *See Circuit Check Inc. v. QXQ Inc.*, 795 F.3d 1331, 1337 (Fed. Cir. 2015); 35 U.S.C. § 282 ("Each claim of a patent . . . shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim."); *Dana Corp. v. Am. Axle & Mfg.*, 279 F.3d 1372, 1376 (Fed. Cir. 2002) (reversible error for the district court not to separately evaluate each claim's validity).

64. "The burden of proof to invalidate . . . patent claims is a heavy one – clear and convincing evidence – and it is a burden that rests squarely on [the patent challenger]." *Mosaic Brands, Inc. v. Ridge Wallet LLC*, 55 F.4th 1354, 1366 (Fed. Cir. 2022) (citing *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 99–114 (2011)); *see also ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1327 (Fed. Cir. 2012); *Procter & Gamble Co. v. Teva Pharm. USA, Inc.*, 566 F.3d 989, 993–94 (Fed. Cir. 2009). Under the clear and convincing evidence standard, a party alleging invalidity must create "in the mind of the trier of fact an abiding conviction that the truth of a factual contention is 'highly probable.'" *Price v. Symsek*, 988 F.2d 1187, 1191 (Fed. Cir. 1993) (citation omitted). The Federal Circuit has likened the standard to "well-nigh irrefragable" proof, which is "evidence that 'cannot be refuted or disproved; incontrovertible, incontestable, indisputable, irrefutable, undeniable.'" *Am-Pro Protective Agency,*

25

*Inc. v. United States*, 281 F.3d 1234, 1239–40 (Fed. Cir. 2002) (quoting Oxford English Dictionary 93 (2d ed. 1991)).

65.     The burden of proof regarding patent validity rests with the Defendants and does not shift to Plaintiffs. *Procter & Gamble*, 566 F.3d at 993–94; *see also Graham v. John Deere Co*., 383 U.S. 1 (1966); *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig*., 676 F.3d 1063, 1079 n.5 (Fed. Cir. 2012) ("[T]he party challenging validity bears the burden of persuasion throughout the litigation." (citing *Microsoft Corp. v. i4i Ltd. Partnership*, 564 U.S. 91, 100 (2011))).

66.     Although the clear and convincing standard applies in all circumstances, it is "an even heavier burden" that applies "even more clearly" where the patent office considered the evidence in question. *Metabolite Laby's., Inc. v. Lab'y Corp. of Am. Holdings*, 370 F.3d 1354, 1368 (Fed. Cir. 2004); *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 109 (2011). Under such circumstances, the party alleging invalidity has "the added burden of overcoming the deference that is due to a qualified government agency presumed to have properly done its job, which includes one or more examiners who are assumed to have some expertise in interpreting the references and to be familiar from their work with the level of skill in the art and whose duty it is to issue only valid patents." *Shire LLC v. Amneal Pharm., LLC*, 802 F.3d 1301, 1307 (Fed. Cir. 2015) (quoting *PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1304 (Fed. Cir. 2008)).

**C.    Nonobviousness**

67.     To invalidate a patent claim under 35 U.S.C. § 103, an accused infringer must prove by clear and convincing evidence that the differences between the claimed subject matter and the prior art are such that the subject matter as a whole would have been obvious to a POSA at the time of the invention. 35 U.S.C. § 103(a); *Cheese Sys., Inc. v. Tetra Pak Cheese & Powder Sys., Inc.*, 725 F.3d 1341, 1352 (Fed. Cir. 2013). Obviousness is a question of law based on the following

26

factual findings: (1) the scope and content of the prior art; (2) the differences between the claims and the prior art; (3) the level of ordinary skill in the art; and (4) objective indicia of nonobviousness. *Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*, 876 F.3d 1350, 1358 (Fed. Cir. 2017) (citing *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17–18 (1966)). The Supreme Court requires that "all evidence relevant to obviousness or nonobviousness be considered, and be considered collectively." *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Pat. Litig.*, 676 F.3d 1063, 1077-78 (Fed. Cir. 2012).

68.     Obviousness is determined as of the time of the claimed invention, from the perspective of a hypothetical POSA to which the claimed invention pertains. *See* 35 U.S.C. § 103; *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 3 (1966); *Procter & Gamble Co. v. Teva Pharm. USA, Inc.*, 566 F.3d 989, 994 (Fed. Cir. 2009). The POSA is a "theoretical construct" and "is not descriptive of some particular individual" who is "presumed to be aware of the all the pertinent prior art." *Endress + Hauser, Inc. v. Hawk Measurement Sys. Pty., Ltd.*, 122 F.3d 1040, 1042 (Fed. Cir. 1997) (quoting *Custom Accessories, Inc. v. Jeffrey-Allan Indus., Inc.*, 807 F.2d 995, 963 (Fed. Cir. 1986)). Factors relevant to determining the attributes of the POSA include "(1) the educational level of the inventor; (2) type of problems encountered in the art; (3) prior art solutions to those problems; (4) rapidity with which innovations are made; (5) sophistication of the technology; and (6) educational level of active workers in the field." *Daiichi Sankyo Co. v. Apotex, Inc.*, 501 F.3d 1254, 1256–58 (Fed. Cir. 2007) (quoting *Envtl. Designs, Ltd. v. Union Oil Co. of Cal.*, 713 F.2d 693, 696 (Fed. Cir. 1983)).

69.     The fact-finder must avoid the "distortion caused by hindsight bias and must be cautious of arguments reliant upon *ex post* reasoning." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 421 (2007); *see also Graham*, 383 U.S. at 36 (quoting *Monroe Auto Equip. co. v. Heckethorn*

*Mfg. & Supply Co.*, 332 F.2d 406, 412 (6th Cir. 1964)) (courts must avoid "slipping into use of hindsight"). "The inventor's own path itself never leads to a conclusion of obviousness; that is hindsight. What matters is the path that the person of ordinary skill in the art would have followed, as evidenced by the pertinent prior art." *Otsuka Pharm. Co. v. Sandoz, Inc.*, 678 F.3d 1280, 1296 (Fed. Cir. 2012) (calling "Defendants' obviousness case . . . a poster child for impermissible hindsight reasoning.); *see also Orexo AB v. Actavis Elizabeth LLC*, 903 F.3d 1265, 1271 (Fed. Cir. 2018) ("The invention must be viewed not with the blueprint drawn by the inventor, but in the state of the art that existed at the time."); *Ortho-McNeil Pharm., Inc. v. Mylan Lab'ys, Inc.*, 520 F.3d 1358, 1364 (Fed. Cir. 2008) ("In retrospect, [the inventor's] pathway to the invention, of course, seems to follow the logical steps to produce these properties, but at the time of invention, the inventor's insights, willingness to confront and overcome obstacles, and yes, even serendipity, cannot be discounted."); *W.L. Gore & Assocs., Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1553 (Fed. Cir. 1983) ("To imbue one of ordinary skill in the art with knowledge of the invention in suit, when no prior art reference [] convey[s] or suggest[s] that knowledge, is to fall victim to the insidious effect of a hindsight syndrome wherein that which only the inventor taught is used against its teacher."); *Metalcraft of Mayville, Inc. v. Toro Co.*, 848 F.3d 1358, 1367 (Fed. Cir. 2017) ("we cannot allow hindsight bias to be the thread that stitches together prior art patches into something that is the claimed invention."); *Mintz v. Dietz & Watson, Inc.*, 679 F.3d 1372, 1379 (Fed. Cir. 2012) ("the proper analysis requires a form of amnesia that 'forgets' the invention and analyzes the prior art and understanding of the problem at the date of the invention."); *In re NTP, Inc.*, 654 F.3d 1279, 1299 (Fed. Cir. 2011) ("Care must be taken to avoid hindsight reconstruction by using the patent in suit as a guide through the maze of prior art references, combining the right references in the right way so as to achieve the result of the claims in suit.").

70.     Where the invention emerged from a crowded field, an allegation that the claimed invention would have been obvious likely relies on hindsight. *See Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 928–29 (Fed. Cir. 2012) ("[T]he district court correctly emphasized and found based on the preliminary record that the art was a crowded field for many years and yet there was not one reference to [the claimed invention]").

71.     To safeguard against the use of hindsight, obviousness must be assessed on the basis of the prior art as a whole. *See Discovision Assocs. v. Disc Mfg., Inc.*, 25 F. Supp. 2d 301, 345 (D. Del. 1998). An expert witness testifying as to obviousness must offer opinions "supported by something more than a conclusory statement" and demonstrate that their understanding of the prior art reflect what "was well known to those of ordinary skill in the art." *In re Buchner*, 929 F.2d 660, 661 (Fed. Cir. 1991).

72.     Thus, the invention is nonobvious unless a POSA as of the priority date had a motivation to select "one reference out of the sea of prior art . . . and combine[] it with [any other relevant references] to address some need present in the field[.]" *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1337 (Fed. Cir. 2016) ("Too often the obviousness analysis is framed as an inquiry into whether a person of skill, with two (and only two) references sitting on the table in front of him would have been motivated to combine . . . the references in a way that renders the claimed invention obvious."); *Rolls-Royce, PLC v. United Techs. Corp.*, 603 F.3d 1325 (Fed. Cir. 2010) (finding the claimed invention nonobvious because of "the broad selection of choices for further investigation available to a person of ordinary skill" and because "no . . . evidence in the record gives a reason to" attempt to achieve the claimed invention); *Ortho-McNeil Pharm.*, 520 F.3d at 1364 (rejecting obviousness challenge on the basis that challenger's expert "discounted the number and complexity of alternatives"); *Leo Pharm. Prods., Ltd. v. Rea*, 726 F.3d 1346, 1356-57 (Fed.

29

Cir. 2013) (the "breadth of [the] choices and the numerous combinations" available in the prior art – at least eight different classes of additives and at least ten different categories of composition forms disclosed in the prior art – rendered the claimed invention not obvious to try); *In re Kubin*, 561 F.3d 1351, 1359 (Fed. Cir. 2009) (quoting *in re O'Farrell*, 853 F.2d 894, 903 (Fed. Cir. 1988)) (a claim is not obvious "where the prior art gave either no indication of which parameters were critical or no direction as to which of many possible choices is likely to be successful.").

73.      Simply because the prior art disclosed a particular combination of claim elements does not mean that an invention would have been obvious. Rather, the patent challenger must prove that the POSA would have had a motivation or "reason" to combine those elements to make or use the claimed invention. *See KSR Int'l*, 550 U.S. at 421; *Orexo AB v. Actavis Elizabeth LLC*, 903 F.3d 1265, 1271 (Fed. Cir. 2018); *In re Cyclobenzaprine II*, 676 F.3d at 1068–69; *Grunenthal GMBH v. Alkem Laboratories Ltd.*, 919 F.3d 1333, 1341 (Fed. Cir. 2019) (A POSA "would have had reason to combine or modify the prior art to arrive at the claimed invention."). In other words, the party alleging obviousness must prove that the POSA would have had an affirmative reason to both select particular features of the prior art and to modify or combine those features to achieve those inventions. *See, e.g.*, *Novartis Pharms. Corp. v. W.-Ward Pharms. Int'l Ltd.*, 923 F.3d 1051, 1059 (Fed. Cir. 2019) (finding motivation to combine where POSA "would have been *motivated to pursue* [the compound] as one of several potential treatment options" for the targeted disease) (emphasis added); *Honeywell Int'l Inc. v. 3G Licensing, S.A.*, 124 F.4th 1345, 1356 (Fed. Cir. 2025) (noting combination must still have been "desirable in light of the prior art" to be obvious); *Endo Pharm. Sols., Inc. v. Custopharm Inc.*, 894 F.3d 1374, 1380 (Fed. Cir. 2018) ("To meet its burden, Custopharm needed to do more than merely show that the prior art does not preclude lowering the dose of TU. Custopharm needed to affirmatively demonstrate that a skilled artisan

30

would have been motivated to lower the dose of TU despite no clear evidence of overdosing under the FDA Guidelines."); *Unigene Labs., Inc v. Apotex, Inc.*, 655 F.3d 1352, 1361 (Fed. Cir. 2011) ("In this case, the patent claims a new composition or formulation to deliver an FDA-approved active ingredient. Thus, the claimed invention is not obvious if a person of ordinary skill would not select and combine the prior art references to reach the claimed composition or formulation.") (citing *Eli Lilly & Co. v. Zenith Goldline Pharm., Inc.*, 471 F.3d 1369, 1380 (Fed. Cir. 2006)); *see also Knauf Insulation, Inc. v. Rockwool Int'l A/S*, 788 F. App'x 728, 733 (Fed. Cir. 2019) (a claimed invention is nonobvious where the prior art did not give a POSA any reason to "cherry-pick components from each" reference "to lead to the claimed invention."); *Bausch & Lomb, Inc. v. Barnes-Hind/Hydrocurve, Inc.*, 796 F.2d 443, 448 (Fed. Cir. 1986) (quoting *in re Wesslau*, 353 F.2d 238, 241 (C.C.P.A. 1965)) (it is improper to "pick and choose from any one reference only so much of it as will support a given position[,] to the exclusion of other parts necessary to the full appreciation of what such reference fairly suggests to one skilled in the art."); *Iron Grip Barbell Co., Inc. v. USA Sports, Inc.*, 392 F.3d 1317, 1320-21 (Fed. Cir. 2004) (because the "difference between the claimed invention and the prior art" is not "the range or value of a particular variable," no presumption of obviousness applies); *Intel Corp. v. Qualcomm Inc.*, No. 2020-2092, 2022 WL 880681, at *4 (Fed. Cir. Mar. 24, 2022) (noting requirement to show "there is something in the prior art as a whole to suggest the desirability . . . of making the combination").

74.    For a method of treatment claim to be obvious, there should be "a basis for a POSA to focus a study on the implications" of a compound for a potential treatment. *Vanda Pharms. Inc. v. Roxane Laby's Inc.*, 203 F. Supp. 3d 412, 427 (D. Del. 2016). Thus, the District of Delaware found nonobvious method of treatment claims directed to using iloperidone to treat patients with schizophrenia who were "CYP2D6 poor metabolizer[s]" where iloperidone was initially

"abandoned" during clinical testing. *Id.* at 419, 426-27. Moreover, even if there were "a basis for a POSA to focus a study on the implications for iloperidone metabolism of mutations in the genes for the CYP2D6, it would have been impossible to predict the results." *Id.* at 425-27. "A solution is not obvious simply because it was obvious to conduct experiments to try to solve the problem." *Id.* at 427.

