IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

HARMONY BIOSCIENCES, LLC,              )   Trial Volume I
HARMONY BIOSCIENCES MANAGEMENT,        )
INC., BIOPROJET SOCIETE CIVILE         )
DE RECHERCHE and BIOPROJET             )
PHARMA SAS,                            )
                                       )
                 Plaintiffs,           )
                                       )   C.A. No. 23-1286(JLH)(SRF)
        v.                             )
                                       )
LUPIN LIMITED, et al.,                 )
                                       )
                 Defendants.           )

                                           J. Caleb Boggs Courthouse
                                           844 North King Street
                                           Wilmington, Delaware

                                           Tuesday, February 17, 2026
                                           10:02 a.m.
                                           Bench Trial

BEFORE:  THE HONORABLE JENNIFER L. HALL, U.S.D.C.J.

APPEARANCES:

                MORRIS NICHOLS ARSHT & TUNNELL, LLP
                BY:  JEREMY A. TIGAN, ESQUIRE

                     -and-

                COVINGTON & BURLING
                BY:  CHRISTOPHER SIPES, ESQUIRE
                BY:  ALEXA HANSEN, ESQUIRE
                BY:  BRIANNE BHARKHDA SULLIVAN, ESQUIRE
                BY:  MEGAN P. KEANE, ESQUIRE
                BY:  CODY REEVES, ESQUIRE
                BY:  ELAINE NGUYEN, ESQUIRE

                                           For the Plaintiffs

APPEARANCES CONTINUED:

      HEYMAN ENERIO GATTUSO & HIRZEL LLP
      BY:  DOMINICK T. GATTUSO, ESQUIRE.

           -and-

      GREENBERG TRAURIG, LLP
      BY:  JONATHAN D. BALL, Ph.D.
      BY:  SCOTT J. BORNSTEIN, ESQUIRE
      BY:  JULIE P. BOOKBINDER, ESQUIRE
      BY:  GIANCARLO SCACCIA, ESQUIRE
      BY:  ANNE ROCK, ESQUIRE

                For the Defendant
                AET Pharma US, Inc.

          ***  PROCEEDINGS  ***

COURTROOM DEPUTY:  All rise.  Court is now in session.  The Honorable Jennifer L. Hall presiding.

THE COURT:  Good morning, everyone.  Please be seated.

ALL COUNSEL:  Good morning, Your Honor.

THE COURT:  We are here for the first day of a bench trial.  This is *Harmony Biosciences vs. AET Pharma*. It's Civil Action Number 23-1286.

Let's go ahead and have counsel put appearances on the record.

MR. TIGAN:  Good morning, Your Honor.

THE COURT:  Good morning.

MR. TIGAN:  Jeremy Tigan with Morris Nichols on behalf of the Plaintiffs.  For Covington & Burling, I'm

joined by Brianne Sullivan.

MS. SULLIVAN:  Good morning, Your Honor.

MR. TIGAN:  Alexa Hansen.

MS. HANSEN:  Good morning, Your Honor.

MR. TIGAN:  Christopher Sipes.

MR. SIPES:  Good morning, Your Honor.

MR. TIGAN:  And behind them, Megan Keane.

MS. KEANE:  Good morning, Your Honor.

MR. TIGAN:  Yale Fu.

MR. FU:  Good morning, Your Honor.

MR. TIGAN:  And Cody Reeves.

MR. REEVES:  Good morning, Your Honor.

MR. TIGAN:  Our client representative from Harmony joins us as well, Charlie Krikorian.  And, of course, our expert witnesses are here, and I'll let Ms. Sullivan introduce them as part of our opening statement.

THE COURT:  Great.  Good morning to all of you.

MR. GATTUSO:  Good morning, Your Honor. Dominick Gattuso from Heyman Enerio Gattuso & Hirzel LLP, on behalf of AET.

We, too, have quite a presence today.  I'll start with Greenberg.  We have Scott Bornstein.

MR. BORNSTEIN:  Good morning, Your Honor.

MR. GATTUSO:  Julie Bookbinder.  Jonathan Ball.

MS. BOOKBINDER:  Good morning, Your Honor.

MR. BALL:  Good morning, Your Honor.

MR. GATTUSO:  Then you have Elan Araj.

MR. ARAJ:  Good morning, Your Honor.

MR. GATTUSO:  Anne Rock.

MS. ROCK:  Good morning, Your Honor.

MR. GATTUSO:  And Emma Cohen.

MS. COHEN:  Good morning, Your Honor.

MR. GATTUSO:  Ariadna Muniz.

MS. MUNIZ:  Good morning, Your Honor.

MR. GATTUSO:  And Harry Busalacchi, who is not here, Your Honor, but in any event.

And then we also have from AET, Katharina Wolff.

MS. WOLFF:  Good morning, Your Honor.

MR. GATTUSO:  And from Sandoz, we have Phil Carey and Nitya Anand.

MS. ANAND:  Good morning, Your Honor.

MR. GATTUSO:  That's our team, Your Honor.

THE COURT:  All right.  Good morning to everybody.  We've got a full courtroom today.  Welcome.

I know everyone's excited to get started with opening statements, but we have some outstanding disputes that it sounds like we need to resolve before I go ahead and sign the Amended Pretrial Order.  I'm not sure what's left of these, and I have multiple documents, some of which I

think have overlapping issues.

So the first thing on the list was a letter that I got, along with the Proposed Amended Pretrial Order on January 27th, 2026.  It talked about some disputes in Amended Exhibit 11, which I understand has to do with defense exhibits that were on the list by Defendants that have settled out.

Is there anything left of this?

MS. HANSEN:  Your Honor, the parties met and conferred last night.  We've decided to drop that issue.  And the language in Paragraph 64 can be deleted, that entire block, and in 72, it will just say DTX Exhibit -- DTX-1.

THE COURT:  Okay.  So let me cross that out.  So all of the proposed language that Defendant proposed and all the proposed language that Plaintiffs proposed; right?

MS. HANSEN:  Yes.

THE COURT:  So that's 64.  I'm crossing that out right now.

MS. HANSEN:  Then the other paragraph to which that relates is 72.

THE COURT:  Okay.  And that should just say what?

MS. HANSEN:  It should just say DTX-1.  There was some dispute over whether it was through 2000, but I think everything after the bracket can be cut.

THE COURT:  I've got it.  Okay.

So the Plaintiffs' proposal comes out. Defendants' proposal comes out.

MS. HANSEN:  Correct.

THE COURT:  Okay.  So that's all been crossed off.

Great.  Okay.

And then the second thing on that list had to do with Dr. Meskill, and then I think I have other papers that have to do with Dr. Meskill.

MS. HANSEN:  You do, Your Honor.  So there's probably been three filings relating to Dr. Meskill.  The issues are largely the same.

The issue concerns -- Dr. Meskill was one of our experts.  He opined on infringement.  Infringement is no longer at issue in this case.

We told AET we were no longer calling him, and AET wants to bring deposition designations from him into this proceeding.  We don't think that's appropriate.

There remain two other experts who are experts in sleep medicine who they can examine and talk to.  We don't need to bring in Dr. Meskill.

THE COURT:  Okay.  And the designation report that I have, that's just what they want to bring.  It doesn't include any counters that you would have if I

allowed this in.

MS. HANSEN:  That specific clip report, I believe does not include our counters.  In an abundance of caution, we've provided counters, in so far as Your Honor is inclined to admit, but our preference would be just let's strike it and move on.

THE COURT:  Got it.  Thank you.

Let's hear from Defendants on this.  This is pretty short.  I read it twice this morning.  What is it that he's going to say that's relevant to the claim or defenses in the case.

MS. BOOKBINDER:  Sure, Your Honor.  So Dr. Meskill served two reports.  One was on infringement for AET, which we agree with the Plaintiffs, that's been stipulated.  But he also served an omnibus report that gives background and his views on treatment of narcolepsy, on the '947 patent and the file history, and there's six minutes of depo testimony that we've identified are addressing those issues.  For example, splitting doses of certain medication, as well as his affiliation with the Plaintiffs.

One of Plaintiffs' sleep experts relies on articles drafted by Dr. Meskill, so we believe it is appropriate to introduce Dr. Meskill's affiliation with them.

THE COURT:  Okay.  You can ask -- well, you

don't dispute that there's some affiliation; right?

MS. HANSEN:  I --

THE COURT:  I mean, they can ask your experts that, and they're going to say that's what it is; right?

MS. HANSEN:  Correct.  I mean, in so far as the article says that the author is affiliated with Harmony.

THE COURT:  That's what it is.

MS. HANSEN:  That's what the article says.

THE COURT:  Yeah.  And then the splitting doses thing, I mean, it didn't seem to me that there was that much relevance.  He says he's done it.  Presumably the experts that are going to be on the stand are also going to say exactly the same thing.

MS. BOOKBINDER:  So, Your Honor, I believe this is an area where there's a difference of opinion.  And because Dr. Meskill is not testifying live, by Plaintiffs' decision, we have these few minutes -- less than six minutes of testimony.  I believe Plaintiffs' counters also run about six minutes.

So we're talking about 12 minutes of testimony on issues relating to treatment.  '947 is method of treatment claim, Claim 13.

And so his testimony with respect to how he treats is not just affiliated by a paid spokesperson for

Plaintiffs, it is relevant to the issues to be tried that other experts are also going to talk about, therapies.

THE COURT: Well, yeah, but they're not offering him. That's sort of the difference; right? I get why it's relevant if they're offering him as a witness, but now they're not.

Can I ask Plaintiffs -- I'm confused. I don't have the reports, so I'm confused about what this omnibus report is.

MS. HANSEN: So the way we set up our reports, given that it concerned Defendant confidential information, there were four of them. We submitted a background report explaining how he was -- he looked at the issue to be treated and then provided a specific opinion with respect to each of the various labels.

After we submitted -- each of these were actually appendices to his cover report. AET stipulated to infringement shortly after we submitted.

THE COURT: So it's an omnibus infringement report?

MS. HANSEN: It was an omnibus infringement report with the specific detail in appendices.

THE COURT: Got it. Okay.

All right. Here's what I'm going to do: I'm not really understanding why this is relevant. I'm not

inclined to admit it, but I'm going to make a final decision on that after I hear from the parties in their opening statements, so I can see if I can discern some relevance.

And then why don't you offer it again at the time you'd like to play it, and we'll make a decision at that point.

MS. BOOKBINDER:  Your Honor, if it would be helpful to hand up or email the Meskill report, we have a copy for the Court and Counsel.

THE COURT:  Yeah.  We'll take that if you've got a copy.

Okay.  So that's Meskill.

What else do we have?

MS. HANSEN:  The remaining issue in the PTO, Your Honor, concerns Paragraph 105.  And this is -- this is simply an issue where the parties reached agreement when there were a number of other Defendants still in the case.

With respect to AET's request -- or actually Defendants' request as to the scope of testimony, we agree that the parties are not going to testify beyond what's in their expert reports.

The -- the provision, as it stands now, given that we're down to one Defendant, is one-sided in so far as if Your Honor is inclined to keep it in, we just prefer to make it bilateral.  Otherwise, we think that the whole thing

can be stricken.

THE COURT:  Okay.  Let me hear from Defendant.

MS. BOOKBINDER:  So, Your Honor, the agreement was previously entered to obviate the need for Defendants at the time of oral argument to file a motion in limine to prevent Plaintiffs from using expert reports -- as you've seen, expert reports served on different Defendants against each other.

THE COURT:  Yeah, That's definitely not going to happen.  That's -- we are all in agreement.

MS. HANSEN:  So that's not going to happen, Your Honor.

THE COURT:  Okay.  Next?

MS. BOOKBINDER:  So we don't understand what Plaintiffs are trying to add and how that is any different from what our experts would be confined to anyway.

So the fact that they're trying to add it raises some concern for us.  And as to one of the disputes that we will make here shortly is Dr. Wenslow's demonstrative disclosed last night, there are issues that do seem to be going into areas from other Defendants.

THE COURT:  Okay.  Well, we're not going to have anyone testify outside their expert reports, and we're not going to have anyone testify inside their expert reports that weren't served on the other side.

So with all of that, we're going to strike the rest of this.  And if there's a dispute about whether anything I've just said has been violated, we'll deal with it when it comes up.

MS. HANSEN:  Thank you, Your Honor.

MS. BOOKBINDER:  Thank you.

THE COURT:  Okay.  And with that, I'm signing the Pretrial Order.

Okay.  Mr. Koehler.

All right.  Now, we've got some objections that are on letters that we haven't dealt with.  There's a -- we already dealt with Meskill, but there's a Schwartz issue.

MS. BOOKBINDER:  Yes, Your Honor.  We -- for AET, we object to a specific portion of the deposition testimony from Dr. Schwartz that Plaintiffs seek to admit because it is in violation of the parties' stipulation just before the pretrial on the construction of "excessive daytime sleepiness."

THE COURT:  Okay.

MS. HANSEN:  Your Honor, this is -- we're not in any way attempting to violate our stipulation.  The agreed-upon construction of EDS, as it's in the claim, is agreed upon.  There remains disputes as to whether or not daytime sleepiness is the same as excessive daytime sleepiness, and that is what the testimony goes to.

Certainly, we have -- we have observed, as we've shown in AET's designations, they're citing to Dr. Schwartz's testimony for the same purpose of testimony they think supports their opinion.

So simply this is, you know, what's good for the goose is good for the gander.

THE COURT:  Yeah.  So we're going to -- I've read this as well this morning.  This is all going to come in.  The parties -- obviously, if you think that in the post-trial briefing one side is violating their stipulation about what the claim term means, you can point that out, and the Court will hold the parties to their stipulations.

But the evidence is going to get admitted, and you can argue it's not relevant because it violates the stipulation.  That's what we'll do with that.

Anything else that we need to address right now?

MS. HANSEN:  I believe there are some objections with respect to certain witnesses, but we defer to Your Honor as to whether we address that now or move on to opening statements and then deal with it in the context of the specific witness.

THE COURT:  Let's deal with it in the context of the witness just so we can get rolling, and all get into our grooves.  And sometimes these things get resolved during the break anyway, so all right.

MS. HANSEN:  Thank you, Your Honor.

THE COURT:  All right.  Let's start with opening -- oh, sorry.

MS. HANSEN:  Sorry, one last thing.  We'd like to move in -- JTX-1 and 2 into evidence.  I believe we have agreement on that.

MS. BOOKBINDER:  No objection.

THE COURT:  Are those the patents?

MS. HANSEN:  Those are the patents.

THE COURT:  Admitted.

(JTX Exhibit Nos. 1 and 2 were admitted into evidence.)

THE COURT:  All right.  Let's proceed.

MS. SULLIVAN:  Good morning, Your Honor.

THE COURT:  Good morning.

MS. SULLIVAN:  Brianne Sullivan on behalf of the Plaintiffs, Harmony Biosciences and Bioprojet.

Now, this case is about Plaintiffs' first-in-class drug, WAKIX, the patients it serves, the inventions that made it possible, and Defendant AET's desire to capitalize on those inventions by selling a generic version of the drug.

Mr. Brooks, may I have the next slide, please?  Thank you.

Now, WAKIX is FDA approved for the treatment of

patients with narcolepsy.  It offers relief from two hallmark symptoms of narcolepsy:  Excessive daytime sleepiness and cataplexy.

In this case, we will be focusing on excessive daytime sleepiness, which is also referred to as "EDS."

WAKIX is a new chemical entity drug, and it is the first and only approved histamine 3 receptor drug, so $H_3$ receptor.  The active ingredient in WAKIX is pitolisant hydrochloride, and it works on the $H_3$ receptor as an antagonist inverse agonist.

WAKIX is a culmination of decades of extensive $H_3$ receptor research led by the co-founder of Bioprojet, Jean-Charles Schwartz.

Now, beyond the mechanism of action, WAKIX is a unique narcolepsy treatment in another respect.

Mr. Brooks, may I have the next slide?

WAKIX is the only treatment for EDS and cataplexy in narcolepsy patients that is not a controlled substance.  So before WAKIX, there were a handful of drugs that narcolepsy patients used to stay awake during the day.

These drugs were primarily stimulants like amphetamines.  Obviously, they posed addiction risks.  All available EDS drugs pre-WAKIX were controlled substances, so they were subject to complicated distribution schemes that limited and complicated patients' access.

For narcolepsy patients with cataplexy, the only FDA approved treatment was sodium oxybate, which is also known as GHB or liquid ecstasy and has well-known illicit uses.

Narcolepsy is a chronic disease whereby the boundaries of sleep and wake are porous, and they blur together. Throughout the day, patients experience the onset of sleep in a sudden, unpredictable and irresistible way. They have what are often referred to in the field as sleep attacks.

Now, excessive daytime sleepiness is pathological. It interferes with daily functioning, and patients experience a fundamental disruption of their sleep-wake cycle that causes them to fall asleep at inappropriate times during the day, for example, in the middle of a conversation or even while driving. In fact, EDS is so serious that in some states, one cannot get a driver's license if they have narcolepsy.

Now, experts have a scale to evaluate whether a patient has EDS, the Epworth Sleepiness Scale. EDS requires a threshold score of 11 or higher.

Mr. Brooks, may I have the next slide?

So let's talk about the $H_3$ receptor. It was discovered in 1983 by Bioprojet's cofounder, Jean-Charles Schwartz and his colleagues. The $H_3$ receptor is

constitutively active, and it controls the amount of histamine in the brain.  It acts as a clamp on histamine production.

So as mentioned, pitolisant hydrochloride is an $H_3$ antagonist, inverse agonist.  An antagonist inhibits the receptor from clamping down on histamine production, thereby allowing some amount of histamine to be continuously produced.  An inverse agonist releases the clamp, increasing histamine production.

Now, as the evidence will show, the prior art did not teach that pitolisant was an inverse agonist.  Your Honor will also hear evidence that for decades after the discovery of the $H_3$ receptor, scientists searched unsuccessfully for useful $H_3$ antagonists.

The histamine system is at the center of a host of downstream activities in the brain.  It modulates histamine activity in the brain and can have many, many different effects.  So some of them are listed here on Slide 7, and they include effects on learning and memory, the cardiac system, wakefulness and sleep, locomotion, and arousal and attention, for example.

Now, this made the $H_3$ receptor a particularly challenging target since the alteration of the receptor's activity could have a wide range of effects.

From the time of the discovery of the

$H_3$ receptor through the mid-2000s, there was ongoing speculation about the different disorders that might be treated through $H_3$ receptor compounds.  Some of them are listed here, and they include:  ADHD, Alzheimer's, schizophrenia, obesity, epilepsy, sleep disorders, allergic rhinitis even and motion sickness.

One of the most puzzling questions in the art, which plagued researchers until the mid-2000's, was whether $H_3$ receptor antagonists would be therapeutically useful for any disease state at all.

Now, that didn't stop companies from trying. Dozens of pharmaceutical companies synthesized thousands of compounds in pursuit of a variety of different indications, but none of these companies succeeded in clinically validating the $H_3$ receptor for any disease states.

Harmony and Bioprojet succeeded where all of these other companies failed, and pitolisant hydrochloride is the only $H_3$ receptor compound that has made it to market. It is the only compound that had that unique collection of characteristics, that special sauce, if you will, that allowed it to treat patients in any disease state, and it represents a major advance for patients afflicted with life-altering EDS.

So let's turn to the disputes in this case.

There are two WAKIX patents at issue here, the

'197 patent and the '947 patent.  The '197 patent is a composition of matter patent, and it claims the particular crystalline form of pitolisant hydrochloride used to manufacture WAKIX.

The '947 patent is a method of treatment patent, and it is directed to methods of treating excessive daytime sleepiness in patients with Parkinson's disease, narcolepsy and sleep apnea.

Now, AET has stipulated to infringement of the '947 patent, as my colleague Ms. Hansen mentioned, but it disputes infringement of the '197 patent.

Now, AET challenges the validity of both patents, and I'll address each patent in turn starting with the '197 patent.

The inventors of the '197 patent were the first to make pitolisant hydrochloride.  The pitolisant hydrochloride they made was in crystalline form, and it had unexpectedly good properties, including stability, and solubility, despite its tendency to take up water.  And these properties, which are described in the patent, made it well suited for use in a pharmaceutical tablet.

Now, Claim 1 of the patent is directed to crystalline pitolisant hydrochloride, which has an x-ray diffractogram comprising four characteristic peaks and which may contain up to 6 percent water.

The infringement question here is whether the crystalline form of Claim 1 will more likely than not be present in at least some of AET's ANDA products upon sale or during its likely shelf life.

Now, let me provide Your Honor with some background about AET's ANDA products.  To make its ANDA products, AET starts with the crystalline form of Claim 1.  There isn't a dispute about that.  AET then attempts to make that crystalline drug substance into an amorphous solid dispersion and make it into tablets.

The evidence will show that the pitolisant hydrochloride in AET's tablets does not remain entirely amorphous.

So here on Slide 14, we have broken down the limitations of the claim.  Of course, the active ingredient in AET's ANDA products is pitolisant hydrochloride.  There's no real dispute about that.  And AET has stipulated that the pitolisant hydrochloride in its ANDA products meet the water content limitation of the claim.

So the dispute here centers on AET's ANDA -- whether AET's products contain crystalline pitolisant hydrochloride having an x-ray diffractogram that comprises characteristic 2-theta peaks at 11.2, 19.9, 20.7 and 34.1 degrees, 2-theta plus or minus 0.2.

Plaintiffs' expert, Dr. Allan Myerson, will walk

the Court through the evidence showing that AET's products meet the disputed limitations of Claim 1.

Dr. Myerson is an expert in chemical engineering and the study and analysis of crystalline forms, and he has over 40 years of experience in pharmaceutical dosage forms, pharmaceutical manufacturing and industrial applications of crystallization.

Slide 15 has an overview of the types of evidence that Plaintiffs will present.  Dr. Myerson will explain AET's tablet manufacturing process, and he will explain how the heat, moisture and mechanical stress used in that process contributes to the formation of the claimed form.

Additionally, he will tell the Court that AET itself performed XRPD testing that detected the claimed crystalline form in its development batches, including a validation batch and ANDA product exhibit batches, so the final product that will be sold.

Now, AET knows from its own testing that its API is not stable, but it, nonetheless, made the decision to omit any kind of solid-state testing from its finished dosage form release specification.

Now, that's Item Number 4 here.  As a result, AET will be able to sell infringing tablets and yet still be in full compliance with its ANDA.

Finally, you will hear about testing conducted by Plaintiffs' experts which provides further evidence that the claimed form is present in AET's tablets.

In summary, the evidence will show that AET's ANDA products infringe Claim 1.

I want to focus for a moment on the testing evidence that will be discussed during trial, most importantly, AET's internal XRPD testing.  Now, I know that the pretrial motions in this case focused primarily on other testing methods, but Plaintiffs' evidence here will focus on XRPD testing conducted by AET itself.

So during development of its ANDA products, AET developed an internal XRPD testing procedure to identify the claimed form of pitolisant hydrochloride in its tablets. That testing procedure focused on the claimed 11.2 peak. And AET used this testing protocol to test development batches and later certain exhibit batches.  And the evidence will show that Plaintiffs' form was detected again and again.

AET detected the claimed form in two of its exhibit batches after storage under accelerated stability conditions for six months.  Now, the exhibit batches are the final product.  They have the same formulation and are made by the same process, and they are representative of what AET will sell.

So Slide 19 shows AET's exhibit batch EK316. This is their internal XRPD testing, and the presence of the claimed form is unmistakable.  The left is the peak list generated by AET itself, and there are peaks at 11.2, 15.4, 16.9, 20.7, and 21.8, plus or minus two degrees -- plus or minus 0.2 degrees 2-theta.  And all of those are unique to the crystalline form and not explained by any other component in AET's tablets.

So we submit that AET's internal testing alone will be sufficient to meet Plaintiffs' burden on infringement.  It shows that AET's amorphous solid dispersion is highly unstable, that crystals are forming in the tablets, and that the crystalline form that is there has an x-ray diffraction pattern that comprises characteristic peaks of Claim 1.

Now, AET has tried to run away from its own XRPD testing.  Among other things, AET argues that the testing -- that because there was also testing on other samples that did not detect the claimed form, that the testing where they found it is to be discounted.  We submit that argument is without merit.

AET also argues that its own testing isn't evidence of infringement because the samples were stored under accelerated stability conditions.  But the purpose of accelerated stability testing is to gather data in the short

term to understand how the components of the drug product will behave over time.

That is precisely the question at issue here, And it is precisely how AET used its own accelerated stability testing.  It used that testing throughout the development process to figure out if a particular formulation was stable or not, and then it did its accelerated stability testing on its exhibit batches to understand how they would perform over the course of their shelf life. And AET relied on six-month accelerated stability data in its request to FDA to approve its proposed shelf life.  But, notably, AET did not tell FDA about the XRPD testing that we will be talking about in this case.

Now, testing by Plaintiffs' experts also confirms that the crystalline form of Claim 1 is in AET's ANDA products.  You will hear the testimony of Dr. Robert Wenslow who conducted ssNMR testing on AET's ANDA products. Dr. Wenslow has over 30 years of experience with solid-state NMR, not just in academia, but also in practical applications in industry.  Dr. Wenslow spent 14 years at Merck where he directed the use of ssNMR to analyze drug substances and drug products.  And since 2011, he has had his own company that provides pharmaceutical development support and analytical services, including ssNMR to

pharmaceutical clients.  Dr. Wenslow designed and performed a particular type of solid-state NMR experiment called a filter experiment to test AET's ANDA products.

Now, this type of experiment relies on the scientific principle that in an NMR experiment, the signal from an amorphous form of a compound decays faster than the signal from a crystalline form of a compound.  And he used this type of -- he designed experiments that could isolate the crystalline signal and test AET's ANDA products.

So you can see on Slide 22 the red spectrum on the top is the ssNMR fingerprint for the claimed crystalline form.  There are two sharp peaks at around 140 and 130 PPM. Below that is the spectrum for AET's tablet that applies the filtering technique Dr. Wenslow designed.  You can see that there are also two sharp peaks around 140 and 130 PPM which align with that, the crystalline form above.

Now, Dr. Wenslow will explain how this data demonstrates that there is crystalline pitolisant hydrochloride in AET's tablets.  And this testing was performed well within the proposed shelf life of AET's ANDA products.

So how do we know that the crystalline pitolisant hydrochloride in AET's tablets has XRPD peaks at 11.2, 19.9, 20.7 and 34.1?  Well, we know it from two independent sources.

First, as I mentioned, AET's own XRPD testing on its exhibit batches shows that the crystalline form of pitolisant hydrochloride is in the claimed form having the XRPD peaks of the claims.

But, second, we know this because of the crystalline pitolisant hydrochloride that Dr. Wenslow used to generate his solid-state NMR fingerprint was subject to XRPD testing conducted by another one of Plaintiffs' experts, Dr. Fabia Gozzo. Dr. Gozzo is an expert in synchrotron x-ray diffraction testing and she conducted testing of the crystalline pitolisant hydrochloride used by the Plaintiff Harmony to make the WAKIX product. She conducted testing on the same batch of WAKIX API that Dr. Wenslow used for his fingerprint, And her testing confirmed that the crystalline pitolisant hydrochloride of Claim 1 -- her testing confirmed that the sample that she tested and the sample that Dr. Wenslow used is the crystalline pitolisant hydrochloride of Claim 1, and it has an x-ray diffractogram comprising peaks at 11.2, 19.9, 20.7 and 34.1 degrees plus or minus 0.2.

So why ssNMR? Well, it is a widely used and accepted technique for characterizing and identifying solid-state forms, particularly for analyzing small amounts of crystalline material in a multicomponent dosage form like AET's. There are a number of literature references that

discuss these advantages, and there are just a few examples here on Slide 25.

I'd like to point out in particular the Byrn 1995 reference, which is one of AET's main prior art references in this case.  And Byrn says, "For bulk drug substances, x-ray powder diffraction and other techniques can identify the polymorph; however, solid-state NMR appears to be the best method for the study of the drug substance in the dosage form."

Now, we understand that AET intends to present XRPD testing that it had done by a company named Bhogala Biosciences.  This is litigation testing.  It was done specifically for this case, But that testing does not undermine the evidence offered by Plaintiffs.  There is no testing report documenting the testing that was performed, and numerous experimental details about the testing are unknown because it was -- it was overseen entirely by counsel.

In fact, none of the AET witnesses that you will hear from this week had direct contact of any kind with the individuals who performed that testing, nor do we know anything about their qualifications or how they prepared the samples.

What we do know is that that method lacked sensitivity and was not well suited for detecting small

amounts of a crystalline form in a multicomponent dosage form.

Now, as I mentioned, AET also argues that Claim 1 is invalid.  It asserts theories that sound in obviousness, lack of written description and lack of enablement.

Now, as recently as last night, AET declined to tell us which of these theories it will present at trial.  I'll briefly touch on them.

Plaintiffs' expert, Dr. Stephen Davies, will testify about the validity of Claim 1.  Dr. Davies is the -- was the chairman of the chemistry department at Oxford.  He has decades of experience with pharmaceutical, medicinal and solid-state chemistry.

Now, the inventors of the '197 patent were the first to make crystalline pitolisant hydrochloride or pitolisant hydrochloride at all.  But AET argues that Claim 1 would have been obvious because pitolisant was disclosed as an oxalate salt in a prior publication.  Now, AET relies on that disclosure plus general references about salt screening and crystalline form screening.

But there was no teaching in the art regarding crystalline forms of pitolisant hydrochloride, nor was there any teaching in the art about what crystallization variables or parameters to apply to crystalline -- excuse me -- to

pitolisant hydrochloride.  Courts have repeatedly rejected arguments of the nature that AET is making here.

So we have on Slide 28 a quote from the Federal Circuit in *Grunenthal v. Alkem*, and notably AET even uses the same Byrn reference that was at issue and rejected in *Grunenthal*.

The Federal Circuit rejected a similar theory in *Pharmacyclics v. Alvogen*, which was also decided by the District Court here in Delaware.  AET's arguments here are even weaker because the prior art here disclosed a different salt.  So we believe that these obviousness arguments will fail.

AET also asserts a lack of written description and enablement.  These arguments generally relate to the water content limitation of the claims.  But these arguments also fail for a number of reasons, including that they rely almost entirely on speculation offered by AET's experts while ignoring the content of the patent.  And in particular, the detailed information that the inventors provided about how water interacts with the crystalline form that they made.

We submit that AET will not be able to show that Claim 1 of the '197 patent is invalid.

So let's talk about the '947 patent.  The asserted claim, Claim 13, is directed to a method of

treating excessive daytime sleepiness in patients suffering from Parkinson's, narcolepsy or sleep apnea by administering pitolisant hydrochloride or its pharmaceutically-acceptable salts.

As I mentioned, the '947 patent resulted from decades of research into $H_3$ antagonists by the Schwartz group.  While a host of other research groups attempted to reach the same goal, WAKIX was the only H3 compound that has ever been approved for any indication.

So given the success of WAKIX, it's easy to fall into a hindsight trap when thinking about its road to approval.  But in reality, that road was long, winding and complicated, and the field was unpredictable.

So to explain this, Your Honor will hear testimony from two witnesses.  Plaintiffs' expert Dr. Paul Reider is a medicinal chemist with decades of experience in drug development, including years overseeing programs at Merck and Amgen.  He'll describe how scientists in the field approached drug discovery, how they choose compounds to advance into clinical development, and he'll explain what was and wasn't known about pitolisant and the rest of the field and why pitolisant would not have been a promising candidate for further development.

Plaintiffs' expert, Dr. Thomas Roth, is a preeminent scholar in the field of sleep medicine.  He is an

editor on *Principles and Practices of Sleep Medicine*, a foundational text in the field.  And he has overseen the treatment of hundreds of narcolepsy patients over the past five decades.  Dr. Roth will explain the complexity of the $H_3$ receptor and the difficulty of finding a drug with the unique combination of qualities needed to treat patients with EDS.

The evidence will show that, despite decades of research, by the 2005 priority date of the patent, no $H_3$ antagonist had succeeded and it was far from clear that any ever would.  It was even unclear whether there were any viable therapeutic uses for $H_3$ antagonists.  The receptor was complex and poorly understood, and it involved a wide spectrum of activities that create all kinds of side effects.

So the bottom line is that researchers did not know what to do with $H_3$ antagonists as of the priority date. The prior art suggested a host of different diseases.  And the only prior art use of an $H_3$ antagonist in humans at the time was in ADHD.  So we have real-world evidence about how difficult it was to navigate the complexities of the H3 receptor and find a compound that would be effective in a disease state.

You can see on Slide 35, these are a sampling of the $H_3$ compounds over the past 26 years that never even made

it to Phase III trials and, obviously, accordingly, failed to make it to market.

