IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

HARMONY BIOSCIENCES, LLC,           ) Trial Volume III
HARMONY BIOSCIENCES MANAGEMENT,     )
INC., BIOPROJET SOCIETE CIVILE      )
DE RECHERCHE and BIOPROJET          )
PHARMA SAS,                         )
                                    )
            Plaintiffs,             )
                                    ) C.A. No. 23-1286(JLH)(SRF)
v.                                  )
                                    )
LUPIN LIMITED, et al.,              )
                                    )
            Defendants.             )

                                    J. Caleb Boggs Courthouse
                                    844 North King Street
                                    Wilmington, Delaware

                                    Thursday, February 19, 2026
                                    10:02 a.m.
                                    Bench Trial

BEFORE:  THE HONORABLE JENNIFER L. HALL, U.S.D.C.J.

APPEARANCES:

            MORRIS NICHOLS ARSHT & TUNNELL, LLP
            BY:  JEREMY A. TIGAN, ESQUIRE

                    -and-

            COVINGTON & BURLING
            BY:  CHRISTOPHER SIPES, ESQUIRE
            BY:  ALEXA HANSEN, ESQUIRE
            BY:  BRIANNE BHARKHDA SULLIVAN, ESQUIRE
            BY:  MEGAN P. KEANE, ESQUIRE
            BY:  CODY REEVES, ESQUIRE
            BY:  ELAINE NGUYEN, ESQUIRE

                            For the Plaintiffs

APPEARANCES CONTINUED:

          HEYMAN ENERIO GATTUSO & HIRZEL LLP
          BY:  DOMINICK T. GATTUSO, ESQUIRE
                    -and-

          GREENBERG TRAURIG, LLP
          BY:  JONATHAN D. BALL, Ph.D.
          BY:  SCOTT J. BORNSTEIN, ESQUIRE
          BY:  JULIE P. BOOKBINDER, ESQUIRE
          BY:  GIANCARLO SCACCIA, ESQUIRE
          BY:  ANNE ROCK, ESQUIRE

                              For the Defendant
                              AET Pharma US, Inc.

               ***  PROCEEDINGS  ***

          COURTROOM DEPUTY:  All rise.  Court is now in session.  The Honorable Jennifer L. Hall presiding.

          THE COURT:  Please be seated.  Good morning, everyone.

          ALL COUNSEL:  Good morning, Your Honor.

          MR. BORNSTEIN:  Good morning, Your Honor.

          THE COURT:  Good morning.

          MR. BORNSTEIN:  Before we start, with the Court's indulgence, I just wanted to raise one important housekeeping matter.

          THE COURT:  Okay.

          MR. BORNSTEIN:  Today is David Sayres', our hot seat consultant's, birthday.

          THE COURT:  Oh, fantastic.

          MR. BORNSTEIN:  So just wanted --

          THE COURT:  Exactly how he wanted to spend his

birthday.

MR. BORNSTEIN:  That's what he said, Your Honor.

THE COURT:  Well, maybe you can buy him a drink after the trial is over tonight.

MR. BORNSTEIN:  I will do that.  I've been ordered to buy you a drink, Mr. Sayres.  We'll gladly do that.

THE COURT:  Okay.  Great.  Happy birthday.

MR. BORNSTEIN:  Your Honor, I think we have one discovery dispute that my colleague, Mr. Ball, is going to raise.

THE COURT:  Okay.

MR. BALL:  Not so much a discovery dispute, but a dispute that's very important that --

THE COURT:  Okay.

MR. BALL:  -- we've come to understand one of Plaintiffs' witnesses intends to testify way outside the scope of the report.

I know Your Honor said we'd address this when it comes up, but it seems to be something that's going to infect the entire testimony.  So we thought it would be appropriate to raise it this morning, and this affects the testimony of Plaintiffs' rebuttal expert, Dr. Roth, on the '947.

THE COURT:  All right.  Well, do me a favor,

give me a copy of Dr. Roth's report and I'll -- oh, gosh.
Okay.

MR. BALL:  He has three reports.  He has three reports and his deposition are all included, I believe, in this binder.

THE COURT:  All right.  Thank you.

MR. BALL:  So with your permission, we'll approach.

THE COURT:  Yeah, yeah.

All right.  Well, let me, at least on the break, familiarize myself with what Dr. Roth is going to say --

MR. BALL:  Sure.

THE COURT:  -- and then we'll move on from there.  Okay?

MR. BALL:  That sounds great.  Is it appropriate for me to set the stage now or --

THE COURT:  No, I don't think so.  Let me get just a fresh look at it myself and then we'll talk about it later.

I think with this case, it's been a little challenging for me because I don't think we've all sat together before to discuss anything substantive.  So I'm learning as we go along what all the positions are, which is great, but it would be helpful for me to just take a look.

MR. BALL:  So I think later this afternoon

before Dr. Roth goes up, we'll renew the objection at that point.

THE COURT:  Okay.  That's fine.

MR. BALL:  Thank you.

THE COURT:  All right.  Are we ready to continue with the cross-examination?

MR. SIPES:  Yes, Your Honor.

THE COURT:  All right.  Let's have the witness retake the stand.

Welcome back, Doctor.  And I'll remind you you're still under oath.

THE WITNESS:  Thank you.

CONTINUED CROSS-EXAMINATION

BY MR. SIPES:

Q.    Good morning, Dr. Kushida.

A.    Good morning.

Q.    Let me start where the -- Your Honor warned that I might start, which is did you discuss yesterday's testimony last night with Counsel?

A.    No, I did not.

Q.    Okay.  Let me come back and try to, again, get to some of the bases of some of your obviousness-type double-patenting opinions.

MR. SIPES:  And, Mr. Brooks, if we could pull up DDX7.66.

BY MR. SIPES:

Q.    Do you recall in your obviousness-type double-patenting opinions you referred to the use codes that are listed for the '430 and '947 patents?

A.    Yes.

Q.    And you understand, do you not, that the use codes for the patents are not prior art?

A.    Yes.

Q.    In fact, they date from, roughly, the approval of pitolisant in 2019; correct?

A.    I believe that's true.  Yes.

Q.    Do you understand at all how use codes are drafted?

A.    I'm not -- I'm not an attorney, so I don't understand that.

Q.    Do you believe the wording of the use code is supposed to be based on the language of the patent claim?

A.    As I said, I'm not an attorney.  I just know what the use code is.

Q.    Are you aware -- well, let's look right on your slide.  You see where it says for the use code, "Submit the description of the specific approved method of use claimed by the patent"?

       Do you understand that reference to "the specific approved method of use" to be the method of use approved by FDA?

Kushida - Cross

A.      All I can say is what I can see there, and that's exactly what you've read.

Q.      And you're aware, of course, that FDA does not approve patent claims?

A.      Yes.

Q.      The reference here to the specific approved method of use, of course, is the method of use approved for the product in the approved product labeling or prescribing information; correct?

A.      I believe so, yes.

Q.      And, in fact, are you aware that FDA has instructed NDA holders that where patent claims are broader than the approved labeling or use different language, the use code should describe the use approved in the product labeling, not the patent language?

A.      As I said, I'm not an attorney.  I'm not familiar with these type of issues, so I can't really comment on it. So I'm not -- I can't say what you're saying is either accurate or not.

Q.      You would agree that if the use code is drafted to track the use approved in the prescribing information, that would explain why the '430 patent and the '947 patent have the same use code?

A.      Could you repeat the question again?

Q.      Yes.  If the use code is drafted to track the use

approved in the product labeling, would that explain why the '430 patent and the '947 patent have the same use code?

A.    Once again, I'm not familiar with the terminology as you placed it so I -- I can't really --

Q.    Are you --

A.    -- accept what you're saying.

Q.    Are you aware that patent listing is mandatory for NDA holders?

A.    You know, once again, I'm not sure about your -- the process itself.  I'm not a regulatory expert.  I'm not with the FDA.  I'm just not -- not sure about that.

Q.    Do you know whether an NDA holder has to submit patent information for a patent if it reasonably thinks the patent might be enforced against an ANDA filer?

A.    I believe so, but as I said, I'm not a regulatory expert, so I can't comment on that.

Q.    What, if any, connection do these use codes have to your obviousness-type double-patenting opinions?

A.    It's just that -- my understanding, it's just that this is submitted to the FDA as a method of use.  And it references the patent claims.  That's the basis of my understanding.

Q.    Let me -- I just want to understand the scope of your opinions here on obviousness and obviousness-type double-patenting.

Kushida - Cross

Q. In forming your opinions in this case, you did not consider whether a POSA would be able to find the dose to use in treating EDS in sleep apnea, narcolepsy or Parkinson's disease patients; correct?

A. Could you repeat that question again?

Q. Yes. In forming your opinions in this case, you did not consider whether a POSA would be able to find the dose to use in treating EDS in sleep apnea, Parkinson's -- narcolepsy or Parkinson's disease patients; correct?

A. So my understanding is that a POSA, as of 2005, you know, would not be able to determine the dose that would be used in humans.

Q. And, in fact, you acknowledged at deposition that you could not give an opinion about what a POSA on April 1st, 2005, would have to do to find the dose to use for pitolisant to treat EDS in Parkinson's disease, narcolepsy or sleep apnea patients; correct?

A. That's true, because the doses were the doses that were part of the experimentation that was conducted up to 2005.

Q. I just want to -- you touched a little bit on the pharmacology of the $H_3$ receptor, and I think it would be helpful to understand that.

MR. SIPES: Mr. Brooks, could we pull up DDX7.22?

BY MR. SIPES:

Q.    It's -- the directional effect of histamine is a little confusing, so I want to make sure that everything is clear.

You show on DDX7.22 that, first of all, the $H_3$ receptor, among other things, controls the release of histamine in the brain; correct?

A.    As I mentioned, what happens is histamine, when it's released by the presynaptic neurons, latches onto the -- binds to the $H_1$, $H_3$ receptor, but then by nature of feedback loop, it will affect the $H_3$ receptor.

And then when the histamine binds to an $H_3$ receptor, it will inhibit the synthesis and release of -- of the histamine from that presynaptic vesicle.

Q.    So I want to make sure the direction is absolutely clear and you have it here, that it reduces the histamine.

So when histamine stimulates the $H_3$ receptor, it causes a reduction in the synthesis of histamine in the brain; correct?

A.    Can you repeat that one more time?  Sorry.

Q.    When histamine stimulates the $H_3$ receptor, the result is for the reduction in the synthesis and release of histamine?

A.    You said it "stimulates."

What you mean is it binds to the $H_3$ receptor and

Kushida - Cross

then inhibits the secretion and release of the -- of histamine from the presynaptic neurons, yes.

Q.    Yeah.  I'm still trying to understand your testimony.

And I think there, when the histamine binds to the $H_3$ receptor, that's sometimes referred to as stimulation of the $H_3$ receptor by histamine; isn't it?

A.    I think --

Q.    I don't want to quibble with words.

A.    I'm just saying that the more accurate representation is a histamine binds to the receptor.

Q.    Fair enough.  When histamine binds to the $H_3$ receptor, the result of that is to reduce histamine levels?

A.    That's correct.  It works by the negative feedback loop.

Q.    And it's -- it's generally thought, too, that the $H_3$ receptor is what's called constitutively active; that is, it's controlling the synthesis and release of histamine even when a histamine is not binding to the receptor?

A.    Yes.  It has a basal constitutive activity.

Q.    And that was known before April 1st of 2005, that it had basal activity -- that was suggested in the literature; correct?

A.    Yes.

Q.    And there are things called inverse agonists.  And when they bind to the $H_3$ receptor, they have the opposite

Ligneau - Deposition Excerpts

effect of histamine; that is, the inverse agonist by binding to the $H_3$ receptor increases the level of histamine synthesis and release.  Correct?

A.    That's correct.

Q.    And $H_3$ antagonists and $H_3$ inverse agonists are different classes of $H_3$ ligands; correct?

A.    Yes.

MR. SIPES:  No further questions, Your Honor.

MR. BALL:  We have no questions.

THE COURT:  All right.  Thank you, Doctor.  You may step down.

MS. COHEN:  Good morning, Your Honor.

THE COURT:  Good morning.

MS. COHEN:  I'm Emma Cohen from AET.

AET's next witness is Xavier Ligneau.

Mr. Ligneau is the head of the pharmacology department at Bioprojet Biotech.  This is a 17-minute and 30-second deposition.

THE COURT:  Okay.  You may approach.  Yes.

MR. SCACCIA:  May I approach?

(Beginning of videotape deposition of Mr. Ligneau:)

Q.    You joined Bioprojet in January of 1991.  Was that your first employment after you finished your formal education?

A.    That is correct.

Q.    What other names has pitolisant been known as?

A.    It was named BF 2.649.

Q.    BF 2.649?

A.    It was also named as FUB 649.

Q.    We are going to hand you what is marked Ligneau Exhibit 8.  Why don't you look it over.  While you do, I will just read that Ligneau Exhibit 8 is an article titled: "Neurochemical and behavioral effects of Ciproxifan, a potent histamine $H_3$ receptor antagonist."

It is from the Journal of Pharmacology and Experimental Treatments, Volume 287, Number 2, from 1998.

First listed author is X. Ligneau.

Are you familiar with Exhibit Number 8?

A.    Yes.

Q.    And this paper, Exhibit Number 8, deals with a compound called Ciproxifan; correct?

A.    That's correct.

Q.    What is Ciproxifan?

A.    Ciproxifan is a histamine $H_3$ receptor antagonist.

Q.    And was that a compound that Bioprojet had been exploring as a potential therapeutic candidate?

A.    This compound started an ex -- exploratory pathway in order to go into clinics.  It was stopped.

Q.    And why was it stopped?

Ligneau – Deposition Excerpts

A.      This compound was stopped because, after the cloning of the histamine $H_3$ receptors in '99, as far as I remember, by J&J, we knew the sequence of the histamine $H_3$ receptor.

Formerly, all the job was done using native rat and/or mouse tissues. And all our in vitro and in vivo investigations were performed using these tissues to get the histamine $H_3$ receptor.

In '99, the histamine $H_3$ receptor was cloned, and we got finally the human histamine $H_3$ receptor, which is of interest for therapeutic application, of course. And we also succeed in getting the mouse and the rat histamine $H_3$ receptor.

Okay. And we had a great surprise to found that this compound was far less potent as a human receptor as compared to its potency at mouse and rat receptors.

Q.      And in 1998, was Ciproxifan an $H_3$ antagonist that Bioprojet was exploring therapeutic applications for?

A.      At that period of time, we were trying to push it forward.

Q.      If you flip, then, to Page 666 -- strike that.

Flip page -- to Page 664, please. There is a figure, Figure 13, shown at the top. And is what is shown here a dose-dependent waking effect for Ciproxifan in a cat in vivo model?

A.      This figure number 13 describes dose-dependent

increase in wake in the cat.

Q.    And do you consider this to be a reliable model for studying promotion of wakefulness, this cat study that was done?

A.    It's one of the models that is able to show in normal animals that that compound has ability to modulate sleep and wake.

Q.    So you agree that this shows a marked dose-dependent waking effect?

A.    It shows a marked dose-dependent effect as a pro-waking agent in the cat.

Q.    So this data that's shown here with the cats, the pro-waking effect of an $H_3$ receptor antagonist, it's consistent with a large variety of experimental evidence in cats and rats; correct?

A.    It is consistent with former results obtained with some histamine $H_3$ receptor antagonist in other animal species.

Q.    So to my question:  Was -- by the arousing effects of $H_3$ receptor antagonist means the wake-promoting effects of $H_3$ receptor antagonists; correct?

A.    In my opinion, it's the same.

Q.    FUB 181 has an imidazole group?

A.    That's correct.

Q.    And it's identical to pitolisant except where in

Ligneau – Deposition Excerpts

pitolisant, the imidazole group is replaced by a piperidine group; correct?

A.     That's correct.

Q.     Okay.  I am handing you what is marked Ligneau Exhibit 11.

Just look it over.  Ligneau Exhibit 11 is an article from Nature, Volume 408, December 14th, 2000. It's titled:  "High Constitutive Activity of Native $H_3$ Receptors Regulates Histamine Neurons in Brain."

The first listed author is Severine Morisset, and then you are listed, along with Jean-Charles Schwartz and others; correct?

A.     That's correct.

Q.     Are you familiar with Exhibit 11?

A.     I am familiar with this exhibit.

Q.     So can you explain to me what is being described generally in Exhibit Number 11?

A.     In this article, we describe that the human histamine $H_3$ receptor presents a constitutive activity.  It means that the receptor, somehow active in the absence of the endogenous ligand, presents some activity.

And, therefore, you can increase, stimulate this receptor by using agonists as usual.  You can also uncouple this receptor by using inverse agonists.  And this was demonstrated either using in vitro models and also by using

Ligneau – Deposition Excerpts

some in vivo model in mice.

Q.      And if we look at -- well, I am just looking here at Table Number 1.  There is a list of inverse agonists, and thioperamide and Ciproxifan are both listed as inverse agonists; correct?

A.      (No reply.)

Q.      Is that correct, sir?

A.      Thioperamide and Ciproxifan are inverse agonists.

Q.      Most of the antagonists were found -- would you agree, sir, that of those several $H_3$ antagonists that were tested, the majority of them were found to be inverse agonists?

A.      In our compounds, most of the compounds that were -- that we -- that were described initially as being antagonists were found to be inverse agonists.

Q.      The protocol you used to ascertain whether the antagonists were inverse agonists is the measurement of 3H arachidonic acid release from CHO cells; correct?

A.      That -- that is one test that is -- that can show that the compound can be an inverse agonist.

Q.      The described task for determining whether these antagonists were inverse agonists was whether they decreased 3H arachidonic acid release from CHO cells?

A.      It was one of the tests that was used.

Q.      So there's many assays that can be used to determine

Ligneau - Deposition Excerpts

whether these compounds are inverse agonists.  One of those

is the assay that you have described in the method section

of Exhibit 11; correct?

A.    That is correct.

Q.    In your view, based on what you know about this

article and what you know about the -- the assay, is there

enough information provided in this paper, Exhibit

Number 11, for others to evaluate whether an antagonist is

an inverse agonist?

A.    I think that people who were -- who have got the art

would be able to repeat the experiments.

Q.    I am handing you Exhibit 14.  Exhibit 14 is from

Arch Pharm, Pharm Med Chem 334, Supplement 2, 1 through 89,

2001.

Are you familiar with this document, sir?

A.    I am familiar with this document.

Q.    Then it goes on to say:  "In order to facilitate a

potential therapeutic use of $H_3$ receptor antagonists for

applications proposed, for example, attention deficit

hyperactivity disorder and Alzheimer's disease, we developed

a novel type of $H_3$ receptor antagonist without an imidazole

moiety."

Do you see that?

A.    I see that.

Q.    Well, it says, "We developed."  What -- what did you

mean by "developed" in this?

A.    In the present case, this summary was written by the German team, and I think that it refers to we synthesize.

Q.    "Through imidazole replacements within known compounds, we were able to identify the piperidine analogue of FUB 181."

Do you see that?

A.    Yes.

Q.    And this refers to FUB 649 as a piperidine analogue of FUB 181; correct?

A.    That is correct.

Q.    And FUB 649 is pitolisant; correct?

A.    FUB 649 is pitolisant.

Q.    Then it concludes:  "FUB 649, a potent and selective non-imidazole $H_3$ receptor antagonist, is a new promising lead for further development."

Do you see that?

A.    Yes.

Q.    What does that mean that it's "a new promising lead for further development"?

A.    It means that we could try to push it a bit further, this compound.

Q.    In the pharmaceutical industry, does a lead compound have a particularized meaning to you?

A.    In the -- when you consider the development of a new

drug candidate, you have to perform several sets of pre-clinical investigation to determine the toxicity, the safety pharmacology and so on.

Q.    So, in other words, if several different $H_3$ antagonists were known, but pitolisant is the lead compound, that means of the known compounds, that is the one that, at least as of that time, in 2001, Bioprojet had determined to be worthwhile to pursue further; correct?

A.    We had in mind to push this compound forward, to try to push it forward.

Q.    And that's what the mention of a lead in Exhibit 14 refers to, a compound that's been selected to be pushed forward; correct?

A.    What is correct is that we -- at that time, we digged this compound.

Q.    "Digged" meaning you really liked it?  What do you mean by "digged"?

A.    This compound presented some interest.  We want to know a little bit further what this compound had.

Q.    So you gave preference to this compound over some other compounds to devote your resources to develop?

A.    This was not in my area to decide that.

Q.    Mr. Ligneau, I have a few questions, if you will indulge me.

        Are you familiar that in English, the verb "to

Ligneau – Deposition Excerpts

dig" has a slang meaning of "to really like"?

A.    Not at all.  For me to dig, I was thinking to go -- digger, it was to -- to -- in French --

(Speaks French).

THE INTERPRETER:  To dig literally, to dig soil.

THE WITNESS:  If I -- it was a -- a wrong word, I apologize.

Q.    So when you were talking earlier about how BF 2.649 was a compound for which you digged, what -- what did you mean by that?

A.    I mean that I went further in the investigation of the properties of this compound.

You want me to expose one example, for example?

(Conclusion of videotape deposition of Mr. Ligneau.)

MS. COHEN:  Your Honor, at this time, we would like to move in DTX-92 and DTX-97.

MS. HANSEN:  No objection.

THE COURT:  They're admitted.

(DTX Exhibit Nos. 92 and 97 were admitted into evidence.)

MS. BOOKBINDER:  Your Honor, AET next calls Dr. Meskill by deposition.

MS. HANSEN:  And, Your Honor, we renew our objection that we raised earlier in this case.  Dr. Meskill

Ligneau – Deposition Excerpts

was a expert that we had used for infringement. We --
because their infringement is no longer at issue in this
case, we are not calling him. We think that the
introduction of his testimony here is totally improper.

THE COURT: Okay. I've already looked at these
clips, haven't I?

MS. BOOKBINDER: Yes, Your Honor. I can pass
them up.

THE COURT: Could you pass me up a fresh copy?

MS. BOOKBINDER: Sure. May I approach?

THE COURT: Yes.

Okay. Can Defendant remind me what the
relevance of this is?

MS. BOOKBINDER: Yes, Your Honor.

Dr. Meskill testified in this short clip
regarding treatment of diurnal somnolence and that it will
benefit patients suffering from excessive daytime
sleepiness.

Yesterday during the cross-examination of
Dr. Kushida, Counsel asked him extensively about this. He
started a whole module at Page 539 of the transcript: Let's
then talk about EDS versus daytime sleepiness. First,
diurnal somnolence is the same thing as daytime sleepiness;
correct?

Dr. Kushida responds: That's correct.

So Dr. Meskill testifies at -- the clip at -- most on point would be at 364:16 to 19:

"What does diurnal somnolence mean?

"Diurnal somnolence means a person experiencing sleepiness during the day."

Then at 368:

"Would reducing diurnal somnolence provide a benefit to sleep apnea patients who suffer from EDS?

"Yes."

The rest of the testimony is brief and related to the same topics.  So, Your Honor, we would submit that the five-ish minutes, under six, that we've -- would be relevant to the case here.

THE COURT:  Okay.  Does Plaintiff dispute either of the answers to these questions?

MS. HANSEN:  We don't, no.  I mean, our argument is -- is primarily procedural.  The expert was on infringement.  It's out of the case.

Certainly any testimony that goes to issues of invalidity would also be beyond the scope, but it really is the expert is out of the case.

THE COURT:  Right.  Yeah.  So on this one, I'm going to agree with Plaintiff.  I mean, I don't want to -- spoiler alert, I'm going to find that diurnal somnolence means a person experiencing sleepiness during the day.  I

don't think anyone disputes that.

I also think there's plenty of bases in the record to find that reducing diurnal somnolence would provide a benefit to sleep apnea patients who suffer from EDS.  I don't think anyone would really dispute that.

So in light of all of that, we're going to exclude the testimony.

Is there anything else I need to say on this?

MS. HANSEN:  Thank you, Your Honor.

MS. BOOKBINDER:  No, Your Honor.  We'll propose it as an undisputed fact then.

THE COURT:  All right.  Thank you very much.

MS. BOOKBINDER:  We'll be calling Dr. Rotella, who is here live.

MS. ARAJ:  Good morning, Your Honor.

THE COURT:  Good morning.

MS. ARAJ:  Elana Araj on behalf of AET.

And at this time, AET calls Dr. David P. Rotella to the stand.  Dr. Rotella's being called as an expert in medicinal chemistry.

And may we approach with some binders?

THE COURT:  Yes.

MS. ARAJ:  Thank you.

COURTROOM DEPUTY:  Please remain standing and raise your hand.

Please state and spell your name for the record.

THE WITNESS:  David Paul Rotella, R-O-T-E-L-L-A.

COURTROOM DEPUTY:  Do you swear or affirm that the testimony you give to the Court will be the truth, the whole truth, and nothing but the truth, so help you God or do you so affirm?

THE WITNESS:  I do.

DAVID P. ROTELLA, the witness herein, after having been duly sworn under oath, was examined and testified as follows:

COURTROOM DEPUTY:  Thank you.  You may be seated.

THE WITNESS:  Your Honor, may I have a Kleenex, please?

THE COURT:  Of course.

DIRECT EXAMINATION

BY MS. ARAJ:

Q.    Good morning, Dr. Rotella.

A.    Good morning.

Q.    Did you prepare a demonstrative for today's direct examination?

A.    Yes, I did.

Q.    And is it what we see here on the screen?

A.    Yes.

Q.    Great.

Now, turning to Slide DDX8.2, please describe your educational background and your experience in the pharmaceutical industry.

A.    I earned a bachelor's degree in pharmacy from the University of Pittsburgh.  A Ph.D. degree in medicinal chemistry from Ohio State University.  And I carried out post-doctoral research in synthetic organic chemistry at the department of chemistry at Penn State University.

My industrial career expands approximately 20 years, where I worked at four different companies as a medicinal chemist, engaged in synthesis of potential new drug candidates, and I had the good fortune to be able to contribute to and lead to the identification of a number of clinical candidate compounds.

Q.    And you worked in drug discovery projects; is that what you just said?

A.    Yes.

Q.    And did any of those drug discovery projects involve or produce a clinical candidate?

A.    Four of them did.

Q.    Where are you currently employed?

A.    I'm currently the Sokol professor of chemistry at Montclair State University in Montclair, New Jersey.

Q.    What do you teach there?

A.    I teach organic chemistry to graduate and

undergraduate students.  I also teach medicinal chemistry to graduate students.

Q.    Do you conduct research as well?

A.    Yes.  My research is independently funded by the National Institute of Health, Department of Defense, and in the past by the pharmaceutical industry.

Q.    Please turn to DTX-4024 in your witness binder.

A.    Okay.  I'm there.

Q.    What is DTX-4024?

A.    That's my Curriculum Vitae.

Q.    And does your Curriculum Vitae summarize your education, training and experience in medicinal chemistry?

A.    Yes, it does.

MS. ARAJ:  Your Honor, AET moves to admit DTX-4024 into evidence.

MS. HANSEN:  No objection.

THE COURT:  It's admitted.

(DTX Exhibit No. 4024 was admitted into evidence.)

MS. ARAJ:  And also at this time, AET offers Dr. Rotella as an expert in medicinal chemistry.

MS. HANSEN:  No objection.

THE COURT:  We will accept his testimony in that field.

MS. ARAJ:  Let's turn to Slide DDX8.3.

Rotella - Direct

BY MS. ARAJ:

Q.    Dr. Rotella, what was your assignment in this case?

A.    My assignment was to offer an opinion regarding the validity or invalidity of Claim 13.

Q.    Did you evaluate Claim 13 from the perspective of a person of ordinary skill in the art at the time of the '947 patent?

A.    Yes.

MS. ARAJ:  Let's turn to Slide DDX 8.4.

BY MS. ARAJ:

Q.    What is shown here?

A.    This is the description of a person of ordinary skill in the art that Dr. Kushida presented previously.  My perspective on this is as a synthetic medicinal chemist, as a part of a team of scientists working on a drug discovery project.

MS. ARAJ:  And turning to Slide DDX8.5.

BY MS. ARAJ:

Q.    What level of ordinary skill in the art did you apply in forming your opinions as a medicinal chemist?

A.    That individuals should have at least a master's degree in organic -- in chemistry or some related science, and that person should also have at least three years experience in drug discovery and development.

Q.    Were you a person of ordinary skill in the art in

medicinal chemistry at the time of the '947 patent?

A.    Yes.

MS. ARAJ:  Turning to slide DDX 8.7.

BY MS. ARAJ:

Q.    What is your understanding of Claim 13 of the '947 patent?

A.    This is a compound to apply in that method in Claim 1 that's selected from four distinct groups of -- four distinct groups.

Q.    And what are those four distinct groups?

A.    The first of those shown in green is the -- that lists the chemical name of a compound now known as pitolisant.  The second of those independent groups referred to the pharmaceutically acceptable salts, hydrates or hydrated salts of pitolisant.  The third group represents polymorphic crystalline structures of pitolisant.  The fourth and final group represents optical isomers, racemates, diastereoisomers or enantiomers of pitolisant.

Q.    Thank you.

Now, is there any term in Claim 13 that informs your opinion that there are four distinct groups in Claim 13 of the '947 patent?

A.    Well, the word "its" in Cases B and D refer clearly to pitolisant, and there's just a single compound claimed there.

Rotella - Direct

Q.      What are your opinions regarding validity of Claim 13 of the '947 patent?

A.      My opinion is that Claim 13 is invalid due to lack of enablement and also indefiniteness.

Q.      And what's the basis for those opinions?

A.      The basis for those opinions is very simple and centers around the description there in Group D.  Pitolisant is an achiral molecule.  It has no chiral carbons; therefore, it cannot have optical isomers, racemates, diastereoisomer or enantiomers.

Q.      Is there any dispute amongst the experts in this case that pitolisant is achiral?

A.      To my knowledge, no.

Q.      So do optical isomers of pitolisant exist?

A.      No.

Q.      Do racemates of pitolisant exist?

A.      No.

Q.      Do diastereoisomers of pitolisant exist?

A.      No.

Q.      Do enantiomers of pitolisant exist?

A.      No.

Q.      Is it possible to make a chiral carbon in pitolisant?

A.      There is no amount of experimentation that could be done to create a chiral carbon in pitolisant and still retain the structure of pitolisant.

Rotella - Direct

Q.    And so how does that inform your opinion that Claim 13 is invalid for lack of enablement?

A.    Well, because you can't enable the chirality and retain the structure of pitolisant.  You can't do it.

Q.    And so how does that chirality analysis inform your opinion that Claim 13 is invalid as indefinite?

A.    Well, a person of skill in the art would immediately recognize that because those compounds don't exist, it's impossible to envision them.

Q.    And would a person of ordinary skill in the art understand the meaning of a claim that doesn't -- that includes something that doesn't exist?

A.    No.

MS. ARAJ:  Turning to Slide DDX8.11.

BY MS. ARAJ:

Q.    Do you have any other opinions related to invalidity of Claim 13 of the '947 patent?

A.    Yes.

Q.    And what are they?

A.    The opinion is that it would have been obvious for a person of skill in the art to -- a person of skill in the art would be motivated to select FUB 649 or pitolisant as a new promising lead for further development.

Q.    What's the basis for your opinion?

A.    The basis for that opinion is the statement by the

Rotella - Direct

company in this article which we've discussed at length here in this -- in this case that this compound is a new promising lead.

Q.     What company are you referring to?

A.     Oh, Bioprojet, my apologies.

Q.     You were in the courtroom yesterday during Dr. Kushida's testimony; is that right?

A.     Yes.

Q.     Did you hear Dr. Kushida testify that a person of ordinary skill in the art would have understood new promising lead for further development at the time of the '947 patent to mean potential clinical therapeutic?

A.     Yes.

Q.     From the perspective of a medicinal chemist, do you agree with Dr. Kushida?

A.     Yes.

Q.     Did you hear Dr. Kushida summarize Bioprojet's $H_3$ antagonist disclosures prior to Meier I, which is at DTX-85 that you see on this slide?

A.     Yes.

Q.     And from the perspective of a medicinal chemist, did you find any of the disclosures that Dr. Kushida summarized particularly significant as they relate to Meier I?

A.     Yes.

            MS. ARAJ:  Mr. Sayres, could you please turn to

DDX 8.15?

BY MS. ARAJ:

Q.    Dr. Rotella, which of the disclosures are you referring to that you found particularly significant?

A.    I'm referring specifically to the PCT application which has been called WO 254.

Q.    And that's the WO 254 application that's shown on DDX 8.15?

A.    Yes.

Q.    Which is DTX 001 -- 0090.

What is significant to a person of ordinary skill in the art about WO 254 as it relates to Meier I?

A.    Well, what it refers to is the discovery of compounds lacking -- or that incorporate other functional groups that remove issues associated with previously known $H_3$ antagonists and it also specifically discloses pitolisant.

Q.    How, from the perspective of an ordinary -- from the perspective of a medicinal chemist in particular, is that -- does that inform your opinions regarding obviousness to select pitolisant as it relates to Meier I?

A.    Well, out of the approximately 180 compounds in this presentation and others synthesized by Bioprojet earlier, one year later, a single compound out of that entire group was identified as a promising new lead for further development.

MS. ARAJ:  Mr. Sayres -- or actually before we move on to that.

BY MS. ARAJ:

Q.    Dr. Rotella, you were in the courtroom on Tuesday during the parties' opening statements; is that right?

A.    Yes.

Q.    Did you hear Plaintiffs' counsel say that the Schwartz group stopped publishing new data about pitolisant in 2002?

A.    Yes.

Q.    Assuming that's true, would that change your opinion regarding the meaning of new promising leads in Meier I?

A.    Not at all, no.

Q.    Why not?

A.    Because in my experience in the pharmaceutical industry, when a molecule is moving into clinical development, publication of any new data stops.

