**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| HARMONY BIOSCIENCES, LLC, HARMONY BIOSCIENCES MANAGEMENT, INC., BIOPROJET SOCIÉTÉ CIVILE DE RECHERCHE and BIOPROJET PHARMA SAS,<br><br>    Plaintiffs,<br><br>v.<br><br>LUPIN LIMITED, et al.,<br><br>    Defendants. | C.A. No. 23-1286 (JLH)<br>**CONSOLIDATED** |

**PLAINTIFFS' OPENING POST-TRIAL BRIEF
REGARDING AET'S INFRINGEMENT**

OF COUNSEL:

Christopher N. Sipes
Megan P. Keane
Brianne (Bharkhda) Sullivan
Cody J. Reeves
Nicole S.L. Pobre
Elaine Nguyen
John Y. Veiszlemlein
Mishael H. Hibshoosh
Covington & Burling LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001-4956
(202) 662-6000

Alexa Hansen
Covington & Burling LLP
Salesforce Tower
415 Mission Street, Ste. 5400
San Francisco, CA 94105
(415) 591-6000

April 9, 2026

Yiye Fu
Covington & Burling LLP
3000 El Camino Real
5 Palo Alto Square, 10th Floor
Palo Alto, CA 94306
(650) 632-4700

Jeremy A. Tigan (#5239)
Megan E. Dellinger (#5739)
Anthony D. Raucci (#5948)
Morris, Nichols, Arsht & Tunnell LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jtigan@morrisnichols.com
mdellinger@morrisnichols.com
araucci@morrisnichols.com

*Attorneys for Harmony Biosciences, LLC,
Harmony Biosciences Management,
Inc., Bioprojet Société Civile de Recherche,
and Bioprojet Pharma SAS*

**Table of Contents**

I.      SUMMARY OF ARGUMENT..........................................................................................1

II.     STATEMENT OF FACTS ............................................................................................2

     A.      Nature and Stage of the Proceeding...........................................................................2

     B.      The '197 Patent .........................................................................................................3

     C.      Crystalline and Amorphous Materials in Pharmaceutical Dosage Forms ..............4

     D.      XRPD.........................................................................................................................5

     E.      ssNMR ......................................................................................................................6

     F.      AET's ANDA Products .............................................................................................7

     G.      Plaintiffs' Expert Witnesses on Infringement of the '197 Patent...........................7

III.    LEGAL STANDARD .................................................................................................8

IV.     ARGUMENT...............................................................................................................10

     A.      AET's Internal Documents and Testing Prove Infringement...............................11

          1.      AET's Own XRPD Testing Demonstrates the Presence of the Claimed Crystalline Form in Its ANDA Products....................................11

          2.      AET's Development Efforts Show that Its Amorphous Solid Dispersion Is Unstable and Likely to Crystallize into the Claimed Form ........................................................................................................18

          3.      AET's Manufacturing Process Causes Crystallization ............................20

     B.      Independent Testing Confirms the Presence of the Claimed Crystalline Form in AET's ANDA Products During Shelf Life .............................................21

     C.      AET's Product Specification Permits the Formation of the Claimed Crystalline Form .....................................................................................................28

V.      CONCLUSION...........................................................................................................30

**Table of Authorities**

**Page(s)**

**Cases**

*AstraZeneca AB v. Dr. Reddy's Labs., Inc.*,
2013 WL 1847639 (D.N.J. May 1, 2013) ...............................................................................17

*Bristol-Myers Squibb Co. v. Aurobindo Pharma USA Inc.*,
477 F. Supp. 3d 306 (D. Del. 2020) ................................................................................. *passim*

*Caraco Pharm. Labs., Ltd. v. Forest Labs., Inc.*,
527 F.3d 1278 (Fed. Cir. 2008).............................................................................................26

*Cephalon, Inc. v. Watson Pharm., Inc.*,
769 F. Supp. 2d 761 (D. Del. 2011)...............................................................................9, 21, 25

*Cosden Oil & Chem. Co. v. Am. Hoechst Corp.*,
543 F. Supp. 522 (D. Del. 1982).............................................................................................9

*CPC Intern., Inc. v. Archer Daniels Midland Co.*,
831 F. Supp. 1091 (D. Del. 1993)..........................................................................................25

*Eisai Co. v. Glenmark Pharms., Ltd.*,
No. CV 13-1279-LPS, 2015 WL 1228958 (D. Del. Mar. 17, 2015) ......................................15

*Exela Pharma Scis., LLC v. Eton Pharms., Inc.*,
No. 20-CV-365 (MN), 2022 WL 806524 (D. Del. Feb. 8, 2022)...........................................29

*Forest Labs., Inc. v. Abbott Labs.*,
239 F.3d 1305 (Fed. Cir. 2001)...............................................................................................9

*Lucent Techs., Inc. v. Gateway, Inc.*,
580 F.3d 1301 (Fed. Cir. 2009)...............................................................................................9

*Markman v. Westview Instruments, Inc.*,
52 F.3d 967 (Fed. Cir. 1995) (en banc)....................................................................................8

*Martek Biosciences Corp. v. Nutrinova, Inc.*,
579 F.3d 1363 (Fed. Cir. 2009)..........................................................................................9, 25

*Novartis Pharms. Corp. v. Par Pharm., Inc.*,
48 F. Supp. 3d 733 (D. Del. 2014)...........................................................................................9

*Olaplex, Inc. v. L'Oreal USA, Inc.*,
845 F. App'x 943 (Fed. Cir. 2021) ...........................................................................................9

*Orexigen Therapeutics, Inc. v. Actavis Labs. FL, Inc.*,
282 F. Supp. 3d 793 (D. Del. 2017)......................................................................................9, 12

*Par Pharm., Inc. v. Hospira, Inc.*,
    835 F. App'x 578 (Fed. Cir. 2020) ...................................................................................9

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005).......................................................................................8

*Salix Pharms., Ltd. v. Norwich Pharms., Inc.*,
    Civ. A. No. 20-430-RGA, 2022 WL 3225381 (D. Del. Aug. 10, 2022) .................................17

*SmithKline Beecham Corp. v. Apotex Corp.*,
    403 F.3d 1331 (Fed. Cir. 2005).......................................................................................16

*Sunovion Pharms., Inc. v. Teva Pharms. USA, Inc.*,
    731 F.3d 1271 (Fed. Cir. 2013)................................................................................. *passim*

*Vectura Ltd. v. GlaxoSmithKline LLC*,
    981 F.3d 1030 (Fed. Cir. 2020)......................................................................................10

**Statutes**

35 U.S.C. § 112...............................................................................................................25

35 U.S.C. § 271(a) ..........................................................................................................29

35 U.S.C. § 271(b) ............................................................................................2, 4, 5, 29

35 U.S.C. § 271(e)(2)(A) .....................................................................................2, 29

35 U.S.C. § 271(e)(4)(A) ...............................................................................................29

**Other Authorities**

21 C.F.R. § 211.166 ................................................................................................14, 15

**Table of Abbreviations**

| Abbreviation | Word or Phrase |
|---|---|
| AET | AET Pharma US, Inc. |
| AET's ANDA Products | 4.45 mg and 17.8 mg pitolisant hydrochloride tablets submitted for FDA approval in Abbreviated New Drug Application No. 218892 |
| ANDA | Abbreviated New Drug Application |
| API | active pharmaceutical ingredient |
| ASD | amorphous solid dispersion |
| Asserted Patents | U.S. Patent No. 8,486,947 and U.S. Patent No. 8,207,197 |
| Bioprojet SCR | Bioprojet Société Civile de Recherche |
| DTX | Defendant's trial exhibit |
| EDS | excessive daytime sleepiness |
| FDA | United States Food and Drug Administration |
| FF | Plaintiffs' Proposed Findings of Fact |
| Gozzo | Dr. Fabia Gozzo |
| Harmony | Harmony Biosciences Management, Inc. and Harmony Biosciences, LLC |
| Hodgkinson | Dr. Paul Hodgkinson |
| ICH | International Council for Harmonisation |
| KAS | Kansas Analytical Services |
| LOD | limit of detection |
| msec | milliseconds |
| Myerson | Dr. Allan Myerson |
| Orange Book | FDA's Approved Drug Products with Therapeutic Equivalence Evaluations |
| PDX | Plaintiffs' demonstrative exhibit |

| Abbreviation | Word or Phrase |
|---|---|
| POSA | person of ordinary skill in the art |
| PTO | Revised Pretrial Order (D.I. 536) |
| PTX | Plaintiffs' trial exhibit |
| RH | relative humidity |
| ssNMR | solid-state nuclear magnetic resonance |
| Steed | Dr. Jonathan Steed |
| sXRPD | synchrotron x-ray powder diffraction |
| the '197 Patent | U.S. Patent No. 8,207,197 |
| the '947 Patent | U.S. Patent No. 8,486,947 |
| Tr. | trial transcript |
| UF | Joint Statement of Uncontested Facts, D.I. 503-1, Ex. 1 |
| XRPD | x-ray powder diffraction |
| WAKIX | Pitolisant tablets approved by the FDA pursuant to New Drug Application No. 211150 held by Harmony |
| Wenslow | Dr. Robert Wenslow |

## I.    SUMMARY OF ARGUMENT

The evidence presented at trial establishes that AET's ANDA Products will contain the crystalline form of pitolisant hydrochloride claimed in the '197 Patent during their commercial shelf life. AET's own internal testing, its manufacturing process, and Plaintiffs' independent ssNMR testing all compel the same conclusion: AET's amorphous solid dispersion is unstable and crystallizes to the claimed crystalline form.

