IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| HARMONY BIOSCIENCES, LLC, HARMONY BIOSCIENCES MANAGEMENT, INC., BIOPROJET SOCIÉTÉ CIVILE DE RECHERCHE and BIOPROJET PHARMA SAS, <br><br> Plaintiffs, <br><br> v. <br><br> LUPIN LIMITED, et al., <br><br> Defendants. | C.A. No. 23-1286 (JLH) (SRF) <br><br> **CONSOLIDATED** |

**DEFENDANT AET PHARMA US INC.'S OPENING POST-TRIAL BRIEF
REGARDING INVALIDITY OF U.S. PATENT NO. 8,486,947**

**TABLE OF CONTENTS**

I.   INTRODUCTION...........................................................................................................1

II.  LEGAL STANDARD ....................................................................................................4

    A. Obviousness-Type Double Patenting..........................................................................4

    B. Obviousness ...............................................................................................................5

    C. Enablement ................................................................................................................6

III. CLAIM 13 OF THE '947 PATENT IS INVALID FOR ODP OVER THE '430 PATENT ...................................................................................................................... 6

    A. The '430 Patent Is a Proper ODP Reference ........................................................... 6

        1. The '430 and '947 Patents Have Common Inventors And Ownership ........................ 7

        2. The '430 Patent Has an Earlier Priority Date Than, and Expires Before, the '947 Patent ...................................................................................................... 7

    B. '430 Patent Claim 1 and '947 Patent Claim 13 Are Not Patentably Distinct ................... 10

    C. '430 Patent Claim 3 and '947 Patent Claim 13 Are Not Patentably Distinct ................... 12

IV.  OBVIOUSNESS OF CLAIM 13 OF THE '947 PATENT ................................................. 15

    A. The State of the Art at the Time of the Alleged Invention ................................. 15

        1. $H_3$ Receptor Antagonists Were Known to Induce Wakefulness ............................... 15

        2. Pitolisant Was Bioprojet's Lead $H_3$ Receptor Antagonist ......................................... 16

    B. The Combination of Brooks and Meier I Invalidates Claim 13 of the '947 Patent .......... 18

    C. A POSA Had Ample Motivation to Combine Brooks and Meier I ................................ 18

        1. Decades of Prior Art Established $H_3$ Receptor Antagonists as the Most-Promising Wake-Promoting Agents ................................................................. 18

        2. A POSA Would Have Been Motivated to Use the Lead $H_3$ Antagonist .................... 20

    D. A POSA Would Have Had a Reasonable Expectation of Success ................................. 20

        1. The Prior Art Explicitly Stated an Expectation of Success ....................................... 21

        2. *In Vivo* Efficacy Supports a Reasonable Expectation of Success............................. 21

        3. Wake-Promoting Agents Would Be Expected to Treat Regardless of the Underlying Cause.............................................................................................. 22

V.   THE ALLEGED OBJECTIVE INDICIA DO NOT SAVE CLAIM 13 .......................... 23

    A. Plaintiffs' Objective Indicia Evidence Cannot Rebut ODP............................................ 23

    B. No Nexus .................................................................................................................. 24

    C. Plaintiffs Have Not Provided Sufficient Evidence of Objective Indicia ........................ 25

        1. No Long-Felt But Unmet Need.................................................................................. 25

        2. No Unexpected Results............................................................................................. 26

        3. No Failure of Others ................................................................................................ 27

i

4. No Industry Praise.................................................................................................... 29

**VI. CLAIM 13 OF THE '947 PATENT IS NOT ENABLED ................................................. 29**

**VII. CONCLUSION ............................................................................................................. 30**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AbbVie Inc. v. Mathilda & Terence Kennedy Inst. of Rheumatology Tr.*,
  764 F.3d 1366 (Fed. Cir. 2014)................................................................................5, 7, 13, 23

*Agrizap, Inc. v. Woodstream Corp.*,
  520 F.3d 1337 (Fed. Cir. 2008)...........................................................................................23

*AK Steel Corp. v. Sollac and Ugine*,
  344 F.3d 1234 (Fed. Cir. 2003)...........................................................................................30

*Amgen Inc. v. Sanofi*,
  598 U.S. 594 (2023)................................................................................................6, 29, 30

*AstraZeneca LP v. Breath Ltd.*,
  88 F. Supp. 3d 326 (D.N.J.) .................................................................................................26

*Cubist Pharms., Inc. v. Hospira, Inc.*,
  805 F.3d 1112, 1126 (Fed. Cir. 2015).................................................................................24

*Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*,
  851 F.2d 1387 (Fed. Cir. 1988)...........................................................................................23

*Eli Lilly & Co. v. Barr Labs., Inc.*,
  251 F.3d 955 (Fed. Cir. 2001)...........................................................................................4, 5

*Galderma Labs., L.P. v. Tolmar, Inc.*,
  737 F.3d 731 (Fed. Cir. 2013).............................................................................................13

*Geneva Pharms., Inc. v. GlaxoSmithKline PLC*,
  349 F.3d 1373 (Fed. Cir. 2003)...........................................................................................10

*Geo. M. Martin Co. v. All. Mach. Sys. Int'l LLC*,
  618 F.3d 1294 (Fed. Cir. 2010)...........................................................................................29

*Gilead Scis., Inc. v. Natco Pharma Ltd.*,
  753 F.3d 1208 (Fed. Cir. 2014)..........................................................................................6, 7

*Graham v. John Deere Co. of Kansas City*,
  383 U.S. 1 (1966)..................................................................................................................5

*In re Hubbell*,
  709 F.3d 1140 (Fed. Cir. 2013).......................................................................................4, 6, 7

*KSR Int'l Co. v. Teleflex Inc.*,
  550 U.S. 398 (2007)......................................................................................................14

*Leapfrog Enters., Inc. v. Fisher-Price, Inc.*,
  485 F.3d 1157 (Fed. Cir. 2007).....................................................................................23

*MagSil Corp. v. Hitachi Glob. Storage Techs., Inc.*,
  687 F.3d 1377 (Fed. Cir. 2012).......................................................................................6

*McRO, Inc. v. Bandai Namco Games Am. Inc.*,
  959 F.3d 1091 (Fed. Cir. 2020).......................................................................................6

*Medichem, S.A. v. Rolabo, S.L.*,
  437 F.3d 1157 (Fed. Cir. 2006).....................................................................................20

*Novartis AG v. Torrent Pharms. Ltd.*,
  853 F.3d 1316 (Fed. Cir. 2017).....................................................................................26

*Oscar Mayer Foods Corp. v. ConAgra, Inc.*,
  45 F.3d 443 (Fed. Cir. Dec. 22, 1994) ..........................................................................27

*Pac. Biosciences of Cal., Inc. v. Oxford Nanopore Techs., Inc.*,
  996 F.3d 1342 (Fed. Cir. 2021).......................................................................................6

*Perfect Web Techs., Inc. v. InfoUSA, Inc.*,
  587 F.3d 1324 (Fed. Cir. 2009).....................................................................................26

*Pfizer, Inc. v. Apotex, Inc.*,
  480 F.3d 1348 (Fed. Cir. 2007)....................................................................................5, 6

*Pfizer, Inc. v. Teva Pharma. USA, Inc.*,
  518 F.3d 1353 (Fed. Cir. 2008)..............................................................................8, 9, 10

*Prometheus Labs., Inc. v. Roxane Labs., Inc.*,
  805 F.3d 1092 (Fed. Cir. 2015)...................................................................................12, 15

*Sitrick v. Dreamworks, LLC*,
  516 F.3d 993 (Fed. Cir. 2008).......................................................................................30

*Studiengesellschaft Kohle GmbH v. N. Petrochemical Co.*,
  784 F.2d 351 (Fed. Cir. 1986).......................................................................................10

*Symbol Techs., Inc. v. Opticon, Inc.*,
  935 F.2d 1569 (Fed. Cir. 1991).....................................................................................27

*Tex. Instruments Inc. v. US Int'l Trade Comm'n*,
  988 F.2d 1165 (Fed. Cir. 1993).....................................................................................25

iv

*Trustees of Boston University v. Everlight Elecs. Co., Ltd.*,
    896 F.3d 1357 (Fed. Cir. 2018)...........................................................................................30

**Statutes**

35 U.S.C. § 103...........................................................................................................1, 3, 5

35 U.S.C. § 112...........................................................................................................1, 4, 6

35 U.S.C. § 121.........................................................................................................8, 9, 10

1952 Patent Act.............................................................................................................8, 9

