# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| HARMONY BIOSCIENCES, LLC, HARMONY BIOSCIENCES MANAGEMENT, INC., BIOPROJET SOCIÉTÉ CIVILE DE RECHERCHE and BIOPROJET PHARMA SAS,<br><br>Plaintiffs,<br><br>v.<br><br>LUPIN LIMITED, et al.,<br><br>Defendants. | C.A. No. 23-1286 (JLH)<br>**CONSOLIDATED** |

## PLAINTIFFS' RESPONSIVE POST-TRIAL BRIEF
## REGARDING INVALIDITY OF U.S. PATENT NO. 8,486,947

OF COUNSEL:

Christopher N. Sipes
Megan P. Keane
Brianne (Bharkhda)
Sullivan  Sarahi Uribe
Cody J. Reeves
Nicole S.L. Pobre
Elaine H. Nguyen
John Y. Veiszlemlein
A.G. Chancellor
Mishael H. Hibshoosh
COVINGTON & BURLING LLP
One City Center
850 Tenth Street NW
Washington, DC 20001-4956
(202) 662-6000

Alexa Hansen
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Ste. 5400
San Francisco, CA 94105
(415) 591-6000

Yiye Fu
COVINGTON & BURLING LLP
3000 El Camino Real
5 Palo Alto Square, 10th Floor
Palo Alto, CA 94306
(650) 632-4700

May 7, 2026

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jeremy A. Tigan (#5239)
Megan E. Dellinger (#5739)
Anthony D. Raucci (#5948)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jtigan@morrisnichols.com
mdellinger@morrisnichols.com
araucci@morrisnichols.com

*Attorneys for Harmony Biosciences, LLC,*
*Harmony Biosciences Management,*
*Inc., Bioprojet Société Civile de Recherche,*
*and Bioprojet Pharma SAS*

**TABLE OF CONTENTS**

I.     INTRODUCTION ................................................................................................ 1

II.    AET FAILED TO PROVE CLAIM 13 OF THE '947 PATENT IS OBVIOUS ................. 3

     A.    AET Failed to Prove a POSA Would be Motivated to Combine Brooks with Meier I.................................................................................................. 4

     B.    AET Failed to Prove a POSA Would Have Had a Reasonable Expectation of Success in Using Pitolisant to Treat EDS in Sleep Disordered Patients ............ 6

     C.    Objective Indicia Confirm the Non-Obviousness of Claim 13............................ 12

III.   AET FAILED TO PROVE CLAIM 13 INVALID OVER THE '430 PATENT ............... 17

     A.    The '430 Patent Is Not a Proper ODP Reference.................................................. 17

     B.    AET Failed to Prove Claim 13 Obvious Over Any Claim of the '430 Patent........................................................................................................ 20

          1.    AET Failed to Prove Claim 13 Obvious over '430 Patent Claim 1.......... 21

          2.    AET Failed to Prove Claim 13 Obvious over '430 Patent Claim 3.......... 24

     C.    Objective Indicia Confirm the Lack of ODP ........................................................ 29

IV.   AET HAS FAILED TO PROVE THAT CLAIM 13 IS NOT ENABLED ..................... 30

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acadia Pharms. Inc. v. Aurobindo Pharma Ltd.*,
706 F. Supp. 3d 477 (D. Del. 2023)................................................................................18, 20

*Allergan Inc. v. Sandoz Inc.*,
796 F.3d 1293 (Fed. Cir. 2015).....................................................................................26, 30

*Allergan USA, Inc. v. MSN Labs. Private Ltd.*,
111 F.4th 1358 (Fed. Cir. 2024) ........................................................................................18

*Amgen Inc. v. Sandoz Inc.*,
2021 WL 5366800 (D.N.J. Sept. 20, 2021) .................................................................13, 17

*Apple Inc. v. Samsung Elecs. Co.*,
839 F.3d 1034 (Fed. Cir. 2016) (*en banc*) ........................................................................4, 5

*Applied Materials, Inc. v. Advanced Semiconductor Materials Am., Inc.*,
98 F.3d 1563 (Fed. Cir. 1996)............................................................................................20

*Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.*,
776 F.2d 281 (Fed. Cir. 1985).............................................................................................3

*In re Cellect*,
81 F.4th 1216 (Fed. Cir. 2023) ..........................................................................................20

*In re Cyclobenzaprine*,
676 F.3d 1063, 1083 (Fed. Cir. 2012)...........................................................................13, 14

*In re Cyclobenzaprine*,
2010 WL 3766530 (D. Del. Sept. 21, 2010) ...............................................................1, 15, 29

*E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.*,
849 F.2d 1430 (Fed. Cir. 1988) ..........................................................................................16

*Ecolochem, Inc. v. S. Cal. Edison Co.*,
227 F.3d 1361 (Fed. Cir. 2000)............................................................................................4

*Eli Lilly & Co. v. Barr Labs., Inc.*,
251 F.3d 955 (Fed. Cir. 2001)............................................................................................18

*Eli Lilly & Co. v. Teva Parenteral Meds., Inc.*,
845 F.3d 1357 (Fed. Cir. 2017)..........................................................................................20

*Eli Lilly & Co. v. Teva Parenteral Meds. Inc.*,
   689 F.3d 1368 (Fed. Cir. 2012)................................................................................21, 29

*Eli Lilly & Co. v. Teva Pharms. Int'l GmbH*,
   8 F.4th 1331 (Fed. Cir. 2021) .............................................................................................7

*Exelixis, Inc. v. MSN Labs.*,
   2024 WL 4491176 (D. Del. Oct. 15, 2024) .....................................................................21

*Gen. Foods v. Studiengesellschaft Kohle mbH*,
   972 F.2d 1272 (Fed. Cir. 1992)........................................................................................21

*Genetics Inst., LLC v. Novartis Vaccines & Diagnostics, Inc.*,
   655 F.3d 1291 (Fed. Cir. 2011)........................................................................................26

*Grunenthal GmbH v. Alkem Labs. Ltd.*,
   919 F.3d 1333 (Fed. Cir. 2019)........................................................................................12

*InTouch Techs., Inc. v. VGO Commc'ns*,
   751 F.3d 1327 (Fed. Cir. 2014)..........................................................................................6

*Janssen Pharms., Inc. v. Teva Pharms. USA*,
   141 F.4d 1367 (Fed. Cir. 2025)............................................................................3, 6, 7, 28

*Knoll Pharm. Co. v. Teva Pharms. USA, Inc.*,
   367 F.3d 1381 (Fed. Cir. 2004)........................................................................................13

*KSR Int'l Co. v. Teleflex Inc.*,
   550 U.S. 398 (2007)...................................................................................................3, 4, 6

*Leo Pharm. Prods., Ltd. v. Rea*,
   726 F.3d 1346 (Fed. Cir. 2013)...................................................................12, 13, 15, 17

*Magna Elecs., Inc. v. TRW Auto. Holdings Corp.*,
   2016 WL 4239187 (W.D. Mich. Jan. 8, 2016) ...............................................................21

*Merck Sharp & Dohme v. Teva Pharm.*,
   217 F. Supp. 3d 782 (D. Del. 2016)................................................................................18

*Novartis AG v. Ezra Ventures LLC*,
   909 F.3d 1367 (Fed. Cir. 2018)........................................................................................18

*OSI Pharms., LLC v. Apotex Inc.*,
   939 F.3d 1375 (Fed. Cir. 2019).................................................................................. *passim*

*Pharmacyclics LLC v. Alvogen Pine Brook LLC*,
   556 F. Supp. 3d 377 (D. Del. 2022), *aff'd* 2022 WL 16943006 (Fed. Cir. Nov.
   15, 2022) .....................................................................................................................25, 28

iii

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
   904 F.3d 965 (Fed Cir 2018)........................................................................22, 25

*Regeneron Pharms., Inc. v. Mylan Pharms. Inc.*,
   127 F.4th 896 (Fed. Cir. 2025) ...............................................................................26

*Sanofi v. Watson Labs. Inc.*,
   875 F.3d 636 (Fed. Cir. 2017).......................................................2, 11, 12, 27

*Sanofi-Aventis U.S. LLC v. Sandoz, Inc.*,
   2023 WL 4175334 (D. Del. June 26, 2023).............................................................11

*Sanofi-Synthelabo v. Apotex Inc.*,
   550 F.3d 1075 (Fed. Cir. 2008)...............................................................................12

*Southwall Techs., Inc. v. Cardinal IG Co.*,
   54 F.3d 1578 (Fed. Cir. 1995)..................................................................................22

*Star Sci., Inc. v. R.J. Reynolds Tobacco Co.*,
   655 F.3d 1364 (Fed. Cir. 2011)..................................................................................4

*TQ Delta, LLC v. Cisco Sys.*,
   942 F.3d 1352 (Fed. Cir. 2019)..................................................................................4

*WBIP LLC v. Kohler Co.*,
   829 F.3d 1317 (Fed. Cir. 2016).................................................................................29

## Statutes

35 U.S.C. § 103...............................................................................................................3

35 U.S.C. § 121......................................................................................................19, 20

## Other Authorities

Pub. L. No. 106-113, § 4402, 113 Stat. 1501, 1501A-557 (1999) ................................19

