**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| HARMONY BIOSCIENCES, LLC, HARMONY BIOSCIENCES MANAGEMENT, INC., BIOPROJET SOCIÉTÉ CIVILE DE RECHERCHE and BIOPROJET PHARMA SAS,<br><br>              Plaintiffs,<br><br>v.<br><br>LUPIN LIMITED, et al.,<br><br>              Defendants. | C.A. No. 23-1286 (JLH)<br>**CONSOLIDATED** |

**PLAINTIFFS' REPLY POST-TRIAL BRIEF
REGARDING AET'S INFRINGEMENT**

OF COUNSEL:

Christopher N. Sipes
Megan P. Keane
Brianne (Bharkhda) Sullivan
Sarahi Uribe
Cody J. Reeves
Nicole S.L. Pobre
Elaine Nguyen
John Y. Veiszlemlein
Mishael H. Hibshoosh
Covington & Burling LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001-4956
(202) 662-6000

Alexa Hansen
Covington & Burling LLP
Salesforce Tower
415 Mission Street, Ste. 5400
San Francisco, CA 94105
(415) 591-6000

Yiye Fu
Covington & Burling LLP
3000 El Camino Real
5 Palo Alto Square, 10th Floor
Palo Alto, CA 94306
(650) 632-4700

Jeremy A. Tigan (#5239)
Megan E. Dellinger (#5739)
Anthony D. Raucci (#5948)
Morris, Nichols, Arsht & Tunnell LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jtigan@morrisnichols.com
mdellinger@morrisnichols.com
araucci@morrisnichols.com

*Attorneys for Harmony Biosciences, LLC,
Harmony Biosciences Management,
Inc., Bioprojet Société Civile de Recherche,
and Bioprojet Pharma SAS*

**TABLE OF CONTENTS**

I.  AET Is Wrong that Plaintiffs' Testing Must Itself Detect All Four XRPD Peaks .............. 2

II.  AET Failed to Refute that the Claimed Form Is in the ANDA Products ........................... 4

    A.  AET's Attempt to Dismiss its Own XRPD Testing Is Meritless............................ 4

    B.  AET's Validation Batch Is Highly Relevant to Infringement ................................. 6

    C.  AET's Cannot Dismiss the Import of its Accelerated Stability Testing.................. 6

    D.  AET's Additional XRPD Testing Fails to Show the Claimed Form Is Absent ........................................................................................................... 8

III.  AET Is Not Entitled to an Inference that Plaintiffs' Testing Failed .................................. 9

IV.  Infringement Results from AET's Manufacturing Process ............................................... 10

V.  AET Effectively Concedes that if Crystalline Pitolisant Hydrochloride Is Present in Its ANDA Product, It Is the Claimed Crystalline Form ............................................... 11

VI.  AET's Criticisms of Plaintiffs' ssNMR Testing Lack Merit ........................................... 13

VII.  *Sunovion* Applies Here Because AET's ANDA Requires Use of the Claimed Form and Permits It to Remain in the Final ANDA Products ..................................................... 14

VIII.  Conclusion ...................................................................................................................... 15

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Adams v. Aqua 388 Cmty. Ass'n*,
  C.A. No. 23-02498, 2024 WL 3402836 (E.D. Cal. July 12, 2024) ........................................10

*Exelixis, Inc. v. MSN Labs. Pvt. Ltd.*,
  C.A. No. 19-2017, 2023 WL 315614 (D. Del. Jan. 19, 2023) ..................................................7

*Horizon Medicines LLC v. Alkem Labs. Ltd.*,
  503 F. Supp. 3d 118 (D. Del. 2020) ........................................................................................5

*Lundbeck v. Lupin Ltd.*,
  C.A. No. 18-88, 2021 WL 4944963 (D. Del. Sept. 30, 2021) ......................................3, 5, 7, 9

*Malletier v. Dooney & Bourke, Inc.*,
  525 F. Supp. 2d 558 (S.D.N.Y. 2007) ......................................................................................8

*Martek Biosciences Corp. v. Nutrinova, Inc.*,
  579 F.3d 1363 (Fed. Cir. 2009) ...............................................................................................3

*Merck Sharp & Dohme LLC v. Mylan Pharms. Inc.*,
  C.A. No. 19-101, 2022 WL 22855168 (N.D.W. Va. Oct. 26, 2022) ......................................15

*Munoz v. PHH Mortgage Corp.*,
  C.A. No. 08-00759, 2025 WL 360758 (E.D. Cal. Jan. 31, 2025) ...........................................10

*Novartis Pharms. Corp. v. Mylan Pharms. Inc.*,
  C.A. No. 19-201, 2024 WL 384929 (N.D.W. Va. Jan. 31, 2024) ......................................5, 11

*Par Pharm., Inc. v. Hospira, Inc.*,
  835 F. App'x 578 (Fed. Cir. 2020) ........................................................................................15

*SmithKline Beecham Corp. v. Apotex Corp.*,
  403 F.3d 1331 (Fed. Cir. 2005) ...............................................................................................3

