IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| HARMONY BIOSCIENCES, LLC, HARMONY BIOSCIENCES MANAGEMENT, INC., BIOPROJET SOCIÉTÉ CIVILE DE RECHERCHE and BIOPROJET PHARMA SAS, | ) ) ) ) ) | |
| | ) | C.A. No. 23-1286 JLH-SRF |
| Plaintiffs, | ) ) | **CONSOLIDATED** |
| | ) | |
| v. | ) | |
| | ) | |
| LUPIN LIMITED, LUPIN PHARMACEUTICALS, INC., NOVUGEN PHARMA SDN. BHD. and NOVUGEN PHARMA (USA) LLC, et al. | ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANT AET PHARMA US INC.'S REPLY POST-TRIAL BRIEF
REGARDING INVALIDITY OF U.S. PATENT NO. 8,486,947**

# TABLE OF CONTENTS

I.  INTRODUCTION ...........................................................................................................1

II.  CLAIM 13 OF THE '947 PATENT IS INVALID FOR ODP OVER THE '430 PATENT..........2

    A.  The '430 Patent Is a Proper Double-Patenting Reference ..........................................2

    B.  '430 Patent Claim 1 and '947 Patent Claim 13 Are Not Patentably Distinct............4

    C.  '430 Patent Claim 3 and '947 Patent Claim 13 Are Not Patentably Distinct............5

III.  OBVIOUSNESS OF CLAIM 13 OF THE '947 PATENT..................................................8

    A.  A POSA Had Ample Motivation to Combine Brooks and Meier I ...........................8

    B.  A POSA Would Have Had a Reasonable Expectation of Success ..........................10

        1.  Reasonable Expectation of Success Does Not Require Clinical Efficacy ........10

        2.  The Prior Art Explicitly Stated an Expectation of Success................................11

IV.  THE ALLEGED OBJECTIVE INDICIA DO NOT SAVE CLAIM 13.......................................13

V.  CLAIM 13 OF THE '947 PATENT IS NOT ENABLED ..........................................................15

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AbbVie Inc. v. Mathilda & Terence Kennedy Inst. of Rheumatology Tr.*,
    764 F.3d 1366 (Fed. Cir. 2014)......................................................................................6

*Acorda Therapeutics, Inc. v. Roxane Lab'ys, Inc.*,
    903 F.3d 1310 (Fed. Cir. 2018)....................................................................................11

*In re Aller*,
    220 F.2d 454 (C.C.P.A. 1955) ........................................................................................8

*Allergan USA, Inc. v. MSN Labs. Pvt., Ltd.*,
    111 F.4th 1358 (Fed. Cir. 2024) .................................................................................1, 2

*Allergan v. Apotex*,
    754 F.3d 952 (Fed. Cir. 2014)................................................................................14, 15

*Aventis Pharma S.A. v. Hospira, Inc.*,
    743 F. Supp. 2d 305 (D. Del. 2010)..............................................................................11

*Eli Lilly and Co. v. Teva Pharms. Int'l GmbH*,
    8 F.4th 1331 (Fed. Cir. 2021)........................................................................................11

*Gilead Scis., Inc. v. Natco Pharma Ltd.*,
    753 F.3d 1208 (Fed. Cir. 2014)......................................................................................2

*Janssen Pharms., Inc. v. Teva Pharms. USA, Inc.*,
    141 F.4th 1367 (Fed. Cir. 2025) ...................................................................................11

*Merck & Co., Inc. v. Hi-Tech Phamacal Co.*,
    482 F.3d 1317 (Fed. Cir. 2007)......................................................................................3

*Novartis AG v. Ezra Ventures*,
    909 F.3d 1367 (Fed. Cir. 2018)......................................................................................3

*Novartis AG v. Torrent Pharms. Ltd.*,
    853 F.3d 1316 (Fed. Cir. 2017)....................................................................................14

*OSI Pharms., LLC v. Apotex Inc.*,
    939 F.3d 1375 (Fed. Cir. 2019)........................................................................11, 12, 13

*Pfizer, Inc. v. Apotex, Inc.*,
    480 F.3d 1348 (Fed. Cir. 2007)....................................................................................12

*Prometheus Labs., Inc. v. Roxane Labs., Inc.*,
    805 F.3d 1092 (Fed. Cir. 2015)..........................................................................................5

*Teva Pharms. USA, Inc. v. Corcept Therapeutics, Inc.*,
    18 F.4th 1377 (Fed. Cir. 2021) ........................................................................................11

**Statutes**

35 U.S.C. § 156(c)(4)..............................................................................................................3

**TABLE OF ABBREVIATIONS**

| | |
|---|---|
| '947 patent | U.S. Patent No. 8,486,947 (JTX-2) |
| AET | AET Pharma U.S., Inc. |
| Bioprojet | Bioprojet Société Civile de Recherche; Bioprojet Pharma |
| Br. | Plaintiffs' Responsive Post-Trial Brief Regarding Invalidity of U.S. Patent No. 8,486,947, D.I. 557 |
| Brooks | Brooks, S. & Black, J., *Novel Therapies for Narcolepsy*, 11(12) EXPERT OPIN. INVESTIG. DRUGS 1821 (2002) (DTX-0080) |
| Cowart | Cowart, M. et al., *Medicinal Chemistry and Biological Properties of Non-Imidazole Histamine H3 Antagonists*, 4 MINI-REVIEWS IN MED. CHEM. 979 (2004) (DTX-0046) |
| EDS | Excessive Daytime Sleepiness |
| ESS | Epworth Sleepiness Scale |
| FOF | Defendant's Proposed Finding of Facts |
| Harmony | Harmony Biosciences Management, Inc.; Harmony Biosciences, LLC |
| HARPS 1 | Bioprojet Clinical Study Report - *Randomized, Multicenter, 12-Week, Double-blind, Placebo-Controlled, Study to Assess the Efficacy and Safety of BF2.649 in Excessive Daytime Sleepiness (EDS) in Parkinson disease, followed by a 9-month Open-Label Extension Phase* - Reference P06-10_Harps 1, dated February 7, 2014 (DTX-0352) |
| HARPS 2 | Bioprojet Clinical Study Report - *Randomized, Multicenter, 12-Week, Double-blind, Placebo-Controlled, Study to Assess the Efficacy and Safety of BF2.649 in Excessive Daytime Sleepiness (EDS) in Parkinson disease, followed by a 9-month Open-Label Extension Phase* - Reference P06-10_Harps 2, dated February 12, 2014 (DTX-0353) |

