IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| HARMONY BIOSCIENCES, LLC, HARMONY BIOSCIENCES MANAGEMENT, INC., BIOPROJET SOCIÉTÉ CIVILE DE RECHERCHE and BIOPROJET PHARMA SAS,<br><br>Plaintiffs,<br><br>v.<br><br>LUPIN LIMITED, et al.,<br><br>Defendants. | C.A. No. 23-1286 (JLH) (SRF)<br><br>**CONSOLIDATED** |

**[CORRECTED] DEFENDANT AET PHARMA US INC.'S REBUTTAL POST-TRIAL BRIEF REGARDING NON-INFRINGEMENT OF U.S. PATENT NO. 8,207,197**

# TABLE OF CONTENTS


I. INTRODUCTION ..... 1

II. LEGAL STANDARD ..... 4

III. AET DOES NOT INFRINGE CLAIM 1 OF THE '197 PATENT ..... 5

A. Plaintiffs Must Show All Four XRPD Peaks To Prove Infringement ..... 5

B. Plaintiffs Offered No Independent XRPD Testing of AET's ANDA Products ..... 6

C. The Law Does Not Support Plaintiffs' Argument that Infringement Can Be Shown with Less than All Four Claimed Peaks ..... 7

D. AET's Internal Testing Protocol Does Not Lessen Plaintiffs' Burden to Show All Four Peaks ..... 11

E. Testing of AET's ANDA Products at Accelerated Conditions Is Irrelevant to the Infringement Inquiry ..... 11

F. Testing of a Development Batch Is Irrelevant to the Infringement Inquiry ..... 13

G. AET's and Independent XRPD Testing Confirms Non-Infringement ..... 15

i. AET's January 2024 Internal XRPD Testing ..... 15

ii. Dr. Steed's July 2025 Testing ..... 15

H. AET's Manufacturing Process Ensures That There Is No Crystalline Pitolisant Hydrochloride in Its ANDA Products ..... 17

I. Testing of AET's ANDA Products Using Unclaimed $^{13}C$ ssNMR Methods Does Not Support Infringement ..... 18

i. $^{13}C$ ssNMR Testing Does Not Generate XRPD Peaks ..... 19

ii. $^{13}C$ ssNMR Testing Shows that AET's ANDA Products Are Amorphous And Dr. Wenslow Has Misinterpreted His Own Data ..... 20

iii. Dr. Wenslow's $T_{1\rho}$ Experiment Was Uncontrolled ..... 22

iv. Dr. Wenslow Omitted Critical Data Points ..... 25

v. Dr. Wenslow's "Filter" Did Not Work. ..... 27

vi. Dr. Wenslow's ssNMR Experiment Cannot Identify the Claimed Form. ..... 29

J. *Sunovion* Does Not Apply Here Where the ANDA Does Not Contain a Specification that Directly Addresses a Claimed Feature ..... 29

IV. CONCLUSION ..... 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott Lab'ys. v. Sandoz, Inc.*,
486 F. Supp. 2d 767 (N.D. Ill. 2007) ....5, 11

*Alza Corp. v. Andrx Pharma., LLC*,
607 F. Supp. 2d 614 (D. Del. 2009) ....4

*Amgen, Inc. v. Sandoz Inc.*,
2021 WL 5366800 (D.N.J. Sept. 20, 2021) ....8

*AstraZeneca AB v. Dr. Reddy's Lab'ys., Inc.*,
2013 WL 1847639 (D.N.J. May 1, 2013) ....10

*AstraZeneca AB v. Dr. Reddy's Lab'ys, Ltd.*,
603 F. Supp. 2d 596 (S.D.N.Y. 2009) ....20

*AstraZeneca AB v. Mylan Lab'ys Ltd.*,
2015 WL 13866396 (D.N.J. Aug. 28, 2015) .... *passim*

*Brigham & Women's Hosp., Inc. v. Perrigo Co.*,
761 F. App'x 995 (Fed. Cir. 2019) ....19

*Bristol-Myers Squibb Co. v. Aurobindo Pharma USA Inc.*,
477 F. Supp. 3d 306 (D. Del. 2020) ....9

*Cephalon, Inc. v. Sun Pharms, Ltd.*,
2012 WL 12904999 (D.N.J. Dec. 20, 2012) ....5, 11

*Cosden Oil & Chem. Co. v. Am. Hoechst Corp.*,
543 F. Supp. 522 (D. Del. 1982) ....10

*DeMarini Sports, Inc. v. Worth, Inc.*,
239 F.3d 1314 (Fed. Cir. 2001) ....4

*Eisai Co. v. Glenmark Pharms., Ltd.*,
2015 WL 1228958 (D. Del. Mar. 17, 2015) ....9

*Exelixis. Inc. v. MSN Lab'ys Pvt. Ltd.*,
2023 WL 315614 (D. Del. Jan. 19, 2023) ....12, 13

*Ferring B.V. v. Watson Lab'ys., Inc.-Fla.*,
764 F.3d 1382 (Fed. Cir. 2014) ....14, 15, 30

*Glaxo Inc. v. Novopharm, Ltd.*,
110 F.3d 1562 (Fed. Cir. 1997)....................4, 14, 15

*Heron Therapeutics, Inc. v. Fresenius Kabi USA, LLC*,
2024 WL 5317378 (D. Del. Dec. 3, 2024)....................4, 30

*Lundbeck v. Lupin Ltd.*,
2021 WL 4944963 (D. Del. Sept. 30, 2021).................... *passim*

*Merck Sharp & Dohme Corp. v. Amneal Pharms. LLC*,
881 F.3d 1376 (Fed. Cir. 2018)....................14

*MicroStrategy Inc. v. Bus. Objects, S.A.*,
429 F.3d 1344 (Fed. Cir. 2005)....................4

*In re Niaspan Antitrust Litig.*,
67 F.4th 118 (3d Cir. 2023) ....................16, 22

*Olaplex, Inc. v. L'Oreal USA, Inc.*,
845 F. App'x 943 (Fed. Cir. 2021) ....................10, 11

*Salix Pharms., Ltd. v. Norwich Pharms., Inc.*,
2022 WL 3225381 (D. Del. Aug. 10, 2022) ....................9

*Sunovion Pharms., Inc. v. Teva Pharms. USA, Inc.*,
731 F.3d 1271 (Fed. Cir. 2013)....................4, 29, 30

*TorPharm, Inc. v. Ranbaxy Pharm., Inc.*,
336 F.3d 1322 (Fed. Cir. 2003)....................6, 7

*Zenith Lab'ys. Inc. v. Bristol-Myers Squibb Co.*,
19 F.3d 1418 (Fed. Cir. 1994)....................4, 9, 11, 19

# TABLE OF ABBREVIATIONS

| | |
|---|---|
| ’197 patent | U.S. Patent No. 8,207,197 (JTX-1) |
| AET | AET Pharma US Inc. |
| AET’s ANDA Products | 4.45 mg and 17.8 mg pitolisant hydrochloride tablets submitted for FDA approval in Abbreviated New Drug Application No. 218892 |
| ANDA | Abbreviated New Drug Application |
| API | Active Pharmaceutical Ingredient |
| Bioprojet | Bioprojet Société Civile de Recherche; Bioprojet Pharma |
| CPMAS | Cross-Polarization Magic Angle Spinning |
| FDA | Food and Drug Administration |
| FOF | Defendant’s Proposed Findings of Fact Regarding Non-Infringement |
| Harmony | Harmony Biosciences Management, Inc.; Harmony Biosciences, LLC |
| HCl | Hydrochloride |
| KAS | Kansas Analytical Services |
| LOD | Limit of Detection |
| Plaintiffs | Harmony Biosciences Management, Inc.; Harmony Biosciences, LLC; Bioprojet Société Civile de Recherche; Bioprojet Pharma |
| POSA | Person of ordinary skill in the art |
| ssNMR | Solid-State Nuclear Magnetic Resonance |
| UF | Uncontested Facts (D.I. 503, Ex. 1) |
| USPTO | United States Patent and Trademark Office |

| | |
|---|---|
| XRPD | X-Ray Powder Diffraction |

## I. INTRODUCTION

Plaintiffs bear the burden of proving by a preponderance of the evidence that AET's ANDA Products meet every limitation of Claim 1 of the '197 patent. They have failed to carry that burden.

Claim 1 is directed to crystalline pitolisant hydrochloride "having an X-ray diffractogram that comprises characteristic peaks (2θ) at 11.2°, 19.9°, 20.7° and 34.1° ±0.2°." D.I. 552 ¶ 9. There is nothing incidental about this language; Bioprojet added it to the claims during prosecution to secure allowance of the patent. FOF ¶¶ 9-12. There can be no reasonable dispute that Claim 1 requires all four peaks. Indeed, the agreed-upon construction of this claim language mandates that the four peaks "*together* uniquely identify the crystalline form," which forecloses Plaintiffs' argument that infringement can be shown with anything less than all four recited peaks.[1] FOF ¶ 20. Plaintiffs did not introduce at trial any XRPD testing showing the presence of all four recited 2θ peaks in AET's ANDA Products. FOF ¶ 20. For that reason, there is a complete failure of proof.