75.    The Federal Circuit has held that when reading language stating "it is expected" in the context of the prior art, "the statement would be understood as nothing more than a statement of the hypothesis being tested." *Sanofi v. Watson Laby's*, 875 F.3d 636, 648 (Fed. Cir. 2017). The Federal Circuit explained that the "'it is expected' statement was not a 'concrete' factual assertion, but instead a mere 'hypothesis,'" and hence, "there was no 'scientifically reasonable likelihood' of [achieving] the claimed [therapeutic result]." *Id.* at 647. In *Sanofi v. Watson Laby's*, the Federal Circuit affirmed Judge Andrews's holding that the asserted method of treatment claim was nonobvious; Judge Andrews had reasoned that "the ['it is expected'] statement . . . would not be read in isolation and taken at face value by a POSA, without appropriate context. . . . the article itself . . . is a brief article describing the rationale and design of the ATHENA clinical trial before any results were reported, and is principally written by the investigators involved in the trial . . . ." *Sanofi v. Glenmark Pharms.*, 204 F. Supp. 3d 665, 691 (D. Del. 2016), *aff'd*, 875 F.3d 636 (Fed. Cir. 2017).

76.    Where there is "not more than a promising field of experimentation . . . the discovery of the patented [invention] [is] not an obvious, particular solution." *Merck & Co., Inc. v. Sandoz, Inc.*, Civ. No. 10-1625-SRC, 2012 WL 266412, at *9 (D.N.J. Jan. 30, 2012). The court found that, in his deposition testimony, the defendant's expert "state[d] unambiguously that the skilled artisan must experiment with [the field of invention] and cannot predict the outcome of the

32

experiments. . . . The evidence of record suggests that the idea of creating [the claimed invention] was not more than a promising field of experimentation, and that the discovery of the patented [invention] was not an obvious, particular solution. . . . the skilled artisan in those circumstances would have been unable to predict the outcome of the experiments necessary to develop the [claimed invention]." *Id.*

77.     In order for a prior art reference to be used in an obviousness analysis, the reference must be analogous art to the claimed invention. *In re Klein*, 647 F.3d 1343, 1348 (Fed. Cir. 2011). A reference is analogous art to the claimed invention if: (1) the reference is from the same field of endeavor as the claimed invention (even if it addresses a different problem); or (2) the reference is reasonably pertinent to the problem faced by the inventor (even if it is not in the same field of endeavor as the claimed invention). *Id.* In determining whether a reference is "reasonably pertinent," one should consider the problem faced by the inventor as disclosed (explicitly or implicitly) in the specification. *Id.*; *see also Janssen Prods., L.P. v. Lupin Ltd.*, 109 F. Supp. 3d 650, 665, 667 (D.N.J. 2014) (finding references to be non-analogous prior art when they "would not logically have commended themselves to a person skilled in the art" in considering the problem).

78.     "Evidence of obviousness, especially when that evidence is proffered in support of an obvious-to-try theory, is insufficient unless it indicates that the possible options skilled artisans would have encountered were finite, small, or easily traversed, and that skilled artisans would have had a reason to select the route that produced the claimed invention." *In re Cyclobenzaprine*, 676 F.3d at 1072. Unlike the situation where there are "limited" possibilities, where there are tens of possibilities in an unpredictable art, the Federal Circuit has affirmed a finding of nonobvious. *See Mylan Pharms. Inc. v. Merck Sharp & Dohme Corp.*, 50 F.4th 147, 153-54, 156 ("the list of 33

33

compounds, with no direction to select sitagliptin from among them, plus the eight 'pharmaceutically preferred' acids and various stoichiometric possibilities, results in 957 salts, some of which may not exist. That is a far cry from the 20 compounds 'envisaged' by [a] narrow genus" especially because "salt formation is an unpredictable art that requires a trial and error process").

79.    An invention is not "'obvious to try' when 'the prior art g[i]ve[s] either no indication of which parameters [a]re critical or no direction as to which of many possible choices is likely to be successful.'" *Sanofi-Aventis Deutschland GmbH v. Glenmark Pharms. Inc., USA*, 748 F.3d 1354, 1360 (Fed. Cir. 2014) (internal citation omitted).

80.    In *Grunenthal GmbH v. Alkem Laby's Ltd.*, the patent challenger contended that a reference providing a flow chart for polymorph screening, Byrn, "discloses a finite number of solvents to use for recrystallization," and therefore, "it would have been obvious to try to produce [the claimed] Form A of tapentadol hydrochloride." 919 F.3d 1333, 1345 (Fed. Cir. 2019). The Federal Circuit rejected this argument, noting "that Byrn identified many variables for screening, i.e., a 'huge number of possible choices,' as opposed to a 'finite number,' as contemplated in KSR." *Id.* "Rather, Byrn simply provides 'a general approach' to polymorph screening, only giving 'general guidance,' without providing 'detailed enabling methodology.'" (quoting In re Kubin, 561 F.3d 1351, 1359–60 (Fed. Cir. 2009)). Thus, the Federal Circuit held that Byrn did not render the claimed crystalline form of tapentadol hydrochloride obvious to try. *Grunenthal*, 919 F.3d at 1345.

81.    A POSA's alleged motivation or reason for modifying or combining the prior art must be assessed with respect to the actual needs in the pertinent art. *See KSR Int'l*, 550 U.S. at 421. In other words, if the POSA would not have believed that the invention would solve those

34

needs, the invention would not have been obvious. *See Bristol-Myers Squibb Co. v. Teva Pharms. USA, Inc.*, 752 F.3d 967, 974–75 (Fed. Cir. 2014) (assessing whether the proposed changes would have been expected to achieve the actual goal of "improved activity"); *Institut Pasteur & Universite Pierre Et Marie Curie v. Focarino*, 738 F.3d 1337, 1346 (Fed. Cir. 2013) (analysis should remain focused on the "highly desired goal, not switch to a different goal that may be a less challenging but also less worthwhile pursuit").

82.    In determining whether the POSA would have been motivated or had reason to make or use the claimed invention, evidence showing that the POSA would *not* have been motivated or had reason to make or use the claimed invention must be considered. *See, e.g.*, *Impax Labs. Inc. v. Lannet Holdings, Inc.*, 893 F.3d 1372, 1380–81 (Fed. Cir. 2018); *Star Sci., Inc. v. R.J. Reynolds Tobacco Co.*, 655 F.3d 1364, 1375 (Fed. Cir. 2011); *Nevro Corp. v. Stimwave Techs., Inc.*, C.A. No. 19-325-CFC, 2019 WL 3322368, at *13 (D. Del. July 24, 2019).

83.    The fact that the inventors "recognized and solved a problem . . . that the prior art did not recognize" tends to show that the patent is not obvious. *Leo Pharm. Prods., Ltd. v. Rea*, 726 F.3d 1346, 1353 (Fed. Cir. 2013); *see also Novartis Pharms. Corp. v. Watson Laby's, Inc.*, 611 F. App'x 988, 996 (Fed. Cir. 2015) ("Without the knowledge of a problem, one of skill in the art would not have been motivated to modify [the prior art] . . . .").

84.    "Focusing on the obviousness of substitutions and differences, instead of on the invention as a whole, is a legally improper way to simplify the often difficult determination of obviousness." *Gillette Co. v. S.C. Johnson & Son, Inc.*, 919 F.2d 720, 724 (Fed. Cir. 1990); *see Syntex (U.S.A.) LLC v. Apotex, Inc.*, 407 F.3d 1371, 1381 (Fed. Cir. 2005) ("[T]he bare question of whether it would have been obvious to substitute one surfactant for another misplaces the proper

focus on the obviousness of the invention as a whole, and likely invites hindsight conclusion, forbidden by our precedent").

85.     Where the prior art is altered by substitution of "one element for another known in the field, the combination must do more than yield a predictable result." *KSR Int'l Co.*, 550 U.S. at 417. In more complex subject matters, like pharmaceutical cases, where the "the claimed subject matter may involve more than the simple substitution of one known element for another or the mere application of a known technique to a piece of prior art ready for the improvement," the court must "determine whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue." *Id.* at 417–18; *see Asahi Glass Co. v. Guardian Indus. Corp.*, 886 F. Supp. 2d 369, 391 (D. Del. 2012) (finding that despite testimony that two metal oxides "were commonly used together in the glass industry," substitution of one metal oxide for the other was neither obvious nor a "[s]imple substitution of one known element for another to obtain predictable results").

86.     Where a party alleges that an invention would have been obvious based on a combination of multiple prior art teachings, "this analysis should be made explicit." *KSR Int'l*, 550 U.S. at 418 (citing *in re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006)). Specifically, the party must identify the specific portions of those references that the POSA would have combined and the reason or expectation concerning that combination. *See ActiveVideo Networks v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1327–28 (affirming exclusion of expert testimony where expert "failed to explain how specific references could be combined, which combination(s) of elements in specific references would yield a predictable result, or how any specific combination would operate or read on the asserted claims"); *Innogenetics, N.V. v. Abbott Lab'ys*, 512 F.3d 1363, 1373–74 (Fed. Cir. 2008) (affirming exclusion of expert testimony where defendant's expert provided

only "vague and conclusory obviousness testimony" that failed to "state how or why a person ordinarily skilled in the art would have found the [asserted claims] obvious in light of some combination of [the asserted] references"); *In re Kotzab*, 217 F.3d 1365, 1371 (Fed. Cir. 2000) ("[P]articular findings must be made as to the reason the skilled artisan, with no knowledge of the claimed invention, would have selected these components for combination in the manner claimed.").

87.    "[C]onflicting teachings can not [sic] reasonably be viewed as suggesting their combination" where the only possible reason to combine those references is "the hindsight knowledge" of the claimed invention. *See Karsten Mfg. Corp. v. Cleveland Golf Co.*, 242 F.3d 1376, 1385 (Fed. Cir. 2001).

88.    There is no motivation to combine a reference with another source if the reference itself teaches away from its combination with that source. *Winner Int'l Royalty Corp. v. Wang*, 202 F.3d 1340, 1350 (Fed. Cir. 2000). "A reference may be said to teach away when a person of ordinary skill, upon reading the reference, would be discouraged from following the path set out in the reference, or would be led in a direction divergent from the path that was taken by the applicant." *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1327 (Fed. Cir. 2009). "[Or] if it suggests that the line of development flowing from the reference's disclosure is unlikely to be productive of the result sought by the applicant." *Tec Air, Inc. v. Denso Mfg. Mich. Inc.*, 192 F.3d 1353, 1360 (Fed. Cir. 1999) (quoting *In re Gurley*, 27 F.3d 551, 553 (Fed. Cir. 1994)).

89.    As courts have recognized, the art of pharmaceutical formulation is unpredictable and compounds in the same class of structure do not have similar "physical-chemical, biological, [or] therapeutic characteristics." *Procter & Gamble*, 566 F.3d at 996 (further observing that "[t]o

infer from one compound the effects in another is dangerous and can be misleading[.]".) *See also Apotex Inc. v. Wyeth LLC*, 657 F. App'x 998, 1003 (Fed. Cir. 2016) (agreeing that it was not obvious to "substitute one antibiotic for a structurally related one").

90.    A party cannot establish that an invention would have been obvious merely by asserting that the POSA "would have arrived at the claimed invention through routine optimization." *Id.* (quoting *in re Stepan Co.*, 868 F.3d 1342, 1346 (Fed. Cir. 2017)). "[T]o have a reasonable expectation of success, one must be motivated to do more than merely vary all parameters or try each of numerous possible choices until one possibly arrives as to successful result, where the prior art gave either no indication of which parameters were critical or no direction as to which of many possible choices is likely to be successful." *In re Stepan Co.*, 868 F.3d at 1347. "A general incentive does not make obvious a particular result, nor does the existence of techniques by which those efforts can be carried out." *In re Deuel*, 51 F.3d 1552, 1559 (Fed. Cir. 1995).

91.    Motivation to combine and reasonable expectation of success are related, but separate, elements of the patent challenger's burden on obviousness. *Eli Lilly & Co. v. Teva Pharms. Int'l GmbH*, 8 F.4th 1331, 1344 (Fed. Cir. 2021) ("A finding . . . that a patent challenger has demonstrated a motivation to combine references does not necessarily imply that the challenger has also met its burden of showing a reasonable expectation of success in achieving a claimed method of treatment."); *Amgen, Inc. v. F. Hoffman-La Roche Ltd.*, 580 F.3d 1340, 1362 (Fed. Cir. 2009) ("An obviousness determination requires that a skilled artisan would have perceived a reasonable expectation of success in making the invention in light of the prior art.").

92.    To have a reasonable expectation of success, the POSA must have been motivated to do more than merely "vary all parameters or try each of numerous possible choices until one

possibly arrived at a successful result, where the prior art gave either no indication of which parameters were critical or no direction as to which of many possible choices is likely to be successful." *In re O'Farrell*, 853 F.2d 894, 903 (Fed. Cir. 1988). Similarly, the POSA must have been motivated to do more than to pursue a "general approach that seemed to be a promising field of experimentation, where the prior art gave only general guidance as to the particular form of the claimed invention or how to achieve it." *Id.* Even where the prior art would have motivated the POSA to perform experiments that would ultimately have resulted in the claimed invention, the invention would not have been obvious if the POSA would not have had a reasonable expectation that such experiments would succeed in yielding the claimed properties; hope of success is not enough to establish reasonable expectation. *See Leo Pharm.*, 726 F.3d at 1357 ("There is no indication in the prior art which of these possible formulations would be the most promising to try . . . . Without a reasonable expectation of success or clues pointing to the most promising combinations, an artisan could have spent years experimenting without success."); *OSI Pharms., LLC v. Apotex*, 939 F.3d 1375, 1385 (Fed. Cir. 2019); *In re Cyclobenzaprine*, 676 F.3d at 1070 ("While it may have been obvious to experiment with the use of the same PK profile when contemplating an extended release formulation, there is nothing to indicate that a skilled artisan would have had a reasonable expectation that such an experiment would succeed in being therapeutically effective."); *Merck & Co., Inc. v. Sandoz, Inc.*, Civ. No. 10-1625-SRC, 2012 WL 266412, at *8 (D.N.J. Jan. 30, 2012) (granting summary judgment of non-obviousness where the evidence established that the POSA "would have been unable to predict the outcome of the experiments necessary to develop the formulation"). "[W]hen there is a high enough quantum of unpredictability—*e.g.*, where the chance of failure is equal to the chance of success or where the prior art supports at best a cautious optimism that a particular course of action will work—the

39

party that bears the burden of proving unpatentability may not have met its burden of showing a reasonable expectation of success." *Teva Pharms. USA, Inc. v. Corcept Therapeutics, Inc.*, 2020 WL 6809812, at \*19 (PTAB Nov. 18, 2020), *aff'd*, 18 F.4th 1377 (Fed. Cir. 2021); *see also Honeywell Int'l Inc. v. Mexichem Amanco Holding S.A. de C.V.*, 865 F.3d 1348, 1355 (Fed. Cir. 2017) (cited by the PTAB in *Teva v. Corcept* as well as by the Federal Circuit's affirmance of the same) (finding that the Board "made what amounts to a finding that one of ordinary skill would *not* have had a reasonable expectation of success" when it found that "one of ordinary skill would no more have expected failure than success"); *Sanofi v. Watson Lab'ys Inc.*, 875 F.3d 636, 648, 650 (Fed. Cir. 2017) (rejecting argument that district court "appli[ed] too high a standard for proving a reasonable expectation of success," affirming the determination that a defendant failed to prove obviousness where a person of ordinary skill in the art "would have been at best cautiously optimistic that dronedarone could reduce the risk of cardiovascular hospitalization and hospitalization for AF in the ATHENA patient population").