It will also be clear that a POSA would not have been motivated to pursue pitolisant.  At the time its inverse agonist properties were not known, and the only data for it in the art was animal binding and potency data.  And even by 2005 that data was stale.

So the Schwartz group stopped publishing new data about pitolisant in 2002.  And that publication said that pitolisant might represent a starting point for development of $H_3$ receptor antagonists.  Rather than endorsing the compound as is, it suggested modification.  And judging by the publications of the Schwartz group published between that time and the priority date, the group itself had seemed to move on to other compounds.  Meanwhile, the field was getting full of compounds from other pharmaceutical companies.

As Plaintiffs' expert will explain, the fact that pitolisant had that secret sauce needed to treat EDS was truly surprising.  In addition to EDS efficacy and long-term safety, pitolisant strikes the right balance of therapeutic characteristics.  It has good bioavailability.  It has a duration of action that keeps narcolepsy patients awake during the day, but clears the system such that they can sleep at night.  And unlike EDS -- other EDS drugs, it

can be dosed once daily and is not a controlled substance.

So as I mentioned, the dispute about the '947 patent centers on validity. AET has taken a scattershot approach to validity for the '947 patent, asserting upwards of nine theories, several obviousness theories, four obviousness-type double patenting theories, lack of written description, enablement and indefiniteness. Again, we do not know which of these theories AET intends to present at trial. So I will briefly touch on obviousness, obviousness-type double-patenting and enablement.

As I mentioned, the evidence will show that there was no motivation to pursue $H_3$ antagonists. And even if there was, a person of ordinary skill in the art would have had no motivation to pursue pitolisant or had a reasonable expectation of success that it would be effective for treating EDS.

So here we have one of AET's obviousness combinations. We have the Brooks reference from 2002 and the Meier 1 reference from 2001. The Brooks reference does not even mention pitolisant. And Meier 1 is an abstract that does mention pitolisant, but it identifies ADHD and Alzheimer's as the therapeutic targets, not sleep and not EDS.

I'll address one of AET's obviousness-type double-patenting arguments which relies on the claims of

Plaintiffs' '430 patent.

Now, as explained in our pretrial briefing, we do not believe that the '430 patent is a proper OTDP reference.  It resulted from a restriction requirement issued by the Patent Office during prosecution of the '197 composition of matter patent.  But -- and but for this restriction requirement, the claims would have had the same expiration date as the '197 patent.  On top of that, Claim 13 of the '947 patent is patentably distinct from the claims of the '94 -- the '430 patent.

The claims of the '430 patent are not directed to pathologically disordered sleep.  Claim 1 is directed to treating sleep apnea, per se, not EDS in sleep apnea.  And as the evidence will show, there are fundamental differences between treating sleep apnea and treating EDS in sleep apnea.

Claim 3 is directed to diurnal somnolence, daytime sleepiness.  It is not even limited to patients, but also includes healthy people.  And the evidence will show that there are, again, important differences in treating diurnal somnolence and treating EDS in Parkinson's, narcolepsy and sleep apnea.

Claim 5 is directed to psychotropic disorders, and EDS is not a psychotropic disorder.

Now, I imagine that the Court will hear that the

'430 patent was listed in the FDA Orange Book for WAKIX, but the standard for listing has nothing to do with the standard for obviousness-type double-patenting.  A broad claim may need to be listed, according to FDA's guidance.  And it is common for an NDA holder to list both genus patents and species patents in the Orange Book that doesn't make the species patents obvious.

Finally, I'll address enablement.  AET's enablement argument is based on the results of a post-priority date Phase III study in Parkinson's patents which failed to meet clinical endpoints.  But the study did show effectiveness in some patients treated and, of course, enablement of a method claim does not require support of a Phase III clinical study.

So, in sum, we are confident that AET will not be able to show invalidity under any of its theories by clear and convincing evidence.  We submit that at the conclusion of these proceedings, it will be clear that AET infringes the '197 patent and that the asserted claims are not invalid.  And we will ask the Court to enter judgment in favor of Plaintiffs Harmony and Bioprojet.

We look forward to trying the case before Your Honor, and we welcome any questions that the Court has.

THE COURT:  Thank you very much.

MR. BALL:  Good morning, Your Honor.

THE COURT:  Good morning.

MR. BALL:  Jonathan Ball for Defendant AET Pharma US.  And before I begin, I'd like to just quickly introduce the client, AET Pharma.  AET is part of a German healthcare company called Alfred E. Tiefenbacher group based in Hamburg.  And they've developed and sold drugs throughout Europe and the rest of the world for over 60 years.

We're joined by a representative from AET, Dr. Katharina Wolff, and she's traveled from Hamburg to be with us today.

We're also joined by representatives from Sandoz, and Sandoz is AET's commercial partner for this drug in the United States.  Sandoz is a global leader in generics and biosimilars.

We have Phil Carey, the IP group head for the U.S.  And we have Nitya Anand, IP litigation counsel at Sandoz.

This case features two familiar tactics that brands use to attempt to block generic competition.  First, there's a polymorph patent for a crystalline form of pitolisant hydrochloride.  But you'll hear that AET's tablets are completely amorphous and that's by design.

AET engineered its tablets specifically to preclude the presence of crystallinity by using a spray granulation manufacturing process which is well known for

producing stable, amorphous drug products.  They also included an excipient called maltodextrin, which is a polymer that is specifically added to ensure the stability of the amorphous form.

Plaintiffs are looking for a proverbial crystalline needle in an amorphous haystack, and their infringement case is more notable for what Plaintiffs won't show than what they will.  The claim requires an x-ray powder diffractogram defined by four specific peaks, but Plaintiffs aren't going to show the Court any x-ray diffraction testing performed by their experts, nor are Plaintiffs ever going to show the Court a single x-ray diffractogram containing the four peaks required by Claim 1.

Second, we have a follow-on method of treatment patent which can't survive an obviousness-type double-patenting analysis over an earlier, but now expired Orange Book patent covering the same approved indication of the drug.  Bioprojet had their patent term for WAKIX, but the primary patent for that indication expired earlier this month.  The law precludes companies from obtaining additional patent terms through follow-on patents having claims that are no more than obvious variations of the originally claimed subject matter.  This is a textbook case of obviousness-type double-patenting.

I'll start with the polymorph patent.  That's

the '197.  Claim 1 is directed to a crystalline form of pitolisant hydrochloride having an x-ray powder diffractogram with characteristic peaks at 11.2, 19.9, 20.7, and 34.1 degrees 2-theta.  The claims didn't always require the x-ray diffractogram peaks.  Instead, Bioprojet originally attempted to patent any crystalline form of pitolisant hydrochloride.  But that claim was rejected by the Patent Office as indefinite.

In explaining the basis for the rejection, the patent examiner noted that an artisan would understand that in comparing a new product, every peak in the diffractogram should be compared.  Bioprojet acquiesced and amended the claim to require the x-ray diffractogram limitations in order to obtain allowance of the '197.

So I don't think there will be any real dispute in this case that x-ray diffraction is the test required by the claims to identify the crystalline form.  But what's remarkable about this case is that Plaintiffs aren't going to show the Court any x-ray diffraction testing of AET's tablets conducted by their experts.

Instead, they'll try to prove their case through inference by relying on nuclear magnetic resonance testing, a technique that's not mentioned anywhere in the patent. It's not mentioned in the claims and it indisputably does not give x-ray diffraction peaks.

Plaintiffs' infringement theory runs headlong into AET's actual and unrebutted XRPD testing of its tablets, testing which proves there is no crystalline pitolisant hydrochloride in those tablets.

You'll hear from AET's crystallography expert, Dr. Jonathan Steed, who will show XRPD testing on all eight exhibit batches, four batches of the 4.45-milligram tablets, and four batches of the 17.8-milligram tablets.

Dr. Steed will show in-house testing that was performed by AET in January of 2024 shortly after the exhibit batches were made.  He'll explain that the x-ray diffractograms for all eight of the exhibit batches show that the pitolisant hydrochloride is completely amorphous. None of the claimed peaks required by the patent are present.

You'll see that AET even developed a second test method, unsurprisingly, called Method 2, to produce high-resolution scans of the narrow region between 10 and 12 degrees 2-theta to further confirm the absence of the strong peak at 11.2 degrees 2-theta, and, therefore, confirm the absence of the claimed crystalline form.

You'll also hear from Dr. Steed about XRPD testing on the same eight exhibit batches that was done under his direction at Bhogala Biosciences at the University of Hyderabad in India.  These tests were conducted in July

of 2025, about 20 months after the tablets were made in order to confirm that no conversion had occurred since the January 2024 in-house testing.

These tablets had all been stored under standard storage conditions from the time they were made until the time they were tested.  Dr. Steed will explain that, like the initial in-house XRPD testing that AET performed, all of the 20-month x-ray diffractograms from his testing are completely clean showing only amorphous pitolisant hydrochloride with no trace of any of the claimed peaks required by Claim 1.

Plaintiffs will offer testimony from no fewer than three experts to try to make out their infringement case on the '197.  We'll hear from Dr. Gozzo, we'll hear from Dr. Wenslow, and we'll hear from Dr. Myerson.  And none of them will offer their own XRPD testing, nor will they challenge Dr. Steed's interpretation of either the January 2024 testing or his July 2025 XRPD testing of the eight exhibit batches.

This is the only XRPD data that you will see in this entire case for AET's tablets maintained under normal storage conditions.  And the obvious question is:  Why are Plaintiffs' experts not offering their own XRPD testing of AET's tablets?

You'll hear that Plaintiffs' expert,

Dr. Gozzo, conducted XRPD testing on Harmony's API.  She even conducted XRPD testing on tablets from another Defendant who's no longer in this case.  And she and Dr. Myerson offered infringement reports against that Defendant based on that testing.

There's no reason why Dr. Gozzo couldn't have also tested AET's tablets.  She had them in her possession as she was running her XRPD experiments, but she never opened the bottles.

The only XRPD testing of the exhibit batches that Plaintiffs will even show the Court are for two batches which were stored under accelerated stability conditions. Those are batches that were held at 40 degrees C.  That's 104, 105 degrees Fahrenheit, 75-percent relative humidity for over six months.

We expect Dr. Myerson to tell the Court that AET detected a peak at 11.2 in two of the accelerated stability batches and that AET believed that to indicate the presence of the claimed crystalline form.  But that's not at all what AET concluded.  You'll hear that AET scientists observed that this could be noise or an experimental artifact.  So the tablets were retested per their standard operating procedure to determine if this peak was real.

And those retests, which we're looking at here, were completely clean, no sign of any feature at 11.2 or any

of the other claimed peaks.  And based on that testing, AET concluded that the tablets were 100-percent amorphous.

It bears mentioning that this accelerated stability testing of this one batch is the only XRPD of an exhibit batch that Dr. Myerson will even contend shows one of the claimed peaks on the full diffractogram.

That little blip right there that we have circled, that is their entire case, Your Honor.  You'll hear from Dr. Steed that regardless of what happens under the extreme accelerated stability conditions, a POSA would attach much, much more importance to the tablets kept under standard storage conditions because, if approved, those are the real-world conditions that the tablets would encounter.

Finally, I want to emphasize that these two batches from the six-month accelerated stability testing, again, are the only x-ray diffractograms of the exhibit batches that Plaintiffs will point to.  But you will not hear testimony from Dr. Myerson or anyone else that these two diffractograms contain all four of the required peaks recited in Claim 1, and any argument that infringement can be shown with less than all the peaks ignores the prosecution history.

To the extent Plaintiffs wanted a claim where the crystalline form could be identified with anything less than the four peaks, they gave that up a long time ago.

They have the '197 patent in hand today because they agreed that all four of the peaks are required, and any argument that less than all four of the peaks is adequate is also precluded by the agreed-upon claim construction in this case, which says that the four peaks together uniquely identify the crystalline form.  This construction aligns with and gives effect to that prosecution history that we discussed.

And with respect to the NMR testing, the undisputed evidence will show that NMR cannot be used to determine the presence of the claimed two theta peaks. You'll also hear from AET's solid-state NMR expert, Professor Paul Hodgkinson, who will explain that Plaintiffs' NMR testing is fraught with errors in design, execution and interpretation, including improper manipulation, and omission of data and lack of proper controls.

In fact, Professor Hodgkinson will explain that when properly interpreted, Plaintiffs' own NMR testing conclusively proves that AET's tablets are a hundred-percent amorphous.

And to our knowledge, no Court has ever accepted Plaintiffs' novel NMR theory to prove the presence of XRPD peaks when a patent claim specifically recites the XRPD peaks.

So to sum up on the '197, the claims require

a -- particular x-ray diffraction peak -- peaks.  That is the test that Bioprojet chose.  Our expert has performed that test, and the results show that tablets are completely amorphous.

I'll turn now to the second patent, which is the '947, the method of treatment.  Claim 13 is the only asserted claim.  It's directed to a method of treating excessive daytime sleepiness with pitolisant in three distinct patient populations:  Those suffering from Parkinson's disease, narcolepsy and sleep apnea.  And only the validity of Claim 13 is at issue.

And the '947 fails for three independent reasons:

First, it's barred by obviousness-type double-patenting because it's not patentably distinct over an earlier Orange Book patent.

Second, it would have been obvious to a POSA in view of the prior art, including Bioprojet's earlier publications on pitolisant.

Third, the patent lacks enablement for treating excessive daytime sleepiness in Parkinson's disease patients.

I'll start with obviousness-type double-patenting.  So Claim 13 covers the approved indication of treating excessive daytime sleepiness in

patients with narcolepsy.  But that's not the only one of Plaintiffs' patents that does so.

Another of their patents, the '430, was also Orange Book listed as claiming the use of pitolisant for the approved indication.

This is a straightforward case of obviousness-type double-patenting.  The '430 is from a separate family, has an earlier priority date, issued first and expired earlier this month, nearly three-and-a-half years before the '947.

The '430 contains two claims that are relevant to the double-patenting analysis.  Claim 1 was directed to the use of pitolisant to treat sleep apnea.  There is no patentable difference between a claim for treating sleep apnea with pitolisant as compared to a claim for treating the primary symptom of sleep apnea with pitolisant.

Both Claim 1 of the '430 and Claim 13 of the '947 contain only one active method step.  That is a step of administering pitolisant to a patient.

In both patents, the drug is the same.  It's pitolisant.  And in both patents, the patients are the same, sleep apnea patients.  So the same drug is given to the same patients in both patents.

The only difference is the '947 merely claims a symptom of sleep apnea being treated, but POSAs understood

that sleep apnea patients have excessive daytime sleepiness. It is a hallmark symptom of obstructive sleep apnea.

You'll hear from AET's sleep expert, Dr. Clete Kushida, a clinical neurologist and chief of Stanford Hospital's division of sleep medicine and renowned sleep clinic.  Dr. Kushida has diagnosed and treated tens of thousands of sleep apnea patients.

You'll hear from Dr. Kushida that excessive daytime sleepiness is a diagnostic criterion for sleep apnea, that every sleep apnea patient suffers from excessive daytime sleepiness.

Carrying out the method of Claim 1 of the '430 by giving pitolisant to sleep apnea patients will invariably treat their excessive daytime sleepiness.  There's nothing patentably distinct about giving the same drug to the same patients to achieve the same result.

You'll hear that POSAs understood that treatment of the underlying breathing disruption in sleep apnea involved only non-pharmaceutical interventions like positive airway pressure, CPAP, surgery or oral appliances, but the pharmaceutical treatments of sleep apnea were stimulant drugs, like amphetamine or Modafinil.

These are drugs which are just given in the daytime as alerting or promoting agents and purely directed at the primary symptom of sleep apnea, which is the

excessive daytime sleepiness.  In other words, a POSA would have understood that the drug pitolisant in Claim 1 of the '430 was not addressing the actual airway collapse in sleep apnea patients, but instead, was treating their major presenting symptom, which is the pervasive feeling of sleepiness felt by sleep apnea patients during the daytime.

That POSAs understood treatment of sleep apnea in the '430 Claim 1 to encompass treatment of the symptoms is shown by the '947 patent itself.  In Working Example Number 2 -- in Working Example 2 of the '947, which is a small human clinical trial of pitolisant in sleep apnea patients, the clinical endpoint -- clinical endpoint being evaluated, it's not the underlying breathing disruption itself, but rather the daytime sleepiness associated with it.

But look at the title.  Even Dr. Schwartz and Bioprojet themselves, when they're studying the reduction in sleepiness in sleep apnea patients, refers to it as treatment of obstructive sleep apnea.  And that's exactly what the '430 claims.

When the evidence is in, we think it will be clear that sleep experts understood Claim 1 of the '430 was about treating the overall clinical presentation of sleep apnea, and excessive daytime sleepiness is the symptom that most frequently brings patients to sleep centers for

treatment.

Bioprojet had its patent for using pitolisant to treat sleep apnea. That patent is now expired, and doctors should be free to treat sleep apnea patients with pitolisant. But they can't because Bioprojet obtained a second follow-on patent, which merely identifies the most common symptom of sleep apnea, a symptom which is always or nearly always present in sleep apnea patients.

That is exactly what the doctrine of obviousness-type double patenting is intended to prohibit. And lest there be any doubt that POSAs understood Claim 1 of the '430 as treating the daytime sleepiness of sleep apnea patients, Claim 3 of the '430 specifically says so.

Claim 3 was directed to treating diurnal somnolence with pitolisant. There's no dispute that diurnal somnolence is just another word for daytime sleepiness. So put another way, Claim 3 of the '430 patent is a method of treating daytime sleepiness.

Plaintiffs even listed the '430 patent in the Orange Book for WAKIX and assigned the same use code to it as they assigned for the '947 patent. That use code was U-1101, which was for treatment of excessive daytime sleepiness in patients with narcolepsy. And they told the FDA that Claim 3 of the '430 patent covered it.

Plaintiffs even asserted the '430 in this case

against other Defendants who are no longer in the case.

You'll hear from Dr. Kushida that there's no patentable difference between treating diurnal somnolence and treating excessive daytime sleepiness.  To the contrary, you'll hear that excessive daytime sleepiness is diurnal somnolence.  It's just a subset of patients, a large subset of patients that report feeling comparatively more sleepy.

Sleep doctors evaluate the degree of daytime sleepiness using a subjective questionnaire called the Epworth Sleepiness Scale which asks patients to score their propensity to fall asleep during the daytime in eight different scenarios such as in a theater, or lying down in the afternoon or in the passenger seat of a car on a long trip and so on.

And by convention, a score of 11 or higher is considered excessive; whereas a score of 10 or below is ordinary daytime sleepiness.  That's all there is to it.  It's not a disease.  It's not a distinction pathology.  It's not even a diagnosis.  It's just a subjective self-assessment by the patient of how sleepy they feel.

And the evidence will show that this is exactly how the term is used in the '947 patent.  You'll see that Dr. Schwartz, the inventor of both the '430 and the '947, filed a declaration with the U.S. Patent and Trademark Office during prosecution of the '947 in which he declared

that excessive daytime sleepiness is measured by the Epworth Sleepiness Scale, which in turn, he told the Patent Office, simply measures the level of daytime sleepiness.

You'll see that Example 2, which we just looked at, of the '947 describes the treatment of sleep apnea patients suffering from excessive daytime sleepiness. We know that because here it says they had an Epworth's score above 12.

And what was the clinical endpoint that Dr. Schwartz and Bioprojet looked at to see if these sleep apnea patients were treated for their excessive daytime sleepiness? A reduction in diurnal somnolence.

In other words, treating diurnal somnolence per the '430 patent is exactly what Dr. Schwartz and Bioprojet used to confirm that pitolisant treats excessive daytime sleepiness in these sleep apnea patients. And, again, the problem is is the '430 is already expired. The '947 runs until 2029.

Plaintiffs had their patent for treating sleep apnea. They had their patent for treating daytime sleepiness in sleep apnea patients, and the public should now be free to use those inventions now that it is expired.

None of Plaintiffs' alleged secondary considerations -- and they're going to lean very hard into secondary considerations in this case -- None of those can

save the '947 patent, because they all apply equally to the '430 patent. Plaintiffs' secondary considerations all relate either to the molecule pitolisant itself, which was a prior art molecule, or they relate to the approved indication of WAKIX. But both the '430 and the '947 patent covered the approved indication of WAKIX.

Now, I want to just touch very quickly on this comment that -- that Plaintiffs made in the opening regarding the availability of the '430 as a reference for obviousness-type double-patenting. And they're making this novel argument that because it was a divisional itself of another patent, that that would somehow preclude its use as a reference in an obviousness-type double-patenting analysis against a completely distinct and separate patent family.

And I would just say that the Court has obviously already asked for this to be pushed to post-trial briefing, so I'll just be very brief on this. But obviousness-type double-patenting, Your Honor, has been with us since the 19th Century. And Section 121 of the Patent Act came in in 1952 in the Patent Act.

And I would just say that it's telling that in the intervening 75 years since 121 came in, Plaintiffs have not been able to find a single case from a Court or from the Patent Office supporting this theory that just because -- just because the '430 itself was a divisional, that somehow

it can be never used against a later filed patent from a completely separate family.

And I would just say that that just simply is not the law, and we think it speaks to the problem that the Plaintiffs have with the '430 patent that they're even making this novel argument.

Turning to obviousness, not only had Dr. Schwartz and Bioprojet spent the decades preceding the filing of the '947 telling the world that $H_3$ antagonists were wake-promoting agents that could treat sleep disorders such as narcolepsy, he and Bioprojet had already disclosed pitolisant as their lead $H_3$ antagonist.

You'll see the Brooks reference from 2002, a review article on new treatments for narcolepsy, which relies on Dr. Schwartz's earlier experimental work to conclude that $H_3$ antagonists could be useful for -- to treat excessive daytime sleepiness and narcolepsy patients.

Brooks sets forth the entire structure of Claim 1 and 13 of the '947 patent. Brooks talks about treating excessive daytime sleepiness with an $H_3$ antagonist in patients that have narcolepsy. The only thing it is missing is it does not mention pitolisant. I think if it mentioned pitolisant, we probably wouldn't be here today, but it doesn't.

But the evidence will show that the molecule it

does mention, thioperamide -- if we go back.  The molecule it does mention here, thioperamide, from Bioprojet was -- was Bioprojet's original and first-generation $H_3$ antagonist. And the evidence will show that it was discovered by Dr. Schwartz in the prior art that thioperamide had poor toxicological and pharmacokinetic properties.

And the evidence will show that pitolisant was the product of a decade of medicinal chemistry efforts to overcome those drawbacks of thioperamide and to optimize the potential of $H_3$ antagonists for human therapeutic use.

And in 2001, Bioprojet announced the discovery of pitolisant in the Meier 1 reference calling it a highly potent and highly-selective $H_3$ antagonist and identifying it as their lead.  They called it a promising lead for further development.

The evidence will show that a POSA would have been motivated to use pitolisant in Brooks' method in place of thioperamide, the molecule that pitolisant was specifically designed to replace.

Further, Dr. Kushida will explain that around the filing date of the '947 patent, there was widespread optimism about the therapeutic potential of H3 antagonists. For example, you'll see the Passani reference, which published just months before the filing of the '947.

And the Passani reference recognizes that

$H_3$ antagonists are the most promising therapeutic approach for the treatment of major wake disorders such as hypersomnia and narcolepsy.

We heard from Plaintiffs' counsel, they'll argue that the pharmacology of pitolisant was not fully characterized in the prior art, that it had its -- the activity was that of an inverse agonist, in addition to being an $H_3$ antagonist.  But that argument is a red herring.

Pitolisant was reported by Bioprojet to be a potent and selective $H_3$ antagonist, and the '947 patent itself admits that $H_3$ antagonists promote wakefulness.

Dr. Schwartz is a highly regarded scientist, and his contributions to the field were certainly significant.  But he disclosed all relevant aspects of the '947 patent years before filing, including the role of the $H_3$ receptor in promoting wakefulness, the benefits of $H_3$ antagonists in treating narcolepsy, as well as the drug pitolisant itself, merely confirming that one of the most potent $H_3$ antagonists ever discovered worked as advertised, just is not inventive.

Plaintiffs' case rests heavily on secondary considerations, mostly failure by others.  But the evidence will show that the examples their experts cite have little or no bearing on Claim 13.  Most of the alleged failures are for indications unrelated to sleepiness:  For example, Alzheimer's, schizophrenia, ADHD, cognition and even

allergic rhinitis.  That is hayfever.

It's simply not probative of the validity of Claim 13 that other companies may have failed to develop different drugs for treating different conditions in different patient populations.

And perhaps even more important, the evidence will show that of these alleged failures, even those that marginally relate to treating sleepiness, none occurred prior to the filing of the '947.

The evidence will show that Bioprojet didn't file the '947 patent in the face of widespread failure by others.  Instead, Bioprojet filed it with a tailwind of promise and every expectation that its lead compound, pitolisant, would succeed.

Finally, the evidence will show that there is a serious problem with the enablement of the '947 patent.  We don't contend that treatment of excessive daytime sleepiness in patients with narcolepsy or sleep apnea is not enabled. Those are approved indications in the United States and in Europe.

But Parkinson's disease is different.  You'll hear from Dr. Kushida that the neurodegenerative process of Parkinson's on the histaminergic system is a confounding factor in that disease.  And you'll also hear that the dopaminergic drugs

that are used to treat Parkinson's disease themselves induce drowsiness.

The evidence will show that the drug Modafinil, which has been the frontline treatment for excessive daytime sleepiness in narcolepsy and sleep apnea from well before when the patent was filed even to this day, was tried without success in the treatment of excessive daytime sleepiness in Parkinson's patients.

To this day, there is no approved treatment for excessive daytime sleepiness in Parkinson's patients, and that includes pitolisant.

The evidence will show that Bioprojet conducted two large placebo controlled Phase III clinical trials to try to get an indication for EDS and Parkinson's.  These were known as the HARPS 1 and HARPS 2 trials.  And in both, the primary endpoint was a reduction in the Epworth Sleepiness Scale score.  And to say that both trials failed is to put it mildly.

The evidence will show that in both the HARPS 1 and the HARPS 2 trials, pitolisant was worse than placebo in treating excessive daytime sleepiness in those patients.

The law doesn't require successful clinical trials to enable a claim.  But the failure of the HARPS 1 and HARPS 2 Phase III trials is objective evidence that the claims are inoperable, at least with respect to the

specifically claimed Parkinson's patients.

There's no amount of experimentation that could enable a person of ordinary skill in the art to practice a method that Plaintiffs themselves have proven does not work.

This is also a problem for Plaintiffs' alleged secondary considerations because the law requires secondary considerations to be co-extensive with the scope of the claim. The secondary considerations can't, in this case, extend to Parkinson's patients when pitolisant itself doesn't help Parkinson's patients.

And with that, I'll say thank you for your time, and we look forward to presenting our case.

THE COURT: All right. Thank you very much.

All right. We'll go ahead and take our morning break.

Can I just have an understanding of what we're going to hear today?

MS. SULLIVAN: Yes, Your Honor. We're going to be starting with the '197 infringement case. The order of witnesses from Plaintiffs is: Dr. Wenslow, followed by Dr. Gozzo, and finally, Dr. Myerson.

THE COURT: Okay. Great.

All right. We'll be back in 15.

COURTROOM DEPUTY: All rise.

(Recess was taken.)

COURTROOM DEPUTY:  All rise.

THE COURT:  Please be seated.

All right.  Let's have Plaintiff call its first witness.

MS. SULLIVAN:  Your Honor, Plaintiffs' first witness will be Dr. Wenslow, but I understand that AET plans to raise a dispute about one of his demonstratives.

THE COURT:  Okay.  Why don't you just raise the disputes contemporaneously.  Since the demonstrative won't be entered into evidence, you can just make the argument for the record.  Yeah.  I mean, I promise you I won't get confused between the difference between the demonstrative and the evidence.

MR. BALL:  That's fine, Your Honor.

THE COURT:  All right.  Thank you very much.

MS. SULLIVAN:  Your Honor, at this time the Plaintiffs call Dr. Robert Wenslow to the stand.

COURTROOM DEPUTY:  Please remain standing and raise your hand.  Please say and spell your name for the record.

THE WITNESS:  Dr. Robert Michael Wenslow, Jr. W-E-N-S-L-O-W.

COURTROOM DEPUTY:  Do you swear or affirm that the questions you give to the Court will be the truth, the whole truth, and nothing but the truth, so help you God, or

do you so affirm?

THE WITNESS:  I do.

COURTROOM DEPUTY:  Thank you.  You may be seated.

DR. ROBERT MICHAEL WENSLOW, the witness herein, after having been duly sworn under oath, was examined and testified as follows:

MS. SULLIVAN:  May I proceed, Your Honor?

THE COURT:  Yes.

DIRECT EXAMINATION

BY MS. SULLIVAN:

Q.    Okay.  Good morning, Dr. Wenslow.

A.    Good morning.

Q.    Now, I know you just stated and you spelled your name, but can you just give us your name again for the record?

A.    Dr. Robert Michael Wenslow, Jr.

Q.    And have you prepared demonstratives to assist the Court in your testimony today?

A.    Yes, I have.

Q.    Okay.

MR. SULLIVAN:  Mr. Beall, can we please have PDX2-1?

BY MS. SULLIVAN:

Q.    At a high level, Dr. Wenslow, what did your work on

Direct - Wenslow

this case involve?

A.    I was asked to perform solid-state NMR testing and design solid-state NMR methods in order to characterize crystalline pitolisant, as well as determine if that crystalline pitolisant was present in the AET products.

Q.    And can you just provide a very high-level explanation of what solid-state NMR is?

A.    Solid-state NMR is a well-established technique for characterizing solid phases like crystal forms and amorphous forms, basically nuclear environments in -- different nuclear environments will have different peaks, and those peaks are characteristic of that solid form.

Q.    Now, before we get into your testing, I'd like to talk about your background.

MR. SULLIVAN:  Mr. Beall, can we have PDX2-2?

BY MS. SULLIVAN:

Q.    And, Dr. Wenslow, can you also turn to PTX-794 in your binder?

A.    I'm there.

Q.    And, Dr. Wenslow, what is PTX-794?

A.    It's my Curriculum Vitae.

Q.    And does your Curriculum Vitae summarize your education, training and experience?

A.    Yes.

Q.    Okay.

Direct - Wenslow

MR. SULLIVAN:  Your Honor, at this time, Plaintiffs move PTX-794 into evidence.  I understand, Your Honor, that we should move --

THE COURT:  Yes.

MS. SULLIVAN:  -- exhibits in as we introduce them.

THE COURT:  Yes, that's right.  Any objection?

MR. BALL:  No objection.

THE COURT:  It's entered.

(PTX Exhibit No. 794 was admitted into evidence.)

BY MS. SULLIVAN:

Q.    Dr. Wenslow, can you briefly explain your educational background for the Court?

A.    I received a bachelor's in chemistry focusing in analytical chemistry from King's College.  Then went to Penn State University where I built my own NMR spectrometer and got a Ph.D. on -- at solid-state NMR applications to solid phases.

Q.    What did you do after earning your Ph.D.?

A.    I went directly to Merck Research Labs in Rahway, New Jersey.

Q.    And how long did you work at Merck?

A.    About 14 years.

Q.    And what did your work at Merck involve?

Direct - Wenslow

A.      I was brought on specifically to bring solid-state
NMR technology to Merck and to start applying it day-to-day
to research and development characterization.

Q.      So can you describe what ssNMR capabilities Merck had
when you joined?

A.      They had nothing.  They didn't even have an
instrument at the time.

Q.      So -- so what did you do after you got there?

A.      Well, first, got an instrument and then started, on a
daily basis, applying solid-state NMR to live research and
development projects.

Q.      And how many compounds did you analyze using ssNMR
during your time at Merck?

A.      Thousands.  We were looking at maybe eight to ten
samples a day.

Q.      And how was your work used by the research and
development people at Merck?

A.      It was live.  And so whenever there were issues of
solid form, is this crystal form present, is there amorphous
present, they would come to me and have me apply solid-state
NMR techniques to characterize materials.  They would then
take that information and direct their crystallization or
direct their formulation and -- to get the appropriate form.

Q.      And is the type of solid-state NMR testing that you
performed at Merck now commonplace in the industry?

Direct - Wenslow

A.      Yes.

Q.      Are there any particular innovations during your time at Merck relating to solid-state NMR that you're particularly proud of?

A.      I'm proud of running fluorine solid-state NMR.  I think it was one of the first fluorine solid-state NMR that was run in the industry.

Also, proud of really applying solid-state NMR to day-to-day understanding of drug products and API, and solving real-world issues.