Q.    And why is that?

A.    Because the company simply wants to control the information associated with that molecule.

Q.    Thank you.

Now, if we could turn to DDX8.16.  How did Bioprojet characterize pitolisant prior to the '947 patent?

A.    It was characterized as an $H_3$ receptor antagonist.

Q.    In the '947 patent, how does Bioprojet characterize

pitolisant?

A.    In the '947 patent, it's characterized as an antagonist/inverse agonist.

Q.    Could you please explain to the Court the difference between $H_3$ antagonists and inverse agonists?

A.    Sure.  So as a medicinal chemist with extensive experience in G-protein-coupled receptors -- and the $H_3$ receptor is one of those -- an antagonist is a molecule that competes with histamine for binding to the receptor.  And when an antagonist binds, it will reduce the activity of the receptor, which in this case is to -- to retard the synthesis and release of histamine.

An inverse agonist binds in the absence of a ligand and effectively does the same thing.

Q.    Prior to the '947 patent, did the prior art demonstrate there was a therapeutic advantage associated with patent -- with compounds that are characterized as $H_3$ antagonists, inverse agonists as compared to $H_3$ antagonists?

A.    No.

Q.    Turning to Slide DDX8.20.

Would a person of ordinary skill in the art at the time of the '947 patent find it unexpected that pitolisant was characterized as an $H_3$ antagonist inverse agonist?

Rotella - Cross

A.    Well, in this paper by Cowart, which was published in 2004, it's indicated there below the highlighted area that it's expected that many compounds described as antagonists may be able to demonstrate inverse agonism in certain assays designed specifically to test for that property.  So it's not a surprise.

Q.    And Cowart is DTX-0046 shown on this slide?

A.    Yes.

            MS. ARAJ:  Your Honor, AET moves to admit DTX-0046 into evidence.

            MS. HANSEN:  No objection.

            THE COURT:  It's admitted.

BY MS. ARAJ:

Q.    Turning to slide DDX8.22.  Are there any other pertinent disclosures in Cowart that you'd like to share?

A.    Well, the most important of them is the last statement there in the box at the bottom where Cowart suggests that non-imidazole $H_3$ antagonists -- and pitolisant was one of those -- have a bright future for treating a broad spectrum of human diseases.

            MS. ARAJ:  Thank you, Dr. Rotella.  I have no further questions --

            THE WITNESS:  Thank you.

            MS. ARAJ:  -- at this time.

            MS. HANSEN:  I have a couple of binders.  Your

Rotella - Cross

Honor's permission to approach?

THE COURT:  Yes.

CROSS-EXAMINATION

BY MS. HANSEN:

Q.    Good morning, Dr. Rotella.  It's good to see you again.

A.    Good morning.  Good to see you as well.

Q.    I'd like to start where you left off with the Cowart 2004 reference.

Now, this was a reference that you considered in the case because Dr. Reider identified it during his rebuttal report; correct?

A.    Yes.

Q.    And you didn't consider Cowart 2004 originally because it wasn't provided to you by counsel?

A.    Yes.

Q.    Now, let's bring up DTX -- I think it was 46.  And this is the Cowart reference in its totality?

A.    Yes.

Q.    And this 2004 paper provides biological data on dozens of compounds; correct?

A.    Yes.

Q.    From multiple different pharmaceutical companies; correct?

A.    Yes.

Rotella - Cross

Q.    And there was a good bit of human data listed for many of these compounds; right?

A.    I don't remember exactly, but I will accept your -- your assertion.

Q.    All of the compounds -- and actually, we can take a look.  If we could go to DTX 46.8.  And so -- I'm sorry -- .9.

And so this is a table, for example, of some of the compounds that are disclosed in here and we see Compound AB 2239.  That's a compound coming out of Abbott; is that right?

A.    Yes.

Q.    And we have human $H_3$ receptor data and rat $H_3$ receptor data for all of these compounds; right?

A.    Yes.

Q.    And all of the compounds that are reported in Cowart 2004 showed measurable biological data at the target of interest?

A.    Yes.

Q.    A researcher could have profiled all of these compounds if they were inclined to do so?

A.    Yes.

Q.    And I'd like to take a look, if we could, at DTX-46.1, if we could.  And in particular, about halfway down the column on the left-hand side, there's a sentence

Rotella - Cross

starting with "Compounds acting as inverse agonists."

A.   Oh, I see it.  Oh, yes, I see that.  Yes.

Q.   And you stated, I believe, on direct that there would have been no benefits to a compound that had inverse agonist activity.

Do you see that?

A.   I said on direct that there was no demonstrated therapeutic advantage associated with inverse agonists.

Q.   But certainly Cowart is saying that compounds acting as inverse agonists at $H_3$ receptors may, in fact, have special utility; right?

A.   Yes.  That "may" is a hypothetical, in my opinion.

Q.   Okay.  I'd like to change focus now, and let's talk about the WO 254 patents, if we -- we could.

Now, this was another of the references that you talked about, and you mentioned how there was about 180 compounds in that patent application, one of which was pitolisant.  And you made the statement that a year later, Meier I plucked a single compound out of that entire group; right?

A.   Yes.  Yes.

Q.   Did you look to see whether or not there were any publications about any of the other compounds in WO 254?

A.   No, I did not.

Q.   Why not?

Rotella - Cross

A.    They weren't -- they weren't provided to me by counsel.

Q.    Okay.  Now, there are a number of factors which must be taken into account when making a recommendation in industry about which compounds to take into clinic; right?

A.    Yes.

Q.    And you would agree with me that one of the factors you need to consider is how the molecule behaves against the target of a disease of interest; right?

A.    Yes.

Q.    Receptor affinity alone is rarely a sufficient criterion to advance a compound into clinical studies?

A.    Yes.

Q.    And because you don't know that a compound that hits on that -- and that's because you don't know that a compound that hits on that target is going to beneficially affect a disease until you test it in humans; correct?

A.    Absolutely in humans, yes.

Q.    Another set of factors that are essential to understand when deciding whether to advance a compound into clinical studies are the properties broadly known as pharmaceutical properties; right?

A.    Yes.

Q.    And those properties include water solubility?

A.    Yes.

Rotella - Cross

Q.   Protein -- plasma protein binding?

A.   Yes.

Q.   Metabolization?

A.   Metabolism, yes.

Q.   Excretion?

A.   Excretion, yes.

Q.   Administration?

A.   Routes of administration, yes.

Q.   PK profile?

A.   Yes.

Q.   Toxicity?

A.   Yes.

Q.   Adverse events when administered to animals?

A.   Yes.

Q.   And it would be desirable to have the profile in a broad receptor screening panel; correct?

A.   Yes.

Q.   Now, in April 2005, you agree that for pitolisant, the POSA didn't know how pitolisant behaved in any animal model; correct?

A.   Correct.

Q.   And as of April 2005, there was nothing --

A.   No.  May I correct?

Q.   You may.

A.   There was data in Meier I that indicated the molecule

was active in an animal model to elevate histamine.

Q.    In the mouse model; correct?

A.    I can't remember which species, but there was some animal data.

Q.    Okay.  And there certainly wasn't any data about how pitolisant behaved in any animal disease model; correct?

A.    Correct.

Q.    And there wasn't any animal data -- or there wasn't any data with respect to how pitolisant behaved in, you know, wakefulness in cats; right?

A.    To my knowledge, no.

Q.    And as of April 2005, there was nothing in the prior art about pitolisant's water solubility?

A.    No.

Q.    Nothing about its plasma protein binding?

A.    No.

Q.    Nothing about how pitolisant would be metabolized?

A.    No.

Q.    Nothing about how pitolisant would be excreted?

A.    No.

Q.    Nothing about its route of administration?

A.    No.

Q.    There was nothing about its PK profile in the prior art; correct?

A.    Correct.

Rotella - Cross

Q.    There was nothing about pitolisant's toxicity profile; right?

A.    Correct.

Q.    We had no idea whether or not pitolisant had adverse events when administered to animals; right?

A.    Correct.

Q.    So there was nothing about pitolisant's profile in a broad receptor screening panel as of April 2005; right?

A.    Correct.

Q.    And, in fact, as of April 2005, there was no human data of any kind on pitolisant; right?

A.    To my knowledge, no.

Q.    Now, we heard you discuss there's some rodent receptor binding data for pitolisant as of April 2005; right?

A.    Yes.

Q.    But there wasn't sufficient data about the structure activity relationship of the class of compounds that included pitolisant that would allow for the prediction of what the human $H_3$ receptor activity would be; correct?

A.    I believe there was some limited structure activity information presented in the '254 patent.  I can't recall specifically, but there was some structure activity information, I believe, in that patent.

Q.    When I asked you at deposition, was there any -- was

Rotella - Cross

there any sufficient SAR on the class of compounds, including pitolisant, that would allow prediction of what the human $H_3$ receptor activity would be, you said "not that I'm aware of in the prior art."  Correct?

A.     Well, you're asking me two different questions here. You asked me a question first about structure activity relationships and then the ability to predict human data. And my comment there was that since there was no human data associated with it, it's not possible to predict that a priori.

Q.     And as of April 2005, it was unknown whether pitolisant was or was not an inverse agonist; right?

A.     Yes, that's correct.

Q.     Now, a medicinal chemist can look at the structure of a molecule and easily determine whether that molecule has a chiral center or not; right?

A.     Yes.

Q.     And there are pharmaceutically acceptable salts that have chiral centers; right?

A.     Yes, there are.

Q.     Tartrates are chiral salts?

A.     Yes.

Q.     Tartrates have two chiral centers?

A.     Yes.

Q.     And there are currently marketed drugs that are

tartrates?

A.    I believe so, yes.

Q.    And you're familiar, of course, with the claim construction law that considers the singular form of a word to include their plural forms; right?

A.    I am not familiar with claim construction law.

Q.    And that's because you don't consider yourself to be an expert in patent term claim construction; right?

A.    That's correct.

Q.    You've never worked on a claim construction declaration?

A.    I have worked with attorneys to construct claims based on my patent activity in the past.

Q.    And, indeed, when you were summarizing your understanding as to the scope of 13, you stated that the claim covered pitolisant, its pharmaceutically acceptable salts, hydrates or hydrated salts of the polymorphic crystalline structures of these compounds or their optical -- or their optical isomers, racemates, diastereomers or enantiomers; right?

A.    Or its optical isomers, racemates, diastereomers or enantiomers.

Q.    That's not actually quite what you said.  Let's pull up Paragraph 30 of your opening report, please.

       And if we could highlight the bottom line there.

It says," Claim 13 limits the genus of Claim 1 to one compound, pitolisant or its pharmaceutically acceptable salts, hydrates, or hydrated salts or the polymorphic crystalline structures of these compounds or their optical isomers, racemates, diastereomers or enantiomers"; right?

A.    Yes.  So I -- I apologize for the mistake.

Q.    I'd like to talk now about the Meier I reference.

MS. HANSEN:  And if we could bring up Meier I, which I believe is -- yes, thank you -- DTX-85.

BY MS. HANSEN:

Q.    And Meier I is actually -- if we could back up a little bit.  Meier I is actually a collection of four abstracts; correct?

A.    It is, yes.

Q.    And so the one that we're really focused on here is C40 or at least that's the one that you've been focused on; right?

A.    Yes.

Q.    Now, in the section -- I wanted to first talk about in the middle of this paragraph where it talks about the development of the piperidine analog of FUB 181, which it called a "suitable new lead."

Do you see that?

A.    Yes.

Q.    But it's not possible for you to answer the question

of whether the authors on this sentence were intending pitolisant to be used as a starting point for the development of additional $H_3$ receptor antagonists because you don't know what they were thinking here; right?

A.    That -- yes.  And I -- as we just heard from an employee of Bioprojet, Bioprojet was very interested in FUB 649 and continued to push it, to use his terminology.

Q.    Was Dr. Ligneau's testimony from 2025 available in the prior art before April 2005?

A.    It was not.  It was something that I just heard a few moments ago.  And he was -- he was present, of course, at the time when this molecule was being investigated.

Q.    And was Bioprojet's internal workings public as of April 2005?

A.    No.

Q.    Thioperamide is an imidazole-containing compound; right?

A.    Yes.

Q.    And you would consider thioperamide and pitolisant to be distinct chemical series?

A.    Yes.

Q.    As of April 2005, the POSA would know that thioperamide was an inverse agonist; right?

A.    Yes.

Q.    Ciproxifan is another imidazole-containing compound;

Rotella - Cross

right?

A.    Yes.

Q.    And Ciproxifan and pitolisant are also in two different chemical series?

A.    Yes.

Q.    And as of April 2005, the POSA would know that Ciproxifan was an inverse agonist; right?

A.    Yes.

Q.    Now, I'd like to change focus a little bit and talk a little bit about your experience.

Now, around 2009, you started working on a program on $H_3$ inverse agonists while you were at Wyeth; right?

A.    Yes.

Q.    And Wyeth called it an $H_3$ inverse agonist program, not an $H_3$ agonist program; right?

A.    We called it an inverse agonist program, yes.

Q.    And you called it an inverse agonist program because when the molecules were being studied, it was evident that they were binding to a site on the receptor that resulted in this inverse agonist property; right?

A.    Yes.

Q.    And the disease target that you were pursuing as part of that program was in cognition; correct?

A.    Yes.

Rotella - Cross

Q.    Now, between 1991 and 2010, I believe you said you worked on about 20 drug products?

A.    Twenty different drug projects.

Q.    Projects, my apologies.

And of the 20 or so projects that you've worked on, there were no compounds that were ultimately approved by FDA or the EME [sic] -- or the European Medical Association; right?

A.    That's correct.

Q.    Now, on average for you across the course of your career for those 20 projects, they lasted about two years on average?

A.    Some longer, some shorter, but on two -- two years approximately is correct.

Q.    And to the best of your recollection, none of those 20 projects started by using a compound that your company had in-licensed from another company; right?

A.    Yes.

MS. HANSEN:    Now, if we could pull up DDX8.17.

BY MS. HANSEN:

Q.    Now, there you listed four references here.  Each of these references was provided to you by counsel; right?

A.    Yes.

Q.    And each of these references was something you discussed in your opening report?

Rotella - Redirect

A.      Yes.

Q.      And all of the materials that you cited in your opening report were provided to you by counsel; correct?

A.      Yes.

Q.      You did not look for any articles about $H_3$ antagonists on which Dr. Schwartz was an author published after a 2002-2003 reference and before April of 2005 because you weren't explicitly directed to do so; correct?

A.      Yes.

Q.      And you also understand that Dr. Schwartz is affiliated with Bioprojet?

A.      Yes.

Q.      And the reason you didn't look for any other references from Bioprojet was because you were asked to evaluate the information that was provided to you and offer comments, feedback and work on developing a report that reflected the valuation of the information you had; correct?

A.      Yes.

            MS. HANSEN:  No further questions.

            THE COURT:  Redirect examination.

                    REDIRECT EXAMINATION

BY MS. ARAJ:

Q.      Dr. Rotella, is human data required for a person of ordinary skill in the art to select a compound for further development?

Rotella - Redirect

A.      Not necessarily.

Q.      You had previously testified, also, during your
cross-examination about chiral salts.  Do you recall that?

A.      Yes.

Q.      Does the '947 patent disclose any example of a chiral
salt of pitolisant?

A.      No.

                MS. ARAJ:  I have no further questions.

                THE COURT:  You may step down.

                THE WITNESS:  Thank you.

                MR. BORNSTEIN:  Your Honor, that concludes our
case-in-chief with respect to invalidity of the '947 patent,
subject, of course, to any rebuttal.

                THE COURT:  Of course.

                All right.  Can somebody give me just a brief
outline of who we're going to hear from on Plaintiffs' side?

                MS. HANSEN:  Sure.  So on the outline of next
witnesses, we are starting, I believe, with some brief
testimony from Dr. Schwartz.  As we explained, we wanted to
play a little bit of video and then we're going to read in
the rest.

                Dr. Schwartz's testimony will be followed by
Dr. Reider, followed by Dr. Roth.

                THE COURT:  Okay.  So we're going to hear the
Schwartz stuff now, and then we're going to take a break.  I

Rotella - Redirect

do -- I need to meet with another judge at around 11:30.  It sounds like that's going to work out perfectly.

MS. HANSEN:  It should.  But we do want to raise a 52(c) motion, if Your Honor would indulge us briefly.

THE COURT:  Okay.  Briefly.

MR. VEISZLEMLEIN:  Good morning, Your Honor. John Veiszlemlein, Covington & Burling for Plaintiffs.

Plaintiffs move under Federal Rule of Civil Procedure 52(c) for judgment that AET has failed to prove by clear and convincing evidence that Claim 13 of the '947 patent is invalid under the doctrines of obviousness-type double-patenting, Section 103 or under Section 112.

I'm happy to provide further argument if Your Honor would like.

THE COURT:  Nope.  I'm going to decline to issue a judgment on partial findings, as we discussed already a couple times during the trial.

I need to issue findings of fact and conclusions of law.  Were I to grant such a motion, it would take me longer to prepare those today than it would just to listen to the rest of the testimony for which we only have a few hours left on the clock.

MR. VEISZLEMLEIN:  Understood, Your Honor. Thank you.

THE COURT:  Thank you.

MR. CHANCELLOR:  Good morning, Your Honor.  My name is A.G. Chancellor here on behalf of Plaintiffs.

At this time, Plaintiffs recall Dr. Jean-Charles Schwartz for further testimony via deposition designation.  Dr. Schwartz is an inventor on both the '197 and '947 patents, and is the co-founder of Plaintiff Bioprojet.

Dr. Schwartz is a French speaker, so his deposition was done with translation.  As mentioned yesterday morning, in the interest of time, Plaintiffs will play the first few minutes of Dr. Schwartz's testimony and the remainder of the testimony will be read into the record by myself and my colleague, Mr. John Veiszlemlein.

The total time of the testimony to be played and read contains 16 minutes and 37 seconds, to be charged to Plaintiffs.  And one minute and 15 seconds to be charged to AET.

May we approach with binders containing the clip sheet?

THE COURT:  Yes.

MR. CHANCELLOR:  And, Your Honor, can we have Mr. Veiszlemlein sit at the stand at this point?

THE COURT:  That's fine.

MR. CHANCELLOR:  Thank you.

May we proceed?

Rotella - Redirect

THE COURT:  Yes.

(Beginning of videotape deposition of Mr. Schwartz.)

COURT REPORTER:  Jean-Charles Schwartz, do you hereby acknowledge that your testimony will be true under the penalties of perjury?

THE WITNESS:  I do.

Q.    Can you state and spell your full name for the record?

A.    My name is Jean-Charles Schwartz.  I am a former university professor, and I'm currently chairman of Bioprojet Biotech.  Bioprojet Biotech.

Q.    How did you discover pitolisant?

A.    By synthesizing hundreds of compounds that were active on the $H_3$ receptor.

Q.    Who did the synthesis of these compounds?

A.    So the synthesis was done collaboratively together with the laboratory in Berlin and the laboratory in London.

Q.    And so the University in Berlin that you are referring to is the Freie Universitat Berlin, F-R-E-I-E; is that correct?

A.    Yes, that's correct.

Q.    And in London, it was the University College London?

A.    That's correct.

Q.    Who was the lead researcher at Freie Universitat

Berlin for this collaboration?

A.    So and the question was what was the name of the lead researcher at the Freie Universitat Berlin?  The answer is Walter Schunack.

Q.    Who -- who was the researcher who first synthesized pitolisant?

A.    It's a researcher who was working under the supervision of Walter Schunack and was called Holger Stark.

Q.    Who was the researcher who first had the idea to make pitolisant?

A.    So it's a bit complicated.  It was actually a collaboration between Robin Ganellin from University College, who was collaborating with his students and with Berlin laboratory.  But it was mainly a research group, a collaboration, a research group working in the framework of -- no, it was, sorry, mainly Robin Ganellin, who was collaborating to the $H_3$ antagonist program.  And it was work done between four partners:  INSERM, Bioprojet, University College, and Freie Universitat Berlin.

Q.    So you cannot identify who first had the idea to make pitolisant?

A.    So it's a joint idea.  When collaborating, the ideas are the fruit of this collaboration.

(Conclusion of videotape deposition of Mr. Schwartz.)

Rotella - Redirect

Q.    And the last sentence states that:  "FUB 649," which is pitolisant, is "a potent and selective non-imidazole $H_3$-receptor antagonist, [and it] is a new promising lead for further development."

Do you see that?

THE WITNESS:  A promising lead?

THE INTERPRETER:  Okay.  So it's a question of translation, lead being not a -- not a clue, but a head of series literally.

Q.    Let me ask a follow-up question.  What is indicated here by the word "lead"?

A.    Commonly a lead is what is called in French a [speaks French] for new components.  So it means a lead drives a new series of promising compounds.

Q.    So in other words, within the class of $H_3$ receptor antagonists, at this time pitolisant was the most promising in that class; is that accurate?

A.    No.  No, that's not what is written there.  What is written there is that it is just a starting point of a promising series.

BY MR. BALL:

Q.    It says it:

"...a new promising lead for further development."  Correct?

A.    Yes.  That is exactly what I'm saying.  It is the

Rotella - Redirect

first of a promising series of H$_3$ antagonists.

Q.    What was the most promising non-imidazole H$_3$ receptor antagonist as of 2001, as of the publication of Exhibit Number 9?

A.    It's probably what this article says, it's 649.  More specifically, it was a series of which 649 was the lead.

Q.    If you take a look at the '947 Patent and flip over to Column 43, please.  And once you are there, I would like to direct your attention to Example Number 2.  In Example Number 2, it's titled:

"Treatment of Obstructive Sleep Apnea with Histamine H$_3$ Antagonists/Inverse Agonists."

Do you see that?

A.    I do see that.

Q.    Okay.  And I am interested in the second paragraph which says:

"This treatment resulted in all subjects in a clear decrease (by more than 60%) in the number of diurnal somnolence episodes and a total prevention of the occurrence of diurnal sleep episodes."

Do you see where I am reading?

A.    Yes, I do see that.

Q.    What is diurnal somnolence?

A.    Diurnal -- diurnal somnolence is one of the disorders of...the troubles linked to the state of sleep and

wakefulness.

BY MR. BALL:

Q.    Is it excessive daytime sleepiness?

A.    Here I think it simply -- simply refers to a -- a state of somnolence during the daytime.

BY MR. BALL:

Q.    Daytime sleepiness; correct?

A.    Yes, it is a daytime sleepiness.

Q.    And what, in your view, is the difference, if any, between diurnal somnolence and excessive daytime sleepiness?

A.    So -- so diurnal somnolence is a symptom.  Whereas excessive diurnal somnolence is a general disorder of -- affecting vigilance and sleep states.

BY MR. BALL:

Q.    Do patients that have excessive daytime sleepiness have diurnal somnolence?

A.    Amongst other symptoms, yes.

BY MR. BALL:

Q.    Sir, look at Example 2 in your '947 Patent, and do you see in that first paragraph "Epworth" E-P-W-O-R-T-H?

A.    Yes.  I see that.

Q.    What is an Epworth score?

A.    It's a scale for assessing a daytime sleepiness.

Q.    Do patients who suffer from sleep apnea have excessive daytime sleepiness?

Rotella - Redirect

A.      Not automatically.

BY MR. BALL:

Q.      Do some patients who have sleep apnea have excessive daytime sleepiness?

A.      Yes, but not all of them.

BY MR. BALL:

Q.      What distinguishes a patient that has sleep apnea suffering from daytime sleepiness from a patient with sleep apnea suffering from excessive daytime sleepiness?

A.      So a person with excessive diurnal sleepiness might have -- might have different disorders as -- for instance, disorders linked to the REM sleep pattern.  Yeah, REM sleep pattern, so he wouldn't only have daytime sleepiness, but he might have episodes of REM sleep during the day.

THE WITNESS:  REM sleep is also called paradoxical sleep.

A.      So REM sleep is in French [speaks French].

BY MR. BALL:

Q.      Do all patients who have EDS suffer from paradoxical sleep disorders?

A.      Not automatically.

BY MR. BALL:

Q.      So are some patients that have EDS simply more sleepy than patients that have daytime sleepiness?

A.      No, they might have other sleep disorders such as

Rotella - Redirect

hallucinations.

Q.    Because they're sleepier; correct?

A.    It's not necessarily linked to the sleepiness intensity, but rather to other mechanisms.

Q.    So what distinguishes those patients from patients that are just very sleepy in the daytime?

A.    They have other symptoms than sleepiness.

BY MR. BALL:

Q.    What?

A.    They have generally, rather generally disorganized states of sleep and vigilance.

BY MR. BALL:

Q.    And are those disorganized sleep -- states of sleep and vigilance caused by, in the case of sleep apnea, a lack of sleep or insufficient sleep during the night time?

A.    I am not an expert in sleep states, but I do not think that mechanisms inducing EDS are perfectly known.

            MR. CHANCELLOR:  That's the end of the testimony, Your Honor.

            THE COURT:  Thank you.  You may step down.

            MR. VEISZLEMLEIN:  Thank you, Your Honor.

            THE COURT:  All right.  At this time, I'm inclined to take the morning break, unless there's something we need to address.

            MS. HANSEN:  I think that's fine, unless there's

Rotella - Redirect

an issue here.

MS. BOOKBINDER:  Your Honor, there's just one --
I think we'll explain -- one word off that we can work
together and --

THE COURT:  Okay.  We'll address it when we get
back from break.

So we'll go ahead and take lunch now, too,
actually.  So let's take an hour.  We'll be back at 12:30.

COURTROOM DEPUTY:  All rise.

(Luncheon recess was taken.)

COURTROOM DEPUTY:  All rise.

THE COURT:  All right.  Please be seated.  Let's
proceed.

MS. NGUYEN:  Good afternoon, Your Honor.  Elaine
Nguyen on behalf of the Plaintiffs.  We'd like to call
Dr. Paul J. Reider who will testify with respect to the
validity of Claim 13 of the '947 patent.

THE WITNESS:  How was your lunch?

THE COURT:  It was very good.  Thank you.  It
was quick.

THE WITNESS:  May I remove Rotella's exhibits?

THE COURT:  Yeah.  We'll have counsel come up
and clean this up for you.

COURTROOM DEPUTY:  Please remain standing and
raise your right hand.  Please rise.

Reider - Direct

THE WITNESS:  I was adjusting the chair.

COURTROOM DEPUTY:  Of course.  Please raise your hand.  Please state and spell your name for the record.

THE WITNESS:  Paul Joseph Reider, R-E-I-D-E-R.

COURTROOM DEPUTY:  Do you swear or affirm that the testimony you give to the Court will be the truth, the whole truth and nothing but the truth, so help you God or do you so affirm?

THE WITNESS:  I do.

PAUL J. REIDER, the witness herein, after having been duly sworn under oath, was examined and testified as follows:

COURTROOM DEPUTY:  Thank you.  You may be seated.

THE WITNESS:  Thank you.

THE COURT:  Let's proceed then.

DIRECT EXAMINATION

BY MS. NGUYEN:

Q.    Good afternoon, Dr. Reider.

A.    Good afternoon.

Q.    Could you please state your full name for the record?

A.    Paul Joseph Reider.

Q.    And have you helped to prepare a set of demonstratives to assist with your testimony today?

A.    I have.

Reider - Direct

Q.    Are these those demonstratives?

A.    Yes.

Q.    Great.  Let's turn to PDX5-2.

What opinions do you intend to provide in this case?

A.    My opinions are pretty short.

One is that there's no motivation to pursue pitolisant for a method of treating EDS in narcolepsy, Parkinson's and sleep apnea as of April 2005, and that Claim 13 is both definite and enabled.

Q.    Great.  Let's turn to your background.

MS. NGUYEN:  Could we please pull up PTX-792.

BY MS. NGUYEN:

Q.    What is this document?

A.    It's a copy of my CV.

Q.    And does your CV accurately summarize your education, training and experience?

A.    It does.

MS. NGUYEN:  At this time, we move to admit PTX-792.

MS. BOOKBINDER:  No objection.

THE COURT:  It's admitted.

(PTX Exhibit No. 792 was admitted into evidence.)

BY MS. NGUYEN:

Q.    What is the highest degree you've received?

A.    I have a Ph.D. in organic chemistry from the University of Vermont.

Q.    Great.  Turning to PDX5-3.

Are you currently employed, Dr. Reider?

A.    No, I'm retired.

Q.    Would you please briefly describe your professional experience before you retired?

A.    Yeah.  For -- I've had three jobs over the past 40 years.  My first job was a bench chemist in the Merck Research Labs of Rahway, New Jersey.  I stayed there for 22 years.  I rose to the rank of vice president of process chemistry.

In -- after 22 years, I moved to the West Coast. I followed my boss to Amgen.  I was given the opportunity to create, under one umbrella, a fully integrated small molecule drug discovery interrelated development unit at Amgen.  I was supposed to create a group of about 500 people.  Ended up with 600 people across four sites.

And in about 2007, I -- I decided that I preferred to work on infectious diseases for neglected populations, TB and malaria, Dengue and other diseases.

So I retired.  I gave the Gates Foundation 20 percent of my time, pro bono, and Princeton offered me a position.  They said I could create a lab, come in and join

Reider - Direct

the chemistry department, teach organic chemistry, drug discovery and do research with undergraduates on those diseases.

Q.    Have you received any awards or accolades for your work?

A.    The one I'm most proud of is the 2011 award for chemistry and service to society from the National Academy of Sciences.

Q.    Have you previously been qualified as an expert in any patent litigation cases?

A.    I have both in New Jersey and in Delaware.

Q.    And in any of those cases, have you been qualified as an expert in medicinal chemistry?

A.    Yes.

Q.    And in any of those cases, have you been qualified as an expert in drug discovery and development?

A.    Yes.

        MS. NGUYEN:  Your Honor, at this time we offer Dr. Paul J. Reider as an expert in the fields of medicinal chemistry and drug development and discovery.

        MS. BOOKBINDER:  No objection.

        THE COURT:  We will permit him to testify in those fields.

BY MS. NGUYEN:

Q.    Looking at PDX5-4, do you have an understanding of

Reider - Direct

what a POSA is for the '947 patent?

A.      I do.

Q.      And is this the definition on the left side of PDX5-4 that you applied in coming to your opinions?

A.      It is.

Q.      And from what perspective did you evaluate the evidence?

A.      That the hypothetical person with a Ph.D. and at least one to two years of experience or a person with a master's degree and at least three to four years of experience in the fields of synthetic or medicinal chemistry.

Q.      Were you in the courtroom when Drs. Rotella and Kushida offered their interpretation of who the POSA for the '947 patent is?

A.      I was.

Q.      And would your opinions differ if you were to use their definition?

A.      No, not at all.

Q.      And were you qualified as a POSA at the time of the priority date of the '947 patent?

A.      I was.

Q.      Let's turn to your opinions relating to obviousness, going to PDX5-5.

        Do you agree with Drs. Rotella and Kushida that

Reider - Direct

in April 2005 the POSA would have been motivated to do anything with pitolisant?

A.    No.  I think -- as I'll try to explain in the ensuing slides, that -- there's actually no motivation to pursue $H_3$ antagonists for EDS and Parkinson's, narcolepsy or sleep apnea.  There were many other mechanisms that really were potentially attractive.  And the $H_3$ antagonist field was just one of the many speculative routes without clinical validation.  I have commented that even if one decided to work in that field, there's certainly no motivation to pursue pitolisant.  There were other antagonists -- sorry -- antagonists that were being evaluated.

But the most important part of my evaluation is that critical biological data was not available for pitolisant.  There's also -- I think we'll discuss the publication gap that Dr. Rotella mentioned in his direct about why nothing was disclosed about pitolisant for a long period of time.

Q.    You mentioned that there were other potential mechanisms speculated to treat EDS.  Well, actually let's go back a second.

How would a medicinal chemist approach drug discovery in April 2005.

A.    So I prepared a -- the final.  This is something I used at Merck and at Amgen to teach young Ph.D.s when they

Reider - Direct

first joined how we do drug discovery and development.

I absconded with the slide and I used it at Princeton for many years.  And now in my retirement, I use it at the Princeton Senior Resource Center as I've been teaching a class to 80-year-olds on drug discovery.

I think it still works.  There are a number of phases, and they take a long period of time.  When we first made this slide, it took about a billion dollars to move a molecule from the beginning to the end of the funnel if you're lucky.  Yes.  Now it's close to $2 billion.

But what we do is we identify a target disease and then we try to identify potential mechanisms of action or receptors that are involved.  We research compounds and classes of compounds that act on those mechanisms and we screen hundreds of compounds.  And then we take a handful of compounds for further development.  By that I'm talking about bringing them to the cusp between hit to lead and lead optimization at the beginning of, if you will, preclinical development.

Q.    During your career, have you ever started with a compound and then figured out what to do with it?

A.    No.

Q.    Can a POSA take every single compound with promising in vitro data into clinical studies?

A.    Absolutely not.

Q.    Based on a POSA'S viewpoint and the literature you have reviewed, where in the drug discovery process was the search for a method of treating EDS in April of 2005?

A.    So in those light green boxes on the left side, it was an early target with, as we've seen, a very complicated biology that had not yet been elucidated.

Q.    What kind of data would you need to advance a compound into clinical studies?

A.    So much to the dismay of many of my colleagues, this was my job for many years, sitting on committees that were at the cusp between hit to lead and lead op.