AET's internal XRPD testing shows that its ANDA Products will contain the claimed crystalline form having all of the peaks identified in the asserted claim. AET developed and validated an XRPD method that identifies the claimed crystalline form. Using that method, AET repeatedly detected characteristic peaks of claim 1 of the '197 Patent in exhibit and validation batches following accelerated stability storage. AET offered no scientifically credible alternative explanation for the XRPD peaks detected. AET's efforts to dismiss its own data and are unavailing. AET and its experts agree that characteristic XRPD peaks, including those recited in the claim, are inherent to a crystalline form. Thus, AET's internal XRPD testing confirms infringement.

AET's manufacturing process results in crystallization. AET starts with crystalline pitolisant hydrochloride and relies solely on operator visual inspection—without any instrument confirmation—to determine if the API has fully dissolved. It then exposes the API to the very conditions known to drive crystallization: moisture, elevated temperatures, and mechanical stress. This, combined with AET's own testing showing the presence of the claimed crystalline form, suffices to make it more probable than not that AET will market infringing product.

Independent expert testing confirms what AET's own data already shows. Dr. Wenslow's ssNMR analysis detected sharp, Lorentzian peaks matching the crystalline API in WAKIX®, demonstrating the presence of crystalline pitolisant hydrochloride in AET's ANDA Products. And Dr. Gozzo's synchrotron XRPD testing confirms that the crystalline pitolisant hydrochloride Dr.

1

Wenslow used for his ssNMR analysis has all the peaks recited in claim 1. These results reinforce the unavoidable conclusion that AET's ANDA Products will contain the claimed crystalline form during their shelf life.

In addition to this clear evidence of infringement, AET's final product specification does not include any solid-state test or any requirement that its pitolisant hydrochloride API in its ANDA Products must be amorphous. If approved, AET's ANDA would permit the sale of products containing the claimed crystalline form—conduct that constitutes infringement as a matter of law under 35 U.S.C. § 271(e)(2)(A). *See Sunovion Pharms., Inc. v. Teva Pharms. USA, Inc.*, 731 F.3d 1271, 1278 (Fed. Cir. 2013).

## II.    STATEMENT OF FACTS

### A.    Nature and Stage of the Proceeding

This is a Hatch-Waxman Act action arising from AET's filing of an ANDA seeking FDA approval to market AET's generic version of Plaintiffs' WAKIX® (pitolisant hydrochloride) tablets prior to the expiration of the '947 and '197 Patents. D.I. 536 (Joint PTO Cover) ¶ 1. Plaintiffs' claims against six other generic pharmaceutical companies seeking approval to market generic versions of WAKIX® were resolved before trial. Between February 17, 2026, and February 19, 2026, the Court held a three-day bench trial for Plaintiffs' claims against AET.

AET has stipulated that the sale, offer for sale, use, and/or manufacture within the United States and/or importation into the United States of any product covered by ANDA No. 218892, in accordance with AET's Proposed Labeling, would constitute infringement of claim 13 of the '947 Patent under 35 U.S.C. § 271(e)(2)(A) and 35 U.S.C. § 271(b). D.I. 332; D.I. 339; D.I. 536 (Joint PTO Cover) ¶ 12; FF ¶ 7. Accordingly, the only remaining infringement dispute addressed at trial related to claim 1 of the '197 Patent.

### B.    The '197 Patent

Claim 1 of the '197 Patent claims a composition of matter: a crystalline form of pitolisant hydrochloride "optionally comprising water up to 6% and having an X-ray diffractogram that comprises characteristic peaks (2θ) at 11.2°, 19.9°, 20.7° and 34.1° ±0.2°." JTX-.14; FF ¶ 9. The '197 Patent identifies additional characteristic peaks of the claimed crystalline form at 15.4°, 16.3°, 16.9°, 17.8°, 21.0°, 21.8°, 22.6°, 24.5°, 24.6°, 25.0°, 25.5°, 26.3°, 28.3°, 30.3°, 35.8°, 40.0°, and 46.0° (±0.2°) 2θ. FF ¶ 10.

The application that led to the '197 Patent originally claimed crystalline pitolisant generally, without specifying a particular form. *See* JTX-3.3. In response to a rejection during prosecution, the applicant amended the claims to recite specific properties of the form described in the patent to clarify that "the *crystalline form* of current claim 1 is now directed *to a form* having an X-ray diffractogram that comprises four specific characteristic peaks," and that therefore "the *crystalline form* is sufficiently defined." JTX-3.590–592 (emphasis added).

The parties have agreed to the following constructions of terms:

| Claim Term(s) in Claim 1 | Agreed-Upon Construction |
|---|---|
| "an X-ray diffractogram that comprises characteristic peaks (2θ) at 11.2°, 19.9°, 20.7° and 34.1° ±0.2" | an X-ray diffractogram that includes peaks at 11.2°, 19.9°, 20.7° and 34.1° ±0.2° (2θ) wherein the peaks together uniquely identify the crystalline form of pitolisant hydrochloride |
| "crystalline" | a solid form having a regularly repeating pattern of molecules or atoms with long range order extending in three dimensions |
| "optionally comprising water up to 6%" | which may have up to 6% water |

FF ¶ 11. The parties' agreed-upon construction leaves unaltered the "having" language of the claim and acknowledges that the four peaks "together uniquely identify the crystalline form."

Plaintiffs' definition of the POSA is: a person holding a bachelor's degree in chemistry, chemical engineering, pharmaceutical science, or a related discipline, with some knowledge of

3

crystalline solid forms and several years of experience in the pharmaceutical industry; or an advanced degree in the above-listed disciplines or a related discipline, with knowledge of crystalline solid forms and less experience. Furthermore, because drug discovery and development are a multidisciplinary effort, the POSA may interface or consult with individuals having specialized expertise such as, for example, persons working in the field of the relevant disorders with a Ph.D. or M.D. and at least one year of research or clinical experience. FF ¶ 17. Such a person may also be working as part of a team. *Id.* Both parties' experts agree that the infringement analysis is the same under either of the parties' proposed POSA definitions. FF ¶ 18.

C.    **Crystalline and Amorphous Materials in Pharmaceutical Dosage Forms**

Crystals are solids in which the constituent atoms or molecules are arranged in a periodic repeating pattern that extends in three dimensions, whereas amorphous materials lack long-range order. FF ¶ 33. Because crystalline forms are thermodynamically more stable than amorphous forms, amorphous materials tend to convert over time to the crystalline state, which is more stable. FF ¶ 34. In pharmaceutical development, amorphous solid dispersions are sometimes used in an effort to kinetically stabilize an amorphous active pharmaceutical ingredient. FF ¶ 35. Despite these efforts, amorphous solid dispersions remain susceptible to crystallization. FF ¶¶ 38–41. Factors such as elevated temperature, increased moisture, and mechanical stress can increase molecular mobility and thereby induce or accelerate crystallization. FF ¶ 39. Crystallization in an amorphous solid dispersion can occur via nucleation, where sufficient molecular mobility permits the API to form crystals, or incomplete amorphization, where the manufacturing process fails to fully eliminate crystalline material. FF ¶ 40.