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| '947 patent | U.S. Patent No. 8,486,947 (JTX-2) |
| AET | AET Pharma U.S., Inc. |
| Alguacil | Alguacil, L.F. & Pérez-García, C., *Histamine H3 Receptor: A Potential Drug Target for the Treatment of Central Nervous System Disorders*, 2 CURRENT DRUG TARGETS – CNS & NEUROLOGICAL DISORDERS 303 (2003) (DTX-0076) |
| ANDA | Abbreviated New Drug Application |
| Arrang | Arrang, J.-M. et al., *Autoinhibition of brain histamine release mediated by a novel class (H3) of histamine receptor*, 302 LETTERS TO NATURE 832 (1983) (DTX-0078) |
| Bioprojet | Bioprojet Société Civile de Recherche; Bioprojet Pharma |
| Brooks | Brooks, S. & Black, J., *Novel Therapies for Narcolepsy*, 11(12) EXPERT OPIN. INVESTIG. DRUGS 1821 (2002) (DTX-0080) |
| CNS | Central Nervous System |
| Cowart | Cowart, M. et al., *Medicinal Chemistry and Biological Properties of Non-Imidazole Histamine H3 Antagonists*, 4 MINI-REVIEWS IN MED. CHEM. 979 (2004) (DTX-0046) |
| CPAP | Continuous Positive Airway Pressure |
| DEA | Drug Enforcement Administration |
| EDS | Excessive Daytime Sleepiness |
| ESS | Epworth Sleepiness Scale |
| FOF | Defendant's Proposed Finding of Facts |

| Ganellin 1995 | Ganellin, C.R. et al., *Design of Potent Non-Thiourea H3-Receptor Histamine Antagonists*, 38 J. MED. CHEM. 3342 (1995) (DTX-0091) |
|---|---|
| Ganellin 1996 | Ganellin C.R. et al., *A novel series of (phenoxyalkyl)imidazoles as potent H3-receptor histamine antagonists*, 39 J. MED. CHEM. 3806 (1996) (DTX-0110) |
| Harmony | Harmony Biosciences Management, Inc.; Harmony Biosciences, LLC |
| HARMONY III | Bioprojet - NCT01399606, *Long Term Open Label Study in Narcolepsy With BF2.649 (Pitolisant) (HARMONYIII)* (DTX-0216) |
| HARPS 1 | Bioprojet Clinical Study Report - *Randomized, Multicenter, 12-Week, Double-blind, Placebo-Controlled, Study to Assess the Efficacy and Safety of BF2.649 in Excessive Daytime Sleepiness (EDS) in Parkinson disease, followed by a 9-month Open-Label Extension Phase* - Reference P06-10_Harps 1, dated February 7, 2014 (DTX-0352) |
| HARPS 2 | Bioprojet Clinical Study Report - *Randomized, Multicenter, 12-Week, Double-blind, Placebo-Controlled, Study to Assess the Efficacy and Safety of BF2.649 in Excessive Daytime Sleepiness (EDS) in Parkinson disease, followed by a 9-month Open-Label Extension Phase* - Reference P06-10_Harps 2, dated February 12, 2014 (DTX-0353) |
| ICSD-1 | American Academy of Sleep Medicine, *International Classification of Sleep Disorders*, (ICSD-1 rev.) (2001) (DTX-0121) |
| Leurs | Leurs, R. et al., *Therapeutic potential of histamine H3 receptor agonists and antagonists*, 19 TiPS 177 (1998) (DTX-0099) |

| | |
|---|---|
| Ligneau 1998 | Ligneau, X. et al., *Neurochemical and behavioral effects of ciproxifan, a potent histamine H3-receptor antagonist*, 287(2) J. PHARMACOL. EXP. THER. 658 (1998) (DTX-0092) |
| Lin | Lin, J.-S. et al., *Involvement of histaminergic neurons in arousal mechanisms demonstrated with H3 receptor ligands in the cat*, 523 BRAIN RES. 325 (1990) (DTX-0107) |
| Meier I | Meier, G. et al., *FUB 649: A Novel Non-imidazole histamine H3-Receptor Antagonist with High In Vitro and Oral In Vivo Potency*, 334(2) ARCH. PHARM. PHARM. MED. CHEM. C40 (2001) (DTX-0085) |
| Miko | Mikó, T. et al., *Novel Nonimidazole Histamine H3 Receptor Antagonists: 1-(4-(Phenoxymethyl)benzyl)piperidines and Related Compounds*, 46 J. MED. CHEM. 1523 (2003) (DTX-0096) |
| Monti | Monti, J.M. et al., *Effects of selective activation or blockade of the histamine H3 receptor on sleep and wakefulness*, 205 EUR. J. PHARMACOLOGY 283 (1991) (DTX-0098) |
| NIH | National Institutes of Health |
| NDA | New Drug Application |
| ODP | Obviousness-Type Double Patenting |
| Onodera | Onodera, K. et al., *Neuropharmacology of the Histaminergic Neuron System in the Brain and its Relationship with Behavioral Disorders*, 42 PROGRESS IN NEUROBIOLOGY 685 (1994) (DTX-0114) |
| OSA | "Obstructive Sleep Apnea" a/k/a "Sleep Apnea" |

| Passani | Passani, M.B. et al., *The histamine H3 receptor as a novel therapeutic target for cognitive and sleep disorders*, 25 TRENDS IN PHARM SCI. 618 (2004) (DTX-0088) |
|---|---|
| Plaintiffs | Harmony Biosciences Management, Inc.; Harmony Biosciences, LLC; Bioprojet Société Civile de Recherche; Bioprojet Pharma |
| Pollard | Pollard, H. & Schwartz, J.-C., *Histamine neuronal pathways and their functions*, 10 TRENDS IN NEUROSCIENCE 86 (1987) (DTX-0105) |
| POSA | Person of ordinary skill in the art |
| Seneviratne | Seneviratne, U. & Puvanendran, K., *Excessive daytime sleepiness in obstructive sleep apnea: prevalence, severity, and predictors*, 5 SLEEP MED. 339 (2004) (DTX-0131) |
| Stark 1996 | Stark, H. et al., *Developments of histamine H3-receptor antagonists*, 21(5) DRUGS OF THE FUTURE 507 (1996) (DTX-0132) |
| Uncontested Facts | Uncontested Facts (D.I. 503, Ex. 1) |
| USPTO | United States Patent and Trademark Office |
| WO 254 | International Patent Publication WO 2000/06254 (DTX-0090) |

ix

## I.    INTRODUCTION

This case concerns AET's ANDA for pitolisant hydrochloride, the approval of which is currently blocked by Plaintiffs' assertion of the '947 patent. AET has proven by clear and convincing evidence that Claim 13—the only asserted claim of the '947 patent—is invalid for obviousness-type double patenting ("ODP"), obviousness under 35 U.S.C. § 103, and failure to satisfy the enablement requirement of 35 U.S.C. § 112. AET respectfully requests that judgment of invalidity be entered so that patients and the healthcare system in the United States can now rightfully have access to a lower-cost treatment for EDS in narcolepsy.

Claim 13 of the '947 patent is directed to a method of using pitolisant to treat "excessive daytime sleepiness" ("EDS"), a symptom that is so common that over 40% of Americans will experience it at some point. Claim 13 limits the treatment of EDS to three patient populations known to suffer from that symptom: "Parkinson's disease, sleep apnea, or narcolepsy." But Plaintiff Bioprojet had already been awarded its patent on treating sleep apnea with pitolisant: the '430 patent. Whether the percentage of sleep apnea patients who exhibit EDS is a "majority" (per Plaintiffs' sleep expert, Dr. Roth), 87.2% at any given time (per a published epidemiological study), or 100% over the course of the disease state (per AET's expert, Dr. Kushida), it is undisputed that EDS is a "hallmark symptom" of sleep apnea. FOF ¶¶ 126-129. Claim 13 of the '947 patent therefore improperly attempts to extend Plaintiffs' monopoly on treating sleep apnea patients with pitolisant by recharacterizing the method of the '430 patent as treating sleep apnea's most common symptom.

Further, a POSA would not have read '430 patent Claim 1 in a vacuum; they would have understood that pitolisant was an $H_3$ receptor antagonist and, as such, a wake-promoting agent. Thus, reading Claim 1 in context, a POSA would have immediately recognized that the benefit of

1

pitolisant lay in treating the EDS associated with sleep apnea.[1] Accordingly, both '430 patent Claim 1 and '947 patent Claim 13 are directed to treating the *same patients* with the *same drug* to achieve the *same result*. Indeed, Plaintiffs' sleep expert, Dr. Roth, admitted at trial that treating "excessive daytime sleepiness," in the context of the '947 patent, is "not distinct" from treating sleep apnea. FOF ¶ 131. Now that the '430 patent is expired, doctors should be free to treat sleep apnea patients with pitolisant. Allowing Claim 13 to stand would extend exclusivity beyond the expiration of the '430 patent—precisely what the doctrine of ODP forbids.

Claim 13 is also invalid for ODP over '430 patent Claim 3, which recites treating "diurnal somnolence" with pitolisant. There is no dispute that "diurnal somnolence" is synonymous with "daytime sleepiness," and that "excessive daytime sleepiness" is simply a comparatively more pronounced manifestation of "daytime sleepiness." Daytime sleepiness is measured by the Epworth Sleepiness Scale ("ESS"), a self-administered patient questionnaire that evaluates the degree of daytime sleepiness on a continuous scale of 0 to 24, where a score of 11 or higher is conventionally labeled "excessive." FOF ¶¶ 39-41. That subjective self-evaluation—rather than any underlying medical attribute—is all that distinguishes patients having "excessive daytime sleepiness" (per '947 patent Claim 13) from the broader group of patients having "diurnal somnolence" (per '430 patent Claim 3). EDS is therefore subsumed within the broader range of diurnal somnolence. FOF ¶ 47. As the trial record shows, a POSA would treat a diurnal somnolence patient with an ESS score of 11 (tipping into the range of "excessive daytime sleepiness") in the same manner as a diurnal somnolence patient with an ESS score of 10, by administering wake-promoting agents such as pitolisant. FOF ¶ 44-46. Indeed, the inventors of the '947 patent drew no meaningful distinction between treating "diurnal somnolence" (per the '430 patent) and treating

---

[1] Indeed, Claim 3 of the '430 patent makes clear that pitolisant treats daytime sleepiness.

"excessive daytime sleepiness" (per the '947 patent): Example 2 of the '947 patent evaluates the treatment of sleep apnea patients with EDS by measuring reduction in "diurnal somnolence." FOF ¶¶ 146, 147.