145 CONG. REC. H6944 (daily ed. Aug. 3, 1999) (Rep. Rohrbacher statement) ...........19

**TABLE OF ABBREVIATIONS**

| Abbreviation | Word or Phrase |
|---|---|
| ADHD | Attention Deficit Hyperactivity Disorder |
| AET | AET Pharma US, Inc. |
| ANDA | Abbreviated New Drug Application |
| Bioprojet | Bioprojet Société Civile de Recherche and Bioprojet Pharma SAS |
| Br. | Defendant's AET Pharma US Inc.'s Opening Post-Trial Brief Regarding Invalidity of U.S. Patent No. 8,486,947 |
| CPAP | Continuous Positive Airway Pressure |
| DDX | Defendants' Demonstrative Exhibit |
| DFF | Defendant's Proposed Findings of Fact |
| DTX | Defendant's Trial Exhibit |
| EDS | Excessive Daytime Sleepiness |
| FDA | United States Food and Drug Administration |
| $H_3$ | Histamine-3 Receptor |
| Harmony | Harmony Biosciences Management, Inc. and Harmony Biosciences, LLC |
| JTX | Joint Trial Exhibit |
| Kushida | Dr. Clete Kushida |
| Ligneau | Xavier Ligneau |
| NSCLC | Non-Small Cell Lung Cancer |
| ODP | Obviousness-Type Double Patenting |
| PD | Parkinson's Disease |
| PDX | Plaintiffs' Demonstrative Exhibit |
| PFF | Plaintiffs' Proposed Findings of Fact |

v

| Abbreviation | Word or Phrase |
|---|---|
| POSA | Person of Ordinary Skill in the Art |
| PTA | Patent Term Adjustment |
| PTO | Revised Pretrial Order (D.I. 536) |
| PTX | Plaintiffs' Trial Exhibit |
| Reider | Dr. Paul J. Reider |
| Rotella | Dr. David Rotella |
| Roth | Dr. Thomas Roth |
| Schwartz | Dr. Jean-Charles Schwartz |
| the '197 Patent | U.S. Patent No. 8,207,197 |
| the '430 Patent | U.S. Patent No. 8,354,430 |
| the '947 Patent | U.S. Patent No. 8,486,947 |
| Tr. | Trial Transcript |
| UF | Joint Statement of Uncontested Facts, D.I. 503-1, Ex. 1 |
| WAKIX | Pitolisant Tablets Approved by the FDA Pursuant to New Drug Application No. 211150 Held by Harmony |

## I.      INTRODUCTION

AET's invalidity attacks on the '947 Patent of obviousness, obviousness-type double patenting (ODP), and enablement collapse under the trial record, the applicable case law, and common sense. With respect to obviousness, AET claims that using pitolisant to treat EDS in sleep disordered patients "followed naturally" from animal data showing $H_3$ antagonists promote wakefulness and pitolisant's identification as a "promising" compound. Br. 15. But the prior art and the real-world facts tell a very different story.

The wake-promoting effects of $H_3$ antagonists were first reported in healthy animals in 1990. DFF 176. Yet despite 15 years of "sustained motivation" to develop $H_3$ antagonists, *id.*, as evidenced by several pharmaceutical companies pursuing myriad $H_3$ antagonists for multiple potential therapeutic purposes, by April 2005, no $H_3$ antagonist had even been tested for EDS in sleep disordered patients. PFF 76, 92, 148–149. That clinical effect was demonstrated for the first time in the pitolisant studies disclosed in the '947 Patent. PFF 150. These failures in the face of sustained effort squarely refute AET's suggestion that success was obvious.

Post-invention history confirms the point. Before 2005, the industry focused $H_3$ antagonists on cognitive disorders—not EDS—and failed. PFF 73, 74, 211, 212. Only after pitolisant's success did companies pivot toward EDS indications—and they failed again. PFF 216, 222, 223. Today, pitolisant remains the only $H_3$ ligand approved for any indication. PFF 5. *See In re Cyclobenzaprine*, 2010 WL 3766530, at *2 (D. Del. Sept. 21, 2010) (where others fail despite having the patent as prior art, that failure "illustrate[s] just how radically different the patent was from past discoveries"). The notion that treating EDS in sleep disordered patients with an $H_3$ antagonist "followed naturally," Br. 15, is irreconcilable with 35 years of failure. PFF 6, 106.

The prior art does not supply motivation or a reasonable expectation of success. A POSA would not have combined AET's references or had a reasonable expectation that any $H_3$

1

antagonist—let alone pitolisant—would treat EDS in patients with narcolepsy, sleep apnea, or PD. PFF 70, 92, 108, 119. Although AET repeatedly points to tests of $H_3$ antagonists in healthy animals, Br. 21, *see also* PFF 134, 136–137, this data is beside the point: no $H_3$ antagonists were tested in patients with disordered sleep or even an animal model of the disorder. PFF 107, 148–149. AET attempts to bridge this gap by citing to articles like Passani and Brooks. Br. 21. But these articles cite to the same healthy animal studies. PFF 136–137. These bare citations do not suffice to meet AET's burden. *Sanofi v. Watson Labs. Inc.*, 875 F.3d 636, 646 (Fed. Cir. 2017); *OSI Pharms., LLC v. Apotex Inc.*, 939 F.3d 1375, 1384 (Fed. Cir. 2019) (discussed *infra*).

At bottom, AET's argument rests on the flawed premise that any wake-promoting agent would treat EDS in any patient population. Br. 22. The record proves otherwise: EDS is "pathological"—it is more intense, harder to resist, and harder to reverse than ordinary daytime sleepiness, PFF 41, 49, 55, and many wake-promoting agents fail in sleep disordered patients. PFF 57, 60, 62, 235. Against that backdrop, AET identifies no prior art suggesting pitolisant—then considered for cognitive indications, and with unknown dosing and safety in humans—would safely and effectively treat EDS in sleep disordered patients. PFF 147, 120–123, 151–156. AET's hindsight narrative is not supported by the facts. *See* PFF 128–129. Claim 13 is not obvious.

AET's ODP arguments fare no better. Relying on two claims from the '430 Patent—itself not a proper ODP reference, given its status as a divisional application of the '197 Patent, PFF 158; *see also* PFF 163–166—AET's arguments distort not only the reference claims, but also the POSA's understanding of the critical differences between EDS and normal daytime sleepiness. *First*, AET's arguments concerning Claim 1 are based on a litigation-driven redrafting of the claim to mean "EDS in sleep apnea". Such untimely claim construction should not be countenanced, nor is it consistent with the plain meaning or intrinsic evidence. *Second*, AET's arguments concerning

2

Claim 3 erroneously conflates "diurnal somnolence" with EDS in patients with narcolepsy, sleep apnea, and PD. For similar reasons as discussed above with respect to obviousness, the POSA would not reasonably expect that a treatment for sleep apnea or diurnal somnolence would also be safe and effective in treating the abnormal, pathological sleepiness of EDS in the sleep disordered patients to which Claim 13 is directed. AET's arguments are not supported by clear and convincing evidence, and Claim 13 is not invalid for ODP.

Finally, AET's enablement challenge, on which it spends just a page, is based entirely on the purported clinical failure of Bioprojet's post-priority HARPS studies in PD patients, which were conducted at 20 mg doses, not the 40 mg doses taught in the '947 Patent. PFF 245, 255, 257. AET has failed to adduce clear and convincing evidence that the treatment of EDS in PD patients taught and claimed in the '947 Patent is not enabled.

## II.   AET FAILED TO PROVE CLAIM 13 OF THE '947 PATENT IS OBVIOUS

AET's obviousness attack rests upon the single combination of Brooks and Meier I. Br. 18, 4. AET cannot meet its burden to demonstrate that Claim 13 is obvious, a finding justified only "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious" to a POSA at the time of the invention. 35 U.S.C. § 103. AET must show "that a skilled artisan would have been motivated to combine or modify the teachings of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success in doing so." *Janssen Pharms., Inc. v. Teva Pharms. USA*, 141 F.4d 1367, 1374 (Fed. Cir. 2025) (cleaned up). "Each fact . . . must be established by clear and convincing evidence." *Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.*, 776 F.2d 281, 292 (Fed. Cir. 1985).

In assessing obviousness, a court "should be aware . . . of the distortion caused by hindsight bias and must be cautious of arguments reliant upon *ex post* reasoning." *KSR Int'l Co. v. Teleflex*

3

*Inc.*, 550 U.S. 398, 421 (2007). "[T]he great challenge of the obviousness judgment is proceeding without any hint of hindsight." *Star Sci., Inc. v. R.J. Reynolds Tobacco Co.*, 655 F.3d 1364, 1375 (Fed. Cir. 2011).

### A.    AET Failed to Prove a POSA Would be Motivated to Combine Brooks with Meier I.

A POSA would not be motivated to combine Brooks with Meier I. "Identifying a motivation to combine the prior art is important because 'inventions in most, if not all, instances rely on building blocks long since uncovered, and claimed discoveries almost of necessity will be combinations of what, in some sense, is already known.'" *TQ Delta, LLC v. Cisco Sys.*, 942 F.3d 1352, 1357 (Fed. Cir. 2019) (quoting *KSR*, 550 U.S. at 418–19). Therefore, "the tests of whether to combine references need to be applied rigorously." *McGinley v. Franklin Sports, Inc.*, 262 F.3d 1339, 1351 (Fed. Cir. 2001). As the Federal Circuit has emphasized,

> the best defense against hindsight-based obviousness analysis is the rigorous application of the requirement for a showing of a teaching or motivation to combine the prior art references. Combining prior art references without evidence of such a suggestion, teaching, or motivation simply takes the inventor's disclosure as a blueprint for piecing together the prior art to defeat patentability—the essence of hindsight.