*TorPharm, Inc. v. Ranbaxy Pharms., Inc.*,
  336 F.3d 1322 (Fed. Cir. 2003) ...............................................................................................3

*Takeda Pharm. Co.v. Handa Pharms., LLC*,
  C.A. No. 11-840, 2013 WL 9853725 (N.D. Cal. Oct. 17, 2013) ...........................................12

*United States v. Moon*,
  512 F.3d 359 (7th Cir. 2008) ...................................................................................................8

Case 1:23-cv-01286-JLH-SRF    Document 561    Filed 05/21/26    Page 4 of 23 PageID #: 24091

*Vectura Ltd. v. GlaxoSmithKline LLC*,
   981 F.3d 1030 (Fed. Cir. 2020)..............................................................................................5

**Statutes**

35 U.S.C. § 271(a) ...............................................................................................................15

35 U.S.C. § 271(e)(2)(A) ......................................................................................................15

iv

**TABLE OF ABBREVIATIONS**

| Abbreviation | Word or Phrase |
|---|---|
| AET | AET Pharma US, Inc. |
| AET Br. | AET's Rebuttal Post-trial Brief Regarding Non-infringement of U.S. Patent No. 8,207,197 (D.I. 560) |
| AET's ANDA Products | 4.45 mg and 17.8 mg pitolisant hydrochloride tablets submitted for FDA approval in Abbreviated New Drug Application No. 218892 |
| ANDA | Abbreviated New Drug Application |
| API | active pharmaceutical ingredient |
| ASD | amorphous solid dispersion |
| Bhogala | Bhogala Biosciences Private Limited |
| DDX | Defendant's demonstrative exhibit |
| DFF | Defendant's Proposed Findings of Fact |
| DTX | Defendant's trial exhibit |
| FDA | United States Food and Drug Administration |
| Gozzo | Dr. Fabia Gozzo |
| Harmony | Harmony Biosciences Management, Inc. and Harmony Biosciences, LLC |
| Hodgkinson | Dr. Paul Hodgkinson |
| ICH | International Council for Harmonisation |
| LOD | limit of detection |
| msec | milliseconds |
| Myerson | Dr. Allan Myerson |
| PDX | Plaintiffs' demonstrative exhibit |
| PFF | Plaintiffs' Proposed Findings of Fact |

v

| Abbreviation | Word or Phrase |
|---|---|
| Pls. Br. | Plaintiffs' Opening Post-Trial Brief Regarding AET's Infringement (D.I. 551) |
| POSA | person of ordinary skill in the art |
| PTX | Plaintiffs' trial exhibit |
| RH | relative humidity |
| SD | solid dispersion |
| ssNMR | solid-state nuclear magnetic resonance |
| Steed | Dr. Jonathan Steed |
| the '197 Patent | U.S. Patent No. 8,207,197 |
| Tr. | trial transcript |
| Wenslow | Dr. Robert Wenslow |
| XRPD | x-ray powder diffraction |

AET does not dispute that it begins the manufacture of its ANDA Products with pitolisant hydrochloride in the claimed crystalline form—i.e., material exhibiting all four claim 1 XRPD peaks. Nor does AET dispute that it developed a sensitive testing method ("Method 2") specifically to detect whether any of that form remains in its finished product. That testing, as well as less sensitive in-house testing, performed on both exhibit and validation batches held under accelerated stability conditions, shows that the crystalline form persists and grows over time in AET's tablets.

AET denigrates even its own testing as lacking all four peaks, but it admits that testing is designed to find the crystalline form used to make its product and which AET's ANDA confirms has all four peaks. DFF 53, 55. While AET's detection of the telltale 11.2° peak in sample after sample is damning, AET also detected multiple additional characteristic XRPD peaks of the claimed form, confirming its continued presence in AET's product. Plaintiffs do not rely on ssNMR as a substitute for XRPD. Rather, such testing further confirms the results of AET's in-house XRPD testing. In contrast, AET's litigation testing merits little to no consideration in the infringement analysis because it lacks not only sensitivity but fundamental indicia of reliability.

Faced with the evidence that AET failed to make a fully amorphous formulation, AET attempts to distort the law and recast the claim construction, arguing that infringement requires simultaneous observation of all four peaks in any given test. The claim imposes no such requirement. It is directed to a crystalline form, not a testing methodology. As AET admits, claim 1 requires Plaintiffs to show "*the presence* of the crystalline form of claim 1 in AET's ANDA Products." AET Br. at 29. Plaintiffs have shown that it is more likely than not that at least some of AET's ANDA Products will contain some quantity of the claimed form upon manufacture or during their shelf life. Furthermore, it is undisputed that AET's ANDA (1) requires the use of the claimed form with all four recited peaks and (2) permits it to remain present in the finished product,

1

which likewise establishes infringement. AET never represented to FDA that its ANDA Products are 100% amorphous; nor could it based on the data it has acquired.