| | |
|---|---|
| Lin | Lin, J.-S. et al., *Involvement of histaminergic neurons in arousal mechanisms demonstrated with H3 receptor ligands in the cat*, 523 BRAIN RES. 325 (1990) (DTX-0107) |
| Meier I | Meier, G. et al., *FUB 649: A Novel Non-imidazole histamine H3-Receptor Antagonist with High In Vitro and Oral In Vivo Potency*, 334(2) ARCH. PHARM. PHARM. MED. CHEM. C40 (2001) (DTX-0085) |
| NIH | National Institutes of Health |
| ODP | Obviousness-Type Double Patenting |
| Op. Br. | Defendant AET Pharma US Inc.'s Opening Post-Trial Brief Regarding Invalidity of U.S. Patent No. 8,486,947, D.I. 553 |
| Passani | Passani, M.B. et al., *The histamine H3 receptor as a novel therapeutic target for cognitive and sleep disorders*, 25 TRENDS IN PHARM SCI. 618 (2004) (DTX-0088) |
| PFF | Plaintiffs' Proposed Findings of Fact Regarding the Validity of the '947 Patent, D.I. 558 |
| Plaintiffs | Harmony Biosciences Management, Inc.; Harmony Biosciences, LLC; Bioprojet Société Civile de Recherche; Bioprojet Pharma |
| POSA | Person of ordinary skill in the art |
| PTA | Patent Term Adjustment |
| PTE | Patent Term Extension |
| USPTO | United States Patent and Trademark Office |
| WO 254 | International Patent Publication WO 2000/06254 (DTX-0090) |

*All emphases added unless otherwise stated.

v

## I.      INTRODUCTION

Plaintiffs cannot overcome the clear and convincing evidence that Claim 13 of the '947 patent is invalid for ODP, as obvious over Brooks in view of Meier I, and lacking enablement. Plaintiffs' Responsive Brief does not grapple with the trial record or the governing law—it evades them.

On ODP, Plaintiffs argue that the '430 patent cannot be a reference even though it is unrelated to the '947 patent and expires earlier. In doing so, Plaintiffs ignore binding precedent confirming that the '430 patent is a valid reference. They also misread *Allergan* and contort the text and purpose of 35 U.S.C. § 121. Plaintiffs fare no better on the merits. Plaintiffs argue that the '947 Claim 13's treatment of "excessive daytime sleepiness" with pitolisant is distinct from Claims 1 and 3 of the '430 patent— directed to treating "sleep apnea" and "diurnal somnolence" with the same drug. But they never confront the core problem: those claims all cover the same therapeutic activity—administering pitolisant to reduce sleepiness—whether described as treating "sleep apnea," "diurnal somnolence," or "EDS." Plaintiffs' expert admitted as much and the intrinsic record confirms it. The law does not permit a patentee to extend its monopoly by repackaging the same method using different words.

On obviousness, Plaintiffs accuse AET of employing "hindsight" but ignore that AET's case is built on the *foresight* of the named inventor Dr. Schwartz and colleagues. In the twenty years preceding the filing of the '947 patent, Dr. Schwartz and colleagues repeatedly told the world that $H_3$ antagonists like pitolisant increase histamine release, "induce an extended wakefulness," and "act as a stimulant." The '947 patent admits as much. Having spent decades instructing the field that $H_3$ antagonists promote wakefulness, Plaintiffs cannot now ignore the roadmap they created. Nor can they plausibly claim that the prior art offered only "hope" where it repeatedly taught that $H_3$ antagonists were expected to treat sleep disorders and were the "the most promising therapeutic approach for the treatment of . . . narcolepsy." FOF ¶ 86. That is not merely hope; it is an expectation.

Plaintiffs' position reduces to a familiar refrain from branded litigants: The claimed method is

1

not obvious because drug development can be difficult. The Federal Circuit has rejected that proposition. The expense and rigor of drug development does not confer patentability.

## II.    CLAIM 13 OF THE '947 PATENT IS INVALID FOR ODP OVER THE '430 PATENT

### A.    The '430 Patent Is a Proper Double-Patenting Reference

The '430 patent qualifies as an ODP reference. It is commonly owned, issued before the '947 patent from a separate family with an earlier priority date, and expired before the '947 patent. FOF ¶¶ 111, 113-117. It is a textbook double-patenting reference under *Gilead Scis., Inc. v. Natco Pharma Ltd.*, 753 F.3d 1208, 1215-17 (Fed. Cir. 2014), controlling precedent that Plaintiffs do not address.