AET's ANDA Products contain amorphous—not crystalline—pitolisant hydrochloride.[2] *See* FOF ¶¶ 65-67, 70, 86-87, 95, 98, 126, 178. AET designed its manufacturing process for its ANDA Products specifically to preclude crystallinity, using a conventional spray granulation process and excipients that were well-known to generate stable amorphous polymeric dispersions. FOF ¶¶ 98-110. As confirmed by both (a) AET's internal XRPD testing shortly after its tablets were made and (b) XRPD testing performed at the direction of AET's expert, Dr. Jonathan Steed, about 20 months later, none of the claimed XRPD peaks are present in AET's ANDA Products. FOF ¶¶ 86, 94-95, 97. They are 100% amorphous. *Id.*

---

[1] All emphasis added unless otherwise stated.

[2] Plaintiff Harmony appears to have conceded this point as they recently filed a related suit against AET alleging infringement of U.S. Patent No. 11,623,920, which claims an "amourphous [sic] solid dispersion comprising pitolisant hydrochloride . . . . " *Harmony Biosciences Management, Inc. et al. v. AET Pharma US, Inc. et al.*, Case No. 1-26-cv-00453 (D. Del. filed Apr. 20, 2026).

Plaintiffs' XRPD proofs rest entirely on AET's internal testing of two exhibit batches[3] (EK316 and EK319) held under extreme storage conditions for 6 months. FOF ¶¶ 47, 49. Leaving aside the fact that such extreme conditions do not reflect the real-world conditions that the tablets will be exposed to, it is undisputed that the diffractograms for those two batches do not show all four peaks required by Claim 1. FOF ¶¶ 49-50, 59, 68. Despite the absence of the required peaks, Plaintiffs incorrectly argue that AET's scientists nevertheless admitted that the claimed crystalline form is present in those two accelerated stability samples because of a blip around 11.2° seen in a single diffractogram.[4] D.I. 551 at 14, 16. That could not be further from the truth. The evidence shows that AET's scientists conducted further testing to determine whether the feature at 11.2° was real and reproducible and found that it was not. FOF ¶ 64. Far from concluding that these two accelerated stability batches contained crystalline pitolisant hydrochloride, AET's rigorous testing confirmed that, like the eight exhibit batches stored under standard storage conditions, these too were 100% amorphous. FOF ¶¶ 65, 70.

Having no direct evidence that AET's tablets meet the XRPD limitations of Claim 1, Plaintiffs try to prove their case through inference using ssNMR—a technique that is not mentioned in the '197 patent and which all the experts agree does not generate the required 2θ peaks. FOF ¶¶ 31, 112-115. Plaintiffs cite no case in which a court has accepted ssNMR testing as

---

[3] Plaintiffs also identify testing of a development batch (PIO/B-009). D.I. 551 at 18. But it is undisputed that this development batch is not one for which AET seeks approval because it has a different formulation and was made using different equipment than the ANDA Products. FOF ¶¶ 71, 73-76.

[4] PTX-51.4 (Method 1 diffractogram of EK316). The Method 1 diffractogram for EK319 under accelerated stability conditions does not even show the "blip" at 11.2° (2θ). FOF ¶ 67. While Plaintiffs argue that AET's Method 2 testing shows a feature at 11.2° (2θ) for EK319, that is not the test recited in Claim 1 because Method 2 scans only the narrow region between 10° and 12° (2θ) and thus cannot provide "an X-ray diffractogram that comprises characteristic peaks (2θ) at 11.2°, 19.9°, 20.7° and 34.1° ±0.2°." D.I. 551 at 13; D.I. 552 at 9; FOF ¶ 52.

a substitute for XRPD testing when the claims specifically call for XRPD peaks. Plaintiffs' novel ssNMR theory, sponsored by their expert Dr. Wenslow, is predicated on his belief that the NMR signal of AET's amorphous pitolisant hydrochloride decays faster than the claimed crystalline pitolisant hydrochloride. D.I. 551 at 22. But that is just Dr. Wenslow's speculation, unsupported by any experimental evidence. His $T_{1\rho}$ filtering experiment requires knowledge of the decay behavior of two standards: (1) the claimed crystalline pitolisant hydrochloride and (2) the amorphous pitolisant hydrochloride in AET's tablets. FOF ¶ 134. That information is necessary to determine a suitable signal acquisition delay time ($\tau$) at which crystalline signal will still be detectable and amorphous will not. *Id.* But Dr. Wenslow's alleged "amorphous standard" was *not* the amorphous polymeric dispersion contained in AET's tablets. FOF ¶¶ 136-137. Instead, he used a different defendant's allegedly amorphous pitolisant hydrochloride, even though it was based on an entirely different amorphization mechanism.[5] FOF ¶¶ 136-138. Notwithstanding that his experiment was fatally uncontrolled, Dr. Wenslow testified that AET's tablets must contain crystalline pitolisant hydrochloride because his "filtered" ssNMR spectra of AET's tablets still showed the presence of pitolisant hydrochloride peaks at his selected delay time. *See* FOF ¶ 172. However, as Dr. Wenslow admits, crystalline peaks should be much narrower than broad amorphous peaks. *See* FOF ¶ 129. Yet the peak shape and position in Dr. Wenslow's allegedly filtered spectrum is *identical* to the unfiltered amorphous spectrum. FOF ¶¶ 175-176. Dr. Wenslow's ssNMR experiments thus prove beyond all doubt what the XRPD evidence already confirmed—AET's ANDA Products are 100% amorphous. FOF ¶ 178.

---

[5] Dr. Wenslow used Novitium's beta-cyclodextrin inclusion complex of pitolisant hydrochloride. FOF ¶ 136.

Plaintiffs' attempt to salvage their infringement case by relying on *Sunovion*. That case does not help Plaintiffs. It is well-settled that *Sunovion* only applies when the ANDA contains a specification directly addressing the infringement inquiry. "When an ANDA is silent with respect to infringement, however, *Sunovion* is inapplicable." *Heron Therapeutics, Inc. v. Fresenius Kabi USA, LLC*, 2024 WL 5317378, at *11 (D. Del. Dec. 3, 2024).

On this record—no XRPD diffractogram showing the four claimed peaks, affirmative XRPD testing confirming absence of crystallinity, a manufacturing process and formulation designed to preclude crystallinity, and an ssNMR theory that is legally irrelevant and scientifically unsound—the evidence compels a finding that AET's ANDA Products do not infringe Claim 1 of the '197 patent. Judgment of non-infringement should be entered in AET's favor.

## II. <u>LEGAL STANDARD</u>

To prove infringement, the patent owner must show by a preponderance of the evidence that "each element of at least one claim of the patent is found in the alleged infringer's product." *Alza Corp. v. Andrx Pharma., LLC*, 607 F. Supp. 2d 614, 623 (D. Del. 2009); *see also DeMarini Sports, Inc. v. Worth, Inc.*, 239 F.3d 1314, 1331 (Fed. Cir. 2001). If even one claim limitation is missing or not met, there is no literal infringement as a matter of law.[6] *See MicroStrategy Inc. v. Bus. Objects, S.A.*, 429 F.3d 1344, 1352 (Fed. Cir. 2005); *see also Glaxo Inc. v. Novopharm, Ltd.*, 110 F.3d 1562, 1566 (Fed. Cir. 1997) ("It is elementary patent law that all limitations are material," and plaintiffs are "required to establish the presence of each limitation of the asserted claims.").

For polymorph patents like the '197 patent, each individual XRPD peak is a claim limitation. *See Zenith Lab'ys. Inc. v. Bristol-Myers Squibb Co.*, 19 F.3d 1418, 1423–24 (Fed. Cir. 1994); *Lundbeck v. Lupin Ltd.,* 2021 WL 4944963, at *94 (D. Del. Sept. 30, 2021), *aff'd in part*

[6] Plaintiffs assert only literal infringement, not infringement under the doctrine of equivalents. D.I. 503 at ¶ 56.

*sub nom. H. Lundbeck A/S v. Lupin Ltd.*, 87 F.4th 1361 (Fed. Cir. 2023) (treating each individual XRPD peak as a claim limitation); *Cephalon, Inc. v. Sun Pharms, Ltd.*, 2012 WL 12904999, at *10-11 (D.N.J. Dec. 20, 2012) (same); *Abbott Lab'ys. v. Sandoz, Inc.*, 486 F. Supp. 2d 767, 774-75 (N.D. Ill. 2007) (same).