93.    Whether a POSA would have had a reasonable expectation of success must be evaluated in light of the desired goal, not "a different goal that may be a less challenging but also less worthwhile pursuit." *Institut Pasteur & Universite Pierre Et Marie Curie v. Focarino*, 738 F.3d 1337, 1346 (Fed. Cir. 2013); *see, e.g.*, *Yamanouchi Pharm. Co. v. Danbury Pharmacal, Inc.*, 231 F.3d 1339, 1345 (Fed. Cir. 2000) (holding that an expectation of "baseline" activity for a drug was insufficient to show obviousness, because the claimed success was not the discovery of one of many compounds exhibiting such baseline activity, but rather "a compound that had high activity, few side effects, and lacked toxicity"). Further, the mere "knowledge of the goal does not render its achievement obvious." *Abbott Lab'y's v. Sandoz, Inc.*, 544 F.3d 1341, 1352 (Fed. Cir. 2008).

40

94.    Whether a POSA would have had a reasonable expectation of success as of the priority date must be assessed with respect to the actual needs in the pertinent art. *See Institut Pasteur*, 738 F.3d at 1345–46. Thus, a fact finder must determine whether the POSA would have believed that the invention would succeed based on the goals that the POSA would have had, regardless of whether those goals are reflected in particular claim limitations. *See, e.g.*, *id.* (finding that the POSA would not have had a reasonable expectation of practicing a method of manipulating a living cell based on prior art references stating that such a method would be toxic to the cell, even though the claims did not expressly require that the cell remain viable).

95.    "To the extent an art is unpredictable, as the chemical arts often are, *KSR*'s focus on these identified, predictable solutions may present a difficult hurdle because potential solutions are less likely to be genuinely predictable." *Eisai Co. Ltd. v. Dr. Reddy's Laby's, Ltd.*, 533 F.3d 1353, 1359 (Fed. Cir. 2008) (internal quotation marks omitted); *see also Honeywell Int'l Inc. v. Mexichem Amanco Holding S.A. DE C.V.*, 865 F.3d 1348, 1356 (Fed. Cir. 2017) ("Unpredictability of results equates more with nonobviousness rather than obviousness, whereas that which is predictable is more likely to be obvious."); *Pharmacyclics LLC v. Alvogen Pine Brook LLC*, 556 F. Supp. 377, 412 (D. Del. 2021), *aff'd*, 2022 WL 16943006 (Fed. Cir. Nov. 15, 2022) ("Discovering new crystalline forms is challenging and unpredictable. . . . An experiment designed to discover new polymorphs is referred to as a polymorph screen. While an artisan of ordinary skill might have had some expectation of finding a crystalline form of a compound, there is no predictability in producing a particular crystalline form before it is discovered."); *see also in re Depomed Patent Litig.*, 2016 WL 7163647 at *51-54 (D.N.J. Sept. 30, 2016), *aff'd sub nom Grunenthal GMBH v. Alkem Laby's Ltd.*, 919 F.3d 1333 (Fed. Cir. 2019) ("[W]hile each individual technique performed during a polymorph screen may be routine, polymorph screening consists of

an unpredictable application of those routine techniques" and "the results of the polymorph screen—*i.e.*, the determination of the structure and properties of the polymorph forms of tapentadol hydrochloride—would have been impossible to predict.").

96.    In *Grunenthal GMBH v. Alkem Laby's Ltd.*, the Federal Circuit affirmed the district court's finding that "a POSA would not have had a reasonable expectation of successfully producing" the claimed crystalline form A of tapentadol hydrochloride. 919 F.3d 1333, 1341 (Fed. Cir. 2019). The patent challenger had argued that the prior art had disclosed (1) Form B, a different, crystalline form of tapentadol hydrochloride and (2) the Byrn reference which provides general guidelines on polymorph screening by "outlin[ing] a number of variables that may be adjusted during the recrystallization process to determine whether polymorphism occurs in a compound." *Id.* at 1341-42.

97.    In *Grunenthal*, the Federal Circuit concluded that "a POSA would not reasonably expect any polymorph screening of Form B to necessarily result in the 'most stable form' of tapentadol hydrochloride (Form A, as Alkem argues)." *Grunenthal*, 919 F.3d at 1343; *see also Pharmacyclics LLC v. Alvogen, Inc.*, 2022 WL 16943006 (Fed. Cir. Nov. 15, 2022) ("Alvogen cites the expert opinion of Dr. Jennifer Swift, who testified that a skilled artisan would have inevitably developed Form A upon performing a routine polymorph screen" but the district court properly credited the testimony of Dr. Myerson that a POSA could not "predict in advance whether a new compound would form polymorphs," nor what the physical properties of any such polymorphs would be). The Federal Circuit characterized Byrn as "provid[ing] insufficient guidance" and a "lack of disclosure" given that Byrn "only notes that [numerous] parameters should be varied." *Id.* at 1342-43. In other words, there was no reasonable expectation of success at achieving the claimed crystalline form because "a POSA would have to manipulate the variables

to 'determine what the crystal form landscape looks like' because 'you don't know what the result's going to be.'" *Id.* at 1342 (quoting patent owner's expert); *see also Pharmacyclics LLC v. Alvogen, Inc.*, 2022 WL 16943006 at *11 (Fed. Cir. Nov. 15, 2022) ("given the lack of teaching in the art regarding crystalline forms of ibrutinib and the expert testimony that polymorph screening can produce unpredictable results, a skilled artisan would not have reasonably expected success in producing Form A of ibrutinib.").

98.    "[E]vidence showing unpredictability in the art" indicates that a skilled artisan "would not have been motivated to combine the references with a reasonable expectation of success." *Honeywell Int'l*, 865 F.3d at 1354; *see also Grünenthal GmbH v. Alkem Lab's Ltd.*, 919 F.3d 1333, 1344-45 (Fed. Cir. 2019) (no reasonable expectation of success where art not "reasonably predictable").

99.    When the prior art does not disclose clinical data, preclinical data, or any data regarding the efficacy of a drug, and treatment for the disease is highly unpredictable, there can be no reasonable expectation of success. *OSI Pharms.*, 939 F.3d at 1383 (finding no reasonable expectation of success when "the asserted references do not disclose *any* data or other information about erlotinib's efficacy in treating NSCLC. The record does not contain any clinical (human) data or preclinical (animal) data. It does not even include *in vitro* (test tube) data regarding erlotinib's effect on NSCLC. At the same time, it is undisputed that NSCLC treatment was highly unpredictable."). Courts have often faulted patent challengers in the pharmaceutical arts for assuming relationships between pharmacokinetic, pharmacodynamic, and even clinical data when such relationships are unreported in the art. *See Abbott Lab'ys v. Sandoz, Inc.*, 544 F.3d 1341, 1349-53; *see also in re Cyclobenzaprine*, 676 F.3d at 1070 (rejecting obviousness theory requiring POSA to assume that "the immediate-release and extended-release [pharmacokinetic] profiles

43

produce the same [pharmacodynamic] effect" where no known pharmacokinetic-pharmacodynamic relationship existed).

100.    For a method of treatment claim, defendants are required to show "that a person of ordinary skill in the art would have had a reasonable expectation that performing the recited method would bring about the recited result." *Eli Lilly & Co. v. Teva Pharms. Int'l GmbH*, 8 F.4th 1331, 1345 (Fed. Cir. 2021) (quoting *Eli Lilly & Co. v. Teva Pharms. Int'l GmbH*, 2020 WL 1540364, at *8 (PTAB Mar. 21, 2020) and "find[ing] no error in this conclusion"); *see also Sanofi v. Watson Laby's Inc.*, 875 F.3d 636, 647 (Fed. Cir. 2017) ("[patent challenger] did not carry their burden of showing that a person of ordinary skill in the art [as of the priority date] would have had a reasonable expectation that" the drug product "would succe[sfully]" treat the relevant "patient population").

101.    Courts have found "unpredictability" in the art of creating a particular crystalline form of a compound. *Takeda Pharm. Co. v. Handa Pharm., LLC*, No. C-11-00840 JCS, 2013 WL 9853725, at *36 (N.D. Cal. Oct. 17, 2013) ("Given the unpredictability of crystallization, absent impermissible hindsight, the lists of potential solvents and solvent combinations set forth in Tietze, Vogel and Gordon would not engender a reasonable expectation of success in any particular method, or in the ability generally to obtain a dexlansoprazole crystal.").

### D.    Obviousness-Type Double Patenting (OTDP)

102.    "Whether a patent qualifies as an OTDP [Obviousness type double patenting] reference is a threshold issue." *Acadia Pharms. Inc. v. Aurobindo Pharma Ltd.*, 706 F. Supp. 3d 477, 487 (D. Del. 2023) (citing *Novartis AG v. Ezra Ventures LLC*, 909 F.3d 1367, 1375 n.4 (Fed. Cir. 2018), *aff'd*, No. 2024-1401, 2025 WL 1618201 (Fed. Cir. June 9, 2025).

103.    An OTDP analysis entails two steps. "First, as a matter of law, a court construes the claim in the earlier patent and the claim in the later patent and determines the differences.

44

Second, the court determines whether the differences in subject matter between the two claims render the claims patentably distinct." *Eli Lilly & Co. v. Barr Laby's*, 251 F.3d 955, 968 (Fed. Cir. 2001).

104.    In assessing OTDP, the fact finder determines whether the claims of the later-expiring patent would have been obvious over the asserted claims of the earlier-expiring reference patent. *See in re Goodman*, 11 F.3d 1046, 1052 (Fed. Cir. 1993) (citing *in re Vogel*, 422 F.2d 438, 441 (C.C.P.A. 1970)).

105.    When determining whether a patent is expiration date of a purported reference patent, the term of the reference patent includes PTE pursuant to 35 U.S.C. § 156. "[A] patent as a whole is extended [through §156] even though its effect may be limited to certain of its claims." *Genetics Institute v. Novartis Vaccines*, 655 F.3d 1291, 1300-01 (Fed. Cir. 2011) ("The text of [35 U.S.C. § 156] subsection (b), which sets forth 'the rights derived from *any patent the term of which is extended* under this section,' is equally clear that § 156 applies to the term of the patent, not individual claim(s).") (citing 35 U.S.C. § 156(b)) (cleaned up).

106.    The burden is on the patent challenger to present clear and convincing evidence of overlap between the claims of patents to invalidate the later issued patent based on the OTDP doctrine. *Procter & Gamble Co. v. Teva Pharm. USA, Inc.*, 566 F.3d 989, 999 (Fed. Cir. 2009).

107.    Whether a patent is invalid for OTDP is "similar" to whether the patent would have been obvious. *See in re Longi*, 759 F.2d 887, 892 n.4 (Fed. Cir. 1985). However, in contrast with obviousness, double patenting depends on what the reference patent *claims*, not what it *discloses*. *Gen. Foods Corp. v. Studiengesellschaft Kohle mbH*, 972 F.2d 1272, 1281 (Fed. Cir. 1992). Thus, "the *disclosure* of a patent cited in support of a double patenting rejection cannot be used as though it were prior art, *even where the disclosure is found in the claims*." *Id.*; *see also In re Braat*, 937

45

F.2d 589, 594 n. 5 (Fed. Cir. 1991) ("The patent disclosure must not be used as prior art."). The patent specification of such a patent is not considered, except to determine the meaning of particular claim terms, if necessary. A claim in a later patent escapes the double-patenting rule even if the innovation is disclosed in the specification of the earlier patent, provided that it's not disclosed in the claims. *In re Kaplan*, 789 F.2d 1574, 1580 (Fed. Cir. 1986).

108.    Any objective indicia of nonobviousness must be considered in determining whether a patent claim is rendered invalid by an earlier claim of the patentee under the OTDP doctrine. *Eli Lilly & Co. v. Teva Parenteral Meds., Inc.*, 689 F.3d 1368, 1381 (Fed. Cir. 2012); *Otsuka Pharmaceuticals Co., Ltd. v. Sandoz, Inc.*, 678 F.3d 1280, 1298 (Fed. Cir. 2012); *see also UCB, INC. v. Accord Healthcare, Inc.*, 201 F. Supp. 3d 491, 536-537 ("Generally, when considering whether a patent is invalid for obviousness-type double patenting, the Court is required to consider objective indicators of nonobviousness, if such evidence is presented.") *aff'd* 890 F.3d 1313 (Fed. Cir. 2018).

109.    Similarly, the patent challenger bears the burden of showing that a POSA would have had a motivation to combine the "earlier claimed [invention]" with other disclosures in the prior art "to make the [invention] of the asserted claim with a reasonable expectation of success." *Otsuka Pharm. Co. v. Sandoz, Inc.*, 678 F.3d 1280, 1298 (Fed. Cir. 2012). "That is traditional obviousness analysis." *Id.*; *see generally supra* ¶¶86-92.

110.    OTDP is an "equitable doctrine." *Immunex Corp. v. Sandoz Inc.*, 964 F.3d 1049, 1059 (Fed. Cir. 2020). Equitable doctrines "cannot be reduced to a precise formula or test." *Zedner v. United States*, 547 U.S. 489, 504 (2006). Instead, equitable doctrines are applied by evaluating the policies underlying the doctrine in the context of the specific case at hand. *See Republic of Philippines v. Pimentel*, 553 U.S. 851, 862-63 (2008) (holding that applicability of a legal

provision "will turn upon factors that are case specific, which is consistent" with the provision being "based on equitable considerations."