Q.      And are there any other accomplishments during your time at Merck that you want to highlight for the Court?

A.      I am proud of using relaxed -- NMR relaxation technology to characterize and detect one form in another.

Q.      Now, what did you do after you left Merck?

A.      I started my own contract research lab called Crystal Pharmatech.

Q.      What does Crystal Pharmatech do?

A.      At a high level, we perform solid-state testing, specifically characterizing materials like polymorphs, solid dispersions, looking for crystalline and amorphous.  We also now do a lot of formulation development, but we've maintained focus on solid-state characterization.

Q.      Did you conduct experiments like those that you performed for this case for your clients at Crystal

Direct - Wenslow

Pharmatech?

A.     Yes.  We -- just like this project, we perform about eight or ten of these a year.  It's become standard practice to apply solid-state NMR when you're looking for low levels of crystalline form in solid dispersion.  And solid dispersions have become so well-used in the field because of low-solubility compounds.

Q.     And have you been published in the scientific literature?

A.     Yes, I have.

Q.     And have any of your publications involved solid-state NMR?

A.     I would say over 90 percent of them are specifically on solid-state NMR.

Q.     Are you an inventor on any patents?

A.     Yes.

Q.     And do your patents involve the use of solid-state NMR?

A.     Again, I'd say about 90 percent focus primarily on solid-state NMR.

           MS. SULLIVAN:  Your Honor, at this time Plaintiffs offer Dr. Robert Wenslow as an expert in the field of solid-state nuclear magnetic resonance.

           MR. BALL:  No objection.

           THE COURT:  We will accept him as an expert in

Direct - Wenslow

that field.

MS. SULLIVAN:  Okay.  Mr. Beall, can we have PDX2-3, please?

BY MS. SULLIVAN:

Q.    Now, Dr. Wenslow, what were you asked to do for this case?

A.    Specifically design and perform solid-state NMR testing to characterize the crystalline pitolisant reference and then determine if that crystalline pitolisant was present in AET's tablets.

Q.    And what conclusions did you reach based on the tests that you performed?

A.    That first and foremost, the solid-state NMR could very easily and readily discriminate between amorphous and crystalline.  And based on not only the spectra, but the relaxation behavior.  And then once I designed an appropriate filter experiment, it was able to easily detect crystalline material in AET's tablets.

Q.    Now, before we walk through your analysis, I'd like to discuss some scientific background relevant to your opinions.

Have you prepared slides to help with that portion of your testimony?

A.    Yes.

MS. SULLIVAN:  Can we have PDX2-4?

Direct - Wenslow

BY MS. SULLIVAN:

Q.   Okay.  So, Dr. Wenslow, can you tell us more generally about what ssNMR is?

A.   It is a well-established characterization tool for solid-state pharmaceuticals, particularly with API and drug product.  The peaks shifting corresponds to different chemical nuclear environments for those nuclei; specifically in this case carbon-13.

And so the spectra itself can be one part of a fingerprint, but it also has a second fingerprint dimension, which is the relaxation behavior.

MS. SULLIVAN:  Can we have PDX2-5?

Thanks.

BY MS. SULLIVAN:

Q.   So I am not going to ask you to provide every detail about an NMR experiment, but can you highlight for us what solid-state NMR concepts are illustrated here on PDX2-5 that you think are particularly relevant to your analysis?

A.   NMR active nuclei act as little magnets.  When they are placed in a large magnetic field, you get more of them that align with the field than against the field.

What we do is we then perturb those nuclei with a radio frequency pulse.  And then as they decay back to equilibrium, that vector cuts a -- cuts a current in the coil that is our signal versus time.  And so we get

what's -- what's called a free induction decay, which is a signal versus time. And then after Fourier transform, we get a spectra with peaks at different chemical shift values based on the nuclear environment of the carbon -- different carbon-13 nuclei.

Q. And I believe you've referred to relaxation in some of your testimony. Can you explain what that is?

A. Relaxation is how the nuclei come back to equilibrium. Different phases are going to have different relaxation based on either how they're interconnected in the unit cell or if they're amorphous.

Amorphous material, in general, have a lot more mobility so their relaxation is going to be a lot faster than crystalline material.

Q. And are all nuclei NMR active?

A. No.

Q. Okay. What are examples of NMR active nuclei that are typically studied in pharmaceutical products?

A. Carbon-13, nitrogen-15, fluorine-19 and phosphorus-31.

Q. And I believe you said that your analysis here involved carbon-13; is that right?

A. Yes.

MS. SULLIVAN: Can we have PDX2-6?

BY MS. SULLIVAN:

Q.    Dr. Wenslow, what is the output of an NMR experiment?

A.    As I mentioned, the output is the free induction decay versus time and then that has to be Fourier transformed.

But during the -- before the Fourier transform, we put in a little bit of apodization, which is line broadening and that's put in to smooth the lines.  And then we perform -- we do the Fourier transform and perform phase correction and baseline correction.

Now, over the years working at Merck, running many, many samples, I want to take user variability out of the processing.  So I use automatic phase correction and automatic baseline correction, so that we know that any differences between samples are real and not -- not a function of how the user has processed the data.

Q.    And are the application of these processing parameters accepted in solid-state NMR?

A.    Yes.

MS. SULLIVAN:  Can we have PDX2-7?

BY MS. SULLIVAN:

Q.    Dr. Wenslow, how is ssNMR used in the pharmaceutical industry today?

A.    It is widely accepted and I've shown two review -- review articles here.  In particular, it's very good at characterizing and differentiating between crystal forms,

monitoring crystalline to amorphous and amorphous to crystalline transitions, and also with complex pharmaceutical products.

Now, the reason why in pharmaceutical products, like specifically a drug product, is that you can find a region of the spectrum that is free of excipient interference and so you can focus in on a certain region and watch what's happening to the API without any impact from the excipients.

Q.    And I believe you're -- the review articles you're referring to on PDX2-7 are the Zheng 2025 article and the Li 2021 article; is that right?

A.    Yes.

Q.    And they are PTX-720 and PTX-244; is that correct?

A.    Yes.

MS. SULLIVAN:  At this time, Plaintiffs move those exhibits into evidence.

THE COURT:  Any objection?

MR. BALL:  No objection.

THE COURT:  They're admitted.

(PTX Exhibit Nos. 720 and 244 were admitted into evidence.)

MS. SULLIVAN:  Mr. Beall, can we have PDX2-8?

BY MS. SULLIVAN:

Q.    So can ssNMR be used to distinguish between

Direct - Wenslow

crystalline forms?

A.    Yes.  It can readily distinguish between crystalline forms.  I've shown here two different crystal forms of finasteride.  And you can see since they're crystalline, we have very sharp peaks.  These are -- these peaks are what's called Lorentzian in nature.  And Form 1 versus Form 2, the carbon spectra for Form 1 is a part of a unique fingerprint for Form 1, in addition to its relaxation phenomenon.  But you can clearly see differences between the crystalline forms and detect one form in the other.

MS. SULLIVAN:  Can we have PDX2-9?

BY MS. SULLIVAN:

Q.    Can ssNMR be used to distinguish between crystalline and amorphous forms of the compound?

A.    Yes.  As shown here for neotame, the amorphous is going to have broad peaks and these peaks we refer to as Gaussian peaks, and they are clearly differentiated from the crystalline peaks.

Now there is some spectra overlap, but, as we mentioned, the spectra is only one part of the fingerprint. Another part is relaxation.

MS. SULLIVAN:  Can we have PDX2-10?

BY MS. SULLIVAN:

Q.    So, Dr. Wenslow, what are we looking at here on PDX2-10?

A.    This is flourine solid-state NMR spectra differentiating a crystalline form.  You see the crystalline form has two sharp Lorentzian peaks, whereas the amorphous has one Gaussian peak.  And this is a one-dimensional spectra.

And on the right, the Du prepared mixtures.  And what you can see is with high amounts of crystalline, around 10 percent, you can see those peaks, the Lorentzian peaks.  However, when you get to very low levels, say in this case .1, they're masked.  The crystalline peaks are masked by this massive amorphous hump.

Q.    And the illustration that you were referring to, that's from the Du paper, PTX-245?

A.    Yes.

MS. SULLIVAN:  We ask for PTX-245 to be admitted into evidence, Your Honor.

MR. BALL:  No objection.

THE COURT:  It's admitted.

(PTX Exhibit No. 245 was admitted into evidence.)

BY MS. SULLIVAN:

Q.    I believe you mentioned this is a flourine-19 example.  Would the same principles apply to carbon-13?

A.    Yes.

MS. SULLIVAN:  Can we have the next slide,

Direct - Wenslow

PDX2-11?

BY MS. SULLIVAN:

Q.    So, Dr. Wenslow, what are you trying to illustrate here?

A.    Specifically here I'm showing T1rho experiment.  In our case, we'll be using T1 -- carbon T1rho.  And what we do is we perform a two-dimensional experiment where we're varying a pulse called tau.  And as we vary that pulse, we're watching the peak decay away.  And so you get a readout -- you get the actual spectra at different slices, number one.  But then you also can get a visual representation, which would be an intensity versus tau value.

Q.    And then how is T1rho used in NMR experiments?

A.    It's used to differentiate between crystal forms or crystalline and amorphous, primarily to perform what we call spectral editing.  So the beauty of solid-state NMR is you can go into this second dimension, this relaxation dimension, and completely filter out one either -- one crystalline form or one amorphous form and detect low levels of other phases that are present.

Q.    And did you use filter experiments during your time at Merck?

A.    Yes.

Q.    And do you use filter experiments at Crystal

Direct - Wenslow

Pharmatech?

A.   Yes.  Now, about 70 percent of our projects, and we have about ten projects a year, are exactly looking at low levels of crystalline in -- in amorphous dispersion.  It's now -- solid-state NMR using relaxation filter is well-established and the go-to method for doing this type of analysis.

Q.   Are there examples of spectral editing filtering experiments in the academic literature?

A.   Yes.

          MS. SULLIVAN:  Okay.  Can we have PDX2-13?

BY MS. SULLIVAN:

Q.   And is this the Du article that we previously discussed, Dr. Wenslow?

A.   This is, yes.

Q.   Okay.  And what does the Du article say about spectral editing?

A.   So this was the same article where you saw the spectra with a small amount of crystalline was masked out by the massive amorphous peak.  Well, Du took advantage of the rapid relaxation of the amorphous and he designed a T1rho experiment where he can detect very low levels of crystalline in amorphous.  He's basically selectively exciting the crystalline.  All the amorphous will fade away and your limit of detection drops significantly.

Direct - Wenslow

MS. SULLIVAN:  And can we have PDX2-14?

BY MS. SULLIVAN:

Q.    And what are you illustrating here with the picture on the right from Du?

A.    The top spectra is the one dimensional, without any filtering.  It's basically the one-dimensional flourine spectra where the crystalline content is about .1 percent. And you can see clearly that it's difficult to detect the crystalline because you've got this massive amorphous peak.

What he then designed was a filter experiment. After he ran the relaxation experiments, he knew what the relaxation of the amorphous was.  And he used a filter value that completely removes the amorphous signal, and that's the T1rho filter.  And then you can clearly see the low-level, sharp crystalline Lorentzian peaks.

Q.    And I think here on the illustration in Du it says flourine-19.  Can this same technique be applied to other active nuclei?

A.    Yes.

Q.    Can it be applied to carbon-13?

A.    Yes.

MS. SULLIVAN:  Can we go to PDX2-12?

BY MS. SULLIVAN:

Q.    Dr. Wenslow, what are you illustrating on PDX2-12?

A.    This is a pictorial representation of how we design

the filter experiment.  And so the crystalline material is represented by the red ball, and you can see it has two sharp peaks.  Whereas, the amorphous is a broad Gaussian peak.

Q.    Now, if you had a mixture of those in a sample vial, how would you differentiate and how would you remove one of those?

A.    Well, when we measure the T1rho for the crystalline in red, you see the -- the curve in red on the graph to the right.  And for the amorphous, you see the curve in blue.  And you can clearly see, which we expect, the amorphous decays away significantly faster.

And, in fact, you can pick a tau value, in this case 0.3 or 300 milliseconds, where the signal of the amorphous has completely decayed away.  So that's what we would use as a T1rho filter.  And now we are selectively exciting crystalline and you can signal average as long as you want to keep dropping your detection limits.

MS. SULLIVAN:  Can we have PDX2-15?

BY MS. SULLIVAN:

Q.    Dr. Wenslow, to summarize, why did you think that T1rho filtering was the correct technique to use for your analysis in this case?

A.    We established that the amorphous decays away significantly faster.  So we can remove the amorphous, focus

and selectively excite the crystalline.  NMR is a quantitative technique.  So once we are filtering out the amorphous, we can run the experiments as long as we want to detect very low levels and there's no excipient overlap.

So you can focus in on a region of the spectra where there's no excipient interference and you're specifically figuring out what's happening to the pitolisant hydrochloride.

MS. SULLIVAN:  Now, can we have PDX2-16?

BY MS. SULLIVAN:

Q.    Dr. Wenslow, what are we looking at here on PDX2-16?

A.    The red spectra is the crystalline pitolisant reference, and you can clearly see sharp carbon peaks, Lorentzian peaks.  And I'm highlighting the region from 120 to 150 PPM, because that is a region where I was 90-percent sure there wouldn't be any excipient interference based on my years of working on drug product.

And the blue -- the blue spectra here is the AET tablet with a filter.  And you can see those identical sharp Lorentzian peaks at the same chemical shift, which for me unambiguously says that there's crystalline pitolisant of the same form of Harmony's reference in the drug product.

Q.    And, Dr. Wenslow, I think you said that you were 90-percent sure that there would be no excipient overlap.  As part of your experiments in the case, did you confirm

Direct - Wenslow

whether or not there was excipient overlap in that region?

A.      Yes.  We analyzed the excipients that were in the AET tablet and had 100-percent confirmation.

Q.      Now, I want to talk about the experiments that you did some more before we get more in depth in your conclusions.

MS. SULLIVAN:  So can we have PDX2-18?

BY MS. SULLIVAN:

Q.      Okay.  Now, Dr. Wenslow, did you personally conduct the testing that you designed for this particular project?

A.      I did not.

Q.      Where was it conducted?

A.      Kansas Analytical, the acronym is KAS.

Q.      And why was KAS chosen for this analysis?

A.      I was asked by counsel where we could get the testing done.  Since my start of the Crystal Pharmatech company, we've worked with Kansas Analytical.  We also worked with a second lab in China, a research lab, but Kansas Analytical is what's called a GMP lab.  They -- they run under good manufacturing practice, so they can deliver material for clinical studies.

So I knew that the data integrity, and the data documentation and the system suitability was all going to be run appropriately.  Plus, I've worked with those analysts for well over ten years, and I know their extensive

Direct - Wenslow

experience in running out experiments that I've designed.

Q.    Okay.  And who specifically at Kansas Analytical worked on this project?

A.    Dr. Mike Hanrahan.

Q.    And have you worked with Dr. Hanrahan before?

A.    Yes.  As I've mentioned, right now we run about 10 to 15 projects with KAS for clients a year and about 30 percent of those I work with Mike.

Q.    And are you aware of Dr. Hanrahan's credentials?

A.    Yes.  He has a Ph.D. specifically in solid-state NMR.

        MS. SULLIVAN:  And can we have PDX2-18?

BY MS. SULLIVAN:

Q.    Okay.  So does -- does PDX2-18 summarize the samples that you tested as part of your analysis relating to AET's tablet samples?

A.    Yes.

Q.    Okay.  And does it summarize information in PTX-243, 731, and 861 through 864?

A.    Yes.

        MS. SULLIVAN:  Your Honor, at this time Plaintiffs move those exhibits into evidence.

        MR. BALL:  No objection.

        THE COURT:  They're admitted.

        (PTX Exhibit Nos. 243, 731, and 861 through 864 were admitted into evidence.)

BY MS. SULLIVAN:

Q.    Now, I'd like to ask you about some of the samples on this slide, Dr. Wenslow.

First of all, what is the batch number for the Harmony pitolisant hydrochloride API that you tested?

A.    142868.

Q.    Okay.  And then I believe --

MS. SULLIVAN:  Let's see.  Can we have 19, please?

BY MS. SULLIVAN:

Q.    Okay.  So if you look on the chart where it says "AET excipient mixture," can you explain what that refers to?

A.    As I mentioned, I wanted to be 100-percent sure there were no excipient interference peaks with the API peaks.  So we made a mixture of all of the AET excipients, ran a carbon spectra and showed there was no excipient interference.

MS. SULLIVAN:  And can we have PDX2-20?

BY MS. SULLIVAN:

Q.    And are the excipient -- is the excipient mixture reflected on PDX2-20 and in PTX-861?

A.    Yes.

MS. SULLIVAN:  And at this time, Your Honor, Plaintiffs move PTX-861 into evidence -- or actually, I believe you've already admitted it.  So I don't think that's necessary.  I apologize.

Can we have PDX2-20?

Let's do 21.

There we go.

BY MS. SULLIVAN:

Q.    How were the samples shipped to KAS?

A.    They were packed in foil patch pouches in -- using clear vials and they were shipped with controlled temperature and a temperature log.

Q.    And when did KAS receive the samples containing AET's tablets and excipients?

A.    May 9th, 2025.

Q.    And is that information reflected in PTX-858?

A.    It is.

MS. SULLIVAN:  Your Honor, at this time we move PTX-858 into evidence.

MR. BALL:  No objection.

THE COURT:  It's admitted.

(PTX Exhibit No. 858 was admitted into evidence.)

MS. SULLIVAN:  Okay.  And can we have PDX2-22?

BY MS. SULLIVAN:

Q.    Okay.  So the experiments column -- experiment type column here has a number of different codes, and I want to talk about what those experiment codes mean.

Did you create a slide that summarizes that

Direct - Wenslow

information?

A.    Yes.

MS. SULLIVAN:  Can we have PDX2-23?

BY MS. SULLIVAN:

Q.    What does the code "CPMASTOSS" mean?

A.    This is cross-polarization magic-angle spinning with total sideband suppression.

The main point is this is how we get our carbon reference spectra and we're able to see the fingerprint spectra of the crystalline versus the amorphous.

Q.    And what is "CP13CT1RHO"?

A.    The second part of the fingerprint is going to be relaxation.  And so the 13C T1rho experiment is the two-dimensional experiment where we vary the tau values for both the crystalline and the amorphous to determine how much faster the amorphous decays away compared to the crystalline.

Q.    And what does "CP13CT1RHOFILTER" mean?

A.    After understanding how quickly the amorphous dies away in the relaxation, we chose a T1rho tau filter value that will selectively excite the crystalline and spectral edit out the amorphous.  And that was the experiment that was used to -- to determine crystalline pitolisant in the AET tablets.

Q.    Okay.  Slide PDX2-23 also lists experimental and

Direct - Wenslow

processing conditions.  How did you choose those conditions?

A.      So the apodization is the line broadening of 40 hertz.  This is what I typically would use for carbon spectra.  I've been doing it for over 30 years.  And the temperature was the temperature that we ran the experiment, which was kept at 18.5.  And the reason for that is we wanted to minimize any -- or eliminate any form transformation that could happen from frictional heating. The contact time was optimized at .75 milliseconds, and that was to give the best carbon signal intensity for all of the samples.

                MS. SULLIVAN:  Can we have PDX2-24?

BY MS. SULLIVAN:

Q.      So, finally, there is a reference on the chart with the samples information to samples from Novitium and a sample relating to beta-cyclodextrin.

                Why are those included in your discussion of the AET testing?

A.      For the amorphous reference, I used the Novitium pitolisant solid dispersion.  I wasn't provided amorphous samples from AET.  And in order to determine that the beta-cyclodextrin was not going to interfere with the peaks, we also analyzed the pure beta-cyclodextrin.

Q.      Okay.  And to your knowledge, did AET produce any amorphous pitolisant hydrochloride solid dispersion samples

Direct - Wenslow

in this case?

A.    Not to my knowledge.

Q.    All right.  And why did you think it was appropriate to use Novitium's solid dispersion to analyze the relaxation of the amorphous pitolisant hydrochloride?

A.    The amorphous peaks, it was clearly amorphous, and the excipients -- there was no excipient interference and there was no interaction with the beta-cyclodextrin.

            MS. SULLIVAN:  Can we have PDX2-25?

BY MS. SULLIVAN:

Q.    Okay.  Dr. Wenslow, can you provide, at a high level, an overview of the sample storage, and preparation and equipment used for the testing?

A.    Mike received the samples.  He immediately put them in a locker that was temperature controlled, humidity controlled.  When he pulled the samples out for analysis, they were also kept under temperature and humidity control because they're a GMP facility.

            The powder samples, we just directly packed into this NMR sample holder, which is called a 7-millimeter rotor.

            For the tablets that -- that tablet wouldn't fit directly into the rotor, So we had to grind it lightly to get the bits and parts into the rotor.  And the reason why we didn't grind it into a pulp powder is because we wanted

Direct - Wenslow

to eliminate any chance of a form transformation in the grinding.

So now those samples were pre-spun at 5.6 kilohertz, which is faster than we actually spun them during analysis. And they were pre-spun because since we're dealing with the tablets with, like, little bits and pieces, we wanted to make sure it wasn't going to get off balance and wanted to make sure it was going to spin. So once we knew the samples were going to spin appropriately, put them in the solid-state NMR unit 400 megahertz, spun the samples at 5 kilohertz.

And now for the system suitability, that was run before every sample in this project and after the last sample that was run. And if we switch from this project to another project, when we came back to the pitolisant project, we would re-perform the system suitability before the first sample and after the last sample.

Q. And why did you use 7-millimeter rotors for this project?

A. Again, we wanted to eliminate any form transformation from happening, so we spun the samples at 5 kilohertz. But, also, since we're looking for low levels of crystalline in amorphous, I wanted as much sample in there as possible, which led us to the 7-millimeter rotor.

Q. And is the information that you just described

Direct - Wenslow

reflected in PTX-228 through 242 and PTX-663 through 666?

A.    Yes.

MS. SULLIVAN:  Your Honor, at this time Plaintiffs move those exhibits into evidence.

MR. BALL:  Your Honor, I will just make a brief objection, because I don't think that Counsel has published or shown any content from any of these exhibits at all. There's just cartoons on the screen, and there's exhibits listed below.  So without actually seeing what the exhibits are and discussing their content or showing them, we would object to that.

MS. SULLIVAN:  Your Honor, I mean, first of all, the exhibits were disclosed to Counsel last night.  They did not raise any objections to us.  So they're aware of what they are.

I mean, for time purposes, I think all of the information that Dr. Wenslow testified about is summarized and supported by these documents.  And so we think that we have discussed them sufficiently for their admission into evidence.  We were trying to be efficient in our presentation of the materials.  But if Your Honor feels that there's more detail needed in order to admit them into evidence, then I think that will inform our examinations going forward.

THE COURT:  I'm looking at these exhibits.

Direct - Wenslow

These look like lab notebook pages.

MS. SULLIVAN:  Correct.

THE COURT:  Is that right?

MS. SULLIVAN:  There's -- we will talk about that on the next slide actually, which is they are the notebook pages reflecting, for example, system suitability, the pre-spinning that was done, the sample preparation for -- and loading into the 7-millimeter rotors, pictures of how the samples were stored, and then the temperature logs and humidity logs that reflect that they were under controlled temperature and humidity for the entire time. Dr. Wenslow reviewed these and discussed them in his report.

THE COURT:  Okay.  Why don't you just put that on the record with his testimony, what you just said.  And then subject to that, move them again, and they're going to be admitted.

MS. SULLIVAN:  Okay.  Thank you.

Can we have PDX2-26?

BY MS. SULLIVAN:

Q.    Dr. Wenslow, how were the steps that you just described documented for this project?

A.    Well, Mike took pictures of the samples as he opened the boxes.  He also shared the raw data files, his project notebooks, equipment logbooks, temperature and humidity logs as well as all the shipping documents.

Direct - Wenslow

Q.    And did you review all of those materials as part of your analysis and preparation of your report in this case?

A.    I did.

MS. SULLIVAN:  Your Honor, at this time we move those exhibits into evidence.

MR. BALL:  No objection.

THE COURT:  They're admitted.

(PTX Exhibits No. 228 through 242 and 663 through 666 were admitted into evidence.)

BY MS. SULLIVAN:

Q.    So let's now walk through your actual testing.

MS. SULLIVAN:  Can we have PDX2-27?

BY MS. SULLIVAN:

Q.    So I think we have broken your experiments up similar to how you described into three categories.  Let's start with the acquisition of the reference spectrum.

How was that set of experiments conducted?

A.    I ran a carbon-13 CPMASTOSS on both the crystalline pitolisant reference as well as the Novitium dispersion sample which had the amorphous reference.

MS. SULLIVAN:  Now, let's turn to PDX2-29.

BY MS. SULLIVAN:

Q.    Okay.  What are we looking at here, Dr. Wenslow?

A.    This is the reference spectrum carbon CPMASTOSS for the crystalline pitolisant sample.  And you can clearly see

in the region from 120 to 150 that there are two sharp peaks, no excipient interference, which we'll show in the next image.

Q.    And what did you learn from this data?

A.    That they're very sharp crystalline peaks and they're in a region that are going to be excipient free and they are Lorentzian peaks.  And I -- see, you can see their relative intensity here, the relative intensity of the peaks as well.

Q.    Okay.  And is the spectrum that's on PDX2-29 and 2-30 in PTX-1230?

A.    Yes.

MS. SULLIVAN:  Your Honor, Plaintiffs move PTX-1230 into evidence.

MR. BALL:  No objection.

THE COURT:  It's admitted.

(PTX Exhibit No. 1230 was admitted into evidence.)

BY MS. SULLIVAN:

Q.    And I think PDX2-30 highlights the two peaks that you were pointing out to us before; is that correct?

A.    Yes.

MS. SULLIVAN:  Mr. Beall, can we have PDX2-31?

BY MS. SULLIVAN:

Q.    Okay.  What are we looking at here, Dr. Wenslow?

A.    This is a comparison of the crystalline reference

with the two sharp peaks in that region versus the amorphous.  Some things to note about the amorphous is the lower signal intensity, the broader peaks.  The peaks are Gaussian in nature, and the relative intensity of these two peaks has changed.

Q.    And --

MS. SULLIVAN:  Your Honor --

BY MS. SULLIVAN:

Q.    And, Dr. Wenslow, is this -- are these spectra reflected in PTX-1232?

A.    Yes.

MS. SULLIVAN:  Your Honor, we move PTX-1232 into evidence.

MR. BALL:  No objection.

THE COURT:  It's admitted.

(PTX Exhibit No. 1232 was admitted into evidence.)

MS. SULLIVAN:  Can we have PDX2-32?

BY MS. SULLIVAN:

Q.    And what are we looking at here, Dr. Wenslow?

A.    This is -- the blue spectra is the excipient mixture. Again, I wanted to have absolute confirmation that there's no excipient interference, and that's very clear from this spectra.

Q.    And is this reflected in PTX-1238?

Direct - Wenslow

A.    Yes.

MS. SULLIVAN:  Plaintiffs move to admit PTX-1238 into evidence.

MR. BALL:  No objection.

THE COURT:  It's admitted.

(PTX Exhibit No. 1238 was admitted into evidence.)

MS. SULLIVAN:  So can we have the next slide, please?

BY MS. SULLIVAN:

Q.    Okay.  So let's talk about your T1rho relaxation experiments.

So can you give us an overview of the T1rho relaxation experiments that you performed here?

A.    The first set of experiments was to get the carbon spectra of the crystalline and amorphous, which is one part of the fingerprint.  The T1rho was to get the second part of the fingerprint.  And so we measured carbon T1rho on both the crystalline and the amorphous by varying tau values and monitoring the signal throughout.

MS. SULLIVAN:  And can we have the next slide, PDX2-34?

BY MS. SULLIVAN:

Q.    Okay.  What are we showing on Slide 34?

A.      This is the slice, the actual tau spectral slice at 16 milliseconds.  And the red is the crystalline pitolisant, and so you can clearly see strong intensity, Lorentzian shifting -- or Lorentzian peaks, whereas the amorphous for the peak at 140, that's down to zero, and there's just a little bit of signal left for the amorphous at around 131.

THE COURT:  Counsel?

MR. BALL:  Your Honor, if I may, we do have an objection to this.  I think it's the issue that we referenced this morning, and you said make the objection at the time.

This is information that is not contained in Dr. Wenslow's reports.  I think Plaintiffs' position is that he discussed it in his deposition.  And so we just want to make the objection for the record that this is outside the scope of his reports.

THE COURT:  Okay.  I didn't understand this morning that that's the basis for the objection.  So let's go ahead and pull the reports out.

MS. SULLIVAN:  And, Your Honor, actually I believe for this one, the relevant report would be Dr. Wenslow's reply report.

THE COURT:  Do I have that?  I do.

MS. SULLIVAN:  And I would direct Your Honor --

I think there's multiple paragraphs where he discusses the

16-millisecond value.  I believe, for example, Paragraph 71.

THE COURT:  Stand by.  Okay.

MS. SULLIVAN:  And --

THE COURT:  Counsel?

MR. BALL:  Your Honor, to the extent that this -- I don't see this figure in here.  To the extent that this text is even remotely relating to that, there was another Defendant in this case that was called Hikma.  And they're addressing Hikma-specific data in arguments, not AET data or AET arguments.

MS. SULLIVAN:  Your Honor, on that front, actually I think Paragraph 6 -- 71 is responding to opinions offered by Dr. Hodgkinson, which is AET's expert, Dr. Kahr, which -- and Park, which were other experts.  But they actually all made similar criticisms.

Dr. Wenslow was responding to them in this paragraph, and he specifically says, It's clear from the data that the signal for the amorphous pitolisant hydrochloride was minimal by the 16-second -- the 16-millisecond time point.  That's what he's illustrating here.  We agree that this specific figure was not put in his -- in his report, but I think --

THE COURT:  And it's also not admitted into evidence; right?

MS. SULLIVAN:  Correct.  It's just for

Direct - Wenslow

illustration purposes.

THE COURT:  Okay.  With all of that, we're not going to exclude the testimony, but your objection has been made for the record.

MR. BALL:  Thank you.

THE COURT:  Thank you.

BY MS. SULLIVAN:

Q.    So, Dr. Wenslow, what did you conclude from the data that we're looking at here?

A.    The -- there was still significant amounts of crystalline pitolisant.  And the amorphous at around 141 was down to zero.  There was a little bit of signal at the 131.

MS. SULLIVAN:  Can we have PDX2-35?

Oh, Your Honor, I do think there are underlying data files from which that data comes, which are PTX-243 and PTX-731.  I don't understand there to be an objection to those underlying data files, and we would ask for those to be admitted into evidence.

MR. BALL:  We don't have an objection to that -- underlying data files.  It's just the comparison that's being shown.

THE COURT:  Okay.  So that's fine.  So the exhibits will be admitted, and the testimony may proceed.

(PTX Exhibit Nos. 243 and 731 were admitted into evidence.)

Direct - Wenslow

MS. SULLIVAN:  Thank you.

BY MS. SULLIVAN:

Q.    Dr. Wenslow, what are we looking at in PDX2-35?

A.    This is the 32-millisecond tau filter value that shows there's still a significant amount of crystalline pitolisant.  And the amorphous, even the peak at 131, has completely died away to zero.

Q.    And is this reflected in PTX-1235?

A.    Yes.

MS. SULLIVAN:  Plaintiffs move to admit PTX-1235 into evidence.

MR. BALL:  No objection.

THE COURT:  It's admitted.

(PTX Exhibit No. 1235 was admitted into evidence.)

MS. SULLIVAN:  Can we have PDX2-36?

BY MS. SULLIVAN:

Q.    And so, Dr. Wenslow, what are we looking at here?

A.    The last two slides show the actual data, the actual spectra.  What I wanted to show was a visual representation of the decay curves, conservative estimate of the visual representation.  And what we can see is, first, the amorphous peak at 141.9 dies away faster than the amorphous peak at 131 because at zero -- sorry, my clicker is not working well.  At 16 milliseconds, we're already down to zero signal.

Direct - Wenslow

Whereas, the amorphous over here at 16 milliseconds, you still have some signal.

But you can clearly see the differences.  The red is the crystalline relaxation.  And so you can clearly see the differences in the crystalline relaxation compared to the amorphous.  And definitely by 32 milliseconds, as we saw in the spectra, all of the amorphous signal has gone away.  We're selectively exciting the crystalline material.

Q.     And can you explain the y-axis of these decay curves?

A.     That's intensity.  Now, it's a normalized intensity.

And what do I mean by that?  Is it -- like I said before, the amorphous signal is just so low.  It's spread out over such a large chemical shift that if I didn't normalize the amorphous signal, it would be very low in the spectra all the way down here.  And so I normalize the intensity just so you can see the decay rates of the amorphous versus the crystalline.

Q.     And in creating your decay curves, did you put in all of the data points that you obtained from your T1rho experiments?