You need to release a great deal of funding when you move into that middle section.  Generally people are asking for 10 to $50 million.  And this is way before clinical.  Clinical you start needing the hundreds of millions of dollars.

But the dataset that we needed, even pretty bare bones data, you required human data.  You would love to know that your target is validated.  You'd like to have validated animal models that reflect the human disease.  But you need tremendous amounts of information on potential warts of the molecule.  You need to understand whether it has bioavailability, whether it gets to the target that you're trying to get to, if it's the brain or the liver.  There are so many different things you need to know, but we've all

Reider - Direct

gotten, you know, pretty good at defining them and knowing what to look for.  We would actually have whole presentations that people would make, bringing those molecules forward.  And if things are missing, it stands out like a sore thumb.  You'll see that.

I'm actually pretty grumpy about this.  I need data with Xs and in big red letters things that are missing so I'll know what to ask for so the next time they come back, a year later, and you know if they filled in the blanks.

Q.    As of April 2005, what kinds of compounds would a POSA have considered for the treatment of EDS in April 2005?

A.    Well, in Brooks they do a very nice job in this review of talking about the different opportunities.  We've heard about the dopaminergic compounds, stimulants.  The Merck group's actually focused more on the orexin agonists which did turn into approved drugs on the other side actually helping you fall asleep.

There are a tremendous amount of opportunities within the slow-wave sleep enhancers.  They're also speculative.  And we've also heard that there was a -- you know, certainly the Schwartz group is interested in $H_3$ antagonists.

Q.    And this is the Brooks 2002 reference you're showing on PDX5-7?

Reider - Direct

A.    It is.

Q.    Let's pull up PDX5-8.  Let's assume that Dr. Kushida and Dr. Rotella are correct that the POSA would have somehow chosen pitolisant off a shelf and queried what to do with it.  What were other potential therapeutic uses that a POSA might have considered for $H_3$ antagonists?

A.    Well, we've heard about a lot of these, and, I mean, the -- I don't want to go through the whole signpost slide, but it starts with cognition and Alzheimer's, and you see motion sickness, sleep and down to congestion and pain. Obesity is also on the list.

Q.    Turning to PDX5-9.  Were there any reasons that the POSA, as of April 2005, may have been discouraged from pursuing $H_3$ antagonists as a route for treating EDS in Parkinson's, narcolepsy or sleep apnea patients?

A.    One of the things that one learns in the pharmaceutical industry is that there are times when a target is right for intervention and there are times when it's time to come back five or ten years later.

When the receptor biology is complicated and unpredictable, it tells you that the field is still evolving and that this is not a great time to intervene.  It was one of the major drawbacks.

The other part is I can't tell you how many times people have tried to move forward without data from

Reider - Direct

predictive animal models from the lab to the first kind of getting function and that will tell them to go back.  You need to have -- honestly, you have to have some sort of predictive animal model.

It's really much better to have human validation models.  If you have a natural product that works as an alerting agent, you kind of know you can use that on the pathway.  But when you don't have clinical validation, you're flying blind.

Q.    Now, you mentioned that $H_3$ receptor biology was quite complex.  Let's make sure we understand how the $H_3$ antagonist field developed.  Going to DDX5-10.  When was the $H_3$ receptor first disclosed?

A.    1983.

Q.    And that was by the Schwartz group?

A.    That's correct.

Q.    And what happened next?

A.    Well, the -- the work that was being done was with the rodent receptor.  You really would prefer to have tools that -- a representative of the target population.  And the joke is you're not really looking for drugs for rats, you'd rather have drugs for people.

So getting, as we heard from a number of different witnesses, the human receptor is really important.  And in 1999, the human receptor became available.

Reider - Direct

Q.    And then what happened?

A.    Well, I think Dr. Rotella disagreed on the importance of the inverse agonist in 2000, the same group that we've heard about before, I think, reported that the $H_3$ receptor has constitutive activity, meaning that there's an opportunity to come up with actually an inverse agonist that can actually give you better impact on the therapeutic pathway.

Q.    Can we go to PDX5-11?

We've heard about these from a few different reasons, but could you explain the difference between inverse agonist and neutral antagonist?

A.    I can.  Wait a minute.  I've tried to do it with colors, but the full agonist -- sorry, so the full agonist is in red, and antagonist in green, and inverse agonist in purple.

A full agonist, as we've heard from a number of witnesses, is going to apply a brake or a clamp onto the release of histamine.  An antagonist would prevent that from happening and allow you to release histamine.

An inverse agonist is going to actually take advantage of its constitutive activity and completely free up the release, and you end up with an even greater amount of histamine being released.

Q.    And what is "activity" in this context, the --

Reider - Direct

A.    The activity action is the activity on the autoreceptor.

Q.    Let's pull up DTX-97, Morisset 2000.

You were just speaking about this paper.  Who authored this paper?

A.    This is Morisset.  You can see that -- you're going to see throughout this -- this trial, you've already seen this, that a large number of the people and the names are the same.  This is the Schwartz group, again, with Ganellin and Stark, but it's suddenly Morisset is the first author.

Q.    Let's look at Page 863 of Morisset, middle of the right column.  What does Morisset teach us regarding $H_3$ inverse agonists?

A.    Well, I think, again, Dr. Rotella and I disagree.  The literature says when you're dealing with activation of the neurons, the potential of intervening with a receptor inverse agonist rather than a neutral antagonist would be a -- more likely to give you the desired effect; i.e., you're better off with an inverse agonist than just a neutral antagonist.

Q.    Going back to the timeline slide, PDX5-10.  Were there any other reports that advanced the field?

A.    One of the ones that I think is seminal is the understanding that the human and the rat receptor data doesn't correlate.  This occurred in 2001.  The same group,

Reider - Direct

again Stark, pointed out that much to everybody's chagrin, everything they had been going with -- the rat receptor wasn't predictive, and they needed to go back and re-profile molecules with the newly available human receptor.

So you have to kind of hit the reset button, go back and re-profile the same compound and ask the question: Do molecules behave the same in both species?  Is there any difference?

I think one witness has said there's a lot of homology.  It turns out from the Stark paper that there's a tremendous difference in the way molecules behave versus the rat and the human, and it's not predictive.  You have to screen for it.

MS. NGUYEN:  Can we pull up PTX-494, please?

Your Honor, we move to admit PTX-494.

MS. BOOKBINDER:  No objection.

THE COURT:  It's admitted.

(PTX Exhibit No. 494 was admitted into evidence.)

BY MR. NGUYEN:

Q.    Let's go to the "Results and Discussion" section of this Stark paper.  What does Stark say about the differences between rats and human receptors?

A.    As I said, they can be different, but Stark says most compounds showed a preference for the rat histamine receptor

Reider - Direct

compared to the affinities for the human receptor.  He

identifies a number of compounds, including thioperamide.

He says whereas Ciproxifan and Cloben --  I

can't even say this one, Clobenpropit, were equally

effective at both receptors, and then he identifies some

compounds that were more potent at the human than the rat.

So you really have to be driven by the data.

You can't just assume that there's equal efficacy.

Q.    Let's turn back to PDX5-10, the timeline.

In the 22 years between 1983, when the

$H_3$ receptor was discovered, and April of 2005, how many

$H_3$ antagonists were disclosed?

A.    Probably thousands.

Q.    And how many of those antagonists that were disclosed

over those 22 years made it to market for any indication?

A.    Just pitolisant.

Q.    Let's assume for the moment that the POSA had,

nonetheless, chosen $H_3$ receptor --

(Clarification by the reporter.)

BY MR. NGUYEN:

Q.    Let's assume for the moment that the POSA has,

nonetheless, chosen $H_3$ antagonists as the route for seeking a

method of treating EDS in Parkinson's, narcolepsy and sleep

apnea patients, how many companies were exploring

$H_3$ antagonists in April 2005?

Reider - Direct

A.    So it would be several.  It might be close to a dozen.

Q.    And where would a POSA look to see what other pharmaceutical companies were working on in the $H_3$ antagonists field?

A.    If we're doing one-stop shopping, you look for the review literature.  They'll usually cover both patents and the scientific papers, peer-reviewed papers.

Q.    Did you seek out review papers with $H_3$ antagonists to conduct your analysis?

A.    I did.

Q.    Let's pull up PDX5-12.

Are these the three review articles on $H_3$ antagonists you reviewed?

A.    They are Stark, you see his name, before establishing the Schwartz group or collaborative, Cowart came out of Abbott, and Bob Aslanian was at Schering-Plough.

MS. NGUYEN:  At this time, Your Honor, we move to admit DTX-53 and DTX-44 into evidence.

MS. BOOKBINDER:  No objection.

THE COURT:  They're admitted.

(DTX Exhibit Nos. 44 and 53 were admitted into evidence.)

BY MS. NGUYEN:

Q.    What evidence did you -- what information did you

Relder - Direct

analyze from these articles?

A.    Well, they have numerous chemical structures, and they have different classes of compounds.  They have data where it's available and look for whether it's relevant or human, whether it's in vitro or in vivo, and what data there was with regard to compounds that had any safety information, bioavailability, brain penetration information, were there safety pharmacology issues that one would know about, but what the state of the art was generally.

MS. NGUYEN:  Can we please bring up the first two pages of PTX-1197?

BY MR. NGUYEN:

Q.    Is this the chart you created with the data from these three review articles?

A.    I believe I -- I can't tell if this is the corrected -- so I had an error of a few compounds that I had listed as having human activity in the original version. Deposition counsel, opposing counsel, pointed them out, and I've since modified them.

A number of compounds that are in the second page moved from human binding data to guinea pig data. Other than that, if these are the corrected ones, then the answer is yes.

Q.    Okay.  I'll represent to you that these are the corrected charts.

Reider - Direct

Q.    Is your testimony today based on these corrected charts?

A.    It is.

Q.    And did correcting those errors change any of your opinions?

A.    No.

MS. NGUYEN:  Your Honor, at this time, we'd like to admit PTX-1197.

MS. BOOKBINDER:  No objection.

THE COURT:  It's admitted.

(PTX Exhibit No. 1197 was admitted into evidence.)

BY MR. NGUYEN:

Q.    Now, what are you depicting with this chart?

A.    The -- again, I'm pretty simplistic.  Compounds that start with a C come from Cowart.  Compounds that come with an A come from Aslanian.  Compounds that start with an S come from Stark.  Some compounds are listed in multiple reviews, so you'll see they have multiple numbers.

But the compound name is in the left column, and then whatever data was available, rat binding data, human binding data, ED 50s in mouse, which I think is the only species that had ED 50s and guinea pig data.

Q.    Is there any human data or data for human $H_3$ receptor assays for pitolisant?

Reider - Direct

A.    No.

Q.    Is there any pre-April 2005 reference you are aware of that disclosed human data for pitolisant?

A.    No.

Q.    Did any of the $H_3$ antagonists besides pitolisant, discussed in these three review articles, prove useful in the treatment of EDS?

A.    No.

Q.    And were any of those $H_3$ antagonists ever approved by the FDA for any indication?

A.    No.

Q.    These three articles reported clearly a lot of data on a lot of $H_3$ antagonists.  But does the data we saw in these articles represent the entire universe of $H_3$ receptor ligands that a POSA would have been interested in?

A.    No.  It only -- so review articles cover a certain period of time trying to be most recent.  It only covers what those three review articles that I chose had in them.

Q.    Would the POSA have limited their search to just non-imidazole compounds?

A.    No.  This is something -- I don't quite understand.  Imidazoles are known to have structural alerts.  There are issues with regards to the CYP pathway.  But you don't throw the baby out with the bath water.

        Imidazole -- so someone who knows drug history

Reider - Direct

knows that the first billion-dollar drug ever reaching that threshold was Tagamet, cimetidine, which is now sold over the counter. It has an imidazole in the structure.

So, right, this says imidazoles are so terrible, it's very confusing. All that alert does is tell you it's an alert. You should be careful when you make it, test for it to see if it was excessive interaction. You don't walk away from it.

The inventors were very concerned, and they focused on replacements. Frankly, they replaced imidazole with piperidine. Piperidines have issues of their own.

Q.    Let's turn to PDX5-13.

Can you please summarize for the Court what information was known about pitolisant in April of 2005?

A.    Yeah. This is how my people are trained to treat me. I need to see a chart that says, What do you got and what's missing? And, frankly, pitolisant had binding data on mouse, binding data on rat, and guinea pig, no human data for binding. It had in vivo potency in mouse. No rat potency in vivo, no Guinea pig, no human.

There was a salt, crystalline oxalate salt that was described with a melting point in the '254 patent. But it was not known whether it had inverse agonism. There was nothing known about tolerability and safety. And nothing known about its PKD -- PD.

Reider - Direct

Q.    Would this data have motivated a POSA to pursue pitolisant for clinical development in April of 2005?

A.    Sorry.  For clinical development?  Absolutely not.

Q.    Now, Dr. Rotella and Dr. Kushida focused on a few other articles.  I'd like to talk briefly about those.

MS. NGUYEN:  Can we please bring up DTX-90?

BY MR. NGUYEN:

Q.    Is this the WO 254 reference?

A.    It is.

Q.    And did you hear Dr. Rotella testify that the POSA would have selected pitolisant from among the compounds disclosed in WO 254?

A.    I did.

Q.    And do you agree with him?

A.    No.  I mean, there are over 170 compounds expressly disclosed in this patent.

Q.    Okay.

A.    Pitolisant is one of them.

Q.    Is there any biological data disclosed in this patent?

A.    Yeah.  There's -- there's data on about 20 compounds, and pitolisant is not one of them.

Q.    Okay.  Let's also -- let's now talk about Meier I.

MS. NGUYEN:  Can we please bring up DTX-85?

BY MS. NGUYEN:

Reider - Direct

Q.    What is Meier I?

A.    So Meier I, this is a supplement to a Med. Chem.
Journal and they have abstracts from scientific meetings.
And it's one of four abstracts shown on this page.

Q.    And who authored Meier I?

A.    This is, again -- you look at it -- the -- the same
group of people:  Meier, Schwartz, and Alexander Stark and
Schunack.  I couldn't pronounce it the way Dr. Schwartz did.

Q.    And I think we've established this, but what is
FUB 649?

A.    Pitolisant.

Q.    This abstract concludes by saying that "FUB 649,"
pitolisant, "is a promising new lead for further
development."

      How would a POSA understand the phrase
"promising new lead for further development"?

A.    Yeah.  We spent a great deal of time at this at
deposition.  What I've said in the footnote in my reports is
that it's impossible to tell what the authors meant with
regard to a new promising lead for further development from
the abstract.

      A POSA can use the context and understand the
history of the program, and a POSA would know that this is a
chemical lead for further chemical modification.

Q.    In what kind of journal does this abstract appear?

Reider - Direct

A.    Med. Chem. Journal.

Q.    Let's go to the next reference, Dr. Rotella. (Sic) Actually, Dr. Rotella mentioned this reference in his report, Liedtke.

MS. NGUYEN:  Can we please bring up DTX-84?

BY MS. NGUYEN:

Q.    And who are the authors of Liedtke?

A.    So Suzanne Liedtke and the -- and a number of the other authors are the same; Stark, Galina Meier, Walter Schunack.  This is the same Galina Meier who is the author of Meier I.

Q.    And let's zoom in on Page 49, the right-hand column.

What does Liedtke say about pitolisant?

A.    So Liedtke talks about a series of non-imidazole $H_3$ antagonists, FUB 661, 637, 722, and FUB 649.  And then she points out specifically the latter compound, FUB 649, also shows high-antagonistic activity and an in vivo -- and in an in vivo model of the mouse, she reports the mouse data that we've seen before, and cites Meier I, and concludes the compound might, therefore, represent starting points for the development of imidazole-free $H_3$ receptor antagonists.

MS. NGUYEN:  At this time, we'd move to admit DTX-84.

MS. BOOKBINDER:  No objection.

THE COURT:  It's admitted.

MS. NYUGEN:  Let's pull up Meier I and Mika

together.

BY MS. NGUYEN:

Q.     What would a POSA understand from these two articles

from Galina Meier and colleagues?

A.     So this is, again, what I mean by the context.  While

you can't tell from the actual abstract what the definition

was, a year later the same authors are saying it's a

starting point.  So I think my analysis is correct, that

it's not a clinical lead.  It's a lead for a chemical

modification.

MS. NGUYEN:  Now, if we could go back to

PDX5-14.

BY MS. NGUYEN:

Q.     Let's talk about the Lin paper that I think

Dr. Kushida mentioned.

When was Lin published?

A.     Lin was published in 1990.

Q.     And what does Lin report?

A.     Lin is the cat model, the idea of taking thioperamide

orally and having an effect on cats.

Q.     Dr. Kushida discussed how, in his opinion, pitolisant

was much better than thioperamide.

As of April 2005, was that borne out by the

data?

A.    Well, no.  Thioperamide was profiled and thioperamide has human binding data.  You don't have any data on pitolisant.

The other thing is that thioperamide was profiled and known to be an inverse agonist, and you don't have that data on pitolisant.  And even if you look at the rat data, thioperamide was tenfold better than pitolisant.

So everything was trending in the wrong direction between thioperamide and pitolisant, or there's no data.

Q.    What was the last paper that reported new data on pitolisant before the priority date?

A.    I believe that was the Liedtke.

MS. NGUYEN:  And going to PDX5-15.

BY MS. NGUYEN:

Q.    When was the Liedtke paper published?

A.    In -- online in November of 2002.

Q.    And how long before the priority date was that?

A.    Over two years.

Q.    Following the publication of Liedtke, did any other papers publish new data about pitolisant?

A.    No.  There was no new data disclosed.

MS. NGUYEN:  And going to PDX5-16.

BY MS. NGUYEN:

Q.    Did the Schwartz Group continue to publish about

Reider - Direct

other $H_3$ antagonist candidates during this time period?

A.    They're pretty prolific.  They would be published on a regular basis.  2002, they referred to a different compound from 254 as a lead structure for interesting subjects for further investigation and development.

2004, they said the field was still somewhat confused, eagerly awaiting confirmation that receptor antagonists might prove useful.  And then they continued in the same vein looking at different types of molecules.

Q.    And in 2005, did they identify a different compound as a promising new lead?

A.    They did.  Apelt did that in 2005.

Q.    Did any of these papers mention pitolisant?

A.    No.

Q.    What would the POSA infer from the absence of publications regarding pitolisant between November 2002 and April 2005?

A.    I -- I disagree with what Dr. Rotella said.  A POSA can only look at what they see in the literature.  The absence of reports of a compound and further information indicates that they likely lost interest.

MS. NGUYEN:  The four papers you've discussed here are DTX-95, 51, 48 and 43.

At this time, we move to admit these.

MS. BOOKBINDER:  No objection.

Reider - Direct

THE COURT:  They're admitted.

(DTX Exhibit Nos. 43, 48, 51 and 95 were admitted into evidence.)

BY MS. NGUYEN:

Q.    Okay.  I'd like to switch gears a bit and talk about your response to Dr. Rotella's opinions regarding indefiniteness.

First, to confirm, were you in the courtroom when Dr. Rotella opined that the POSA would not understand the scope of Claim 13?

A.    I was.

Q.    And do you agree with him?

A.    No.

MS. NGUYEN:  Turning to PDX5-17.

BY MS. NGUYEN:

Q.    Is this the legal standard for indefiniteness that you applied in reaching your opinion?

A.    It is.

Q.    Dr. Rotella gave a brief primer on stereochemistry or explained chirality.

Do you disagree with any of his concepts?

A.    No.  He was quite accurate.

Q.    And do you agree with Dr. Rotella that pitolisant is achiral?

A.    Of course.

Relder - Direct

Q.    Do you agree with Dr. Rotella that pitolisant itself does not form optical isomers, racemates, diastereomers or enantiomers?

A.    Certainly.

Q.    And would a POSA understand that?

A.    I would hope that a sophomore organic student would understand that.

Q.    You heard Dr. Rotella say that Claim 13 recites four categories of compounds.  Is that a complete list of what the categories of compounds that Claim 13 recites?

A.    No.  There are nine categories.

Q.    Have you illustrated that here on PDX5-18?

A.    I have.

Q.    And what categories of compounds did Dr. Rotella omit?

A.    Well, he omitted the salts, hydrates, hydrated salts and polymorphic crystalline forms of pitolisant and the potential optical isomers, racemates, diastereomers and enantiomers.

Q.    Could a POSA identify chiral compounds among the categories of Claim 13 compositions that Dr. Rotella omitted?

A.    Yes.

Q.    Would a POSA be able to prepare potential chiral salts of pitolisant?

Reider - Direct

A.      Yes.

            MS. NGUYEN:  Let's turn to PDX5-20.

BY MS. NGUYEN:

Q.      What have you illustrated here?

A.      I've taken three different chiral assays that are actually in marketed pharmaceutical products and shown what a potential chiral salt of pitolisant covered by Claim 13 would look like.  The one with lactic acid has a single stereogenic center, and they can form optical isomers, racemates or enantiomers.

            And then taking the same approach with another example, malic acid that comes from apples.  And in this case, one can have optical isomers, racemates and enantiomers.

            And, finally, I think, as came up during cross-examination, the tartaric acid has two chiral centers.  So the potential salts could have optical isomers, racemates, enantiomers or diastereomers.

            MS. NGUYEN:  Turning to PDX5-23.

BY MS. NGUYEN:

Q.      Are all these types of salts pharmaceutically acceptable?

A.      They are.  And the one on the far right is actually Ambien.

Q.      And how do you know that?

Reider - Direct

A.    Well, it says Ambien on the label.

Q.    Sorry.

How do you know that these salts are pharmaceutically acceptable?

A.    Oh.  They're in approved drugs.  And the Ambien one actually is a single enantiomer.  The -- the one in the middle is a racemate.  They use a racemic malic acid.

MS. NGUYEN:  At this time, we move to admit PDX -- PTX-490, 467, and 466.

MS. BOOKBINDER:  No objection.

THE COURT:  They're admitted.

(PTX Exhibit Nos. 466, 467, and 490 were admitted into evidence.)

BY MS. NGUYEN:

Q.    Is a POSA well-equipped to determine which compounds within the scope of Claim 13 have a chiral center?

A.    Yes.

Q.    Would a POSA ascertain the scope of Claim 13 with reasonable certainty?

A.    I believe so.

Q.    Would a POSA be able to make and use enantiomers, racemates, diastereomers or optical isomers of pharmaceutically acceptable salts of pitolisant as recited in Claim 13?

A.    Yes.

Reider - Direct

MS. NGUYEN:  Thank you, Dr. Reider.  I have no further questions.

THE WITNESS:  You're welcome.

MS. BOOKBINDER:  Permission to approach?

THE COURT:  Yes.

THE WITNESS:  So I should put away my initial binders and take their binders?

THE COURT:  You may need either one.

THE WITNESS:  Okay.  I'm terrible at --  I think she's coming to me.

CROSS-EXAMINATION

BY MS. BOOKBINDER:

Q.    Good afternoon, Dr. Reider.  I'm Julie Bookbinder for Greenberg Traurig from AET.

A.    Good afternoon.  How are you?

Q.    I'll have a few questions for you today.

A.    Okay.

Q.    Dr. Reider, you have not offered any opinions on obviousness-type double-patenting of '947, Claim 13 in view of the '430 patent; correct?

A.    That's correct.

Q.    I noticed that you didn't look at the text of Claim 13 in your direct examination.

MS. BOOKBINDER:  I'm going to ask Mr. Sayres to pull up JTX-2, Claim 13 of the '947 patent and JTX-2.25.

Reider - Cross

BY MS. BOOKBINDER:

Q.    Dr. Reider, Claim 13 is a method, according to Claim 1, so it includes all limitations of Claim 1; is that right?

A.    That's correct.

Q.    And then if we continue reading Claim 13, it states, "Wherein the compound is selected from," and then we've got the chemical name for pitolisant; right?

A.    Yes.

Q.    And then if we continue on, again, it recites, "Or its pharmaceutically acceptable salts, hydrates, or hydrated salts, or the polymorphic crystalline structures of this compound or its isomers, racemates, diastereomers or enantiomers.

That's what Claim 13 says; right?

A.    Correct.

Q.    Why don't we look at how you presented the claim.

MS. BOOKBINDER:  Could we please pull up, Mr. Sayres, PDX5.18?

BY MS. BOOKBINDER:

Q.    It's your opinion that Claim 13 covers at least nine categories of compounds; right?

A.    Yes.

Q.    And just so we're clear from your direct examination, you're counting those by starting with the top row separate five boxes:  Pitolisant, pitolisant salts, pitolisant

hydrates, hydrated salts of pitolisant and polymorphic crystalline structures of the last four categories; right?

A.    That's correct.

Q.    And --

A.    Well, actually --

Q.    Sir, I --

A.    I'll go five categories, even though A can't exist; right?  It's not of the last four categories.  It's A, B, C, D and E, but you're essentially correct.

Q.    Thank you for clarifying.

You've testified as an expert on behalf of a patent holder about ten times; right?

A.    Say that again, please.

Q.    You've testified as an expert on behalf of a patent holder about ten times; correct?

A.    No, I believe more than that.

Q.    Okay.

A.    In the course of my life?

Q.    Thank you.  So more than ten.

My question for you is:  You understand that the Court determines the meaning of claim terms in a patent, not the lawyers or even the expert witnesses; right?

A.    Yes.

Q.    Can we go ahead to Slide 5.19, please, PDX, your next slide?

Reider - Cross

So it's true, then, that if the Court determines that optical isomers, racemates, diastereomers and enantiomers all relate to pitolisant, then they can't be made, and that's a matter of scientific fact; right?

A.    I'm sorry.  That they can't be made or that from the legal point of view can't be made.

Q.    No.  Scientifically, sir.  I believe you testified to this at your deposition.  I just wanted to confirm that you still agree with that?

A.    Say it again, please.

Q.    Optical isomers --

A.    Yeah.

Q.    -- racemates, diastereomers, and enantiomers of pitolisant --

A.    Oh, pitolisant.  Absolutely.  I'm sorry.

Q.    -- can be made?

A.    I'm sorry.  I'm sorry.  I thought you were talking about the salts.

Q.    Thanks.

Let's go ahead to your next slide.  You've titled your slide PDX2-10 -- thanks.  You -- you titled this slide "Potential Chiral Salts of Pitolisant Covered by Claim 13"?

A.    I did.

Q.    Sir, you'd agree with me that the '947 patent does not disclose a lactic acid salt of pitolisant; correct?

Reider - Cross

A.    That is correct.

Q.    You have the same title on the next slide, PDX5-21;
right?

A.    Yes.

Q.    You would agree that the '947 patent does not
disclose a malic acid salt of pitolisant, either; right?

A.    Or a tartrate.

Q.    You were here for Dr. Rotella's testimony this
morning; right?

A.    I was.

Q.    You would agree with Dr. Rotella that the '947 patent
does not disclose any example of a chiral salt of
pitolisant?

A.    '947 doesn't disclose any salts.

Q.    It doesn't disclose any salts.

        Let's move ahead to your Slide 23.

        You've identified three drugs, and I'm not sure
you said it, but you're alleging that these have chiral
salts; is that correct?

A.    They have.  They're made from lactic acid, malic acid
and tartaric acid, yes.  The one on the far right is a
single enantiomer.

Q.    Sir, I'm sorry to interrupt.  I'm just on a time
schedule here.

        The lactic, malic and tartrate drugs are all

Reider - Cross

salt drugs; right, just so we have a clear record?

A.   That's correct.

Q.   You're not suggesting that these drugs have anything to do with pitolisant, are you?

A.   They're illustrative of pharmaceutically-acceptable salts that are on the market.

Q.   But they're not another form of pitolisant; correct?

A.   Correct.

Q.   The first drug, Primacor, is an intervenous treatment of patients with acute decompensated heart failure; right?

A.   That's correct.

Q.   Then the next one, Axert, is indicated for acute treatment of migraines; right?

A.   Absolutely.  It's a triptan.

Q.   And Ambien, Ambien is actually indicated for short-term treatment of insomnia characterized by difficulty with sleep initiation, that's falling asleep?

A.   Yes.

Q.   So that is sort of the opposite of the WAKIX drug here, which is for ...

A.   Right.

Q.   And the '947, to be very clear, the '947 patent doesn't say anything about any of these three drugs; right?

A.   Absolutely correct.

Q.   Dr. Reider, I'll turn your attention back to Meier I

that your counsel showed you, DTX-85.

MS. BOOKBINDER:  Mr. Sayres, if we could have DTX-85, and then in the top right quadrant is the Meier reference, C40.

BY MS. BOOKBINDER:

Q.    So this is the article in which Dr. Schwartz, the inventor of the '947 patent, as your counsel pointed out, stated at the bottom that pitolisant is "the new promising lead for further development"; correct?

A.    That's -- it says it's a new promising lead. Schwartz actually said the Germans wrote it and it was translated, but he confirmed it.

Q.    So that's what it says here in Meier I in DTX-85 in the last sentence; correct?

A.    Yes.

Q.    You testified earlier a few moments ago that you require context to interpret that phrase to understand the history of the program; right?

A.    I think that's accurate.

Q.    You don't know the development history of pitolisant, do you?

A.    No, from the published literature.

Q.    You don't know it at all; correct?

A.    I only know what was in the published literature, as a POSA would.

Reider - Cross

Q.    You're offering opinions on behalf of Bioprojet

today; right?

A.    That's correct.

Q.    You understand you're here for the testimony that

Dr. Schwartz founded Bioprojet and still works there; right?

A.    I do.

Q.    You never asked Bioprojet or their attorneys if you

could speak with Dr. Schwartz, did you?

A.    That's correct.

Q.    You also didn't consider the development stage that

Bioprojet was actually undertaking with Dr. Schwartz when he

characterized it as a promising new lead; correct?

A.    That's true.

Q.    So you didn't consider the fact that Bioprojet was

scaling up manufacturing of pitolisant to a kilogram scale

by 2001; right?

A.    It was not in the literature.

Q.    So you didn't consider it?

A.    Did not.

Q.    You also didn't consider the fact that Bioprojet had

already performed Ames tests and mutagenic tests; correct?

A.    I only learned about that at deposition when counsel

showed me privileged documents.

Q.    So you didn't consider it in your analysis; right?

A.    That's true.

Reider - Cross

Q.   Finally, you didn't consider that Bioprojet had completed hERG testing at Quintiles during this period; right?

A.   That's also correct.

Q.   Dr. Reider, You would agree with me that human data is not required in order for a POSA to be motivated to select a compound for further development; right?

A.   Absolutely.

Q.   You understand that in the '947 patent, there is both animal and human data; right?

A.   Yes.

Q.   So it's your contention that at the time the '947 patent was filed, the Stark, Ganellin and Schwartz group had not published anything new about pitolisant in nearly two years; right?

A.   I believe that's accurate.

Q.   So in the front of your binder, sir, in the very, very front, there should be DTX-2.  Do you see that?

A.   Not yet.  You want to put it on the screen or should I --

Q.   Here we go.  It is DTX-2, European patent 1100503?

A.   Okay.  Thank you.

Q.   Do you see that?

A.   I do.

Q.   Okay.  So are you comfortable if I refer to this as

EP 503?

A.    Yes, ma'am.

Q.    Great.  So EP 503 is the issued patent from WO 254, which we've just discussed, and I'll direct you to Number 87 on the right, international publication number.

Do you see that?

A.    I see it.

Q.    Okay.  So you understand that EP 503 is the patent at issue that issued from the WO 254 application?

A.    I do.

Q.    And if we scroll down on the page a bit, we see that this is the same list of inventors; right, as WO 254, starting with Dr. Schwartz?

A.    I do.

Q.    And at the top left -- and go to the top of the page -- you see that the date of publication is September 22nd, 2004; Right?

A.    I do.

Q.    So you understand that publication of a patent means it's publicly available; right?

A.    That's correct.

Q.    I'd like to show you what this patent disclosed to the public about pitolisant in 2004.  That's the same time period that you said there was a publication gap; right?

A.    Correct.  If there's biological data in here, I

apologize, would you please point me to it?

MS. BOOKBINDER:  Mr. Sayres, can you please go to DDX10.03?

BY MS. BOOKBINDER:

Q.    We're going to look at the claims of EP '503, sir.

A.    Not the experimental, the claims?

Q.    We're going to the claims on page -- excuse me -- on Page 88 of the document.  It's a bit lengthy.  We have it on the screen as well in front of you.

A.    I'm there.

Q.    Okay.  So can I direct you to Claim 47?  You see Claim 47 of the EP '503 patent?

A.    Not in German.  The ones in English?

Q.    In English, yes, on Page 88 of the document.  It's just before the German version.

A.    Okay.

Q.    Okay.  So you're at Claim 47?

A.    I am.

Q.    And that's claiming the use of pitolisant; right?

A.    (Reading to self.)  Yes.

Q.    And Claim 47 is a use directed to any one of Claims 1 to 46.  And you see on the same page, we can look at Claim 40.

A.    I do.

Q.    Okay.  So Claim 47 includes the use of pitolisant for

Reider - Cross

treatment in Claim 40 of Alzheimer's disease and attention, wakefulness and memorization disorders; right?

A.    I'm sorry.  I was looking for biological data that had been released in the time frame.  I thought that was your question.

Q.    Sir, if you -- I would appreciate if you listen to the question.  Please let me know if you have -- need any clarification.

A.    Sure.

Q.    We're at Claim 47 in EP '503 --

A.    Right.

Q.    -- directed to the use according to any one of Claims 1 to 46 wherein the compound is pitolisant.  So Claim 40, which is on the same page and on the screen, is use, when read with Claim 47 of pitolisant, for treatment of Alzheimer's disease and attention, wakefulness and memorization disorders.