Stability testing, including accelerated stability testing, is routinely performed in the pharmaceutical industry to determine whether changes in solid state form will occur during a product's shelf life. FF ¶ 43. Conditions for the common types of stability testing are established

by the ICH guidelines, which provide globally accepted standards for pharmaceutical development and manufacturing. FF ¶ 44. Under the ICH guidelines, accelerated stability testing is conducted by storing the drug product, in its final packaging, at 40°C and 75% relative humidity for up to six months. *Id*. Accelerated stability testing is recognized as a reliable tool for evaluating how a drug product will behave under normal storage conditions over time. FF ¶¶ 45–46. As a result, accelerated stability data are routinely relied upon to support proposed expiration dates and to predict the solid-state stability of pharmaceutical products throughout their commercial shelf life. *Id*.

### D.    XRPD

X-ray powder diffraction ("XRPD") is a well-established analytical technique used to characterize and identify crystalline forms. FF ¶ 47. It can be used to distinguish crystalline materials from amorphous materials and to differentiate between crystalline forms of the same compound (*i.e.*, polymorphs). FF ¶¶ 48, 49; UF ¶ 16. When a material is analyzed by XRPD, it produces a diffraction pattern—also known as a diffractogram—containing peaks that arise from the atomic arrangement of the substance tested. FF ¶ 47. These peaks are inherent to a crystalline form: they reflect the fixed, repeating crystal lattice and therefore are a fundamental property of that form. FF ¶¶ 47, 49, 50. For this reason, an XRPD pattern is commonly described as a "fingerprint" of a particular crystalline form. FF ¶ 48; UF ¶ 15.

The peaks observed in a diffractogram can be compared to known characteristic peaks to identify the presence of a particular solid form. FF ¶ 49. Importantly, it is not necessary for an XRPD pattern to exhibit every characteristic peak of a crystalline form to confirm that the form is present. FF ¶¶ 49, 51, 53. The appearance of even one unique characteristic peak is sufficient, because those peaks are inherent to—and diagnostic of—the crystalline structure. FF ¶¶ 49, 50.

5

Like all analytical techniques, XRPD has a limit of detection, below which the presence of a crystalline form cannot be reliably distinguished from background noise. FF ¶¶ 52, 53. In XRPD analysis, the limit of detection is influenced by factors such as the nature of the sample, sample preparation, preferred orientation, scan parameters, and instrument variability. FF ¶ 52. As a result, for a given sample and testing protocol, some characteristic peaks of a crystalline form may fall below the limit of detection, even though the crystalline form itself is present. FF ¶ 53.

### E.    ssNMR

Solid-state nuclear magnetic resonance ("ssNMR") is another powerful analytical technique for identifying crystalline forms and distinguishing crystalline material from amorphous material. FF ¶¶ 42, 54. An ssNMR analysis produces a spectrum containing characteristic peaks that arise directly from the molecular structure and local chemical environment of the substance being analyzed. FF ¶ 54. Each ssNMR spectrum therefore serves as a "fingerprint" of a particular solid-state form of a compound, allowing reliable identification of that form. FF ¶ 55.

The shape and position of ssNMR peaks provide clear insight into solid-state structure. Amorphous materials exhibit broader, Gaussian-shaped peaks reflecting structural disorder, whereas crystalline materials produce sharper, Lorentzian-shaped peaks characteristic of an ordered crystal lattice. FF ¶ 54. Peak positions may also shift between amorphous and crystalline forms, further enabling form identification. FF ¶ 54.

ssNMR is a widely accepted and routinely used technique for characterizing solid-state forms in pharmaceutical science, particularly for detecting small amounts of crystalline material in multicomponent dosage forms. FF ¶¶ 56, 60. It is especially well suited to such analysis here because (1) ssNMR can readily distinguish crystalline and amorphous forms by using relaxation phenomena to isolate crystalline signal, (2) there are no excipient peaks in the key region of the spectrum for API analysis, and (3) unlike XRPD, ssNMR is an inherently quantitative bulk

6

technique so sensitivity can be increased by extending experimental runtime, allowing detection of even very small quantities of crystalline material. FF ¶ 61.

### F.    AET's ANDA Products

AET's ANDA Products are tablets containing pitolisant hydrochloride as the active ingredient. FF ¶ 20. AET's ANDA Products have two dosage strengths: 4.45 and 17.8 mg. FF ¶ 19. To make its ANDA Products, AET starts with crystalline pitolisant hydrochloride "optionally comprising water up to 6% and having an X-ray diffractogram that comprises characteristic peaks (2θ) at 11.2°, 19.9°, 20.7° and 34.1° ±0.2°." JTX-1.14; FF ¶ 69. In other words, AET starts with the claimed form. FF ¶ 69. AET attempts to make that crystalline drug substance into an amorphous solid dispersion during its drug product manufacturing process by mixing the crystalline pitolisant hydrochloride with maltodextrin and water and spray granulating the mixture onto microcrystalline cellulose. FF ¶ 70.

AET has stipulated that its ANDA Products meet the "optionally comprising water up to 6%" limitation of claim 1 of the '197 patent. FF ¶ 21.

### G.    Plaintiffs' Expert Witnesses on Infringement of the '197 Patent

***Dr. Allan Myerson*** opined on AET's infringement of the '197 Patent. His analysis included evaluation of the key analytical testing, including XRPD testing conducted by AET, XRPD testing by Dr. Gozzo, and ssNMR testing by Dr. Wenslow. FF ¶¶ 150. Dr. Myerson brings nearly five decades of chemical-engineering scholarship and practical pharmaceutical-manufacturing experience to these opinions: he has served as a chemical engineering professor for 49 years, including the past 16 years at the Massachusetts Institute of Technology, and holds degrees in chemical engineering from Columbia University (B.S.) and the University of Virginia (M.S. and Ph.D.). FF ¶ 27. His research and teaching focus squarely on the issues at the center of this dispute—crystallization science; solid forms of pharmaceuticals; and the manufacturing of APIs

and drug products—and he has published approximately 320 peer-reviewed papers in these areas. FF ¶ 27. Beyond academia, Dr. Myerson has hands-on experience developing continuous manufacturing technologies to produce both APIs and finished drug products, including work on a reconfigurable, portable device capable of manufacturing APIs and finished drug products for multiple drugs. FF ¶ 28. Accordingly, the Court recognized Dr. Myerson's expertise in pharmaceutical dosage forms, development, and manufacturing. FF ¶¶ 26, 28. Dr. Myerson was the only expert recognized by the Court to have expertise in these fields. FF ¶¶ 26, 28.

**Dr. Robert Wenslow** opined on his ssNMR testing of AET's ANDA Products and the crystalline pitolisant API in WAKIX®. FF ¶¶ 152–153, 158. Dr. Wenslow specializes in solid-state characterization testing for the pharmaceutical industry as a co-founder at Crystal Pharmatech and has over 30 years of experience designing and performing ssNMR experiments, including 14 years developing the ssNMR program at Merck. FF ¶ 30. Throughout his time at Merck and Crystal Pharmatech, Dr. Wenslow has had extensive experience conducting T1rho filtering experiments, a specific type of ssNMR experiment used to identify low levels of a crystalline form in samples with high amorphous content. FF ¶¶ 30–31.

**Dr. Fabia Gozzo** opined on her synchrotron XRPD testing of the crystalline pitolisant API in WAKIX®. FF ¶¶ 200, 203. Dr. Gozzo directed the construction and development of the synchrotron XRPD station at the Swiss Light Source facility in Switzerland and has extensive experience regularly performing and analyzing the results of synchrotron XRPD testing. FF ¶ 32.

## III. LEGAL STANDARD

The infringement analysis involves two steps. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). First, the Court construes the disputed claim terms as they would be understood by a person of ordinary skill in the art. *Id.*; *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005). Second, the properly construed

8

claims are compared to the accused product to determine whether infringement has occurred. *Markman*, 52 F.3d at 976.

To prevail, a patentee must prove infringement by a preponderance of the evidence. *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1317–18 (Fed. Cir. 2009). Infringement is established if at least some of the accused products meet the limitations of the asserted claim. *Orexigen Therapeutics, Inc. v. Actavis Labs. FL, Inc.*, 282 F. Supp. 3d 793, 816 (D. Del. 2017), *rev'd in part on other grounds sub nom. Nalpropion Pharm., Inc. v. Actavis Labs. FL, Inc.*, 934 F.3d 1344 (Fed. Cir. 2019). Plaintiffs need only show "that it is 'more likely than not' that some quantity, however miniscule, of the [claimed form]" is present in at least some of AET's ANDA Products. *Cephalon, Inc. v. Watson Pharm., Inc.*, 769 F. Supp. 2d 761, 778 (D. Del. 2011), *aff'd*, 446 F. App'x 306 (Fed. Cir. 2011) (Rule 36).