Likewise, Bioprojet told the NIH, in connection with its Phase III clinical trial for Wakix®, that pitolisant "reduced significantly the diurnal somnolence compared to placebo" in previous studies on narcoleptic patients, "***confirming*** its wakening effect against EDS."[2] FOF ¶¶ 155, 156. Thus, the success of treating diurnal somnolence per the '430 patent Claim 3 is what "confirm[ed]" treatment of EDS per the '947 patent. Plaintiffs further acknowledged this equivalence by listing Claim 3 of the '430 patent in the Orange Book as covering the same approved indication as Claim 13 of the '947 patent. FOF ¶¶ 149-152. It would have been abundantly obvious to a POSA to practice Claim 3 of the '430 patent on patients suffering from sleep apnea or narcolepsy, as it was well known to sleep doctors that these are the patients most in need of wake-promoting agents. At best, '947 patent Claim 13 is directed to a subset of "diurnal somnolence" patients who subjectively feel sleepier, but there is no question that they would benefit from a treatment for their diurnal somnolence. FOF ¶ 144. Nothing in '947 patent Claim 13 provides a patentable distinction.

Claim 13 of the '947 patent is also invalid under 35 U.S.C. § 103 over the combination of Brooks and Meier I. Brooks disclosed that $H_3$ antagonists "such as thioperamide (BioProjet, Societe Civile de Recherche) increase wakefulness" and "may prove useful in treating EDS due to narcolepsy or other causes." FOF ¶¶ 106, 165. A POSA would have known that thioperamide was Bioprojet's first-generation $H_3$ antagonist—potent but unsuitable for human use due to toxicity and poor pharmacokinetics—and that Bioprojet spent years developing improved compounds to replace it. FOF ¶¶ 87-89. That effort culminated in pitolisant, identified in Meier I as a highly

---

[2] All emphases added unless otherwise stated.

3

potent and selective $H_3$ antagonist and touted as a developmental "lead." FOF ¶¶ 101-103. A POSA would have been motivated to use Bioprojet's "lead" $H_3$ antagonist, pitolisant, in the method taught by Brooks in place of thioperamide, the compound pitolisant was developed specifically to replace. A POSA would have had a reasonable expectation of success in doing so. Named inventor Dr. Schwartz (and his collaborators) spent the decade preceding the filing of the '947 patent telling the world that $H_3$ antagonists were wake-promoting agents that could treat sleep disorders such as narcolepsy. FOF ¶¶ 80-82. By the'947 patent's priority date,[3] $H_3$ antagonists were regarded as the "most promising" therapeutic approach for narcolepsy. FOF ¶ 109. There is nothing inventive about using Bioprojet's lead $H_3$ antagonist in Brooks' method of treating EDS in narcolepsy.

Finally, Claim 13 of the '947 patent is invalid under 35 U.S.C. § 112 for lack of enablement. Claim 13 expressly recites the treatment of EDS in Parkinson's disease patients. But Plaintiffs' own placebo-controlled Phase III clinical trials (HARPS 1 and HARPS 2) failed to demonstrate utility for that indication. Remarkably, pitolisant performed worse than placebo in both trials. FOF ¶¶ 257-266. No amount of experimentation could enable a POSA to practice the full scope of Claim 13 when Plaintiffs have proven that pitolisant does not treat EDS in Parkinson's disease patients.

For the reasons presented at trial and below, Claim 13 of the '947 patent is invalid.

## II.    LEGAL STANDARD

### A.    Obviousness-Type Double Patenting

ODP is a judicially created doctrine which prevents claiming obvious variants of subject matter claimed in another patent where "granting both exclusive rights would effectively extend the life of patent protection." *In re Hubbell*, 709 F.3d 1140, 1145 (Fed. Cir. 2013) (quotations

---

[3] The '947 claims priority to a foreign application filed April 1, 2005. Uncontested Facts ¶ 36.

omitted); *Eli Lilly & Co. v. Barr Labs., Inc.*, 251 F.3d 955, 967 (Fed. Cir. 2001). "[T]he fundamental reason for [this] rule is to prevent unjustified timewise extension to the right to exclude granted by a patent no matter how the extension is brought about." *Eli Lilly*, 251 F.3d at 968 (citations omitted). The doctrine "ensures that the public gets the benefit of the invention after the original period of monopoly expires." *AbbVie Inc. v. Mathilda & Terence Kennedy Inst. of Rheumatology Tr.*, 764 F.3d 1366, 1373 (Fed. Cir. 2014). Under ODP, a claim in a later-expiring patent is invalid if it is not patentably distinct from the claim in an earlier-expiring reference patent alone or together with the prior art. *See id.* at 1378–79. The analysis has two steps: (1) identify differences between the earlier-expiring reference claim and the later-expiring claim, and (2) determine whether those differences render the later claim patentably distinct (analogous to analyzing obviousness). *Id.* at 1374, 1378.

## B.    Obviousness

A patent claim is invalid for obviousness "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103(a). Whether a patent claim is obvious is a question of law based on four underlying questions of fact: (a) the level of ordinary skill in the pertinent art; (b) the scope and content of the prior art; (c) the differences between the prior art and the claims at issue; and (d) secondary considerations, which are also known as objective indicia of nonobviousness. *See Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17–18 (1966).

This analysis also requires "that a skilled artisan would have been motivated to combine the teachings of the prior art references . . . [with] a reasonable expectation of success in doing so." *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1361 (Fed. Cir. 2007) (citations omitted). A "motivation to combine the relevant prior art teachings . . . does not have to be found explicitly in

5

the prior art references sought to be combined, but rather may be found in any number of sources, including common knowledge, the prior art as a whole, or the nature of the problem itself." *Id.* at 1362 (quotation omitted).

### C.    Enablement

35 U.S.C. § 112(a) requires that the patent's specification must enable a person of ordinary skill in the art to make and use the claimed invention. The enablement requirement "enforces the essential *quid pro quo* of the patent bargain by requiring a patentee to teach the public how to practice the full scope of the claimed invention." *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 959 F.3d 1091, 1099–1100 (Fed. Cir. 2020) (quotation omitted); *see also Amgen Inc. v. Sanofi*, 598 U.S. 594, 610 (2023). "A claim is not enabled if . . . a relevant artisan would not be able to practice the claimed invention without undue experimentation." *Pac. Biosciences of Cal., Inc. v. Oxford Nanopore Techs., Inc.*, 996 F.3d 1342, 1350 (Fed. Cir. 2021) (quotation omitted). The enablement requirement guards against "overbroad claiming that might otherwise attempt to cover more than was actually invented. Thus, a patentee chooses broad claim language at the peril of losing any claim that cannot be enabled across its full scope of coverage." *MagSil Corp. v. Hitachi Glob. Storage Techs., Inc.*, 687 F.3d 1377, 1381 (Fed. Cir. 2012).

### III.    CLAIM 13 OF THE '947 PATENT IS INVALID FOR ODP OVER THE '430 PATENT

#### A.    The '430 Patent Is a Proper ODP Reference

The disputed issue here is one of law: whether the earlier-expiring '430 patent, which stems from a separate family, qualifies as a double patenting reference against the later-expiring, commonly owned '947 patent. For a patent to qualify as reference for ODP, it must satisfy two requirements—(1) there must be some commonality between the reference patent and the challenged patent (*see In re Hubbell*, 709 F.3d 1140 (Fed. Cir. 2013)); and (2) its expiration date

6

must fall before that of the challenged patent (*see Gilead Scis., Inc. v. Natco Pharma Ltd.*, 753 F.3d 1208, 1215-17 (Fed. Cir. 2014)). The '430 patent meets both requirements.

### 1.    The '430 and '947 Patents Have Common Inventors And Ownership

Commonality exists where patents share: (1) the same inventive entity, (2) a different inventive entity with at least one common inventor, or (3) a common assignee/owner. *In re Hubbell*, 709 F.3d at 1146. It is uncontested that the '430 patent and the '947 patent are commonly owned by Bioprojet, and share two common inventors, Jean-Charles Schwartz and Jeanne-Marie Lecomte. Uncontested Facts ¶¶ 37, 115-117. Thus, commonality for ODP is met. *See Eli Lilly*, 251 F.3d at 967-68; *Pfizer*, 518 F.3d at 1363.

### 2.    The '430 Patent Has an Earlier Priority Date Than, and Expires Before, the '947 Patent

The Federal Circuit has held that "the determining factor" for assessing which patent qualifies as an "earlier" ODP reference is the patent's expiration date, thereby establishing the general rule that "an earlier-expiring patent can qualify as an [ODP] reference for a later-expiring patent[.]" *Gilead*, 753 F.3d at 1215-17. This rule serves the "bedrock principle of our patent system that when a patent expires, the public is free to use not only the same invention claimed in the expired patent but also obvious or patentably indistinct modifications of that invention." *Id.* at 1214. The '430 patent qualifies as an ODP reference under *Gilead*.

Like the ODP reference in *Gilead*, the '430 patent stems from a separate family, claims an earlier priority date, and expires before the asserted '947 patent. *See Gilead*, 753 F.3d at 1210; FOF ¶¶ 113-120; Uncontested Facts ¶147. The '430 patent therefore qualifies as an ODP reference. *See Gilead*, 753 F.3d at 1215–17; *see also AbbVie*, 764 F.3d at 1373-74 ("[W]here, as here, the applicant chooses to file separate applications for overlapping subject matter and to claim different priority dates for the applications, the separate patents will have different expiration dates since

7

the patent term is measured from the claimed priority date. When such situations arise, the doctrine of obviousness-type double patenting ensures that a particular invention . . . does not receive an undue patent term extension.").

AET expects Plaintiffs to argue that the safe harbor provision of 35 U.S.C. § 121 prevents the '430 patent from serving as an ODP reference because it is a "divisional" application. *See* D.I. 507, App. A1; D.I. 526 at 2. This argument fails. The relevant text of § 121 provides:

> A patent issuing on an application with respect to which a requirement for restriction under this section has been made, or on an application filed as a result of such a requirement, shall not be used as a reference either in the Patent and Trademark Office or in the courts against a divisional application or against the original application or any patent issued on either of them, if the divisional application is filed before the issuance of the patent on the other application.