*Ecolochem, Inc. v. S. Cal. Edison Co.*, 227 F.3d 1361, 1371–72 (Fed. Cir. 2000) (internal quotations omitted). Both the determination of what the prior art teaches and whether a POSA would be motivated to combine those teachings are questions of fact that AET must prove with clear and convincing evidence. *Apple Inc. v. Samsung Elecs. Co.*, 839 F.3d 1034, 1051 (Fed. Cir. 2016) (*en banc*). AET has failed to do so.

In attempting to meet its burden, AET focuses on a single statement from the 2002 review article, Brooks, that "$H_3$ antagonists, such as thioperamide . . . increase wakefulness, and . . . such agents may prove useful in treating EDS due to narcolepsy." Br. 18 (quoting DTX-80.5). As AET concedes, Brooks does not mention pitolisant. *Id*.

4

Meier I, AET's other primary reference, a medicinal chemistry abstract about pitolisant, does not mention EDS or narcolepsy. PFF 115. Instead, the uses proposed in Meier I are cognitive disorders—Alzheimer's and ADHD. PFF 115–116. Indeed, all of the prior art disclosing pitolisant propose only cognitive uses; none proposes its use in treating EDS in narcolepsy, sleep apnea, or PD. PFF 91, 114–116, 118. As AET's expert, Dr. Kushida, conceded, a POSA would not view the cognitive uses proposed for pitolisant in the prior art as relevant at all to treating excessive daytime sleepiness. *E.g.*, PFF 117. That the pitolisant prior art "expresses a preference for a divergent use" undermines any assertion that the POSA would be motivated to combine such art with Brooks. *See, e.g.*, *Apple*, 839 F.3d at 1051 n.15 (a prior art preference for a divergent use for an element is "relevant to a finding regarding whether a skilled artisan would be motivated to combine").

AET places great weight on Meier I's description of pitolisant as a potent and selective $H_3$ antagonist and "a new promising lead for further development." *E.g.*, Br. 20. But Meier I's description of pitolisant as potent, selective, or promising in the context of suggesting development for cognitive indications (PFF 115–116) does not support its use for treating EDS in sleep disorders. Indeed, as Dr. Kushida acknowledged, a POSA in 2005 would believe that different $H_3$ antagonists could have different pharmacologic effects. PFF 85. In particular, a POSA would believe that different $H_3$ antagonists would have different wakefulness effects. PFF 86–89. In addition, a POSA would not know how an $H_3$ antagonist that might be useful for cognitive disorders compared to one that might be useful for sleep disorders. PFF 87. Tellingly, AET identifies no prior art suggesting that an $H_3$ antagonist useful for the treatment of cognitive disorders should be used for treatment of EDS in sleep disorders.

Dr. Kushida's own interpretation of Brooks is that it suggests "using $H_3$ antagonists *like thioperamide*" to treat narcolepsy. Tr. 498:14–499:5 (Kushida) (emphasis added). But absent from

the trial record is any prior art describing pitolisant as similar to thioperamide. Meier I never mentions thioperamide, and it describes pitolisant as a "novel type" of H3 antagonist. PFF 115. Pitolisant is not like thioperamide in structure. PFF 104. A POSA would also understand the two to be functionally distinct—at the time, thioperamide was understood to be an H3 inverse agonist; pitolisant was not. PFF 83, 105, 140. In 2005 (and now), H3 inverse agonists were understood to be a distinct and "special class" of H3 antagonists that had "special utility" due to their ability to raise histamine above a patient's basal levels, PFF 77–80, further undercutting any assertion that pitolisant would be seen in 2005 as like thioperamide.

In essence, AET's asserted motivation to combine is nothing more than pitolisant being described in Meier I as a potent H3 antagonist and Brooks stating that H3 antagonists such as thioperamide may prove useful in narcolepsy. But there were thousands of H3 antagonists in the prior art, and pitolisant is neither like thioperamide nor suggested as a treatment for EDS or narcolepsy. PFF 81, 104, 109–111, 138–139, 145. AET's argument is thus the conclusory assertion the Federal Circuit has made clear does not show a clear and convincing motivation to combine. *See, e.g.*, *InTouch Techs., Inc. v. VGO Commc'ns*, 751 F.3d 1327, 1351 (Fed. Cir. 2014) (requiring "'articulated reasoning with some rational underpinning' to make the asserted combinations") (quoting *KSR*, 550 U.S. at 418). AET has failed to meet its burden that a POSA would be motivated to combine Brooks with Meier I, which alone suffices to defeat AET's obviousness challenge.

### B.    AET Failed to Prove a POSA Would Have Had a Reasonable Expectation of Success in Using Pitolisant to Treat EDS in Sleep Disordered Patients

Separate from its obligation to prove a motivation to combine, AET must also prove by clear and convincing evidence that a POSA would have had a reasonable expectation of success in doing so, which is also a question of fact. *Janssen*, 141 F.4th at 1374.

Because Claim 13 is expressly drawn to methods for treating EDS in patients suffering

from narcolepsy, sleep apnea, or PD, AET must prove a POSA would have had a reasonable expectation of success in treating EDS in those patients. *See*, *e.g.*, *Eli Lilly & Co. v. Teva Pharms. Int'l GmbH*, 8 F.4th 1331, 1344–45 (Fed. Cir. 2021). As the Federal Circuit has explained, "it was not enough for the [challenger] to have shown that the skilled artisan would have pursued the claimed method of treatment option, but the [challenger] also had to show that the skilled artisan would have reasonably expected success in the treatment." *Id.* at 1344. Here, success would be defined as a safe and effective treatment of EDS in sleep disordered patients. Certainly, AET's briefing supports this definition of success. Br. 15, 29–30. *First*, its enablement argument depends upon Claim 13 requiring pitolisant to be effective. Br. 29–30.[1] *Second*, AET argues a POSA would consider toxicity and pharmacokinetics as part of its obviousness argument (as motivation to select pitolisant as a solution to address thioperamide's drawbacks), *e.g.*, Br. 15, rendering those considerations part of a POSA's definition of success. *Janssen*, 141 F.4th at 1383 (affirming consideration of "unclaimed factors in the analysis [of reasonable expectation of success] if a skilled artisan would reasonably consider these unclaimed factors in the process of creating a useful claimed invention.") (internal quotations omitted). As discussed below, a POSA would not reasonably expect pitolisant to be safe and effective to treat EDS in sleep disordered patients.

There is no dispute that the field of art for the '947 Patent in April 2005 was highly unpredictable. PFF 98. The H3 receptor is distributed throughout the central nervous system, regulates other neurotransmitters in addition to histamine, and "constitutes one of the most important brain-activating systems." DTX-88.1; PFF 67. Passani, which AET identifies as the closest in time prior art, PFF 69, describes H3 receptor biology and pharmacology as "far from

---

[1] Though AET's enablement argument interprets the claim to require a "statistically significant improvement in EDS," Br. 30, the definition of treatment in the '947 Patent makes no mention of statistical significance. PFF 17.

7

being fully understood" and warns that "a key aspect of the unresolved puzzle of $H_3$ receptor pharmacology" was the wide range of therapeutic potential of $H_3$ antagonists, including "possible roles" in cognition, sleep disorders, obesity, epilepsy, and myocardial dysfunction. DTX-88.1, PFF 68.[2] Dr. Kushida conceded that a POSA "would know that different $H_3$ antagonists could have different pharmacologic effects." Tr. 526:6–12 (Kushida), PFF 85. Further, in April 2005, understanding $H_3$ receptor biology and developing an $H_3$ receptor ligand was "a difficult process, and it's challenging." Tr. 524:1–6 (Kushida), PFF 71.

AET adduced no evidence of any $H_3$ antagonist treating EDS in either an animal model of disordered sleep or in patients. Indeed, Dr. Kushida conceded that no such animal model existed in the prior art and that the only clinical use of $H_3$ antagonists in the prior art was a then on-going study in ADHD, for which no results were available. PFF 74, 76, 132. There was thus no basis on which a POSA could reasonably conclude that any $H_3$ antagonist, let alone pitolisant specifically, would prove effective in treating EDS in sleep disordered patients.

To be sure, studies as far back as 1990 had shown that $H_3$ antagonists such as thioperamide could extend wakefulness in healthy animals. PFF 75, 135–137. However, the trial record demonstrates that improving wakefulness in healthy animals and humans is not the same as treating EDS in patients with sleep disorders. PFF 51, 142–143. A POSA would understand there is a clear separation between healthy humans with some daytime sleepiness and sleep disordered patients with EDS. PFF 51, 54. Both sides' experts agreed (and the parties stipulated) that EDS in Claim 13 has a plain and ordinary meaning; that is, a "pathological sleepiness that interferes with daytime functioning, characterized by repeated inappropriate lapses into sleep or irresistible sleep

---

[2] Further complexity arises from the fact that there are many slightly different $H_3$ receptors ("isoforms"). PFF 84. Different $H_3$ antagonists might have different affinities for different isoforms, which would result in different biological effects. PFF 85.

8

attacks during the waking state." PFF 19–20, 42. As Dr. Kushida acknowledged (and the prior art teaches), sleep disordered patients, whatever their level of daytime sleepiness, have "abnormal daytime sleepiness." PFF 48. The daytime sleepiness associated with EDS in narcolepsy, sleep apnea, or PD is thus "more intense," "harder to resist," and "harder to reverse." PFF 49.