## I.  AET Is Wrong that Plaintiffs' Testing Must Itself Detect All Four XRPD Peaks

AET is wrong that the agreed-upon construction of claim 1 "forecloses Plaintiffs' argument that infringement can be shown with anything less than all four recited peaks." AET Br. at 1. The construction simply confirms that the peaks identified in claim 1 "together uniquely identify the crystalline form of pitolisant hydrochloride." PFF 11. Claim 1 is directed to a particular crystalline form of pitolisant hydrochloride—not to any method of detecting that form. PFF 9, 16. The construction does not require infringement testing to visually display all four peaks—it merely specifies that the composition of matter claimed has the listed XRPD peaks. Plaintiffs embrace that construction. A different crystalline form of pitolisant—one which has different characteristic XRPD peaks—would not be within the scope of the claim. AET incorrectly conflates the *identity* of a crystalline form with the *detectability* of its features. The claim requires a crystalline form "having" specified peaks—not that every peak must be experimentally observed in every sample.

The science of crystalline forms and XRPD that would inform a POSA's understanding is not in dispute. The X-ray diffraction peaks generated by a particular crystalline form are a function of the unique crystal structure itself. PFF 47–50; DFF 24; Tr. 353:24‑354:20, 356:4–17 (Steed). AET does not contest that characteristic XRPD peaks are inherent to a given crystalline form, meaning the form always has the same set of characteristic XRPD peaks. Tr. 353:24‑354:20, 406:2‑4 (Steed). Accordingly, once the presence of the claimed form is determined, *infra* Sections II.A.–II.D., it necessarily follows that the form will "hav[e]" an XRPD diffractogram comprising the four claimed peaks, even where some fall below the limit of detection. PFF 9.

AET's construction would improperly convert Plaintiffs' composition of matter claim into

a method of detection claim. But, nothing in the claim language, agreed construction, or prosecution history supports importing such a limitation. As the prosecution history confirms, the XRPD peaks were added not to impose a detection requirement, but to define with specificity which crystalline form was being claimed in response to the Examiner's indefiniteness rejection. PFF 12–16. Evidence showing that that claimed crystalline form is present is relevant to infringement, regardless of the technique used. *Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1372 (Fed. Cir. 2009) ("A patentee may prove infringement by any method of analysis that is probative of the fact of infringement, and circumstantial evidence may be sufficient.") (internal citations and quotation marks omitted). Nothing in the prosecution history suggests that all four recited peaks must be observable in XRPD testing performed on a single sample.

As explained in Plaintiffs' opening brief, claim 1 contains no limitation on amount or crystal size. Pls. Br. at 26. AET does not dispute this. Indeed, it makes no arguments and cites no evidence to the contrary. Nonetheless, it asks the Court to read claim 1 so as to implicitly include such limitations. This would be error. *See, e.g.*, *SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331 (Fed. Cir. 2005).

*Lundbeck* does not support AET's reading of the claims. That case involved materially different claim language requiring that a form be "characterized by" certain peaks "as shown in" specific diffractogram Figures—and different infringement evidence. *See Lundbeck v. Lupin Ltd.*, C.A. No. 18-88, 2021 WL 4944963, at *10–11 (D. Del. Sept. 30, 2021). The claim here is fundamentally different; it is directed to the crystalline form created by the inventors, which "ha[s] an X-ray diffractogram that comprises" peaks at 11.2°, 19.9°, 20.7°, and 34.1° 2θ. PFF 9. *TorPharm, Inc. v. Ranbaxy Pharms., Inc*., 336 F.3d 1322 (Fed. Cir. 2003) is also beside the point. The applicant here did not "acquiesce[] to the examiner's narrow view of patentable subject

3

matter" through its response and amendment. To the extent that "the public is entitled" to draw any conclusions from this amendment, it is simply that the scope of the pending claim is to a single crystalline form "having" an XRPD pattern with those four peaks. PFF 12–13.

Even if AET were correct that the claim requires a showing of all four peaks, as explained below, that requirement is satisfied here at least by AET's undisputed use of API exhibiting all claim 1 peaks and testing confirming that some of that material remains and grows over time.

## II.    AET Failed to Refute that the Claimed Form Is in the ANDA Products

### A.    AET's Attempt to Dismiss its Own XRPD Testing Is Meritless

Contrary to AET's suggestions, Plaintiffs do not rely on the presence of a single peak to demonstrate that AET's ANDA Products contain the claimed form. Rather, Plaintiffs rely on the fact that AET indisputably begins with the claimed crystalline form (with all four peaks) to make its products and used its own testing to look for the continued presence of that form. Indeed, it detected *eight* characteristic peaks of the claimed crystalline form across six separate tests of its exhibit and validation batches. PFF 92, 94, 95, 107, 109, 111. AET is conspicuously silent about the fact that its accelerated stability testing of EK316 detected five characteristic peaks: 11.2°, 15.4°, 16.9°, 20.7°, and 21.8° 2θ. PFF 111. AET cannot credibly contend that this constellation of peaks is simply a series of perfectly placed "blips." When AET detected a nearly identical pattern of peaks in PIO/B-009, its own scientists concluded that "[t]he diffractogram exhibits Pitolisant Hydrochloride crystalline form characteristic reflexes by XRD analysis." PTX-656.1.