Plaintiffs instead try to expand the narrow holding of *Allergan USA, Inc. v. MSN Labs. Pvt., Ltd.*, 111 F.4th 1358, 1366 (Fed. Cir. 2024), arguing that the '430 patent cannot be a reference because it does not result in an "unwarranted" timewise extension of their monopoly. Br. at 18-19. But *Allergan* has no bearing here. It only applies when the reference and subject patents share a common priority date. In *Allergan*, the Federal Circuit held that "a first-filed, first-issued, later-expiring claim [cannot] be invalidated by a later-filed, later issued, earlier-expiring reference claim ***having a common priority date***." *Allergan*, 111 F.4th at 1366. The Federal Circuit explained that post-URAA, patents with a common priority date would normally expire on the same date and thus there "is little risk of an unjustified extension of term subject to ODP." *Id.* at 1367. *Allergan* is inapplicable beyond its facts.

Plaintiffs ask the Court to expand the exception of *Allergan* to swallow the general rule from *Gilead*. The Court should decline this invitation. As in *Gilead*, the reference patent (the '430 patent) and the challenged patent (the '947 patent) are not related and do not share a common priority date. *Gilead*, 753 F.3d at 1209-10. Moreover, the '430 patent was the first to claim methods of treating sleep apnea and daytime sleepiness with pitolisant. FOF ¶¶ 116-17, 121, 138. Plaintiffs do not dispute that those claims were filed on February 10, 2005 (foreign priority date) whereas the method claim of the

2

'947 patent was filed on April 1, 2005 (foreign priority).[1] Thus, the methods claimed in the '430 patent were filed first, issued first, and expired first.[2] Plaintiffs' attempt to claim a patentably indistinct method with a later expiration date is precisely the unwarranted timewise extension ODP prevents.

Plaintiffs do not deny that the '430 patent expires before the '947 patent. Instead, Plaintiffs engage in misdirection by pointing to a *different* patent, the '197 patent, which they argue establishes the period of their monopoly over their methods of treatment. Br. at 19-20. This argument fails for several reasons. First, the '197 patent does not claim any method of treatment. Rather, it claims a composition of matter, crystalline pitolisant hydrochloride. *See* JTX-1.14. The '197 patent thus does not set the term for Plaintiffs monopoly over claims to a method of treatment. The '430 patent does. Second, the only reason the '197 patent expires later than the '947 patent is because Plaintiffs selected the composition claims for PTE. *See* FOF ¶¶ 157, 159; JTX-3.792. But for the PTE,[3] the '197 patent also would have expired before the '947 patent. *Id.*; FOF ¶ 158. PTE is disregarded in calculating the relevant expiration dates for purposes of an ODP analysis. *See Novartis AG v. Ezra Ventures*, 909 F.3d 1367, 1372-75 (Fed. Cir. 2018); *Merck & Co., Inc. v. Hi-Tech Phamacal Co.*, 482 F.3d 1317, 1322-23 (Fed. Cir. 2007). Finally, AET does not rely on the '197 patent as a reference patent. Plaintiffs' strawman argument concerning this patent is legally irrelevant because the § 121 safe harbor in which Plaintiffs seek shelter does not apply to unrelated patent families. *See* Op. Br. at 8-10. Plaintiffs also argue that the '430 patent's methods of treating sleep apnea and diurnal somnolence with a polymorph of pitolisant have not entered the public domain because that polymorph remains protected by the '197

---

[1] Plaintiffs argue that the '430 patent was filed on June 7, 2012. PFF ¶¶ 157-58, 160. But they ignore that it claims priority to earlier foreign and PCT applications. FOF ¶ 116. Plaintiffs cite no authority suggesting that the divisional filing date is the "filing date" for purposes of ODP.

[2] The '947 patent would have expired after the '430 patent even without the awarded PTA. *See* DTX-0001.0001; JTX-2.2; DTX-0375.0002.

[3] Plaintiffs could have pursued PTE for the '430 patent but elected not to. Their choice to extend the '197 patent cannot likewise extend the methods of treatment of the '430 patent. 35 U.S.C. § 156(c)(4).

patent. Br. at 19, n.3. But even if true, that does not mean that the methods of treating those conditions with pitolisant generally are not now in the public domain. Plaintiffs' choice to narrowly claim the use of a crystalline form of pitolisant in the '430 patent should not prevent the public from using obvious variants of this method. Now that '430 patent has expired, the public should be free to use the claimed methods—or obvious variants.

**B.      '430 Patent Claim 1 and '947 Patent Claim 13 Are Not Patentably Distinct**

'430 patent Claim 1 treats sleep apnea, whereas '947 patent Claim 13 treats the primary symptom of sleep apnea—EDS—in those same patients. FOF ¶¶ 54, 122, 126-29. Plaintiffs have no response to the overwhelming record evidence that '947 patent Claim 13 is not patentably distinct from '430 patent Claim 1.[4] There is no dispute that, as of the filing of the '947 patent, EDS was a "hallmark symptom" of sleep apnea and that sleep apnea drugs focused on treating the resulting EDS. FOF ¶¶ 126, 133. Nor is there any dispute that $H_3$ antagonists, like pitolisant, were known to promote wakefulness. FOF ¶¶ 18, 72-73, 96. Thus, a POSA would understand that treating sleep apnea with pitolisant according to '430 patent Claim 1 would invariably treat the primary symptom of sleep apnea (EDS) via the known wake-promoting activity of $H_3$ antagonists. FOF ¶¶ 133, 134, 136. In fact, a POSA would have understood that is what '430 patent Claim 1 covers.[5] '430 patent Claim 1 and '947 patent Claim 13 are both directed to treating the *same* patients with the *same* drug. And, both achieve the *same* result. Plaintiffs' sleep expert, Dr. Roth, admitted at trial that treating "excessive daytime sleepiness," in the context of the '947 patent, is "not distinct" from treating sleep apnea. FOF ¶ 131.