## III. AET DOES NOT INFRINGE CLAIM 1 OF THE '197 PATENT

Plaintiffs have failed to prove that AET's ANDA Products meet two key limitations of asserted claim 1 of the '197 patent: (1) "crystalline pitolisant hydrochloride" and (2) "having an X-ray diffractogram that comprises characteristic peaks (2θ) at 11.2°, 19.9°, 20.7° and 34.1° ±0.2°." D.I. 552 ¶ 8. The parties' experts agreed that XRPD is the only test that can be used to identify the recited 2θ peaks. FOF ¶¶ 31, 112-115. In fact, Plaintiffs' experts admitted that if they had been permitted to conduct testing to determine the presence of the claimed crystalline pitolisant hydrochloride in AET's ANDA Products, they would have performed XRPD testing. FOF ¶¶ 32-33, 45. But for reasons known only to Plaintiffs' counsel, Drs. Wenslow, Gozzo, and Myerson—each of whom professes expertise in XRPD—were never authorized to perform XRPD testing. FOF ¶¶ 33, 42-45. Plaintiffs' infringement case founders on a glaring omission: they failed to offer even a single XRPD diffractogram showing all four claimed peaks. FOF ¶ 20.

### A. Plaintiffs Must Show All Four XRPD Peaks to Prove Infringement

Claim 1 of the '197 patent requires that the crystalline pitolisant hydrochloride have "an X-ray diffractogram that comprises characteristic peaks (2θ) at 11.2°, 19.9°, 20.7° and 34.1° ±0.2°." D.I. 552 ¶ 8. The plain language of the claim requires four recited peaks. *Id.* Plaintiffs concede that this limitation is not mere excess but was required to obtain allowance of the '197 patent. D.I. 551 at 3. Plaintiff Bioprojet initially tried to claim any crystalline form of pitolisant hydrochloride. FOF ¶ 9. But the USPTO rejected that broad claim as indefinite under 35 U.S.C. §112 because the characteristic XRPD peaks were not recited in the claim. FOF ¶ 10. Rather than

traverse the § 112 rejection, Plaintiffs acquiesced by amending the claim to add the "four specific characteristic peaks" recited in Claim 1. FOF ¶¶ 11-12. Claim 1 of the '197 patent thus only covers Form 1 crystalline pitolisant hydrochloride having a diffractogram with the four recited 2θ peaks. *See* D.I. 552 ¶ 8.

Consistent with the prosecution history, the parties agreed that "an X-ray diffractogram that comprises characteristic peaks (2θ) at 11.2°, 19.9°, 20.7° and 34.1° ±0.2°" means that "the peaks *together* uniquely identify the crystalline form of pitolisant hydrochloride." FOF ¶ 20. Having specifically amended Claim 1 to include the four XRPD peaks to secure allowance of the '197 patent and having agreed that those four peaks "together" uniquely identify the claimed crystalline form, Plaintiffs cannot now argue that infringement can be shown by an X-ray diffractogram with fewer than all four peaks. *See TorPharm, Inc. v. Ranbaxy Pharm., Inc.*, 336 F.3d 1322, 1330 (Fed. Cir. 2003) ("the public is entitled to equate an inventor's acquiescence to the examiner's narrow view of patentable subject matter with abandonment of the rest. Such acquiescence may be found where the patentee narrows his or her claims by amendment[.]").

### B. Plaintiffs Offered No Independent XRPD Testing of AET's ANDA Products

The most striking feature of Plaintiffs' infringement case is the complete absence of XRPD testing showing the four XRPD peaks required by Claim 1. FOF ¶ 20. Plaintiffs did not introduce at trial any XRPD testing of AET's tablets conducted by their testifying experts. FOF ¶ 30.

It is undisputed that Plaintiffs' XRPD expert, Dr. Fabia Gozzo, was asked to run XRPD tests on former co-defendant MSN's ANDA products. FOF ¶ 44. But Dr. Gozzo was not asked to perform, and in fact did not perform, tests on AET's ANDA Products even though she had them in her possession when she conducted her sXRPD testing. FOF ¶¶ 42, 44. She never even opened the bottles. *Id*. Dr. Gozzo offered no explanation for this omission. FOF ¶ 44.

Similarly, Plaintiffs' expert, Dr. Wenslow, acknowledged at trial that his company, Crystal Pharmatech, has XRPD equipment in-house and that he personally performs XRPD testing in connection with his work at Crystal Pharmatech. FOF ¶ 45. He even informed Plaintiffs' counsel that he could perform XRPD testing but was only asked to conduct ssNMR testing despite not having NMR equipment at Crystal Pharmatech. *Id*. Still, Dr. Wenslow testified that he could have but chose not to conduct XRPD testing. *Id.* His choice not to perform XRPD is notable given that he testified that "as an analytical chemist," to determine whether a sample has the claimed XRPD peaks, "[he] would measure the x-ray diffractogram, and [] would obtain an x-ray diffractogram and determine the presence of the peaks and the 2-theta values associated with those peaks." *Id*.

Dr. Myerson also testified that he did not have the ability to request the testing he wanted in connection with his infringement opinions. *See* FOF ¶¶ 32-33. Instead, he was merely given data curated by Plaintiffs' counsel. *Id.* In fact, he asked Plaintiffs' counsel to provide him with XRPD data on AET's ANDA Product when forming his infringement opinions but was told there was none. FOF ¶ 33.

### C. The Law Does Not Support Plaintiffs' Argument that Infringement Can Be Shown with Less than All Four Claimed Peaks

Having no XRPD evidence showing the presence of all four peaks in a single diffractogram of AET's ANDA Products, Plaintiffs argue that the law does not require them to do so. D.I. 551 at 6-7, 17, n.3. Plaintiffs are incorrect.

Courts have rejected the notion that a missing XRPD peak can be presumed to exist "below the limit of detection," particularly in the absence of any limit of detection analysis by a plaintiff. *See Amgen, Inc. v. Sandoz Inc.*, 2021 WL 5366800, at *35 (D.N.J. Sept. 20, 2021) ("Dr. Myerson's assertion that the 20.7 peak is below the limit of detection is especially bald considering his failure to opine on what the limit of detection may have been for the 20.7 Form B peak in the context of

Dr. Gozzo's experiments"); *Lundbeck*, 2021 WL 4944963, at *96-98. Notably, finding non-infringement in *Lundbeck*, Judge Stark faulted Dr. Myerson for relying on the presence of a single XRPD peak and allegedly "undetectable peaks" to support infringement of a claim requiring a specific XRPD diffractogram. *Id.* at *96-98, 100; FOF ¶ 27. The claim at issue in *Lundbeck* was very similar to Claim 1 of the '197 patent, as shown below.

| **'197 patent** | ***Lundbeck*** |
|---|---|
| **Claim 1:** "Crystalline [pitolisant hydrochloride] . . . having an X-ray diffractogram that comprises characteristic peaks (2θ) at 11.2°, 19.9°, 20.7° and 34.1° ±0.2." | **Claim 2:** "[vortioxetine] hydrobromide salt in a crystalline form which is characterized by XRPD reflections at 6.89, 9.73, 13.78 and 14.63 ±0.10° 2θ." |

As here, the claim in *Lundbeck* specified XRPD as the analytical test used to determine the claimed crystalline form and explicitly recited four XRPD reflections/peaks. Just as he attempts to do here, Dr. Myerson offered opinions in *Lundbeck* that infringement could be shown with a single peak.[7] *Lundbeck*, 2021 WL 4944963 at *28. Judge Stark was not persuaded by Dr. Myerson's opinions:

> Where, as here, however, the overwhelming abundance of careful XRPD images developed expressly for purposes of determining infringement detects no more than one of the multiple characteristic peaks – effectively ruling out the remaining peaks characteristic of the particular form – *and particularly where the claims identify the particular crystalline form by the presence of multiple characteristic peaks, evidence of the presence of just a single (even discriminatory) peak is not sufficient to amount to proof by a preponderance of the evidence.*

*Id.* at *94 (citations omitted). That rationale applies here.

Plaintiffs' reliance on *Eisai* (a *Markman* decision that did not address questions of infringement) and *Bristol-Myers Squibb Co.* for their "detection" theory is misplaced. D.I. 551 at

[7] Plaintiffs, through Dr. Myerson, recycle many of the same theories and arguments that the court already found were insufficient to show infringement of a nearly identical claim in *Lundbeck*—(1) reliance on a single peak to show infringement; (2) reliance on testing of samples held under accelerated stability conditions; (3) reliance on a non-representative, development batch; and (4) reliance on a different testing method from the method required by the asserted claim. *See generally* D.I. 551; *Lundbeck*, 2021 WL 4944963 at *28-30.

15-16, citing *Eisai Co. v. Glenmark Pharms., Ltd.*, 2015 WL 1228958, at *8 (D. Del. Mar. 17, 2015) and *Bristol-Myers Squibb Co. v. Aurobindo Pharma USA Inc.*, 477 F. Supp. 3d 306, 347 (D. Del. 2020). Neither case involved claims that recited specific XRPD diffractograms.