111.    "The [OTDP] doctrine's primary goal is to prevent an *unjustified* timewise extension of patent exclusivity." *Allergan USA, Inc. v. MSN Laby's Pvt. Ltd.*, 111 F.4th 1358, 1367 (Fed. Cir. 2024) (emphasis added); *see also Novartis Pharms. Corp. v. Breckenridge Pharm. Inc.*, 909 F.3d 1355, 1364 (Fed. Cir. 2018) (reversing district court invalidation on the basis of OTDP and upholding patent validity on appeal because the district court relied too heavily on Federal Circuit law involving "patent prosecution gamesmanship" and the case at bar involved "different circumstances"); *id.* at 1362 ("The key purpose of obviousness-type double patenting is . . . to prevent a patent owner from controlling the public's right to use the patented invention beyond the . . . patent term of that invention.").

112.    To properly effectuate the equitable policy underlying OTDP, Congress enacted 35 U.S.C. § 121. *See Boehringer Ingelheim Int'l GmbH v. Barr Laby's, Inc.*, 592 F.3d 1340, 1350 (Fed. Cir. 2010). 35 U.S.C. § 121 provides that "[i]f two or more independent and distinct inventions are claimed in one application, the Director may require the application to be restricted . . . . A patent issuing on an application with respect to which a requirement for restriction has been made, or on an application filed as a result of such a requirement, shall not be used as a reference."

113.    "Prior to the 1952 Patent Act, when § 121 was enacted, patentees could be faced with a situation in which . . . the PTO imposes a restriction requirement on a patent application because the PTO concludes that the application claims invention A and invention B which are deemed to be *patentably distinct* inventions. The applicant then removes claims to invention B from the restricted application and files those claims in a subsequent application. The restricted application and the subsequent application later issue as patents. In a later court challenge, a court

47

concludes that invention A and invention B are *not* patentably distinct, and thus the claims in the patent resulting from the subsequent application are invalid for double patenting of the same invention." *St. Jude Med., Inc. v. Access Closure, Inc.*, 729 F.3d 1369, 1376-77 (Fed. Cir. 2013); *see also Boehringer v. Barr*, 592 F.3d at 1350; *Studiengesellschaft Kohle mbH v. N. Petrochemical Co.*, 784 F.2d 351, 358 (Fed.Cir.1986) (Newman, J., concurring). Thus, "the safe harbor" of 35 U.S.C. § 121 "is provided to protect an applicant from losing rights" by way of an OTDP challenge "when an application is *divided*." *Boehringer v. Barr*, 592 F.3d at 1350 (emphasis in original); *see also id.* at 1352 ("the purpose of § 121—namely, to prevent a patentee who divides an application in which a restriction requirement has been made from risking invalidity due to double patenting"); *Acadia Pharms. Inc. v. Aurobindo Pharma Ltd.*, 706 F. Supp. 3d 477, 482 (D. Del. 2023) ("The safe harbor provision arose from difficulties created by restriction requirements imposed by the [PTO] during examination, followed by double patenting challenges in the courts . . . . This conflicting result was recognized as inherently unfair, and the safe harbor was created to preclude it.") (quoting in full, with alterations, *St. Jude Med., Inc. v. Access Closure, Inc.*, 729 F.3d 1369, 1376-77 (Fed. Cir. 2013)).

114.    So long as "the line of demarcation between the 'independent and distinct inventions' that prompted the restriction requirement [is] maintained" all patents issuing from any applications filed "as a result of" a restriction requirement are on equal footing for OTDP purposes: if one such patent cannot serve as an OTDP reference, nor can another. *See Boehringer v. Barr*, 592 F.3d at 1353-54 n.3 (Fed. Cir. 2010) (quoting *Gerber Garment Tech., Inc. v. Lectra Sys., Inc.*, 916 F.2d 683, 688 (Fed. Cir. 1990)); *Boehringer v. Barr*, 592 F.3d at 1351 (Under "[s]ection 121 . . . a patent issuing on either *the* original application . . . or *a* divisional application . . . cannot be used as a reference against either 'the original application' or 'a divisional application.'"); *Applied*

*Materials, Inc. v. Advanced Semiconductor Materials Am., Inc.*, 98 F.3d 1563, 1568 (Fed. Cir. 1996) ("[w]hen the existence of multiple patents is due to the administrative requirements imposed by the Patent and Trademark Office, 35 U.S.C. § 121 provides that the inventor shall not be prejudiced by having complied with those requirements. Thus when two or more patents result from a PTO restriction requirement . . . § 121 insulates the ensuing patents from the charge of double patenting."); *see also Acadia Pharms. Inc. v. Aurobindo Pharma Ltd.*, 706 F. Supp. 3d 477, 486 (D. Del. 2023) (holding improper using an alleged OTDP reference because the safe harbor provision of section 121 applied and reasoning that "what is relevant is not 'how any such applications are filed,' but the application being 'due to the administrative requirements imposed by the [PTO], in the sense that, absent the restriction requirement, the applicant could have retained in the [original application] the claims prosecuted in the [descendant] application.'") (quoting *Boehringer v. Barr*, 592 F.3d at 1353-54); *see also Acadia*, 706 F. Supp. 3d at 487 (observing that "the logic and purpose of OTDP is flipped on its head [by using a later filed patent as reference]: rather than preventing a patent owner from unjustifiably extending the term of a patent, OTDP would operate to cut off a patent term that would have been valid but for a later-filed patent.") .

115.    The Federal Circuit has cautioned against utilizing the "as a result of" restriction requirement and Section 121 safe harbor provision standard too narrowly. *Boehringer v. Barr*, 592 F.3d 1340, 1353 n.3 (Fed. Cir. 2010). Rather, the safe harbor applies equivalently to all "child application[s] [filed] 'due to the administrative requirements imposed by the Patent and Trademark Office.'" *Id.* ("We see no principled distinction . . . so long as no two applications claim the same 'invention' as defined by the examiner.").

### E.    Objective Indicia of Nonobviousness

#### 1.    General

49

116.    The Federal Circuit requires consideration of all of the evidence under the *Graham*

factors before reaching a decision on obviousness, and that includes evidence of secondary

considerations, also called "objective indicia of nonobviousness." *Graham*, 383 U.S. at 17–18.

"Objective indicia of nonobviousness play a critical role in the obviousness analysis." *Leo Pharm.*

*Prods., Ltd. v. Rea*, 726 F.3d 1346, 1358 (Fed. Cir. 2013). Thus, in determining the question of

obviousness, evidence of objective indicia must be considered as part of the analysis. *See In re*

*Cyclobenzaprine*, 676 F.3d at 1079–80. This requirement is a "check against hindsight bias." *See*

*id*. at 1078–79. Objective indicia of non-obviousness include copying, long-felt, but unmet need;

failure of others; industry acceptance and praise; and unexpected results—all of which tend to

demonstrate that the claimed inventions would not have been obvious. Objective indicia evidence

"may often be the most probative and cogent evidence in the record." *Procter & Gamble*, 566 F.3d

at 998.

117.    The patentee is "not required to present evidence" of objective indicia. *Novartis*

*Pharm. Corp. v. W.-Ward Pharm. Int'l Ltd.*, 287 F. Supp. 3d 505, 510 (D. Del. 2017) (internal

citations omitted). However, "[w]hen present, such objective evidence must be considered. It can

be the most probative evidence of nonobviousness in the record, and enables the district court to

avert the trap of hindsight. On the other hand, the absence of objective evidence does not preclude

a holding of nonobviousness because such evidence is not a requirement for patentability." *Custom*

*Accessories, Inc. v. Jeffrey-Allan Industries, Inc.*, 807 F.2d 955, 960 (Fed. Cir. 1986).

### 2.    Nexus

118.    A patentee asserting objective indicia must show a "nexus" between the objective

indicia and the claimed invention. *See Henry Penny Corp. v. Frymaster LLC*, 938 F.3d 1324, 1332

(Fed. Cir. 2019). Nexus is presumed where "the patentee shows that the asserted objective

evidence is tied to a specific product and that product 'is the invention disclosed and claimed in

the patent.'" *WBIP, LLC v. Kohler Co.*, 829 F3d. 1317, 1329 (Fed. Cir. 2016). Under such circumstances, the burden shifts to the party alleging obviousness to rebut the presumed nexus. *See id.* The party alleging obviousness "cannot successfully rebut the presumption with argument alone—it must present evidence." *Id.* (citing *Brown & Williamson Tobacco*, 229 F.3d 1120, 1130 (Fed. Cir. 2000)). A showing that the objective indicia relate to both claimed and unclaimed features is insufficient to rebut the presumption. *See, e.g.*, *Ecolochem, Inc. v. S. Cal. Edison Co.*, 227 F.3d 1361, 1378 (Fed. Cir. 2000). In addition to the presumption of nexus, "the patent owner is still afforded an opportunity to prove nexus by showing that the evidence of secondary considerations is the 'direct result of the unique characteristics of the claimed invention.'" *Fox Factory, Inc. v. SRAM, LLC*, 944 F.3d 1366, 1373–74 (Fed. Cir. 2019) (quoting *In re Huang*, 100 F.3d 135, 140 (Fed. Cir. 1996)).

119.    Indeed, the nexus between a patented invention and objective indicia (e.g. long-felt need, praise, skepticism, failure of others) can be based on benefits of the invention which do not need to be expressly recited in the claims. This well-settled legal principle dates back to *United States v. Adams*, 383 U.S. 39 (1966). *See E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430, 1433 (Fed. Cir. 1988) (discussing *Adams* and holding "[t]hough using water was not expressly included in the claims, that unexpected feature was relevant to the Court's decision on nonobviousness.") (citing *Graham*, 383 U.S. at 17–18).

120.    As the Federal Circuit has elaborated, imposition of a "strict requirement" that objective indicia be recited in the claims is "improper"; "[o]bjective evidence of nonobviousness need only be 'reasonably commensurate with the scope of the claims.'" *Rambus Inc. v. Rea*, 731 F.3d 1248, 1257 (Fed. Cir. 2013) (evidence of high-speed memory systems was commensurate

with the scope of the claims even though it was not recited in the claims, because it was attributable to the patent's claimed dual-edge data transfer functionality).

121.    Moreover, benefits may manifest after the issuance of the patent, but are nonetheless, relevant objective evidence of non-obviousness. *See Genetics Inst., LLC v. Novartis Vaccines & Diagnostics, Inc*., 655 F.3d 1291, 1307 (Fed. Cir. 2011) ("[I]t would be error to prohibit a patent applicant or patentee from presenting relevant indicia of nonobviousness, whether or not this evidence was available or expressly contemplated at the filing of the patent application . . . . Relevant secondary considerations often are not manifest even until well after the issuance of a patent."); *see also Sanofi-Aventis Deutschland GmbH v. Glenmark Pharm*. *Inc.*, 748 F.3d 1354, 1360 (Fed. Cir. 2014) ("[P]atentability may consider all of the characteristics possessed by the claimed invention, whenever those characteristics become manifest.").

122.    A patented invention need not be solely responsible for the objective indicia. *See, e.g.*, *Continental Can Co. v. Monsanto Co.*, 948 F.2d 1264, 1273 (Fed. Cir. 1991) ("It is not necessary, however, that the patented invention be solely responsible for the commercial success, in order for this factor to be given weight appropriate to the evidence, along with other pertinent factors."); *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1394 (Fed. Cir. 1988) ("A patentee is not required to prove . . . that the commercial success of the patented invention is *not* due to factors other than the patented invention. . . . A requirement for proof of the negative of all imaginable contributing factors would be unfairly burdensome, and contrary to the ordinary rules of evidence."). Accordingly, the fact that a marketed product embodies multiple patents does not undermine the nexus between that product and the claimed inventions or require the objective indicia to be apportioned between those inventions. *See, e.g.*, *WBIP*, 829 F.3d at 1331–37 (presumption of nexus exists where marketed products were covered by and coextensive

with claims of two patents); *In re Cyclobenzaprine*, 676 F.3d at 1080–83 (objective indicia attributable to multiple patents); *Star Sci., Inc. v. R.J. Reynolds Tobacco Co.*, 655 F.3d 1364, 1376 (Fed. Cir. 2011) (objective indicia attributable to two patents).

123.    Objective evidence of non-obviousness need only be "reasonably commensurate with the scope of the claims." *Rambus v. Rea*, 731 F.3d at 1257. Thus, a patentee need not "produce objective evidence of nonobviousness for every potential embodiment of the claim." *Id.* "This does not mean that an application is required to test every embodiment within the scope of his or her claims. If an applicant demonstrates that an embodiment has an unexpected result and provides an adequate basis to support the conclusion that other embodiments falling within the claim will behave in the same manner, this will generally establish that the evidence is commensurate with the scope of the claims." *In re Huai-Hung Kao*, 639 F.3d 1057, 1073 (Fed. Cir. 2011) (citations omitted) (finding improper Board's overly strict holding that "secondary considerations were not commensurate with the scope of the claim" because only evidence regarding a single embodiment was provided).

124.    A patentee "need not sell every conceivable embodiment of the claims in order to rely upon evidence of [objective indicia], so long as what was sold was within the scope of the claims." *See id*. at 1069 (quoting *in re DBC*, 545 F.3d 1373, 1384 (Fed. Cir. 2008)); *see also Applied Materials, Inc. v. Advanced Semiconductor Materials Am. Inc.*, 98 F.3d 1563, 1570 (Fed. Cir. 1996) ("[A] patentee need not show that all possible embodiments within the claims were successfully commercialized in order to rely on the success in the marketplace of the embodiment that was commercialized."). For these reasons, objective indicia relating to a single embodiment in a claim covering multiple embodiments can be sufficient and should be considered in assessing obviousness. *See, e.g.*, *Genetics Inst., LLC v. Novartis Vaccines & Diagnostics, Inc.*, 655 F.3d

53

1291, 1308–09 (Fed. Cir. 2011). A nexus must therefore only be found between the objective evidence of non-obviousness and the claimed invention set forth in the claims.

### 3.    Copying

125.    Evidence of others copying the claimed invention supports a finding of nonobviousness. *Ortho-McNeil Pharm., Inc. v. Mylan Labs, Inc.*, 520 F.3d 1358, 1365 (Fed. Cir. 2008) (holding that "method of use claims are nonobvious" based on evidence of copying which "is not just a cumulative or confirmatory part of the obviousness calculus but constitutes independent evidence of nonobviousness."); *Akamai Technologies, Inc. v. Cable & Wireless Internet Services, Inc.*, 344 F.3d 1186, 1196 (Fed. Cir. 2003); *Ruiz v. A.B. Chance Co.*, 234 F.3d 654, 660 (Fed. Cir. 2000). Evidence of copying is relevant to pharmaceutical method of treatment claims. *Liqwd, Inc. v. L'Oreal USA, Inc.*, 941 F.3d 1133, 1139 (Fed. Cir. 2019) (finding that the PTAB "erred by disregarding its finding that L'Oreal copied Liqwd's patented method" of using maleic acid in keratin treatment).