A.     No.  Like I always do, I made a decision on which points to exclude, especially when there was no signal.

Q.     And in your opinion, what are the most important points on the curve for understanding the crystalline and amorphous relaxation behavior?

Direct - Wenslow

A.    The early parts of the curves, specifically between zero and 5 tau gives you the -- how the curve is relaxing and has the most signal.

Q.    And are the decay curves that you created reflected in PTX-1233 and PTX-1234?

A.    Yes.

MS. SULLIVAN:  Plaintiffs move to admit PTX-1233 and 1234 into evidence.

MR. BALL:  No objection.

THE COURT:  They're admitted.

(PTX Exhibits No. 1233 and 1234 were admitted into evidence.)

BY MS. SULLIVAN:

Q.    Now, are you aware that AET's expert, Dr. Hodgkinson, made alternative decay curves?

A.    Yes.

Q.    And they used your T1rho data?

A.    They used all the data, yes.

Q.    And did you review those decay curves?

A.    I did.

MS. SULLIVAN:  Okay.  Can we have PDX2-37?

BY MS. SULLIVAN:

Q.    Okay.  And are these Dr. Hodgkinson's decay curves?

A.    Yes, they are.

Q.    And I think you mentioned Dr. Hodgkinson's decay

curves included all of the data points that you collected, including those you thought should be omitted; is that right?

A.    Correct.

Q.    And what, if any, conclusions do you draw from Dr. Hodgkinson's decay curves?

A.    I draw the exact same conclusions.  First, the amorphous peak at 140 has a faster decay rate than the amorphous at 130.  And you can see that by the signal -- zero signal at 15, 16 milliseconds where there's still some signal remaining for the amorphous.

And then next you can see the significantly different relaxation rate of the crystal versus the amorphous.  And at 32 milliseconds, there's no signal remaining for the amorphous.  And that's the appropriate tau value to use as a selective excitation filter experiment.

MS. SULLIVAN:  Can we have the next slide, Mr. Beall?

Thank you.

BY MS. SULLIVAN:

Q.    So let's walk through your solid-state NMR analysis of AET's drug product.

So as a reminder, what tau value did you choose for your filtering experiment?

Direct - Wenslow

A.    32 milliseconds.

MS. SULLIVAN:  Okay.  Can we have PDX2-39?

BY MS. SULLIVAN:

Q.    Okay.  So these are the spectra that we reviewed earlier in your examination.  Can you remind us what each of these spectra -- spectrum represent?

A.    The peaks we're looking at are the region from 120 to 150 PPM.  These peaks are free of any excipient interference.  The red spectra is the crystalline pitolisant reference, carbon reference spectra.  And the blue spectra is the AET tablet filtered with the 32-millisecond filter.  And you can clearly see the presence of sharp Lorentzian-type peaks where also the relative intensity of these two peaks here have changed from the amorphous.  And the peaks are at the chemical shift that confirm the presence of crystalline pitolisant, the same reference as the Harmony reference that are in the drug product.

MS. SULLIVAN:  Your Honor, Plaintiffs move to admit PTX-1239 into evidence.

MR. BALL:  No objection.

THE COURT:  It's admitted.

(PTX Exhibit No. 1239 was admitted into evidence.)

MS. SULLIVAN:  Okay.

BY MS. SULLIVAN:

Direct - Wenslow

Q.    And, Dr. Wenslow --

                MS. SULLIVAN:  Can we have the next slide, please?

BY MS. SULLIVAN:

Q.    So what are we looking at here?

A.    The top olive spectra is the unfiltered spectra.  And the red -- so basically it's the carbon spectra of the AET tablet without filtering.

        The red spectra is the tablet with the 32-millisecond filtering compared to the crystalline pitolisant reference.

Q.    And what's the significance of this comparison to your opinions?

A.    The unfiltered spectra has broader peaks.  And, also, the relative intensity of -- the relative intensity of the 141 to 132 peak is different in the unfiltered tablet compared to the filtered tablet.  And the peaks in the filtered tablet are at the same chemical shift as the crystalline pitolisant peak.  And similar -- aligned with and similar roughly intensity.

Q.    Now, the peaks in the filtered red spectrum seem slightly broader than the crystalline peaks below.

        Can you explain that?

A.    They are broader.  And so when amorphous crystalizes from a dispersion, the particle size is going to be very

Direct - Wenslow

small compared to if you were to directly crystallize something.  When you directly crystallize, you get micrometers, like 30-micrometer-sized particles.  Whereas in the amorphous dispersion, you're getting nano-sized particles.  And that particle size has an impact on the carbon line widths.

Q.     Now, and just for housekeeping purposes, I think some of the previous spectra we were looking at, the crystalline spectra showed up as red.  Here, it shows up as blue.

       Can you explain the color-coding system to us?

A.     The processing software doesn't allow you to change the colors.

Q.     And can you explain, how long did you run the experiments on the AET tablets?

A.     The filtered tablets were run for, I believe it was, 24 hours.  Whereas, the unfiltered was run for, I believe, eight hours.

Q.     Okay.  And why did you choose different scan times for different samples?

A.     For the filtering experiment, we were looking at low levels of crystalline present in the tablet.  So we needed to run for a longer period of time.  I knew -- I know that we were filtering out all of the amorphous, and so letting it signal average until the -- you started to see the crystalline peaks come in.  Whereas, for the unfiltered

tablet, I was just getting a reference and decided that the eight-hour scan was long enough.

Q.    Okay.

MS. SULLIVAN:  We have no further questions for Dr. Wenslow.

Oh, but I am told that I am -- that I did not ask for this to be moved into evidence, PTX-1240. Plaintiffs move to admit it.

MR. BALL:  No objection.

THE COURT:  It's admitted.

(PTX Exhibit No. 1240 was admitted into evidence.)

MS. SULLIVAN:  Then we have no further questions for Dr. Wenslow.

THE COURT:  Thank you.

(Discussion held off the record:)

THE COURT:  Let's proceed.

MR. BALL:  Your Honor, would you like for us to proceed with the cross now or lunch break?

THE COURT:  Now.  Let's proceed.  Yeah.

CROSS-EXAMINATION

MR. BALL:  And, Your Honor, may I approach with witness binders?

THE COURT:  Yes, yes.

BY MR. BALL:

102

Cross - Wenslow

Q.   Good morning, Dr. Wenslow.  Or, I guess, we're in the afternoon, So good afternoon.

A.   Good afternoon.

Q.   You and I met before.  We met at your deposition.  So it's good to see you again.

A.   Likewise.

Q.   And I have a quick question and I may not have caught it, but I thought I heard you testify that you had selected KAS and Dr. Michael Hanrahan to run the NMR experiments?

A.   Yes.

Q.   Okay.  But, in fact, you didn't select him.  The attorneys just told you that you would be working with KAS Laboratories and Dr. Michael Hanrahan; isn't that the case?

A.   That's not a correct statement.

     MR. BALL:  Well, let's take a look at the deposition transcript, then, if we could.

     Mr. Sayres, could you pull up the deposition of Dr. Wenslow from October 16th, 2025?

BY MR. BALL:

Q.   And I may be mistaken, sir, but if we could go to Page 49 of that deposition transcript.

     And were you asked -- sir, on Page 49 at Line 5 under oath, were you asked, "Did you select KAS to perform these nuclear magnetic resonance experiments in this case?"

     And did you answer, "I did not."

A.    Yes.

Q.    Okay.  And then were you also asked, "How did you come to understand that KAS was going to perform the nuclear magnetic resonance experiments?  And did you answer, "I was told by counsel that I would be working with Dr. Hanrahan?

A.    Yes.

Q.    Okay.  Thank you, sir.

A.    Can I add something to that?

Q.    You can -- you can do that later.  We're limited on time --

A.    Oh.

Q.    -- so let's proceed.

And I think you said you were employed by an organization called Crystal Pharmatech, Incorporated?

A.    Yes.

Q.    And that's a contract research organization, a CRO?

A.    Yes.

Q.    And it provides research support to the pharmaceutical industry?

A.    Yes.

Q.    And one of the things that -- is it fair to say one of the things pharmaceutical companies engage Crystal Pharmatech to do is to attempt to identify polymorphs of substances?

A.    That's one of the testing that we do.

Cross - Wenslow

Q.    And in performing that work, Crystal Pharmatech uses a variety of different analytical techniques; is that fair to say?

A.    Yes.

Q.    And x-ray powder diffraction is one of those techniques that Crystal Pharmatech uses to identify crystalline drugs?

A.    Yes.

Q.    And am I correct that Crystal Pharmatech has equipment in-house for performing XRPD?

A.    Yes.

Q.    In fact, XRPD is a technique that you have personally performed in connection with your work at Crystal Pharmatech; is that fair to say?

A.    Yes.

Q.    And when you were approached by Plaintiffs' counsel to work on this case, you made Plaintiffs' counsel aware that Crystal Pharmatech could actually perform XRPD testing for this case; correct?

A.    Yes.

Q.    And you were specifically asked by counsel to do solid-state NMR; correct?

A.    I was asked to evaluate solid-state NMR for detecting crystalline pitolisant in AET tablets.

Q.    Sir, were you specifically asked by Plaintiffs'

counsel to conduct solid-state NMR testing for this case?

A.     Yes.

Q.     Okay.  And you -- you had the ability to perform XRPD on AET's samples; correct?

A.     Yes.

Q.     But you just chose not to; correct?

A.     It wasn't necessary.

Q.     You chose not to, sir; is that correct?

A.     I chose not to because it was not necessary.

Q.     Okay.  You're an analytical chemist by training?

A.     Yes.

Q.     You have a Ph.D. in analytical chemistry?

A.     Correct.

Q.     And is it fair to say that as an analytical chemist, to determine whether a sample has x-ray diffractogram peaks recited in Claim 1 of the '197 patent, you, as an analytical chemist, would obtain an x-ray diffractogram and determine the presence of the peaks in the 2-theta values associated with those peaks?  Is that true, sir?

A.     Well, number one, I'm not a patent attorney, but I know that x-ray has characteristic peaks of forms, just like solid-state NMR has characteristic peaks of forms.  I analyzed the solid-state NMR, found those characteristic peaks of the crystalline form in the tablet.  Therefore, the x-ray peaks are present.

Cross - Wenslow

Q.      Let's -- let's pull up your deposition testimony.

MR. BALL:  Mr. Sayres, if we could go to Page 67, and let's look at Line 10 on Page 67.

BY MR. BALL:

Q.      You were asked at your deposition, sir:  "How, as an analytical chemist, do you understand that one determines whether or not the crystalline material has this x-ray diffractogram?"

And your answer under oath that day was:  "As an analytical chemist, I would measure the x-ray diffractogram, and I would obtain an x-ray diffractogram and determine the presence of the peaks and the 2-theta values associated with those peaks."

Was that your testimony under oath at your deposition, sir?

A.      Yes.

Q.      Okay.  And now, in this case, you used ssNMR alone as the only testing that you performed on AET's tablets; correct?

A.      Yes.

Q.      And -- but you would agree that the peaks that an NMR spectrum produces are not 2-theta peaks.  You would agree with that?

A.      They are not.

Q.      And you would agree that an NMR spectrum does not

identify 2-theta peaks at 11.2, 19.9, 20.7, and 31.4.  Would you agree with that, sir?

A.    I agree with that.

Q.    And there -- other than x-ray techniques, isn't it fair to say that you're not aware of any other method for generating x-ray diffraction patterns; correct?

A.    No.

Q.    And you have testified as an expert several times prior to this case; is that fair to say?

A.    That is correct.

Q.    And you've never previously testified about this T1rho spectral editing technique that you're offering today?

A.    Testified?  No.  I've run hundreds of them over the last ten years.

Q.    "No" is fine, sir, if the answer to my question is "no."

And unlike the XRPD machine, which you do have at Crystal Pharmatech, it's fair to say that you don't have an NMR machine?

A.    As I stated, yeah, we don't have one internally.  We use Kansas Analytical.

Q.    And that's why counsel had to enlist the services of Kansas Analytical because you don't have your own NMR machine to actually perform experiments; correct?

A.    They asked me whether -- who I would use.  I said

Kansas Analytical or a Chinese research facility.  We decided on Kansas Analytical.

Q.    Let's -- let's talk a little bit, then, about your spectral editing experiment, the T1rho experiment that you've done.

Would you agree -- maybe it would be helpful if we pull up -- if we pull up one of your own slides.

MR. BALL:  Mr. Sayres, could we pull up PDX2-36?

BY MR. BALL:

Q.    And so, sir, you would agree with me that in carrying out this experiment, you used -- you need a sample that you believe to be authentically crystalline to use as one control; is that fair to say?

A.    That's fair to say.

Q.    And then you need another sample which is going to be reflective of the amorphous state of the drug to use as your other sample; correct?

A.    Need an amorphous reference.

Q.    Okay.  So you've got two different controls, a crystalline and an amorphous control.  You'd agree with that?

A.    Yes.

Q.    And in this case, the amorphous control that you used, I see it's Novitium's SD, and you understand that to be the API from another party that's not in this case;

correct?  No longer in this case?

A.    Correct.  It was the only sample I had.  I wasn't given a sample from AET.

Q.    And are you aware of how AET's product is made?

A.    Yes.

Q.    Okay.  And is it your understanding that AET uses a spray granulation method to make its amorphous pitolisant hydrochloride in situ during the process?

A.    Yes.

Q.    Let's leave this up, please.

Now, in carrying out this technique, what is important is that you're able to discriminate sufficiently between the decay curves of the crystalline material and the amorphous material such that you can select a delay time, which you referred to as your tau value at which you will have detectable signal from crystalline, but virtually no signal from the amorphous.

Do you agree with that?

A.    Correct.

Q.    All right.  And, of course, if there was detectable signal from amorphous, you wouldn't be able to use a 32-millisecond Tau value and conclude that, in fact, it must be crystalline as opposed to amorphous.  You'd agree with that; correct?

A.    Correct.  And we saw -- saw that from the slices,

that there's no signal for the amorphous in 32 milliseconds.

Q.    Thank you, sir.

So in looking at the standard from Novitium, do you understand that Novitium used what is called a beta-cyclodextrin complex?

A.    Yes.

Q.    Let's pull up DTX-32, please.

Sir, DTX-32 is this article from Saha, and I think we took a look at this at your deposition.  I'll just flip to Page 2.  There's a structure shown on Page 2 on the left.

Do you see this ring structure that says "beta-cyclodextrin"?

A.    Yes.

Q.    And, sir, do you recognize that as a beta-cyclodextrin?

A.    Yes.

Q.    And then if we go to the first page of Saha, and we can highlight the first paragraph, please.  It says, "Cyclodextrins (CDs) are the cyclic oligosaccharides containing six (alpha-CD), seven (alpha-CD), and eight (gamma-CD), glucopyranose units found by an alpha 1-4 linkage forming a truncated conical structure."

Do you see that?

A.    Yes.

Cross - Wenslow

Q.    All right.  And, sir, do you generally agree that that is an accurate description of a beta-cyclodextrin?

A.    It is.

Q.    Okay.  And then it goes on to say, "Thus, because of their unique structure, i.e. fairly rigid and well-defined hydrophobic cavities and hydrophilic rims having primary and secondary - OH groups (Figure 1), they are of particular interest in the modern science."

      Do you see that?

A.    Yes.

Q.    Now, you would agree with me, sir, that you have no opinions or no basis to form an opinion as to the hydrophobic natures of the interior cavity of a beta-cyclodextrin.  You would agree with that; right?

A.    I would agree with that.

Q.    Okay.  And then it goes on to say, "CDs are useful for controlled delivery of organic, inorganic, biological and pharmaceutical molecules due to their ability to form inclusion complexes with diverse guest molecules by encapsulating the non-polar part of the guest into its hydrophobic cavity and stabilizing the polar part by the polar rims."

      Do you see what we've highlighted here?

A.    Yes.

Q.    And you would agree with me that you were in no

Cross - Wenslow

position to offer an opinion, one way or another, either agreeing or disagreeing with the mechanism with which beta-cyclodextrin incorporates molecules into the hydrophobic cavity.

Is that fair to say, sir?

A.    Fair to say.

Q.    Okay.  So, for example, if I were to ask you if you had an understanding as to whether the interaction -- the host-guest interaction of a beta-cyclodextrin with a drug compound would come about due to weak Van der Waals interactions with the hydrophobic interior of the beta-cyclodextrin, you wouldn't have an understanding one way or the other on that; correct?

A.    I understand that beta-cyclodextrin forms inclusion complexes that can slow down the API mobility.

Q.    And, sir, in fact, what you don't have is an understanding of the nature of the interaction between a beta-cyclodextrin, the interior hydrophobic cavity and how that interacts with the drug molecule.

That's correct, isn't it, sir?

A.    I know that cyclodextrin is formed, but linear chain dextrins don't form inclusion complexes.

Q.    Let's go ahead and pull up your deposition testimony to see what you understood at your deposition.

MR. BALL:  If we could go to Page 114,

Cross - Wenslow

Mr. Sayres.  And, sir, at your deposition, were you asked -- let's actually start on 113, Mr. Sayres, starting on Line 24.

BY MR. BALL:

Q.    Were you asked at your deposition:  "My question was specifically beta-cyclodextrin, and my question is:  Do you have an understanding, one way or the other, as to the interior of a beta-cyclodextrin is generally -- is a generally hydrophobic environment?"

And your answer:  "I can't speak to the hydrophobicity of a beta-cyclodextrin."

That was your testimony?

A.    Correct.

Q.    And then you were asked:  "Do you have an understanding as to inclusion complexes with beta-cyclodextrin in small molecules that come about because weak Van der Waals interactions with the hydrophobic interior of a beta-cyclodextrin?"

And was your answer:  "I can't speak towards the mechanism of beta-cyclodextrin inclusion complexes"?

Is that your answer, sir?

A.    Correct, but I know the impact of the amorphous mobility specifically on carbon solid-state NMR for amorphous materials.

Q.    And I think I may have already asked you this, but do

Cross - Wenslow

you have an understanding as to whether AET uses a beta-cyclodextrin inclusion complex in its ANDA products formulation?

A.     I'd have to pull up the exact excipient list, but I don't think so.

Q.     Okay.  Well, thank you.

In fact, I think you just went over the excipient list in your opening testimony.  We can pull that back up.

A.     Yeah.

Q.     Why don't we do that.

MR. BALL:  Mr. Sayres, could you go to PDX2-20?

BY MR. BALL:

Q.     And, sir, could you just review PDX2-20, which is PTX-861-2 -- dot 2 and confirm to the Court whether or not AET uses a beta-cyclodextrin inclusion complex in its products?

A.     It does not.

Q.     You're familiar with the concept of an amorphous solid dispersion?

A.     Yes.

Q.     And that's a type of amorphous form where the drug is formulated with a polymer such that the drug and polymer are molecularly mixed.  Would you agree with that?

A.     Yes.

Q.     All right.  And that amorphous solid dispersion, what

I just described, that can stabilize an amorphous drug due to energetically favorable interactions of the drug and polymer as well as reduced molecular mobility of the drug.

Do you agree with that?

A.    Yes.

Q.    Okay.  Let's pull up DTX-23, please.

All right.  Is -- DTX-23 is an article, I believe, that you've -- you've authored?

A.    I'm one of the authors, correct.

Q.    You participated in this article; is that fair to say?

A.    Yes.

Q.    And if we look at the first paragraph there, can we scroll down?  Beginning with "amorphous solid dispersions," do you see where it says "amorphous solid dispersions (ASDs) are being used with increasing frequency for poorly soluble pharmaceutical compounds in development.  These systems consist of an amorphous active pharmaceutical ingredient (API) stabilized by a polymer to produce a system with improved, physical stability and the ability to sustain supersaturation in the in vivo milieu when compared with an amorphous API."

Do you see that?

A.    I see it.

Q.    And do you agree with that statement?

Cross - Wenslow

A.    I agree with that statement.

Q.    And then it says in -- let's scroll down to where we see the word "implicit" four lines from the bottom.

"Implicit in the term physical stability is the resistance of the amorphous material toward reversion to the thermodynamically-favored crystalline phase."

Do you see that?

A.    Yes.

Q.    And do you agree with that?

A.    I agree with that, but it definitely does crystalize, and that's where Karthik and I would use solid-state NMR to detect the crystallization in the dispersion.

Q.    And, in fact, what you wrote in your article is that implicit in the term "physical stability" is the resistance of the amorphous material toward reversion to the thermodynamically crystalline material; correct, crystalline phase?

A.    But it still can crystallize.

Q.    Let's go, if we can, to the next column.  And do you see a line beginning with "other dispersing agents"?

A.    Yes.

Q.    Can we highlight that sentence, please?

And you see where it says there, sir, that "Other dispersing agents such as phospholipids and cyclodextrins have also been used under the amorphous

Cross - Wenslow

dispersion nomenclature, but these systems rely on different solubilizing mechanisms (micelle formation and complexation, respectively) and should be differentiated from the polymer-based systems."

          Do you see that?

A.     Yes.

Q.     And do you agree with that, sir, that the beta-cyclodextrin complexes should be differentiated from the polymer-based systems?

A.     Yes.  They form stronger interactions to slow down the amorphous mobility the most.

Q.     Sir, if we could go to DTX -- these are all in your witness binder.  You don't have to, you know, just look up here.

A.     It's okay.

Q.     You've got the binder, too.

A.     No, I like when someone is highlighting.  It's tough for me sometimes to pick out the sentence.

          MR. BALL:  And I'm doing a terrible job of admitting these references, so I'm going to have to go back at the end, Your Honor, unfortunately, and try to get this done.

BY MR. BALL:

Q.     Let's turn to DTX-017.  And DTX-017, sir, is this a white paper published by your CSO Crystal Pharmatech?

Cross - Wenslow

A.    It is.

Q.    And is it fair to say that you reviewed this publication before publication?

A.    Yes.

Q.    You understood it?

A.    Yes.

Q.    And it's fair to say that you approved it for publication?

A.    Yes, I'm the one in the company that characterizes dispersions and specifically when they start crystallizing.

Q.    Thank you.

On the first page of the article, when it says, Crystal Pharmatech, your organization, it says, In order to -- the lower left-hand column, please.  Keep going down.

It says, "In order to improve stability and maintain the high apparent solubility, amorphous dispersions have been produced with polymers."

Do you see that, sir?

A.    Yes.

Q.    And is that a statement that you agree with?

A.    Yes.

Q.    Okay.

A.    They can still crystallize, though.

Q.    Thank you.

And if we go down to -- well, it says, "In fact,

Cross - Wenslow

the goal of the polymer is to form a miscible solid (one phase containing the amorphous API and polymer) which decreases or prevents crystallization in the solid-state in solution."

Is that a statement that Crystal Pharmatech wrote?

A.    It is.  If people know how to appropriately make the dispersion, this will happen, but it does not crystallize when they're not prepared appropriately.

Q.    Thank you, sir.

So when you published this, this is a statement that you reviewed, you understood and you agreed with when this was published; correct?

A.    Yes.

Q.    Then if we look right above that, it says, "The term amorphous" -- I'm sorry, right above Figure 2.  It says, "The term amorphous solid dispersion has also been used for other solubilization mechanisms such as complexation (cyclodextrins) and micelle formation (phospholipids)."

Do you see what I'm reading?

A.    Yes.

Q.    Then it goes on to say, "While these systems are called dispersions, it is important to note the unique mechanisms so appropriate studies can be performed to obtain a better understanding of the overall system."

Cross - Wenslow

                    Do you see that?

A.      Yes.

Q.      And did Crystal Pharmatech, when they published this

and when you reviewed, understood and approved -- you agreed

that it is important to note the unique mechanism of

complexation with cyclodextrins as compared to the polymeric

systems; true, sir?

A.      True.

Q.      Okay.

                    THE COURT:  Why don't we go ahead and take our

lunch break.  It's 1:00 p.m.  We'll be back at 1:30.

                    MR. BALL:  Thank you.

                    COURTROOM DEPUTY:  All rise.

                    (Luncheon recess was taken.)

                    COURTROOM DEPUTY:  All rise.

                    THE COURT:  Please be seated.  Are we ready to

proceed?

                    MR. BALL:  We are.

                    THE COURT:  All right.  Let's continue.

                    MR. BALL:  All right.  Thank you, Your Honor.

And before we get started, so I don't forget it a second

time, I'd like to move three exhibits that I covered so far:

DTX-32, DTX-23, and DTX-17.

                    MS. SULLIVAN:  No objection, Your Honor.

                    THE COURT:  They're admitted.

(DTX Exhibit Nos. 17, 23, and 32 were admitted into evidence.)

BY MR. BALL:

Q.   All right.  Can we take a look, Dr. Wenslow, at your opening -- your direct slides at PDX2-12?

MR. BALL:  Could we pull that up, Mr. Sayres?

BY MR. BALL:

Q.   And if I understood correctly, on the right-hand side, you're illustrating -- just by way of background, you're illustrating a T1rho experiment where you're showing a T1rho decay curve for the crystalline standard, not the material in this case.  But -- and then the T1rho decay curve for an amorphous standard, again not the one in this case, but just an exemplary depiction; correct?

A.   Correct.

Q.   And I see a vertical dotted line there at, I guess, it's 0.3.  What are the units?  My eyes aren't good enough to make it out.

A.   Seconds.

Q.   Seconds?

A.   Seconds, yes.

Q.   So it says 0.3 seconds.  And do I take it that this dotted line represents the tau filter that would be applied in that case?

A.   It is one of the filters that can be used, yes.

Cross - Wenslow

Q.    And so when the tau filter is being selected here at 0.3 seconds, I notice that there's actual data points being depicted at the very value that you're selecting the tau value in this example.

You would agree with me that this is showing data points at 0.3; correct?

A.    And -- yes, this is a pictorial example, but there are data points there but --

Q.    That's fine.  And then, in fact, there's data points at longer periods of time than the 0.3; correct?

A.    Yes.

Q.    And what we're really trying to do is get a very good picture or idea at 0.3, what is the behavior -- the relaxation behavior of the crystalline and what is the relaxation behavior of the amorphous standard so that we can discriminate between them; correct?

A.    You want to look at the spectra.  You have the spectra, and you can clearly see at the 300, for this example, that there's no signal for the amorphous.

Q.    Sir, my question to you:  You agree with me that what we're trying to do is find a tau value here where at 0.3 milliseconds, there's no signal or undetectable signal, and at 0.3 seconds, the crystalline signal is present?

A.    This is just a check.  The real data you can see --

Q.    Sir?

A.      -- where the point is.

Q.      Sir, do you understand my question?

A.      Yes.

Q.      We're very short on time, so a "yes" or "no" would be helpful.

A.      Okay.

Q.      Do you -- is this showing that at 0.3 seconds, you want negligible signal for the amorphous, but detectable signal for the crystalline?

A.      Correct.

Q.      And are these dots indicating that there was data acquired at the 0.3 point?

A.      It's a data point.

Q.      And is it also showing at the 0.5, after the 0.3 seconds, there's data points illustrated there?

A.      Correct.

Q.      Okay.  Let's go to then, if we could, your -- just staying on -- on your slides, let's go to PDX2-36.

        And now, what -- what I notice when I look at these -- and I'm looking at the one on the left to start with.  So 144 -- 140 PPM, left and right, those correspond to two different peaks on the NMR spectrum; correct?

A.      Correct.

Q.      One of the peaks is 140?

A.      Yes.

Q.   And one of the peaks is 130?

A.   Approximately, yes.

Q.   Fine.  Let's look at the approximately 140 peak.

Now, on your crystalline spectrum there, it looks like the only data point I see -- well, the last data point in the time series that I see is at 8 milliseconds.

Is that fair to say?

A.   Yes.

Q.   And what you're doing is you're trying to extrapolate all the way out to 32 milliseconds what the behavior -- the T1rho behavior is going to be -- or strike that.  Sorry.  Let me rephrase it better.  It wasn't a great question.

You're trying to extrapolate all the way out to 32 milliseconds what the intensity of the signal for the crystalline material would be; correct?

A.   There's no reason to extrapolate.  You could actually look and see the signal.

Q.   Sir, on these curves with your T1rho filtering, with your curves that you're plotting here in the red dotted line, you were extrapolating to 32 milliseconds; correct?

A.   With this presentation, yes.

Q.   And, in fact, on this presentation what you haven't shown is a data point at 32 for the crystalline material.

Would you agree with that?

A.   Yes.

Cross - Wenslow

Q.    And I don't see any data points after 8 milliseconds

on the crystalline -- crystalline decay curve.

        Am I right on that?

A.    You're right, yes.

Q.    So for instance, you probably had data at

16 milliseconds; is that fair to say?

A.    Yes.

Q.    But you just didn't plot it; right?

A.    I made a decision that -- not to plot it.

Q.    You made the decision not to plot that data.  And, in

fact, you had data at 32 milliseconds and you just made that

same decision not to plot it; isn't that true, sir?

A.    Yes.  That's what I've done for 30 years.

Q.    And for the blue curve, which corresponds to the

Novitium beta-cyclodextrin amorphous dispersion that we

are -- or beta-cyclodextrin inclusion complex that we were

talking about, again, it looks like some data points are

missing.

        Would you agree with me?

A.    There are missing data points.

Q.    I don't see anything at 8 plotted there, do you?

A.    No.

Q.    And I certainly don't see anything at 32, do you?

A.    No.

Q.    But I think you just said you had those?

A.    Yes, and they're clearly decayed away to zero from the slices.

Q.    Are you able to estimate from looking at this -- at 32 milliseconds, are you able to estimate, approximately, for us on the red curve for the standard what the intensity is at 32 milliseconds?

A.    The y-axis are relative intensity, so I really can't extrapolate on -- I mean, if you want me to visually try, yeah, it's like two.

Q.    Okay.  So somewhere around two you think.  I think at your deposition we went through the calculation and we came up with 1.49.

      Do you recall that?

A.    I don't specifically.

Q.    Do you have any reason to doubt that it's 1.49?

A.    I don't.

Q.    That's fine, sir.

      MR. BALL:  So two -- let's pull up -- let's pull up DTX-388, please, Mr. Sayres.

BY MR. BALL:

Q.    And looking at this, do you recognize DTX-388 as -- as the spreadsheet that you used to prepare the data that was shown in PTX-1233 and 1234 that we were just looking at at PDX2 -- 2-36?

A.    It was -- this was used to provide -- to make those

Cross - Wenslow

plots.

Q.    Thank you.

And you did this personally; you did this yourself?

A.    Well, I actually used the automated in the -- for the processing software to come up with the data -- the points, and then just put them into the Excel myself.

We're just looking for the decay rate of the amorphous versus the crystalline, so just the visual representation just to show the decay.

Q.    And the data from here, these plots -- my point is, the plot you're showing right there is identically the plot that we were looking at on PDX2-36; correct?

A.    It should be.

Q.    Right.  And I notice -- you said that you used the software to generate the intensity, so that just comes from the Bruker NMR instrumentation, the intensities; correct?

A.    The -- well, it's -- yeah, the data points.  The points.

Q.    The data points for the intensity, those come from the Bruker software?

A.    Yes.

Q.    You're not just subjectively calculating that, that is that -- that -- those are numbers that the -- the Bruker NMR software is providing to you?

A.    Yes.

Q.    And those are listed there in Column A.

I'd like to look at -- because I think we said the top is KAS 25002.

Do you recognize that as your data for the amorphous sample?

A.    Yes.

Q.    And then underneath that is KAS 25001.

Do you recognize that as your data for the crystalline sample?

A.    Yes.

MR. BALL:  So, Mr. Sayres, in Columns F, G and H, can we just highlight there the two that are missing -- that are empty?

And then can we highlight 32 as well?

And let's highlight 32.

BY MR. BALL:

Q.    All right.  And can you just confirm that the ones we have highlighted here, which are at 4 milliseconds, 8 milliseconds, and 32 milliseconds for the amorphous material, you did not plot when you rendered your Excel plots?

A.    I did not.

Q.    And then going down to the crystalline sample, can you just confirm to us that the data at 2 milliseconds and

Cross - Wenslow

32 milliseconds you did not plot?

A.     That's correct.

Q.     Now, when we're looking at the -- the curve for the Novitium -- sorry.

When we're looking at the curve at the 140 PPM for the crystalline API decay curve, you estimated it to be -- the intensity to be about two at 32 milliseconds.  I said it was 1.49, but I'm not going to quarrel with you about that.

So would you agree with me that you had a number in hand for the actual intensity measured by the Bruker NMR equipment at 32 milliseconds?

A.     For which sample again?

Q.     For the amorphous.

A.     That was clearly noise.  I showed it was noise.

Q.     That's fine, sir.

Did you have a number in hand that was given to you by the Bruker software for the amorphous at 32?

A.     Yeah.  There's a number.

Q.     And what was that number?  Can you just read it to us?

A.     32.687.

Q.     And then what you do is you're trying to scale these on the same scale, so you multiply it by 3.15 and you come out with 2.16405; correct?