        Did I read that correctly?

A.    You did.

Q.    So during the so-called publication gap, the Schwartz group was issued a patent, which was publicly available, disclosing that treatment; correct?

A.    Yes.

        MS. BOOKBINDER:  Can we please have DDX10.4?

BY MS. BOOKBINDER:

Q.    Sir, to your knowledge, Dr. Schwartz and his colleagues didn't file patents on the other 169 compounds that you say were disclosed in WO 254, did they?

A.    Method of use patents, I mean, they had already been patented and disclosed in '254.

Q.    Sir, I'm going to ask you the question again:  To your knowledge, Dr. Schwartz and his colleagues didn't file patents on the other 169 compounds that you say were disclosed in WO 254, did they?

A.    I'm very confused.  They've already been patented.

Q.    The compounds were already patented?

A.    They were in a composition of a matter of claims and listed and disclosed.  They've already been disclosed in a patent.

Q.    So, Dr. Reider, I think we're missing each other here.  I'm asking you whether Dr. Schwartz had patented the other compounds other than pitolisant prior to WO 254, to your knowledge?

A.    Prior to '254?  I don't believe they had.

Q.    Instead they selected the lead compound of pitolisant, and they received this issued patent; correct?

A.    You said prior to '254.  You asked, Have they filed patents on the 170 disclosed -- chemically disclosed species prior to '254?  '254 was where they were disclosed and patented.

Reider - Cross

Q.    And the one that was patented was pitolisant; correct?

A.    Are you specifically asking about method-of-use patents?

Q.    Sir?

A.    I'm sorry, Counselor.  '254 has 170-something compounds line by line disclosing the chemical structures.

Q.    Sir, again, I apologize, but we are on a tight time schedule.  So I will reask the question, and I'd appreciate a direct answer.

Are you -- you are not aware of Dr. Schwartz and his group filing -- filing patents outside of the EP '503, which issued and published in 2004, directed to use of pitolisant?  I'll stop there.

A.    I can answer that.  The answer to that is I'm not aware.

Q.    Thank you.

MS. BOOKBINDER:  Your Honor, I'd like to move into evidence DX2 -- DTX-2, the '503 patent.

THE COURT:  Any objection?

MS. NYUGEN:  No objection.

THE COURT:  It's admitted.

(DTX Exhibit No. 2 was admitted into evidence.)

MS. BOOKBINDER:  No more questions at this time, Your Honor.

Reider - Redirect

THE COURT:  Thank you.

REDIRECT EXAMINATION

BY MS. NYUGEN:

Q.    Just a few more questions for you, Dr. Reider.

Would a POSA have had access to any of Bioprojet's proprietary information as of April 2005?

A.    No.

MS. NGUYEN:  Can we pull up the '947 patent, please, Mr. Brooks?

And can we go to Page 14, Lines 12 through 20, Column 14?  I'm so sorry.

BY MR. NGUYEN:

Q.    What does the '947 patent disclose here?

A.    So 3-4 chlorophenyl propyl, 3-5 trans dimethylpiperidine propyl ether or the pharmaceutically-acceptable salts.  It's in a list of compounds above it, I believe.

And this says "or their pharmaceutically-acceptable salts, hydrates or hydrated salts with the polymorphic crystalline structures of these compounds with their optical isomers, racemates, diastereoisomers or enantiomers."

But there's a -- you'd have to readjust the size of it.  There's a number of compounds listed.

Q.    Great.  Thank you.

Reider - Redirect

Could we go to Column 41, Line 63, to Column 42, Line 2?

And what does the '947 patent disclose here?

A.    Well, the specification defines pharmaceutically or pharmaceutically acceptable refers to molecular -- electro entities and compositions that do not produce an adverse, allergic, or other untoward reaction when administered to an animal or human as appropriate.

Q.    Thank you.

Can we also pull up DTX-2 which counsel was just showing you?

And can we zoom in on the date of filing in the top left?

When was the EP '503 patent filed?

A.    The 29th of July 1999.

MS. NYUGEN:  No further questions.

THE COURT:  All right.  You may step down.

THE WITNESS:  Thanks.  If you get the API, let me know.

MR. BALL:  Your Honor, if I may, we --

THE COURT:  Yes.

MR. BALL:  We addressed this this morning, and I'd like to make a --

THE COURT:  All right.

MR. BALL:  -- a quick --

Reider - Redirect

THE COURT:  Let's hear it.

MR. BALL:  -- a quick motion or objection on the forthcoming testimony from Dr. Roth.

THE COURT:  Okay.

MR. BALL:  So there's a significant problem here.  Dr. Roth is going to testify on issues of obviousness, obviousness-type double-patenting.  The problem with that is he authored several reports.  He had a rebuttal report on invalidity.  He had an opening report on infringement, a reply report.

And he applied lexicography as to the meaning of excessive daytime sleepiness throughout his reports.  He said it had a specialized meaning within the context of the '947 patent.  He said it was different than the plain and ordinary meaning.  He said that Dr. Kushida, our expert, applied the plain and ordinary meaning.

We had a Daubert that was DI-404 that we had filed, because we were saying their construction was basically tardy because they hadn't raised it at the claim construction stage, and they sprung it on us during -- during expert reports.

But one day before the Pretrial Order went in, we reached agreement where Plaintiffs asked us to withdraw the Daubert in exchange for them dropping their lexicography argument and going with the plain and ordinary meaning for

Reider - Redirect

the case at trial.

And this is DI-518.  This letter was filed with the Court the day before the Pretrial Order went in.

So we have a situation where all of Dr. Roth's reports are based on a claim construction that Plaintiffs are no longer even sponsoring.  They've just -- they've just dropped it.

So we understood that he was going to be addressing objective indicia, and that's fine.  We're happy to let him come up and, you know, discuss things like long-felt need or whatever.

But if he's going to go into the '947 and talk about obviousness of a claim for treating excessive daytime sleepiness over the prior art, or more particularly, obviousness-type double-patenting where he's going to say that excessive daytime sleepiness, you know, means something different than diurnal somnolence, that was all predicated on this lexicography argument that they -- that they had.

THE COURT:  Are you saying to me that you think he should only be able to testify on objective indicia?

MR. BALL:  I'm saying he has no reports which offer the claim construction that they've agreed to, which is the plain and ordinary meaning.

THE COURT:  So when you made this agreement with them regarding the claim construction, you understood them

Reider - Redirect

to be essentially giving up their right to present any rebuttal testimony on obviousness -- Is that -- or just objective indicia?

MR. BALL:  Sorry, Your Honor.  As I was saying, objective indicia -- I mean, that was -- that was half his report.  And so when the opening came in, we understood that -- I mean, they went right into objective indicia, and we thought that was going to be their rebuttal case, because he had a lengthy expert report on objective indicia.  We did not understand that he was going to get up and testify on these issues, because he has no reports on those issues.

So this is a simple matter of they're trying to put up a witness to testify outside the scope of his expert reports, if he's talking about things like the meaning of excessive daytime sleepiness.

THE COURT:  All right.  Let me hear from the other side.

MS. HANSEN:  Sure.  And, Your Honor, I think you've caught on to something that we actually -- is concerning to us, too.

Certainly, the stipulation was filed the day before the pretrial conference.  It is a definite -- it's a stipulation about a claim construction.  At no point until, frankly, 11:00 p.m. last night was this issue raised by counsel.

If they thought that we were actually dropping obviousness or obviousness-type double-patenting, they certainly could have asked us.  They asked us about a lot of other things in the intervening three weeks.

But this is -- this is a very late-raised issue that we had no idea was going to happen.  I mean, look, the parties have experts.  We have experts on both sides.  If they thought we were dropping our obviousness or obviousness-type double-patenting, that would certainly be something that they should have clarified if they thought that that was what the stipulation did.

It wasn't our expectation at all.

THE COURT:  Right.  So you've agreed that it's going to carry the plain and ordinary meaning.

MS. HANSEN:  Correct.

THE COURT:  And your expert, does he say somewhere in his rebuttal report that he is assuming it carries the plain and ordinary meaning?

MS. HANSEN:  It's a little bit more nuanced than that, Your Honor.

THE COURT:  Okay.

MS. HANSEN:  So counsel is correct, he did offer a lexicography opinion.  However, it was plain and ordinary meaning plus.

THE COURT:  This is the problem with plain and

ordinary meaning; right?

MS. HANSEN:  Well, actually, in specific, he said pathological sleep that interferes with daytime activity.

THE COURT:  All right.  So is he going to say that it means something different than plain and ordinary meaning?

MS. HANSEN:  He is not.

THE COURT:  And so if he's not -- what's your response to their argument, then, that he's giving a new opinion that he didn't give before?

MS. HANSEN:  Given that the obviousness opinion, Your Honor, was in the context of the broader opinion, certainly if he's arguing that the broader definition wouldn't have been obvious, then it follows that the narrower opinion shouldn't have been -- wouldn't have been obvious.

THE COURT:  Is that a new -- is that a new opinion?

MS. HANSEN:  No, Your Honor.

THE COURT:  All right.  Here's what we're going to do.  We're going to start with the testimony, and we'll have defense counsel make contemporaneous objections.  I need to understand this better.  You-all are very clearly in the weeds on this, and I can't make some sort of omnibus

Reider - Redirect

ruling that I think is going to be reasoned at this point without actually hearing the testimony.

MS. HANSEN:  Okay.

THE COURT:  Counsel.

MR. BALL:  Yeah, Your Honor.  Instead of making objection to -- objection to the testimony, because we really don't want to interfere with the presentation, and obviously, time is limited, If I could -- if we could have a standing objection to this, and then maybe it's something that we can brief, you know, post-trial.

THE COURT:  No.  I don't think so.  I think we should just get it on the record today as it happens.  So -- and we'll try to sort it out as best we can.  And if there is something that I don't feel like I can resolve today, then we'll deal with it post-trial.

MR. BALL:  Will do.  Thank you.

THE COURT:  Yeah.

MS. HANSEN:  Your Honor, the Plaintiffs call Dr. Thomas Roth to the stand.

And may we approach with binders for the witness and the Court?

THE COURT:  Yes.

COURTROOM DEPUTY:  Please remain standing and raise your hand.  Please state and spell your name for the record.

Reider - Redirect

THE WITNESS:  Thomas Roth.  T-H-O-M-A-S.
R-O-T-H.

COURTROOM DEPUTY:  Do you swear or affirm that the testimony you give to the Court will be the truth, the whole truth and nothing but the truth, so help you God, or do you so affirm?

THE WITNESS:  I so affirm.

COURTROOM DEPUTY:  Thank you.

THOMAS ROTH, the witness herein, after having affirmed under oath, was examined and testified as follows:

MS. HANSEN:  Your Honor, may we proceed?

THE COURT:  Yes.

DIRECT EXAMINATION

BY MS. HANSEN:

Q.    Good afternoon, Dr. Roth.  Could you please state your name for the record?

A.    My name is Thomas Roth.

Q.    Have you prepared any demonstratives to assist with your testimony today?

A.    I have.

Q.    Turning to PDX6-1, and I apologize, I'm moving in the wrong direction.  At a high level, what were you asked to opine about in this case?

A.    The validity of the '947 patent.

Q.    Turning to PDX6-2, what, if any, is your current

Roth - Direct

employment?

A.      I'm emeritus professor in the department of medicine at Wayne State University.  I'm emeritus director of the Sleep Disorders Center at Henry Ford Hospital.

Q.      What is the Sleep Disorders Center?

A.      The Sleep Disorder Center at Henry Ford Hospital was something I founded in 1978.  It is a center -- it's the 13th in the United States.  It's a center committed to, one, the treatment of patients with sleep and wake disorders, and to educate physicians, active physicians, residents and fellows in the practice of sleep medicine.

Q.      Sir, do you have a medical degree?

A.      I do not.

Q.      What is your highest degree?

A.      Ph.D. from the University of Cincinnati.

Q.      Over the course of your career, have you been involved in the diagnosis and treatment of patients with sleep disorders?

A.      I have in multiple ways.  I have been involved at a national level, the National Heart and Lung Institute, and I started a National Center on Sleep Disorders Research.  And the goal of the National Center on Sleep Disorders Research was to educate physicians about the diagnosis and management of sleep disorders and to develop a research strategy for the future.

Roth - Direct

At the first meeting of that society, I was elected to chair the National Center.  In addition, the American Academy of Sleep Medicine, which Dr. Kushida spoke about, has had about 49 presidents.  Three of those have been Ph.D.s.  I was the first of those.

Q.    Have you been involved with the overseeing of the education of, for example, other physicians?

A.    Yes.  So at a -- at a broad level, I've given grand rounds in virtually every major medical school in the United States, but more locally, I have been involved in training fellows.  I've been training -- training physicians from other departments.  I've been involved in supervising individual fellows before taking patient histories and after taking patient histories.

And when the center first started in 1978, about the first 15 years, we had a clinical case conference every Friday where we had all the patients in there, all the fellows, consultants from ENT -- from ear, nose and throat, and from pulmonary medicine, and I chaired all of those.

So I have an individual supervision level, at a medical grand rounds level.  And at a fellow level, I've done all of those things.

Q.    Over the course of your career, how many patients with sleep disorders did you oversee?

A.    I would estimate, you know, it -- it varied depending

Roth - Direct

on my role in the -- in the division over time, but I would estimate across time about 150 per year.

Q.    And when did you --

A.    More early on, less recently.

Q.    When did you start advising medical doctors on the treatment of patients with sleep disorders?

A.    Oh, I would say 1970 when I first got into the field, people asked me about that all the time.

Q.    Have you overseen the treatment of patients with narcolepsy?

A.    Yes.

Q.    Over the course of your career, can you estimate how many patients with narcolepsy for which you have overseen their treatment?

A.    I would estimate over 20 years.  So for 20 years, that would be, you know, about 400, 300.

Q.    Have you ever seen the treatment of patients with sleep apnea?

A.    Yes.

Q.    Over the course of your career, can you estimate how many patients with sleep apnea for which you have overseen their treatment?

A.    Probably a hundred a year, so 20 years, 2,000.

Q.    Have you ever overseen the treatment of EDS in patients with Parkinson's over the course of your career?

A.      Much less frequently.  I would say total over the 30 years about 15 max.

Q.      Over the course of your career, other than in overseeing the treatment of patients, have you had any other occasion to work with Parkinson's patients?

A.      Well, yes.  I've done clinical work on understanding the daytime sleepiness in Parkinson's patients.  We had a collaborative research with Mount Sinai in New York, and then I had contacts that recruited narcolepsy -- Parkinson's patients with daytime sleepiness and evaluated that.  And I was consulted by both the EMEA and the FDA in terms of understanding daytime sleepiness in Parkinson's patients.

Q.      Have you ever participated in any industry-sponsored clinical trials in the field of sleep medicine?

A.      I have.  I guess over the years, you know, I would say, you know, maybe 50, 60, probably more very early on. With time I thought it would be more appropriate for younger investigators to be the principal investigators.

        But more importantly, I served as an investigator in terms of consulting to companies in terms of developing the protocols which go into clinical trials.

Q.      And how many of those trials concerned the treatment of EDS in patients with chronic diseases like narcolepsy?

A.      You know, early on, it was probably less, maybe 30, 40 percent.  In the last 20 years, it's probably 70,

Roth - Direct

80 percent.  So there has been a shift from understanding insomnia to understanding excessive daytime sleepiness.

Q.    Now, I see you cite to PTX-793 on this slide.  What is this document?

A.    Which document are you talking about?

Q.    If we could turn to PTX-793.

A.    It's my Curriculum Vitae.

Q.    Does this document accurately set forth your education, training and experience?

A.    It does.

Q.    Have you held any leadership positions in any professional organizations?

A.    Yeah.  There's -- in the United States, you have three major sleep societies.  There's the American Academy of Sleep Medicine, which is the clinical organization.  There's the Sleep Research Society, which is predominantly a research society, and then there is the National Sleep Foundation, which is an advocacy hyphen patient education physician society.

I served as presidents of all three of those.  In the case of the National Sleep Foundation, I was the first. In the case of the American Academy of Sleep Medicine, I succeeded Dr. Dement as the second president.

Q.    Are these organizations that you just mentioned well respected in the field of sleep medicine?

Roth - Direct

A.     They define sleep medicine in the United States.

Q.     Have you received any honors and awards for your work on sleep medicine?

A.     I have.

Q.     What would you describe as the most gratifying honor or award that you've received?

A.     Well, from a narcicisstic point of view, I like the awards -- I was awarded the annual lecture of the Thomas Roth Lecture of Excellence, so I get to see my name on the program every year, the Thomas Roth Lecture of Excellence. It's the only one named, and I guess that's why I like it the best, you know.

And the Nathaniel Kleitman award, the American Sleep Disorder Association, Dr. Kushida spoke about that.  I got that the first year I was eligible to get it.

So all of those are great awards.  I'm not sure, you know -- other than my narcissim distinguishes between them.

Q.     Turning to PDX6-3, have you held any editorial positions for professional journals or textbooks?

A.     The standard textbook in sleep medicine is, you know, Principles and Practice of Sleep Medicine.  I have, in conjunction with Dr. Dement and Dr. Kryger, served as co-editor and chief of that.  As we speak right now, we're now editing the eighth volume in Principles and Practice.

I've also served as editor, you know, in journals. I was editor-in-chief of Sleep, the Journal of Sleep. The Journal of Sleep is the dominant journal in our field.

I succeeded again -- Dr. Dement again as the second editor-in-chief.

Q.    Have you served as a peer reviewer for any scientific journals?

A.    Yes. I mean, you know, within the sleep journals, I've had leadership positions. You know, unfortunately, in the more medical journal -- internal medical journals, they're looking for sleep expertise, which they don't necessarily have.

So I review things for Lancet. I review for things like New England Journal of Medicine. I reviewed for the Journal of the American Medical Association. So, yes, I've done a lot of reviews.

Q.    Have you authored any publications, sir?

A.    Yes, I have.

Q.    About how many total publications do you have?

A.    I'll break them down into three categories. I've had about 600 -- roughly 600 peer-reviewed publications, about 250 chapters and about 700 abstracts.

Q.    And in very general terms, what are the fields that most of these publications occur or concern?

Roth - Direct

A.    99.9% sleep medicine.

Q.    As part of your work, do you consult with pharmaceutical companies?

A.    I do.

Q.    We don't need an exhaustive list, but can you identify a few of the pharmaceutical companies with which you have worked?

A.    Sure.  Pfizer, Merck, Lilly, Upjohn, Sandoz, Abbott.

Q.    At a high level, what has your consulting work involved?

A.    Well, it's involved in three things.  It's involved in -- in identifying and progressing clinical research programs forward in terms of designing protocols, inclusion criterion, exclusion criterion.

The second thing I do, which I think is potentially, in my eyes, my best strength, is I interpret the results of studies and what they mean.

And, thirdly, I tend -- I have gone as a consultant to the -- for the companies to the FDA, and I have also served on the Food & Drug Administration Pharmacy Advisory Boards.

Q.    Why do you do consulting work for pharmaceutical companies?

A.    Well, you know, one of the things to maintain leadership in the field, you have to know what's going on.

Roth - Direct

You know, we just heard there's a two-year gap before something came on the market.  So one of the ways I keep track -- and most of the stuff, before it gets on the market, is under CDA, so you don't know about it.

So I -- by consulting with these companies, I stay abreast of the field.

MS. HANSEN:  Your Honor, at this time, Plaintiffs offer Dr. Roth as an expert in the field of sleep medicine.

MR. BALL:  No objection.

THE COURT:  We'll permit him to testify in that field.

BY MS. HANSEN:

Q.    Dr. Roth, are you familiar with Claim 13 of the '947 patent?

A.    Yes, I am.

Q.    Were you in the courtroom during Dr. Kushida's testimony?

A.    Yes, I was.

Q.    Do you recall that Dr. Kushida testified that Claim 13 would have been obvious to the person of ordinary skill in the art as of April 2005?

A.    Did I hear that?  Yes, I did.

Q.    Do you agree with him?

A.    No, I do not.

Roth - Direct

Q.    Do you also recall that Dr. Kushida testified that Claim 13 would have been invalid for obviousness-type double-patenting in light of two claims in the '430 patent?

A.    Yes.

Q.    Do you agree with him?

A.    No.

Q.    Do you recall that Dr. Kushida testified that Claim 13 would have been invalid for lack of enablement?

A.    I remember him saying that.

Q.    Do you agree with him?

A.    No, I do not.

Q.    Before we get further into the substance of your opinion that Claim 13 -- about Claim 13, I wanted to briefly cover some scientific background.

        MS. HANSEN:  And if we can go to PDX6-4.

BY MS. HANSEN:

Q.    Realizing we're well into the third day of trial, I don't believe we've heard testimony as to what narcolepsy is.

A.    Well --

Q.    What is narcolepsy?

A.    Narcolepsy is a disorder which sort of has an abnormal regulation of both sleep and wake, but the primary symptom of narcolepsy is excessive daytime sleepiness.  And I mentioned before that I lectured the fellows who are in

Roth - Direct

training.  And like any other students, you know, they tend to get drowsy.

One of the fellows once asked me, you know, what is the difference between daytime sleepiness and excessive daytime sleepiness.  And I said, if you fall asleep in the lecture, that's daytime sleepiness.  If I fall asleep in the lecture, that's excessive daytime sleepiness.  So I think it's pretty clear what's irresistible and what's resistible.

Another example is if a person with daytime sleepiness is driving down the highway and they feel sleepy, they'll drive down the road for the next five minutes, stop, take a nap, get some coffee.  A person with irresistible sleepiness is highly likely to have an accident if they continue.

Q.    Now, other than EDS, are there -- what are some of the main symptoms of narcolepsy?

A.    Well, there's -- narcolepsy is abnormality.  At least Type 1 narcolepsy is a type of abnormality of the REM system.  So what they have is REM-related symptoms, so things like atonia, which is loss of muscle tone, which we all have every night in REM sleep.  It could be hallucinations, which we all have every night when we dream.  And the muscle atonia, which we all have when we dream as well.

MS. HANSEN:  I apologize, but housekeeping.  I'd

Roth - Direct

like to move PTX-793 into evidence.

MR. BALL:  No objection.

THE COURT:  It's admitted.

(PTX Exhibit No. 793 was admitted into evidence.)

BY MS. HANSEN:

Q.    Are there any other diseases that have excessive daytime sleepiness, EDS, as a symptom?

A.    Multitudes.

Q.    Could you name a few?

A.    Well, in the sleep field, there would be -- you know, there would be idiopathic hypersomnia.  There would be -- well, Parkinson's, which is sort of a sleep disorder.  There could be nocturnal narconis.  There would be lots of them.

Outside of the sleep field, it could be cancer. It could be fibromyalgia.  There's a multitude of them.

Q.    I'd like to turn to some more fundamental biology.

MS. HANSEN:  And turning to PDX6-5.

BY MS. HANSEN:

Q.    How is the sleep-wake system regulated?

A.    Well, so sleep and wake, you know, people sort of analogize sleep and wake to a seesaw.  When we're kids, you know, sleep goes up, you know, wake goes down.  Wake goes up, sleep goes down.  So people think of hypocretin and histamine as the two transmitter systems which flip that

seesaw up and down.

So this is what flips it.  And dopamine, which is mostly driving wakefulness, and adenosine, which is mostly driving sleep, further supports those systems.  The timing of those systems is dictated by circadian rhythms, which we're not going to talk about.

Q.    And I see that you have a reference here at the bottom.  Is this a reference that you used in preparing this slide, PTX-551?

A.    It is.

MS. HANSEN:  Move to admit PTX-551 into evidence.

MR. BALL:  No objection.

THE COURT:  It's admitted.

(PTX Exhibit No. 551 was admitted into evidence.)

BY MS. HANSEN:

Q.    We've heard a lot about histamine.

MS. HANSEN:  And I'd like to turn to PDX6-6.

BY MS. HANSEN:

Q.    Can you explain some of the systems in the human body that are affected by histamine?

A.    Yeah.  Histamine is distributed throughout the whole body and so it affects things like we just talked about, wake and sleep, both in terms of regulating -- you know,

Roth - Direct

sleep -- you know, wakefulness and, you know -- and, you know -- and sleep, there are effects on food intake.  We talked about weight loss, locomotion, histamine affects it.  Huge effect as analgesic.  Emotion:  Sadness, depression, schizophrenia.  Arousal and attention is a very big area.  So it affects wakefulness in the sense of attention, you know, because wakefulness is an immediate or a cognitive function.  And it has a big effect on learning and memory.  And then it has cardiac effects, mostly as a side effect.

Q.    Now, I see on the bottom here that you have some exhibits:  PTX-567, PTX-563, and DTX-91.  I believe DTX-91 has already been admitted.

Are these references that you relied on in preparing this slide?

A.    Yes, sir -- yes, ma'am.

MS. HANSEN:  I'd like to move in PTX-567 and PTX-563.

MR. BALL:  We have no objection on those.

Just those two?

MS. HANSEN:  DTX-91 is already in evidence.

THE COURT:  Admitted.  They're admitted.

(PTX Exhibit Nos. 563 and 567 were admitted into evidence.)

MS. HANSEN:  Thank you, Your Honor.

BY MS. HANSEN:

Roth - Direct

Q.    Because of these widespread --

MS. HANSEN:  Let's turn to PDX6-7.

BY MS. HANSEN:

Q.    Because of these widespread effects, what were some of the speculated uses for $H_3$ antagonists as of April 2005?

A.    Well, the -- a few of the ones mentioned and pursued were cognitive functions, like ADHD, attention disorders, Alzheimer's.  But also, classically, histamines were developed for -- allergic rhinitis, motion sickness, epilepsy, obesity.  A lot of interest in pain and congestion, so there's a myriad of things that were pursued.

Q.    And so I see that you have some citations on the bottom of this slide to DTX-84, DTX-46, DTX-88, DTX-97 and DTX-91.

       Are all those references that you used in preparing this slide?

A.    Yes, they are.

MS. HANSEN:  Now, I believe some of those have been entered into evidence, and so, thus, I would only move in DTX-46 and DTX-97.

MR. BALL:  No objection.

THE COURT:  They're admitted.

(DTX Exhibit Nos. 46 and 97 were admitted into evidence.)

BY MS. HANSEN:

Roth - Direct

Q.     Now, I want to talk about excessive daytime sleepiness specifically.

MS. HANSEN:  Turning to PDX6-8.

BY MS. HANSEN:

Q.     What is EDS?

A.     Well --

MR. BALL:  Your Honor, we'd just raise our same objection to the witness discussing what EDS is.

THE COURT:  All right.  Well, why don't we hear what he says.  And then if he testifies outside the scope of his report, then we'll have counsel direct us to where it's in the scope of his report and we'll go from there.

MR. BALL:  Okay.

THE WITNESS:  Well, the father in our field is Dr. William Dement and Dr. William Dement -- you know, while we all call it excessive daytime sleepiness, he called it pathological sleepiness, and I tend to use that term.

And pathological sleepiness or excessive daytime sleepiness is a level of sleepiness which interferes with activities of daily living and has an effect on safety, productivity.  People can't keep jobs, and they fall asleep at inappropriate times.

It is by patient measurement, is measured with something called the Epworth Sleepiness Scale.  And it is -- the Epworth Sleepiness Scale gets an estimate of sleepiness

Roth - Direct

over a two-week period, and it is a scale from zero to 24. And basically Johns did a lot of research and showed that numbers above 11 suggest -- are associated with disorders of pathological sleepiness, disorders like narcolepsy, sleep apnea.

MR. BALL:  Your Honor, if he's just talking about the plain and ordinary meaning and he's not expressing an opinion as to what it means on the '947 patent, we're fine with this.  He's taken a completely different view on the '947.

THE COURT:  Right.  I didn't hear him say anything about the '947 patent.  It sounded exactly like what everybody's experts have said so far in the case.

MR. BALL:  Just saying that is -- we're fine.

THE COURT:  Okay.  Got it.

BY MS. HANSEN:

Q.    What is daytime sleepiness?

A.    Well, daytime sleepiness is, as Dr. Kushida says, you know, it's something we all experience.  You know, it's something we all have, like sitting in a courtroom.  You know, very clearly things which bore people, you know, will make people sleepy.  You know, seeing -- you know, sitting in a movie in a dark room can make people sleepy.  So it's something we all experience intermittently.  Unlike excessive daytime sleepiness, which is a chronic condition

Roth - Direct

with very little pauses in between.

Q.    Do people with excessive daytime sleepiness experience sleepiness during the day?

A.    They experience sleepiness all the time.

Q.    Then how come EDS in patients with Parkinson's, narcolepsy and sleep apnea isn't just sleepiness during the day?

A.    Because sleepiness during the day is something we all experience.  We -- we can postpone it.  We can alleviate it, you know, simply.  Excessive daytime sleepiness in those patients is irreversible sleep -- irreversible sleep attacks.  They can't fight it.  They lose jobs.  They have car accidents.  People with normal daytime sleepiness don't experience those things.

        Again, I go back to Dr. Dement, there's pathological sleepiness.

Q.    Do you consider there to be a meaningful distinction between the terms "diurnal somnolence" and "daytime sleepiness"?

A.    No.

        MR. BALL:  So, Your Honor, we just have an objection.  She's, obviously, asking him a question about '430, Claim 3 versus the '947 patent, and so on that, we raise the objection.

        THE COURT:  Wait a second.  I didn't hear

Roth - Direct

anything about the patent.  I did remember -- my memory is not great, but I do remember a dispute where you wanted to get exactly that testimony in from a deposition later, what he just said, but now you object to it?

MR. BALL:  Well, he's saying that they're different, so the --

THE COURT:  No.  I think he just said they were the same.

MS. HANSEN:  He said they were the same.

THE WITNESS:  I said daytime sleepiness and diurnal somnolence are the same.

MR. BALL:  We'll take it.

THE COURT:  We're good.  Okay.  That's why I was confused.

BY MS. HANSEN:

Q.    How does EDS in patients with chronic conditions, like narcolepsy, Parkinson's and sleep apnea compare to the type of sleepiness that, for example, healthy individuals experience?

A.    Well, it's more chronic.  It's more dangerous.  It's more intense and it's harder to resist and harder to reverse.

Q.    I see there's a citation here to DTX 3228.  Is this a reference that you used to prepare this slide?

A.    It is.

Roth - Direct

MS. HANSEN:  Move to admit DTX-3228 into evidence.

MR. BALL:  No objection.

THE COURT:  It's admitted.

(DTX Exhibit No. 3228 was admitted into evidence.)

MS. HANSEN:  Let's turn to PTX6-9.

BY MS. HANSEN:

Q.    Do all treatments for daytime sleepiness work to treat EDS?

A.    No, they do not.

Q.    Why not?

A.    Well, because they provide only temporary and mild relief.  So, for example, you know, people who are sleepy will often, you know, take coffee to help them.  As we said, they may drive down the highway for another half an hour, you know.  I mean, I think this slide really typifies that. You know, here's a person talking to another person, and in one minute, they are falling asleep in the middle of a conversation.

That's not daytime somnolence.  That's excessive daytime sleepiness.  And caffeine doesn't help that.  That woman has a cup of coffee in her hand.  She's drinking it and falling asleep.

Q.    Now, let's turn to talk about some of the approved

Roth - Direct

treatments for narcolepsy that were available prior to April 2005.  And turning to PDX6-10, as of April 2005, what treatment options were there to treat narcolepsy patients?

A.    Well, we have got to remember there are two types of narcolepsy.  We didn't get into that, but there's Type 1 narcolepsy, which has excessive daytime sleepiness, and those REM intrusions had mostly cataplexy.  So if you have Type 1 narcolepsy, you have excessive daytime sleepiness, and you have cataplexy.  So for excessive daytime sleepiness, amphetamines, methylphenidate and Modafinil were the main treatments.  Sodium oxybate at that point, it was used often, but it was off label.

Now, if you turn to cataplexy, cataplexy was treated with antidepressant medications, whether they tried tricyclics, SSRIs, SNRI inhibitors.  And sodium oxybate was, in fact, indicated for cataplexy.

Q.    Now, I see sodium oxybate sort of occupies that center space between EDS and cataplexy.  Could you use it to treat both EDS and cataplexy?

A.    Well, at that point in time, in 2005, it was labeled only for cataplexy, but it was used all the time for both.

Q.    Now, I also see a citation underneath there that says "two times nightly."

What does that mean?

A.    Sodium oxybate has a three-hour half-life.  And you

would take your first dose -- and it was liquid -- at about when you went to bed.  And three hours or four hours later, you take your second dose to get through the day -- to get through the night.  So unlike those other medications on your left, which are taken when you get up in the morning, sodium oxybate is taken at night before you go to sleep.

Q.    Now, were there any other drawbacks of -- in pre-April 2000 -- for the pre-April 2005 treatments for EDS and narcolepsy?

A.    Well, you know, all the drugs and the dopaminergics, they're all scheduled.  You know, the FDA schedules them.

So for -- Modafinil, for example, is a Schedule IV.  Amphetamines are Schedule II.  So they're all scheduled drugs.

And, hence, there are some varying degrees of abuse liability, but they all have abuse liability.  Sodium oxybate is a very scheduled drug.  And, again, all the antidepressants are off label, and we all know all the side effects associated with antidepressants.

Q.    So what does it mean to be a scheduled drug?

A.    Well, whenever -- mostly CNS drugs, but not exclusively CNS drugs.  The Food and Drug Administration and the DEA requires companies to do a series of studies, both animal studies in terms of preference and things like that and human studies to assess -- and they study drug addicts

Roth - Direct

and they study -- ask them how much they like the drug and compared to nonscheduled drugs.  And based on those judgments, they make a decision whether it's going to be scheduled or not.  And it's going to be Schedule II, III or IV.