"A patentee may prove infringement by 'any method of analysis that is probative of the fact of infringement, and circumstantial evidence may be sufficient.'" *Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1372 (Fed. Cir. 2009) (quoting *Forest Labs., Inc. v. Abbott Labs.*, 239 F.3d 1305, 1312 (Fed. Cir. 2001)); *Novartis Pharms. Corp. v. Par Pharm., Inc.*, 48 F. Supp. 3d 733, 738, 741, 743-44 (D. Del. 2014). The infringement inquiry is not limited to analytical techniques discussed in the asserted patent. *See, e.g.*, *Cosden Oil & Chem. Co. v. Am. Hoechst Corp.*, 543 F. Supp. 522, 530 (D. Del. 1982) (finding infringement of composition claim based on NMR testing, even though NMR was "not available" as of the priority date); *Olaplex, Inc. v. L'Oreal USA, Inc.*, 845 F. App'x 943, 950-51 (Fed. Cir. 2021) (reversing summary judgment of noninfringement because NMR testing, while not mentioned in the asserted patent, showed the presence of maleic acid).

In the ANDA context, "[w]hat a generic applicant asks for and receives approval to market, if within the scope of a valid claim, is an infringement." *Sunovion,* 731 F.3d at 1279; *see also Par Pharm., Inc. v. Hospira, Inc.*, 835 F. App'x 578, 586 (Fed. Cir. 2020) ("Even where internal documents suggest that a generic product will not meet a claim limitation in practice, representations about the ANDA's scope control the infringement analysis."). Accordingly, if an ANDA specification permits the marketing of an infringing product, "a judgment of infringement must necessarily ensue." *Sunovion*, 731 F.3d at 1278.

## IV.    ARGUMENT

Plaintiffs have proven by a preponderance of the evidence that AET's 4.45 mg and 17.8 mg ANDA Products contain the claimed crystalline form of pitolisant hydrochloride. FF ¶¶ 117, 150, 204–205. AET's own internal XRPD testing confirms that the claimed crystalline form will be present in AET's ANDA Products during their shelf life. FF ¶¶ 79–149. AET's manufacturing process, which begins with the claimed form, exposes its products to precisely the conditions known to induce crystallization—elevated temperature, moisture, and mechanical stress—and therefore promotes formation of the claimed crystalline form. FF ¶¶ 69–78. AET's internal documents and testing alone satisfies Plaintiffs' burden and establishes infringement of claim 1. *See Vectura Ltd. v. GlaxoSmithKline LLC*, 981 F.3d 1030, 1036–37 (Fed. Cir. 2020) (affirming infringement based on expert analysis, product testing, and defendant's internal documents).

Testing by Plaintiffs' experts confirms that conclusion. Dr. Wenslow's ssNMR analysis, together with Dr. Gozzo's synchrotron XRPD testing, further demonstrates that AET's ANDA Products contain the claimed crystalline form. FF ¶¶ 150–210. Critically, all experts agree that XRPD peaks are inherent features of a crystalline form corresponding to its structure. FF ¶¶ 47, 49, 50, 116. Consistent with that principle, AET's internal XRPD data and Dr. Wenslow's ssNMR results establish that AET's ANDA Products contain crystalline pitolisant hydrochloride having an

10

X-ray diffractogram comprising characteristic peaks at 11.2°, 19.9°, 20.7°, and 34.1° ± 0.2. FF ¶¶ 117, 150, 204–205.

Finally, AET's ANDA confirms infringement as a matter of law. AET's product specification places no restriction on the presence of the claimed crystalline form; instead, the specification permits its inclusion. FF ¶¶ 206–210. As a result, AET seeks approval to market ANDA Products that fall squarely within the scope of claim 1 of the '197 Patent. That conduct constitutes infringement. *See Sunovion,* 731 F.3d at 1278.

### A. AET's Internal Documents and Testing Prove Infringement

#### 1. AET's Own XRPD Testing Demonstrates the Presence of the Claimed Crystalline Form in Its ANDA Products

AET's own XRPD testing demonstrates that its ANDA Products will contain the claimed crystalline form within their proposed shelf life. FF ¶¶ 79–149. Based on the 6-month accelerated stability testing and 18-month long-term stability testing AET submitted to FDA, the agency has advised that it will grant AET's ANDA Products a shelf life of at least 24 months. FF ¶¶ 123–124. The evidence shows that the crystalline form of claim 1 will form in at least some of AET's tablets during that period.

AET performed XRPD on its ANDA Products using an XRPD testing protocol it created for the express purpose of detecting Plaintiffs' crystalline form in its finished tablets. FF ¶¶ 79–89; PTX-47.2 ("XRD method conditions for the identification of 'Pitolisant Hydrochloride' API polymorphic form in "Pitolisant Film-Coated Tablets' (amorphous)"). AET's XRPD protocol sets forth two methods: Method 1, which scans from 2° to 40° 2θ over 15 minutes, and Method 2, which is far more sensitive, scanning only from 10° to 12° 2θ over 30 minutes. FF ¶ 79. Both methods rely on detection of the claim 1 characteristic peak at 11.2° 2θ to confirm the presence of the claimed crystalline form in AET's tablets. FF ¶¶ 83–87.

11

Indeed, AET's protocol directs the analyst to "[c]heck for the presence of 'Pitolisant Hydrochloride' crystalline form characteristic reflex at 11.2° ± 0.2° 2θ." FF ¶¶ 83–87; PTX-47.5 (steps 2.3 and 2.5). It further instructs that, if the 11.2° peak is detected using either method, the conclusion to be reached is that "The diffractogram exhibits 'Pitolisant Hydrochloride' crystalline form characteristic reflex by XRD analysis." FF ¶ 87. In other words, AET's protocol recognizes that a peak at 11.2° is unique and distinctive to the claimed crystalline form, and that detection of this peak alone indicates that the claimed form is present in the sample, as there is no other component of AET's tablets that generates a peak at 11.2° ± 0.2° 2θ. FF ¶¶ 83–85, 97, 112; *see Bristol-Myers Squibb,* 477 F. Supp. 3d at 324–326 ("[a] peak at 12.4 degrees is indicative of crystalline apixaban because it is within 0.1 degrees of the characteristic peak at 12.3 listed in the [] patent" and is not attributable to an excipient).

To demonstrate infringement, Plaintiffs need only to show by a preponderance of evidence "**at least some** of Defendant's tablets will" contain the claimed crystalline form during their shelf life. *Orexigen Therapeutics*, 282 F. Supp. 3d at 816 (emphasis added). AET's internal testing is sufficient to meet this burden.[1] AET detected Plaintiffs' claimed crystalline form in samples from exhibit batches EK316 and EK319 held under accelerated stability conditions for six months. FF ¶¶ 106–107, 109, 111–112. In batch EK316, not only was an unmistakable peak at 11.2° ± 0.2° 2θ detected by the more sensitive Method 2 analysis, FF ¶ 109 and PTX-51.7–51.8, but AET also detected peaks at 11.2°, 15.4°, 16.9°, 20.7°, and 21.8° ± 0.2° 2θ by Method 1, FF ¶ 111 and PTX-51.4–51.5. As shown below, these peaks are apparent in the diffractograms AET generated and in the peak lists generated by AET's HighScore Plus software—software commonly used by POSAs

---

[1] As AET's ANDA Products are made with a common blend and the same manufacturing process, FF ¶ 25, infringement evidence as to the 17.8 mg tablet applies equally to the 4.45 mg tablet. *Bristol-Myers Squibb Co. v. Aurobindo Pharma USA Inc.*, 477 F. Supp. 3d 306, 347 (D. Del. 2020).

in XRPD analysis. FF ¶ 82; PTX-47.4–47.5. This set of peaks is attributable to the claimed form

and not attributable to other ingredients in the tablet. FF ¶¶ 97, 112.







The characteristic 11.2° peak of the claimed form was likewise detected in EK319 by Method 2.

FF ¶ 107; PTX-50.6–50.7. It is entirely expected that Method 2 would detect the 11.2° peak when

Method 1—or methods with comparable sensitivity—do not, because Method 2 was specifically

designed to achieve a lower limit of detection. FF ¶¶ 81, 102, 113. As Dr. Myerson explained,

Method 1 is a "fast scan" that is "not a very sensitive method," and "the level of detection is not

very good." Tr. 212:15–25, 261:7–17 (Myerson); FF ¶ 81. Nonetheless, even using its Method 1

protocol with a poor limit of detection, AET found the claimed crystalline form in exhibit batch

EK316, including two of the peaks explicitly recited in claim 1.