On its face, § 121 precludes "an application filed as a result of [a restriction requirement]" (or patent issuing thereon) from being "used as a reference . . . ***against the original application***" (or patent issuing thereon). Nothing in § 121 precludes using the '430 patent as an ODP reference against a patent having no familial relationship to it or the "original application." FOF ¶¶ 119, 120.

Congress drafted § 121 as part of the 1952 Patent Act to address a specific, narrow problem: the inequity that arose when the USPTO required an applicant to divide a single application into multiple applications, and then later used those very divisions to invalidate the resulting patents. *Pfizer, Inc. v. Teva Pharma. USA, Inc.*, 518 F.3d 1353, 1361 (Fed. Cir. 2008). As is still the case today, prior to § 121, the USPTO could impose a requirement for restriction when a single patent application contained claims directed to two or more independent and distinct inventions. *Id.* at 1360-61. Once such a requirement issued, the applicant was forced to elect one group of claims to prosecute in the original application and to file separate, divisional applications for the remaining claim groups. *Id.* at 1361. Despite the USPTO's determination that the claims were patentably distinct, prior to § 121, the USPTO and the courts could still reject or invalidate

8

the subsequent divisional application based on double patenting over the original application from which it had been divided. *Id.* As such, an applicant's failure to challenge a restriction requirement was "at his peril" because the restriction did not protect the resulting divisional from a later double patenting rejection. *Id.* (citing *In re Kauffman*, 152 F.2d 991, 993 (C.C.P.A. 1946); *In re Ferenci*, 83 F.2d 279, 282-83 (C.C.P.A. 1936)).

Congress drafted § 121 to eliminate this unfairness. The House Report accompanying the 1952 Patent Act explains the purpose and scope of what became § 121:

> This section enacts as law existing practice with respect to division, at the same time introducing a number of changes. Division is made discretionary with the Commissioner. The requirements of section 120 [now section 121] are made applicable and *neither of the resulting patents can be held invalid over the other merely because of their being divided in several patents*. In some cases a divisional application may be filed by the assignee.

*Pfizer, Inc.*, 518 F.3d at 1360 (quoting H.R. Rep. No. 82-1923, at 20 (1952)). Commentary from P.J. Federico, one of the principal drafters of the 1952 Patent Act, also confirms that the safe harbor was a solution to the specific problem of divisional applications being rejected on ODP grounds over the original application (or vice versa) following a restriction requirement—nothing more:

> The third sentence of section 120 [now section 121] is the one which provides that *neither the original or divisional application* (or patent), resulting from a requirement for restriction, *shall affect the validity of the other* merely because of their being divided into several applications or patents as a result of the requirement; however, the divisional application must be filed before the issuance of the patent on the other application. This sentence is rather awkwardly worded. It stated that *neither shall be used "as a reference" against the other* and the Revision Notes state that "neither of the resulting patents can be held invalid over the other merely because of their being divided in several patents," and the meaning and intention are believed clear. *The provision obviously would not apply to matters having no relation to the particular requirement for restriction which was made.*

P.J. Federico, *Commentary on the New Patent Act*, at 35 (1954) (reprinted at 75 J. Pat. & Trademark Off. Soc. 161, 196 (1993)). Section 121 itself and its legislative history thus confirm that it only precludes a divisional application from being used as an ODP reference against another

9

application (or patent) from the same family stemming from the restriction requirement. It does not apply to patents lacking such a relationship.

Accordingly, courts have strictly construed the § 121 safe harbor to protect only divisionals and applications within the same family. *See Pfizer*, 518 F.3d at 1360; *Geneva Pharms., Inc. v. GlaxoSmithKline PLC*, 349 F.3d 1373, 1378 (Fed. Cir. 2003) ("If the [challenged patent] and the [reference patent] trace their lineage back to a common parent which was subject to a restriction requirement, then § 121 intervenes to prevent a nonstatutory double patenting rejection."); *Studiengesellschaft Kohle GmbH v. N. Petrochemical Co.*, 784 F.2d 351 (Fed. Cir. 1986).

### B. '430 Patent Claim 1 and '947 Patent Claim 13 Are Not Patentably Distinct

Claim 1 of the '430 patent is directed to a method of treating sleep apnea by administering an effective amount of pitolisant. FOF ¶ 121. The only difference between '430 patent Claim 1 and '947 patent Claim 13 is that '430 patent Claim 1 refers to sleep apnea, whereas '947 patent Claim 13 refers to the primary symptom of sleep apnea—EDS—in those same sleep apnea patients. FOF ¶¶ 54, 122.

As of the filing of the '947 patent, the ICSD-1 identified EDS as a diagnostic criterion for sleep apnea. FOF ¶ 53.[4] The '947 patent itself acknowledges that sleep apnea "*is characterized by* periodic collapse of the upper airway during sleep with apneas (periodic cessation of breathing), hypopneas (repetitive reduction in breathing) or a continuous or sustained reduction in ventilation and *excessive daytime sleepiness* . . . ." FOF ¶ 55. Indeed, Plaintiff Bioprojet admitted that EDS is the most "frequently reported symptom of sleep apnea." FOF ¶ 125. Plaintiffs' expert, Dr. Roth, also confirmed that EDS is the number one reason that sleep apnea patients come into sleep centers for treatment (FOF ¶ 130), that the majority of sleep apnea patients experience EDS (FOF ¶ 127),

---

[4] Consistent with the ICSD-1, Dr. Kushida testified that 100% of the tens of thousands of sleep apnea patients that he has treated have EDS. FOF ¶ 129.

10

and that EDS is a "hallmark symptom" of sleep apnea. FOF ¶ 126. Other record evidence discloses the prevalence of EDS in sleep apnea patients to be 87.2%. FOF ¶ 128. There can be no dispute that most, if not all, sleep apnea patients experience EDS.

As of the priority dates (and issue dates) of the '430 and '947 patents, there were no FDA approved pharmacological treatments for the disordered breathing underlying sleep apnea. FOF ¶ 132. Pharmacological therapy for sleep apnea instead focused on treating the resulting EDS. FOF ¶ 133. A POSA would therefore understand that administering pitolisant under '430 patent Claim 1 was not directed to correcting airway obstructions, but rather to alleviating EDS via the known wake-promoting activity of $H_3$ antagonists. FOF ¶¶ 133, 134, 136.[5]

Example 2 of the '947 patent confirms this understanding. Example 2 is a small human clinical study evaluating pitolisant in sleep apnea patients. FOF ¶ 146. The clinical endpoint measured was change in daytime sleepiness—specifically, "the number of diurnal somnolence episodes." FOF ¶ 146. Despite evaluating daytime sleepiness rather than airway obstruction, the title of Example 2 is "Treatment of Obstructive Sleep Apnea . . ." FOF ¶ 146. Example 2 therefore confirms that the '947 patent regards "treatment of sleep apnea" as synonymous with treatment of the daytime sleepiness symptom. FOF ¶¶ 146, 147.

Given this context, a POSA would understand that '430 patent Claim 1 and '947 patent Claim 13 cover the same method: administering pitolisant to treat EDS in sleep apnea patients. FOF ¶ 137. Both claims target the same patients, use the same drug, and achieve the same result— promoting wakefulness. FOF ¶ 134, 147. Plaintiffs' expert admitted that "excessive daytime sleepiness," as used in the '947 patent, is "not distinct" from sleep apnea. FOF ¶ 131. The '947

---

[5] In this regard, a POSA would have also been aware of '430 patent Claim 3, which explicitly claims treatment of daytime sleepiness with pitolisant.

patent Claim 13 merely recites the major symptom of sleep apnea (EDS) that would invariably be treated when carrying out '430 claim 1. FOF ¶ 15, 54. That does not patentably distinguish it from Claim 1 of the '430 Patent. *See Prometheus Labs., Inc. v. Roxane Labs., Inc.,* 805 F.3d 1092, 1098-99 (Fed. Cir. 2015) (finding obvious claims to treat symptoms of irritable bowel syndrome in women based on prior art disclosing treatment of irritable bowel syndrome generally).

### C.    '430 Patent Claim 3 and '947 Patent Claim 13 Are Not Patentably Distinct

Claim 3 of the '430 patent is directed to a method of treating daytime sleepiness ("diurnal somnolence") by administering pitolisant. FOF ¶ 138. The only difference between '430 patent Claim 3 and '947 patent Claim 13 is that '430 patent Claim 3 broadly refers to treating daytime sleepiness, whereas '947 patent Claim 13 refers to treating the subset of *excessive* daytime sleepiness in narcolepsy, sleep apnea, and Parkinson's disease patients. FOF ¶ 140. A POSA would not view this difference as patentably distinct. FOF ¶ 141.