Drugs that promote wakefulness in healthy people thus will not necessarily treat EDS in patients with disordered sleep. PFF 56–57, 60–62. For example, Brooks cautions that the therapeutic effect of the stimulants then known to treat EDS in narcolepsy came from their dopaminergic action and that "other alerting agents" are "of limited usefulness due to poor tolerability and/or lack of efficacy." PFF 60, 102. Pitolisant was not known to be dopaminergic. PFF 102, 131. A POSA in 2005 would also be aware of drugs (like modafinil) that treat ordinary daytime sleepiness but not EDS in PD. PFF 61. AET itself acknowledges that "it would be inappropriate to infer" that a drug found safe and effective for one indication would be safe and effective for another. DFF 271. Thus, even if a given $H_3$ antagonist might improve wakefulness in healthy humans, that does not provide a reasonable expectation that it would treat EDS in sleep disordered patients. PFF 130, 141, 145.

As Dr. Kushida acknowledged, evidence of improved wakefulness may relate to cognitive rather than sleep effects, PFF 88, conceding that a POSA may not be able to distinguish whether an $H_3$ antagonist would be useful for treating cognitive rather than sleep disorders because improved wakefulness "might be due to enhancing the alertness that in turn would affect the cognition." Tr. 527:12–21 (Kushida); *see also* PFF 87. Although AET erroneously cites the studies of $H_3$ antagonists on wakefulness in healthy animals as evidence of a reasonable expectation of success in treating EDS in sleep disorders, Br. 21–22, the reference it cites (Ligneau 1998) explains that because the effect observed "was to enhance fast cortical rhythms, known to occur during

9

increased vigilance, and to cause a quiet waking state, a positive outcome in **attentional tests** could be anticipated." DTX-92.8 (emphasis added). Ligneau 1998 thus concludes that the tested $H_3$ antagonist had therapeutic potential in treating "aging or degenerative disorders in which vigilance, attention and memory are impaired;" it does not suggest sleep disorders. *Id.*; *see also* PFF 90. This connection between improved wakefulness and cognition is also reported in WO '254. PFF 91. Thus, improved wakefulness in healthy animals does not provide a reasonable expectation of success in treating EDS in disordered sleep, because wakefulness in healthy sleepers can be a cognitive rather than sleep effect. PFF 143–145. As noted above, "alerting agents," as Brooks warns, are not necessarily useful for treating EDS. PFF 60.

AET relies heavily on the statement in Brooks that an $H_3$ antagonist like thioperamide may prove useful in narcolepsy. Br. 3, 18. But Brooks does not report original research supporting that assertion; instead, it cites simply to Lin, a 1990 study of thioperamide on healthy cats. PFF 137. Lin provides no evidence of the effect of an $H_3$ antagonist on EDS in disordered sleep; there is no such evidence in the prior art. PFF 135, 148–149, 156.

AET's argument is even weaker than the showing the Federal Circuit rejected in *OSI Pharmaceuticals, LLC v. Apotex Inc.*, 939 F.3d 1375 (Fed. Cir. 2019). There, the court reversed a Board finding of obviousness because the prior art failed to establish a reasonable expectation of success under the lower preponderance of the evidence standard. Although a review article described erlotinib as having "promising" activity, "particularly in patients with NSCLC," it cited no erlotinib-specific supporting data or studies. That absence was dispositive because there was "no data or other promising information regarding erlotinib's efficacy" and that the references amounted to "no more than hope." *Id*. at 1384–85. As the Federal Circuit made clear, "***hope that a potentially promising drug will treat a particular cancer is not enough to create a reasonable***

10

***expectation of success in a highly unpredictable art.***" *Id*. at 1385. (emphasis added).

The Federal Circuit has repeatedly reaffirmed this principle. *See Sanofi*, 875 F.3d at 646 (unsupported statements of an "expected" biological result are mere hypotheses, not evidence); *Sanofi-Aventis U.S. LLC v. Sandoz, Inc.*, 2023 WL 4175334, at *14 (D. Del. June 26, 2023) (even "hope and cautious optimism" do not meet the "higher bar" of reasonable expectation of success). AET's reliance on statements that $H_3$ antagonists "may prove useful" fares no better. Br. 21. At most, these statements reflect speculative hope—not evidence—and hope is legally insufficient in a highly unpredictable field such as the treatment of EDS in sleep disorders. *See* PFF 98.

Moreover, AET adduced no evidence from which a POSA would obtain a reasonable expectation of success regarding the use of pitolisant, specifically. In *OSI* and *Sanofi*, the prior art provided information from clinical studies of use of the drug in question. Here, none of the prior art disclosing pitolisant even suggested using it to treat EDS in a sleep disordered patient. PFF 114–115, 118–119, 147, 153–154, 156. There was no information about the clinical use of pitolisant in any humans, nor even data from animal sleep studies. PFF 112–113, 147–148. Nor was there information in the prior art about the pharmaceutical properties of pitolisant, the "factors that are essential to understand when deciding to advance a compound into clinical studies." PFF 153–154. A POSA thus did not have sufficient information to determine a dose for use in humans, let alone form a reasonable expectation of whether a dose might be safe and effective. PFF 151–152. Accordingly, it cannot be said that the prior art expressed even a hope—let alone cautious optimism—that pitolisant might be able to treat EDS in sleep disordered patients. AET's evidence does not approach what is required to show a reasonable expectation of success in a highly unpredictable field like that of the treatment of EDS in sleep disordered patients. *E.g.*, *Sanofi-Aventis*, 2023 WL 4175334, at *14 ("[C]autious optimism is not sufficient, nor is hope.") (citing

11

*Sanofi*, 875 F.3d at 650; *OSI*, 939 F.3d at 1385).

Indeed, when confronted with the lack of a "track record" regarding whether an H$_3$ antagonist could improve wakefulness in sleep disordered patients, PFF 132, or tests of pitolisant in any model of a disorder, PFF 92, 113, Dr. Kushida essentially admitted that his obviousness opinion was based simply on a purported motivation to try, not an expectation of success. In his words, despite the lack of evidence, "a POSA would still be motivated to try it . . . a POSA at that time would think, you know, there's a possibility of why don't I test it out." Tr. 535:4–21 (Kushida). An assertion that an invention would have been obvious-to-try does not substitute for clear and convincing evidence of a reasonable expectation of success. *See Grunenthal GmbH v. Alkem Labs. Ltd.*, 919 F.3d 1333, 1345 (Fed. Cir. 2019) (obvious-to-try requires a showing, among other things, "that there are a finite number of identified, predictable solutions that would lead to an expectation of success") (cleaned up); *Sanofi-Synthelabo v. Apotex, Inc.*, 550 F.3d 1075, 1089–90 (Fed. Cir. 2008) (rejecting obviousness where the result of what was obvious to try was unpredictable). Thus, AET's obviousness assertion based on the combination of Brooks and Meier I fail.

### C.   Objective Indicia Confirm the Non-Obviousness of Claim 13

In assessing obviousness, courts must consider objective considerations of non-obviousness, including failure of others, unexpected results, long-felt but unmet need and praise. *See, e.g.*, *Leo Pharm. Prods., Ltd. v. Rea*, 726 F.3d 1346, 1358 (Fed. Cir. 2013). Objective indicia are "*part of* the whole obviousness analysis, not just an afterthought." *Id*. at 1357 (citation omitted).

***Failure of others:*** In the forty years since the discovery of the H$_3$ receptor, *see* PFF 66, most of the country's largest pharmaceutical companies attempted to develop therapeutic H$_3$ antagonists. PFF 209. AET has acknowledged that, from at least 1990 onward, researchers in the field "maintained a sustained motivation" to develop an H$_3$ antagonist as a treatment for EDS in narcolepsy and "continued to pursue this approach" up through April 2005. DFF 176. Despite this

12

sustained effort, even today the only H$_3$ ligand approved for any use is pitolisant. PFF 5, 210; *see Leo Pharm.*, 726 F.3d at 1358 ("While FDA approval is not determinative of nonobviousness, it can be relevant in evaluating the objective indicia of nonobviousness.").

Thousands of H$_3$ antagonists are described in the prior art literature. PFF 81. By 2005, several H$_3$ antagonists were advancing towards clinical trials in multiple potential therapeutic areas. PFF 211. Over the next two decades, over a dozen Phase II trials of H$_3$ antagonists or inverse agonists would be conducted. PFF 212. Other than pitolisant, none succeeded; indeed, no compound advanced even to Phase III, and nothing has been reported on these compounds in years. PFF 212–221. This alone is compelling evidence of non-obviousness. *Knoll Pharm. Co. v. Teva Pharms. USA, Inc.*, 367 F.3d 1381, 1385 (Fed. Cir. 2004) (failure of others to obtain FDA approval relevant objective indicia); *see also Amgen Inc. v. Sandoz Inc.*, 2021 WL 5366800, *20 (D.N.J. Sept. 20, 2021) (finding testimony of discontinued development persuasive as evidence of failure); *In re Cyclobenzaprine,* 676 F.3d 1063, 1083 (Fed. Cir. 2012) ("Where, as here, the obviousness determination turns on whether [the POSA] would have expected that a particular formulation . . . would render a therapeutically effective treatment[,] objective indicia of failure of others and longfelt need are particularly telling.").

Part of the unpredictability of developing an H$_3$ antagonist is the lack of clarity in the field concerning the therapeutic potential for H$_3$ antagonists. The prior art was replete with hypotheses for which H$_3$ antagonists might be used. PFF 72, 215. Phase II trials of H$_3$ antagonists and inverse agonists were conducted in a wide range of potential indications, including cognitive indications like ADHD and Alzheimer's disease; sleep disorders like EDS in narcolepsy, sleep apnea, and PD; and various other disorders like allergic rhinitis, schizophrenia, and multiple sclerosis. PFF 215.