Despite this, AET baldly asserts that the peaks it detected in the precise locations recited by the '197 Patent are "blips," "noise or an artifact." AET Br. at 2, 12. They are not. Not only are the peaks visible in the diffractograms themselves, but AET's own testing software identified all eight of these characteristic peaks as Bragg peaks detectable above the noise. PFF 93, 108, 110, 127; Tr. 353:24–355:1 (Steed). AET's own expert declined to take any position on what these peaks

4

are or why they appeared repeatedly in AET's testing, thus offering no support for AET's post hoc "blip" theory. PFF 93, 108, 110.

AET also argues that observed XRPD peaks are just "blips" because they did not appear in testing of "a fresh sample." AET Br. at 12–13. AET's reliance on later testing does not negate its original results. It just means that the claimed form is detectable in some tablets but not in others. Inter-tablet variability does not absolve AET of infringement; the claimed form need only be present in some of AET's tablets. PFF 89; *Horizon Medicines LLC v. Alkem Labs. Ltd.*, 503 F. Supp. 3d 118, 155 (D. Del. 2020) (finding infringement even where "a majority . . . of the tablets did not meet the limitation"), *aff'd*, 2021 WL 5315424 (Fed. Cir. Nov. 16, 2021).

While Plaintiffs do not rely solely on the peak at 11.2° 2θ, AET's repeated detection of this telltale peak is compelling infringement evidence. AET developed its XRPD protocol to detect the claimed crystalline form and instructed analysts to deem it present when the 11.2° peak is detected. PFF 80, 83, 87; DFF 53, 55; *see also Lundbeck*, 2021 WL 4944963, at *94, ("A single peak may provide a sufficient basis [to find] that crystallization is present" and "be indicative of the presence of a particular crystalline form …" depending on the details of the XRPDs.). AET's argument that the absence of a peak at 11.2° *proves* that "its product is 100 percent amorphous," DFF 55, ignores its detection limits—indeed, AET's own protocol asserts only that it "*might* be in amorphous form," PTX-47.5 (emphasis added). In any event, having adopted the 11.2° peak as a definitive test for crystallinity for development purposes, AET cannot now disavow it in litigation. *See, e.g.*, *Vectura Ltd. v. GlaxoSmithKline LLC*, 981 F.3d 1030, 1035 (Fed. Cir. 2020) (finding that an internal study that "GSK sought to discount" at trial supported the jury's finding of infringement); *Novartis Pharms. Corp. v. Mylan Pharms. Inc.*, C.A. No. 19-201, 2024 WL 384929, at *28 (N.D.W. Va. Jan. 31, 2024) (rejecting Mylan's attempts to discount its own purity testing).

### B.    AET's Validation Batch Is Highly Relevant to Infringement

AET's attempt to dismiss its own testing of batch PIO/B-009, which detected the 11.2°, 16.3°, 19.9°, 20.7°, and 22.6° peaks corresponding to the claimed form, is unavailing. PFF 90, 92, 94, 95. PIO/B-009 was AET's validation batch, used to validate analytical methods and assess the behavior of its formulation. PFF 98–99. AET has not identified any meaningful distinction between this validation batch and its ANDA Products that would justify disregarding these test results. AET offered no evidence that use of a slightly different grade of silicon dioxide, PFF 98, 100, would alter crystallization behavior. Nor did it explain how differences in equipment scale would affect the formation of the claimed crystalline form. Dr. Steed speculated that there could be differences in operating parameters, AET Br. at 15, but identified none. Finally, AET suggests that the batch was out of specification for water content, *id.* at 14, but Dr. Steed admitted that the final water content of the batch complied with AET's ANDA specification, PFF 101.

AET's testing of batch PIO/B-009—which detected multiple characteristic peaks of the claimed form, including many of the same peaks AET detected in EK316, PFF 95, 107, 109, 111— provides compelling corroborative evidence of infringement. With PIO/B-009, AET did not conclude that these peaks were noise or artifacts. Rather, AET deemed the claimed form present. PTX-656.1. PIO/B-009 reinforces the conclusion that AET's manufacturing process results in the persistence and growth of the claimed crystalline form.

### C.    AET's Cannot Dismiss the Import of its Accelerated Stability Testing

AET cannot run from its accelerated stability testing. The purpose of this testing was to determine the stability of the product after manufacture, including detecting changes to the active ingredient, which is why XRPD testing was done. PFF 80, 107, 109, 111. AET's litigation-driven attempt to recast standard accelerated stability conditions as "extreme" rings hollow. AET Br. at 2. AET followed ICH Guidelines, storing its tablets in their final packaging for six months at 40°C

and 75% RH, before XRPD testing. PFF 44, 118–19. Such accelerated stability testing is widespread in the pharmaceutical industry and sanctioned by FDA regulations as a proxy for long-term stability. PFF 43–46. If this testing was not predictive, it would not be used.

AET conspicuously fails to address its extensive reliance on accelerated stability testing in its ANDA submissions to FDA. PFF 122–24. It is undisputed that AET relied on accelerated stability testing during the development of its ANDA Products and relied on six-month accelerated stability testing (40°C/75% RH) in its ANDA to support its proposed shelf life. *See, e.g.*, PFF 46, 78, 122–23; PTX-32.81, 84. AET should not be permitted to tell the FDA that six-month accelerated stability testing is representative and reliable, but tell the Court it is not.