---

[4] Plaintiffs argue that Claims 1 and 3 of the '430 patent cannot be read together in the ODP analysis. *See* Br. at 21, n.5. The cases Plaintiffs cite do not support their claim. Even if that were true, it is unnecessary to read Claims 1 and 3 of the '430 patent together to establish that POSAs reading Claim 1 understood that pitolisant would treat daytime sleepiness. *See* FOF ¶¶ 93-96, 134-36.
[5] Plaintiffs do not even try to reconcile their position with Example 2 of the '947 patent, which equates "Treatment of Obstructive Sleep Apnea" with treating the sleepiness associated with sleep apnea. *See* FOF ¶ 146; Op. Br. at 11.

4

That admission is fatal.[6] The law does not permit a patentee to claim the treatment of a medical disorder and then later extend their patent monopoly by obtaining a patent to treat its primary symptom. *See Prometheus Labs., Inc. v. Roxane Labs., Inc.*, 805 F.3d 1092, 1098-99 (Fed. Cir. 2015); Op. Br. at 12. Plaintiffs do not even attempt to distinguish *Prometheus*.

Plaintiffs accuse AET of improperly "rewrit[ing]" Claim 1 of the '430 patent. Br. at 21-22. But AET does not ask the Court to construe this claim, let alone rewrite it. AET asks the Court to recognize that a POSA reading Claim 1 in 2005 would have understood that all or nearly all sleep apnea patients experience EDS and that all pharmacological treatment of sleep apnea was directed to this symptom, not the underlying airway obstruction. Plaintiffs' speculative theories about pitolisant treating sleep apnea through weight loss or muscle tone improvement (Br. at 21, 23) find no support in the record.[7] The only mechanism by which pitolisant was understood to act—and the only one the '947 patent supports—is wake promotion through the $H_3$ receptor pathway, which is the treatment of EDS that Claim 13 purports to claim. *See* FOF ¶¶ 18, 28, 80, 96, 132-34, 216.

### C.    '430 Patent Claim 3 and '947 Patent Claim 13 Are Not Patentably Distinct

The only difference between '430 patent Claim 3 and '947 patent Claim 13 is that '430 patent Claim 3 is directed to treating daytime sleepiness whereas '947 patent Claim 13 is directed to treating *excessive* daytime sleepiness in narcolepsy, sleep apnea, and PD patients. *Compare* DTX-0375.0014

---

[6] Plaintiffs try to walk back this admission by claiming Dr. Roth was testifying based on a construction of EDS that was not the plain and ordinary meaning. PFF ¶ 188. AET objected to Dr. Roth's testimony at trial because he was trying to address the plain and ordinary meaning of EDS whereas his expert reports were based on lexicography. *See* Tr. 680:5-682:15. Plaintiffs' counsel argued that Dr. Roth's testimony should be permitted because the construction in his reports included the plain and ordinary meaning. *See* Tr. 683:13-684:17 (arguing that Dr. Roth's opinions were "plain and ordinary meaning plus"). Plaintiffs cannot now disavow his trial testimony after having argued that his opinions were based on a construction of EDS encompassed the plain and ordinary meaning to secure their admission.

[7] Indeed, Dr. Kushida confirmed at trial that treatments for obesity had little impact on sleep apnea and thus "a POSA as of 2005 would know that . . . to treat sleep apnea pharmacologically would be treating the EDS." Tr. 555:12-21 (Kushida); FOF ¶ 133.

*with* JTX-2.24-25. This is a patently indistinct difference of degree. Op. Br. at 12-15; *AbbVie Inc. v. Mathilda & Terence Kennedy Inst. of Rheumatology Tr.*, 764 F.3d 1366, 1373 (Fed. Cir. 2014). Plaintiffs try to avoid this conclusion by labeling EDS as an "abnormal" or "pathological"[8] condition and asserting that it differs in the "sleep-disordered" patient subpopulations recited in Claim 13. Br. at 24-26. But there is no evidence of these alleged differences—EDS is not a pathology, diagnosis, or disease; it is just a degree of sleepiness along a continuum. FOF ¶¶ 34, 38.

The '947 patent makes clear that treating diurnal somnolence encompasses treating EDS in sleep disordered patients. Example 2 evaluates treatment of EDS in sleep apnea patients by measuring reductions in "diurnal somnolence," confirming that the two are not separate phenomena as Plaintiffs' attorney argument would have the Court believe. JTX-2.24. Dr. Schwartz also explained to the USPTO that EDS is measured using the ESS—a tool that quantifies the "level of daytime sleepiness" on a "scale" ranging from 1-24. FOF ¶ 27; JTX-4.1064. And Bioprojet represented to the NIH that pitolisant "reduced significantly the diurnal somnolence compared to placebo" in previous studies on narcoleptic patients, "***confirming its wakening effect against EDS***." FOF ¶ 155-56.

Plaintiffs' current position cannot be reconciled with their own Orange Book listings and their litigation history, which confirm that treating diurnal somnolence *is* treating EDS in sleep-disordered patients. FOF ¶¶ 112, 150-152. Plaintiffs listed '430 patent Claim 3 and '947 patent Claim 13 in the Orange Book as both covering the same method of treating EDS in narcolepsy patients. *Id.* And they even asserted '430 patent Claim 3 in this litigation against other Defendants. FOF ¶ 112. Plaintiffs cannot now argue that treating diurnal somnolence differs from treating EDS. Remarkably, Plaintiffs do not even address their Orange Book listing or assertion of the '430 Patent in their brief.