In *Eisai,* the claim recited interplanar spacings (d values) of the crystalline lattice. *Eisai*, 2015 WL 1228958, at *7-8. It did not claim a test to measure the recited d values. The relevant claim in *Bristol-Myers Squibb Co.* is even more inapt. There, the claim recited "crystalline apixaban" generally—the same type of broad claim Bioprojet unsuccessfully tried to obtain. It did not specify any required analytical data characterizing the crystalline form.[8] *Bristol-Myers Squibb*, 477 F. Supp. 3d at 312-13. It is unremarkable that other courts have permitted a single peak to identify crystalline materials where the claims at issue did not require multiple, specifically enumerated XRPD peaks.

The other cases Plaintiffs rely on fare no better. *Salix* involves patent claims directed to polymorphs reciting three XRPD peaks but does not state – as Plaintiffs imply – that proof of one of the three recited XRPD peaks would lead to a finding of infringement. *See* D.I. 551 at 17, citing *Salix Pharms., Ltd. v. Norwich Pharms., Inc.*, 2022 WL 3225381 (D. Del. Aug. 10, 2022). Likewise, *AstraZeneca* involved a claim reciting a compound that "is characterized by the following major peaks in its X-ray diffractogram." *See* D.I. 551 at 18, citing *AstraZeneca AB v. Dr. Reddy's Lab'ys., Inc.*, 2013 WL 1847639 (D.N.J. May 1, 2013). That clause was construed to mean "identifiable by reference to an X-ray diffractogram that includes the major peaks below," in view of the *AstraZeneca* Court's observation that "the positions of the peaks may differ somewhat because of slight experimental errors." *AstraZeneca*, 2013 WL 1847639, at *9. Neither

---

[8] While the *BMS* court noted that a single peak could be "indicative" of the claimed crystalline material based on the patent specification, its infringement finding relied on expert testing identifying *four* XRPD peaks. *See Bristol-Myers Squibb*, 477 F. Supp. 3d at 317, 321, 343.

the construction nor the observation indicates that infringement could be found without ***each*** major peak recited in the claim, only that the positions of the peaks may differ somewhat.

Finally, *Cosden Oil* and *Olaplex* do not even relate to crystalline polymorph claims and merely stand for the proposition that the infringement inquiry is not limited to analytical techniques discussed in the asserted patent but not recited in the claims. D.I. 551 at 9, citing *Cosden Oil & Chem. Co. v. Am. Hoechst Corp.*, 543 F. Supp. 522 (D. Del. 1982) (asserted claims recite certain contents of vinyl); *Olaplex, Inc. v. L'Oreal USA, Inc.*, 845 F. App'x 943 (Fed. Cir. 2021) (asserted claims recite range of weight percent of active ingredient).

Plaintiffs also mischaracterize the record in asserting that "[t]he appearance of even one unique characteristic peak is sufficient, because those peaks are inherent to—and diagnostic of—the crystalline structure." D.I. 551 at 5. Plaintiffs' expert, Dr. Myerson, only testified that peaks are unique for each crystal form of a compound, and speculated that "if you have unambiguously identified that the crystalline form is present, it means that all the peaks are present even if they are below their limit of detection." *See* D.I. 552 ¶ 49; FOF ¶ 27. In fact, Dr. Myerson agreed that all four peaks are required by Claim 1 and admitted the '197 patent does not use a single peak to identify the claimed polymorph of pitolisant hydrochloride. FOF ¶ 21. No witness testified, and Plaintiffs submitted no other evidence, supporting the contention that one peak is sufficient let alone diagnostic of a specific crystalline structure. Indeed, Dr. Steed testified that a single peak is not enough and the USP chapter on XRPD supports his testimony. FOF ¶ 27. Nor did any witness testify that any one of the claimed peaks is unique to or unambiguously identifies the claimed Form 1 of pitolisant hydrochloride as opposed to any other form of crystalline pitolisant hydrochloride. FOF ¶ 179. Defendant's expert, Dr. Paul Hodgkinson testified that there were other crystalline forms of pitolisant hydrochloride. *Id.* That testimony was unrebutted.

Plaintiffs have provided no evidence, let alone shown by a preponderance, that AET's ANDA Products have an X-ray diffractogram that comprises the four characteristic peaks (2θ) at 11.2°, 19.9°, 20.7° and 34.1° ±0.2° together, thus AET's ANDA Products do not infringe Claim 1. FOF ¶ 20.

### D. AET's Internal Testing Protocol Does Not Lessen Plaintiffs' Burden to Show All Four Peaks

Plaintiffs also urge the Court to conflate AET's internal analytical protocols that mention one XRPD peak with proof of infringement for a claim requiring four XRPD peaks. *See* D.I. 551 at 11. Plaintiffs' argument is legally erroneous. Whether or not AET's protocol refers to "characteristic peaks" and uses the *absence* of one such peak as an indicator that AET's ANDA Product is completely amorphous (*see* FOF ¶ 55) has no bearing on the determination of whether AET's ANDA Products infringe Claim 1, which requires the presence of four XRPD peaks that together uniquely identify the specific crystalline form of pitolisant hydrochloride. FOF ¶ 20; *see Zenith*, 19 F.3d at 1423–24; *Lundbeck*, 2021 WL 4944963, at *94 (treating each individual XRPD peak as a claim limitation); *Cephalon,* 2012 WL 12904999, at *10-11 (same); *Abbott Lab'ys.,* 486 F. Supp. 2d at 774-75 (same).

### E. Testing of AET's ANDA Products at Accelerated Conditions Is Irrelevant to the Infringement Inquiry

Plaintiffs' entire infringement case based on XRPD testing of AET's ANDA Products reduces to results from two accelerated stability samples of exhibit batches EK316 and EK319—neither of which displayed all four claimed peaks. FOF ¶¶ 57-59, 67-69. For EK319, Dr. Myerson admitted that *none* of the recited peaks were present in Method 1 testing. FOF ¶ 68. And for EK316, Dr. Myerson admitted that at least two peaks were absent. FOF ¶ 59.

Testing of batches held under accelerated stability conditions is not probative of infringement of Claim 1. Accellerated stability conditions do not reflect the product AET will

actually sell. FOF ¶ 49. AET's ANDA specifies storage at 22.5 ± 2.5 °C and 55% RH. FOF ¶ 85. The six-month accelerated stability conditions Plaintiffs rely on—40 °C (104-105 °F) and 75% RH continuously for six months—are extreme conditions that do not reflect real-world storage. FOF ¶¶ 49-50. Dr. Steed explained the scientific reason accellerated conditions are particularly unsuitable to evaluate any effect on the solid-state form:

> [T]he accelerated stability studies aren't—are not informative about physical form transformations necessarily because there can be a threshold issue. So there can be a set of conditions under which a physical form might change from one thing to another, for example, amorphous to crystalline, that might happen, say, for example, at 40 degrees, but doesn't happen at all at 25.

FOF ¶ 49. Even Plaintiffs' own expert, Dr. Myerson, conceded: "Q. And, sir, these—these six months accelerated stability testing, this doesn't reflect the real-world storage conditions for AET's ANDA products; true? A. That's correct. That's not the purpose of accelerated stability." FOF ¶ 50. For this reason, several courts have discounted the relevance of solid-state testing of batches held under accelerated stability conditions. *See Lundbeck*, 2021 WL 4944963, at *95-97; *Exelixis Inc. v. MSN Lab'ys Pvt. Ltd.*, 2023 WL 315614, at *13 (D. Del. Jan. 19, 2023).

Plaintiffs instead rely on what can only be described as a "blip" at 11.2° 2θ in the Method 1 diffractogram of AET's internal testing of one exhibit batch (EK316) held at accelerated stability conditions for 6 months. *See* FOF ¶ 57. AET's scientists noted that this blip may have been noise or an artifact so, under their standard operating procedure, the testing was re-run on a fresh sample. FOF ¶¶ 55-56, 60-63. The resulting Method 1 and Method 2 XRPD tests were completely clean without a trace of any feature at 11.2° 2θ (let alone the other 3 peaks required by Claim 1). FOF ¶¶ 64, 66. Based on this, AET concluded that "[t]he diffractogram doesn't exhibit Pitolisant hydrochloride crystalline form characteristic reflexes (at 11.2° ± 0.2° 2θ) by XRD analysis" and that "the API polymorphic form in the drug product is an amorphous form." FOF ¶ 65.