126.    While generic manufacturers must show bioequivalence, such a showing does not require the generic copy all aspects of the branded drug. *ProStrakan, Inc. v. Actavis Laby's UT, Inc.*, 2018 WL 11363829 at *70 (E.D. Tex. 2018), *aff'd*, 789 F. App'x 757 (Fed. Cir. 2019) (Rule 36). Copying aspects unrelated to bioequivalence is thus an indicium of non-obviousness. *See, e.g.*, *id.* ("While copying may not be probative in the context of a patent that covers an active pharmaceutical ingredient, such a fact can be highly probative of non-obviousness where, as here, a generic drug manufacturer is free to use a noninfringing formulation so long as other FDA requirements (e.g., bioequivalence) are satisfied."); *Dey, L.P. v. Teva Parenteral Meds., Inc.*, 6 F. Supp. 3d 651, 681 (N.D. W. Va., 2014), *aff'd*, 600 F. App'x 773 (Fed. Cir. 2015) (Rule 36) ("The [Hatch-Waxman] Act does not require TEVA to copy [the Reference Listed Drug's] 'inactive ingredients' or 'excipients,' which, here, are the features of [the Reference Listed Drug's] that

54

make aqueous formoterol suitable for long-term use. . . . [That Teva] chose to reverse engineer Dey's formulation based on Dey's patents . . . provides a strong indication that the prior art provided Teva with no obvious alternative to Dey's invention."); *see also Abraxis BioScience v. Actavis LLC*, Case No. 16-1925 (JMV), 2017 WL 9808442, at *3 (D.N.J. Sept. 12, 2017) (recognizing that evidence of "copying aspects of an approved drug unrelated to demonstrating bioequivalency (or that the generic drug meets other requirements under the Hatch-Waxman Act)" may be relevant to the non-obviousness inquiry) (quoting *The Medicines Co. v. Mylan, Inc.*, 2014 WL 2464732 at *4 (N.D. Ill. June 2, 2014)); *Pfizer, Inc. v. Perrigo Co.*, 988 F. Supp. 686, 693 (S.D.N.Y. 1997) ("That Perrigo resorted to copying the patented formula is strong evidence that the improvements introduced by Advanced Formula PLAX® were not obvious from the prior art references. Had they been obvious, Perrigo presumably would not have needed to resort to copying.").

### 4.    Unexpected Results

127.    The existence of unexpected properties is an objective indicium of non-obviousness.

128.    Unexpected results are an objective indicium of non-obviousness where, as here, the "claimed invention exhibits some superior property or advantage that a person of ordinary skill in the relevant art would have found surprising or unexpected." *Daiichi Sankyo Co. v. Mylan Pharms., Inc.,* 670 F. Supp. 2d 359, 382 (D.N.J. 2009), *aff'd*, 619 F.3d 1346 (Fed. Cir. 2010) (quoting *In re Soni,* 54 F.3d 746, 750 (Fed. Cir. 1995)). "The basic principle behind this rule is straightforward—that which would have been surprising to a person of ordinary skill in a particular art would not have been obvious." *In re Soni*, 54 F.3d at 750.

129.    While minor differences in degree may be insufficient to demonstrate unexpected results, it is not necessary to show a difference "in kind" to support non-obviousness. *See In re*

55

*Soni*, 54 F.3d at 751 ("[W]hen an applicant demonstrates *substantially* improved results . . . and states that the results were unexpected, this should suffice to establish unexpected results."); *In re Corkill*, 771 F.2d 1496, 1501 (Fed. Cir. 1985) ("A greater than expected result is an evidentiary factor pertinent to the legal conclusion of . . . obviousness."); *In re Wagner*, 371 F.2d 877, 885 (C.C.P.A. 1967) ("Whether the difference between the claimed invention and the prior art is a difference 'in kind' or a difference 'in degree' is not mentioned in section 103. Section 103 simply requires a determination as to whether the invention as a whole would have been obvious to one of ordinary skill in the art at the time of appellant's invention. An unexpected increase in physiological activity may be persuasive evidence of unobviousness.").

130.    "[E]vidence of unexpected results may be [considered] . . . even if that evidence was obtained after the patent's filing or issue date." *Genetics Inst., LLC v. Novartis Vaccines & Diagnostics, Inc.*, 655 F.3d 1291, 1307 (Fed. Cir. 2011); *see also Knoll Pharm. Co., Inc. v. Teva Pharms. USA, Inc.*, 367 F.3d 1381, 1385 (Fed. Cir. 2004) ("There is no requirement that an invention's properties and advantages were fully known before the patent application was filed. . . . Nor is it improper to conduct additional experiments and provide later-obtained data in support of patent validity."). "[P]atentability may consider all of the characteristics possessed by the claimed invention, whenever those characteristics become manifest." *Sanofi-Aventis v. Glenmark*, 748 F.3d at 1360. Such evidence may include "test data showing that the claimed composition[ ] possess[es] unexpectedly improved properties or properties that the prior art does not have." *In re Dillon*, 919 F.2d 688, 692–93 (Fed. Cir. 1990).

## 5.    Long-Felt Need

131.    Evidence that a claimed invention satisfied a long-felt, but unmet need supports a conclusion of non-obviousness. *See KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007); *Apple Inc. v. Samsung Elecs. Co.*, 839 F.3d 1034, 1056 (Fed. Cir. 2016) (en banc). This is "because it is

reasonable to infer the need would not have persisted had the solution been obvious." *Apple*, 839

F.3d at 1056. A long-felt need arises when there is "an articulated identified problem [as of the

priority date] and evidence of efforts to solve that problem." *AstraZeneca Pharm. LP v. Anchen

Pharm., Inc.*, C.A. No. 10-1835-JAP-TJB, 2012 WL 1065458, at *48 (D.N.J. Mar. 29, 2012)

(citation omitted). Thus, there is no requirement that the need remain unmet until the invention

actually becomes available on the market.

132.    To satisfy a long-felt, unmet need, a claimed invention need not completely

eliminate a problem; it need only reach a result superior to prior available options. *Eli Lilly & Co.

v. Sicor Pharm., Inc.*, 705 F. Supp. 2d 971, 1008 (S.D. Ind. 2010) (finding "the first drug in thirty

years to produce an improvement in overall survival" satisfied a long-felt, unmet need for new

treatment options, even though it did not present a complete cure for pancreatic cancer), *aff'd* 426

F. App'x 892 (Fed. Cir. 2011)

### 6.    Failure of Others

133.    Evidence that others attempted, but failed to achieve a claimed invention supports

a conclusion of non-obviousness. *KSR Int'l*, 550 U.S. at 406; *In re Cyclobenzaprine*, 676 F.3d at

1081–82. "The purpose of evidence of failure of others is to show 'indirectly the presence of a

significant defect in the prior art, while serving as a simulated laboratory test of the obviousness

of the solution to a skilled artisan.'" *In re Cyclobenzaprine*, 676 F.3d at 1082 (quoting *Symbol

Techs., Inc. v. Opticon, Inc*., 935 F.2d 1569, 1578–79 (Fed. Cir. 1991)).

134.    In assessing failure of others, the question is not whether others attempted and

failed to create the specific inventions claimed by the patents, but whether others attempted and

failed to solve the problem addressed by the inventions. *See, e.g.*, *In re Cyclobenzaprine*, 676 F.3d

at 1082; *Eli Lilly & Co. v. Zenith Goldline Pharm., Inc.,* 364 F. Supp. 2d 820, 852 (S.D. Ind. 2005)

(fact that numerous investigators had "tried but failed to develop a safe, atypical antipsychotic drug between 1975 and 1990" supported non-obviousness of patented drug).

### 7.    Praise or Industry Acceptance

135.    "Evidence that the industry praised a claimed invention or a product that embodies the patent claims weighs against an assertion that the same claimed invention would have been obvious." *Apple*, 839 F.3d at 1053. "Thus, if there is evidence of industry praise of the claimed invention in the record, it weighs in favor of the non-obviousness of the claimed invention." *Id.* (citing *Institut Pasteur & Universite Pierre Et Marie Curie v. Focarino*, 738 F.3d 1337, 1347 (Fed. Cir. 2013); *Power-One, Inc. v. Artesyn Techs., Inc.*, 599 F.3d 1343, 1352 (Fed. Cir. 2010)); *Pro-Mold & Tool Co. v. Great Lakes Plastics Inc.*, 75 F.3d 1568, 1574 (Fed. Cir. 1996).

### F.    Enablement

136.    Pursuant to 35 U.S.C. § 282 and § 112(a), a patent specification is presumed to sufficiently enable the subject matter of the claimed invention. A party asserting invalidity for lack of enablement must prove, by clear and convincing evidence, that the specification fails to teach a POSA how to make and use the claimed invention without undue experimentation, as of the filing date sought. *See In re Wands*, 858 F.2d 731, 735-37 (Fed. Cir. 1988); *see also Streck, Inc. v. Rsch. & Diagnostic Sys., Inc.*, 665 F.3d 1269, 1288 (Fed. Cir. 2012) ("The enablement requirement is met where one skilled in the art, having read the specification, could practice the invention without undue experimentation.") (internal quotations omitted); *Ajinomoto Co. v. Archer-Daniels-Midland Co.*, 228 F.3d 1338, 1345 (Fed. Cir. 2000) ("Enablement is determined from the viewpoint of persons of skill in the field of the invention at the time the patent application was filed."); *Cephalon, Inc. v. Watson Pharm., Inc.*, 707 F.3d 1330, 1336 (Fed. Cir. 2013) ("The burden of proof . . . to show that the . . . patents are invalid for lack of enablement is by clear and convincing evidence.").

137.    To be enabling, a patent does not need to guarantee that all embodiments of the invention will be operative. *Atlas Powder Co. v. E.I. du Pont De Nemours & Co.*, 750 F.2d 1569, 1576 (Fed. Cir. 1984) ("It is not a function of the claims to specifically exclude ... possible inoperative substances[.]") (citation omitted); *Warner Lambert Co. v. Teva Pharms. USA, Inc.*, C.A. No. 99-922-DRD, 2007 WL 4233015, at *15 (D.N.J. Nov. 29. 2007) ("A patent can support extremely broad claims even if some of the embodiments are inoperative.").

138.    "Lack of factual support for expert opinion going to factual determinations, however, may render the testimony of little probative value in a validity determination." *Cephalon, Inc.*, 707 F.3d at 1338 (quoting *Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.*, 776 F.2d 281, 294 (Fed. Cir. 1985)). Thus, conclusory statements by experts that performing the relevant experimentation would be "difficult" or "complicated" are not sufficient to constitute clear and convincing evidence of undue experimentation. *Cephalon, Inc*, 707 F.3d at 1338 (citing *Ashland Oil*, 776 F.2d at 294).

139.    The specification does not need to "necessarily describe how to make and use every possible variant of the claimed invention, for the artisan's knowledge of the prior art and routine experimentation can often fill gaps, interpolate between embodiments, and perhaps even extrapolate beyond the disclosed embodiments, depending upon the predictability of the art." *AK Steel Corp. v. Sollac & Ugine*, 344 F.3d 1234, 1244 (Fed. Cir. 2003); *Amgen Inc. v. Sanofi*, 598 U.S. 594, 610-11 (2013) ("That is not to say a specification always must describe with particularity how to make and use every single embodiment within a claimed class."); *see also In re Vaeck*, 947 F.2d 488, 496 (Fed. Cir. 1991) ("[P]atent applicants are not required to disclose every species encompassed by their claims, even in an unpredictable art."); *Pfizer*, 555 F. App'x at 967 ("[T]he

inventors were not required to provide a detailed recipe for preparing every conceivable permutation of the compound they invented to be entitled to a claim covering that compound.").

140.    "Optionally" is a term used in patent claims to convey an element or feature that may be present but is not required. *See e.g.*, *Alnylam Pharms. Inc. v. Moderna, Inc.*, C.A. No. 22-335, D.I. 125 (D. Del. Aug. 21, 2023) (adopting parties' jointly agreed construction of "optionally comprises" as "may or may not contain"); *10X Genomics Inc. v. The Univ. of Chicago*, IPR2015-01162. Paper 14 at 9–11 (PTAB Nov. 16, 2015) (Institution Decision) (construing "optionally[] at least one or more chemical reactants" to mean that inclusion is "optional and not required"); *Oracle Corp. v. Thought, Inc.*, IPR2014-00118, Paper 16 at 16 (PTAB Apr. 25, 2014) (Institution Decision) ("[W]e construe 'optionally its links to other objects of an object model' as a feature that could be included in the claimed system but is not included necessarily in the claimed system."); *Santarus, Inc. v. Par Pharm., Inc.,* C.A. No. 7-551, 2008 WL 5736587, at *1 (D. Del. Nov. 5, 2008) (construing "at least one optional Secondary Buffer" as "not required . . . but which can be combined"); *Ex Parte Wu*, 10 U.S.P.Q.2d 2031, 1989 WL 281900, at *3 (Bd. Pat. App. & Interf. 1988) (denying Request for Reconsideration on the basis that "the term 'optionally' clearly indicates that the [element] may, or may not, be present" in the composition).

141.    Further, since the patent specification is directed to one of skill in the art, "a patent need not teach, and preferably omits, what is well known in the art." *Hybritech Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1384 (Fed. Cir. 1986); *see also Falko-Gunter Falkner v. Inglis*, 448 F.3d 1357, 1365 (Fed. Cir. 2006); *Pfizer*, 555 F. App'x at 966-67 (rejecting accused infringers' contention that the specification had to describe how to make each species in a genus to satisfy enablement).