A.    Yes.

Q.    Okay.  And you would agree with me, then, that 2.16405, the actual measured amount of intensity for the amorphous sample was higher than your predicted crystalline sample at 32 milliseconds?

A.    That number is higher.  That's impossible.

Q.    All right.  Sir, you're saying it's impossible, but that's what the data showed.

MR. BALL:  Let's take a look, if we could, at DTX -- I'm sorry, Your Honor.  I'd like to move in DTX-388, please.

THE COURT:  Any objection?

MS. SULLIVAN:  No objection, no.

THE COURT:  It's admitted.

(DTX Exhibit No. 388 was admitted into evidence.)

MR. BALL:  Let's take a look at PDX2-35.

BY MR. BALL:

Q.    I think you were discussing this figure earlier?

A.    Yeah.  This is the real data.

Q.    This is 32 milliseconds; correct?

A.    Yes.

Q.    And now it's got the crystalline in red?

A.    Correct.

Q.    The crystalline peaks in red.

Cross - Wenslow

And then the amorphous sample is in blue here; correct?

A.    Yes.

Q.    Sitting here today, are you aware of how long the data acquisition time for the amorphous solid dispersion sample was here?

A.    I think it was 158 scans.

Q.    And that translates to 11 minutes; right?

A.    Yeah.

Q.    Eleven minutes.

A.    Yes.

Q.    Okay.  Now, let's go to your actual NMR data that you took of AET samples.

MR. BALL:  If we could go to PDX2-40.

BY MR. BALL:

Q.    In red, that's your filtered spectra?

A.    Mm-hmm.

Q.    A 32-millisecond delay; right?

A.    Correct.

Q.    You used your tau of 32 milliseconds and you acquired this.  And you're saying, you know, there's peaks there; they must be crystalline.

How long did you scan, sir, to get that spectrum?

A.    Twenty-four hours.

Cross - Wenslow

Q.    Twenty-four hours.

So going back to your earlier exhibit, PDX2.35 -- let's go back.

When you're trying to show what it would look like at 32 milliseconds, you scanned for 11 minutes; right?

A.    Yes, the intent of this experiment was to get the decay rate of the pure amorphous.  The intent of running the tablet was to see very, very low levels, which is why the experiment ran longer.

Q.    And, sir, you would agree that the signal increases with the number of scans; correct?

A.    If there's signal, it will increase.

Q.    And, in fact, the relationship between the signal and the number of scans is the signal increases directly proportional to the number of scans; correct?

A.    The square root of the numbers --

Q.    Well, no.  The noise increases with the square root of the number of scans.  The signal increases directly with the number of scans.  So when you do the math, the signal-to-noise ratio improves proportional to the square root of the number of scans.

You agree with that; right?

A.    Correct.  Yes.

Q.    And the truth is, you -- you have no idea what this spectrum would look like if you scanned for 24 hours?

A.      I disagree with that.

MR. BALL:  Mr. Sayres, could we pull up Dr. Wenslow's deposition testimony at Page 150.  And I'd like to go to Lines 14 through 18, please.

BY MR. BALL:

Q.      Sir, at -- at your deposition, were you asked at Line 14:  "You don't know what this figure would look like had you done that" -- and I guess I should back up.  We're talking about Figure 6 from your report, which coincides with this figure we were just looking at.

And you were asked:  If you ran that for 24 hours, that signal to noise or the strength of the signal is going to increase proportionally to the number of scans.

And you said:  "That's correct."

And then the question was:  "You don't know what this figure would look like had you done that?"

You were asked that; right?

And your answer, under oath that day, was:  "I can't hypothesize on what the spectra would look like without running the spectra."

Was that your answer at your deposition?

A.      Sure.  I can't predict what noise is going to look like after a number of scans.

Q.      All right, sir.  That's fine.

And the truth is, this was scanned for

Cross - Wenslow

11 minutes and you can't find what you don't look for;
right?

A.      That's not a correct assessment.

        MR. BALL:  I'd like to pull up DTX -- sorry,
DDX 2.2 [sic], please.

BY MR. BALL:

Q.      I think in your testimony before, I heard you say that
when you conducted your filter, that the peaks that we're
looking at here -- let's look at 140.

        I think you said the peak coincided or lined up
with the crystalline peak.  Do you recall that testimony and
the filtered spectrum -- the red lining up with the blue?

A.      Yes, that and the relative intensity.

Q.      And -- but your testimony was that it lined up with
the blue?

A.      Yes.

Q.      And, in fact, sir, it lined up with the green.
Nothing changed between the original unfiltered spectrum and
the filtered spectrum with regard to that peak position;
correct?

A.      Yes.  I mean, the signal to noise is pretty poor on
that.

Q.      And it's also true, sir, that in evaluating the line
widths when you're discussing this, you didn't do any
software evaluation, any mathematical evaluation of the line

widths; correct?

A.      No.  I've done this for so long, it was so easy.

Q.      You just eyeballed it?

You just eyeballed it?

A.      I -- I overlaid.  I wouldn't say I just eyeballed.  I overlaid.

Q.      You just eyeballed this, sir.

Are you telling me that you did something besides visual inspection of these two peaks?

A.      No, I didn't calculate line width.

Q.      All right.  And, for example, you didn't determine a half width at half height for any of these line widths; is that fair to say?

A.      No, I did not.

MR. BALL:  Your Honor, I'd like to move to admit DTX-1079, which was shown on DDX 2.2.

MS. SULLIVAN:  You said 2.2?

MR. BALL:  2.2.

MS. SULLIVAN:  Is that what we're looking at here?

MR. BALL:  That's what we're looking at here.

MS. SULLIVAN:  All right.  We don't have an objection to that, Your Honor.

THE COURT:  It's admitted.

(DTX Exhibit No. 1079 was admitted into

Wenslow - Redirect

evidence.)

MR. BALL:  Sir, I have no further questions for you.  Thank you for your time.

THE WITNESS:  Thank you.

THE COURT:  Any redirect?

MS. SULLIVAN:  Yes, Your Honor.

REDIRECT EXAMINATION

BY MS. SULLIVAN:

Q.    First, Dr. Wenslow, I want to get some clarification on some testimony that you gave on cross-examination, so I'm going to try to read it correctly.

I believe Mr. Ball asked you:  And you agree, sir, that the beta-cyclodextrin complexes should be differentiated from the polymer-based systems?

And you said:  Yes, they form stronger interactions to slow down the amorphous mobility the most.

I just want to get a clarification, when you're referring to -- when you're referring to which of those systems form stronger interactions to slow down the amorphous mobility, which system were you referring to?

A.    Specifically the beta-cyclodextrin.

Q.    Now, with respect to the filtering technique that you used for your experiments, does the signal from the amorphous form of the compound have to be zero at the tau value in order for the filter to work properly?

A.    No.  You just need a significant difference between the crystalline intensity and the amorphous intensity.

Q.    And in your opinion, was there significant differentiation between the crystalline signal and the amorphous signal, the tau value you chose, to make that evaluation?

A.    Absolutely.

Q.    And could the peaks that you detected in AET -- in your opinion, could the peaks that you detected in AET's filtered ANDA product samples be explained by residual amorphous signal?

A.    No.

Q.    Why not?

A.    Because the line widths had changed, the relative intensity had changed, and they were at the exact chemical shift position as the crystalline.  Plus, I know that the amorphous is essentially zero.

Q.    Now, there was also a question about -- in the spreadsheet that you put together -- the data point for the amorphous signal and I -- excuse me, the data point for the amorphous form.  I think you started to explain whether or not you thought that data point was noise or signal.

Would you like to explain further about your belief about whether or not the data points for the amorphous at 32 milliseconds are signal or noise?

A.    It's clearly noise.  I was trying to be conservative with showing the curves, but you can clearly see that it was picking and noise is noise.  So it can pick something up here, it can pick something up down there.

MS. SULLIVAN:  Thank you, Your Honor.  No further questions of Dr. Wenslow.

THE COURT:  Thank you.  You may step down.

MR. REEVES:  Your Honor, Plaintiffs call Dr. Fabia Gozzo.

COURTROOM DEPUTY:  Please remain standing and raise your hand.

Please state and spell your name for the record.

THE WITNESS:  Fabia Gozzo, G-O-Z-Z-O.

COURTROOM DEPUTY:  You swear or affirm that the testimony you give to the Court will be the truth, the whole truth, and nothing but the truth, so help you God, or do you so affirm?

THE WITNESS:  I do.

FABIA GOZZO, the witness herein, after having been duly sworn under oath, was examined and testified as follows:

COURTROOM DEPUTY:  Thank you.  You may be seated.

MR. REEVES:  Your Honor, may we approach with some direct exam binders?

Wenslow - Redirect

THE COURT:  That's fine.

MR. REEVES:  And just for the record, this is Cody Reeves on behalf of the Plaintiffs.

DIRECT EXAMINATION

BY MR. REEVES:

Q.    Good afternoon, Dr. Gozzo.  Could you please introduce yourself to the Court?

A.    Good afternoon.  My first name is Fabia and my last name is Gozzo.

Q.    Have you prepared any demonstratives to assist with your testimony today?

A.    Yes, I did.

MR. REEVES:  Let's pull up PDX3, please.

BY MR. REEVES:

Q.    Dr. Gozzo, at a high level, what did your work in this case involve?

A.    I've been asked to perform synchrotron X-ray powder diffraction measurement on the sample of the pitolisant crystalline reference from the Harmony company.

Q.    So before we discuss your testing of the Harmony API in greater detail, let's take a minute and walk through your background.

Could you please turn to PTX-789 in your binder?

Could you tell me what this is?

A.    This is a copy of my Curriculum Vitae.

Wenslow - Redirect

Q.   And does your CV accurately characterize your education, training and experience?

A.   It does.

          MR. REEVES:  Plaintiffs move to admit PTX-789.

          MR. BORNSTEIN:  No objection, Your Honor.

          THE COURT:  It's admitted.

          (PTX Exhibit No. 789 was admitted into evidence.)

          MR. REEVES:  Let's turn to PDX3-2, please.

BY MR. REEVES:

Q.   Dr. Gozzo, are you currently employed?

A.   Yes.

Q.   Where?

A.   In my own company, Excelsus Structural Solutions.

Q.   Could you tell us what Excelsus does?

A.   Excelsus is a spinoff company of the Paul Scherrer Institute, which is the largest federal institute of research in Switzerland.  And the company offers analytical services and consultancy based on the use of synchrotron radiation, particularly synchrotron XRPD to the industry.  Pharmaceutical industry in particular.

Q.   What do you do in your role at Excelsus?

A.   Well, besides being the CEO of the company, I do perform synchrotron testing and offer consultancy in the field.

Wenslow - Redirect

Q.    Can you describe your educational background?

A.    Yes, I hold bachelor and master degrees in physics, and I did a Ph.D. in physics -- solid-state physics at the Swiss Federal Institute of Technology in Switzerland.

Q.    What did you do prior to founding Excelsus?

A.    Right before founding the company, I've been for many years senior scientist at the Paul Scherrer Institute, responsible for the construction and development of the powder diffraction station at the Swiss synchrotron facility.

Q.    How many times have you personally conducted synchrotron XRPD testing?

A.    I think thousands of times.

Q.    Have you been published?

A.    Yes.  I've published approximately a hundred articles, the majority of which during the period of my career where I was working in institution -- research institutions, but also later.

Q.    How many of those articles relate to synchrotron XRPD testing?

A.    The majority of them.

        MR. REEVES:  Your Honor, Plaintiffs offer Dr. Gozzo as an expert in synchrotron XRPD testing.

        MR. BORNSTEIN:  No objection, Your Honor.

        THE COURT:  All right.  We'll permit her to

testify in that field.

BY MR. REEVES:

Q.    Dr. Gozzo, let's move now to talk about the testing that you conducted.

        MR. REEVES:  If I could have PDX3-3.

BY MR. REEVES:

Q.    So can you just briefly explain for us what X-ray powder diffraction is?

A.    Yes.  It is an experimental technique that consists of sending an X-ray beam onto a sample, typically a powder sample, and the scatter intensity -- the scatter -- the elastic scatter intensity out of the atoms of the material are recorded by a detector as a function of the angle.  And these generate a diffractogram, also called diffraction pattern, which is a plot that shows these elastical scatter intensity, versus the angle.

        MR. REEVES:  Let's go to the next slide, PDX3-4.

BY MR. REEVES:

Q.    What is synchrotron XRPD testing?

A.    Well, synchrotron XRPD is essentially the same technique where the -- the X-ray beam is generated by a giant source of x-rays at a synchrotron facility.

Q.    What's the impact of using a synchrotron facility to generate the X-rays, as opposed to an X-ray tube in the laboratory?

Wenslow - Redirect

A.      Well, the main difference using -- is in the quality of the data.  So the technique, as I said, is the same, but the quality of the results obtained is much higher, thanks to the particular properties of synchrotron radiation.

Q.      Where did you conduct your synchrotron testing in this case?

A.      I used the synchrotron facility in Spain, ALBA Synchrotron near Barcelona.

Q.      Why did you select the ALBA Synchrotron for your testing?

A.      Well, I had the opportunity to evaluate the synchrotron facility and the powder diffraction station at ALBA.  And the reason why I was using ALBA Synchrotron and not the Swiss source in Switzerland is because in the past two years, the Swiss Synchrotron facility is undergoing a major shutdown for a renovation to SLS 2.0.

        MR. REEVES:  Could I have PDX3.5, please?

BY MR. REEVES:

Q.      What sample did you test as part of your work in this case?

A.      I tested one sample of Harmony crystalline API of pitolisant.

Q.      When did you receive that sample?

A.      On March 18th, 2025.

Q.      Where did you receive that sample?

Wenslow - Redirect

A.    I received it in Basel, Switzerland where we have our own labs.

Q.    After you received the sample at your facility in Switzerland, what did you do with it?

A.    Well, as usual, the parcel was inspected in our lab. So the content of the parcel was inspected.  It was also -- inspected the temperature log that the company that delivered the parcel, and then the content was stored under controlled conditions in our SUPERDRY storage cabinet in the lab.

Q.    Does PTX-871 contain pictures reflecting your receipt and storage of the sample that you tested?

A.    Yes, it does.

        MR. REEVES:  Plaintiffs move to admit PTX-871.

        MR. BORNSTEIN:  No objection, Your Honor.

        THE COURT:  It's admitted.

        (PTX Exhibit No. 871 was admitted into evidence.)

        MR. REEVES:  Let's go to PDX3-6, please.

BY MR. REEVES:

Q.    How did you prepare the sample for testing?

A.    So for -- to perform this testing, it is necessary to load the powder into glass capillary that you can see in this picture.  So the powder was loaded in these glass capillaries inside a closed glove box that is conditioned with a gentle flow of inert atmosphere of nitrogen.

Wenslow - Redirect

Then the capillary was cut, sealed and inserted in Falcon tubes that you can also see in the picture.  Then the Falcon tube was sealed, inserted in an aluminum pouch that was evacuated and sealed and placed back in the SUPERDRY cabinet until the shipment was ready to go.

Q.    Who prepared that shipment -- or I'm sorry -- who prepared that sample?

A.    The sample was prepared by Mrs. Melanie Garnier, who is our laboratory manager.  Under my supervision, of course.

Q.    Do PTX-870 and PTX-872 reflect your photos and records relating to the preparation of the sample that you tested?

A.    Yes.

MR. REEVES:  Plaintiffs move to admit PTX-870 and 872.

MR. BORNSTEIN:  No objection.

THE COURT:  It's admitted.  They are admitted.

(PTX Exhibit Nos. 870 and 872 were admitted into evidence.)

MR. REEVES:  Let's go to the next slide, PDX3-7, please.

BY MR. REEVES:

Q.    How was the sample that you tested transported to the ALBA Synchrotron in Spain?

A.    We always use a specialized company in shipment of

Wenslow - Redirect

pharmaceutical samples under controlled conditions.  So the -- the parcel was -- that we prepared was inserted in a box that was a controlled temperature, picked up in our lab and delivered in my hands at ALBA.

Q.    Who conducted the synchrotron XRPD testing on the sample?

A.    I did myself.

Q.    When did you conduct your testing?

A.    That was on the 29th of April, 2025.

Q.    Do PTX-873 and PTX-874 reflect your shipping documents and photos of the sample that you shipped to the ALBA Synchrotron?

A.    Yes, correct.

          MR. REEVES:  Your Honor, Plaintiffs move to admit PTX-873 and PTX-874.

          MR. BORNSTEIN:  No objection, Your Honor.

          THE COURT:  They're admitted.

          (PTX Exhibit No. 873 and 874 were admitted into evidence.)

BY MR. REEVES:

Q.    All right.  Dr. Gozzo, let's turn now to the results of your synchrotron testing.

          MR. REEVES:  If I could have PDX3-8.

BY MR. REEVES:

Q.    What are we looking at on this slide?

Wenslow - Redirect

A.      Here we are looking at diffraction patterns.  So the one at the bottom in that pink, the FGCB159, is the synchrotron XRPD pattern that I collected at ALBA on pitolisant crystalline form and overlaid, you see the powder pattern that I obtained by digitizing a figure in -- in the U.S. '197 patent.

Q.      How did you digitize the diffractogram from the '197 patent?

A.      We used a commercial software for digitalization of figures.

Q.      And is that method that you used to digitalize that diffraction pattern routinely used by other scientists in your field?

A.      Yes, it's a very straightforward operation.

Q.      Based on the analysis that you did, were you able to draw any conclusions?

A.      Well, from the qualitative inspection of the -- and the overlay of the patterns, then I was able to identify, I mean, the correspondence between the peaks in the pattern I collected and the one that is -- I mean, the digitalization of the U.S. patent.  So I recognized that as being pitolisant API from ALBA, yes.

Q.      Sorry.  This is a long list of exhibits, but do PTX-866, PTX-867, PTX-1098, 1099, 1100, 1101, 1103, 1104, 1105 and 1106 represent the diffractogram and the

underlying data files that you used to generate that diffractogram?

A.    Correct.

            MR. REEVES:  Your Honor, Plaintiffs move to admit those exhibits.

            MR. BORNSTEIN:  No objection, Your Honor.

            THE COURT:  They're admitted.

            (PTX Exhibit Nos. 866, 867, 1098, 1099, 1100, 1101, 1103, 1104, 1105 and 1106 were admitted into evidence.)

            MR. REEVES:  Nothing further, Your Honor.

            THE COURT:  Thank you.

            MR. BORNSTEIN:  May I proceed, Your Honor?

            THE COURT:  Yes.

            MR. BORNSTEIN:  Thank you.

                        CROSS-EXAMINATION

BY MR. BORNSTEIN:

Q.    Good afternoon, Dr. Gozzo.  Did I pronounce that right?

A.    Yes.

Q.    Okay.  It's nice to meet you.  We've never met before; right?

A.    Right.

Q.    I believe you testified a moment ago that you were hired in this case by the lawyers for Harmony to perform

synchrotron XRPD testing of Harmony's API; correct?

A.    Correct.

Q.    You were also retained to conduct XRPD testing of another Defendant in this case, a company called MSN Pharmaceuticals; correct?

MR. REEVES:  I am going to object at this point, Your Honor, to beyond the scope of the direct examination and not relevant under Rule 401.

THE COURT:  Counsel?

MR. BORNSTEIN:  Your Honor, it's certainly relevant.  You know, the testing that she performed was very much the heart of her testimony a moment ago, and the fact that she did other testing as part of this same type of testing she discussed a moment ago is not only relevant, but it's consistent with her testimony.

THE COURT:  I'm going to allow it.  We're not going to get into the results or anything.

MR. BORNSTEIN:  Absolutely not.  I will be very brief on this.

THE COURT:  All right.  It's overruled.

MR. BORNSTEIN:  Thank you, Your Honor.

BY MR. BORNSTEIN:

Q.    Let me ask you the question again, Dr. Gozzo.

In addition to testing the Harmony API in this case, you were also retained and conducted tests from

Gozzo - Cross

another company called MSN Pharmaceuticals; correct?

A.    Correct.

Q.    Okay.  You understand that the opinions that you provided in this case that we just talked about a moment ago were intended to assist the Plaintiff in connection with allegations of infringement against AET, my client, relating to the '197 patent; correct?

A.    I haven't been involved in any legal opinions, so I performed measurements on the reference.  That would be more correct to say.

Q.    Thank you for that clarification, Doctor.

So, for example, you didn't evaluate the claims in the '197 patent to determine if there was infringement by AET; correct?

A.    I haven't.  That's correct that I haven't offered any opinion on infringement.

Q.    Understood.  And you also didn't offer any opinions relating to whether or not the Harmony API was met by the claims of the '197 patent; right?

A.    I'm not involved, as I said, in any of the legal opinions.

Q.    Thank you for that clarification, Doctor.

Let me show you a document, Dr. Gozzo.  It's been marked as DTX-250.

Do you recognize this document?

A.    Yes, I do.

Q.    We'll try to blow it up a little bit for you.

A.    Okay.

Q.    This is an article in analytical testing that you prepared; correct?

A.    Yes.

Q.    And let me -- the title of the article is "The power of synchrotron X-ray powder diffraction for the characterization of pharmaceuticals"; correct?

A.    Correct.

Q.    And let me direct your attention on the left-hand column -- oh, thank you.

MR. BORNSTEIN:  I'm reminded, Your Honor -- forgive me for interrupting in the middle of my question, Dr. Gozzo.

I'm reminded that I haven't provided Your Honor with the cross-examination binders.  May I please approach?

THE COURT:  Yes.

MR. BORNSTEIN:  My apologies for not doing that at the beginning.

My apologies.

BY MR. BORNSTEIN:

Q.    Let me ask you the question again, Dr. Gozzo.

So let me direct your attention to the left-hand side of DTX-250.

Gozzo - Cross

Do you see the quote here where it says, "In the field of pharmaceutical powders, XRPD is considered the gold standard method for the identification and quantification of solid forms (i.e. polymorphs, solvates, hydrates, salts, co-crystals and amorphous forms)."

Do you see that?

A.     Yes, I do.

Q.     And you agree with that statement; correct?

A.     Yes.

MR. BORNSTEIN:  Your Honor, move for admission of DTX-250.

MR. REEVES:  No objection.

THE COURT:  It's admitted.

(DTX Exhibit No. 250 was admitted into evidence.)

BY MR. BORNSTEIN:

Q.     Let me turn your attention, please, to PDX3-5.  This was an exhibit -- a demonstrative exhibit you used a moment ago.  I believe you testified a moment ago that you received the samples of the Harmony API on March 18, 2025; correct?

A.     Yes.

Q.     Now, that same day you also received samples of the MSN product that you tested; right?

A.     Right.

Q.     And that same day, you received samples of AET's

Gozzo - Cross

product; correct?

A.    I received a parcel with many different samples that are described in the exhibits.

Q.    Thank you very much, Doctor.

Let me turn your attention to PTX-868.  This is a Plaintiffs' exhibit.  This is a letter from a Dr. David Engers to Melanie Garnier at your company, Excelsus Structural Solutions; right?

A.    Correct.

Q.    And in the first sentence of this correspondence, it indicates, "Please find enclosed 53 samples."

Do you see that?

A.    Yes, I do.

Q.    And then it goes on to say, "The appended packing list provides a brief description of each sample, including reference numbers"; right?

A.    Right.

Q.    And that's consistent with your testimony that you received the samples of at least the products from AET, Harmony and MSN on -- on or about that date; correct?

A.    Correct.

Q.    And let's turn to --

MR. BORNSTEIN:  Let me move to admit, Your Honor, PTX-868.

MR. REEVES:  No objection, Your Honor.

THE COURT:  It's admitted.

(PTX Exhibit No. 868 was admitted into evidence.)

MR. BORNSTEIN:  Thank you, Your Honor.

BY MR. BORNSTEIN:

Q.    Next, let me direct your attention to PTX-869.  This is a document entitled "Excelsus Parcel Inspection."

Do you recognize this document?

A.    I do.

Q.    And this is, in fact, a form that you signed from Excelsus confirming the receipt of those samples; right?

A.    Yes.

Q.    And this is consistent with your testimony a moment ago.  It's dated March 18, 2025.

Do you see that?

A.    Yes.

Q.    Let me turn your attention to the next page of the document.

And just for completeness, do you see under where it says "Correction," that references the MSN samples we discussed a moment ago?

A.    Sorry.  Where are you?

Q.    I'm sorry.  I know it's very small text.

Look on the bottom right-hand portion where it says "Correction."

Gozzo - Cross

A.   Yes.

Q.   And do you see --

A.   Yes.

Q.   -- where it references the receipts of the MSN samples?

A.   Yes.

Q.   Okay.  And then at the top of the page, do you see the reference to a number of samples from AET?

A.   Yes.

Q.   Okay.  And then all the way at the bottom of the "Correction" section, it references that Harmony sample that you tested as well; right?

A.   Yes.

Q.   Okay.

MR. BORNSTEIN:  Your Honor, move to admit PTX-869.

MR. REEVES:  No objection.

THE COURT:  It's admitted.

(PTX Exhibit No. 869 was admitted into evidence.)

BY MR. BORNSTEIN:

Q.   Now, we already established that you performed synchrotron XRPD testing on Harmony's sample.

Do you recall that that testing occurred on April 29th, of 2025?

A.    Yes, I just read it a minute ago.

Q.    Thank you very much.

That same day you also performed testing on MSN'S products; right?

A.    I don't remember the dates.  Maybe, But it's in writing somewhere.

Q.    Okay.  Understand.

And I am going to refrain from showing you the document.  I'll represent to you and to the Court that I believe it was the same date, and your counsel can direct the record, but I don't want to go too deeply into the MSN testing, if that's okay with you, Doctor.

A.    It's fine.

Q.    Okay.  And so that same day, April 29, 2025, you were already in possession of AET's product; right?

A.    I -- I mean, as we already looked at together, the parcel, a unique parcel arrived with all samples on March 18th, so if this is your question.

Q.    It is my question.  Thank you for confirming that, Doctor.

A.    Okay.

Q.    And you did not perform any testing on April 29, 2025, or at any time of AET's sample; correct?

A.    Correct.

Q.    Now, that sample is still sitting in your laboratory

today; right?

A.    It should.

Q.    And the bottles have never been opened; isn't that true?

A.    Not that I am aware about.

Q.    Okay.  Now, isn't it true that you don't know why you were asked to run tests on MSN samples, but not on AET samples?

A.    No.  I don't know why.

Q.    Okay.  And you never asked the lawyers for Harmony why you weren't asked to test those samples; right?

A.    No, I haven't.

Q.    Dr. Gozzo, let me show you PTX-867.2, please.  You testified about this document a moment ago; correct?

A.    Correct.

Q.    And this is the overlay, if I understand you correctly, with Figure 1 from the '197 patent over the results of your S -- XRPD testing of Harmony's sample; right?

A.    Correct.

Q.    Just to try to focus you in on one point.  We've created a demonstrative exhibit.  I'm going to identify it for the Court as DDX-3.2.

And I'll represent to you, Dr. Gozzo, that this is simply a blow-up of your exhibit that we discussed a moment

ago, which was 867, and we just focused in on one particular location.

Does that look correct to you?

A.    Yes.

Q.    Okay.  You placed that vertical line that's associated with the number 34.1 on this exhibit; correct?

A.    Correct.

Q.    And that numerical value, it wasn't selected -- 34.1, I'm referring to.  That wasn't selected by a computer or computer-generated peak-picking software; correct?

A.    Correct.

Q.    You put that number on there; right?

A.    Correct.

Q.    And if you can look in the bottom right-hand portion where I circled where the actual peak is associated with that line, it's to the left of the 34 number, isn't it?

A.    Correct.

Q.    Okay.  And so it's still identified as 34.1, but you would agree that the actual peak is the left of 34 to some amount; right?

A.    Yeah, just slightly on the left within the plus/minus 02 degrees, yeah.

Q.    You say "plus/minus 02."  You didn't use computer-generated pick-peaking software to accurately identify precisely where that peak was; right?

Gozzo - Cross

A.    No, I just placed it at the highest intensity within that tolerance.

Q.    Right.  Now, if you wanted to know precisely where that peak was on your exhibit, you could have used computer-generated peak-picking software; right?

A.    Yes.

Q.    In fact, when you did the testing on MSN's product, you used computer-generated peak-picking software; right?

A.    Correct.

Q.    Okay.  But you decided not to do so in this instance; right?

A.    It wasn't my decision.  I wasn't asked to do that, and so I didn't do it.

Q.    I see.  So the lawyers didn't ask you to do it as it related to this particular exhibit, PTX-867; right?

A.    I wasn't asked to perform any fit of the peak obstruction of this patent; correct.

        MR. BORNSTEIN:  I have no further questions. Thank you very much.

        Your Honor, for completeness, could I ask for the demonstrative exhibit, which we just discussed a moment ago, which is DDX -- give me a moment.  I'll get to the number -- DDX-3.2 to be admitted into evidence?

        THE COURT:  We generally don't admit demonstratives.  Is that -- was it on your exhibit list?

MR. BORNSTEIN:  It was not on the exhibit list, but all it is is a blow-up of an exhibit, their exhibit. And so I just wanted to focus in on one point.

MR. REEVES:  We would object, Your Honor.  I mean, the underlying exhibit is in evidence.  I don't think there's any reason to admit that.

THE COURT:  Yeah, that objection is sustained. We won't admit it.

MR. BORNSTEIN:  Okay.  Thank you, Your Honor.

THE COURT:  Thank you.

MR. REEVES:  Brief redirect, Your Honor?

THE COURT:  Yes.

MR. REEVES:  Could I have PDX3-8 pulled up, please?

REDIRECT EXAMINATION

BY MR. REEVES:

Q.    Dr. Gozzo, counsel just asked you questions about why you didn't generate a peak list for the diffractogram shown in PDX3-8.

Do you recall that?

A.    Yes.

Q.    Was it necessary, in your opinion, to create a peak list for this analysis?

A.    No.  I mean, you can see that both peaks that appear in the synchrotron diffraction pattern well correspond to

Gozzo - Redirect

the digitalization of the U.S. '197 patent, So it wasn't necessary.

MR. REEVES:  Nothing further.  Thank you.

THE COURT:  Thank you.  You may step down, Doctor.

Are we ready?

MS. SULLIVAN:  Your Honor, our next witness will be Dr. Myerson.  But before we call him, I think there's an issue that Plaintiffs feel compelled to raise based on a combination of Dr. Gozzo's testimony and the opening statement offered by AET's counsel, which relates to the -- the testing report of Dr. Stephan Parent, which was earlier excluded by Judge Fallon and then the objections were overruled by Your Honor.

I think we were surprised -- I mean, we have been abiding by that entirely.  We haven't mentioned it, obviously, but we were surprised to hear in opening statement and in arguments relating to -- and trying to seemingly infer that Plaintiffs did not have XRPD evidence to present, and then Mr. Bornstein just asked a series of questions well outside Dr. Gozzo's direct on the same topic insinuating that -- regarding she had the samples and didn't test.  And he said even to today, not before opening reports.

And I think that's problematic and, I think, opens -- we believe that that lays the foundation or creates

the issue of opening the door to the testing performed by

Dr. Parent in this case, which is highly relevant to the

infringement issues, especially now that AET's arguing that

their XRPD evidence is unrebutted and insinuating that

Dr. Gozzo could have done testing up until today, but didn't

do it.

THE COURT:  Remind me, the backstory on

Mr. Parent.

MS. SULLIVAN:  So the backstory there, Your

Honor, was in Dr. Myerson's opening report, he had the data

that we presented in his direct, so AET's internal XRPD

testing, which he analyzed, and Dr. Wenslow's ssNMR analysis

in response.  AET's experts argued that that wasn't

sufficient and raised a number of arguments about the

reliability of Dr. Wenslow's testing to identify crystalline

forms.

In reply we presented an expert report from

Dr. Parent, who conducted synchrotron X-ray diffraction

testing of AET's tablets, which confirmed the exact

conclusions drawn by Dr. Wenslow that there were

crystalline -- there was crystalline pitolisant

hydrochloride present in those tablets, and it had all of the

peaks of both Claims 1 and 2 of the patent.

AET moved to exclude it because it was submitted

in reply.  And Judge Fallon excluded it, and Your Honor

agreed with that ruling.  But now with the -- the arguments that AET is making, I think, are inconsistent with the -- with those rulings and with the issue that that testimony should be excluded, isn't relevant and was late disclosed.

THE COURT:  Okay.  I understand your point, and I think it would have more force if we had a jury in the room that might be confused about what's going on, But we don't.  And so if they want to make the argument, whatever they want to make, you can respond with whatever happened in the case in your briefing.

MS. SULLIVAN:  That --

THE COURT:  But you're asking me to now put on testimony from your expert?