Q.      Let's turn to what the POSA may have been looking for when developing drugs for treating EDS and chronic conditions like narcolepsy.  Turning to PDX 6-11, what, if any, pharmacological parameters would be particularly important when developing a drug to treat EDS in patients with chronic diseases like narcolepsy?

A.      Well, you know, obviously, we've heard, you know, from our previous presenter, the most important thing is brain -- is bioavailability and specifically brain penetration.  Very clearly the drug must reach the physiological site of action in the brain.  A good example of that, as we said, narcolepsy Type 1 is an abnormality of the orexin system.  They don't have any orexin.

So the logical thing is, well, why don't you just give them a replacement of orexin?  It will be better. The problem is orexin doesn't pass the blood-brain barrier. So the companies have spent the last 20 years developing drugs to get it, to get brain penetration of orexin into the system.

The second most important thing -- these are

Roth - Direct

long, chronic diseases.  So, you know, because they are long

diseases, they have to be tolerated.  If patients don't take

the drug, they're not effective.  And then, finally, you

have to -- you know, you have the situation where if I keep

you awake during the day, 6, 7, o'clock, 8 o'clock at night,

it's good.  But if it's 10, 11 o'clock at night, I wake you

up, That's bad because then you'll be more sleepy the next

day.  So those things are very important.

Q.    And what would you clarify or classify that last

category as?

A.    Half-life, duration of action.  It's actually more

duration of action than half-life.  Everybody thinks it's

half-life, but it's duration of action, which is a

combination of half-life and dose.

Q.    Let's cover a few preliminaries before we get to the

heart of your opinions.  Were you instructed as to the

standard to be used in evaluating whether a patent claim

would have been obvious over the prior art?

A.    Yes, I was.

Q.    Does this slide accurately reflect that standard?

A.    Yes, it does.

Q.    In evaluating whether Claim 13 would have been

obvious, did you consider the credentials of a person of

ordinary skill in the art?

A.    I did.

Roth - Direct

Q.    Turning to PDX6-13.

Is this the definition of a POSA that you used?

A.    Yes, it is.

Q.    Now, based on his testimony, Dr. Kushida's definition required that the team member, with respect to the therapeutic aspects of the '947 patent, would have had a medical degree.

Do you agree that one needs to have a medical degree to have expertise in the treating of EDS in patients with narcolepsy, Parkinson's or sleep apnea?

A.    No.  The National Center on Sleep Disorders Research has recruited physicians -- has recruited Ph.D.s to educate physicians, fellows.  American Academy of Sleep Medicine has had three Ph.D.s as presidents of their societies who authored many of the practice guidelines.  So, no, I do not.

Q.    Now, you've told us that you don't have a medical degree.  Regardless, by April 2005, what experience, if any, did you have, from the perspective of a person with a medical degree and several years of clinical and research experience, in the treatment of excessive daytime sleepiness?

A.    As I mentioned, at a national level, giving courses to physicians at the annual meeting on treating excessive daytime sleepiness and having symposiums at national meetings, at a local level, running weekly case conferences

with fellows and other physicians.  And on an individual basis, supervising individual fellows on the diagnosis and management of sleep disorders.

Q.    Would your opinions regarding the validity of Claim 13 be any different if you were to use the definition that Dr. Kushida used?

A.    They would not.

Q.    And in evaluating whether the claims were obvious, are you using the same April 2005 priority date that Dr. Kushida used?

A.    I am.

Q.    Let's turn to PDX6-14.  Can you briefly summarize for the Court why you disagree with Dr. Kushida's obviousness conclusions?

A.    Sure.  Because as of 2005, there was absolutely no motivation to pursue pitolisant.  You know, in his description, there was a whole series of data available as of April 2005 for method of treating excessive daytime sleepiness.  And very clearly, pitolisant out of that did not stand out.  And equally important, there's no reasonable expectation of anything happening, much less that pitolisant would be effective in treating EDS in narcolepsy, sleep apnea.

And the objective indicia, which I think are very important, includes unexpected results, long-term need

Roth - Direct

for nonscheduled treatment, failure to develop other $H_3$

antagonists and industry praise demonstrating

non-obviousness of this discovery.

THE COURT:  Counsel?

MR. BALL:  Your Honor, we object to this, the

first two, no motivation and no reasonable expectation.

Here, he's talking about the claims of the '947 and the

meaning of excessive daytime sleepiness in those claims.

And he does not have opinions on that based on the -- based

on the plain and ordinary meaning of excessive daytime

sleepiness.

THE COURT:  Okay.  But I heard him say in his

testimony he's talking about motivation to pursue pitolisant

in treating EDS in patients with narcolepsy, sleep apnea and

Parkinson's.  That's what he testified to in his report;

right?  I'm just saying.

MR. BALL:  Yes.  Yes.

THE COURT:  I'm going to allow him to testify in

accordance with his report.

MR. BALL:  Well, in his report, excessive

daytime sleepiness is not excessive daytime sleepiness that

he is discussing today.

THE COURT:  In his report -- well, I'm going to

let him testify -- put aside the patent.

I'm going to let him testify about whether or

Roth - Direct

not, as a factual matter, there was a motivation to pursue the drug as a method of treating EDS in patients with narcolepsy, sleep apnea and Parkinson's.  And if you want to argue in the post-trial briefing that that opinion is irrelevant because treating excessive daytime sleepiness is not just restricted to those indications, you are free to do that.

Does that make sense?

MR. BALL:  It does, but that's not our argument.

THE COURT:  Okay.

MR. BALL:  He says excessive daytime sleepiness means narcolepsy.  His opinion is that the patent has redefined excessive daytime sleepiness as meaning narcolepsy, not just simply excessive daytime sleepiness.

THE COURT:  I didn't hear him give that opinion. That was -- but that was his opinion, but I haven't heard him give it on the stand.

MR. BALL:  That's why what he just offered is outside the scope of his opinions.

THE COURT:  Okay.  Counsel?

MS. HANSEN:  Your Honor, as we said, in his reports, the opinion that he offered was that the definition of EDS in the context of the '947 patent was the definition that he's given, but also, in addition, covered a little bit more.  So his opinions would apply equally to the plain and

ordinary meaning as well.

THE COURT:  Okay.  I'm going to conditionally admit the testimony, subject to parties raising it in the briefing that it's outside the scope of his report.

MR. BALL:  Thank you.

MS. HANSEN:  Thank you.

BY MS. HANSEN:

Q.    Now, Dr. Roth, just to clarify this for the Court, given this colloquy, do -- before we get into your opinions, you understand that the parties have agreed that the term "excessive daytime sleepiness" carries its plain and ordinary meaning; correct?

A.    Exactly.  And, in fact, if I may add, in my deposition and in my reports, I talk about it in that context as well as the other contexts.  I talk about it both ways.

Q.    In rendering your opinions today, you understand that you'll be limiting your opinions to just EDS, meaning pathological sleepiness that interferes with daytime living, comprising irresistible urges to sleep?

A.    I do.

MS. HANSEN: Mr. Brooks, if we could pull up DDX7.36, please.

BY MS. HANSEN:

Q.    Now, Dr. Kushida discussed a number of references

Roth - Direct

that were published from 1983 to 2001.  Have you reviewed these references?

A.    I have.

Q.    Indeed, were there any references dated before the April 2005 priority date that Dr. Kushida discussed yesterday that you haven't considered?

A.    Not -- not that I can think of.

Q.    So I'd like to focus on Dr. Kushida's primary reference.

MS. HANSEN:  And if we could turn to DTX-80, Mr. Brooks, which conveniently is also entitled "Brooks."

BY MS. HANSEN:

Q.    We heard how Dr. Kushida summarizes this paper. Could you please summarize how you would summarize Brooks 2002?

A.    Okay.  So Brooks 2002 is a foray into understanding the future or novel therapies for the treatment of narcolepsy.

Q.    And what, in general terms, does this paper cover?

A.    It covers current treatments for narcolepsy and various options for the future development of drugs to treat narcolepsy.

Q.    Let's turn to Table 1 of Brooks.  What is shown in Table 1?

A.    Well, these were the drugs which are currently being

used to treat narcolepsy.  And they're all dopamine -- dopaminergic drugs.

Q.    What does being a "dopaminergic" drug mean?

A.    Well, it means it works on the dopamine system, which as we said before is the wake system.  Unfortunately, it also has a lot of side effects, cardiac mostly.  But they're scheduled drugs, and scheduled drugs have all kinds of concerns with them.

You know, there are limitations on physicians, depending on the state, of how much you can prescribe, how many pills, how many renewals, where you can do it.

So, for example, oxybate only has a couple of different pharmacies which can do it in every state, so there are limitations on scheduled drugs.  And patients are afraid of them, and doctors are afraid of them.

Q.    Have you heard the term "stimulant" before?

A.    Yes.

Q.    In the context of treating EDS, what is a stimulant?

A.    Well, a stimulant literally means it's any drug which alerts you, but mostly it's used in -- in association with dopaminergic drugs.

Q.    Let's turn to Page 1825 and look at that first full paragraph.

We heard Dr. Kushida point to these sentences that you see on the screen here --

A.    Mm-hmm.

Q.    -- as motivation to use an $H_3$ antagonist to treat EDS and conditions like narcolepsy.

A.    Mm-hmm.

Q.    In your opinion, would the POSA have pursued $H_3$ antagonists over one of the existing classes of drugs shown to actually have a clinical effect in EDS and narcolepsy patients?

A.    No.

Q.    Why not?

A.    Well, first of all, it talks about the fact that histamine receptor agonists have been shown to increase slow wave sleep in --

Q.    Dr. Roth, you're going to have to slow down.  The court reporter needs to --

A.    I'm sorry.  I grew up in New York, so you have to live with that.

        So -- so histamine receptor agonists have been shown to increase slow wave sleep in animals.

        Two things:  One, animal data, as we have heard repeatedly, doesn't transfer well to human data.  Okay?

        And two, there are a series of drugs, which we'll talk about, orexin and others, which I tried to develop, drugs which increase slower sleep, which have had no success in treating excessive daytime sleepiness.

Roth - Direct

And antagonists, you know -- if you talk about for Gliatech, you know, they said there may be proof -- you know, may be useful in treating due to narcolepsy.

So, you know, there's no statement that there's any data to suggest that there will be, except their effect on slow wave sleep, which we know is useless.

Q.    Now, turning to the expert opinion and conclusions of this paper, what does Brooks focus on as the next level -- the next avenues for development?

A.    His conclusions are the same as everybody else in our field and what -- and everybody in industry and everybody who's developing drugs and everybody who's treating narcolepsy in patients, you know, the future of the treatment of narcolepsy falls into the orexin agonists -- orexin agonists, you know, in Type 1 narcolepsy where there is no orexin in the system.  You know, orexin, once it gets into the system is almost, you know -- you know, curative rather than simply symptomatic, but it can go there.

In Type 2 narcolepsy, it's much more, you know, symptomatic.  So, you know, today, if we look at how many people are studying orexin agonists to treat narcolepsy and neuropathic hypersomia, Parkinson's, dozens.  How many people are studying histaminergic drugs?  None.

Q.    Dr. Kushida testified also about another paper by author Passani, which contained a statement regarding

Roth - Direct

$H_3$ antagonists being the most promising therapeutic approach for the treatment of major wake disorders such as hypersomnolence and narcolepsy.

Do you agree with that statement --

A.    No.

Q.    -- from the perspective of someone in April of 2005?

A.    No, I do not.

Q.    What was the most promising approach?

A.    Orexin.

Q.    We also heard Dr. Reider talk about the concept of $H_3$ inverse agonists.

What, if anything, does Brooks 2002 say about the use of inverse agonists?

A.    Brooks doesn't mention pitolisant nor does he mention inverse agonists generally.

Q.    We heard Dr. Reider also talk about some of the drawbacks that he saw in using $H_3$ antagonists as of April 2005.

MS. HANSEN:  Turning to PDX6-15, Mr. Brooks, which I have over advanced.  There we go.

BY MS. HANSEN:

Q.    Are there any additional drawbacks that you think would dissuade a POSA from pursuing the $H_3$ antagonist class to treat EDS in patients with chronic diseases like narcolepsy?

A.    Yeah, this relates to something we talked about before, and that is you want a silver bullet.  You want something which goes from your mouth to the center of the brain or body which does this.

Well, in fact, histamine is everywhere, in and out of the brain.  As a result of that, it has a myriad of effects, both good and bad.  But the side effects we worry about is effect on learning, memory, on attention, on emotion.  What does it do to depression; what does it do to weight, what does it do to activity?

So there's a lot of things.

Q.    So let's assume that the POSA ignored all that and still decided to pursue $H_3$ antagonists as a route for treating EDS in narcolepsy patients.

A.    Mm-hmm.

Q.    Were you in the courtroom when Dr. Reider testified earlier about the known $H_3$ antagonists as of April 2005?

A.    Yes, I was.

Q.    Turning to Slide 6-16.  How would you summarize your understanding whether the POSA would have found pitolisant a desirable compound to pursue for further development for any purpose as of April of 2005?

A.    Well, one of the things, you know, which I couldn't agree more in his testimony, is that to go forward, ideally I want human data.  But, secondarily, at least I want data

Roth - Direct

in animals which have the disease.

There is no data available -- animal data and -- you know, on any of these diseases in either humans or in people with disease.  The only data available is animal data primarily on binding data.

And there's no data on PKPD relationship such as half-life and inverse agonism, so there's -- we don't have a lot on pitolisant.

Q.    Turning to Slide 6-17, would a POSA have been motivated to combine the teachings of Brooks 2002 with specifically pitolisant, as mentioned in Meier I?

A.    No.

Q.    Why not?

A.    Well, because, as we've heard Expert Opinion, it doesn't specifically talk anything about pitolisant, and it doesn't say that -- anything about it.  And Meier I talks about it in the context mostly of cognitive functioning and things like that.

Q.    And when you referred to Expert Opinion, you were referring to the Brooks 2002 paper?

A.    Correct.

Q.    So let's assume, again, for some reason a POSA would have been motivated to use pitolisant in a method of treatment of EDS in patients with Parkinson's, narcolepsy or sleep apnea.

Roth - Direct

Would the POSA have had a reasonable expectation that pitolisant would be successful in treating EDS in those patient populations?

A.    No, because again, we are not given any preliminary data that suggests that it's possible.  You know, the data we are given is in things like attention, and Alzheimer's and things like that.  We're not given any data on the effects of these drugs on any sleep-wake function.

We're given data on wake time, but that's not sleep wake function.

Q.    First, are you defining success to be a treatment with regulatory approval?

A.    Ideally, but not necessarily.  You know, like I said, sodium oxybate was used off label quite a bit to treat excessive daytime sleepiness, so I can find success as many clinicians do.  The American Academy of Sleep Medicine is people -- provisional approval or, you know -- but, no, I think the ideal has to be FDA approval.

But, no, it is not the only criterion.  I mean, drugs that work work if they're safe.

Q.    Let's turn to PDX6-18.  What would the ideal properties for a treatment for EDS in patients with chronic conditions like Parkinson's, narcolepsy and sleep apnea be?

A.    Well, you know, this is in no specific order, but top of my list would be brain penetrant, being bioavailable.

It's one of the reasons that we've had big troubles with orexin.

But we want long-term efficacy.  This is a chronic disease.  We want long-term safety.  Orexin is all over the place.  We want to know they're safe.  We want a half-life or duration of action, more appropriately, which will keep them awake during the day 6, 7 o'clock at night, but allows them to sleep at 9, 10 o'clock and on once-daily dosing.

I don't want them to have to take it twice a day, because they're going to forget it the second time, or they're going to take it too late the second time.  And I want lower abuse potential, mostly because doctors are more likely to prescribe it, patients are more likely to take it, and it's safer.

Q.    Again, Dr. Roth, I have to remind you just to slow down a tiny little bit, if you could.

A.    I just got the word from somebody who really counts, because she's typing it.

Q.    Now, what expectations, if any, with respect to any of the properties that you just articulated, would the POSA have had about pitolisant's suitability to treat EDS in narcolepsy from this data?

A.    Which data are you referring to?

Q.    From the data that we saw about or that we heard

Roth - Direct

Dr. Reider testify about for pitolisant that was available in April 2005?

A.    We don't have any human data or animal data in animals which have the disease, and that's what we want. And that's what a POSA would want.

Q.    Okay.  I'd like to walk through --

MS. HANSEN:  And we can take this down, Mr. Brooks.

BY MS. HANSEN:

Q.    I'd like to walk through some of Dr. Kushida's reasons why he opined that there -- there might be a reasonable expectation of success.

Do you recall his testimony that a POSA would be able to expect $H_3$ antagonists to be effective based on data showing that the compound thioperamide could increase wakefulness in healthy cats and rats?

A.    I remember him saying that, yes.

Q.    Do you agree with him?

A.    No.

Q.    Why not?

A.    Well, because increasing wakefulness in a normal cat, A, we don't quite know what it means, because cats have very strange sleep-wake schedules and they stay awake for periods of time.  But increasing wake time is not the same thing as preventing sleep attacks.

Roth - Direct

Q.    By April 2005, was there any clinical data linking $H_3$ antagonists and treating EDS in any patient population?

A.    I'm sorry.  I missed the question.

Q.    By April 2005, was there any clinical data linking $H_3$ antagonists and treating EDS in any patient population?

A.    No.

Q.    In April of 2005, would a POSA have considered $H_3$ antagonists to be stimulants akin to amphetamines, and pursued them for treatment of EDS?

A.    Well, again, you know, words -- words are tough.  You know, are they stimulants in the sense that they were -- keep -- they will reverse EDS?  Yes.  Are they stimulants in terms of the way we think of stimulants, i.e. the dopamine drugs which are scheduled?  The answer is no.

Q.    I'm sorry.  I must have missed your testimony.

        Are you saying that $H_3$ antagonists were stimulants in the term -- I'm sorry.  I'm not sure I understood your testimony.

        Could you re-clarify?

A.    Repeat your question and maybe I can give a better answer.

Q.    Sure.  In April of 2005 --

A.    Oh.

Q.    -- would a POSA have considered $H_3$ antagonists to be stimulants akin to amphetamines and pursued them for

Roth - Direct

treatment of EDS?

A.    That's easy.  I just didn't understand the question or didn't listen well.

The answer is no.

Q.    And why is that?

A.    Because, again, there was no data to suggest that it does that.

Q.    Would a POSA reasonably expect that a compound that was part of a class generalized to promote wakefulness would treat EDS in patients with narcolepsy, Parkinson's and sleep apnea?

A.    No.

Q.    Why not?

A.    Well, because promoting wakefulness and treating EDS are not the same thing.

Q.    Why is that?

A.    Well, because lots of things promote wakefulness, but that doesn't mean they're able to reverse people's sleep attacks.  They're just not the same thing.  Caffeine will increase wakefulness.  Caffeine is not particularly good at treating excessive daytime sleepiness.

Q.    I'd like to change gears slightly.

Would you consider there to be a clinical distinction between people who are sleepy during the day and patients suffering from EDS?

Roth - Direct

A.     Yes, a very large distinction.  You know, as you know

Dr. Kushida said, you know, virtually the world, the

universe, has daytime somnolence at one point or another.

In a population-based NIH study, which we did and published,

20 percent of the American population have excessive daytime

sleepiness.  But even within that, only a very small portion

of those people have EDS associated with Parkinson's,

narcolepsy or sleep apnea.

So we have daytime somnolence.  We have

excessive daytime sleepiness.  And then we have excessive

daytime sleepiness with Parkinson's, narcolepsy or sleep

apnea.  So it's a very, very small part of the population.

Q.     To summarize, in your opinion, as of April 2005,

would a POSA have reasonably expected that pitolisant would

be successful in treating EDS in patients with Parkinson's,

narcolepsy or sleep apnea?

A.     No.

Q.     I'd like to transition now to some of Dr. Kushida's

other arguments concerning OTDP.

MS. HANSEN:  Let's turn to PDX6-19.

THE COURT:  Can we go ahead and take our

afternoon break here at this point?  And we'll have you

reask the question when we come back.

MS. HANSEN:  Of course.

THE COURT:  All right.  We'll be back in 15.

Roth - Direct

THE WITNESS:  All right.  Do I stay here or...

THE COURT:  You can take a break.  Yeah.

THE WITNESS:  I can't talk to anybody?

THE COURT:  Well --

THE WITNESS:  I'm just kidding.  I'm just kidding.

THE COURT:  -- you can talk to them, just not about your testimony.

THE WITNESS:  I'm just kidding.

THE COURT:  All right.

(Recess was taken.)

COURTROOM DEPUTY:  All rise.

THE COURT:  Please be seated.

All right.  Let's continue.

BY MS. HANSEN:

Q.   Dr. Roth, is this the legal standard for obviousness-type double-patenting that you applied in rendering your opinions?

A.   It is.

Q.   Dr. Kushida testified that the '947 patent is invalid for obviousness-type double-patenting over Claims 1 and 3 of the '430 patent.

Do you agree?

A.   I do not.

MS. HANSEN:  Turning to PDX6-20.

Roth - Direct

BY MS. HANSEN:

Q.   What are the differences between Claim 1 of the '430 patent and Claim 13 of the '947 patent?

A.   Claim 1 of the '430 patent directs at -- is directed at treating sleep apnea as a disorder.  Sleep apnea, it's a disorder.

Claim 13 of the '947 patent is directed at the treatment of EDS, specifically with patients with sleep apnea.

MR. BALL:  Your Honor, we just -- we renew our objection on that.

THE COURT:  Okay.  Same ruling.

BY MS. HANSEN:

Q.   We heard Dr. Kushida describe sleep apnea.

What is sleep apnea?

A.   Well, sleep apnea is a disease where the upper airway collapses when you breathe.  The way we breathe is we throw our diaphragm out and suck air in.  Okay.  If you have a very narrow airway, if you have a -- if you are an offensive lineman on a football team and you have no airway at all, you suck your airway closed and that's an apnea.  No air passes for a minimum of ten seconds.  So the primary endpoint in all sleep apnea therapies is AHI, apnea-hypopnea index.

There are many drugs being studied for sleep

Roth - Direct

apnea today.  One was recently approved and the primary endpoint is AHI, apnea-hypopnea index.

The secondary endpoint is a hypoxemic burden. When you're not breathing, you're desaturating.  So how much are you desaturating.  Daytime sleepiness typically is secondary or tertiary endpoint.  Excessive daytime sleepiness is generally a secondary or tertiary endpoint.

Q.    Do all patients with sleep apnea have EDS?

A.    They do not.

Q.    What percentage of sleep apnea patients have EDS?

A.    That's a very difficult number to give, and -- and I could give you literature from anywhere from 30 to 80 percent and it all depends on the age of the person.

Okay.  So, for example, women have much less apnea than men until menopause, then they have more apnea than men, you know.  And the reason women -- so women have less apnea because they don't throw their weight into their upper airway.

So very clearly -- so it's different in men and women.  As we get older, we get it.  So young children rarely have apnea, although they can.  And then in their 20s and 30s, they start getting apnea.  And then in their 50s, 60s, 70s, and 80s, almost everybody has apnea, but they're very mild.  They have five, ten events a night and they don't have daytime sleepiness.

Roth - Direct

Q.    So, Dr. Roth, I apologize.  Do you have a percentage of the patients -- of sleep apnea patients that have EDS?

A.    I'm going to say 40 percent.

Q.    Based on your experience, what is the most common symptom of sleep apnea?

A.    The most common symptom of sleep apnea is snoring.

          In other words --

Q.    As of April 2005 --

A.    Sorry.

Q.    As of April 2005, what was the most common treatment for sleep apnea?

A.    2005, it was CPAP.  In other words, as I said, you suck your air -- you throw your airway out, you suck your air in.  So continuous positive air pressure is -- if you can imagine a vacuum cleaner blowing air into your nose, that's what it does.  CPAP, blows -- it mechanically splints your upper airway.

Q.    And when is CPAP used?

A.    It's used at night.

Q.    As of April 2005, were there any pharmaceutical treatments for sleep apnea?

A.    Approved, no.

Q.    As of April 2005, was there any data in the prior art that would support the idea that pitolisant had any effect on sleep apnea, per se?

Roth - Direct

A.   Sleep apnea, per se, or potential mechanism for sleep apnea?

Q.   Sleep apnea, per se.

A.   No.

Q.   Now, we talked about how some of the speculated uses for $H_3$ antagonists were in the treatment of obesity on motor skills and locomotor skills.

How, if at all, would that information have impacted how a POSA would have interpreted a claim to treat -- using pitolisant to treat sleep apnea?

A.   Well, they could hypothesize that -- that sleep apnea is mostly or differentially seen in overweight people or obese people.  And to the extent that you can lose weight, you -- you would get some improvement.

Or sleep apnea is a neuromuscular disease.  Your upper air muscles -- your intercostal muscles can't stay patent against the negative pressure.  So if they can enrich that -- and we have electronics which do that -- they could conceivably do that.  But there was no data that it could do any of that.

Q.   As of April 2005, based on the data available for pitolisant, would a POSA have expected that because the '430 patent uses pitolisant in a method of treating sleep apnea, that pitolisant could be -- could be used to treat specifically EDS in sleep apnea?

A.    No.

MS. HANSEN:  Let's turn to Claim 3 of the '430 patent, and turning to PDX6-21.

BY MS. HANSEN:

Q.    What are the differences between Claim 3 of the '430 patent and Claim 13 of the '947 patent?

A.    Well, Claim 3 of the '430 patent is directed at treating diurnal somnolence, or ultimately we call it daytime sleepiness.  And as we heard from Dr. Kushida, and I repeated it, all of us have daytime sleepiness; all of us have daytime somnolence.

In fact, Claim 3 gives no specified patient population for the treatment of diurnal somnolence.  It doesn't say treat apnea, or treat tall people or treat anybody.  It's just what it said, it doesn't identify that.

Claim 13 of the '947 is directed at EDS specifically in narcolepsy, Parkinson's and sleep apnea patients.

MR. BALL:  Your Honor, just same objection.

THE COURT:  Same -- okay.  It's noted for the record.  Same ruling.

MR. BALL:  Can I just have a continuing objection on this so I don't have to --

THE COURT:  Well, some of -- what I want to make sure is that we give counsel for Plaintiffs' side an

Roth - Direct

opportunity to correct it to the extent in -- the places where you think it's outside the report.  So I think we just need to have you --

MR. BALL:  Understood.

MS. HANSEN:  -- object.

THE COURT:  Yeah.

THE WITNESS:  So if I may, so there's no real expectation that the treatment of diurnal somnolence would successfully treat pathological or excessive daytime sleepiness.

(Reporter clarification.)

Q.    Sure.  Now, we talked about this a little bit earlier.  Is there a difference between treating EDS in certain chronic disease states and treating general diurnal somnolence?

A.    There's huge differences.  There are a lot of things which work in diurnal somnolence, caffeine being the most popular.  Although if you're young today, I suspect it's Red Bull, but there's lots of things people use to treat daytime somnolence.  Okay.  Those things do not treat EDS.

Q.    Are there any diseases where patients have the symptom of daytime sleepiness, but not EDS?

A.    Are there any diseases?

Q.    Where patients have the symptom of daytime sleepiness, but not EDS.

Roth - Direct

A.      Oh, yeah.

Q.      Can you give us an example?

A.      Insomnia.

Q.      What's used to treat insomnia?

A.      Sleeping pills.  We actually see Ambien up there.
That's one -- you know, it's one of the most commonly used
drugs to treat that.  So people with insomnia have
difficulty sleeping at night, and as a result of that, they
have some daytime sleepiness during the day.

Q.      Would Ambien be useful to treat EDS in patients with
Parkinson's, narcolepsy and sleep apnea?

A.      Ambien actually would blunt the arousal response and
make the apnea worse.  It's contraindicated in sleep apnea.

Q.      Okay.  But would -- would -- would Ambien treat EDS
in a patient with narcolepsy?

A.      Absolutely not.

Q.      Would there have been a reasonable expectation of
success in reducing daytime sleepiness in patients with
chronic conditions like narcolepsy in light of Claim 3 of
the '430 patent?

A.      Absolutely not.

Q.      Why not?

A.      Because there's no data to suggest that treatments of
daytime somnolence have any effect on excessive daytime
sleepiness.

Roth - Direct

Q.    Now, looking at Claim 3, are there any limitations on patient population in Claim 3?

A.    No, there are none.

Q.    Why does that matter?

A.    Well, because it means that this is a treatment for all people at all times.  It's not intended to treat EDS.

Q.    So to summarize, do you think that it would have been obvious to use pitolisant to treat EDS in -- in narcolepsy -- or do you think that it would have been obvious to a POSA to use pitolisant to treat EDS in narcolepsy, sleep apnea and Parkinson's in light of either Claim 1 or Claim 3 of the '430 patent?

A.    No.

Q.    I'd like to transition now to objective indicia and turning to PDX6-22.

         At a very high level, what are the four objective indicia that you have listed here on this slide?

A.    Failure of others, long-term -- long-felt, but unmet need, unexpected results and praise or industry and acceptance.

Q.    Now, before we get into these areas, I want to make a slight detour.

         Turning to PDX6-23, are you familiar with the legal concept of nexus as it relates to objective indicia?

A.    Yes.

Roth - Direct

Q.    Does the standard that you were instructed on appear on this slide?

A.    Yes, it does.

        MS. HANSEN:  If we could turn to PTX-141, Mr. Brooks.

BY MS. HANSEN:

Q.    What is this document, Dr. Roth?

A.    It looks like the package insert or -- you know, for WAKIX.

Q.    And turning back now to PDX6-24, why does using WAKIX for the treatment of EDS in patients with narcolepsy, in accordance with the WAKIX labeling, practice Claim 13 of the '947 patent?

A.    Well, the claim in the patent is a method of treating excessive daytime sleepiness, comprising administering to a patient in need thereof wherein the said patient is suffering from Parkinson's disease, narcolepsy or sleep apnea.  Now, parallel to that, you have the label of WAKIX which says, "indicated for the treatment of excessive daytime sleepiness in adult patients with narcolepsy and pediatric patients 6 years and older."

        And then in Claim 13, it talks about pitolisant, and the WAKIX prescribing information identifies pitolisant as the drug.  So there's a 1-to-1 correspondence between the claim and the label.

Q.      Is WAKIX a drug that you recommend to the fellows that you oversee that they prescribe to their narcolepsy patients when appropriate?

A.      It's an option.

Q.      Why?

A.      Because most patients, especially Type 1 narcolepsy patients, have both -- you know, they have both excessive daytime sleepiness and cataplexy.

        And other than sodium oxybate which, you know, have some difficulties associated with, not -- not irreversible, but they have some difficulty associated with it.  This is the only drug which treats both excessive daytime sleepiness and cataplexy so that they don't have to take two drugs.

        Also, it's a nonscheduled drug, and many patients don't like scheduled drugs.  And many physicians don't like prescribing scheduled drugs.

Q.      So with that out of the way, let's turn to the first objective indicia you listed, failure of others.  Do any other approved drugs, other than WAKIX, act on the $H_3$ receptor?

A.      No, they do not.

Q.      Were there any attempts by others to develop an H3 antagonist for clinical use that failed?

A.      Yes.

Roth - Direct

Q.      Going to PDX6-24 -- 26, excuse me, what are some of the pharmaceutical companies that attempted to develop an $H_3$ antagonist for clinical use?

A.      GSK, Merck, Pfizer, Johnson and Johnson, AstraZeneca, Sanofi, Abbott, Lilly, Cephalon, Novo Nordisk, Wyeth, Arena.

You know, one of the things you asked me before is why do I consult for industry.  And one of the reasons I consult for industry is because I had all of this information because I consulted for Arena on $H_3$ antagonists. I consulted for Cephalon on $H_3$ antagonists.  And I consulted for Merck on $H_3$ antagonists.

Q.      Now --

A.      So this enables me to know what's happening out there before the publications.

Q.      Now, turning to -- I see there's a reference here to PTX-548.  Is this the reference you used to prepare this slide?

A.      Correct.

MS. HANSEN:  I'd like to move PTX-548 into evidence.

MR. BALL:  No objection.

THE COURT:  It's admitted.

(PTX Exhibit No. 548 was admitted into evidence.)

MS. HANSEN:  And just to clarify, did I move

Roth - Direct

PTX-141 into evidence?  If not, can I do that now, labeling?

MR. BALL:  That was the WAKIX label.

MS. HANSEN:  Yeah.

THE COURT:  It's admitted.

MR. BALL:  No objection.

(PTX Exhibit No. 141 was admitted into evidence.)

BY MS. HANSEN:

Q.    Did any of the -- these companies advance an H$_3$ antagonist compound into Phase 2 clinical trials for the treatment of narcolepsy, sleep apnea or Parkinson's patients?

A.    Yes.

Q.    Turning to PDX6-27.  Can you please explain what you've shown on this slide?

A.    Well, on this slide, there are six columns.  The first column is the name of the compound which the company gave.  The second column is the company which is developing the drug.  The third column is the indication for which they are developing the drug.  And as you can see, it's narcolepsy -- narcolepsy, sleep apnea and Parkinson's.  So it's all the things we talked about.

The fourth column is when they started Phase 2.  And you can see that's as late as 2017.  The last -- and the next-to-last column is the last reported information.  So

Roth - Direct

for most of these drugs, we have heard nothing about what they've done on clinicaltrials.gov in any publication, any abstract since 2020.  So at least five years have gone by since we were told anything.