AET's expert admitted that AET detected a peak at 11.2° 2θ in at least five different diffractograms relating to AET's ANDA Products. FF ¶ 149. As AET itself concluded, detection of the characteristic crystalline pitolisant hydrochloride peak 11.2° ± 0.2° 2θ alone demonstrates the presence of the crystalline form Plaintiffs invented and claimed in the '197 Patent. FF ¶¶ 80, 83–87. But here, AET detected more than just that single peak in its exhibit batches. There is no dispute that the peaks AET detected in EK316 at 11.2°, 15.4°, 16.9°, 20.7°, and 21.8° ± 0.2° 2θ are all attributable to the claimed crystalline form. FF ¶¶ 9–10, 111, 112. Moreover, the 20.7° peak is a characteristic peak expressly recited in claim 1. FF ¶¶ 8, 9, 130. AET offers no alternative explanation—nor could it—for the appearance of this constellation of characteristic XRPD peaks in EK316 other than the presence of the crystalline form claimed in the '197 Patent. FF ¶¶ 110, 127–128. The only explanation for these peaks that is supported by the evidence is the presence of the claimed crystalline form.

Accelerated stability conditions demonstrate that the claimed crystalline pitolisant hydrochloride will more likely than not form in AET's ANDA Products during their proposed 24-month shelf life. FF ¶¶ 43– 46, 78, 119–124. Indeed, the purpose of accelerated stability testing is to gather data in the short term to understand how the components of a drug product will behave over time. FF ¶ 121. Federal Regulations require AET to have "a written testing program designed to assess the stability characteristics of drug products" and specify that "[t]he results of such stability testing shall be used in determining appropriate storage conditions and expiration dates." 21 C.F.R. § 211.166; FF ¶ 45. It further specifies that "accelerated studies . . . may be used to support tentative expiration dates" when full shelf-life studies are ongoing. 21 C.F.R. § 211.166.

Here, AET used accelerated stability testing for this very purpose.[2] AET relied on certain 6-month accelerated stability testing in its submission to FDA regarding proposed shelf life. FF ¶ 122. AET expressly represented to FDA that the 6-month accelerated stability data it submitted were predictive of the stability and behavior of its ANDA Products over their commercial shelf life. FF ¶ 122. In other words, AET told FDA that the results observed under six months of accelerated conditions reflect what will occur during long-term storage of the products as marketed. *Id*. After relying on selective 6-month accelerated stability testing to secure regulatory approval, AET cannot now disavow the predictive nature of such testing that is unhelpful to its non-infringement position. AET's accelerated stability testing shows that its ANDA Products form the claimed crystalline form during their proposed shelf life. FF ¶ 120.

What is more, throughout development of its ANDA Products, AET performed and relied on accelerated stability testing to investigate different amorphization techniques and understand if pitolisant hydrochloride in a particular formulation would crystallize over time. FF ¶¶ 78, 121. AET used the results of accelerated stability testing to select both the amorphous solid dispersion approach and the final formulation for its ANDA Products. FF ¶¶ 78, 122. Again, having used accelerated stability testing during development to investigate the precise questions at issue here, AET cannot now claim that such testing does not provide meaningful insight into whether its ANDA Products will contain the claimed crystalline form.

At trial, AET argued that it does not infringe unless all four claim 1 peaks are above the limit of detection in XRPD testing of its tablets. AET is wrong legally and factually. First, courts

---

[2] The accelerated stability conditions applied here (40°/75% RH) were not stress conditions. They comport with ICH guidelines. The tablets were kept in their ANDA-specified container closure system before testing. FF ¶ 118.

have repeatedly held that it is unnecessary for an accused product to display all characteristic XRPD peaks of a claimed crystalline form. *Bristol-Myers Squibb,* 477 F. Supp. 3d at 347 (finding that the presence of a single characteristic peak "can (and, here, does) provide a sufficient basis from which to find the presence of" the crystalline form); *Eisai Co. v. Glenmark Pharms., Ltd.*, No. CV 13-1279-LPS, 2015 WL 1228958, at *8 (D. Del. Mar. 17, 2015) (the claimed crystalline form and its characteristic XRD spectra recited in the claim "does not require all of the recited [peak]-values to be present in every experimental run (i.e., an exact one-to-one match).").

Second, it is not surprising that some of the recited peaks could not be detected over the limit of detection, particularly using AET's Method 1, which is not designed to have a low limit of detection. FF ¶ 81. AET's expert speculated that at best the limit of detection for the 11.2° peak with Method 1 is approximately 1%, which means that 7% of the pitolisant hydrochloride must crystallize before that peak can be detected. FF ¶¶ 142–48. Dr. Myerson explained that the 34.1° peak is a low intensity peak; a POSA would understand the difficulty of detecting it in a multi-component sample. FF ¶¶ 104, 114–116. The 19.9° peak may similarly be masked by the amorphous background of the AET tablet. FF ¶¶ 114, 116; PTX-51.4.

Third, AET itself concluded that the 11.2° peak, which is unmistakably detected in five exhibit batch samples, is the key indicator of the presence of Plaintiffs' crystalline form in its ANDA Products. FF ¶¶ 83–85, 149. Fourth, the constellation of characteristic peaks (11.2°, 15.4°, 16.9°, 20.7°, and 21.8° ± 0.2° 2θ by Method 1) detected in exhibit batch EK316, is attributable to the claimed form and cannot be explained by the other components of AET's ANDA Products, thus, confirming that the claimed form is present in AET's ANDA Products. FF ¶¶ 111–12.

AET's assertion that all four peaks of claim 1 must be detectable would import a limitation into claim 1 requiring a particular *amount* of the crystalline form sufficient to permit detection.

16

But, claim 1 is directed to a particular crystalline form, not to a particular amount of the claimed form or a particular XRPD test method sufficient to allow detection of the XRPD peaks. FF ¶¶ 15–16; *see SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331 (Fed. Cir. 2005) (it was error for district court to construe claim directed to specific compound—"Crystalline paroxetine hydrochloride hemihydrate"—to exclude trace amounts). This is clear from the language of the claim itself. Claim 1 is directed to a specific compound: a crystalline form of pitolisant hydrochloride "having an X-ray diffractogram that comprises characteristic peaks (2θ) at 11.2°, 19.9°, 20.7° and 34.1° ±0.2°." FF ¶¶ 9, 15–16.

The plain language of claim 1 requires a crystalline form that has certain peaks. FF ¶ 9. The crystalline form described in claim 1 ***has*** an X-ray diffractogram comprising these peaks because the characteristic XRPD peaks of the form are an inherent property. FF ¶¶ 47–50, 114–116; *see also Salix Pharms., Ltd. v. Norwich Pharms., Inc.*, Civ. A. No. 20-430-RGA, 2022 WL 3225381, at *3 (D. Del. Aug. 10, 2022) (Andrews, J.), *aff'd*, 98 F.4th 1056 (Fed. Cir. 2024) ("X-ray powder diffraction [] peaks are an inherent characteristic of a polymorph."). Indeed, there is no dispute that the XRPD peaks of the form are an inherent property. Tr. 406:2-4 (Steed) ("Q: And you agree that an XRPD pattern is inherent to a crystalline form; correct? A: Yes"). The fact that XRPD peaks are inherent is precisely why AET relies on a single, unique peak (at 11.2°), which has no inference with other components in its tablets, to identify the form. FF ¶¶ 83–86.

But, AET's implied assertions to the contrary, neither the claim itself nor the parties' agreed construction require that proving infringement of claim 1 requires that all four of the recited peaks are ***detected***.[3] Detectability of XRPD peaks in a sample depends upon a variety of factors including

---

[3] That the claim is not directed to peak "detection" is clear: if all four peaks were detected in AET's ANDA Products, but the peaks were also attributable to the presence of excipients in AET's tablet, (continued…)

the nature of the sample, the way a sample is prepared, experimental conditions, and instrument variability. FF ¶¶ 52–53; DTX-1051.0004; *see, e.g.*, *AstraZeneca AB v. Dr. Reddy's Labs., Inc.*, 2013 WL 1847639, at *9 (D.N.J. May 1, 2013) (rejecting construction that would have required an XRPD that would be "perfectly identical to Figure 1" because it was "too rigid"). Because AET's ANDA Products contain crystalline pitolisant hydrochloride that has all peaks characteristic of the form regardless of whether each of those four XPRD peaks is above the limit of detection, AET's ANDA Products infringe claim 1. FF ¶¶ 79–149.