EDS is a complaint of difficulty in maintaining desired wakefulness or a complaint of excessive amount of sleep. FOF ¶ 36. It is a common symptom experienced by 43% of Americans. FOF ¶ 37. Daytime sleepiness (or "diurnal somnolence") falls along a continuum with EDS representing a more pronounced degree of daytime sleepiness relative to mild daytime sleepiness or drowsiness. FOF ¶¶ 38, 142. Sleep doctors typically assess daytime sleepiness using the subjective ESS questionnaire, which asks a patient to rate, on a scale from 0 to 3, their propensity to fall asleep in eight scenarios. FOF ¶¶ 39, 40. The responses are summed to yield a score from 0 to 24. FOF ¶ 40. An ESS score of 11 or above[6] is often labeled EDS. FOF ¶ 41. EDS can be "mild," "moderate," or "severe" based on the ESS score. FOF ¶ 42. Physicians treat daytime sleepiness the same way regardless of score—by administering wake-promoting agents. FOF ¶ 46. EDS

---

[6] This is not a hard and fast rule. Some researchers, including Plaintiffs' expert, Dr. Roth, consider an ESS score of 10 or above to be EDS. FOF ¶¶ 43-46.

differs from daytime sleepiness only in nomenclature rather than any underlying medical or physiological distinction; it is simply an ESS score of 11 or above on a continuous scale of daytime sleepiness. FOF ¶¶ 43, 45, 142. As Federal Circuit precedent makes clear, such differences in degree cannot sustain patentable distinctness. *See In re Peterson*, 315 F.3d 1325, 1330 (Fed. Cir. 2003) ("[A] prior art reference that discloses a range encompassing a somewhat narrower claimed range is sufficient to establish a *prima facie* case of obviousness."); *see also Galderma Labs., L.P. v. Tolmar, Inc.*, 737 F.3d 731, 739 (Fed. Cir. 2013) (rejecting secondary indicia of nonobviousness as constituting "only a difference in degree from the prior art results" and not a probative "difference in kind"); *AbbVie*, 764 F.3d at 1381 (a later expiring patent that claimed to treat a subset of patients with more severe rheumatoid arthritis was an obvious variant of a patent that claims treatment of rheumatoid arthritis patients generally).

The intrinsic record confirms that daytime sleepiness and EDS are not patentably distinct. FOF ¶¶ 145, 147, 148. Example 2 of the '947 patent describes a study directed to the treatment of sleep apnea patients with pitolisant. FOF ¶ 146. The patients in the study had ESS scores above 12, indicating that they suffered from EDS. *Id.* The treatment was evaluated based on the patients' reduction in "diurnal somnolence." *Id.* In other words, Example 2 used treatment of diurnal somnolence to confirm that pitolisant treated EDS. *Id.* The '947 patent thus confirms that Claim 3 of the '430 patent and Claim 13 of the '947 patent are directed to the treatment of the same symptom, daytime sleepiness ("diurnal somnolence"). FOF ¶ 145.

Likewise, inventor Dr. Schwartz equated EDS with diurnal somnolence during prosecution of the '947 patent. FOF ¶ 148. In a declaration submitted to the USPTO, Dr. Schwartz referred to data from human clinical trials in which "excessive daytime sleepiness [wa]s measured with the Epworth Sleepiness Scale (ESS). The Epworth Sleepiness Scale is used to determine the level of

13

daytime sleepiness . . . ." FOF ¶ 27. Similarly, Bioprojet told the NIH as justification for its HARMONY III clinical trial on the reference listed drug, Wakix®, that "[i]n narcoleptic patients, results obtained in the previous studies showed that [pitolisant] reduced significantly the diurnal somnolence compared to placebo **_confirming_** its waking effect against excessive daytime sleepiness." FOF ¶ 155. Therefore, the ability of pitolisant to treat "diurnal somnolence" is precisely what "confirm[ed]" that it treats EDS.[7] FOF ¶ 156.

Plaintiffs also listed '430 patent Claim 3 and '947 patent Claim 13 in the Orange Book as covering the same approved method of treating EDS in narcolepsy patients.[8] FOF ¶¶ 149-152. Plaintiff should not, now, be heard to argue that treatment of diurnal somnolence would not treat EDS in narcolepsy patients.

A POSA would not consider the specific patient populations of Claim 13 of the '947 patent to patentably distinguish from Claim 3 of the '430 patent. FOF ¶¶ 123, 141. A POSA would have understood that sleep apnea and narcolepsy were both characterized by the EDS symptom and both were treated symptomatically using stimulants or wake-promoting drugs. FOF ¶¶ 51, 52, 54, 58, 59. The intrinsic record confirms that understanding. FOF ¶¶ 28, 145. For example, Dr. Schwartz's declaration submitted to the USPTO declared that "the effect of the compounds of the invention **_is purely targeting the symptom of excessive daytime sleepiness_**," regardless of the underlying pathology. FOF ¶¶ 28, 157. Put simply, pitolisant, like other stimulants, merely wakes a person up, it does not treat the cause of the sleepiness. Giving such a drug to narcoleptics and sleep apnea patients would have been an obvious choice. *See KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406

---

[7] The '947 patent defines "treatment" as including "alleviating" or "reducing" symptoms. FOF ¶ 16. Claim 13 therefore does not require a complete cure or remission of EDS. Treating diurnal somnolence would, at the very least, alleviate or reduce EDS. FOF ¶¶ 47, 58, 61.

[8] Plaintiffs asserted the '430 patent in this case against other Defendants. Uncontested Facts ¶ 112.

14

(2007). FOF ¶¶ 133, 134, 136, 189. Identifying particular patient populations that would benefit from wake-promoting agents does not meaningfully distinguish '947 patent Claim 13 from '430 patent Claim 3. FOF ¶¶ 141, 157, 159. *See Prometheus Labs., Inc.*, 805 F.3d at 1098-99.

## IV.    OBVIOUSNESS OF CLAIM 13 OF THE '947 PATENT

### A.    The State of the Art at the Time of the Alleged Invention

The state of the art as of the filing date of the '947 Patent is largely unrebutted. Notably, there is no dispute that the prior art disclosed that: (1) $H_3$ receptor antagonists were known to increase histamine synthesis and release in the brain (FOF ¶¶ 64, 65, 96); (2) histamine was understood to be a "waking amine" which regulates the sleep-wake cycle (FOF ¶¶ 62, 67); (3) orally administered $H_3$ antagonists induce wakefulness in animals in a marked, dose-dependent manner (FOF ¶¶ 71, 74); (4) thioperamide was a potent $H_3$ antagonist developed by Bioprojet but was unsuitable for human use due to toxicity (from the thiourea moiety) and poor pharmacokinetics (due to the presence of an imidazole ring) (FOF ¶ 87); (5) medicinal chemistry efforts sought to remedy the deficiencies of thioperamide by replacing the thiourea group and imidazole ring (FOF ¶¶ 88, 92); (6) pitolisant emerged directly from this effort, was disclosed in early patents, and was identified in the literature as a potent, selective, and promising lead compound. (FOF ¶¶ 93-95, 101, 104). Its use for treating EDS followed naturally from this body of knowledge, and "advances that would occur in the ordinary course without real innovation" are not deserving of a patent. *KSR*, 550 U.S. at 419, 426-27.

### 1.    $H_3$ Receptor Antagonists Were Known to Induce Wakefulness

Long before filing the '947 patent, Dr. Schwartz and his colleagues had identified histamine as a core neurotransmitter in sleep–wake regulation. FOF ¶ 62. Histaminergic neurons were known to be maximally active during wakefulness and largely silent during sleep. FOF ¶ 66. Because of this role, Dr. Schwartz referred to histamine as a "waking amine." *See* FOF ¶ 67.

15

While investigating the role of histamine in the regulation of sleep/wake in the early 1980s, Dr. Schwartz's group discovered the histamine $H_3$ receptor. FOF ¶ 63. They found that, unlike $H_1$ and $H_2$ receptors, the $H_3$ receptor functions primarily as a presynaptic autoreceptor in the central nervous system. FOF ¶ 64. Its physiological role is to inhibit the synthesis and release of histamine through a classic negative-feedback mechanism. FOF ¶ 64. From this mechanism alone, the wake-promoting implication was clear to Dr. Schwartz's group: blocking the $H_3$ receptor would remove inhibitory control over histamine release, thereby increasing central histamine levels and promoting arousal. FOF ¶¶ 65, 72. This insight set the stage for decades of research focused on $H_3$ antagonists as agents to enhance wakefulness. FOF ¶ 74.

From the late 1980s through the 1990s, Dr. Schwartz and others showed that $H_3$ receptor antagonists reliably increase wakefulness. FOF ¶ 77. For example, Lin demonstrated that the $H_3$ antagonist thioperamide, when orally administered to cats, produced a marked, dose-dependent increase in wakefulness. FOF ¶ 71. The same findings were replicated in other animal models. FOF ¶ 74. The effect was not limited to thioperamide, as Dr. Schwartz was able to replicate the findings of Lin using the $H_3$ antagonist ciproxifan. FOF ¶ 76. By the early 1990s, the literature consistently characterized $H_3$ antagonists as centrally acting wake-promoting agents, with proposed indications in narcolepsy, hypersomnia, and vigilance disorders. FOF ¶ 73.

### 2.    Pitolisant Was Bioprojet's Lead H₃ Receptor Antagonist

Dr. Schwartz and his colleagues arrived at their lead compound, pitolisant, after several years of medicinal chemistry efforts.

Thioperamide was the first potent and selective $H_3$ antagonist synthesized by Dr. Schwartz's group; the prototypical $H_3$ receptor antagonist and the benchmark compound against which later $H_3$ antagonists were measured. FOF ¶¶ 68-69. Despite its potency, thioperamide had

16

clinical limitations. *FOF ¶ 87.* It contained an imidazole ring, which was associated with low blood-brain barrier penetration, leading to poor pharmacokinetics and bioavailability, and cytochrome P450 inhibition. *Id.* It contained a thiourea group which was associated with liver toxicity. *Id.* Thioperamide thus was ill-suited for use in humans. *Id.*

The limitations of thioperamide created a clear research objective for Dr. Schwartz's group: identify a safer $H_3$ antagonist without an imidazole moiety, to improve the metabolic profile and brain penetration. FOF ¶¶ 88, 92. Medicinal chemistry programs throughout the 1990s by Dr. Schwartz and his colleagues explicitly pursued this goal. FOF ¶ 89. As Dr. Schwartz explained, it was important to improve the brain penetration of the $H_3$ antagonists because "an $H_3$ antagonist entering the brain would permit an increase in histamine transmission through histaminergic pathways and thereby potentiate the role of histamine in controlling the waking state and so ***act as a stimulant***." FOF ¶ 80. Pitolisant resulted from these efforts, specifically replacing the imidazole group on a potent $H_3$ antagonist, referred to as FUB 181, with a piperidine moiety. FOF ¶ 95. Dr. Schwartz's group first published on pitolisant and other non-imidazole alkylamine $H_3$ receptor ligands in EP 0 982 300 and the international counterpart, WO 254. FOF ¶ 93. WO 254 reiterates the previously disclosed therapeutic potential for $H_3$ antagonists, stating that they were known to increase cerebral histamine release and "through this mechanism they induce an extended wakefulness." FOF ¶ 96.