AET attempts to dismiss these failures in other indications as irrelevant to the non-

13

obviousness of the claimed use of pitolisant at issue here. But AET is wrong. The myriad failures of H3 antagonists in *multiple* indications for which a use was hypothesized demonstrates that expecting H3 antagonists to work for *any* indication, without clinical validation, would not have been obvious. PFF 227. Dr. Kushida acknowledges this, observing that the H3 receptor pharmacology remained sufficiently unpredictable such that a POSA could not reasonably expect H3 antagonists to succeed in indications like ADHD and Alzheimer's without testing them in clinical trials. PFF 226; Tr. 827:24–828:5(Kushida) ("[A] POSA looking at this would, you know, not really think that … these conditions could be—could be, you know, treated. So it wouldn't be obvious."); *see also* Tr. 829:4–7 (Kushida) ("[I]n terms of these other conditions, that wouldn't be obvious. It would not be obvious, sorry."). It simply is not credible to suggest that the prior art gave a POSA a reasonable expectation of success in using an H3 antagonist for treatment of EDS in sleep disordered patients when researchers in the field instead pursued H3 antagonists for other indications Dr. Kushida concedes were wholly speculative. *Id.* This conclusion is especially compelling given the pharmaceutical industry devoted so many resources, including multiple clinical trials, to developing H3 antagonists for those other indications, and still failed to achieve a safe and effective treatment. PFF 209–225.

The lack of EDS clinical trials of H3 antagonists prior to April 2005, when contrasted with the existence of other H3 antagonist clinical studies, PFF 149, 222, is also objective evidence of the difficulty in achieving the claimed result. That, in the 15 years between Lin 1990 and April 2005, the field pursued H3 antagonists in cognitive clinical trials like ADHD and not sleep disorders, PFF 149, confirms that it was not for lack of interest (AET admits there was a "sustained motivation" to develop H3 antagonists, DFF 176) but rather because of the difficulty in developing an H3 antagonist for use in treating EDS in sleep disorders. *Cyclobenzaprine*, 676 F.3d at 1083

14

("The long delay between the marketing of an immediate-release formulation and Amrix, and Dr. Steiner's testimony of longfelt need, moreover, supports the inference that it was difficult for researchers to create a therapeutically effective, extended-release product."); *Leo Pharm.*, 726 F.3d at 1359 ("The intervening time between the prior art's teaching[s] . . . and the eventual preparation of a successful composition speaks volumes to the nonobviousness of the '013 patent.").

The post-priority failures in the field also confirm non-obviousness. As Dr. Kushida conceded, not only were cognitive indications the only ones advanced into the clinic before 2005, "once pitolisant succeeded, then you start to see more companies shifting from the cognitive into the EDS domain." Tr. 832:24–833:4 (Kushida); PFF 222. A clear example of that is Johnson & Johnson, which first conducted clinical studies of its $H_3$ antagonist, bavisant, in ADHD and then, after it saw the published pitolisant studies by Harmony, shifted its $H_3$ antagonist program into EDS in PD. PFF 223. In addition, when those in the field ultimately decided to pursue sleep disorders with $H_3$ ligands, they did so mostly with $H_3$ inverse agonists. PFF 224. Despite these developments, none of these programs succeeded. Even today, pitolisant is the only $H_3$ ligand approved for any indication. PFF 5. As a court in this District previously observed, "[i]f others continue to fail despite having the patent as prior art, such failures may illustrate just how radically different the patent was from past discoveries." *Cyclobenzaprine*, 2010 WL 3766530, at *2.

***Long-Felt Need:*** There was also a long-felt need for new treatments for EDS in sleep disordered patients. PFF 230. As Dr. Roth testified, the prior treatments for EDS in sleep disordered patients involved scheduled drugs, complicating treatment and raising abuse concerns. PFF 96, 229–233; *see also* PFF 235. While AET disputes the need for an EDS treatment that was not scheduled, arguing that controlled substances are "routinely prescribed," Br. 25, it nonetheless agrees that researchers had a "sustained motivation" and "continued to pursue" an $H_3$ antagonist

15

as a treatment for EDS in sleep disordered patients. DFF 176. Pitolisant indisputably met this sustained desire for an $H_3$ antagonist to treat EDS in those patients and thus satisfies that long-felt need in the field, whether that need arose from pitolisant's lack of abuse potential or other attributes. PFF 228, 236. In either case, that pitolisant was the first and remains the only drug to satisfy the long-felt need for an $H_3$ antagonist to treat EDS in sleep disorders, and the only drug to do so that is not controlled, further supports the non-obviousness of Claim 13. PFF 236.

***Unexpected Results:*** Pitolisant also demonstrated unexpected benefits, including its ability to treat cataplexy. PFF 237. There is no dispute that pitolisant, when administered to narcolepsy patients to treat EDS, also treats cataplexy. PFF 2, 238. Nor is there any dispute concerning the benefit to narcolepsy patients; in Dr. Kushida's words, pitolisant's dual-action relieves narcolepsy patients from living on the "double-edged sword" of suffering sleep attacks from too little stimulation and cataplexy attacks from too much. PFF 242.

AET argues that pitolisant's unexpected treatment of cataplexy is irrelevant because "Claim 13 relates to the treatment of EDS, not cataplexy." Br. 27. But cataplexy is another symptom of narcolepsy (PFF 39), AET admits all narcolepsy patients have EDS (DFF 48), and the WAKIX labeling shows that pitolisant treats cataplexy at the same dose and in the same patients. PFF 2, 238, 243. That is, reduction of cataplexy is an additional benefit provided to narcolepsy patients by administering pitolisant. PFF 40, 243. There is thus a clear nexus between Claim 13 and the reduction of cataplexy. PFF 203. *See e.g.*, *E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430, 1433 (Fed. Cir. 1988).

AET asserts that pitolisant's treatment of cataplexy is irrelevant because not all narcolepsy patients have cataplexy. Br. 27. But this too misses the point. Again, pitolisant's reduction in cataplexy is not independent of the treatment of EDS; rather both effects arise from the same act

16

of administering the same dose of pitolisant to treat EDS in narcolepsy patients, PFF 2, 243, and therefore may properly be considered. *See Amgen*, 2021 WL 5366800, *17, *29 (finding unexpected results on tolerability (which was not a claim limitation but arises from the act of administering compound) persuasive for claimed compound and methods of treating psoriasis). Yet even the post-2012 art that AET relies on observes that stimulants provide no therapeutic effect on cataplexy, DTX-217.1-2, and Dr. Kushida acknowledged that "too much stimulation may induce cataplexy," Tr. 835:14–22 (Kushida); PFF 241–242. That pitolisant treats both the cataplexy and EDS of narcolepsy thus demonstrates that the therapeutic effect of pitolisant on disordered sleep results not simply from a stimulant or "wake-promoting" action—as AET repeatedly asserts—but rather arises from more complex, and poorly understood, pharmacologic effects. PFF 238. Indeed, the WAKIX labeling warns that "[t]he mechanism of action of pitolisant in excessive daytime sleepiness (EDS) in patients 6 years and older with narcolepsy or cataplexy in adult patients with narcolepsy is unclear." PTX-141.12. AET's assertion that pitolisant's therapeutic effect on EDS in sleep disordered patients is just the predictable result of administering a wake-promoting agent is unfounded; pitolisant's unexpected benefits confirm the unpredictable and complex nature of both $H_3$ receptor pharmacology and the treatment of disordered sleep. *See*, *e.g.*, *Leo Pharm.*, 726 F.3d at 1358 (unexpected benefits "are a strong indication that the [challenged patent's] combination of known elements yields more than just predictable results").

## III.    AET FAILED TO PROVE CLAIM 13 INVALID OVER THE '430 PATENT

AET's ODP arguments fail for two independent reasons. *First*, AET's identified reference patent, the '430 Patent, is not a proper ODP reference; and *second*, Claim 13 is patentably distinct from either Claim 1 or Claim 3 of the '430 Patent.

### A.    The '430 Patent Is Not a Proper ODP Reference

AET fails to establish that the '430 Patent is a proper ODP reference. "Whether a patent

17

qualifies as an OTDP reference is a threshold issue." *Acadia Pharms. Inc. v. Aurobindo Pharma Ltd.*, 706 F. Supp. 3d 477, 487 (D. Del. 2023) (citing *Novartis AG v. Ezra Ventures LLC*, 909 F.3d 1367, 1375 n.4 (Fed. Cir. 2018)). AET erroneously assumes that it is sufficient to show (in addition to common inventors and ownership) that the '430 Patent expires before the '947 Patent. Br. 7. That is incorrect. As AET acknowledges, "ODP is a judicially created doctrine which prevents claiming obvious variants of subject matter claimed in another patent where 'granting both exclusive rights would effectively extend the life of patent protection.'" Br. 4. The reason for ODP is "to prevent unjustified timewise extension to the right to exclude" after the original period of monopoly expires. Br. 5 (quoting *Eli Lilly & Co. v. Barr Labs., Inc.*, 251 F.3d 955, 967 (Fed. Cir. 2001)). As the Federal Circuit made clear in *Allergan USA, Inc. v. MSN Labs. Private Ltd.*, 111 F.4th 1358 (Fed. Cir. 2024), invalidating a patent "simply because it expires later," without it being an unwarranted, timewise extension, would be "antithetical to the principles of ODP." *Id.* at 1369.