AET posits that accelerated stability testing may not be predictive of solid state form due to "threshold issue[s]," citing testimony from Dr. Steed, but this is pure speculation. AET Br. at 12. Dr. Steed admitted on cross-examination that he is not aware of any threshold conditions that are necessary to induce phase changes for pitolisant hydrochloride. PFF 125.

AET also claims that "several courts have discounted the relevance of solid-state testing of batches held under accelerated stability conditions," but the cases AET cites are very different from this one. The testing in *Exelixis, Inc. v. MSN Labs. Pvt. Ltd.*, C.A. No. 19-2017, 2023 WL 315614 (D. Del. Jan. 19, 2023), was not ICH-compliant in-house accelerated stability testing. *Id.* at *11-13; *id.* at *13 (conditions used were "a far cry from what is recommended by the ICH guidelines"). Rather, as part of litigation testing, samples that were provided to a testing expert three years after manufacture were subjected to 40 °C/75% RH for up to 8 weeks. *Id.* at *11, *14. *Lundbeck*, 2021 WL 4944963, involved (1) non-ICH-compliant use of accelerated stability conditions to stress litigation samples and (2) in-house accelerated stability testing by a defendant. *Id.* at *95–100. The former was not done here. On the latter, the court found the particular test results in that case

7

unpersuasive on solid-state changes, but did not reject accelerated stability testing outright. *Id.* at *96. AET has identified no case where a court has found that ICH-compliant accelerated stability testing performed by the defendant cannot reliably predict changes in solid state form.

#### D.        AET's Additional XRPD Testing Fails to Show the Claimed Form Is Absent

To counter its XRPD testing on EK316 and EK319 that detected the claimed crystalline form, AET points to other XRPD testing on its exhibit batches that did not detect it. This evidence does not negate the affirmative results in EK316 and EK319. First, AET cites in-house testing it conducted on its exhibit batches using Method 1 and Method 2, AET Br. at 16, but that testing was conducted in January 2024—just two months after the exhibit batches were manufactured. PFF 131. As Dr. Myerson explained, crystals grow over time in a drug product, such that peaks can emerge in a diffraction pattern after crystals sufficient to exceed the limit of detection have had time to form. Tr. 178:22–79:22 (Myerson). This principle is illustrated by AET's own testing of PIO/B-009, in which the appearance and intensity of the characteristic XRPD peaks increased from one testing period to the next. PFF 103.

Second, AET points to litigation testing conducted at Bhogala Biosciences by persons unknown. Although AET asserts that Dr. Steed "directed" this testing, AET Br. at 16, in reality he had no contact with anyone who performed the testing and did not know their identities or credentials. *United States v. Moon*, 512 F.3d 359, 362 (7th Cir. 2008) ("vital questions" under F.R.E. 703 include "was the lab work done properly?"); *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 666 (S.D.N.Y. 2007) (excluding expert testimony where testifying expert "exercised little if any supervision"). The record is devoid of critical foundational documentation for the testing, including laboratory notebooks and information about sample storage and preparation. PFF 133–38. AET tacitly recognizes the critical shortcomings of this testing evidence, trying to fill gaps in its brief and proposed findings and arguing that Plaintiffs have waived their

objections. AET Br. at 16 n.10. Not so. Plaintiffs maintain their objections and urge the Court to exclude the testing altogether. D.I. 507 at App. A2. Even if admissible, the Bhogala testing is unreliable and the Court should afford it no weight.

The little we do know about the Bhogala testing shows that it provides no real insight into the infringement inquiry due to its lack of sensitivity. *See Lundbeck*, 2021 WL 4944963, at *95 (giving reduced weight to "less sensitive XRPD" testing conducted by persons whose skills and experience were unknown). The testing conditions Bhogala appears to have used are comparable to AET's Method 1, which Dr. Myerson explained is a low sensitivity test and which Dr. Steed admitted produced diffractograms with "a lot of noise." PFF 139, 141. AET knows how to develop a "slow focus scan . . . to detect . . . crystalline material with high sensitivity"—its own Method 2—and yet chose to instruct Bhogala to conduct testing using only the less sensitive method. Although it did not determine the LOD for the method, Dr. Steed guessed that it would be in the "range of 1 to 2 percent or so." Tr. 404:22–405:2 (Steed). If correct, a substantial amount (7 to 14%) of the pitolisant hydrochloride in AET's tablets would need to be in the claimed form before detection. PFF 147–48. At most, the Bhogala testing reflects the deliberate limitations of AET's chosen methodology, not the absence of the claimed crystalline form.