---

[8] Plaintiffs repeatedly characterize EDS as a "more intense, harder to resist, and harder to reverse" sleepiness, which confirms that EDS is simply a degree of sleepiness. Br. at 2, 9, 25, 27.

It is undisputed that sleepiness is measured by sleep doctors using a subjective patient self-assessment (ESS) to measure the propensity to fall asleep under eight real-world scenarios. FOF ¶¶ 39-40. A score of 11 or above is deemed excessive daytime sleepiness, which itself may range from mild to severe. FOF ¶¶ 41-42. The difference between a score of 10 versus 11 does not, as Plaintiffs argue, represent a major transition from sleepiness to pathology. FOF ¶¶ 42-47. It is just the patient's subjective estimation of how sleepy they feel. FOF ¶ 39.

Dr. Kushida's trial testimony confirms that physicians treat daytime sleepiness the same way across the sleepiness spectrum by administering wake-promoting agents (*e.g.*, stimulants). FOF ¶ 46. Plaintiffs likewise concede that, as of 2005, stimulants like modafinil were used to treat both "ordinary daytime sleepiness" and EDS associated with narcolepsy and sleep apnea. Br. at 27; PFF ¶ 94. Plaintiffs' expert's own publications also recognize that caffeine, long used to treat diurnal somnolence, was effective in treating EDS. FOF ¶¶ 60, 205; DTX-0217.0002.

Nor do the patient subpopulations recited in Claim 13 supply a patentable distinction. A POSA would understand that the '947 patent addresses symptomatic treatment of sleepiness, not the underlying disease. FOF ¶¶ 28-29, 58. Sleep apnea and narcolepsy were treated symptomatically with stimulants by promoting wakefulness, not by treating the underlying disorder. FOF ¶¶ 58-59, 132-33. As Dr. Schwartz himself confirmed, "[c]ompounds of the invention exhibit a purely symptomatical activity on excessive daytime sleepiness." FOF ¶ 28. The claimed subpopulations thus do not alter the nature of the treatment—it treats the same symptom.

Plaintiffs also claim that the absence of clinical testing and dosing information in Claim 3 of the '430 patent is "fatal" to the ODP argument. Br. at 28. It is not. Neither '430 patent Claim 3 nor '947 patent Claim 13 recite any dose let alone require a "safe and effective dose." JTX-2.24-25. Both claims just require administering pitolisant. *Id.*; DTX-0375.0014-15. '430 patent Claim 3 thus need not

include a dose to render '947 patent Claim 13 invalid. Plaintiffs should not be heard to complain that '430 patent Claim 3 lacks dosing information when '947 patent Claim 13 similarly omits such information, particularly where Bioprojet listed both patents in the Orange Book for treating EDS in narcolepsy. Still, determining optimal dosing is a matter of routine drug development. *See In re Aller*, 220 F.2d 454, 456 (C.C.P.A. 1955). Claim 13 thus is not patentably distinct from '430 patent Claim 3.

## III.    OBVIOUSNESS OF CLAIM 13 OF THE '947 PATENT

Plaintiffs' validity arguments follow the typical branded playbook, alleging general unpredictability in the field and difficulties associated with drug development while leaning on secondary considerations. Plaintiffs do not dispute that the prior art combination of Brooks and Meier I disclose every element of Claim 13. FOF ¶ 166. Plaintiffs instead focus on motivation to combine and expectation of success. Those arguments falter under the weight of the prior art.

### A.    A POSA Had Ample Motivation to Combine Brooks and Meier I

Plaintiffs mischaracterize the motivation to combine Brooks and Meier I found in the prior art, arguing that "AET focuses on a single statement" from Brooks for a motivation to combine. Br. at 4. In doing so, Plaintiffs ignore that the motivation to use pitolisant to treat EDS in narcolepsy emerged from more than two decades of published research establishing: (1) the mechanism by which $H_3$ antagonists promote wakefulness and *in vivo* proof of principle demonstration of efficacy; (2) their use for treating sleep disorders; and (3) Bioprojet's medicinal chemistry efforts to overcome the drawbacks of thioperamide and arrive at their "lead" $H_3$ antagonist, pitolisant. Op. Br. at 18-20.

A POSA would not read Brooks's disclosure that $H_3$ antagonists "such as thioperamide (BioProjet, Societe Civile de Recherche) increase wakefulness," and "may prove useful in treating EDS due to narcolepsy or other causes" in isolation. FOF ¶¶ 165, 168. Instead, a POSA would be armed with over two decades of published research from Dr. Schwartz and his colleagues aimed at the development of clinically suitable $H_3$ antagonists for promoting wakefulness. FOF ¶¶ 87-104. Brooks

8

specifically calls out Bioprojet's work with thioperamide in the landmark proof-of-principle study, Lin 1990, where orally administered thioperamide elicited a marked, dose-dependent increase in wakefulness at the expense of slow-wave sleep in cats. FOF ¶¶ 70-71, 165, 169; *see also* DDX7.40. A POSA reading Brooks would have known that thioperamide was toxic and poorly bioavailable and would have been motivated to pursue more suitable $H_3$ antagonists. FOF ¶¶ 87-104. Meier I identifies pitolisant[9]—Bioprojet's non-imidazole $H_3$ antagonist designed to overcome the drawbacks of thioperamide—as "one of the most potent $H_3$ antagonists both *in vitro* and *in vivo* with high selectivity for the $H_3$ receptor" and as "a new promising ***lead*** for further development." FOF ¶¶ 100-101, 104.