Plaintiffs also rely on accelerated stability testing of another exhibit batch EK319. But the Method 1 diffractogram for this exhibit batch did not show a feature at 11.2° 2θ. FOF ¶ 67. In fact, none of the recited peaks were present in the Method 1 diffractogram, consistent with an entirely amorphous drug product even under these extreme conditions. *Id*. Plaintiffs point to AET's Method 2 testing of EK319, which revealed the possibility of an ambiguous feature near 11.2° 2θ.[9] FOF ¶ 69. As with EK316, AET noted the ambiguity and re-ran the XRPD test on a fresh sample. FOF ¶¶ 69-70. Here too, the resulting Method 1 and Method 2 XRPD tests did not show any feature at 11.2° 2θ or any of the other 3 peaks required by Claim 1. FOF ¶ 69. Based on this, AET concluded that "[t]he diffractogram doesn't exhibit Pitolisant hydrochloride crystalline form characteristic reflexes (at 11.2° ± 0.2° 2θ) by XRD analysis" and that "the API polymorphic form in the drug product is an amorphous form." FOF ¶ 70. Indeed, as AET's corporate representatives testified, AET has never encountered any conversion of the amorphous API in its ANDA Products into the crystalline form. FOF ¶ 98.

Plaintiffs thus provided no evidence that AET's ANDA Products contain crystalline pitolisant hydrochloride having an X-ray diffractogram that comprises characteristic peaks (2θ) at 11.2°, 19.9°, 20.7° and 34.1° ±0.2°.

### F. Testing of a Development Batch Is Irrelevant to the Infringement Inquiry

Lacking any direct or credible evidence of crystalline pitolisant hydrochloride in AET's ANDA Products (much less the claimed form), Plaintiffs rely on AET's internal testing of a lab scale development batch, PIO/B-009, to show infringement. D.I. 551 at 18-20, 26. But there is no dispute that PIO/B-009 has a different formulation than AET's ANDA Products and was made using different equipment. FOF ¶¶ 73-77. Plaintiffs' reliance on development batch PIO/B-009

[9] Method 2 focuses on the narrow range of 10 to 12° 2θ and cannot prove infringement of Claim 1 because it cannot produce a diffractogram having the four recited peaks. FOF ¶ 54.

fails because that batch is not representative of AET's ANDA Products. FOF ¶¶ 71, 76. The infringement inquiry centers on "what is likely to be sold,"—not on formulations and processes AET experimented with and abandoned during development. *Ferring B.V. v. Watson Lab'ys., Inc.-Fla.*, 764 F.3d 1382, 1387-88, 1408 (Fed. Cir. 2014); *see also Bayer*, 212 F.3d 1401, 1408 (Fed. Cir. 2014) ("if the ANDA a well-defined compound, then the ultimate question of infringement is usually straightforward" (internal quotations and citations omitted)); *Merck Sharp & Dohme Corp. v. Amneal Pharms. LLC*, 881 F.3d 1376, 1385 (Fed. Cir. 2018) ("[T]he critical inquiry is whether [the API sample] is representative of what is likely to be approved and marketed."); *Glaxo*, 110 F.3d at 1570 ("What is likely to be sold, or, preferably, what will be sold, will ultimately determine whether infringement exists.").

***Different Formulation.*** There is no dispute that PIO/B-009 has a different formulation than AET's ANDA Products. FOF ¶ 76. PIO/B-009 contains Syloid AL1 FP, a silicified microcrystalline cellulose that AET added to that development batch to help control moisture. FOF ¶ 75. This excipient is absent from AET's ANDA Products. *Id*. Syloid AL1 FP is functionally different from the colloidal silicon dioxide used in the ANDA Products, which functions only as a glidant. *Id*. Moreover, the precursor batch PIO/B-008 used to prepare PIO/B-009 had a loss on drying that was out of specification. FOF ¶ 79. This affected the water content of PIO/B-009 itself. FOF ¶¶ 78-81. Dr. Myerson acknowledged that there were formulation differences between AET's ANDA Products and this development batch, such that it is not a product that AET is seeking approval to market in its ANDA. FOF ¶¶ 76-77.

***Different Manufacturing Process.*** While PIO/B-009 used a spray granulation process, it was not prepared with the same validated, commercial-scale spray granulation process used to make AET's ANDA Products. FOF ¶ 73. For example, PIO/B-009 was granulated on laboratory-

scale equipment (FBE 5) rather than the larger-scale, validated equipment (FBE 125) used for exhibit batches. *Id*. As Dr. Steed explained: "[T]hey will have different operating parameters that will affect the behavior of the final batch . . . It can be all manner of differences, like spray temperature, spray duration, drying temperature, notable head pressure. You know, the moisture content of the underlying—underlying blend." *Id*. Dr. Myerson admitted that this development batch was made with different, smaller scale equipment than AET's ANDA Products. FOF ¶ 74. Dr. Myerson also agreed that manufacturing process differences, including scale, the equipment used, and the pararameters employed can affect the attributes of the resulting product. *Id.*

Given the significant formulation and manufacturing differences between PIO/B-009 and AET's ANDA Products, it is not representative of AET's ANDA Products and is irrelevant. *See Ferring*, 764 F.3d at 1408-10; *Lundbeck*, 2021 WL 4944963, at *99 ("The development batch results Plaintiffs turn to as indicative of infringement [] are not relevant to the infringement analysis because they are not representative of the product Zydus will sell."). If anything, Plaintiffs' reliance on this non-represenative batch highlights the weakness of their proofs.

**G. AET's and Independent XRPD Testing Confirms Non-Infringement**

While the burden of proof rests solely on Plaintiffs, AET presented consistent XRPD testing confirming that its ANDA Products are 100% amorphous. For example, AET's internal XRPD testing and independent testing directed by Dr. Steed confirm that AET's ANDA Products do not contain the claimed crystalline form. FOF ¶¶ 88-97.

**i. <u>AET's January 2024 Internal XRPD Testing</u>**

Within about two months of manufacturing all eight exhibit batches in November 2023, AET performed XRPD testing of its ANDA Products. FOF ¶¶ 84-85. None of this testing showed any of the four claimed peaks. FOF ¶ 86. The results of this testing are unrebutted. FOF ¶ 87.

**ii. <u>Dr. Steed's July 2025 Testing</u>**

To further verify what AET's internal testing showed upon manufacture, Dr. Steed directed an independent laboratory he selected, Bhogala Biosciences Private Limited, to perform XRPD testing of AET's tablets that had been stored under standard conditions for almost 20 months. FOF ¶¶ 88-93. As Dr. Steed testified, the Bhogala Biosciences XRPD diffractograms for all eight exhibit batches showed no hint of crystalline pitolisant hydrochloride in AET's ANDA Products because none of the four XRPD peaks recited in Claim 1 were present. FOF ¶¶ 94. That testimony stands unrebutted. Dr. Steed also testified that the Bhogala Biosciences XRPD diffractograms are consistent with the diffractograms of the same eight exhibit batches tested in-house by AET shortly after manufacture. FOF ¶ 95. That testimony is also unrebutted.

While Plaintiffs have previously argued that the Bhogala Biosciences lacks foundation and is unreliable, they did not preserve this argument in their opening post-trial brief.[10] In any event, there was ample foundation laid for the testing and unrebutted evidence of its reliability. Dr. Steed chose Bhogala Biosciences because it is associated with a solid-state chemist Dr. Steed knows and respects, Dr. Ashwini Nangia, and because they "are a center of excellence in solid form science." FOF ¶ 88. Dr. Steed selected the scan conditions based on general industry standards and AET's Method 1 but doubled the scan time to increase sensitivity, was familiar with the instrument used at Bhogala Biosciences, and specified how Bhogala Biosciences should handle the samples they received. FOF ¶¶ 90-91, 93. Dr. Steed also confirmed the reliability of the Bhogala Biosciences testing through multiple means. First, this testing was consistent with internal testing performed

[10] Plaintiffs moved in limine seeking to preclude the Bhogala Biosciences testing. D.I. 507 at A2. The Court conditionally denied this motion in limine and admitted the testimony and exhibits at trial without any objection from Plaintiffs. Order After Pretrial Conference, D.I. 526 at 2. Plaintiffs did not object to the Bhogala Biosciences testing in their Opening Brief and, therefore, AET understands that it has been waived. *See In re Niaspan Antitrust Litig.*, 67 F.4th 118, 135 (3d Cir. 2023) ("Arguments raised for the first time before a district court in a reply brief are deemed forfeited.").

by AET on the same exhibit batches twenty months earlier. FOF ¶ 95. The diffractograms of these exhibit batch "look exactly like they did at two months" and were "consistent with the appearance of an amorphous powder diffraction." *Id*. Second, Dr. Steed confirmed that the testing was performed according to his instructions from his independent review of the raw data files provided by Bhogala Biosciences. FOF ¶ 93. As Dr. Steed explained, the metadata from the raw data files he reviewed and the diffractograms themselves confirmed that Bhogala Biosciences ran its tests according to Dr. Steed's instructions. *Id.*

### H. AET's Manufacturing Process Ensures That There Is No Crystalline Pitolisant Hydrochloride in Its ANDA Products

The process used to make the pitolisant hydrochloride in AET's ANDA Products precludes the presence of crystalline pitolisant hydrochloride in AET's ANDA Products. FOF ¶ 98. AET generates amorphous pitolisant hydrochloride for use in its ANDA Products via spray granulation. FOF ¶¶ 100, 108. Spray-granulation is a conventional technique known to produce amorphous solid-state forms. FOF ¶ 101. The amorphous pitolisant hydrochloride in AET's ANDA Products is generated by first completely dissolving pitolisant hydrochloride and maltodextrin in purified water to produce a clear solution. FOF ¶ 99. The complete dissolution of the purchased third party pitolisant hydrochloride is confirmed by two operators. FOF ¶¶ 99, 106-107.