142.    "The enablement requirement is met where one skilled in the art, having read the specification, could practice the invention without 'undue experimentation.'" *Streck, Inc. v. Rsch. & Diagnostic Sys., Inc.*, 665 F.3d 1269, 1288 (Fed. Cir. 2012) (quoting *In re Wands*, 858 F.2d at 736–37). "Enablement is a question of law . . . based on underlying factual inquiries." *Cephalon*, 707 F.3d at 1336. "Whether undue experimentation is needed is not a single, simple factual determination, but rather is a conclusion reached by weighing many factual considerations." *Id.* at 737. These include: "(1) the quantity of experimentation necessary, (2) the amount of direction or guidance presented, (3) the presence or absence of working examples, (4) the nature of the invention, (5) the state of the prior art, (6) the relative skill of those in the art, (7) the predictability or unpredictability of the art, and (8) the breadth of the claims." *Id.*

143.    A specification is not "necessarily inadequate just because it leaves the skilled artisan to engage in some measure of adaptation or testing." *Amgen*, 598 U.S. at 611. The specification need not spell out every detail of the invention, otherwise "patent specifications would turn into production specifications, which they were never intended to be." *Koito Mfg. Co. v. Turn-Key-Tech, LLC*, 381 F.3d 1142, 1156 (Fed. Cir. 2004). A claim is still enabled where some experimentation is required, provided that experimentation is not "undue." *In re Wands,* 858 F.2d at 737 ("Enablement is not precluded by the necessity for some experimentation such as routine screening."). In addition, "enablement is not measured against the cumulative time and effort it takes to make every embodiment within a claim." *Amgen*, 598 U.S. at 615. While a patent "must enable a skilled artisan to practice the full scope of the invention" "it does not need to ensure that a skilled artisan can practice the entire scope of the invention within a short period of time." *Erfindergemeinschaft UroPep GbR v. Eli Lilly & Co.*, 276 F. Supp. 3d 629, 661 (E.D. Tex. 2017) (J. Bryson, sitting by designation), *aff'd*, 739 F. App'x 643 (Fed. Cir. 2018). Even "a considerable

61

amount of experimentation is permissible, if it is merely routine, or if the specification in question provides a reasonable amount of guidance." *Johns Hopkins Univ. v. CellPro, Inc.*, 152 F.3d 1342, 1360 (Fed. Cir. 1998); *see also Cephalon*, 707 F.3d at 1338 ("extensive experimentation does not necessarily render the experiments unduly extensive where the experiments involve repetition of known or commonly used techniques."); *see also PPG Indus., Inc. v. Guardian Indus. Corp.*, 75 F.3d 1558, 1564 (Fed. Cir. 1996) ("The test is not merely quantitative, since a considerable amount of experimentation is permissible, if it is merely routine, or if the specification in question provides a reasonable amount of guidance with respect to the direction in which the experimentation should proceed to enable the determination of how to practice a desired embodiment of the invention claimed."); *Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*, 520 F.3d 1358, 1365–66.

144.    In the pharmaceutical context, a claim is enabled even if the POSA would need to experiment with different physicochemical parameters to make and use certain embodiments. *See, e.g.*, *Cephalon, Inc. v. Watson Pharm. Inc.*, 707 F.3d 1330, 1339–40 (Fed. Cir. 2013); *Warner Lambert Co. v. Teva Pharm. USA, Inc.*, C.A. No. 99-922-DRD, 2007 WL 4233015, at *13 (D.N.J. Nov. 29. 2007).

145.    "[A] patentee is not required to provide actual working examples." *Alcon Rsch. Ltd. v. Barr Lab'ys, Inc.*, 745 F.3d 1180, 1189 (Fed. Cir. 2014). The Federal Circuit "ha[s] rejected enablement challenges based on the theory that there can be no guarantee that prophetic examples actually work." *Id.* "The burden is on one challenging validity to show by clear and convincing evidence that the prophetic examples together with other parts of the specification are not enabling." *Id.* at 1189-90. "Only a sufficient description enabling a person of ordinary skill in the art to carry out an invention is needed." *Allergan, Inc. v. Sandoz Inc.,* 796 F.3d 1293, 1310 (Fed. Cir. 2015). Because "[e]nablement is determined from the viewpoint of skill in the field of the

62

invention at the time the patent application was filed" a claimed invention directed to unknown embodiments may be enabled if a skilled artisan possessed sufficient background knowledge to practice the embodiment. *Ajinomoto Co., Inc. v. Archer-Daniels-Midland Co.*, 228 F.3d 1338, 1345 (Fed. Cir. 2000).

146.    A patent claim is enabled even if some inoperative embodiments fall within the scope of the claim. *See Atlas Powder*, 750 F.2d at 1576 ("It is not a function of the claims to specifically exclude . . . possible inoperative substances[.]") (quoting *In re Dinh-Nguyen*, 492 F.2d 856, 858–59 (C.C.P.A. 1974)); *Warner Lambert*, 2007 WL 4233015, at *15 ("A patent can support extremely broad claims even if some of the embodiments are inoperative."); *in re Wands*, 858 F.2d at 739 n.29 ("Even if we were to accept the PTO's 2.8% success rate, we would not be required to reach a conclusion of undue experimentation."). In fact, even if it would have been "impossible" for the patent applicant to draft a claim directed to "operable [embodiments] and exclude the inoperable ones," the claims have been found to be enabled. *Atlas Powder*, 750 F.2d at 1576.

147.    Declarations submitted during patent prosecution can be consulted in determining whether a specification contains adequate written description and would enable a POSA to practice the claimed invention. *See Helsinn Healthcare S.A. v. Teva Pharms. USA, Inc.*, 855 F.3d 1356, 1373-75 (Fed. Cir. 2017) (relying on declarations by the inventors submitted during prosecution of the patent-in-suit as well as declarations submitted by the inventors of the patent-in-suit during prosecution of related patent applications in concluding that "[t]he evidence is overwhelming that before the critical date of January 30, 2002, it was established that the patented invention would work for its intended purpose of reducing the likelihood of emesis").

148.    "The completion of Phase III studies and final FDA approval are not pre-requisites for the invention . . . to be ready for patenting." *Helsinn Healthcare*, 855 F.3d at 1373. The data

required for FDA approval is not required for a patent to "m[e]et the requirements of 35 U.S.C. § 112." *Id.* at 1375; *see also in re Brana*, 51 F.3d 1560, 1568 (Fed. Cir. 1995) ("FDA approval . . . is not a prerequisite for finding a compound useful within the meaning of the patent laws."). The Federal Circuit has rejected reasoning to the contrary as an "unduly restrictive standard" that "would preclude the filing of meritorious patent applications in a wide variety of circumstances." *Helsinn Healthcare*, 855 F.3d at 1375. *See also In re Brana*, 51 F.3d 1560, 1567 (Fed. Cir. 1995) (noting that 'the requirements under the law for obtaining a patent' are different from 'the requirements for obtaining government approval to market a particular drug for human consumption').";*See also United Therapeutics Corp. v. Liquidia Techs., Inc.*, 74 F.4th, 1360, 1369, 1371 (Fed. Cir. 2023) ("[P]ractitioners are informed by the findings of the regulatory agency to avoid treatment of . . . a subset of patients who would not benefit or should not take the claimed treatment. That does not mean that such claims are not sufficiently enabled or supported by written description.") (citation omitted).

149.    In *United Therapeutics Corp. v. Liquidia Techs., Inc.*, the Federal Circuit upheld the validity of claims "directed to a method of treating pulmonary hypertension comprising inhalation of Treprostinil," concluding that the claims were enabled and supported by adequate written description. 74 F.4th at 1363-64 (Fed. Cir. 2023). The patent challenger argued that the claimed method was not enabled, because the method "would not benefit" one subset of patients with pulmonary hypertension, Group 2 patients. *Id.* at 1368. The Federal Circuit rejected this argument: "[T]he record demonstrates that the claimed administration of treprostinil vasodilates the pulmonary vasculature and reduces pulmonary blood pressure even in Group 2 PH patients. . . . That a study—administering treprostinil-like prostacyclins to Group 2 PH patients—failed due

64

to increased mortality, yet showed 'improvement in a patient's hemodynamics,' may be an issue

for the FDA. But our focus is on the claimed invention." *Id.* at 1370.

150.    "Section 112 requires enablement of only the claimed invention, not

matter outside the claims." *McRO, Inc. v. Bandai Namco Games Am. Inc.,* 959 F.3d 1091, 1100

(Fed. Cir. 2020) (internal quotation marks removed).

151.    Courts do not approve of "use of a later [] publication disclosing a later [] existing

state of the art in testing an earlier [] application for compliance with § 112, first paragraph." *In re*

*Hogan*, 559 F.2d 595, 605 (C.C.P.A. 1977); *see also Genuine Enabling Tech. LLC v. Sony Corp.*,

No. CV 17-135, D.I. 303 at 24-25 (D. Del. Apr. 12, 2021) (ordering defendant's expert to "base

his enablement analysis on the state of the art as it existed on the filing date"); ); *Novartis Pharms.*

*Corp. v. Torrent Pharma Inc.*, 125 F.4th 1090, 1100 (Fed. Cir. 2025) ("[The scenario of *Hogan*]

is precisely the case here. The later-discovered valsartan-sacubitril complexes, which arguably

may have improved upon the 'basic' or 'underlying' invention claimed in the '659 patent, cannot

be used to 'reach back' and invalidate the asserted claims.") (quoting *Hogan*, 559 F.2d at 606).

### G.    Written Description

152.    The first paragraph of 35 U.S.C. § 112 requires that "[t]he specification . . . contain

a written description of the invention."

153.    "To overcome the presumption of validity of patents, the accused must show that

the claims lack a written description by clear and convincing evidence." *Hynix Semiconductor Inc.*

*v. Rambus Inc.*, 645 F.3d 1336, 1351 (Fed. Cir. 2011) (citations omitted). "[W]hether a claim is

supported by an adequate written description is a factual inquiry, and has been for some time." *Id.*

at 1351 (citing *Ariad*, 598 F.3d at 1355; *Utter v. Hiraga*, 845 F.2d 993, 998 (Fed. Cir. 1988));

*Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010)) (en banc) (written

description is "an objective inquiry into the four corners of the specification from the perspective of a person of ordinary skill in the art.").

154.    "The test is whether the disclosure 'conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date.'" *Streck, Inc.*, 665 F.3d at 1285 (quoting *Ariad*, 598 F.3d at 1351). The written description requirement "'does not demand either examples or an actual reduction to practice; a constructive reduction to practice that in a definite way identifies the claimed invention can satisfy the written description requirement.'" *Id.* (quoting *Ariad*, 598 F.3d at 1352). There is no requirement that a patent specification must disclose working examples. *In re Borkowski*, 422 F.2d 904, 908 (C.C.P.A. 1970) ("a specification need not contain a working example if the invention is otherwise disclosed in such a manner that one skilled in the art will be able to practice it without an undue amount of experimentation"); *Endo Pharm. Inc. v. Mylan Pharm. Inc.*, No. 11-CV-00717 (RMB/KW), 2014 WL 334178, at *28 (D. Del. Jan. 28, 2014), *motion for relief from judgment granted*, No. 11-CV-717 (RMB/KW), 2014 WL 2532179 (D. Del. June 2, 2014) (finding that Defendants relied too heavily on the absence of working examples in the specification). Written description should be assessed based on the specification as a whole.

155.    "[T]he critical inquiry is whether the patentee has provided a description that 'in a definite way identifies the claimed invention' in sufficient detail that a [person of ordinary skill in the art] would understand that the inventor was in possession of it at the time of filing." *Alcon Research Ltd. v. Barr Labs., Inc.,* 745 F.3d 1180, 1190-92 (Fed. Cir. 2014) (quoting *Ariad*, 598 F.3d at 1350); *GlaxoSmithKline LLC v. Banner Pharmacaps, Inc.*, 744 F.3d 725, 730 (Fed. Cir. 2014) (affirming a finding of adequate written description where the specification "provide[d] a description by structure and process of creation that matche[d] the claimed term" and "[t]he

structural identification . . . require[ed] that the structure result from (one or any of three) identified processes."); *id.* at 731 ("The claim term and its corresponding description, however broad, identify certain structures produced by certain processes. We have not required more for an adequate written description that matches claim scope."); *see also Pozen Inc. v. Par Pharm., Inc.,* 696 F.3d 1151, 1167 (Fed. Cir. 2012) (written description satisfied where a POSA would understand disclosures that were "not a new or unpredictable concept")

156.    Whether the written description requirement has been satisfied is determined as of the filing date. *Ariad*, 598 F.3d at 1351 ("[T]he test for sufficiency is whether the disclosure of the application relied upon reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date."); *see also Vas-Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1563 (Fed. Cir. 1991). "[A] patentee can rely on information that is 'well-known in the art' to satisfy written description." *Streck, Inc. Research & Diagnostic Sys., Inc.*, 665 F.3d 1269, 1285 (Fed. Cir. 2012) (citation omitted). But, courts do not approve of "the use of a later [] publication disclosing a later [] existing state of the art in testing an earlier [] application for compliance with § 112, first paragraph." *In re Hogan*, 559 F.2d 595, 605 (C.C.P.A. 1977); *Novartis Pharms. Corp. v. Torrent Pharma Inc.*, 125 F.4th 1090, 1098 (Fed. Cir. 2025) (reversing a district court's finding of invalid written description because "[t]he fact that the '659 patent does not describe a complexed form of valsartan and sacubitril does not affect the validity of the patent. That complex—not discovered until four years after the priority date of the '659 patent—is not what is claimed.").

157.    "'[A]n applicant is not required to describe in the specification every conceivable and possible future embodiment of his invention.'" *Hologic, Inc. v. Minerva Surgical, Inc.*, C.A. No. 15-cv-1031-JFB, 2018 WL 3193223, at *13 (D. Del. June 28, 2018) (quoting *Cordis Corp. v.*

*Medtronic AVE, Inc.*, 339 F.3d 1352, 1365 (Fed. Cir. 2003)). The "written description [requirement] does not require inventors, at the time of their application for a patent, to reduce to practice and be in physical possession of every species[.]" *Pfizer Inc. v. Teva Pharm. USA, Inc.*, 555 F. App'x 961, 968 (Fed. Cir. 2014); *see also In re Angstadt*, 537 F.2d 498, 502–03 (C.C.P.A. 1976) (applicants "are not required to disclose every species encompassed by their claims even in an unpredictable art").

158.    A sufficient description of a genus requires the disclosure of either "a representative number of species falling within the scope of the genus or structural features common to the members of the genus so that one of skill in the art can 'visualize or recognize' the members of the genus." *Hynix Semiconductor*, 645 F.3d at 1353 (citing *Ariad*, 598 F.3d at 1350). There is no special rule for supporting a genus by the disclosure of a species; so long as disclosure of the species is sufficient to convey to one skilled in the art that the inventor possessed the subject matter of the genus, the genus will be supported by an adequate written description." *Id.* (citing *Ariad*, 598 F.3d at 1351). A single representative embodiment, while not required, can support written description of a claimed genus. *See, e.g.*, *Invitrogen Corp. v. Clontech Labs., Inc.*, 429 F.3d 1052, 1073 (Fed. Cir. 2005); *Bilstad v. Wakalopulos*, 386 F.3d 1116, 1124–25 (Fed. Cir. 2004); *see also Allergan Sales, LLC v. Sandoz, Inc.*, 717 F. App'x 991, 995 (Fed. Cir. 2017); *in re Herschler*, 591 F.2d 693, 701 (C.C.P.A. 1979) (specification's disclosure of a single example species was sufficient); *In re Fuetterer*, 319 F.2d 259, 265 (C.C.P.A. 1963) (Rich, J.) (disclosure of four species was sufficient even for huge genus that was not fully known at the time of the invention); *Erfindergemeinschaft UroPep GbR v. Eli Lilly & Co.*, 276 F. Supp. 3d 629, 643–59 (E.D. Tex. 2017), *aff'd*, 739 F. App'x 643 (Fed. Cir. 2018).