MS. SULLIVAN:  Well, the testimony that was excluded was part of Dr. Myerson's testimony.  So before he takes the stand, I wanted to raise this in order to confirm that we are not --

THE COURT:  Ah.

MS. SULLIVAN:  That we won't be permitted for him to provide any testimony about that testing, because as things stand, those opinions were excluded.  And if Your Honor says that they're still out, we will not, of course, present any testimony about it.

But we do -- we don't want to have a situation where then we're arguing in post-trial briefing about what

the response to that is when we don't have evidence about the testing.

THE COURT:  Well, you can't argue about stuff that's not in evidence.

MS. SULLIVAN:  Exactly.

THE COURT:  And so you're asking me to say that he can now testify according to stuff that was already excluded.  The answer to that is no.  We're not -- we're going to stick with the prior discovery rulings in the case.  I think that answers your question.

MS. SULLIVAN:  It does, Your Honor.

THE COURT:  All right.  Thank you very much.

MS. SULLIVAN:  Plaintiffs call Dr. Allan Myerson to the stand, and he'll be testifying about AET's infringement of Claim 1 of the '197 patent.

COURTROOM DEPUTY:  Please remain standing and raise your hand.  Please state and spell your full name.

MS. SULLIVAN:  And may we approach with the binders?

THE COURT.  Yes.

COURTROOM DEPUTY:  Please remain standing and raise your hand.

Please state and spell your name for the record.

THE WITNESS:  Allan, A-L-L-A-N.  Stuart, S-T-U-A-R-T.  Myerson, M-Y-E-R-S-O-N.

COURTROOM DEPUTY:  Do you swear or affirm that the testimony you give to the Court will be the truth, the whole truth, and nothing but the truth, so help you God, or do you so affirm?

THE WITNESS:  I do.

COURTROOM DEPUTY:  Thank you.  You may be seated.

ALLAN STUART MYERSON, the witness herein, after having been duly sworn under oath, was examined and testified as follows:

THE COURT:  Let's proceed.

DIRECT EXAMINATION

BY MS. SULLIVAN:

Q.    Dr. Myerson, can you please introduce yourself to the Court?

A.    Yes.  My name is Allan Stuart Myerson.

Q.    And have you prepared slides to help the Court in understanding your testimony?

A.    I have.

MS. SULLIVAN:  Can we have PDX4-2?

BY MS. SULLIVAN:

Q.    Okay.  And, Dr. Myerson, can you turn to PTX-791 in your binder?

A.    Yes.  Okay.

Q.    What is PTX-791?

Myerson - Direct

A.    That's a copy of my CV.

Q.    And does your Curriculum Vitae summarize your education, expertise and experience?

A.    It does.

MS. SULLIVAN:  Your Honor, Plaintiffs move to admit PTX-791.

MR. BALL:  No objection.

THE COURT:  It's admitted.

(PTX Exhibit No. 791 was admitted into evidence.)

BY MS. SULLIVAN:

Q.    Can you please tell the Court about your educational background?

A.    Yes.  I have a bachelor's degree in chemical engineering from Columbia University in 1973 and a master's and Ph.D. in chemical engineering from the University of Virginia in 1975 and 1977.

Q.    And please explain your professional background.

A.    Yes.  Since getting my Ph.D. in 1977, for the last 49 years, I've been a chemical engineering professor at a number of different universities, the last 16 years at MIT.

Q.    And what is the focus of your research?

A.    The focus of my research is crystallization science and technology, pharmaceutical manufacturing, both of active pharmaceutical ingredients and finished drug products, solid

Myerson - Direct

forms of pharmaceuticals and novel pharmaceutical dosage forms.

Q.   And do you have experience with pharmaceutical manufacturing?

A.   I do.

Q.   And can you explain that to the Court?

A.   Yes.  On the academic side, for example, I was the principal investigator of the Norvatis-MIT Centers For Continuous Manufacturing.  And with my colleagues, we developed continuous manufacturing technologies and implemented them building a manufacturing line at MIT to make both active pharmaceutical ingredient and drug product.

In another project sponsored by DARPA called Pharmacy on Demand, myself and some colleagues developed the reconfigurable, portable device that could make 15 different generic drugs, both the active pharmaceutical ingredient and the drug product.

And most recently, I'm principal investigator in the MIT continuous mRNA manufacturing projects, funded by the FDA.  We're developing new technologies for making mRNA lipid nanoparticles.

Q.   Are you published in the scientific literature?

A.   Yes.  I've published approximately 320 refereed articles.

Q.   What courses do you teach?

Myerson - Direct

A.    I only teach one class a year, and I alternate between pharmaceutical engineering and crystallization science and technology.

Q.    Have you previously been qualified as an expert in patent litigation matters?

A.    Yes, many times.

Q.    And in what areas have you been qualified as an expert?

A.    In solid forms of pharmaceuticals, meaning polymorph solvates, for example, pharmaceutical manufacturing, pharmaceutical dosage forms.

Q.    Have you been qualified as an expert in crystallization science and technology?

A.    Yes, and in many cases.

MS. SULLIVAN:  Your Honor, at this time we offer Dr. Myerson as an expert in crystallization science and technology, including the study of solid forms and pharmaceuticals, pharmaceutical manufacturing of active -- active pharmaceutical ingredients and final drug products and drug product formulation development.

MR. BALL:  No objection.

THE COURT:  All right.  We will accept his testimony in those fields.

MS. SULLIVAN:  Can we have the next slide, please?

Thank you.

BY MS. SULLIVAN:

Q.    So, Dr. Myerson, what's shown on PDX4-3?

A.    Yes.  On the left, we see the first page of the '197 patent, the patent-in-suit.  And on the right, we see Claim 1 of the '197 patent, which is the claim at issue in this case.

Q.    And what is the '197 patent directed to?

A.    It's directed to a particular crystalline form of pitolisant hydrochloride as described in Claim 1 with a particular -- four powder diffraction peaks.

Q.    And did you conduct an assessment to determine whether AET's ANDA products infringe Claim 1 of the '197 patent?

A.    I did.

Q.    And what conclusion did you reach?

A.    In my opinion, they do.

MS. SULLIVAN:  Can we have the next slide, please?

BY MS. SULLIVAN:

Q.    Did you apply a legal standard when forming your infringement opinions in this case?

A.    Yes.

Q.    And is that -- the legal standard that you applied, is that reflected on PDX4-4?

Myerson - Direct

A.    Yes.

MS. SULLIVAN:  And can we have PDX4-5?

BY MS. SULLIVAN:

Q.    What's shown on this slide, Dr. Myerson?

A.    Yes.  On the left is my definition of a person of ordinary skill in the art that I used, and on the right is the definition given by AET's expert.

Q.    Would your opinions change if you applied AET's definition of a person of ordinary skill in the art in this case?

A.    No.

Q.    And are you aware that the parties in this case have agreed to constructions of certain terms of Claim 1 of the '197 patent?

A.    Yes.

Q.    And are the constructions shown on PDX4-6?

A.    Yes.

Q.    And did you apply the parties' agreed-upon constructions when evaluating infringement in this case?

A.    I did.

Q.    Okay.  So before we walk through your infringement analysis, I'd like to discuss some of the scientific background relevant to your opinions.

So, first, let's talk about what it means for something to be in crystalline form.

Myerson - Direct

MS. SULLIVAN:  Can we please have PDX4-6 -- 7?

Excuse me.

BY MS. SULLIVAN:

Q.    What is a crystalline solid?

A.    Yes, a crystalline solid is a solid where the molecules are in a periodic repeating arrangement with long-range order.

Q.    And what is an amorphous solid?

A.    An amorphous solid is a solid where the molecules do not have any long-range order.  The simplest example of an amorphous solid we see all the time is window glass.

MS. SULLIVAN:  And can we have the next slide, please?

BY MS. SULLIVAN:

Q.    Can a given compound form more than one type of crystalline form?

A.    Yes, for compounds, we call that polymorphism.  And for elements, we call it allotropism.  And a nice example is graphites and diamonds.  They're both just crystalline forms of carbon, and the only difference is the way the carbon atoms are packed together.

MS. SULLIVAN:  Could we have the next slide, please?

BY MS. SULLIVAN:

Q.    So you previously discussed the difference between

Myerson - Direct

amorphous and crystalline forms.  Can amorphous forms of

compounds be used as active pharmaceutical ingredients in

pharmaceutical products?

A.    Yes.

Q.    Are there any special considerations when using an

amorphous pharmaceutical ingredient as an API?

A.    Yes.  Well, one problem with amorphous solids is they

tend to crystallize because they're not stable.  And so

they -- when they're used, they're generally stabilized, and

we've heard about amorphous solid dispersion.

The other problem with amorphous solids by

themselves is they're less chemically stable than

crystalline solids.  So, again, they need to be stabilized.

Q.    And are there strategies employed in the industry to

attempt to stabilize amorphous APIs?

A.    Yes.

Q.    Okay.  What are some of those strategies?

A.    Yeah.  Well, the most common one is making an

amorphous solid dispersion, and I have just an example here

of how you might make one.

Q.    Can you walk us through the example, please?

A.    Yes.  So you take your active pharmaceutical

ingredient in a dispersion.  A dispersion can be a polymer

like polyvinylpyrrolidone, or it can be a polysaccharide

like maltodextrin, and they're dissolved together in a

Myerson - Direct

solvent, often water.  So now you have a solution.

And you can do it a couple of ways.  One way is you spray dry it, and you get the spray-dried particles of the dispersion with the API inside them, and I'll describe that in a minute -- after they're dry.  Or you can spray granulate them where you spray that onto another compound, which is an inert compound and make granularity of the polymer API on top of the -- on top of the inert material.

But in any case, the result is something called an amorphous solid dispersion.  And what that means is the -- the drug molecules are dispersed in finite domains within the polymer -- the polymer, for example.  They're not -- they're not a solid solution.  They're not -- they're not individually molecularly dispersed.

But they're a dispersion meaning that the domains have some size.  They're bigger than the single molecule.  And the key to stabilizing them in an amorphous dispersion is minimizing the molecular mobility of the molecule, so they can't come together to form a crystal.

Q.    Other than what you described, are there other kinds of amorphous solid dispersions?

A.    Well, there are another category.  I mean, in -- in the pharmaceutical world, they often refer to, for example, inclusion complexes with -- with cyclodextrin as amorphous solid dispersions, and they're effectively similar.  Only

Myerson - Direct

in an -- in an inclusion complex, we have a molecule like cyclodextrin with a cavity, and inside the cavity you have -- a very small cavity, you have the amorphous material.

And it stabilizes because the cavity is so small it has very, very little molecular movement.

MS. SULLIVAN:  Can we have the next slide, please?

BY MS. SULLIVAN:

Q.    So what factors can impact the stability of an amorphous form in a drug product?

A.    Yes.  Well, again, it goes back to the molecular mobility.  And the one thing that really impacts a molecular mobility more than anything else is the presence of moisture.  Okay?

Moisture reduces what's known as a glass transition temperature and increases the molecular mobility in an amorphous dispersion.  It's known as a plasticizer. And because of that, when you have water getting into an amorphous dispersion, it's much more likely to crystallize.

It's -- also the increase in temperature will also make it more likely to crystallize because of -- molecular mobility increases with temperature, and to some degree, mechanical stress.  And, also -- that's a different slide.

Myerson - Direct

MS. SULLIVAN:  Can we have the next slide, please?

BY MS. SULLIVAN:

Q.    So what are the pathways or mechanisms that can cause an amorphous solid dispersion to crystallize?

A.    Yeah.  Well, this is a nice example from an article by Moseson in 2023, and it talks about two pathways for making an amorphous solid dispersion crystallize.

If we look at the bottom one, B, that's very similar to what I was just talking about.  So here what you're looking at is an amorphous dispersion, and you're -- basically the line is the polymer chains, and the dots are the amorphous API.

And if there's enough molecular mobility, the API gets together to form a critical-sized cluster, and that cluster can then nucleate and grow into crystals.

So that's -- that's starting with an amorphous dispersion with no crystals in it.

The one above, A, is the incomplete amorphization pathway.  In that case you -- you didn't completely make everything amorphous in your amorphous dispersion to you actually have seed crystals.  And because you have seed crystals, if you have molecular mobility, they can just grow.

Q.    And the Moseson 2023 article that you mentioned,

Myerson - Direct

that's PTX-701?

A.      Yes.

MS. SULLIVAN:  Plaintiffs move to admit PTX-701 into evidence.

MR. BALL:  No objection.

THE COURT:  It's admitted.

(PTX Exhibit No. 701 was admitted into evidence.)

MS. SULLIVAN:  Can we have PDX4-13?

BY MS. SULLIVAN:

Q.      Now, how do pharmaceutical companies assess the stability of a drug substance or a drug product?

A.      Yes, they -- they -- they look at it three ways.  The first is called stress testing.  In stress testing, you can expose the API or the drug product directly to certain variables like moisture, light, temperature or pressure. And what you're just looking for is to see if any of those things will cause, for example, an amorphous-to-crystalline transition, or polymorphic transition or decomposition.  So that's stress testing.

Now, long-term stability testing is testing where the drug product, in its final packaging not open to the air, in its final, final packaging is put in an environmental chamber at typically 25 degrees C and 60-percent relative humidity.  And it's held there, and

Myerson - Direct

periodically, typically every couple of months, a sample is pulled, and it's tested.

And that's how shelf life is often determined. And if you want a 36-month shelf life and you want to use long-term stability, you would have to do long-term stability testing for 36 months.

And because of that, there's something called accelerated stability testing. And accelerated stability testing, the drug product in its final packaging is put in an environmental chamber at 40 degrees C, 75-percent relative humidity and held up to six months.

And the whole idea of accelerated stability testing is giving the pharmaceutical company an opportunity to figure out what's going to happen in the longer period of time and try to get the shelf life and get approval without waiting for three years for their long-term stability testing to be done.

MS. SULLIVAN:  Can we have PDX4-14?

BY MS. SULLIVAN:

Q.    So what are we looking at here, Dr. Myerson, relating to stability?

A.    Yeah.  On the left, we have the Federal Code of Regulations.  And on the right, we have the ICH Stability Testing Guidelines.

Q.    Okay.  And why did you think that those were notable

Myerson - Direct

for this discussion?

A.    Yes.  Well, if we look on -- on the left under B, it says, "Accelerated studies combined with basic stability information and the component work product that contain the closure system may be used to support tentative expiration dates provided full shelf life studies are not available and are being conducted," which is basically what I was just explaining before.

Q.    And how do companies use the ICH guidelines?

A.    Well, the ICH guidelines give them the typical conditions for stability testing.

Q.    And the ICH guidelines are PTX-203?

A.    Yes.

            MS. SULLIVAN:  Plaintiffs move to admit PTX-203 into evidence.

            MR. BALL:  No objection.

            THE COURT:  It's admitted.

            (PTX Exhibit No. 203 was admitted into evidence.)

            MS. SULLIVAN:  So let's go to PDX4-15.

BY MS. SULLIVAN:

Q.    So how does accelerated stability assess -- testing assess changes in solid-state form in a drug product or a drug substance?

A.    Well, so you can take the sample and test for the

Myerson - Direct

presence, for example, of a crystalline form using one of a number of different methods. And also typically you're also looking at the purity and decomposition products by HPLC or some other equivalent method.

Q.      So how does the example that you have on PDX4-15 show how accelerated stability is conducted?

A.      Well, if you look at this in the example, if you assume that your initial drug was -- looked amorphous within the limit of detection of the X-ray test you were doing and you did your accelerated stability and got the result after three months that we see, you see crystalline peaks emerging.

So clearly something's changing, something's crystallizing. And after six months, those peaks are growing, so clearly the material is crystallizing in this amorphous dispersion.

Q.      And, Dr. Myerson, if one looked at the initial blue XRPD example here and we don't see sharp peaks, does that mean that there's no crystalline material present?

A.      No. It simply means that within the limit of detection of the test method used, there's no crystalline peaks determined.

Q.      Okay. Now, you mentioned that there are a number of different analytical methods that can be used for this type of analysis.

Myerson - Direct

Can you explain what those are?

A.     Yes.  So typically when you're looking at something like this, a drug product, an amorphous dispersion, you can do powder X-ray diffraction.  You can do solid-state NMR. You can use Raman spectroscopy and Raman mapping.  You can use Fourier Transform Infrared Spectroscopy.  And to some degree, you can use differential scanning calorimetry.

Q.     Can all of those techniques be used to detect whether a sample contains crystalline or amorphous material?

A.     Yes.

Q.     Now, can one use more than one method to identify a crystalline form?

A.     Yes.  In my laboratory, we typically will characterize things by several methods.

Q.     And one thing that you mentioned was XRPD, and we've discussed XRPD quite a bit today.

A.     Yes.

Q.     So we won't -- and Dr. Gozzo testified about it a little, so we won't get into a ton of detail.  But can you --

            MS. SULLIVAN:  Can we go to the next slide, please?

BY MS. SULLIVAN:

Q.     So can you explain what "XRPD" is?

A.     Yes.  Like we heard from Dr. Gozzo, we -- in x-ray -- powder x-ray diffraction, we have an x-ray source.  In a

laboratory, it's an x-ray tube.  We shine an x-ray of a particular wavelength on a -- on a crystalline powder because the wavelength of the x-ray is -- it's of the same order of the distance between the atoms.  We get diffraction.

We get diffraction.  We get a diffractogram. Each of those peaks in a diffractogram represent an interplane or spacing in the crystal lattice.  That's why I have the one on the lattice plane shown.  And they're unique for each crystal form of a given compound.

MS. SULLIVAN:  Okay.  Can we have the next slide, please?

BY MS. SULLIVAN:

Q.    So what issues affect the use of X-ray diffraction when analyzing pharmaceuticals?

A.    Well, first, the sample preparation, something called preferred orientation.  Preferred orientation refers to the possibility or the tendency of crystals to not randomly orient in the sample holder.  And preferred orientation can impact the peak intensity that is -- that's observed.

Then we have instrument variability and scan rate.  Instrument variability simply meaning different instruments with different power x-ray tubes and different types of detectors will be different from each other in terms of their limit of detection.

And the scan rate, how long you scan your

material determines the signal that you're going to get and how much signal compared to the noise.

And then, of course, when you have multi-components of drug -- drug products, you have multiple signals that can mask the peaks for a given crystalline form.  So all of these things impact something called the limit of detection.

Q.    And how -- I just want to ask about sample preparation specifically, how can that affect limit of detection?

A.    Well, for example, if you overgrind something, you can turn -- turn a material from crystalline to amorphous.

MS. SULLIVAN:  So can we have PDX4-18?

BY MS. SULLIVAN:

Q.    Okay.  So you mentioned "limit of detection."  Please explain what limit of detection is.

A.    Yeah.  Limit of detection is the smallest detectable amount of a particular substance that you can find in a mixture given the particular instrumentation and procedures that you used to do this analysis.

So I have an example here which is very simple. Imagine you have an X-ray of a pure substance, and you want to look at for -- how -- if you can see a little bit of a another substance in there.  So you do what's called a spiking study.  You just add what you're looking for and

Myerson - Direct

look to see if you see any peaks that are characteristic of that.

So in this example, we added 1 percent and didn't see anything.  We added 3 percent, we didn't see anything.  And we add 5 percent, a peak emerges.  So the limit of detection of this method is about 5 percent.

MS. SULLIVAN:  And can we have PDX4-19?

BY MS. SULLIVAN:

Q.    Dr. Myerson, what does this slide illustrate about limit of detection?

A.    Well, this is another way to look at it.  Imagine that we have the four mountain peaks in the ocean.  And when the water is at this level, you can't see any of them.  Okay.  But the four peaks -- we know -- the four peaks are there, we just can't see them.

And now if the water recedes a little bit, as we look in the next slide, we can see one peak.  We still can't see the other three.  But all four peaks are always there.  And if we continued removing the water, we'd see additional peaks.  And that's kind of how limit of detection works.

The more of something in there, the more of the peaks that you will see.

Q.    Now, I'd like to talk briefly about solid-state NMR.

Were you in court earlier for Dr. Wenslow's testimony about solid-state NMR?

Myerson - Direct

A.    Yes.

Q.    Okay.  And did Dr. Wenslow's testimony about how solid-state NMR works, is that consistent with your understanding?

A.    Yes.

Q.    Have you used solid-state NMR in your own work?

A.    I have.

Q.    Have you used it to analyze multicomponent samples?

A.    Yes.

Q.    And have you used it -- and do you consider it to be a reliable technique for that purpose?

A.    Yes.

Q.    And have you used it to analyze amorphous solid dispersions?

A.    Yes, But not of actual products.  Of products we were developing or methods we were developing to make amorphous dispersions.

Q.    And do you consider it a reliable technique for that kind of analysis?

A.    Yes.

        MS. SULLIVAN:  Now, can we have the next slide, please?

BY MS. SULLIVAN:

Q.    Now, are there advantages associated with using solid-state NMR over other techniques to analyze

multicomponent samples like drug products?

A.     Yes.  This is reflected in the USP on solid-state NMR that we have shown on the left.

Q.     Okay.  And, first of all, what is the USP?

A.     The United States Pharmacopeia.  And it -- the USP produces methods for doing various tests that are widely accepted in the pharmaceutical industry, as well as monographs on different drugs.

Q.     And the document -- or the USP that we're looking at on the screen is PTX-713.  It says "to be official."

Is PTX-713 the current proposed USP monograph for ssNMR?

A.     Yes.

MS. SULLIVAN:  Your Honor, Plaintiffs move to admit PTX-713 into evidence.

MR. BALL:  No objection.

THE COURT:  It's admitted.

(PTX Exhibit No. 713 was admitted into evidence.)

BY MS. SULLIVAN:

Q.     So, Dr. Myerson, what are some of the advantages of ssNMR discussed in the USP?

A.     Well, just a couple to highlight.  One is the unambiguous identification of polymorphs and other solid forms.  High confidence and low-level qualification of

Myerson - Direct

multicomponent solids is another.

And if we look at the very bottom it says, "Carbon-13 ssNMR spectroscopy is the most commonly used approach to characterize drug products and formulations."

MS. SULLIVAN:  And can we have PDX4-22?

BY MS. SULLIVAN:

Q.      Dr. Myerson, what are we looking at here?

A.      This is a review article by Steed and Steed from 2015.

Q.      And who are the authors here?

A.      The first author -- the first Steed, Kirsty Steed, is a researcher at Durham University.  The second author, Jonathan Steed, is a professor at Durham University and AET's expert.

Q.      And what does the 2005 Steed article tell us about the use of ssNMR in analyzing solid forms?

A.      Well, really -- really in that first paragraph, usually an important contemporary tool in molecular solid-state chemistry is the use of CPMSNMR spectroscopy in resolving questions of solid form that can be ambiguous by x-rays.

Q.      And then what are you showing on the second quote there?

A.      There the main point is that solid-state NMR is highly sensitive to both molecular structure and local

Myerson - Direct

intermolecular interactions, and it can -- which is important in how it can assist as a resolution of issues arising from the long-range average nature of diffraction data.

Q.    Now, Dr. Myerson, do you agree with Dr. Steed's characterization of ssNMR in this 2015 paper?

A.    Yes.

Q.    And the paper is PTX-714; Is that correct?

A.    Yes.

MS. SULLIVAN:  Plaintiffs move PTX-714 into evidence.

MR. BALL:  No objection.

THE COURT:  It's admitted.

(PTX Exhibit No. 714 was admitted into evidence.)

MS. SULLIVAN:  Okay.  Can we have the next slide, please?

BY MS. SULLIVAN:

Q.    So I'd like to talk about the '197 patent.

So what are we showing on PDX4-23?

A.    4-23 was -- we're showing Figure 1 of the '197 patent, which is the crystalline form of pitolisant hydrochloride, and so the full powder X-ray.

And then on the right we're showing Claim 1, which lists four characteristic peaks, 11.2, 19.9, 20.7, and

Myerson - Direct

34.1.  And then underneath, we have other peaks shown in Figure 1.  And we have the whole long peak list with virtually all the peaks listed.

Q.    Okay.  And do you have any observations about the peaks identified in Claim 1?

A.    Yes.  Well, the peak at 34.1 is a very small peak, and so it's clear that's going to be hard to see when there's not very much of the crystalline material present in the mixture.

Q.    Okay.  And if one were able to -- were not able to detect 34.1 in a given sample, but did detect the others, what would that tell you about the presence of the claim form?

A.    Well, the claim form would clearly be there.  You know, the -- all the peaks are in an intrinsic property to crystalline form.  So if you have unambiguously identified that the crystalline form is present, it means all the peaks are present even if they are below their limit of detection.

MS. SULLIVAN:  Your Honor, I think at this point we're going to move into discussion of AET's ANDA product.  I think counsel has the demonstratives.  I just wanted to flag now whether there's any confidentiality concerns we need to address before we go into that testimony.

MR. BALL:  We're fine with that.

THE COURT:  All right.  Let's proceed.

Myerson - Direct

BY MS. SULLIVAN:

Q.     So let's move on to AET's ANDA products.

Can we have the next slide?  So what type of dosage form is AET's ANDA product?

A.     It's a tablet.

Q.     And what are the dosage strengths?

A.     Dosage strengths are 4.45 milligrams and 17.8 milligrams.

Q.     Can you please give the Court an overview of the formulation of AET's ANDA products?

A.     Yes.  Well, so if we go through the first stage, it says "drug solution."  That's where the dissolving pitolisant hydrochloride maltodextrin, which is a disperser, which are polysaccharide and water.

And then the next step is a fluid bed granulation. What that means is they're spraying that water on the microcrystalline cellulose to make granules of microcrystalline cellulose, maltodextrin and pitolisant hydrochloride where the pitolisant hydrochloride is dispersed within the maltodextrin.

Then, those granules are mixed with other excipients that are listed there and that goes to a tablet press where they're compressed into tablet cores.

Then, the next step is a film coating step where Opadry, which is a coating, is dissolved in water, sprayed on

Myerson - Direct

the tablets. And then the tablets are dried and coated and that's the end of the manufacturing process.

Q.    And how do the pitolisant hydrochloride and maltodextrin in the AET ANDA products interact?

A.    I'm sorry?

Q.    Sorry. How do the pitolisant hydrochloride and maltodextrin in the ANDA products interact?

A.    Yes. Well, it's like we looked at before. The -- the pitolisant hydrochloride is dispersed within the maltodextrin in finite domains because it's forming an amorphous dispersion within the maltodextrin.

Q.    Now -- and the information that you've just described about the formulation, that comes from PTX-32?

A.    Yes.

            MS. SULLIVAN:  Plaintiffs move to admit PTX-32 into evidence.

            MR. BALL:  No objection.

            THE COURT:  It's admitted.

            (PTX Exhibit No. 32 was admitted into evidence.)

            MS. SULLIVAN:  Okay. Can we have the next slide, please?

BY MS. SULLIVAN:

Q.    So what form of pitolisant hydrochloride does AET start their manufacturing process with?

A.    Yes. They get their pitolisant hydrochloride from

Myerson - Direct

two different sources.  If we look on the left, they get it from Emnar DMF Number 039126.  And we see the powder x-ray diffraction pattern of Emnar pitolisant hydrochloride.  And we have stars above the four claimed peaks to show it's the same crystalline form as claimed in the '197 patent.

And this -- this diffractogram, the peaks are labeled, that was done by Emnar.  And the water content in the Emnar pitolisant hydrochloride ranges from 2.03 percent to 2.15 percent.

On the right we have Nuray DMF Number 036859.  And, again, we have crystalline and pitolisant hydrochloride.  That's the same as the crystal form in the '197 patent.  And they, in fact, compare it to the four peaks in the '197 patent in the DMF, and we see that the peaks are all there.  And the water content in Nuray's DMF ranges from 1.99 percent to 2.43 percent.

Q.    And does the information that you just described come from PTX-260, PTX-261, PTX-8- -- excuse me, 282 and PTX-285?

A.    Yes.

MS. SULLIVAN:  Plaintiffs move to admit those exhibits.

MR. BALL:  No objection.

THE COURT:  They're admitted.

(PTX Exhibit Nos. 260, 261, 282 and 285 were admitted into evidence.)

Myerson - Direct

MS. SULLIVAN:  Okay.

BY MS. SULLIVAN:

Q.     Now, Dr. Myerson, I think you told us earlier that, in your opinion, AET's ANDA products infringe Claim 1 of the '197 patent.  So I'd like to talk about the evidence that you considered in forming your opinion.

MS. SULLIVAN:  So can we have PDX4-26?

BY MS. SULLIVAN:

Q.     Does PDX4-26 summarize the evidence that you relied on in coming to your conclusions?

A.     Yes, these are all the different reasons I used coming to my conclusions and we'll go through each of them in turn.

Q.     Okay.  So let's start with AET's manufacturing process.

MS. SULLIVAN:  Can we have PDX4-28?

BY MS. SULLIVAN:

Q.     Okay.  Is this -- does this schematic represent AET's manufacturing process?

A.     Yes.

Q.     And can you please walk us through that process?

A.     Yeah.  Well, let's start with the precaution at the top that says, "Pitolisant hydrochloride tends to absorb moisture from the surrounding environment.  Don't expose the materials to moisture."  So that's what it says at the top.

Myerson - Direct

So now if we look at the process, we're taking pitolisant hydrochloride and maltodextrin, glucidex-12, which is a grade of maltodextrin, again, a polysaccharide, which is -- which is a bunch of long-chain glucoses of different molecular weights.  And I believe the average molecular weight of one is about 1,500.  In purified water, they're dissolved and mixed, and then sprayed in a fluid bed granulator and then dried.

So if we could look at the conditions there.

Q.    And so I take it, Dr. Myerson, you've annotated the manufacturing process to help with our discussions?

A.    Yes.

Q.    Okay.  You want to walk us through the parts of it that you think are significant.

A.    Yes, that's right.

So we get to the drying process of the granules.  So we're adding heat.  And the heat that's being added, it's the product that's being heated to 40 degrees C, plus or minus 15 degrees C when it's being dried.  So we've got water.  We've got -- we've got water.  We've got a granule and we're heating it.  Okay.

Then in the next part of the process, where -- we're taking the dried granules and we're adding the other excipients.  We're sifting, and milling and compressing, and the relative humidity control says that they can have

relative humidity during this process not more than 65 percent, which is significant.  Meaning that you can -- the material can absorb water during this part of the process.

Then the last part of the process is when we're coating, we're taking Opadry and purified water.  And I always find this interesting.  You have a product that says don't expose the material to moisture, but then at the end you spray water on it.  So you're spraying water on it to coat it and you're heating it.  And you're heating it now, in this case, to -- to 45 degrees C, plus or minus 10 degrees C.  And the water content, of course, is relatively high in the final drug product.  It says between 1 and 6.5 percent.

So, in summary, we have all the things that can lead to cause crystallization in an amorphous dispersion.  We have water and we have heat, and whether it crystallizes immediately or some time during its lifetime, it's definitely on the way based on this manufacturing process.

Q.    Okay.  And the information that you've just summarized about the manufacturing process, that comes from PTX-32, PTX -- which I believe is already admitted -- PTX-33, PTX-45 and PTX-842; is that correct?

A.    Yes.

MS. SULLIVAN:  Plaintiffs move for admission of

Myerson - Direct

those exhibits.

MR. BALL:  No objection.

THE COURT:  They're admitted.

(PTX Exhibit Nos. 33, 45 and 842 were admitted into evidence.)

MS. SULLIVAN:  Okay.  And can we have PDX4-30?

BY MS. SULLIVAN:

Q.    Okay.  And how much water do AET's finished ANDA products contain?

A.    Yeah.  Somewhere between 3 -- 3.03 percent and somewhere in the low 4 percent, which is a lot of water because -- particularly compared to the amount of pitolisant in the product, because this is in the whole tablet.  So it's 4 percent of the mass of the tablet.  And the percentage of pitolisant in the whole tablet is very small.  So there's plenty of water to interact with the amorphous dispersion of pitolisant.

Q.    And in your opinion, what effect would that have?

A.    It's very likely to cause it to crystallize.

Q.    Okay.  And the water content data that we've looked at, that's from PTX-1158?

A.    Yes.

MS. SULLIVAN:  Plaintiffs move for admission of PTX-1158.

MR. BALL:  No objection.

Myerson - Direct

THE COURT:  It's admitted.

(PTX Exhibit No. 1158 was admitted into evidence.)

BY MS. SULLIVAN:

Q.    So let's discuss the next category of evidence that you considered, AET's detection of the claimed form by XRPD in development batches.

MS. SULLIVAN:  Can we have PDX4-32?