Q.    And what does the passage of these five years indicate as to whether or not the compound has progressed further?

A.    Well, typically it means the program has failed or they're rethinking it.

Q.    Were any of these compounds advanced into Phase 3 clinical testing?

A.    They were not.

Q.    Were any of these compounds approved for therapeutic use in humans?

A.    They were not.

Q.    I see you have in the final column a list of references.

What are those?

A.    Those are the references I used to populate this table.

MS. HANSEN:  I'd like to move into evidence DTX-49, DTX-42, PTX-506, PTX-508, PTX-511, PTX-520, PTX-586 and PTX-598.

MR. BALL:  No objection.

THE COURT:  They're admitted.

Roth - Direct

(DTX Exhibit Nos. 42 and 49 were admitted into evidence.)

(PTX Exhibit Nos. 506, 508, 511, 520, 586 and 598 were admitted into evidence.)

BY MS. HANSEN:

Q.    Now, did any of the companies we were looking at on Slide PDX6-26 pursue $H_3$ antagonist compounds for indications like ADHD or Alzheimer's?

A.    Okay.  So --

Q.    Turning to PDX6-28 --

A.    Right.  So these are other central nervous system things that H3s are looked at.  And so, again, first column, identification of the molecule; second column, the company; third column, ADHD.  And here we have all the cognitive kinds of things, ADHD and Alzheimer's.

Next column, fourth column, when did they start Phase 2?  And fifth column, 6th column, whatever, it's the last reported information.  And here we haven't heard anything since 2013.

So 12 years have gone by since they started the program where we haven't heard anything.  And the last column are the citations I used to populate this table.

Q.    And what, if anything, does the fact that we haven't heard anything about these compounds since at least 2013 mean in terms of whether or not they've progressed further

in development?

A.     Well, this is 12 years.  So I suspect the program is totally shut down.

Q.     Were any of these compounds tested in Phase 3 testing?

A.     They were not.

MS. HANSEN:  I'd like to move into evidence DTX-54, PTX-509, PTX-510, PTX-525, PTX-554, PTX-561, PTX-565, PDX-585, PDX-590, and PDX-602.

MR. BALL:  No objection.

THE COURT:  They're admitted.

(PTX Exhibit Nos. 509, 510, 525, 554, 561, 565, 585, 590, and 602 and DTX Exhibit No. 54 were admitted into evidence.)

BY MS. HANSEN:

Q.     We've talked about some specific objections.  Did any of the companies that we looked at on PDX6-26 pursue $H_3$ antagonist compounds for any other indications?

MS. HANSEN:  And turning to PDX6-29.

THE WITNESS:  Yes.  So here we have four different molecules.  First column are the molecules or the compounds.  Second column is the company.  Third column is indication and allergic rhinitis -- and these are very diverse; allergic rhinitis, schizophrenia, multiple sclerosis.

Roth - Direct

The next column is when did they start Phase II. And the last column is when they would get the last piece of information, and the last piece of information for any of these was eight years ago in 2017.

And the last column are the references I used to populate this table.

Q.   What does the fact that we haven't seen information about these compounds since at least 2017 mean in terms of their continued development?

A.   It suggests that they were terminated.

MS. HANSEN:  I'd like to move into evidence PTX-516, PTX-517, PTX-518, PTX-522, PTX-526, PTX-553, PTX-569 and PTX-595.

MR. BALL:  No objection.

THE COURT:  They're admitted.

(PTX Exhibit Nos. 516, 517, 518, 522, 526, 553, 569 and 595 were admitted into evidence.)

BY MS. HANSEN:

Q.   Did the literature report on any $H_3$ antagonists that were being explored, either in Phase I or at the preclinical stage work for any indication?

A.   Yes.

MS. HANSEN:  Turning to PDX6-30.

BY MS. HANSEN:

Q.   Can you please explain what you've shown here on this

Roth - Direct

slide?

A.    Well, here these are the drugs which never got into Phase II.  So these -- these drugs -- so, again, the first column is the identification of the compounds; the second column is the company; the third column is how far did they get.  Preclinical means it's animal data.

You know, Phase I studies euphemistically called SAD and MAD studies; single ascending doses and multiple ascending doses.  And these are basically safety studies trying to see if the drugs are safe to go into Phase II clinical trials.

And to the last -- the next column is the last date we heard from them.  And you can see it's as late as 2019, and so that's six years.  And so for Phase I to go into Phase II, that's a very long time.

Q.    And what is in the final column on this slide, PDX6-30?

A.    The citations I used to populate -- the references I used to populate the table.

Q.    Were any of these compounds ever advanced into Phase II?

A.    Not that I'm cognizant of.  Nothing that's in the literature.

MS. HANSEN:  I'd like to move DTX-551 -- to be clear, that was DTX-51, PTX-534, PTX-546, PTX-549, PTX-550,

Roth - Direct

PTX-556, PTX-570, PTX-577, PTX-578, PTX-581, and PTX-596 into evidence.

MR. BALL:  No objection.

THE COURT:  They're admitted.

(DTX Exhibit No. 51 was admitted into evidence.)

(PTX Exhibit Nos. 534, 546, 549, 550, 556, 570, 577, 578, 581, and 596 were admitted into evidence.)

BY MS. HANSEN:

Q.    Now, did you hear Dr. Reider's testimony earlier today about the thousands of other $H_3$ receptor compounds that he thought would be available in the literature demonstrating $H_3$ antagonist activity?

A.    I did.

Q.    Were any of the compounds Dr. Reider reviewed, excluding pitolisant, of course, ever approved for use in patients?

A.    No.

Q.    Now, we've talked now about several dozen companies that attempted to develop $H_3$ antagonists.

What does this failure of others describe about the complexity of the -- of moving a compound into -- for treatment of a disease associated with an $H_3$ antagonist?

A.    It means it's a long, hard journal -- journey.  It's a long, hard journey.

Q.    Now, the next objective indicia you mentioned was

long-felt need.

MS. HANSEN:  Turning to PDX6-32.

BY MS. HANSEN:

Q.    Can you briefly explain why you believe WAKIX met a long-felt need?

A.    Well, the need was twofold.  It's to get a drug, which is taken by day, which treats both -- which treats both excessive daytime sleepiness and cataplexy.  WAKIX did that.

And the other thing that was needed was a drug which was effective and safe, but was not a controlled substance.  And not being a controlled substance means it's easier to prescribe, patients are more likely to take it, and it's safer.

Q.    You talked earlier about controlled substances having abuse potential.  As of April 2005, had the abuse potential of then existing EDS drugs been recognized?

A.    They were all scheduled.

Q.    Which means what?

A.    It means they had all been recognized as having some significant degree of abuse liability, some more than others.

MS. HANSEN:  Can we turn -- pull up DTX-4491?

BY MS. HANSEN:

Q.    What is this paper, Dr. Roth?

Roth - Direct

A.    This is a practice parameter from the American Academy of Sleep Medicine on the treatment of narcolepsy.

Q.    And what year is this from?

A.    Sure.  2000.

Q.    Turning to Page 451 in the introduction.

What does Lintner warn about the then existing treatments for narcolepsy?

A.    Well, you know, Dr. Lintner is cognizant of the fact that these are all -- at this point in history, all scheduled molecules.  And he says, "Nevertheless, many healthcare providers are overly cautious in approaching treatment of narcolepsy."

What he's saying is doctors don't want to prescribe these drugs for a variety of reasons.  They have to pay for it.  You know, they can only prescribe a certain amount of pills.  And the precautions are different in every state.  And it's because stimulant medications, which are the mainstay of narcolepsy treatments, are regulated by Government agencies to prevent abuse.

Q.    Now, let's --

A.    And beyond him, patients are afraid to take it.

Q.    Understood.

Now, the fourth objective indicia that you mentioned was unexpected results.

In your opinion, would a person of ordinary

Roth - Direct

skill in the art have -- in 2005 have found it unexpected that pitolisant, as an $H_3$ receptor antagonist and inverse agonist, would have therapeutic benefits as a method of treating EDS in patients with Parkinson's, narcolepsy and sleep apnea?

A.    No.  As we heard earlier today, to take a -- to take a project and to become a program, you'd want to have at least some preliminary human data or some animal data in a model of the disease.  Neither of those were available, so it's an unexpected result.

Q.    Okay.  I apologize.  I think I asked the question in the negative.  Would -- let me try this again.

Would a person of ordinary skill in the art in April of 2005 have found it unexpected that pitolisant, as an $H_3$ receptor antagonist inverse agonist, had a therapeutic benefit as a method of treating EDS in patients with Parkinson's, narcolepsy and sleep apnea?

A.    Yes.

Q.    Thank you.

MS. HANSEN:  Turning to PDX6-34.

BY MS. HANSEN:

Q.    Why would pitolisant's therapeutic benefits have been unexpected?

A.    Well, there's several reasons.  One, there's no other $H_3$ receptor compound that has ever been approved for any

Roth - Direct

indication, by any form -- by any governmental agency in the United States, in Japan, or in Europe.  All other existing EDS treatments, as of April 2005, were all dopaminergic, except for sodium oxybate.

Research into $H_3$ antagonists was still early and speculative in 2005.  In 2005, several treatment indications had been proposed for $H_3$ antagonists, other than EDS. Things like Alzheimer's disease, obesity, schizophrenia, so a lot of those things.  And unexpected that pitolisant will have a suitable half-life for daily dosing.

So very hard to believe that you could just get the right half-life -- and it's really not half-life, it's more duration of action, because I've tried to indicate half-life.  Duration of action is a function of half-life and dose.

So, you know, you get a drug, which is going to keep you awake so you can talk to your family at dinner at 8, 9 o'clock at night, and be able to go to sleep at 11 o'clock, that was unexpected.

MS. HANSEN:  Turning to PDX6-35.

BY MS. HANSEN:

Q.   What are -- and talking about praise or industry acceptance.

At a high level, what is your opinion regarding this last topic?

Roth - Direct

A.    Well, I think the industry, you know, have -- you know, accepted the fact that this is an accomplishment to getting a drug, treating both the major symptoms, and being on schedule, and -- and the societies have recognized that. And, you know, very clearly pitolisant received praise for being the only noncontrolled drug with an EDS indication.

MS. HANSEN:  Let's turn to DTX-185.

BY MS. HANSEN:

Q.    What is this document?

MS. HANSEN:  Mr. Brooks.

THE WITNESS:  Again, this is again from the American Academy of Sleep Medicine.  It's the treatment of central disorders of hypersomnolence or excessive daytime sleepiness from the American Academy of Sleep Medicine in clinical practice.  So they're evaluating drugs which are used to treat disorders of excessive daytime sleepiness.

BY MS. HANSEN:

Q.    Now, looking down the first page of this, under adult patients with narcolepsy, what recommendations do the guidelines make for pitolisant?

A.    They give it the strongest recommendation.

Q.    And turning to Table 1 on Page 1838.

What does a "strong recommendation" mean in these practice guidelines?

A.    It means all patients should receive the recommended

Roth - Direct

course of action.  And very importantly it says, "Adherence to this recommendation" should -- "could be used as a quality criteria or preferred performance indicator."

More and more doctors are judged on their performance and this is a performance indicator.

Q.    Now, continuing down the page to Table 2.

What are the critical outcomes stated with regards to the benefits of pitolisant?

A.    Well, it treats excessive daytime sleepiness --

MR. BALL:  Can I just make an objection?

Counsel, is this in the reports?  If so, can you direct me?

MS. HANSEN:  That it was -- yes.  Opening report, 44.

MR. BALL:  From the infringement report?

MS. HANSEN:  Mm-hmm.

MR. BALL:  No objection.

THE COURT:  Okay.

BY MS. HANSEN:

Q.    Continuing down the page to Table 2.

What are the critical outcomes stated with regard to the benefits of pitolisant?

A.    Okay.  So it has a checkmark for excessive daytime sleepiness.  It has a checkmark for cataplexy.  It has a checkmark for disease of severity, and that means the more

Roth - Direct

severe the EDS, the better it works.

Now, there's no checkmark for quality of life. And throughout this whole table, the lack of a checkmark doesn't mean it doesn't do it. It means it wasn't measured or it was not in the physical analysis practice, so they couldn't put it on the table. So virtually nobody evaluated quality of life as an incredibly important endpoint.

MS. HANSEN: I also realized I neglected to admit DTX-4491 into evidence, that was the 2000 Lintner article.

MR. BALL: No objection.

THE COURT: It's admitted.

(DTX Exhibit No. 4491 was admitted into evidence.)

BY MS. HANSEN:

Q. I'd like to turn back to your slides and turn to PDX6-36.

Did you -- Dr. Kushida testified that he believes Claim 13 of the '947 patent is invalid for enablement.

Do you agree with that opinion?

A. No, I do not.

Q. Are these the legal standards on PDX6-36 for enablement that you applied in rendering your opinions?

A. Yes.

Roth - Direct

MS. HANSEN:  Moving to PDX6-37.

BY MS. HANSEN:

Q.    Are these the legal factors for enablement that you considered in preparing your opinion?

A.    Yes.

Q.    Now, Dr. Kushida testified that, in his opinion, there was insufficient data in the specification to enable a POSA to use pitolisant to treat EDS in Parkinson's patients.

Do you agree?

A.    No, I do not.

MS. HANSEN:  I'd like to pull up JTX-2.  And let's take a look at the examples, which start at Column 43.

BY MS. HANSEN:

Q.    Let's first take a look at Examples 1 and 4.

What do these examples show?

A.    Well, Example 1 is an important example.  This is an animal -- it's not an animal generally.  It's an animal, which with an animal -- with an induced Parkinson's disease. It's an MPTP model.  And in the literature, this is accepted as a model for impairing daytime alertness.  It's well-documented in the literature, by Lin especially.

And what they found is that these data were obtained from a very reliable model PD.  And, as I said, it's, per Lin, very, very mild.  So treatment with histamine $H_3$ antagonist/inverse agonist --

Roth - Direct

(Reporter clarification.)

BY MS. HANSEN:

Q.   Dr. Roth, you have to slow down.

A.   I'm sorry.  These data obtained in a very reliable model of PD show that the treatment of histamine $H_3$ antagonists/inverse agonists is able not only to treat excessive daytime sleepiness, which is detrimental to every day life for PD patients, but also to reestablish normal sleep architecture.

Example 4 is the study where they took patients who are currently being treated by Parkinson's -- with Parkinson's drugs, and they added to them 40 milligrams of WAKIX.  And what's very interesting, these patients tolerated WAKIX very, very well, to the point that the combination lowered the dose of anti-Parkinson's to be administered.

So it didn't increase side effects, it decreased side effects.  So 40 milligrams in Parkinson's patients was a safe treatment.

Now, I want to add that in the context of the fact that 40 milligrams is the dose which is specified, it's a dose which has been shown to be safe, effective in the other cause of EDS, which is narcolepsy and sleep apnea.

Q.   And when you said "WAKIX," did you mean pitolisant?

A.   Yes.

Roth - Direct

Q.    Let's turn briefly to Example 5.  What's reflected in Example 5?

A.    So the title of Example 5 is the "Treatment of Narcolepsy with Histamine $H_3$ Antagonists/Inverse Agonists."

Now, that's the title.  If we go to the first sentence, it says, "Two clinical studies were conducted on patients suffering from obstructive sleep apnea (OSA) in a single-blinded or double-blinded trial against placebo with a polysomnographical test on patients."

Now, one of those two is wrong.  Okay.  One of those two is wrong.

I think from the standpoint of parsimony, I think that Example 5 is -- the title is correct, because we already have an example of sleep apnea in one of the other examples.

So in sleep -- in narcolepsy patients, in both studies, 40 milligrams once for three to seven days, daytime sleepiness improved.  In accordance with the Epworth Sleepiness Scale, according to the frequency of naps, daytime sleepiness occurrences, average daytime sleepiness can be reduced by up to 50 percent.

So in these narcolepsy patients, Epworth got better.  Their daytime sleepiness got better.  And their excessive daytime sleepiness got better.

Q.    Let's turn now to Example 2.  What does Example 2

Roth - Direct

show?

A.    Well, Example 2 is the one I was talking about from the point of parsimony.  This is the treatment of obstructive sleep apnea with $H_3$ antagonists/inverse agonists.

Again, this title doesn't reflect the study, because it's not the treatment of obstructive sleep apnea. But what they measured was the decrease in the number of diurnal somnolence episodes so that there's no mention of what it does to sleep apnea.  It only mentions what it does to daytime sleepiness in sleep apnea.

There's no mention of an AHI or hypoxemia, which are the cardinal symptoms of sleep apnea.  It only talks about what it did to their daytime sleepiness.

So in the last paragraph, the "treatment resulted in all subjects in a clear decrease (by more than 60%) in the number of diurnal somnolence episodes and a total prevention of the occurrence of diurnal sleep episodes.  In addition, nocturnal sleep duration was not decreased, and its quality was improved.  This clinical trial establishes, for the first time, the utility of $H_3$ antagonists/inverse agonists in obstructive sleep apnea."

Q.    What would a POSA understand from all of this clinical data with respect to whether or not pitolisant could be used to treat EDS in Parkinson's patients?

A.    Well, it would tell you -- you know, one of the

Roth - Direct

examples will tell you that it's safe in to -- up to 40 milligrams in patients with other drugs.  It tells you this in this animal model.  It significantly improved animals' daytime alertness periods of uninterrupted waking, and it showed you that -- that in the context of apnea, in narcolepsy, 40 milligrams is the right dose.

Q.   Now, we know that pitolisant has been approved to treat EDS in patients with narcolepsy.  Is pitolisant approved for any other purpose?

A.   It's approved in Europe for the treatment of sleep apnea.

MS. HANSEN:  Thank you.  No further questions at this time.

CROSS-EXAMINATION

BY MR. BALL:

Q.   Good morning.  Good to see you again.

A.   It's good afternoon.

Q.   Or good afternoon.  We're going to have some witness binders here, so just bear with us.

A.   Take your time.  I can move these.

MR. BALL:  Your Honor, may we approach?

THE COURT:  Yes.

MR. BORNSTEIN:  Can I give this one to the witness?

THE COURT:  Of course.

THE WITNESS:  Thank you.

MR. BORNSTEIN:  You're welcome.

MR. BALL:  May we begin?

THE COURT:  Yes.

BY MR. BALL:

Q.    Okay.  Now, good afternoon, sir.

A.    Good afternoon.

Q.    I've pulled up JTX-2, which is a copy of the '947 patent.  If we could go to JTX-2.23.  I have a quick question for you on nomenclature.  Can we expand this and look at the definition of obstructive sleep apnea?

And if we can highlight that -- the first few lines down, please.

"As used herein, 'obstructive sleep apnea,' (also referred to herein as OSA), denotes a breathing disorder that occurs primarily during sleep."

Is that referred to as sleep disordered breathing?

A.    Yes, it is.

Q.    Okay.  Dr. Roth, your educational training is in the field of psychology; correct?

A.    Correct.

Q.    You have a master's degree and a Ph.D. both in the field of human learning?

A.    Correct.

Roth - Direct

Q.    And you're -- you're not a medical doctor?

A.    Correct.

Q.    You've never been enrolled in a medical program?

A.    Correct.

Q.    You're not licensed to treat patients?

A.    Correct.

Q.    You've never been licensed to treat patients?

A.    Correct.

Q.    You've never treated narcolepsy?

A.    Correct.

Q.    You've never treated obstructive sleep apnea?

A.    Correct.

Q.    You've never treated Parkinson's patients?

A.    Correct.

Q.    You've never treated excessive daytime sleepiness; correct?

A.    Correct.

Q.    And you don't prescribe medications?

A.    Correct.

Q.    You've never prescribed a medication to treat excessive daytime sleepiness?

A.    Correct.

Q.    And you're familiar with AET's expert, Dr. Clete Kushida?

A.    Yes, I am.

Roth - Direct

Q.    And -- and with -- with all respect to your many accomplishments, as between yourself and Dr. Kushida, who has more expertise in the clinical treatment of ESS, excessive daytime sleepiness?

A.    In terms of understanding individual patients, he does.

Q.    And it would be fair to say, to the extent that he's even treated one patient for excessive daytime sleepiness, he has more expertise in the clinical management of excessive daytime sleepiness than yourself?

A.    In direct management, yes.

Q.    Now, we just heard your testimony today on validity issues for the '947 patent, and I think it's fair to say that today you are applying a different construction of the term "excessive daytime sleepiness" than you applied when you authored your several reports in this case, including your opening report on infringement, your rebuttal report on invalidity, and your reply report on infringement; is that fair to say?

A.    No.

Q.    Okay.  Well, let's take a look at that.

A.    Can finish my answer?  I used both definitions --

Q.    Yeah.

A.    -- of EDS in all of those documents.

Q.    And, in fact, the definition that you applied, you

said that a POSA, looking at the '947 patent, would understand that the patentee has redefined the term "excessive daytime sleepiness" as being different from the scientific or clinical meaning of excessive daytime sleepiness.

That's something you said in your reports; correct?

A.   In the context of that patent, he or she would have understood that.

Q.   That -- and correct.  And that was -- when you analyzed infringement issues and you analyzed invalidity issues in this case, you applied your reading of the patent, which was that the term "excessive daytime sleepiness" had been redefined by the patentee in a very specialized meaning within the context of the '947 patent; isn't that true, sir?

A.   No.

Q.   Okay.  Let's look at what you actually did say.  Can we pull up your deposition, sir, at -- let's go to Page 124.  Let's go to Line 17, sir.

When you were asked at your deposition --

A.   I -- I'm looking for it.  I'm sorry.

Q.   It's in your transcript -- deposition transcript which you should have in front of you.

A.   Deposition 2 or 1?  Deposition 1?

Q.   Its' -- it's Page 124.  It would have been on the

first day of your deposition.

A.      Page 124.

Q.      Okay.  Sir, you were asked:  "So the '947 patent, in your opinion, redefines the term 'EDS' in a manner" --

A.      Hold on.  I'm --

Q.      Sir?

A.      Page 124 of the little pages?  I'm trying to get to the page.

Q.      Let me just read it.  We also have it up here for you if -- if that's helpful for you to see it on the larger screen.

        I will wait and allow you to find it.

A.      Okay.

        THE COURT:  Why don't you take a second to find it.

        THE WITNESS:  So what is it?  It's page what?

BY MR. BALL:

Q.      Page 124.

A.      It's not the bottom of the pages; right?

Q.      The page numbers are on the top right-hand corner.

A.      Oh, okay.

Q.      It should be.  And do you see, if you go down there's line numbers --

A.      Yeah.  I got it.  I got it.

Q.      -- on the left-hand side?

Roth - Direct

And you were asked:  "So the '947 patent, in your opinion, redefines the term 'EDS' in a manner other than the clinical or scientific definitions?"

And you answered:  "Yes."

That was your answer at your deposition; correct?

A.    That's one of my answers, yes.

Q.    And then let's take a look at your expert report. Why don't we look at your opening report on infringement, which you should have in front of you.  And I'll direct you to Page 17 of your opening report on infringement.

MR. BALL:  Can we go to Page 17, Paragraph 53, Mr. Sayres?

BY MR. BALL:

Q.    And I'll just read this.  Do you see where you're saying, "The discussion of EDS in the '947 patent in the file history," and you say:  "In Section VII, I discussed my scientific understanding of EDS.  The '947 patent takes a different approach and provides for a different definition of EDS than the scientific definition I discussed above of pathological sleepiness that interferes with daytime functioning."

That's what you wrote in your report, isn't it, sir?

A.    It's one of the things I wrote.

Roth - Direct

Q.    Sir, that's what you wrote in your report; correct?

A.    It is one of the things that -- it is not the only thing I wrote in my report.

Q.    And the definition that you were testifying to today is pathological sleepiness that interferes with daytime function, a construction that you said is not applicable to the '947 patent; correct, sir?

A.    I said both in my depositions.

Q.    Let's go to page -- let's go to the rebuttal report.

By the way, did you apply the same claim construction for purposes of infringement that you did for invalidity?

A.    I did.

Q.    You did?

A.    I did.

Q.    Yeah.

MR. BALL:  And so if we go to Page 22 of your rebuttal report on the invalidity issues.

And, Mr. Sayres, if we could highlight Paragraph 63.

BY MR. BALL:

Q.    What you say is, again, "Above, I discussed my scientific understanding of EDS.  The '947 patent takes a different approach and provides for a different definition of EDS than the clinical definition I discussed above of

pathological sleepiness that interferes with daytime functioning."

Is that what you said in your rebuttal report, sir?

A.      That is a quote from my rebuttal report.

Q.      And, in fact, if we go to Paragraph 64 of the rebuttal report -- and we can look at the first full sentence -- what you say is that the '947 has defined EDS as including narcolepsy; correct?

A.      Correct.

Q.      And so you had concluded, as your construction was, that EDS is being defined in the '947 patent as narcolepsy, or including narcolepsy; correct?

A.      In part.

Q.      And the reason you did that, sir --

A.      In part.

Q.      And the reason you did that, sir, is because there were Defendants in this case that did not have an EDS indication on their labels; correct?

A.      They did not have an EDS indication on what label?

Q.      On their proposed labels.  They had a cataplexy indication, but not an EDS indication.

Do you recall that, sir?

A.      Not at all.

Q.      So you don't recall offering testimony that EDS, as

it is used in the '947 patent, covers cataplexy?

A.      I do remember that.

Q.      Okay.  And let's look, in fact, at what you said, if we could go back --

A.      But it did not exclude EDS.

Q.      If we go back to your opening report and we go to Page 24 at Paragraph 71.

What you say there is that, in your opinion, the phrase treatment of excessive daytime sleepiness in a patient with narcolepsy "would encompass alleviating both pathologic sleepiness that interferes with daytime functioning and displaced manifestations of REM sleep that emerge during wakefulness or semi-wakefulness, and, hence, covers treating both EDS and cataplexy."

That was your construction, was it not?

A.      My construction was that it treats EDS in the clinical sense of the word, or the scientific sense, which we've been talking about all day today.

But, in addition, it talks about cataplexy.

Q.      Did you write this, sir?

A.      Yeah, I -- yeah, that's what it says.

Q.      And that is a meaning different from the plain and ordinary meaning of the term "excessive daytime sleepiness"; correct?

A.      But --

Roth - Direct

Q.      Sir, is it different than the plain and ordinary meaning of the term "excessive daytime sleepiness"?

A.      It is different than the plain and simple definition.

Q.      And, in fact, you acknowledge that Dr. Kushida was applying the plain and ordinary meaning, or what you referred to as the scientific definition; correct?

A.      What I have in that sentence there.

Q.      And, sir, in fact, you also testified that a POSA, outside the context of the '947, would have understood the meaning of EDS to be what Dr. Kushida has applied; correct?

A.      Outside of the patent, absolutely.

Q.      Yeah.  And, in fact, what you -- let's go back to cataplexy for a second.

A.      Can I read that?

Q.      When you -- when you spoke --

A.      Can I read that?

Q.      -- about cataplexy, sir, cataplexy is a condition of sudden muscle weakness that comes on in narcolepsy patients; is that right?

A.      Correct.

Q.      And it can be brought on by strong emotions, such as muscle weakness during the daytime -- or, sorry.  It's muscle weakness during the daytime that can be brought on by strong emotions, such as laughter, anger, fear or surprise.

        Is that fair to say?

Roth - Direct

A.    That's what cataplexy is.

Q.    And so under your claim construction, EDS, as used in
Claim 13 of the '947 patent, included sudden muscle weakness
during the daytime usually associated with strong emotions
such as laughter, anger, fear, surprise; correct?

A.    Yes.  And also --

Q.    And, sir, another thing that you believe is that
excessive daytime sleepiness must encompass what you refer
to as re-establishing normal sleep architecture; is that
correct?

A.    Sleep architecture in the sense that you sleep by
night and you stay alert by day.

Q.    Oh.  In other words, you're saying it requires
re-establishing sleep architecture, but in a meaning that is
different from the meaning of re-establishing sleep
architecture that's used in the field; correct?

A.    It's one of the ones which are used in the field.

Q.    Well, let's look at what you said.  Let's go to your
deposition at Page 95.  And let's look at lines -- we can
go -- we can go above that for context, 94.  And starting at
Line 21.

      And you were asked:  "Do you cite anything that
defines sleep architecture in the way you just said?"

      And then if we go down, you were asked:  "And so
this way that you're using it is sort of your subjective

Roth - Direct

understanding of it based on the '947 patent, not based on how it's used in the field?"

And your answer was:  "Correct."

That was your testimony at deposition; right?

A.    Right.

Q.    And then it's fair to say that that use of improving sleep architecture is different from the way that you have used that term in your own papers and in your own work; correct?

A.    Correct.

Q.    Under your construction, EDS encompassed sleep disordered breathing?

A.    Under my construction of the '94 -- the original one I had or the '947 patent?

Q.    Yeah.  Let's talk about when you formed your opinion, the construction that you had, that you understood --

A.    At that time?

Q.    -- of the '947.

A.    Yes.  It encompassed sleep apnea, yes.

Q.    And that was your opinion, even though you've never used it that way in your entire career; correct?

A.    Never used what in my entire career?

Q.    The term "excessive daytime sleepiness."

A.    I use that every day in my --

Q.    You never used it the way that you used it in your

Roth - Direct

expert reports; correct?

A.    Oh, correct.

Q.    Mm-hmm.  And --

A.    In parts of my expert report.  In other parts of my expert report, I use EDS -- such as the paragraph you just had up two minutes ago -- by using it in the traditional sense.

Q.    And, in fact, sir, you have never seen anyone else in the field use the term "excessive daytime sleepiness" the way you used it when you formed your opinions in the case; correct?

A.    Relative to the '947 patent, yes.

Q.    You acknowledge it's not the scientific meaning?

A.    I -- yes.

Q.    And you acknowledge that it's not the meaning that is used by physicians, such as Dr. Kushida; correct?

A.    Correct.

        MR. BALL:  I want to talk about the '430 patent.

        Can we pull that up, Mr. Sayres?

        Can we go to Claim 1, please?

        Can we go to Claim 1 toward the end of the document?  And blow that up, please.

BY MR. BALL:

Q.    So Claim 1 of the '430 patent, and you testified about this today, it is a method for the treatment of sleep

Roth - Direct

apnea; correct?

A.      Correct.

Q.      And sleep apnea involves sleep-disordered breathing; correct?

A.      It is sleep-disordered breathing.

Q.      It is sleep-disordered breathing.

        And you would agree with me, sir, would you not, that sleep apnea and sleep-disordered breathing are not distinct from excessive daytime sleepiness as it is used in the '947 patent?

A.      Can you say that again?

        MS. HANSEN:  Objection, Your Honor.  The parties have agreed on a definition of EDS to mean the plain and ordinary meaning.

        I'm not entirely certain what this testimony is he's trying to elicit.

        THE COURT:  Overruled.

BY MR. BALL:

Q.      Sir, you would agree with me that "excessive daytime sleepiness," as that term is used in the '947 patent, Claim 13, is not distinct from sleep-disordered breathing; correct?

A.      It would include sleep-disordered breathing, correct.

Q.      And, in fact, treatment of sleep apnea, treating sleep-disordered breathing, is not distinct from treating

Roth - Direct

excessive daytime sleepiness?

A.      In the sense of the '947 patent?

Q.      Yes.

A.      Or in terms -- oh, no.

Q.      Let's look at your deposition testimony.

        MR. BALL:  Can we go to Page 110?  And can we pull up -- let's highlight from Lines 3 through 5 -- sorry, 3 through 9, please.

BY MR. BALL:

Q.      And you were asked:  "Using excessive daytime -- is the patent -- is it using excessive daytime sleepiness as being distinct from sleep-disordered breathing?"

        Your answer was:  "No."

        Was that the testimony you gave at your deposition, sir?

A.      That's what it says.

Q.      Okay.  And then you were asked:  "So sleep-disordered breathing, in your view, is the same as excessive daytime sleepiness within this patent?"

        Was your answer "yes," sir?

A.      That's what I said.

Q.      Okay.

A.      But it doesn't say anything about the symptom of excessive daytime sleepiness, which is what I was -- which is what I was discussing in my testimony.

Q.    You would agree that as of 2005, there were no pharmacological treatments for sleep apnea, per se; correct?

A.    None approved by the FDA.

Q.    Mm-hmm.

A.    Several under investigation.

Q.    There were no drugs approved, correct, for treating the actual airway obstruction itself in sleep apnea?

A.    No.

Q.    Instead, all the pharmacological treatments of obstructive sleep apnea targeted the symptoms of OSA; correct?

A.    No.  In fact, if you read the label for those drugs like Modafinil, what they say is for the treatment of refractory sleepiness of patients who are not improved adequately with CPAP therapy.

So it's not in lieu of CPAP therapy, it's adjunctive therapy, if the symptomatic -- symptom of EDS did not get better.

So, no, it does not say that they're treating the apnea with those drugs.  It's saying refractory sleepiness from CPAP.

Q.    So, sir, the drugs that were available as of 2005 for treating sleep apnea -- and you're calling it refractory because the patients were using CPAP and they still had a residual level of sleepiness during the day.  The drugs that

Roth - Direct

were available were treating the residual sleepiness, not the underlying sleep disorders; correct?

A.    There are no drugs in 2005 which are indicated for the treatment of sleep apnea.  The one drug which was on the market, one, was Modafinil and Provigil, and its indication was for the treatment of excessive daytime sleepiness refractory to CPAP therapy.