### 2. AET's Development Efforts Show that Its Amorphous Solid Dispersion Is Unstable and Likely to Crystallize into the Claimed Form

The crystallization of pitolisant hydrochloride observed in AET's exhibit batches is not a fluke; it is part of a consistent and well-documented pattern reflecting the instability of AET's amorphous solid dispersion. It is undisputed that, during development, AET tested multiple excipients and amorphization processes and observed formation of the claimed crystalline form in multiple development batches. FF ¶¶ 77–78, 122; PTX-54.1 ("Pitolisant Hydrochloride crystalline form reflexes observed & API polymorphic form conversion observed (amorphous to crystalline)").

Most tellingly, AET observed virtually the identical crystallization pattern in validation batch PIO/B009 as in exhibit batches EK316 and EK319. FF ¶ 90. As with its exhibit batches, AET observed multiple XRPD peaks corresponding to the claimed crystalline form in batch PIO/B009. FF ¶¶ 90–92, 94–96. This is a validation batch, meaning that it is "essentially the same as the final manufacturing process and formulation." FF ¶ 99; Tr. 199:9–18 (Myerson); PTX-646.5 (batch

---

AET would undoubtedly argue that it does not infringe because the question is whether the crystalline form is present, not the peaks.

PIO/B-009 was used to validate HPLC method for evaluating blend assay and blend uniformity). With this validation batch, AET conducted XRPD testing after both three and six months of ICH-compliant accelerated stability storage. FF ¶¶ 91–92, 94. Using its more sensitive Method 2, AET detected the characteristic peak at 11.2° ± 0.2° 2θ after just three months of accelerated stability storage, FF ¶ 92, PTX-55.9-55.10, and again after six months of accelerated stability storage, FF ¶ 94. After six months, Method 1 also detected peaks at 11.2°, 16.3°, 19.9°, 20.7°, and 22.6° ± 0.2° 2θ. FF ¶ 95; PTX-656.3-656.4. These telltale peaks are all characteristic of the claimed form, and three—11.2°, 19.9°, and 20.7°—are expressly recited in claim 1 of the '197 Patent. FF ¶¶ 9–10. Again, this constellation of peaks is not attributable to any other component in the formulation. FF ¶ 97. AET's testing of validation batch PIO/B-009 shows that the infringing crystals are present—and growing—in AET's tablets long before the six-month mark. FF ¶ 103.

AET's own conclusions confirm the significance of these findings. At three months, AET concluded that a "[v]ery trace level API crystalline form reflex [was] observed at 11.2° 2θ by XRD analysis." PTX55.1; FF ¶ 92. At six months, AET concluded that the "diffractogram exhibits Pitolisant Hydrochloride crystalline form characteristic reflexes by XRD analysis." PTX656.1; FF ¶ 94. AET's expert, Dr. Steed, did not dispute these conclusions, nor did he offer any alternative explanation for the source of these peaks. FF ¶¶ 93, 97; Tr. 417:15–421:5 (Steed). AET can offer no logical explanation for the position that detection of the peaks at 11.2°, 16.3°, 19.9°, 20.7°, and 22.6° ± 0.2° 2θ (detected in PIO/B-009) lead to the conclusion that the crystalline form of the '197 Patent is present but detection of the peaks at 11.2°, 15.4°, 16.9°, 20.7°, and 21.8° ± 0.2° 2θ (detected in EK316) does not.

The relevance of PIO/B009 to AET's ANDA Products is clear. The formulation of validation batch PIO/B009 is nearly identical to the ANDA Products, differing only in the use of a

19

slightly different grade of silicon dioxide. FF ¶¶ 98–100; Tr. 415:10–14 (Steed). There is no evidence that this minor variation would materially alter the crystallization behavior of pitolisant hydrochloride. To the contrary, Dr. Myerson—the only expert with specialized expertise in pharmaceutical formulation and development—opined that PIO/B009 is sufficiently representative of AET's ANDA Products. FF ¶¶ 98–99. And if it were not, AET would not have relied on it as a validation batch. *Id.* AET's testing of validation batch PIO/B009 provides compelling evidence that the amorphous pitolisant hydrochloride in AET's ANDA Products will likewise convert to the claimed crystalline form and will do so on a comparable timeline.

### 3.    AET's Manufacturing Process Causes Crystallization

It is also clear from the record why the claimed crystalline pitolisant hydrochloride forms in AET's ANDA Products. As Dr. Myerson explained, AET's manufacturing process causes AET's unstable amorphous solid dispersion to crystallize. FF ¶¶ 69–78. Unlike Dr. Myerson, neither of AET's experts were qualified by the Court as experts in pharmaceutical manufacturing of active pharmaceutical ingredients and final drug products, or in drug product formulation development. FF ¶¶ 26, 28–29. Dr. Steed admitted that he has never worked on developing a pharmaceutical manufacturing process. FF ¶ 29.

Both crystallization pathways (incomplete amorphization and nucleation) are at play in AET's manufacturing process. PTX-701; FF ¶¶ 73, 75–77. First, AET's process is susceptible to incomplete amorphization because it employs no instrumental verification, no filtration, and no quantitative method to ensure that crystalline API used in its manufacturing process does not enter the subsequent processing steps. FF ¶ 73. Instead, AET relies solely on operator visual inspection to determine whether complete dissolution has occurred. *Id.* Second, AET's manufacturing process subjects AET's ANDA Products to conditions that induce nucleation and facilitate crystal growth: high temperature, moisture, and mechanical stress. FF ¶¶ 75–77. For example, granules containing

20

water and the API are dried at 40°C ± 15°C. FF ¶ 75. The granules are then combined with other excipients and compressed. *Id.* AET's manufacturing process allows ambient humidity to reach 65% RH, and the final step of the process involves spraying water on the finished tablets and adding heat. *Id*. Dr. Steed did not dispute that heat, moisture, and mechanical stress can cause crystallization, nor did he dispute that AET's manufacturing process subjects AET's ANDA Products to these stresses during manufacturing. *Id.*

AET acknowledges the danger of exposing its API to moisture, admitting that "pitolisant hydrochloride tends to absorb moisture from the surrounding environment" and cautioning internally "don't expose the materials to moisture." PTX-33.17; Tr. 192:18-193:8 (Myerson); FF ¶ 74. AET nonetheless ignores its own warning. Furthermore, 3.61% to 4.28% water remains in AET's finished tablets, enabling continued molecular mobility and crystal growth. FF ¶ 76.

*      *      *

AET's internal XRPD testing, development history, and manufacturing process alone prove "that it is 'more likely than not' that some quantity of the crystalline form of claim 1 is "present in the ANDA product." *Cephalon*, 769 F. Supp. 2d at 778.

**B.      Independent Testing Confirms the Presence of the Claimed Crystalline Form in AET's ANDA Products During Shelf Life**

Dr. Wenslow's ssNMR testing, along with Dr. Gozzo's sXRPD testing, provide further confirmation that AET's ANDA Products infringe. FF ¶ 200; *see Bristol-Myers Squibb*, 477 F. Supp. 3d at 343–44.

ssNMR is a well-established analytical tool used to identify solid state forms in pharmaceutical products. FF ¶¶ 54–56. The U.S. Pharmacopeia describes ssNMR as "an invaluable tool for pharmaceutical analysis" that enables "[u]nambiguous identification of polymorphs and other solid forms" and "[h]igh confidence in the low-level quantification of multicomponent

solids." PTX-713.1; FF ¶¶ 58–60. ssNMR is "particularly valuable for characterizing polymorphism, monitoring crystalline-amorphous transitions, and detecting low-level impurities in their native states," particularly for "complex pharmaceutical products." PTX-720.2; *see also* PTX-244.1 ("[ssNMR] can confidently differentiate polymorphs of APIs, crystalline and amorphous forms of drug substances and excipients in complex formulations, based on their structural, chemical, and spectroscopic differences."); FF ¶ 56. ssNMR has advantages over XRPD for samples like AET's ANDA Products, including no excipient interference in the region of interest and the quantitative bulk nature of the technique. FF ¶ 61. Unlike XRPD, ssNMR can readily distinguish crystalline and amorphous forms by using relaxation-based spectral editing. FF ¶¶ 61, 63. Indeed, AET's own expert has acknowledged in a publication, ssNMR is a "[a] hugely important contemporary tool" for "resolving questions of solid form that can be ambiguous by X-ray means." PTX-714.6; FF ¶ 68.