Further research by Dr. Schwartz and others led to identifying pitolisant as their "lead" clinical candidate. FOF ¶ 101. For example, Meier I identified pitolisant (also called FUB 649) as the non-imidazole version of FUB 181 and called it "one of the most potent $H_3$ antagonists both *in vitro* [] and *in vivo* [] with high selectivity for the $H_3$ receptor." FOF ¶ 100. Unlike prior non-imidazole $H_3$ antagonists, the potency of pitolisant was comparable to thioperamide. FOF ¶ 174.

17

Dr. Schwartz identified pitolisant as "a new promising lead for further development." FOF ¶ 101.

Pitolisant's emergence as a lead compound thus was the logical outcome of a clearly defined research program aimed at replacing thioperamide with a safer, comparably effective non-imidazole analog.

## B.    The Combination of Brooks and Meier I Invalidates Claim 13 of the '947 Patent

Claim 13 of the '947 patent is directed to a method of treating EDS with pitolisant in narcolepsy, sleep apnea, and Parkinson's disease patients. FOF ¶ 15. But methods of treating EDS in patients with narcolepsy and sleep apnea with pitolisant were known and described in the prior art. FOF ¶¶ 106, 165. Dr. Kushida testified, without rebuttal, that the combination of prior art references, Brooks and Meier I, meets all limitations of '947 patent Claim 13. FOF ¶¶ 162, 166; *see also* Uncontested Fact ¶ 150.

## C.    A POSA Had Ample Motivation to Combine Brooks and Meier I

Brooks teaches that "$H_3$ antagonists, such as thioperamide (BioProjet, Societe Civile de Recherche) increase wakefulness" and observes that "[s]uch agents may prove useful in treating EDS due to narcolepsy or other causes." FOF ¶ 165. Although Brooks does not disclose pitolisant, Meier I identifies pitolisant as a highly potent and selective $H_3$ antagonist based on *in vivo* testing and touts it as a "lead" compound for further development. FOF ¶¶ 101, 164, 170. Claim 13 of the '947 patent merely follows the instructions of Brooks using Bioprojet's lead compound, pitolisant, which was specifically designed to overcome the drawbacks of the first generation $H_3$ antagonist, thioperamide. FOF ¶¶ 172, 174, and 175; *see also supra* § IV B. That is not inventive.

### 1.    Decades of Prior Art Established $H_3$ Receptor Antagonists as the Most-Promising Wake-Promoting Agents

Brooks' suggestion to treat EDS in narcolepsy using $H_3$ antagonists did not emerge in isolation. FOF ¶ 81. By April 2005, more than two decades of published research had established

18

that $H_3$ receptor antagonists promote wakefulness through a well-understood mechanism of action: increasing the synthesis and release of cerebral histamine, which induces an extended state of wakefulness. FOF ¶¶ 18, 77, 96; *see also* § IV.A.2, *supra.* Even the '947 patent admits that "[a]ntagonists of histamine H3-receptor are known especially to increase synthesis and release of cerebral histamine" and that "[t]hrough this mechanism, they induce an extended wakefulness. . . ." FOF ¶ 18. The '947 patent thus confirms that the mechanism by which pitolisant promotes wakefulness, and thus treats EDS, was well-established in the prior art, not newly discovered by the inventors. FOF ¶¶ 18, 216. A POSA reading the prior art in April 2005 would have known that an $H_3$ antagonist, like pitolisant, would promote wakefulness and thereby ameliorate EDS in the claimed patient populations. FOF ¶ 217.

As discussed above, pitolisant was the result of a medicinal chemistry effort to improve upon the first generation $H_3$ antagonist, thioperamide. FOF ¶¶ 104, 172. As part of that effort, Bioprojet identified an $H_3$ antagonist known as FUB 181. FOF ¶ 89. That compound was highlighted in a 1996 article, Stark, as one of the "most potent $H_3$-receptor antagonists reported so far" with "proposed" indications including narcolepsy. FOF ¶ 82. Pitolisant resulted directly from the replacement of the imidazole group in FUB 181 with a piperidine ring to improve upon the pharmacokinetics. FOF ¶ 95. Meier I suggests using pitolisant for the "indications proposed" for FUB 181. FOF ¶ 171. Accordingly, POSAs would have understood that pitolisant would be useful for narcolepsy as that was one of the indications proposed for FUB 181 in Stark. FOF ¶ 82.

Dr. Kushida identified numerous prior art references establishing the histaminergic pathway's role in regulating wakefulness. *See supra* § IV A. These include Bioprojet's WO 254, the first disclosure of pitolisant, which taught that $H_3$ antagonists were known to increase cerebral histamine release and "through this mechanism they induce an extended wakefulness." FOF ¶ 96.

19

### 2.    A POSA Would Have Been Motivated to Use the Lead $H_3$ Antagonist

Prior to the filing of the '947 patent, the prior art had identified pitolisant as the leading candidate. FOF ¶¶ 101, 103. For example, Meier I characterized pitolisant as "one of the most potent antagonists both *in vitro* [] and *in vivo* [] with high selectivity for the $H_3$ receptor" and designated it "a new promising lead for further development." FOF ¶¶ 100-101. Meier I's disclosure of pitolisant as a "lead for further development" would have motivated a POSA to use it with the method disclosed in Brooks. FOF ¶ 175. Indeed, Brooks specifically references the $H_3$ antagonist research performed by Bioprojet on thioperamide. FOF ¶ 169. This would have further motivated a POSA to review other $H_3$ antagonists disclosed by Bioprojet, especially given the known drawbacks associated with thioperamide. FOF ¶ 88, 175.

As Dr. Kushida testified, the development of pitolisant specifically resulted from an effort to find an $H_3$ antagonist with potency comparable to thioperamide, but without thioperamide's known drawbacks. FOF ¶¶ 172-174. Pitolisant addressed both concerns. FOF ¶¶ 102, 174. These extensive public disclosures represented a compelling motivation to select pitolisant to use in the method of treating EDS in patients with narcolepsy disclosed by Brooks.

### D.    A POSA Would Have Had a Reasonable Expectation of Success

AET also established at trial that a POSA in April 2005 would have had a reasonable expectation of success in using pitolisant to treat EDS in patients with narcolepsy and sleep apnea. A reasonable expectation of success does not require certainty; it requires only that a POSA reasonably expected the claimed method to work. *See Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1165 (Fed. Cir. 2006) ("Obviousness does not require absolute predictability of success;" rather, "[a]ll that is required is a reasonable expectation of success" in making the invention via the combination) (citation omitted).

Here, the prior art provided explicit statements of expected efficacy, demonstrated *in vivo*

20

activity in multiple species through a well-understood mechanism, and identified pitolisant as a lead compound optimized for therapeutic use. FOF ¶¶ 101, 176. That showing more than satisfies the legal standard.

### 1. The Prior Art Explicitly Stated an Expectation of Success

The prior art did not merely suggest a hypothesis; it articulated an affirmative expectation that $H_3$ antagonists would successfully treat EDS in narcolepsy. For example:

- Onodera stated that thioperamide "is *expected* to be useful for the therapy of narcolepsy and dementia." FOF ¶ 79.

- Alguacil stated that "[l]igands of the H3 receptors could be *expected* to affect sleep and wakefulness by changing central histaminergic tone." FOF ¶ 108.

- Brooks expressly stated that $H_3$ antagonists "may prove useful in treating EDS due to narcolepsy or other causes." FOF ¶ 168.

- Passani concluded that $H_3$ antagonists "provide the *most promising* therapeutic approach for the treatment of major wake disorders such as hypersomnia and narcolepsy." FOF ¶ 109.

- Ganellin 1995 stated that "an $H_3$ antagonist entering the brain would permit an increase in histamine transmission through histaminergic pathways and thereby potentiate the role of histamine in controlling the waking state and so *act as a stimulant*." FOF ¶ 80.

These statements establish that, as of April 2005, the scientific community expected $H_3$ antagonists to be useful for treating sleep disorders, like narcolepsy, as recited in Claim 13 of the '947 Patent. *See* FOF ¶ 176.

### 2. *In Vivo* Efficacy Supports a Reasonable Expectation of Success

A POSA's expectation of success was also grounded in demonstrated *in vivo* efficacy of $H_3$ antagonists across multiple animal species. Lin demonstrated that the $H_3$ antagonist thioperamide, when orally administered to cats, promoted wakefulness in a marked, dose-dependent manner. FOF ¶ 71. Ligneau 1998 obtained similar effects with the orally administered $H_3$ antagonist, ciproxifan. FOF ¶ 76. Monti replicated the waking effect in other animals. FOF ¶

75. These *in vivo* demonstrations, in species used as models for human sleep-wake physiology, provided substantial evidence that $H_3$ antagonists worked as predicted by Dr. Schwartz's early work on the histaminergic pathway. FOF ¶¶ 74, 84. The '947 patent itself confirms this reasoning. Example 1 of the '947 patent relies on changes in wakefulness in a cat model and uses those results to conclude that pitolisant would be effective in treating EDS. FOF ¶ 254. If the animal model of Example 1 was sufficient to support the claims of the '947 patent, it was equally sufficient to establish a POSA's reasonable expectation of success from the prior art.