*Allergan* is instructive. There, the challenged patent was the first to claim the disputed subject matter, and it expired after the later reference patent only because it had PTA. But, because the challenged patent claimed the subject matter first, the longer term could not be said to be an unwarranted, timewise extension over the later-issued patent, "and therefore [was] not subject to ODP." *Id.* "Put otherwise, the fact that the [challenged] patent expires later **is of no consequence** here because it is not a second, later expiring patent for the same invention." *Id.* (cleaned up; emphasis added). In short, *Allergan* establishes that an earlier-expiring patent will not serve as an ODP reference patent without a showing that the challenged patent provides an unwarranted, timewise extension of the invention claimed. Without that showing, the fact that the challenged patent expires later "is of no consequence." *Id.*; *see also Merck Sharp & Dohme v. Teva Pharm.*, 217 F. Supp. 3d 782, 787–88 (D. Del. 2016) (rejecting ODP where reference patent expired earlier

18

due to "the oddity" of a terminal disclaimer required to revive an abandoned application: "This is not an instance of a patentee seeking to extend the patent term with 'sequential' applications.").

AET makes no effort to show that the '947 Patent constitutes an unwarranted, timewise extension of the '430 Patent's inventions. It cannot, because of the '197 Patent. The '430 Patent is a divisional of the '197 Patent: they share a common specification, and the '430 Patent claims fall within those of the '197 Patent.[3] PFF 163–167. The "original period of monopoly" thus runs until the '197 Patent's expiration—after the '947 Patent expires.[4] AET does not argue that the '947 Patent is invalid for ODP over the '197 Patent, PFF 162, nor could it. As a result, the '947 Patent does not constitute a timewise extension of the invention claimed in the '430 Patent because the '430 Patent's invention does not enter the public domain until the '197 Patent expires. PFF 168.

AET's ODP challenge is at odds with the principles set forth in 35 U.S.C. § 121. While AET argues that statute does not directly protect the '947 Patent, it concedes that the '430 Patent cannot serve as a reference patent against the claims of the later-expiring '197 Patent. Br. 10 (Section 121 protects "divisionals and applications within the same family"). That is because Section 121 prevents the earlier expiration of the divisional '430 Patent from allowing the invention to enter the public domain earlier than the expiration of the parent '197 Patent.

That the '947 Patent must be shielded from the '430 Patent (as the '947 Patent is shielded from the '197 Patent, because of the '197 Patent's later expiration) is fully consistent with the

---

[3] AET obscures this relationship by asserting that the '430 Patent claims methods of using "pitolisant." Br. 10. In fact, it claims methods of using the crystalline form of pitolisant hydrochloride claimed outright in the '197 Patent. PFF 167.

[4] The '947 Patent's effective life would be only 12 years, 6 months, and 21 days if it expired with the '430 Patent. PFF 161. This unjust result is not warranted by ODP doctrine and is contrary to Congressional intent: in 1999, Congress created a patent term adjustment scheme to provide something close to the historical 17-year term. Pub. L. No. 106-113, § 4402, 113 Stat. 1501, 1501A-557 (1999); 145 CONG. REC. H6944 (daily ed. Aug. 3, 1999) (Rep. Rohrbacher statement).

purpose of Section 121. As the Federal Circuit has observed, "when the existence of multiple patents is due to the administrative requirements imposed by the Patent and Trademark Office, 35 U.S.C. § 121 provides that the inventor shall not be prejudiced by having complied with those requirements." *Applied Materials, Inc. v. Advanced Semiconductor Materials Am., Inc.*, 98 F.3d 1563, 1568 (Fed. Cir. 1996). The inventors here originally filed both their composition and method claims in the application leading to the '197 Patent and were forced to divide those claims by the examiner's unappealable restriction requirement. PFF 163–165. That is, but for the restriction requirement, the '430 Patent claims would have issued with the '197 Patent and expired after the '947 Patent. PFF 166. The inventors should not be prejudiced by the restriction requirement, yet AET seeks to do exactly that by asserting the '430 Patent as an ODP reference patent.

Moreover, even if AET was correct that it does not matter that the '430 Patent exists solely as a result of unappealable action by the examiner, it would still not be a proper reference because it was filed after the application for the '947 Patent. *See, e.g.*, *In re Cellect*, 81 F.4th 1216, 1230 (Fed. Cir. 2023) ("[T]he challenged patents are entitled to their full term, including the duly granted PTA, unless they are found to be later-filed obvious variations of earlier-filed, commonly owned claims."); *Acadia*, 706 F. Supp. 3d at 488 ("[P]utative OTDP references must be earlier-filed to be available as a reference."); PFF 157–158, 160.

Thus, AET cannot meet its threshold obligation to show that the '430 Patent is a proper reference patent against the '947 Patent for ODP purposes.

### B.    AET Failed to Prove Claim 13 Obvious Over Any Claim of the '430 Patent

Even were the '430 Patent a proper reference patent, AET's ODP challenge still fails. As with obviousness, AET here too must prove that Claim 13 is obvious over either Claim 1 or Claim 3 of the '430 Patent. *See, e.g.*, *Eli Lilly & Co. v. Teva Parenteral Meds., Inc.*, 845 F.3d 1357, 1375

20

(Fed. Cir. 2017). AET has failed to meet its burden with regard to either claim.[5]

### 1.    AET Failed to Prove Claim 13 Obvious over '430 Patent Claim 1

Claim 1 is directed to a "method of treatment of sleep apnea," by administering crystalline pitolisant. DTX-375.14. Sleep apnea is a disorder involving collapse of the upper airways during sleep and consequent difficulty breathing. PFF 173. As of 2005, treatment of sleep apnea involved minimizing airway collapse through positive air pressure (via nightly use of CPAP machines), weight loss, or improvement in muscle tone. PFF 178, 181–182, 186.

AET's ODP argument is predicated upon rewriting Claim 1. AET argues that, because "there were no FDA approved pharmacologic treatments for the disordered breathing underlying sleep apnea . . . [a] POSA would therefore understand that . . . Claim 1 was not directed to correcting airway obstructions, but rather to alleviating EDS." Br. 11. However, Claim 1 by its plain terms is directed to treating sleep apnea, not to treating EDS in sleep apnea patients. A simple comparison of Claim 1 to Claim 13 makes clear the claims are differently directed.[6] PFF 169.

To be sure, an ODP analysis can begin with claim construction. *See, e.g.*, *Eli Lilly & Co. v. Teva Parenteral Meds. Inc.*, 689 F.3d 1368, 1378–79 (Fed. Cir. 2012). However, AET did not seek construction of Claim 1 during the claim construction phase of the case, and it is too late to do so

---

[5] Claims 1 and 3 cannot be used together for ODP. In ODP, one compares the challenged claim to one claim: "[D]ouble patenting is based entirely on what is claimed, reading each claim as an entirety to determine what invention it defines." *Gen. Foods v. Studiengesellschaft Kohle mbH*, 972 F.2d 1272, 1281 (Fed. Cir. 1992); *see also Exelixis, Inc. v. MSN Labs.*, 2024 WL 4491176, at *3 (D. Del. Oct. 15, 2024) ("[T]he court determines whether the differences in subject matter between the two claims render the claims patentably distinct."); *Magna Elecs., Inc. v. TRW Auto. Holdings Corp.*, 2016 WL 4239187, at *8 (W.D. Mich. Jan. 8, 2016) (ODP may not be based on two claims from different reference patents).

[6] Though AET suggests that EDS occurs in almost 90% of sleep apnea patients, DFF 128, the study it cites (Seneviratne) assessed EDS in sleep apnea patients in Singapore and expressly observes that the incidence of EDS among sleep apnea patients in U.S. studies is "very much lower." DTX-131.4; PFF 177; *see also* PFF 174–175. Whatever the correct incidence, however, EDS is not itself sleep apnea but rather a symptom, resulting from pathologically disordered sleep due to prolonged sleep apnea. PFF 176.

now. *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 904 F.3d 965, 974 (Fed. Cir. 2018) ("It is well-settled that a party cannot reserve a new claim-construction argument for the post-trial motion stage of litigation."). Instead, Claim 1 should be given its plain meaning, which is treatment of sleep apnea, not treatment of EDS in sleep apnea patients.

In any event, AET's purported claim construction is meritless. The '430 Patent expressly defines "treatment" to mean treatment of the disease or pathologic condition, not alleviation of the symptoms of the disease. PFF 171.[7] AET ignores the actual words of the claim and instead improperly relies upon its expert's conclusory testimony, untethered to the intrinsic evidence. PFF 187. Indeed, the impropriety of AET's approach is manifested by its reliance on Example 2 of the '947 Patent to "confirm" its proposed construction of '430 Patent, Claim 1. Br. 11. The '947 Patent is not prior art, and its use to construe the reference patent is precisely the type of ad hoc, litigation-driven claim construction condemned by the Federal Circuit. *See Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1578 (Fed. Cir. 1995) ("A patentee may not proffer an interpretation for the purposes of litigation that would alter the indisputable public record consisting of the claims, the specification and the prosecution history[.]"). Indeed, Dr. Kushida admitted on cross-examination that he only looked to '947 Patent, Example 2 to understand Claim 1 because AET's attorneys instructed him to do so. PFF 172. If anything, the different wording of reference Claim 1 compared to challenged Claim 13 (treatment of sleep apnea versus treatment of EDS in sleep apnea patients) confirms the ***difference*** between the claims, belying their purported sameness.