## III.   AET Is Not Entitled to an Inference that Plaintiffs' Testing Failed

AET contends that there was a "failure of Plaintiffs' testifying experts to conduct XRPD testing on AET's ANDA Products," and requests an inference that "Plaintiffs knew that such testing would not have helped their case." AET Br. at 7 (citing *Lundbeck*). This stunning argument is belied by the procedural history of the case. Plaintiffs' expert Stephan Parent did conduct XRPD testing on AET's ANDA Products, and that testing unequivocally detected the presence of all four XRPD peaks recited in claim 1. *See* D.I. 355; D.I. 355-1 at 25. Although the Court excluded that testing on procedural grounds, it is undisputed that Plaintiffs offered that evidence. It is improper

and fundamentally unfair for AET to make statements that it knows are directly refuted by excluded evidence. *See, e.g.*, *Adams v. Aqua 388 Cmty. Ass'n*, C.A. No. 23-02498, 2024 WL 3402836, at *2 (E.D. Cal. July 12, 2024) ("Under California law, it is improper for counsel to assert or imply facts not in evidence that counsel knows excluded evidence could refute.") (quotation marks omitted); *Munoz v. PHH Mortgage Corp.*, C.A. No. 08-00759, 2025 WL 360758, at *3 (E.D. Cal. Jan. 31, 2025) ("Plaintiffs [seek] to have it both ways by attempting to use the ruling on motion in limine #5 as both a sword and a shield to allow themselves to introduce expert testimony on an issue while preventing Defendants from responding.").

## IV.    Infringement Results from AET's Manufacturing Process

There is no dispute that AET makes its ANDA Products using the claimed form of pitolisant hydrochloride—the identity of which is confirmed by XRPD testing showing **all** characteristic peaks described in the '197 Patent, including all four peaks recited in Claim 1. PTX-282.4, 282.7 (directly comparing the XRPD peaks of AET's starting material to the claim 1 peaks); *see also* PDX4-25; PTX-32.10, PTX-32.38. AET's amorphization approach, which depends on visual inspection during manufacture rather than available instrumentation, is insufficient to eliminate the presence of crystalline pitolisant hydrochloride. PFF 73. This is apparent from AET's testing and development work. PFF 77, 90, 106. Furthermore, evidence in the record confirms that deviations from expected dissolution behavior pose a problem for ASDs, which undercuts AET's unsupported assumption that their crystalline starting material converts completely to amorphous in their ASD. PTX-218.20 ("[C]hallenges such as poor stability as a result of hygroscopicity, deviations from expected dissolution behavior, and poor processability may limit [ASDs'] utility as a viable formulation strategy."); PTX-701 ("Crystallinity may be found in an ASD from one of two pathways: incomplete amorphization during processing . . . or crystal creation."); PFF 38–42.

While AET's brief vigorously asserts that the pitolisant hydrochloride in its tablets is 100%

amorphous, AET's ANDA does not make that pledge to FDA. AET's ANDA neither represents nor requires that the crystalline API used as its starting material completely converts to amorphous. AET's ANDA states that the ANDA Products contain amorphous pitolisant hydrochloride; not that the API is 100% amorphous.[1]

AET does not meaningfully challenge Dr. Myerson's conclusion that AET's manufacturing process—its heat, moisture, and mechanical stress—facilitates the growth of crystalline pitolisant hydrochloride. PFF 39, 75. AET admits that "moisture is a key factor that can affect the stability of amorphous pitolisant HCl and its potential for conversion to crystalline form." DFF 75, 81. AET does not dispute that amorphous solids are inherently unstable and tend to convert to the more stable crystalline form under such conditions, especially when nucleating crystals are already present. PFF 38. Indeed, AET offers no explanation for why its process, which subjects the API to these precise stressors, would not facilitate the crystallization observed in its own testing. Nor could it. None of AET's experts were qualified in pharmaceutical manufacturing, and none possesses anything close to experience in pharmaceutical formulation and process development that the Court recognized in Dr. Myerson. PFF 27–28. Instead, AET relies heavily on statements from AET's fact witnesses whose qualifications are not established in the record. *See* DFF 98–102 (citing testimony from Herb and Joshi). Such self-serving testimony cannot substitute for expert analysis on complex issues of crystallization and manufacturing science.

## V.    AET Effectively Concedes that if Crystalline Pitolisant Hydrochloride Is Present in Its ANDA Product, It Is the Claimed Crystalline Form

AET's suggestion that an unidentified crystalline form could explain the XRPD evidence is unsupported speculation and contradicts its own testing approach. AET Br. at 11. AET's

---

[1] AET suggests that Plaintiff Harmony's action against AET for infringement of an ASD patent is inconsistent with its position here. It is not. AET's tablets contain both the claimed crystalline form and pitolisant hydrochloride in an ASD. *See Novartis*, 2024 WL 384929, at *27, n.6.

"Method 2" is designed to "detect any trace of crystalline material" by using a "high sensitivity" scan to look for an XRPD peak at 11.2° 2θ.[2] DFF 53, 55. There is no dispute that the crystalline material Method 2 was designed to detect is that of the '197 Patent. PFF 79–80; DFF 52–53. Indeed, AET's Method 2 is predicated upon AET's recognition that the only crystalline form of pitolisant hydrochloride likely to be present in its product is a form with an intense peak at 11.2° 2θ. The only crystalline form of pitolisant hydrochloride known to have such a peak is the form described and claimed in the '197 Patent. PFF 84. AET cannot now speculate—without evidence— that some other unknown form explains the very signal its testing assigns to the claimed form.