Plaintiffs resort to a grammatical argument[10] that Brooks only refers to "$H_3$ antagonists ***like thioperamide***" to suggest that AET failed to show that "pitolisant [is] similar to thioperamide." Br. at 5-6. Plaintiffs' reading of Brooks is unsupported. Plaintiffs introduced no evidence that a POSA would read Brooks so narrowly. Contrary to Plaintiffs' claim, the prior art described pitolisant as comparable to thioperamide. FOF ¶¶ 173-174; DTX-0084.0007 ("[pitolisant] also shows high antagonist activity in an in vivo model of the mouse ($ED_{50}$ of 1.6 mg/kg, compared to an $ED_{50}$ of 1.0 mg/kg for . . . thioperamide[])").[11] Substituting pitolisant for the molecule it was designed to replace is not inventive.

Plaintiffs do not argue that any prior art taught away from using pitolisant for EDS in patients with narcolepsy. Instead, Plaintiffs wrongly claim that pitolisant was only suggested for "cognitive indications" rather than sleep disorders. Br. at 5, 27. Plaintiffs ignore the explicit teachings from the prior art, including WO 254 (and the admission in the '947 patent) that $H_3$ antagonists were known to

---

[9] Pitolisant was disclosed by Bioprojet in WO 254 in 2000. FOF ¶ 93.

[10] Plaintiffs mischaracterize this as "Dr. Kushida's own interpretation of Brooks." Br. at 5. But Dr. Kushida merely repeated the relevant disclosures from Brooks. Tr. 498:14-499:5.

[11] Plaintiffs also assert that a POSA would not have considered pitolisant to be like thioperamide because by 2002 thioperamide had been identified as having inverse agonist activity. Br. at 6. But this argument ignores the fact that Brooks discloses that thioperamide is an $H_3$ antagonist. FOF ¶ 165.

promote an extended wakefulness. FOF ¶¶ 18, 81, 96. Indeed, inventor Dr. Schwartz testified that:

> Q. So you would agree with me that as of March 1st, 2000, Bioprojet had disclosed pitolisant, and that it is useful to promote wakefulness?
>
> A. *Yes.*

Tr. 438:17-20 (Schwartz); FOF ¶ 134. Plaintiffs cannot now credibly argue that pitolisant was only disclosed for "cognitive disorders." Like $H_3$ antagonists generally, Dr. Schwartz testified that pitolisant was known in the prior art for promoting wakefulness. *Id.* Moreover, Meier I states that pitolisant was developed "to facilitate a potential therapeutic use of $H_3$ receptor antagonists for applications proposed, e.g., [ADHD] and Alzheimer's disease" for the precursor to pitolisant, FUB 181. DTX-0085.0001. The "e.g." is exemplary, not limiting. Dr. Kushida's trial testimony that the "applications proposed" for FUB 181 expressly included narcolepsy is unrebutted. FOF ¶¶ 81-82; DDX7.28. This is supported by the numerous publications from Dr. Schwartz and his colleagues touting the wake-promoting benefits of $H_3$ antagonists and their therapeutic role as stimulants, including for the treatment of narcolepsy. FOF ¶¶ 68-86. Indeed, the prior art considered $H_3$ receptor antagonists to be "the most promising therapeutic approach for the treatment of . . . narcolepsy." DTX-0088.0004. Far from being "conclusory" (as Plaintiffs claim), these extensive disclosures would have provided a POSA with ample motivation to use Bioprojet's "lead" compound, pitolisant, in Brooks' method of treating EDS in narcolepsy patients.

### B.    A POSA Would Have Had a Reasonable Expectation of Success

Plaintiffs' "reasonable expectation" arguments misstate the law and ignores the prior art.

#### 1.    Reasonable Expectation of Success Does Not Require Clinical Efficacy

Plaintiffs' argument rests on an artificially heightened standard. According to Plaintiffs, "success" must include "a safe and effective treatment of EDS in sleep-disordered patients." Br. at 7. But Claim 13 does not require any level of safety or efficacy. It only requires "treating," which the

'947 patent defines as including alleviating or reducing symptoms. FOF ¶ 15-16. Plaintiffs' claim that the prior art must demonstrate clinical safety and efficacy ignores this definition and the law. "The reasonable-expectation-of-success analysis must be tied to the scope of the claimed invention." *Teva Pharms. USA, Inc. v. Corcept Therapeutics, Inc.*, 18 F.4th 1377, 1381 (Fed. Cir. 2021). Plaintiffs' reliance on *Eli Lilly* and *Janssen* is thus misplaced. *See* Br. at 6-7. Those cases merely recognize that safety and efficacy considerations may inform a reasonable expectation of success. They do not require that "success" be defined to include proof of clinical safety and efficacy. *See Eli Lilly and Co. v. Teva Pharms. Int'l GmbH*, 8 F.4th 1331, 1346 (Fed. Cir. 2021); *Janssen Pharms., Inc. v. Teva Pharms. USA, Inc.*, 141 F.4th 1367, 1383 (Fed. Cir. 2025). Efficacy data is not "always required for a reasonable expectation of success," *OSI Pharms., LLC v. Apotex Inc.*, 939 F.3d 1375, 1385 (Fed. Cir. 2019), and obviousness does not require "[c]onclusive proof of efficacy," *Acorda Therapeutics, Inc. v. Roxane Lab'ys, Inc.*, 903 F.3d 1310, 1333 (Fed. Cir. 2018) (cleaned up); *see also Aventis Pharma S.A. v. Hospira, Inc.*, 743 F. Supp. 2d 305, 342–43 (D. Del. 2010), *aff'd*, 675 F.3d 1324 (Fed. Cir. 2012) (where "safety[ ] and efficacy are not requirements of the asserted claims," a defendant need not prove "'a reasonable expectation of success' with respect to . . . safety[ or] efficacy"). Plaintiffs' attempt to read "safety and efficacy" into Claim 13 thus fails.