Complete dissolution is also confirmed as a matter of scientific certainty. FOF ¶ 104. Pitolisant hydrochloride is a highly water-soluble substance. *Id.* The '197 patent discloses that pitolisant hydrochloride has an aqueous solubility of 4 g/ml at 23 °C. *Id*. In the manufacture of the ANDA Products, AET dissolves 3.250 kg of pitolisant hydrochloride in 15.234 kg of water to make a clear solution. *Id*. As Dr. Steed explained:

> [Pitolisant hydrochloride] is a very soluble active ingredient, and large amounts of water are used, more than enough that thermodynamically, as a matter of certainty, that the pitolisant hydrochloride will dissolve way below its saturation solubility. And then we've got the maltodextrin present as well. And so it's a matter of

> thermodynamic and kinetic certainty, given the time that they take to—that it will dissolve to form a homogenous solution.

FOF ¶ 104. In other words, the ratio of pitolisant hydrochloride to water in AET's manufacturing of its ANDA Products guarantees complete dissolution of the pitolisant hydrochloride. *Id.* The generation of a "clear solution" in the manufacture of AET's ANDA Products thus indicates that the pitolisant hydrochloride is completely dissolved. FOF ¶ 99. AET also confirmed that its process generates purely amorphous pitolisant hydrochloride based on its own internal XRD testing of its ANDA Products, which have never shown any traces of crystallinity. *See* § III.i, above; FOF ¶ 98.

The formulation of AET's ANDA Products also precludes crystallization of pitolisant hydrochloride. *See* FOF ¶¶ 99-104, 106-110. AET added the excipient maltodextrin to its formulation to serve as a stabilizer to prevent conversion of the amorphous form to a crystalline state. FOF ¶ 102; *see also* FOF ¶ 103. Indeed, Dr. Herb confirmed that maltodextrin was specifically added to the formulation as "further insurance from—apart from those two steps . . . to avoid recrystallization." *Id.*

Plaintiffs only offer speculation through their expert Dr. Myerson about theoretical possibilities of crystallization during manufacture of AET's ANDA Products. FOF ¶ 105. According to Dr. Myerson, AET lacks sufficient process controls to ensure that the pitolisant hydrochloride does not completely dissolve. *See* FOF ¶ 104. But Dr. Myerson did not personally inspect AET's manufacturing facility to look at the dissolution of pitolisant hydrochloride. FOF ¶ 105. And, when questioned at trial, admitted that he could only speculate as to whether crystalline pitolisant hydrochloride starting material could survive AET's manufacturing process. *Id.* Dr. Myerson's speculation cannot override the actual, empirical testing of AET's Products. *See* *Brigham & Women's Hosp., Inc. v. Perrigo Co.*, 761 F. App'x 995, 1003-04 (Fed. Cir. 2019).

### I. Testing of AET's ANDA Products Using Unclaimed $^{13}C$ ssNMR Methods Does Not Support Infringement

Given their failure to prove that crystalline pitolisant hydrochloride is present in AET's ANDA Products under the XRPD testing method required by Claim 1, Plaintiffs try to salvage their infringement case by relying on $^{13}C$ ssNMR testing sponsored by their expert, Dr. Wenslow. But ssNMR testing is not a surrogate for XRPD testing. FOF ¶¶ 112-115. Nor does Dr. Wenslow's ssNMR testing show that AET's ANDA Products contain any crystalline form of pitolisant hydrochloride, let alone the *claimed* form. Dr. Wenslow's methodology is fraught with errors and unsupported assumptions. If anything, Dr. Wenslow's ssNMR testing confirms that AET's ANDA Products contain only amorphous pitolisant hydrochloride.

**i. $^{13}C$ ssNMR Testing Does Not Generate XRPD Peaks**

As explained above, Claim 1 is directed to Form 1 pitolisant hydrochloride as defined by four specific XRPD peaks. D.I. 552 ¶ 9. Having specifically amended the claims to require XRPD, infringement cannot be shown using other methods of analysis such as NMR. *Zenith*, 19 F.3d at 1423 (noting that, where asserted claim required a specific x-ray diffraction analysis, "two [other] kinds of tests [were] only inferentially relevant given that the claim [was] drafted in terms of x-ray diffraction lines. Thus [the other tests] *cannot substitute* for a proper comparison of those lines") (emphasis added); *see also AstraZeneca AB v. Dr. Reddy's Lab'ys, Ltd.*, 603 F. Supp. 2d 596, 612 (S.D.N.Y. 2009), *aff'd,* 356 F. App'x 421 (Fed. Cir. 2009) (rejecting plaintiff's suggestion that methods other than x-ray diffraction be used to measure the accused products because the patentee "was the master of its own patent application, and the patents in suit *require* that the necessary degree of crystallinity be visible using x-ray powder diffraction"); *Lundbeck,* 2021 WL 4944963, at *28 ("[D]iffractograms prepared using slow-scan XRPD analysis is weak evidence of infringement because a POSA would understand that FIGS. 1-17 of the [patents] . . . were prepared using regular ('normal') scan XRPD."); *AstraZeneca AB v. Mylan Lab'ys Ltd.*, 2015 WL 13866396, *9 (D.N.J. Aug. 28, 2015) (finding no likelihood of success on patentee's

infringement claim where accused infringer maintained that ANDA product was amorphous and patentee "conspicuously avoided subjecting any of the . . . product samples to [XRPD] testing, despite the fact that [the] asserted claims expressly invoke[d] that type of testing to describe the claimed compound").

It is undisputed that ssNMR is not referenced anywhere in the '197 patent and cannot measure or produce 2θ peaks. FOF ¶¶ 112-113.

### ii. $^{13}$C ssNMR Testing Shows that AET's ANDA Products Are Amorphous And D. Wenslow Has Misinterpreted His Own Data

Plaintiffs' expert, Dr. Wenslow, obtained a high quality conventional $^{13}$C ssNMR of AET's ANDA Products.[11] FOF ¶ 126. However, Dr. Wenslow ignored the conventional $^{13}$C ssNMR spectrum of AET's ANDA Products showing that they contain only amorphous pitolisant hydrochloride:




*Id.*; DTX-1076 (annotated); DDX5.4. AET's ssNMR expert, Dr. Hodgkinson, explained that the conventional ssNMR spectrum is the best way to distinguish between crystalline and amorphous forms of a drug substance, and that DTX-1076 unequivocally shows the absence of any crystalline pitolisant hydrochloride in AET's tablets. FOF ¶ 127.

[11] DTX-1076 is the conventional $^{13}$C ssNMR taken without any signal acquisition time delay.

Dr. Wenslow focuses on the two peaks at about 131 ppm and 141 ppm as these are attributable to pitolisant hydrochloride rather than excipients. FOF ¶ 128. Dr. Wenslow concedes that the shape of these two peaks in the conventional or "unfiltered" $^{13}C$ ssNMR spectrum is characteristic of amorphous pitolisant hydrochloride due to their broad shape. FOF ¶ 129. Indeed, the USP chapter on ssNMR and other materials relied on by the parties confirms that amorphous peaks are typically 4 to 20 times broader than crystalline peaks. FOF ¶ 129 ("[T]he crystalline and amorphous forms can be readily differentiated by their largely different peak positions and line widths."). As Dr. Hodgkinson explained, if any crystalline pitolisant hydrochloride was present in the sample, it would have been seen on the conventional $^{13}C$ ssNMR spectrum of AET's tablets. FOF ¶ 130. As Dr. Hodgkinson further explained, that is because ssNMR is an additive technique and any sharp peak corresponding to crystalline pitolisant hydrochloride would appear on top of a broad amorphous peak if it was present. FOF ¶ 130. Dr. Wenslow fundamentally misunderstands the physics of $^{13}C$ ssNMR in arguing that crystalline peaks can be "masked" or drowned out by the broad amorphous peak. FOF ¶ 132. An amorphous peak would not drown out or mask a crystalline peak. *Id.* But, crystalline peaks, if present, would always be detectable in the $^{13}C$ ssNMR, as confirmed by the USP chapter on ssNMR. FOF ¶ 131. There is no dispute that there are no sharp, crystalline peaks at about 131 ppm or 141 ppm in the conventional $^{13}C$ ssNMR spectrum of AET's ANDA Products. FOF ¶ 129. Accordingly, this spectrum (DTX-1076) proves that AET's ANDA Products contain 100% amorphous pitolisant hydrochloride. *Id.* That should have been the end of the analysis.