159.    As with other validity issues, a party alleging insufficient written description must provide factual support for its legal allegations. Thus, general or conclusory expert testimony is not enough to support a finding of insufficient written description. *See, e.g.*, *WBIP*, 829 F.3d at 1339 (citing *Koito Mfg. Co. v. Turn-Key-Tech*, LLC, 381 F.3d 1142, 1152 (Fed. Cir. 2004)).

## H.    Definiteness

160.    Under 35 U.S.C. § 112 ¶ 2, a patent "specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." Because a patent is presumed to be valid, a party alleging indefiniteness has the burden of proving its factual allegations by clear and convincing evidence. *See, e.g.*, *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1345 (Fed. Cir. 2015). To be definite, a patent need only define the universe over which the patentee seeks protection. The patent need not define every possible embodiment of the claims. *See, e.g.*, *Alcon Research Ltd. v. Barr Labs., Inc.*, 745 F.3d 1180, 1189 (Fed. Cir. 2014); *In re Wakefield*, 422 F.2d 897, 903 (C.C.P.A. 1970). "A patent need not explicitly include information that is already well known in the art." *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 875 F.3d 1369, 1376 (Fed. Cir. 2017). "Moreover, claims need not be plain on their face in order to avoid condemnation for indefiniteness; rather, what [this court has] asked is that the claims be amenable to construction, however difficult that task may be." *SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331, 1340 (Fed. Cir. 2005) (citing *Exxon Research & Eng'g Co. v. United States*, 265 F.3d 1371, 1375 (Fed. Cir. 2001)).

161.    A claim is definite if it "inform[s] those skilled in the art about the scope of the invention with reasonable certainty"; therefore, definiteness depends on claim construction. *See Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014); *Intel Corp. v. VIA Techs., Inc.*, 319 F.3d 1357, 1367 (Fed. Cir. 2003). When interpreting the scope of a claim, courts generally

adopt "the full range of interpretation *reasonable* to persons skilled in the art." *Mylan Pharms. v. Kremers Urban Development Co.*, 2004 WL 57218 at *3 (D. Del. Jan. 13, 2004) (emphasis added).

162.    The Federal Circuit has held that the word "its" encompasses both a plural and singular meaning. *01 Communique Lab'y, Inc. v. LogMeIn, Inc.*, 687 F.3d 1292, 1297 (Fed. Cir. 2012) ("The patent's use of words such as 'a,' 'its,' and 'the' in the claims is insufficient to limit the meaning of 'locator server computer' to a single physical computer."). Similarly, the claim term "an isomer" has been construed as "one or more isomers." *Radius Health, Inc. v. Orbicular Pharm. Techs. Pvt. Ltd.*, 2025 WL 2841885 (D. Mass. Oct. 7, 2025) (citing *01 Communique*, 687 F.3d at 1297); *see generally Mylan Pharms. v. Kremers Urban Development Co.*, 2004 WL 57218 at *3 (D. Del. Jan. 13, 2004) (quoting the "well settled" rule of law enunciated by the Federal Circuit that "the term 'a' or 'an' *ordinarily means* 'one or more'" and explaining that "[t]he ordinary meaning . . . is the full range of interpretation reasonable to persons skilled in the art") (emphasis added) (quoting *Tate Access Floors, Incl. v. Interface Architectural Ress., Inc.*, 279 F.3d 1357, 1370 (Fed. Cir. 2002)); ., *Azurity Pharms., Inc. v. Alkem Laby's Ltd.*, 2021 WL 5332406 at *3 (D. Del. Nov. 16, 2021) (Stark, J.) ("the general rule that 'a' in a patent claim means 'one or more' provides support . . . in both the 'consisting essentially of' claims *and (even more strongly) in the 'comprising' claims*.") (emphasis added).

## I.    Inventorship

163.    "Inventorship is a question of law." *Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456, 1460 (Fed. Cir. 1998). Inventorship of a patent is presumed to be correct. *Nartron Corp. v. Schukra USA., Inc.*, 558 F.3d 1352, 1356 (Fed. Cir. 2009). Specifically, the inventors named in an issued patent are presumed to be correct, and the burden of showing incorrect inventorship is a "heavy one" which must be proved by clear and convincing evidence. *Hess v. Advanced Cardiovascular Sys., Inc.*, 106 F.3d 976, 980 (Fed. Cir. 1997).

164.    Under 35 U.S.C. § 102(f), one cannot obtain a valid patent if "he did not himself invent the subject matter sought to be patented." This provision requires that a patent accurately name the correct inventors of a claimed invention. *Pannu v. Iolab Corp.*, 155 F.3d 1344, 1349 (Fed. Cir. 1998); *see also* 35 U.S.C. § 101 ("Whoever invents . . . may obtain a patent."); 35 U.S.C. § 115 ("An application for patent . . . shall include . . . the name of the inventor."). "Determining 'inventorship' is nothing more than determining who conceived the subject matter at issue, whether that subject matter is recited in a claim in an application or in a count in an interference." *Sewall v. Walters*, 21 F.3d 411, 415 (Fed. Cir. 1994). "If nonjoinder of an actual inventor is proved by clear and convincing evidence, a patent is rendered invalid." *Pannu*, 155 F.3d at 1349.

165.    Conception is the touchstone of inventorship, which requires a definite and permanent idea of the complete and operative invention. *Tavory v. NTP, Inc.*, 297 F. App'x 976, 979 (Fed. Cir. 2008) (citations omitted). A joint inventor must contribute to the invention's conception. *CODA Dev. S.R.O. v. Goodyear Tire & Rubber Co.*, 916 F.3d 1350, 1358 (Fed. Cir. 2019); *Fina Oil*, 123 F.3d at 1473 ("[T]o be a joint inventor, an individual must make a contribution to the conception of the claimed invention that is not insignificant in quality, when that contribution is measured against the dimension of the full invention.").

166.    However, a joint inventor need not "make the same type or amount of contribution" to the invention nor contribute to every claim; a contribution to one claim is enough. *CODA Dev. S.R.O.*, 916 F.3d at 1358 (internal quotation marks and citations omitted); *see also Vanderbilt Univ. v. ICOS Corp.*, 601 F.3d 1297, 1303 (Fed. Cir. 2010) ("[E]ach contributor need not have their own contemporaneous picture of the final claimed invention in order to qualify as joint inventors."). It is enough for one to contribute conception to a single claim in order to be considered a joint inventor. *See SmithKline Diagnostics, Inc. v. Helena Lab. Corp.,* 859 F.2d 878,

71

888 (Fed. Cir. 1988). A joint inventor need only contribute to one claim element of a claim. "Additionally, the law of inventorship does not hinge co-inventor status on whether a person contributed to the conception of all the limitations in any one claim of the patent. Rather, the law requires only that a co-inventor make a contribution to the conception of the subject matter of a claim." *Eli Lilly & Co. v. Aradigm Corp.*, 376 F.3d 1352, 1361–62 (Fed. Cir. 2004). A co-inventor need only contribute to one element of a claim. *Id.*; *see also Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456 (Fed. Cir. 1998).

167.    There is no "explicit lower limit on the quantum or quality of inventive contribution required for a person to qualify as a joint inventor." *Fina Oil*, 123 F.3d at 1473. Rather, a joint invention is the product "of a collaboration between two or more persons working together to solve the problem addressed." *Id.*; *see also CODA Dev. S.R.O.*, 916 F.3d at 1359; *Eli Lilly*, 376 F.3d at 1359 ("Joint inventorship . . . can only arise when collaboration or concerted effort occurs—that is, when the inventors have some open line of communication during or in temporal proximity to their inventive efforts[.]") (citation omitted). Evaluating joint inventorship has been described as "one of the muddiest concepts in the muddy metaphysics of patent law." *In re VerHoef*, 888 F.3d 1362, 1365 (Fed. Cir. 2018) (internal quotation marks and citation omitted).

168.    "Because co-inventors need not contribute to the subject matter of every claim of the patent, inventorship is determined on a claim-by-claim basis." *Gemstar-TV Guide Int'l, Inc. v. Int'l Trade Com'n*, 383 F.3d 1352, 1381 (Fed. Cir. 2004).

169.    "Incorrect inventorship is a technical defect in a patent that may be easily curable." *Canon Comp. Sys. v. Nu-Kote Int'l, Inc.*, 134 F.3d 1085, 1089 (Fed. Cir. 1998). A patentee may correct improper inventorship in an issued patent either through an application to the PTO or by an order of a court. 35 U.S.C. § 256. If a court determines that there is clear and convincing

evidence of incorrect inventorship, "a patentee may invoke Section 256 to save the patent from invalidity." *Pannu v. Iolab Corp.*, 155 F.3d 1344, 1350 (Fed. Cir. 1998). When a patent owner invokes Section 256, "the patentee must then be given an opportunity to correct inventorship pursuant to that section." *Id.*

## III.  LISTING

### A.  Issue to be Litigated

170.    Whether Novitium is entitled to a finding that the Use Code U-1102 is improperly listed for the '947 Patent.

### B.  Requirements for Listing a Patent in the Orange Book

171.    NDA holders "shall" list any "patent for which a claim of patent infringement could reasonably be asserted . . . and that claims the drug for which the applicant submitted the [NDA] and is a drug substance (active ingredient) patent or a drug product (formulation or composition) patent; or [is a patent that] claims a method of using such drug." 21 U.S.C. § 355(b)(1)(A)(viii). As to method of treatment claims, "the applicant must submit information only on those patents that claim indications or other conditions of use for which approval is sought or has been granted in the NDA." 35 U.S.C. § 355(b)(1); *see also Jazz Pharms., Inc. v. Avadel CNS Pharms., LLC*, 60 F.4th 1373, 1380 (Fed. Cir. 2023) (listable method of treatment patents are directed to "those methods of use are directly relevant to the NDA in question.").

172.    The FDA has permitted NDA holders, "in their unreviewable discretion, to determine whether eligible patents are listed in the Orange Book." *aaiPharma Inc. v. Thompson*, 296 F.3d 227, 241–42 (4th Cir. 2002).

173.    "[A] patent must be listed . . . if it is reasonable to conclude that a person who makes, uses, or sells the drug would infringe the claim." *Apotex, Inc. v. Thompson*, 347 F.3d 1335, 1344 (Fed. Cir. 2003). "[T]he category of claims as to which infringement could reasonably be

asserted is plainly broader than the category of claims that are infringed. Section 355(b)(1) and its implementing regulations encourage broad disclosure and do not require NDA applicants to make an extrajudicial determination of actual infringement." *Bayer Schering Pharma AG v. Lupin, Ltd*., 676 F.3d 1316, 1325 (Fed. Cir. 2012). Indeed, ANDA applicants have argued that an NDA holder's failure to identify an approved use as protected by a listed patent may serve to estop the NDA holder from enforcing the patent against the ANDA applicant. *See GlaxoSmithKline LLC v. Teva Pharms. USA*, 7 F.4th 1320, 1332 (Fed. Cir. 2021).

174.    In this infringement inquiry, "the 'accused product' is the drug that is the subject of the NDA and the 'accused method' is a method that is reasonably likely to be used by a hypothetical infringer." *Apotex, Inc. v. Thompson*, 347 F.3d at 1344; *see also Teva Branded Pharm. Prods. R&D, Inc. v. Amneal Pharms. of N.Y.*, 124 F.4th 898, 915 (Fed. Cir. 2024) ("[T]his necessary condition of infringement is met by something that the patent claims. . . . But that does not mean that nothing else counts as infringement."). "Patent information that is not [of this] type . . . shall not be submitted." 35 U.S.C. § 355(c)(2).

175.    To list a patent in the Orange Book, the innovator submits an FDA Form 3542 (for approved NDAs) or Form 3542a (for NDAs that are not yet approved). 21 C.F.R. § 314.53(d)(4). As to method of treatment patents, FDA requires that the information submitted by the innovator include use code(s) identifying "the approved method(s) of use claimed by the patent for which a claim of patent infringement could reasonably be asserted if a person not licensed by the owner of the patent engaged in the manufacture, use, or sale of the drug product." 21 C.F.R. §314.53(b)(1). Use Codes are not part of the Hatch-Waxman Act, but rather are a regulatory aid which FDA created to assist FDA in evaluating whether an ANDA applicant seeks approval for a use protected by a listed patent, which allows the patent owner to be on notice and enforce its patent prior to

FDA approval of the ANDA. Because FDA lacks expertise in patent law and has a purely ministerial function in compiling the Orange Book, *Teva Branded Pharm Prods. R&D, Inc. v. Amneal Pharms. of N.Y., LLC*, 124 F.4th 898, 906 (Fed. Cir. 2024), FDA adopted "an approach that requires the NDA applicant or holder or patent owner to identify the approved methods of use protected by the patent." FDA, Preamble to Final Rule, 68 Fed. Reg. 36676, 36682 (June 18, 2003). FDA reasoned that the Agency needed the NDA applicant to identify the methods of use for which a claim of infringement could reasonably be asserted because it could not defer to the determinations of the ANDA applicant. *Id.* ("If ANDA and 505(b)(2) applicants could always avoid the possibility of a 30-month stay" via "a section viii statement" then "there would be little reason for *any* applicant to submit a paragraph IV certification for a method-of-use patent.") (emphasis added).

176.    Patent information for listing in the Orange Book should be submitted within 30 days after approval of an NDA or supplemental application. If a patent is newly issued after the application has been approved, NDA holders should submit the required patent information for any patent that meets the criteria for submission within 30 days of issuance of the patent for it to be considered timely filed. 21 U.S.C. § 355(c)(2).

177.    "When a generic drugmaker applies to market a drug using the same active ingredient as a branded drug, the Food and Drug Administration ("FDA") cannot approve the generic company's application if the generic company's drug would infringe the brand-name manufacturer's patent. The FDA checks for whether the generic company's drug would infringe by looking at which patents the brand-name manufacturer listed in a publication called the Orange Book. If the brand-name manufacturer lists a non-expired patent that the brand-name manufacturer purports claims its drug, the FDA will not approve the generic company's application. Instead, .

. . the FDA withhold[s] approval of the generic company's application for thirty months." *Teva Branded Pharm. Prods. R&D, Inc. v. Amneal Pharms. of N.Y.*, 124 F.4th 898, 902-03 (Fed. Cir. 2024).