BY MS. SULLIVAN:

Q.    Okay.  Dr. Myerson, did you review documents regarding AET's development of its current ANDA product?

A.    I did.

Q.    Okay.  And what were you able to conclude from your review of those documents?

A.    Well, they used -- initially they -- multiple different methods to try to make their amorphous drug product.  They used different excipient carriers.  For example, they used hydroxypropyl beta-cyclodextrin.  They used crospovidone, a mixture of crospovidone and microcrystalline cellulose to attempt to stabilize the amorphous API.  They trialed spray granulation and hot-melt exclusion processes.

And in multiple development batches, they found that the material crystallized.  And what that tells me is that the amorphous pitolisant

hydrochloride likes to crystallize.  It's hard to stabilize.

Q.    The development documents that you reviewed and have summarized here, are they PTX-40, PTX-52 and PTX-54?

A.    Yes.

MS. SULLIVAN:  Plaintiffs move to admit those exhibits into evidence.

MR. BALL:  No objection.

THE COURT:  They're admitted.

(PTX Exhibit Nos. 40, 52 and 54 were admitted into evidence.)

MS. SULLIVAN:  So can we have PDX4-33?

BY MS. SULLIVAN:

Q.    Okay.  Now, does AET have a protocol for its internal XRPD testing?

A.    Yes.

Q.    And is AET's protocol reflected in PTX-47?

A.    Yes.

MS. SULLIVAN:  Your Honor, Plaintiffs move to admit PTX-47 into evidence.

MR. BALL:  No objection.

THE COURT:  It's admitted.

(PTX Exhibit No. 47 was admitted into evidence.)

MS. SULLIVAN:  Can we have the next slide?

BY MS. SULLIVAN:

Q.    Okay.  What is AET's protocol for its XRPD testing?

A.    Yes.  They have something called Method 1 and Method 2.  In Method 1, they're doing a XRPD analysis starting at the angle of 2 degrees and scanning to 40 degrees over a period of 15 minutes.  That is not a very sensitive scan.  It's a relatively short scan time over a large angular range.

In Method 2, they're particularly focused on looking at the characteristic peak at 11.2, 2-theta.  And so they're starting at 10 and going to 12, and they're doing that for 30 minutes.  So Method 2 is far, far more sensitive with a lower limit of detection than Method 1.

Q.    And can we go to the next slide, please?

And what is AET's testing protocol designed to do?

A.    Well, it -- this description says, "Check for the presence of pitolisant hydrochloride crystalline form characteristic reflex at 11.2, plus or minus .2 degrees, 2-theta, in the sample diffractogram analyzed by Method 2 and save the diffractogram."

And then in the second line it says, "If that happens, the diffractogram exhibits pitolisant hydrochloride crystalline form characteristic reflexes by XRPD analysis."

Q.    Why does AET focus on the peak at 11.2?

A.    That's, I believe, the largest peak in the x-ray diffraction of the pitolisant hydrochloride.

Myerson - Direct

Q.    So --

A.    And I'm sorry.  And it doesn't overlap any of the excipient peaks.

Q.    So let's talk about some of the testing that AET performed.  So let's go to PDX4-37.

Okay.  So here you have testing for a batch entitled PIO/B-009.  Is it okay if I refer to this as B-009?

A.    Yes.

Q.    So can you tell us:  What is batch B-009?

A.    It's a validation batch, but it's not an exhibit batch.  And it's under three months of accelerated stability.

Q.    Okay.  And how does B-009 compare to the ANDA product?

A.    It's very, very similar.  I mean -- and it's listed as a validation batch, which would indicate it should be essentially the same as the final manufacturing process and formulation.  There's a very, very slight difference.

Q.    Okay.  And what are you showing on -- on this slide, on PDX4-36?

A.    Well, if we look at the left, we see that using Method 1, there's -- we don't see any peaks of the crystalline form, which is not particularly surprising because, as I said, that's not a very sensitive method.

But if we look at Method 2, we clearly see the

Myerson - Direct

peak at 11.2.

Q.    And with respect -- and you said this is on three months of accelerated stability?

A.    Yes.

Q.    And what did AET conclude based on this testing?

A.    That -- that the crystalline material was present.

Q.    Okay.  And what did you -- what do you conclude based on this testing?

A.    Well, that it's clear that the pitolisant hydrochloride is crystallizing.  And if the pitolisant hydrochloride is present, then all the claimed peaks are present whether you can see them or not.

Q.    And is the testing that you're describing relating to B-009 and three months of accelerated stability reflected in PTX-55, PTX-56 and PTX-646?

A.    Yes.

        MS. SULLIVAN:  Plaintiffs move those exhibits into evidence, Your Honor.

        MR. BALL:  No objection.

        THE COURT:  They're admitted.

        (PTX Exhibit Nos. 55, 56 and 646 were admitted into evidence.)

        MS. SULLIVAN:  And can we have PDX4-37?

BY MS. SULLIVAN:

Q.    Dr. Myerson, what are we showing here?

Myerson - Direct

A.      This is indicating a validation batch with Nuray API 17.8-milligram film tablets.

Q.      All right.  And this is from PTX-55?

A.      Yes.

MS. SULLIVAN:  Can we have the next slide?

BY MS. SULLIVAN:

Q.      So, Dr. Myerson, what are you showing on this slide?

MR. BALL:  Your Honor, before we get to this, we do have an objection about this slide and the testimony that we expect Dr. Myerson to make about this slide.

In his reports, he has one small paragraph in his reports and all he says is that AET detected a peak at 11.2.  He doesn't go through everything that's highlighted here.

He was asked specifically at deposition about this, and he confirmed that he was not conducting an analysis of this XRPD spectrum; he was just relying on AET's statement with regard to a peak at 11.2.  He wasn't going through these other peaks that Counsel has indicated on this.  And so we think the testimony should be limited to the reports.

THE COURT:  Counsel.

MS. SULLIVAN:  Your Honor, Dr. Myerson directly provided these opinions in his reply report at Paragraph 25 where he said -- he showed the Method 1 diffractogram and he

Myerson - Direct

said that AET detected multiple peaks corresponding to the claimed form.

THE COURT:  All right.  Well, let's hear what the testimony is, then we'll hear the objection if you think it's going outside the report.

Do I have the reply report here?

MS. SULLIVAN:  You should, Your Honor.

MR. BALL:  Counsel, can you just indicate which portion of the reply report you're at?

MS. SULLIVAN:  Reply report, Paragraph 25.

THE COURT:  Okay.  I've got 25.  Let's go ahead and hear the testimony.

MR. BALL:  Your Honor, if I may.  I'm going to withdraw that objection.  I made just an error in terms of what diffractogram I thought we were looking at, so I -- my apologies.

THE COURT:  All right.  Understood.  It's withdrawn.

Thank you.

BY MS. SULLIVAN:

Q.    And, candidly, I've lost my place, So I am just going to ask Dr. Myerson if he knows where he was in his part of the description to pick up where he left off.

A.    Okay.  I can just start?

Q.    You can continue with your explanation.

Myerson - Direct

A.    Okay.  Okay.  This is a diffractogram at six months accelerated stability using Method 1.  So it's a full scan.  So you have the opportunity to see other peaks.  And we see on the left the peak list, and that peak list is generated by AET's software that they have on the diffractometer, which is software called HighScore Plus, which is the same software actually I have on my diffractometer.  And it's automated peak-picking software.

And we see that AET identified five peaks that are characteristic of the claimed crystalline form, and three of those peaks are Form 1 peaks.  They did not detect the peak at 34.1, which is not, again, surprising because that's such a small peak.  It's below the limit of detection, but just clearly shows the material is converting to the claimed crystalline form.

MS. SULLIVAN:  Let's go to PDX4-39.  Oh, I know.

I'm sorry.  Actually can we go back?  I'm sorry.

BY MS. SULLIVAN:

Q.    And what conclusion did AET reach about this data?

A.    It says, "The diffractogram exhibits pitolisant hydrochloride crystalline form characteristic reflexes by XRPD analysis."

Q.    Okay.  And that's on PTX-656?

A.    Yes.

MS. SULLIVAN:  And Plaintiffs move to admit

Myerson - Direct

PTX-656.

MR. BALL:  No objection.

THE COURT:  It's admitted.

(PTX Exhibit No. 656 was admitted into evidence.)

MS. SULLIVAN:  So can -- now, can we have PDX4-39?

BY MS. SULLIVAN:

Q.    Okay.  Dr. Myerson, what are we showing on this slide?

A.    Yeah, this is the same batch at six months accelerated stability analyzed by Method 2.  And if you recall, when we looked at the three months' stability by Method 2, the peak was much smaller.  And now the peak's gotten much larger, showing that the material is continuing to crystallize with time.  That's why the peak gets bigger. You have more signal.

Q.    Now, are you able to draw -- were you able to draw any conclusions from the presence of these peaks in the diffractograms of batch B-009?

A.    Yes, That the claimed crystalline form is present and the amorphous material is crystallized.

Q.    And how did that factor into your infringement analysis?

A.    Well, it is -- it's direct evidence of infringement.

Myerson - Direct

Q.      Now, I'd like to talk to you about the third category of infringement evidence you considered, AET's testing of its exhibit batches.

A.      Yes.

Q.      First of all, can you explain what an exhibit batch is?

A.      Yes.  When developing a drug product, a company needs to come up with a manufacturing technique and a set of standards for that product that they have to meet.  And after they do that, they need to manufacture a minimum of three batches in a row at commercial scale using the equipment they plan to use when they're making stuff for sale and demonstrate that they meet all the specifications that they put in their ANDA.

Q.      And so, in your opinion, are exhibit batches representative of the ANDA products that will be sold if the FDA approves the product?

A.      Yes, that's the whole purpose of exhibit batches.

        MS. SULLIVAN:  So can we have PDX4-41?

BY MS. SULLIVAN:

Q.      Okay.  When were AET's exhibit batches manufactured?

A.      November 2023.

Q.      Okay.  And is the information regarding manufacture of AET's exhibit batches in PTX-49?

A.      Yes.

Myerson - Direct

MS. SULLIVAN:  Plaintiffs move PTX-49 into evidence.

MR. BALL:  No objection.

THE COURT:  It's admitted.

(PTX Exhibit No. 49 was admitted into evidence.)

BY MS. SULLIVAN:

Q.    And did AET perform internal XRPD testing using their previously discussed method on exhibit batches?

A.    Yes.

MS. SULLIVAN:  So can we have PDX4-42?

BY MS. SULLIVAN:

Q.    Okay.  So what are we looking at on this slide, Dr. Myerson?

A.    This is exhibit batch EK319, and it's six months accelerated stability.

Q.    And what document does this testing come from?

A.    PTX-50.

Q.    And which exhibit batch was tested in PTX-50?

A.    Exhibit batch EK319.

MS. SULLIVAN:  Plaintiffs move to admit PTX-50 into evidence, Your Honor.

MR. BALL:  No objection.

THE COURT:  It's admitted.

(PTX Exhibit No. 50 was admitted into evidence.)

BY MS. SULLIVAN:

Myerson - Direct

Q.    Okay.  And, Dr. Myerson, what does the peak list reflect here?

A.    Well, the peak list -- well, this is Method 2.  And so they're looking for the peak at 11.2.  And AET software identified a peak at 11.2.  I agree it's a small-ish peak, but the software identified the peak at above the noise.  And looking at it with your eye, it does look like a peak above the noise.  But clearly their software, which is the same software I use, identified it as a peak.

Q.    And, Dr. Myerson, AET's expert has opined that he does not think it's a real crystalline peak, but rather an artifact or an ambiguity.

Do you agree with that?

A.    I don't.  It would be -- it would be a very odd artifact or ambiguity to show up exactly at the right place.

MS. SULLIVAN:  Now, can we have PDX4-43?

BY MS. SULLIVAN:

Q.    Okay.  What are we showing on PDX4-43?

A.    This is a different batch, exhibit batch EK316.  It's six months accelerated stability, and here the peak is larger.  I don't think there's any question that you could say that wasn't a peak.

Q.    And what document does the testing shown on PDX4-43 come from?

A.    PTX-51.

Myerson - Direct

MS. SULLIVAN:  Plaintiffs move to admit PTX-51 into evidence.

MR. BALL:  No objection.

THE COURT:  It's admitted.

(PTX Exhibit No. 51 was admitted into evidence.)

BY MS. SULLIVAN:

Q.    Okay.  What is the exhibit batch that is reflected in PTX-51 and PTX-4-43?

A.    EK316.

Q.    Okay.  So is that a different exhibit batch than we were looking at before?

A.    Yes.

Q.    And what testing method was used here?

A.    This is Method 2.

Q.    Okay.  And is there a peak associated with the diffractogram for EK316 in the Method 2 testing that we're looking at here?

A.    Yeah.  Again, the 11.2 peak is clearly present.

Q.    Okay.  And what's reflected in the peak list associated with this experiment?

A.    Again, the 11.2 peak.

Q.    And, Dr. Myerson, AET's expert has opined that he doesn't think this is a real crystalline peak, but rather an artifact, or ambiguity or resulting from some other explanation.

Myerson - Direct

Do you agree with that?

A.     I -- I do not agree.

Q.     Why not?

A.     It's clearly a peak.  It's at the right place.  I --
I can't imagine it would be anything else.

MS. SULLIVAN:  And can we have PDX4-44?

MR. BALL:  Your Honor, sorry for the premature
objection on the previous slide.  This is the one which my
objection pertains.

Here his report is very clear.  He's relying on
one paragraph.  He cites to a single peak, and
his testimony was that AET believes they identified that
peak.  He confirmed at deposition that he was doing no
independent analysis of this.  He was relying only on a
single peak from AET's internal documents, and Counsel's
clearly here intending to walk Dr. Myerson through multiple
peaks for which he just never expressed an opinion.

THE COURT:  Counsel?

MS. SULLIVAN:  Yes.  Your Honor, first of all,
the peaks that are highlighted here are actually the peaks
that are in the peak list in the document itself.  But,
Dr. Myerson, did opine on this.  So he specifically talked
about this diffractogram and the peak list on Page 39 of his
opening report.

THE COURT:  Stand by.

Myerson - Direct

MS. SULLIVAN:  And then there's another section in his reply.  If Your Honor would like me to point you to that, I can as well.

THE COURT:  And what's the objection?

MR. BALL:  If I may, Your Honor.  So that is in the report.  He's highlighted --

THE COURT:  I understand.

What's the other section?

MS. SULLIVAN:  In Paragraph 18 of his reply report, he refers to this batch and this testing.  It's cross-referenced with the other sections of his opening report and says that --

THE COURT:  What page?

MS. SULLIVAN:  Page 6, Paragraph 18.

THE COURT:  Stand by.

MS. SULLIVAN:  Shows the presence of the claimed form through the presence of multiple characteristic peaks.

THE COURT:  Okay.  Did he ever point out which ones he was talking about?

MS. SULLIVAN:  Look at his -- well, Your Honor, he discussed the peak list itself, which is what we're highlighting here.

THE COURT:  Well, he said, "Here is the peak list."  Did he discuss it?

MS. SULLIVAN:  The discussion is here on Page 39

Myerson - Direct

of his report.  That's the -- that's the discussion of the peak list.

THE COURT:  That's just a clip-out of the two figures; right?

MR. BALL:  And, Your Honor, possibly I can cut through this.

THE COURT:  Sure.

MR. BALL:  I asked him at deposition specifically about this.  I said --

THE COURT:  Where am I looking?

MR. BALL:  It's in his deposition at Page 629. I asked him, "Do you set --

THE COURT:  Stand by.

MR. BALL:  Sorry.  "Do you set forth" --

THE COURT:  Stand by.

Okay.  Go ahead.

MR. BALL:  I asked him, beginning on Line 10 about this Paragraph 89 and whether or not he's setting forth an independent analysis of the XRPD spectra for batch EK316.  And his answer is "I think I understand what you mean.  I'm relying on AET's analysis."

And then he goes on to discuss the next one, the next batch that they're going to cover, and he says, again, he's relying only on AET's analysis.  He never picked out specific peaks from that peak list that's shown on Page 39

Myerson - Direct

of his report, Nor did he correlate those to any patent claims or to the claimed form of pitolisant hydrochloride.

THE COURT:  Okay.  Hold on.  Let me back up here.

I understand the objection.  I've read the two paragraphs cited in the opening report, and the reply report, as well as the deposition testimony.

And I think what I'm seeing on the screen here now is fairly within an opinion he has already provided. But if this goes into something more than what I think it's going to go into, we may cut him off.

All right?

Thank you.  It's overruled.

BY MS. SULLIVAN:

Q.    So, Dr. Myerson, what peaks are identified in the peak list for exhibit batch EK316?

A.    Yes, we see five peaks identified.  Three of them are from Claim 1 of the '197 patent.  The other two are characteristic of Form 1.  It's actually the same peaks we saw in the validation batch previously.  And we -- we're just missing the peak at 34.1, same as before.  That would be very hard to see, but this clearly indicates the crystalline form is present.  And, again, this is a very, very -- it's not a method that is -- has a high limit of detection.  It's a relatively fast scan.

Q.    And are you -- and are you aware of any other components of AET's ANDA products that would cause the peaks that are -- that would cause a peak at 11.2?

A.    No.  There's no -- there's no overlap with anything, And that's why AET picked the peak at 11.2 would be characteristic of the form.

Q.    Okay.

A.    And, again, as we've seen -- as the material crystallizes, the peak at 11.2 grows.  And we're clearly getting continued crystallization with time.

Q.    And are the peaks, the additional peaks that were detected in the peak list, are they visible in the diffractogram itself for EK316?

A.    Yeah.  They're quite small, but, again, the peak-picking software picked them out as peaks above the background, which is why you use software because your eye doesn't necessarily discern at that level.

Q.    Now, AET's expert has opined that the Method 1 testing of EK316 isn't evidence of infringement because the 34.1 peak wasn't detected.

How do you respond to that?

A.    Well, as I've noted previously, if you identify the crystalline form, then the -- and the crystalline form is present, then all the peaks are present, whether you can see them or not, because they're an intrinsic property of the

Myerson - Direct

crystalline form.

Q.    And -- and what conclusions have you reached about the pitolisant hydrochloride in AET's ANDA products -- in the AET ANDA products that it will sell upon approval based on AET's own XRPD testing?

A.    That the material is not stable and will crystallize with time and, thus, it's more likely than not that they will infringe the '197 patent when they sell their pitolisant.

Q.    Now, AET's expert has opined that AET's internal testing doesn't show that because it was performed on samples that were on six months of accelerated stability.

      Do you agree with that?

A.    I do not.  Accelerated stability is, as I noted previously, a very good way to determine how your material is going to behave under much longer termed storage.  So six months could be a very good predictor of what will happen at 24 months.

              MS. SULLIVAN:  Can we have the next slide, please?

BY MS. SULLIVAN:

Q.    Now, has AET relied on accelerated stability testing as part of its ANDA?

A.    Yes.  If we look at what it says here, it says the proposed 30 months expiration dating for this product is

Myerson - Direct

supported by the six months accelerated stability data (40 degrees C, 75-percent relative humidity) and the 18 months long-term stability data, 25 degrees, 60-percent relative humidity, and ongoing long-term stability study in the container closure system.

And what this is really saying is they have to make use of the six months accelerated to propose a date longer than 18 months because they haven't done any long-term stability longer than 18 months.  So they -- the FDA would require them to use the long-term stability.

Q.    And the submission that -- to the FDA that you're discussing, that's PTX-1190?

A.    Yes.

MS. SULLIVAN:  Plaintiffs move PTX-1190 into evidence.

MR. BALL:  No objection.

THE COURT:  It's admitted.

(PTX Exhibit No. 1190 was admitted into evidence.)

BY MS. SULLIVAN:

Q.    Now, to the best of your knowledge, has AET submitted the XRPD testing on exhibit batches EK316 and EK319 that we were just discussing to the FDA?

A.    No, not to my knowledge.  They have not submitted that data to the FDA.

Myerson - Direct

MS. SULLIVAN:  Can we have the next slide,
please?

Thanks.

BY MS. SULLIVAN:

Q.    And we just looked at a request for a 30-month
proposed shelf life.

Has FDA granted that request?

A.    No.  It turned -- it turned the request down and
indicated -- they asked them to revise the drug product
expiration to a maximum of 24 months and indicated extension
beyond that date can be submitted in the future
post-approval supplement after satisfactory long-term
stability data has been collected.

Q.    And --

THE COURT:  Let's go ahead and take our
afternoon break.  It's 3:40.  We'll be back in 15.

COURTROOM DEPUTY:  All rise.

(Recess was taken.)

COURTROOM DEPUTY:  All rise.

THE COURT:  Please be seated.

All right.  Are we ready to continue?

MS. SULLIVAN:  We are, Your Honor.

BY MS. SULLIVAN:

Q.    Dr. Myerson, I believe where we left off was
discussing the -- that FDA responded to the 30-month shelf

Myerson - Direct

life request saying that it would grant 24 months of shelf life.

So -- so I understand it, based on the six-month accelerated stability data, plus 18 months of long-term stability data, FDA was willing to grant a shelf life of 24 months; is that correct?

A.    That's right.  They -- they -- the six months accelerated stability was important because they haven't done long-term stability up to 24 months.  So they're using it -- using a combination of those two things to allow them to go out to 24 months.

Q.    And is the correspondence that you were referencing PTX-1253?

A.    Yes.

Q.    So what does that mean for -- how does the six months' stability data relate to the 24 months' shelf life?

A.    Well, they -- because they -- they -- well, they submitted -- what they submitted showed no -- they indicated no stability problem in the six months accelerated stability or the 18 months' long-term stability.  The FDA was willing to go out to 24 months even though the long-term stability hadn't gone to 24 months.  So the FDA is making use of the six months' stability in determining -- accelerated stability in allowing them 24 months' approval.

MS. SULLIVAN:  Now, can we have PDX4-47, please?

Myerson - Direct

BY MS. SULLIVAN:

Q.    Dr. Myerson, the XRPD testing we've been discussing so far was all conducted on AET's 17.8-milligram tablets.

Do you have an opinion as to whether the 4.45-milligram tablets will also contain the claimed crystalline form?

A.    Yes.  I do have an opinion, and my opinion is they will contain the claimed crystalline form.

Q.    And why is that?

A.    Well, if we look at the -- the document on the screen here, the 4.5 -- the 4.45-milligram tablets are made from a common blend, meaning they make one blend, and then at the end they just pick a different tablet press to use to make the finer drug product.  So everything about the manufacturing process is identical.

MS. SULLIVAN:  And, Your Honor, just for housekeeping purposes from the prior slide, Plaintiffs move to admit into evidence PTX-1253.

MR. BALL:  No objection.

THE COURT:  It's admitted.

(PTX Exhibit No. 1253 was admitted into evidence.)

BY MS. SULLIVAN:

Q.    So, Dr. Myerson, based on the totality of the evidence that we've discussed so far, do you have an opinion

Myerson - Direct

regarding whether it is more likely than not that the crystalline form of Claim 1 will be present during the shelf life of AET's ANDA product?

A.    Yes, I do have an opinion, and it's my opinion that it will be more likely than not that AET's ANDA product will contain the claimed crystalline form during the shelf life of its product.

        MS. SULLIVAN:  Now, let's -- can we have the next slide?

BY MS. SULLIVAN:

Q.    Let's discuss the fourth category of evidence that you considered in forming your opinion, AET's protocols and specifications.

        MS. SULLIVAN:  Can we have PDX4-49?

BY MS. SULLIVAN:

Q.    Did you review the release specification for AET's ANDA product in forming your opinion in the case?

A.    I did.

Q.    And what is a release specification?

A.    Release specification is all the tests that are done on the drug product before it can be released for sale.

Q.    Does AET's specification include any tests to analyze the solid-state form of pitolisant hydrochloride in AET's ANDA products?

A.    No.

Myerson - Direct

Q.    So what is the implication of that?

A.    The implication is that they can sell a product with the claimed solid-state form.

Q.    Now, is AET's product specification PTX-842?

A.    Yes.

MS. SULLIVAN:  Your Honor, Plaintiffs move to admit PTX-842 into evidence.

MR. BALL:  No objection.

THE COURT:  It's admitted.

(PTX Exhibit No. 842 was admitted into evidence.)

MS. SULLIVAN:  And going to the next slide.

Thank you.

BY MS. SULLIVAN:

Q.    Does AET's internal procedures call for the -- for a solid-state testing of the pitolisant hydrochloride at any point during its manufacturing process?

A.    No, I put together this little flow chart for different parts of the process.  So at the beginning where they make their pitolisant hydrochloride maltodextrin solution, they don't check, except visually, to see if all the pitolisant hydrochloride crystals dissolve.  And there's no light scattering nephelometry or filtering.  They have no solid-state test of any kind during the tablet manufacturing process.  For example, on the granules or on the final

Myerson - Direct

tablets.  And they have no -- they have no crystallization specification or solid-state test for -- during stability testing.

Q.    And so even though we've seen some stability testing that AET performed, that's not actually required by its stability protocol; is that correct?

A.    No, it is not.

Q.    Okay.  Now -- and the documents that you -- that reflect these various testing protocols, they're in PTX-38, 39, 45, 842 and 1189; correct?

A.    Correct.

MR. BALL:  No objection, Your Honor.  I jumped the gun, but --

MS. SULLIVAN:  But I -- so they're in evidence? I take it they're in evidence.

Thank you.

THE COURT:  We'll admit them.

(PTX Exhibit Nos. 38, 39, 45, 842 and 1189 were admitted into evidence.)

MS. SULLIVAN:  Okay.  Now, can we have the next slide?

BY MS. SULLIVAN:

Q.    Now, Dr. Myerson, based on your review of AET's manufacturing product, the process specification and AET's own internal testing of development batches and

Myerson - Direct

exhibit batches, is it your opinion that it's more likely than not that during their shelf life, the ANDA products that AET will sell will contain crystalline pitolisant hydrochloride -- crystalline pitolisant hydrochloride of Claim 1 of the '197 patent?

A.    Yes.  It is my opinion that that will occur.

Q.    Okay.  So I'd like to walk through the elements here and have you explain why you think each one is met.

So let's start with pitolisant hydrochloride. Can you walk us through it there?

A.    Yeah.  It's not disputed that the drug product has pitolisant hydrochloride.

Q.    And with respect to the water content limitation?

A.    I believe that's been stipulated to.

Q.    So why are Elements 1 and 4 met?  So crystalline pitolisant hydrochloride having an X-ray diffractogram that comprises characteristic peaks at 11.2, 19.9, 20.7 and 34.1 plus or minus 0.2 degrees 2-theta?

A.    Yeah.  Well, as we've seen, AET's validation batch and the -- two of their exhibit batches display one or more of the claimed peaks that are characteristic of pitolisant hydrochloride, a claimed crystalline form, meaning that the -- that the form is present.  All of the peaks except the 34.1 have been detected.  And as I've noted before, if the crystalline form is present, then all of the peaks are

present, even if below the limit of detection because the peaks are an intrinsic property of the crystalline form.

And, of course, if it's -- if it's crystalline and we get x-ray peaks, obviously, the first element is met and then the last element is met.

Q.    Now, Dr. Myerson, I'd like to talk to you about your fifth category of evidence, the independent testing by Plaintiffs' experts.

A.    Yes.

Q.    What independent testing did you rely on?

A.    The testing described by Dr. Gozzo and the testing described by Dr. Wenslow.

MS. SULLIVAN:  Can we have the next slide, please?

BY MS. SULLIVAN:

Q.    So let's start with Dr. Wenslow's testing and -- I think you said in court that you were here in court earlier for Dr. Wenslow's testing; correct?

A.    Yes.

Q.    Or testimony?

Now, did you review Dr. Wenslow's expert report?

A.    I did.

Q.    And do you agree with the protocol that Dr. Wenslow used to conduct his testing?

A.    Yes.

Myerson - Direct

Q.     Now, in your opinion, does Dr. Wenslow's testing demonstrate that AET's ANDA products contain crystalline pitolisant hydrochloride?

A.     In my opinion, they do.

Q.     Can you briefly explain why that is?

A.     Yes.  Well, as we heard from Dr. Wenslow, he first determined the characteristic peaks of pitolisant hydrochloride of the claimed crystalline form by testing a pure Harmony sample that was also tested by Dr. Gozzo, who demonstrated it was a pure crystalline form.

        And then he did his filtered studies on the AET tablet, AET tablet subtracting out the amorphous signal. And he -- he -- as we see in this diagram, that he got the same peaks indicating that crystalline pitolisant hydrochloride was present.

Q.     Okay.  Now, how does Dr. Wenslow's testing show that the crystalline pitolisant hydrochloride in AET's ANDA products has an x-ray diffractogram that comprises characteristic peaks at 11.2, 19.9, 20.7 and 34.1 degrees 2-theta plus or minus 0.2?

A.     Yes.  Well, this is -- this is a matter of linking methods.  So if you take a powder diffraction pattern of a -- of a standard, and you then characterize that standard using another analytical method like solid-state NMR, or Raman spectroscopy or FTIR, you can come up with a --

characteristics peaks for that form using those methods.

And then when you take a sample and -- and measure the sample using another method, you can say that crystalline form is there, and you've just linked that back to the x-ray because you've originally taken the x-ray of the same sample.

So this is done all the time because you don't always do the same analytical method to characterize a given material.  You use multiple methods.

Q.    Now, so let's talk about Dr. Gozzo's testing.

MS. SULLIVAN:  Can we have PDX4-54?

A.    Yes.

MR. BALL:  Your Honor, I'm sorry.  We have an objection to this.  This Harmony API peak position is not information from an expert report that has ever been served on AET.  This may have been part of some different expert proceedings involving this witness, but certainly not AET.

THE COURT:  All right.  Counsel?

MS. SULLIVAN:  Your Honor, in Dr. Myerson's opening cover report, so Dr. Myerson, similar to what we were talking about before, did an omnibus infringement report and then specific -- Defendant-specific infringement reports.

I have places to point you to in each of them. Let's start with the opening cover report.

Myerson - Direct

THE COURT:  Okay.

MS. SULLIVAN:  Paragraph 97.

THE COURT:  All right.  Stand by.

Okay.  This is on Page 42 of the opening expert report?

MS. SULLIVAN:  Let me try to get there myself.  And there he -- so in Paragraph 97, Dr. Myerson says that "The diffractogram contains the peaks of Claim 1 and Claim 2 of the '197 patent."  He has the diffractogram figure next to that.

THE COURT:  I think I'm looking at the wrong Paragraph 97.

Okay.  I'm looking at the appendix.

MS. SULLIVAN:  Oh, yeah.  So that's the tricky part.

THE COURT:  Okay.  Okay.

So I see what looks like this diagram in Paragraph 97.  Yes.

You agree?

MR. BALL:  We agree with that.

THE COURT:  Okay.

MS. SULLIVAN:  And Dr. Myerson, in the discussion of it, says that it contains all of the Claim 1 and Claim 2 peaks from the '197 patent.

THE COURT:  Okay.  Counsel?

Myerson - Direct

MR. BALL: We don't disagree it says that. Our position is the Harmony API peak position on the right-hand column that's listed there, that is not information lining -- that -- matching these peaks up to specific peak positions. This information was --

THE COURT: All right. But I -- so the claimed peak positions, those are in the patent claims that we're litigating; right? Yes?

MR. BALL: Those are, yes.

THE COURT: Okay.

MR. BALL: But these --

THE COURT: And then the right ones, they would be the same -- oh, I see. There's numbers on the right that they say they haven't seen those.

Have they seen those numbers?

MS. SULLIVAN: Your Honor, I believe -- and I believe that Dr. Myerson can -- he was asked about this at his deposition and gave this testimony --

THE COURT: Gave these numbers that are on this right column?

MS. SULLIVAN: I believe that he -- can I check the transcript?

THE COURT: Yes.

MS. SULLIVAN: I believe that -- so the testimony that I'm thinking of relates specifically to the

34.1 peak.  There was a discussion of exactly where in the diffractogram that is.  Dr. Myerson said that it was just to the --

THE COURT:  So the answer is "no," he didn't say these numbers before?

MS. SULLIVAN:  He did not say these numbers before, other than the 34.1 -- other than his discussion of the 34.1 peak.

THE COURT:  But that's in the patent claim.  Did he say 33.93?

MS. SULLIVAN:  Sorry.  He did not say 33.93.

THE COURT:  All right.

MS. SULLIVAN:  He said just -- he said just to the -- I believe just to the left of that.

THE COURT:  So the Court is going to be considering the claimed peak position numbers as well as the numbers that are on this diagram which are in the report, but I'm going to ignore these numbers on the right --

MS. SULLIVAN:  Understood, Your Honor.

THE COURT:  -- column.

Counsel, does that resolve your objection?

MR. BALL:  It does, Your Honor.  There's --

Counsel may introduce some exhibits, PTX's below, and I'm not sure if these are reflected in those or not.  So we may have an objection, which I won't jump the gun this time.  But if

Myerson - Direct

Counsel tries to introduce those, we may have a --

THE COURT:  You don't have those exhibits?