Q.    I think we can agree on that.  And so my point was: The drugs that were available on -- as of 2005 were not treating the underlying breathing disruption.  They were treating the refractory sleepiness --

A.    Correct.

Q.    -- associated with it?

A.    Correct.

Q.    Thank you, sir.

A.    They were treating excessive daytime sleepiness, not sleep apnea.

Q.    And that would include Modafinil?

A.    Only Modafinil.

Q.    And -- and, in fact, Modafinil's marketed under the label Provigil, and it had had an approved indication for treating excessive daytime sleepiness associated with OSA; is that right?

A.    Refractory to CPAP.

Q.    You would agree with me that a POSA understood that

Roth - Direct

EDS is the hallmark symptom of obstructive sleep apnea; true?

A.     I'm not sure what you mean by "hallmark symptom." The most common symptom of sleep apnea is snoring.  A hundred percent of sleep apnea patients snore.  Only a -- only a small majority of sleep apnea patients have excessive daytime sleepiness.

         MR. BALL:  Can we go to the rebuttal report, Mr. Sayres, at 350, please?

         Paragraph 350.

BY MR. BALL:

Q.     Do you see there, sir, the sentence beginning with, "For example, EDS is not a hallmark of Parkinson's"?

         Can we highlight that sentence?

A.     Mm-hmm.

Q.     "Like it is for narcolepsy or sleep apnea."

         Did you write that, sir?

A.     Yes, I did, and I agree with it.

Q.     Let's pull up DTX-217, please.

A.     Can I put that in context, or are we moving on?

Q.     Sir, we've got a very short amount of time.  I think --

A.     Okay.

Q.     -- your counsel -- counsel for Plaintiffs will be able to --

Roth - Direct

A.    Sure.

Q.    -- do that with you.

If we look at DTX-217, by the way, this is Thomas Roth, Ph.D.  That's you, the author?

A.    That's me.

Q.    Sole author?

A.    Sole author.

Q.    And this is an article titled "Pharmacotherapy of Excessive Sleepiness" --

A.    Correct.

Q.    -- published in 2012?

A.    Yes.

Q.    Sorry.  It's very small --

A.    Yes, it is.

Q.    -- font.

So it published well after the filing date of the '947 patent; you would agree?

A.    Yes.

Q.    Let's just look at a few of the statements here. Under "indications," do you see where it says, "It is critical to recognize that stimulants are drugs that enhance alertness and improve functions that are compromised by elevated levels of sleepiness.  Thus, these medications are meant for symptomatic management, not disease modification or prevention."

Roth - Direct

That's certainly a true statement, isn't it, sir?

A.    Yes, it is.

Q.    And then if we go to the next page, and there's a paragraph there beginning "More recently."

Do you see that?

A.    Yes.

Q.    And it says, "More recently, Modafinil and its isomer have been studied and approved for refractory sleepiness associated with obstructive sleep apnea."  And then it refers to shift-work disease?

A.    Shift-work disorder.

Q.    And then you say it's important to clarify --

A.    Yes, I do.

Q.    -- that the medications do not improve the OSA, per se.  That's certainly a true statement, isn't it?

A.    Right.

Q.    And you say that they merely improve sleepiness produced by these disorders; correct?

You certainly agree with that; correct?

A.    Correct.

Now, let's go down a couple sentences.

Do you see where it says "However"?

A.    Am I on the left side or the right side?

Q.    No, I'm sorry.  Let's just -- there's three lines

Roth - Direct

down from where Mr. Sayres has highlighted.

"However, sleepiness is typically the major

symptom of concern for the patient."

Did you write that, sir?

A.    Yeah, it says that.  Right.

Q.    And so at the time you wrote this in 2012, you certainly thought that sleepiness was the major symptom of concern for the OSA patients correct?

A.    Excessive daytime sleepiness is the main reason they came in.

Q.    Thank you for clarifying, because I think you -- before you mentioned snoring, but daytime --

A.    No, no.

Q.    -- sleepiness is the major symptom of concern for OSA patients that's bringing them into sleep clinics.

That's true, isn't it, sir?

A.    I did not say that the patients come in for snoring. What you asked me is what is the hallmark symptom.  The one symptom which is present in all obstructive sleep apnea patients is snoring.  Excessive daytime sleepiness is the reason they come into the clinic, but it's not there for all patients.

So, before you asked me about the hallmark symptoms, and now you're asking me:  What is the typical patient complaining about?

Roth - Direct

Q.    Let's move on.  If we go to the right-hand side --
same --

         MR. BALL:  Leave this up, please, Mr. Sayres.

BY MR. BALL:

Q.    If we go to the right-hand side, there's a paragraph
beginning with "The other stimulants."

         Do you see that?

A.    Yes.

Q.    It says, "Given that other stimulants are effective
for treating sleepiness and narcolepsy, one might infer that
they can be used for these other indications."

A.    No.  I'm not with you.

Q.    Sure.

A.    Oh, you skipped a line.

Q.    Let's highlight the full sentence.

A.    "Given that other stimulants are effective for
treating" -- (Witness reading to himself.)

         Okay.

Q.    And you -- sir, and then you say -- so what you're
saying is the stimulants -- and we're talking about
Modafinil.  We're talking about amphetamine; correct?

A.    Yes.

Q.    Ritalin, methylplenidate, things of that nature?

A.    Mm-hmm.

Q.    Correct?

Roth - Direct

A.      Mm-hmm.

Q.      And what we're saying -- what you're saying is because they're effective in treating sleepiness in narcolepsy patients, one may think -- one may be tempted to infer that they can be used for other indications as well, but that is not the case; right?

A.      That is not the case.

Q.      And, in fact -- well, some of the reasons why you couldn't do that -- if we go down, do you see where it says, "In addition, the dose of medication needed to treat"?

        Can we highlight that?

A.      I see it.

Q.      So if we're talking about something like treatment of EDS in -- I'll just make one up -- Parkinson's disease, you would agree, wouldn't you, sir, that the dose of the medication needed to treat the level of sleepiness seen in different conditions needs to be empirically determined?

A.      It must be tested and in double-blind placebo control trials.

Q.      Correct.  You just wouldn't use the dose from one indication with -- where -- with the patients that have another indication; correct?

A.      Correct.

Q.      And -- but -- and, in fact, that wouldn't even be a safe thing to do, would it, sir?  You would agree that,

Roth - Direct

thus, until the dose-related efficacy and safety of a given drug in various EDS populations are determined, their off-label use is ill-advised?

That's certainly something you would agree with, isn't it, sir?

A.    Yes.

Q.    Okay.

A.    But --

Q.    And then --

A.    -- the reason --

Q.    Let's get --

A.    The reason -- you're skipping stuff.  The reason I said that is not the case, it's because -- primarily because the FDA said it's not the case.  Cephalon went in, and I say that in that deposition there.  I say that Cephalon went in with indications for shift-work disorders, for refractory sleep apnea and for narcolepsy.  And they wanted it for all sleep disorders.  And the FDA said, No, you have to study in each condition individually.

Q.    Thank you, sir.

Let's go down to where it says, "Aside from these indications, stimulants, and especially the more recently developed ones, are used off label for sleepiness due to other sleep disorders."

And then you go on to mention there, "Sleepiness

due to neurologic disorders such as Parkinson's."

Is that right?

A.    I don't see Parkinson's.  I see Kleine-Levin -- yes, yes.  I'm sorry.  Two lines below that, Kleine-Levin.

Q.    Okay.  Let's go to the next page.  Can we?

And then if we can expand the left-hand column.  And then do you see it says, "It must be recognized that while there are individual published studies of the use of stimulants, typically Modafinil in these populations, there are no large-scale clinical trials defining the appropriate dose or the safety of the medication in that specific population."

That was certainly true when you wrote this in 2012; correct?

A.    Correct.

Q.    And the -- let's go back to the previous page.  I thought I saw a slide in your opening presentation about coffee and caffeine; right?

A.    It was coffee in front of somebody.

Q.    Well, there was a picture, you know, somebody had a cup of coffee, and I think all of us, you know --

A.    I'll accept --

Q.    -- are a little jealous --

A.    I'll accept that.

Q.    -- of that.  And I think what you said is that

Roth - Direct

caffeine or coffee would treat diurnal somnolence, but it would not treat excessive daytime sleepiness. That was the testimony you gave; correct?

A.    Correct.

Q.    And if we look at the table that we have on DTX-217, Table 1, is it titled "Commonly Used Pharmacologic Compounds For Excessive Daytime Sleepiness"?

A.    Correct.

Q.    And you listed caffeine, 100 to 200 milligrams --

A.    Correct.

Q.    -- as a commonly used pharmacological compound for excessive daytime sleepiness; correct?

A.    Correct.

Q.    And that was certainly true when you wrote this in 2012?

A.    It it was used, but it didn't work. The average --

Q.    Go ahead, sir.

A.    The average patient which walks into our clinic complaining of excessive daytime sleepiness is on 6-, 700 milligrams of caffeine and continues to complain of excessive daytime sleepiness. So while it is used, it certainly is not effective for EDS.

Q.    And you chose to include it at an effective dose of 100 to 200 milligrams --

A.    Right.

Q.    -- as a commonly used pharmacological compound for the treatment of excessive daytime sleepiness in your paper in 2000- -- in 2012 --

A.    Mm-hmm.

Q.    -- along with things such as amphetamine, Modafinil, methylphenidate, sodium oxybate and others; correct?

A.    Uh-huh.

Q.    Is that a "yes"?

A.    Yes.  It's used, but not effective.

MR. BALL:  And if we haven't already done so, Your Honor, I'd like to admit DTX-21.

MS. HANSEN:  No objection.

THE COURT:  It's admitted.

MR. BALL:  DTX-217, I'm -- I mispronounced.  We can strike that.

MS. HANSEN:  Still no objection.

THE COURT:  We'll admit that, too.

(DTX Exhibit No. 217 was admitted into evidence.)

MR. BALL:  Can we pull up DTX-182, please?

BY MR. BALL:

Q.    DTX-182, I believe, is another article of yours. You've authored this with a medical doctor, John W. Winkelman; correct?

A.    Yes.

Roth - Direct

Q.    And that was in 2020.  I'm sorry.  It's on the bottom.  It's very small.

A.    Sure, 2020.  We'll work from it.

Q.    You can take my word from it.

MR. BALL:  But can you highlight that at the bottom, Mr. Sayres?

BY MR. BALL:

Q.    Okay.  2020 that you published this?

A.    Sure, absolutely.

Q.    And if we go to the first column, it -- the article is about "Recognizing and Treating Excessive Daytime Sleepiness in Patients With Narcolepsy"; correct?

A.    Correct.

Q.    Let's scroll down to the third paragraph, and it says "This report."

"This report, based on presentations given by Thomas Roth, Ph.D. and John W. Winkelman, M.D., will address how" the screen -- "how to screen patients for EDS, diagnose narcolepsy, select evidence-based treatments for EDS, and monitor for residual EDS in patients being treated for narcolepsy."

Correct?

A.    Correct.

Q.    And you would agree with me that evidence-based treatment is a treatment that is based on data rather than

Roth - Direct

opinion?

A.      Correct.

Q.      Okay.  And if we could go in this article to DTX-182.6.  And can you expand that portion referring to caffeine?

A.      Oh, yeah.

Q.      All right.  So in 2022, you're referring here in your article about evidence-based treatments to a small study where researchers compared 200 milligrams of caffeine with placebo in participants with narcolepsy, and the first assessment followed the first dose.  The next assessment took place after one week of daily use; correct?

A.      Yes.

Q.      And the results indicated that those taking caffeine had significant improvements in alertness; is that right sir?

A.      That's not what the paper says.

Q.      Sir, did you write this?

A.      Well, either John or I wrote it.  I don't know which of us.

Q.      And either you or John wrote that the "Results indicated that those taking the caffeine had significant improvements in alertness"; is that right, sir?

A.      Yes, but not compared to placebo.

Q.      And then what was written above, "Dr. Roth," I

Roth - Direct

believe that's you; right, next to caffeine?

A.    Mm-hmm.

Q.    It says "Dr. Roth discussed caffeine as an agent that may be useful to some patients with excessive daytime sleepiness."

Was that your opinion, sir?

A.    Patients with narcolepsy typically take caffeine in very large doses.  As I said, the average patient with narcolepsy walks into our clinic complaining of excessive daytime sleepiness consuming 6- to 900 milligrams of caffeine.

Q.    Had you concluded, sir, in 2020 that caffeine may be used with some patients --

A.    Mm-hmm.

Q.    -- with EDS -- may be used for -- may be useful for some patients with excessive daytime sleepiness?

A.    Yes, but not clear what it's useful for.  My wife consumes decaffeinated coffee.  I don't know what that's useful for, either.

Q.    Can we take a look, sir, at DTX-216?

MR. BALL:  Now, before I do that, let me move in DTX-182, please.

MS. HANSEN:  No objection.

THE COURT:  It's admitted.

(DTX Exhibit No. 182 was admitted into

Roth - Direct

evidence.)

BY MR. BALL:

Q.    All right.  DTX-216, this is the "Long Term Open Label Study in Narcolepsy with BF2.649 (Pitolisant) (HARMONY III.)"

You're familiar with HARMONY III; correct, sir?

A.    I am.

Q.    And this was a clinical trial that was conducted by Bioprojet on the drug Wakix or the drug pitolisant; correct?

A.    That is correct.

Q.    And it was studying excessive daytime sleepiness in patients with narcolepsy?

A.    Yeah.

MR. BALL:  Can we scroll down, Mr. Sayres, to the study overview, so this will be more clear?

THE WITNESS:  Yeah.  I thought -- this is not the study I was looking at.

MR. BALL:  Okay.  Can we blow that up?

BY MR. BALL:

Q.    We discussed this at your deposition, but you're welcome to look it over.

A.    Yes.

MR. BALL:  Mr. Sayres, can you highlight --

THE WITNESS:  Do I have that here in my book?

BY MR. BALL:

Roth - Direct

Q.    It should be in the --

A.    Where?

Q.    -- in this binder at Tab DTX-216.

A.    Is it long?  I can read it off here.

Q.    I think, sir, I'm just going to ask you about what you see right here on the screen --

A.    Okay.

Q.    -- so it's very brief.

      Based on the highlighted portion here, which you can read or we can read it out loud, this was a Phase III study; correct?

A.    Correct.

Q.    And it was on the long-term safety and efficacy of pitolisant in treatment of excessive daytime sleepiness (EDS) in narcoleptic patients with or without cataplexy."  Correct?

A.    Correct.  Correct.

Q.    Okay.  And there's a detailed description right underneath that where it says "in narcoleptic patients."  Do you see what I'm referring to?

A.    Yes.

Q.    It says, "In narcoleptic patients, results obtained in the previous studies showed that BF2.649 reduced significantly the diurnal somnolence compared to placebo."

      Let me stop there for a second.  So this is

Roth - Direct

saying, sir, that pitolisant in previous studies had been shown to significantly reduce diurnal somnolence; correct?

A.    If you keep reading, "confirming its wakening effect against EDS."

Q.    I certainly agree with that.  I want to take it one piece at a time.  So can we -- can we look at the first point?

You agree with me that HARMONY -- or sorry, strike that -- Bioprojet has explained here, in connection with the HARMONY III clinical trial, that the previous studies with pitolisant in narcolepsy patients showed that it significantly reduced diurnal somnolence --

A.    Yes.

Q.    -- compared to placebo.  I'll stop there.

You agree with that?

A.    I agree that that's what they said --

Q.    Mm-hmm.

A.    -- but I don't know what the data says.  As you said, it's not about opinion.  It's about data.  So I don't know what data they're referring to there.

Q.    And I'm not asking you to interpret the underlying data.  I'm just asking if you agree with me that what HARMONY -- what Bioprojet has said here is that in narcoleptic patients, previous studies have shown that pitolisant reduces significantly diurnal somnolence compared

to placebo?

A.      What -- you read what it says.

Q.      And that treatment of diurnal somnolence is what confirmed -- confirmed the waking effect against excessive daytime sleepiness, as you just said; right?

A.      That's what it says.

Q.      You don't disagree with that, do you?

A.      I don't know what the data is.  In other words, I don't know what the data is on daytime somnolence relative to what the data is on EDS or if they differ.

Q.      That's fine.  I'm not going to hold you to the data because I haven't shown underlying data here.

A.      Oh, okay.

Q.      But you don't disagree with me that Bioprojet is saying that the significant reduction in diurnal somnolence is what has confirmed the waking effect against excessive daytime sleepiness?

A.      That's exactly what they say.

Q.      Thank you, sir.

        MR. BALL:  Can we pull up DTX-90, please?

        Before we do that, I'd like to move in DTX-216.

        MS. HANSEN:  No objection.

        THE COURT:  It's admitted.

        (DTX Exhibit No. 216 was admitted into evidence.)

Roth - Direct

BY MR. BALL:

Q.    All right.  Now, sir, DTX-90 is a copy of WO 254; correct?

A.    Yes.

Q.    You're familiar with this one?

A.    Sure.  Yes, but not off the top of my head.  I'd have to read it.

Q.    That's fine.

A.    Yeah.

Q.    Let me show you something, and if you are -- if you need to skim through -- you have it in front of you, by the way, in your witness binder --

A.    Okay.

Q.    -- so you're welcome to grab that.

        MS. HANSEN:  I'm pretty sure he doesn't because I don't.

        MR. BALL:  Do we not have that?  It was in Plaintiffs --

        (Discussion held off the record.)

BY MR. BALL:

Q.    Do you still have Plaintiffs' witness binder in front of you?

A.    I do.

Q.    Why don't you look at DTX-90 in the witness binder that Plaintiffs have provided.

Roth - Direct

A.      DTX-80, 85, 88.  After 88, I have 107.

Q.      All right.  It's DTX-90.

A.      80.

Q.      It's -- sorry.  It's in the -- it's in your direct examination binder, sir, that you just went through with counsel.  DTX-90.

THE COURT:  Do you want to approach the witness stand and you can show him?

MR. BALL:  May I?

THE COURT:  Yeah.

MR. BALL:  This is the witness binder that Plaintiffs had, and DTX-90 is this.

THE WITNESS:  Okay.

BY MR. BALL:

Q.      I think you were testifying about WO 254 just a few moments ago.  You're welcome to look it over.

MR. BALL:  But in the meantime, Mr. Sayres, could you go to the --

THE WITNESS:  Oh, yeah.

MR. BALL:  -- first page.  Keep going.

THE WITNESS:  The first page?

MR. BALL:  Or next page, Mr. Sayres.  Next.

Let's stop there.  And can you blow up this paragraph beginning with "Antagonists."

BY MR. BALL:

Q.    All right.  Sir, you see in WO 254, which published in 2000, this is the Bioprojet patent that Dr. Schwartz filed.

Do you see where it says, "Antagonists of histamine $H_3$ receptor are known especially to increase synthesis and release of cerebral histamine."

Do you see that?

A.    Mm-hmm.

Q.    And it goes on to say, "Through this mechanism" -- you understand that's referring to the negative feedback loop --

A.    Correct.

Q.    -- the presynaptic auto receptor --

A.    Mm-hmm.

Q.    -- feature that Dr. Schwartz was involved in discovering for the $H_3$ receptor?

A.    Yes.  Mm-hmm.  Yes.

Q.    And then it says, "Through this mechanism" -- so through that negative feedback loop -- "they induce an extended wakefulness."  I'll stop there.

Do you see that?

A.    Yes.

Q.    And is it fair to say that you agree with this statement that antagonists of $H_3$ are known to induce an extended wakefulness?

A.    I only know that in animal studies.  In cat studies, in normal cats.  I know -- I don't know that in any -- in any animal model.  I don't know that in any human study.  And extended wakefulness is not EDS.

Q.    My --

A.    In fact, the next sentence talks about improving cognitive processes.  So that may relate to attention more than EDS.

Q.    Sir, this statement -- isn't it true that you agree with this statement?

A.    No, I don't.  I have no idea why he says that "$H_3$ receptors are known, especially to increase synthesis" in -- that's fine -- "through this mechanism, induce extended wakefulness."

I don't know who, and how long and in what species.

Q.    Let's look at your deposition transcript at Page 225, please.

A.    Are we done with this?  Can I close it?

Q.    We're going to -- you might hold onto it just for a second, but -- I can come over and help you move it.

A.    I'm good.  Deposition where?

Q.    Let's go to Page 225 of your deposition.

You were asked at Page 225:  "And so you agree with this statement that antagonists of histamine $H_3$ induce

an extended wakefulness?"

And was your answer "yes"?

A.    Yes.

Q.    Okay.  Sir, you can -- you can set that aside now.

A.    But, again, I did not specify in what species, under what conditions, and how does that relate to EDS.

Q.    That's fine, sir.  Thank you.

You testified, I believe, that there was a long-felt unmet need for scheduled drugs to treat excessive daytime sleepiness.  Is that...

A.    I think that was for unscheduled drugs.

Q.    There was a need for unscheduled drugs.  That was your testimony; correct?

A.    Yes.

Q.    And I think you testified that you're not a medical doctor; correct?

A.    Correct.

Q.    You've never had to decide whether or not to prescribe a drug based on the scheduled or unscheduled nature; is that true?

A.    No, but I've discussed that a lot with a lot of physicians.  I've also consulted with the FDA about scheduling drugs.

Q.    By the way, sir, pitolisant and Modafinil, would you agree that they have similar efficacies for treating

Roth - Direct

excessive daytime sleepiness?

A.      I don't know of any comparator studies between them.

        MR. BALL:  Okay.  Let's go back and pull up your article, DTX-182.  If we could go to DTX-182.6 and go to the top left-hand side.

BY MR. BALL:

Q.      Do you see where it -- you write in your article in 2020, "A network meta-analysis reported that" --

A.      Right.

Q.      -- "pitolisant is not inferior to Modafinil --

A.      Right.

Q.      -- "in relieving EDS and is" --

A.      Correct.

Q.      -- "superior to the treatment of cataplexy."

        Do you see that?

A.      Yes.

Q.      And then if you go down, you say, "A prior network meta-analysis compared Modafinil, pitolisant, and sodium oxybate.  Results indicated that Modafinil, sodium oxybate and pitolisant had similar efficacy in reducing excessive daytime sleepiness."

        Do you see that?

A.      Correct.

Q.      Okay, sir.

A.      That -- that's not a study.  That's a meta-analysis

Roth - Direct

of a lot of studies.

Q.    That's what you wrote in your paper?

A.    That is correct.  I didn't say there's a study which shows that.

Q.    Is the half-life of a drug important for deciding whether it would be useful for treating excessive daytime sleepiness?

A.    Yes, it would be.

Q.    And is it fair to say that there is a sweet spot of about 10 to 12 hours for that half-life?

A.    As I mentioned, it's not simply half-life.  It's duration of action, which is a function of half-life and dose.

Q.    Was it your opinion that there is a sweet spot for half-life between 10 and 12 hours for developing a drug --

A.    Yes.

Q.    -- for the half-life for developing a drug to treat excessive daytime sleepiness?

A.    At therapeutic level.

Q.    And, sir, what is the half-life listed in the label of WAKIX for pitolisant hydrochloride?

A.    I don't remember.

Q.    Let's pull it up.

          MR. BALL:  Let's pull up DTX-364, please.

          THE WITNESS:  I think it was -- I think it's --

I think it's 19.

MR. BALL:  That is not --

(Discussion held off the record.)

MR. BALL:  I will come back to that.

BY MR. BALL:

Q.    While we're finding that, let me ask you:  Does the '947 patent say anything about half-life in the claims?

A.    It does not.

Q.    Does the '947 patent say anything about any dosing regimen in the claims?

A.    It says 40 milligrams.

Q.    In the claims?  Let's --

A.    Oh.  In the claims?  No.

Q.    Okay.  Does the '947 patent require any particular duration of treatment in the claims?

A.    In terms of days, weeks, or months?  No.

Q.    Does the '947 patent require chronic administration?

A.    It does not.

Q.    ADHD, sir, is not mentioned in the claims of the '947; correct?

A.    Correct.

Q.    Schizophrenia is not mentioned in the claims of the '947?

A.    Correct.

Q.    Alzheimer's?

Roth - Direct

A.    Correct.

Q.    Obesity is not mentioned in the claims of the '947?

A.    Correct.

Q.    Allergic rhinitis, is that hayfever?

A.    Yes.

Q.    And that's not listed in the claims of the '947; correct?

A.    Correct.

Q.    Nasal blockage?

A.    Correct.

Q.    Cognitive disorders?

A.    Correct.

Q.    Okay.  So in the direct witness binder, you should have a copy of PTX-141, which is the label.

MR. BALL:  Your Honor, may I approach and give him a hand?

THE WITNESS:  Just show me where it is on the slide.  The slide has the half-life on it, just put it up there.

MR. BALL:  If you go to pharmacokinetics, it's on Page PTX-141.13.  Expand that and highlight "elimination," please.

BY MR. BALL:

Q.    All right.  Sir, what is the half-life that is listed here in the label for WAKIX at the 35.6-milligram single

Roth - Direct

dose?

What is the median half-life?  It is 20 hours; correct?

A.    Correct.

Q.    Well outside of the sweet spot; correct?

A.    Not well outside.  The range is seven and a half to 24.2.  And as I said -- and as I said in my deposition, there are numbers which are different than that which give it lower --

Q.    You wanted it to be so you --

A.    And, in fact -- and, in fact, it is long in some patients, as insomnia is the number one AE, adverse event.

Q.    And you would agree with me that insomnia is the number one adverse event for pitolisant; right?

A.    I don't agree with you.  That's what the data says.

Q.    Thank you.

Can you take a look in the witness binder that we gave you and try to find DTX-352?

Do you see on the top right-hand corner there, it says, "HARPS 1"?

A.    Oh, yeah.  Okay.

Q.    Are you familiar with the HARPS 1 study?

A.    Yes, I am.

Q.    And there's a title of the study, you'll see it's, "Randomized, multicenter, 12-week, double-blind,

Roth - Direct

placebo-controlled study to assess the efficacy and safety of BF2.649 in excessive daytime sleepiness in Parkinson's disease, followed by a nine-month open-label extension phase."  Correct?

A.     Correct.

Q.     And, sir, do you understand that this was a Phase III study, the HARPS 1, that was conducted by Bioprojet to try to show that pitolisant would treat excessive daytime sleepiness in Parkinson's patients?

A.     Correct.

Q.     If we go in this document -- and we can just, for the sake of time, cut to the chase.

          MR. BALL:  If we go to DTX-352.9.  At the bottom, can we highlight that paragraph?

BY MR. BALL:

Q.     Under "Efficacy," it says, "The primary objective of this study was to determine whether the study drug was more effective at reducing excessive daytime sleepiness in patients with Parkinson's disease than the placebo during the double-blind phase"; correct?

A.     Correct.

Q.     And that was studied on the primary endpoint of a reduction of the Epworth Sleepiness Scale score; correct?

A.     Correct.

Q.     If we flip to the next page.  At the very top, it

says the score decreased by minus 4.3 -- that's minus 4.3 on the Epworth Sleepiness Scale?

A.    Correct.

Q.    So it decreased by minus 4.3, and minus 3.3 in the placebo and the BF2.649 group respectively?

A.    Right.

Q.    Do you see that, sir?

A.    Yes.

Q.    And is this saying that the Epworth Sleepiness Scale scores in this clinical trial showed that the improvement was greater with placebo than it was with pitolisant?

A.    Numerically.

Q.    Numerically greater with placebo, a sugar pill; correct --

A.    Yes.

Q.    -- then it was with pitolisant?

You would agree with that; right?

A.    Yes.

Q.    And then if we go down, do you see where it says, "It, therefore, must be concluded that BF2.649 was not more effective at reducing EDS than placebo."

You agree with that; correct?

A.    Correct.

Q.    And if we scroll down further, do you see where --

A.    Can I comment on -- I can't comment on the data at

Roth - Direct

all?

Q.    Sir --

A.    I won't.

Q.    -- let me just get through this.  I'm very limited on time.  Your counsel -- counsel for Plaintiffs, you can do that.

Do you see then where it says, "The decrease in the mean ESS score between baseline and V6" -- V6 was the end of the 12-week double-blind phase; right?

A.    Right.

Q.    And, sir, it says, "The mean ESS score between baseline and V6 indicated that the 5-milligram and 20-milligram" -- 5-milligram was the lowest dose?

A.    That they studied, yes.

Q.    And 20-milligram was the highest dose?

A.    It's a therapeutic dose, yes.

Q.    So the 5 and the 20-milligram dose of BF2.649 -- we'll skip over the data -- was less effective at reducing EDS than placebo?

A.    Right.

Q.    And then it goes on to say, "With only the 10-milligram strength of the drug affecting an equivalent reduction."

So at least the 10-milligram was as good as the sugar pill; right?

Roth - Direct

A.    Yes.

Q.    Okay.  But the 20-milligram and the 5-milligram were both worse than the sugar pill; correct?

A.    They were numerically lower, yes.

Q.    And they conclude, "Therefore, the placebo seemed more effective at reducing excessive daytime sleepiness than the 5- and 20-milligram strength of BF2.649."  Correct?

A.    That's what they say.

Q.    There was some secondary efficacy criteria as well?

A.    Correct.

Q.    And none of those showed statistical improvements in -- in any sleep-related parameters; correct?

A.    Correct.

Q.    Okay.  You can set that one aside.

A.    Hold on.

Q.    I think you have another one, sir, in your binder.  DTX -- let me move that, DTX-352.

          MR. BALL:  I'd like to move that in.

          MS. HANSEN:  No objection.

          THE COURT:  It's admitted.

          (DTX Exhibit No. 352 was admitted into evidence.)

BY MR. BALL:

Q.    If we look at DTX-353, please, that's also in your binder.  On the top right, you see this is the HARPS 2

Roth - Direct

clinical trial.

Are you familiar with this one?

A.    Yes, I am.

Q.    So yet another clinical trial, Phase 3, that was run by Bioprojet to try to show that pitolisant could treat excessive daytime sleepiness in Parkinson's patients; correct?

A.    Correct.

Q.    And then if we just skip ahead, we can go to DTX-353 at Page 10. And if we highlight, "The score decreased by minus 3.76 and minus 3.94 in the placebo and the BF2.649 group respectively."

You see what I'm looking at?

A.    Mm-hmm. Yes.

Q.    And it says, "There was no statistical significance between the groups." Correct?

A.    Correct.

Q.    And then it says, "It must, therefore, be concluded that BF2.649 was not more effective at reducing EDS than placebo."

Is that right?

A.    At 20 milligrams.

Q.    And then if we see below, "The decrease in mean ESS" -- that's Epworth Sleepiness Scale. "The decrease in mean ESS score between baseline and V6" -- the end of the

study -- "indicated that the 20-milligram dose of BF2.649 was less effective at reducing EDS than the placebo with only the 5-milligram and 10-milligram strength of the study drug effecting a higher reduction of EDS than a placebo."

Do you see that?

A.    That's what it says.

Q.    Okay.  So the 20-milligram dose, the highest dose was worse again?

A.    Was not different from is what it says.

Q.    Well, let me just read it to you.  It says, "Was less effective at reducing EDS" --

A.    Mm-hmm.

Q.    -- "than placebo."

A.    Right.

Q.    Okay.  And then on this one, the secondary endpoints -- oh, well, let's just read the final line in that paragraph.

"Therefore, the placebo seemed more effective at reducing EDS than the 20-milligram strength of BF2.649."

That was the conclusion?

A.    Correct.

Q.    And if we go on down, it's talking about secondary endpoints again.  Were any of the secondary efficacy endpoints related to any sort of sleepiness condition?

Were those statistically significant at all?

Roth - Direct

A.      Well, relative to placebo, no.

MR. BALL:  I'd like to move in DTX-353.

MS. HANSEN:  No objection.

THE COURT:  It's admitted.

(DTX Exhibit No. 353 was admitted into evidence.)

MR. BALL:  Sir, I want to thank you for your time.

REDIRECT EXAMINATION

BY MS. HANSEN:

Q.    Just a few questions on rebuttal on redirect, Dr. Roth.  Could you explain what a meta-analysis is?

A.      Yeah.  Meta-analysis is typically undertaken when you don't have big effects.  If you take -- you know, you, obviously, have a hundred people there, a hundred people there, and you put them all into one pool and you make believe you have a very large study.

It is a mathematical game to show efficacy when individual studies don't show that.

Q.    And is that --

A.      May not show that.

Q.    And is a meta-analysis the same as a head-to-head study?

A.      It is not.

MS. HANSEN:  If we could pull up DTX-352,

Roth - Direct

Mr. Brooks, Page 17.

BY MS. HANSEN:

Q.    Now, could we go to the conclusion, please, and take a look at that first sentence?  What does that first sentence say that reads -- starts with "Despite"?

A.    Where's this from?  I'm sorry.

Q.    This is -- I'm sorry.

        MS. HANSEN:  Can you back it up, Mr. Brooks?

        If we could go up to the top.

BY MS. HANSEN:

Q.    This is from the HARPS 1 study.

A.    Oh, okay.  Right.  Go ahead.

        Thank you.

Q.    So, apologies.  Going down to the conclusion, what does the first sentence state?

A.    "Despite a trend in the study showing a response to treatment" --

Q.    Dr. Roth, you really have to slow down.

A.    I know.  That was really bad.

        "Despite a trend in the study showing a response to treatment on the primary efficacy criterion, it has been concluded that BF2.649 administered at the daily dose of 20 milligrams a day for a three-month period in Parkinson's patients did not show better efficacy than placebo, neither on primary efficacy criterion or secondary efficacy

Roth - Direct

criteria.  ED reductions between V-3, V -- Visit 3, Visit 4, Visit 5, and baseline Visit 2, number of diurnal involuntary sleep attacks, and episodes of severe sleepiness."