Relaxation based spectral editing using T1rho filtration is an established method for differentiating between crystalline and amorphous forms in a sample. FF ¶ 63; PTX-713.7. It relies on the scientific principle that in an ssNMR experiment the signal from an amorphous form of a compound decays faster than the signal from a crystalline form to isolate the crystalline signal. FF ¶¶ 62–63, 163–164. The usefulness of T1rho filtration for detecting small amounts of a crystalline form that would otherwise be masked by the amorphous content of a sample is explained in Du 2022. FF ¶¶ 66, 68; PTX-245.4, PTX-245.7 (Figure 4A from Du 2022).



Dr. Wenslow has deep expertise with ssNMR and T1rho filtering, regularly performing and supervising such testing in support of Merck's pharmaceutical research and development program for 14 years and at the contract research organization he has run for the past 15 years. FF ¶¶ 30–31. Dr. Wenslow used ssNMR to characterize the claimed crystalline form and obtain its fingerprint. FF ¶ 152. It is undisputed that Dr. Gozzo's sXRPD testing shows that the crystalline pitolisant hydrochloride reference Dr. Wenslow used has an X-ray diffractogram that comprises characteristic peaks (2θ) at 11.2°, 19.9° 20.7° and 34.1° ± 0.2°. FF ¶¶ 200–201, 204. With the ssNMR fingerprint for the claimed form in hand, Dr. Wenslow designed and performed carbon-13 T1rho filter experiments to determine whether that form is present in AET's ANDA Products. FF ¶¶ 152, 158, 162. It is.

To choose the tau value for his filter, Dr. Wenslow studied the decay of the crystalline pitolisant hydrochloride reference sample provided by Harmony and the solid dispersion provided by AET's co-defendant Novitium. FF ¶¶ 169–74. AET did not provide any samples of its amorphous solid dispersion for testing. FF ¶ 168. Dr. Wenslow determined based on his expertise and experience that the relaxation of Novitium's solid dispersion provided satisfactory data to allow him to choose a tau value that would sufficiently discriminate between crystalline and

23

amorphous signal. FF ¶¶ 169–73. The data showed that, at 32 msec, the crystalline pitolisant hydrochloride signal remained significant while the signal for the amorphous solid dispersion was gone. FF ¶ 172.[4] Dr. Wenslow chose 32 msec for his filter and used it to test samples from an exhibit batch of AET's ANDA Products. FF ¶ 175. This testing was performed in May 2025—18 months after the exhibit batches were manufactured and well within the 24-month proposed shelf life for AET's ANDA Products. FF ¶¶ 23, 156.

The resulting ssNMR spectrum for AET's tablet is shown below in blue. PTX-1239. It contains sharp crystalline pitolisant hydrochloride peaks that align with the peaks of crystalline reference spectrum (red) between 150–120 ppm, establishing that the crystalline form is present in AET's ANDA Products. FF ¶ 175; PTX-1239.



As Dr. Wenslow explained, these peaks are sharp Lorentzian peaks that cannot be explained by residual amorphous signal. FF ¶¶ 54, 175–76. Indeed, the peaks detected in the filter experiment of AET's tablets do not have the broad Gaussian appearance of amorphous peaks. FF ¶¶ 54, 175; *Bristol-Myers Squibb*, 477 F. Supp. 3d at 317–318. Dr. Myerson, who is also well-versed in ssNMR

---

[4] At 16 msec, the signal for the amorphous peak near 140 ppm was completely gone and the signal for the amorphous peak near 130 ppm was barely above the noise, reinforcing the conclusion that a 32msec filter was more than adequate to isolate the crystalline signal. FF ¶ 173.

testing, reviewed Dr. Wenslow's testing methodology and results and reached the same conclusion. Tr. 183:23–184:20, 223:16–224:4 (Myerson); *see also* FF ¶ 56.

Dr. Wenslow's ssNMR testing is consistent with, and confirms, the evidence from AET's own files. Like AET's XRPD testing, Dr. Wenslow's testing shows that crystals form in AET's tablets. FF ¶¶ 172–173. These crystals have an X-ray diffractogram that comprises characteristic peaks (2θ) at 11.2°, 19.9°, 20.7° and 34.1° ±0.2°. FF ¶¶ 200–201, 204. This is apparent both from AET's XRPD testing, which detected peaks that are only attributable to the claimed form, and the testing of Dr. Gozzo, which confirms that the crystalline pitolisant hydrochloride Dr. Wenslow used for comparison has all four claimed XRPD peaks. FF ¶¶ 200–201, 204.

AET has argued that the prosecution history of the '197 Patent precludes reliance on ssNMR testing as evidence of infringement. AET is wrong. First, as explained above, *see supra* Sections II.B.1 and IV.A.1, the applicant's amendment to what is now claim 1 of the '197 Patent did not restrict the test methods which could be used to prove infringement. Instead, the applicant stated that the amendment was made to limit the claim, which previously encompassed ***all*** crystalline forms, to a ***particular*** crystalline form, and ensure that form was "sufficiently defined" so as to satisfy 35 U.S.C. § 112. JTX-3.590–592; FF ¶¶ 12–16. Second, while "the patentee, has the burden to prove infringement, there is no requirement that it do so in the precise manner an accused infringer demands." *Bristol-Myers Squibb,* 477 F. Supp. 3d at 343. A patentee may prove infringement with any probative evidence. *Martek*, 579 F.3d at 1372.

*Bristol-Myers Squibb*, 477 F. Supp. 3d at 343–46, is illustrative of the usefulness of ssNMR to the infringement analysis. In that case, a court in this District found infringement of a crystalline composition of matter claim based on infringement evidence that included XRPD and ssNMR. *Id.* at 343–44. One of patentee's experts detected a subset of the characteristic XRPD peaks associated

with crystalline apixaban in samples of the accused products. Another expert performed ssNMR testing of the ANDA product and observed ssNMR peaks that correspond to ssNMR peaks of the crystalline reference API. The court concluded that "[t]he results of the SSNMR testing by BMS['s] expert [] provide further support for the conclusion that [the] ANDA products contain crystalline apixaban." *Id.* at 343. The same is true here. The results of Dr. Wenslow's ssNMR testing provide further support for the conclusion that AET infringes.

Some of the crystals that form in the finite domains of an amorphous solid dispersion may be smaller than those made by other crystallization processes. PTX-701.2–3; Tr. 99:21–100:6 (Wenslow); Tr. 172:17–173:19, 175:4–24 (Myerson). That does not change the infringement analysis for several reasons. First, the crystals of a form "can be a range of sizes, including relatively small nanocrystals." *Cephalon*, 769 F. Supp. 2d at 766; *CPC Intern., Inc. v. Archer Daniels Midland Co.*, 831 F. Supp. 1091, 1094 (D. Del. 1993) ("[N]ucleation favors the formation of many smaller crystals; growth favors the formation of fewer, larger crystals."). They are still crystalline; they have a regularly repeating pattern of molecules or atoms with long range order extending in three dimensions. FF ¶¶ 11, 33. Second, claim 1 contains no specific or minimum crystal size and there would be no basis to import such a limitation in the claim. *Compare* JTX-1.14 (claim 1) *with Caraco Pharm. Labs., Ltd. v. Forest Labs., Inc.,* 527 F.3d 1278, 1286 (Fed. Cir. 2008) (claims directed to, *inter alia*, "crystalline particles of escitalopram oxate of a particular size range"); *Bristol-Myers Squibb,* 477 F. Supp. 3d at 346 (claims with crystalline particle size limitation requiring "a $D_{90}$ equal to or less than 89μm").

Third, crystals continue to nucleate and grow during storage of a drug product and will do so in the case of AET's ANDA Products. FF ¶¶ 41, 77–78, 101; PTX.701.3. Indeed, such crystal growth was seen in AET's own testing. FF ¶¶ 91, 93, 94, 103. In validation batch PIO/B-009, the

26

characteristic peak at 11.2° was detected by AET's Method 2 after three months, but not by the less sensitive Method 1. FF ¶¶ 81, 92, 102. By six months, numerous characteristic peaks were detected by Method 1, evidencing continued conversion and crystal growth between the testing periods. FF ¶¶ 94–96, 103. Fourth, AET's testing of EK316 definitively shows that the crystals that form in AET's drug product are those of the claimed form, as five of the characteristic peaks in the patent (11.2°, 15.4°, 16.9°, 20.7°, and 21.8°) were clearly detected. FF ¶ 111. Notably, Dr. Wenslow also tested samples from EK316 (FF ¶ 156), so the results of AET's testing are directly applicable to interpretation of Dr. Wenslow's results.