### 3. Wake-Promoting Agents Would Be Expected to Treat Regardless of the Underlying Cause

A POSA's expectation of success was further supported by the nature of EDS itself. As established at trial and discussed above, EDS is a symptom, not an independent disease or pathology, characterized by an inability to maintain wakefulness during the daytime to a degree that interferes with daily functioning. *See* Section III.C, *supra*; FOF ¶¶ 33-35.

Because EDS is a symptom (i.e., sleepiness), any agent that promotes wakefulness will provide a benefit to the patient. FOF ¶ 187. That is what stimulants, such as pitolisant, modafinil, and amphetamine do: they directly promote arousal regardless of the underlying cause of the sleepiness. FOF ¶¶ 157, 159. A POSA would have recognized that pitolisant, as an $H_3$ antagonist would be likely to promote wakefulness and therefore provide a benefit to narcoleptics and other patients having the symptom of EDS.[9] FOF ¶ 217. As is the case with amphetamine and modafinil, Dr. Schwartz confirmed in his declaration filed at the USPTO, the effect of pitolisant is "purely symptomatical," and independent of the underlying disease or condition. FOF ¶¶ 28, 157.

Finally, there would have been a reasonable expectation of success because (1) pitolisant

---

[9] As Dr. Kushida testified, this is fundamentally different for Parkinson's disease because the EDS conditions can be associated both with that disease and with the medications used to treat it. FOF ¶ 57.

was known to be a potent $H_3$ antagonist (*see e.g.*, Meier I), (2) WO 254, which first disclosed pitolisant, stated that $H_3$ antagonists "induce an extended wakefulness," and (3) the '947 patent, itself, admits what Dr. Schwartz stated in WO 254: that $H_3$ antagonists "induce an extended wakefulness." FOF ¶¶ 18, 96, 100. Plaintiffs cannot now deny the truth of their own statements regarding the benefit of $H_3$ antagonists like thioperamide.

## V.    THE ALLEGED OBJECTIVE INDICIA DO NOT SAVE CLAIM 13

Plaintiffs have raised alleged long-felt need, unexpected results, failure of others, and industry praise results as objective indicia of non-obviousness. These contentions fail. Plaintiffs' scattershot approach fails to tie the alleged objective indicia to any novel aspect of Claim 13. There is no nexus to a claimed and novel feature, and no evidence of these alleged objective indicia are tied to the '947 patent rather than the '430 patent. Plaintiffs' objective indicia arguments rest on and attributes unrelated to Claim 13. Accordingly, they cannot overcome the overwhelming evidence that Claim 13 would have been obvious to a POSA. *See, e.g., Leapfrog Enters., Inc. v. Fisher-Price, Inc.*, 485 F.3d 1157, 1162 (Fed. Cir. 2007); *Agrizap, Inc. v. Woodstream Corp.*, 520 F.3d 1337, 1344 (Fed. Cir. 2008).

### A.    Plaintiffs' Objective Indicia Evidence Cannot Rebut ODP

Objective indicia must possess a "nexus" to the merits of the claimed invention. *See Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1392 (Fed. Cir. 1988). In an ODP analysis, the court must determine whether the later claims are "patentably distinct" from the earlier expiring claims. *AbbVie, Inc.*, 764 F.3d at 1374. Therefore, to carry any evidentiary weight, any objective indicia must be attributable to the differences between Claim 13 of the '947 patent and Claims 1 and 3 of the '430 patent, rather than to the subject matter they share.

Plaintiffs' evidence of objective indicia relates to the use of pitolisant for the treatment of EDS in patients with narcolepsy or sleep apnea, both of which are also encompassed within the

23

claims of the '430 patent. FOF ¶ 191. As explained above, there is no patentable difference between Claims 1 and 3 of the '430 patent and Claim 13 of the '947 patent—Claims 1 and 3 of the '430 patent are directed to those same uses. *See supra* § III.B. and III.C; FOF ¶¶ 137, 145. Because there are no "new" features of the '947 patent to independently drive Plaintiffs' alleged objective indicia, they cannot save Claim 13 of the '947 patent. Furthermore, Plaintiffs listed both the '430 and the '947 patents in the Orange Book as covering the same approved indication of Wakix®. FOF ¶¶ 149-150. There is no evidence of objective indicia that Plaintiffs can point to for the '947 patent that does not apply equally to the '430 patent. FOF ¶¶ 195-196. All of Plaintiffs' evidence concerns either the properties of pitolisant itself (e.g., half-life, non-scheduled nature, etc.) or its alleged unexpected benefit in treating EDS. But these benefits are found equally in the claims of the '430 patent, as both Claims 1 and 3 recite pitolisant and its benefit in the treatment of sleep apnea and diurnal somnolence, respectively.

### B.      No Nexus

For secondary considerations of non-obviousness to be accorded substantial weight, "a nexus must exist between the evidence and the merits of the claimed invention." *Novartis AG v. Torrent Pharms. Ltd.*, 853 F.3d 1316, 1330 (Fed. Cir. 2017) (quotation omitted). Where secondary considerations are not commensurate in scope with the claims, they cannot rebut a strong prima facie case of obviousness. *Allergan, Inc. v. Apotex Inc.*, 754 F.3d 952, 965 (Fed Cir. 2014) (citation omitted) ("objective evidence of non-obviousness must be commensurate in scope with the claims which the evidence is offered to support."); *see also Cubist Pharms., Inc. v. Hospira, Inc.*, 805 F.3d 1112, 1126 (Fed. Cir. 2015). Plaintiffs have failed to show the requisite nexus.

Plaintiffs primarily rely on Wakix® (and to a lesser extent Ozawade®) as purported commercial embodiments of '947 patent Claim 13. FOF ¶¶ 191, 196. But these commercial embodiments alone are insufficient. To invoke any presumption of nexus, Plaintiffs must show

that these products are co-extensive with Claim 13, which they cannot do.

Claim 13 broadly covers methods of treating EDS using pitolisant in patients suffering from three conditions—Parkinson's disease, narcolepsy, or sleep apnea. FOF ¶ 190. Plaintiffs have only identified commercial embodiments for two of these embodiments. Wakix® is indicated for EDS associated with narcolepsy and, although not approved in the United States, Ozawade® is only indicated for EDS associated with sleep apnea. FOF ¶ 191. Plaintiffs identify no commercial embodiment for treating EDS in Parkinson's disease patients. FOF ¶ 192.

Critically, Plaintiffs' own Phase III clinical trials for Parkinson's disease (HARPS 1 and HARPS 2) showed that pitolisant failed to treat EDS associated with Parkinson's disease. FOF ¶¶ 257-269. Those failures show that Plaintiffs' evidence of alleged objective indicia is not co-extensive with Claim 13. Where, as here, a claim is broader than the alleged commercial embodiment, there can be no presumption of nexus. Absent nexus, Plaintiffs' secondary considerations are entitled to little to no weight.

### C.    Plaintiffs Have Not Provided Sufficient Evidence of Objective Indicia

#### 1.    No Long-Felt But Unmet Need

Plaintiffs will argue that Wakix® allegedly satisfied a long-felt, unmet need for a "non-controlled" medication to treat EDS. But to establish long-felt need, Plaintiffs must show "an articulated identified problem" and evidence that the problem persisted despite efforts to solve it. *Tex. Instruments Inc. v. US Int'l Trade Comm'n*, 988 F.2d 1165, 1178 (Fed. Cir. 1993). Plaintiffs have not provided any such evidence of long-felt need. Long before the '947 patent and even today, clinicians routinely prescribed controlled substances, including stimulants, to treat EDS without hesitation. FOF ¶¶ 200-201. Indeed, controlled substances remain widely prescribed as front-line EDS therapies, both before and after Wakix® entered the market. FOF ¶ 207. In other words, Wakix® has not meaningfully changed the recommendations for the treatment of EDS in patients

25

with narcolepsy. FOF ¶ 209. Moreover, there were non-scheduled treatment options for EDS in patients with narcolepsy. FOF ¶ 205. Caffeine was a non-scheduled substance often used to treat EDS with narcolepsy. FOF ¶¶ 60, 205.

The references Plaintiffs rely on do not establish that a non-controlled alternative was required or unmet. *See e.g.*, FOF ¶¶ 197-199. At most, those references identify a drawback of prior therapies, not a long-felt but unmet need tied to non-controlled status. *Perfect Web Techs., Inc. v. InfoUSA, Inc.*, 587 F.3d 1324, 1332 (Fed. Cir. 2009) (a patentee cannot merely point to drawbacks in the art; it must "show that these drawbacks constituted a long-felt, unmet need").

Moreover, Claim 13 does not even require non-controlled status. FOF ¶ 210. That property is neither recited in any claim of the '947 patent nor discussed in its specification. FOF ¶ 210. A "need" premised on drug scheduling cannot support non-obviousness where that feature is not claimed. *Novartis*, 853 F.3d at 1330 (where the secondary consideration "actually results from something other than what is both claimed and novel in the claim, there is no nexus to the merits of the claimed invention."). Finally, whether a drug is controlled under DEA regulations is not a property of the drug. FOF ¶ 211. It is simply an agency determination which is subject to change. *See AstraZeneca LP v. Breath Ltd.*, 88 F. Supp. 3d 326, 388-89 (D.N.J.), *aff'd*, 603 F. App'x 999 (Fed. Cir. 2015). Thus, Plaintiffs have not identified a long-felt need.