Moreover, AET is wrong that the purported novelty in 2005 of a pharmacologic treatment for sleep apnea is a reason to rewrite the claim. No principle of claim construction supports redrafting a claim because the plain meaning would constitute a novel use—patent claims are

---

[7] Of note, the '947 Patent defines "treatment" to encompass alleviation of symptoms. PFF 17.

supposed to be novel. Nor would a pharmacologic treatment for sleep apnea seem impossible to a POSA in 2005. To the contrary, he or she would know that obesity and sleep apnea were connected, PFF 181, and the prior art described treatment of obesity as a potential $H_3$ antagonist use. PFF 72, 182. Claim 1 is thus readily understood on its plain terms, not as AET would redraft them.

AET is thus wrong in asserting that '430 Patent, Claim 1 and '947 Patent, Claim 13 "cover the same method." Br. 11. And AET makes no argument that use of pitolisant to treat sleep apnea itself renders obvious its administration to treat EDS in sleep apnea patients. AET does not point to *any* evidence, let alone clear and convincing evidence, that a POSA would be motivated to modify a treatment for sleep apnea to treat EDS in the patients as well, or that a POSA would reasonably expect success in doing so. Its own expert conceded he offered no testimony on the validity of Claim 13 were Claim 1 construed to cover treatment of sleep apnea through weight loss, and he admitted that such a construction would change his views. PFF 183–184.

AET's sole attempt to remedy this deficiency is the assertion that EDS, as a symptom of sleep apnea, "would invariably be treated when carrying out '430 claim 1." Br. 12. But its citations for this point are to the '947 Patent and testimony that EDS is a "primary symptom" of sleep apnea. *See* DFF 15, 54. AET cites no evidence that using pitolisant to treat sleep apnea would invariably treat EDS in sleep apnea patients as well. PFF 174–175. A POSA would know that weight loss did not work well to treat sleep apnea. PFF 185. In Dr. Kushida's words, "the treatments for obesity for sleep apnea just don't work." Tr. 556:22 (Kushida); PFF 185.[8] A POSA would not expect a treatment for sleep apnea to treat EDS in sleep apnea patients. PFF 191.

Moreover, AET simply ignores the differences between treating sleep apnea and treating

---

[8] Indeed, Bioprojet's clinical trials confirmed that pitolisant's treatment of EDS in sleep apnea was unrelated to obesity. PFF 27–28. The trial record is devoid of evidence that weight loss alleviates disordered sleep resulting from sleep apnea.

EDS in sleep apnea. CPAP, for example, is administered at night, PFF 178; pitolisant is administered during waking hours, PFF 4. Nor is there any evidence that the dose would be the same: the parties agree that "it is not appropriate to infer the safe and effective dose of a drug for one indication based on the safe and effective dose of that drug for a different indication," DFF 271, and Bioprojet's HARPS trials confirm that lower doses of pitolisant are not effective to treat EDS in at least some sleep disordered patients, PFF 257; Br. 30.

In short, AET has failed to adduce clear and convincing evidence either that treating EDS in sleep apnea patients invariably results from carrying out '430 Patent, Claim 1 or that a POSA would be motivated to modify Claim 1 to use pitolisant to treat EDS in sleep apnea patients and reasonably expect success. PFF 189–190. Indeed, AET acknowledges in its attempt to redraft Claim 1 that pharmacologic treatment for sleep apnea was unknown to a POSA, *see* PFF 179, DFF 132; that concession confirms that a POSA would lack any basis to expect such an unfamiliar treatment to treat EDS in a sleep apnea patient. AET has thus failed to meet its burden to show Claim 13 is invalid for ODP. PFF 201.

### 2.    AET Failed to Prove Claim 13 Obvious over '430 Patent Claim 3

Claim 3 is directed to a "method for the treatment of diurnal somnolence" by administering crystalline pitolisant. DTX-327.14. For this argument, AET asserts that treating diurnal somnolence necessarily encompasses the treatment of EDS in patients with narcolepsy, sleep apnea, or PD. Br. 12–13. AET does not undertake a claim construction analysis of "diurnal somnolence," but rather argues this is so merely because EDS involves daytime sleepiness, albeit (in AET's words) "more pronounced" than ordinary daytime sleepiness. *Id.* In making this argument, AET ignores that the EDS in Claim 13 occurs in patients with narcolepsy, sleep apnea, or PD (i.e., pathological conditions, PFF 44, 50, 192), and thus, in Dr. Kushida's admission, involves "abnormal daytime sleepiness." PFF 55. But abnormal daytime sleepiness (EDS) is

24

different from ordinary daytime sleepiness. PFF 45–49. Indeed, in the prior art, daytime sleepiness associated with pathologic conditions is referred to as "somnolence syndrome," whereas "diurnal somnolence" refers to tiredness resulting from "sleep deprivation as a result of nocturnal jobs, overwork or jet-lag." DTX-88.4; PFF 50. AET does not point to clear and convincing evidence that a POSA would understand '430 Patent, Claim 3 to encompass using crystalline pitolisant to treat EDS in narcolepsy, sleep apnea, or PD. The fact that Claim 3 does not contain any reference to narcolepsy, sleep apnea, or PD, or, indeed, sleep disordered patients at all undermines such an assertion that a method of treating diurnal somnolence encompasses a method of treating EDS in sleep disordered patients.[9] *See Pharmacyclics LLC v. Alvogen Pine Brook LLC*, 556 F. Supp. 3d 377, 403 n.8 (D. Del. 2022) (rejecting assertion that disclosure of treating MCL in reference claim would be understood by a POSA to teach treating relapsed or refractory MCL), *aff'd* 2022 WL 16943006 (Fed. Cir. Nov. 15, 2022).

In any event, even if Claim 3 covers EDS in sleep disordered patients, it does so in a vast continuum that also covers "simple drowsiness resulting from a bad night's sleep." Tr. 540:15–17 (Kushida); PFF 193–195. Diurnal somnolence is something "everyone in the world experiences." Tr. 460:6–7 (Kushida); PFF 46, 192. By contrast, EDS in sleep disordered patients is a "pathological sleepiness that interferes with daytime functioning, characterized by repeated inappropriate lapses into sleep or irresistible sleep attacks during the waking state." Tr. 541:11–18 (Kushida); PFF 20, 42. The daytime sleepiness associated with EDS in narcolepsy, sleep apnea, or PD is "more intense," "harder to resist," and "harder to reverse." Tr. 705:16–22 (Roth); PFF 49.

---

[9] Not only is AET too late to seek construction, *see Power Integrations*, 904 F.3d at 974, the intrinsic evidence contradicts AET's proposed construction. The '430 Patent specification describes the treatment of "sleep disorders" separately from treatment of "diurnal somnolence." DTX-375.5 at 3:12-13. The one relevant study in the '430 Patent is a study of "awakening and vigilance" in healthy volunteers; there is no trial in sleep disordered patients. DTX-375.13-14.

At best for AET, EDS in sleep disordered patients is a distinct, narrow sliver of the vast continuum of diurnal somnolence experienced by "everyone in the world." PFF 192. That Claim 3 may broadly cover what is claimed in Claim 13 does not show obviousness. *See Regeneron Pharms., Inc. v. Mylan Pharms. Inc.*, 127 F.4th 896, 913 (Fed. Cir. 2025) ("We have made clear that 'domination'—where one patent with a broader claim reads on an invention defined by another patent's narrower claim, as a genus does a species, it 'dominates' the latter patent—by itself does not give rise to double patenting."). To the contrary, obviousness requires "the focused factual analysis of motivation and reasonable expectation of success." *Id.* at 912; *see also OSI*, 939 F.3d at 1383–84 (error to find treatment of NSCLC obvious from prior art suggestion of generic anticancer activity and reversing based on lack of reasonable expectation of success).[10]

AET argues that pitolisant "would have been an obvious choice," Br. 14, but this is a rephrasing of "obvious-to-try" that fails, absent a showing of reasonable expectation of success. AET makes no effort in its ODP argument to demonstrate a reasonable expectation of success. Indeed, as discussed above and below, a POSA would not have a reasonable expectation of success in treating the pathologic sleepiness of EDS in narcolepsy, sleep apnea, or PD patients.

A POSA would know that a drug that promotes wakefulness in healthy people will not necessarily treat EDS in sleep disordered patients, PFF 146, and Brooks cautions that the then-known treatments for EDS were dopaminergics, PFF 94, and that "other alerting agents" were "of limited usefulness due to poor tolerability and/or lack efficacy." PFF 60. Ligneau 1998 indicates that improved wakefulness in healthy animals may be a vigilance effect, suggesting utility for

---

[10] AET cannot assert a presumption of obviousness based on overlap—that presumption applies only to overlapping ranges, and, even then, only where the prior art range does not encompass a large range. *Genetics Inst., LLC v. Novartis Vaccines & Diagnostics, Inc.*, 655 F.3d 1291, 1306–07 (Fed. Cir. 2011); *Allergan Inc. v. Sandoz Inc.*, 796 F.3d 1293, 1304–05 (Fed. Cir. 2015).

attentional rather than sleep disorders. PFF 89. A POSA in 2005 would also know of drugs (for example, modafinil) that treat ordinary daytime sleepiness but do not treat EDS in PD. PFF 61. A POSA could not reasonably expect that a treatment of diurnal somnolence would treat the "pathologic sleepiness" of EDS in sleep disordered patients—a sleepiness that was more intense, harder to resist, and harder to reverse. PFF 145.