While AET asserts that other crystalline forms of pitolisant exist, DFF 179, there is no evidence in the record that any other form has a peak (let alone an "intense peak") at 11.2° 2θ or any other position identified in the '197 Patent. PFF 9–10, 84. To the contrary, as AET admits, a different polymorphic form will have "a nonequivalent x-ray powder diffraction pattern." DFF 40.

Indeed, AET offers no evidence that any other form of pitolisant hydrochloride has any of the XRPD peaks observed in AET's tablets. The only testimony AET cites to support even the existence of other polymorphic forms is its ssNMR expert, Dr. Hodgkinson. DFF 179. But Dr. Hodgkinson was not qualified as an expert in either solid state forms or XRPD. DFF 8. And he disclaimed having done any analysis of other polymorphs, the conditions that produce them, or their features (including their XRPD peaks). PFF 187. Tellingly, Dr. Steed, who *was* qualified as an expert in solid state forms, DFF 4, did not opine that other forms of pitolisant hydrochloride could be the source of the XRPD peaks detected by AET. Thus, there is no meaningful dispute that

---

[2] Contrary to AET's contention that its internal characterizations have "no bearing," AET Br. at 11, courts have relied on defendants' internal documents identifying a subset of "characteristic" peaks in making an infringement determination. *See, e.g., Takeda Pharm. Co.v. Handa Pharms., LLC*, C.A. No. 11-840, 2013 WL 9853725, at *17 (N.D. Cal. Oct. 17, 2013).

any crystalline pitolisant hydrochloride present in AET's product is the claimed form.

## VI.    AET's Criticisms of Plaintiffs' ssNMR Testing Lack Merit

AET's criticisms of Dr. Wenslow's ssNMR testing lack merit. First, Plaintiffs do not rely "solely" on Dr. Wenslow's testing or use it as a "substitute" for XRPD. Rather, Dr. Wenslow's testing, which has advantages over XRPD for detecting crystals in a mostly amorphous sample, confirms the conclusions drawn from AET's ANDA, manufacturing process, and internal XRPD testing—the claimed crystalline form is present in AET's ANDA Products.

Second, Dr. Wenslow did not concede that the key peaks in the unfiltered spectrum of AET's ANDA Products are amorphous, AET Br. at 21; he testified that they are broader than those of the filtered and crystalline spectra, precisely as one would expect from a tablet that contains a high proportion of amorphous pitolisant hydrochloride with small amounts of the claimed crystals. PFF 54, 61, 66. Dr. Hodgkinson's claim that a mixture of amorphous and crystalline forms of a compound would generate a peak that looks like a Prussian helmet, AET Br. at 21; DDX5.6, is belied by the scientific literature, which unequivocally supports Dr. Wenslow's testimony that crystalline signal can be masked by the amorphous content, which is why spectral editing is used to identify crystalline form in just this type of sample. PFF 61, 63, 66; PTX-245.4, PTX-245.7.

Third, Dr. Wenslow's method development was scientifically sound. Dr. Wenslow used Novitium's SD to identify a tau value at which there was sufficiently diminished amorphous signal, which would indisputably decay faster than the crystalline signal. PFF 169–173. The method requires not complete elimination of amorphous signal but sufficient discrimination between it and the crystalline signal. PFF 64. And the data showed that the amorphous signal, which decays and does not rebound, was nearly gone by 16 msec and completely gone by 32 msec. PFF 172, 173. AET's focus on extrapolated curves and a data point that is clearly noise does not change the data. While Dr. Hodgkinson disagreed with Dr. Wenslow's decay curves, the substitute curves he created

confirm sufficient signal discrimination. PFF 182. Moreover, Novitium's SD would only have had less molecular mobility and therefore a slower decay rate than AET's ASD. PFF 174, 196.

Fourth, the position of the 131 ppm peak has clearly shifted from the unfiltered tablet spectrum to the filtered tablet spectrum. Moreover, AET does not dispute that both peaks in the filtered spectrum align with the peaks of the crystalline standard. That the 131 ppm peak has narrowed, sharpened, and shifted in the filtered spectrum is apparent. PFF 175. As Dr. Wenslow explained, residual amorphous content cannot account for the peaks observed in AET's filtered tablet. PFF 176. He was not alone; Dr. Myerson testified that he reviewed Dr. Wenslow's testing and believed the method and conclusions to be sound. Tr. 223:16–224:4 (Myerson).