## 2.    The Prior Art Explicitly Stated an Expectation of Success

Plaintiffs' Responsive Brief does not address the explicit expectation of success expressed throughout the prior art. *See* Op. Br. at 21. Notably, Plaintiffs argue that Passani discloses unpredictability in the field of $H_3$ receptor antagonists.[12] Br. at 7-8. Yet, they ignore that, despite any

---

[12] Plaintiffs rely on Cowart to argue that inverse agonists have "special utility" over antagonists. Br. at 6. But they ignore that Cowart states: "[i]t is expected that many compounds described as antagonists may be able to demonstrate inverse agonism." DTX-0046.0001. Cowart concludes: there is a "bright future for nonimidazole $H_3$ antagonists for treating a broad spectrum of human diseases." *Id.* at 0011.

11

such alleged unpredictability, Passani concludes that $H_3$ antagonists were "the most promising therapeutic approach for the treatment of major wake disorders such as hypersomnia and narcolepsy." FOF ¶ 86. In connection with the wake promoting effects of $H_3$ antagonists, Passani explains "their therapeutic use is consistent with histamine-containing neurons and $H_3$ receptor functions" with a more clearly defined mechanism of action than "currently used 'waking' drugs" used to treat narcolepsy, like methylphenidate and modafinil. DTX-0088.0004. In advancing pitolisant through the clinic for EDS in narcolepsy, Bioprojet simply confirmed that Passani and Brooks were correct.

Plaintiffs' argument that no reasonable expectation of success existed because "the field of art for the '947 patent in April 2005 was highly unpredictable" misstates the law. Br. 7-8. "[O]bviousness cannot be avoided simply by a showing of some degree of unpredictability in the art so long as there was a reasonable probability of success." *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1364 (Fed. Cir. 2007). Generalized appeals to routine pharmaceutical research cannot save the '947 patent. *Id.*

The record instead shows that a POSA would have had a reasonable expectation of success based on multiple prior art references demonstrating *in vivo* efficacy of $H_3$ antagonists across species and confirming the well-understood mechanism by which they promote wakefulness. Op. Br. at 20-22. Plaintiffs try to dismiss these *in vivo* demonstrations, asserting that they were not performed in a disease model. Br. at 8-9. But Plaintiffs offer no evidence that a POSA would expect pitolisant to operate any differently in a diseased versus a healthy patient. Plaintiffs' critique rehashes their failed attempt to distinguish EDS from diurnal somnolence. As explained above in Section II.C., that distinction, based on Plaintiffs' wordplay, finds no support in the record.

Plaintiffs also lean heavily on *OSI*. *See* Br. at 10-12. But *OSI* involved a claim to the treatment of cancer (NSCLC) with a compound for which the prior art contained no *in vivo* or *in vitro* data. *OSI Pharms.*, 393 F.3d. at 1383. NSCLC was so unpredictable that over 15 years 1,631 Phase 2 clinical

12

trials resulted in only 7 FDA approvals. *Id.* at 1378. "[T]he only reasonable expectation at the time of the invention was failure, not success," given the 99.5% Phase 2 clinical trial failure rate for NSCLC. *Id.* at 1385. Here, the prior art contained: (1) extensive *in vivo* demonstrations that orally administered H$_3$ antagonists promote wakefulness in a marked dose-dependent manner; (2) repeated disclosures generalizing those effects to the class of H$_3$ antagonists; and (3) *in vitro* and *in vivo* potency and selectivity data for pitolisant. FOF ¶¶ 62-86; 93-104. This is not the mere "hope" rejected in *OSI*; it is an evidence-based expectation of success grounded in a well-known mechanism of action.

## IV.    THE ALLEGED OBJECTIVE INDICIA DO NOT SAVE CLAIM 13

### A.    Plaintiffs' Evidence of Objective Indicia Cannot Rebut ODP

Plaintiffs have failed to explain how any alleged objective indicia apply differently to the '947 patent than to the '430 patent. They cannot because Plaintiffs listed Claim 3 of the '430 patent in the Orange Book as covering the same indication as Claim 13 of the '947 patent. FOF ¶¶ 149–52. Whatever unexpected results, long-felt need, or failure by others attaches to Claim 13 of the '947 patent applies with equal force to Claim 3 of the '430 patent. Moreover, Plaintiffs merely identify an unclaimed benefit, the treatment of cataplexy, as an unexpected result of Claim 13. Br. at 16-17. Yet Claim 13 says nothing about the treatment of cataplexy, which is only associated with Type 1 narcolepsy. FOF ¶ 248; PFF ¶ 39; Tr. 835:23-836:6 (Kushida). It is not associated with Type 2 narcolepsy, sleep apnea, or PD, and bears no reasonable correlation to the full scope of Claim 13. Finally, Plaintiffs do not explain why treatment of cataplexy would not also be a benefit from practicing '430 patent Claim 3 with Type 1 narcolepsy patients.

### B.    No Nexus

Plaintiffs conducted two Phase 3 clinical trials on pitolisant for treating EDS in PD patients, which showed that treatment of PD patients with pitolisant was less effective than not giving the drug at all. FOF ¶¶ 268-69. None of Plaintiffs' alleged objective indicia relates to the treatment of EDS in

PD patients and thus are not coextensive with the scope of the claims. Plaintiffs do not rebut this.