Ignoring what was evident from the conventional $^{13}C$ ssNMR spectrum, Dr. Wenslow used a signal acquisition time delay filter to purportedly "remove" signal from amorphous pitolisant hydrochloride so that he could "identify" supposed crystalline pitolisant hydrochloride in AET's

tablets.[12] Dr. Wenslow referred to this technique as "spectral editing." D.I. 552 ¶ 162. But spectral editing cannot be used to discover crystalline peaks that are not visible in a conventional $^{13}C$ ssNMR spectrum.[13] FOF ¶¶ 132-133. This is because the spectral editing performed by Dr. Wenslow does not increase the sensitivity of the $^{13}C$ ssNMR testing. FOF ¶ 133. Rather, it only degrades the $^{13}C$ ssNMR spectrum by reducing the signal-to-noise ratio, making it more difficult to identify solid-state forms. *Id.* $^{13}C$ ssNMR spectral editing thus cannot find a crystalline needle in an amorphous haystack, as Dr. Wenslow has tried to do.

#### iii. Dr. Wenslow's $T_{1\rho}$ Experiment Was Uncontrolled

Even if spectral editing could be used to conjure crystalline material that is not present in a conventional $^{13}C$ ssNMR spectrum, Dr. Wenslow's filtering experiment suffered from several flaws. Principally, his experiment was uncontrolled. FOF ¶¶ 136-141. Dr. Wenslow conducted his $^{13}C$ ssNMR testing in two parts. FOF ¶ 134. First, he purports to characterize the $T_{1\rho}$ relaxation behavior of crystalline and amorphous "standards" of pitolisant hydrochloride to determine a time (tau ($\tau$) value) at which the signal from the amorphous "standard" was no longer detectable (or "negligible") but the signal from the crystalline pitolisant hydrochloride was detectable. *Id*. Then, Dr. Wenslow obtained $^{13}C$ ssNMR spectra of one of AET's ANDA Products using that tau ($\tau$) delay time. *Id.* (Wenslow). Under his theory, any signal observed at about 131 ppm and 141 ppm must be from crystalline material in AET's ANDA Products because the amorphous signal had allegedly gone to zero. *Id*.

---

[12] Dr. Wenslow only performed experiments on a single batch of AET's 17.8 mg ANDA Products. But he did not test AET's 4.45 mg ANDA Products. FOF ¶ 123.

[13] Dr. Wenslow testified that the Du article used ssNMR to identify crystalline peaks that were "masked by [a] massive amorphous hump." FOF ¶¶ 120-121. Dr. Wenslow ignores that Du's Figure 4 uses an "x50" magnification of the filtered spectrum, whereas the unfiltered spectrum is not similarly magnified. FOF ¶ 121. Dr. Wenslow has no evidence that the crystalline peaks would not be visible in the unfiltered spectrum under x50 magnification. *Id*.

But Dr. Wenslow has no idea what the decay behavior is or should be for AET's amorphous drug substance because he did not use an amorphous "standard" that was representative of the amorphous material in AET's ANDA Products. FOF ¶¶ 136-138. He instead used the API of another defendant, Novitium. FOF ¶ 136. Unlike AET's ANDA Products, Novitium's API is an inclusion complex of pitolisant hydrochloride in a beta-cyclodextrin. *Id*. As explained at trial, that amorphous "standard" is critically different from the amorphous pitolisant hydrochloride in AET's ANDA Products. FOF ¶ 139.

The evidence shows that the $T_{1\rho}$ relaxation behavior is related to the molecular dynamics ("stochastic processes") of the pitolisant hydrochloride, which in turn is determined by the local environments experienced by the pitolisant hydrochloride. FOF ¶ 135. The mechanism by which a beta-cyclodextrin interacts with a pitolisant hydrochloride molecule is completely different than that of an amorphous polymeric dispersion as in AET's ANDA Products. FOF ¶ 138. Beta-cyclodextrin is a truncated cone-shaped structure formed by a ring of seven glucose units. FOF ¶ 139. Beta-cyclodextrin stabilizes amorphous molecules by forming inclusion complexes of a drug inside its hydrophobic interior cavity. *Id*.

AET's ANDA Products do not use a beta-cyclodextrin inclusion complex. FOF ¶ 137. AET's ANDA Products contain a polymeric amorphous dispersion of pitolisant hydrochloride and maltodextrin on microcrystalline cellulose. *Id*. These are fundamentally different stabilization mechanisms: the cavity of beta-cylcodextrin is hydrophobic whereas maltodextrin is not. FOF ¶ 138-139. Dr. Myerson conceded, and Dr. Hodgkinson confirmed, that the molecular dynamics will be different between a beta-cyclodextrin inclusion complex, on the one hand, and an amorphous solid dispersion of maltodextrin and microcrystalline cellulose, on the other. FOF ¶

140. Dr. Wenslow did not account for these differences because he is in "no position to offer an opinion" on the nature of these interactions. FOF ¶ 141.

Despite not having an understanding of the nature of the interaction between a beta-cyclodextrin and pitolisant hydrochloride, Dr. Wenslow's own industry publications confirm that beta-cyclodextrin inclusion complexes should be "differentiated from the polymer-based systems" because they "rely on different solubilizing mechanisms (micelle formation and complexation, respectively)." FOF ¶ 142. Dr. Wenslow agreed that "it is important to note the unique mechanism of complexation with cyclodextrins as compared to the polymeric systems." FOF ¶ 143.

As Dr. Hodgkinson explained, the differences in these stabilization mechanisms are important because the local environment of pitolisant hydrochloride in Novitium's beta-cyclodextrin amorphous complex would differ significantly from the local environment of amorphous pitolisant hydrochloride in AET's ANDA Products. FOF ¶ 144. The different local environments experienced by the amorphous pitolisant hydrochloride would lead to different relaxation behaviors. *Id*. Dr. Wenslow's $\tau$ delay time determined using Novitium's beta-cyclodextrin complex thus is not an appropriate filter for AET's ANDA Products. *Id*. In other words, Dr. Wenslow had no idea what the relaxation behavior should have been for AET's amorphous polymeric dispersion, nor did he have any reliable scientific basis to expect that no signal would remain at his selected 32 ms delay time.

Plaintiffs try to explain away Dr. Wenslow's failure to select an appropriate standard by arguing that it would not affect his results. D.I. 551 at 27. According to Plaintiffs, the amorphous pitolisant hydrochloride in AET's ANDA Products have more molecular mobility and would have a faster $T_{1\rho}$ relaxation behavior than Novitium's beta-cyclodextrin complex, so the filter Dr. Wenslow selected was appropriate. *Id.* But Plaintiffs have no support for their argument. Dr.

Wenslow did not conduct any experiments to determine the relaxation behavior of the amorphous pitolisant hydrochloride in AET's ANDA Products. FOF ¶ 145. Moreover, as Dr. Hodgkinson testified, $T_{1\rho}$ relaxation is not dictated purely by molecular mobility. FOF ¶ 146. It is more complex and can depend on many factors other than molecular mobility, "so depending on the nature of the molecular motion, as you change the rate of the motion, the $T_{1\rho}$ value can get shorter or larger." *Id*. Plaintiffs' attorney argument has no basis in the record or in science. Dr. Wenslow's failure to use an appropriate amorphous "standard" renders his opinions and conclusions unreliable.[14]

**iv. <u>Dr. Wenslow Omitted Critical Data Points</u>**

Dr. Wenslow's calculation of his τ delay time is also defective because he inexplicably omitted key data points he had collected—including data points at the very τ value he selected. FOF ¶¶ 147, 153. Dr. Wenslow admitted at trial that he omitted data points when extrapolating his $T_{1\rho}$ decay curves, stating simply that he "made a decision not to plot it." FOF ¶ 148. But that is not science. A POSA would not omit data points; as Dr. Hodgkinson explained: "If you have a whole series of time points, you acquire those time points, and then you analyze the data that you've got . . . But what you don't do is start to selectively pick and choose what data to use." FOF ¶ 149. Selectively including or excluding data points can "completely change how the curve looks." FOF ¶ 150. Indeed, as shown at trial, that is what Dr. Wenslow's data manipulation did. He artificially increased the decay behavior for the allegedly amorphous "standard" (DTX-0434) and artificially decreased the decay behavior for the crystalline "standard" (DTX-0018). FOF ¶ 151. For example, for his $T_{1\rho}$ decay curve of the amorphous standard at 141 ppm, Dr. Wenslow obtained eleven data points but inexplicably omitted the experimental values at 4, 8, and 32 ms from his curve. FOF

[14] As discussed in Section III.I.v. below, the inadequacy of Dr. Wenslow's "amorphous standard" is proven by his subsequent ssNMR experiments, which showed that his filtered and unfiltered spectra were unchanged. *See* FOF ¶ ¶ 174-178.