178.    By statute, the FDA must regularly update the Orange Book to include patent information submitted after a product has been approved. 21 U.S.C. §§ 355(j)(7)(ii)-(iii).

179.    Because listing is a complex aspect of FDA law, an incorrect understanding of FDA law renders expert testimony on listing unreliable and not credible. *See Integra Lifesciences I, Ltd. v. Merck KGaA*, 496 F.3d 1334, 1342 (Fed. Cir. 2007) ("[W]hen an expert witness' statement of the law is incorrect, that view of the law cannot be relied upon to support the verdict." which "cannot be sustained on the incorrect position that only experiments related to safety in humans are subject to the FDA Exemption at the IND application stage.").

## C.    Procedure for Disputing Listing

180.    The Orange Book Transparency Act of 2021 "codif[ies] current [FDA] regulations and practice regarding the types of patent . . . information listed in the Orange Book. H.R. Rep. No. 116-47, at 6. The regulatory provisions that Congress referenced reflect that, since 2003, the FDA has interpreted the class of patents that claim the drug for which the applicant submitted the application to 'consist of drug substance (active ingredient) patents, drug product (formulation and composition) patents, and method-of-use patents.' 21 C.F.R. § 314.53(b)(1). The FDA defines 'drug substance' to mean 'an active ingredient,' and it defines 'drug product' to mean 'a finished dosage form . . . that contains a drug substance, generally, but not necessarily, in association with one or more other ingredients.' 21 C.F.R. § 314.3(b)." *Teva Branded Pharm. Prods. R&D, Inc. v. Amneal Pharms. of N.Y., LLC*, 121 F.4th 898, 907 (Fed. Cir. 2024).

181.    "If the generic company provides the NDA holder notice of a paragraph IV certification, and if the NDA holder sues for infringement within forty-five days, Congress has

authorized the generic company to bring a counterclaim that can require the NDA holder to fix its listed patent information in the Orange Book." *Teva Branded Pharm. Prods. R&D, Inc. v. Amneal Pharms. of N.Y., LLC*, 121 F.4th 898, 906 (Fed. Cir. 2024)); *see also* 21 U.S.C. § 355(c)(ii)(I) ("the [generic] applicant may assert a counterclaim seeking an order requiring the [NDA] holder to correct or delete the patent information submitted by the [NDA] holder . . . on the ground that the patent does not claim either—the drug for which the application was approved; or an approved method of using the drug") (cleaned up). A generic company may bring a claim for delisting solely via this procedure. 21 U.S.C. § 355(c)(ii)(II) (Congress has "not authorize[d] the assertion of a [delisting] claim . . . in any civil action or proceeding other than . . . described"); *see also Apotex, Inc. v. Thompson*, 347 F.3d 1335, 1347 (Fed. Cir. 2003).

182.    Under 21 C.F.R. § 314.53(f), "if any person disputes an Orange Book listing, that person must notify the FDA." *Apotex, Inc. v. Thompson*, 347 F.3d 1335, 1347 (Fed. Cir. 2003) (citing 21 C.F.R. § 314.53(f)). "The patent listing dispute communication must include a statement of dispute that describes the specific grounds for disagreement regarding the accuracy or relevance of patent information for FDA to send to the applicable NDA holder. For a dispute regarding the accuracy or relevance of patent information regarding an approved method of using the drug product, this statement of dispute must be only a narrative description (no more than 250 words) of the person's interpretation of the scope of the patent." 21 C.F.R. § 314.53(f). "The agency will then ask the NDA holder to confirm the correctness of the patent information." *Apotex*, 347 F.3d at 1347. Otherwise, the NDA holder must "withdraw or amend the patent information . . . within 30 days." 21 C.F.R. § 314.53(f). "Unless the NDA holder withdraws or amends its patent information in response to the patent listing dispute, the Agency will not change the patent information in the Orange Book." *Id.*

183.    Challengers to Orange Book listings have no recourse against FDA. *Avadel CNS Pharms., LLC v. Becerra*, 638 F. Supp. 3d 23, 32-34 (D.D.C. 2022). "[I]f the NDA holder . . . submit[s] inaccurate patent information[] [t]he FDA does not police this process, as . . . it lacks patent-law expertise and thus cannot determine whether the patents that a patent owner lists in the Orange Book are properly included. . . . Thus, it effectively plays only a 'ministerial' role" in regard to listing disputes. *Teva Branded Pharm. Prods. R&D, Inc. v. Amneal Pharms. of N.Y.*, 124 F.4th 898, 906 (Fed. Cir. 2024); *see also Apotex, Inc. v. Thompson*, 347 F.3d 1335, 1348-49 (Fed. Cir. 2003) ("we find nothing in the Hatch–Waxman Act that supports Apotex's argument that the FDA has a duty to screen Orange Book submissions by NDA applicants and to refuse to list those that do not satisfy the statutory requirements for listing"); *aaiPharma Inc. v. Thompson*, 296 F.3d 227, 233, 243 (4th Cir. 2002) (upholding the "very limited mechanism for resolving disputes regarding [Orange Book] listings" specified in 21 C.F.R. § 314.53(f) and accordingly concluding that "FDA may persist in its purely ministerial approach to the Orange Book listing process.").

## IV.    REMEDIES

### A.    Issues to be Litigated

#### 1.  As against AET

184.    Whether Plaintiffs are entitled to a judgment that AET has infringed the '947 and '197 Patents pursuant to 35 U.S.C. § 271(e)(2). AET has stipulated that submission of ANDA No. 218892 constitutes an act of infringement with respect to claim 13 of the '947 Patent.

185.    Whether Plaintiffs are entitled to a judgment that AET has infringed the '947 Patents pursuant to 35 U.S.C. § 271 (b). AET has stipulated that the sale, offer for sale, use, and/or manufacture within the United States and/or importation into the United States of any product covered by ANDA No. 218892, in accordance with AET's Proposed Labeling (and any proposed or approved labeling in AET's ANDA that does not remove the indication of treatment of

excessive daytime sleepiness (EDS) in patients with narcolepsy), prior to the expiration of the '947 Patent would constitute an act of infringement of claim 13 of the '947 Patent under 35 U.S.C. § 271(b).

186.    Whether Plaintiffs are entitled to a judgment that AET has infringed the '197 Patents pursuant to 35 U.S.C. § 271 (a), (b) and/or (c).

187.    Whether Plaintiffs are entitled to an order under 35 U.S.C. § 271(e)(4)(A) that the effective date of any FDA approval of AET's ANDA be no earlier than the last expiration date of either of the '947 or '197 Patents, or any later expiration of exclusivity for either of the '947 or '197 Patents, including any extensions or regulatory exclusivities.

188.    Whether Plaintiffs are entitled to a permanent injunction enjoining AET, each of its officers, agents, employees, parents, affiliates, and subsidiaries, and all persons and entities acting in concert with AET or on its behalf from commercially manufacturing, using, offering for sale, or selling AET's ANDA Product within the United States, or importing AET's ANDA Product into the United States, until the last expiration date of either of the '947 or '197 Patents, including any additional extensions or exclusivity period applicable to those patents.

**2.  As against Novitium**

189.    Whether Plaintiffs are entitled to a judgment that Novitium has infringed the '947 and '197 Patents pursuant to 35 U.S.C. § 271(e)(2).

190.    Whether Plaintiffs are entitled to a judgment that Novitium has infringed the '947 Patents pursuant to 35 U.S.C. § 271 (b).

191.    Whether Plaintiffs are entitled to a judgment that Novitium has infringed the '197 Patents pursuant to 35 U.S.C. § 271 (a), (b) and/or (c).

192.    Whether Plaintiffs are entitled to an order under 35 U.S.C. § 271(e)(4)(A) that the effective date of any FDA approval of Novitium's ANDA be no earlier than the last expiration

date of either of the '947 or '197 Patents, or any later expiration of exclusivity for either of the '947 or '197 Patents, including any extensions or regulatory exclusivities.

193.    Whether Plaintiffs are entitled to a permanent injunction enjoining Novitium, each of its officers, agents, employees, parents, affiliates, and subsidiaries, and all persons and entities acting in concert with Novitium or on its behalf from commercially manufacturing, using, offering for sale, or selling Novitium's ANDA Product within the United States, or importing Novitium's ANDA Product into the United States, until the last expiration date of either of the '947 or '197 Patents, including any additional extensions or exclusivity period applicable to those patents.

### 3.  As against Hikma

194.    Whether Plaintiffs are entitled to a judgment that Hikma has infringed the '947 and '197 Patents pursuant to 35 U.S.C. § 271(e)(2).

195.    Whether Plaintiffs are entitled to a judgment that Hikma has infringed the '947 Patents pursuant to 35 U.S.C. § 271 (b).

196.    Whether Plaintiffs are entitled to a judgment that Hikma has infringed the '197 Patents pursuant to 35 U.S.C. § 271 (a), (b) and/or (c).

197.    Whether Plaintiffs are entitled to an order under 35 U.S.C. § 271(e)(4)(A) that the effective date of any FDA approval of Hikma's ANDA be no earlier than the last expiration date of either of the '947 or '197 Patents, or any later expiration of exclusivity for either of the '947 or '197 Patents, including any extensions or regulatory exclusivities.

198.    Whether Plaintiffs are entitled to a permanent injunction enjoining Hikma, each of its officers, agents, employees, parents, affiliates, and subsidiaries, and all persons and entities acting in concert with Hikma or on its behalf from commercially manufacturing, using, offering for sale, or selling Hikma's ANDA Product within the United States, or importing Hikma's ANDA

Product into the United States, until the last expiration date of either of the '947 or '197 Patents, including any additional extensions or exclusivity period applicable to those patents.

### 4.  As against MSN

199.    Whether Plaintiffs are entitled to a judgment that MSN has infringed the '947 and '197 Patents pursuant to 35 U.S.C. § 271(e)(2).

200.    Whether Plaintiffs are entitled to a judgment that MSN has infringed the '947 Patents pursuant to 35 U.S.C. § 271 (b).

201.    Whether Plaintiffs are entitled to a judgment that MSN has infringed the '197 Patents pursuant to 35 U.S.C. § 271 (a), (b) and/or (c).

202.    Whether Plaintiffs are entitled to an order under 35 U.S.C. § 271(e)(4)(A) that the effective date of any FDA approval of MSN's ANDA be no earlier than the last expiration date of either of the '947 or '197 Patents, or any later expiration of exclusivity for either of the '947 or '197 Patents, including any extensions or regulatory exclusivities.

203.    Whether Plaintiffs are entitled to a permanent injunction enjoining MSN, each of its officers, agents, employees, parents, affiliates, and subsidiaries, and all persons and entities acting in concert with MSN or on its behalf from commercially manufacturing, using, offering for sale, or selling MSN's ANDA Product within the United States, or importing MSN's ANDA Product into the United States, until the last expiration date of either of the '947 or '197 Patents, including any additional extensions or exclusivity period applicable to those patents.

### 5.  As against All Defendants

204.    Whether, pursuant to 35 U.S.C. § 285, the Court should determine that this is an exceptional case and award reasonable attorney fees to Plaintiffs.

205.    Whether, pursuant to Federal Rule of Civil Procedure 54(d)(1), the Court should award costs to Plaintiffs.

### B.     Legal Standards

206.     Section 271(e)(4)(A) provides that when a party infringes a patent by submitting an ANDA, "the court shall order the effective date of any approval of the drug . . . involved in the infringement to be a date which is not earlier than the date of expiration of the patent which has been infringed." The effective date in a district court's order therefore will be "the date of patent expiration, including any patent extension." *In re Omeprazole Patent Litig.*, 536 F.3d 1361, 1367–68 (Fed. Cir. 2008); *see also Research Found. of State Univ. of N.Y. v. Mylan Pharms. Inc.*, Nos. 63 09-184-LPS, 10-892-LPS, 2012 WL 1901267, at *4–5, 7 (D. Del. May 25, 2012) (directing FDA to withdraw final approval of any product that is the subject of an ANDA deemed to infringe and ordering the effective date to be the date of expiration of the asserted patent, or any extension of that date).

207.     In furtherance of a patent owner's right to exclude, district courts may grant injunctions "in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable." *Apple Inc. v. Samsung Elecs. Co.*, 809 F.3d 633, 638 (Fed. Cir. 2015) (quoting 35 U.S.C. § 283); *see also Edwards Lifesciences AG v. CoreValue, Inc.*, 699 F.3d 1305, 1314 (Fed. Cir. 2012) ("A patentee's right to exclude is a fundamental tenet of patent law."); *Research Found. of State Univ. of N.Y. v. Mylan Pharms. Inc*., Nos. 09-184- LPS, 10-892-LPS, 2012 WL 1901267, at *1–2 (D. Del. May 25, 2012) (entering a permanent injunction "enjoining [accused infringer] and those in concert with it from the commercial manufacture, use, sale, and offer for sale within the United States or importation into the United States of any drug described in [accused infringer's] ANDA . . . until expiration of the [asserted] Patent."). A plaintiff seeking a permanent injunction for patent infringement must show:(1) it has suffered irreparable injury; (2) the remedies available at law, such as monetary damages, are inadequate to compensate for the injury of patent infringement; (3) considering the

balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) the public interest would not be disserved. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 390–94 (2006).

208.    Section 285 of the Patent Act provides that a "court in exceptional cases may award reasonable attorney fees to the prevailing party." 35 U.S.C. § 285. An exceptional case within the meaning of the statute is "one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014). Whether a case is exceptional is a question committed to the Court's discretion, and the Court must consider the totality of the circumstances in reaching its conclusion. *Id.* In assessing the totality of the circumstances, the Court may consider, *inter alia*, "frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." *Id*. at 554 n.6. A party seeking attorneys' fees must show the case is exceptional by a preponderance of the evidence. *Id.* at 557–58. The Court may award attorneys' fees in "the rare case in which a party's unreasonable conduct—while not necessarily independently sanctionable—is nonetheless so 'exceptional' as to justify an award of fees." *Id.* at 555; *see also MarcTec, LLC v. Johnson & Johnson*, 664 F.3d 907 (Fed. Cir. 2012) (finding that the case was exceptional and awarding Johnson & Johnson fees for having to rebut theories that disregarded the district court's claim construction and were therefore legally irrelevant); *Takeda Chem. Indus., Ltd. v. Mylan Labs., Inc.*, 549 F.3d 1381 (Fed. Cir. 2008) (finding that the case was exceptional based on Defendants' shifting obviousness theories and awarding fees).

209.    Under Federal Rule of Civil Procedure 54(d)(1), unless provided otherwise,

"otherwise, costs—other than attorney's fees—should be allowed to the prevailing party.