MR. BALL:  I don't have these PTX's on hand.
I'm not sure.

THE COURT:  Well, were you given them?

MR. BALL:  Yeah.

THE COURT:  No, I mean, were you given them
during the course of discovery?

MR. BALL:  I -- yes, but I think we have --

THE COURT:  Okay.

MR. BALL:  Actually, I'm not sure about that,
because there was an entirely separate proceeding with a
Defendant, MSN, and that's where I think this came from.

THE COURT:  Okay.  Well, let's see what happens,
and we'll go from there.

MS. SULLIVAN:  Happy to.

I would say, also, Your Honor, we did identify
the exhibit last night during the exchange, and we got no
objections about those.

THE COURT:  You got no objections to the
exhibits when you exchanged them last night?

Okay.  Have you admitted them?

MS. SULLIVAN:  We have not admitted them.

THE COURT:  Okay.

MS. SULLIVAN:  Actually --

THE COURT:  Yes, you have -- they are in evidence, so --

MS. SULLIVAN:  Yes.

THE COURT:  -- they're admitted, Mr. Koehler tells me.

MS. SULLIVAN:  Thank you.

BY MS. SULLIVAN:

Q.     So, Dr. Myerson, were you in court earlier today for Dr. Gozzo's testimony?

A.     I was.

Q.     And did you review Dr. Gozzo's expert reports?

A.     I did.

Q.     And do you agree with the protocol that Dr. Gozzo used to conduct her testing?

A.     I did.  I do.

Q.     And did Dr. Gozzo's testing detect the four characteristic peaks of Claim 1 in the Harmony API samples?

A.     Yes.

Q.     Now, does Dr. Gozzo's testing help you to understand Dr. Wenslow's ssNMR testing?

A.     Yeah.  As I noted, Dr. Gozzo's testing ties the solid-state NMR testing of Dr. Wenslow to the claimed crystalline form.

Q.     And do you have an opinion as to whether or not the claimed XRPD peaks are present in Harmony's API?

Myerson - Direct

A.    Yes.  In my opinion, they are.

Q.    And I think for clarity of the record, which batch of crystalline pitolisant hydrochloride did Dr. Gozzo test?

A.    Batch number 142868.

Q.    And which batch of crystalline pitolisant hydrochloride did Dr. Wenslow test?

A.    Same batch.

Q.    All right.  Now, Dr. Myerson, did you review documents relating to the shipment and storage of the samples that were tested by Drs. Wenslow and Gozzo?

A.    I did.

Q.    And is PTX-811 one of those documents?

A.    Yes.

Q.    Okay.  Now, based on review of those documents, do you have an opinion about whether the shipment and storage conditions of the samples that were tested by Dr. Wenslow and Gozzo could have caused some sort of crystalline form conversion?

A.    I believe that they were shipped under the appropriate conditions, which would not have caused crystalline form conversion.

Q.    Okay.

        MS. SULLIVAN:  And Plaintiffs move PTX-811 into evidence.

        MR. BALL:  No objection.

Myerson - Direct

THE COURT:  It's admitted.

(PTX Exhibit No. 811 was admitted into evidence.)

MS. SULLIVAN:  Now can we have the next slide?

BY MS. SULLIVAN:

Q.    Dr. Myerson, how do Dr. Gozzo's testing and Dr. Wenslow's testing affect your opinion regarding AET's infringement of Claim 1?

A.    They confirm the opinion that I had previously based on AET's data.

MS. SULLIVAN:  Your Honor, one moment.

We have no further questions for Dr. Myerson.

THE COURT:  All right.  Thank you.

Cross-examination?

You may proceed.  Oh, you may approach first, and then you may proceed.

MR. BALL:  May I approach, Your Honor?  We have one more copy.

THE COURT:  Yes.

CROSS-EXAMINATION

BY MR. BALL:

Q.    All right.  Good afternoon, Dr. Myerson.

A.    Mr. Ball.

Q.    It's good to see you again.  We were last together at your three-day deposition in Chapel Hill in December.

Myerson - Cross

A.    Yes.  Very nice time.

Q.    It was a long one.

A.    Yes.

Q.    Okay.  Sir, you testified earlier on PDX4-25, if we could pull that up.  I may have the wrong slide.  It's not -- it's not necessary.

You testified about some API that AET uses from Emnar and Nuray.  Do you recall that testimony?

A.    Yes.

Q.    And that API you testified was crystalline, and it met the limitations of the claims of the '197 patent?

A.    Correct.

Q.    But you understand that when AET makes its ANDA products, those materials are dissolved in a large volume of water so that the crystal structure is destroyed.  And this happens abroad.

You understand that; correct?

A.    I understand -- I understand they're attempting to make a solution.  I think we discussed at my deposition the possibility that they didn't completely dissolve the API in their -- in their solution because they only used visual means.  But I agree that they are attempting to make a homogenous solution.

Q.    And so whatever crystal form is in those APIs that were purchased from the DMF suppliers, that's really not

Myerson - Cross

relevant to the issues in this case.  That happens overseas, and it's dissolved in water to -- to destroy the crystalline form; correct?

A.    Unless it's not completely dissolved and seeds are left as we discussed in my deposition.

Q.    But -- but you have no evidence that it was not completely dissolved.  That's true; isn't it?

A.    That's true, but I have no evidence that it was completely dissolved.

Q.    All right.  And, in fact, you haven't tested AET's aqueous solution of the pitolisant hydrochloride to determine if there's undissolved crystalline material.  That's true; right?

A.    That's correct.

Q.    You haven't personally inspected AET's manufacturing facility to look at their dissolution of pitolisant hydrochloride; that's correct, too?

A.    That's correct.  I agree.

Q.    And isn't it true that you just really can't say that the pitolisant hydrochloride does not completely dissolve in AET's manufacturing process?

A.    I have no information that confirms either way, though I would not disagree that it's likely to have dissolved.  But, again, they don't do any tests.

Q.    You've testified in many cases throughout your career

Myerson - Cross

involving polymorphic forms?

A.    Yes.

Q.    And it's fair to say that those many cases include instances where a Defendant believes their drug substance in their tablets is in an amorphous form; correct?

A.    Yes.

Q.    And in several of those cases, you've offered testimony that the Defendants' amorphous form drug substance converts to or otherwise contains some amount of crystalline drug substance; is that fair?

A.    Yes.

Q.    And am I -- am I correct in saying that your work in those cases generally falls into one of two categories: We'll call them Type 1 cases where you get to determine the testing that you want done, or Type 2 cases where you don't have the ability to request anything.  The attorneys just give you the data to rely on.

Is that fair?

A.    That's correct.

Q.    And by the way, this case is of the second type where the attorneys just gave you the data; correct?

A.    Correct.

Q.    In this case, you had no input into selecting the type of testing to do; true?

A.    True.

Myerson - Cross

Q.    You specifically asked the attorneys when you were forming your opinions before you put in your report, Is there any X-ray data?  You asked them that, didn't you?

A.    Yes.

Q.    And that's because you wanted XRPD data for the AET tablets; true?

A.    I would have liked XRPD data and, in fact, any type of data that was available.

Q.    And the attorneys told you that there wasn't any XRPD data available for AET's drug product; true?

A.    They.

Q.    Sir, I'm talking about when you put your report in, your opening report in this case --

A.    Okay.

Q.    -- and you were forming your opinions and you asked the attorneys, Is there any X-ray data?  They told you there was no x-ray data available for the AET drug product; is that correct?

A.    That's true when I was filing my opening report.

Q.    And in those cases, where you're -- and let's call them the Type 1 cases.  In the -- in the Type 1 cases where you're able to direct the testing of the generic's ANDA product, isn't it true that you have always recommended that x-ray powder diffraction experiments be conducted when you're evaluating whether there are crystals in an amorphous

Myerson - Cross

drug product?

A.    That's correct.

Q.    And that's particularly true, sir, isn't it, where the patent claims themselves require x-ray powder diffraction?

A.    Could you say that again?

Q.    That's particularly true -- I had asked you about always recommending XRPD.  And my second question to you was:  That's particularly true where the patent claims themselves require x-ray powder diffraction; correct?

A.    I guess.  I mean, I would say I always ask for x-ray powder diffraction, irregardless of the patent claim.

Q.    Fair enough.  We won't quibble.

A.    Yeah.

Q.    When you put together your opening infringement report in this case, you were aware of XRPD testing that was done by Dr. Gozzo for another Defendant who's no longer in the case.  That's true; correct?

A.    Yes.

Q.    And you agree that XRPD is a better analytical technique than ssNMR if you want to directly observe the x-ray peaks in a given sample?

A.    Well, that's certainly true because it's the only way you can observe x-ray peaks.

Q.    And thank you.  You got to my next question.

Myerson - Cross

And, in fact, NMR can't be used to measure 2-theta peaks; correct?

A.     That's correct.

Q.     If you want to directly measure the peaks, you have to use x-ray --

A.     That's correct.

Q.     -- correct?  That's obvious; correct?

A.     Yes.

Q.     And directly measuring the x-ray diffraction peaks, that can be done with both lab XRPD as well as the synchrotron XRPD that we heard from Dr. Gozzo about; correct?

A.     That's correct.  Of course, synchrotron has a lower limit of detection.

MR. BALL:  Let's pull up PTX-216, Mr. Sayres.

BY MR. BALL:

Q.     Sir, are you familiar with PTX-216, which is an article by Birju Saha titled "Analytical Techniques for Quantification of Amorphous/Crystalline Phases in Pharmaceutical Solids?"

A.     And I don't really remember if I'm familiar with this or not.

Q.     We discussed this one at your deposition.

A.     Okay.  Well --

Q.     Let's go through it, and maybe it will ring a bell to

Myerson - Cross

you?

A.    Well, thankfully, I don't remember everything that we discussed at my deposition.

Q.    I think we can all agree.

I'll direct your attention to PTX-216.3.

A.    Okay.

Q.    There's a section titled "Powder X-Ray Diffraction PXRD."

Do you see that?

A.    Yes.

Q.    And the first sentence under that says, "Diffraction techniques are perhaps the most definitive method of detecting and quantifying molecular order in any system."

You agree with that statement, don't you, sir?

A.    Yes.

Q.    And you would also agree that crystalline materials are defined by having order -- having long-range order on the -- involving hundreds, if not thousands or tens of thousands of molecules; correct?

A.    Correct.

Q.    And isn't it also true that the amorphous form is defined by a lack of order?

A.    A lack of long-range order.

Q.    A lack of long-range order?

A.    Correct.

Myerson - Cross

Q.    Let's take a look at PTX-196, please.  PTX-196, I think you do recognize this; correct?

I'll let you take a second, but it's also broadcast on the screen.

A.    Yeah, it's the chapter from Harry Brittain's book.

Q.    And this is Chapter 6, "Methods For the Characterization of Polymorphs and Solvates" by Harry Brittain; correct?

A.    Correct.

MR. BALL:  And I'm being told to move in PTX-216 and PTX-196 before I forget.

THE COURT:  Any objection?

MS. SULLIVAN:  One moment, Your Honor.

Your Honor, I'm -- which exhibit is this, Mr. Ball?  I'm sorry.

MR. BALL:  Well, we're moving in Saha, which we just looked at the Saha reference.  And then we're moving in Harry Brittain's chapter --

MS. SULLIVAN:  We have no objection to that.  I apologize --

THE COURT:  They're admitted.

MS. SULLIVAN:  -- for taking a moment to figure that out.

(PTX Exhibit Nos. 196 and 216 were admitted into evidence.)

BY MR. BALL:

Q.    All right.  Sir, you would agree that this is part of a well-known book on polymorphism and characterization of pharmaceutical solids?

A.    Yes.

Q.    And I'll direct your attention to PTX-196.2, please.

MR. BALL:  Can we expand this?

BY MR. BALL:

Q.    All right.  There's a statement here, "However, it cannot be overemphasized that the defining criterion for existence of polymorphic types must always be nonequivalence of crystal structures."

That's a statement you agree with; correct?

A.    Yes.

Q.    And then it goes on to say, "For compounds of pharmaceutical interest, this ordinarily implies a nonequivalent x-ray powder diffraction pattern is observed for each suspected polymorphic variation."

That's the statement you agree with, isn't it, sir?

A.    Yes.

Q.    And Dr. Brittain goes on to say, "All other methodologies must be considered as sources of supporting and ancillary information.  They cannot be taken as definitive proof for the existence of polymorphism by

Myerson - Cross

themselves alone."

Do you see that?

A.    Yes.

Q.    And you agree with that, too, sir?

A.    I do.

Q.    You run a research lab at MIT?

A.    Yes.

Q.    And as part of your research lab, if you were given AET's tablets in your lab as a research project and you were asked to determine whether or not those tablets -- whether the claimed peaks were present, you would use a range of different techniques; is that fair to say?

A.    Yes.

Q.    And that range of techniques would include XRPD?

A.    Yes.

Q.    It would include ssNMR?

A.    Yes.

Q.    It would include Raman mapping?

A.    Yes.

Q.    It would include FTIR?

A.    Yes.

Q.    And, in fact, that's what you always do; isn't that true?

A.    Generally.  Generally, I do try to do -- if you gave me that particular problem, that's what I would do.

Myerson - Cross

Q.   Okay.  And in cases where you provided infringement opinions related to polymorphic claims -- polymorph claims that reference specific XRPD diffraction peaks, you've never previously relied on NMR alone as the only test on the accused product; correct?

A.   I'm sorry.  Is the question where claims are to x-ray diffraction peaks?

Q.   Yes.

A.   That's correct.

Q.   And you would agree that ssNMR doesn't give direct structural information on polymorphic forms?

A.   That's correct.

Q.   And you would -- in that case, you would still need to do x-ray diffraction to get the structural information; correct?

A.   Correct.

Q.   Let's go to PTX-196 which we're on.  And let's go to Page 9 or 196.9.  There's a section "X-ray Powder Diffraction."

     All right.  Let's just stay on the -- and do you see -- yeah.  Do you see where we've highlighted here where Dr. Brittain says, "For these reasons, and to its inherent simplicity of performance, the technique of x-ray powder diffraction is the predominant tool for the study of polycrystalline materials and is eminently suited for the

Myerson - Cross

routine characterization of polymorphs and solvates?"

You certainly agree with that; correct?

A.    Yes.

Q.    And then Dr. Brittain goes on to say, "Since every compound produces its own characteristic powder pattern",

MR. BALL:  We'll let them catch up.  This is on PTX-196 at Page 10, please.  Okay?

BY MR. BALL:

Q.    Do you see, sir, here it says -- Harry Brittain says, "Since every compound produces its own characteristic powder pattern owing to the unique crystallography of its structure, powder x-ray diffraction is clearly the most powerful and fundamental tool for the specification for a specification of the polymorphic identity of an analyte"?

You agree with that statement, too, don't you, sir?

A.    Yes.

Q.    Now, let's flip through to Page 264.  Internal Page 264.

MR. BALL:  It's PTX-196.38, please.

BY MR. BALL:

Q.    Do you see here where Dr. Brittain is talking about nuclear magnetic resonant spectroscopy -- spectrometry?

A.    Mr. Ball, one question.  Is this the first or the second edition of this book?

Myerson - Cross

Q.    This, I believe, is the 1999.

A.    So '99.  Okay.

Q.    Do you see where Dr. Brittain is talking about nuclear magnetic resonance spectrometry?

A.    Yes.

Q.    And I'll direct your attention to the sentence we highlighted here on the next page, PTX-196.39, where Dr. Brittain says, "With respect to nuclear magnetic resonance, powerful as the technique has proven to be, one must remember that the ultimate arbiter of polymorphism is crystallography and not spectroscopy."

Do you see that?

A.    Yes.

Q.    And you agree with that?

A.    Yes.

Q.    You've never testified at trial on T1rho filtering for solid-state NMR; is that correct?

A.    I believe -- I believe that's correct.

I'm a little hazy on a couple of cases, but I think that's correct.

Q.    And I understand that you're relying on Dr. Wenslow's NMR analysis in this case, but you're not yourself rebutting Dr. Hodgkinson, Defendant AET's NMR expert; correct?

A.    Correct.

Q.    You've reviewed Dr. Wenslow's analysis; correct?

A.    Yes.

Q.    And so you know that the amorphous standard that Dr. Wenslow used in his T1rho filtering experiment was a beta-cyclodextrin inclusion complex of pitolisant hydrochloride; correct?

A.    Correct.

Q.    And that means that the pitolisant hydrochloride in that material is inside the cavity of the beta-cyclodextrin; correct?

A.    Correct.  It's in the cavity.  The cavities are very small.

MR. BALL:  And let's pull up DTX 32, please, Mr. Sayres.  Let's go to the second page.

BY MR. BALL:

Q.    And I would just ask you on this:  You agree that what we're seeing in Figure 1 on DTX-32 is the molecular structure of beta-cyclodextrin?

A.    Yes, on the left.  The molecules that's shown.

MR. BALL:  And then let's turn to DTX-32, at Page 5.

And we see Figure 7.  Can we expand that just a little bit?

BY MR. BALL:

Q.    Figure 7 shows two -- two small molecules.  One of them is nicotinic acid and one of them is ascorbic acid, but

Figure 7 is depicting nicotinic acid and ascorbic acid respectively -- respectively entering inside sort of a cup configuration.

Do you see that?

A.    Yes.

Q.    And you agree that Figure 7 is a reasonable way of depicting how beta-cyclodextrins form inclusion complexes with small molecules; correct?

A.    Yeah, it's not the greatest figure in the world. It's not how I would have depicted it, but it's okay.

Q.    It's a reasonable depiction?

A.    Yes.

Q.    And, again, AET's ANDA product formulation does not include a beta-cyclodextrin; correct?

A.    Correct.

MR. BALL:  Your Honor, we'd also ask to move in DTX-32.

MS. SULLIVAN:  No objection.

THE COURT:  It's admitted.

(DTX Exhibit No. 32 was admitted into evidence.)

BY MR. BALL:

Q.    And, sir, you agree that the cavity walls on the inside of a beta-cyclodextrin tend to be hydrophobic; is that correct?

A.    Yes.

Myerson - Cross

Q.    And so that interaction between the drug molecule and the interior surface of the beta-cyclodextrin would be different than what you may expect from the interaction of the same drug with maltodextrin or microcrystalline cellulose; correct?

A.    The interaction would be certainly different and certainly the domain sizes are very different as well.

Q.    All right.  And that's because maltodextrin and microcrystalline cellulose are not hydrophobic.

You would agree with that; correct?

A.    Yeah, but the -- that's right, though the key is the maltodextrin and the amorphous dispersion.  The microcrystalline cellulose is what's used to make the granules, but the key is the maltodextrin pitolisant hydrochloride dispersion that's dispersed on the MCC.

Q.    But, sir, you agree that the interaction is different because maltodextrin and microcrystalline cellulose are not hydrophobic and, therefore, there would be some differences in the interaction.

You agree with that; correct?

A.    Yeah, that's fair.

Q.    And in comparing between an amorphous polymeric dispersion versus a cyclodextrin inclusion complex, you would agree that the molecular dynamics for the drug will be different in those two scenarios; correct?

Myerson - Cross

A.    That -- yeah.  So, I'm sorry.  Could you say that again, please?

Q.    In comparing between an amorphous polymeric dispersion versus a cyclodextrin inclusion complex, you would agree that the molecular dynamics for the drug will be different in those two scenarios; correct?

A.    Yes.  A molecular mobility will be much lower inside the beta-cyclodextrin.

Q.    Now, I'd like to turn to the development batches that you were talking about.

          You recall your testimony earlier?

A.    Yes.

Q.    One of those development batches was PIO/B-009; correct?

A.    Yes.

Q.    And the testing -- the only testing that you're citing for the batch PIO/B-009 is accelerated stability testing; correct?

A.    Yes.

Q.    You haven't looked at any XRPDs of that material under standard storage conditions; correct?

A.    I -- I don't recall seeing those.  I might have.  I just don't recall.

Q.    And PIO/B-009 is not one of the ANDA products; correct?

Myerson - Cross

A.     It's a development batch, but it's also listed as a validation batch.

Q.     Sir --

A.     A validation batch is --

Q.     I heard your testimony earlier.  I'm asking a very specific question, which is:  PIO/B-009, it is not one of the ANDA products; correct?

A.     I think you should rephrase that to mean --

Q.     It's not a product for which AET is seeking approval; correct?

A.     It depends on how you define what a validation batch means, but it's not an exhibit batch.  I will agree with that.

Q.     Sir, PIO/B-009 is not a product for which AET is seeking approval in its ANDA.

       You agree with that; correct?

A.     I guess that's correct, with the caveat that they listed it as a validation batch and that has certain implications.

Q.     And you don't dispute that differences in formulation can lead to differences in stability of the amorphous form; correct?

A.     That's true.

Q.     And you don't dispute that PIO/B-009 was also made with laboratory scale spray equipment; correct?

Myerson - Cross

A.    That's correct.

Q.    And you don't dispute that laboratory scale spray equipment versus the validated commercial equipment can potentially lead to different attributes of the product?

A.    That's correct.

Q.    Things like nozzle temperature, spray rate, product temperature, all of those things can contribute to different product attributes; correct?

A.    That's correct.

Q.    And isn't it true that even with the same equipment operated with different parameters, that can make a difference in the product?

You agree with that; correct?

A.    Sorry.  The same equipment operated with different parameters?

Q.    Yes.

A.    Yes, that can make a difference.

Q.    I think your testimony earlier was that amorphous pitolisant hydrochloride in a drug product will -- will or may convert to crystalline pitolisant hydrochloride due to residual moisture present in the drug product?

A.    Yes.

Q.    You don't know those parameters for PIO/B-009, do you?

A.    I'm sorry.  Which parameters?

Myerson - Cross

Q.    The water content.

A.    Was that not in any of my reports?  I don't recall.

Q.    And -- well, sitting here today, sir, are you prepared to testify as to the water content of PIO/B-009?

A.    Well, the water content would be within the specifications, but I don't know where it is between 1 and 6.5 percent.

Q.    Sir, isn't it true that you haven't formed any opinions as to how the water content compares to AET's ANDA product?

A.    I -- if -- if you tell me at my deposition I didn't see any of that data, then I'll agree.  I just don't recall.

Q.    And you don't know whether PIO/B-009 meets the water content specification set forth in AET's ANDA, do you?

A.    I don't know that I have any specific information that verifies whether it does or doesn't.

Q.    All right.  And you also referred to a development batch called PIT/B-045, I believe.

A.    I don't recall that at all.  Sorry.

Q.    That's fine.

I'd like to look at the accelerated stability testing that you referred to for the AET exhibit batches. Those were batches EK316 and EK319.

You recall that; correct?

A.    Yes.

Myerson - Cross

Q.   And you would agree -- strike that.

You testified --

MR. BALL:  I'd like to pull up PDX4-44,
Mr. Sayres.

Let's go to the next.  Yeah, PDX4-45.

BY MR. BALL:

Q.   And I think we were looking at this before.  It's a diffractogram Method 1 for exhibit batch EK316.  It's six months of accelerated stability; Correct?

A.   Yes.

Q.   And I think you testified or -- either you or Counsel said it, that all of the peaks here were present except for 34.1.

Was that the testimony?

A.   All of the -- all of the Claim 1 peaks, except for 34.1.

Q.   Yeah, That's what I thought I heard.

But let's look at Claim 1, sir.  Claim 1 requires 11.2; correct?

A.   Correct.

Q.   It requires 19.9?

A.   You're correct.  19.9.

Q.   All right.  Sir, so I didn't see 19.9 picked on this.

A.   No, you're correct.  It's not there.

Q.   Okay.  And so then, also, 34.1 is not on here.

Myerson - Cross

A.    That's correct.

Q.    So these little tiny bumps that we see in the noise that you're pointing to, it's only 11.2 and 20.7; correct?

      Am I right about that?

A.    Yes, those are -- those are peaks that have been identified.

Q.    And just to be clear, 19.9 and 34.1 are not?

A.    That's correct.

Q.    And these are batches that are stored at 40 degrees C for six months?

A.    Correct.

Q.    So they're -- it's 104, 105 Fahrenheit continuously for six months or longer; is that right?

A.    Yes.  And they're in their final packaging.

Q.    And you would agree that the rate of conversion, if at all, of amorphous to crystalline, under those conditions would be increased; correct?

A.    Correct.  And we've -- we see that in the -- the Method 2 data comparing the three months and the six months with how it's growing.  So it's -- it's increasing with time.

Q.    And, sir, these -- these six months accelerated stability testing, this doesn't reflect the real-world storage conditions for AET's ANDA products; true?

A.    That's correct.  That's not the purpose of

Myerson - Cross

accelerated stability.

MR. BALL:  And can we pull up EK319, please?

Sorry.  That's PT -- I'm just going to pull up PTX-50.3.

BY MR. BALL:

Q.    It's the same spectra, sir, but this is the version you rely on in your report for EK319, 6-month accelerated stability testing.  And the only question I have for you about this is that you were not identifying a peak at 34.1?

A.    Is that a question?

Q.    Yes.  You're not identifying a peak at 34.1; correct?

A.    I'm a little lost.  Where is -- where is this?

Q.    This is the six-month accelerated stability testing for EK319, one of the batches that you spoke of today.

A.    Okay.  This is six months EK319.  I'm with you.

Q.    And my only questions for you about this are:  On EK319, you're not testifying that there's a peak present at 34.1; correct?

A.    Correct.

Q.    And with EK319, you're not testifying that there is a peak present at 20.7; correct?

A.    Correct.  Correct.

Q.    And with respect to EK319 on the six months stability testing, you are not testifying that there is a peak at 19.9; correct?

Myerson - Cross

A.    Correct.

Q.    And, in fact, on the Method 1 here, you're not even testifying that there is a peak at 11.2, are you?

A.    That's correct.

Q.    All right.  Now, you've offered testimony in other cases where you have tried to establish infringement of a claim that specifies XRPD peaks by offering less than all of the peaks; correct?

A.    Correct.

Q.    And one of those cases was *Lundbeck v. Lupin*.

Are you familiar with that case?

A.    Yes.

Q.    And in that case, the patent claim required three -- sorry.  It required four specific characteristic XRPD peaks.

Do you recall that?

A.    I do.

Q.    And that was in front of Judge Stark?

A.    Yes.

Q.    And Judge Stark criticized your testimony in that case as not showing all of the four peaks and trying to establish infringement with less than all four peaks; correct?

A.    In that particular case with those circumstances, that's correct.

Q.    Isn't it true, sir, in this case you didn't review

the prosecution history before you formed your opinions?

A.    I believe that's correct.

Q.    And then I think it's fair to say, the prosecution history formed no part of your analysis?

A.    Correct.

Q.    So you didn't know that Bioprojet had originally tried to get a claim to any crystalline pitolisant at the time you did your analysis; fair?

A.    At the time I wrote my opening report, that's correct.

Q.    And you didn't know that the examiner had rejected that claim as being indefinite, did you?

A.    I did not.

Q.    And you didn't know that the examiner said that an artisan -- a skilled artisan in comparing a new -- or a new product, every peak of the diffractogram should be compared.

You didn't know that; correct?

A.    Correct.

Q.    And you didn't know that Bioprojet had responded by amending the claim to specifically add the four characteristic peaks in this case; correct?

A.    Correct.

Q.    But you have reviewed the '197 patent; right?

A.    Correct.

Q.   And so, let's pull up -- or you may have it in your binder, but let's just look at the Claim 1 of the '197 patent.

You agree it requires all four peaks; 11.2, 19.9, 20.7, 34.1; correct?

A.   Can we put up the words of the claim?

Q.   Yes, we can.

MR. BALL:   Let's put up the language of the claim.

Can we pull up JTX-1.14?

BY MR. BALL:

Q.   You don't disagree that the claim requires an x-ray diffractogram that comprises characteristic peaks 2-theta at 11.2, 19.9, 20.7 and 34.1, do you, sir?

A.   No.   You -- you should have said of pitolisant hydrochloride.

Q.   Of pitolisant hydrochloride, of course.

A.   Yes.

Q.   And so you have read the patent.   Does the patent say anywhere the polymorph can be shown by a peak at 34.1 alone?

A.   It does not discuss that.

Q.   And does it say that the polymorph can be shown by a peak at 20.7 alone?

A.   It does not say that.

Q.   What about 19.9 alone?

A.    Does not say that.

Q.    And does the patent say anything about showing the claimed polymorph with a peak at 34.1 alone?  Sorry, 11.2 alone?

A.    It does not.

Q.    I'm going to re-ask that question.

Does Claim 1 -- strike that.

Does the '197 patent say anything about showing the claimed polymorph by the peak at 11.2 alone?

A.    It does not.

MR. BALL:  That's all I have for you, sir. Thank you.

THE WITNESS:  You're welcome.

MS. SULLIVAN:  Brief redirect, Your Honor.

REDIRECT EXAMINATION

BY MS. SULLIVAN:

Q.    So, Dr. Myerson, Mr. Ball asked you about whether or not there was x-ray data available for AET's ANDA products before you wrote your report.  So I just want to ask you some questions about that.

So the AET internal XRPD testing that you discussed in your opening -- in your -- in your direct examination, was that available to you before you formed your opinions and wrote your report in this case?

A.    Yes.  I was responding, I think, to Dr. -- to

Myerson - Redirect

Mr. Ball's question about independent x-ray testing.  But, of course, AET's internal data was available.

Q.    Okay.  And you discussed -- you analyzed that and discussed that AET internal testing in your opening report; is that correct?

A.    Correct.

MS. SULLIVAN:  Now, can we have -- can we have PDX4-44?  I think this --

BY MS. SULLIVAN:

Q.    On this slide, I believe Mr. Ball asked you about the presence of the 19.9 peak; correct?

A.    Correct.

Q.    Okay.  So of the Claim 1 peaks, which are clearly visible in the x-ray diffractogram for Method 1 EK316?

A.    It's the 11.2 and the 20.7.

Q.    Okay.  Does the fact that the 19.9 and 34.1 peaks are not detected in this particular diffractogram change any of your opinions on infringement?

A.    No.

Q.    Why is that?

A.    Because another three peaks that are -- that are the claimed form -- the claimed form -- that go with the claimed form that are listed in the '197 patent are present, so the form is clearly there.  And as I've said multiple times, if the form is there, all the peaks are there, whether you see

them or not, because they're an intrinsic property of the crystalline.

MS. SULLIVAN: And then can we have PTX-50.3?

Thank you, Mr. Brooks.

BY MS. SULLIVAN:

Q.    And you were asked about this diffractogram, as well.

Dr. Myerson, this is the Method 1 testing method for EK319?

A.    Yes.

Q.    Is it surprising to you that you sought -- that we see the 11.2 peak in the Method 2 diffractograms for this batch, but not the Method 1 diffractogram for this batch?

A.    Not surprising at all, since Method 1 is -- has -- is not a very sensitive method and the level of detection is not very good. Where in Method 2, the level of detection is much lower. So we saw a small peak by -- in Method 2 with 11.2 that you wouldn't expect to see in Method 1.

MS. SULLIVAN: Okay. Thank you. I have no further questions.

THE COURT: Thank you. You may step down.

Your torture is over, Doctor.

Thanks. It's good to see you. You may be excused.

Oh. All right. Are we good?

All right. Go ahead.

So I think that's a good place to end for today.

Who are we going to be hearing from tomorrow? Do we know yet?

MR. BALL:  We do, Your Honor.  If you -- one moment.  Do you have it?

MS. BOOKBINDER:  Your Honor, I'm sure Plaintiffs will be closing their case in chief, but I'll wait for them.

MS. SULLIVAN:  Yes, Your Honor.  With that, we have no more witnesses.  We'll close our case-in-chief.

THE COURT:  Okay.  All right.

MS. BOOKBINDER:  I believe we would like to make a motion --

THE COURT:  Let's go ahead and do that in the morning.  It's been a long day.  We'll just have you briefly state the basis for your motion in a few sentences, the grounds upon which it rests tomorrow, but I don't need you to read in an entire brief.

All right.  And then who are we going to hear from?

MS. BOOKBINDER:  Then we will hear from Dr. Paul Hodgkinson, who will testify live.  We have the -- about 18 minutes of video depositions from two witnesses.  Then, Dr. Jonathan Steed --

THE COURT:  Okay.

MS. BOOKBINDER:  -- live.

THE COURT:  Okay.  Okay.  Great.

All right.  Have a good night, everybody.  We'll see you tomorrow.

DEPUTY CLERK:  All rise.

(Court was adjourned at 5:04 p.m.)

I hereby certify the foregoing is a true and accurate transcript from my stenographic notes in the proceeding.

/s/ Heather M. Triozzi
Certified Merit and Real-Time Reporter
U.S. District Court