You know, that's a fatigue scale.  UPRS is a Parkinson's scale.  Adverse events.  Leave the dopamine -- dopamine agonist dosage, regimen change.  CGI, quality of life, you know, all those things.

Q.    Thank you.

If you could turn to your rebuttal report at Paragraph 350.

A.    Is that still on this topic or we're changing topics?

Q.    We're changing topics, Dr. Roth.

A.    Oh, can I make a comment on that?

Q.    I'm sorry.  On what?

A.    On those studies.

Q.    Sure.

A.    Okay.  It is very important.  The American Academy of Sleep Medicine talks about a reduction of two points on the Epworth Sleepiness Scale to show clinical benefit.  So these patients did show a clinical benefit, albeit so did the placebo group.  In fact, what's really unique about this study is you've got a huge placebo response and a reasonable effect on that.  So it's not that WAKIX didn't work.  It's just the placebo was gangbusters, and it's not clear why that is.

Roth - Direct

If we look at the data, the standard deviations are massive.  So I don't quite know with that.

Also, if you look at the secondary endpoints, more than -- slightly more than 50 percent of the patients reported that they were better.

Q.   Okay.  Thank you, Dr. Roth.

MS. HANSEN:  Mr. Brooks, now if we could go to Paragraph 350.

BY MS. HANSEN:

Q.   Now, counsel directed your attention to a statement here where you said, "For example, EDS is not a hallmark of Parkinson's, like it is for narcolepsy or sleep apnea."

Right?

A.   Right.

Q.   And you wanted a chance to explain?

A.   Yeah.

Q.   Please explain.

A.   Okay.  Yeah, please.

So it's not a hallmark.  So excessive daytime sleepiness in narcolepsy and sleep apnea.  IN narcolepsy, a hundred percent of the patients have it.

In narcolepsy and sleep apnea, maybe 40, 50, 60 percent have it.

In Parkinson's disease, not everybody has it. It's not a diagnostic criteria.

If you look at diagnostic criteria of PD, you don't have EDS, so it's not a hallmark symptom.  It's there.

And when you do studies in Parkinson's disease, you've got to screen for sleepiness because many patients don't have that with Parkinson's disease.  That is not the case for sleep apnea and narcolepsy.

MS. HANSEN:  Thank you, Dr. Roth.

No further questions.

THE COURT:  You may step down.  Thank you.

THE WITNESS:  Thank you.  You may take a rest.

MR. BORNSTEIN:  Your Honor, we have one final witness.  I just wanted to level-set with time.  I don't think it's going to matter because we're going to be under either one, but by our calculation, we have, I believe, 49 minutes left.  We're not going to need probably half of that.  But, again, I just want to make sure we're not butting up against any time constraints.

(Discussion held off the record.)

THE COURT:  All right.  We've got you with 42.

MR. BORNSTEIN:  Forty-two is fine.  Let's take your number.

Thank you, Your Honor.

MS. HANSEN:  Your Honor, Plaintiffs have nothing further on validity, outside of cross, of course, of their witness.

Roth - Direct

THE COURT:  All right.  Thank you very much.

MR. BALL:  Your Honor, we'd like -- Defendants would like to call Dr. Clete Kushida.

MR. BORNSTEIN:  Your Honor, may I approach the witness?

THE COURT:  Yes.

MR. BALL:  May I?

THE COURT:  Yes, yes.

DIRECT EXAMINATION

BY MR. BALL:

Q.    Good afternoon, Dr. Kushida.

A.    Good afternoon.

MR. BALL:  Your Honor, as a matter of housekeeping, and it's very bad form on my part, but during Dr. Kushida's direct earlier, he had his CV.  It was DTX-424.  I'm informed I forgot to move that in, so I'd ask to move that.

MR. SIPES:  No objection.

THE COURT:  It's admitted.

(DTX Exhibit No. 424 was admitted into evidence.)

BY MR. BALL:

Q.    Dr. Kushida, Dr. Roth discussed alleged secondary considerations of non-obviousness.

Do Dr. Roth's secondary considerations

Kushida - Direct

demonstrate non-obviousness of the '947 patent?

A.    They do not.

Q.    Let's go through -- you've got some slides on rebuttal.

A.    Yes.

Q.    Have you prepared some slides?

A.    Yes.  Yes.

Q.    Let's pull those up, please.

Let's go to the next slide, please.  One of the things that Dr. Roth discussed was an alleged long-felt but unmet need for a nonscheduled substance to treat excessive daytime sleepiness.

Did you hear that testimony?

A.    I heard that.

Q.    In your clinical opinion, would a POSA have understood that there was an unmet need for nonscheduled treatment --

A.    They would not.

Q.    -- for excessive daytime sleepiness?

A.    I'm sorry.  They would not.

Q.    And can you explain?

A.    Yes.  Because when we treat patients, there's really not a consideration -- not too much of a consideration of scheduled versus nonscheduled drugs.  A person may prescribe, you know, hundreds of scheduled drugs, and we

Kushida - Direct

just try to match the medication with the -- with the patient, looking at efficacy, looking at safety.

So there's really not a consideration of scheduled versus nonscheduled.

Q.    And in your direct examination earlier, we discussed treatments of excessive daytime sleepiness that were available prior to the priority date of the '947 patent.

Do you recall that?

A.    Yes.

Q.    And you mentioned Modafinil was one of those?

A.    That's correct.

Q.    Is Modafinil a scheduled substance?

A.    It is.

Q.    Is Modafinil associated with a significant potential for abuse?

A.    No, it is not.

Q.    Can you explain?

A.    Yes.  Modafinil, you know, typically you would want to have a conversation with patients that have disorders in which there's excessive daytime sleepiness.  I inform them that if I prescribe Modafinil, it's essentially like taking several cups of coffee.  It's not really that there's a big potential for abuse.  Of course, I go over it with them.

Q.    And what are you showing here in DTX-182 in the lower part of your slide?

Kushida - Direct

A.    Yes.  It states that Modafinil is not associated with the significant potential for abuse.

Q.    Who's the author of DTX-182?

A.    It's Dr. Roth and Dr. Winkelman.

Q.    Okay.  On the right-hand side of this -- by the way, you mentioned Modafinil.  Do you prescribe it to children?

A.    Absolutely.

Q.    Teens?

A.    Yes.

Q.    Adults?

A.    Yes.

Q.    Elderly?

A.    Yes.

Q.    Have you ever encountered any problems prescribing Modafinil to those patients based on any potential for abuse?

A.    None whatsoever.

Q.    Do you weigh the scheduled nature of Modafinil when you're deciding whether or not to prescribe that drug to a patient?

A.    No.  I try to fit the medication with the patient. And if it's a scheduled drug, you know, quite frankly, it just involves a few extra clicks on the screen to electronically prescribe the medication and to obtain a DEA certificate every two years or so.

Q.    Let's explore that.  I was going to ask you if there was any barriers to a physician prescribing a scheduled drug.

A.    There really isn't.  And Dr. Roth mentioned that, you know, there's a fear on the part of -- of prescribers and patients of that, so we don't like to do it.

I really disagree with that, because that's something that we do on a daily basis, especially in the field of sleep medicine.  You know, we -- we don't -- it doesn't become an issue.  And even in the discussion with my colleagues, I've never heard any physician tell me, Oh, you know, I'm afraid of prescribing a scheduled drug or I don't like to do that.  You know, we just simply look at what's best for our patients.

Q.    Is a DEA certificate required?

A.    A DEA certificate is required to prescribe scheduled drugs.

Q.    Is that something that's difficult for a physician to obtain?

A.    No.  We just have to apply for it twice a year. We'll get a reminder about it.  We -- we, you know, provide payment for it, and then -- and then we'll get it in a couple of weeks.

Q.    If you're prescribing something like Modafinil, is that subject to any sort of REMs requirements or anything of

that nature?

A.    No.

Q.    What are you referring to on the right-hand box from DTX-182?

A.    Yes.  On the right hand, it mentions that Dr. Roth discussed caffeine as an agent that may be useful to some patients with excessive daytime sleepiness.

Q.    Do you prescribe -- or I guess "prescribe" is not the correct word.  Do you recommend to your patients that have excessive daytime sleepiness to consume caffeine?

A.    Yes.  I -- I tell them that if they would like to self manage use of caffeine, that's totally fine and that I would recommend it, particularly because you -- as most people know, it's the most commonly self-administered substance in the world, especially for excessive daytime sleepiness or daytime somnolence.

Q.    And in your experience with your patients in a clinical setting, is caffeine or coffee -- is it effective for patients that have excessive daytime sleepiness?

A.    Yes, it can be effective.  You know, they can use it, you know, when they're feeling drowsy.  Even when they feel drowsy while driving, it's not unusual for patients to say, you know, I'm going to get some caffeine or drink coffee.

Q.    Okay.  Let's go to the next slide, please.

Kushida - Direct

Sir, has the drug WAKIX, pitolisant hydrochloride -- has that changed the treatment recommendations in the field of sleep medicine?

A.    By means of like in publications or --

Q.    Well, let's say for treatment of excessive daytime sleepiness in narcolepsy, have doctors stopped prescribing Modafinil?

A.    No.  It hasn't really changed the landscape that much, I would say.

Q.    What are you showing on DTX-185 -- on DDX13.3, what are you showing from DTX-185?

A.    Yes.  What I'm showing is these are American Academy of Sleep Medicine Clinical Practice Guidelines, and it's on the treatment of central disorders of hypersomnolence.

Q.    And these are recommendations -- I see strength of recommendations, strong -- strong, and it lists Modafinil and pitolisant.  Can you describe what you're showing here in the highlighting?

A.    Yes.  So what happens is in the development of these papers, there's a task force that's assembled.  And what that task force does is they look over hundreds of thousands of papers.  And on the basis of that, they decide, you know, what -- how strong the recommendations are or how strong the evidence is to develop recommendations.

And so, as you can see, that's highlighted.  You

have Modafinil and pitolisant and both of them are strong recommendations.  You go across, it looks like excessive daytime sleepiness.  And then also highlighted -- for Modafinil, a plus is it enhances quality of life.

Q.     So is it fair to say that Modafinil's been available for treatment of excessive daytime sleepiness for over 35 years?

A.     Yes.

Q.     And it's still to this day a strong recommendation for treating excessive daytime sleepiness?

A.     Yes.

Q.     In your clinical practice, would you regard it as a frontline treatment?

A.     Absolutely.  That's one of the major go-to medications that I -- I use for patients that do complain of excessive daytime sleepiness.

Q.     Do you prescribe pitolisant?

A.     I'd have to think the last time I prescribed it. It's been years.

Q.     Why do you favor Modafinil over pitolisant?

A.     Well, personally, I -- I feel that the potency of Modafinil is better.  It appears to be more effective for my patients, and the quality of life indication -- or not indication, but recommendation is compatible with what I've -- with what I've seen, also, is that patients, you

Kushida - Direct

know, seem to respond well, you know, when they take this medication, enhancing their activities of daily living.

Q.    Let me ask you this:  It says "Critical outcome showing clinically significant improvement," and then one of those critical outcomes is listed as "quality of life."

A.    Yes.

Q.    Can you explain what that is?

A.    Yes, so what that means is that there will be questionnaires indicating domains of quality of life, and that can include like areas centered around like work, family, driving, sports, you know, all these different things.  And they'll ask these subjects, research participants in these studies, to indicate, you know, how it has improved their quality of life.

And so, in a statistically significant manner, they'll compare these patients that have received this medication and have not, and they'll indicate the quality-of-life measures.

Q.    And so was there a quality-of-life recommendation for pitolisant?

A.    There was.

Q.    My question --

A.    Oh, no, I'm sorry.  I'm sorry.  Modafinil, not pitolisant.

Q.    Let's just make sure the record is clear.  Was there

Kushida - Direct

a quality-of-life recommendation for Modafinil?

A.      There was.

Q.      Was there a quality-of-life recommendation for pitolisant?

A.      There was not.

Q.      Okay.

            THE COURT:  Counsel, let's go ahead and take a brief break, give our court reporter a break here.  We'll take 15 minutes.

            COURTROOM DEPUTY:  All rise.

            (Recess was taken.)

            COURTROOM DEPUTY:  All rise.

            THE COURT:  Please be seated.  Let's continue.

BY MR. BALL:

Q.      All right, sir.  We're in the home stretch.  A few more questions.

            MR. BALL:  If -- if we could go to the next slide, Mr. Sayres.

BY MR. BALL:

Q.      You heard testimony from Dr. Roth that it wouldn't have been predictable that an $H_3$ antagonist could treat excessive daytime sleepiness as of the priority date of the '947 patent.

            And do you agree with Dr. Roth?

A.      I disagree.

Q.    And can you explain, with reference to DDX13.4, what reference information you're relying on here and how that relates to your opinion?

A.    Yes.  As -- as you can see from this slide, there's been numerous publications:  Onodera in 1994, Alguacil in 2003, Passani in 2004, that indicate that these $H_3$ antagonists, including thioperamide, is expected to be useful for the therapy of narcolepsy.  That's in Onodera.

Alguacil states that ligands of the $H_3$ receptors could be expected to affect sleep and wakefulness by changing histaminergic tone; and that, therefore, $H_3$ antagonists could be of interest in the management of narcolepsy.

And then Passani, in 2004, states that these $H_3$ receptor antagonists provide the most promising therapeutic approach for the treatment of major wake disorders, such as narcolepsy and also --

Q.    So -- go ahead.  Go ahead.  I interrupted.  Please finish.

A.    I was just going to say that the Stark publication in 1996, which states that pharmacologic and clinical outlook, it states in his Table 2, potential indications for H2 receptor antagonists, and it highlights narcolepsy.

Q.    And, sir, would a POSA -- as of the priority date of the patent, would they have agreed with Onodera, Alguacil,

Passani, Stark, that the $H_3$ receptor antagonist would be expected to be useful as a therapy for narcolepsy?

A.      Absolutely.

              MR. BALL:  Let's go to the next slide.

BY MR. BALL:

Q.      There was -- I think -- I think you were watching the testimony of Dr. Roth and he talked about what he considered to be alleged failures by others to develop $H_3$ antagonists; correct?

A.      Correct.

Q.      And can you explain what you're illustrating here on DDX13.5?

A.      Yes.  So the studies that are highlighted in red indicate ones that, you know, really don't have relevance, you know, to excessive daytime sleepiness.  So these, you know, are ones where, you know, the indication wasn't anything to do with excessive daytime sleepiness.

              The ones in blue, there's a possibility, but, you know, there's no way to know for sure.  And you notice that only, I think, three of them mention excessive daytime sleepiness.  The other ones, you know, mention disorders that, you know, might be associated with excessive -- that are associated with excessive daytime sleepiness.

Q.      I noticed one at the bottom says EDS and Parkinson's disease.

Do you see that?

A.    Yes.

Q.    Do you have any observations as to whether or not it would be informative at all that a drug would have allegedly failed to treat EDS in Parkinson's disease patients?

A.    Yes.  That -- that goes back to the enablement opinion that I had earlier.

Q.    Now, is there -- would a POSA have understood that there's any sort of clear mechanistic connection, based on the biology of the $H_3$ receptor and pathways, between being an antagonist or an inverse agonist at $H_3$ and treating something like Alzheimer's disease?

A.    Yeah.  I think it's very speculative at best.

Q.    What about -- what about MS, schizophrenia, allergic rhinitis, can you comment on those?

A.    Yeah.  These are like neurologic disorders and, in particular, these are chronic neurologic disease conditions, especially the ones that you mentioned like Alzheimer's. Also, you know, cognition.  Even MS, you know, is a degenerative condition.

So these type of disorders, I just can't appreciate why they would be, you know, studied in this context.

Q.    Would they have any bearing to a POSA on the obviousness or non-obviousness of Claim 13 of the '947

Kushida - Direct

patent?

A.    Yes.  So, you know, a POSA looking at this would, you know, not really think that these medications -- or these conditions could be -- could be, you know, treated.  So it wouldn't be obvious.

Q.    I'm sorry.  So it -- I just couldn't hear.  I know you're --

A.    My --

Q.    -- speaking up, but I just couldn't hear you.

A.    Right.  So a POSA would look at this and see that, you know, it really wouldn't be obvious over, you know, Meier versus Brooks, that it would potentially treat, you know, wakefulness.  But any of these other conditions, no.

Q.    Okay.  So you're saying it would be obvious over Meier in view of Brooks that it would treat wakefulness, but not these other conditions.

      And I'm sorry to --

A.    Yeah.

Q.    -- move like this, but -- and I'm sorry to lean like this, I just couldn't hear.

A.    Yeah.

Q.    So I was asking him to clarify.

A.    Yeah.  I can restate it.

      THE COURT:  I understand the objection.  We'll let him testify.

Kushida - Direct

Go ahead.

Do you have an answer to that?

THE WITNESS:  Yes, I did.

So it's, you know, obvious over Meier in light of Brooks, you know, for treating excessive daytime sleepiness, but in terms of these other conditions, that wouldn't be obvious.  It would not be obvious, sorry.

MR. BALL:  Let's go to the next slide, please.

BY MR. BALL:

Q.    What are you -- what are you showing here, sir?

A.    So the reason I'm showing this timeline is that there's only one that's before the priority date of the '947 patent, and that's -- that study is GT-2331.

Now, the prior slide it showed that, you know, this -- the indication was for attention deficit hyperactivity disorder, or ADHD.  The ones to the right of this, as I mentioned, you know, are -- are, you know, either nonrelevant or the relevance is in question.

Q.    And what would a POSA conclude concerning this timeline as to whether or not there were failures that are relevant to the '947 patent?

A.    Yeah.  It would be difficult because, you know, these studies, they can terminate for any -- any reason.  And being a principal investigator on -- on these type of studies, you know, there's many reasons why, you know,

Kushida - Direct

studies terminate.  It could be things like funding.  It could be market.

It -- sometimes it's just the strategic, you know, goals of a company in any given year.  And I've certainly been on the receiving end of that.  You know, I'll get a notification when I'm in the midst of enrolling patients for a study that, Oh, you know, we're going to be terminating the study and, you know, I'm not privy to the reasons.

Q.    And you said you're PI on anywhere from eight to ten clinical trials at a given time?

A.    Correct.

Q.    And in that context as working on a clinical trial as a principal investigator, can you explain why -- what, if anything, a POSA would understand merely from a Phase I or a Phase II trial not proceeding?

A.    It's just speculation on our part.  A lot of times we don't get an answer.

Q.    Did you see any evidence from Dr. Roth in his testimony that any of these had actually failed?

A.    I -- I did not.  I did not note that, that they failed for whatever reason.

Q.    Great.

MR. BALL:  And with that, sir, I have no further questions.

Kushida - Cross

THE COURT:  Cross-examination.

CROSS-EXAMINATION

BY MR. SIPES:

Q.    I'm not sure if I'm supposed to apologize for saying this, but I do have a few questions.  So, Dr. Kushida, I appreciate you bearing with me late in the day.

THE COURT:  You don't have to apologize.

BY MR. SIPES:

Q.    Let me start where you ended with this -- these lists of compounds, if we could.

MR. SIPES:  So, Mr. Brooks, if we could pull up your -- at DDX13.5.

BY MR. SIPES:

Q.    This list of compounds is based on the list of compounds you had in your reply report in Paragraph 133; correct?

A.    Correct.

Q.    And I've noticed some changes, so I'd be curious to -- to talk to you about those -- first about those.

So if you look in your reply report in Paragraph 133 -- I believe you were given it, but if not we can certainly provide you with a copy -- you list bavisant in your reply report as being tested for ADHD, and that's certainly true.  Bavisant, which is -- you're aware bavisant is a J&J drug; correct?

Kushida - Cross

A.    Correct.

Q.    And J&J actually started by looking at it for the treatment of ADHD; correction?

A.    I believe so.

Q.    And then beginning in 2019, or thereabouts, it then shifted -- the ADHD trial failed and it then shifted to what you have on your chart, going back to DDX13.5, EDS and Parkinson's?

A.    That's correct.

Q.    Yeah.  And if you look at the next page, that's -- you're reporting 2019.  I think actually if you look, enrollment was around 2017, but we're talking about the same time.

Essentially what happened is J&J started looking at bavisant -- and bavisant is an $H_3$ receptor antagonist; correct?

A.    Correct.

Q.    It started looking at attention -- at ADHD.  Then roughly 2017, after it saw the published pitolisant studies and the work that Bioprojet and Harmony published, it shifted its $H_3$ antagonist program into EDS and Parkinson's; correct?

A.    I'm taking your word for it.

Q.    That's what the timing suggests; right?

A.    That's what the timing suggests.

Kushida - Cross

Q.   Okay.  And, in fact, although you don't show all the timing, there's a trend, is there not, that once pitolisant succeeded, then you start to see more companies shifting from the cognitive into the EDS domain; correct?

A.   Yes, I could -- I could -- suppose you could make that -- that comment.

Q.   Now, let me take a look at another thing.  I'm just trying to understand ways in which these failures relate to what Bioprojet did and the successes that they had.

Now, in 133 of your reply report, you also indicated the kind of $H_3$ ligand that these drugs were. You've omitted that from your slide today, right, but you've, for example, differentiated between $H_3$ antagonists and $H_3$ inverse agonists; correct?

A.   Correct.

Q.   And it's fair to say that if you look at your chart in 133, sir, after pitolisant -- they learned of pitolisant and its success in EDS, companies were looking at inverse agonists for EDS; correct?

Well, what --

A.   Yes.

Q.   Yeah.  Okay.  Yes.

In fact, when you look at it on your chart, all of the compounds in Paragraph 133 --

MR. SIPES:  Why don't we pull up our own.

We've taken your Paragraph 133 and made a chart.

PDX11.1, Mr. Brooks.  This may make it easier for you.

BY MR. SIPES:

Q.     If we look here at -- at the -- in the -- not in the cognitive, but in the sleep domain, you -- one of the ones you list is J&J 172, 16498 for narcolepsy.  That's an inverse agonist.

Now, we'll come back to GSK 189254 -- or I'm sorry, that's the next one.  I'm having trouble reading.  GSK -- sorry.  I have it here.  GSK 189254, and that's an $H_3$ antagonist for narcolepsy.

The next one, APD 916, that's an inverse agonist.  And the next one after that is -- did I miss one?  I don't think so -- oh.  MK 0249 where they moved into EDS and OSA after Alzheimer's and ADHD.

That's MK 249, inverse agonist; correct?

A.     Correct.

Q.     And then the next one after that is J&J 17216498 in narcolepsy, and that's also an inverse agonist; correct?

A.     Correct.

Q.     So even on your chart, all but one of the $H_3$ ligands studied in sleep, rather than cognition, are inverse agonists; correct?

A.     Well, yes.  You stated that four out of the five

were, but there is still one that was an $H_3$ antagonist.

Q.    Now, in fact, GSK later published that GSK 189235,
however, was an inverse agonist; correct?

A.    That I'd have to double-check.  I can't just make
that comment or that opinion right now.

Q.    Fair enough.

So -- and in terms of the cognition reports,
those are mostly $H_3$ antagonists, correct, on your --

A.    Mostly, yes.  But they're -- yeah, there are a few
that are also $H_3$ -- yes, mostly.

Q.    Yeah.  So let me then turn now to a little bit about
the benefits of pitolisant, the unexpected benefits of
pitolisant.

And you talked a little bit about lifestyle,
improvement in lifestyle.  Let's talk about the lifestyle of
narcolepsy patients.

It is the case, is it not, that those with
narcolepsy typically live on a metaphorical double-edged
sword, because too much stimulation may induce cataplexy,
whereas not enough may provoke EDS or sleep attacks;
correct?

A.    Yes.

Q.    In fact, those are your exact words.  You have
written that, that narcolepsy patients live on a
metaphorical double-edged sword because of trying to steer

between too much stimulation leading to cataplexy and too little, not providing sleep attacks; correct?

That's your words?

A.    Yes.  It's for NT1 patients, narcolepsy Type 1 patients, because those are the patients that have cataplexy, plus excessive daytime sleepiness.

Q.    And pitolisant is approved to treat both cataplexy and EDS in narcolepsy patients; correct?

A.    That's correct.

Q.    And so pitolisant, because it treats both cataplexy and EDS in narcolepsy patients, would help alleviate that double-edged sword of too much stimulation causing cataplexy and not enough provoking EDS; correct?

A.    Yes.  Once again, in the NT1 population.

Q.    And at no point in your testimony have you suggested that using an $H_3$ antagonist to treat cataplexy was expected by a POSA in 2005; correct?

You haven't expressed that opinion?

A.    That is correct.  I haven't -- I haven't expressed an opinion about that.

Q.    Okay.  And, finally, just to put to bed this caffeine issue, the article that you cite to for caffeine, let's say being useful, is an article --

MR. SIPES:  Let's turn to DDX13.2.

BY MR. SIPES:

Kushida - Cross

Q.    You're quoting an article from 2020; correct?

A.    Correct.

Q.    So that's 15 years after the critical date here of -- of 2005; correct?

A.    Correct.

Q.    The only piece of prior art that we've discussed in this three days that discusses the effects of caffeine on EDS in narcolepsy is Brooks 2002; correct?

A.    I believe so.

Q.    And your thinking is in 2020, this is showing that caffeine -- it says "may be useful to some patients with EDS"; correct?

A.    That's -- that's not my words, it's Dr. Roth's.

Q.    Yeah.  But, in fact, the next slide you have, DDX13.3, you're now looking at actual treatment guidelines from 2021 -- from Maski 2021; correct?

A.    That's correct.

Q.    And that's actually the American Association of Sleep Medicine; correct?

A.    No.  It's called the American Academy of Sleep Medicine.

Q.    My apologies, the American Academy of Sleep Medicine.

Now, the list of recommended interventions for EDS, caffeine is not on that list; correct?

A.    Yes, that's true.

MR. SIPES:  I have no further questions, Your Honor.

MR. BALL:  Just very, very briefly.

The '947 patent, please.

Can you go to the claims?

REDIRECT EXAMINATION

BY MR. BALL:

Q.    Okay.  Sir, Claim 1 of the '947 begins here.

MR. BALL:  If we can blow that up, Mr. Sayres.

BY MR. BALL:

Q.    And, sir, take a look at Claim 1.  I'm sure you're familiar with it.  It goes on to the next page, so unfortunately we're -- we're going to have to scroll, instead of leaving it all up.

Sir -- so, sir, my question to you is very brief:  Asserted Claim 13, which depends from Claim 1, does it say anything at all about cataplexy?

A.    It does not.

Q.    Do any of the claims of the '947 patent mention cataplexy?

A.    It does not.

MR. BALL:  That's it.  Thank you, sir.

THE COURT:  Thank you.  You may step down, Doctor.

MR. BALL:  Your Honor, with that, we are closed.

Kushida - Redirect

THE COURT:  All right.  Both sides agree?

MR. SIPES:  We're finished.

THE COURT:  All right.  Great.  Have a seat.

MR. GATTUSO:  Your Honor, if I may.

THE COURT:  Yes.

MR. GATTUSO:  And I apologize.  I know it's late and it's been a long week.

There are a couple of admitted trial exhibits that we just want to address very quickly with Your Honor.  Both sides have discussed it.  We're in agreement.

THE COURT:  Okay.

MR. GATTUSO:  But because they are admitted trial exhibits, we thought it would be useful to just get it into the record now before we depart --

THE COURT:  Okay.

MR. GATTUSO:  -- If that's okay.

So during Dr. Steed's direction examination, at our request, AET, Your Honor, admitted four DTX exhibits, they were 1004, 1005, 1017, and 1018.

At the end of the day when we looked at the admitted trial exhibits, we confirmed that those four exhibits are duplicates to PTX exhibits that had already been admitted.  Those PTX exhibits are PTX-32, 33, 50 and 51.

We have agreed, subject to your approval, that,

for clarity in the record and to avoid confusion in post-trial briefing, that we could swap the DTX references in the transcript for those PTX references so there's just one set of exhibits instead of duplicates.

THE COURT:  Okay.  Do you think you could get the requested swapping into the court reporter within two weeks of getting the transcript?

MR. GATTUSO:  Absolutely, Your Honor.  And there's one other set of issues that I actually need to put glasses on to see.

So in terms of the transcript, DTX-30, it should have been admitted as DTX-370.

THE COURT:  Okay.

MR. GATTUSO:  And then there are in the transcript PTX-17, 23 and 32.  It should actually be DTX-17, DTX-23 and DTX-32.

And then there are three other exhibits that were admitted, but just not reflected in the transcript. And those are DTX-1076, DTX-1031, and JTX-3.

And so we'll work with Ms. Triozzi to get all of that together.

THE COURT:  Okay.  Thank you.

MR. GATTUSO:  Thank you.

THE COURT:  Any other housekeeping issues?

MR. SIPES:  I don't believe so, Your Honor.

Kushida - Redirect

THE COURT: Okay. All right. Let's talk just briefly about what I was thinking for the post-trial briefing.

I went ahead and looked back at what the parties had proposed. What I was thinking was that we'd have two sets of briefing, one set for infringement on the one patent and the other set for invalidity on the other patent, and I was thinking that both sets of briefing could follow -- each set could follow the 30-30-15. So 30 opening, 30 response, and 15 reply. And I would expect that, at least for the invalidity briefing, that secondary considerations are addressed in the opening brief, rather than waiting until the reply, so that way we can just have one reply.

And then accompanying the briefing would be proposed findings of fact that cite -- that are listed numerically and that cite to exhibits and testimony, and I don't -- it seemed like the parties wanted a limit on those. I think 40 pages should be enough for the infringement and -- on the one side and then the invalidity on the other.

Okay. I also had a couple thoughts that I wanted to share. I thought this case was very well tried. I really -- I really appreciated hearing from both the lawyers and the experts. We had an awful lot of brain power in the courtroom this week, maybe more than needed for some of these concepts, but I -- it was my pleasure and honor to

Kushida - Redirect

get to hear from all of the experts in the field that came to talk to me.

And I know sometimes, as patent lawyers, we take it personally when the -- if we win the case or lose the case. But at the end of the day, the facts are what the facts are. And I thought that both sides really did the best possible job they could have done with the facts that you were given and your clients should know that. Both sides did a really nice job.

I wanted to give you some of my initial thoughts while they're fresh in my mind. Don't quote these back to me in the post-trial briefing, but in case it's helpful for you when you're maybe discussing in the hall outside about whether the case can get resolved or what you want to focus on in the post-trial briefing, this is what I'm thinking right now:

On the infringement case, I was fully tracking everything that was going on. I don't think that I saw evidence sufficient to prove by preponderance that the ANDA product infringes.

And I say that for two reasons. The first is, as a legal matter, to infringe, I think -- and we'll take a look at this in the post-trial briefing -- I think you need to prove that the proposed ANDA product has the diffraction pattern with the claimed peaks, and I don't think we had

Kushida - Redirect

evidence to show that by a preponderance.

I also think that I got Plaintiffs' theory on this, and even if I agree that the theory was permissible as a legal matter, even if the claim was broad enough to cover a product that contains nano-sized crystals that are in the same crystal form as a crystal that was the claimed peaks, I'm not sure that I saw evidence sufficient to meet the burden to prove that the proposed ANDA product has that, either. We'll take a closer look at that. And, also, I don't think it matters, as a legal matter, because of the first thing that I said. So that's the infringement case.

With respect to the invalidity case, I'll start with 112. My tentative ruling is that I haven't heard evidence sufficient to prove that the claim is invalid under 112. I think the evidence was clear that any person of skill in the art could see that the claimed molecule had no chirality, no one disputed it. My conclusion on that was that the claim was sloppy, but it's probably not invalid.

Obviousness-type double-patenting, we'll look at that carefully. It's more of a legal question than a scientific question. I understand that Plaintiffs' position on obviousness-type double-patenting is going to depend, in part, on the fact that there was a restriction requirement. I'll take a close look on at that; that's not something I've had occasion to research. So that's more a legal argument

Kushida - Redirect

than a scientific argument.

Regarding obviousness, that's also a legal question. Defendants certainly presented plenty of evidence that it was obvious to pursue pitolisant as a drug. There was also evidence to use it for EDS. But obviousness to try is not the standard and there certainly was evidence presented that this was an unpredictable field. So we will take a close look at that.

I will say, compared to other method-of-treatment patents that I've looked at, there seems to be more expressed suggestion in the prior art to pursue investigation of the claimed method than I have seen in other cases. I don't know if that will change the result, but I offer that observation.

Regarding secondary considerations, the thing that I'm interested in hearing about in the post-trial briefing is how to define the scope of what we're looking at for the secondary considerations. So for failure of others, failure of others to do what? For long-felt need, long-felt need for what?

Unexpected results. Is it unexpected efficacy? Unexpected mechanism of action? There seems to be a disagreement and I will be interested to hear what the law says on that.

And the way that I think about objective indicia

is not to look at sound bytes from other cases, but to really think about the purpose that we look at objective indicia, which is to guide against hindsight bias when somebody claims that the prior art taught in a certain direction.  So the parties should frame their discussion about objective indicia with that in mind.

I'm not in a position to give you a sense today about how I think it will come out on obviousness and obviousness-type double-patenting.  We'll look at it very closely in the post-trial briefing, but I wanted to offer that.

Does anyone have any questions or comments?

MR. BORNSTEIN:  Nothing for us, Your Honor.

MR. SIPES:  Nothing from us, Your Honor.

THE COURT:  All right.  Thank you very much, everybody.  Have a good night.

COURTROOM DEPUTY:  All rise.

(Court was adjourned at 5:30 p.m.)

I hereby certify the foregoing is a true and accurate transcript from my stenographic notes in the proceeding.

/s/ Heather M. Triozzi
Certified Merit and Real-Time Reporter
U.S. District Court