At trial, AET lodged several criticisms of Dr. Wenslow's testing. Each is without merit. AET criticized Dr. Wenslow for using Novitium's solid dispersion to determine the tau value for his T1rho filter because Novitium's solid dispersion is a beta-cyclodextrin inclusion complex whereas AET's solid dispersion is a spray granulated dispersion using maltodextrin. AET's experts speculated that the relaxation behavior of the two materials would be different but offered no opinions regarding—and conducted no experiments to determine—how they would purportedly differ. FF ¶¶ 196–197. The undisputed record evidence establishes that beta-cyclodextrin inclusion complexes have less molecular mobility than polysaccharide amorphous solid dispersions, like AET's. FF ¶ 196. Accordingly, to the extent there would be any difference between the relaxation rates, AET's amorphous solid dispersion would have faster relaxation and a faster T1rho than Novitium's. FF ¶ 196. Thus, as Dr. Wenslow explained, Novitium's solid dispersion was an appropriate reference standard to use for method development. FF ¶ 174.

AET also criticized Dr. Wenslow for omitting data points from the decay curves he created to check his choice of a 32 msec tau value. This argument is wrong for several reasons. First, as Dr. Wenslow explained, the data itself is the most important source of information for informing

the choice of tau value. FF ¶ 171–172. Here, the data showed that at 16 msec the amorphous signal was at zero for the 140 ppm peak and nearly at zero for the 130 ppm peak. FF ¶ 173. At 32 msec, the amorphous signal was extinguished for both peaks. FF ¶ 172, 175. The data make clear that any data points above zero at 32 msec resulted from noise. FF ¶ 179. AET's expert Dr. Hodgkinson admitted that decay is unidirectional; once the signal reaches zero, it does not come back. FF ¶ 167. It is undisputed that amorphous signal for the 140 ppm peak is below zero at 16 msec. FF ¶ 173. Accordingly, it cannot be the case that there is signal for that peak at 32 msec, as AET contends.

Second, Dr. Hodgkinson admitted that there can be scientific justification for omitting data points and that, like Dr. Wenslow, he omitted data points from the set when making his decay curves because he believed the signal to be zero. FF ¶¶ 180–181. Dr. Wenslow reviewed the underlying data to determine which time points represented meaningful signal. FF ¶¶ 171–173. Third, the decay curves Dr. Hodgkinson made also support Wenslow's conclusions regarding the relative decay of the crystalline and amorphous pitolisant hydrochloride and his choice of tau value. FF ¶ 182. Fourth, the T1rho filter technique does not require complete elimination of the amorphous signal, but rather choice of a tau value at which there is sufficient differentiation between the crystalline and amorphous signal. FF ¶¶ 171–73, 178. Using either expert's assessment of the decay, 32 msec is such a value. FF ¶¶ 171–73, 178, 182.

**C.   AET's Product Specification Permits the Formation of the Claimed Crystalline Form**

AET also infringes because it seeks FDA approval for an ANDA Product that falls within the scope of claim 1 of the '197 Patent. Critically, there is no dispute that AET's final product specification does not require the pitolisant hydrochloride in its ANDA Products to be amorphous. FF ¶ 207. Nothing in that specification prohibits the release of finished tablets containing crystalline pitolisant hydrochloride. FF ¶ 207. Nor does the specification include any test to

identify the solid-state form of the API in AET's ANDA Products. FF ¶ 207. In fact, AET does not test the solid-state form of the pitolisant hydrochloride in its ANDA Products at any point during its manufacturing process. FF ¶ 208. Its ANDA long-term stability protocol likewise imposes no requirement that the pitolisant hydrochloride in the tablets be amorphous and includes no testing to determine whether the API is crystalline or amorphous. FF ¶ 209. In short, nothing in AET's ANDA prevents it from selling tablets that contain claimed crystalline form.

The significance of that omission is underscored by AET's development history and internal testing. After detecting crystalline pitolisant hydrochloride in its exhibit batches, validation batch, and development batches, FF ¶¶ 77, 90, 92, 94, 95, 105, 106, 107, 109, 111, AET nonetheless chose to omit any solid-state specification or testing from its ANDA. That decision leads to only one conclusion: AET does not believe its ANDA Products would consistently satisfy a specification that prohibits crystalline pitolisant hydrochloride. Whatever AET's motivation, the legal consequence is clear.

AET's ANDA—if approved—would permit AET to market and sell tablets containing the claimed crystalline form of pitolisant hydrochloride, and thus a product that infringes claim 1 of the '197 Patent. FF ¶ 210. That is infringement *per se*. *See e.g.*, *Sunovion*, 731 F.3d at 1278 (holding infringement per se where ANDA applicant "has asked the FDA to approve, and hopes to receive from the FDA, approval to market a product within the scope of the issued claims."); *see also Exela Pharma Scis., LLC v. Eton Pharms., Inc.*, No. 20-CV-365 (MN), 2022 WL 806524, at *3 (D. Del. Feb. 8, 2022) (summarizing case law, which "makes clear that if a product that an ANDA applicant is asking the FDA to approve for sale falls within the scope of an issued patent, a judgment of infringement must necessarily ensue") (cleaned up).

## V.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court find that (1) AET's making, using, offering to sell, or selling in the United States, or importing into the United States of AET's ANDA Products will infringe claim 1 of the '197 Patent under 35 U.S.C. § 271(a) and claim 13 of the '947 Patent under 35 U.S.C. § 271(b); and (2) the submission of AET's ANDA infringes those patent claims under 35 U.S.C. § 271(e)(2)(A). Plaintiffs further request that the Court enter an order pursuant to 35 U.S.C. § 271(e)(4)(A) that the effective date of any approval of AET's ANDA shall be a date which is not earlier than the expiration date of the '197 Patent, including any extensions and/or additional periods of exclusivity to which Plaintiffs are or become entitled, and an order permanently enjoining AET, its affiliates, subsidiaries, and each of its officers, agents, servants and employees and those acting in privity or concert with them, from making, using, offering to sell, or selling in the United States, or importing into the United States AET's ANDA products until after the latest expiration date of the '197 Patent, including any extensions and/or additional periods of exclusivity.

OF COUNSEL:

Christopher N. Sipes
Megan P. Keane
Brianne (Bharkhda) Sullivan
Cody J. Reeves
Nicole S.L. Pobre
Elaine Nguyen
John Y. Veiszlemlein
Mishael H. Hibshoosh
Covington & Burling LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001-4956
(202) 662-6000

Alexa Hansen
Covington & Burling LLP
Salesforce Tower
415 Mission Street, Ste. 5400
San Francisco, CA 94105
(415) 591-6000

Yiye Fu
Covington & Burling LLP
3000 El Camino Real
5 Palo Alto Square, 10th Floor
Palo Alto, CA 94306
(650) 632-4700

/s/ Jeremy A. Tigan
Jeremy A. Tigan (#5239)
Megan E. Dellinger (#5739)
Anthony D. Raucci (#5948)
Morris, Nichols, Arsht & Tunnell LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jtigan@morrisnichols.com
mdellinger@morrisnichols.com
araucci@morrisnichols.com

*Attorneys for Harmony Biosciences, LLC,
Harmony Biosciences Management,
Inc., Bioprojet Société Civile de Recherche,
and Bioprojet Pharma SAS*

April 9, 2026

## CERTIFICATE OF SERVICE

I hereby certify that on April 9, 2026, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on April 9, 2026, upon the following in the manner indicated:

Dominick T. Gattuso, Esquire                                    *VIA ELECTRONIC MAIL*
Catherine E. Lynch, Esquire
HEYMAN ENERIO GATTUSO & HIRZEL LLP
222 Delaware Avenue, Suite 900
Wilmington, DE 19801
*Attorneys for Defendant AET Pharma US, Inc.*

Scott J. Bornstein, Esquire                                    *VIA ELECTRONIC MAIL*
Jonathan Ball, Ph.D.
Julie P. Bookbinder, Esquire
Elana B. Araj, Esquire
Giancarlo Scaccia, Esquire
Anne Rock, Esquire
Ariadna Muniz, Esquire
Emma Cohen, Esquire
GREENBERG TRAURIG, LLP
One Vanderbilt Avenue
New York, NY 10017
*Attorneys for Defendant AET Pharma US, Inc.*

/s/ *Jeremy A. Tigan*

Jeremy A. Tigan (#5239)