### 2. No Unexpected Results

Plaintiffs next invoke alleged "unexpected results," asserting that pitolisant's efficacy in treating EDS was surprising. That argument fails. As explained above, nothing about pitolisant's use to treat EDS was unexpected given the prior art. *See supra* § IV.D; FOF ¶¶ 217, 218. Plaintiffs conflate alleged uncertainty about clinical development with unexpected results. But obviousness does not require certainty of FDA approval, only a reasonable expectation of success. Under

26

Plaintiffs' theory, any drug is "unexpected" if it has succeeded in clinical trials and passed regulatory hurdles. Moreover, the '947 patent defines "treating" as alleviating or reducing symptoms. Claim 13 requires only a modest improvement in EDS, it does not require curing EDS or putting it into remission. FOF ¶ 16. There is nothing unexpected about a wake-promoting agent reducing sleepiness. FOF ¶ 187. Plaintiffs further argue that pitolisant has an unexpected half-life that makes it ideally suitable for treating EDS. *See* FOF ¶¶ 219-221. However, Plaintiffs' expert conceded at trial that the 20-hour half-life of pitolisant is outside of the "sweet-spot" for an EDS treatment and, as a consequence, leads to insomnia as the most common side-effect. FOF ¶¶ 221-222. Finally, Plaintiffs argue that the ability of pitolisant to treat another symptom of narcolepsy, cataplexy, is an unexpected result. FOF ¶¶ 214, 248. However, Claim 13 relates to the treatment of EDS, not cataplexy. And even if some narcolepsy patients also suffer from cataplexy, the ability of pitolisant to treat cataplexy is limited to those Type-1 narcoleptics and has nothing to do with Type-2 narcoleptics, Parkinson's disease patients, or sleep apnea patients. *See Allergan,* 754 F.3d at 965.

### 3.    No Failure of Others

Plaintiffs also argue that the alleged failure of other companies to develop H₃ antagonists supports non-obviousness. But Plaintiffs' evidence of failure of others is largely non-probative of the claimed features and speculative at best.

Failure of others must be tied to the claimed invention and the problem which the challenged patent purports to solve. *See Symbol Techs., Inc. v. Opticon, Inc.,* 935 F.2d 1569, 1578 (Fed. Cir. 1991); *Oscar Mayer Foods Corp. v. ConAgra, Inc.*, 45 F.3d 443 (Fed. Cir. Dec. 22, 1994). Most of the cited "failures" do not relate to the problem the '947 patent Claim 13 purports to solve: treating EDS in patients having Parkinson's disease, narcolepsy, or sleep apnea. FOF ¶¶

27

238, 240-245. Most of the alleged failures Plaintiffs identified targeted different indications and patient populations (e.g., ADHD, Alzheimer's disease, hay fever, schizophrenia, obesity, cognitive disorders, multiple sclerosis, neuropathic pain, and memory impairment). FOF ¶¶ 240, 244. These alleged failures are simply not probative because they do not relate to the subject matter of Claim 13 of the '947 patent. Plaintiffs offered no evidence that these other indications would naturally flow from antagonism of the $H_3$ receptor. As discussed above and as admitted in the '947 patent, the benefit of pitolisant in promoting wakefulness is the direct and natural consequence of increasing histamine synthesis and release in the brain. FOF ¶ 96. Plaintiffs' expert did not even attempt to establish at trial that these disparate conditions, many of which are intractable and poorly understood, have anything to do with the well-understood and documented wake-promoting role of the $H_3$ antagonists. At best, Plaintiffs point to a single trial for EDS in Parkinson's disease (JNJ-31001074 - Bavisant), a single trial for EDS in sleep apnea (MK-0249), and two trials for "narcolepsy" (GSK-189254 and JNJ-17216498). FOF ¶¶ 234-236. With respect to the Parkinson's disease trial, that alleged failure cannot be probative of the non-obviousness of Claim 13 when pitolisant, itself, failed clinical trials for treating EDS in Parkinson's disease patients. *See* § VI, *infra*. The trial of MK-0249 for EDS in sleep apnea is not analogous to EDS as used in the '947 patent. FOF ¶¶ 234, 235. That trial failed to reach significance on the primary endpoint, an objective measure known as MWT, but "improved subjective end points," including ESS. FOF ¶ 235. Plaintiffs' expert, Dr. Roth concluded that "[t]he findings on the ESS are in line with previous positive findings on this scale with the $H_3$ receptor inverse agonist tiprolisant/pitolisant in patients with narcolepsy or EDS." FOF ¶ 235. Regarding the narcolepsy trials, Plaintiffs' expert did not offer any testimony or evidence as to the clinical results underlying the alleged failure. Regarding the preclinical and phase I alleged failures, only two of Plaintiffs' alleged failures relate

28

to the claimed indications (JNJ-10181457 or ADP916). FOF ¶ 244. Plaintiffs offered no evidence that either JNJ-10181457 or ADP916 was being investigated for excessive daytime sleepiness (EDS) in narcolepsy and thus offered no evidence as to whether the alleged failures relate to the claimed features of Claim 13. FOF ¶ 244. Plaintiffs also offer no evidence that any of these programs failed. FOF ¶ 231. Indeed, pharmaceutical companies decide not to pursue particular programs or compounds for many different reasons, including commercial, regulatory, strategic, and operational considerations, none of which bear on obviousness. FOF ¶¶ 232, 233.

### 4.      No Industry Praise

Finally, Plaintiffs point to supposed praise for Wakix®, including references to its ability to treat both EDS and cataplexy in narcoleptics and its status as a non-controlled drug. These arguments just repackage the allege unexpected results and fail for the same reasons, including:

1. Cataplexy is not claimed in the '947 patent. Praise for an unclaimed feature cannot support nonobviousness. Geo. M. Martin Co. v. All. Mach. Sys. Int'l LLC, 618 F.3d 1294, 1305 (Fed. Cir. 2010) ("[i]ndustry praise must . . . be linked to the patented invention."). FOF ¶¶ 247, 248.

2. Praise for being non-controlled again relates to a feature not claimed and not novel. Id. FOF ¶¶ 250, 251. Moreover, Dr. Roth offered no evidence of "praise" for its non-controlled regulatory status.

Plaintiffs have not shown that Wakix® altered the standard of care or achieved widespread industry acclaim attributable to the claimed method. *See* FOF ¶¶ 207-209; *See* DTX-0185. In short, Plaintiffs have failed to show any alleged praise.

## VI.    CLAIM 13 OF THE '947 PATENT IS NOT ENABLED

Claim 13 of the '947 patent is not enabled because it recites inoperative uses of pitolisant and therefore does not meet the requirement that "the specification must enable the full scope of the invention as defined by its claims." *Amgen Inc. v. Sanofi*, 598 U.S. 594, 610 (2023).

Claim 13 recites using pitolisant to treat EDS in patients with Parkinson's disease, yet

29

Bioprojet's HARPS 1 and HARPS 2 Phase III clinical trials confirm that the specification does not enable that use. Those trials failed to show any statistically significant improvement in EDS in patients with Parkinson's disease compared to placebo. FOF ¶¶ 267, 268. Indeed, the highest dose of pitolisant was "less effective at reducing EDS than the placebo." FOF ¶ 269. Dr. Schwartz confirmed that the clinical trials failed. FOF ¶ 267. Moreover, to this day, no drug, including pitolisant, is approved for treating EDS in Parkinson's disease patients. FOF ¶ 273.

Furthermore, the '947 patent provides only one purported example of such treatment (Example 1), which describes administering pitolisant to MPTP-treated cats to study pitolisant's effects in cats with Parkinson's disease. FOF ¶ 254. But MPTP-treated cats are not a reliable animal model for Parkinson's disease, and Dr. Schwartz testified that no preclinical EDS model for Parkinson's disease exists. FOF ¶ 254. Thus, the '947 patent lacks any meaningful data concerning the treatment of EDS with pitolisant in patients with Parkinson's disease. FOF ¶¶ 254-256.

Consistent with *Amgen*, courts have repeatedly held that claims are invalid where even one claimed option is not enabled. *See, e.g.*, *Trustees of Boston University v. Everlight Elecs. Co., Ltd.*, 896 F.3d 1357, 1363–64 (Fed. Cir. 2018) (invalidating claim where one of "the six referenced permutations" was not enabled); *Sitrick v. Dreamworks, LLC*, 516 F.3d 993, 999–1000 (Fed. Cir. 2008) (invalidating claims where one of two embodiments was not enabled); *AK Steel Corp. v. Sollac and Ugine*, 344 F.3d 1234, 1244–45 (Fed. Cir. 2003) (same).

## VII.  CONCLUSION

Claim 13 of the '947 Patent is invalid for ODP, as obvious over the Brooks in view of Meier I, and for lack of enablement.

OF COUNSEL:

Scott J. Bornstein
Jonathan Ball, Ph.D.
Julie P. Bookbinder
Elana B. Araj
Giancarlo Scaccia
GREENBERG TRAURIG, LLP
One Vanderbilt Avenue
New York, NY 10017
(212) 801-9200
Scott.Bornstein@gtlaw.com
ballj@gtlaw.com
bookbinderj@gtlaw.com
elana.araj@gtlaw.com
scacciag@gtlaw.com

Dated: April 9, 2026

HEYMAN ENERIO
GATTUSO & HIRZEL LLP

/s/ Dominick T. Gattuso
Dominick T. Gattuso (# 3630)
222 Delaware Ave., Suite 900
Wilmington, DE 19801
(302) 472-7300
dgattuso@hegh.law

*Attorneys for Defendant AET Pharma US, Inc.*

31