In addition, a POSA would be aware that some drugs can enhance wakefulness by improving vigilance—a wake-promoting action that is directed at cognition, not disordered sleep. PFF 144. Here, as Dr. Kushida admitted, WO '254, which disclosed pitolisant, expressly linked the wake-promoting effects of $H_3$ antagonists to treatment of cognitive, rather than sleep, disorders. PFF 91. The prior art here is devoid of any report of pitolisant in either an animal model of disordered sleep or sleep disordered patients. PFF 112–113. Thus, as above regarding AET's obviousness challenge, the trial record here is even weaker than that found insufficient by the Federal Circuit in *OSI* and *Sanofi*. *See OSI*, 939 F.3d at 1384; *Sanofi*, 875 F.3d at 646.

What is more, here too AET ignores the differences between the treatment of diurnal somnolence in Claim 3 and the treatment of EDS in sleep disordered patients in Claim 13. AET asserts that "[p]hysicians treat daytime sleepiness the same way regardless of score—by administering wake-promoting agents." Br. 12. This ignores that Claim 13 is directed to treating EDS in narcolepsy, sleep apnea, and PD patients. There is no evidence—let alone clear and convincing evidence—that a POSA would believe that EDS in sleep disordered patients would be treated the same way as mild drowsiness in a healthy human with temporary sleep loss. To the contrary, the prior art warned that, in patients with disordered sleep, "[w]hatever their level of daytime sleepiness, it can be taken to be abnormal." DTX-175.4; PFF 48. A POSA would not expect to treat the abnormal daytime sleepiness of EDS in narcolepsy, sleep apnea, or PD patients

27

the same as drowsiness experienced by healthy humans. PFF 196, 199–201.

The trial record also establishes that the treatment of daytime sleepiness depends upon the patient's condition—which AET acknowledges. *See* DFF 271 ("[I]t is not appropriate to infer the safe and effective dose of a drug for one indication base on the safe and effective dose of that drug for another indication."); DFF 272 ("The dose of the medication needed to treat EDS in different conditions must be tested in double-blind, placebo-controlled, clinical trials."). Thus, far from treating "daytime sleepiness" the same way for everyone, a POSA would have to independently determine how to treat each different type of patient. PFF 59.

This need for independent analysis is fatal to AET's ODP argument. Its own expert conceded that a POSA would not be able "to determine the dose that would be used in humans" to treat EDS in sleep apnea, narcolepsy, or PD patients, and he could not say what a POSA would do to find such a dose. Tr. 581:6–20 (Kushida); PFF 151. The '430 Patent, Claim 3 does not teach the safe and effective dose to treat EDS in narcolepsy, sleep apnea, or PD patients, which AET concedes is required to carry out the method of Claim 13. Indeed, as AET emphasizes in connection with its enablement challenge, a clinical study with the (sub-therapeutic) 20 mg/day dose of pitolisant made the drug look worse than placebo in treating EDS in PD patients, DFF 269, demonstrating one of the challenges to using pitolisant to treat EDS in sleep disordered patients (the difficulty in finding an effective dose). Thus, even were a POSA motivated to try pitolisant in a sleep disordered patient, neither the prior art nor Claim 3 provide a POSA with a basis to reasonably expect success in doing so, because there is nothing that provides a POSA with a way to determine the safe and effective dose to treat EDS in sleep disordered patients. *See Pharmacyclics*, 556 F. Supp. 3d at 408 (rejecting ODP where the dosing of the challenged claim was neither taught by the prior art nor part of the reference patent claim); *see also Janssen*, 141

28

F.4th at 1383 (affirming lack of obviousness where POSA would not reasonably expect success with dosing regimen of claimed method of treating).

### C. Objective Indicia Confirm the Lack of ODP

Consideration of objective indicia of non-obviousness is a required part of an ODP analysis. *Eli Lilly*, 689 F.3d at 1381. Here the strong objective indicia evidence is equally relevant to refuting AET's ODP argument. *See supra* § II.C; PFF 202, 207. With respect to failure of others, as Dr. Kushida conceded, after learning of pitolisant's success in treating EDS in sleep disordered patients, others attempted to follow in Bioprojet's footsteps by developing an $H_3$ antagonist/inverse agonist for treating sleep disorders. Tr. 832:14–833:6. None succeeded. PFF 209–210. These failures, occurring well after publication of the '430 Patent (and its original application), confirm "just how radically different" the claimed method is. *Cyclobenzaprine*, 2010 WL 3766530, at *2.

Unexpected results are also applicable here. *See WBIP LLC v. Kohler Co.*, 829 F.3d 1317, 1330–31 (Fed. Cir. 2016) ("[I]t is the claimed combination as a whole that serves as a nexus for the objective evidence; proof of nexus is not limited to only when objective evidence is tied to the supposedly 'new' feature(s)."). AET makes no argument that Claims 1 or 3 of the '430 Patent render expected pitolisant's treatment of cataplexy alongside EDS. Indeed, AET's ODP argument depends entirely on its characterization of pitolisant as "wake promoting," Br. 14, and there is no evidence that such agents would be expected to alleviate cataplexy. PFF 239–240. Pitolisant's dual action shows that its therapeutic effect is not through "wake promotion," as AET asserts, but rather through complex, poorly understood mechanisms of action (as WAKIX's labeling indicates). PFF 238. Combined with the failure of all other $H_3$ antagonists/inverse agonists to achieve FDA approval for any indication, let alone for EDS in any patient population, the objective indicia here show that AET is wrong that treatment of EDS in narcolepsy, sleep apnea, or PD is simply a matter of administering a wake promoting agent. Claim 13 of the '947 Patent instead reflects a radical

29

departure from the claims of the '430 Patent. PFF 244. AET's ODP attack does not amount to clear and convincing evidence of obviousness.

## IV.    AET HAS FAILED TO PROVE THAT CLAIM 13 IS NOT ENABLED

A patent claim is presumed enabling, and AET must prove by clear and convincing evidence that Claim 13 is not enabled. *Allergan*, 796 F.3d at 1309. AET devotes a single page to its challenge, which is entirely based on the post-priority HARPS trials failing to show "statistically significant improvement in EDS in patients with Parkinson's disease compared to placebo." Br. 30; PFF 256. As AET concedes, however, the doses of pitolisant tested in HARPS were 20 mg/day and below. DFF 258. By contrast, the pitolisant dose taught in the '947 Patent for treating EDS in sleep disordered patients is 40 mg/day. PFF 252–255. The approved dose of pitolisant is 40 mg/day. PFF 259.

AET adduced no evidence that a 40 mg/day dose is not safe and effective to treat EDS in PD patients. By contrast, the '947 Patent sets forth considerable evidence about the safety and effectiveness of the 40 mg/day dose. PFF 246–255. Example 1 shows that pitolisant, when tested in a "very reliable model" of PD, was able to both "treat the excessive daytime sleepiness which is so detrimental in the everyday life of PD patients" and to "reestablish a normal sleep architecture." JTX-2.24 at 43:41–45; PFF 246–248. Examples 2 and 5 report clinical trials showing that 40 mg/day of pitolisant was able to treat EDS in patients with sleep apnea and narcolepsy. PFF 253–255. And Example 4 reports a clinical study in PD patients, showing that 40 mg/day was safe and well-tolerated in those patients. PFF 249–251. These disclosures would enable a POSA to carry out the claimed invention by administering 40 mg/day of pitolisant as a safe and effective dose to treat EDS in PD patients. PFF 255, 258. The '947 Patent's teachings are presumed enabling, and AET has failed to adduce clear and convincing evidence to the contrary. PFF 245.

OF COUNSEL:

Christopher N. Sipes
Megan P. Keane
Brianne (Bharkhda) Sullivan
Sarahi Uribe
Cody J. Reeves
Nicole S.L. Pobre
Elaine H. Nguyen
John Y. Veiszlemlein
Mishael H. Hibshoosh
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001-4956
(202) 662-6000

Alexa Hansen
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Ste. 5400
San Francisco, CA 94105
(415) 591-6000

Yiye Fu
COVINGTON & BURLING LLP
3000 El Camino Real
5 Palo Alto Square, 10th Floor
Palo Alto, CA 94306
(650) 632-4700

May 7, 2026

MORRIS NICHOLS ARSHT & TUNNELL LLP

/s/ *Jeremy A. Tigan*

Jeremy A. Tigan (#5239)
Megan E. Dellinger (#5739)
Anthony D. Raucci (#5948)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jtigan@morrisnichols.com
mdellinger@morrisnichols.com
araucci@morrisnichols.com

*Attorneys for Harmony Biosciences, LLC,
Harmony Biosciences Management,
Inc., Bioprojet Société Civile de Recherche,
and Bioprojet Pharma SAS*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 7, 2026, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on May 7, 2026, upon the following in the manner indicated:

Dominick T. Gattuso, Esquire                                    *VIA ELECTRONIC MAIL*
Catherine E. Lynch, Esquire
HEYMAN ENERIO GATTUSO & HIRZEL LLP
222 Delaware Avenue, Suite 900
Wilmington, DE  19801
*Attorneys for Defendant AET Pharma US, Inc.*

Scott J. Bornstein, Esquire                                     *VIA ELECTRONIC MAIL*
Jonathan Ball, Ph.D.
Julie P. Bookbinder, Esquire
Elana B. Araj, Esquire
Giancarlo Scaccia, Esquire
Anne Rock, Esquire
Ariadna Muniz, Esquire
Emma Cohen, Esquire
GREENBERG TRAURIG, LLP
One Vanderbilt Avenue
New York, NY 10017
*Attorneys for Defendant AET Pharma US, Inc.*


                                                    */s/ Jeremy A. Tigan*

                                                    Jeremy A. Tigan (#5239)