## VII. *Sunovion* Applies Here Because AET's ANDA Requires Use of the Claimed Form and Permits It to Remain in the Final ANDA Products

AET's ANDA is not "silent" as to the claimed crystalline form. AET Br. at 30. Far from silent, the ANDA affirmatively *requires* the use of the claimed form of pitolisant hydrochloride to make its product. PTX-282.4, 282; PDX4-25; PTX-32.10, PTX-32.38. AET's process—which relies solely on visual inspection to ensure full dissolution of the crystalline API—neither credibly eliminates any possibility of residual crystalline material nor legally precludes its presence. PFF 73. AET's data demonstrate the inadequacy of that approach; it detected the starting crystalline form in a validation batch and again in exhibit batches stored under accelerated stability conditions. Yet AET's ANDA imposes no requirement to test for, or confirm the absence of, crystalline API prior to release, despite developing a test method (Method 2) purportedly designed for that very purpose. DFF 53, 55. Nor do its specifications for in-process controls, finished product, or shelf life test for, limit, or preclude the claimed form. PFF 207–208. AET acknowledges that its ANDA does not specify the solid state form of pitolisant hydrochloride in its final product. DFF 48.

Even beyond the specifications, nothing in the ANDA requires the pitolisant hydrochloride

14

in AET's tablets to be 100% amorphous. AET identifies no such requirement, nor has it represented to FDA that its products will be free of crystalline pitolisant hydrochloride. AET Br. at 3; DFF 178. It could not do so: that representation would contradict its own testing.

Thus, this is not a case where the ANDA is "silent" as to infringement. Instead, this is a case where the ANDA requires starting with the claimed crystalline form and permits the sale of product in which the form is present. AET is thus seeking approval for product that may contain the claimed crystalline form, and that is sufficient for infringement under *Sunovion*. *See Merck Sharp & Dohme LLC v. Mylan Pharms. Inc.*, C.A. No. 19-101, 2022 WL 22855168, at *15 (N.D.W. Va. Oct. 26, 2022) ("ANDA product infringed the disputed patent because the generic had sought FDA approval for a product that could contain an amount of the compound in the claimed range.").

*Merck v. Mylan*, cited *supra*, and *Par Pharm., Inc. v. Hospira, Inc.*, 835 F. App'x 578, 586 (Fed. Cir. 2020), are far more instructive than the cases AET cites. In *Par*, the Federal Circuit affirmed the district court's ruling that the ANDA, if approved, would allow the sale of a drug product having the claimed "about 0.01 to 0.4 mg/mL" of a transition metal complexing agent. *Id.* at 585–86. The ANDA was not "silent" on the issue, as it implicitly recognized the component as a potential impurity by setting an upper limit on "elemental impurities," a term encompassing transition metals, allowing the presence of complexing agent within the claimed range. *Id.* at 582, 586. Here, AET's ANDA expressly ***requires*** use of the claimed crystalline pitolisant hydrochloride to make its generic tablets and its specifications do not forbid sale of product in which that crystalline material persists and grows, as AET's own testing shows is likely to happen.

## VIII. Conclusion

For the foregoing reasons, Plaintiffs respectfully request that the Court find that AET infringes claim 1 of the '197 Patent under 35 U.S.C. § 271(e)(2)(A) and 35 U.S.C. § 271(a).

15

OF COUNSEL:

Christopher N. Sipes
Megan P. Keane
Brianne (Bharkhda) Sullivan
Sarahi Uribe
Cody J. Reeves
Nicole S.L. Pobre
Elaine Nguyen
John Y. Veiszlemlein
Mishael H. Hibshoosh
Covington & Burling LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001-4956
(202) 662-6000

Alexa Hansen
Covington & Burling LLP
Salesforce Tower
415 Mission Street, Ste. 5400
San Francisco, CA 94105
(415) 591-6000

Yiye Fu
Covington & Burling LLP
3000 El Camino Real
5 Palo Alto Square, 10th Floor
Palo Alto, CA 94306
(650) 632-4700


May 21, 2026

*/s/ Jeremy A. Tigan*
Jeremy A. Tigan (#5239)
Megan E. Dellinger (#5739)
Anthony D. Raucci (#5948)
Morris, Nichols, Arsht & Tunnell LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jtigan@morrisnichols.com
mdellinger@morrisnichols.com
araucci@morrisnichols.com

*Attorneys for Harmony Biosciences, LLC,
Harmony Biosciences Management,
Inc., Bioprojet Société Civile de Recherche,
and Bioprojet Pharma SAS*

## CERTIFICATE OF SERVICE

I hereby certify that on May 21, 2026, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on May 21, 2026, upon the following in the manner indicated:

Dominick T. Gattuso, Esquire                                    *VIA ELECTRONIC MAIL*
Catherine E. Lynch, Esquire
HEYMAN ENERIO GATTUSO & HIRZEL LLP
222 Delaware Avenue, Suite 900
Wilmington, DE  19801
*Attorneys for Defendant AET Pharma US, Inc.*

Scott J. Bornstein, Esquire                                     *VIA ELECTRONIC MAIL*
Jonathan Ball, Ph.D.
Julie P. Bookbinder, Esquire
Elana B. Araj, Esquire
Giancarlo Scaccia, Esquire
Anne Rock, Esquire
Ariadna Muniz, Esquire
Emma Cohen, Esquire
GREENBERG TRAURIG, LLP
One Vanderbilt Avenue
New York, NY 10017
*Attorneys for Defendant AET Pharma US, Inc.*

*/s/ Jeremy A. Tigan*

Jeremy A. Tigan (#5239)