### C.    Plaintiffs Have Not Provided Sufficient Evidence of Objective Indicia[13]

*No Long-Felt Need.* Plaintiffs argue a long-felt need for "non-scheduled" EDS treatments. Br. at 15-16. But Claim 13 does not require non-scheduled status—a feature found nowhere in the '947 patent or its file history. FOF ¶ 210; *See generally* JTX-4. Plaintiffs cannot manufacture a long-felt need for an unclaimed feature. *Novartis AG v. Torrent Pharms. Ltd.*, 853 F.3d 1316, 1330 (Fed. Cir. 2017). Moreover, modafinil, though scheduled, remains widely prescribed, and the clinical recommendations favor it for EDS in narcolepsy. FOF ¶¶ 207–09. Caffeine, which is unscheduled, was also available. FOF ¶¶ 60, 205. Dr. Kushida also testified that the scheduled or unscheduled nature is not a material consideration for a sleep doctor treating patients with EDS. FOF ¶ 199. It is just a regulatory status. Dr. Roth, who has never treated a patient or prescribed a medication, conceded that Dr. Kushida has more expertise in the clinical treatment of EDS. FOF ¶ 198; Tr. 762:1-11 (Roth).

*No Unexpected Results.* Plaintiffs argue that the ability of pitolisant to treat cataplexy was "unexpected." Br. at 16. As discussed above, Claim 13 says nothing about cataplexy. *See* Section IV.A. Cataplexy applies only to Type 1 narcolepsy—not to Type 2 narcolepsy, sleep apnea, or PD. Objective indicia must be commensurate with claim scope. *Allergan v. Apotex*, 754 F.3d 952, 965 (Fed. Cir. 2014). Treatment of cataplexy thus does not bear on the non-obviousness of Claim 13.

*No Failure of Others.* Plaintiffs do not even try to tie their alleged "failures of others" to the claimed invention and the problem which the '947 patent Claim 13 purports to solve: treating EDS in patients having PD, narcolepsy, or sleep apnea. Plaintiffs instead rely on the industry's alleged failure to develop "therapeutic $H_3$ antagonists" generally. Br. at 12. Except for few examples, Plaintiffs' failure-of-others evidence relates to the wrong indications, the wrong patient populations, or both. *Id.*

---

[13] Plaintiffs no longer argue that pitolisant's half-life is an unexpected result or that Wakix® has received any industry praise.

at 13, 15. Most "failures" relate to ADHD, Alzheimer's disease, allergic rhinitis, schizophrenia, multiple sclerosis, and other indications outside Claim 13's scope. FOF ¶¶ 240-41, 244. Failures in unclaimed indications do not speak to non-obviousness of what *is* claimed. *Allergan*, 754 F.3d at 965-66. Moreover, unlike the wake-promoting benefits of $H_3$ antagonists, which flow directly from the mechanism of action, there is no clear link between this array of disorders and the $H_3$ receptor. FOF ¶ 216; *see also* Tr. 827:8-23 (Kushida). And Plaintiffs' expert offered no such explanation at trial.

The handful of alleged within-scope failures (Bavisant in PD, MK-0249 in sleep apnea) are equally unhelpful. FOF ¶ 234. Bavisant's failure in PD cannot be informative of non-obviousness where pitolisant itself failed to treat EDS in PD (*see* Section V). And MK-0249 showed improvement on the ESS scale—the same metric that defines EDS in the '947 patent. FOF ¶¶ 146, 235. Plaintiffs have no response to their expert's admission that MK-0249 was comparable to pitolisant in its alleviation of EDS. FOF ¶ 235. Plaintiffs offer no evidence that any of these programs failed. FOF ¶¶ 231-33.

## V.    CLAIM 13 OF THE '947 PATENT IS NOT ENABLED

Claim 13 recites methods of treating EDS in patients suffering from "Parkinson's disease, sleep apnea, or narcolepsy." FOF ¶ 15. A claim is invalid when even one claimed embodiment is inoperative. *See* Op. Br. at 30 (collecting cases). Plaintiffs do not address this controlling authority. Plaintiffs' Phase 3 HARPS 1 and 2 trials prove that pitolisant does not treat EDS in PD patients. FOF ¶¶ 257-269. Indeed, pitolisant performed worse than placebo even at the highest tested dose. FOF ¶ 269.

Plaintiffs argue the HARPS 1 and 2 trials used up to 20 mg, whereas the '947 patent uses 40 mg doses of pitolisant for *other* indications. Br. at 30. But there is no evidence that 40 mg doses of pitolisant would be effective in PD patients. Indeed, the HARPS 1 and 2 studies indicate that a *lower* dose of pitolisant (10 mg) was more effective than 20 mg in PD patients. FOF ¶¶ 260-261. Attorney argument cannot overcome Plaintiffs' clinical trial results. Claim 13 of the '947 patent is invalid.

OF COUNSEL:

Scott J. Bornstein
Jonathan Ball, Ph.D.
Julie P. Bookbinder
Elana B. Araj
Giancarlo Scaccia
Greenberg Traurig, LLP
One Vanderbilt Avenue
New York, NY 10017
(212) 801-9200
Scott.Bornstein@gtlaw.com
ballj@gtlaw.com
bookbinderj@gtlaw.com
elana.araj@gtlaw.com
scacciag@gtlaw.com

Dated: May 21, 2026

HEYMAN ENERIO
GATTUSO & HIRZEL LLP

*/s/ Dominick T. Gattuso*
Dominick T. Gattuso (# 3630)
222 Delaware Ave., Suite 900
Wilmington, DE 19801
(302) 472-7300
dgattuso@hegh.law

*Attorneys for Defendant AET Pharma US, Inc.*

16