¶ 152. As shown below, this omission dramatically changed the apparent decay behavior and permitted him to conclude that the amorphous signal had gone to zero at 32 ms (when, in reality, it had not):




DTX-0434 (annotated to emphasize omitted data points); FOF ¶ 157. In fact, the measured value at 32 ms for the amorphous standard *exceeded* his extrapolated value for the *crystalline* standard. FOF ¶ 155. Indeed, Dr. Wenslow's data manipulation was so extensive that he could not even fit the data at 131 ppm for his crystalline standard to reflect the physical reality of relaxation behavior. FOF ¶ 156. That is, rather than fitting his decay curve for the crystalline "standard" at 131 ppm to an exponential curve, which would be consistent with the underlying physics of the decay, Dr. Wenslow fit this curve to an inverse logarithmic function. *Id.*

When the omitted data points are restored, Dr. Wenslow's curves revealed that "there is significant intensity left at 32 milliseconds" for the amorphous material. FOF ¶ 156. But under Dr. Wenslow's spectral editing theory, no amorphous signal must remain at the 32 ms τ delay time. FOF ¶ 157. As Dr. Hodgkinson explained, that amorphous signal remained is fatal to Dr. Wenslow's analysis. *Id.*[15]

[15] Plaintiffs also try to justify Dr. Wenslow's omissions by claiming that the amorphous signal had already gone to zero at 16 ms. D.I. 551 at 28. But there was no scientific basis for that conclusion because the data includes both signal and noise. Tr. 327:18-328:18 (Hodgkinson). Moreover, Dr.

v. **Dr. Wenslow's "Filter" Did Not Work**

Dr. Wenslow testified that the peaks at about 131 ppm and 141 ppm became sharper in the filtered spectrum and resembled those of the crystalline standard. FOF ¶ 169. That is merely an illusion he created by displaying the ssNMR spectra on an extremely wide horizontal scale, in PTX-1239. *Id.*

This distortion makes all the peaks appear sharper[16] but that is simply a function of the horizontal compression of the spectrum, which inexplicably is plotted on a scale spanning -100 ppm to 320 ppm, even though the signal is contained entirely between 0 ppm and 200 ppm. FOF ¶ 169. Indeed, the same spectra Dr. Wenslow generated without artificially compressing the spectra (scale spanning ~200 ppm to 45 ppm) confirm that the peak shapes for the unfiltered and filtered AET ANDA Products are far broader than the crystalline standard and show that AET's ANDA Products contain only amorphous pitolisant hydrochloride. FOF ¶ 170.




DTX-1079. In the figure above, the green is the unfiltered original spectrum of AET's ANDA Product tablets. FOF ¶ 171. The red is the "filtered" spectrum, applying the τ delay time. *Id.* The

Wenslow's experiments were not run for enough time to generate amorphous signal FOF ¶¶ 164-167. And even if they were, Plaintiffs' theory does not explain why he omitted other data points.

[16] Even on this condensed scale there are obvious differences in the breadth of these peaks.

blue is the crystalline pitolisant hydrochloride from the WAKIX® product. *Id.* As shown above, the peaks at 131 ppm and 141 ppm in Dr. Wenslow's filtered spectrum of AET's ANDA Product are the same position and shape as in the unfiltered spectrum, confirming that AET's ANDA Products contain amorphous pitolisant hydrochloride. FOF ¶ 172. Indeed, Dr. Wenslow admitted at trial that "nothing changed between the original unfiltered spectrum and the filtered spectrum with regard to that peak position." FOF ¶ 173. To further show that these spectra did not change, Dr. Hodgkinson prepared an overlay of the crystalline, unfiltered, and filtered spectra of DTX-1079 on the same scale (normalized to the peak height at 141 ppm):




FOF ¶ 174. As can be seen in DTX-0015, the peak shapes and positions at about 141 ppm are identical for both the filtered and unfiltered spectra of AET's ANDA Products, meaning that nothing changed. FOF ¶ 175. The pitolisant hydrochloride started out as amorphous in the unfiltered spectrum (green) and remains amorphous in the filtered spectrum (red). *Id.* All Dr. Wenslow's filtering did was reproduce the spectra for the amorphous material. FOF ¶ 176. In either case, the peak at 141 ppm in both the filtered and unfiltered spectra of the ANDA Products are far broader than the crystalline pitolisant hydrochloride (blue). FOF ¶ 177. Dr. Wenslow's experiment thus proved beyond all doubt that AET's ANDA Products are 100% amorphous. FOF ¶ 178.

#### vi. <u>Dr. Wenslow's ssNMR Experiment Cannot Identify the Claimed Form</u>

Even if Dr. Wenslow's methodology could detect crystalline material (it cannot), he has not established that any such material would be the crystalline form claimed in the '197 patent, as opposed to one of the other known crystalline forms of pitolisant hydrochloride. FOF ¶ 179.

Dr. Wenslow made no attempt to validate that the peaks in his filtered spectrum are uniquely attributable to the specific crystalline form claimed in the '197 patent. Dr. Wenslow's testing thus does not "prov[e] anything about [the] solid-state form" that can be identified by his experiments. FOF ¶ 180.

### J. *Sunovion* Does Not Apply Here Where the ANDA Does Not Contain a Specification that Directly Addresses a Claimed Feature

Plaintiffs claim that the lack of a specification for solid-state form in AET's ANDA is evidence of infringement. D.I. 551 at 28. But this critique is unavailing. Plaintiffs must prove that the crystalline form of Claim 1 is present in AET's ANDA Products. Even if the release specification does not prohibit the presence of crystalline pitolisant hydrochloride, that does not help Plaintiffs *prove the presence* of the crystalline form of Claim 1 in AET's ANDA Products.

Plaintiffs also contend that "a judgment of infringement must necessarily ensue" where an ANDA specification is silent about a disputed limitation of an Orange Book-listed patent. *See* D.I. 551 at 10, 29, citing *Sunovion Pharms., Inc. v. Teva Pharms. USA, Inc.*, 731 F.3d 1271, 1278 (Fed. Cir. 2013). This argument lacks merit. *Sunovion* addressed a narrow circumstance where an ANDA expressly defined a critical product characteristic in its specification and tied infringement directly to that express specification. 731 F.3d at 1278. That premise is missing here. Unlike in *Sunovion*, AET's ANDA—by Plaintiffs' own admission—does not contain a specification on the solid-state form of pitolisant hydrochloride. FOF ¶ 181. There is no statement that AET's ANDA product will possess the crystalline pitolisant hydrochloride of Claim 1. *Id.* In fact, AET's ANDA

states that its ANDA Products contain amorphous pitolisant hydrochloride. FOF ¶ 182. Following Plaintiffs' faulty logic, any patent claim is infringed when there is no specification in the ANDA. That is not the law. Courts have confirmed that *Sunovion* is limited to circumstances where the ANDA contains a specification that would permit infringement. *See Ferring*, 764 F.3d at 1387-88; *Heron Therapeutics, Inc. v. Fresenius Kabi USA, LLC*, 2024 WL 5317378, at *11 (D. Del. Dec. 3, 2024). Likewise, courts have rejected attempts to extend *Sunovion* to situations where there is no specification that addresses infringement. *See Ferring.*, 764 F.3d at 1387-88; *Heron*, 2024 WL 5317378, at *11 ("When an ANDA is silent with respect to infringement, however, *Sunovion* is inapplicable.").

*Sunovion* thus does not permit an inference of infringement from silence.

## IV. CONCLUSION

The evidence at trial compels the conclusion that AET's ANDA Products do not contain the crystalline form of pitolisant hydrochloride claimed in Claim 1 of the '197 patent and thus will not infringe the only asserted claim of the '197 patent.

OF COUNSEL:

Scott J. Bornstein
Jonathan Ball, Ph.D.
Julie P. Bookbinder
Elana B. Araj
Giancarlo Scaccia
Greenberg Traurig, LLP
One Vanderbilt Avenue
New York, NY 10017
(212) 801-9200
Scott.Bornstein@gtlaw.com
ballj@gtlaw.com
bookbinderj@gtlaw.com
elana.araj@gtlaw.com
scacciag@gtlaw.com

Dated: July 8, 2026 [corrected version]

HEYMAN ENERIO
GATTUSO & HIRZEL LLP

*/s/ Dominick T. Gattuso*
Dominick T. Gattuso (# 3630)
222 Delaware Ave., Suite 900
Wilmington, DE 19801
(302) 472-7300
dgattuso@hegh.law

*Attorneys for Defendant AET Pharma US, Inc.*